**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

GLOBAL HEALTH COUNCIL *et al.*,

                *Plaintiffs*,

      v.

DONALD J. TRUMP *et al.*,

                *Defendants*.

Civil Action No. 25-cv-402

**MOTION AND MEMORANDUM OF LAW IN SUPPORT OF
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS .................................................................................................. 3

    A.    Congress Establishes USAID as an Independent Agency and Appropriates Funding for Foreign Assistance .............................................................................. 3

    B.    Defendants Abruptly Freeze Foreign-Assistance Funding .................................... 6

    C.    The Funding Freeze Harms Longstanding Partners............................................ 14

LEGAL STANDARD........................................................................................................ 19

ARGUMENT ..................................................................................................................... 20

I.    Plaintiffs Will Be Irreparably Harmed Absent a TRO and Preliminary Injunction ......... 20

II.    Plaintiffs Are Likely to Succeed on the Merits................................................................. 25

    A.    Defendants' Actions Violate the APA ................................................................. 25

    B.    Defendants' Actions Violate the Separation of Powers....................................... 32

    C.    Defendants' Actions Are *Ultra Vires* ................................................................ 34

III.    The Balance of Equities and Public Interest Weigh Heavily In Favor of Defendants ..... 35

CONCLUSION.................................................................................................................. 37

# TABLE OF AUTHORITIES

**Cases**                                                                Page(s)

*Allied Loc. & Reg'l Mfrs. Caucus v. EPA*,
    215 F.3d 61 (D.C. Cir. 2000) ........................................................................28

*Appalachian Power Co. v. EPA*,
    208 F.3d 1015 (D.C. Cir. 2000) ..................................................................26

*Ark Initiative v. Tidwell*,
    816 F.3d 119 (D.C. Cir. 2016) ....................................................................27

*Beacon Assocs., Inc. v. Apprio, Inc.*,
    308 F. Supp. 3d 277 (D.D.C. 2018) ............................................................23

*Bennett v. Spear*,
    520 U.S. 154 (1997) ....................................................................................26

*Burlington Truck Lines, Inc. v. United States*,
    371 U.S. 156 (1962) ....................................................................................27

*C.G.B. v. Wolf*,
    464 F. Supp. 3d 174 (D.D.C. 2020) ............................................................35

*Cath. Health Initiatives v. Sebelius*,
    617 F.3d 490 (D.C. Cir. 2010) ....................................................................34

*CFPB v. Com. Fin. Servs. Ass'n*,
    601 U.S. 416 (2024) ....................................................................................31

*Chamber of Com. of U.S. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ....................................................................34

*Changji Esquel Textile Co. v. Raimondo*,
    40 F.4th 716 (D.C. Cir. 2022) .....................................................................19

*Clean Air Council v. Pruitt*,
    862 F.3d 1 (D.C. Cir. 2017) ........................................................................26

*Clinton v. City of New York*,
    524 U.S. 417 (1998) ....................................................................................33

*D.A.M. v. Barr*,
    474 F. Supp. 3d 45 (D.D.C. 2020) ..............................................................35

*Davis v. Pension Ben. Guar. Corp.*,
    571 F.3d 1288 (D.C. Cir. 2009) ..................................................................19

*Dep't of Navy v. FLRA*,
  665 F.3d 1339 (D.C. Cir. 2012) ........................................................................32

*DHS v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020) .............................................................................................29

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) ..........................................................................................30

*Endo Par Innovation Co. v. Becerra*,
  2024 WL 2988904 (D.D.C. June 10, 2024) ......................................................23

*Greatness v. FEC*,
  831 F.3d 500 (D.C. Cir. 2016) ..........................................................................35

*Hall v. Johnson*,
  599 F. Supp. 2d 1 (D.D.C. 2009) ......................................................................19

*In re Aiken County*,
  725 F.3d 255 (D.C. Cir. 2013) ..................................................................31, 33

*In re OMB—Withholding of Ukraine Security Assistance*,
  B-331564, 2020 WL 241373 (Comp. Gen. Jan. 16, 2020) ................................33

*Kendall v. United States*,
  37 U.S. (12 Pet.) 524 (1838) .............................................................................34

*League of Women Voters of United States v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ........................................................................19, 20

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................................................27, 28, 29

*Nat'l Council of Nonprofits v. OMB*,
  __ F. Supp. 3d __, 2025 WL 368852 (D.D.C. Feb. 3, 2025) ................11, 20, 21, 36

*Nat'l R.R. Passenger Corp. (Amtrak) v. Sublease Int. Obtained Pursuant to an
  Assignment and Assumption of Leasehold Int. Made as of Jan. 25, 2007*,
  2024 WL 3443596 (D.D.C. July 15, 2024) .......................................................20

*Open Communities Alliance v. Carson*,
  286 F. Supp. 3d 148 (D.D.C. 2017) ..................................................................35

*Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*,
  324 F.3d 726 (D.C. Cir. 2003) ..........................................................................26

*Rochester Pure Waters Dist. v. EPA*,
  960 F.2d 180 (D.C. Cir. 1992) ..........................................................................32

*Sackett v. EPA*,
   566 U.S. 120 (2012) ..........................................................................26

*Safari Club Int'l v. Jewell*,
   842 F.3d 1280 (D.C. Cir. 2016) ........................................................26

*Sierra Club v. Env't Prot. Agency*,
   955 F.3d 56 (D.C. Cir. 2020) ............................................................26

*Train v. City of New York*,
   420 U.S. 35 (1975) ............................................................................31

*Transactive Corp. v. United States*,
   91 F.3d 232 (D.C. Cir. 1996) ............................................................27

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
   967 F.2d 598 (D.C. Cir. 1992) ..........................................................34

*West Virginia v. EPA*,
   142 S. Ct. 2587 (2022) ......................................................................35

*Xiaomi Corp. v. Dep't of Defense*,
   2021 WL 950144 (D.D.C. March 12, 2021) ......................................23

**Constitutional Provisions & Statutes**

United States Constitution
   Art. I, § 9, cl. 7 ................................................................................33
   Art. II, § 1, cl. 2 ..............................................................................33
   Art. II, § 3 ........................................................................................33

2 U.S.C.
   §§ 682 *et seq.* ..................................................................................30
   § 683(b) ......................................................................................30, 31

5 U.S.C.
   § 104 ..................................................................................................5
   § 704 ............................................................................................20, 25
   § 706(2)(A) ......................................................................................27

22 U.S.C.
   § 2151 ................................................................................................3
   § 6601(a) ............................................................................................5

31 U.S.C. § 1301(a) ..............................................................................31

Department of State. Foreign Affairs Reform and Restructuring Act of 1998 §
   1413, Pub. L. No. 105-277, 112 Stat. 2681, 2681-791 ......................5

Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, tits.
II-III, II-III, 138 Stat. 460, 739-43 ...........................................................5, 6, 31, 32

Impoundment Control Act, Pub. L. No. 93-344, 88 Stat. 333 ..........................................30, 31, 32

**Executive Branch Materials**

John Barsa, Acting Administrator, U.S. Agency for Int'l Dev., Remarks at the
Concordia UNGA Summit (Sept. 21, 2020), USAID Archive,
https://bit.ly/4hwmx32 ...................................................................................4, 28

*Exec. Order No. 14,169 § 3(d), 90 Fed. Reg. 8619 (Jan. 20, 2025) ......................... 6, 7, 8, 27-30

Media Note, USAID, Office of the Spokesperson (Feb. 3, 2025),
https://bit.ly/4hVdBUR...................................................................................12

Memorandum For Heads of Executive Departments and Agencies 1, M-25-13
(Jan. 27, 2025).............................................................................................10, 11

*Memorandum from the Secretary of State ¶ 1, 25 STATE 6828 (Jan. 24, 2025) .............8, 12, 28

*Presidential Authority to Impound Funds Appropriated for Assistance to
Federally Impacted Schools*, 1 Op. O.L.C. Supp. 303 (1969)................................34

Reorganization Plan and Report Submitted by President Clinton to the Congress
on December 30, 1998, Pursuant to Foreign Affairs Reform and Restructuring
Act of 1998 Section 1601 ........................................................................................5

*Report to the Sen. Subcomm. on Separation of Powers*, B-135564, 1973 WL
159460 (Comp. Gen. July 26, 1973)...............................................................33

Statement by the President Upon Signing the Foreign Assistance Act, 1 Pub.
Papers 588 (Sept. 4, 1961) .......................................................................................3

USAID, Clarification on Implementing the President's Executive Order on
Reevaluating and Realigning United States Foreign Aid (Jan. 26, 2025) ................................9

USAID, Follow-Up Instructions for Implementing Executive Order Reevaluating
and Realigning United States Foreign Aid (Jan. 24, 2025) ......................................................9

USAID, Notice on Implementation of Executive Order on *Reevaluating and
Realigning United States Foreign Aid* (Jan. 24, 2025) ........................................................8, 9

**Other Authorities**

Tim Carpenter, *Kansas's Moran, Davids Sound Alarm on Delay of USAID Food
Aid to Starving Pepple Worldwide*, Kansas Reflector (Feb. 7, 2025),
https://bit.ly/40U5KQl; ...................................................................................15

v

Chantal Da Silva, *What Cutting USAID Could Cost the U.S. — And How China, Russia May Benefit*, NBC News (Feb. 4, 2025), https://bit.ly/3WVDNGy ............................. 4

Chantal Da Silva, *What Cutting USAID Could Cost the U.S.—How China, Russia May Benefit,* NBC News, Feb 4, 2025 ................................................................... 30

Kimberlee Kruesi, *What Is USAID and What Impact Does It Have Across the Globe*, Time (Feb. 6, 2025), https://bit.ly/4hxXhtb ................................................. 15

Alex Marquardt et al., *USAID Employees Around the World Will Be Placed on Leave Friday and Ordered to Return to US,* CNN (Feb. 5, 2025), https://bit.ly/3CNJtM6 ............................................................................................ 12

Humeyra Pamuk, *Trump Administration Puts on Leave USAID Staff Globally in Dramatic Aid Overhaul*, Reuters (Feb. 4, 2025) .................................................... 11

Christopher Vondracek, *Shuttering of USAID Could Mean the End of Millions in Income for Midwest Farm Operations,* Minn. Star Tribune (Feb. 6, 2025), https://bit.ly/4guXYlK ........................................................................................... 15

Declan Walsh, *"We Are in Disbelief": Africa Reels as U.S. Aid Agency is Dismantled*, N.Y. Times (Feb. 8, 2025) ...................................................................... 15

## INTRODUCTION

This lawsuit seeks to enjoin an unlawful and unconstitutional exercise of executive power that has created chaos in the funding and administration of the United States Agency for International Development (USAID) and other federal foreign-assistance programs, causing grievous irreparable harm to Plaintiffs and other grantees, contractors, and partners.

