## DECLARATION OF JAMES BUTCHER

I, James Butcher, declare as follows:

1.    I am the President and CEO of Chemonics International.  I submit this declaration in support of Plaintiffs' application for a temporary restraining order in this matter.  The statements made in this declaration are based on my personal knowledge and my understanding of information made available to me pursuant to my duties at Chemonics.

2.    Chemonics is a U.S. employee-owned company headquartered at 1275 New Jersey Avenue SE, Washington, DC 20003.  Founded in 1975, Chemonics has worked in more than 100 countries.  As an employee-owned, American company, Chemonics works to safeguard American security, promote economic prosperity, and address global challenges before they reach American shores.  Working on behalf of the U.S. Department of State and the U.S. Agency for International Development ("USAID") and with other partners, we have delivered results across the spectrum of country contexts, from stable societies and high-growth economies to challenging environments embroiled in political or military conflict.

3.    Chemonics works on a range of USAID projects, including:

    a.    Promoting collaboration between U.S. agricultural manufacturers, universities, and Ukrainian farmers to drive innovation, efficiency, and resilience in Ukraine's agricultural sector in support of national and global food security;

    b.    Working with urban municipalities and communities to counter incentives to join gangs and creating safe public spaces,

addressing the root causes of migration to the U.S. from El

Salvador;

c.      Enabling early identification of food crises that could lead to

conflict, mass migration, and destabilization—issues that

directly affect U.S. national security;

d.      Helping resettle Venezuelan migrants permanently in Colombia

by supporting Colombian visa processes and assisting with job

skills training and placement to prevent migration to the U.S.

southern border;

e.      Delivering health commodities, strengthening national supply

chain systems, and providing global supply chain leadership to

ensure lifesaving health supplies reach those in need, when

they need them;

f.      Working alongside local governments and community groups to

address threats to Iraq's security and stability through

rehabilitation of schools, health facilities, and infrastructure in

districts impacted by the ISIS conflict and returnees to stem

Iranian influence; and

g.      Improving local governance mechanisms in Uzbekistan to spur

economic growth and job creation to reduce the country's

reliance on foreign aid from the United States and counter the

influence of China, its largest trading partner.

4.      Approximately 88% of Chemonics and its subsidiaries' funding comes

from USAID.

5.   As of January 24, 2025, Chemonics was working with USAID on 104 different projects in over 90 countries.  This includes the $12 billion Global Health Supply Chain Program-Procurement and Supply Management (GHSC-PSM) contract, $205 million Ukraine Agriculture Growing Rural Opportunities (AGRO) contract, $200 million Famine Early Warning Systems Network 8 Decision Support contract, $82 million Colombia Venezuela Response and Integration Activity contract, $66 million Iraq Regional Program (IRP) II contract, $43 million El Salvador Communities Working Together contract, and $15 million Uzbekistan Local Governance Activity contract, among numerous other contracts and cooperative agreements.

6.   Chemonics received stop-work orders from USAID for 98 of 104 of Chemonics' projects.  The orders directed Chemonics to cease all award implementation immediately until further notice from Contracting Officers or Agreement Officers.  Limited waivers for Chemonics' Global Health Supply Chain – Procurement and Supply Management project ("GHSC-PSM") related to HIV/AIDS, Malaria and Maternal Child Health programming were received on February 3, 2025, February 6, 2025 and February 10, 2025, respectively, for an initial period of 30 days.  While Chemonics was excited to receive these waivers, it is both challenging and impractical to abruptly halt global supply chains midstream and then resume operations in a short period without reassurances that Chemonics will not have to cease operations again in 30 days. For GHSC-PSM, Chemonics has successfully accessed USAID funds to pay some suppliers and freight forwarders for

3

work performed prior to the stop-work orders, but to date, USAID has been unable to provide clear guidance as it relates to outstanding vendor and supplier obligations at the global and local levels, including for those programs that have received the partial waivers. Additionally, GHSC-PSM anticipates being able to offer less favorable pricing terms moving forward, as our vendors, suppliers and subcontractors lose confidence in our ability to meet our contractual obligations. Chemonics has received no other waivers to date.

