## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AIDS VACCINE ADVOCACY COALITION, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 25-00400 (AHA) |
| UNITED STATES DEPARTMENT OF STATE, *et al.*, | |
| Defendants. | |
| GLOBAL HEALTH COUNCIL, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 25-00402 (AHA) |
| DONALD J. TRUMP, *et al.*, | |
| Defendants. | |

## BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER
## AS *AMICUS CURIAE* IN SUPPORT OF
## PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Brian R. Frazelle (DC Bar No. 1014116)
Miriam Becker-Cohen (DC Bar No. 1616670)
Nina G. Henry (DC Bar No. 90017399)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* Constitutional Accountability Center states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... ii

INTEREST OF *AMICUS CURIAE* ..................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ..................................... 1

ARGUMENT ........................................................................................................ 6

    I.    To Guard Against the Risk of a Tyrannical President, the Framers Vested Control of Appropriations and Spending in Congress, Ensuring the Structural Separation of the Sword and the Purse ................................................. 6

    II.    For Over Two Hundred Years, Congress Has Jealously Guarded Its Control Over the Purse Strings Through Federal Legislation Governing Spending and Impoundments............................................................................................. 12

    III.    The President and His Subordinates Have No Authority to Defy the Will of Congress by Refusing to Execute Duly Enacted Laws Requiring the Disbursement of Federal Funding........................................................... 15

CONCLUSION...................................................................................................... 22

i

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Campaign Clean Water, Inc. v. Ruckelshaus*,
    361 F. Supp. 689 (E.D. Va. 1973) ........................................................................ 19

*CFPB v. Cmty. Fin. Servs. Ass'n of Am.*,
    601 U.S. 416 (2024) ............................................................................................ 8

*Clinton v. City of New York*,
    524 U.S. 417 (1998) ............................................................................ 4, 11, 12, 17

*Cmty. Action Programs Exec. Dirs. Ass'n of N.J. v. Ash*,
    365 F. Supp. 1355 (D.N.J. 1973) ......................................................................... 19

*Guadamuz v. Ash*,
    368 F. Supp. 1233 (D.D.C. 1973) ........................................................................ 19

*Harrington v. Bush*,
    553 F.2d 190 (D.C. Cir. 1977) ............................................................................ 12

*In re Aiken County*,
    725 F.3d 255 (D.C. Cir. 2013) ............................................................................ 16

*INS v. Chadha*,
    462 U.S. 919 (1983) ...................................................................................... 11, 12

*Kendall v. United States ex rel. Stokes*,
    37 U.S. 524 (1838) ............................................................................ 1, 4, 16, 17, 19

*Loc. 2677, Am. Fed'n of Gov't Emps. v. Phillips*,
    358 F. Supp. 60 (D.D.C. 1973) ........................................................................... 19

*Louisiana ex rel. Guste v. Brinegar*,
    388 F. Supp. 1319 (D.D.C. 1975) ........................................................................ 4, 19

*Maine v. Fri*,
    486 F.2d 713 (1st Cir. 1973) ............................................................................... 18

*Medellín v. Texas*,
    552 U.S. 491 (2008) ............................................................................................ 16

*Nat'l Council of Cmty. Mental Health Ctrs., Inc. v. Weinberger*,
    361 F. Supp. 897 (D.D.C. 1973) ......................................................................... 18, 19

## TABLE OF AUTHORITIES – cont'd

Page(s)

*Nat'l Treasury Emps. Union v. Nixon*,
  492 F.2d 587 (D.C. Cir. 1974)................................................................. 18

*OPM v. Richmond*,
  496 U.S. 414 (1990) ........................................................................ 11

*Pennsylvania v. Weinberger*,
  367 F. Supp. 1378 (D.D.C. 1973)........................................................ 19

*Reeside v. Walker*,
  52 U.S. 272 (1850) ........................................................................ 11

*Rochester Pure Waters Dist. v. EPA*,
  960 F.2d 180 (D.C. Cir. 1992)............................................................. 8

*Seila Law LLC v. CFPB*,
  591 U.S. 197 (2020) ........................................................................ 4

*Sioux Valley Empire Elec. Ass'n v. Butz*,
  504 F.2d 168 (8th Cir. 1974)............................................................. 18

*State Highway Comm'n of Mo. v. Volpe*,
  479 F.2d 1099 (8th Cir. 1973)........................................................ 5, 18

*Train v. City of New York*,
  420 U.S. 35 (1975) ........................................................................ 5, 17

*United States v. Butler*,
  297 U.S. 1 (1936) ........................................................................ 9

*United States v. MacCollom*,
  426 U.S. 317 (1976) ........................................................................ 11

*United States v. Midwest Oil Co.*,
  236 U.S. 459 (1915) ........................................................................ 12

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*,
  665 F.3d 1339 (D.C. Cir. 2012)........................................................ 8, 13

*U.S. House of Representatives v. Mnuchin*,
  976 F.3d 1 (D.C. Cir. 2020)............................................................. 11

**TABLE OF AUTHORITIES – cont'd**

Page(s)

*Util. Air Regul. Grp. v. EPA,*
    573 U.S. 302 (2014) ........................................................ 12

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ........................................... 3, 12, 16, 19


CONSTITUTIONAL PROVISIONS

Articles of Confederation of 1781, art. IX, para. 6 .................................... 8

Del. Const. of 1776, art. VII .................................................... 7

Mass. Const. of 1780, ch. 2, § 1, art. XI ................................... 7

U.S. Const. art. I, § 8 .................................................... 2, 8

U.S. Const. art. I, § 9 .................................................... 3, 10, 11


STATUTES AND LEGISLATIVE MATERIALS

Act of Apr. 30, 1790, ch. 10, 1 Stat. 119 .................................... 4

Act of Feb. 12, 1868, ch. 8, 15 Stat. 35 ..................................... 13

Act of Feb. 27, 1906, ch. 510, 34 Stat. 48 .................................. 13

Act of Mar. 3, 1809, ch. 28, 2 Stat. 535 ................................... 12

Act of Mar. 3, 1905, ch. 1484, 33 Stat. 1257 .............................. 13

Act of July 12, 1870, ch. 251, 16 Stat. 251 ............................... 13

An Act Declaring the Rights and Liberties of the Subject and Settling the Succession
    of the Crown (Bill of Rights), 1689, 1 W. & M., c.2 (Eng.) ................................ 7

