```
                      UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA


AIDS VACCINE ADVOCACY            .
COALTION, et al.,                .
                                 .
          Plaintiffs,            .
                                 .   CA No. 25-0400 (AHA)
      v.                         .
                                 .
UNITED STATES DEPARTMENT OF      .
STATE, et al.,                   .
                                 .
          Defendants.            .
. . . . . . . . . . . . . . . .  .
                                 .
GLOBAL HEALTH COUNCIL,           .
et al.,                          .
                                 .
          Plaintiffs,            .   CA No. 25-0402 (AHA)
                                 .
      v.                         .
                                 .
DONALD J. TRUMP, et al.,         .   Washington, D.C.
                                 .   Tuesday, February 25, 2025
          Defendants.            .   11:00 a.m.
. . . . . . . . . . . . . . . .  .


                   TRANSCRIPT OF MOTION HEARING
                BEFORE THE HONORABLE AMIR H. ALI
                  UNITED STATES DISTRICT JUDGE

     APPEARANCES:

For Plaintiffs                   LAUREN BATEMAN, ESQ.
Case No. 25-0400:                Public Citizen Litigation Group
                                 1600 20th Street NW
                                 Washington, DC 20009


For Plaintiffs                   STEPHEN K. WIRTH, ESQ.
Case No. 25-0402:                Arnold & Porter Kaye Scholer LLP
                                 601 Massachusetts Ave. NW
                                 Washington, DC 20001


For Defendants:                  INDRANEEL SUR, ESQ.
                                 U.S. Department of Justice
                                 1100 L St. NW
                                 Washington, DC 20530
```

Court Reporter:                    BRYAN A. WAYNE, RPR, CRR
                                   U.S. Courthouse, Room 4704-A
                                   333 Constitution Avenue NW
                                   Washington, DC 20001

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

```
1                    P R O C E E D I N G S

2                   (Via Telephone Conference)

3            THE DEPUTY CLERK:  We're here today for a motion

4       hearing in civil action 25-400, Aids Vaccine Advocacy

5       Coalition, et al., versus the United States Department of

6       State, et al., as well as civil action 25-402, Global Health

7       Council, et al., versus Donald Trump, et al.

8          Beginning with counsel for the plaintiff in case 25-400,

9       please state your name for the record.

10           MS. BATEMAN:  Hi.  My name is Lauren Bateman with

11      Public Citizen Litigation Group.  I represent plaintiffs in

12      case 400.

13           THE DEPUTY CLERK:  And defense?

14           MR. SUR:  Good morning.  This is Indraneel Sur at

15      the United States Department of Justice for the defendants.

16           THE DEPUTY CLERK:  Thank you.  And counsel for

17      plaintiffs in case 402?

18           MR. WIRTH:  Good morning.  This is Stephen Wirth

19      from Arnold & Porter on behalf of all plaintiffs in case 402.

20           THE DEPUTY CLERK:  And counsel for defense.

21           MR. SUR:  In case 402, this is Indraneel Sur for the

22      United States Department of Justice for the defendant.

23           THE DEPUTY CLERK:  Thank you all.

24           THE COURT:  All right.  Thanks, everyone.  Good

25      morning.  We've got two cases here called.  The Court has
```

1   received the new emergency motion to enforce in the Global

2   Health Council case, No. 402.  Called this hearing quickly

3   in the interest of hearing from the parties on it.  And given

4   the overlap in the AIDS vaccine case, which is the 400 case,

5   I'll hear from plaintiffs in that case too.

6       I understand, Mr. Sur, you'll be representing the

7   defendants in both of those cases.

8       Couple of things at the outset.  In terms of protocol

9   today, I'm going to start by hearing from plaintiffs in the

10  Global Health 402 case, given they have the pending motion.

11      Counsel for plaintiffs in 400, the AIDS vaccine case, I do

12  anticipate hearing from you briefly only to the extent that

13  you have a difference with or something to supplement what

14  you've heard from counsel in 402 in the interest of not just

15  having repetitive argument.

16      I'll then hear from counsel for the defendant, Mr. Sur,

17  and if I have questions after that, I'll let you all know.

18      You know, probably clear, but my main interest here is

19  what's happening on the ground as it relates to the pending

20  motion to enforce my temporary restraining order.  This is not

21  an opportunity to relitigate the TRO itself, which remains in

22  effect, has not been stayed, and must be followed by the

23  parties.

24      If I can, I'll resolve the pending motion orally today

25  so that the parties in the case can move forward.  But the

1    parties do remain under the obligation to file the joint

2    status report I've asked for tomorrow.  And if there's more I

3    want included in that, at the end of this hearing I'll let you

4    know that too.

5        All right.  With that, counsel for plaintiffs in the Global

6    Health Council case, 402, you've got the floor.

7        MR. WIRTH:  Good morning, Your Honor.  Stephen Wirth

8    from Arnold & Porter.  To begin, I just want to thank the

9    Court for promptly convening this hearing.  As we said in our

10   motion, we don't make this request lightly, and we deeply

11   appreciate the Court's continued attention to this case.

12       I'd like to start briefly by addressing the harms at

13   issue here.  You have our briefing and the declarations that

14   we filed yesterday.  I think you can tell from those that the

15   harms here are extremely immediate and need to be remedied

16   within hours, days at the most, or else my clients will face

17   truly irreparable harms to their businesses.  They're in the

18   midst of shuttering -- they're about to sign usurious loan

19   documents.  This is truly an emergency, and that is why we

20   filed this motion.

21       But I also wanted to raise to the Court's attention the

22   fact that our named plaintiffs are not the only plaintiffs

23   here who are suffering.  We represent two associations and the

24   members of those associations are suffering very similar harms

25   as our named individual organizational plaintiffs.  I'll just

give one example for the Court's attention.

I was recently given a message from one of the organizations who's a member of SBAIC, and this woman owns a small business.  She's owed almost a million dollars from the government.  And she wrote to me:  "The impact on me is that my business will not only close, but at 60 years old I will have to go and keep working into old age to make up for that $1 million loss which is backed by my personal wealth.  And I will have almost no assets on which to live."

These are real harms to real people, and they go very deep. And so I want to make sure that the Court is aware of them. Not to mention, though, the truly disastrous humanitarian effects that are happening right now all around the world. So unless the Court has specific questions about the harms, I would like to turn to what we understand is happening on the ground with respect to payments.

THE COURT:  This may connect, and you can feel free to tell me you're going to explain it in the context of discussing what's going on on the ground, that's fine, but I do have a question.  Obviously, it does seem like these harms are very much the same type of harms that were briefed and evidence was provided at the TRO consideration phase.  So it's concerning that they've continued.

I just want to clarify, the harms you referred to, whether it be the example you just gave or really hopefully all of

them, are you speaking specifically and exclusively as to nonpayment for work that has already been completed or that had already been completed before the TRO, for instance, or are you speaking of money owed under, you know, agreements projecting them into the future?

MR. WIRTH:  Yes, Your Honor.  Again, Stephen Wirth. We are speaking about money owed for work that was completed prior to the TRO.  There are also harms related to failure to release money that is obligated going forward, and some of my clients were unable to draw down money from funds that have already been obligated.

But we're primarily talking today, the examples that we gave in our declarations, for example, this is all for money that is presently owed for past work and that our clients need access to immediately in order to continue surviving as ongoing concerns.  So we are talking about primarily past work.

THE COURT:  Got it.  All right.  Why don't you go ahead and continue where you were headed, and I'm sure I'll have some clarification questions.

MR. WIRTH:  Absolutely.  So what we understand, and what I know from my clients, is that they are not being paid for all of this work that's already been done.  Since the government has -- since the Court entered the TRO and repeatedly reaffirmed it over the last few days, there have

1    been -- payments have essentially slowed to, from our

2    understanding, complete standstill.  The government said last

3    week in the -- in its status report that some $250 million had

4    been slated to be disbursed last week.  We've seen no evidence

5    of that.  Certainly, to the extent there have been any

6    payments at all, they've been a very, very, very small

7    fraction of that.

8        And it's our understanding that those payments are being

9    stopped by new procedures that these defendants have begun

10   imposing on the approval process at these agencies, at USAID

11   and at the State Department.

12       And our understanding is they're requiring new

13   justifications for invoices that have already been approved,

14   that have already gone through the entire approval process,

15   and that they have added a new level of approval at the very

16   top that requires the sign-off of a single person; and they're

17   at the point now where that person needs to individually approve

18   every single line item, and there are so many line items that

19   it's simply impossible.

20       I'll be very interested to hear what the government

21   represents as to what's happening on the ground, but these

22   representations that I'm making today are based on

23   conversations that I've had with numerous people at all levels

24   within both agencies, and my understanding is that this is a

25   policy choice that has been made at the highest levels, that

1      it is in furtherance of the same policy choices that were made

2      pursuant to the executive order that this Court has already

3      temporarily restrained.  And we believe that the government

4      has taken essentially no action to make prompt payments under

5      the TRO.

