**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AIDS VACCINE ADVOCACY COALITION, *et al.*,<br><br>        *Plaintiffs*,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF STATE, *et al.*,<br><br>        *Defendants*. | Civil Action No. 25-cv-400 (AHA) |
| GLOBAL HEALTH COUNCIL, *et al.*,<br><br>        *Plaintiffs*,<br><br>    v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>        *Defendants*. | Civil Action No. 25-cv-402 (AHA) |

## JOINT STATUS REPORT

The parties respectfully submit this joint status report pursuant to the Court's orders issued February 22 and February 25, 2025. The parties jointly report that they were unable to come to an agreement with regard to the facts at issue or the discovery necessary to resolve any factual disputes, so they have set out their individual statements below.

## PLAINTIFFS' STATEMENT

Defendants provided their statement for incorporation into this Joint Status Report at 12:04 pm. Noncompliance with the Court's deadline is not due to any delay on Plaintiffs' part.

1

I.      **Plaintiffs' Statement of the Facts**

Plaintiffs' Complaints (*GHC* ECF No. 30-1; *AVAC* ECF No. 1) and motions to enforce set forth the facts as alleged in this litigation, and Plaintiffs reaffirm those facts here. In this section, Plaintiffs set forth additional facts and supporting evidence related to Defendants' persistent noncompliance with the provisions of the Court's TRO and its subsequent orders enforcing the TRO. To Plaintiffs' knowledge, in the 13 days since the Court entered its TRO, Defendants have undertaken no meaningful efforts whatsoever to comply, either with it or the with the Court's subsequent orders with respect to enforcement. Instead, Defendants have erected numerous new barriers to compliance at every turn. This conduct cannot be explained as anything other than willful defiance of the Court's orders.

A.      **Defendants implement the Executive Order by terminating contracts, suspending grants and cooperative agreements, issuing stop-work orders, and pausing disbursement of all foreign-assistance funds.**

On January 20, 2025, President Trump issued Executive Order 14,160, entitled "Reevaluating and Realigning United States Foreign Aid." 90 Fed. Reg. 8619. The Executive Order, *inter alia*, implemented a 90-day spending "pause," *id.* § 3(a), directed "[r]eviews of each foreign assistance program . . . under guidelines provided by the Secretary of State," *id.* § 3(b), and ordered "[t]he responsible department and agency head[]," to "make determinations within 90 days of this order on whether to continue, modify, or cease each foreign assistance program . . . with the concurrence of the Secretary of State," *id.* § 3(c).

Over the following weeks, Defendants set about implementing the Executive Order through a series of memoranda and directives issued by USAID and State Department leadership. *See GHC* Compl. ¶¶ 41–57; Resp. to Court Order at 1–3 (*GHC* ECF No. 19); Jessica Doe Decl. ¶¶ 2–33 (*AVAC* ECF No. 26-3). Over the course of four days—from February 9 to 13—Defendants issued four "tranches" of contracts, grants, cooperative agreements, and awards that had been

selected by State Department leadership for immediate termination. Resp. to Court Order at 1–3 (*GHC* ECF No. 19); Jessica Doe Decl. ¶¶ 2–33 (*AVAC* ECF No. 26-3). These tranches included hundreds of contracts, grants, cooperative agreements, and awards. *See* Jessica Doe Decl. ¶¶ 2–33 (*AVAC* ECF No. 26-3); First Marocco Decl. ¶ 12 (*GHC* ECF No. 25-1).

In an email sent February 11, Senior Procurement Executive (SPE) Jami Rodgers directed agency personnel—namely, the Contracting and Agreement Officers (COs) who manage contracts and awards—to terminate the contracts and awards *en masse*, without engaging in any individualized review, in order to quickly implement "the President's Executive Order on Reevaluating and Realigning United States Foreign Aid." Jessica Doe Decl. ¶ 29 (*AVAC* ECF No. 26-3). Senior Procurement Executive Jami Rodgers further stated that "[a]n Action Memorandum for each tranche of awards was reviewed and cleared through the State Department's Director of Foreign Assistance and approved by the Secretary. These action memos will be filed in a shared drive. This documentation along with this email can be used to support the terminations." *Id.* Those action memos were never shared with COs. *Id.* ¶ 30.

