## DECLARATION OF CLARA DOE

I, Clara Doe, declare the following under penalty of perjury:

1. I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2. I am a Contracting and Agreement Officer at USAID.

3. I have been working for the Agency for well over a decade and am charged with carrying out the operational work of USAID, which is primarily a procurement agency, as we implement our mission through federal assistance mechanisms including contracts and grants.

4. On February 13, 2025, a Temporary Restraining Order (TRO) issued in *AIDS Vaccine Advocacy Coalition v. U.S. Department of State*, No 25-cv-400, and *Global Health Council v. Trump*, No. 25-cv-402. I understood the TRO to mean that USAID could no longer enforce stop-work orders, suspensions, or terminations. I also understood it to mean that USAID would need to disburse funds to implementing partners. USAID Contracting Officers awaited agency guidance from the Senior Procurement Executive (SPE) Jami Rodgers on how to implement the TRO.

5. On February 14, 2025, Contracting Officers began to contact USAID leadership in Washington with questions regarding the implementation of the TRO. Many of these questions were based on issues raised by contractors and recipients of grants regarding the TRO and their outstanding vouchers that had not been paid from as far back as costs incurred in November of last year.

6. One Contracting Officer requested "urgent guidance" as to whether he should rescind termination letters that had been issued prior to the TRO but would not become effective until after the TRO was released. That Contracting Officer cc'd an email group that included all

field-based Contracting Officers. That Contracting Officer also flagged that their Mission had more than 20 vouchers from contractors and recipients of grants that had not been paid. The majority of those vouchers fell under the 12(d) exception in a State cable (known as an ALDAC), which provided that vouchers could be paid for "legitimate expenses incurred prior to the date of this ALDAC under existing awards or legitimate expenses associated with stop-work orders."  The Contracting Officer also stated that some of those vouchers were for activities that were also authorized to continue work under the PEPFAR waiver for HIV services.  The Contracting Officer noted that those contractors and recipients could not restart work under the approved PEPFAR waiver until payment issues were resolved. The Contracting Officer requested Agency-wide clarification for the process to get vouchers paid.

7. On Saturday February 15, 2025, the USAID Industry Liaison sent out a "Special Notice to All Foreign Assistance Recipients," quoting the language from the TRO.  The only additional information was "We will provide further guidance on this TRO as soon as we are able to do so."

8. SPE Rodgers finally emailed guidance on February 17, 2025 at 6:43 PM EST. The guidance was vague and unclear. It gave no clear directions on how to implement the TRO in regards to whether Contracting Officers should lift stop work orders, if terminations in effect should be retracted, if termination notices that had been sent but were not yet in effect should be rescinded, nor did it detail any instructions for obtaining payment for vouchers that had been approved for payment by Missions after review to ensure all costs were reasonable, allowable and allocable. The notice stated, in bold: "Accordingly, until further notice, all Contracting and Agreement Officers should not enforce any Agency directive issued under Executive Order

14169 and the Secretary's implementing memorandum that requires that generalized stop work, suspension, or pause of Agency contracts, grants or other federal assistance awards."

9. The notice also said that the "Front Office" would be adding a new process for payments to ensure integrity and prevent fraud but otherwise did not give any information about how to process payments, whether for vouchers that fall under a waiver or in order to comply with the TRO. The notice's statement about new integrity processes appeared to go beyond the scope of the ALDAC.

10. All of the awards under my portfolio undergo multiple levels of review to identify fraud, including financial reviews of vouchers by multiple levels, monitoring by technical and Contracting staff in person and remotely, review by USAID staff of submitted products by contractors and grantees for sufficiency and quality. Other reviews can also include audits and investigations done by the Office of Inspector General, audits done by the Government Accounting Office, audits and financial reviews done by the Mission, and audits done internally by the contractors and grantees. While occasional isolated instances of fraud are found through these processes, in my experience, the issues are addressed in a timely and appropriate manner. I have never served in a Mission that had widescale fraud issues nor have I ever heard of any Mission that has had such issues.

11. Under the Federal Acquisition Regulations, the Contracting Officer is the Agency individual responsible for determining whether costs are reasonable, allowable, and allocable. The Contracting Officer, or the Contracting Officer's Representative who is delegated part of the Contracting Officer's authority through a designation letter, is the individual with authority to approve the voucher for payment. That voucher is then reviewed by the Office of Financial Management (OFM), and then the Controller (the Foreign Service Officer in OFM) certifies the

payment. A certified payment then goes to the U.S. Treasury for final payment to the contractor or grantee.

12. For all vouchers currently unpaid for my Mission, that review process was performed by the individual with authority, and that individual approved the voucher for payment. The Controller was unable to certify the voucher because they had been locked out of Phoenix (the online system where the Controller physically certifies the payment).

13. I am not aware of anyone in the "Front Office" that has authority to determine whether costs vouchered under a contract or grant are reasonable, allowable, or allocable. Even if someone in the "Front Office" has this authority, they have no specific knowledge of the terms or scope of the individual awards, the performance of the contractor or grantee under the specific awards, nor of the normally incurred costs under the specific award. I am unsure how they would be able to make an informed decision on whether an approval of a voucher or disallowance of cost is appropriate.

14. As of February 24, 2025, the Agency has not paid any of the programmatic vouchers for any of the contractors or grantees of my Mission, even though all of those vouchers have been approved by the Agency official with authority to determine that the costs are reasonable, allowable, and allocable. All of these vouchers fall within the ALDAC 12(d) exception. Some of these awards also fall within approved waivers given by the Secretary of State.

15. In my opinion, payments could easily be completed if Mission Controllers were given access back to the Phoenix system to certify payments. Instead, as of February 24, 2025, all my Mission Controllers were put on administrative leave and had not been given access to

Phoenix prior to that. I believe all but a handful of Mission Controllers were put on administrative leave.

16. Given the high levels of oversight over expenditures and the above facts, I believe the assertion that there is widescale fraud or that USAID's payment systems are "ineffective" to be wholly without merit.

17. Based on the above facts and Peter Marocco's declaration regarding contract remedies available to aggrieved contractors (e.g., submitting certified claims after non-payment), I believe the Agency leadership has no intent on repaying any outstanding vouchers.

18. Based on the above facts, I believe there is no reasonable explanation for the Agency's conduct except that the Agency is purposely slow rolling guidance and making it intentionally vague to prevent actual implementation of the TRO.

19. Based on the above facts, I believe there is no reasonable explanation for the conduct of Agency leadership except that Agency leadership is producing guidance to give the appearance of compliance with the TRO but is still intentionally making it impossible to implement.

20. Based on the above facts, I believe the Agency leadership's constant changing of goalposts for payments is an act of bad faith and not a serious attempt to pay debts owed by the U.S. Government even though these costs have already been approved by the individual with authority to determine these costs are reasonable, allowable, and allocable.

21. Based on the above facts and given the normal level of review of vouchers, I believe the actions and statements provided to date are an act of bad faith with the intent to cause harm to USAID contractors and grantees by trying to bankrupt them through a refusal to pay for

allowable costs that are owed under the terms of those awards which is contrary to federal regulations and basic contract law.

    I declare under penalty of perjury that the foregoing is true and correct.

    Executed on February 24, 2025

*/s/ Clara Doe*
Clara Doe
