**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| GLOBAL HEALTH COUNCIL, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br> *Defendants*. | Civil Action No. 25-cv-402 (AHA) |

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

REPLY ........................................................................................................................................ 3

I.      Plaintiffs Will Be Irreparably Harmed Absent a Preliminary Injunction ........................... 4

II.     Plaintiffs Are Likely to Succeed on the Merits .................................................................. 6

      A.      The Court Has Subject Matter Jurisdiction ............................................................. 6

      B.      Defendants' Actions Violate the APA ..................................................................... 13

      C.      Defendants' Actions Violate the Separation of Powers ......................................... 22

      D.      Defendants' Actions Are *Ultra Vires* ................................................................... 26

III.    The Balance of Equities and Public Interest Weigh Heavily in Favor of Plaintiffs ......... 27

IV.     No Bond Should Be Required ............................................................................................. 28

V.      The Court Should Grant Appropriate Relief ...................................................................... 28

**REPLY**

In ordinary times, when a district court issues an order enjoining the government from unlawful action, the government complies. In ordinary times, the government recognizes the importance of foreign-assistance funding to our national interests. In ordinary times, the government would not gleefully try to dismantle a government agency overnight, fire American workers without cause or notice, or jeopardize the very existence of businesses and nonprofits that have for decades provided programming aimed at preventing starvation, disease, and death, and that employ thousands of Americans.

These, of course, are not ordinary times.

There is no dispute that Plaintiffs are suffering immense and irreparable harms. Their businesses are shuttering; they are being forced to lay off employees; their personnel are being threatened; food is rotting; medical supplies are expiring; and community relationships that took decades to build are crumbling. All of this is happening due to Defendants' flagrantly unlawful conduct, which is contrary to the fundamental structure of our Constitution, and breathtakingly arbitrary and capricious. Indeed, Defendants admit they abruptly stopped all funding without considering the potential harms and terminated thousands of awards without meaningful review.

And the madness continues. Just yesterday—instead of working to comply with the Court's enforcement order—Defendants spent the day cancelling thousands more contracts and awards, including *over 200* of Plaintiffs' contracts or awards. Those terminations and suspensions were across the board—even awards with waivers for life-saving humanitarian aid and essential services. Then, early this morning, the acting Senior Procurement Executive sent an urgent email to the skeleton staff that remains at the agency:

> As you are aware, today USAID issued termination notices for a large number of awards. These awards were identified by the Front Office after a full review of USAID obligations and programs and were personally reviewed and approved for termination by Secretary

3

Rubio and PTDO Deputy Administrator Marocco. We will be sharing a full list of awards terminated with additional details soon.

We understand that some of these awards may have been for essential services, which the Front Office would like to turn back on. We need your immediate input on any awards that may have been terminated that contain essential services related to the safety, security, and operations of USAID staff.[1]

Shoot first. Ask questions later. Words like "arbitrary" and "capricious" hardly capture the callous incompetence on display.

This Court already determined, in granting the TRO, that Plaintiffs had a likelihood of success on the merits and that Plaintiffs are suffering irreparable harm from the government's unlawful actions. Since then, a mountain of additional evidence has emerged confirming the government's arbitrary and capricious conduct. And Plaintiffs' harms have only increased, and are nothing short of devastating. A preliminary injunction is necessary to put an immediate halt to Defendants' lawless conduct and to preserve Plaintiffs' rights while they pursue their claims.

## I.    Plaintiffs Will Be Irreparably Harmed Absent a Preliminary Injunction

This Court has already found, in multiple orders, that grave irreparable harm is a certainty if Defendants' actions are not enjoined. ECF 21; ECF 28; ECF 37; ECF 41. These findings reflect the extensive and unrebutted record evidence of the severe harms that Plaintiffs have already suffered, and will continue to suffer in the absence of a preliminary injunction. *See* ECF 7, 29, 42. If anything, Plaintiffs are suffering even greater irreparable injury since the issuance of the TRO. For example, the abrupt suspension of programming and lack of payments, combined with inflammatory and false statements by U.S. government officials regarding USAID, have created increasingly unsafe conditions for Chemonics staff abroad, including in Ukraine, Georgia, and Nigeria, who face direct attacks, threatening online harassment, threats from creditors, and eviction

---

[1] Undersigned counsel has personally reviewed this email, and Plaintiffs can submit an appropriate declaration to support if Defendants contest it.

by landlords, without adequate security protections. 2/27 Butcher Decl.[2]

Defendants themselves have "acknowledged that the types of harms … affecting Plaintiffs' businesses, as well as the availability of food and medicine, are types of harm that are appropriately considered in the irreparable harm inquiry." ECF 21 at 7. Yet they contend (at 39) that the injuries that Plaintiffs identify—imminent financial ruin, undermining of their core missions and ability to deliver critical services to vulnerable populations—somehow "do not meet the 'high standard' for irreparable harm." Defendants' arguments are disingenuous at best.

First, Defendants assert in passing (at 39) that the harm is not "certain" or "actual" because an "individualized review process" supposedly "could prevent the harm from transpiring." But that process has already resulted in the purported termination of awards for every Plaintiff. And a review does nothing to mitigate the harm from not being paid *while the review is ongoing*.

Second, Defendants assert (at 40) that Plaintiffs have not proven "extreme hardship to the business" or a threat to their "very existence." But this Court has already found that Plaintiffs in fact face imminent insolvency and a threat to their very existence if Defendants' actions continue. ECF 21, at 8 ("Plaintiffs have made a sufficient preliminary showing that the loss of funding at issue in this litigation threatens the very existence of their business.") (citations omitted). And Defendants have not rebutted that showing. To the contrary, they have sought to exploit Plaintiffs' near-insolvency as a reason not to comply with this Court's orders to resume payments. *See* Emergency Mot. for Stay at 12, No. 25-5047 (D.C. Cir.) (arguing that "there is no sure possibility of the government's recovering the funds if it later determines that particular payments should not

---

[2] Plaintiffs seek leave of the Court to file the following new declarations in conjunction with this Reply: Butcher Decl.; Varol Decl.; Jane Doe Decl.; Jocelyn Decl.; Jessica Doe Decl. These declarations further support findings of irreparable harm and Plaintiffs' arguments on the merits. The parties met and conferred, and Defendants would not oppose on the condition that the Plaintiffs would not oppose a motion by Defendants for leave to respond to any new matter introduced in the further declarations you mention. Plaintiffs would not oppose such a motion.

have been made," in part because Plaintiffs are "insolvent or nearly so").

## II.    Plaintiffs Are Likely to Succeed on the Merits

Plaintiffs are likely to prevail, both on the threshold question of subject matter jurisdiction and on the merits of each of their claims for relief.

