# DECLARATION OF CAN VAROL, CHEMONICS INTERNATIONAL, INC. CHIEF FINANCIAL OFFICER

I, Can Varol, declare the following under penalty of perjury:

1. I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2. I am the Chief Financial Officer (CFO) of Chemonics International, Inc. (Chemonics).

3. Chemonics is an employee-owned sustainable development company. Founded in 1975, Chemonics has been a trusted partner to the U.S. government for 50 years, having successfully implemented more than 1,000 foreign assistance programs in more than 100 countries on behalf of USAID and other U.S. government clients. Approximately 88% of Chemonics and its subsidiaries' funding comes from USAID. As of January 20, 2025, Chemonics was working with USAID on 104 different projects in over 90 countries.

4. I have worked at Chemonics for over a decade and am charged with overseeing Chemonics's corporate finance and administration functions, including treasury, accounting, capital structure, and the organization's overall budgeting and financial reporting.

5. As an implementing partner to the U.S. government, Chemonics's first and foremost duty is to be a good steward of taxpayer funds, ensuring the best value to the government in the performance of our contractual obligations and that the government obtains the benefit of every dollar spent. This is assured in part through extensive, rigorous, and continuous review and vetting procedures on the part of USAID and other government bodies throughout the entirety of the contract lifecycle, beginning before any work is conducted (upon our submission of a proposal in response to a government solicitation), through various audits performed after the contract has closed.

6. We emphasize that, prior to the work-stoppage, Chemonics normally received payment for all its USAID vouchers within 30 days of submission. Considering just 2024, of more than 920 invoices paid to date, the USAID paid on average 24 days after invoice receipt, with 788 invoices (85%) paid in 30 days or less.

7. Upon receipt of an invoice, USAID, through the cognizant COs, may question any itemized cost. In doing so, USAID can demand that Chemonics produce all documentation that the CO requires to support that cost and justify it as allowable. This may include documents such as invoices, proof of payments (receipts), and/or memos explaining why the cost is allowable as per the regulations and the contract. If the CO finds the contractor's justification or documentation insufficient, they may deem the cost unallowable. At this point, the CO would deduct that amount as well as any applicable indirect costs or fees, from the payment they are required to make against that invoice.

8. By the time we submit an invoice for costs incurred under a contract, those costs and the activities to which it is attached has gone through multiple rounds of Chemonics and USAID review to ensure it conforms to the terms of the prime contract; relevant and controlling federal regulations; and internal Chemonics policies and procedures that reflect the extensive oversight that the US government already demands of its partners to prevent fraud, waste, and abuse by ensuring all costs incurred and paid are allocable to the contract, allowable per the constraints of controlling regulations, and reasonable.

9. Before any project begins, in response to USAID's request for proposals, Chemonics submits a robust proposal presenting our technical approach to achieving the goals and objectives of the project, management and personnel approach, and a detailed cost proposal that includes detailed cost estimates and a description of our internal controls and systems to ensure

that any costs incurred during the project implementation are reasonable, real, allocable, allowable, and represent best value to the government.

10. USAID provides technical direction to the project, including review and, where required, written approvals of technical reports, specifications, or technical information to be delivered. Each contract sets a process for progress and other reports and deliverables, including annual work plans, activity monitoring, evaluation, and learning plans, monthly progress reports, quarterly progress reports, annual reports, final contract completion reports, demobilization plans, grants under contract manuals, subcontracting reports, or other reports as required, that are reviewed and approved by USAID, mainly Contracting Officer's Representatives (CORs).

11. For cost reimbursable projects (which describes the majority of Chemonics's USAID-issued awards), an invoice is generated when all costs incurred by the project for the previous month are reviewed and approved by Chemonics's project offices and multiple home office teams (project management units, Finance & Accounting, business unit Senior Vice Presidents).

12. Projects incur costs in compliance with the terms and conditions of their awards, and upon obtaining all relevant client approvals or adequate notifications. This may include mandated CO or COR approval of international travel, personnel salaries, technical assignments, subcontractor deliverables, project reports and deliverables, grant recipients, subcontractor consents.

13. Any costs incurred are in line with annual work plans that are collaboratively developed by each project with local counterparts and USAID and are approved by USAID.

14. Chemonics has a robust records management system, and for any costs incurred, Chemonics keeps all supporting documents including relevant internal and client approvals.

15. All costs incurred are recorded in our accounting software and reviewed by the project management units as they are booked for allocability and allowability. Before any payment is made, the costs go through a project review and approval process. Chemonics finance teams' responsibility is to ensure complete and accurate financial records.

