APPEAL,TYPE–D

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:25–cv–00402–AHA</u>
### *Internal Use Only*

GLOBAL HEALTH COUNCIL et al v. DONALD J. TRUMP et al

Assigned to: Judge Amir H. Ali

Related Case:  1:25–cv–00400–AHA

Case in other court:  USCA, 25–05047

Cause: 05:0706 Judicial Review of Agency Actions

Date Filed: 02/11/2025

Jury Demand: None

Nature of Suit: 899 Administrative Procedure Act/Review or Appeal of Agency Decision

Jurisdiction: U.S. Government Defendant

**<u>Plaintiff</u>**

| | | |
|---|---|---|
| **GLOBAL HEALTH COUNCIL** | represented by | **Allison Gardner**<br>ARNOLD & PORTER KAYE SCHOLER LLP<br>601 Massachusetts Avenue, NW<br>Washington D.C., DC 20001–3743<br>202–942–5000<br>Email: allison.gardner@arnoldporter.com<br>*ATTORNEY TO BE NOTICED* |
| | | **Dana Kagan McGinley**<br>ARNOLD & PORTER<br>601 Massachusetts Ave. NW<br>Washington, DC 20001<br>202–942–6421<br>Email: Dana.KaganMcGinley@arnoldporter.com<br>*ATTORNEY TO BE NOTICED* |
| | | **Daniel Reuben Yablon**<br>ARNOLD & PORTER KAYE SCHOLER LLP<br>601 Massachusetts Ave., NW<br>Washington, DC 20001<br>202–942–5009<br>Email: Daniel.Yablon@arnoldporter.com<br>*ATTORNEY TO BE NOTICED* |
| | | **Sally Pei**<br>ARNOLD & PORTER KAYE SCHOLER LLP<br>601 Massachusetts Avenue, NW<br>Washington, DC 20001<br>(202) 942–5000<br>Fax: (202) 942–5999<br>Email: sally.pei@arnoldporter.com<br>*ATTORNEY TO BE NOTICED* |

1

**Samuel M. Witten**
ARNOLD & PORTER
601 Massachusetts Avenue, NW
Washington, DC 20817
202–942–6115
Email: samuel.witten@apks.com
*ATTORNEY TO BE NOTICED*

**Stephen K. Wirth**
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Ave. NW
Washington, DC 20001
202–942–6739
Fax: 202–942–5999
Email: stephen.wirth@arnoldporter.com
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**SMALL BUSINESS ASSOCIATION**          represented by  **Allison Gardner**
**FOR INTERNATIONAL**                                   (See above for address)
**COMPANIES**                                           *ATTORNEY TO BE NOTICED*

**Dana Kagan McGinley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sally Pei**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel M. Witten**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen K. Wirth**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**HIAS**                                 represented by  **Allison Gardner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dana Kagan McGinley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen K. Wirth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MANAGEMENT SCIENCES FOR HEALTH, INC.**

represented by **Allison Gardner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dana Kagan McGinley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Reuben Yablon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sally Pei**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel M. Witten**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen K. Wirth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CHEMONICS INTERNATIONAL, INC.**

represented by **Allison Gardner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dana Kagan McGinley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Reuben Yablon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sally Pei**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel M. Witten**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen K. Wirth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DAI GLOBAL LLC**                         represented by **Allison Gardner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dana Kagan McGinley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Reuben Yablon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sally Pei**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel M. Witten**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen K. Wirth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DEMOCRACY INTERNATIONAL,**         represented by **Allison Gardner**
**INC.**                                        (See above for address)
*ATTORNEY TO BE NOTICED*

**Dana Kagan McGinley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Reuben Yablon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sally Pei**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel M. Witten**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen K. Wirth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**AMERICAN BAR ASSOCIATION**         represented by

**Allison Gardner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dana Kagan McGinley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Reuben Yablon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sally Pei**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel M. Witten**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen K. Wirth**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**DONALD J. TRUMP**
*in his official capacity as President of the*
*United States of America*

represented by **Indraneel Sur**
U.S. DEPARTMENT OF JUSTICE
1100 L St. NW
Washington, DC 20530
202−616−8488
Email: <u>Indraneel.Sur@usdoj.gov</u>
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**MARCO RUBIO**
*in his official capacity as Secretary of*
*State and Acting Administrator of the*
*United States Agency for International*
*Development*

represented by **Indraneel Sur**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**PETER MAROCCO**
*in his official capacity as Acting Deputy*
*Administrator for Policy and Planning,*
*Acting Deputy Administrator for*
*Management and Resources of the*
*United States Agency for International*

represented by **Indraneel Sur**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

*Development, and Director of Foreign*
*Assistance at the Department of St*

**Defendant**

| | | |
|---|---|---|
| **RUSSELL T. VOUGHT** | represented by | **Indraneel Sur** |
| *in his official capacity as Director of the* | | (See above for address) |
| *Office of Management and Budget* | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **UNITED STATES DEPARTMENT OF STATE** | represented by | **Indraneel Sur** |
| | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT** | represented by | **Indraneel Sur** |
| | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **OFFICE OF MANAGEMENT AND BUDGET** | represented by | **Indraneel Sur** |
| | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **CONSTITUTIONAL ACCOUNTABILITY CENTER** | represented by | **Brianne Jenna Gorod** |
| | | CONSTITUTIONAL ACCOUNTABILITY CENTER |
| | | 1200 18th Street, NW |
| | | Suite 501 |
| | | Washington, DC 20036 |
| | | (202) 296–6889 ext. 304 |
| | | Email: brianne@theusconstitution.org |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Miriam Becker–Cohen** |
| | | CONSTITUTIONAL ACCOUNTABILITY CENTER |
| | | 1200 18th Street, NW |
| | | Suite 501 |
| | | Washington, DC 20036 |
| | | 202–296–6889 |
| | | Email: miriam@theusconstitution.org |
| | | *ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 02/11/2025 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number ADCDC–11470798) filed by DAI GLOBAL LLC, HIAS, DEMOCRACY INTERNATIONAL, INC., SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, AMERICAN BAR ASSOCIATION, GLOBAL HEALTH COUNCIL, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC.. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons, # 9 Summons, # 10 Summons)(Wirth, Stephen) (Entered: 02/11/2025) |
| 02/11/2025 | 2 | NOTICE OF RELATED CASE by All Plaintiffs. Case related to Case No. 25–cv–400. (Wirth, Stephen) (Main Document 2 replaced on 2/11/2025) (znmw). (Entered: 02/11/2025) |
| 02/11/2025 | 3 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION (Wirth, Stephen) (Entered: 02/11/2025) |
| 02/11/2025 | 4 | MOTION for Temporary Restraining Order , MOTION for Preliminary Injunction by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION. (Attachments: # 1 Text of Proposed Order)(Wirth, Stephen) (Entered: 02/11/2025) |
| 02/11/2025 | 5 | NOTICE of Appearance by Daniel Reuben Yablon on behalf of GLOBAL HEALTH COUNCIL, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION (Yablon, Daniel) (Entered: 02/11/2025) |
| 02/11/2025 | 6 | NOTICE of Appearance by Sally Pei on behalf of GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION (Pei, Sally) (Entered: 02/11/2025) |
| 02/11/2025 | 7 | DECLARATION by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION re 4 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction . (Attachments: # 1 Declaration of Elisha Dunn–Georgiou, # 2 Declaration of Robert Nichols, # 3 Declaration of Mark Hetfield, # 4 Exhibit to Hetfield Decl., # 5 Declaration Marian Wentworth, # 6 Declaration of James Butcher, # 7 Declaration of Zan Northrip, # 8 Declaration of Eric Bjornlund, # 9 Declaration of Scott Carlson)(Wirth, Stephen) (Entered: 02/11/2025) |
| 02/11/2025 | | Case Assigned to Judge Loren L. AliKhan. (znmw) (Entered: 02/11/2025) |
| 02/11/2025 | 8 | SUMMONS (9) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(znmw) (Entered: |

| | | |
|---|---|---|
| | | 02/11/2025) |
| 02/11/2025 | 9 | NOTICE of Appearance by Samuel M. Witten on behalf of GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION (Witten, Samuel) (Entered: 02/11/2025) |
| 02/11/2025 | 10 | NOTICE of Appearance by Allison Gardner on behalf of GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION (Gardner, Allison) (Entered: 02/11/2025) |
| 02/11/2025 | 11 | ENTERED IN ERROR.....NOTICE of Appearance by William Perdue on behalf of GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION (Perdue, William) Modified on 2/11/2025 (znmw). (Entered: 02/11/2025) |
| 02/11/2025 | 12 | NOTICE of Appearance by Dana Kagan McGinley on behalf of GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION (Kagan McGinley, Dana) (Entered: 02/11/2025) |
| 02/11/2025 | | NOTICE OF ERROR regarding 11 Notice of Appearance,. The following error(s) need correction: Attorney William Perdue is not an active member of this Court's bar; a Pro Hac Vice motion has not been filed in this case. (znmw) Modified on 2/11/2025 (znmw). (Entered: 02/11/2025) |
| 02/11/2025 | | RESOLVED.....NOTICE of Provisional Status re 12 NOTICE of Appearance by Dana Kagan McGinley on behalf of All Plaintiffs (Kagan McGinley, Dana).<br><br>Your attorney renewal has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney–renewal.<br><br>Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 2/18/2025. (znmw) Modified on 2/12/2025 (zhcn). (Entered: 02/11/2025) |
| 02/11/2025 | 13 | NOTICE OF RELATED CASE by All Defendants. Case related to Case No. 1:25–cv–352. (Edelman, Christopher) (Entered: 02/11/2025) |
| 02/11/2025 | 14 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– William Perdue, Filing fee $ 100, receipt number ADCDC–11472347. Fee Status: Fee Paid. by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR |

| | | |
|---|---|---|
| | | HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION. (Wirth, Stephen) (Entered: 02/11/2025) |
| 02/11/2025 | 15 | RESPONSE re 13 Notice of Related Case filed by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION. (Wirth, Stephen) (Entered: 02/11/2025) |
| 02/11/2025 | | MINUTE ORDER: For the reasons stated in the court's order in *AIDS Vaccine Advocacy Coalition v. U.S. Department of State*, No. 25–CV–400, ECF No. 12, it is hereby ORDERED that the Clerk of Court shall TRANSFER this related matter to the Calendar and Case Management Committee. Signed by Judge Loren L. AliKhan on 02/11/2025. (lclla1) (Entered: 02/11/2025) |
| 02/11/2025 | | Case directly reassigned to Judge Amir H. Ali, as related, pursuant to Minute Order dated 2/11/2025. Judge Loren L. AliKhan is no longer assigned to the case. (ztnr) (Entered: 02/12/2025) |
| 02/12/2025 | 16 | NOTICE by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION re 4 Motion for TRO,, Motion for Preliminary Injunction, (Wirth, Stephen) (Entered: 02/12/2025) |
| 02/12/2025 | | MINUTE ORDER. The Court will hold a telephonic motion hearing in No. 25–cv–00400 and No. 25–cv–00402 on February 12, 2025, at 1:30 p.m. The information for the public access line is as follows: the toll–free number is 833–990–9400, and the Meeting ID is 771021014. Signed by Judge Amir H. Ali on 2/12/2025. (lcaha2) Modified on 2/12/2025. (zalh) (Entered: 02/12/2025) |
| 02/12/2025 | | Minute Entry for telephonic proceeding held before Judge Amir H. Ali: Motion Hearing held on 2/12/2025 re 4 Motion and Memorandum of Law in Support of Temporary Restraining Order and Preliminary Injunction. Oral arguments heard. The Court takes the motion under advisement. A written order is forthcoming via Chambers. The Court orders the parties to submit a proposed order by 4:30 PM today and the necessary documentation regarding any terminations by 7:00 PM today. (Court Reporter: William Zaremba) (zalh) (Entered: 02/12/2025) |
| 02/12/2025 | 17 | NOTICE *Related to February 12, 2025 Hearing* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D: Proposed Order)(Edelman, Christopher) (Entered: 02/12/2025) |
| 02/12/2025 | 18 | NOTICE *of Revised Proposed Order* by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION re Motion Hearing,, 4 Motion for TRO,, Motion for Preliminary Injunction, (Pei, Sally) (Entered: 02/12/2025) |

| 02/12/2025 | 19 | RESPONSE TO ORDER OF THE COURT re 2/12/2025 MINUTE Order by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Wirth, Stephen) Modified event on 2/13/2025 (mg). (Entered: 02/12/2025) |
|---|---|---|
| 02/12/2025 | 20 | NOTICE *of supplemental information* by UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT re 17 Notice (Other), (Attachments: # 1 Exhibit)(Sur, Indraneel) (Entered: 02/12/2025) |
| 02/13/2025 | 21 | ORDER granting in part and denying in part Plaintiffs' 4 Motion for a Temporary Restraining Order. Defendants shall file a status report by 2/18/2025. The parties shall file a joint status report by 2/14/2025 at 5:00 PM. See document for details. Signed by Judge Amir H. Ali on 2/13/2025. (lcaha2) Modified on 2/14/2025. (zalh) (Entered: 02/13/2025) |
| 02/14/2025 | 22 | TRANSCRIPT OF STATUS CONFERENCE – MOTIONS – TEMPORARY RESTRAINING ORDER VIA ZOOM TELECONFERENCE PROCEEDINGS before Judge Amir H. Ali held on February 12, 2025; Page Numbers: 1–74. Court Reporter/Transcriber: William Zaremba; Email: William_Zaremba@dcd.uscourts.gov. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, PDF or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 3/7/2025. Redacted Transcript Deadline set for 3/17/2025. Release of Transcript Restriction set for 5/15/2025.(Zaremba, William) (Entered: 02/14/2025) |
| 02/14/2025 | 23 | Joint STATUS REPORT by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION. (Wirth, Stephen) (Entered: 02/14/2025) |
| 02/14/2025 |  | MINUTE ORDER. The Court is in receipt of the parties' 23 joint status report proposing a briefing schedule. Defendants shall respond to Plaintiffs' 4 motion for preliminary relief by February 21, 2025. Plaintiffs shall reply by 12:00 p.m. on February 27, 2025. Signed by Judge Amir H. Ali on 2/14/2025. (lcaha2) (Entered: 02/14/2025) |
| 02/18/2025 | 24 | NOTICE of Appearance by Indraneel Sur on behalf of All Defendants (Sur, Indraneel) (Entered: 02/18/2025) |

