**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

GLOBAL HEALTH COUNCIL, et al.

          *Plaintiffs*,

    v.

DONALD J. TRUMP, in his official capacity as
President of the United States of America, et al.,

          *Defendants*.

Civil Action No. 25-cv-402-AHA

**RESPONSE TO DEFENDANTS' STATUS REPORTS**

The Global Health Council Plaintiffs respectfully submit this response to Defendants' recent status reports. Plaintiffs have endeavored for the last month to work cooperatively with Defendants to facilitate Defendants' payments of outstanding invoices without the need for the Court's involvement. However, Plaintiffs are compelled to submit this response to bring certain matters to the Court's attention and to correct Defendants' misleading account of the facts and events of the last month. Plaintiffs also submit this response to Defendants' mischaracterizations of the law and of this Court's preliminary injunction in their continued refusal to spend appropriations that Congress required Defendants to spend.

## A. Defendants' Payments to Plaintiffs Have Slowed without Adequate Explanation

In its March 10 opinion granting in part a preliminary injunction, the Court found it "appropriate and feasible to order Defendants to continue to process payments at a rate of approximately 300 per day." ECF No. 60 at 46. Although the Court left open the possibility that it would "revisit this benchmark if Defendants make a specific showing of legitimate feasibility concerns," *id.*, Defendants have not submitted any request to the Court to alter the benchmark payment rate that the Court ordered.

Defendants initially processed payments at a rate consistent with the Court's order, but that has fallen off substantially since mid-April. As shown in the table further below, Defendants made fewer than *10 payments a day* between their April 17 and May 1 status reports (131 payments over 14 days), without asking the Court for leave to lower the benchmark payment rate.

Defendants have also repeatedly pushed back the date on which they anticipate completing payments to Plaintiffs for work completed before February 13, 2025. In their status reports on March 27 and April 3, Defendants wrote that they "expect to process the remaining payments to Plaintiffs by April 10, 2025." ECF No. 64 at 2; ECF No. 67 at 2. In their April 10 status report,

Defendants revised the estimated completion date for payments to Plaintiffs to April 25. ECF No.

69 at 2. Their April 17 status report then moved that date to May 5, with an added caveat that

Defendants only expect "to substantially complete" processing the remaining payments by that

date. ECF No. 72 at 2. Finally, on May 2, Defendants kept that target date to "substantially

complete" the payments as May 5, but added that they would finish processing payments to

Plaintiffs by June 6 "if the Court were to set a deadline for the submission by Plaintiffs of invoices"

by "May 15." ECF No. 79 at 2.

The below chart summarizes Defendants' payments to Plaintiffs and non-Plaintiffs, as well

as the various dates by which Defendants have represented they would complete payments, based

on Defendants' statements in their status reports.

| Status Report Date | Payments to Plaintiffs Since Prior Status Report | Payments to non-Plaintiffs Since Prior Status Report | Defendants' Estimated Date for Completing Payments to Plaintiffs |
|---|---|---|---|
| 3/27/2025 | 314 | 5750 | 4/10/2025 |
| 4/3/2025 | 43 | 2601 | 4/10/2025 |
| 4/17/2025 | 26 | 317 (administrative stay entered during week) | 4/25/2025 |
| 4/24/2025 | 72 | N/A | 5/5/2025 to "substantially complete" |
| 5/1/2025 | 59 | N/A | 5/5/2025 to "substantially complete;" 6/6/2025 if the Court orders Plaintiffs to submit invoices by 5/15 |

In their May 2 status report, Defendants suggest for the first time that Plaintiffs are

responsible for the government's failure to complete processing of these payments in a timely

manner. That is false.

2

Over the past several weeks, Plaintiffs have made repeated efforts to work with Defendants to facilitate payments. On April 15, Plaintiffs emailed defense counsel spreadsheets listing 720 outstanding invoices and drawdown requests from Plaintiffs that had not been paid. *See* Ex. A (4/15/25 email from Jacobson to Sur). Given Defendants' statement in their April 10 status report that the remaining payments were "more labor intensive … because of particular transaction and documentation-specific details," Plaintiffs explained that they had "not received any outreach from USAID or State regarding any of these invoices, such as to request missing documentation," but nonetheless Plaintiffs were "prepared to provide the government with any information necessary to ensure prompt payment under the court's orders." *Id.* Defense counsel confirmed receipt but failed to provide any additional information over the next week. On April 23, Plaintiffs emailed defense counsel again, noting the marked decrease in Defendants' rate of making payments to Plaintiffs. *Id.* (4/23/25 email from Jacobson to Sur). Plaintiffs also noted that they had provided Defendants with information on all outstanding payment requests a week earlier, but Plaintiffs had not received any further outreach from Defendants seeking additional documentation or information. Plaintiffs asked that Defendants notify Plaintiffs by close of business that day whether Defendants required additional information, or else Plaintiffs would notify the Court. *Id.*