In an unprecedented series of actions, the President and other executive-branch officials have sought to dismantle an independent agency established by Congress and withhold billions of dollars in congressionally appropriated foreign-assistance funding. One cannot overstate the impact of that unlawful course of conduct: on businesses large and small forced to shut down their programs and let employees go; on hungry children across the globe who will go without; on populations around the world facing deadly disease; and on our constitutional order.

As directed by federal statute, USAID and the Department of State administer billions of dollars appropriated by Congress each year for foreign assistance. Through grantees, contractors, subcontractors, and other partners—many of whom have worked with USAID for decades—the agency plays a critical role in advancing the United States' interests and standing abroad.

But on the day he took office, President Trump issued an executive order announcing his view that U.S. foreign-assistance programs are "antithetical to American values" and ordered a "pause" on all foreign-assistance funding. Since then, the Department of State, USAID, and the Office of Management and Budget (OMB) have issued a series of vague, unreasoned directives implementing the executive order. The reality on the ground is even more dire than those directives would suggest. With extremely limited exceptions, and the State Department have halted the flow of funding even to existing partners, even for work performed before President Trump took office, plunging those organizations (and the people who depend on them) into turmoil and costing thousands of Americans their jobs. At the same time, the Department of State has apparently

undertaken to permanently shutter USAID and discontinue its operations altogether. Officials have gone so far as to pull the USAID sign down from its headquarters.

Defendants have been candid about their motivations. As agency memoranda, guidance, and public statements make clear, the President disagrees with Congress's choice to establish USAID and fund foreign-assistance operations, which have been legislatively mandated for more than a half century. And in implementing his executive order, the government has offered no reasoned justification for its actions other than to effectuate the President's "policy agenda."

Just yesterday, the USAID Office of Inspector General sounded the alarm on the scope and effects of Defendants' actions. The waiver process that supposedly allows certain foreign-assistance programs to resume is opaque and illusory. The freeze has halted not just the obligation of new funding, but the disbursement of funds for work that has already been performed. And far from combating waste, fraud, and abuse in U.S. foreign-assistance programs, Defendants' actions have exacerbated it.

Like other abrupt funding freezes that courts have already enjoined, the actions here violate basic precepts of administrative law, numerous federal statutes, and bedrock separation-of-powers principles. Neither the President nor his subordinates have authority to thwart duly enacted statutes and substitute their own funding preferences for those Congress has expressed through legislation. And the scant explanations offered to justify dismantling USAID's operations utterly fail to grapple with its grave implications for USAID partners, the people who depend on them, and the United States. The Court should enter a temporary restraining order (TRO) consistent with Plaintiffs proposed order and direct expedited briefing on converting the TRO into a preliminary injunction.

## STATEMENT OF FACTS[1]

**A.    Congress Establishes USAID as an Independent Agency and Appropriates Funding for Foreign Assistance**

For more than a half century, federal law has declared it the policy of the United States to support economic development and foster democratic institutions abroad through foreign assistance. *See* Foreign Assistance Act of 1961 § 102, Pub. L. No. 87-195, 75 Stat. 424, 424 (codified as amended at 22 U.S.C. § 2151). And for more than a half century, USAID has fulfilled that statutory mandate by leading American efforts to alleviate poverty, disease, and humanitarian need; supporting developing countries' economic growth; and building countries' capacity to participate in world trade. Cong. Rsch. Serv., IF10261, U.S. Agency for International Development: An Overview 1 (2025) (CRS Report).

Founded in 1961, USAID was established to counter the influence of the Soviet Union during the Cold War and to run various foreign-assistance programs based on the idea that American security was tied to stability and economic advancements in other nations—the cornerstone of what is now called "soft power." As President Kennedy stated on signing the Foreign Assistance Act, "Our adversaries are intensifying their efforts in the entire under-developed world. Those who oppose their advance look to us and I believe, at this dangerous moment, we must respond." Statement by the President Upon Signing the Foreign Assistance Act, 1 Pub. Papers 588 (Sept. 4, 1961), http://bit.ly/4hwm68U. Or as Sen. Lindsey Graham noted more

---

[1] This motion is supported by the accompanying declarations of Elisha Dunn-Georgiou, President and CEO of the Global Health Council (GHC); Robert Nichols, General Counsel at the Small Business Association for International Companies (SBAIC); Mark Hetfield, President of HIAS; Marian Wentworth, President and Chief Executive Officer of Management Sciences for Health, Inc. (MSH); James Butcher, President and CEO of Chemonics International; Zan Northrip, Executive Vice President for Development Consulting at DAI Global, LLC (DAI); Eric Bjornlund, President and CEO of Democracy International, Inc.; Scott Carlson, Associate Executive Director in Charge of the Center for Global Programs at the American Bar Association (ABA).

recently, soft power is a "critical component of defending America and our values." Chantal Da Silva, *What Cutting USAID Could Cost the U.S. — And How China, Russia May Benefit*, NBC News (Feb. 4, 2025), https://bit.ly/3WVDNGy. "If you don't get involved in the world and you don't have programs in Africa where China's trying to buy the whole continent, we're making a mistake," Graham explained. *Id.*

Since its establishment, USAID has played a critical role in furthering core U.S. interests by reducing the spread of communicable disease, fighting child poverty, improving access to education, and promoting economic growth, among other functions. In the 1960s, for example, USAID was a key part of the global effort to eradicate smallpox and, years later, a similar effort to fight polio. Today, USAID plays an indispensable role in implementing the President's Emergency Plan for AIDS Relief, a program that, since its inception during the George W. Bush Administration in 2003, has delivered AIDS treatment to tens of millions of people in 54 countries.

USAID's work is essential to addressing the root causes of extremism, terrorism, and international conflict. As then-Acting USAID Administrator John Barsa put it in 2020, "Our aid advances American interests by reducing the vulnerability of populations to extreme ideologies[;] …. [it] cultivates democracies an creates a network of states that advance our common interests and values[;] … [it] restores stability, and prevents disasters from creating the conditions that can give rise to conflict and discord[;] … [and it] can stop wars before they start, reducing the need to put our men and women in uniform in harm's way." John Barsa, Acting Administrator, U.S. Agency for Int'l Dev., Remarks at the Concordia UNGA Summit (Sept. 21, 2020), USAID Archive, https://bit.ly/4hwmx32 (Barsa, *Remarks*). In short, USAID has long played a key role in furthering American interests.

But USAID does not do this alone. In fact, USAID generally does not implement foreign-assistance projects itself. Most USAID projects are administered through grants, cooperative

agreements, or contracts with partner organizations. *See* CRS Report at 1. USAID partners, including American companies employing thousands of Americans, thus perform the lion's share of the work necessary to safeguard American security, promote economic prosperity, and address global challenges before they reach American shores.

In 1998, Congress formally established USAID as an independent agency outside the Department of State. Foreign Affairs Reform and Restructuring Act of 1998 § 1413, Pub. L. No. 105-277, 112 Stat. 2681, 2681-791; *see* 5 U.S.C. § 104. In so doing, Congress carefully circumscribed the President's authority to make changes to the agency's structure or operations, allowing the President only sixty days after its establishment to eliminate the agency or reassign its functions. 22 U.S.C. § 6601(a). President Clinton declined to do so. Instead, he ordered that "USAID will remain a distinct agency with a separate appropriation." Reorganization Plan and Report Submitted by President Clinton to the Congress on December 30, 1998, Pursuant to Section 1601 of the Foreign Affairs Reform and Restructuring Act of 1998.

Since then, Congress has repeatedly appropriated funds for foreign assistance through USAID. The most recent of those appropriations bills, enacted into law March 23, 2024, directs funding to USAID for global health programs, development assistance, disaster assistance, and initiatives to promote and strengthen democracy abroad, among other purposes. *See* Further Consolidated Appropriations Act of 2024 ("2024 Appropriations Act"), Pub. L. No. 118-47, div. F, tits. II-III, 138 Stat. 460, 739-43. Likewise, Congress has appropriated funds for foreign aid to be administered by the Department of State. Most recently, the 2024 Appropriations Act directs funding to the Department of State for treating and preventing HIV/AIDS, promoting democracy, assisting refugees, preventing the proliferation of nuclear weapons, combatting terrorism, demining conflict zones, and controlling the international flow of narcotics. *Id.*, 138 Stat. 742-49.