7. In response to the stop-work orders, Chemonics has made extraordinary and difficult decisions to conserve and spend its cash on hand, prioritizing securing American lives and U.S. property overseas for as long as possible. As of February 10, 2025, Chemonics and its U.S. subsidiaries have furloughed 750 of its US-based staff, which represents 63% of its US-based workforce. As a result, some furloughed employees will struggle to pay for basic necessities, including housing and food. Of the non-furloughed U.S. employees, 241 have had their hours reduced by 25%, while the remaining 100 employees have had their hours reduced by 66%, in each case with corresponding pay cuts. Not a single U.S. employee continues to be paid to work full-time.

8. In addition, both furloughed and non-furloughed employees have lost access to certain key employee benefits, including paid family leave and HSA contributions, and while Chemonics has committed to paying healthcare benefits to all employees through the end of March, it has been forced to increase the employee contribution by 30% both for its furloughed and non-furloughed staff. If Chemonics' current financial situation continues, it will furlough additional employees at the

4

end of this month and will be unable to extend healthcare benefits to furloughed

employees beyond March.

9.     In addition to the direct impact of these furloughs on staff, the

employee furloughs have severely eroded Chemonics' talent base, on which its

reputation relies, and had a devastating impact on Chemonics' ability to resume

operations if and when the stop-work orders are lifted. Moreover, although

Chemonics relies overwhelmingly on its USAID business, the staff furloughs have

impacted other areas of its business because its subsidiaries and business lines who

serve other clients, including non-U.S. governmental clients, rely on many of the

employees who have been furloughed. In addition, a number of clients of

Chemonics' subsidiaries, including foreign governmental clients, have expressed

concerns about the impact of the furloughs and stop-work orders on the

subsidiaries' ability to perform their contracts. Finally, as a result of the stop-work

orders and staff furloughs, Chemonics has been forced to abandon business

strategies and corporate priorities, such as its inorganic growth strategy, including

mergers and acquisitions and venture capital investments.

10.     To the extent possible, Chemonics has deferred payments due to its

suppliers, vendors, and landlord, in some cases in breach of its contractual

obligations, which has already eroded reputations built over time and will

negatively impact future financial terms when conducting business. As a result of

the stop-work orders, Chemonics has had subcontractors and grantees allege

breach of contract, damaging Chemonics' reputation.

11.     Chemonics depends heavily on a line of credit it has established with a

syndicate of banks since 2022. On Friday, February 9, 2025, Chemonics indicated to the lead lender its desire to draw on its line of credit in order to fund Chemonics' ongoing operations. For the first time in the history of Chemonics' relationship with the lender, it indicated that it could not approve such a draw down immediately and would need to discuss first with the credit partner and the other lender, expressing that Chemonics' current financial situation, driven by external factors related to USAID's dissolution rather than with the company management's decisions, gives rise to a material adverse effect resulting in the syndicate's right to decline the draw down under their contractual arrangements with Chemonics.

12.     The USAID stop-work orders have threatened Chemonics' ability to implement vital programs that advance national security, food security, economic growth, and humanitarian assistance worldwide. The suspension of work will erase years of progress, stir anti-American sentiment, threaten national security, and delay critical health resources, potentially leading to hundreds of thousands of deaths from HIV, AIDS, malaria, and reproductive health conditions.  In international development work, trust can take decades to earn, but can be destroyed in an instant. The destruction of that trust has already begun as a direct result of the stop-work orders.

13.     Specific impacts of the stop-work orders include:

a.   In Ukraine, Chemonics procured nearly $2 million in irrigation systems from leading U.S. manufacturers, with $1.3 million due to have payment made on arrival. This equipment has already departed the U.S. and is expected to arrive at customs in February.

6

Failure to pay will reduce U.S. manufacturers' sales and delay the equipment's entry into Ukraine's market.

b.  In Iraq, while rehabilitation work is ongoing, Chemonics (and by extension, the U.S. Government) assumes legal custody of facilities. The severe delays caused by a stop-work order have resulted in additional costs, exposed the government to legal risks and liabilities, and raised questions of mismanagement and corruption. This not only erases years of progress, but also risks stirring anti-American sentiment and threatening national security.

c.  In Colombia, 11 one-stop-shops for Venezuelan migrants to obtain temporary visas and nine workforce development centers now lack the resources necessary to operate, leaving migrants without access to social integration services. Agreements that Chemonics had negotiated with four banks to provide bank account registration and other financial services for migrants could not be signed, resulting in reputational harm. Similarly, each day the stop-work order remains in place, we lose the engagement of more than 1,500 private sector companies across different sectors that had agreed to promote job hiring and placement of Venezuelan migrants and connect migrant-led businesses to market opportunities. Chemonics fears that, without access to these services, more Venezuelan migrants will turn to illegal smuggling and human trafficking to on-migrate to the U.S. border.