Financial Services and General Government Appropriations Act,
    Pub. L. No. 117-103, 136 Stat. 239 (2022) ........................... 14

Financial Services and General Government Appropriations Act,
    Pub. L. No. 117-328, 136 Stat. 4650 (2022) ......................... 15

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

General Appropriations Act of 1951,
Pub. L. No. 81-759, 64 Stat. 595 (1950) ................................................................. 14

H. Rep. No. 117-393 (2022) ..................................................................................... 15

Impoundment Control Act of 1974,
Pub. L. No. 93-344, 88 Stat. 297 ............................................................................. 14

Pub. L. No. 100-119, 101 Stat. 754 (1987) ............................................................. 14

S. Rep. No. 93-688 (1974) ....................................................................................... 14

2 U.S.C. § 683 ................................................................................................. 3, 4, 14

2 U.S.C. § 684 ..................................................................................................... 3, 14

31 U.S.C. § 1301 ............................................................................................... 3, 12

31 U.S.C. § 1341 ............................................................................................... 3, 14

31 U.S.C. § 1342 ..................................................................................................... 14

31 U.S.C. § 1350 ..................................................................................................... 14


BOOKS, ARTICLES, AND OTHER AUTHORITIES

Bruce Ackerman, *Taxation and the Constitution*,
99 Colum. L. Rev. 1 (1999) ........................................................................................ 9

William Blackstone, *Commentaries on the Laws of England* (1791 ed.) .................. 6

Brutus, Va. J. (Dec. 6, 1787), *reprinted in* 8 *The Documentary History of the
Ratification of the Constitution by the States: Virginia*
(John P. Kaminski et al. eds., 1988) ....................................................................... 10

Gerhard Casper, *Appropriations of Power*,
13 U. Ark. Little Rock L.J. 1 (1990) ......................................................................... 6

Josh Chafetz, *Congress's Constitution: Legislative Authority and the
Separation of Powers* (2017) ............................................................................... 6, 10

**TABLE OF AUTHORITIES – cont'd**

Page(s)

*The Debates in the Several State Conventions on the Adoption of the Federal
Constitution* (Jonathan Elliot ed., 1836)....................................................... 3, 10

Ralph E. Erickson, Acting Assistant Attorney General, OLC, *Memorandum Re:
Constitutional Power of Congress to Compel Spending of Impounded Funds*
(Jan. 7, 1972)..................................................................................... 21

*The Federalist No. 30* (Clinton Rossiter ed., 1961)...................................... 2, 9

*The Federalist No. 31* (Clinton Rossiter ed., 1961)...................................... 9

*The Federalist No. 47* (Clinton Rossiter ed., 1961)...................................... 11

*The Federalist No. 58* (Clinton Rossiter ed., 1961)...................................... 9

*The Federalist No. 78* (Clinton Rossiter ed., 1961)...................................... 9

Paul F. Figley & Jay Tidmarsh, *The Appropriations Power and Sovereign Immunity*,
107 Mich. L. Rev. 1207 (2009) ............................................................... 7

Louis Fisher, Cong. Rsch. Serv., Court Cases on Impoundment of Funds: A Public
Policy Analysis (1974)........................................................................... 20

Alexander Hamilton, *Report on the Subject of Manufactures* (1791) ...................... 9

An Impartial Citizen, Petersburg Va. Gazette (Jan. 10, 1788), *reprinted in*
8 *The Documentary History of the Ratification of the Constitution by the
States: Virginia* (John P. Kaminski et al. eds., 1988)......................................... 10

David Lindsay Keir, *The Constitutional History of Modern Britain Since 1485*
(9th ed. 1966)....................................................................................... 6

Letter to Joseph Jones (May 31, 1780), *in The Writings of George Washington from
the Original Manuscript Sources 1745-1799*
(John C. Fitzpatrick ed., 1931) ................................................................. 8

F.W. Maitland, *The Constitutional History of England* (1908)............................... 6, 7

Julian Davis Mortenson & Nicholas Bagley, *Delegation at the Founding*,
121 Colum. L. Rev. 277 (2021).............................................................. 15

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*The President's Veto Power*,
12 Op. O.L.C. 128 (1988) .................................................................................... 21

*The Records of the Federal Convention of 1787* (Max Farrand ed., 1911) ............... 2, 8, 9, 11

William H. Rehnquist, Assistant Attorney General, OLC, *Memorandum Re:
Presidential Authority to Impound Funds Appropriated for Assistance to
Federally Impacted Schools* (Dec. 1, 1969) ........................................................ 5, 20

Robert J. Reinstein, *The Limits of Executive Power*,
59 Am. U. L. Rev. 259 (2009) ............................................................................. 6, 7

John G. Roberts, Jr., *Memorandum for Fred F. Fielding Re: Impoundment
Authority* (Aug. 15, 1985) .................................................................................. 5, 21

Richard D. Rosen, *Funding "Non-Traditional" Military Operations: The Alluring
Myth of a Presidential Power of the Purse*,
155 Mil. L. Rev. 1 (1998) .................................................................................... 2

Neil M. Soltman, *The Limits of Executive Power: Impoundment of Funds*,
23 Cath. U. L. Rev. 359 (1973) ........................................................................... 14

Joseph Story, *Commentaries on the Constitution of the United States* (1833) .......... 11

Ralph W. Tarr, Acting Assistant Attorney General, OLC, *Memorandum Re:
Legal Authority to Take Action to Forestall a Default* (Oct. 21, 1985) ............... 21

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and preserve the rights, freedoms, and structural safeguards that it guarantees. CAC accordingly has an interest in this case and the questions it raises about our Constitution's separation of powers.

## INTRODUCTION AND SUMMARY OF ARGUMENT

There is perhaps no tenet more central to our tripartite form of government than the separation of the powers of the sword and the purse. Defendants' unliteral effort to cut off all funding to countless foreign aid programs makes a mockery of this principle, flying in the face of our Constitution's Spending and Appropriations Clauses, which give Congress—not the President—control over the public fisc. This Court should not sanction this unlawful power grab. To do so would "vest[] in the President a dispensing power, which has no countenance for its support in any part of the constitution," and "assert[] a principle, which if carried out in its results to all cases falling within it, would be clothing the President with a power to control the legislation of congress, and paralyze the administration of justice." *Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 525 (1838).