6           THE COURT:  Mr. Wirth, can I ask you, you referred to a

7      new level of approval at the top requiring the sign-off of a

8      single person.  Is that at one of the agencies in particular

9      that you're speaking or is that at both?

10          MR. WIRTH:  So my understanding, Your Honor, is that

11     the State Department has essentially subsumed many of the

12     functions of USAID, and several people are functioning in

13     roles at both agencies.

14        I'm sorry to sort of interrupt this colloquy, but I'm

15     getting word from my client that the public line is not --

16          THE DEPUTY CLERK:  Your Honor, this is the courtroom

17     deputy.

18        (Simultaneous speaking.)

19          THE DEPUTY CLERK:  Good morning.  This is the courtroom

20     deputy.  We are aware of the issues with the public line.

21     There is nothing that I can do about it at this moment, but

22     the IT staff is aware and they're about to come up here and

23     try to work on it.  But there is nothing that the Court can do

24     at this moment.  It's up to His Honor if he wants to continue

25     or wait until they can try to fix it.  Thank you.

1          THE COURT:  Okay.  Do you have an ETA on what the

2     timeline would be to fix it?

3          THE DEPUTY CLERK:  Your Honor, I do not.  I'm sorry.

4     I just called them about two minutes ago.

5          THE COURT:  Okay.  Do the parties have a position on

6     whether they'd like to pause for a moment?

7          MR. WIRTH:  Your Honor, we're happy to proceed if the

8     Court is comfortable proceeding, but we're also happy to take

9     a brief recess if you would like.

10          THE COURT:  Mr. Sur?

11          MR. SUR:  Same for us, Your Honor.  At your discretion.

12     Thank you.

13          THE COURT:  Yeah.  Why don't we go ahead, then, if

14     both parties, at least on the instant motion, are comfortable

15     proceeding.  I appreciate you letting me know about the issue,

16     and I appreciate the work the courtroom deputy and the IT

17     staff are doing to get the public line up.

18       So can you continue your answer to my question.  You were

19     saying that the State Department under your understanding has

20     subsumed, but I guess I'm wondering -- it sounds like the

21     answer to my question is yes, that there is a single person as

22     to both the State Department and as to USAID?

23          MR. WIRTH:  I believe that's true.  I'm not a hundred

24     percent certain who that person is or whether it's the same

25     person.  But my understanding is -- and the government

1    obviously has far more visibility into the agency than I do.

2    But my understanding is that Ken Jackson at USAID is in charge

3    of all approvals coming up through the agency.  And I'm not

4    sure if he's also in charge of the approvals out of the State

5    Department, but that would potentially also be Pete Marocco,

6    who submitted the declaration in support of the government's

7    status report last week.

8         THE COURT:  All right.  Mr. Sur, I'll expect you to

9    clarify that, but for the moment, that's helpful.

10        Did you have more you wanted to offer before I get to my

11   questions, Mr. Wirth?

12        MR. WIRTH:  No, Your Honor.  Happy to answer any

13   questions that you have.

14        THE COURT:  Okay.  So I know at the past hearing

15   which took place just a day after the TRO motion itself, you,

16   and I think the government also, wasn't able to provide much

17   specificity on the details of how these payments actually

18   work.  I take it some time has passed, and based on the

19   motions, that you all maybe know a lot more about that.

20        So could you walk me through that?  I mean, your motion

21   refers to invoices, reimbursement requests, access to letter

22   of credit facilities and I think drawdowns of those, and then

23   other payment management systems for grants.  It would just be

24   helpful to hear your understanding of the differences between

25   these things and how they all apply to the pending motion you

1    filed and to the TRO.

2         MR. WIRTH:  Yes, Your Honor.  So the way that these

3    agencies operate is largely through two different -- two

4    different large sort of categories:  Their acquisition funds,

5    their acquisition contracts, which operate sort of like a

6    normal government contract.  These are essentially, you know,

7    payments for specific services.  That is generally done

8    through a contract and then the contractors submit vouchers

9    for payment for services rendered.

10        And that is submitted to lower-level agency staff who are

11   responsible for processing the vouchers, ensuring that the

12   work was in fact completed, that all other, you know, aspects

13   of the contract have been honored.  And then the -- that goes

14   into a payment management system at USAID, it's called

15   Phoenix.

16        Once all the approvals are taken care of and the agency

17   has assured itself that the payment is proper, then it is

18   processed and funds are disbursed from the Treasury.  That's

19   sort of the typical process.

20        The other type of general category is assistance

21   agreements.  And these are in the form of grants or

22   cooperative agreements.  And oftentimes these sorts of awards

23   are managed through a letter of credit facility.  And so the

24   funds are made available, and then the awardee can draw down

25   funds from the award to pay for expenses on an ongoing basis.

1    And it's generally important in a variety of circumstances,

2    but oftentimes these implementing partners need to have

3    immediate access to funds, so within certain parameters

4    they're able to access funds immediately.  And then those

5    drawdowns are subject to a variety of audits.

6        And so my understanding is that on sort of both sides of

7    the equation, things have been broken.  The Phoenix payment

8    system for vouchers, generally for past work, has been --

9    access to that by staff, by agency personnel, has been

10   severely limited, and so -- I'm sorry.  Am I still on the

11   line?

12              THE COURT:  I can still hear you.

13              MR. WIRTH:  Okay.  Good.  I'm sorry.  I heard a noise,

14   and I thought I might have been disconnected.

15       All right.  So as I was saying, my understanding is that

16   agency staff no longer have the access that they used to to

17   the system, which means that approvals are being done by only

18   a very small group of people, at sort of the lower and mid

19   levels, and then everything is being funneled up to a single

20   approver, and this has created a huge backlog for past

21   vouchers and the like.

22       On the other side of the equation, so letter of credit and

23   other payment management systems --

24              THE COURT:  I think we're getting the public line

25   connected, so let's pause and I'll ask the deputy to let us

1    know when we should restart.

2         THE DEPUTY CLERK:  Apologies, Your Honor.  We're trying

3    to get it connected again now.

4       (Pause.)

5         THE DEPUTY CLERK:  Okay.  Your Honor, we're reconnected

6    again.  I'm going to have to test it out on my cell phone.  If

7    you guys can continue speaking.  You can hear me?  OIT says

8    they can hear me.  They're testing it out.  So hopefully now

9    it'll work.

10        THE COURT:  Okay, great.  Mr. Wirth, you were just in

11    the middle of discussing how in practice things have, on your

12    understanding, have been frozen in the context of both the

13    acquisition contracts and the assistance agreements.  So

14    please continue.

15        MR. WIRTH:  Absolutely, Your Honor.  So with respect to

16    the assistance agreements, my understanding is that access to

17    the payment management systems and letter of credit facilities

18    was shut off sometime the week of January 20, and it has not

19    been -- access has not been resumed since then.

20      Just a few days ago -- and this is in an attachment to the

21    Northrip declaration that we filed on Monday -- we had a email

22    from a government official that said USAID facilities -- or

23    payments are not going out from the agency.  And that's

24    consistent with our experience.  From what we can tell --

25        THE COURT:  Let me clarify that.  Mr. Wirth, when you

say that access was shut off and has not been restored, is

that on the agency's side, meaning it's not been restored

to the people on the agency who would ordinarily access the

system?  Or is it in some way shut down on the receiver's

side?  Or tell me if that question doesn't make sense.

MR. WIRTH:  I think that question makes sense.

My understanding is that on the receiver side, everything has

been shut down and they're not able to access funds.  Normally

what happens is when a person wants to draw on one of these

letter of credit facilities, they go into the payment management

system or the facility that they use to make these types of

draws, they put in a request for a specific amount.  So long as

it meets parameters, it is disbursed generally within 24 hours.

And what my clients have been seeing on the ground is that

when they make these requests, the disbursement date -- it says

that the request has been processed but then the disbursement

date is set for almost a year from now, which makes no sense.

And so when they have inquired with agency personnel as to

what's happening, the answer is that no payments are going out

from the agency right now.

I'm not sure to what extent the agency personnel themselves

have lost access to these systems.  My understanding is that for

some time period potentially there was access to Phoenix that

was shut off.  I think that some personnel currently have access

to Phoenix, and in fact, have made all of the normal approvals

1    through the system that is -- that they normally do, and that

2    right now the thing that is stopping the payments from going out

3    is this final level of approval.

4         THE COURT:  Okay.  Understood.  And just to make sure

5    I'm still clear on this, obviously the invoices that are being

6    submitted on the side of the acquisition contracts is for work

7    that has already been completed, and the focus right now is on

8    work that was completed prior to February 13, the date of the

9    Court's TRO.  And the same in the context of the assistance

10   agreements and the letter of credit facilities as you

11   described them.