During the same period, Defendants halted outgoing disbursements from USAID and the State Department pursuant to the Executive Order. On January 27, Certifying Officers worldwide reported that certified payments were not being processed through USAID's accounting system (Phoenix) to the U.S. Treasury for disbursement. Della Doe Decl. ¶ 6. On February 3, Certifying Officers lost the ability to certify payments in Phoenix. *Id.* On February 5, all USAID controllers received a diplomatic cable stating that USAID personnel could no longer process payments themselves but must request approval from a State Department official. *Id.*, Ex. 1 (Walter Doe Decl. ¶ 10). And on February 11, COs were notified that Phoenix was closed and that "the Agency has temporarily restricted access to Phoenix until further notice." Jessical Doe Decl. ¶ 32 (*AVAC*

ECF No. 26-3). During this period all disbursements from USAID and the State Department to implementing partners stopped. *See id.*; Decls. in Support of TRO Mot. (*GHC* ECF No. 7).

**B.      The Court enjoins the Restrained Defendants from implementing the Executive Order.**

On February 13, 2025, the Court enjoined all Defendants aside from President Trump (the "Restrained Defendants") from enforcing or giving effect to Sections 1, 5, 7, 8, and 9 of Dep't of State, Memorandum, 25 STATE 6828 (Jan. 24, 2025), and any other directives that implement Sections 3(a) and 3(c) of Executive Order Number 14,169, "Reevaluating and Realigning United States Foreign Aid" (Jan. 20, 2025). TRO at 14 (ECF No. 21). The Court's order has two primary components: It enjoins the Restrained Defendants from "suspending, pausing, or otherwise preventing the obligation or disbursement of appropriated foreign-assistance funds in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025." *Id.* And it enjoins the Restrained Defendants from "issuing, implementing, enforcing, or otherwise giving effect to terminations, suspensions, or stop-work orders in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025." *Id.*

**C.      Defendants are not complying with the Court's order with respect to "the obligation or disbursement of appropriated foreign-assistance funds"**

Since the Court issued the TRO, Defendants have taken no meaningful steps to comply with the TRO's injunction of the spending pause.

*First*, Defendants have maintained the Executive Order's pause of all foreign-assistance funds. *See* Second Marocco Decl. ¶¶ 11–20 & Ex. C (*GHC* ECF 39-1). To Plaintiffs' knowledge, Defendants have made no or almost no disbursements of foreign-assistance funds since the Court issued the TRO or since the Court's order granting Plaintiffs' motion to enforce yesterday. Notably, the most recent Marocco Declaration does not identify a single payment issued since the

Court entered the TRO; nor does it describe any specific actions undertaken by Defendants or agency personnel to restart payments in the past 13 days. The Marocco Declaration also does not dispute that even after the Court entered the TRO, "Secretary Rubio … implemented a [new] 15-day disbursement pause on all **$15.9B worth of grants** at the State Department." Dunn-Georgiou Decl. ¶ 3 (*GHC* ECF No. 29-1).

*Second*, Defendants have issued no guidance on how agency personnel should implement the TRO's injunction of the spending pause. *See* Della Doe Decl. ¶¶ 8–9. In the 13 days since the TRO was issued, there has been no official (or unofficial) guidance released to USAID's Certifying Officers concerning how the TRO's injunction of the spending pause should be implemented. *Id.* The only new official guidance USAID issued to Certifying Officers since the TRO was on February 20 and concerned the Agency's own administrative payments, such as staff salaries and benefits, rent, utilities, and security services. *Id.* And notably, the only guidance cited by the Marocco Declaration concerns a FAQ dated February 24 regarding the implementation of exceptions and waivers *under the blanket spending pause*, which confirms that the pause remains in effect. Second Marocco Decl., Ex. C (*GHC* ECF 39-1).

*Third*, Defendants have added new layers of review to all disbursements of foreign-assistance funds, including requiring line-by-line policy justifications for payments for past work that has already been approved through normal approval processes. *See* Ellie Doe Decl. ¶¶ 9–15; Della Doe Decl. ¶¶ 8–11; Clara Doe Decl. ¶¶ 11–15; *see also* Mot. to Enforce at 7 (*GHC* ECF No. 29) (describing artificial bottleneck). And because Defendants are treating the foreign-assistance pause as still in effect, they are requiring all approvals of disbursements of funds for work prior to January 24 to be approved under the waiver categories set out in 25 STATE 6828, which imposes additional significant approval and documentation requirements. *See* Second Marocco Decl., Ex. C (*GHC* ECF 39-1); Ellie Doe Decl. ¶¶ 9–15; Della Doe Decl. ¶¶ 10–11.