### A.    The Court Has Subject Matter Jurisdiction

#### 1.    Neither the Contract Disputes Act nor the Tucker Act Divests this Court of Jurisdiction

Defendants argue that the Contract Disputes Act and the Tucker Act channel Plaintiffs' claims to the Civilian Board of Contract Appeals or the Court of Federal Claims, but they appear to concede that those statutes may not apply even to claims asserted directly under Plaintiffs' award documents. Defendants acknowledge (at 14) that "some Plaintiffs may have award documents that are not procurement contracts" and therefore are not covered by the Contract Disputes Act. *See* 41 U.S.C. § 7102; *see also Wesleyan Co. v. Harvey*, 454 F.3d 1375, 1378 (Fed. Cir. 2006) (defining procurement contracts narrowly). Defendants' supposition is true—many Plaintiffs and their members are not contractors at all, operating instead under grants, cooperative agreements, and subawards; and some contractors *also* operate under other awards. *See* ECF 7-8, ¶¶ 7-8; ECF 7-9, ¶ 7. Defendants likewise acknowledge (at 14) that the Tucker Act governs only "breach claims for express or implied contracts over $10,000." *See* 28 U.S.C. § 1491. Plaintiffs and their members operating under grants, cooperative agreements, or subawards thus could not sue in the Court of Federal Claims either. *See U.S. Enrichment Corp. v. United States*, 117 Fed. Cl. 548, 553 (2014).

This Court must have jurisdiction over only a single plaintiff's claims to hold the challenged agency action unlawful and set it aside. *See New York Republican State Comm. v. Sec. & Exch. Comm'n*, 927 F.3d 499, 503 (D.C. Cir. 2019) ("If any one of the petitioners has standing to raise a claim, then this court has jurisdiction over that claim without regard to whether any other

petitioner also has standing."). Defendants' failure to even *assert* that no plaintiff's claims could proceed here is reason enough to find that Defendants are unlikely to succeed on this argument.

But the defects in Defendants' position run deeper. The D.C. Circuit "ha[s] explicitly rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract'" must be heard outside of district courts. *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967–68 (D.C. Cir. 1982)). Rather, under both the Tucker Act and Contract Disputes Act, the critical question is whether a claim "is at its essence a contract claim." *Id.* at 1106; *see A&S Council Oil Co. v. Lader*, 56 F.3d 234, 240 (D.C. Cir. 1995) (applying *Megapulse* to Contract Disputes Act). In answering that question, courts look to "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Crowley*, 38 F.4th at 1106. APA review thus "will not be cut off" solely because agency action occurs in "the field of government contracting in general." *Scanwell Lab'ys, Inc. v. Shaffer*, 424 F.2d 859, 865–66 (D.C. Cir. 1970). Even if the court "may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action … into one on the contract and deprive the court of jurisdiction it might otherwise have.'" *Crowley*, 38 F.4th at 1107.

Here, "the face of the complaint" establishes that Plaintiffs' claims are statutory and constitutional. *Id.* at 1108. Plaintiffs assert a "right to be free from government action beyond its congressional authority." *Id.* (cleaned up). They ground that right in the Constitution, the APA, the Impoundment Control Act, the Anti-Deficiency Act, and the 2024 Appropriations Act. *See, e.g.*, Compl. ¶¶ 79–110; *see also Crowley*, 38 F.4th at 1108 ("[T]he sources of [Plaintiffs'] claimed right are the statutes identified in [Plaintiffs'] complaint."). Plaintiffs' thus "seek to enforce" duties imposed on the government by law, not by any contract. *Crowley*, 38 F.4th at 1108.

The subject of Plaintiffs' claims, moreover, is sweeping agency actions that go beyond

particular funding instruments. Plaintiffs challenge actions that freeze funding wholesale *rather than* on any individualized basis. Compl. ¶ 96–97. That is why, in pleading their claims, Plaintiffs did not attach or quote their award documents. *See* Opp. 12. To the extent Defendants are now defending their *en masse* terminations based on the terms of individual contracts and grants, that is a problem of Defendants' own making. It has no bearing on this Court's jurisdiction, which turns on "the face of the complaint," not any defenses that a defendant might assert. *Crowley*, 38 F.4th at 1108; *cf. Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 830 (2002) (subject matter jurisdiction is assessed based on a plaintiff's "well-pleaded complaint").

Likewise, the remedies Plaintiffs seek are not "specific to actions that sound in contract." *Crowley*, 38 F.4th at 1107 (citation omitted). Rather, Plaintiffs "seek[] only [the] declaratory and injunctive relief" of holding unlawful and setting aside agency actions and enjoining their implementation. *Id.* at 1111 (citation omitted). These are textbook APA remedies, unavailable for breach of contract. *See N.J. Conservation Found. v. FERC*, 111 F.4th 42, 63 (D.C. Cir. 2024) ("Vacatur is the normal remedy when we are faced with unsustainable agency action." (citation omitted)). Defendants nowhere explain how Plaintiffs could challenge Executive Order 14,169 and the agency actions implementing it in suits on individual grants and contracts before the Court of Federal Claims or Civilian Board of Contracting Appeals. The implication appears to be that Plaintiffs cannot litigate these claims at all, which runs directly counter to APA's "strong presumption of reviewability." *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 99 (D.C. Cir. 2021).

The D.C. Circuit's recent decision in *Crowley* is on point. There, a contractor sought declaratory and injunctive relief to remedy the General Services Administration's withholding of contract payments pursuant to a purported audit. *See Crowley*, 38 F.4th at 1103. The court squarely rejected the argument that these claims were, in effect, monetary and therefore contractual. Instead, the contractor's claims, like Plaintiffs' here, were "ultimately based, not on breach of contract, but

on an alleged governmental violation" of federal statutes—vindicating rights that "exist independently of the contract." *Id.* at 1109 (cleaned up). And like the claims in *Crowley*, while "success on the merits may obligate the United States to pay," Plaintiffs' claims for declaratory and injunctive relief would also vindicate other important interests. *Id.* at 1112 (quoting *Kidwell v. Dep't of Army, Bd. for Correction of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995)). For example, equitable relief would enable Plaintiffs to resume their "business operations," salvage their "professional reputation[s]," *see id.* at 1111, preserve "ongoing contractual relationship[s]" with other parties, and obtain future awards under which the government has no present obligation. *E.g.*, ECF. 4, at 20–25. The value of that relief is hardly "negligible in comparison" to any monetary recovery. *Crowley*, 38 F.4th at 1111. That "declaratory and injunctive relief" would "effect the release" of wrongly withheld funds thus does not transform Plaintiffs' suit into a contract claim for money damages. *Id.* at 1112 (citation omitted).