16. The Chemonics project management unit is further responsible for reviewing and approving project office accounting records for the closing reporting period, making sure that any costs were incurred in compliance with the terms of the award and respective approvals. For each payment made by the home office, Chemonics has a review and approval process, and home office project management unit, accounts payable, and cash management teams review all cost elements and sign off on each payment, including for expense reports, timesheets, international subcontract milestones, licenses and other costs generated in the U.S.

17. Once the accounting month is closed, Chemonics drafts an invoice for the costs incurred in the prior month in accordance with the contract.

18. The draft invoice is then reviewed by Chemonics project management units to confirm the terms and conditions of the contract are met and invoiced costs are in accordance with the contract budget and any required USAID approvals. The draft invoice is subsequently reviewed and approved by the business unit Senior Vice Presidents.

19. The invoice and accompanying memoranda, where required per established practices, as per the terms and conditions, are sent to the contacts specified in the contract, generally the COR and Mission's Offices of Financial Management. Each invoice includes a summary of costs incurred during the closed month by Chemonics's Cost Accounting Standards (CAS) categories, and detailed transactions enabling USAID's detailed review.

20. The USAID COR then performs a review of the invoice and accompanying documents to ensure costs are incurred within the terms and conditions of the contract and, as needed, sends their questions to Chemonics.

21. Chemonics then provides a response to these questions. With some USAID Missions, we receive confirmation that the invoice has been submitted for processing while others tell us to follow up if we do not timely receive payment.

22. Another instrument used by Chemonics is a letter of credit (LOC), which is a mechanism by which USAID is able to provide advances to its direct grantees.

23. Per ADS 636, for-profit organizations that issue grants under contracts are eligible to use the LOC for grant program expenses. Funds received from the LOC are direct advances from the U.S. Treasury to finance the grant program, as opposed to normal project expenditures, which are paid with Chemonics funds and invoiced. Since we are handling government funds with the LOC, we are held to a very high standard of accountability.

24. The U.S. government's right to audit contractor invoices is included in Federal Acquisition Regulation (FAR) 52.215-2 "Audit and Records – Negotiation" (included in the vast majority of our cost-reimbursable contracts) and FAR 52.216-7 "Allowable Cost and Payment," which states that at any time before final payment under the contract, the CO may have the contractor's invoices audited, and that they may reduce payments by amounts found by the CO that do not constitute allowable costs or for prior overpayments or underpayments. As noted, USAID regularly audits and reviews after the fact costs incurred under contracts, some of which take place while a contract is still active and others after the project has closed.

25. **Incurred Cost Audit**. The Incurred Cost Audit is a crucial process to ensure that government contractors/implementing partners comply with federal regulations regarding

allocating and reporting costs on government contracts. This audit reviews Chemonics's incurred costs for each fiscal year to verify their allowability, allocability, and reasonableness under the Federal Acquisition Regulation (FAR 31.201-2) and the Cost Accounting Standards (CAS). By examining Chemonics's accounting practices and annual financial records, the cognizant auditors aim to identify discrepancies or unallowable costs, such as excessive overhead or unapproved subcontractor costs, that may impact the financial integrity of government contracts. During the audit, the auditors review transactions and proof of payments and verify that FAR, CAS, GAAP (General Accounting Practice), and government compliance, such as Fly and Buy America, are followed. This process helps protect taxpayer interests and raises accountability and transparency in expended government funds. The 2021 Incurred Cost Audit, the most recent audit conducted by Cognizant auditors, was completed with no questioned costs.

26.     **Cost Account Standard Audits**. Chemonics is also subject to periodic Cost Account Standard (CAS) audits. CAS audits are conducted to ensure compliance with federal regulations governing cost accounting practices in government contracting. The main focus of the Cost Account Standard Boards is to promote consistency and transparency in the allocation of costs associated with government contracts. During a CAS audit, the auditors assess whether Chemonics has implemented adequate accounting practices, maintained proper documentation, and applied consistent cost methods across all contracts. The outcome of these audits may lead to penalties or disallowances if Chemonics is found noncompliant. CAS audits play a crucial role in safeguarding government funds and ensuring that contractors are held to high standards of accountability and integrity, providing a sense of security to all stakeholders. Chemonics has successfully passed its CAS audits, which have noted that Chemonics's internal controls, as they

relate to the audit objective, have been properly designed and implemented and are operating effectively to prevent or detect and correct noncompliance due to fraud or error.