| 02/18/2025 | 25 | STATUS REPORT *regarding Compliance* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET. (Attachments: # 1 Exhibit USAID & State Decl, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit OMB Decl)(Sur, Indraneel) (Entered: 02/18/2025) |
|---|---|---|
| 02/19/2025 | 26 | Unopposed MOTION for Leave to File *Amicus Curiae Brief* by CONSTITUTIONAL ACCOUNTABILITY CENTER. (Attachments: # 1 Proposed Amicus Brief, # 2 Text of Proposed Order)(Gorod, Brianne) (Entered: 02/19/2025) |
| 02/19/2025 | 27 | NOTICE of Appearance by Miriam Becker–Cohen on behalf of CONSTITUTIONAL ACCOUNTABILITY CENTER (Becker–Cohen, Miriam) (Entered: 02/19/2025) |
| 02/20/2025 | 28 | ORDER. Plaintiffs' motion for contempt and to enforce the Court's temporary restraining order in No. 25–cv–00400 is granted in part and denied in part. See document for details. Signed by Judge Amir H. Ali on 2/20/2025. (lcaha2) (Entered: 02/20/2025) |
| 02/20/2025 | 29 | MOTION to Enforce *Temporary Restraining Order* by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION. (Attachments: # 1 Declaration of Elisha Dunn–Georgiou, # 2 Declaration of Robert Nichols, # 3 Declaration of Rachel Levitan, # 4 Declaration of Marian Wentworth, # 5 Declaration James Butcher, # 6 Declaration Zan Northrip, # 7 Declaration Eric Bjornlund, # 8 Declaration Scott Carlson, # 9 Text of Proposed Order)(Wirth, Stephen) (Entered: 02/20/2025) |
| 02/20/2025 | 31 | RESPONSE re 25 Status Report, filed by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION. (See docket entry 29 to view document)(mg) (Entered: 02/21/2025) |
| 02/21/2025 | 30 | ERRATA by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION re 1 Complaint,,. (Attachments: # 1 Errata (Corrected Complaint))(Wirth, Stephen) (Entered: 02/21/2025) |
| 02/21/2025 | | MINUTE ORDER. The Court is in receipt of Plaintiffs' 29 motion to enforce the Court's temporary restraining order. Plaintiffs request that the Court order "the immediate payment of all funds owed and due to Plaintiffs and other USAID and State Department implementing partners." ECF No. 29 at 1. The motion is denied without prejudice as moot in light of the Court's order yesterday that Defendants are to "immediately cease [the blanket suspension of funds] and to take all necessary steps to honor the terms of contracts, grants, cooperative agreements, loans, and other federal foreign assistance awards that were in existence as of January 19, 2025, including but not limited to disbursing all funds payable under those terms." ECF No. 28 at 5. |

| | | The parties in this case and No. 25–cv–00400 shall meet and confer and file a consolidated joint status report by February 26, 2025, at 12:00 p.m., addressing Defendants' "prompt compliance with the order." Defendants' Br., *AIDS Vaccine*, ECF No. 28 at 8. Signed by Judge Amir H. Ali on 2/21/2025. (lcaha2) (Entered: 02/21/2025) |
|---|---|---|
| 02/21/2025 | 32 | STANDING ORDER. The parties are ordered to comply with the directives set forth in the attached standing order. See document for details. Signed by Judge Amir H. Ali on 2/21/2025. (lcaha2) (Entered: 02/21/2025) |
| 02/21/2025 | 33 | MOTION to Clarify re 21 Order on Motion for TRO,, Set/Reset Deadlines, 28 Order , MOTION to Stay by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP. (Sur, Indraneel) (Entered: 02/21/2025) |
| 02/21/2025 | 34 | Memorandum in opposition to re 4 Motion for TRO,, Motion for Preliminary Injunction, *combined with opposition in No.400* filed by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP. (Sur, Indraneel) (Entered: 02/21/2025) |
| 02/22/2025 | 35 | ORDER. To the extent Defendants' 33 motion to clarify is not mooted by the discussion herein, it is denied, and Defendants' motion to stay the Court's TRO pending an emergency appeal is also denied. See document for details. Signed by Judge Amir H. Ali on 2/22/2025. (lcaha3) (Entered: 02/22/2025) |
| 02/24/2025 | 36 | Emergency MOTION to Enforce *Temporary Restraining Order* by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION. (Attachments: # 1 Declaration of Eric Bjornlund, # 2 Declaration of Zan Northrip, # 3 Declaration of Phillip Green, # 4 Declaration of Elisabeth Sigler, # 5 Text of Proposed Order)(Wirth, Stephen) (Entered: 02/24/2025) |
| 02/24/2025 | | MINUTE ORDER. The Court is in receipt of Plaintiffs' 36 emergency motion to enforce. The Court will hold a telephonic motion hearing on February 25, 2025, at 11:00 a.m. The information for the public access line is as follows: the toll–free number is 833–990–9400, and the Meeting ID is 771021014. Signed by Judge Amir H. Ali on 2/24/2025. (lcaha1) Modified on 2/25/2025. (zalh) (Entered: 02/24/2025) |
| 02/25/2025 | 37 | TRANSCRIPT OF MOTION HEARING before Judge Amir H. Ali held on February 25, 2025; Page Numbers: 1–60. Date of Issuance: 2/25/2025. Court Reporter: Bryan A. Wayne. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter. |

| | | |
|---|---|---|
| | | **NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 3/18/2025. Redacted Transcript Deadline set for 3/28/2025. Release of Transcript Restriction set for 5/26/2025.(Wayne, Bryan) (Entered: 02/25/2025) |
| 02/25/2025 | | Minute Entry and Order for proceedings held via Zoom before Judge Amir H. Ali: Motion Hearing held on 2/25/2025 re 36 Emergency MOTION to Enforce *Temporary Restraining Order* filed by GLOBAL HEALTH COUNCIL, DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, CHEMONICS INTERNATIONAL, INC., MANAGEMENT SCIENCES FOR HEALTH, INC., HIAS. Oral arguments HEARD, motion GRANTED for the reasons stated on the record. The restrained defendants are ordered to comply as discussed by 11:59 p.m. on February 26, 2025. (Court Reporter Bryan Wayne) (znbn) (Entered: 02/25/2025) |
| 02/25/2025 | 38 | NOTICE OF INTERLOCUTORY APPEAL TO DC CIRCUIT COURT as to Order on Motion to Enforce,,, Motion Hearing,, by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP. Fee Status: No Fee Paid. Parties have been notified. (Sur, Indraneel) Modified event on 2/26/2025 (mg). (Entered: 02/25/2025) |
| 02/25/2025 | 39 | MOTION to Stay re Order on Motion to Enforce,,, Motion Hearing,, by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP. (Attachments: # 1 Declaration)(Sur, Indraneel) (Entered: 02/25/2025) |
| 02/25/2025 | | USCA Case Number 25−5047 for 38 Notice of Appeal to DC Circuit Court, filed by RUSSELL T. VOUGHT, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, PETER MAROCCO, DONALD J. TRUMP, MARCO RUBIO, UNITED STATES DEPARTMENT OF STATE. (mg) (Entered: 02/26/2025) |
| 02/26/2025 | 40 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 38 Notice of Appeal to DC Circuit Court,. (mg) (Entered: 02/26/2025) |
| 02/26/2025 | 41 | ORDER denying Defendants' 39 motion to stay. See document for details. Defendants shall promptly file notice of this order with the Court of Appeals. Signed by Judge Amir H. Ali on 2/26/2025. (lcaha2) (Entered: 02/26/2025) |
| 02/26/2025 | 42 | Joint STATUS REPORT by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI |

| | | |
|---|---|---|
| | | GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION. (Attachments: # 1 Declaration of Zahra Doe, # 2 Declaration of Della Doe, # 3 Declaration of Ellie Doe, # 4 Declaration of Clara Doe, # 5 Declaration of Sandra Doe)(Wirth, Stephen) (Entered: 02/26/2025) |
| 02/26/2025 | 43 | LARGE ADDITIONAL ATTACHMENT(S) *Defense Exhibits A and B* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP 42 Status Report, filed by GLOBAL HEALTH COUNCIL, DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, CHEMONICS INTERNATIONAL, INC., MANAGEMENT SCIENCES FOR HEALTH, INC., HIAS. (Attachments: # 1 Declaration)(Sur, Indraneel) (Entered: 02/26/2025) |
| 02/26/2025 | 44 | LARGE ADDITIONAL ATTACHMENT(S) *Defense Exhibit C* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP 43 Large Additional Attachment(s),, filed by RUSSELL T. VOUGHT, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, PETER MAROCCO, DONALD J. TRUMP, MARCO RUBIO, UNITED STATES DEPARTMENT OF STATE. (Sur, Indraneel) (Entered: 02/26/2025) |
| 02/26/2025 | 45 | NOTICE *by Defense in Clarification* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP re 42 Status Report, (Sur, Indraneel) (Entered: 02/26/2025) |
| 02/27/2025 | 46 | REPLY to opposition to motion re 4 Motion for TRO,, Motion for Preliminary Injunction, filed by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION. (Attachments: # 1 Declaration of Can Varol, # 2 Declaration of James Butcher, # 3 Declaration of Jane Doe, # 4 Declaration of Jessica Doe, # 5 Declaration of Jocelyn Doe, # 6 Text of Proposed Order)(Wirth, Stephen) (Entered: 02/27/2025) |
| 03/03/2025 | 47 | MOTION for Leave to File *Supplement to the Record* by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION. (Attachments: # 1 Declaration of Nicholas Enrich, # 2 Exhibit (OMB Budget Data Request No. 25–08), # 3 Text of Proposed Order)(Wirth, Stephen) (Entered: 03/03/2025) |
| 03/03/2025 | | MINUTE ORDER. The Court's hearing on preliminary injunction motions in this case and No. 25–cv–00400, planned for March 4, 2025, will be held on March 6, 2025, at 2:00 p.m. in Courtroom 19– In Person before Judge Amir H. Ali. The Court will consider the parties' arguments and issue an opinion thereafter with full dispatch. The |

| | | |
|---|---|---|
| | | expiration date for the Court's temporary restraining order remains 11:59 p.m. on March 10, 2025, or the date the Court resolves the preliminary injunction motions, whichever is sooner. Signed by Judge Amir H. Ali on 3/3/2025. (lcaha2) Modified on 3/4/2025. (zalh) (Entered: 03/03/2025) |
| 03/03/2025 | 48 | MOTION for Leave to File *Partially Opposed Surreply* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP. (Attachments: # 1 Proposed Surreply, # 2 Declaration, # 3 Text of Proposed Order)(Sur, Indraneel) (Entered: 03/03/2025) |
| 03/05/2025 | | MINUTE ORDER. The parties shall meet and confer and file a joint status report by 11:00 a.m. tomorrow proposing a schedule for Defendants to come into compliance with the Court's temporary restraining order ("TRO") and the Court's February 25, 2025, order enforcing the TRO. The joint status report need not address compliance with the February 25, 2025, order for the period that the order was subject to administrative stay; however, it should address steps taken during all other periods up until the filing of the joint status report and include specificity with respect to milestones and timelines for Defendants coming into compliance thereafter. The parties' proposed schedule should account for the length of time that has passed since the TRO was entered and the feasibility of any compliance timelines.<br><br>At the preliminary injunction hearing tomorrow, the parties should be prepared to address the substantive arguments at issue in the preliminary injunction motions. The Court will hear argument from all parties; however, Plaintiffs in the two cases are encouraged to coordinate to avoid duplicative arguments and will be given the opportunity to propose a division of the issues between counsel. The parties should also be prepared to discuss the steps Defendants have taken to come into compliance with the Court's orders, including any further steps that were executed following the parties' joint status report, as well as the parties' proposed schedule for Defendants coming into compliance. Signed by Judge Amir H. Ali on 3/5/2025. (lcaha2) (Entered: 03/05/2025) |
| 03/05/2025 | | MINUTE ORDER. A public access line will be provided for tomorrow's preliminary injunction hearing. The information for the public access line is as follows: the toll–free number is 833–990–9400, and the Meeting ID is 771021014. Persons remotely accessing court proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. *See In re: Prohibition on Photographing, Recording, Broadcasting, and Livestreaming Judicial Proceedings*, Standing Order 24–31 (JEB) (Sept. 18, 2024). Signed by Judge Amir H. Ali on 3/5/2025. (lcaha2) (Entered: 03/05/2025) |
| 03/05/2025 | 49 | Consent MOTION for Leave to File *Response to Plaintiffs' Supplemental Materials* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP. (Attachments: # 1 Response to Plaintiffs' Supplemental Materials, # 2 Text of Proposed Order)(Sur, Indraneel) (Entered: 03/05/2025) |
| 03/06/2025 | 50 | Joint STATUS REPORT by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI |

| | | |
|---|---|---|
| | | GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION. (Wirth, Stephen) (Entered: 03/06/2025) |
| 03/06/2025 | 51 | NOTICE OF SUPPLEMENTAL AUTHORITY by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP (Sur, Indraneel) (Entered: 03/06/2025) |
| 03/06/2025 | | Minute Entry for proceedings held before Judge Amir H. Ali: Motion Hearing held on 3/6/2025. Oral arguments on preliminary injunction motions heard. (Court Reporter Sonja Reeves) (znbn) (Entered: 03/06/2025) |
| 03/07/2025 | 52 | NOTICE *regarding Court inquiry of March 6, 2025* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP re 50 Status Report, (Sur, Indraneel) (Entered: 03/07/2025) |
| 03/07/2025 | 53 | NOTICE *responding to Court's request for information regarding Plaintiffs' and Plaintiffs' members' invoices* by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION re Status Conference (Pei, Sally) (Entered: 03/07/2025) |
| 03/07/2025 | | MINUTE ORDER. As discussed at yesterday's hearing, the Court believes it would be helpful to have additional information to serve as benchmarks in assessing feasibility in reaching compliance with the TRO. These benchmarks will allow the Court to continue to provide clarity as to what is needed for compliance with the TRO, while ensuring that due regard is given to feasibility. As the parties discussed, such benchmarks would also be pertinent to the Court's consideration of any relief to be granted in a preliminary injunction. The Court is in receipt of Defendants' 52 notice stating that they are not currently able to provide information regarding the number of payments processed for Plaintiffs as it relates to Defendants' paragraph 10 in the parties' 50 joint status report, and may need until noon on Monday to provide this information. If Plaintiffs can offer any information or estimate as to how many outstanding invoices were processed in the period described, they should provide that information to the Court as soon as possible. |
| | | Furthermore, in the interest of facilitating the Court's ruling with respect to enabling letter of credit drawdown and reimbursement requests for Plaintiffs and their members, the parties shall confer and file a brief joint status report by 5:00 p.m. today addressing whether such requests have been enabled and, if not, the agreed upon timeline for doing so. Signed by Judge Amir H. Ali on 3/7/2025. (lcaha2) (Entered: 03/07/2025) |
| 03/07/2025 | 54 | STATUS REPORT *in response to Order of March 7, 2025* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP. (Sur, Indraneel) (Entered: 03/07/2025) |
| 03/08/2025 | 55 | Unopposed MOTION for Leave to File *Supplemental Declaration* by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR |

| | | |
|---|---|---|
| | | INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION. (Attachments: # 1 Declaration of Vladimir Gurin, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10)(Wirth, Stephen) (Entered: 03/08/2025) |
| 03/09/2025 | 56 | Consent MOTION for Leave to File *response to supplemental matter* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP. (Attachments: # 1 Proposed Response, # 2 Text of Proposed Order)(Sur, Indraneel) (Entered: 03/09/2025) |
| 03/09/2025 | 57 | NOTICE *of supplemental material* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP re 44 Large Additional Attachment(s),, (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit)(Sur, Indraneel) (Entered: 03/09/2025) |
| 03/10/2025 | 58 | TRANSCRIPT OF MOTION HEARING, ORAL ARGUMENT ON PRELIMINARY INJUNCTION, before Judge Amir H. Ali held on March 6, 2025; Page Numbers: 1–176. Date of Issuance:March 7, 2025. Court Reporter/Transcriber Sonja L. Reeves, RDR, CRR, Telephone number (202) 354–3246, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 3/31/2025. Redacted Transcript Deadline set for 4/10/2025. Release of Transcript Restriction set for 6/8/2025.(Reeves, Sonja) (Entered: 03/10/2025) |
| 03/10/2025 | 59 | NOTICE of Supplemental Authority *regarding ruling in 25–cv–469* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP re 51 NOTICE OF SUPPLEMENTAL AUTHORITY (Attachments: # 1 Exhibit)(Sur, Indraneel) Modified event title on 3/11/2025 (znmw). (Entered: 03/10/2025) |
| 03/10/2025 | | MINUTE ORDER. The Constitutional Accountability Center's 26 motion for leave to file an amicus curiae brief; Plaintiffs' 47 55 motions for leave to supplement the |