Defense counsel responded quickly requesting a meet and confer. At that meeting, Defendants—for the first time—informed Plaintiffs that there were purported issues with many of the payment requests. Ex. A (4/23/25 email from Sur to Jacobson), (4/25/25 email from Jacobson to Sur). Defense counsel thereafter emailed Plaintiffs spreadsheets showing 358 payments requests for which there were purported issues. For the vast majority of these, the spreadsheets claimed that the invoices had never been received and needed to be resubmitted. For others, the spreadsheets indicated either "In Process" or "Issue w/Invoice. Resolve with COR or AOR." *Id.* (4/25/25 email

from Jacobson to Sur).[1] Further, with respect to some drawdown requests on cooperative agreements or grants, the spreadsheets directed Plaintiffs to "Please cancel in PMS and resubmit."

Plaintiffs responded, requesting among other things the identity of the "COR or AOR" for those relevant invoices, details about the payment requests supposedly "In Process," and further information on how to resubmit the other invoices, since some Plaintiffs had already resubmitted them to their COR or AOR and received no response. *Id.* Indeed, for nearly all of the invoices that Defendants claimed were not received and needed to be resubmitted, Plaintiffs had in fact submitted those invoices long ago, and agency officials had confirmed receipt of some of them. *See id.* (5/1/25 email from Jacobson to Sur).

Defendants' answer was largely non-responsive. In response to Plaintiffs' requests for the identities of the CORs and AORs that Plaintiffs needed to contact, defense counsel indicated that "USAID will identify the AOR/COR and have them reach out to the vendor." Ex. A (4/29/25 email from Sur to Jacobson). *Id.* In response to Plaintiffs' requests for more information on the invoices listed as "In Process," defense counsel said this means they are "currently under review." *Id.*

On May 1, Plaintiffs again sought this and other information. Plaintiffs again asked for the identities of the CORs and AORs that Plaintiffs supposedly need to contact to facilitate payment of these outstanding invoices. Plaintiffs also again asked for information about payment requests described as "In Process." Plaintiffs also informed defense counsel that at least one plaintiff specifically asked their contracting officer whether particular invoices should be resubmitted as directed on Defendants' spreadsheets; the contracting officer responded that the agency had the

---

[1] A "COR" is a Contracting Officer's Representative and an "AOR" is an Agreement Officer's Representative.

invoices and there was no need to resubmit them. *Id.* Other Plaintiffs had been told to resubmit

invoices to ei@usaid.gov, and had done so, but received no acknowledgement or response. *Id.*

Further, Plaintiffs also informed defense counsel that Plaintiff ABA had received an email

from defendthespend@hhs.gov telling the ABA that it was required to upload additional

information to justify its invoices, including a "specific description of why the funds are necessary,

and why they are aligned with the award." Ex. A (5/1/25 email from Jacobson to Sur).[2] The email

also directed the ABA to upload information to a portal on DOGE.gov, which tells the funding

recipient: "Additional information is requested for this payment request, pertinent to Executive

Order 14222. Please provide a more detailed justification. An ideal payment justification describes

what the award is for, what the funds will be used for, and why it is necessary." Ex. B. Several

other Plaintiffs have now received similar emails and demands for information from the

"defendthespend@hhs.gov" email address. Plaintiffs asked defense counsel for the legal authority

for requiring Plaintiffs to submit this information to an entity different from the agency paying the

invoice, and for requiring Plaintiffs to submit additional information to justify payments that this

Court's preliminary injunction requires the agencies to make. Ex. A (5/1/25 email from Jacobson

to Sur).

In Defendants' response, they ignored Plaintiffs' questions about why Plaintiffs were being

required to submit additional information to DOGE. *See* Ex. A (5/2/25 email from Sur to

Jacobson). They again declined Plaintiffs' request to provide the identities of the CORs and AORs

that Plaintiffs must contact to get certain invoices processed. *See id.* They said it was "not feasible

---

[2] "Defend the Spend" appears to be an additional layer of review conducted by DOGE officials
before agency payments are made. *See* https://x.com/DOGE/status/1911208855066849712
(describing "Defend the Spend" and stating that the submissions from funding recipients will be
posted on the DOGE website); *see also* D. Diamond et al., *DOGE begins to freeze health-care
payments for extra review*, Washington Post (Apr. 17, 2025),
https://www.washingtonpost.com/politics/2025/04/17/doge-trump-grants-hhs-nih-backlog/.

to provide mid-process tracking" on the invoices listed as "In Process." *Id.* And finally, Defendants

asked that Plaintiffs resubmit the supposedly "missing invoices." *Id.*

In reality, Plaintiffs had already submitted nearly all of the invoices and drawdown requests

that they were told to resubmit. Plaintiffs still have at least 522 total invoices and drawdown

requests that have not been paid, despite Defendants' representations that payments to Plaintiffs

would be "substantially complete" by today, May 5. These outstanding requests amount to in

excess of $70 million.