The 2024 Appropriations Act speaks in mandatory terms. For example, it directs that funds

appropriated for global health programs "shall be apportioned directly to [USAID]." *Id.*, 138 Stat. 740. Other provisions similarly provide that specific funding amounts "shall" be apportioned to USAID for specified purposes. *E.g.*, *id.*, 138 Stat. 741-43. The Act generally prohibits deviation from these funding allocations beyond small, defined amounts without congressional consultation and justification based on case-by-case exigencies. *See id.* § 7019(b), 138 Stat. 772.

### B.    Defendants Abruptly Freeze Foreign-Assistance Funding

Starting two weeks ago, things changed drastically. Defendants have dismantled the federal foreign-assistance system, reducing USAID to a husk of its former self: stripped of funding, devoid of employees, unable to perform basic tasks, and ultimately swallowed by the State Department.

This hollowing out began with Executive Order 14,169. Exec. Order No. 14,169, 90 Fed. Reg. 8619 (Jan. 20, 2025). In this Order, entitled "Reevaluating and Realigning United States Foreign Aid," President Trump claimed that "[t]he United States foreign aid industry and bureaucracy are not aligned with American interests and in many cases antithetical to American values. They serve to destabilize world peace by promoting ideas in foreign countries that are directly inverse to harmonious and stable relations internal to and among countries." *Id.* § 1. He further asserted that "[i]t is the policy of United States that no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President of the United States." *Id.* § 2.

In order to more "fully align[]" foreign-assistance programs with President Trump's policy preferences, Executive Order 14,169 directs four actions. *Id.* First, it directs a "90-day pause in United States foreign development assistance," purportedly "for assessment of programmatic efficiencies and consistency with United States foreign policy." *Id.* § 3(a). It requires all "department and agency heads with responsibility for United States foreign development assistance programs" to "immediately pause new obligations and disbursements of development

assistance funds to foreign countries and implementing non-governmental organizations, international organizations, and contractors." *Id.* Under the order, programs are to be paused "pending review[]," and OMB is to "enforce this pause through its apportionment authority." *Id.* This "pause" may be waived for specific programs by the Secretary of State. *Id.* § 3(e).

Second, the Executive Order directs each "responsible department and agency head[]" to initiate those"[r]eviews of each foreign assistance program … under guidelines provided by the Secretary of State, in consultation with the Director of OMB." *Id.* § 3(b).

Third, based upon these reviews, "[t]he responsible department and agency head[], in consultation with the Director of OMB" is ordered to "make determinations within 90 days of this order on whether to continue, modify, or cease each foreign assistance program … with the concurrence of the Secretary of State." *Id.* § 3(c).

Fourth, Executive Order 14,169 purportedly allows "[n]ew obligations and disbursements of foreign development assistance funds [to] resume for a program prior to the end of the 90-day period" only after "a review is conducted, and the Secretary of State or his designee, in consultation with the Director of OMB, decide to continue the program in the same or modified form." *Id.* § 3(d). Any "other new foreign assistance programs and obligations must be approved by the Secretary of State or his designee, in consultation with the Director of OMB." *Id.*

Defendants swiftly set to work implementing the President's order. On January 22, 2025, then-USAID Acting Administrator Jason Gray instructed agency employees that, pursuant to the Executive Order, "USAID will immediately pause all new program-funded commitments and new or incremental obligations." USAID, Initial Instructions for Implementing Executive Order Reevaluating and Realigning United States Foreign Aid (Jan. 22, 2025) (Gray Initial Instructions). Gray further stated that "[t]his directive encompasses every level of programming—including at the obligation (e.g., development objective agreement) and subobligation levels. Any pause on

disbursements will be subject to further guidance." *Id.* Gray's instructions permitted waivers only "for emergency humanitarian assistance" with individual approval from "both the Acting Administrator of USAID and the Director of Foreign Assistance at the U.S. Department of State," subject to a waiver process that supposedly was forthcoming. *Id.*

On January 24, 2025, and "[c]onsistent with the President's Executive Order on Reevaluating and Realigning United States Foreign Aid," Secretary of State Marco Rubio issued a memorandum "paus[ing] all new obligations of funding, pending a review, for foreign assistance programs funded by or though the Department and USAID." Memorandum from the Secretary of State ¶ 1, 25 STATE 6828 (Jan. 24, 2025) (Rubio Memo).

Secretary Rubio asserted that the funding freeze's purpose was "to determine whether the foreign assistance policies and interests supported by appropriations are not duplicated, are effective, and are consistent with President Trump's foreign policy." *Id.* ¶ 2. To "ensure that all foreign assistance is aligned with President Trump's foreign policy agenda," he ordered a "government-wide comprehensive review of all foreign assistance." *Id.* ¶¶ 3, 4. He further directed that "no new obligations shall be made for foreign assistance until such time as the Secretary shall determine, following a review," and that "contracting officers and grant officers [must] immediately issue stop-work orders" for any "existing foreign assistance awards." *Id.* ¶ 7. In short, Secretary Rubio mandated that the State Department and USAID would provide no foreign assistance "without [his] authorization or the authorization of his designee." *Id.* ¶ 5.

The same day, USAID Senior Procurement Executive Jami Rodgers issued a notice "[i]n accordance with the President's Executive Order" to "paus[e] all new obligations of funding, and sub-obligations of funding under Development Objective Agreements." USAID, Notice on Implementation of Executive Order on *Reevaluating and Realigning United States Foreign Aid* (Jan. 24, 2025) (Rodgers Guidance). Rodgers directed agency contracting and agreement officers

to "immediately issue stop-work orders, amend, or suspend existing awards." *Id.* He also forbid

agency personnel to "issue new awards or release any new requests for proposals (RFPs), requests

for application (RFAs), notices of funding opportunities (NOFOs), or any other kind of solicitation

for foreign assistance funding until each activity has been reviewed and approved as consistent

with the President's policy." *Id.*

Also the same day, Acting Administrator Gray issued follow-up instructions for

implementing the Executive Order and the Rubio Memo. USAID, Follow-Up Instructions for

Implementing Executive Order Reevaluating and Realigning United States Foreign Aid (Jan. 24,

2025) (Gray Follow-Up Instructions). Gray directed that, "[p]er the [Rubio Memo], within 30 days,

the Director of the Department of State's Policy Planning Staff (S/P) or its designate shall develop

appropriate review standards to ensure that all foreign assistance is aligned with President Trump's

foreign policy agenda. Information on this review process will be shared as it becomes available."

*Id.* Gray further directed that, "[c]onsistent with and building on" the Gray Initial Instructions, "all

new program-funded obligations and subobligations are to remain on pause unless exempt." *Id.*

Gray also announced that he was "immediately directing all contracting and agreement officers to

issue stop-work orders or bilateral amendments, consistent with the terms of the relevant awards

or agreements, until determinations are made following the review." *Id.* Finally, Gray stated, "[w]e

will provide further guidance related to implementation of this direction including the process for

waivers as soon as possible. We will also provide subsequent guidance on how USAID will review

all programs, to include current and ongoing programs, to ensure they are aligned with the foreign

policy of the President of the United States." *Id.*

Two days later, on January 26, 2025, Gray issued a clarification. USAID, Clarification on

Implementing the President's Executive Order on Reevaluating and Realigning United States

Foreign Aid (Jan. 26, 2025) (Gray Clarification). This clarification reportedly "included a directive

for staff to refrain from external communications outside of communications necessary to implement the pause." USAID Office of Inspector General, Advisory Notice, *Oversight of USAID-Funded Humanitarian Assistance Programming Impacted by Staffing Reductions and Pause on Foreign Assistance* (OIG Report) at 1 (Feb. 10, 2025) (quotation marks omitted).

The next day, then-Acting OMB Director Matthew J. Vaeth issued a similar directive. On January 27, 2025, he issued a memorandum ordering a "temporary pause of agency grant, loan, and other financial assistance programs." Memorandum For Heads of Executive Departments and Agencies 1, M-25-13 (Jan. 27, 2025) (capitalization modified), https://bit.ly/3WUBPWY. That memorandum directed that, to implement the Executive Order and the President's other policy directives, "each agency must complete a comprehensive analysis of all their Federal financial assistance programs," and, in the interim, "**temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance, and other relevant activities that may be implicated by the executive order[], including, but not limited to, financial assistance for foreign aid. [and] nongovernmental organizations." *Id.* at 2.

Vaeth's memorandum, while expressly written to implement President Trump's Executive Order 14,169, gave additional reasons for OMB's actions. The memorandum cited the need "to align Federal spending and action with the will of the American people as expressed through Presidential priorities." *Id.* at 1; *see also id.* at 2 ("This temporary pause will provide the Administration time to review agency programs and determine the best uses of the funding for those programs consistent with the law and the President's priorities."). Vaeth also stated that "[f]inancial assistance should be dedicated to advancing Administration priorities, focusing taxpayer dollars to advance a stronger and safer America, eliminating the financial burden of inflation for citizens, unleashing American energy and manufacturing, ending 'wokeness' and the weaponization of government, promoting efficiency in government, and Making America Healthy

Again. The use of Federal resources to advance Marxist equity, transgenderism, and green new deal social engineering policies is a waste of taxpayer dollars that does not improve the day-to-day lives of those we serve." *Id.* at 1.