7

d. Under Chemonics' GHSC-PSM project, Chemonics received USAID approval for and has made contractual commitments to suppliers for $240 million worth of health commodities prior to receipt of the applicable stop-work order. These commodities are at various stages of manufacture. Another $150 million in health commodities remain stranded in warehouses around the world and $88.5 million are currently in transit. As commodities wait to be routed, risks include products being delivered without means for pick up, damage, expiry, temperature excursions, and theft. Not delivering these health commodities on time could potentially lead to as many as 566,000 deaths from HIV/AIDS, malaria, and unmet reproductive health needs, including 215,000 pediatric deaths. Further, Chemonics is already receiving increasingly urgent messages from suppliers, many asking for reasonable assurance of our ability to pay costs previously incurred and instructions, while others are already taking an adversarial posture citing rights under the contract to seize orders. In addition, the project is confronting similar challenges in its management of subcontracts for warehousing and distribution of commodities – the project has been effectively choked of its ability to negotiate with these subcontractors to maximize subcontract terms and take any requisite contractual actions to preserve Chemonics' ability to both pause work under the stop-work order and remobilize under partial

8

or complete lifting thereof.

    e.  In El Salvador, each day the stop work order is in effect

undermines progress made by Chemonics enhancing safety,

economic opportunities, and safer environments. These work

stoppages disrupt services designed to prevent organized crime and

reduce migration, and they impede the development and

implementation of long-term policies and organizational capacity of

our government counterparts to sustain these gains.

14.    Even the short-term pause in funding to date has caused significant

harms to Chemonics' reputation, which is exacerbated by the fact that Chemonics

has roughly $103.6 million in outstanding invoices issued to USAID for work

performed in 2024, most of which were submitted prior to the stop-work orders.  Of

these invoices, $18.6 million of them are past due with no visibility into when they

may be paid. If the outstanding invoices remain unpaid, 145 U.S. companies in 23

states and D.C., including 106 large businesses (such as NGOs, universities, and

private companies) and 39 U.S. small businesses, as well as roughly 2,500 local

organizations in more than 50 countries, will not be paid for the work Chemonics

contracted them to do and that has already been performed.  This, in turn, leaves

Chemonics vulnerable to lawsuits.

15.    Chemonics operates in countries that are often distrustful of outside

influence and aid, especially from the United States.  It has taken years, and in

some cases decades, to build relationships, goodwill, reputations, and trust with our

partners—all of which is being damaged now.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 10, 2025, in <u>Falls Church, Virginia, USA</u>



James Butcher (Feb 10, 2025 23:05 EST)

James Butcher
President and CEO,
Chemonics International,
Inc.

# Declaration of Harms - Chemonics - Butcher

**Final Audit Report**                                       2025-02-11

| | |
|---|---|
| Created: | 2025-02-11 |
| By: | Allison Gardner (Allison.Gardner@arnoldporter.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA8YXGpwsIS7b990Woaf_FwnJTR6q8ZJ79 |

## "Declaration of Harms - Chemonics - Butcher" History

📄 Document created by Allison Gardner (Allison.Gardner@arnoldporter.com)
   2025-02-11 - 3:01:46 AM GMT- IP address: 163.116.146.118

📧 Document emailed to James Butcher (jbutcher@chemonics.com) for signature
   2025-02-11 - 3:02:08 AM GMT

📄 Email viewed by James Butcher (jbutcher@chemonics.com)
   2025-02-11 - 4:04:04 AM GMT- IP address: 153.92.40.38

🖊 Document e-signed by James Butcher (jbutcher@chemonics.com)
   Signature Date: 2025-02-11 - 4:05:21 AM GMT - Time Source: server- IP address: 153.92.40.38

✅ Agreement completed.
   2025-02-11 - 4:05:21 AM GMT