While the choice to vest Congress and not the President with control over appropriations and spending was "uncontroversial" by the time of the Founding, *CFPB v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 431 (2024), that consensus marked the culmination of centuries of struggle

---

[1] No person or entity other than *amicus* and its counsel assisted in or made a monetary contribution to the preparation or submission of this brief. All parties consent to the filing of this brief.

in England for parliamentary supremacy. Historically, British kings had used their royal prerogatives both to legislate and to tax and spend without the approval of Parliament. The result was a blurring of the lines between the monarch's pocket money and the national treasury, leading kings to spend public funds however they pleased, including to finance petty military advances unsanctioned by the people. Only after the Glorious Revolution, when "[t]he whole basis for the monarchy had transformed," Richard D. Rosen, *Funding "Non-Traditional" Military Operations: The Alluring Myth of a Presidential Power of the Purse*, 155 Mil. L. Rev. 1, 42 (1998), were royal attempts to seize the purse strings finally squelched once and for all.

In "defining the . . . powers" of the new nation, the American Founders firmly rejected the historic "Prerogatives of the British Monarch." 1 *The Records of the Federal Convention of 1787*, at 65 (Max Farrand ed., 1911) ["*Farrand's Records*"] (James Wilson). Almost every post-Revolution state constitution vested the spending and appropriations authorities in a multimember legislative body. Even the Articles of Confederation, despite leaving the federal government without the critical power to raise revenue through taxation, granted the appropriations power to the Confederation Congress.

Against that backdrop, when the Framers gathered in Philadelphia to draft the new Constitution, there was no question that Congress would be granted the powers to tax, spend, and appropriate funds. The authority "to pay the Debts and provide for the common Defence and general Welfare of the United States," U.S. Const. art. I, § 8, cl. 1, was deemed "indispensable" to the ability of the federal government to do its job, *The Federalist No. 30*, at 188 (Clinton Rossiter ed., 1961) (Alexander Hamilton). At the same time, the choice to vest this sweeping power in Congress—the people's representatives—was designed to check executive power by giving the legislature complete control over payments from the Treasury. That is why, as Edmund Randolph

explained at the Virginia ratifying convention, the new office of the president need not be feared: "He can handle no part of the public money except what is given him by law." 3 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 201 (Jonathan Elliot ed., 1836) ["*Elliot's Debates*"].

While the Spending Clause affirmatively empowers Congress, the text of the Appropriations Clause evinces a clear limitation on executive authority. Phrased in the negative, it declares that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. Because appropriations must be made "by Law," *id.*, and the President's role in lawmaking is highly circumscribed, he has no authority to designate or spend funds without Congress's approval. In the Supreme Court's words, "the President's power to see that the laws are faithfully executed" is a direct "refut[ation] [of] the idea that he is to be a lawmaker," *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952), particularly in a realm like appropriations or spending where he enjoys none of "his own constitutional powers," *id.* at 637 (Jackson, J., concurring).

Consistent with this rule, Congress has jealously guarded its control over the purse strings since the Founding. For instance, the Tenth Congress passed the precursor to what is now called the Purpose Statute, providing that "[a]ppropriations shall be applied only to the objects for which [they] were made." 31 U.S.C. § 1301(a). Congress subsequently passed the Anti-Deficiency Act, making executive officials subject to criminal punishment for authorizing an expenditure that exceeds an appropriation. *Id.* § 1341(a)(1)(A). And with the Impoundment Control Act of 1974 (ICA), Congress prohibited the President from proposing to defer or rescind funds without sending a "special message" to Congress justifying the decision. 2 U.S.C. §§ 683-84. Deferrals may not be made for policy reasons, *id.* § 684(b), and rescissions are subject to congressional approval, *id.*

3

§ 683. These laws reaffirm that the President has no power to unilaterally withhold funding appropriated by Congress based on mere policy disagreement.

To be sure, as noted above, the President may *ask* Congress to rescind funding on that basis. *Id.* And Congress itself may delegate discretion to the President and his agencies with respect to the implementation of federal spending programs. *See, e.g.*, Act of Apr. 30, 1790, ch. 10, § 11, 1 Stat. 119, 121 (delegating to the President the authority to issue regulations governing army benefits program). But critically, in any of these scenarios, Congress retains the final word, guarding against the dangers posed by transfer of the purse strings to the branch that wields the sword.

In recognition of these "structural protections against abuse of power [that] were critical to preserving liberty," *Seila Law LLC v. CFPB*, 591 U.S. 197, 223 (2020), courts across the nation, including the Supreme Court, as well as high ranking executive branch attorneys, have consistently recognized that the President enjoys no constitutional power to freeze, pause, rescind, or impound funds duly appropriated by Congress. The Supreme Court first made this clear in 1838, unanimously rejecting the authority of a newly appointed Postmaster General to withhold funding appropriated by Congress for a contract that he claimed was tainted by political favoritism. *Kendall*, 37 U.S. at 525.

The issue came to a head again during the 1970s when "President Nixon, the Mahatma Gandhi of all impounders, asserted . . . that his constitutional right to impound appropriated funds was absolutely clear." *Clinton v. City of New York*, 524 U.S. 417, 468 (1998) (Scalia, J., concurring in part and dissenting in part) (quotation marks omitted). A slew of decisions "proved him wrong," *id.*—sometimes explicitly, *e.g.*, *Louisiana ex rel. Guste v. Brinegar*, 388 F. Supp. 1319, 1324-25 (D.D.C. 1975) ("the President's express or implied constitutional powers [do not] justify

4

holding back authorized funds"), and other times implicitly, by scrutinizing the relevant statutory language to ascertain whether it granted discretion to spend less than the full amount of funds appropriated, *e.g.*, *State Highway Comm'n of Mo. v. Volpe*, 479 F.2d 1099, 1114 (8th Cir. 1973). One of these cases made it all the way to the Supreme Court, which unanimously rejected Nixon's claim that the language of the governing statute gave him discretion to withhold environmental protection funds. *See Train v. City of New York*, 420 U.S. 35, 42-47 (1975).