12        In other words, the drawdown, when it comes to the letter

13   of credit, is not a drawdown for something that happened

14   yesterday or today, but at least the focus right now is a

15   drawdown for something that happened prior to February 13.

16   Is that right?

17        MR. WIRTH:  Yes.  That's the focus right now.

18        THE COURT:  Okay.  So I'm looking at your proposed

19   order.  Do you have that in front of you, counsel?

20        MR. WIRTH:  I do, Your Honor.

21        THE COURT:  Can you walk me through the first two

22   components of that and just connect it to what you were

23   saying?  It may be obvious, but I want to make sure I fully

24   understand --

25        (Simultaneous speaking.)

1      THE COURT:  -- pay all invoices, and then permit and

2  promptly pay.  I just want to understand exactly what those

3  two are getting at.

4      MR. WIRTH:  Absolutely, Your Honor.  I don't think

5  these are obvious.  These are complicated, and I will admit

6  I'm not a government contracts expert, so I've been learning

7  this very quickly over the last couple of weeks as well.

8      So my understanding is that currently my clients have

9  numerous invoices that they've already submitted and that

10  they believe have already been approved through the normal

11  processes at USAID and potentially also at the State

12  Department, though I think State Department normally operates

13  on grants, not on contracts, but I can't make any specific

14  representations as to that.

15      So take the first of these instances, the pay all invoices

16  and letter of credit drawdown request, this would be for

17  acquisition contracts and specifically mentions work completed

18  prior to the entry of the Court's TRO.  So this would be sort

19  of typical government contracts type payments.

20      I understand that in like a small number of cases these are

21  not done through invoices but they're done through letter of

22  credit drawdown requests, which I think is unusual, but my

23  clients say that both of them need to be represented.

24      With respect to the second prong, so this is for grants and

25  assistance agreements, and these agreements permit drawdowns

1   on an ongoing basis and also, you know, for both past work and

2   for future work.  And in order to continue to do work under

3   the contracts that are currently in operation, the grants and

4   agreements that are currently in operation, they need to make

5   drawdowns on an ongoing and regular basis.  And so this is to

6   ensure that they are permitted to access those letter of

7   credit facilities and other payment management systems.

8           THE DEPUTY CLERK:  Are the parties still here?

9   Testing one, two, three.  Can you hear us?

10          MR. WIRTH:  I'm here.

11          THE DEPUTY CLERK:  Okay.

12          MR. SUR:  This is counsel for the government.

13          THE DEPUTY CLERK:  I think we lost --

14          THE COURT:  My apologies.  Judge Ali is here, and I

15   was asking a question but I was on mute.

16          THE DEPUTY CLERK:  Oh, okay.  My apologies, Your Honor.

17   Thank you.

18          THE COURT:  Thank you.  Mr. Wirth, because we're here

19   on a motion to enforce the TRO, can you make the connection,

20   then -- connect the dots as you see it between the relief

21   you're asking for -- and I'm really focused on the first two

22   points for now because I think the other ones are self-

23   explanatory about just following the order -- connect those

24   first two to the TRO itself for me.

25          MR. WIRTH:  So the TRO specifically ordered the

1    government to not take any actions to pause the disbursement

2    of foreign assistance funds, and these two components of

3    the proposed order go directly to the government's -- to

4    the temporary restraining order insofar as it orders the

5    government to stop any pause of disbursement of foreign

6    assistance funds.

7         THE COURT:  Right.  And is one way to look at how you

8    drafted here the first point we were talking about that begins

9    "Pay out all invoices and letter of credit," that's looking at

10   funds from before February 13, before the date of the TRO, and

11   the second one is looking at drawdowns in the future?  Tell me

12   if I'm --

13        MR. WIRTH:  No, not necessarily --

14        THE COURT:  -- oversimplifying.

15        MR. WIRTH:  I'm sorry.  No, Your Honor, it's not that

16   simple.  So my understanding is that these drawdown requests

17   can also be for past work.  So it's not as simple as saying

18   that it's only for past or only for future.  It depends on the

19   specific language of the grants and the assistance agreements

20   and what those funds are going to be used for.

21        THE COURT:  Okay.  So try again.  Tell me again what

22   that second point adds that's not already in the first point.

23        MR. WIRTH:  Well, the first point is specific to

24   acquisition contracts, and the second point is with respect to

25   grants and assistance agreements.  These are all the -- these

1    are all the --

2         THE COURT:  I see.  I see.  Okay.  Thank you.  That's

3    helpful.  I'm sorry to interrupt you.  So the key difference

4    is later in the sentence where it says "on contracts for work"

5    in the first one, and in the second one it says "for

6    reimbursement on grants and assistance agreements."  That's

7    the focus?

8         MR. WIRTH:  Yes.  Exactly, Your Honor.  And I think the

9    distinction is important because, with respect to sort of

10   vouchers that are submitted for work on contracts, I think my

11   understanding is those are all sort of retrospective for past

12   work, but that on grants and assistance agreements, draw-down

13   requests can be both retrospective and prospective, and so

14   this covers the waterfront, so to speak.

15        THE COURT:  Understood.  When it came to the meaning of

16   the second one, at least again as to the focus of your motion

17   which is for, you know, I don't think a significant amount but

18   it's for work completed prior to the entry of the TRO, if the

19   second paragraph included that qualification at the end, in

20   other words that the focus is for work completed prior to the

21   entry of the Court's TRO?

22        MR. WIRTH:  I -- I do worry that that would

23   unnecessarily limit the scope of the Court's TRO which

24   specifically refers to all disbursements of foreign assistance

25   funds.  Some of my clients receive drawdowns on an ongoing

1    basis, and I do worry that this would cut them off from credit

2    in a way that would perpetuate the irreparable harms they are

3    currently facing.

4         THE COURT:  Understood.  Fair point.  I think that

5    would be narrower than the TRO itself.  I'm just trying to

6    understand exactly the narrow focus -- or at least the highest

7    priority if that makes sense, of what's been enjoined.

8         Let me ask you a different question:  Can you give me

9    plaintiffs' position on the main regulation that defendants

10   have cited as authorizing suspension and termination?  And I'm

11   not trying to get ahead and hear your argument on the PI

12   necessarily.  I know you all still have time to get your brief

13   on file under the briefing schedule that's been entered, but

14   specifically as it relates to the present motion to enforce

15   the TRO, what is the place that the regulation that -- I think

16   it's 2 C.F.R. § 700.14 -- how does that relate to the present

17   TRO and your motion to enforce?

18        MR. WIRTH:  So my answer to that is that the Court has

19   already ordered the government to make payments and to stop

20   pausing the disbursement of foreign assistance funds.  Whether

21   the government can terminate contracts really is not relevant

22   to that specific question that we are seeking the Court --

23   seeking to enforce right now.

24        As the Court is aware, we are preparing our reply brief

25   which directly deals with the sort of subject matter question,

1    subject matter jurisdiction question the government has

2    raised.  We believe that we have strong arguments that there

3    is jurisdiction under the APA and that we absolutely can bring

4    exactly these types of claims because they are based on --

5            THE COURT:  Understood.  I'm sorry, counsel, this is

6    probably my fault.  I don't want to push you ahead to your PI

7    arguments.  I think the first part of your answer does the

8    trick for me.

9        And then I guess -- again, jumping ahead a little bit, and

10   this may be jumping into the PI, might be jumping ahead to

11   beyond the PI, but not in terms of merits argument.  I guess

12   I'm just interested, Counsel, in, for lack of a better way to

13   put it, what do you see as the ultimate end game here

14   realistically?

15       And let's just posit that it seems like -- and this does

16   not go to necessarily the compliance with the TRO, which is

17   the question before the Court right now, but clearly the

18   administration is signalling that it does not want to contract

19   with your clients, and you all satisfied your burden to show

20   irreparable harm and a likelihood of success on the merits was

21   done, and the government needs to comply with the Court's

22   order -- and I'm going to talk to the government soon -- and

23   that includes unfreezing payments, as I've said and

24   reiterated, and I'll come to that, but I guess I'm just -- do

25   you see a path to this actually leading to the reinstatement

1    of long-term contracts with your clients?

2         MR. WIRTH:  Yes, Your Honor.  So first of all, just to

3    be very clear, what we're here today for is so that we can

4    even get to the PI hearing.  The clients need to get to the PI

5    hearing in order to then be able to craft an order that will

6    be able to protect them going forward, a preliminary

7    injunction that protects their rights.

8         But we do see a path forward here.  The government has said

9    that they have the authority to cancel all these contracts.