*Fourth*, approvals for all payments are being routed through a single (or a small number of) political appointees, who are refusing to authorize essentially any payments. *See* Della Doe Decl. ¶¶ 7, 9; Northrip Decl. ¶ 8 (*GHC* ECF No. 29-6); *see also* Second Marocco Decl., Ex. C (*GHC* ECF 39-1). Public reporting also indicates that "DOGE" employees acting at the direction of Elon Musk have "veto[ed]" payments that make it through that authorization process.[1]

*Fifth*, USAID's and the State Department's payments mechanisms were operating effectively prior to January 20 until Defendants introduced the technical problems that they now say make it difficult to comply with the TRO. Specifically, the most recent Marocco Declaration states that "both State and USAID" previously could process "several thousand payments each day." Second Marocco Decl. ¶ 15 (*GHC* ECF 39-1). But now Defendants complain that it will take "multiple weeks" for USAID to process only "2,000 outstanding and newly created payment requests." *Id.* ¶ 4. It should come as no surprise that Defendants cannot timely process the volume of payments needed when they have disrupted access to the agencies' payment systems, added additional unnecessary processes and procedures into the systems, and funneled all payments through an artificial bottleneck of just a few political appointees who are not familiar with the underlying contracts and awards. *See* Clara Doe Decl. ¶¶ 12–15. That said, if Defendants had begun complying with the Court's order 13 days ago, they would surely now be able point to *some* progress in that time. *Cf.* Second Marocco Decl. ¶ 4 (*GHC* ECF 39-1). But Defendants have not even identified any steps taken to comply.

---

[1] Matt Bai, *The blinding contempt of the DOGE bros*, Wash. Post (Feb. 24, 2025), https://www.washingtonpost.com/opinions/2025/02/24/musk-doge-usaid-cuts-dc/.

*Sixth*, Defendants' asserted interest in combatting fraud is pretextual, and the additional processes are unnecessary to prevent overpayments. *See* Clara Doe Decl. ¶¶ 9–21; Zahra Decl. ¶¶ 11, 16–21; Mot. to Enforce at 10 & n.7 (*GHC* ECF No. 29) (citing sources).

*Seventh*, if Defendants abandoned their untested and unnecessary new policies, procedures, and approvals, USAID and the State Department would be able to process payments in a timely manner. *See* Clara Doe Decl. ¶¶ 12–15. Contrary to Mr. Marocco's statement in his declaration filed last night that "there are currently no payments prepared and sitting in the USAID system that can be readily sent to the recipients," (*GHC* ECF 39-1, ¶ 19), Plaintiffs became aware less than three hours before the filing of this joint status report of specific information showing that that is not the case. Multiple Contracting and Award Officer Representatives have indicated to Plaintiffs—including through screenshots of USAID's payment system and memos to file—that there are, in fact, vouchers and invoices that have been fully reviewed and cleared for payment and therefore can and should be paid promptly.[2]

### D.    Defendants are not complying with the Court's order with respect to "terminations, suspensions, or stop-work orders."

Since the Court issued the TRO, Defendants have also taken no meaningful steps to comply with the TRO's provision with respect to terminations, suspensions, or stop-work orders.

*First*, to Plaintiffs' knowledge, Defendants have continued to treat all terminations issued prior to the issuance of the TRO as continuing in full force and effect. *See* First Marocco Decl. ¶¶ 12, 16. In fact, Defendants issued guidance that the TRO had "[n]o effect on terminated awards." Zahra Doe Decl. ¶ 13.

---

[2]    Given when they learned this information, Plaintiffs were not able to present this information in a citable form at the time of filing this joint status report. Plaintiffs stand ready to present this information to the Court through declarations at the Court's request.

*Second*, a small number of suspensions and stop-work orders with respect to grants and cooperative agreements have been lifted. *See, e.g.*, Dunn-Georgiou Decl., Exs. A–C (*GHC* ECF No. 29-1). But, in Plaintiffs' and their members' experiences, the overwhelming majority of suspensions and stop-work orders remain in effect. *See* Zahra Doe Decl. ¶¶ 10–17.