Defendants miss the mark when they characterize Plaintiffs' claims as claims for "delayed payment," which will eventually "ripen into the type of payment claims that can only be brought" under the Contract Disputes Act or the Tucker Act. Opp. 12–17. Plaintiffs' claims will never "ripen into the type of payment claims that can only be brought" under the Contract Disputes Act or the Tucker Act because they are not payment claims. *See supra*. That Defendants' statutory and constitutional violations have caused Plaintiffs financial injury, *see, e.g.*, Opp. 12, 15–16, and likely breached numerous contracts along that way, does not change that fact. As this Court put it in *Kidwell*, "[e]ven where a monetary claim may be waiting on the sidelines, as long as the plaintiff's complaint only requests non-monetary relief that has considerable value independent of any future potential for monetary relief, [courts must] respect the plaintiff[s'] choice of remedies and treat the complaint as something more than an artfully drafted effort to circumvent the jurisdiction of the Court of Federal Claims." 56 F.3d at 284 (citation omitted); *see also Megapulse*,

672 F.2d at 971. That is why courts routinely review agency actions under the APA in ways that also open the door to individual contract actions. *See, e.g.*, *Trustees of California State Univ. v. Riley*, 74 F.3d 960, 966–67 (9th Cir. 1996).[3]

Because Plaintiffs seek equitable relief for constitutional and statutory claims, this Court, not the Court of Federal Claims or the Civilian Board of Contract Appeals, has jurisdiction.

## 2.    Sovereign Immunity Does Not Bar Plaintiffs' Claims

The APA waives the federal government's immunity for suits challenging agency action "seeking relief other than money damages," 5 U.S.C. § 702, a waiver that "applies to any [claims] whether under the APA or not." *Chamber of Com. v. Reich*, 74 F.3d 1322, 1328 (D.D.C. 1996). Here, Plaintiffs seek vacatur, a declaration, and injunctive relief—archetypal APA remedies—so their claims fall squarely within the APA's waiver. The D.C. Circuit has held that the APA's waiver applies even when the plaintiff has "some interest in a monetary reward from the federal government or [when] success on the merits may obligate the United States to pay the complainant." *Crowley*, 38 F.4th at 1108.

As explained, Defendants are wrong (at 15) to characterize Plaintiffs' claims as for "delayed payment," but regardless, the APA's waiver would apply all the same. The Supreme Court has read "money damages" narrowly in this context to cover only "a suit seeking money in compensation for the damage sustained by the failure of the Federal Government to pay as mandated." *Bowen v. Massachusetts*, 487 U.S. 879, 900 (1988). "Neither the House nor Senate

---

[3] *See also, e.g.*, *Holy Cross Coll., Inc. v. Criswell*, No. 23-30085, 2024 WL 2318166 (5th Cir. May 22, 2024) (reviewing "deobligat[ion]" of grant funds under APA); *Tennessee v. Becerra*, 117 F.4th 348 (6th Cir. 2024) (reviewing grant termination under APA); *New York v. DOJ*, 951 F.3d 84, 92 (2d Cir. 2020) (reviewing grant criteria under APA); *Planned Parenthood of Greater Washington & N. Idaho v. Dep't of Health & Hum. Servs.*, 946 F.3d 1100 (9th Cir. 2020) (reviewing grant criteria under APA); *Tyler v. Dep't of Educ. Rehab. Servs. Admin.*, 904 F.3d 1167 (10th Cir. 2018) (reviewing denial of contract assignment under APA); *Cont'l Training Servs., Inc. v. Cavazos*, 893 F.2d 877 (7th Cir. 1990) (reviewing grant eligibility revocation under APA).

Reports (there was no Conference Report) intimates that Congress intended the term 'money damages' as a shorthand for whatever forms of monetary relief would be available under the Tucker Act. To the contrary, the federal sovereign immunity case law, which the Reports discuss at length, suggests that Congress would have understood the recovery of specific monies to be specific relief in this context." *Id.* at 899 (internal citations and quotation marks omitted).

Here too, binding precedent directly controls. In *Bowen*, the Supreme Court rejected the argument that an injunction to enforce a statute's mandate that the government "shall pay" certain sums to States amounted to money damages unavailable under the APA. *Id.* at 900 (quoting 42 U.S.C. § 1396b)). As the Court explained, the State was not seeking monetary compensation for injuries caused by the government's failure to pay; rather, it was "seeking to enforce the statutory mandate itself, which happens to be one for the payment of money." *Id.* "That is, since the orders are for specific relief (they undo the Secretary's refusal to reimburse the State) rather than for money damages (they do not provide relief that substitutes for that which ought to have been done) they are within the District Court's jurisdiction under § 702's waiver of sovereign immunity." *Id.* at 910. That reasoning applies with equal force here. An injunction barring Defendants from implementing Executive Order 14,169 would not "transform the nature of the relief sought," which is "specific relief, not relief in the form of damages." *Id.* at 901; *see Kidwell*, 56 F.3d at 284 (claim for equitable relief may proceed in district court even if "success on the merits may obligate the United States to pay the complainant").

The principal case on which Defendants rely only confirms that this Court has jurisdiction. In *A&S Council Oil*, plaintiffs expressly "sought money damages" to compensate them for the "reasonable profit" they allegedly could have earned on prohibited subcontracts. 56 F.3d at 237. That claim was plainly one for compensatory damages based on "the profit margins [plaintiffs] should have earned on their subcontracts." *Id.* The claims for money damages in *A&S Council* bear

no resemblance to Plaintiffs' claims here, which seek equitable relief against unlawful and unconstitutional agency action, not a retrospective award to compensate them for financial harms.

Even if the APA's sovereign-immunity waiver did not apply here (it does), the Court still would have jurisdiction to enter equitable relief against unlawful and *ultra vires* conduct by the federal-officer Defendants. As both the Supreme Court and D.C. Circuit have held, "if the federal officer, against whom injunctive relief is sought, allegedly acted in excess of his legal authority, sovereign immunity does not bar a suit." *Reich*, 74 F.3d at 1329; *see Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949) (when a federal "officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden[,] [h]is actions are ultra vires his authority and therefore may be made the object of specific relief"); c*f. Ex parte Young*, 209 U.S. 123, 159–60 (1908). This Court should reject Defendants' attempt to skirt these longstanding precedents and shoehorn Plaintiffs into individual breach-of-contract actions in a forum where Plaintiffs could neither vindicate the rights nor attain the remedies that form the gravamen of their claims.

### 3.     All Plaintiffs Have Standing

Defendants contend that the funding recipient Plaintiffs (i.e., Plaintiffs other than the associations GHC and SBAIC) "lack Article III standing to challenge" the agency actions here. But standing boils down to whether the plaintiff has "a personal stake in the case," i.e., can they answer the question "What's it to you?" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citation omitted). What's this lawsuit to Plaintiffs? Everything. Defendants' foreign-aid freeze has devastated Plaintiffs' businesses, employees, and professional reputations. Defendants confusingly argue (at 18) that Plaintiffs lack standing, on the theory that the requested relief would not be tailored to redress Plaintiffs' "pocketbook injur[ies]" that result (in Defendants' view) from "individual instrument-specific agency decisions." Defendants' argument is doubly flawed.