27. **Financial System Audits**. The Overhead, Special Cost, and Closeout Branch of the Office of Acquisition and Assistance within the Management Bureau (M/OAA/CAS/OCC) is the central unit authorized to act as the Cognizant Federal Agency Official (CFAO) to determine whether Chemonics's accounting system complies with the requirements for an adequate accounting system as prescribed in 48 C.F.R. § 252.242-776, "Accounting Systems Administration." Chemonics's financials system is also audited to ensure that the company's financial statements accurately reflect the company's financial position and performance while adequately adhering to general accounting principles (GAAP). During a financial system audit, the auditors review transactions, assess the effectiveness of internal controls, and examine the reliability of the financial reporting system. This audit helps to identify potential weaknesses or risks, ensuring that financial information is reliable and the organization can make decisions based on accurate data. It was determined that Chemonics's accounting system is designed to adequately accumulate, segregate, and identify costs under US government awards and allow for proper differentiation between costs, indirect costs, and unallowable costs in compliance with government regulations.

28. **USAID Mission Audits**. In addition to extensive third-party audits, the USAID Missions conduct a financial and compliance review in project offices across the world, including projects implemented by Chemonics. They include review of costs for allocability, allowability and reasonableness as well as internal processes and controls.

29. **Chemonics Internal Review**. Chemonics's standard practice is to conduct internal reviews by its Finance and Compliance team to provide reasonable assurance that regulations,

policies and processes are adhered to across over 100 projects implemented by Chemonics. The main objectives are to (a) carry out an assessment of a project's accounting, finance and operations controls in order to provide reasonable assurance that project is in compliance with Chemonics's policies, procedures, guidelines, and with the client's rules and regulations; (b) validate the reliability and integrity of the project's accounting, financial, and operating information; (c) verify compliance with the contract's special requirements; and (d) confirm that the project has been taking steps to comply with all applicable local governmental laws and regulations as per local counsel and/or CPA firm recommendations. These reports are available to the client. Only in 2024, the FCR team conducted a review of over 60% of project offices.

30.     **Contractor Purchasing System Review (CPSR) Audit**. Chemonics has operated the GHSC-PSM project tasked with procurement of over $7 billion of health commodities (for HIV treatment, malaria, family planning, maternal and childcare heath) for over 50 countries since 2015. Since the inception of GHSC-PSM, Chemonics' approved purchasing system for procurement – the first of its kind for a non-Department of Defense contractor, for whom approved purchasing systems are more routine -- has twice been subject to a contractor purchasing system review, once in 2016 and again in 2020. Per FAR Part 44.3, "The objective of a contractor purchasing system review (CPSR) is to evaluate the efficiency and effectiveness with which the contractor spends Government funds and complies with Government policy when subcontracting."

31.     The CPSRs were conducted by the Defense Contract Management Agency and in both instances, Chemonics' purchasing system was granted approval after the comprehensive audits of policies, procedures, and transactions (PSM and non-PSM), including provision of information on over 18,000 transactions during the most recent CPSR. These audits are comprehensive and conducted in accordance with a DCMA CPSR Guidebook, which details the

types of reviews, scope, and steps involved. Chemonics' approved purchasing system as well as the numerous other financial and performance audits our programs undergo stands as a testament to Chemonics' commitment to responsible stewardship of U.S. taxpayer funds and mitigation of the potential for waste, fraud, or abuse of those funds.

32. As a direct and unavoidable result of the continued failure of the US government to issue payment, Chemonics continues to make deeper cuts to our spending, significantly impacting our staff and ongoing operations. As of February 26, 2025, Chemonics and its U.S. subsidiaries have furloughed 782 of Chemonics's U.S.-based staff, which represents 67% of its U.S.-based workforce. As a result, some furloughed employees will struggle to pay for basic necessities, including housing and food. Of the non-furloughed U.S. employees, 234 have had their hours reduced by 25%, and 89 employees have had their hours reduced by 66%, in each case with corresponding pay cuts.

33. Chemonics depends heavily on a line of credit it has established with a syndicate of banks since 2022. On Friday, February 9, 2025, Chemonics indicated to the lead lender its desire to draw on its line of credit in order to fund Chemonics's ongoing operations. The lenders' obligation to make any specific loan is subject to the condition that Chemonics had not experienced any change that had or could reasonably be expected to have a Material Adverse Effect (as defined in the loan documents). Chemonics's lenders ultimately consented to Chemonics's requested drawdown, subject, however, to Chemonics signing an acknowledgement that there in fact had been a change which had or could reasonably be expected to have a Material Adverse Effect as a result of President Trump's Executive Order and the ensuing stop-work orders. As part of the acknowledgement, the lenders consented to waive the related condition for this specific drawdown only. Unless and until Chemonics's financial situation changes drastically, the lenders now have

documentation that will allow them to deny any future drawdown requests. If the lenders were to deny all future drawdown requests, and no additional invoices are paid by USAID, and depending on whether overdue payments to vendors can be delayed, Chemonics would run out of funding on before the end of March 2025.