| | | |
|---|---|---|
| | | record; Defendants' <u>48</u> motion for leave to file a sur–reply; and Defendants' <u>49</u> <u>56</u> motions for leave to respond to Plaintiffs' supplemental materials are granted. Signed by Judge Amir H. Ali on 3/10/2025. (lcaha3) (Entered: 03/10/2025) |
| 03/10/2025 | <u>60</u> | MEMORANDUM OPINION AND ORDER. Plaintiffs' <u>4</u> motion for a preliminary injunction is granted in part and denied in part. See document for details. The parties shall file a joint status report by March 14, 2025, that apprises the Court of Defendants' compliance with this order and proposes a schedule for next steps in this matter. Signed by Judge Amir H. Ali on 3/10/2025. (lcaha2) (Entered: 03/10/2025) |
| 03/11/2025 | | Set/Reset Deadlines: Joint Status Report due by 3/14/2025. (zalh) (Entered: 03/11/2025) |
| 03/14/2025 | <u>61</u> | Joint STATUS REPORT *under Order of March 10, 2025* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP. (Sur, Indraneel) (Entered: 03/14/2025) |
| 03/17/2025 | <u>62</u> | LEAVE TO FILE DENIED– Robert Heghmann's Petition. This document is unavailable as the Court denied its filing. Pro Se party has been notified by first class mail. "LEAVE TO FILE DENIED." Signed by Judge Amir H. Ali on 3/17/2025. (mg) (Entered: 03/17/2025) |
| 03/17/2025 | | MINUTE ORDER. The Court is in receipt of the parties' <u>61</u> joint status report. The Court's March 10, 2025, preliminary injunction adopted a feasibility benchmark of approximately 300 payments per day. By March 19, 2025, Defendants shall submit a status report which includes the updated total number of payments for work completed prior to February 13, 2025 (1) which have been processed since March 10 for Plaintiffs; (2) which have been processed since March 10 for non–Plaintiffs; and (3) which remain to be processed for Plaintiffs and non–Plaintiffs. Defendants' status report shall include a proposed timeline for processing the remaining payments that is consistent with the Court's benchmark. Signed by Judge Amir H. Ali on 3/17/2025. (lcaha2) (Entered: 03/17/2025) |
| 03/19/2025 | <u>63</u> | STATUS REPORT *under Order of March 17, 2025* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP. (Sur, Indraneel) (Entered: 03/19/2025) |
| 03/24/2025 | | MINUTE ORDER. The Court is in receipt of Defendants' <u>63</u> status report. Defendants propose to submit another status report by March 27, 2025. Defendants shall file another status report by March 27, 2025, which includes the same information as directed in the Court's March 17, 2025, minute order, and every seven days thereafter until otherwise ordered by the Court. Signed by Judge Amir H. Ali on 3/24/2025. (lcaha2) (Entered: 03/24/2025) |
| 03/27/2025 | <u>64</u> | STATUS REPORT *respecting Order of March 24, 2025* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP. (Sur, Indraneel) (Entered: 03/27/2025) |
| 03/28/2025 | | |

| | | |
|---|---|---|
| | | MINUTE ORDER. The Court is in receipt of Defendants' <u>64</u> status report. Defendants' proposed timeline appears consistent with the Court's feasibility benchmark with respect to work completed prior to February 13, 2025. To the extent the parties have outstanding disputes regarding Defendants' compliance, or further information required from Plaintiffs in order for Defendants to meaningfully comply, as it relates to terminations, suspensions, or stop–work orders issued between January 20, 2025, and February 13, 2025, the parties shall meet and confer and attempt to resolve such issues.<br><br>In their next status report, Defendants shall also include (1) the steps they have taken to date to comply with the preliminary injunction's directive that Defendants "are enjoined from unlawfully impounding congressionally appropriated foreign aid funds and shall make available for obligation the full amount of funds that Congress appropriated for foreign assistance programs in the Further Consolidated Appropriations Act of 2024," and (2) any next steps necessary to come into compliance with that aspect of the Court's preliminary injunction. Signed by Judge Amir H. Ali on 3/28/2025. (lcaha2) (Entered: 03/28/2025) |
| 04/01/2025 | <u>65</u> | NOTICE OF INTERLOCUTORY APPEAL TO DC CIRCUIT COURT as to <u>60</u> Memorandum & Opinion, by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP. Fee Status: No Fee Paid. Parties have been notified. (Sur, Indraneel) Modified event on 4/2/2025 (mg). (Entered: 04/01/2025) |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AIDS VACCINE ADVOCACY COALITION, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF STATE, *et al.*, <br><br> *Defendants*. | Civil Action No. 25-00400 (AHA) |
| GLOBAL HEALTH COUNCIL, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br> *Defendants*. | Civil Action No. 25-00402 (AHA) |

## DEFENDANTS' NOTICE OF APPEAL

All Defendants hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from the Memorandum Opinion and Order (No. 25-cv-400, Doc. 60; No. 25-cv-402, Doc. 60) issued on March 10, 2025, and from all orders antecedent to such order and opinion and thus incorporated therein.

1

Dated: April 1, 2025                    Respectfully submitted,

                                        YAAKOV M. ROTH
                                        Acting Assistant Attorney General
                                        Civil Division

                                        ERIC J. HAMILTON
                                        Deputy Assistant Attorney General

                                        ALEXANDER K. HAAS
                                        Director

                                        LAUREN A. WETZLER
                                        Deputy Director

                                        CHRISTOPHER R. HALL
                                        Assistant Branch Director

                                        */s/ Indraneel Sur*
                                        INDRANEEL SUR (D.C. Bar 978017)
                                        CHRISTOPHER D. EDELMAN
                                        Senior Counsels
                                        United States Department of Justice
                                        Civil Division, Federal Programs Branch
                                        1100 L St. NW
                                        Washington, DC 20005
                                        Phone: (202) 616-8488
                                        Email: indraneel.sur@usdoj.gov

                                        *Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AIDS VACCINE ADVOCACY COALITION, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-00400 (AHA) |
| UNITED STATES DEPARTMENT OF STATE, *et al.*, | |
| *Defendants*. | |
| GLOBAL HEALTH COUNCIL, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-00402 (AHA) |
| DONALD J. TRUMP, *et al.*, | |
| *Defendants*. | |

<u>**Memorandum Opinion and Order**</u>

The provision and administration of foreign aid has been a joint enterprise between our two political branches. That partnership is built not out of convenience, but of constitutional necessity. It reflects Congress and the Executive's "firmly established," shared constitutional responsibilities over foreign policy, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 62 (2015) (Roberts, C.J., dissenting), and it reflects the division of authorities dictated by the Constitution as it relates to the appropriation of funds and executing on those appropriations. Congress, exercising its exclusive Article I power of the purse, appropriates funds to be spent toward specific foreign policy aims. The President, exercising a more general Article II power, decides how to spend those funds in faithful execution of the law. And so foreign aid has proceeded over the years.

This case involves a departure from that firmly established constitutional partnership. Here, the Executive has unilaterally deemed that funds Congress appropriated for foreign aid will not be spent. The Executive not only claims his constitutional authority to determine *how* to spend appropriated funds, but usurps Congress's exclusive authority to dictate *whether* the funds should be spent in the first place. In advancing this position, Defendants offer an unbridled view of Executive power that the Supreme Court has consistently rejected—a view that flouts multiple statutes whose constitutionality is not in question, as well as the standards of the Administrative Procedure Act ("APA"). Asserting this "vast and generally unreviewable" Executive power and diminution of Congressional power, Defendants do not cite any provision of Article I or Article II of the Constitution. *See generally Glob. Health*, ECF No. 34.

When courts have confronted Executive overreach of the foreign policy power in the past, they have stood prepared to reaffirm Congress's role. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–89 (1952); *Zivotofsky*, 576 U.S. at 62 (Roberts, C.J., dissenting) ("For our first 225 years, no President prevailed when contradicting a statute in the field of foreign affairs."). So too they have stood firm when the Executive treads on Congress's spending power. *See In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.) (granting mandamus). Three Justices aptly captured the import to our nation's founding: "Before this country declared independence, the law of England entrusted the King with the exclusive care of his kingdom's foreign affairs." *Zivotofsky*, 576 U.S. at 67 (Scalia, J., joined by Roberts, C.J., and Alito, J., dissenting). But "[t]he People of the United States had other ideas." *Id.* The People "considered a sound structure of balanced powers essential to the preservation of just government, and international relations formed no exception to that principle." *Id.* They "adopted a Constitution that divides responsibility for the Nation's foreign concerns between the legislative and executive departments." *Id.*

Today, this Court reaffirms these firmly established principles of our Constitution. At the same time, however, the Court is mindful of limitations on its own authority. While Congress has directed courts to "hold unlawful and set aside" certain agency action, 5 U.S.C. § 706(2), and the Supreme Court has admonished that the "duty of the judicial department to say what the law is" includes resolving disputes between Congress and the President over foreign policy power, *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)), courts remain constrained in the relief they can offer. The Court must be careful that any relief it grants does not itself intrude on the prerogative of a coordinate branch. The Court accordingly denies Plaintiffs' proposed relief that would unnecessarily entangle the Court in supervision of discrete or ongoing Executive decisions, as well as relief that goes beyond what their claims allow. For the reasons herein, the Court grants in part and denies in part Plaintiffs' motions for a preliminary injunction.

## I.    Background

### A.  The Political Branches' Joint Framework For The Provision And Administration Of Foreign Aid

The general framework for foreign aid relevant here began with Congress's enactment of the Foreign Assistance Act of 1961 ("FAA"), Pub. L. No. 87-195, 75 Stat. 424 (codified as amended at 22 U.S.C. § 2151 *et seq.*). In the FAA, Congress sets forth principles to guide U.S. foreign policy as it relates to foreign aid. Congress "reaffirms the traditional humanitarian ideals of the American people and renews its commitment to assist people in developing countries to eliminate hunger, poverty, illness, and ignorance." 22 U.S.C. § 2151(a). The act further declares that "a principal objective of the foreign policy of the United States is the encouragement and sustained support of the people of developing countries in their efforts to acquire the knowledge and resources essential to development and to build the economic, political, and social institutions

which will improve the quality of their lives." *Id.* Congress also sets forth specific priorities for such foreign assistance: "(1) the alleviation of the worst physical manifestations of poverty among the world's poor majority; (2) the promotion of conditions enabling developing countries to achieve self-sustaining economic growth with equitable distribution of benefits; (3) the encouragement of development processes in which individual civil and economic rights are respected and enhanced; (4) the integration of the developing countries into an open and equitable international economic system; and (5) the promotion of good governance through combating corruption and improving transparency and accountability." *Id.* Congress declares that "pursuit of these goals requires that development concerns be fully reflected in United States foreign policy and that United States development resources be effectively and efficiently utilized." *Id.*

In addition to setting forth these principles and priorities, the FAA explicitly recognizes and authorizes the President's role in administering aid allocated toward those ends. With respect to various areas in which aid is to be targeted, such as health programs, economic development, anticrime efforts, military education, and peacekeeping, Congress authorizes the President "to furnish assistance" "on such terms and conditions as he may determine." *See, e.g.*, *id.* §§ 2151b(c)(1), 2291(a)(1)(G)(4), 2346(a), 2347(a), 2348.

The FAA led to the creation of the United States Agency for International Development ("USAID"), first by executive order, *see* Exec. Order No. 10973, 26 Fed. Reg. 10469 (Nov. 3, 1961), and more than thirty years later enshrined by legislation in the Foreign Affairs Reform and Restructuring Act of 1998, *see* 22 U.S.C. § 6563. In the years since, Congress has regularly appropriated foreign assistance funds to USAID for specific purposes, including "[f]or necessary expenses to enable the President to carry out the provisions of the Foreign Assistance Act of 1961." Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460, 740. For

example, the appropriations act provides: "For necessary expenses to carry out the provisions of chapters 1 and 10 of part I of the Foreign Assistance Act of 1961, for global health activities, in addition to funds otherwise available for such purposes, $3,985,450,000, to remain available until September 30, 2025, and which shall be apportioned directly to the United States Agency for International Development," and it further specifies the global health issues that amount is to be spent on. *Id.* The act appropriates other funds "directly to the Department of State" to be spent on specific issues, such as "the prevention, treatment, and control of, and research on, HIV/AIDS." *Id.* at 742; *see also, e.g.*, *id.* at 743 (appropriating funds to the State Department "[f]or necessary expenses to carry out the provisions of the Foreign Assistance Act of 1961 for the promotion of democracy globally").

### B. The Issuance And Implementation Of Executive Order No. 14169

On January 20, 2025, the President issued an executive order entitled "Reevaluating and Realigning United States Foreign Aid." Exec. Order No. 14169, 90 Fed. Reg. 8619 (Jan. 20, 2025). The order directed an immediate pause in "United States foreign development assistance." *Id.* § 3(a). It also directed responsible department and agency heads to review each foreign assistance program and to determine within ninety days of the order "whether to continue, modify, or cease each foreign assistance program," in consultation with the Director of the Office of Management and Budget ("OMB") and with the concurrence of the Secretary of State. *Id.* §§ 3(b), (c). The order directed that the Secretary of State would have authority to waive the pause "for specific programs" and separately allowed for new obligations or the resumption of disbursements during the ninety-day review period, if a review was conducted sooner and the Secretary of State, in consultation with the Director of OMB, approved. *Id.* §§ 3(d), (e).

In the days that followed, agency officials took actions to institute an immediate suspension of all congressionally appropriated foreign aid. On January 24, the Secretary of State issued a

memorandum suspending all new funding obligations, pending a review, for foreign assistance programs funded by or through the State Department and USAID. *Glob. Health*, ECF No. 43 at 14. USAID officials also issued instructions to immediately pause all new programs, issue stop-work orders, and develop appropriate review standards. *Glob. Health*, ECF Nos. 58-1 to 58-4. OMB issued a memorandum ordering a temporary pause of all federal financial assistance, including assistance for foreign aid and nongovernmental organizations. *Glob. Health*, ECF No. 1 ¶ 47. Plaintiffs provide numerous letters terminating or suspending their awards following these actions. *See, e.g.*, *Glob. Health*, ECF No. 7-4 at 2, 5, 7, 13. The record shows that within a few weeks, the State Department suspended more than 7,000 awards and terminated more than 700. *See Glob. Health*, ECF No. 25-1 ¶¶ 25–28. USAID proceeded at a similar pace, suspending and terminating 230 awards in a two-day span and, in total, terminating almost 500 awards and suspending thousands of others in just weeks. *Glob. Health*, ECF Nos. 20, 20-1, 25-1 ¶ 12.