In light of these facts, Defendants' recitation of events in their most recent status report is

misleading at best. The total number of invoices and drawdown requests from Plaintiffs that remain

to be processed is not 79 as Defendants claim (ECF No. 79 at 2); there are at least 522 invoices

and drawdown requests from Plaintiffs pertaining to work performed before February 13 that have

not been paid.[3] 320 of those invoices and requests are from the list that Plaintiffs transmitted on

April 15. 202 of them have been submitted since April 15, consistent with the normal practice and

timeline for submitting such requests.[4] Defendants did not receive "additional payment requests

details from Plaintiffs" on April 15 (*id.*); Plaintiffs sent a list on that date of outstanding invoices

and drawdown requests that were nearly all *previously* submitted (Plaintiffs have documentary

proof of these previous submissions if needed). It is astounding that Defendants seemingly have

lost a substantial number of invoices that Plaintiffs previously submitted, many months ago. This

is not a problem of Plaintiffs' making, and indeed Plaintiffs have never experienced such a

---

[3] The actual number of remaining invoices and drawdown requests, and the total dollar amount outstanding, is likely much higher, as some Plaintiffs are awaiting information from their members on outstanding payment requests as of this filing.

[4] Plaintiffs have submitted additional invoices in recent weeks as part of the normal process of invoicing on government projects, as it can take time for prime contractors to receive invoices from their subcontractors and other vendors assisting with the projects.

situation of the federal government losing invoices in their many years of working with the government. Nevertheless, Plaintiffs are prepared to resubmit these invoices (and have already done so) to facilitate Defendants' prompt payment of these long-overdue invoices. And Defendants nowhere mention to the Court that some Plaintiffs are being required to submit additional information, apparently to DOGE, to "justify" Defendants' making payments that this Court ordered Defendants to make nearly two months ago.

Plaintiffs have taken all appropriate steps to receive the payments owed to them under this Court's preliminary injunction. Plaintiffs have gone further than required, cooperating with Defendants' requests, re-requests, and re-re-requests for information supposedly needed to process the invoices. Plaintiffs are now compelled, however, to bring the above matters above to the Court's attention given the devastating effects on Plaintiffs' of Defendants' continued delays.

## B. Defendants Are Not Complying with the Impoundment Prong of the Preliminary Injunction

Defendants have maintained in their status reports that they are not impounding funds in violation of the preliminary injunction, even though they are currently obligating and expending only a small fraction of the appropriations available to USAID and the State Department for foreign assistance programs. In their April 3 status report, Defendants represented that they were conducting "a programmatic review of all foreign assistance programs to ensure those programs are aligned with the President's foreign policy agenda." ECF 67, at 2-3. In their April 17 status report, Defendants represented that they have "completed" their programmatic review. ECF 72, at 2. Yet since April 17, Plaintiffs have seen no indication that Defendants have resumed obligating and disbursing appropriated foreign-assistance funds. And in their most recent status report, Defendants further state that they are "continu[ing] to evaluate the appropriate next steps to address the provision in this Court's March 10, 2025, order regarding obligation of funds." ECF 79, at 2.

In their most recent status report, Defendants further state that they "understand that portion of the injunction to require them to make available covered funds before they expire, which will happen as soon as September 30, 2025, for some of the funds at issue." ECF 79, at 2-3. Defendants thus maintain that they believe they can "comply with that direction" by "obligating and expending funds … before that deadline." *Id.* at 3; *see* ECF 67, at 3 (similar). Defendants similarly have maintained that their delay in obligating and expending funds "does not implicate the Impoundment Control Act" because the Government Accountability Office has endorsed an agency "taking the steps it reasonably believes are necessary to implement a program efficiently and equitably, even if the result is that funds temporarily go unobligated." *Id.* at 4 (quoting *In re James R. Jones, House of Representatives*, B-203057 L/M, 1981 WL 23385 (Comp. Gen. Sept. 15, 1981)).