Vaeth's memorandum has since been stayed and rescinded. A court in this District has enjoined the government from "implementing, giving effect to, or reinstating under a different name the directives in OMB Memorandum M-25-13 with respect to the disbursement of Federal funds under all open awards," and ordered it to "to release any disbursements on open awards that were paused due to OMB Memorandum M-25-13." *Nat'l Council of Nonprofits v. OMB*, __ F. Supp. 3d __, 2025 WL 368852, at *14 (D.D.C. Feb. 3, 2025).

Defendants have nonetheless continued to carry out the Executive Order and implementing directives by Rubio, Gray, Rodgers, and Vaeth. USAID issued stop-work orders to contractor and grantee agency partners, requiring them to immediately stop work and to minimize the incurrence of costs allocable to the work covered by the order during the period of work stoppage. Subject to limited waivers—for which a formal approval process does not exist—Defendants have halted the flow of foreign-assistance funding to USAID partners. In a declaration filed with this Court yesterday, Defendant Morocco admitted that USAID "has generally paused all expenditures in connection with foreign aid," for "both new programs … as well as existing ones." Decl. of Pete Marocco ¶ 28, *Am. Foreign Serv. Ass'n v. Trump* (*AFSA*), No. 25-cv-352 (D.D.C. Feb. 10, 2025), ECF No. 20-1; *see* Notice of Correction, *AFSA*, ECF No. 21 (similar).

Defendants simultaneously began cutting agency employees and contractors. The State Department shut down all overseas USAID missions, immediately recalling thousands of USAID employees. Humeyra Pamuk, *Trump Administration Puts on Leave USAID Staff Globally in Dramatic Aid Overhaul*, Reuters (Feb. 4, 2025), https://bit.ly/3WU13oq. It placed thousands of USAID employees on administrative leave, directing them "not to enter USAID premises, access

USAID systems, or attempt to use your position or authority with USAID in any way without [the] prior permission [of Peter Marocco] or prior permission of a supervisor in your chain of command." Alex Marquardt et al., *USAID Employees Around the World Will Be Placed on Leave Friday and Ordered to Return to US*, CNN (Feb. 5, 2025), https://bit.ly/3CNJtM6. Defendants have also caused thousands of institutional support contractors and employees of USAID contractors or grantees to be laid off or furloughed. As the USAID Office of Inspector General observed in a February 10, 2025 report, these "personnel actions … have substantially reduced the [agency's] operational capacity." OIG Report at 1.

On February 3, 2025, Defendants took further action to dismantle USAID, with a press release announcing that Secretary of State Rubio had been appointed as Acting Administrator. Media Note, Office of the Spokesperson (Feb. 3, 2025), https://bit.ly/4hVdBUR. That press release asserted that "it is now abundantly clear that significant portions of USAID funding are not aligned with the core national interests of the United States." *Id.* The next day, Secretary Rubio sent a letter to the congressional committees providing "notice" and advising Congress of the State Department's "intent to initiate consultations … regarding the manner in which foreign aid is distributed around the world." Image of letter available at Brett Murphy (@BrettMurphy), X (Feb. 3, 2025, 3:41 PM), https://bit.ly/3Q9gWDQ. Secretary Rubio designated Pete Marocco as USAID Deputy Administrator, and directed him to "begin the process of engaging in a review and potential reorganization of USAID's activities to maximize efficiency and align operations with the national interest." *Id.* Secretary Rubio also stated that "USAID may move, reorganize, and integrate certain missions, bureaus, and offices into the Department of State, and the remainder of the Agency may be abolished consistent with applicable law." *Id.*

Although the Rubio Memo purported to freeze only "new obligations," Defendants have in fact acted to abruptly halt the overwhelming majority of disbursements even for *existing* grants

to USAID and State Department partners. Grant recipients remain totally cut off from federal funds, including funds appropriated in fiscal year 2023 or earlier and payments for work already performed, even where the Department of State has purported to issue a waiver. As the USAID Inspector General has recognized, "uncertainty about the scope of foreign assistance waivers and permissible communications with implementers, has degraded USAID's ability to distribute and safeguard taxpayer-funded humanitarian assistance." OIG Report at 5. For example, USAID has failed to make payment on over $120 million in invoices for work Plaintiff DAI has already completed, some of which are now past due. Plaintiff Chemonics has roughly $103.6 million in outstanding invoices issued to USAID for work performed in 2024, most of which were submitted prior to the stop-work orders. And USAID has failed to pay tens of millions of dollars for work performed by Plaintiff SBAIC's members, including Democracy International.

USAID continues to implement the Executive Order and the Rubio Memo by terminating contracts with hundreds of USAID contractors. Those terminations are based on hourly targets rather than substantive considerations. The termination notices, for example, give no indication what criteria Defendants have applied in the "review process," if any. And once terminated, it may be impossible to reinstate or restore these contracts without starting the procurement process anew.

The State Department has also halted disbursement of appropriated foreign-assistance funding through programs administered outside USAID. For example, Plaintiff ABA implements 59 programs funded by the Department of State. They commit the Department of State to more than $109 million in funding over the next five years, of which approximately $42 million is now frozen. The Department of State has also ordered Plaintiff HIAS to suspend or halt work entirely on more than $20 million in grants—on top of USAID's order that HIAS halt work on a $18.5 million cooperative agreement to assist the most vulnerable populations in Venezuela.

The effect of these actions has been to halt foreign-assistance funding wholesale. In the

words of the USAID Inspector General, "staff reductions, together with a lack of clarity about the scope of the humanitarian assistance waivers and the extent of permissible communications between BHA staff and its implementers, has significantly impacted USAID's capacity to disburse and safeguard its humanitarian assistance programming." OIG Report at 2.

President Trump summed up his view of Defendants' actions in a post on social media: "USAID IS DRIVING THE RADICAL LEFT CRAZY, AND THERE IS NOTHING THEY CAN DO ABOUT IT BECAUSE THE WAY IN WHICH THE MONEY HAS BEEN SPENT, SO MUCH OF IT FRAUDULENTLY, IS TOTALLY UNEXPLAINABLE. THE CORRUPTION IS AT LEVELS RARELY SEEN BEFORE. CLOSE IT DOWN!" @realDonaldTrump, Truth Social (Feb. 7, 2025). In fact, Defendants' efforts to close down USAID have not served to combat waste, fraud, and abuse, but rather have exacerbated it. Defendants' actions have "curtailed USAID's ability to vet humanitarian assistance awards for potential terrorist ties and monitor aid deliveries in high-risk environments." OIG Report at 3 (capitalization omitted). They also have "limited [the agency's] ability to receive and respond to allegations of fraud, waste, abuse, or diversion of humanitarian aid." *Id.* at 4.

### C.    The Funding Freeze Harms Longstanding Partners

Defendants' actions have devastated USAID's and the State Department's partners. Most of USAID's programs are implemented—whether by grant, cooperative agreement, or contract— by private-sector partners. CRS Report, *supra*, at 1. USAID has thousands of partners—Plaintiffs among them—including nonprofit organizations, for-profit contractors, universities, international organizations, and foreign governments. *See id.* Their work is critical to USAID's efforts to fight disease, educate children, provide clean water, and support economic and other forms of development in approximately 130 countries around the world. *See id.* And they do their jobs in some of the most needy parts of the world, including throughout conflict zones. *See id.*

Defendants' actions stopped these efforts, with immediate consequences. Half a billion dollars worth of food grown in America's heartland—enough to feed more than 30 million people—is rotting in domestic ports and warehouses, unable to reach starving populations abroad. Tim Carpenter, *Kansas's Moran, Davids Sound Alarm on Delay of USAID Food Aid to Starving Pepple Worldwide*, Kansas Reflector (Feb. 7, 2025), https://bit.ly/40U5KQl; Christopher Vondracek, *Shuttering of USAID Could Mean the End of Millions in Income for Midwest Farm Operations*, Minn. Star Tribune (Feb. 6, 2025), https://bit.ly/4guXYlK. Efforts aimed at preventing and treating disease have stalled out as tens—if not hundreds—of thousands of healthcare workers are let go. Declan Walsh, "*We Are in Disbelief*": *Africa Reels as U.S. Aid Agency is Dismantled*, N.Y. Times (Feb. 8, 2025), https://bit.ly/40RJpCT. Girls' access to education has been cut off, demining operations have been defunded, and shelter for Ukrainian citizens fleeing Russian bombardment has been jeopardized. Kimberlee Kruesi, *What Is USAID and What Impact Does It Have Across the Globe*, Time (Feb. 6, 2025), https://bit.ly/4hxXhtb.

Plaintiffs are not immune. Plaintiff Democracy International's Justice, Rights, and Security—Rapid Response Activity provides lifesaving humanitarian assistance, which includes essential medicines, medical services, food, shelter, and subsistence assistance. To name just two of many impacted programs: In Bangladesh, Democracy International has had to stop providing medical care to hundreds of adolescents and young students who were seriously injured and traumatized in the violent crackdowns on protesters last summer, leaving them without necessary medical services. And in Burkina Faso, human rights defenders who are working to track violence against Christian communities are at risk of being killed because Democracy International's program can no longer help them relocate and provide them with food, shelter, and subsistence. *See* Bjornlund Decl. ¶¶ 5, 12.