High-ranking executive attorneys joined the chorus. Nixon's own head of the Office of Legal Counsel (OLC) in the Department of Justice, future-Chief Justice William Rehnquist, made clear his view that "the President does not have a constitutional right to impound . . . funds not-withstanding a congressional direction that they be spent." OLC, *Memorandum Re: Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools* 6 (Dec. 1, 1969) ["Rehnquist Memo"]. And over a decade later, future-Chief Justice John Roberts, in his role as legal advisor to President Reagan, echoed Rehnquist's views: "I think it clear that [the President] has [no impoundment authority] in normal situations, and we should discourage [the use of] impoundment as a viable budget planning option." John G. Roberts, Jr., *Memorandum for Fred F. Fielding Re: Impoundment Authority* at 1 (Aug. 15, 1985) ["Roberts Memo"].

This unbroken line of authority refutes Defendants' claim of authority to withhold federal funding via unilateral executive action. Defendants' efforts may be brazen, but they are not novel—they have been repeatedly rejected as contrary to foundational constitutional principles for over a century.

## ARGUMENT

I.   **To Guard Against the Risk of a Tyrannical President, the Framers Vested Control of Appropriations and Spending in Congress, Ensuring the Structural Separation of the Sword and the Purse.**

**A.**   When the Framers wrote the Constitution more than two centuries ago, they took pains to deny the President the kind of sweeping powers the King of England had enjoyed.  In the sixteenth and seventeenth centuries, British Kings had used their royal prerogatives both to legislate, and to tax and spend, without the approval of Parliament.  *See, e.g.*, Robert J. Reinstein, *The Limits of Executive Power*, 59 Am. U. L. Rev. 259, 272-77 (2009).  Historically, the British monarch was entitled to various sources of "ordinary" revenue, such as rents from crown lands and fines imposed in royal courts.  1 William Blackstone, *Commentaries on the Laws of England* 286, 289 (1791 ed.).  Parliament had no say in how "the king's revenue" was spent, and there was no firm distinction "between the national revenue and the king's private pocket money."  F.W. Maitland, *The Constitutional History of England* 309, 433 (1908).  "[U]nconstrained by the need to consult the representatives of the people," Gerhard Casper, *Appropriations of Power*, 13 U. Ark. Little Rock L.J. 1, 4 (1990) (quotation marks omitted), English kings generally spent their money on whatever they pleased.

For many kings, that meant war with other European nations.  But because the crown's "ordinary" revenue often fell short when funding these endeavors, *see* Josh Chafetz, *Congress's Constitution: Legislative Authority and the Separation of Powers* 46 (2017), there developed a second stream of "*extraordinary* revenue," financed by taxes specially levied for the king's use, 1 Blackstone, *supra*, at 306-07.  These grants of "extraordinary" tax revenue required Parliamentary authorization, David Lindsay Keir, *The Constitutional History of Modern Britain Since 1485*, at 38 (9th ed. 1966), and, increasingly, Parliament also "claimed the power to appropriate the supplies granted to the king," "to say that they shall be spent in this or that manner," Maitland, *supra*,

at 183-84. Parliament asserted that authority only sporadically until its struggle with the Stuart kings led to a reconfiguration of the British constitution around the principle of parliamentary supremacy.

After centuries of struggle, Parliament finally succeeded in curtailing the king's abuses of power attendant to his sweeping authority over the purse. Following the Glorious Revolution, "in granting money to the crown," Parliament always "appropriated the supply to particular purposes more or less narrowly defined." *Id.* at 433. At the same time, the Bill of Rights of 1689 prohibited the various devices the King had used to raise money on his own, providing that "levying money for or to the use of the Crown by pretence of prerogative, without grant of Parliament, for longer time, or in other manner than the same is or shall be granted, is illegal." An Act Declaring the Rights and Liberties of the Subject and Settling the Succession of the Crown (Bill of Rights), 1689, 1 W. & M., c.2, § 4 (Eng.). Finally, in 1782, Parliament further eliminated the King's prerogative to determine how the "civil list"—the domestic budget—would be spent. Paul F. Figley & Jay Tidmarsh, *The Appropriations Power and Sovereign Immunity*, 107 Mich. L. Rev. 1207, 1229 (2009).

**B.** In drafting the Constitution, "the prerogatives that had been discredited in England were naturally rejected by the Framers." Reinstein, *supra*, at 307. After the American Revolution, the vast majority of state governments required legislative authorization for the withdrawal of any funds from a state treasury. *See, e.g.*, Del. Const. of 1776, art. VII (requiring funds be "appropriated by the general assembly"); Mass. Const. of 1780, ch. 2, § 1, art. XI ("No moneys shall be issued out of the treasury of this Commonwealth, and disposed of . . . but by warrant under the hand of the Governour for the time being, with the advice and consent of the Council, for the necessary defence and support of the Commonwealth; and for the protection and preservation of

the inhabitants thereof, agreeably to the acts and resolves of the General Court."). The Articles of Confederation similarly granted the Confederation Congress exclusive authority to "ascertain the necessary sums of Money to be raised for the service of the united states, and to appropriate and apply the same for defraying the public expenses," although they failed to give the central government the critical power to levy taxes, instead relying on the states for raising revenue. Articles of Confederation of 1781, art. IX, para. 6.

Still, "[b]y the time of the Constitutional Convention, the principle of legislative supremacy over fiscal matters engendered little debate and created no disagreement." *CFPB*, 601 U.S. at 431. It was "uncontroversial" that the authority to raise and disburse public funds should "reside in the Legislative Branch" rather than with the chief executive. *Id.*; *see* 2 *Farrand's Records* 131, 274 (debate limited to whether authority over the purse strings should be further confined to the direct representatives of the people in the House of Representatives). The Framers thus gave Congress, not the President, the lawmaking power, including "exclusive power over the federal purse." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (Kavanaugh, J.) (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992)).

In the Taxing and Spending Clause, the Framers granted Congress the affirmative power to raise revenue and to spend funds. The Clause is the first and one of the most sweeping powers the Constitution confers upon the legislature, providing the power "[t]o lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. It reacted to the failure of the Articles of Confederation to grant the federal government authority to tax and spend for the defense and general interests of the union, creating such an ineffectual central government that, according to George Washington, it nearly cost Americans victory in the Revolutionary War. *See* Letter to

Joseph Jones (May 31, 1780), *in* 18 *The Writings of George Washington from the Original Manuscript Sources 1745-1799*, at 453 (John C. Fitzpatrick ed., 1931).