10   If that's in fact true, then they will have to go through the

11   proper processes to cancel contracts.  What they can't do is

12   do what they've done here.  So, you know, our understanding is

13   that many of these contracts do serve the national interest,

14   and if they were actually going through these contracts and

15   evaluating them, that they would not cancel these contracts,

16   even if they had the ultimate authority to do so.

17        And beyond that, I think there's a couple of other issues

18   at issue here.  We're not saying the government has to spend

19   these foreign assistance funds to operate specific contracts.

20   But we are saying that the government can't unlawfully impound

21   all of these funds and make no foreign assistance obligations

22   going forward.

23        So what we would want going forward is not necessarily that

24   our clients' specific contracts will be kept in perpetuity.

25   That may not be possible.  And in fact, the government may

1    have the ability to cancel some of them.  But they can't do

2    this wholesale cancelation of all of their contracts all at

3    once.  They have to actually follow the law when canceling or

4    terminating agreements or grants.  And they actually have to

5    spend these foreign assistance funds that have been

6    appropriated by Congress, that have specific statements as to

7    how they are to be spent.  And the Executive Branch --

8         THE COURT:  Thank you.  I think that answers my

9    question.  I promised I wouldn't force you to argue the PI on

10   the spot.  That's helpful enough as you've answered it.  I

11   appreciate that.

12        So why don't I hear from counsel for the plaintiffs in the

13   AIDS vaccine case, 400.  Again, my interest would be anything

14   in your position based on your clients that differs from what

15   I've just heard from Mr. Wirth, or anything you can offer that

16   would supplement that, what I've just heard.

17        MS. BATEMAN:  Thank you so much, Your Honor.  This is

18   Lauren Bateman for plaintiffs in 25-cv-400.  I'm grateful for

19   the opportunity to speak and will remain mindful of this

20   Court's direction to only note areas where plaintiffs'

21   positions are different and to provide only additive

22   information.

23        We agree entirely with plaintiffs in 25-cv-402 about the

24   extent of noncompliance, but as we see it, the question before

25   the Court is not whether to enforce one part of the TRO; the

1     question is whether defendants are complying or violating the

2     TRO.  And they appear to be violating it in all respects.

3         So plaintiffs in 25-cv-400 would renew their motion to

4     enforce and motion for civil contempt, seeking enforcement of

5     the entire TRO, and we urge the Court not to enter relief that

6     would narrow the relief that the Court has already now thrice

7     granted.

8         I have a couple of factual additions that I'd like to add

9     to supplement Mr. Wirth's portrayal of the situation:  First,

10    we know that defendants have initiated new terminations in the

11    last couple of days explicitly on the bases forbidden by the

12    TRO.  On February 23 --

13            THE DEPUTY CLERK:  Counsel, the court reporter needs

14    you to slow down a moment.  And also, Your Honor, we're going

15    to attempt to reconnect the system one more time.

16            THE COURT:  Okay.  Apologies, Ms. Bateman.  We'll go

17    ahead and pause until the deputy confirms that we're

18    reconnected.

19            MS. BATEMAN:  Thank you, Your Honor.  My apologies.

20            THE DEPUTY CLERK:  Okay.  Pause for one moment.  We're

21    going to try this again.

22        Okay, Your Honor.  Back on the record.

23            THE COURT:  Okay.  Go ahead, Ms. Bateman.

24            MS. BATEMAN:  Thank you.  I was just indicating that

25    our understanding is that defendants have initiated new

terminations explicitly on the bases forbidden by the TRO in the last couple of days. On February 23 a notice was issued to contracting officers to terminate a new tranche of awards. And that notice made clear that the authority to do so came from Secretary Rubio with the explicit instruction that those terminations were implementing the executive order.

And then subsequently, at approximately 4:30 p.m. yesterday, contracting officers received an email from Adam Cox, whose title is acting deputy director of foreign operations. That email indicated that they were instructed by DOGE to terminate several awards that same night, and also indicated that many -- and "many" is capitalized in that email -- more terminations are coming and that Foreign Service officers were authorized for overtime to effectuate those terminations.

We understand that the government now says oh, it was a mistake for us to say that the executive order was the basis for those terminations, but -- and that emails with the agency claim that Secretary Rubio individually reviewed all of the terminations and decided on his own to terminate those awards, but that's frankly a fantastical claim. Given the number and complexity of the awards at issue, it's implausible on its face, and it's also worth considering the implausibility of that claim given Secretary Rubio's travel schedule from February 13 to 19. He was in Germany, then Israel, and then

1    Saudi Arabia and the United Arab Emirates.

2        So the key in plaintiffs' view is not whether defendants

3    can conjure some alternative pretextual basis for their

4    actions.  And the Supreme Court has been very clear about

5    this.  In *Department of Commerce v. New York*, that's the

6    census case before the Supreme Court, Chief Justice Roberts

7    wrote for the Court and said that when a court receives an

8    explanation for agency action that is incongruent with what

9    the record reveals about the agency's priorities and

10   decisionmaking process --

11       (Simultaneous speaking.)

12       THE DEPUTY CLERK:  Counsel, please watch your speed.

13   Counsel, please watch your speed for the benefit of the court

14   reporter.  Thank you.

15       MS. BATEMAN:  My apologies.  Thank you.

16       In closing on that point, courts are not required to

17   exhibit a naïveté from which ordinary --

18       THE COURT:  Understood.  Yeah, I certainly have that

19   point, and it's been something I've reiterated each time any

20   sort of clarification has been sought.  That this is not

21   about, you know, continuing to suspend funds while the

22   government can come up with post hoc rationalization or a

23   pretextual basis for the action that I think I deemed likely

24   to be arbitrary and capricious in the first place.

25       And I'm familiar with the *Department of Commerce* case,

1        which I think was cited in the Court's last order.

2            Tell me anything else that you would supplement the prior

3        argument on or differ from.

4            MS. BATEMAN:  Thank you, Your Honor.  Two other points,

5        and I'll make them briefly.  On the subject of personnel

6        access to payment processing systems, on February 23, USAID

7        began to implement reductions of force that likewise appeared

8        tailored to circumvent the Court's orders.  Our understanding

9        is that those RIFs include financial management staffers, so

10       those are the people who would actually do the disbursement of

11       awards to implementing partners.

12           Our understanding is that before February 23 defendants

13       blocked those staffers from access to payment systems, but

14       after February 23, there's hardly anyone at the agency who has

15       those jobs.  And without those people, the funds can't move,

16       so there can't be compliance with the Court's order.

17           Defendants either know that or they're acting with such

18       ignorance and haste that they don't know what they're breaking

19       as they're breaking it.

20           Also included in that RIF were employees who interact on a

21       day-to-day basis with recipients of foreign aid assistance.

22       Those are the people who would theoretically get these

23       programs back up and running after a suspension is lifted.

24       And those people likewise have largely been terminated or

25       placed on administrative leave.

1    One other point for Your Honor's consideration.  To add

2    supplemental information to Mr. Wirth's discussion of the

3    problem of bottleneck at individual approval -- for individual

4    approval of line items, I wanted to call this court's

5    attention to reporting in *The Washington Post* in the last

6    couple of days.  That reporting details how Elon Musk and two

7    DOGE employees took over the USAID payment processing system,

8    stopping payments entirely and making the supposed waivers

9    issued by Secretary Rubio completely ineffectual.

10    That reporting indicates that USAID managers prepared

11    packages of payments that should have ostensibly been covered

12    by waivers and got the agency's interim leaders to sign off on

13    those packages, but each time Musk and one or two other

14    employees of DOGE would veto the payments.

15    That reporting is consistent with what I've gleaned in

16    speaking to people from within the agency.  My understanding

17    is that bureaus have flagged that they don't have access to

18    payment systems to effectuate the TRO, but the agency just has

19    not responded to those requests.

20    Just to take one example, nobody in the entire Global

21    Health Bureau, which among other things drives PEFPAR

22    programs, has access to the payment systems at all.  It's just

23    two 20-somethings and Elon Musk.  So essentially no funds are

24    being distributed.

25    THE COURT:  Can you clarify that statement?  The

1   systems you're referring to, are those USAID systems to

2   approve and put the payments forward, or are they

3   Treasury-side systems?

4         MS. BATEMAN:  Our understanding is that Phoenix is a

5   USAID-side system through which USAID employees can actually

6   approve disbursement of payments.

7         THE COURT:  And that's the system you're saying DOGE is

8   now controlling?

9         MS. BATEMAN:  That's right.

10        THE COURT:  Okay.  Understood.

11        MS. BATEMAN:  Thank you, Your Honor.

12        THE COURT:  Anything else?

13        MS. BATEMAN:  Nothing else.  We'd just conclude by

14  reiterating that we seek enforcement of the TRO in its

15  entirety.  Thank you.