*Third*, the terminations issued prior to the Court's TRO (none of which have been rescinded) are being maintained for pretextual reasons. Senior agency officials have stated that Secretary Rubio has individually reviewed all of the prior terminations and determined that they were allowable under the terms of the individual awards, and that the terminations are in the national interest and consistent with priorities. But, as explained below, it would be impossible for one person or even a group of people to meaningfully review all of these contracts and awards in such a short period. *See also* Zahra Doe Decl. ¶¶ 36–37. Nor is it plausible that every single contract or award originally terminated under a blanket ban of hundreds of contracts would—on subsequent review, applying different criteria—each individually be terminated.

*Fourth*, since the Court issued the TRO, Defendants have continued issuing new tranches of terminations, re-sending prior tranches (which had been originally issued *before* the TRO), and directing COs to terminate all of the awards as quickly as possible without any further individual review. On February 23, SPE Rodgers circulated a fifth tranche of contract terminations and directed COs to an FAQ dated February 20, 2025, which did not discuss the TRO but rather continued to refer to the Executive Order. *See* Zahra Doe Decl. ¶ 24. Specifically, the FAQ stated: "The termination authority is delegated to the Senior Procurement Executive from the Acting USAID Administrator, Secretary Rubio, who has instructed USAID to terminate these awards as part of the <u>President's Executive Order on Reevaluating and Realigning United States Foreign Aid</u>. Please refer to the M/OAA Director's email to A&A staff dated February 10, 2025." *Id.*

Undersigned counsel for Plaintiffs in Case 25-cv-402 immediately alerted counsel for the

Defendants of Defendants' noncompliance with the TRO. An hour later, USAID Industry Liaison Matthew Johnson sent an email stating that the FAQ had been retracted: "The Q&A document sent around earlier has been withdrawn and will be updated. That document reflected an outdated and now inaccurate version with several citations that indicated that President Trump's Executive Orders were the basis for termination actions." *Id.* ¶ 26. The email continued: "For the avoidance of doubt, Tranche 5 termination authority has no relationship to any Executive Order. These awards were individually reviewed by Secretary Rubio and the USAID Front Office and were determined to be inconsistent with the national interest and Agency priorities." *Id.* ¶ 27. The email continued: "Accordingly, USAID has elected to enforce termination authorities in the relevant instruments. Similarly, Secretary Rubio has individually reviewed Tranches 1-4 and made similar determinations in his capacity as Acting Administrator of USAID." *Id.* ¶ 28.

Similarly, on February 24, Senior Technical Advisor (STA) Adam Cox, sent an email stating that he and remaining COs in Washington had "been instructed by DOGE and [SPE] Jami [Rodgers] to terminate several awards tonight, so you may see some awards of yours that have been terminated. You should be CC'd on any emails that are going out. This of course will have to be officially done later in time through a GLAAS action from someone [else] in the Mission/Region covering that portfolio, but I wanted to give you a heads up." *Id.* ¶ 33. The email continued: "There are MANY more terminations coming, so please gear up!" STA Cox also stated in private messages that "DOGE" had originally planned to call COs around the world "in the middle of the night" and force them to terminate the awards. *Id.* ¶ 34. This was considered but rejected as not "feasible." *Id.* He also stated, "Supposedly these [new terminations] do not violate the TRO because they were individually reviewed by Rubio and this was overseen by DOJ." *Id.* He further stated, "Rubio reviewed and wants action." *Id.*

*Fifth*, leadership within the agencies have circulated no memorandums or legal opinions

justifying their actions, either before or after the Court issued the TRO. *Id.* ¶ 35; Jessica Doe Decl. ¶¶ 29–30 (*AVAC* ECF No. 26-3).

    *Sixth*, it is implausible that the Secretary himself or even a group of political appointees engaged in a meaningful individualized review of the hundreds of contracts and awards terminated prior to the Court's TRO or after the Court's TRO in the past two weeks. Contracts, grants, cooperative agreements, and other awards are lengthy, technical, and complicated documents. Zahra Doe Decl. ¶ 36. They often include technical specifications that are dozens of pages long, as well as lengthy technical appendices. *Id.* It would take a single person many weeks of work to substantively review hundreds of contracts and awards, especially if that person was not already familiar with the programs at issue. *Id.* Beyond that, without consulting the COs and CORs/AORs who manage a specific contract or award, it would be impossible in most cases to understand whether a specific award could be terminated, effective immediately, without incurring even greater termination costs or causing even greater harms to the national interest or agency priorities. *Id.* ¶ 37. For example, the COs and CORs/AORs have specific information about the status of ongoing work, whether immediate termination would incur sunk costs (for example, by allowing already-purchased food and medicine to expire), whether immediate termination would risk the health or safety of Agency personnel or implementing partners, among many other award-specific factors. *Id.*

### E.    Defendants have terminated the overwhelming majority of USAID personnel in a manner that make compliance with the Court's order extremely difficult, if not impossible.