First, Plaintiffs' injuries are not mere "pocketbook" injuries; Plaintiffs have sustained concrete, non-economic injuries, including harassment, intimidation, and threats to their employees' physical safety, and imminent legal actions arising from Plaintiffs' inability to fulfill their obligations overseas. *E.g.*, 2/27 Butcher Decl. This reality disposes of Defendants' strained citations (at 19) to cases involving remote, speculative harms or mere "fear arising from a foreign policy." Second, as explained above, Plaintiffs are challenging sweeping agency policies and decisions, not instrument-specific determinations. Defendants do not assert, nor could they, that Plaintiffs' injuries would not have occurred without Executive Order 14,169 and all the unlawful steps Defendants took to implement it. This Court ordering Defendants to lift the freeze would start the funds flowing again, undo the terminations, suspensions, and stop-work orders, and allow Plaintiffs to begin to pick up the pieces. That is textbook injury, causation, and redress.[4]

## B.    Defendants' Actions Violate the APA

### 1.    Defendants' Actions Are Reviewable Under the APA

Leaving no colorable threshold issue unraised, Defendants claim (at 30-32) that there is in fact no agency action for the Court to review. Defendants' arguments are meritless.

---

[4] "[T]he suit may proceed" if "at least one plaintiff has standing." *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023). But the associational Plaintiffs—GHC and SCAIC—have standing too. "An association has standing to bring suit on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596 (D.C. Cir. 2015) (citation omitted). GHC and SBAIC meet each prong. First, Defendants' actions harm many of GHC and SBAIC's members, including individual plaintiffs in this lawsuit. *See* ECF 7-2 at 1; ECF 7-1 at 1. Second, the associations' efforts to protect funding for foreign aid projects are "germane" to their organizational purposes of "promot[ing] the meaningful utilization of U.S. small businesses at U.S government agencies providing foreign assistance," ECF 7-2 at 1, and "identifying priority world health problems and reporting on them to the U.S. public, legislators, international and domestic government agencies, academic institutions, and the world health community," ECF 7-1 at 1. Third, since the suit raises "pure question[s] of law"—whether Defendants' blanket foreign aid pause violated the APA, various budget and funding statutes, and/or the Constitution—it "turns entirely on whether [Defendants] complied with [their] statutory obligations" and requires no individual membership participation. *Ctr. for Sustainable Econ.*, 779 F.3d at 597 (citation omitted).

To begin with, Defendants contend (at 31) that "Plaintiffs do not even identify a concrete action that either of the defendant agencies here ... has taken that could specifically be redressed by a federal court." Not so. Plaintiffs do in fact challenge "circumscribed [and] discrete" agency actions and have clearly identified them throughout this litigation. *See, e.g.*, ECF 18.

Defendants also contend (at 31) that their implementation of the executive order is unreviewable under the APA because it "is effectively ... the President's action."[5] But as this Court has recognized, agency actions are not insulated from APA review just because they emanate from an executive order. In its TRO, the Court highlighted the fundamental flaws in Defendants' argument. Among other things, the Court noted that Defendants had not "ground[ed] their argument in the text of the APA, which specifically defines 'agency' to include 'each authority of the Government of the United States.'" And the relevant agency directives and determinations here, in and of themselves "ha[ve] immediate effect and constitute the action under review, without the review of the President." The Court rightly observed that, at least as framed at the TRO stage, "Defendants' argument … proves too much—it would allow the President and agencies to simply reframe agency action as orders or directives originating from the President to avoid APA review." TRO at 11-12. Other federal courts agree. *See, e.g.*, *Arizona v. Su*, 121 F.4th 1, 15 (9th Cir. 2024).

Defendants have failed to remedy these fatal defects at the preliminary injunction stage. Defendants simply cite (at 31) without elaboration two district court cases for the proposition that where an agency "act[s] on behalf of the President, [its] actions [a]re not reviewable under the APA." Neither endorses Defendants' theory. In both cases, the courts relied on *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992), to hold that agency actions were not reviewable under

---

[5] Defendants also argue (at 31) that "[b]ecause an executive order is a presidential action, and not an agency action," Plaintiffs' challenges to the EO "under the APA are not reviewable." But Plaintiffs are not challenging the EO under the APA. *See* Compl. at 35.

the APA because they were exercises of discretionary authority committed by law to the President. *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 801 F. Supp. 2d 383, 403 (D. Md. 2011); *Detroit International Bridge Co. v. Government of Canada*, 189 F. Supp. 3d 85, 101 (D.D.C. 2016). That is not the situation here.

Moreover, the D.C. Circuit has made clear that "*Franklin*['s denial of APA review of presidential action] is limited to those cases in which the President has final constitutional or statutory responsibility for the *final step* necessary for the agency action directly to affect the parties." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996). That agency actions "are based on [an] Executive Order hardly seems to insulate them from judicial review under the APA, *even if the validity of the Order were thereby drawn into question*." *Id.*(emphasis added). Courts therefore regularly review under the APA agency actions taken to carry out presidential directives (such as executive orders). *See, e.g.*, *East Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1236-37, 1251-52 (9th Cir. 2018); *Sherley v. Sebelius*, 689 F.3d 776, 780, 784-85 (D.C. Cir. 2012); *Zhang v. Slattery*, 55 F.3d 732, 740, 743-45 (2d Cir. 1995); *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1166 (9th Cir. 1997). Here, as this Court has previously explained, the agency directives and actions that Plaintiffs challenge here "have immediate effect" without further action from the President. TRO at 11; *see Chamber of Com.*, 74 F.3d at 1327. Defendants never argue otherwise.

### 2.    Defendants' Actions Are Arbitrary and Capricious

Defendants have no explanation for "why a blanket suspension of all congressionally appropriated foreign aid, which set off a shockwave and upended reliance interests for thousands of agreements with businesses, nonprofits, and organizations around the country, was a rational precursor to reviewing programs." TRO at 10. And, remarkably, Defendants do not even respond to Plaintiffs' argument (and the Court's holding) that Defendants did not grapple with Plaintiffs'

15

"serious reliance interests" when changing course—a failure that is alone sufficient to sustain an APA claim. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020).[6]

Instead, Defendants quibble over the "the concept of a blanket." 2/25 Hr'g Tr. 40:1–5. Defendants argue (at 37) that they did not, in fact, impose a blanket suspension, pointing to the elusive "waivers" that Secretary Rubio nominally approved but for which he never issued any guidance. But experience shows that the waiver program did not merely suffer a case of the "hiccups." 2/12 Hr'g Tr. 30:21. It was dead on arrival. To this day, nobody at USAID or State has any answers about what activities are covered; and even the handful of implementing partners who were granted limited waivers were never paid. *See, e.g.*, ECF 7-3, ¶¶ 11–12, ¶ 20; ECF 7-6, ¶ 6; ECF 29-5 ¶ 4. Since then, Defendants have not identified a single successful waiver payment; instead they have provided a dizzying guidance document that describes the labyrinthine procedures needed to get a single waiver approved. ECF 39-1, Ex. C. Simply put, the illusory waivers are symptomatic of Defendants' arbitrary and capricious actions.