34. The following is a specific example demonstrative of harm directly and unavoidably created by the U.S. Government's failure to issue payment.

35. In Ukraine, USAID via Chemonics coordinates and collaborates with at least six local water users' associations (Kvitneve Dzherelo, Chorniavska, Shchedra Zemlia, Strong Water, Agua Life, and Lymanetska), which have already invested nearly $1.1 million in irrigation upgrades to dismantle outdated water delivery equipment and prepare pumping stations for the installation of new water and energy-saving irrigation systems across Ukraine. Despite the fact that this activity was initiated and in-progress prior to the stop-work order, we have been unable make payments to facilitate completion of delivery and installation, which will result in an additional estimated $2 million loss to U.S. taxpayers if not resolved. Additionally, Ukraine's irrigation providers will be unable to complete planned upgrades or restart their systems before the start of the upcoming irrigation season in April of this year. This will potentially leave 6,000 hectares of agricultural land, including 2,000 hectares in frontline areas, without irrigation. This disruption will severely hinder farmers' ability to harvest crops, jeopardizing food supplies for millions of people in Ukraine and around the world who rely on Ukrainian grain.

36. The recent Stop Work Order issued against USAID Nigeria/LUWASH's ongoing rehabilitation projects has led to unforeseen challenges, both economically and in public health. These projects, which are essential for the enhancement of water infrastructure in Lagos, Nigeria, are now at a standstill. At the time of the Stop Work Order, LUWASH had three active Fixed Price

Rehabilitation Subcontracts worth about $7.8 million to complete vital rehabilitation at five mini waterworks in Lagos, Nigeria, improving water security, public health, and quality of life for underserved populations.

37. The three Nigerian subcontractors conducting this work had deployed staff, equipment, supplies and work under progress at all five sites were stopped immediately following the stop work order. As these are fixed price subcontracts, no advances are provided and payments are only due at completion of the deliverables. The three subcontractors have incurred significant costs in implementing those deliverables and strongly expressed their financial difficulties as a result of the stop work order which is preventing them from completing any deliverable in progress for payment. Without the needed cashflow to negotiate a payment for partially completed deliverables, these local subcontractors are sitting on nearly $1million dollars of incurred expenses that they cannot reclaim. The sudden unavailability of payments disrupts the livelihoods of these subcontractors who may not be able to survive financially for the next 90 days and whose reputation may be negatively impacted due to broken promises to their banks, suppliers and employees, causing a ripple effect across the Lagos economy. Additionally, if the subcontractors are not able to recover financially and stay in business, the project may require additional time and funds to identify other subcontractors to complete the work. The LUWASH project directly supports the United Nations Sustainable Development Goal 6: Clean Water and Sanitation. The stalling of these mini-waterworks jeopardizes years of progress toward achieving this goal in Lagos. This disruption in the rehabilitation of the mini waterworks will severely delay the availability of clean and safe water to thousands of residents in targeted low-income communities throughout Lagos. Those households that were expecting improved water access will remain reliant on unsafe water sources, increasing the risk of waterborne diseases such as cholera and

typhoid. Subcontractors were forced to partially demobilize in order to secure their equipment at the time of the Stop Work Order. Remobilizing to continue the rehabilitation works will come at an additional cost as will termination as there will be costs associated with demobilization. Furthermore, in the case of at least two of five mini waterworks, most existing electromechanical systems, including high-lift pumps and chemical mixer pumps, have been dismantled by the subcontractors in preparation for reinstallation, leaving the sites completely inoperable at the time of the stop work order since the critical equipment has not been reinstalled. Furthermore, removed filter sand media from the rehabilitation works at 2 of the 5 sites remain stockpiled on-site at the risk of being washed into drains during rainfall, leading to waterway blockages and increasing the risk of site flooding. This could leave the sites in a worse condition then before the rehabilitation work started and would increase the total cost to the US taxpayer to clean the site before completing the rehabilitation or even demobilization should we have to abandon the work.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 27, 2025.

/s/ Can Varol
Can Varol