### C. The Present Litigation

Plaintiffs, who are all recipients of or have members who receive foreign assistance funding, filed these actions and sought temporary restraining orders ("TROs") enjoining Defendants from giving effect to Executive Order No. 14169 and the subsequent implementations.[1] The Court held a hearing in both cases, and Plaintiffs thereafter submitted revised proposed orders that narrowed the scope of their requested relief. *AIDS Vaccine*, ECF No. 16-1; *Glob. Health*, ECF No. 18. The Court granted Plaintiffs' motions in part and issued a temporary restraining order on still narrower terms. *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of*

---

[1] The parties filed notices of related cases that included *National Council of Nonprofits v. Office of Management and Budget*, No. 25-cv-00239-LLA (D.D.C.), and *American Federation of Government Employees v. Trump*, No. 25-cv-00352-CJN (D.D.C.). The judges assigned to those cases determined that the present cases were not sufficiently related, and the cases were submitted for random assignment. *See AIDS Vaccine*, ECF No. 12; *Am. Fed'n*, ECF No. 32.

*State*, __ F. Supp. 3d __, No. 25-cv-00400, 2025 WL 485324 (D.D.C. Feb. 13, 2025). The Court found that Plaintiffs had made a strong preliminary showing of irreparable harm. *Id.* at *2–4. Among other things, Plaintiffs provided evidence that they had been and would continue to be forced to shut down program offices, to furlough or terminate staff, and in some cases to shutter their businesses entirely. *Id.* They further adduced evidence that Defendants' actions had and would continue to have a catastrophic effect on the humanitarian missions of several Plaintiffs and their members. *Id.* The Court also concluded that Plaintiffs were likely to succeed on the merits of their claim that the challenged agency action was arbitrary and capricious in violation of the APA, particularly given Defendants' failure to consider enormous reliance interests. *Id.* at *4–5. Finally, the Court held that the equities and the public interest favored Plaintiffs in light of the existential threats they faced and the lack of any compelling countervailing harms identified by Defendants. *Id.* at *6.

Although the Court determined that temporary injunctive relief was warranted, it found that Plaintiffs' requested injunctions were overbroad and narrowed the relief in multiple ways. *Id.* Specifically, the Court rejected Plaintiffs' request to enjoin the President or the Executive Order itself; limited its temporary relief only to the implementation of specific sections of the Executive Order; and rejected language that would have dictated personnel decisions or operational details in complying with the injunction. *Id.* The Court also declined to enjoin Defendants from taking action to enforce the terms of individual contracts, including expirations, modifications, or terminations pursuant to contractual provisions. *Id.* With those limitations, the Court temporarily enjoined Defendants (excluding the President) from implementing directives "suspending, pausing, or otherwise preventing the obligation or disbursement of appropriated foreign-assistance funds" or "issuing, implementing, enforcing, or otherwise giving effect to terminations,

suspensions, or stop-work orders" in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance awards in existence as of January 19, 2025. *Id.* at *6–7.

In the two weeks that followed, Plaintiffs moved multiple times to enforce the Court's TRO and hold Defendants in contempt, providing evidence that Defendants continued their freeze and further evidence of irreparable harm to businesses and organizations across the country. *AIDS Vaccine*, ECF No. 26; *Glob. Health*, ECF No. 29; *see Glob. Health*, ECF No. 29-1 (discussing February 18 internal email stating that Secretary of State "has implemented a 15-day disbursement pause on all $15.9B worth of grants at the State Department" and directing recipients to "review the President's executive orders and recommend termination of grants that do not comply with those orders" (emphasis omitted)). The Court declined to hold Defendants in contempt and reaffirmed certain flexibility and authority Defendants reserved, consistent with the TRO. *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, __ F. Supp. 3d __, No. 25-cv-00400, 2025 WL 569381, at *1–2 (D.D.C. Feb. 20, 2025); *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, __ F. Supp. 3d __, No. 25-cv-00400, 2025 WL 577516, at *1–2 (D.D.C. Feb. 22, 2025). However, the Court also reiterated: "[T]o the extent Defendants have continued the blanket suspension, they are ordered to immediately cease it and to take all necessary steps to honor the terms of contracts, grants, cooperative agreements, loans, and other federal foreign assistance awards that were in existence as of January 19, 2025, including but not limited to disbursing all funds payable under those terms." *AIDS Vaccine*, 2025 WL 569381, at *3; *AIDS Vaccine*, 2025 WL 577516, at *3.

Within a few days, Plaintiffs in both cases had renewed their motions to enforce. *Glob. Health*, ECF No. 36; *Glob. Health*, ECF No. 37 at 25. Plaintiffs explained that, despite the Court's orders, they were still owed millions of dollars on due and overdue invoices and reimbursement

requests; they still lacked access to letter of credit facilities and other payment management systems; and their contracts and awards terminated pursuant to the Executive Order remained terminated. *Glob. Health*, ECF No. 36 at 2. In addition, several plaintiffs were facing "new and mounting irreparable harms that threaten their very existence and which require emergency relief prior to the Court's hearing on the preliminary injunction motion." *Id.*

The Court held a motions hearing on February 25. At the hearing, Defendants' counsel acknowledged that the TRO foreclosed them from giving effect to suspensions or terminations that were issued before February 13. *Glob. Health*, ECF No. 37 at 33–34. The Court asked Defendants' counsel if he was "aware of steps taken to actually release those funds" over the prior two weeks, consistent with the TRO and later orders. *Id.* at 35. Counsel responded that he was "not in a position to answer that." *Id.* For that and other reasons set forth on the record, the Court orally granted Plaintiffs' second set of motions to enforce the TRO. The Court ordered Defendants to unfreeze funds for work completed prior to the TRO, giving Defendants an additional thirty-six hours to come into compliance. *Id.* at 57–58.

Defendants appealed and moved to stay the Court's oral ruling, asserting for the first time that it would not be possible to process payments within that time. *Glob. Health*, ECF No. 39. Defendants also provided additional details on suspensions and terminations since the issuance of the TRO. *Glob. Health*, ECF No. 42. In particular, Defendants represented that they had completed an independent, individualized review process for over 13,000 USAID and State Department awards following the Court's TRO, which resulted in the termination of all but 500 USAID awards and all but 2,700 State Department awards. *Id.*

This Court denied Defendants' motion for a stay pending appeal, pointing out that Defendants had not previously raised the issue of feasibility. *AIDS Vaccine Advoc. Coal. v. U.S.*

*Dep't of State*, No. 25-cv-00400, 2025 WL 625755, at *2 (D.D.C. Feb. 26, 2025). The D.C. Circuit dismissed the appeal for lack of appellate jurisdiction, noting that the February 25 order did not modify Defendants' obligations under the TRO. *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. 25-5046, 2025 WL 621396, at *1 (D.C. Cir. Feb. 26, 2025). Defendants filed an emergency application in the Supreme Court, which issued an administrative stay. The Court subsequently denied Defendants' application to vacate the February 25 order and instructed this Court to "clarify what obligations the Government must fulfill to ensure compliance with the temporary restraining order, with due regard for the feasibility of any compliance timelines." *Dep't of State v. AIDS Vaccine Advoc. Coal.*, 604 U.S. __, No. 24A831, 2025 WL 698083 (U.S. Mar. 5, 2025).

Upon remand from the Supreme Court, this Court promptly ordered the parties to address the feasibility of processing payments. *Glob. Health*, Min. Order (Mar. 5, 2025). The Court also held a lengthy hearing on Plaintiffs' preliminary injunction motions and the issue of feasibility. At the hearing, the parties agreed that compliance with the February 25 order required Defendants to make approximately 2,000 USAID payments and to enable drawdowns for awards that proceed on letters of credit. *Glob. Health*, ECF No. 58 at 131–33; *see Glob. Health*, ECF No. 39-1 ¶ 4. The Court requested benchmarks to help evaluate the feasibility of processing payments. The parties identified a declaration from Defendants indicating that USAID and State previously had been capable of processing several thousand payments each day. *Glob. Health*, ECF No. 58 at 133; *see Glob. Health*, ECF No. 39-1 ¶ 15. As a more recent benchmark, Defendants explained that they had been able to release some payments to Plaintiffs; they have since clarified that they processed approximately 100 payments in an overnight period. *Glob. Health*, ECF No. 58 at 125; *see Glob. Health*, ECF No. 54 at 2. The Court ordered Defendants to begin by paying Plaintiffs' outstanding invoices and letter of credit drawdowns within a four-day period, which would be a small

10

fraction—apparently just 1% to 10%—of the rate at which the agencies previously processed payments and appeared consistent with the rate that Defendants had been able to process payments the night before. *Glob. Health*, ECF No. 58 at 144–46. The Court asked the parties to come back with any further information that would be helpful in assessing feasibility and setting a clear, administrable benchmark. *Id.* at 147–49.

## II.    Discussion

"A preliminary injunction is an extraordinary remedy never awarded as of right" and, to the contrary, "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008). In particular, a plaintiff must establish four factors: "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. In granting a TRO, the Court found that Plaintiffs had established these factors. As discussed below, however, the Court finds that the ground has shifted some since that time, both in terms of further actions on the part of the agencies and further development of the parties' arguments.

The Court begins by addressing Article III standing. Upon concluding that Plaintiffs clearly have standing, the Court turns to the *Winter* factors. The Court finds that, although Plaintiffs have shown a likelihood of success under the APA as to the initial agency action they challenged, their challenge to Defendants' subsequent review of awards is a closer call, and Plaintiffs have not satisfied their burden. Plaintiffs' constitutional claims, on the other hand, have a substantial likelihood of success, particularly given Defendants' failure to offer a defensible interpretation of the separation of powers. Because Plaintiffs have shown irreparable harm, which remains largely

uncontested, and the remaining factors favor Plaintiffs, the Court grants preliminary injunctive relief in part, tailored to the scope of claims likely to succeed and the relevant harms.[2]

### A. Plaintiffs Have Demonstrated Standing

"To establish Article III standing, the plaintiff must have 'suffered an injury in fact' that 'is fairly traceable to the challenged action of the defendant' and it must be 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Banner Health v. Price*, 867 F.3d 1323, 1333–34 (D.C. Cir. 2017) (quoting *Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S. 167, 180–81 (2000)). As the Court detailed in its TRO opinion, Plaintiffs adduced evidence that Defendants' actions had caused them immense harm, including by inflicting massive financial injuries, forcing them to significantly reduce core operations and staff, and jeopardizing their missions. *AIDS Vaccine*, 2025 WL 485324, at *2–4. Those injuries are fairly traceable to the challenged agency action in this case: namely, the blanket suspension of funds. And a determination that the blanket suspension was unlawful, and therefore cannot be given effect, would likely redress at least some of the harms Plaintiffs have suffered.[3]

Defendants did not dispute Plaintiffs' standing at the TRO stage. In their preliminary injunction briefing, however, they now argue Plaintiffs have failed to show Article III standing, and the Court pauses to address that argument. Defendants contend that Plaintiffs allege "no more

---

[2] Some courts have employed a "sliding scale" approach to the preliminary injunction factors, particularly before the Supreme Court's decision in *Winter*. *See Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, __ F. Supp. 3d __, No. 25-cv-239, 2025 WL 368852, at *9 (D.D.C. Feb. 3, 2025) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). The Court's analysis here does not depend on the sliding scale method and arrives at the same place when each prong is evaluated as "an independent, free-standing requirement." *Sherley*, 644 F.3d at 393 (citation omitted).

[3] In seeking preliminary relief, a plaintiff generally need only show a substantial likelihood of standing. *See, e.g.*, *Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 104 (D.C. Cir. 2019). Here, Plaintiffs' standing is plain.

than" a "pocketbook injury" from the terminations of their awards and are attempting to challenge "implementing acts that do *not* affect Plaintiffs directly." *Glob. Health*, ECF No. 34 at 18 (quoting *Collins v. Yellen*, 594 U.S. 220, 243 (2021)). Defendants' argument is difficult to parse and is not supported by the case law they cite. First, when considering injury in fact, financial injury, or "pocketbook injury," is generally considered the gold standard or "prototypical form of injury in fact." *Collins*, 594 U.S. at 243. Indeed, when asked at the preliminary injunction hearing, Defendants conceded that this is "recognized as an Article III injury." *Glob. Health*, ECF No. 58 at 63. Here, Plaintiffs argue that the injury not only can be traced to, but flows directly from, the Executive Order and its implementations directing the suspension of congressionally appropriated foreign aid. Indeed, the Executive Order and its implementations are what caused the agreements' review and their suspension or termination. Moreover, Defendants' argument overlooks Plaintiffs' injuries that go beyond their "pocketbook." Plaintiffs have adduced evidence that Defendants' actions have critically compromised their missions, causing disruption to programs, substantial layoffs, threats to employees' physical safety, and impending legal action. *See, e.g.*, *AIDS Vaccine*, ECF Nos. 1-11, 1-12; *Glob. Health*, ECF Nos. 36-1, 46-2; *see also AIDS Vaccine*, 2025 WL 485324, at *2–4 (summarizing evidence of harm).[4]

---

[4] Defendants separately challenge whether two plaintiffs have established associational or organizational standing. *Glob. Health*, ECF No. 34 at 19–21. The Court "need only find one party with standing." *Ams. for Safe Access v. Drug Enf't Admin.*, 706 F.3d 438, 443 (D.C. Cir. 2013). And, in any event, the associations have standing. Their members would likely have standing because they have been harmed by the challenged actions, *see Glob. Health*, ECF Nos. 7-1, 7-2; the interests that the associations seek to protect are "germane" to their organizational purposes, *see Glob. Health*, ECF Nos. 7-1 ¶ 3, 7-2 ¶ 2 (describing organizational purposes of "identifying priority world health problems and reporting on them to the U.S. public, legislators, international and domestic government agencies, academic institutions, and the world health community" and "promot[ing] the meaningful utilization of U.S. small businesses at U.S government agencies providing foreign assistance"); and, because the relief sought is "invalidation of agency action," the claims do not require consideration of individual members' circumstances. *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596–97 (D.C. Cir. 2015) (citation omitted).

At bottom, the relief Plaintiffs seek, an order invalidating Defendants' blanket directive to suspend congressionally appropriated foreign aid, would mean the government must honor its aid agreements for a period greater than it did. That includes obligations directly affecting Plaintiffs' pocketbooks and their ability to fulfill their organizational missions, honor their responsibilities to employees, and meet their commitments to community partners. That is textbook injury, causation, and redress.[5]

### B. Plaintiffs Are Likely To Succeed On The Merits

Plaintiffs challenge Defendants' blanket suspension of foreign aid under the APA as both arbitrary and capricious and contrary to law, and they also assert constitutional claims that Defendants' actions violate the separation of powers. *AIDS Vaccine*, ECF No. 1 ¶¶ 45–73; *Glob. Health*, ECF No. 1 ¶¶ 111–31. The Court need only find that Plaintiffs are likely to succeed on one of these claims for this factor to weigh in favor of a preliminary injunction. That said, any relief should be tailored to the particular claims likely to succeed.

Here, Plaintiffs' claims challenge different Executive actions. Plaintiffs' APA claims challenge the Secretary of State's January 24 memorandum and other contemporaneous directives implementing Executive Order No. 14169 by suspending congressionally apportioned foreign aid, and they seek relief for the consequences that resulted from those directives. Plaintiffs'

---

[5] Defendants have also filed a sur-reply suggesting that the case is moot in light of their subsequent review and decisions to terminate Plaintiffs' contracts and grants. *Glob. Health*, ECF No. 48-1 at 3–5. This argument is not persuasive. Plaintiffs ask the Court to vacate or set aside the agency action that led to the blanket suspension of funds. Granting such vacatur would have the effect of remedying, at least in part, the injuries that give Plaintiffs standing to sue in the first place. While this may not make Plaintiffs whole, it is not a circumstance where it is "impossible for the court to grant any effectual relief." *Id.* at 3 (quoting *Spirit of the Sage Council v. Norton*, 411 F.3d 225, 228 (D.C. Cir. 2005)). As discussed below, however, Defendants' subsequent review and decisions to terminate do constitute distinct agency action, which Plaintiffs have not challenged. *See infra* section II.B.1.c.

constitutional claims challenge Defendants' authority to unilaterally rescind or defer funds that Congress has appropriated in accordance with its spending power. The Court begins with Plaintiffs' statutory claims and then turns to their constitutional claims.