Defendants' attempts to unconstitutionally delay obligating and disbursing foreign-assistance funds are just as improper today as they were when Defendants made the same arguments in opposing Plaintiffs' motion for a preliminary injunction. This Court has already explained that, under the Constitution, the Executive Branch may not intentionally delay obligating or expending appropriated funds because it does not like the policies for which Congress appropriated the funds. ECF No. 60 at 29-38. The Impoundment Control Act provides the Executive Branch a mechanism for undertaking "deferrals" for other reasons, but not to ensure funds are spent in accordance with the President's policy preferences. GAO, *Office of Management and Budget—Withholding of Ukraine Security Assistance, B-331564*, at 6 (Jan. 16, 2020), https://perma.cc/6TMT-3CH2; *see* ECF 46, at 18-19. But that is what Defendants are doing here. Defendants continue to cite to authorities concerning "programmatic delays," but programmatic delays occur when the Executive Branch takes time in order to *advance* programs consistent with

Congress's intent expressed through appropriations legislation. As the Government Accountability Office has explicitly held, programmatic delays do *not* include delays designed "to ensure that the funds [a]re not spent in a manner that could conflict with the President's foreign policy." *Id.* at 6 (quotation marks omitted). Defendants' policy-based delays in obligating and expending USAID and State Department appropriations are unconstitutional and conflict with this Court's preliminary injunction.

It gets worse. As set forth in Plaintiffs' amended complaint, recent public statements by Defendants affirmatively indicate that they do *not* intend obligate and disburse appropriated foreign-assistance funds. On March 10, Defendant Rubio announced in a post on X that Defendants were "officially cancelling 83% of the programs at USAID." @Marco Rubio, Mar. 20, https://x.com/marcorubio/status/1899021361797816325. On March 28, Defendant Lewin sent a memorandum to all USAID employees announcing that Defendants will seek to retire USAID's independent operation." Will Steakin & Lucien Bruggeman, *After months of cuts, State Department says it's officially shuttering USAID*, ABC News, Mar. 28, 2025.

Also on March 28, the State Department sent a Congressional Notification to Congress expressing its "intent to realign select USAID functions to the Department and to phase out others." Congressional Notification Transmittal Letter, March 28, 2025, at 3, http://bit.ly/42t0Yvn. The State Department stated that "USAID conducted a comprehensive review of its existing programs and awards to assess their alignment with U.S. foreign policy objectives," and that "numerous programs were discontinued" as a result. *Id.* Further, the State Department stated that it "has carefully considered which USAID programs could continue to advance the Administration's foreign policy objectives," which "have been determined to be humanitarian assistance, global health functions, strategic investment, and limited national security programs." *Id.* The State

Department explained that it planned to restructure the organization to retain these limited functions but that "[o]ther functions … would be eliminated." *Id.* at 4.

And just ***today***, Plaintiffs received a letter from USAID that "[t]he State Department intends to assume responsibility for the administration of all remaining USAID programs pursuant to a directive from U.S. Secretary of State Marco Rubio." Ex. C. The letter suggests that this transition will occur on July 1, 2025. While Defendants have suggested that USAID will not begin obligating funds again, at the earliest, until after their pending interlocutory appeal is resolved, Defendants have not explained how the State Department will be able to lawfully obligate funds that were appropriated to USAID. If the State Department cannot lawfully do so, then Defendants' unlawful deferrals of spending USAID's appropriations may effectuate a permanent impoundment of the funds.

In short, Defendants' continued delays in obligating and expending appropriated foreign-assistance funds are flatly consistent with this Court's preliminary injunction and the constitutional principles underlying the injunction.

Dated: May 5, 2025                           Respectfully submitted,


                                             */s/ Daniel F. Jacobson*
                                             Daniel F. Jacobson (D.C. Bar # 1016621)
                                             John Robinson (D.C. Bar # 1044072)
                                             JACOBSON LAWYERS GROUP PLLC
                                             1629 K Street NW, Suite 300
                                             Washington DC, 20006
                                             Tel: (301) 823-1148
                                             dan@jacobsonlawyersgroup.com

                                             William C. Perdue (D.C. Bar 995365)*
                                             Sally L. Pei (D.C. Bar 1030194)
                                             Samuel M. Witten (D.C. Bar 378008)
                                             Stephen K. Wirth (D.C. Bar 1034038)
                                             Dana Kagan McGinley (D.C. Bar 1781561)
                                             Allison Gardner (D.C. Bar 888303942)
                                             Daniel Yablon (D.C. Bar 90022490)
                                             Samuel F. Callahan (D.C. Bar 888314461)
                                             ARNOLD & PORTER KAYE SCHOLER LLP
                                             601 Massachusetts Ave., NW
                                             Washington, DC 20001-3743
                                             Tel: (202) 942-5000
                                             stephen.wirth@arnoldporter.com

                                             *application for admission pending

                                             *Counsel for Plaintiffs*

11