Plaintiff DAI's portfolio has been similarly devastated, with far-ranging, often life-

threatening effects. Specifically, Defendants' actions have frozen funding for shelter for minors seeking protection from recruitment into criminal gangs in Central America, for cybersecurity for the government of Ukraine, for civil-society organizations contending with brutal authoritarian violence in Burma, and for efforts to track and contain zoonotic diseases in Bangladesh. *See* Northrip Decl. ¶ 10.

Plaintiff Chemonics, under its Global Health Supply Chain Program-Procurement and Supply Management project, has received approval for and has made contractual commitments to suppliers for $240 million worth of medicines and other health supplies that were manufactured prior to receipt of the applicable stop-work order and are in various stages in the supply chain. Another $150 million in health commodities remain stranded in warehouses around the world, and $88.5 million are currently in transit. As commodities wait to be routed, products risk expiring, being damaged, being stolen, or being delivered without means for pick-up. Not delivering these health commodities on time could potentially lead to as many as 566,000 deaths from HIV/AIDS, malaria, and unmet reproductive health needs, including 215,000 pediatric deaths. *See* Butcher Decl. ¶ 13.

Plaintiff ABA has had tens of millions of dollars in USAID and State Department funding frozen. This freeze has decimated ABA's programs, including its efforts to protect religious freedom in Asia, fight human trafficking in the Democratic Republic of Congo and Colombia, prepare Ukraine to recover from Russia's invasion, advance democracy in Myanmar, and combat money laundering and terrorism in South America. Carlson Decl. ¶¶ 7, 14.

Plaintiff GHC's members, including Plaintiffs Chemonics and MSH, have also been severely impacted by the freeze. One member has had to suspend a $20 million hospital accreditation program in Cambodia. Another will have to close up to 1,226 primacy care clinics. And a third has had to delay implementation of anti-malarial campaigns in Africa that must take

place before the rainy season to be effective. *See* Dunn-Georgiou Decl. ¶ 8.

Plaintiff SBAIC's members—small businesses that provide foreign assistance in all sectors and all geographies, including conflict zones—have also faced ruinous injuries. SBAIC's members, including Plaintiff Democracy International, have had their projects devastated by losing access to vitally necessary appropriated funds. *See* Nichols Decl. ¶¶ 2, 5.

Plaintiff HIAS has had its work helping refugees across South America and Africa put on hold, including its work helping displaced children who are at high risk of trafficking, sexual exploitation, abuse, and neglect. *See* Hetfield Decl. ¶¶ 14.

These programs cannot simply be restarted on command. USAID's partners are hemorrhaging resources and employees.

Plaintiff Democracy International has furloughed 100 percent of its 95 U.S.-based home office employees and placed 163 of 176 employees (92.6 percent) working on USAID projects in overseas offices on "administrative leave," pending resolution of stop work/suspension orders; Democracy International is not currently able to pay those on administrative leave and will not be able to pay them unless and until USAID pays past invoices and draws, and agrees to pay continuity costs. Democracy International has also cancelled all benefits, including health insurance, for employees; terminated all consultants; shut down all but one of its overseas offices (which has non-USAID funding); and downsized its computer systems and licenses. *See* Bjornlund Decl. ¶ 11.

Plaintiff DAI, in the last 10 days alone, has furloughed 383 U.S.-based staff, retracted many signed offers of employment, reduced salaries for senior staff members by 20%, deferred payments to hundreds of vendors, summarily terminated numerous subcontracts and grants, and violated the terms of hundreds of leases and other contractual arrangements. In numerous cases, DAI staff members are no longer able to meet their own critical financial obligations for housing, education,

and medical care. Pushed to the brink, some have already begun to leave DAI's permanent employ, imposing costly future requirements for recruitment and training. *See* Northrip Decl. ¶¶ 7, 8.

Plaintiff GHC's members, including Plaintiffs Chemonics and MSH, are at risk of having to permanently scale back or cease operations.

Plaintiff Chemonics has furloughed 750 of its US-based staff, which represents 63% of its U.S.-based workforce, and reduced the hours of the remaining U.S. employees. As a result, some furloughed employees will struggle to pay for basic necessities, including housing and food. Further, if Chemonics's current financial situation continues, it will furlough additional employees at the end of this month and will be unable to extend healthcare benefits to furloughed employees beyond March. *See* Dunn-Georgiou Decl. ¶¶ 7, 8.

Plaintiff MSH is being forced to take imminent, extraordinary measures, including furloughing nearly 50% of its U.S.-based staff and reducing hours for the remaining employees, terminating long-standing partnerships with more than 50 consultants, and is facing the prospect of letting go as many as 1,000 employees abroad. *See* Wentworth Decl. ¶ 9.

Many of Plaintiff SBAIC's members are already running on thinly stretched lines of credit, each day without USAID payments brings them closer to bankruptcy. *See* Nichols Decl. ¶ 10.

Plaintiff HIAS has had to lay off more than 500 international staff, shutter its program offices, and defer payments to vendors. *See* Hetfield Decl. ¶ 13.

At this rate, many of USAID's and the State Department's partners—including several Plaintiffs—will simply not be around to carry on their projects even if Defendants decide to turn funding for foreign assistance back on.

Some USAID and State Department partners have been placed in the impossible position of having to choose between furloughing their employees or having enough (already obligated) cash on hand to ensure they are able to secure American lives and U.S. property overseas for as

long as possible. For example, staff from Plaintiff DAI have been notified that legal actions are being prepared against them in their countries of assignment, and they are acutely aware that they, their dependents, and their belongings could be stranded overseas if USAID continues to repudiate its payment obligations. Northrip Decl. ¶ 12.

Defendants' actions also shred Plaintiffs' and other partners' credibility within the communities that they operate in. These organizations often operate in unstable, conflict-torn environments. The people and governments there are often skeptical of them and their efforts. It takes hard work to build trust in these communities and to prove that they are truly there to help. Once that trust is gained, these communities then rely on these organizations for important, basic services. Defendants have forced Plaintiffs and others to abruptly shut their doors and cease offering those services, destroying the trust and credibility that has been built up over decades.

## LEGAL STANDARD

A party seeking a TRO or preliminary injunction must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (citation omitted); *accord Hall v. Johnson*, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009) ("The same standard applies to both temporary restraining orders and to preliminary injunctions." (citation omitted)).

Courts in this Circuit apply these factors on a "sliding scale," and thus "an unusually strong showing on one of the factors" may compensate for a lesser showing on another. *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009) (citation omitted); *see Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) (noting potential tension in caselaw but reserving the question of "whether the sliding-scale approach remains valid"); *Nat'l R.R.*

*Passenger Corp. (Amtrak) v. Sublease Int. Obtained Pursuant to an Assignment and Assumption of Leasehold Int. Made as of Jan. 25, 2007*, 2024 WL 3443596, at *1-2 (D.D.C. July 15, 2024) (recognizing that district courts remain bound by sliding-scale precedent).

## ARGUMENT

All TRO and preliminary injunction factors favor Plaintiffs here. As a result of the Executive Order and Defendants' steps to implement it, Plaintiffs are already suffering grievous irreparable harm that threatens their very existence. Defendants' actions likely violate the Administrative Procedure Act and the Constitution and are *ultra vires*. And neither principles of equity nor the public have any interest in a violation of the law, much less where the violation compromises the public interest by degrading programs critical to promoting U.S. policies and interests around the world. A TRO and preliminary injunction should issue to prevent Plaintiffs from suffering these harms until this Court has the opportunity to further consider the case.

## I.    Plaintiffs Will Be Irreparably Harmed Absent a TRO and Preliminary Injunction

Absent interim relief, Plaintiffs will suffer multiple forms of irreparable harm.

*First*, Defendants' conduct here threatens Plaintiffs' very existence. "[O]bstacles [that] unquestionably make it more difficult for the [plaintiff] to accomplish [its] primary mission … provide injury for purposes … [of] irreparable harm." *Newby*, 838 F.3d at 9. And loss of funding causes irreparable harm "where the loss threatens the very existence of the movant's business." *Nat'l Council of Nonprofits*, 2025 WL 368852, at *12 (citation omitted). In *National Council of Nonprofits*, a coalition of nonprofit organizations recently sought to enjoin the OMB memorandum that paused federal loans, grants, and other funding. As here, the plaintiffs alleged that that funding is "the lifeblood of operations and programs for many … nonprofits, and [that] even a short pause in funding … could deprive people and communities of their life-saving services." *Id.* at *2. The court granted a TRO, enjoining the government "from implementing, giving effect to, or

reinstating under a different name the directives in" the OMB memorandum that froze disbursement of federal funds. *Id.* at *14.

Relevant here, the court found irreparable harm because if "the freeze were to remain in effect, Plaintiffs' members will suffer 'existential injuries' and some programs may 'simply disappear.' Their workers may be unable to pay for housing or food. Some have already been forced to 'shutter [their] programs' just to make payroll. And patients or customers that rely on their services may be denied care when it is most needed. For some, these are harms for which 'there can be no do over and no redress.'" *Id.* at *12-13 (internal citations omitted).