Indeed, it was the need "to provide adequate fiscal powers for the national government" that motivated the Framers to write a new Constitution. Bruce Ackerman, *Taxation and the Constitution*, 99 Colum. L. Rev. 1, 6 (1999). Alexander Hamilton called the power to raise and spend funds "an indispensable ingredient in every constitution," *The Federalist No. 30*, *supra*, at 188, deeming "revenue" "the essential engine by which the means of answering the national exigencies must be procured," *The Federalist No. 31*, *supra*, at 195. James Madison similarly explained that "[t]his power over the purse may, in fact, be regarded as the most complete and effectual weapon . . . for obtaining a redress of every grievance, and for carrying into effect every just and salutary measure." *The Federalist No. 58*, *supra*, at 359.

The Framers thus adopted Governor Randolph's recommendation that the federal government should have the power to "provide for the common defence and general welfare of the United States" in the Taxing and Spending Clause, 2 *Farrand's Records* 493, 497, choosing a phrase that was as "comprehensive as any that could have been used," Alexander Hamilton, *Report on the Subject of Manufactures* 54 (1791); *see also United States v. Butler*, 297 U.S. 1, 66 (1936) (adopting Hamilton's view that "the power of Congress to authorize expenditure of public moneys for public purposes is not limited by the direct grants of legislative power found in the Constitution"). There was no question that such sweeping power should be granted to the "immediate representatives of the people" in Congress, *The Federalist No. 58*, *supra*, at 359 (James Madison)—the branch that "not only commands the purse but prescribes the rules by which the duties and rights of every citizen are to be regulated," *The Federalist No. 78*, *supra*, at 465 (Alexander Hamilton).

While the Framers crafted the Taxing and Spending Clause as a sweeping grant of authority to Congress, they framed the Appropriations Clause as a *limitation* on the executive: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. The Clause's simple, uncontroversial command was repeatedly invoked during the ratification debates to assuage "Anti-Federalist fears of a tyrannical president." Chafetz, *supra*, at 57. Alexander Hamilton explained that "where the purse is lodged in one branch, and the sword in another, there can be no danger." 2 *Elliot's Debates* 349. George Nicholas similarly emphasized that "[a]ny branch of government that depends on the will of another for supplies of money, must be in a state of subordinate dependence, let it have what other powers it may." 3 *id.* at 17; *see, e.g.*, 3 *id.* at 201 (James Madison) (responding to allegations that the President would be king by explaining that "[t]he purse is in the hands of the representatives of the people"); 4 *id.* at 330 (Charles Pinckney) ("With this powerful influence of the purse, [Congress] will be always able to restrain the usurpations of the other departments.").

Popular writings and treatises similarly conveyed that because the President could not "appropriate the public money to any use, but what is expressly provided by law," the President's powers would leave "dignity enough for the execution" of the office "without the possibility of making a bad use of it." An Impartial Citizen, Petersburg Va. Gazette (Jan. 10, 1788), *reprinted in* 8 *The Documentary History of the Ratification of the Constitution by the States: Virginia* 295 (John P. Kaminski et al. eds., 1988); *see, e.g.*, Brutus, Va. J. (Dec. 6, 1787), *reprinted in* 8 *The Documentary History of the Ratification of the Constitution by the States: Virginia* 215 (John P. Kaminski et al. eds., 1988) (Appropriations Clause mandates that "any evils which may arise from an improper application of the public money must either originate with, or have the assent of the immediate Representatives of the people"). As Joseph Story put it, the Appropriations Clause

10

prevents the executive from "apply[ing] all [the United States'] monied resources at his pleasure." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1342, at 213-14 (1833).

These historical sources align with the text and syntactical structure of the Appropriations Clause. Because "the clause is phrased as a limitation, it means that 'the expenditure of public funds is proper only when authorized by Congress, not that public funds may be expended unless prohibited by Congress.'" *U.S. House of Representatives v. Mnuchin*, 976 F.3d 1, 8 (D.C. Cir. 2020) (quoting *United States v. MacCollom*, 426 U.S. 317, 321 (1976) (plurality opinion)). In other words, "[h]owever much money may be in the Treasury at any one time, not a dollar of it can be used in the payment of any thing not thus previously sanctioned." *Reeside v. Walker*, 52 U.S. 272, 291 (1850).

The Appropriations Clause thus makes clear that "[a]ny exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *OPM v. Richmond*, 496 U.S. 414, 425 (1990). This rule recognizes that "[t]here can be no liberty where the legislative and executive powers are united in the same person[] or body." *The Federalist No. 47*, *supra*, at 302 (James Madison) (quoting Montesquieu); *see* 3 *Farrand's Records* 149 (James McHenry) ("[T]here can be no regulation more consistent with the Spirit of Economy and free Government [than] that it shall only be drawn forth under appropriation by Law.").

The President's role in appropriating and spending funds is accordingly circumscribed. Because appropriations must be "made by Law," U.S. Const. art. I, § 9, cl. 7, the Clause demands that spending be authorized by the "single, finely wrought and exhaustively considered, procedure" for enacting legislation set forth in the Constitution. *Clinton*, 524 U.S. at 439-40 (quoting *INS v. Chadha*, 462 U.S. 919, 951 (1983)). Under that procedure, "except for recommendation

11

and veto, [the President] has no legislative power," *Youngstown*, 343 U.S. at 655 (Jackson, J.,

concurring), for the Constitution simply "does not confer upon him any power to enact laws or to

suspend or repeal such as the Congress enacts," *United States v. Midwest Oil Co.*, 236 U.S. 459,

505 (1915); *see, e.g.*, *Clinton*, 524 U.S. at 447 (President lacks "unilateral power to change the text

of duly enacted statutes").

This means that the executive branch cannot make an end-run around the "step-by-step,

deliberate and deliberative process" the Framers prescribed for legislating, including in the realm

of spending and appropriations. *Chadha*, 462 U.S. at 959. To license such executive lawmaking

"would deal a severe blow to the Constitution's separation of powers," *Util. Air Regul. Grp. v.