16        THE COURT:  Okay.  Mr. Sur, I'll hear from you on

17  behalf of the defendants in both cases now.

18        MR. SUR:  Good morning, Your Honor.  Indraneel Sur from

19  the Department of Justice for the defendants.

20     I guess I will begin by noting that the defendants have

21  been focusing their efforts on preparation of the submissions

22  for the compliance and joint status report, working under the

23  Court's order with the due date for tomorrow, and that has

24  been the focus of the significant energy.

25     So when the plaintiffs in No. 402 early yesterday morning

1    raised this prospect of a renewed motion, there was failure of

2    time essentially for me to find anything.  I did -- and the

3    defendants do now have -- received plaintiffs' invoices and

4    are analyzing them.  But as for much of the assertions about

5    the facts, insofar as any of them are in the record at all,

6    we've not had the opportunity to respond to that.

7        And so at the outset, the Court noted the submissions for

8    tomorrow, and I think the Court also suggested that it might

9    provide guidance on what might be the appropriate content of

10   that submission.  So in that respect I might respectfully

11   submit that it would be appropriate to give the defendants an

12   opportunity to address some of what's been asserted here about

13   the facts.

14       But -- Mr. Wirth made certain assertions.  He did have the

15   benefit of pointing to the record on the previous motion, but

16   the dilemma is that the previous motion was denied, right,

17   albeit without prejudice for its renewal, but the renewal

18   papers didn't --

19           THE COURT:  Mr. Sur, let me maybe direct you to

20   something --

21           MR. SUR:  Sure.

22           THE COURT:  -- that would be helpful at this point.

23   I take your point that a motion was filed while the joint

24   status report was pending, but I'll remind you the government

25   also filed Friday, around midnight if I recall, its own

1    version of that after the joint status report was ordered as

2    well.

3        And so, you know, right now the Court has before it a

4    motion to enforce.  I've been clear that this is not going to

5    become -- well, certainly not intended to ever become a review

6    of individual contract determinations.  You're bringing it

7    down to that level right now, and I don't want to as the

8    court.

9        I think there are some basic questions that have been

10   posed here, and while you may not have reviewed those specific

11   invoices, the TRO has been in effect for now 12 days, since

12   February 13, and there are some just basic questions.

13       So let me just ask you, you know, the TRO was clear and the

14   Court has said it was clear that defendants could not continue

15   the blanket suspension of foreign aid funds pending a review.

16   And that was based on a finding that the plaintiffs had shown

17   irreparable harm.  It sounds like there's evidence right now

18   that it's deepened.

19       And to be honest -- obviously there's the PI motion pending

20   and briefing which the Court will consider, but at the TRO

21   phase I don't take the government really to have ever rebutted

22   that irreparable harm.  And there was a likelihood of success

23   that at least under the APA, for failing to consider that

24   irreparable harm, that the plaintiffs were likely to prevail.

25       And so the plaintiffs seem to be saying that the blanket

pause was not lifted in any meaningful sense.  I'd like you
to tell me in simple terms what action you are aware of that
the agency has lifted the blanket pause.

MR. SUR:  So to begin with, I think that after the
TRO -- and this was provided in the February 18 status report,
that after the TRO, the agencies gave instructions about the
TRO and notice to the funding recipients and to the officers
who managed the grants.  And the Court heard this morning
assertions about subsequent terminations, but -- and actually,
we had an exchange with plaintiffs Sunday night about that.

But the subsequent terminations have been, as I understand
it, grounded in individualized review which was consistent
with clauses in the Court's TRO distinguishing the blanket
from the individualized review.

THE COURT:  Let's just break this down a little bit.
So why don't we focus on two different periods.  Let's focus
on before February 13, the date of my TRO, and after February
13 separately.  So let's just focus on the period before
February 13.

There were suspensions pursuant to the EO in the
implementing orders that were enjoined by my TRO, and there
may have even been a series of suspensions and terminations
communicated during that window between January 19 and
February 13.

Are you contending that those suspensions and terminations

1    that would have occurred during that period remain valid and

2    should be given effect?

3         MR. SUR:  No, we understand the TRO to foreclose those.

4    I think that's clear.

5         THE COURT:  So that's helpful.  I appreciate that.  And

6    I appreciate you being candid about that.

7      So then, are you aware of steps that the agencies here have

8    taken to actually unpause the disbursement of funds as to

9    agreements that fall within that category or work done before

10   February 13?

11        MR. SUR:  So let me focus on that last point, if I

12   might, about the work done before February 13.

13        THE COURT:  Well, I actually want to focus on my

14   question, which is -- you just said to me that you understand

15   that any of the suspensions and terminations that took place

16   before February 13 are invalid and can't be given effect under

17   the TRO.  I do want to hear your full answer, but has the

18   government began -- has the government unfrozen disbursements

19   as to those contracts or assistance agreements for those --

20   for at least that period?

21        MR. SUR:  So for the -- the period before the TRO --

22   this is going back to February 18 joint status report, the

23   plaintiffs' characterization of some of those decisions --

24   and there's a wide variety, right, of grants and foreign

25   assistance arrangements, contracts -- was that all of them

1    were under the same challenged authority, and the government

2    explained in the status report that there were

3    contract-specific categories.

4       So where there were contracts that resumed and they had

5    claims for work done, there actually was a process for that.

6    The Secretary of State's memorandum, which was published at

7    page 2586828 [sic] of paragraph 12(d) provided for legitimate

8    expenses incurred prior to the date of that -- it's called an

9    ALDAC -- under existing awards or legitimate expenses

10   associated with stop-work orders.

11      So there was a process -- the legitimate expense waivers.

12   And that hasn't been disputed in the complaint, that that is

13   there for the work that has been done.

14         THE COURT:  Hey.  I guess I'm not sure why I can't

15   get a straight answer from you on this.  Are you aware of an

16   unfreezing of the disbursement of funds for those contracts

17   and agreements that were frozen before February 13?  And

18   you've acknowledged that under the TRO any of the terminations

19   or suspensions that took place before February 13 are

20   foreclosed, they're invalid and shouldn't be given effect.

21   Are you aware of steps taken to actually release those funds?

22         MR. SUR:  I'm not in a position to answer that.  I

23   think we will be in a position to answer that in the joint

24   status report.

25         THE COURT:  Well, we're 12 days into the TRO, and

you're here representing the government.  You had represented
in the initial February -- it wasn't a joint status report,
to be clear, to correct you, it was a status report from the
government, from the defendant, and, you know, made issue of
that it had been five days and there had been a holiday
weekend, but we're now 12 days in and you can't answer me
whether any funds that you've kind of acknowledged are covered
by the Court's order have been unfrozen?

MR. SUR:  All I can do really is say that the
preparations are underway for the joint status report on
compliance due tomorrow, and --

THE COURT:  It's not really [indiscernible] to a joint
status report, right?  The joint status report was something
I asked for.  And I'm asking you right now what you are aware
of.  Sounds like the answer is no.  If the answer's no, you
can say no, that you're not aware of any actions to unfreeze.

MR. SUR:  As I said, there was a legitimate expense
waiver process that is in place.  Beyond its presence, I can't
really go beyond that.

THE COURT:  But that's not referred to the TRO.  You're
citing back to the implementing regulation that's a part of
it, of the same implementing regulation that the TRO enjoins.
But I'm asking you -- this hearing is about enforcing the TRO
and compliance with the TRO.

MR. SUR:  So I do understand that.  I do also

understand the motion before the Court, the motion to enforce

to actually seek relief that is somewhat different in

character and is explicitly monetary. And if the Court would

allow, I would appreciate the chance to elaborate a little bit

on that part of it.

THE COURT: On which part of it?

MR. SUR: That the relief before the Court as requested

in the present motion to enforce actually goes beyond the TRO

in that it is even more expressly of a monetary character and

therefore raises a serious problem of sovereign immunity.

THE COURT: Well, yeah. We can come to that. I mean,

I don't understand the argument. It seems like what you're

saying is instead of unfreezing or unpausing the funds, as the

TRO required, you just won't because of immunity. If you want

to brief that at the PI stage, I suppose you can. It's not an

argument that you all raised at the TRO phase.

Let me just ask you, though, here, because I think this is

important: I have from you an acknowledgement that

suspensions or terminations from before February 13 are

invalid under the TRO. And I appreciate that. I just want to

be clear here --

MR. SUR: I'm sorry --

THE COURT: Let me just finish my question. I just

want to be clear here. So I understand that there is a review

of the agency's legal authorities and contractual terms, but I

1    assume then that you understand that it's not enough to just

2    go ahead and come up with a legal authority or contractual

3    term that would have justified a termination before February

4    13.  So an agency could be free to do that with independent

5    justification and legal authority in the future, but that

6    wouldn't justify or give effect to the terminations that

7    actually were communicated before February 13.