    Finally, the government has dramatically reduced USAID's workforce in recent days in a matter that will have the predictable effect of making compliance with the TRO extremely difficult, if not impossible, going forward. There are insufficient remaining employees to effect payments

or manage contracts, grants, cooperative agreements, and other awards going forward. Della Doe Decl. ¶ 12; Sandra Doe Dec. ¶¶ 13–14; Mot. to Enforce at 9 (*GHC* ECF No. 29) (citing sources).

## II.    Plaintiffs' Proposed Discovery Plan

Plaintiffs met and conferred with the government at 9:00 am this morning, February 26, 2025—the earliest time that Defendants stated they would be able to meaningfully confer—to seek to discern the government's position on the factual contentions set forth above. The government stated that it was not in a position to respond to any of Plaintiffs' contentions. Plaintiffs therefore have identified witnesses and documents that bear on the disputes regarding the government's compliance with the TRO and the Court's orders.

### A.  Witnesses

#### 1.  Pete Marocco

Pete Marocco has submitted several extensive declarations in this matter attesting to the government's purported compliance with the TRO. The government represented to Plaintiffs that they consider that Mr. Marocco is competent and the most appropriate witness to speak to these issues. Plaintiffs agree that Mr. Marocco's testimony may be necessary to evaluate Defendants' compliance with the TRO, but it is not sufficient. As noted above, in just the last few hours, Plaintiffs have received specific information from career USAID personnel contradicting statements made in the declaration Mr. Marocco filed last night. And this case is not the first time career USAID staff have questioned Marocco's statements and competence. In 2020, a dissent channel memo stated that Marocco "leveraged once-routine administrative processes to reopen previously-approved plans, interrogate and redirect country programs, halt movement on programs, procurements, and people, and inject uncertainty into daily operations and office planning." USAID, Dissent Channel Memo (Sept. 17, 2020), *available at* https://static.politico.com/02/1a/e19abea24ed0afd7ec69eada8d24/oti-dissent-channel-memo-

91720.pdf. "He has eschewed providing direction in writing or through other formal channels, and rarely sent guidance to teams directly implicated. Instead, he has conveyed orders and decisions, sometimes only orally, to individual staff … who then must attempt to relay this information as best they can to colleagues. This has inevitably generated significant confusion over intent and expectations, and made it difficult to confirm decisions or maintain adequate records." *Id.*

### 2. Marco Rubio

Defendants indicated that they would resist Secretary Rubio being called as a witness under the apex doctrine. However, Defendants have represented to this Court that Secretary Rubio had "personal involvement" in decisions to terminate contracts and grants. Second Marocco Decl. ¶¶ 5, 6. Communications from senior agency officials have also stated that Secretary Marocco "individually" reviewed hundreds of contracts and awards and determined to terminate them. Zahra Doe Decl. ¶¶ 27–28, 34.

### 3. Jami Rodgers

Mr Jami Rodgers is a senior bureau official at USAID. He has been delegated termination authority by Secretary Rubio and has been responsible for issuing guidance to agency personnel about terminations of contracts. Zahra Doe Decl. ¶ 24.

### 4. Senior Bureau Official at State Department

Plaintiffs consider that it would be useful to hear live testimony from a career senior bureau official at the State Department who has firsthand knowledge about terminations.

### 5. Career officials competent to testify about payment

It would be useful to hear live testimony from career, nonpolitical agency personnel, both at USAID and at the State Department—potentially from in the office of the Chief Financial Officer of USAID and the office of the Under Secretary for Management (M) at the State

Department—who have firsthand knowledge about decisions and processes relating to payments and disbursements.

**B. Documents**

Discovery of documents in the following categories would assist the parties and the Court in assessing the government's compliance with the Court's orders. Plaintiffs' proposals are not intended to be unduly burdensome or vexatious; Plaintiffs are necessarily limited in their knowledge of what documents exist, how voluminous they are, and how difficult they would be to locate and produce. In the limited time in which the government was available to meet and confer, the government did not offer any views on potential document requests or on ways to narrow them. Plaintiffs remain open to tailoring or narrowing document requests with the Court's guidance and further input from Defendants.