Evidence developed since the TRO further reinforces the Court's holding that Defendants' conduct is likely arbitrary and capricious. For example, Defendant Marocco has admitted that the review process for selecting contracts, grants, and other awards for termination consisted of little more than a cursory review of a spreadsheet, with a single line of data per award, which "included information about the recipient, the amount of the award, the subject matter, and a description of the project that *often* included the location of the project." 2/25 Marocco Decl. ¶ 5 (ECF 39-1)

---

[6] Similarly, Defendants have no answer to the great harms the blanket suspension has caused Plaintiffs and others, except to simply assert (at 38), conspicuously without citation, that "President Trump and Secretary Rubio ultimately exercised their discretion to determine that it would not be possible to consider the consequences of various approaches in the absence of a temporary pause." In other words, Defendants argue that they could not even *consider* the possible harmful consequences of their actions before taking the harmful actions. If that recursive argument held water, then arbitrary and capricious review would be dead letter.

(emphasis added). In other words, Defendants were terminating and suspending hundreds of millions of dollars in awards based on a one-line summary, without actually looking at the award documents themselves, without consulting the personnel who manage the project, and, at least in some cases, without even knowing "the location of the project." *Id.*[7] The evidence also shows that Defendants have implemented a series of arbitrary and capricious new processes, procedures, and approvals that serve no rational purpose (except to grind foreign-assistance funding to a halt). *See* Joint Status Report at 4–6 (ECF 42) (citing evidence); Jessica Doe Decl. ¶ 11. Before Defendants took over, "both State and USAID" could process "several thousand payments each day." 2/25 Marocco Decl. ¶ 15. Now Defendants complain that it will take "multiple weeks" for USAID to process only "2,000 outstanding and newly created payment requests." *Id.* ¶ 4.

Finally, Defendants have invoked an interest in combatting waste, fraud, and abuse. *See* Opp. 44 (quoting 2/25 Marocco Decl. ¶ 9). But Defendants have identified no evidence whatsoever that any paused or delayed disbursement would be fraudulent. Moreover, the agencies already have mechanisms to ensure program integrity. *See* USAID, Automated Directive System chs. 630 & 636 (rev. 2019); Varol Decl.; Jocelyn Doe Decl. ¶ 6. In fiscal year 2024, for example USAID made $4.04 million in overpayments (out of an agency budget of $40 billion), of which all but $80,000 were recovered by the agency—a recovery rate of 97.95%—higher than that of nearly every other agency. *See* PaymentAccuracy.gov, *Annual Improper Payments Datasets*, https://www. paymentaccuracy.gov/payment-accuracy-the-numbers/; *see* USAID, Office of Inspector Gen., *USAID Complied with the Payment Integrity Information Act of 2019 for Fiscal Year 2023*, Report

---

[7] Defendants have also represented that Secretary Rubio had "personal involvement" in decisions to terminate contracts and grants. 2/25 Marocco Decl. ¶¶ 5, 6 (ECF 39-1); *see also* Zahra Doe Decl. ¶¶ 27–28, 34 (ECF 42-1). But it is implausible that the Secretary himself or even a group of political appointees engaged in a meaningful individualized review of the hundreds of contracts and awards terminated prior to or after the Court's TRO. Zahra Doe Decl. ¶¶ 36–37.

0-000-24-006- C (May 28, 2024). And each entity receiving $1 million or more in federal funding must also undergo an audit and share the findings of the audit with each federal funding source. *See* 2 C.F.R. § 200.501.

Moreover, Defendants' supposed interest in combatting fraud is belied by other actions they have taken to implement the funding freeze. As the USAID Inspector General reported, before Defendants summarily fired him, "staffing shortages and limitations on communications with aid organizations stemming from the cessation of U.S. foreign assistance have limited USAID's ability to receive, react to, and report allegations of diversion." USAID, Office of Inspector Gen., *Oversight of USAID-Funded Humanitarian Assistance Programming Impacted by Staffing Reductions and Pause on Foreign Assistance*, at 5 (Feb. 10, 2025). Likewise, Defendants' arbitrary and capricious dismissal of substantially all of USAID's workforce in recent days will make it impossible to effect payments or manage contracts, grants, cooperative agreements, and other awards going forward. Joint Status Report at 10–11 (citing evidence); Jocelyn Doe Decl. ¶¶ 8–14.

### 3.    Defendants' Actions Are Contrary to Law

In any event, Defendants' actions also violate the Impoundment Control Act, the Anti-Deficiency Act, the 2024 Appropriations Act, and the separation of powers. Defendants misunderstand or simply ignore the statutory limitations on the Executive's authority to decline to obligate and disburse funds appropriated by Congress.

Defendants all but admit that their actions violate the Impoundment Control Act. Defendants do not dispute that that statute allows Executive Branch officials to withhold or delay the obligation or disbursement of appropriated funds *only* upon transmission of a special message to Congress and *only* for limited, non-policy purposes. Mot. 30; *In re Aiken County,* 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (plurality opinion). Defendants admit that the President has transmitted no special message, and—more importantly—they do not even attempt to argue that their actions

serve one of the statutorily permitted purposes. *See* Opp. 35. The undisputedly improper purpose behind the freeze refutes Defendants' suggestion that the only appropriate relief here is "a directive to communicate the special message." *Id.* The proper remedy is vacatur and an injunction against implementation.