### 1. Plaintiffs Will Likely Prevail, At Least In Part, On Their APA Claims

The APA permits judicial review of "final agency action" and requires a court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 704, 706(2)(A). Here, the final agency action Plaintiffs challenge is the Secretary of State's January 24 memorandum and other contemporaneous directives implementing Executive Order No. 14169 by suspending congressionally apportioned foreign aid. *Glob. Health*, ECF No. 1 ¶ 113; *AIDS Vaccine*, ECF No. 1 ¶ 61. Plaintiffs claim that these actions were both arbitrary and capricious and contrary to law.

### a. Plaintiffs' Claims Seeking To Invalidate The Agencies' Implementing Directives Are Properly Asserted Under The APA

Defendants raise a threshold challenge as to whether the APA is the right home for Plaintiffs' claims. The APA provides for judicial review of claims "seeking relief other than money damages" and does not apply where another statute "grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702; *see also id.* § 704 (final agency action is subject to APA review where "there is no other adequate remedy in a court"). According to Defendants, Plaintiffs' claims might "ripen into" claims under the Contract Disputes Act ("CDA"), which applies to government procurement contracts, including for the "procurement of services," and channels claims to the U.S. Court of Federal Claims or the Civilian Board of Contract Appeals after an exhaustion process. *Glob. Health*, ECF No. 34 at 12; *see* 41 U.S.C. §§ 7102(a)(2), 7104(b), 7105(e)(1)(B). Alternatively, Defendants argue, Plaintiffs' claims must proceed under the Tucker Act, which applies to claims for breach of contract against the federal government over $10,000

15

and channels those claims to the Court of Federal Claims. *Glob. Health*, ECF No. 34 at 14; *see* 28 U.S.C. § 1491(a)(1). On Defendants' account, Plaintiffs have attempted to package contractual claims for "delayed payments" as ones for injunctive relief under the APA, and therefore they fall under one of these other two acts rather than the APA. *Glob. Health*, ECF No. 34 at 15.[6]

Defendants' argument is unpersuasive for several reasons. First, Plaintiffs' APA claims, by their terms, challenge specific agency actions—here, the implementing policy directives—and ask the Court to "hold them unlawful and set them aside." *Glob. Health*, ECF No. 1 ¶¶ 112–14, 116–17, 122. That's precisely the relief that is afforded—indeed, *required*—by and routinely granted under the APA. *See* 5 U.S.C. § 706(2) (providing that courts "shall . . . hold unlawful and set aside agency action" that violates APA's substantive standards). The complaints do not seek money damages. It is, of course, true that after a court sets aside agency action, a natural consequence may be the release of funds withheld pursuant to that action. The Supreme Court recognized this in *Bowen v. Massachusetts*, 487 U.S. 879 (1988). There, the Court considered whether the APA provided jurisdiction to order the Secretary of Health and Human Services to undo his refusal to reimburse the plaintiff. The Court explained that its cases "have long recognized" that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Id.* at 893. The Court concluded: "since the orders are for specific relief (they undo the Secretary's refusal to reimburse the State) rather than for money damages (they do not provide relief that substitutes for that which ought to have been done) they are within the District Court's jurisdiction under § 702's waiver of sovereign immunity." *Id.* at 910.

---

[6] As Defendants acknowledged at the preliminary injunction hearing, this argument applies only to Plaintiffs' APA claims and does not bear on their constitutional claims. *Glob. Health*, ECF No. 58 at 87.

16

Indeed, even to the extent that payments might result from Plaintiffs' APA claims, they do not resemble a "money damages" claim, for breach of contract or otherwise. Here, as the Supreme Court recognized, Judge Bork's "explanation of the plain meaning of the critical language" in the APA is instructive. *Id.* at 894. In *Maryland Department of Human Resources v. Department of Health & Human Services*, 763 F.2d 1441 (D.C. Cir. 1985), Judge Bork considered the APA's application to "injunctive relief enjoining defendants from reducing funds otherwise due to plaintiffs" and held that this was "not a claim for money damages, although it is a claim that would require the payment of money by the federal government." *Bowen*, 487 U.S. at 894 (alteration and internal quotation marks omitted) (quoting *Maryland*, 763 F.2d at 1446). He explained that any funds that would flow to the plaintiff as the result of agency action being held unlawful under the APA were not "money in compensation for the losses, whatever they may be, that [plaintiff] will suffer or has suffered by virtue of the withholding of those funds." *Id.* at 895 (quoting *Maryland*, 763 F.2d at 1446). The same is true here. Plaintiffs are not seeking compensation for their losses due to the failure to pay them, which, as in any contract case, could be far greater than the amount withheld pursuant to the agency policy; Plaintiffs seek only invalidation of the policy, including the withholding of payment that flowed from it. *See also Am.'s Cmty. Bankers v. FDIC*, 200 F.3d 822, 829 (D.C. Cir. 2000) ("[M]oney damages represent compensatory relief, an award given to a plaintiff as a substitute for that which has been lost; specific relief in contrast represents an attempt to restore to the plaintiff that to which it was entitled from the beginning.").

Second, Defendants' argument that Plaintiffs' APA claims are contract claims that must proceed under the CDA or Tucker Act is unpersuasive. The D.C. Circuit has "explicitly rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act' because to do so would

'deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government.'" *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967–68 (D.C. Cir. 1982)). "Exclusive jurisdiction in Claims Court under the Tucker Act does not lie 'merely because [a plaintiff] hints at some interest in a monetary reward from the federal government or because success on the merits may obligate the United States to pay the complainant.'" *Id.* at 1108 (alteration in original) (quoting *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995)). The question under both the CDA and Tucker Act is whether the action "is *at its essence* a contract claim." *Id.* at 1106 (quoting *Megapulse*, 672 F.2d at 967); *see A&S Council Oil Co. v. Lader*, 56 F.3d 234, 240 (D.C. Cir. 1995). That inquiry turns on (1) "the source of the rights upon which the plaintiff bases its claims," and (2) "the type of relief sought (or appropriate)." *Crowley*, 38 F.4th at 1106 (quoting *Megapulse*, 672 F.2d at 968).

As set forth above, "the face of the complaint" in both cases makes clear that Plaintiffs are asserting a right "to be free from government action beyond [its] congressional authority." *Id.* at 1108 (alteration in original) (citation omitted). The sources of Plaintiffs' claims "are the statutes identified in [their] complaint[s]," *id.*, which include the APA, the Impoundment Control Act, the Anti-Deficiency Act, and the Further Consolidated Appropriations Act of 2024. *AIDS Vaccine*, ECF No. 1 ¶¶ 45–73; *Glob. Health*, ECF No. 1 ¶¶ 79–110. And, consistent with those sources, the remedy Plaintiffs seek is simply to "hold unlawful and set aside agency action." 5 U.S.C. § 706(2); *Glob. Health*, ECF No. 1 ¶¶ 112–14, 116–17, 122; *see also N.J. Conservation Found. v. FERC*, 111 F.4th 42, 63 (D.C. Cir. 2024) ("Vacatur is the normal remedy when we are faced with unsustainable agency action." (internal quotation marks and citation omitted)). Plaintiffs do not seek money damages and, to return to Judge Bork's apt distinction, do not seek the contractual

remedy of "money in compensation for [their] losses, whatever they may be," in relation to any breach of their agreements. *Bowen*, 487 U.S. at 895 (quoting *Maryland*, 763 F.2d at 1446). Indeed, it would be quite extraordinary to consider Plaintiffs' claims to sound in breach of contract when they do not at all depend on whether the terms of particular awards were breached—they instead challenge whether the agency action here was unlawful, irrespective of any breach.[7]

To be sure, some Plaintiffs or other parties may have individual claims sounding in contract that could be brought against their respective contracting counterparties. The critical point is that here Plaintiffs assert APA claims to invalidate agency policy directives, regardless of any breach of any agreement or the extent of their losses. *See Kidwell*, 56 F.3d at 284 ("Even where a monetary claim may be waiting on the sidelines, as long as the plaintiff's complaint only requests non-monetary relief that has considerable value independent of any future potential for monetary relief—that is, as long as the sole remedy requested is declaratory or injunctive relief that is not negligible in comparison with the potential monetary recovery—we respect the plaintiff's choice of remedies and treat the complaint as something more than an artfully drafted effort to circumvent

---

[7] As Plaintiffs point out, the record also suggests they have subawards and cooperative agreements that do not fall under the CDA or Tucker Act. *See, e.g.*, *Glob. Health*, ECF Nos. 7-3 ¶ 8, 7-5 ¶¶ 4–5. Defendants seem to concede that not *all* of Plaintiffs' awards are contracts subject to those statutes. *See Glob. Health*, ECF No. 34 at 14 (accepting that "some Plaintiffs may have award documents that are not procurement contracts" and only "some of the claims may proceed under the Tucker Act" (emphasis omitted)); *see also U.S. Enrichment Corp. v. United States*, 117 Fed. Cl. 548, 553 (2014) (recognizing that "[s]ubcontractors and other third parties are generally not permitted to raise claims directly against the government"); *Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*, 703 F. Supp. 3d 126, 134 (D.D.C. 2023) (rejecting application of Tucker Act to USAID cooperative agreement). Thus, even assuming Plaintiffs have some agreements that qualify as contracts within the CDA or Tucker Act, they also have agreements that would lack those alternative avenues and fall within the APA. *Cf. Ams. for Safe Access*, 706 F.3d at 440 (denying jurisdictional challenge where court found that at least one named petitioner had standing).

the jurisdiction of the Court of Federal Claims." (internal quotation marks and citations omitted)).

Plaintiffs' claims are properly asserted under the APA.[8]

>    b.  *Plaintiffs Will Likely Prevail In Showing That Defendants' Initial Directives To Freeze Foreign Aid Were Arbitrary And Capricious*

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Rather, the court "must confirm that the agency has fulfilled its duty to examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (internal quotation marks omitted) (quoting *State Farm*, 463 U.S. at 43). "[A]n agency rule would be arbitrary and capricious if the agency has relied

---

[8] In opposing a TRO, Defendants contended that because the President is not an "agency" within the meaning of the APA, an agency's actions implementing presidential directives are also free from APA review. The Court rejected that argument, finding that Defendants did not ground their argument in the text of the APA, which specifically defines "agency" to include "each authority of the Government of the United States," 5 U.S.C. § 551(1), and that Defendants failed to meaningfully define the bounds of their argument. *AIDS Vaccine*, 2025 WL 485324, at *5. To the extent Defendants renew that argument at the preliminary injunction stage, they do not develop it any further, and the Court rejects it for the same reasons stated in the TRO. *Glob. Health*, ECF No. 34 at 30–31; *see also Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) ("[T]hat the Secretary's regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA, even if the validity of the Order were thereby drawn into question.").

Defendants also argue in passing that their directives to suspend aid are not sufficiently circumscribed and discrete agency actions to be challenged under the APA, citing cases where plaintiffs sought "wholesale improvement" of an agency's programs. *Glob. Health*, ECF No. 34 at 31–32 (citing *Ala.-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 490 (5th Cir. 2014)). But the agency directives Plaintiffs challenge are precisely the sort of "agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy" that the APA explicitly includes and is routinely applied to. 5 U.S.C. § 551(4); *cf. Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 893–94 (1990) (noting that while challenges seeking "wholesale correction" of an entire program are not proper under the APA, judicial intervention, where appropriate, still "may ultimately have the effect of requiring a regulation, a series of regulations, or even a whole 'program' to be revised by the agency in order to avoid the unlawful result that the court discerns").

20

on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (alteration in original) (quoting *State Farm*, 463 U.S. at 43).

In granting a TRO, the Court concluded that Plaintiffs were likely to succeed in showing that Defendants' implementation of a blanket suspension of congressionally appropriated foreign aid pending review was arbitrary and capricious. The Court explained that there was nothing in the record that provided "a rational connection between the facts found and the choice made" to impose an immediate and wholesale suspension of foreign aid in order to review programs. Moreover, nothing in the record suggested that Defendants considered and had a rational reason for disregarding the massive reliance interests of businesses and organizations that would have to shutter programs or close their doors altogether. The blanket suspension thus "entirely failed to consider an important aspect of the problem." *AIDS Vaccine*, 2025 WL 485324, at *5.

This continues to be true with respect to the original implementing directives. Defendants have yet to offer any explanation, let alone one supported by the record, for why a blanket suspension setting off a shockwave and upending reliance interests for thousands of businesses and organizations around the country was a rational precursor to reviewing programs. Instead, Defendants assert that the Executive Order and January 24 implementing memorandum provided "more than enough explanation" given the Executive's "vast" powers over foreign affairs. *Glob. Health*, ECF No. 34 at 37. But the Executive Order simply stated that the purpose of the freeze was to allow the administration to assess programmatic efficiencies and ensure that foreign aid is consistent with U.S. foreign policy. Exec. Order No. 14169 § 3(a). And the implementing memorandum said:

> Across the United States government, it is currently impossible to access sufficient information in one place to determine whether the foreign assistance policies and interests supported by appropriations are not duplicated, are effective, and are consistent with President Trump's foreign policy. The Department needs a centralized repository from which senior Department, USAID officials, Ambassadors, missions and others can draw sufficiently detailed information from which the Secretary can make judgments. Further guidance regarding a new or updated repository and mandatory bureau submissions to it will be forthcoming.

*Glob. Health*, ECF No. 43 at 14.

The desire to review programs for efficiency or consistency, and to access information in one place, does not have a rational connection to the directives to proceed with a sudden, blanket suspension of congressionally appropriated aid. Nor do any of these articulated goals demonstrate consideration of the immense reliance interests among businesses and other organizations across the country. When an agency suddenly changes course, it must recognize "longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)). There is, of course, nothing inherently arbitrary and capricious about agencies conducting a review of aid programs for these purposes or building a centralized repository. But these assertions alone do not provide a rational explanation for why such a review required an immediate and wholesale suspension of all aid—including many longstanding programs taking place pursuant to contractual terms—and do not bear on the failure to consider the reliance interests of small and large businesses that would have to shutter programs or close altogether and furlough or lay off swaths of Americans in the process.[9]

_____

[9] Defendants attempt to hollow out arbitrary and capricious review with various arguments. For example, they say that rather than ask whether Defendants considered reliance interests, the Court can merely infer from Defendants' silence that they "exercised their discretion to determine that it

Defendants also insist that the funding freeze was not "comprehensive or undifferentiated" because the Secretary of State approved certain waivers, including for foreign military financing, emergency food assistance, and legitimate expenses incurred before the pause went into effect. *Glob. Health*, ECF No. 34 at 37. But none of those waivers involve or demonstrate consideration of the massive reliance interests of U.S. businesses and organizations. And the record belies the assertion that the waivers provided any meaningful relief from the blanket freeze. At the TRO stage, Plaintiffs proffered specific facts that the availability of a waiver did not meaningfully mitigate the harm described, and Defendants acknowledged "hiccups" in the waiver process. *Glob. Health*, ECF No. 22 at 31; *see AIDS Vaccine*, 2025 WL 485324, at *4. In particular, State Department officials could not provide any information regarding qualification for waivers, while officials in USAID bureaus were unresponsive to similar inquiries. *Glob. Health*, ECF No. 7-3 ¶¶ 11–12, 19–20. Even if an organization received a waiver, moreover, no aid would be disbursed because the government's payout portals were disabled. *Id.* ¶ 11. And one plaintiff received limited waivers lasting for only thirty days, which did little to address the harm due to the uncertainty as to whether the company would have to halt operations again at the end of that period. *Glob. Health*, ECF No. 7-6 ¶ 6.