The same is true here. For instance, as a result of the blanket freeze on funding, USAID has failed to pay Plaintiff Democracy International millions owed on completed work from existing contracts and cooperative agreements, and has issued stop-work orders. Bjornlund Decl. ¶ 10. Because of the failure to pay funds owed on completed work alone, Democracy International "had to cease all operations as of January 31, 2025." *Id.* ¶ 11. Democracy International's President and CEO attests, "[w]e have furloughed 100 percent of our 95 U.S.-based home office employees and placed 209 of 219 employees (over 95 percent) in overseas offices on 'administrative leave' without pay, pending resolution of stop work/suspension orders. We have cancelled all benefits, including health insurance, for employees and have terminated all consultants." *Id.* Beyond that, "[t]he company has not been able to pay virtually all of its obligations to contractors, vendors (including our mission-critical IT vendor), landlords under existing leases, program partners, grantees, outside advisors …. We have been unable to pay termination costs for home office or overseas employees, such as accrued vacation time or, in other countries, legally mandated severance benefits. We have shut down and attempted to secure all but one of our overseas offices (which has non-USAID funding) and downsized our computer systems and licenses." *Id.*

Likewise, USAID has not paid more than $100 million in outstanding invoices for work

already performed by Plaintiff DAI, and in the last 10 days "DAI has furloughed 383 U.S.-based staff, retracted numerous signed offers of employment, reduced salaries for non-furloughed senior staff members by 20%, deferred payments to hundreds of vendors, summarily terminated numerous subcontracts and grants, and violated the terms of hundreds of leases and other contractual arrangements." Northrip Decl. ¶ 8.

Similarly, Plaintiff Chemonics International, as a result of the USAID payment freeze, "has furloughed 750 of its US-based staff, which represents 63% of its US-based workforce," and reduced the hours of the remaining U.S. employees. Butcher Decl. ¶ 7. "As a result, some furloughed employees will struggle to pay for basic necessities, including housing and food." *Id.* "If Chemonics' current financial situation continues, it will furlough additional employees at the end of this month and will be unable to extend healthcare benefits to furloughed employees beyond March." *Id.* ¶ 8.

Plaintiffs HIAS and MSH face similar risks. *See* Hetfield Decl. ¶ 2 ("The suspension of all foreign assistance represents an existential threat to HIAS' mission and funding."); *id.* ¶ 13 ("[O]ver 535 HIAS staff have been laid off and many hundreds more are vulnerable to termination."); Wentworth Decl. ¶ 6 ("MSH immediately ceased all program activities for all USAID-funded projects, with on-going catastrophic effects to our projects, people, partners, and organization.").

Further, Plaintiff the Global Health Council explained that "[i]f the funding freeze cintinues … many GHC members may be forced to permanently scale back or cease operations." Georgiou Decl. ¶ 10. Small businesses are suffering harm from the funding freeze as well. Plaintiff SBAIC explained that "USAID's small business partners now have months of unpaid invoices, with no respite in sight. Unable to communicate with USAID, small businesses are incurring incalculable risk under stop work orders by observing usual stop work order practices …. This risk is especially

alarming in light of the apparent dismantling of the agency itself." Nichols Decl. ¶ 8. "[T]he very existence of our members is uncertain and at grave risk. SBAIC's members spent tens of millions of dollars in the period before the stop work orders …, and USAID's failure to pay for work done as far back as the fourth quarter of 2024 has disrupted cash flow and caused most of SBAIC's members to furlough most U.S. national staff in home offices and on contracts, and terminate foreign national staff or risk keeping them and being uncertain of payments under stop work orders." *Id.* ¶ 11. These are existential threats to Plaintiffs, which by itself constitutes irreparable harm.

*Second*, even if Plaintiffs could survive, Defendants' conduct will cause lasting harm to Plaintiffs in terms of goodwill, reputation, and relationships with employees, partners, subcontractors, foreign governments, and other stakeholders cultivated over many years. Injury to reputation is typically viewed as irreparable. *See, e.g.*, *Xiaomi Corp. v. Dep't of Defense*, 2021 WL 950144, at *9-10 (D.D.C. March 12, 2021); *Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018). "[S]uch harm can be irreparable if it is unrecoverable from any other party," and if the harm is "also ... great, certain and imminent." *Endo Par Innovation Co. v. Becerra*, 2024 WL 2988904, at *7 (D.D.C. June 10, 2024) (citation omitted).

Here, the government's conduct will cause great, certain, and imminent injury to Plaintiffs in the form of lost goodwill, broken trust, and damaged credibility. As Plaintiff Democracy International explained, "[s]uddenly freezing programs has destroyed hard-earned trust and relationships with employees, partners, subgrantees, government agencies, and other stakeholders and led to a loss of trust for those organizations with their constituencies. Some of our vendors, partners, and grantees will quickly go out of business. Our employees have lost their health insurance as well as all of their other benefits. The freeze has undermined the credibility of our staff and partners in their communities and with their stakeholders. It has already caused them

23

serious legal and financial problems and the loss of credibility has threatened their ability to make a living; it has even put some in danger of arrest or reprisals due to their inextricable association with these USAID programs." Bjornlund Decl. ¶ 14.

Indeed, Democracy International noted that: "If left unpaid, we will soon be in default on our contracts and have legal problems with landlords and vendors. Our shareholders … will have to pay taxes on the company's 2024 income for income they never received without being reimbursed by the company. The freeze has left us vulnerable to claims of local labor law violations for failure to pay legally mandated termination and other benefits. We are unable to pay taxes due, including employee withholding taxes, and accordingly will incur serious penalties. Because of these problems, the security of our overseas program leads … and some senior staff in the countries in which we work could be threatened. Even if the stop work orders are lifted or the company could receive future funding from non-U.S. government clients, the company's ability to be legally registered and to operate in countries in the future is threatened. Relationships cannot be repaired even if past invoices are paid or programs are later resumed." *Id.* ¶ 15.

Other Plaintiffs are in the same boat. Plaintiff Chemonics described the more than $100 million in outstanding invoices for USAID work performed in 2024, and "[i]f the outstanding invoices remain unpaid, 145 U.S. companies in 23 states and D.C., including 106 large businesses (such as NGOs, universities, and private companies) and 39 U.S. small businesses, as well as roughly 2,500 local organizations in more than 50 countries, will not be paid for the work Chemonics contracted them to do and that has already been performed," causing severe reputational harm. Butcher Decl. ¶ 14; *id.* ¶ 15 ("It has taken years, and in some cases decades, to build relationships, goodwill, reputations, and trust with our partners—all of which is being damaged now."); Northrip Decl. ¶ 12 ("In addition to permanently damaging our reputation as a reliable partner in the United States and in countries around the world, the U.S. government's

actions have placed our staff and the legal representatives of our foreign entities at heightened risk.
With every day that goes by, DAI staff placed in service in unstable environments at the behest of
the U.S. government are at higher risk of physical harm, as they confront angry vendors, equipment
providers, and landlords—all of whom have previously operated in good faith partnership with
DAI and the U.S. government."); *id.* ¶ 10 (describing reputational and other injuries); Wentworth
Decl. ¶ 12 (MSH's goodwill and brand equity has taken "decades of hard work" and "constancy
and programmatic excellence" to build, but "it was shaken when we communicated the wholesale,
unplanned, immediate cessation of all project activities. Unless reversed immediately, the trust and
reliance these healthcare actors were willing to place on MSH will be eroded day after day, until
it is completely gone."). Plaintiff SBAIC likewise confirmed that "[o]ur small business members
represent companies that have spent years building reputations, capabilities, good will, and trust
with USAID and other partners, including international, regional, and local. Loss of this hard-won
capability that took years of brick-by-brick effort, would be a grave loss to the businesses, to the
US Government, and to the field of foreign aid." Nichols Decl. ¶ 9.

## II. Plaintiffs Are Likely to Succeed on the Merits

Plaintiffs are likely to succeed on the merits of each of their claims for relief. Defendants'
actions violate the APA, violate the separation of powers, and are *ultra vires*.

### A. Defendants' Actions Violate the APA

Defendants' actions to implement the Executive Order are final agency actions reviewable
under the APA, and they are arbitrary and capricious and contrary to law.

#### 1. Defendants' Actions Are Final Agency Actions

Under the APA, courts may review only "final agency action." 5 U.S.C. § 704. Agency
action is final if it "mark[s] the consummation of the agency's decisionmaking process" and
determines "rights or obligations … from which legal consequences will flow." *Bennett v. Spear*,

520 U.S. 154, 178 (1997) (citation omitted).

Here, the Rubio Memo, the Rodgers Guidance, the Gray Initial Instructions, Gray Follow-Up Instructions, Gray Clarification, and other actions Defendants have taken to implement the Executive Order are final. Nothing about them is "merely tentative or interlocutory nature." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000). Rather, Defendants' orders read like a "ukase"—they "command[]," "require[]," "order[]," and "dictate[]." *Id.* at 1023; *see, e.g.*, Rubio Memo ¶ 7 ("Effective immediately, [Department officials] shall ensure that … no new obligations shall be made."); USAID Notice, at 1 ("USAID is pausing all new obligations of funding, and sub-obligations."). While foreign-assistance payments purportedly may resume if a "waiver" is granted or after a "review" is completed, those processes are a sham. Even with waivers in place, payments are still frozen, and Defendants are terminating contracts by the hundreds, eliminating any possibility that payments will resume. In any event, "[t]he mere possibility that an agency might reconsider" its decision "does not suffice to make an otherwise final agency action nonfinal." *Sackett v. EPA*, 566 U.S. 120, 127 (2012). An agency's decision to "grant[] an application for interim relief from a … standard while it reconsider[s] that standard …. represents the final agency position on this issue, has the status of law, and has an immediate and direct effect on the parties." *Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017) (citation omitted); *see Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1289 (D.C. Cir. 2016) (time-limited "suspension was not a moving target, but a final and binding determination" (citation omitted)).