EPA*, 573 U.S. 302, 327 (2014), undermining the careful "choices [that] were consciously made

by men who had lived under a form of government that permitted arbitrary governmental acts to

go unchecked," *Chadha*, 462 U.S. at 959.

## II.    For Over Two Hundred Years, Congress Has Jealously Guarded Its Control Over the Purse Strings Through Federal Legislation Governing Spending and Impoundments.

Since the earliest days of the Republic, Congress has exercised its "plenary power" to give

meaning to the Appropriations Clause through federal laws. *Harrington v. Bush*, 553 F.2d 190,

194-95 (D.C. Cir. 1977). These laws reinforce Congress's control over the purse by imposing

heightened restrictions on executive efforts to spend or withhold funds without congressional ap-

proval.

The story begins in the Tenth Congress with the predecessor of what is known today as the

Purpose Statute. *See* 31 U.S.C. § 1301(a) (current version). By passing that law, Congress com-

manded that "the sums appropriated by law for each branch of expenditure in the several depart-

ments shall be solely applied to the objects for which they are respectively appropriated, and to no

other." Act of Mar. 3, 1809, ch. 28, 2 Stat. 535, 535. As originally enacted, the law included a

12

narrow exception for instances when Congress was on recess and the secretary of a department petitioned the President for funds "necessary for the public service," *id.*, but even this limited exception was later repealed by Congress, *see* Act of Feb. 12, 1868, ch. 8, 15 Stat. 35, 36. The foundational principle that appropriations must be carried out as authorized by Congress has been a "core tenet of appropriations law" ever since. *U.S. Dep't of Navy*, 665 F.3d at 1348 (Kavanaugh, J.).

In 1905 and 1906, Congress passed the first versions of the Anti-Deficiency Act, which further restricted executive branch deviation from congressional appropriations. *See* Act of Mar. 3, 1905, ch. 1484, § 4, 33 Stat. 1257; Act of Feb. 27, 1906, ch. 510, § 3, 34 Stat. 48. These provisions were rooted in legislation from 1870, which made it unlawful "for any department of the government to expend . . . any sum in excess of appropriations made by Congress for that fiscal year." Act of July 12, 1870, ch. 251, §7, 16 Stat. 251. As enacted in 1906, the Anti-Deficiency Act made clear that "[n]o Executive Department or any other Government establishment" could spend, contract, accept volunteers, or employ privately hired workers outside of what was "authorized by law," and all appropriations "shall be adhered to and shall not be waived or modified except upon the happening of some extraordinary emergency or unusual circumstance which could not be anticipated." 34 Stat. at 49. In such an emergency, the Executive had to write to Congress to provide its reasoning. *Id.* Violators would be stripped of their office and punished by "imprisonment for not less than one month" or "a fine of not less than one hundred dollars." *Id.*

In 1950, Congress amended the Anti-Deficiency Act to reiterate its core provisions while clarifying that "reserves may be established to provide for contingencies, or to effect savings whenever savings are made possible by or through changes in requirements, greater efficiency of operations, or other developments subsequent to the date on which such appropriation was made

available." General Appropriations Act of 1951, ch. 896, § 1211(a)-(c)(2), Pub. L. No. 81-759, 64

Stat. 595, 765-66 (1950) (current version at 31 U.S.C. §§ 1341, 1342, 1350). Although the full

text and structure of the 1950 amendment made clear that it modernized and reaffirmed the central

requirements of existing law, President Richard Nixon abused the Act's new provision permitting

reserves for "other developments," using this language as a blank check to unlawfully cut billions

of dollars from federal programs with no meaningful justification. *See* Neil M. Soltman, *The Lim-

its of Executive Power: Impoundment of Funds*, 23 Cath. U. L. Rev. 359, 369 (1973).

Nixon's impoundments resulted in a national outcry, leading to the passage of the ICA as

a reassertion of Congress's power against a President who sought to seize control of the appropri-

ations process. Pub. L. No. 93-344, tit. X, 88 Stat. 297, 332 (1974). To avoid presidential subver-

sion of congressional policy, the ICA required the President to follow specific procedures to seek

Congress's approval for any proposed delay or cancellation of appropriated funds. *See* S. Rep.

No. 93-688, at 75 (1974) ("the objective [of the ICA] is to assure that the practice of reserving

funds does not become a vehicle for furthering Administration policies and priorities at the expense

of those decided by Congress"). In 1987, Congress amended the ICA to allow the President to

make deferrals "to provide for contingencies," "to achieve savings made possible through changes

in requirements or greater efficiency of operations," or as required by statute, while also making

explicit the rule that deferrals may not be made for policy reasons. Pub. L. No. 100-119, tit. II,

§ 206, 101 Stat. 754, 785-86 (1987); *see* 2 U.S.C. § 684 (current ICA).

Finally, in the wake of President Trump's unlawful spending deferrals during his first term,

Congress passed new laws to further secure its power of the purse. Legislation enacted in early

2022 requires prompt public reporting of apportionment decisions and requires all executive agen-

cies to report unlawful delays or conditions on appropriations. Financial Services and General

Government Appropriations Act, Pub. L. No. 117-103, §§ 204(a)-(d), 748, 136 Stat. 239, 256-57, 306 (2022). Later that same year, Congress made these accountability measures permanent and added new protections against unlawful impoundments, such as new reporting requirements for violations of the ICA. Financial Services and General Government Appropriations Act, Pub. L. No. 117-328, §§ 204, 748-49, 136 Stat. 4650, 4667, 4718 (2022); *see* H. Rep. No. 117-393, at 12 (2022) ("Appropriations are laws like any other and can be rescinded only through the bicameralism and presentment procedures that the Constitution prescribes."). These recent laws, like those that came before them, reaffirm Congress's plenary power of the purse, pushing back against unauthorized executive attempts to usurp that power.

## III. The President and His Subordinates Have No Authority to Defy the Will of Congress by Refusing to Execute Duly Enacted Laws Requiring the Disbursement of Federal Funding.