8        I assume you would agree with that given that you agreed

9    that it would violate the TRO to give those effect.

10        MR. SUR:  Where I'm having difficulty is that I think

11   as the February 18 report explained, the authorities for the

12   terminations and suspensions were up -- as best as we know,

13   part of these various contracts, grants and cooperative

14   agreements all along.

15        THE COURT:  Yeah.  I mean, I think that's kind of the

16   point, Counsel, right?  The TRO didn't say that there's no

17   underlying authority; that the agency is, you know, not acting

18   pursuant to the scope of its typical authority.  The TRO very

19   clearly, and it now has been reiterated, that the plaintiffs

20   were likely to succeed, at least for now, under the APA.

21        And so it wasn't about whether there was an underlying

22   authority.  For example, the Court didn't get to the

23   separation of powers problem.  The question was about the

24   failure to consider the irreparable harm here and the massive

25   reliance interest.  And finding new authorities does nothing

1    to do that, to address that.

2        So, you know, I think that it's explicit in the TRO but

3    it's also just illogical to say, well, we found some

4    authorities.  Again, the government has its authorities going

5    forward, but I think the point I'm trying to make, and this is

6    the point about not just coming up with a pretextual basis for

7    what has been held to likely be arbitrary and capricious and

8    enjoined -- I guess I'm not understanding where there is any

9    confusion here.  It seems kind of clear as day to me.

10        MR. SUR:  So, Your Honor, I think I would only be

11    reiterating what we've said in our previous filings, which is

12    that the Court's TRO we think appropriately recognized that

13    there were authorities that were located in contracts and

14    grants, and that the enforcement of those agreements at the

15    agreement-specific level was appropriate.  So -- and that I --

16        (Simultaneous speaking.)

17        THE COURT:  I take your point -- I understand the

18    government's position that it was appropriate.  I'm sorry,

19    counsel.  You're saying that -- I guess I'm hearing you say

20    two things.  One, it sounds like you're saying that the

21    termination of grants was appropriate.  Clearly, you prefer

22    not to have been enjoined.  But I also heard you say that you

23    understand that terminations and suspensions prior to February

24    13 were in fact enjoined.  I think the language you used was

25    foreclosed by the Court's TRO.

1     MR. SUR:  I think to that point insofar as -- I'm sorry

2  to interrupt.  But as I understood it to be insofar as it was

3  a blanket, I thought I was responding -- I'm sorry if I wasn't

4  clear.  I thought I was responding to the Court's question

5  about the concept of a blanket.

6     THE COURT:  Well, before February 13, everything was

7  proceeding pursuant to the blanket directive to terminate and

8  suspend.  That's what the directive was, implementing the

9  executive order.

10     MR. SUR:  So this is in the February 18 status report

11  as well, that following the TRO the agencies reviewed and

12  concluded that those suspensions and terminations were

13  consistent with terms of the contracts or grants or

14  cooperative agreements.  So maybe that's where I'm having

15  the -- in that --

16     THE COURT:  How is that different from just being a

17  post hoc rationalization kind of piece by piece of the kind of

18  en masse suspension that was deemed arbitrary and capricious?

19  I guess I can't tell whether you're just restating a position

20  that you want to preserve because you disagree with the TRO,

21  or there's actually some degree of confusion to begin with.

22  It seems clear to me, plaintiffs have articulated here in a

23  clear way as well.

24     So to the extent it's just a policy disagreement in terms

25  of the outcome of the TRO, that's fine, but I'd appreciate you

1    just being candid about that.

2         MR. SUR:  Um, well, I'm not certain if I would use the

3    term "confusion" so much as that the Court we think in the

4    original TRO in some sense recognized that there are

5    contract-level authorities and didn't foreclose that.  So --

6    you know, the government's subsequent filings I think have

7    sought to explain how those contract-level authorities have

8    been working.

9         THE COURT:  Okay.  All right.  We're going to move on

10    from that.  Why don't we focus on -- I'm not sure I understand

11    that point insofar as it deals with anything before February

12    13, because at that time, and I made clear that it's not just

13    about finding a contract term or a legal authority that

14    applies, but it cannot be taking place pursuant to the same

15    action here, which was a general directive to pause.  And so

16    everything before February 13 clearly was under that general

17    directive.

18     Let me turn you to the other period I mentioned, post

19    February 13, so after the TRO.  I want you to tell me again

20    what actions you understand have been taken -- aside from

21    mailing the notice, mailing a copy of the TRO and saying

22    further guidance would be provided, I want to know what

23    actions have been taken, including whether funds have been

24    unfrozen based on the TRO, and if so, what funds have and what

25    funds have not.

1          MR. SUR:  These would be I think the logical subjects

2     of the joint status report that is underway.  I don't have the

3     ability to recite those particular facts at this hearing.

4          THE COURT:  Twelve days into the TRO, you can't give me

5     any facts about funds being unfrozen based on the TRO?

6          MR. SUR:  I can -- I mean, there is this waiver

7     process.  And --

8          THE COURT:  Which was part of -- my TRO didn't have a

9     waiver process in it.  I'm asking about in response to my TRO.

10         MR. SUR:  Right.  So the TRO didn't enjoin paragraph

11    12(d) of the memorandum we were talking about, so that process

12    for approval of waivers of the pause --

13         THE COURT:  Counsel, is your answer then that the only

14    funds that have been reinstated are the ones that could have

15    been reinstated under the initial implementation of the TRO,

16    meaning only if they went through the waiver process?  That

17    sounds to me like you're just operating under the procedures

18    of the implementation.

19         MR. SUR:  So I'm offering that as one example.

20         THE COURT:  Can you give me other examples?

21         MR. SUR:  So in the joint status report -- I'm sorry.

22    I have incorrectly referred to it as the joint status report.

23    This is actually the February 18th status report -- there are

24    additional examples in that report and the supporting

25    declaration.

1          THE COURT:  Of funds being unfrozen in response to the

2     TRO?

3          MR. SUR:  I can only give you what the description here

4     is, authorization and requested disbursement of foreign

5     assistance funding.

6          THE COURT:  Okay.  All right.  Can you tell me -- look,

7     I'm interested in what the general directives have been since

8     the TRO.  So your clients, the heads of these agencies, issued

9     directives before the TRO.  These are the ones that were

10    restrained by the TRO that implemented the blanket suspension

11    of funds pending their review.  So that was enjoined.  After

12    the TRO, did they issue new directives walking that back?

13         MR. SUR:  Some of -- my understanding is we described

14    that in the February 18th status report.

15         THE COURT:  Can you describe it for me now, because I

16    didn't see that.

17       (Pause.)

18     Are you aware of directives from your clients or other

19    senior officials at the agencies that walked back the initial

20    general directive to suspend and terminate funds?

21         MR. SUR:  When you say "walked back," I think there

22    were notices of the TRO.  This is -- they stated -- if I

23    may --

24         THE COURT:  Go ahead.

25         MR. SUR:  -- for example, in the declaration that

1    supported the February 18th status report, paragraph 5, the

2    notice to the acquisition and assistance staff at USAID stated

3    that until further notice the contracting and agreement

4    officers should not enforce any agency directive issued under

5    Executive Order 14169 and the Secretary's implementing

6    memorandum that requires the generalized stop-work, suspension

7    or pause of agency contracts, grants or other federal

8    assistance awards.

9        That was exhibit -- sorry, this was paragraph 5 of the

10   declaration, and then it pointed to Exhibit C.

11            THE COURT:  Counsel, I hope you understand why this

12   is important as the attorney who's presumably advising your

13   clients and you're here representing them.  The Court's been

14   clear and, you know, as recent as when the government came on

15   Friday night and asked for further clarification, the Court

16   said that the qualification about when there are terms in the

17   contract or other legal authorities which allow termination

18   applies, but not when the terminations are still deriving from

19   a general directive to suspend aid.  That's repeated

20   throughout the document we filed.  I haven't seen the

21   emergency appeal you had referred to in that document be

22   filed, and the TRO is still in effect.

23       So if I were you, you know, I would think it would be

24   very important to point to some sort of directive that --

25   or something that indicates that the suspensions that are

1    happening under lawful authority, whether it be a regulation

2    or the terms of the contract or otherwise, is not still just

3    deriving from a general direction to suspend aid from the

4    agency, because that, again, is the very action that was held

5    to be likely arbitrary and capricious, that general directive.

6    And I don't even take the defendants to have ever disputed

7    that at the TRO stage.  Maybe I'll -- you know, I'll look

8    closely at your PI briefing.

9        So I'll leave it at that, but I would think it would be

10   important for you to be able to explain that to your clients

11   and to point to that.

12       MR. SUR:  I realize I've said this before, but if I may

13   say it one more time, I do think that the submissions that are

14   underway now offered for tomorrow will help.