**Terminations**

1.  All documents reflecting the rescission or lifting of terminations of contracts issued between January 20, 2025 and February 13, 2025.

2.  For contracts terminated between January 20, 2025 and February 13, 2025:

    a.  The administrative record for the original termination, including but not limited to the "Action Memoranda" referred to in Special Procurement Executive Jami Rodgers' communication of February 11, 2025, instructing contracting officers to terminate awards in Tranches 1-3.  *See AVAC* ECF No. 26-3, ¶ 29.

    b.  All documents memorializing the reasons for maintaining the termination in effect after February 13, 2025.

3.  A list of all contracts terminated after the issuance of the TRO, specifying (1) the date of each termination and (2) the reason for each termination.

4.    The administrative record for the termination of any contract after the issuance of the TRO.

5.    The spreadsheets referred to in paragraph 5 of the Second Marocco Declaration (*GHC* ECF 39-1), reflecting (1) policy staff's "first line review," (2) the "senior policy official's recommendations", (3) Mr Marocco's determinations, and (4) the review of the Secretary of State.

6.    The list referred to in paragraph 6 of the Second Marocco Declaration (*GHC* ECF 39-1), reflecting (1) the review, recommendations, and justifications of the Senior Bureau Official, and (2) the edits made by the Office of the Secretary pursuant to the Secretary's instructions.

7.    The "other lists of contracts and grants that were sent to the leadership at USAID for termination through a content search or other means and these were approved for termination," referred to in paragraph 6 of the Second Marocco declaration.

**Suspensions/stop-work orders**

8.    A list of all suspensions/stop-work orders issued between January 20, 2025 and February 13, 2025.

9.    A list of all suspensions or stop-work orders issued between January 20, 2025 and February 13, 2025 that have been rescinded, listed by date, specifying the reason for each rescission (including but not limited to whether the activities covered were subject to a waiver).

10.    The administrative record for the issuance of any stop-work or suspension order since the issuance of the TRO.

**Payments**

11. A list of all payments made to implementing partners since February 13, 2025, by date, amount, and specifying whether each payment was for activities subject to a waiver.

12. Documents reflecting or describing the procedures and systems used to process payments prior to January 20, 2025.

13. To the extent not already provided to the Court and to Plaintiffs, copies of all directives and instructions issued to contracting officers and agreement officers about the processing of payments, dated after February 13, 2025.

14. The administrative record for the decision to implement new payment systems and processes.

15. A list of all pending payment requests since February 13, 2025 that have not yet been approved.

16. All evidence relating to DOGE employees' oversight of payments.

17. All evidence that any payment to any Plaintiffs or their members for work completed prior to January 20, 2025 would present a risk of waste, fraud, or abuse.

<u>**DEFENDANTS' STATEMENT**</u>

1. After the Court issued a TRO on February 13, 2025, the Department of State and USAID issued both public notice, via the sam.gov website, and notice to the counterparties to their various agreements that the TRO was in effect that quoted the operative terms of that Order. No. 1:25cv400, ECF 22-2 & 22-3. Separately, the Department of State and USAID issued directives to contracting officers and grant officers to comply with the TRO, again quoting the operative terms of the TRO. *Id.* ECF 22-4 & 22-5. For example, USAID's Chief Acquisition Officer and Senior Procurement Executive instructed, "Accordingly, until further notice, all Contracting and

Agreement Officers should not enforce any Agency directive issued under Executive Order 14169 and the Secretary's implementing memorandum that requires the generalized stop work, suspension, or pause of Agency contracts, grants, or other federal assistance awards."

2.      Given the Court's order restraining the generalized pause, Defendants moved quickly to conduct "a good-faith, individualized assessment of [each] contract or grant and, where the terms or authority under law allows, taking action with respect to that particular agreement consistent with any procedures required." *Glob. Health*, ECF No. 28 at 2, 6.  More specifically, in order to comply with the TRO, Defendants have been expeditiously examining each USAID and State foreign assistance award on an individual basis and through a multi-step process to determine whether, beyond the directives to the contract and grants officers to comply with the TRO, USAID and State will either lift the particular stop work orders or terminate the funding instrument under authority conferred by both the contracts/grants and independent legal authority.  2/25 Marocco Decl. ¶ 3.