Defendants also do not seriously contest that their actions withhold or delay the obligation and disbursement of appropriated foreign-assistance funds. While Defendants note that—theoretically—a funding pause resulting from the "normal and orderly operation of the government" would "not qualify as an impoundment or a failure to make funds 'available for obligation' under the statute," *id.* (citations omitted), the freeze here was far from "normal and orderly," and Defendants make no effort to show otherwise. Agencies do not violate the Impoundment Control Act when they engage in "programmatic delays," which "occur when an agency is taking necessary steps to implement a program, but because of factors external to the program, funds temporarily go unobligated." Gov. Accountability Office, *Office of Management and Budget—Withholding of Ukraine Security Assistance*, B-331564, at 7 (Jan. 16, 2020). But programmatic delays do not include circumstances where, as here, a delay results not from some "external factor causing an unavoidable delay," but rather from the agency "on its own volition" choosing to pause a program whose "execution was … well underway." *Id.* Indeed, the notion that "reviews undertaken to ensure compliance with presidential policy prerogatives" are permissible "programmatic delays"—exactly the position Defendants suggest here but lack the conviction to state outright—has "no basis in law." *Id.*

Rather than defending their actions as lawful, Defendants principally argue that this Court lacks authority to grant relief. To begin, Defendants argue that because the Impoundment Control Act authorizes some enforcement by the Comptroller General, it precludes any enforcement through the APA. Opp. 35. But the mere possibility of Comptroller General enforcement does not

"preclude judicial review." 5 U.S.C. § 701(a)(1). "[P]reclusion must be fairly discernible in the statutory scheme … with sufficient clarity to overcome the strong presumption in favor of judicial review." *Confederated Tribes of the Chehalis Rsrv. v. Mnuchin*, 976 F.3d 15, 21 (D.C. Cir. 2020) (cleaned up), *rev'd on other grounds*, 594 U.S. 338 (2021). "[A] claim … is not barred by another statute if the other statute does not cover the type of grievance the plaintiff seeks to assert under the APA." *El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 887 (D.C. Cir. 2014).

Here, Defendants overlook that while the Impoundment Control Act prohibits withholding or delaying "the obligation *or* expenditure" of appropriated funds, the Comptroller General may sue only if appropriated funds are "not made available for *obligation*." 2 U.S.C. §§ 682(1), 687 (emphases added). Defendants' interpretation thus would leave half of the statute unenforceable by anyone. In this case, the Comptroller General could not sue for one of the principal violations Plaintiffs assert—failure to disburse funds already obligated. While Defendants cite two out-of-circuit district court decisions barring private enforcement through the APA, *see* Opp. 35, those cases do not address the fact that Comptroller General suits are limited to challenging failures to obligate, not disburse. And multiple courts have recently held that that the Impoundment Control Act is privately enforceable. *See PFLAG, Inc., v. Trump*, 2025 WL 510050, at *16 (D. Md. Feb. 14, 2025); *Nat'l Council of Nonprofits v. OMB*, 2025 WL 368852, at *12 (D.D.C. Feb. 3, 2025).

Defendants also claim that Plaintiffs' Impoundment Control Act challenge is "not ripe," Opp. 35, but their arguments have nothing to do with ripeness and are unavailing in any event. Plaintiffs meet the standard two-part ripeness test: (1) they will suffer "hardship" if review is denied—indeed they will face devastating irreparable harm—and (2) the issues are "fit[]" for judicial review given that Defendants all but admit that their actions violate the statute. *TikTok Inc. v. Garland*, 122 F.4th 930, 947 (D.C. Cir. 2024), *aff'd*, 145 S. Ct. 57 (2025). The theoretical permissibility of an externally-caused programmatic "pause," Opp. 35—which again, the funding

freeze was not—has no bearing on ripeness. Nor does it matter that the 2024 Appropriations Act does not "require[] Defendants to contract with Plaintiffs specifically." *Id.* Defendants have implemented a blanket funding freeze that purports to extend beyond the March 14 expiration of the 2024 Appropriations Act; Defendants do not contend that they intend to take the funds they do not spend on Plaintiffs' awards and spend them on other awards. *Cf. Policy & Research, LLC v. Dep't of Health and Human Servs.,* 313 F. Supp. 3d 62, 71 n.4 (D.D.C. 2018) (noting that plaintiffs dropped a claim that a grant termination violated the Impoundment Control Act because the agency intended to recompete the appropriated funds for other projects). If appropriated funds are not spent on Plaintiffs' awards, they will not be spent at all.

The funding freeze also violates the Anti-Deficiency Act and the 2024 Appropriations Act, which Defendants largely ignore. As Plaintiffs explained, the Anti-Deficiency Act bars Executive Branch officials from establishing a "reserve" except for the same limited purposes for which the Impoundment Control Act authorizes a deferral. 31 U.S.C. § 1512(c); *see* Mot. 31. Defendants do not explain what they have done with unspent funds *other than* place them in a reserve. And again, Defendants do not even attempt to argue that the freeze serves one of the statute's permitted purposes. As for the 2024 Appropriations Act, that statute undisputedly requires USAID and the State Department to spend specified amounts of appropriated funds—with certain small deviations—for particular foreign-assistance purposes. *See* Mot. 5-6, 31-32. Defendants do not claim that the funding freeze fits within the statute's permitted deviations. Nor do they claim that the funds that otherwise would have gone to Plaintiffs' projects will go to other projects that still serve Congress's purposes—which would be impossible in any event given the looming March 14 government funding deadline. Notably, unlike the Impoundment Control Act, Defendants do not claim that the Anti-Deficiency Act or the 2024 Appropriations Act allow for enforcement by the Comptroller General or contain any other alternative mechanism that would preclude judicial

review under the APA. And even before the Impoundment Control Act's passage, courts—including the Supreme Court—enforced spending directives in funding statutes. *See, e.g.*, *Train v. City of New York*, 420 U.S. 35, 37–41 (1975).

It bears emphasis that, for all Defendants' insistence on the terms and conditions of particular funding instruments, those terms and conditions are irrelevant to Plaintiffs' claims under the Impoundment Control Act, the Anti-Deficiency Act, and the 2024 Appropriations Act. Those statutes require appropriated funds to be spent for the purposes Congress specified, full stop. That particular instruments may grant discretion to terminate particular contracts or awards in particular circumstances is no defense. If halting disbursements or terminating particular instruments would cause appropriated funds to go unobligated or unspent, those actions are contrary to law and Defendants may not take them.[8]

## C.    Defendants' Actions Violate the Separation of Powers

The Constitution vests Congress, not the Executive, with "exclusive power" over federal spending. *Dep't of Navy v. FLRA*, 665 F.3d 1339, 1346 (D.C. Cir. 2012). No fewer than five different constitutional provisions confirm that the power of the purse is Congress's alone. First among Congress's enumerated authorities is the power to spend. U.S. Const., art. I, § 8, cl. 1. By denying that same authority to the Executive, the Appropriations Clause, *id.*, art. I, § 9, cl. 7, protects liberty by ensuring that "the purse is lodged in one branch, and the sword in another." 2

---

[8] In fact, the terms and conditions of funding instruments generally do not permit termination if it would result in a statutory violation. Even where instruments allow termination for convenience, it is a breach of contract if "the agency (1) terminates the contract in bad faith or (2) abuses its discretion." *TigerSwan, Inc. v. United States*, 118 Fed. Cl. 447, 451 (2014). In evaluating whether there has been an abuse of discretion, courts consider (among other things) "any violations of an applicable statute." *Id.* Even worse, while termination decision made by *contracting officers* are entitled to some deference, termination decisions made by *superiors*—like the termination decisions here—"are not entitled to … deference," and the contracting officer's "failure to make an independent decision weighs in favor of finding an abuse of discretion." *Id.* at 453.