Despite pointing to the possibility of waivers again in their preliminary injunction briefing, Defendants have not proffered any evidence to rebut the showing Plaintiffs made at the TRO stage. Meanwhile, Plaintiffs offer even more evidence that the waiver process has been largely irrelevant. *See, e.g.*, *Glob. Health*, ECF No. 29-5 ¶ 4 (plaintiff received no payments in week after entry of

---

would not be possible to consider the consequences of various approaches in the absence of a temporary pause." *Glob. Health*, ECF No. 34 at 38. In the alternative, they argue that an agency need not articulate a rationale for its action "beyond simple compliance with the President's directives." *Id.* at 37–38. These arguments conflict with the APA's mandate and, as already noted, would dramatically and impermissibly cabin judicial review under the APA. *See supra* n.8.

TRO, including for programs that had received waivers); *AIDS Vaccine*, ECF No. 26-3 ¶¶ 37–38 (programs receiving waivers were not able to restart due to lack of funding); *AIDS Vaccine*, ECF No. 46-1 at 4 (internal USAID memorandum concluding that successful implementation of waiver process "was not possible due to administrative and bureaucratic challenges, including contradictory and shifting guidance regarding approval for required activities and failure of Agency leadership to process disbursement of funds for activities once approved").

Because the current record does not include "a rational connection between the facts found and the choice made" and indicates Defendants "entirely failed to consider an important aspect of the problem," Plaintiffs are likely to succeed on their APA claims as they relate to the original directives implementing a blanket suspension of aid.

> c. *Although A Close Question, Plaintiffs Will Likely Not Prevail In Showing That Defendants' Subsequent Terminations Flow From The Original Directives In Violation Of The APA*

Although Plaintiffs are likely to succeed in showing Defendants' implementing directives violated the APA, the parties disagree on how far that goes—namely, whether the invalidation of the initial implementing directives affects the review of agreements and large-scale terminations that occurred after the Court entered its TRO on February 13, 2025. This is a close question on this record, but the Court finds Plaintiffs have not made an adequate showing that the large-scale terminations resulted from the same agency action they challenge in their complaints. The Court's conclusion is also informed by Plaintiffs' failure to offer a clear and administrable standard for determining when terminations would no longer be tainted by the original implementing directives without entangling the Court in supervision of Executive decisions as to individual agreements.

As described above, the APA requires a plaintiff to identify the "agency action" they seek to set aside, 5 U.S.C. §§ 704, 706(2), and here Plaintiffs challenge the directives implementing the Executive Order. *See Glob. Health*, ECF No. 1 ¶¶ 112–14, 116–17, 122. The effect of the

24

implementing directives in their immediate wake is plain—they ordered contracting officers and grant officers to "immediately issue stop-work orders" articulated under "the terms of the relevant award" for all existing foreign assistance awards. *Glob. Health*, ECF No. 43 at 16. Agency employees accordingly sent out waves of suspension and termination notices with boilerplate language.[10]

After the Court's TRO, however, Defendants claim they conducted a new individualized and comprehensive review of awards. In the interest of tailoring its TRO to the reliance interests at stake, the Court did not enjoin Defendants from taking actions based on the particular terms of individual contracts. *AIDS Vaccine*, 2025 WL 485324, at *6–7; *see also AIDS Vaccine*, 2025 WL 569381, at *2 (explaining that "nothing in the TRO limits the agencies from conducting an individualized review of agreements and taking action as to a particular agreement where the agency determines that it has lawful authority to do so"). The Court explained that "[w]hile agency determinations based on wholly independent legal authority and justification such as the terms of particular agreements or sets of agreements, rather than deriving from a general directive to suspend aid, may be subject to some other legal challenge, whether it be under the APA, separation of powers, individual breach of contract cases, or otherwise, such determinations do not violate the present TRO." *AIDS Vaccine*, 2025 WL 577516, at *2. It also cautioned that "of course, the TRO does not permit Defendants to simply search for and invoke new legal authorities as a post-hoc rationalization for the enjoined agency action." *Id.* at *1 (quoting *AIDS Vaccine*, 2025 WL 569381, at *1).

---

[10] Examples of these notices in the record simply state that programs were suspended "[c]onsistent with the President's Executive Order" or terminated because the award "no longer effectuates agency priorities and is terminated in accordance with the U.S. Department of State Standard Terms and Conditions and 2 CFR 200.340." *E.g.*, *Glob. Health*, ECF No. 7-4 at 2, 5.

As described above, in the roughly two weeks following the TRO, Defendants issued thousands of terminations, ultimately canceling roughly 9,900 of 13,100 USAID and State Department awards. *See Glob. Health*, ECF No. 42 at 16. Defendants attest that these terminations were the result of an independent review process based on the terms of the programs and the agencies' independent legal authority to terminate them. They rely principally on a declaration from USAID Deputy Administrator Pete Marocco, which states: "USAID led a rigorous multi-level review process that began with spreadsheets including each contract, grant, or funding instrument where each line of the spreadsheeting reflected one such agreement and included information about the recipient, the amount of the award, the subject matter, and a description of the project that often included the location of the project." *Glob. Health*, ECF No. 39-1 ¶ 5. Marocco further describes a process in which policy staff performed an initial review of whether individual agreements were in line with foreign policy priorities, followed by a senior policy official's review, followed by Marocco's review, followed by the Secretary of State's review. *Id.* The declaration describes a similar process for State Department awards. *Id.* ¶ 6. As of February 26, Defendants indicated that the review process had been completed for both USAID and State. *Glob. Health*, ECF No. 43-1 ¶¶ 1–2. In total, nearly 5,800 USAID awards were terminated, while more than 500 were retained. *Id.* ¶ 1. At State, approximately 4,100 awards were terminated, while roughly 2,700 were retained. *Id.* ¶ 2.

Plaintiffs in both cases opted to rely on their initial TRO motions at the preliminary injunction stage. Accordingly, their opening motions do not address the post-TRO landscape, and their arguments were limited to their reply briefs and oral argument. Their principal argument is that the review process was a sham. *Glob. Health*, ECF No. 46 at 16–17. Plaintiffs assert that Defendants "were terminating and suspending hundreds of millions of dollars in awards based on

a one-line summary, without actually looking at the award documents themselves, without consulting the personnel who manage the project, and, at least in some cases, without even knowing 'the location of the project.'" *Id.* at 17. They highlight, for instance, Marocco's assertion that the first stage of the review process "*often* included the location of the project" as a demonstration of how shallow the review was. *Id.* at 16 (quoting *Glob. Health*, ECF No. 39-1 ¶ 5). Plaintiffs also say it is "implausible" that the Secretary of State or a group of political appointees could have "engaged in a meaningful individualized review of the hundreds of contracts and awards terminated prior to or after the Court's TRO." *Id.* at 17 n.7. They support these arguments with declarations from contracting officers who dispute that any case-by-case review could have plausibly taken place. *Glob. Health*, ECF No. 42-1 ¶ 36; *AIDS Vaccine*, ECF No. 26-3 ¶ 49.

The Court does not reach the merits of these arguments because Plaintiffs have not adequately shown that they arise from the same agency action challenged in this case. Even accepting that the review process described by Marocco took place in a cursory manner, that does not make it the same agency action as the implementing memoranda, as opposed to a distinct, flawed agency action that must be challenged as such.[11]

Plaintiffs come closer in their argument that the subsequent review was pretext to turn the blanket suspension of foreign aid funds into a near-blanket termination of those funds. Relying on *Department of Commerce v. New York*, 588 U.S. 752 (2019), Plaintiffs argue that "[n]ot a shred of evidence suggests that Defendants had the terms and conditions of award agreements in mind when they initiated blanket suspensions and terminations." *AIDS Vaccine*, ECF No. 45 at 4–5. In

---

[11] To be sure, Plaintiffs may be able to formulate some new challenge to Defendants' process leading to these later terminations, whether in an APA claim premised on the relevant action or a contractual challenge based on the terms of individual awards. The Court expresses no view as to the proper forum for such challenges or whether they might have merit; the point is that they are distinct from the challenge Plaintiffs currently advance.

doing so, they cite some evidence that supports their allegation of pretext. For example, Plaintiffs point to terminations following Defendants' review that make no reference to the terms of agreements or legal authority. *See AIDS Vaccine*, ECF No. 44 at 7–10. They also identify several terminations after the review process that continued to assert the termination was "part of" or "in alignment with" the Executive Order. *AIDS Vaccine*, ECF No. 40-4 ¶ 24; *Glob. Health*, ECF Nos. 55-2 to 55-6. And Plaintiffs provide anonymous declarations, including one showing that a senior official instructed contracting officers to follow earlier terminations with expanded termination notices "tailored to the specific award and implementing partner, referencing the relevant clauses or provisions within the award." *AIDS Vaccine*, ECF No. 55-1. While Plaintiffs' showing is sufficient to raise questions, on this record they have not met the high standard of a "strong showing of bad faith or improper behavior." *Dep't of Com.*, 588 U.S. at 781 (citation omitted).

Plaintiffs' proposed relief highlights further difficulty with their argument. They ask for an order requiring Defendants to revoke all terminations and suspensions issued since January 20— a total of roughly 9,900 awards—and to develop plans to restart those programs within ten days. *Glob. Health*, ECF No. 46-6 at 2–3. Plaintiffs also propose that Defendants be required to submit status reports to the Court every two weeks providing "an individualized statement of reasons" for any new termination or suspension. *Id.* at 4. And they do so without articulating a meaningful standard for the Court to distinguish between those terminations that are still affected by the original implementing directives and those that are not. This would devolve into the type of intensive supervision of day-to-day agency activities, as well as inquiry into the terms of individual awards, that the Court has expressly rejected. The Court accordingly finds that Plaintiffs are

unlikely to succeed on their APA challenge as to the large-scale terminations in the process that followed the Court's TRO.[12]

### 2. *Plaintiffs Will Likely Prevail On Their Constitutional Claims*

Plaintiffs also assert that Defendants are acting in violation of the separation of powers, including Congress's shared power over foreign policy, its exclusive power over spending, and the expression of those powers through statutes that constrain the Executive's authority in relation to foreign aid spending and the impoundment of appropriated funds. These claims are distinct in scope from Plaintiffs' APA claims, in that they are not premised on the initial blanket directive to suspend funds pending review or an alleged policy to mass terminate aid programs. The argument here is that, irrespective of any particular agency action that may be subject to APA review, Defendants are engaging in a unilateral rescission or deferral of congressionally appropriated funds in violation of Congress's spending power, as expressed in multiple statutes whose constitutionality has not been questioned. The Court concludes that Plaintiffs are likely to succeed on these claims as well.

In considering claims related to Executive power, including with respect to foreign affairs, the Supreme Court has applied "Justice Jackson's familiar tripartite framework." *Zivotofsky*, 576 U.S. at 10 (citing *Youngstown*, 343 U.S. at 635–38 (Jackson, J., concurring)). The first category of this framework recognizes that when "the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in

---

[12] Plaintiffs' other APA claims, that Defendants acted contrary to law, must also be premised on "agency action," 5 U.S.C. §§ 704, 706(2), and therefore do not afford any relief distinct from Plaintiffs' arbitrary and capricious claims. The contrary-to-law claims are likely to succeed insofar as they concern Defendants' initial directives and actions implementing the Executive Order, for the same reasons Plaintiffs' separation of powers claims (addressed in the next section) are likely to succeed. The contrary-to-law claims are unlikely to succeed as to the review process and terminations after February 13, 2025, for the same reasons just articulated in this section.

his own right plus all that Congress can delegate." *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring). The second category recognizes that "in absence of either a congressional grant or denial of authority," there is a "zone of twilight in which [the President] and Congress may have concurrent authority." *Id*. at 637. The third recognizes that when "the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb," and "he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Id.*

Here, Plaintiffs argue that Defendants are operating in the third category of the tripartite framework, in which they have taken "measures incompatible with the expressed or implied will of Congress." *See AIDS Vaccine*, ECF No. 45 at 8. Plaintiffs observe that, consistent with the purposes outlined in the Foreign Assistance Act of 1961, Congress has explicitly appropriated foreign aid funds for specified purposes. In March of last year, Congress passed the Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460. That act provides: "For necessary expenses to carry out the provisions of chapters 1 and 10 of part I of the Foreign Assistance Act of 1961, for global health activities, in addition to funds otherwise available for such purposes, $3,985,450,000, to remain available until September 30, 2025, and which shall be apportioned directly to the United States Agency for International Development." 138 Stat. at 740. It further specifies various purposes for which this appropriation "shall be made available," including "training, equipment, and technical assistance" to build public health institutions; specific health programs like child survival, maternal health, and immunization; and programs for the prevention, treatment, and control of HIV/AIDS, tuberculosis, polio, malaria, and other infectious diseases. *Id.* The act similarly provides for funds that "shall be apportioned directly to the Department of State" for specified purposes. *Id.* at 742; *see also id.* at 743.

Congress has further asserted its spending power in the Congressional Budget and Impoundment Control Act of 1974, Pub. L. No. 93-344, 88 Stat. 297, which explicitly prohibits the President from impounding appropriated funds without following certain procedures. For permanent impoundments or "rescissions," Congress specified that if the President "determines that all or part of any budget authority will not be required to carry out the full objectives or scope of programs for which it is provided" or "should be rescinded for fiscal policy or other reasons," he must "transmit to both Houses of Congress a special message" addressing the amount, reasons, impact, and other information related to the proposed recission of funds. 2 U.S.C. § 683(a). The act requires that the funds in question be made available for obligation unless Congress rescinds the appropriation within forty-five days. *Id.* § 683(b). The act also imposes procedural requirements, including a special message to Congress, where the President seeks to temporarily impound or "defer" funds. *Id.* §§ 682(1), 684(a).

Defendants do not object to the constitutionality of any of these statutes. They do not, for instance, contend Congress exceeded its authority by mandating that funds be used for specified foreign aid purposes or by mandating the President follow procedures before permanent or temporary impoundment. At the same time, the record here shows that Defendants are acting to rescind or defer the funds Congress has appropriated and have no intent to spend them. Plaintiffs point to multiple public statements in which the President and other senior officials have said Defendants' actions are being undertaken to end foreign aid funding. For example, they cite contemporaneous statements from the State Department that these actions "prevented" foreign aid spending for policy reasons and to save taxpayer money; from a presidential advisor stating that it is "[t]ime for [USAID] to die"; and from the President stating "CLOSE IT DOWN" with respect to USAID. *See AIDS Vaccine*, ECF No. 13-1 at 12–13 (alterations in original); *Glob. Health*, ECF

No. 4 at 14. When given the opportunity in these proceedings, Defendants have not disputed this is their intent. *See also AIDS Vaccine*, ECF No. 46-1 at 35 (internal USAID memorandum indicating that more than $2 billion appropriated to USAID for specific health objectives "has been blocked from obligation to partners").[13] Yet it is uncontested that Defendants have not undertaken the procedures required for the impoundment of congressionally appropriated aid, whether permanent or temporary, by the Impoundment Control Act. *See Glob. Health*, ECF No. 58 at 102–03.[14]

This is accordingly a circumstance in which the Executive's power is "at its lowest ebb." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). As a result, Defendants' actions must be "scrutinized with caution," and they "can rely only upon [the President's] own constitutional powers minus any constitutional powers of Congress over the matter." *Id.* Here, the President's powers come from his general Article II responsibility to serve as the Executive and take care that the laws be faithfully executed. U.S. Const. art. II, § 3. The powers of Congress involve not only its general shared responsibility over foreign affairs, but its core and "exclusive power over the federal purse." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (Kavanaugh, J.) (citation omitted); *see* U.S. Const. art. I, §§ 8, 9. It is well established that "whether the realm is foreign or domestic, it is still the Legislative Branch, not the Executive Branch, that makes the law," and this includes Congress's core spending power. *Zivotofsky*, 576 U.S. at 21; *see*

---

[13] When asked to identify anything in the record indicating "an intention to spend the amount that's been sidelined by terminating the large majority of agreements," Defendants' counsel stated that he was "not familiar with somewhere in the record that there is." *Glob. Health*, ECF No. 58 at 100–01. Although Defendants requested and were granted the opportunity to "send [the Court] a letter after the hearing," they did not do so. *Id.* at 101.