And the "concrete consequences" of those commands are already being felt by Plaintiffs and across the globe. *Sierra Club v. Env't Prot. Agency*, 955 F.3d 56, 63 (D.C. Cir. 2020) (citation omitted). As Defendants stop payments and gut USAID, Plaintiffs must halt operations, lay off employees, and—in many cases—close up shop. *See Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003) ("An agency action is

deemed final if it is definitive and has a direct and immediate effect on the day-to-day business of the party challenging the agency action." (cleaned up)).

### 2.    Defendants' Actions Are Arbitrary and Capricious

On the merits, Defendants' actions to implement the Executive Order are arbitrary and capricious. The APA requires courts to "hold unlawful and set aside" any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under that standard, a reviewing court "must confirm that the agency has fulfilled its duty to 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (quoting *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (citation omitted). And agency action must be "upheld, if at all, on the same basis articulated in the order by the agency itself." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 169 (1962).

Here, Defendants have failed to "identif[y] and explain[] the reasoned basis" for their sudden, blanket freeze on foreign aid. *Transactive Corp. v. United States*, 91 F.3d 232, 236 (D.C. Cir. 1996). President Trump's order claimed that the "United States foreign aid industry and bureaucracy are not aligned with American interests and in many cases antithetical to American values." Exec. Order No. 14,169 § 1, 90 Fed. Reg. 8619 § 1 (Jan. 20, 2025). In the President's view, "[t]hey serve to destabilize world peace by promoting ideas in foreign countries that are directly inverse to harmonious and stable relations internal to and among countries." *Id.* But the

Executive Order offered no explanation or justification for this vague and sweeping statement. On the contrary, the government has long taken the position that foreign aid and development promote peace and global security by addressing the root causes of extremism and violence. *See, e.g.*, Barsa, *Remarks*, *supra*.

The Rubio Memo, in turn, cited the Executive Order as the basis for the funding freeze, and further claimed that "[i]t is currently impossible to access sufficient information in one place to determine whether the foreign assistance policies and interests supported by appropriations are not duplicated, are effective, and are consistent with President Trump's foreign policy." Rubio Memo ¶ 2. Yet that claim about the need for access to information in one place bears no connection to the direction to "immediately issue stop-work orders" for existing grants and contracts, or to halt the process of reviewing proposals for new grants and contacts. No subsequent directive purporting to implement the President's executive order or the Rubio Memo has identified any other ground for freezing foreign-assistance funding. *Id.* ¶¶ 7-9

In any event, Defendants have not explained why a comprehensive, undifferentiated freeze was necessary to achieve their purported goals. Nor have they explained why they eschewed a more orderly and targeted approach—such as one that aimed only at particular programs Defendants found to be destabilizing or corrupt or that kept funding in place for the 90 days Defendants claim it will take to identify such problematic programs. *See Allied Loc. & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000) ("To be regarded as rational, an agency must also consider significant alternatives to the course it ultimately chooses.").

Defendants have also "entirely failed to consider … important aspect[s] of the problem." *State Farm*, 463 U.S. at 43. Defendants have claimed that they are still conducting a review of all foreign-assistance funding, which necessarily means that they have not yet evaluated "important aspect[s] of the problem." *Id.* And at the same time they claim that a review is ongoing, Defendants

have dismissed the agency personnel with the experience and technical expertise necessary to conduct any supposed review.

Defendants have also ignored that these programs are not light switches to be turned on and off at will. Without funding, Plaintiffs and other partners must lay off staff, cut ties with local actors, and essentially terminate their operations. Plaintiffs cannot even take the steps necessary to remain ready to resume work (if the freeze is lifted) or to wind down their projects in an orderly manner (if it is not). Indeed, there is a serious risk that Plaintiffs simply will not exist if Defendants ever decide to un-pause their programs. And while, ordinarily, partners who have been ordered to stop work may coordinate with USAID officials to obtain interim funding to keep them afloat until work resumes, such funding has been halted and such coordination is impossible given that Defendants have sidelined critical USAID personnel. So notwithstanding Defendants' assertion that they may "decide to continue [some] program[s] in the same or modified form," Exec. Order No. 14,169 § 3(d), 90 Fed. Reg. 8619 (Jan. 20, 2025), they have not grappled with the reality that those programs may not be able to be revived.

Defendants have also failed to account for the substantial reliance interests their actions have eviscerated. "When an agency changes course … it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (citation omitted). Yet Defendants did not consider the effect the freeze would have on grantees, contractors, and other partners—and their employees—all of whom have relied on longstanding USAID and State Department policies.

Defendants have also failed to account for how foreign-assistance programs further U.S. interests and how a sudden withdrawal of U.S. assistance will provide opportunities to U.S. adversaries and risk instability in countries around the world. Analysts and experts are warning that China and Russia will quickly step in to fill the void—and indeed are already doing so. *See,*

*e.g.*, Chantal Da Silva, *What Cutting USAID Could Cost the U.S.—How China, Russia May Benefit*, NBC News, Feb 4, 2025; Kruesi, *supra*. For similar reasons, Defendants have not justified their abrupt change in position. For years, the U.S. government has considered foreign aid programs an important part of America's foreign policy and national security strategy. *See, e.g.*, John Barsa, USAID Administrator, Remarks at the Concordia UNGA Summit (Sept. 21, 2020). Now, however, Defendants have asserted that foreign aid programs are a threat to those same interests. *See* Exec. Order No. 14,169 § 1, 90 Fed. Reg. 8619 (Jan. 20, 2025). But they have failed to "display an[y] awareness that [they are] changing position[s]," much less articulated "good reasons" for the shift. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quotation marks omitted).

### 3.    Defendants' Actions Are Contrary to Law

Defendants' actions are also contrary to law in at least three ways—they violate (1) the Impoundment Control Act of 1974 and the Anti-Deficiency Act of 1982; (2) the 2024 Appropriations Act; and (3) the constitutional separation of powers.

*First*, Congress has expressly disabled the President from declining to obligate or disburse appropriated funds in the Impoundment Control Act, Pub. L. No. 93-344, 88 Stat. 333 (codified as amended at 2 U.S.C. §§ 682 *et seq.*). Under that statute, appropriated funds "shall be made available for obligation" unless the President transmits a special message to Congress and Congress rescinds the appropriation. 2 U.S.C. § 683(b). The Act also permits the President to "defer[]" a budget authority—to withhold or delay the obligation or expenditure of appropriated funds—but only for limited purposes, for a limited time, and after transmitting a special message to Congress. *Id.* § 684(a); *see id.* § 682(1). Deferral is permissible only "(1) to provide for contingencies; (2) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (3) as specifically provided by law." *Id.* § 684(b). "No officer

30

or employee of the United States may defer any budget authority for any other purpose." *Id.* Neither the President nor any executive officer may defer obligation or expenditure of appropriated funds merely for policy reasons. *In re Aiken County,* 725 F.3d 255, 261 n.1 (D.C. Cir. 2013). Here, by refusing to spend appropriated funds to "align[]" spending with President Trump's "policy agenda," Rubio Memo ¶ 3, Defendants have violated the Impoundment Control Act.

The Anti-Deficiency Act, Pub. L. No. 97-258, 96 Stat. 929 (codified as amended at scattered sections of Title 31), imposes similar restrictions. Under that statute, "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). And "[i]n apportioning or reapportioning an appropriation, a reserve may be established only" for the same limited purposes the Impoundment Control Act allows a deferral. *Id.* § 1512(c)(1). Government officers thus violate the Anti-Deficiency Act if they establish a monetary reserve by withholding appropriated funds from their congressionally assigned program for any other purpose. To the extent Defendants are holding appropriated foreign-assistance funds in reserve to effectuate the President's policy preferences rather than spending them as Congress has directed, Defendants have violated the Anti-Deficiency Act.

*Second*, Defendants also have violated the appropriations statutes, including the 2024 Appropriations Act, which direct USAID and the State Department to spend appropriated funds for particular foreign-assistance purposes. When Congress wishes to give the executive branch discretion to spend less than the full amount appropriated, Congress uses specific language—for example, that an agency is appropriated "sums not exceeding" or "up to" an amount for a particular purpose. *See, e.g., CFPB v. Com. Fin. Servs. Ass'n*, 601 U.S. 416, 432-33 (2024); *id.* at 442-43 (Kagan, J., concurring). Absent such language, courts properly understand appropriations statutes as commands to obligate and expend the full amount of money appropriated. *See, e.g.*, *Train v. City of New York*, 420 U.S. 35 (1975) (prior to enactment of Impoundment Control Act,

interpreting statute to require the agency to spend the full amounts specified for a particular program, and rejecting the agency's argument that it had discretion to spend less).

Here, the relevant appropriations statutes confer no discretion to halt foreign-assistance funding wholesale. To the contrary, the 2024 Appropriations Act specifies that the appropriated amounts "shall" be apportioned and used for specified purposes, including USAID's global health programs, development assistance, disaster assistance, and initiatives to promote and strengthen democracy abroad. *See* Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, titles II-III, 138 Stat. 460, 739-43. The 2024 Appropriations Act also appropriates funds to the Department of State for treating and preventing HIV/AIDS, promoting democracy, assisting refugees, preventing the proliferation of nuclear weapons, combatting terrorism, demining conflict zones, and controlling the international flow of narcotics. *Id.*, 138 Stat. 742-49. By broadly halting obligations and expenditures related to these purposes, Defendants have violated these congressional appropriations.