Because the Framers gave the appropriation and spending powers to Congress, and because they strictly limited the President's lawmaking powers, the executive branch has no power to unilaterally cancel or pause programs for which Congress has set aside funding based on presidential disapproval of the policies underlying those programs. To be clear, the President may *propose* the rescission of funds to Congress and seek its approval pursuant to the ICA's procedures. And *Congress itself* may choose to delegate to the President and executive branch agencies discretion regarding how to implement the programs for which it appropriates money—indeed it has done so since the Founding. *See generally* Julian Davis Mortenson & Nicholas Bagley, *Delegation at the Founding*, 121 Colum. L. Rev. 277 (2021) (cataloging Founding-era delegations, including of the power to set funding conditions and to make payments to offset the national debt). But that discretion is always limited by statute, and typically restricted to the terms of implementation, not *whether* to implement at all.

15

Thus, "[t]he President's authority to act, as with the exercise of any governmental power, 'must stem either from an act of Congress or from the Constitution itself.'" *Medellín v. Texas*, 552 U.S. 491, 524 (2008) (quoting *Youngstown*, 343 U.S. at 585). That authority is at its "lowest ebb" when the President acts contrary to the will of Congress, particularly in a realm like appropriations and spending where he enjoys none of "his own constitutional powers." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). Simply put, the President and federal agencies "may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress." *In re Aiken County*, 725 F.3d 255, 260 (D.C. Cir. 2013) (Kavanaugh, J.).

In recognition of these core separation of powers principles, courts across the nation, including the Supreme Court, as well as high ranking executive branch attorneys, have consistently recognized that the President enjoys no constitutional power to freeze, pause, rescind, or impound funds duly appropriated by Congress.

**A.** In *Kendall v. United States ex rel. Stokes*, 37 U.S. 524 (1838), the Court unanimously rejected newly appointed Postmaster General Amos Kendall's claim that he could withhold money that Congress had, by statute, required him to spend. The Justices balked at the Attorney General's assertion that Kendall possessed some inherent constitutional authority to rescind appropriated funds, remarking that "[t]o contend that the obligations imposed on the President to see the laws faithfully executed, implies a power to forbid their execution; is a novel construction of the constitution, and is entirely inadmissible." *Id.* at 525. Sanctioning such a theory would be, according to the Court, "vesting in the President a dispensing power, which has no countenance for its support in any part of the constitution." *Id.* The Court refused to "assert[] a principle, which if carried out in its results to all cases falling within it, would be clothing the President with a power to control the legislation of congress." *Id.*

16

Critically, it was irrelevant to the Court that Kendall claimed the rescission was necessary because his predecessor had negotiated a contract tainted by political favoritism. As the Court put it: "The act required by the law to be done by the postmaster general is, simply to credit S. & S. with the full amount of the award of the solicitor of the treasury. This is a precise, definite act, purely ministerial; and about which the postmaster general has no discretion whatever." *Id.* In other words, the Executive's policy justifications for withholding funds—however sound they might be—were irrelevant because the Executive lacked discretion to withhold the funds in the first place.

In *Train v. City of New York*, 420 U.S. 35 (1975), the Supreme Court again unanimously rejected the principle that the President holds an inherent constitutional power to withhold funds in defiance of Congress. President Nixon, through his Environmental Protection Agency Secretary Russell Train, claimed authority to withhold funding allocated by Congress to subsidize municipal sewer and water treatment projects under the Federal Water Pollution Control Act Amendments of 1972. *Id.* at 37-41. The Court held that Nixon had no such authority because the relevant statute did not delegate any discretion to rescind environmental protection funds under the given circumstances. *Id.* at 42-49. Implicit in that conclusion was the premise that any presidential discretion to withhold appropriated funds must be granted by Congress as a matter of legislative grace. As Justice Scalia later succinctly summarized it, "our decision . . . in *Train v. City of New York*, 420 U.S. 35 (1975), proved [President Nixon] wrong" in his claim to a "constitutional right to impound appropriated funds." *Clinton*, 524 U.S. at 468 (Scalia, J., concurring in part and dissenting in part) (quotation marks omitted).

Courts of appeals across the country, including the D.C. Circuit, have similarly held that the President's discretion to spend less than the total amount of appropriated funds is limited by

Congress's direction as expressed in the text of the relevant statute. In *National Treasury Employ-ees Union v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974), the D.C. Circuit held that mandatory statutory language required the President to put into effect a pay raise for members of the plaintiff union. *Id.* at 601; *see id.* at 604 ("[N]othing in the Constitution commits to the President the ultimate authority to construe federal statutes," and the President's duty to "take Care the Laws be faithfully executed" "does not permit the President to refrain from executing laws duly enacted by the Con-gress as those laws are construed by the judiciary."). In *State Highway Commission of Missouri v. Volpe*, 479 F.2d 1099 (8th Cir. 1973), the Eighth Circuit held that the Secretary of Transportation could not impound funds for state highway programs for reasons beyond those Congress had sup-plied. *Id.* at 1114; *see also id.* ("[W]hen the impoundment of funds impedes the orderly progress of the federal highway program, this hardly can be said to be favorable to such a program. In fact, it is in derogation of it."). Other appellate courts have reached similar conclusions compelling the executive branch to disburse funds in accordance with statutory commands, *e.g.*, *Sioux Valley Em-pire Elec. Ass'n v. Butz*, 504 F.2d 168, 178 (8th Cir. 1974), or upholding preliminary injunctions to that effect, *e.g.*, *Maine v. Fri*, 486 F.2d 713, 716 (1st Cir. 1973).

District courts across the country, including this Court, have also squarely rejected the no-tion that the President possesses some inherent constitutional power to impound funds. When President Nixon's health department attempted to withhold appropriated funds for staffing of var-ious community mental health centers, this Court held that the President did not have the authority to decline to pay funds "made mandatory by conscious, deliberate congressional action." *Nat'l Council of Cmty. Mental Health Ctrs., Inc. v. Weinberger*, 361 F. Supp. 897, 901 (D.D.C. 1973). In other words, there was "no basis for defendants' assertion of inherent constitutional power in

the Executive to decline to spend in the face of a clear statutory intent and directive to do so." *Id.* (citing, *inter alia*, *Kendall* and *Youngstown*).

In *Guadamuz v. Ash*, 368 F. Supp. 1233 (D.D.C. 1973), this Court held again (this time in the context of the Rural Environmental Assistance Program) that where "[m]oney has been appropriated by the Congress to achieve the purposes of [a] program[,] . . . the Executive has no residual constitutional power to refuse to spend these appropriations." *Id.* at 1244. The executive branch's policy justifications for the impoundment—to combat inflation, unemployment, and other economic problems—were irrelevant in this Court's view, just as they had been in *Kendall*: "nowhere does our Constitution extol the virtue of efficiency and nowhere does it command that all our laws be fiscally wise. It does most clearly, however, state that laws, good or bad, be enacted by the Congress and enforced by the President." *Id.* at 1243.