15       THE COURT:  Okay.  I appreciate that.  I'm going to

16   take that to mean that you're still in conversations with your

17   clients, and that's what your inability to give a clear answer

18   to the Court is today.  You can correct me if I'm wrong on

19   that.

20       MR. SUR:  Yeah, I would have to go back to the clients.

21       THE COURT:  Yeah.  Understood.  Okay.

22       So let me just see if I have any other questions for you,

23   Mr. Sur.

24       MR. SUR:  May I ask, would the Court permit me to

25   briefly address some of the points that are specific to the

1    monetary character of the relief sought on this particular

2    motion?

3         THE COURT:  Well, maybe.  Yes, but to this extent:

4    I said at the outset that the purpose of this hearing is to

5    understand and to hear arguments on the motion to enforce the

6    TRO.  It is not an opportunity to relitigate the TRO.  So if

7    there are arguments that you want to make that limit the scope

8    of injunctive relief, the place for that would have been in

9    your PI briefing.

10        So I hope any argument you're going to make about that is

11   in your PI briefing.  But if you want to make arguments about

12   what the scope of the TRO actually was, then those arguments

13   are welcome.

14        MR. SUR:  Right.  So I mean, again, I'll try to be very

15   brief.  But the sovereign immunity question is brought into

16   particular focus by the proposed order, including the clauses

17   that the Court discussed with counsel for plaintiffs in

18   No. 402 earlier this morning, because they have an explicitly

19   monetary character, demanding compensation for past work and

20   including relief that addresses the letters of credit.

21        As the Court notes, in the PI briefing we did address this

22   question of sovereign immunity, and the APA sovereign immunity

23   waiver not covering monetary claims premised on contracts.

24   But I do think it's helpful to understand in the particular

25   context of this morning's discussion that the particular

1    motion by the GHC plaintiffs is again framed in terms of

2    compensation for past work under contract and letters of

3    credit, very explicitly of a monetary character, the nature of

4    that relief.  And sort of an even sharper focus than some of

5    the other elements of the preliminary injunction bringing this

6    question.

7        So here again, there would be, for contract by the

8    government, remedies that are described in our PI motion under

9    the Contract Dispute Act that would proceed maybe in the Court

10   of Federal Claims but not as part of the APA's waiver of

11   sovereign immunity which is for nonmonetary relief.

12       THE COURT:  Understood.  I appreciate that.  I do have

13   that argument.  I have it in your preliminary injunction

14   briefing.  It's not something that's come up in your TRO

15   briefing until today, or TRO arguments or submissions until

16   today.  And as I said, this is not an opportunity to

17   relitigate the TRO.  The TRO is in effect, it hasn't been

18   stayed or overturned in any sort of way.  I do want to make

19   that clear.

20       So let me ask you about some particular things in the

21   record following the TRO that stood out to me.  I'm going to

22   give you one example.  I'm looking at ECF 29-1.  This is an

23   attachment to -- I'm sorry.  I should clarify.  This is in the

24   Global Health Council case, No. 402, the same case that has

25   the pending motion to enforce.

1    And as I understand it, ECF 29-1 is a declaration from

2    someone who describes an email from a State Department

3    official on February 18.  So this is five days after the

4    Court's TRO.  And the email apparently said, "Secretary Rubio

5    has implemented a 15-day disbursement pause on all 15.9

6    billion worth of grants at the State Department."

7    And apparently the same email directed personnel in a

8    particular bureau to undertake an assessment of all grants at

9    the post and then still said, "Review the President's

10   executive orders and recommend termination of grants that do

11   not comply with those orders."

12   So this is five days after the TRO.  I understand that

13   Ms. Bateman, counsel in the 400 case, AIDS vaccine, referred

14   to other instances in which guidance sent after February 13,

15   after the emergency relief, also are referring to review

16   pauses of disbursements and reviews pursuant to the

17   implementation that's been enjoined by the Court.

18   Can you provide any context for me on that that might be

19   helpful?

20        MR. SUR:  If I may just go back one step.  So this is

21   in case No. 402, this is document 29-1, just to catch up to

22   where you were.

23        THE COURT:  Yes.

24        MR. SUR:  And was it a particular exhibit, or was it a

25   declaration matter?

1          THE COURT:  Dunn-Georgiou declaration.  It is paragraph

2    3 where it starts to --

3          MR. SUR:  Okay.  I might briefly be able to address

4    this point about the executive orders.  And if I understand

5    that correctly -- I apologize for not seeing the quote here as

6    I'm scrolling through the PDF.  But the reference to executive

7    orders I think does not encompass the order that is challenged

8    in this action.  If there were a number of other executive

9    orders that announced various policies of the administration

10   including as to foreign assistance -- so I take the reference

11   to executive orders to be -- to those other, unchallenged for

12   purposes of this case, policies.  But again, because I'm not

13   seeing the quote, I'm not able to put that in the proper

14   context.

15         THE COURT:  Okay.  I can tell you exactly where it is.

16   It's document 29-1.  It's the first page.

17         MR. SUR:  Uh-huh.

18         THE COURT:  And you can see in paragraph 3 it quotes

19   the email from the State Department official that says

20   "Colleagues, Secretary Rubio has implemented" -- I won't read

21   it all again, but it should be right there in front of you.

22         MR. SUR:  I'm sorry, yes.  So I take the discussion to

23   be about the executive orders that I was talking about earlier

24   that are not the executive order that's challenged here.  But

25   that is pointing out that some grants are not, you know,

1    consistent with some of the other executive orders.

2         THE COURT:  Well, can you clarify the color on that

3    first sentence, that's again five days after the TRO, says

4    there's the implementation of a 15-day disbursement pause on

5    all 15 billion worth of grants at the State Department?

6         MR. SUR:  I don't actually have anything further beyond

7    what's on the text here.  I don't know the underlying --

8         THE COURT:  Okay.  Mr. Sur, I appreciate it.  Is there

9    any other thing you'd like to clarify, particularly if you

10   have any information about the kind of on-the-ground how these

11   grants work?  Mr. Wirth provided I think a helpful explanation

12   of the two categories, the contracts versus the assistance

13   agreements and the differences between invoices and lines of

14   credit.

15      No worries if that's clear, but I wanted to give you the

16   opportunity to clarify anything that he might have gotten

17   wrong about how that works.

18        MR. SUR:  Beyond understanding the lines of credit to

19   be a particularly sharp instance of the monetary character of

20   the relief sought, I don't actually have a further

21   understanding of those.  So I wouldn't be able to comment on

22   that.

23      I do in that respect just want to go back to another point,

24   which was that the legitimate expense provisions that we were

25   talking about earlier, they remain open, including to the

1    plaintiffs who are before the Court today.  So there has been

2    no, you know, final decision on these particular plaintiffs'

3    claims as to those, you know, expenses.  And I don't think it

4    would be arbitrary to make a determination on legitimate

5    expenses.

6        So again, just focusing on the particular motion that's

7    before the Court with that proposed order, the availability

8    of the legitimate expense provision, where it has not yet been

9    determined to be applied, I don't think would be --

10           THE COURT:  Can you clarify what you mean by

11    "legitimate expense"?  Is it kind of a repackaging of the

12    fraud argument that was raised in the Friday filing?

13           MR. SUR:  I don't think so.  I think it's a distinct

14    process that was built into the Secretary of State's

15    memorandum.

16           THE COURT:  Okay.  And is -- just a moment.

17        Okay.  Actually, I don't have any more questions for you,

18    Mr. Sur.

19        Mr. Wirth, I'll give you the chance to respond briefly to

20    anything critical here.

21           MR. WIRTH:  Yes, Your Honor.  I'll be brief.  I think

22    what the Court's colloquy with the government has revealed is

23    that the government has done nothing to make the flow of

24    payments happen, or at least that government counsel's is

25    aware of nothing the government has done, and certainly can't

1    contradict my clients' experiences that they've received no

2    payments that they are owed.

3        As far as we're aware, there's been zero directives from

4    the agency with respect to the unfreezing of funds.  There

5    have been, you know, some statements with respect to

6    suspensions and terminations, which is a separate question

7    entirely.  With respect to the unfreezing of funds, we're

8    aware of no directives from leadership whatsoever since the

9    Court's TRO over -- almost two weeks ago.

10       The government refers to the legitimate expense waiver, but

11   that was a waiver that was included in the -- a waiver to the

12   provisions that this court has already enjoined.  And even if

13   the invoices at issue here were subject to that waiver, no

14   payments have been made.  So the waiver is illusory.  So the

15   government's invocation of the waiver makes no sense two times

16   over.