3.      As of this morning, that process has been completed for USAID and State Department. 2/26 Marocco Decl. ¶¶ 1-2. Secretary Rubio has now made a final decision with respect to each award, on an individualized basis, affirmatively electing to either retain the award or terminate it pursuant to the terms of the instrument or independent legal authority as inconsistent with the national interests and foreign policy of the United States.  *See id.*  USAID is in the process of processing termination letters with the goal to reach substantial completion within the next 24-48 hours.  As a result, no USAID or State obligations remain in a suspended or paused state.  In total, nearly 5800 USAID awards were terminated, and more than 500 USAID awards were retained.  The total ceiling value of the retained awards is approximately $57 billion.  In total, approximately 4,100 State awards were terminated, and approximately 2,700 State awards were retained.  Defendants are committed to fully moving forward with the remaining awards and

programs that USAID and Secretary Rubio have determined to retain.

4.      As to past-due payments on work completed before January 24, 2025, Secretary of State Rubio has directed that invoices identified by the Plaintiffs be processed and expedited for payment without the ordinary vetting procedures, in a good-faith effort to comply with the Court's order of February 25, 2025. Those payments from State, in the amount of approximately $4 million, are expected to be issued today. With respect to USAID, however, even with this expedition and the bypassing of ordinary payment protocols, USAID expects it could take up to two weeks for the payments to issue to the Plaintiffs due to the larger volume of payments requested and the need to manually identify, review, and pull each invoice. *See* 2/26 Marocco Declaration ¶¶5-7 (explaining why time is needed). Nevertheless, certain funds, exceeding $11 million, have been released for transfer to certain of the Plaintiffs this morning. 2/26 Marocco Declaration ¶¶3-4. This process has already begun and is being prioritized by the agency. For this and other reasons, Defendants have sought an emergency stay of the Court's order from this Court and the Court of Appeals.

5.      As to parties not before the Court, it is not technically possible for Defendants to process all payments by February 26 at 11:59pm. For USAID, it is estimated that the Court's order would require the payment of at a minimum $1.5 billion dollars across approximately 2,000 payment requests, including many that need to be newly created. For State, it is estimated that the Court's order would require the payment of at a minimum $400 million in outstanding payment requests. These payments cannot be accomplished in the time allotted by the Court and would instead take multiple weeks. 2/25 Marocco Decl. ¶ 4. Again, for this reason among others, Defendants have sought emergency relief from this Court and the Court of Appeals.

6.      Additional time is required because restarting funding related to terminated or suspended agreements is not as simple as turning on a switch or faucet. Rather, the payment

systems of USAID and State are complicated and require various steps before payments are authorized to be disbursed by the U.S. Treasury, Department of Health and Human Services, and/or the Department of State, involving multiple agencies, which are not a party to this litigation. The approval process must comply with the Federal Managers Financial Integrity Act and the Federal Financial Management Improvement Act. At a high level, their payment system requires: (1) working with vendors, (2) creating new payment requests, (3) getting them certified, (4) getting them re-certified, and (5) effectuating payments electronically through the Department of the Treasury, Health and Human Services or if overseas through the Department of State, or a combination thereof. The documentary evidence necessary to ensure compliance with policy added time to a process that already required certain controls, including appropriate separation of duties, to validate an invoice, review for compliance with appropriation law and accounting standards, and make the final payment. Adding an additional documentation step into an existing complex process, takes time to before it is fully efficient. Training for the staff, adjusting the system, and developing data management tools all resulted in a backlog of payments which is being addressed. *Id.* ¶ 14.  Again, as described above, the Secretary has directed that payments to the plaintiffs be expedited pursuant to this Court's order, including by bypassing these important checks and protocols, but even then, full payment cannot feasibly be accomplished by midnight tonight.

7.    Defendants have provided substantial information regarding their compliance with the Court's order, including multiple declarations. Discovery is thus unnecessary. Rather, the parties should proceed in the ordinary course, beginning with the resolution of the preliminary injunction motion on which the Court has stated it will rule with expedition.

8.    Nevertheless, Plaintiffs through their submission today propose to seek expansive discovery to support their characterizations of Defendants' TRO compliance, including contract-

specific documents and testimony from both high-level and subordinate officials in USAID and State. Plaintiffs' requests are inconsistent with this Court's most recent order, which noted "that the TRO does not place this Court in the position of supervising Defendants' determinations as to whether to continue or terminate individual grants based on their terms." ECF 34 at 3.

9. Plaintiffs' proposal is particularly inappropriate given that they press claims under the Administrative Procedure Act, where the "focal point for judicial review" is "the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

10. The issues on which Plaintiffs now demanding discovery also far exceed the scope of the TRO-phase of these actions. They concern distinct policy decisions, personnel decisions, and individual contract-specific decisions, none of which even bears on TRO compliance, and much of which would only be appropriately considered in an individual breach of contract action that would be governed by distinct statutory, regulatory, and administrative processes. Plaintiffs' misguided effort to use the TRO phase of these actions as a platform for seeking sweeping judicial oversight of two entire agencies and every aspect of their operations is properly rejected.

11. To the extent that the Court requires testimony on Defendants' compliance efforts, Pete Marocco "manage[s] the day-to-day operations at USAID" and also serves as Director of Foreign Assistance at the Department, and has provided the declarations previously submitted in this case. *Id.* ¶ 2.

12. In that regard, any effort to seek testimony from Secretary Rubio should be rejected. "[T]op executive department officials should not, absent extraordinary circumstances, be called to testify regarding their reasons for taking official actions." *Simplex Time Recorder Co. v. Sec'y of Labor*, 766 F.2d 575, 586 (D.C. Cir. 1985) (citing *United States v. Morgan*, 313 U.S. 409, 422 (1941) (*Morgan II*)); *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252,

268 (1977); *cf. In re Dep't of Com.*, 139 S. Ct. 16, 17 (2018) (mem.) (opinion of Gorsuch, J., joined by Thomas, J.) (agreeing with order staying deposition of Cabinet secretary). Hence, the D.C. Circuit and other circuits have issued writs of mandamus to prevent compulsion of testimony from high-level Government officials. *In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008) (*per curiam*) (Vice President's Chief of Staff); *accord In re McCarthy*, 636 F. App'x 142 (4th Cir. 2015) (EPA Administrator); *In re United States (Jackson)*, 624 F.3d at 1372-73 (same); *In re United States (Reno & Holder)*, 197 F.3d 310, 313-14 (8th Cir. 1999) (Attorney General and Deputy Attorney General); *In re United States (Kessler)*, 985 F.2d 510, 512-13 (11th Cir. 1993) (*per curiam*) (FDA Commissioner). Simply put, "[t]he duties of high-ranking executive officers should not be interrupted by judicial demands for information that could be obtained elsewhere." *In re Cheney*, 544 F.3d at 314. Hence, testimony from Secretary Rubio because of his role in the decisional process concerning the contracts and grants at issue in these cases would not be justified by the necessary "exceptional" circumstances, given the availability of Marocco. Requiring Secretary Rubio's testimony by contrast "would constitute an 'unwarranted impairment' of the functioning of" the Department. *In re Cheney*, 544 F.3d at 314 (quoting *Cheney*, 542 U.S. at 390).

13.    Per the Court's oral ruling on February 25, Defendants attach guidance issued by USAID and State since the TRO.

*     *     *

Dated: February 26, 2025

ERIC J. HAMILTON
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director

LAUREN A. WETZLER
Deputy Director

CHRISTOPHER R. HALL
Assistant Branch Director

*/s/ Indraneel Sur*
INDRANEEL SUR
Senior Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Phone: (202) 616-8488
Email: indraneel.sur@usdoj.gov

*Counsel for Defendants*

Respectfully submitted,

*/s/ Stephen K. Wirth*
William C. Perdue (D.C. Bar 995365)*
Sally L. Pei (D.C. Bar 1030194)
Samuel M. Witten (D.C. Bar 378008)
Stephen K. Wirth (D.C. Bar 1034038)
Dana Kagan McGinley (D.C. Bar 1781561)
Allison Gardner (D.C. Bar 888303942)
Daniel Yablon (D.C. Bar 90022490)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel: (202) 942-5000
stephen.wirth@arnoldporter.com

*application for admission pending

*Counsel for Plaintiffs in Case No. 25-402*

*/s/ Lauren E. Bateman*
Lauren E. Bateman (D.C. Bar 1047285)
Allison M. Zieve (D.C. Bar 424786)
Nicolas A. Sansone (D.C. Bar 1686810)
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street, NW
Washington, DC 20009
Tel: (202) 588-1000

*Counsel for Plaintiffs in Case No. 25-400*