*The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 349 (A. Hamilton) (Jonathan Elliot ed., 2d ed. 1836). The requirements of bicameralism and presentment, U.S. Const., art. I, § 7, cl. 2, forbid the Executive Branch to pick and choose among the appropriations Congress mandates. *See Clinton v. City of New York*, 524 U.S. 417, 438 (1998). Under the Vesting Clause, the President possesses only the "executive power" as conferred by Article II. U.S. Const., art. II, § 1, cl. 2. And the Take Care Clause obligates the President to "faithfully execute[]" the law as Congress enacts it. U.S. Const., art. II, § 3.

The long-held consensus view of every branch of government is that the Executive violates the separation of powers by withholding funds that Congress has directed be spent. Mot. 33-34. When the President "has policy reasons … for wanting to spend less than the full amount appropriated by Congress for a particular project or program[,] … even the President does not have unilateral authority to refuse to spend the funds." *Aiken County*, 725 F.3d at 261 n.1 (plurality opinion). Defendants (at 24–26) do not dispute this foundational rule or that they have declined to spend congressionally appropriated foreign-assistance funds for policy reasons. *See* Exec. Order No. 14169 (directing that "no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President of the United States"); 25 State 6828 (directing review to determine whether foreign assistance is "consistent with President Trump's foreign policy"). Instead, they contend that because foreign affairs are involved, the Executive Branch may override Congress's spending directives.

That position is baseless. The Supreme Court in *Youngstown* expressly rejected the argument that the President's invocation of foreign affairs allows him to defy Congress in an area that the Constitution commits to its authority. There, President Truman claimed that seizing steel mills was necessary to fulfill his functions as Commander in Chief. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). But despite the President's broad authority in military

matters, making law "is a job for the Nation's lawmakers," not the President. *Id.* That is just as true in the context of congressional appropriations, which are no less "Law" than other federal statutes. U.S. Const., art. I, § 9, cl. 7. "Congress alone controls the raising of revenues and their appropriation and may determine *in what manner and by what means they shall be spent*," even in domains like "military and naval procurement" where the President may have independent power. *Youngstown*, 343 U.S. at 643  (Jackson, J., concurring) (emphasis added). And Defendants' claimed authority to defy Congress's directives here is even weaker than in *Youngstown*, because they rely only on the foreign-affairs power—a power shared with Congress—rather than an exclusively executive one like foreign recognition or military command. *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21–22 (2015).

Defendants draw exactly the wrong lesson from *Zivotofsky*. As the Supreme Court expressly held in that case, "[t]he Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue." *Id.* at 21. Instead, the Court distinguished between powers that the Constitution vests exclusively in the President (like foreign recognition, *see* U.S. Const. art. II, § 3) and those (like the power of the purse, *see* U.S. Const. art. I, § 9) where Congress plays the preeminent role. *See Zivotofsky*, 576 U.S. at 20–21; *see also id.* at 62 ("The Constitution allocates some foreign policy powers to the Executive, grants some to the Legislature, and enjoins the President to 'take Care that the Laws be faithfully executed.'" (Roberts, C.J., dissenting) (quoting U.S. Const., art. II, § 3)). The mere fact that appropriated funds may be spent abroad gives the Executive no authority to defy Congress's directives: "whether the realm is foreign or domestic, it is still the Legislative Branch, not the Executive Branch, that makes the law." *Id.* at 21. That is particularly true where, as here and in *Youngstown*, the President's actions would deprive United States persons and companies of property or funds in which they have an interest. *See Youngstown*, 343 U.S. at 587.

24

Defendants' remaining scattershot arguments fare no better. For one, a claim that the Executive Branch has usurped Congress's power of the purse is not, as Defendants contend (at 23), "purely statutory." *See, e.g.*, *Clinton*, 524 U.S. at 438 (line-item veto of appropriations violated Presentment Clause); *U.S. House of Representatives v. Mnuchin*, 976 F.3d 1, 14 (D.C. Cir. 2020) (usurpation of spending authority caused House of Representatives "a concrete and particularized constitutional injury"), *vacated as moot*, 142 S. Ct. 332 (2021); *Aiken County*, 725 F.3d at 262 n.3 ("the Appropriations Clause acts as a separate limit on the President's power" over spending). And like in *Youngstown*, Defendants assert that the President acted pursuant to his "inherent constitutional power." *Dalton v. Specter*, 511 U.S. 462, 473 (1994); *see* Opp. 24–26; Mot. to Clarify, ECF 33, at 2–3; Exec. Order No. 14169 (invoking no statutory authority). Plaintiffs' claim that the Executive Branch lacks such authority sounds in the separation of powers. *See Youngstown*, 343 U.S. at 587–88.[9]

Similarly misguided is Defendants' passing argument that the executive branch has "unreviewable discretion not to take action." Opp. 25. Under that "quite narrow[]" exception to the APA's presumption in favor of judicial review—which by definition has no bearing on Plaintiffs' constitutional claim—no APA claim lies against action committed to agency discretion by law. *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020). Even if that limited exception extended to constitutional claims, it would not apply here, because it typically covers only "an agency's decision not to institute enforcement proceedings." *Id.* And "prosecutorial discretion encompasses the discretion not to *enforce* a law against private parties; it does not encompass the discretion not to follow a law imposing a mandate or prohibition on the Executive

---

[9] Defendants' undeveloped assertion (at 23) that Plaintiffs' ultra vires claim is "purely statutory" is mistaken for the same reason.

Branch." *Aiken County*, 725 F.3d at 266 (plurality opinion).

At their core, Defendants' separation-of-powers arguments amount to the view that Congress is powerless to set any standards for foreign-assistance spending. That position is fundamentally at odds with the Constitution's division of legislative and executive powers. As Justice Jackson cautioned in *Youngstown*, "Presidential claim to a power at once so conclusive and preclusive"—such as the unilateral authority to categorically withhold billions of dollars Congress has appropriated, as Defendants claim here—"must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." *Youngstown*, 343 U.S. at 638.

### D.    Defendants' Actions Are *Ultra Vires*

Defendants all but ignore Plaintiffs' *ultra vires* claim, which is further basis for concluding that Plaintiffs are likely to succeed on the merits. Under longstanding circuit precedent, "[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996).

Defendants' actions are unauthorized by statute or any other authority. Defendants cite scattered provisions stating that the President "is authorized to furnish assistance, on such terms and conditions as he may determine, for" various purposes. *E.g.*, 22 U.S.C. § 2151b(b)(1). Those general provisions do not remotely authorize the radical actions Defendants took here: halting foreign-assistance disbursements wholesale and terminating the majority of existing foreign-assistance instruments based on a review process so hasty it barely even qualifies as "cursory." And Defendants actions are patently unauthorized under the major questions doctrine, which Defendants also ignore. Defendants do not dispute that their actions are of "vast economic and political significance," *West Virginia v. EPA*, 597 U.S. 697, 716 (2022) (citation omitted), nor could they—they are the subject of daily press coverage and intense congressional scrutiny, and will decide the fate of an entire industry, not to mention thousands of American jobs and the health

and safety of countless people around the world. On issues of profound public importance, courts "expect[] Congress to speak clearly" when conferring such broad executive authority. *Nat'l Council of Nonprofits v. OMB*, No. 25-cv-239, 2025 WL 597959, at *16 (D.D.C. Feb. 25, 2025) (quoting *NFIB v. OSHA*, 595 U.S. 109, 117 (2022)). Defendants cannot point to anything close to the "clear congressional authorization" that such sweeping actions would require. *West Virginia*, 597 U.S. at 723 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

### III.    The Balance of Equities and Public Interest Weigh Heavily in Favor of Plaintiffs

The public interest and balance of equities overwhelmingly favors a preliminary injunction. Defendants have not attempted to rebut Plaintiffs' evidence that their unlawful actions are bringing Plaintiffs'—and the entire sector's—very existence to the brink. This industry-wide extinction will devastate the American economy. *See, e.g.*, ECF 4 at 35–36. Plaintiffs' work is also valuable independent of its economic worth. It advances U.S. interests abroad and improves—and, in many cases, literally *saves*—the lives of millions of people across the globe. It helps prevent disease, instability, and crises abroad, before they reach U.S. shores. Defendants' actions are bringing Plaintiffs' work, and its benefits, to crashing halt. *See, e.g.*, *id.* at 36–37. Food rotting, Americans out of work, U.S. businesses ruined, and critical medical care withheld: these are the fruits of Defendants actions, and they contest none of them. *See* Opp. 43–45.

Instead, even amid the chaos they have created, Defendants summon the hutzpah to claim that the equities favor them. Invoking "national security" and "foreign affairs" as talismans, they claim (at 44) the Court should let them to continue to slash and burn because "[t]he public has an interest in ensuring that tax dollars are not spent towards foreign aid projects that are not aligned with American interests." But even when tax dollars are at stake, the public has "*no interest* in the perpetuation of unlawful agency action." *Open Communities Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (emphasis added). And even in the foreign-affairs context, "the public

interest is served when administrative agencies comply with their obligations under" federal law. *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009).

## IV.    No Bond Should Be Required

The Court should not require Plaintiffs to post security under Federal Rule of Civil Procedure 65(c) for any preliminary injunction. "Courts in this Circuit have found the Rule 'vests broad discretion in the district court to determine the appropriate amount of an injunction bond,' including the discretion to require no bond at all." *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) (cleaned up). Given that Defendants' actions have completely cut off what is, for many Plaintiffs, their primary source of funding, requiring substantial security "would have the effect of denying the plaintiffs their right to judicial review of administrative action." *NRDC v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971); *see* ECF 7-3, ¶ 7; ECF 7-5, ¶ 4; ECF 7-6, ¶ 4; ECF 7-7, ¶ 4, ECF 7-8, ¶ 7. A bond would be particularly unjust here because the frozen payments consist largely of funds the government owes implementing partners for work already performed. As another court in this District recently held, "where the government is alleged to have unlawfully withheld … previously committed funds to countless recipients, it would defy logic … to hold Plaintiffs hostage for the resulting harm." *Nat'l Council of Nonprofits*, 2025 WL 597959, at *18.

## V.    The Court Should Grant Appropriate Relief

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Dept of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020) (quotation source omitted). Defendants contend (at 46–47) that any injunctive relief here should be limited to affording "complete relief to the plaintiffs" and "address only the contract-specific decisions concerning each plaintiffs' funding awards," rather than conduct concerning other parties or decisions. But it is within the Court's power under the APA to issue universal relief, even at the preliminary stage. *See Texas v. U.S.*, 809 F.3d 134, 188

28

& n.211 (5th Cir. 2015) (citing cases), *aff'd*, 579 U.S. 547, 547 (2016) (per curiam). And as Plaintiffs have explained, the conduct at issue is not "contract-specific decisions" but rather Defendants' broad policies and actions.

Over the past several days, Defendants' continued failure to comply with the TRO in any meaningful way has made clear that effective, enforceable preliminary relief will require unwinding Defendants' deliberate steps (both before and after the TRO) to dismantle systems for providing foreign-assistance funding—and to prevent Defendants from doing so going forward, at least during the pendency of this litigation. Defendants' unlawful efforts to destroy the foreign-assistance funding systems extend beyond the mere issuance of agency guidance documents; they have included actions such as unplugging computer systems used to process payments, firing employees necessary to process funds or manage contracts, and otherwise creating chaos in a system that had been running smoothly for decades. All of these steps have had the predictable (if not intended) practical effect of slowing the flow of foreign aid funds to a trickle.

To be clear, Plaintiffs are not asking the Court to micromanage internal agency processes and operations, but only to ensure the "restor[ation of] the status quo as it existed before Defendants' blanket suspension of congressionally appropriated funds." *AVAC* ECF No. 41, at 6. Plaintiffs are agnostic as to how Defendants should restore systems and processes to the status quo as it existed before January 20, 2025. For instance, Plaintiffs are not insisting that specific employees be rehired, but only that the agencies maintain sufficient staff to ensure that payments can be processed at rates comparable to those that the agency achieved before January 20, 2025. Plaintiffs also acknowledge the Court's previous hesitation, at the TRO stage, to issue "directives as to … specific operational details … in the absence of evidence of non-compliance." ECF No. 21. But, particularly in light of Defendants' continued inability or unwillingness to abide by this Court's orders, Plaintiffs respectfully submit that more specific relief that bears on "administrative,

operational, human resource, or technical hurdles" to full compliance with this Court's orders is now warranted. A proposed order is attached.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion.

Dated: February 27, 2025

Respectfully submitted,

/s/ Stephen K. Wirth
William C. Perdue (D.C. Bar 995365)*
Sally L. Pei (D.C. Bar 1030194)
Samuel M. Witten (D.C. Bar 378008)
Stephen K. Wirth (D.C. Bar 1034038)
Dana Kagan McGinley (D.C. Bar 1781561)
Allison Gardner (D.C. Bar 888303942)
Daniel Yablon (D.C. Bar 90022490)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel: (202) 942-5000
stephen.wirth@arnoldporter.com

*application for admission pending

*Counsel for Plaintiffs*