[14] Defendants also do not respond to Plaintiffs' argument that they have violated the Anti-Deficiency Act, which prohibits officials from establishing a "reserve" except in specific circumstances (which Defendants do not claim are present here). *See* 31 U.S.C. § 1512(c)(1).

*also id.* at 16 (noting that the President "could not build an American Embassy abroad without congressional appropriation of the necessary funds"). Under "settled, bedrock principles of constitutional law," the President "must follow statutory mandates so long as there is appropriated money available and the President has no constitutional objection to the statute." *Aiken County*, 725 F.3d at 259 (emphasis omitted). And if the authority to make law and control spending is to mean anything, it means the President may not disregard a statutory mandate to spend funds "simply because of policy objections." *Id.*; *see also id.* at 261 n.1 (explaining that where a President has policy reasons "for wanting to spend less than the full amount appropriated by Congress for a particular project or program," it remains the case that "even the President does not have unilateral authority to refuse to spend the funds" and must propose a rescission to Congress for its approval).[15]

Here, Defendants do not contest that they are declining to spend appropriated funds based on policy objections—indeed, they have explicitly said so. *See* Exec. Order No. 14169 § 2 ("[N]o further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President of the United States."); *Glob. Health*, ECF No. 43 at 15 (January 24 memorandum directing departments and agencies to ensure that all foreign assistance is aligned with the President's foreign policy agenda). Their principal argument, repeatedly asserted throughout their brief, is that the President has "vast and generally unreviewable" powers in the realm of foreign affairs. *Glob. Health*, ECF No. 34 at 2, 10, 24. Defendants do not ground their position in any specific provision of the Constitution or articulate any limits to this expansive

---

[15] Plaintiffs observe that even before the Impoundment Control Act took effect, the Supreme Court recognized that the Executive was not free to override Congress's spending power by making the unilateral decision to allot "less than the entire amounts authorized to be appropriated." *Train v. City of New York*, 420 U.S. 35, 41 (1975).

authority. Nor do they engage in any analysis of how these asserted powers relate to those vested in Congress under Article I of the Constitution; indeed, Defendants never cite Article I or mention Congress's spending power. Defendants instead rely on broad language from *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936), to argue that the President is "the sole organ of the federal government in the field of international relations." *Glob. Health*, ECF No. 34 at 25.

This argument falls short for several reasons. First and foremost, the Supreme Court has explicitly rejected it. The Court has explained that *Curtiss-Wright* does not stand for such "unbounded power." *Zivotofsky*, 576 U.S. at 20; *see also id.* at 66 (Roberts, C.J., dissenting) (explaining that Supreme Court cases "have never accepted such a sweeping understanding of executive power"). To the contrary, the Supreme Court has recognized that, notwithstanding the Executive's important role in foreign affairs, "it is essential the congressional role in foreign affairs be understood and respected." *Id.* at 21 (majority opinion). To repeat, "whether the realm is foreign or domestic, it is still the Legislative Branch, not the Executive Branch, that makes the law." *Id.* Or, as the Chief Justice aptly summarized, the Constitution "allocates some foreign policy powers to the Executive, grants some to the Legislature, and enjoins the President to 'take Care that the Laws be faithfully executed.'" *Id.* at 62 (Roberts, C.J., dissenting) (quoting U.S. Const. art. II, § 3). The Executive is therefore "not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue." *Id.* at 21 (majority opinion); *see also Youngstown*, 343 U.S. at 635 n.2 (Jackson, J., concurring) ("It was intimated [in *Curtiss-Wright*] that the President might act in external affairs without congressional authority, but not that he might act contrary to an Act of Congress.").

34

Indeed, the claim to "vast and generally unreviewable" power to impound congressionally appropriated aid is weaker here than in past invocations in the foreign affairs context. In *Zivotofsky*, for instance, the Executive pointed to a long line of "judicial precedent and historical practice" showing that the power at issue, recognition, was "for the President alone," and the Court emphasized "the lack of any similar power vested in Congress." 576 U.S. at 14, 21. Defendants do not claim there is *any* precedent or history allowing the President to dictate whether to spend foreign aid for the statutory purposes here. And the Constitution *explicitly* vests in Congress the power to spend, U.S. Const. art. I, § 8, cl. 1, and appropriate funds, *id.* art. I, § 9, cl. 7. This "power over the purse was one of the most important authorities allocated to Congress in the Constitution's 'necessary partition of power among the several departments.'" *Dep't of Navy*, 665 F.3d at 1346–47 (quoting The Federalist No. 51, at 320 (James Madison) (Clinton Rossiter ed., 1961)). In the third *Youngstown* category, the President "can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." 343 U.S. at 637 (Jackson, J., concurring). The constitutional power over whether to spend foreign aid is not the President's own—and it *is* Congress's own.[16]

---

[16] In analyzing the President's authority to impound in the context of domestic spending, some have noted the possibility that unique problems could arise in conflicts between spending mandates and a foreign policy question "confided by the Constitution to [the President's] substantive direction and control." Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, Re: Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools, 1 Supp. Op. O.L.C. 303, 311 (Dec. 1, 1969); *see* John G. Roberts, Jr., Memorandum for Fred F. Fielding Re: Impoundment Authority at 2 (Aug. 15, 1985) ("Roberts Memorandum"). But even in the context of foreign affairs, a problem arises only "if spending would conflict with a constitutional obligation vested in the President." Roberts Memorandum at 2. Defendants have not articulated their argument with remotely sufficient shape to give rise to such a problem—they do not ground the authority to impound here in any particular "constitutional obligation vested in the President"; they do not articulate *any* bounds to the authority; and they have not raised any challenge to the constitutionality of the governing statutes, as applied or otherwise, including the appropriations act and Impoundment Control Act.

Aside from their unbounded view of Executive power in foreign policy, Defendants observe that Congress's "appropriations acts grant the President significant discretion in how to use these funds." *Glob. Health*, ECF No. 34 at 33. They also cite *City of New Haven v. United States*, 809 F.2d 900, 901 (D.C. Cir. 1987), to argue that a "pause" in funding does not qualify as an impoundment. *Glob. Health*, ECF No. 34 at 35. These arguments are unavailing. No one does or could doubt that the Executive is afforded significant discretion in administering the funds appropriated or, as Defendants put it, "how to use these funds." *See, e.g.*, 22 U.S.C. § 2151b(c)(1) (authorizing the President "to furnish assistance, on such terms and conditions as he may determine," for certain programs). As described, the constitutional partnership between the political branches has always recognized the Executive's role in determining *how* appropriated funds are spent. The critical point here, which Defendants do not contest, is that Congress's appropriations laws set the amount that is to be spent. That is, the appropriations laws reflect an exercise of Congress's own, core constitutional power to determine *whether and how much* money is spent. Defendants do not argue that Congress's appropriations laws delegate that core authority to the Executive.

Moreover, the notion that the Executive has simply "paused" appropriations does not avoid the problem. As an initial matter, the contention is belied by public statements indicating that this action has been taken to save taxpayer money and end USAID for policy reasons, which Defendants have not disputed when given the opportunity. And the case Defendants cite to authorize a pause of appropriated funds stands for just the opposite proposition. In *City of New Haven*, the D.C. Circuit recognized that the Impoundment Control Act's legislative history indicated that the President might invite little controversy when it comes to "trivial" impoundments relating to the "normal and orderly operation of the government." 809 F.2d at 908. But the Court

explained that other impoundments, those "designed to negate congressional budgetary *policies*," were precisely the kind that Congress "was determined to forestall." *Id.* A blanket suspension of billions of dollars appropriated by Congress for specific purposes can hardly be classified as trivial. And, indeed, the record makes clear that Defendants' impoundment was specifically "designed to negate congressional budgetary policies."[17]

The Court accordingly finds that Plaintiffs are likely to succeed on their separation of powers claims and rejects Defendants' unbridled understanding of the President's foreign policy power, which would put the Executive above Congress in an area where it is "firmly established" that the two branches share power, *Zivotofsky*, 576 U.S. at 62 (Roberts, C.J., dissenting), where

---

[17] Defendants offer some arguments in passing that there is no avenue to relief even if they are in violation of valid statutes expressing Congress's spending power. First, they say this makes Plaintiffs' claims "purely statutory" and therefore not cognizable as constitutional claims, citing *Dalton v. Specter*, 511 U.S. 462 (1994). *Glob. Health*, ECF No. 34 at 23. But *Dalton* "merely stands for the proposition that when a statute entrusts a discrete specific decision to the President and contains no limitations on the President's exercise of that authority, judicial review of an abuse of discretion claim is not available." *Chamber of Com.*, 74 F.3d at 1331. Here, by contrast, Plaintiffs assert that the Executive has attempted to usurp Congress's power over the purse in violation of the separation of powers, and there is no asserted or plausible argument that the President is simply exercising discretionary authority conferred by statute. Nor do Defendants explain how this argument can be squared with then-Judge Kavanaugh's decision issuing mandamus relief in *Aiken County*. *See* 725 F.3d at 267.

Defendants also claim that violation of the Impoundment Control Act cannot be a basis for finding action contrary to law under the APA because the Impoundment Control Act allows for enforcement by the Comptroller General. *Glob. Health*, ECF No. 34 at 35. This argument is limited to Plaintiffs' contrary-to-law APA claims, *see supra* n.12, and lacks merit. The APA, by its terms, applies unless another statute "preclude[s] judicial review." 5 U.S.C. § 701(a)(1). And as the D.C. Circuit has observed, any such preclusion must have "sufficient clarity to overcome the strong presumption in favor of judicial review." *Confederated Tribes of Chehalis Rsrv. v. Mnuchin*, 976 F.3d 15, 21 (D.C. Cir. 2020) (quoting *Thryv, Inc. v. Click-To-Call Techs., LP*, 590 U.S. 45, 53 (2020)), *rev'd on other grounds sub nom. Yellen v. Confederated Tribes of Chehalis Rsrv.*, 594 U.S. 338 (2021).

Finally, Defendants argue that the *AIDS Vaccine* Plaintiffs' separate claim under the Take Care Clause cannot be a basis for affirmative relief. *Glob. Health*, ECF No. 34 at 26. However, the Court need not reach that claim or argument since it concludes that Plaintiffs are likely to succeed on their separation of powers claims.

Congress is exercising one of its core powers, and where there is no constitutional objection to the laws it has made.[18]

## C.  Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Injunctive Relief

The Court's order granting in part Plaintiffs' motions for a TRO described evidence of the immense irreparable harm to businesses and organizations across the country, which has, at least to date, gone unrebutted by Defendants. *AIDS Vaccine*, 2025 WL 485324, at *2–4. As the Court explained, this included immense financial harm to Plaintiffs and, in many cases, forced them to significantly cut down on staff or otherwise reduce core operations. A few examples are illustrative:

- One plaintiff, a large investigative journalism organization, has USAID and State Department grants that constitute 38% of its budget, supporting investigations into corruption, sanction violations, and other wrongdoing. *AIDS Vaccine*, ECF No. 13-4 ¶¶ 2, 6–7, 9. Due to the suspension of appropriated funding and stop-work orders received as a result, the organization has been forced to cut 43 of 199 staff members, with most remaining being moved to a shorter work week. *Id.* ¶ 12. The organization has had to cancel events, cut travel for reporting, and freeze new equipment purchases. *Id.* The organization attests that the disruption will continue absent relief. *Id.* ¶ 13.

- A nonprofit plaintiff focused on protecting refugees and asylum seekers has had to lay off 535 staff members since receiving termination and suspension notices for multiple grants. *Glob. Health*, ECF No. 7-3 ¶¶ 3–4, 13. It has been forced to shutter program offices and defer payments to vendors. *Id.* ¶ 21.

---

[18] The Court notes that, for similar reasons, Plaintiffs would be likely to succeed on their claim that Defendants acted *ultra vires*. *Glob. Health*, ECF No. 1 ¶¶ 129–31. "When an executive acts *ultra vires*"—meaning beyond the scope of his power—"courts are normally available to reestablish the limits on his authority." *Chamber of Com.*, 74 F.3d at 1328 (quoting *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)). Defendants do not identify any authority, statutory or otherwise, that would authorize this sort of vast cancelation of congressionally appropriated aid. Even if they did, Defendants do not dispute that they would be in the territory of having to show "clear congressional authorization" based on the "vast economic and political significance" of these actions. *See West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 716, 723 (2022) (citations omitted). Needless to say, canceling billions of dollars in congressionally appropriated funds is "no everyday exercise of federal power." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 117 (2022) (internal quotation marks and citation omitted).

- A plaintiff representing small businesses across all sectors attests that the suspension included USAID failing to pay its members for months of unpaid invoices. *Glob. Health*, ECF No. 7-2 ¶ 8. This has forced small businesses to furlough "most U.S. national staff in home offices and on contracts, and terminate foreign national staff or risk keeping them and being uncertain of payments under stop work orders." *Id.* ¶ 10.

- Another plaintiff focused on addressing the global HIV/AIDS epidemic has already been forced to lay off seven employees and will lay off ten more over the next month if the suspension of appropriated foreign aid continues. *AIDS Vaccine*, ECF No. 13-2 ¶ 12.

In addition, several plaintiffs had attested to how the blanket suspension of funds undermined their core missions and jeopardized vital services to vulnerable populations. For example:

- One plaintiff asserts that the suspension of appropriated foreign aid has disrupted critical health programs, including maternal and child health programs and infectious disease prevention efforts administered by its member organizations. *Glob. Health*, ECF No. 7-1 ¶ 8. One of those member organizations reports that a $20 million project to support the development of hospital accreditation in Cambodia has been suspended. *Id.* ¶ 8(a). Another reports that a stop-work order has disrupted a total of $4 million in funding for American Schools and Hospitals Abroad grants in Nepal and Vietnam. *Id.* ¶ 8(c). And another reports that the freeze has delayed several time-sensitive antimalaria campaigns that are expected to benefit millions of people in Kenya, Uganda, Ghana, Ethiopia, and Zimbabwe. *Id.* ¶ 8(d). The plaintiff attests that the suspension of appropriated foreign aid funding "is an existential threat to [its] members and their life-saving work." *Id.* ¶ 11.

- Another plaintiff reports that it can no longer fund shelters for minors in Central America trying to escape recruitment into criminal gangs. *Glob. Health*, ECF No. 7-7 ¶ 10.

- A different plaintiff explains that it has abruptly stopped providing medical services for hundreds of adolescents and young students in need in Bangladesh. *Glob. Health*, ECF No. 7-8 ¶ 12(a).

- An additional plaintiff that supports HIV prevention research and the rollout of HIV prevention medication to high-risk communities in various African countries asserts that the funding freeze has disrupted clinical trials and the rollout of life-saving medication. *AIDS Vaccine*, ECF No. 13-2 ¶¶ 3–4, 11.

Based on this evidence, the Court concluded that Plaintiffs had made a sufficient preliminary showing that Defendants' actions "threaten[ed] the very existence of [their] business." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). And they had likewise shown that the "obstacles" created by Defendants' conduct "make it more difficult for the [plaintiffs] to accomplish their primary mission." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).[19]

Over the weeks that have followed, Plaintiffs have continued to produce more evidence of irreparable harm. A supplemental declaration from one plaintiff, for example, explains that the funding freeze has impacted its ability to meet financial obligations, which has in turn placed staff at risk of harassment, intimidation, and potential physical harm. *Glob. Health*, ECF No. 46-2 ¶ 2. Personnel have also been stranded in high-risk environments due to insufficient repatriation funding. *Id.* ¶ 3. And the loss of funding has forced security cutbacks, jeopardizing sensitive equipment and program-related data. *Id.* ¶ 6. As of February 26, the same plaintiff had furloughed around two-thirds of its U.S.-based workforce because of the funding freeze. *Glob. Health*, ECF No. 46-1 ¶ 32. Another plaintiff reiterated that, unless it received the funds owed by USAID, it

---

[19] The Court also noted that Plaintiffs' evidence showed severe harm to their "goodwill, reputation, and relationships with employees, partners, subcontractors, foreign governments, and other stakeholders." *AIDS Vaccine*, 2025 WL 485324, at *3 n.2 (quoting *Glob. Health*, ECF No. 4 at 23). This included concrete examples such as having to violate contractual duties by deferring payments to suppliers, vendors, and landlords, *Glob. Health*, ECF No. 7-6 ¶¶ 10, 15; disruptions to relationships with longstanding partners whose trust had been cultivated over decades, *id.*; and having to go back on previous assurances made to clients and partners in reliance on the agreements that have now been canceled, *Glob. Health*, ECF No. 7-9 ¶ 21. *See Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962) (holding that irreparable harm was apparent where defendant's conduct "could not fail to damage [plaintiff's] good name"); *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 59, 103 (D.D.C. 2017) ("Injury to reputation can, at least at times, rise to the level necessary to support the issuance of an injunction."); *Xiaomi Corp. v. Dep't of Def.*, No. 21-cv-280, 2021 WL 950144, at *9 (D.D.C. Mar. 12, 2021) (collecting cases).

would be forced to make another round of furloughs within about two weeks, reducing a staff of more than 250 to as few as ten. *Glob. Health*, ECF No. 29-4 ¶ 7.

Several declarations from the *Global Health* Plaintiffs further illustrate the ongoing irreparable harm:

- One plaintiff attests that if USAID does not pay outstanding invoices forthwith, the plaintiff will be in serious legal jeopardy in both the United States and other countries. *Glob. Health*, ECF No. 36-1 ¶ 7. The plaintiff will be forced to default on numerous contracts, including for corporate insurance and legal services—all while it is facing threatened legal action from staff members because it does not have funds to pay employees. *Id.* ¶¶ 8–9. And the risks to the plaintiff "are worsening by the day," as it faces an increased likelihood of not being able to repatriate staff members, pay local legal counsel, or meet obligations to local communities. *Id.* ¶¶ 12, 15–17.

- Another plaintiff explains that it has been forced to furlough an additional 124 staff members since the TRO was issued because it still has not received any payments. *Glob. Health*, ECF No. 36-2 ¶¶ 3, 5. Organizational staff and their families "are suffering ongoing financial hardship that worsens with each passing day of reduced or no compensation." *Id.* ¶ 5. The plaintiff is in imminent danger of being forced to suspend thousands of staff members without pay, which could violate labor laws in countries where it operates. *Id.* ¶ 9.

- Still another declaration explains that without imminent payment, a small business focused on energy and infrastructure will be forced to close its doors due to insolvency and to walk away from active federal contracts. *Glob. Health*, ECF No. 36-3 ¶¶ 5–6.

- Likewise, another plaintiff planned to lay off "a substantial number of its workforce" due to the lack of funding and will have to shutter its doors in all but five to seven of its twenty-four country offices. *Glob. Health*, ECF No. 36-4 ¶¶ 4, 6.

Defendants do not rebut these existential threats to the survival and core missions of businesses and organizations around the country. They respond that there is no irreparable harm because there is an ongoing, individualized review process that "could prevent the harm from transpiring at all." *Glob. Health*, ECF No. 34 at 39. And they insist that any damage to Plaintiffs and other enterprises is recoverable. *Id.* at 40–42. Defendants' point is well taken in one respect—

41

the Court has found that Plaintiffs are not likely to succeed on this record as it relates to terminations resulting from Defendants' subsequent review process. And, as discussed below, the Court's relief must be tailored in that respect.

But Defendants' argument is unpersuasive as it relates to irreparable harm. Defendants have now stated that they have completed their review process and have represented that they will cancel the vast majority of congressionally appropriated foreign aid. While it is true that the relevant Executive action here has the effect of withholding substantial amounts of funds, the harm here goes to the very subsistence of the organizations, many of which are on the brink of shuttering entirely, and poses an existential threat to the viability of their humanitarian missions. In fact, Defendants have not hesitated to cite the threat of insolvency to Plaintiffs as a justification for not making payments. *See Glob. Health*, ECF No. 39-1 ¶ 25 ("[T]he plaintiffs have claimed that many grant recipients and contractual counterparties are insolvent or nearly so, raising the high likelihood that they will immediately spend any funds they receive—making it impossible for the Government to recover those funds as a practical matter."). Defendants' actions are, in effect, the massive disruption of a whole industry or sector, and Plaintiffs have made a strong showing that the harm is "both certain and great," as well as "actual and not theoretical." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citation omitted).

### D.  The Balance Of The Equities And The Public Interest Favor Plaintiffs

The final two factors, balancing the equities and the public interest, generally "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016). Here, they also weigh in Plaintiffs' favor.

As the D.C. Circuit has explained, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12. "To the

42

contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (internal quotation marks and citation omitted). Additionally, the harms that Plaintiffs have suffered—and will continue to suffer absent preliminary injunctive relief—are stark. Plaintiffs have adduced ample evidence that the funding freeze has had dire humanitarian consequences and has devastated businesses and programs across the country. Defendants still have made no effort to rebut that showing.

Defendants respond that they are undertaking a thorough review of foreign aid programs to determine which ones "make sense for the American people," and they assert that the public has an interest "in the Executive effectuating foreign affairs." *Glob. Health*, ECF No. 34 at 44–45 (citation omitted). But the Executive's ability to review foreign aid programs is not at issue here. The Court's TRO order explicitly declined to "enjoin any aspect of the Government's ability to conduct a comprehensive internal review of government programs." *AIDS Vaccine*, 2025 WL 485324, at *6. Indeed, the Court has concluded above that Plaintiffs are not likely to succeed in challenging Defendants' review process on this record. *See supra* section II.B.1.c. And while the public no doubt has an interest in the Executive carrying out his important role in foreign affairs, it also has an interest in ensuring those duties are carried out in accordance with law, including the APA, and with the role prescribed to Congress, also a democratically elected branch, under the Constitution. To the extent Defendants' argument seeks more than that, it is merely a repackaging of their unbridled view of Executive foreign affairs power that has been repeatedly rejected by the Supreme Court. *See supra* section II.B.2. In terms of the equities and the public interest, the Executive is equal to, not above, Congress and its laws. However, the scale tips in favor of Plaintiffs on these factors in light of their additional, unrebutted showing of enormous harm.

43

E.  Scope Of Relief

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017). The court "need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case." *Id.* at 580 (citation omitted). As it did at the preliminary injunction hearing, the Court emphasizes that the scope of the injunctive relief should be tailored to the particular claims that are likely to succeed and the particular showings made as to the other factors.

As described above, the Court finds that Plaintiffs are likely to succeed on their APA claims challenging the agency directives that implemented the blanket suspension of congressionally appropriated aid, but they are not likely to succeed as to the review and large-scale terminations that occurred in the process that took place after February 13, 2025. The Court accordingly finds it proper to preliminarily enjoin the parts of those directives, and the actions taken pursuant to them, to implement the freeze between January 20, 2025, and February 13, 2025. However, the Court denies Plaintiffs' request to preliminarily enjoin or invalidate the subsequent review process or the mass terminations that resulted from it.[20] The Court also finds that Plaintiffs are likely to succeed on their constitutional claims that Defendants' withholding of congressionally

---

[20] The Court notes that Defendants have preserved the government's frequent argument that relief under the APA should apply only to the particular plaintiffs before the Court. As the Court observed at the preliminary injunction hearing, this argument has not been endorsed by the Supreme Court. *Cf. Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 831 (2024) (Kavanaugh, J., concurring) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989))).

appropriated foreign aid funds violates the separation of powers. Again, however, the relief must be properly tailored.

The Court concludes that Plaintiffs' proposed relief is overbroad in two additional respects as to their APA claims and one as to their constitutional claims. First, Plaintiffs propose relief that goes beyond the implementing directives they challenged in their APA claims, such as specifically enjoining Defendants from "terminating, furloughing, or placing personnel on administrative leave" and ordering them to "restore the status quo as it existed before January 20, 2025," including by "restoring technical systems" and restoring prior processes to approve payments. *Glob. Health*, ECF No. 46-6 at 2–4. The Court finds that dictating operational decisions would go beyond the proper relief. While the Court has expressed concern about the length of time before Defendants took action to comply with the TRO, Defendants have since represented that they will adjust staffing levels as needed to comply with the Court's order and have taken at least some steps to do so. *Glob. Health*, ECF No. 58 at 125–26.

Second, and relatedly, the Court cannot adopt Plaintiffs' proposal that Defendants achieve "payment processing rates equivalent to those achieved before January 20, 2025." *Glob. Health*, ECF No. 46-6 at 3. In denying Defendants' application to vacate this Court's order enforcing its TRO, the Supreme Court emphasized the need for "due regard for the feasibility of any compliance timelines." *AIDS Vaccine*, 2025 WL 698083. While that direction was given in the context of the TRO, it applies equally to the preliminary injunction. This Court has since invited both written and oral submissions on the issue of feasibility. During its hearing concerning feasibility, the Court sought the parties' views on creating a clear and feasible benchmark as it relates specifically to the remaining funds to be disbursed at the TRO phase. Given that the parties frequently articulated their respective arguments in terms of the number of payments processed, the Court proposed that

metric and invited the parties' submissions, including requesting data from the parties on what number of payments processed per day would be feasible (or range of payments processed, to the extent not all payments are created equal).

The parties agree that, as of the time of the appeal, there were roughly 2,000 outstanding payments to be processed by USAID, along with additional payments to be processed by State. *Glob. Health*, ECF No. 58 at 131–33. They also agree that both USAID and State could previously "process several thousand payments each day." *Glob. Health*, ECF No. 39-1 ¶ 15. As a benchmark of the current state, Defendants have submitted that after the Supreme Court lifted its administrative stay, they were able to create the capacity to process about 100 payments over one night. *Glob. Health*, ECF No. 54 at 2. In light of these benchmarks, the Court found it feasible for Defendants to process roughly 1,200 payments to Plaintiffs over the course of a four-day period, or roughly 300 payments per day. *See Glob. Health*, ECF No. 53 at 1 (stating that *Global Health* Plaintiffs have around 1,200 outstanding invoices). Although the Court has invited submissions and discussions related to feasibility, there has not been any specific objection to this rate. The Court accordingly finds it appropriate and feasible to order Defendants to continue to process payments at a rate of approximately 300 per day. Although this is a small fraction of the rate at which payments were processed in a single day before January 20, 2025, it nonetheless allows for Defendants to come into compliance within a relatively short period, at a demonstrated level of current capability. The Court may revisit this benchmark if Defendants make a specific showing of legitimate feasibility concerns.

As to the separation of powers claims, Plaintiffs' proposed relief is overbroad insofar as it would specifically order Defendants to continue to contract with them. As discussed, the violation here results from the Executive's decision to unlawfully impound funds appropriated by Congress

for specific foreign aid purposes. To be sure, Plaintiffs observe that they occupy a large share of the sector serving the relevant foreign aid purposes, as demonstrated by the severe harm they have faced as a result of the disruption to the sector, and accordingly it may well be that the only or most practical way for Defendants to carry out their duty to spend the funds is to revive existing partnerships, as Plaintiffs suggest. *See Glob. Health*, ECF No. 58 at 47–48. However, the separation of powers dictates only that the Executive follow Congress's decision to spend funds, and both the Constitution and Congress's laws have traditionally afforded the Executive discretion on how to spend within the constraints set by Congress. The appropriate remedy is accordingly to order Defendants to "make available for obligation the full amount of funds Congress appropriated" under the relevant laws. *See City of New Haven v. United States*, 634 F. Supp. 1449, 1460 (D.D.C. 1986), *aff'd*, 809 F.2d 900 (D.C. Cir. 1987); *cf. Aiken County*, 725 F.3d at 260 (granting mandamus relief and concluding that agency could not "decline to spend previously appropriated funds" toward specified purpose).[21]

## III.    Conclusion

For the reasons above, the Court grants in part and denies in part Plaintiffs' motions for a preliminary injunction. Consistent with this opinion, it is hereby **ORDERED**:

- Defendants Marco Rubio, Peter Marocco, Russell Vought, the U.S. Department of State, the U.S. Agency for International Development, and the Office of Management and Budget (the "Restrained Defendants") and their agents are enjoined from enforcing or giving effect to sections 1, 5, 7, 8, and 9 of the January 24 State Department

---

[21] Defendants request that the Court stay any order issuing a preliminary injunction for a short time while they decide whether to appeal. *Glob. Health*, ECF No. 34 at 45. That request is denied as premature. If, after reviewing this opinion and order, Defendants decide to pursue an appeal, they may move for a stay pending appeal and the Court will consider it in the ordinary course.

memorandum, and any other directives that implement sections 3(a) and 3(c) of Executive Order No. 14169, by giving effect to any terminations, suspensions, or stop-work orders issued between January 20, 2025, and February 13, 2025, for any grants, cooperative agreements, or contracts for foreign assistance. Accordingly, the Restrained Defendants shall not withhold payments or letter of credit drawdowns for work completed prior to February 13, 2025.

- The Restrained Defendants are enjoined from unlawfully impounding congressionally appropriated foreign aid funds and shall make available for obligation the full amount of funds that Congress appropriated for foreign assistance programs in the Further Consolidated Appropriations Act of 2024.

It is further **ORDERED** that the Restrained Defendants shall take all steps necessary to effectuate this order and shall provide written notice of this order to all recipients of contracts, grants, and cooperative agreements for foreign assistance that were in existence between January 20, 2025, and February 13, 2025. The parties shall file a joint status report by March 14, 2025, that apprises the Court of Defendants' compliance with this order and proposes a schedule for next steps in this matter. The Court is prepared to hold a prompt hearing at the request of the parties to address any feasibility concerns. The February 13 temporary restraining order issued by the Court is hereby dissolved.

**SO ORDERED.**

_____

AMIR H. ALI
United States District Judge

Date:   March 10, 2025

48