*Third*, as explained immediately below, Defendants' actions also contravene numerous constitutional guarantees designed to protect liberty through the separation of powers.

### B.     Defendants' Actions Violate the Separation of Powers

The Constitution vests Congress, not the Executive, with "exclusive power" over federal spending. *Dep't of Navy v. FLRA*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992)). Understood since the founding as "'the most complete and effectual weapon'" of a representative body, Congress's power of the purse serves as "a bulwark of the Constitution's separation of powers among the three branches of the National Government." *Id.* (quoting The Federalist No. 58, at 359 (James Madison) (Clinton Rossiter ed., 1961)). To ensure that Congress alone would control the public fisc, the Constitution both grants to Congress the power to direct federal spending and denies that power to the other

branches. The spending power is the first listed among Congress's enumerated powers in Article 1, Section 8. And the Appropriations Clause forbids the expenditure of federal funds except "in Consequence of Appropriations made by Law." *Id.*, art. I, § 9, cl. 7.

Consistent with the Constitution's division of legislative and executive powers, the President must "faithfully execute[]" the law as Congress enacts it. U.S. Const., art. II, § 3. Like other statutes enacted by Congress, an appropriations act is "Law." *Id.*, art. I, § 9, cl. 7. The separation of powers forbids the President to revise or ignore such a law once duly enacted. *See Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

The President also lacks inherent constitutional power to withhold funds that Congress has lawfully appropriated. Absent statutory authorization, the President possesses only the powers that the Constitution independently confers on the Executive. U.S. Const., art. II, § 1, cl. 2. The power to set federal funding policies is not among those powers. When the President "has policy reasons … for wanting to spend less than the full amount appropriated by Congress for a particular project or program[,] … even the President does not have unilateral authority to refuse to spend the funds." *Aiken County,* 725 F.3d at 261 n.1.

Longstanding historical practice and the reasoned views of every branch of government confirm that the President has no authority to unilaterally revise congressional appropriations. The Comptroller General, the top legislative-branch official charged with oversight of federal expenditures, has explained in opinions going back to 1973 that "[t]he Constitution grants the President no unilateral authority to withhold funds from obligation." *In re OMB—Withholding of Ukraine Security Assistance*, B-331564, 2020 WL 241373 (Comp. Gen. Jan. 16, 2020); *see Report to the Sen. Subcomm. on Separation of Powers*, B-135564, 1973 WL 159460 (Comp. Gen. July 26, 1973). And the Supreme Court, since before the Civil War, has disapproved assertions of executive power to withhold funds required to be disbursed by statute. *See Kendall v. United*

*States*, 37 U.S. (12 Pet.) 524, 610 (1838).

Indeed, since 1969, even the Department of Justice has adhered to that settled understanding of the separation of powers. As later-Chief Justice Rehnquist wrote in an Office of Legal Counsel opinion, "the suggestion that the President has a constitutional power to decline to spend appropriated funds … is supported by neither reason nor precedent." *Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, 1 Op. O.L.C. Supp. 303, 309 (1969). That "the President disagree[s] with spending priorities established by Congress" cannot "justify his refusal to spend." *Id.* at 311.

Here, Defendants have usurped for the executive branch the legislature's exclusive powers by refusing to spend what Congress has ordered. That violates the separation of powers.

### C.    Defendants' Actions Are *Ultra Vires*

"It is central to the real meaning of the rule of law and not particularly controversial" that executive branch actors have no power to act unless authorized to do so by Congress or the Constitution. *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 621 (D.C. Cir. 1992). This principle is such a "cardinal principle" of American law, *Cath. Health Initiatives v. Sebelius*, 617 F.3d 490, 497 (D.C. Cir. 2010) (Brown, J. concurring), that no express statutory cause of action is necessary to sue to enjoin *ultra vires* executive action. Courts "presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996).

Here, Defendants can identify no statutory or constitutional authority for their wholesale freeze of foreign-assistance funding. Under the major questions doctrine, moreover, agencies must point to "clear congressional authorization" when they claim power to take actions of vast "economic and political significance." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). In

*West Virginia*, for example, the Supreme Court held that the EPA lacked the authority to devise certain emissions caps that would have "billions of dollars of impact," because the Clean Air Act did not provide a clear statement to allow the agency to make such a drastic change from the existing standards. *Id.* at 2605. Here, Defendants' unilateral, overnight freeze of billions of dollars in congressionally appropriated funding implicates at least as serious economic and political questions. Defendants' actions lack any congressional authorization, much less the clear authorization Supreme Court precedent requires.

### III.    The Balance of Equities and Public Interest Weigh Heavily In Favor of Defendants

"When the movant seeks to enjoin the government, the final two TRO factors—balancing the equities and the public interest—merge." *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (D.D.C. 2020) (citing *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)). "It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quotation marks and citations omitted). Likewise, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Open Communities Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws—such as the APA, as well as regulations … —that govern their existence and operations." *Id.* (internal quotation marks and citations omitted). Thus, for the same reasons that Plaintiffs are likely to succeed on the merits, equity and the public interest require relief.

But even if this Court were to balance the government's interests as if it were a private party, the scales tip heavily towards Plaintiffs: in one pan, the government continuing its regular expenditures of a relatively small portion of the federal budget that has already been directed to be spent for a specified purpose, a routine practice that has not caused the government injury yet in the months and years it has been doing so; in the other, Plaintiffs (and the many USAID and State

35

Department partners not currently before this Court) staring down the barrel of a threat to their very existence, with follow-on consequences to their employees, landlords, creditors, subgrantees, and the people who rely on their services—without the privilege the government invokes of simply stopping payment without notice or consequence. *See Nat'l Council of Nonprofits*, 2025 WL 368852, at *13 ("The declarations and evidence presented by Plaintiffs paint a stark picture of nationwide panic in the wake of the funding freeze. Organizations with every conceivable mission—healthcare, scientific research, emergency shelters, and more—were shut out of funding portals or denied critical resources .... [T]he balance of the equities and public interest heavily favor granting Plaintiffs' request.").

But there is more. Plaintiffs provide essential services furthering U.S. interests that will be destroyed. As Plaintiff Democracy International explains, "[t]he damage from suddenly stopping work on programs is profound and incalculable. Stopping the programs has done immense damage to people and organizations who had relied on our assistance .... [T]his includes leaving human rights defenders vulnerable to threats to their physical safety; stopping emergency assistance to refugees and victims of state-sponsored violence; interrupting programs working to prevent at-risk youth from joining gangs and protecting communities from violence; and leaving beneficiaries vulnerable to being recruited into terrorist organizations. It has undermined the credibility and thus the effectiveness of civil society and human rights and democracy advocates and undermined years-long efforts to build trust with local governments, parliaments, and other government institutions that is essential for success." Bjornlund Decl. ¶ 13.

"The suspension of work will erase years of progress, stir anti-American sentiment, threaten national security, and delay critical health resources, potentially leading to hundreds of thousands of deaths form HIV, AIDS, malaria, and reproductive health conditions. In international development work, trust can take decades to earn, but can be destroyed in an instant. The

destruction of that trust has already begun …." Butcher Decl. ¶ 12.

Other Plaintiffs have explained the public health risks in ceasing funding, including healthcare services abroad that ultimately "protect[] Americans from disease outbreaks reaching U.S. shores." Wentworth Decl. ¶ 3.c. Plaintiff the Global Health Council explained that "[t]he funding freeze has disrupted critical health programs, including maternal and child health, infectious disease prevention, and health system strengthening efforts in vulnerable regions." Georgiou Decl. ¶ 8. "The uncertainty and financial distress caused by this funding freeze have compromised global health progress and put millions of lives at risk. Without immediate intervention, organizations that provide essential health services—including vaccination programs, HIV/AIDS treatment, malaria prevention, and emergency response efforts—will be forced to shut down operations." *Id.* ¶ 9.

And the freezing of funds could undermine programs that foster the "rule of law and participatory democracies around the world," including ABA programs that "result in a safer, more prosperous, and stable planet," and "create more favorable environments for U.S. business interest and enhance the viability of global markets." Carlson Decl. ¶ 3; *see id.* ¶¶ 14-22 (describing ABA programs injured by freeze). If the rule of law still means something in this country, an injunction is warranted here.

## CONCLUSION

The Court should grant a TRO, set a briefing schedule and a hearing on whether to convert the TRO to a preliminary injunction, and grant a preliminary injunction.

Dated: February 11, 2025                    Respectfully submitted,

                                            /s/ Stephen K. Wirth
                                            William C. Perdue (D.C. Bar 995365)*
                                            Sally L. Pei (D.C. Bar 1030194)
                                            Samuel M. Witten (D.C. Bar 378008)
                                            Stephen K. Wirth (D.C. Bar 1034038)
                                            Dana Kagan McGinley (D.C. Bar 1781561)
                                            Allison Gardner (D.C. Bar 888303942)
                                            Daniel Yablon (D.C. Bar 90022490)
                                            ARNOLD & PORTER KAYE SCHOLER LLP
                                            601 Massachusetts Ave., NW
                                            Washington, DC 20001-3743
                                            Tel: (202) 942-5000
                                            stephen.wirth@arnoldporter.com

                                            *application for admission pending

                                            *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that this document will be served on Defendants in accordance with Fed.

R. Civ. P. 4.

/s/ Stephen K. Wirth