These cases are not outliers. Rather, they are part of a long and unbroken line of district court decisions, largely reached during the Nixon years when the issue of impoundment came to a head, which soundly rejected President Nixon's claim that he had constitutional authority to withhold appropriated funds. *See, e.g.*, *Brinegar*, 388 F. Supp. at 1324-25 (rejecting the "argument . . . that the President's express or implied constitutional powers justify holding back authorized funds"); *Pennsylvania v. Weinberger*, 367 F. Supp. 1378, 1381 (D.D.C. 1973) (no executive authority to withhold funds where statutory language of appropriation was "mandatory in nature"); *Loc. 2677, Am. Fed'n of Gov't Emps. v. Phillips*, 358 F. Supp. 60, 77-78 (D.D.C. 1973) ("An administrator's responsibility to carry out the Congressional objectives of a program does not give him the power to discontinue that program, especially in the face of a Congressional mandate that it shall go on."); *Campaign Clean Water, Inc. v. Ruckelshaus*, 361 F. Supp. 689, 696 (E.D. Va. 1973) ("More than a century ago the United States Supreme Court laid to rest any contention that

the President has the power [of impoundment] suggested."); *Cmty. Action Programs Exec. Dirs. Ass'n of N.J. v. Ash*, 365 F. Supp. 1355, 1360 (D.N.J. 1973) ("The Executive Branch has no authority, even for motives such as the control of inflation, to decide for itself whether to obey a law after the President has signed a bill into law, or after Congress has overridden a Presidential veto."); *see also* Louis Fisher, Cong. Rsch. Serv., Court Cases on Impoundment of Funds: A Public Policy Analysis (1974) (cataloguing cases rejecting attempts at impoundment during the Nixon years). Many of these decisions were never even appealed; rather, perhaps in recognition of the weakness of its legal arguments, the Nixon administration paid out the mandated funds in accordance with district court orders effectuating the will of Congress. *See* Fisher, *supra*, at 80-90.

   **B.**   High-ranking and respected executive branch attorneys, including some who went on to become Supreme Court justices, have also consistently rejected theories of an inherent presidential authority to withhold funds appropriated by Congress.  Future Chief Justice William Rehnquist, writing in 1969 as the head of the Justice Department's OLC, explained that "[w]ith respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent."  Rehnquist Memo 7.  Rehnquist then doubled down, declaring it "*extremely difficult* to formulate a constitutional theory to justify a refusal by the President to comply with a congressional directive to spend."  *Id.* (emphasis added).  Though "[i]t may be argued that the spending of money is inherently an executive function, . . . the execution of any law is, by definition, an executive function, and it seems an anomalous proposition that because the Executive branch is bound to execute the laws, it is free to decline to execute them."  *Id.*

   Fifteen years later, future-Chief Justice John Roberts reached a similar conclusion for the Reagan administration Office of White House Counsel.  He wrote a memo seeking to "dampen

any hopes that inherent constitutional impoundment authority may be invoked to achieve budget goals," warning that "[o]ur institutional vigilance with respect to the constitutional prerogatives of the presidency requires appropriate deference to the constitutional prerogatives of the other branches, and no area seems more clearly the province of Congress than the power of the purse." Roberts Memo 1.

The Reagan administration OLC later adopted Roberts's position in a formal advisory opinion, declaring that "[t]here is no textual source in the Constitution for any inherent authority to impound" in "the face of an express congressional directive to spend." *The President's Veto Power*, 12 Op. O.L.C. 128, 166-67 (1988). Citing Rehnquist's earlier memorandum, the Office explained that "reliance upon the President's obligation to 'take Care that the Laws be faithfully executed' . . . to give the President the authority to impound funds in order to protect the national fisc, creates the anomalous result that the President would be declining to execute the laws under the claim of faithfully executing them." *Id.* at 167. Several other OLC memoranda reached the same conclusion. *See, e.g.*, Ralph E. Erickson, Acting Assistant Attorney General, OLC, *Memorandum Re: Constitutional Power of Congress to Compel Spending of Impounded Funds* (Jan. 7, 1972); Ralph W. Tarr, Acting Assistant Attorney General, OLC, *Memorandum Re: Legal Authority to Take Action to Forestall a Default* (Oct. 21, 1985).

In sum, there is no shortage of authority rejecting executive encroachment on Congress's power of the purse, whether under the guise of inherent presidential power, policy disagreement, or budget austerity. Under the Constitution, the responsibility of agencies is not to ensure that "appropriations . . . are consistent with President Trump's foreign policy." State Department Memo at 1 (ECF No. 1-10 in 25-cv-400). Rather, the responsibility of agencies is to effectuate *congressional* policy as expressed through mandatory appropriations.

**CONCLUSION**

For the foregoing reasons, this Court should grant Plaintiffs' motions for a preliminary injunction.

Dated:  February 19, 2025                    Respectfully submitted,

                                             */s/ Brianne J. Gorod*
                                             Brianne J. Gorod

                                             Elizabeth B. Wydra (DC Bar No. 483298)
                                             Brianne J. Gorod (DC Bar No. 982075)
                                             Brian R. Frazelle (DC Bar No. 1014116)
                                             Miriam Becker-Cohen (DC Bar No. 1616670)
                                             Nina G. Henry (DC Bar No. 90017399)
                                             CONSTITUTIONAL ACCOUNTABILITY CENTER
                                                 1200 18th Street NW, Suite 501
                                             Washington, D.C. 20036
                                             (202) 296-6889
                                             brianne@theusconstitution.org

                                             *Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Local Rule 7(o)(4) because it does not exceed 25 pages.

I further certify that the attached *amicus* brief complies with the typeface and type style requirements of Local Rule 5.1(d) because it has been prepared in a proportionally spaced typeface using Microsoft Word and 12-point Times New Roman font.

Executed this 19th day of February, 2025.

*/s/ Brianne J. Gorod*
Brianne J. Gorod

*Counsel for Amicus Curiae*