17       And I just want to be very clear, there was some discussion

18   of terminations.  Terminations are a separate question.  But

19   the key point here is that even on contracts that have been

20   terminated, whether or not those terminations remain in effect

21   or not or have been re-upped or not, the government still has

22   to make payments that are owed regardless of whether the

23   government decides to terminate contracts.

24       The government referred to contract-level authorities.

25   They've cited no contract-level authorities for the

1    proposition that the government can refuse to pay its debts,

2    much less refuse to give meaning to the Court's TRO.  I do

3    want to focus very carefully on the language of the TRO here,

4    which specifically directed the government to stop suspending,

5    pausing or otherwise preventing the obligation or disbursement

6    of appropriated foreign assistance funds.

7        And I think what's crucial here and what's been

8    demonstrated by the government in this colloquy is that

9    they've done absolutely nothing to give meaning to that

10   provision of the TRO.

11       The government briefly mentioned the monetary nature of the

12   relief here.  I want to be very clear, the order that we put

13   forward sets out relief that is necessary to give effect to

14   the TRO.  We are going to fully brief the APA issues in our

15   reply brief.  But to be clear, the APA permits injunctive

16   relief that has the effect of causing the government to make

17   out payments.  There's case after case after case for that

18   proposition.  There's nothing stopping the Court from ordering

19   the relief that we've requested.  And to be clear, this is

20   relief that is necessary to give meaning to the TRO.  This is

21   not separate relief.

22       Finally, I do want to correct some either misunderstandings

23   or misstatements from the government with respect to the

24   terminations here.  The government has said that the

25   terminations prior to February 13 are currently invalid.  Our

1    understanding is that the government has decided that every

2    single termination that it effected prior to the Court's TRO

3    remains in effect.  They were never rescinded, they were never

4    taken off the books, they simply added a post hoc

5    rationalization for every single one of those.  That includes

6    all four tranches of the terminations that occurred in the

7    days around when we filed our complaint.

8        But we're here right now primarily discussing the failure

9    of the government to do anything whatsoever with respect to

10   the freeze of foreign assistance funds.  They still have done

11   nothing to stop the pause.  And to be clear, they still owe

12   that money even on terminated contracts, even if those

13   terminations are ultimately deemed to be valid, which we do

14   not believe they are.

15       So that's all I have to say.  Thank you.

16           THE COURT:  Thanks, Mr. Wirth.

17       Okay.  So the Court's going to take about a 15-minute

18   recess.  And I'll honor that.  If folks need to get up for 15

19   minutes and return to the phone in about 15 minutes, you have

20   my word I won't come back before that.  I also don't

21   anticipate coming back much after that.  But I do want to take

22   some time to consider the arguments and see what clarity I can

23   offer here orally.

24       So I will be back.  Appreciate it.

25           THE DEPUTY CLERK:  This honorable court is in a brief

1    recess.

2         (Recess from 12:31 p.m. to 1:01 p.m.)

3         THE DEPUTY CLERK:  Good afternoon.  Counsel for

4    plaintiffs in the 400 case, are you present?

5         MS. BATEMAN:  Yes.  Lauren Bateman for the plaintiffs

6    is present.

7         THE DEPUTY CLERK:  Thank you.  And defense?

8         MR. SUR:  Yes, I am.  This is Indraneel Sur for the

9    Department of Justice for the defendants.

10        THE DEPUTY CLERK.  Thank you.  And plaintiffs in the

11   402 case, are you present?

12        MR. WIRTH:  Yes.  This is Stephen Wirth on behalf of

13   plaintiffs.

14        THE DEPUTY CLERK:  All right.  Your Honor, we're ready.

15        THE COURT:  All right.  Thanks, everyone.  I appreciate

16   your patience.  And I wish I could say I'll give you that 15

17   minutes back, but I don't have a way of doing that.

18      The Court is prepared to rule on plaintiffs' written motion

19   to enforce in 402 and plaintiffs' oral motion to enforce in

20   400.

21      The Court makes clear at the outset that this ruling is

22   taking place in the context of enforcing specific aspects of

23   the Court's TRO, those that have been the focus of today's

24   hearing.  And accordingly, I'm making clear that in enforcing

25   specific components of the TRO, the Court is in no way

limiting the scope of the TRO or modifying its terms.

In granting the temporary restraining order, the Court made clear that the restrained defendants were enjoined from "suspending, pausing, or otherwise preventing the obligation or disbursement of appropriated foreign assistance funds in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025."

And in granting the subsequent motion to enforce, the Court made clear that, "To the extent defendants have continued the blanket suspension, they are ordered to immediately cease it and to take all necessary steps to honor the terms of contracts, grants, cooperative agreements, loans, and other federal foreign assistance awards that were in existence as of January 19, 2025, including but not limited to disbursing all funds payable under those terms."  That's the Court's February 20th order.

Counsel for defendants today have acknowledged that the Court's TRO forecloses giving effect at least to any suspension or termination which took place before the Court's temporary restraining order on February 13, 2025.

Plaintiffs have submitted evidence that defendants have not lifted the suspension or freeze of funds as the TRO required. Defendants have not rebutted that evidence, and when asked today, defendants were not able to provide any specific

1   examples of unfreezing funds pursuant to the Court's TRO.

2       At the hearing today, defendants did for the first time, at

3   least as it relates to the TRO, argue that monetary relief

4   cannot be a consequence of the TRO under the APA due to

5   sovereign immunity.  The Court notes this is a further example

6   of the shifting ground that's taken place at the TRO phase and

7   that the argument's not sufficiently developed to be

8   considered today.

9       I do understand that defendants have included this argument

10  in their briefing at the preliminary injunction stage, and the

11  Court will of course give it due consideration at that stage.

12  And as the Court has noted several times, once the parties

13  complete their briefing schedule at the preliminary injunction

14  phase, the Court stands prepared to hold a hearing and resolve

15  the preliminary injunction as expeditiously as possible.

16      In the meantime, the motion to enforce the TRO is the issue

17  before the Court.  And the very point of a TRO is to prevent

18  irreparable harms in the course of considering a preliminary

19  injunction.

20      So, for these reasons, the Court is going to grant

21  plaintiffs' motion to enforce and finds that the relief

22  requested by plaintiffs in their proposed order is

23  appropriate.  So to be clear and to give effect to the Court's

24  TRO, the Court orders as follows:

25      By 11:59 p.m. on February 26, 2025, the restrained

1    defendants shall pay all invoices and letter of credit

2    drawdown requests on all contracts for work completed prior to

3    the entry of the Court's TRO on February 13.

4        They shall permit and promptly pay letter of credit

5    drawdown requests and requests for reimbursements on grants

6    and assistance agreements -- this is also for the purpose of

7    this motion to enforce, for work completed prior to the entry

8    of the Court's TRO on February 13.

9        And defendants shall take no actions to impede the prompt

10   payment of appropriated foreign assistance funds and shall

11   take all necessary action to ensure the prompt payment of

12   appropriated foreign assistance funds.

13       I'm reiterating that this relief takes place in the context

14   of a specific request to enforce the TRO.  This in no way

15   narrows the scope of the TRO itself.

16       That's the Court's ruling.

17       I do want to turn to the joint status report on compliance

18   that -- I'll be clear that the parties remain under an order

19   to file that joint status report by noon tomorrow.

20       Obviously, the required disbursements pursuant to this

21   motion to enforce that the Court has granted may still be

22   underway when the status report is filed; however, the report

23   shall confirm what steps have been taken by that time and that

24   such disbursements will be made by 11:59 p.m. tomorrow.

25       And in the interest of ensuring compliance with the Court's

1    order, as I previously ordered, to the extent there remain any

2    disputes as to compliance -- and here I'm speaking of the

3    whole TRO, not just the present motion to enforce.  To the

4    extent there remain disputes as to compliance, the parties

5    shall identify agency officials, employees, or other witnesses

6    who can testify under oath as to those disputes.

7        Finally, based on the discussion at today's hearing, I'm

8    also ordering defendants to provide the Court and plaintiffs

9    any directives or guidance that defendants or their agents

10   have sent since the Court's TRO on February 13 which pertain

11   to the implementation of the TRO or the suspension or

12   termination of agreement, and any directive or guidance after

13   the Court's TRO on February 13 which pertain to the

14   implementation of the TRO or the suspension or termination

15   of agreement.  And I want those by noon tomorrow as well.

16       And just in the interest of being clear, that would include

17   any directives or guidance that defendants or their agents

18   send through tomorrow, up until -- so even if it follows the

19   discussions we've had at the hearing today.  And I want those

20   documents by noon tomorrow.

21       With that, we can adjourn for the day.  I appreciate

22   everyone's time.

23           THE DEPUTY CLERK:  All right.  Thank you all.  This

24   honorable court is adjourned.

25           (Proceedings adjourned at 1:09 p.m.)

\* \* \* \* \* \*

CERTIFICATE

    I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne