**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

GLOBAL HEALTH COUNCIL, *et al.*,

        *Plaintiffs*,

    v.

DONALD J. TRUMP, *et al.*,

        *Defendants*.

Civil Action No. 25-cv-402 (AHA)

<u>**GLOBAL HEALTH COUNCIL PLAINTIFFS'
MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO ENFORCE PRELIMINARY INJUNCTION**</u>

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION .................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

    A.   The Preliminary Injunction .................................................................................... 3

    B.   Developments Since the Preliminary Injunction .................................................... 4

LEGAL STANDARD ............................................................................................................ 8

ARGUMENT ....................................................................................................................... 8

    I.   Defendants Are Violating the Preliminary Injunction ........................................... 8

    II.   The Court Should Enforce Its Injunction ............................................................ 13

CONCLUSION ................................................................................................................... 21

# TABLE OF AUTHORITIES

**Cases**

*Borden v. United States*,
   593 U.S. 420 (2021) ......................................................................................................... 18

*City of Houston, Tex. v. Dep't of Hous. & Urb. Dev.*,
   24 F.3d 1421 (D.C. Cir. 1994) ........................................................................................ 19

*Clinton v. City of New York*,
   524 U.S. 417 (1998) ......................................................................................................... 18

*Connecticut v. Schweiker*,
   684 F.2d 979 (D.C. Cir. 1982) ........................................................................................ 19

*Doe 2 v. Esper*,
   2019 WL 4394842 (D.D.C. Sept. 13, 2019) ................................................................... 15

*In re Sealed Case*,
   121 F.3d 729 (D.C. Cir. 1997) ........................................................................................ 15

*Kifafi v. Hilton Hotels Ret. Plan*,
   79 F. Supp. 3d 93 (D.D.C. 2015) ................................................................................. 8, 12

*Savignac v. Jones Day*,
   763 F. Supp. 3d 17 (D.D.C. 2025) ................................................................................... 15

*Shawnee Tribe v. Mnuchin*,
   984 F.3d 94 (D.C. Cir. 2021) .......................................................................................... 19

*Recycling Sols., Inc. v. District of Columbia*,
   175 F.R.D. 407 (D.D.C. 1997) ........................................................................................ 15

**Statutes**

2 U.S.C. § 683(b) ................................................................................................................. 17, 20

2 U.S.C. § 688 ........................................................................................................................... 17

31 U.S.C. § 1512(a) ................................................................................................................... 10

Pub. L. No. 118-47, 138 Stat. 460 (Mar. 23, 2024) ............................................................ 13, 14

**Regulations**

2 C.F.R. § 700.2 ................................................................................................................ 11

2 C.F.R. § 200.201-211 ..................................................................................................... 11

2 C.F.R. § 200.204 ............................................................................................................. 11

4 C.F.R. § 21.1 ................................................................................................................... 12

4 C.F.R. § 21.6 ................................................................................................................... 12

48 C.F.R. § 5.003 ............................................................................................................... 11

48 C.F.R. § 5.203 .......................................................................................................... 11, 12

**Executive Branch Materials**

Proposed Rescissions of Budgetary Resources (May 28, 2025) ........................................ 6

*The Grants Lifecycle*, Grants.gov ................................................................................... 11

*What is the Grant Lifecycle?*, Grants.gov Community Blog (Sept. 19, 2016) .............. 11

**Legislative Branch Materials**

GAO, *Principles of Federal Appropriations Law* (3d ed. 2004) ................................... 19

GAO, *Impoundment Control Act—Withholding of Funds Through Their Date of Expiration*,
    B-330330 (Dec. 10, 2018) ....................................................................................... 7, 17

GAO, *Office of Management and Budget—Withholding of Ukraine Security Assistance*,
    B-331564 (Jan. 16, 2020) ............................................................................................ 9

Dominick A. Fiorentino, Cong. Research Serv., RS22536,
    *Overview of the Federal Procurement Process and Resources* (2023) ................ 11, 12

**Other Authorities**

Jennifer Scholtes, *White House Floats a New Funding Trick—And GOP Lawmakers
    Grimace*, Politico (June 20, 2025) .............................................................................. 7

Tony Romm, *White House Eyes Rarely Used Power to Override Congress on Spending*,
    N.Y. Times (June 17, 2025) ......................................................................................... 7

## INTRODUCTION

In February, after finding that Defendants had not complied with the "clear" terms of the Temporary Restraining Order (TRO), this Court granted Plaintiffs' motion to enforce the order. ECF 28 at 1. Defendants had failed for weeks to comply with the order, even though they had not sought a stay pending appeal. ECF No. 41 at 2.

History repeats itself. This time, Defendants' failure to comply with the Court's order is measured in months. For 106 days and counting, Defendants have failed to comply with the portions of the Court's preliminary injunction prohibiting Defendants from impounding foreign assistance appropriations, and from giving effect to terminations issued prior to February 13, 2025. The injunction is clear. With regard to impoundments, Defendants may not "unlawfully impound[] congressionally appropriated foreign aid funds," and must "make available for obligation the full amount of funds that Congress appropriated for foreign assistance programs in the Further Consolidated Appropriations Act of 2024." On terminations, Defendants are enjoined from "giving effect to any terminations, suspensions, or stopwork orders issued between January 20, 2025, and February 13, 2025, for any grants, cooperative agreements, or contracts for foreign assistance." Defendants have never claimed ambiguity in the injunction or uncertainty on how to comply. Nor have Defendants sought a stay pending appeal. Instead, Defendants have effectively granted themselves a stay.

Defendants have made virtually no effort to obligate the funds subject to the injunction, including with respect to the billions in appropriations that are set to expire in September. Defendants have remarkably claimed that they need not take any actions until, at the earliest, the D.C. Circuit resolves the pending interlocutory appeal, which Defendants have asked that court to resolve by August 15. Defendants accordingly are violating the Court's prohibition on

deferring foreign aid spending, and it appears that they intend to cause funds to permanently lapse in September. Indeed, Defendants' response to the motion to enforce filed in *AIDS Vaccine Advocacy Coalition v. Department of State* (*AVAC*), No. 25-cv-400 (D.D.C.), strongly suggests that, if they do not prevail on appeal, they nonetheless will seek to permanently impound the funds via a "pocket rescission," in which Defendants submit a rescission proposal to Congress less than 45 days before the funds expire and then claim that they are free not to spend the funds before they lapse. And Defendants' other actions are consistent with their having no intent to ever spend the appropriations. They have not begun the time-consuming and multi-step process of soliciting applications for new contracts and grants, and they have shuttered USAID and abolished most of its functions. Defendants also have violated the termination portion of the injunction, instructing USAID staff to "effectuate" terminations issued prior to February 13.

Plaintiffs respectfully request that the Court enforce the preliminary injunction by: (1) confirming that Defendants must obligate all expiring foreign assistance appropriations in accordance with Congress' specific directives for how the funds must be spent; (2) requiring Defendants to submit a detailed plan for compliance; (3) ordering Defendants to immediately start all steps necessary to obligate expiring funds; (4) making clear that Defendants may not leverage their ongoing noncompliance to impound funds through a "pocket rescission" or other means; (5) explaining that the Court will, if needed as a last resort, extend the expiring funds' period of availability to prevent them from being impounded; and (6) prohibiting Defendants from effectuating terminations issued prior to February 13 without the awardee's consent.

## BACKGROUND

### A. The Preliminary Injunction

This Court issued its preliminary injunction three-and-a-half months ago—on March 10, 2025. PI Op., ECF No. 60. Relevant here, the Court held that Plaintiffs would likely prevail on their claims that Defendants were violating the separation of powers and acting ultra vires by "engaging in a unilateral rescission or deferral of congressionally appropriated funds." *Id.* at 29. And in reaching that conclusion, the Court found that Defendants were "acting to rescind or defer the funds Congress has appropriated and ha[d] no intent to spend them." *Id.* at 31. The President and senior officials had made "multiple public statements" confirming that Defendants were taking actions to end foreign aid funding. *Id.* Defendants "ha[d] not disputed this [was] their intent," notwithstanding multiple opportunities to do so in these proceedings. *Id.* at 32. And it was "uncontested" that Defendants "ha[d] not undertaken the procedures required for the impoundment of congressionally appropriated aid, whether permanent or temporary, by the Impoundment Control Act." *Id.*

Accordingly, the Court held that, under "settled, bedrock principles of constitutional law," Plaintiffs were likely to succeed on their separation-of-powers claim that Defendants were intentionally and unlawfully refusing to spend Congressionally appropriated funds. *Id.* at 33. "[I]f the authority to make law and control spending is to mean anything, it means the President may not disregard a statutory mandate to spend funds 'simply because of policy objections.'" *Id.* (quoting *In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013)). The Court also held that "Plaintiffs would be likely to succeed on their claim that Defendants acted *ultra vires*," because "Defendants do not identify any authority, statutory or otherwise, that would authorize this sort of vast cancellation of congressionally appropriated aid." *Id.* at 38 n.18.

The Court accordingly enjoined Defendants from "unlawfully impounding congressionally appropriated foreign aid funds," and ordered Defendants to "make available for obligation the full amount of funds that Congress appropriated for foreign assistance programs in the Further Consolidated Appropriations Act of 2024." *Id.* at 48.

The Court also enjoined Defendants "from enforcing or giving effect to sections 1, 5, 7, 8, and 9 of the January 24 State Department memorandum, and any other directives that implement sections 3(a) and 3(c) of Executive Order No. 14169, *by giving effect to any terminations*, suspensions, or stop-work orders issued between January 20, 2025, and February 13, 2025, for any grants, cooperative agreements, or contracts for foreign assistance." *Id.* at 47-48 (emphasis added). The Court enjoined Defendants from effectuating the pre-February 13 terminations after concluding that the actions that resulted in the terminations (the January 24 memorandum and other contemporaneous directives implementing Executive Order No. 14169) were likely arbitrary and capricious.

**B. Developments Since the Preliminary Injunction**

Immediately following the preliminary injunction, Plaintiffs asked Defendants how they intended to comply. ECF No. 61 at 4. Defendants provided only a broad, generalized statement that "unless the preliminary injunction is stayed or reversed or vacated on appeal, they intend[ed] to comply." *Id.*; *see id.* at 12.

After reviewing the parties' joint status report, on March 28, the Court directed that Defendants include in their next status report "(1) the steps they have taken to date to comply with the preliminary injunction's [anti-impoundment directive], and (2) any next steps necessary to come into compliance with that aspect of the Court's preliminary injunction." In response, Defendants stated that they "[r]ecogniz[ed] that the preliminary injunction applies until or unless

4

Defendants receive appellate relief from it," but again offered no concrete plan for compliance, stating only that "USAID and State continue to evaluate the appropriate next steps to address the provision in this Court's March 10, 2025, order regarding obligation of funds." ECF No. 67 at 4.

 In a May 6 hearing addressing, among other things, Defendants' compliance with the preliminary injunction, Defendants again failed to provide a plan for compliance with the anti-impoundment order, suggesting instead that they will obligate no funds at all until the D.C. Circuit rules on Defendants' appeal of the preliminary injunction. *See* 5/6/2025 Hr'g Tr. at 32 (suggesting that "with the decision on August 15th, there still would be time . . . to obligate the amount of funds" expiring on September 30).

Defendants' status reports confirm that they have taken no tangible steps to comply with the injunction. In status reports spanning three months, Defendants have repeated that they continue to "analyze" and "evaluate" "next steps" without providing any concrete plan as to how they intend to comply. *See* ECF 61 at 12 (Mar. 14 status report); ECF 67 at 3-4 (Apr. 3 status report); ECF 75 at 2 (Apr. 24 status report); ECF 79 at 2 (May 1 status report); ECF 84 at 2 (May 8 status report); ECF 86 at 2-3 (May 15 status report); ECF 87 at 2–3 (May 22 status report); ECF 88 at 2 (May 29 status report); ECF 90 at 2 (June 5 status report), ECF 93 at 2 (June 12 status report). Despite initially reporting that they were conducting a review of foreign assistance programs "to ensure those programs are aligned with the President's foreign policy agenda," Defendants subsequently confirmed that this review was "separate and apart from this case" and not in response to the preliminary injunction. 5/6/2025 Hr'g Tr. at 27. In any event, they have since reported that that review has been completed, without any indication as to how they now intend to comply with the Court's order. *See* ECF 67, at 2-3; ECF 79, at 2.

Spending data confirms that Defendants are not obligating the funding subject to the Court's injunction. Per USASpending.gov, USAID has obligated a paltry **$4.63 million** for contracts and grants since March 11.[1] The State Department has awarded just 132 grants representing $511 million in total obligations since the injunction was issued, and many of these obligations appear to be from appropriations other than the funds at issue here.[2]

Defendants have made clear that they intend to continue impounding foreign assistance funds. On March 10, Secretary Rubio announced that Defendants were "officially cancelling 83% of the programs at USAID,"[3] and as mentioned USAID has not awarded new funds to re-purpose the funds associated with these terminations. On March 28, the State Department sent a Congressional Notification stating, among other things, that numerous USAID functions "would be eliminated" or "abolished." Congressional Notification Transmittal Letter, March 28, 2025, at 4, http://bit.ly/42t0Yvn. The Notification indicated that "realign[ing]" certain USAID functions within the State Department and "phas[ing] out others" would help streamline government functions. *Id.* at 1. For example, consolidating USAID's global health programs into the State Department would "allow[] the Department's programs to achieve greater impact with fewer dollars." *Id.* at 5. The Notification also included a chart showing that USAID had nearly $24 billion in appropriations that remained unobligated. *Id.* at 8-9. The Notification gave no indication as to how the State Department intended to obligate these funds in light of its proposed plans to eliminate USAID programs.

---

[1] https://www.usaspending.gov/search?hash=d94ebe64093a7cbb621a781340130c7c.
[2] https://www.usaspending.gov/search?hash=81673e7b34b1c6aaa8a6e864b4aee3ce.
[3] @Marco Rubio, Mar. 20, https://x.com/marcorubio/status/1899021361797816325.

Defendants have also strongly suggested that they will employ a tactic for impounding funds known as "pocket rescission."[4] If the President transmits a special message proposing that funds be rescinded—more than 45 congressional session days before the funds expire—the Impoundment Control Act allows the Administration those 45 days to refrain from spending funds while Congress considers that proposal. 2 U.S.C. § 683(b). In their D.C. Circuit brief in this case, and in their opposition to the motion to enforce in *AVAC*, Defendants have suggested that the Administration could wait until less than 45 days before the end of the fiscal year, submit a rescission proposal to Congress at that point, and then claim that the funds expired during the 45-day period—thus purportedly relieving the Administration of the requirement to ever obligate the funds. Defs. Br. 45-46, No. 25-5097 (D.C. Cir. May 9, 2025); Defs. Opp'n to Mot. to Enforce the Prelim. Inj, at 4-6, *AVAC*, No. 25-cv-400 (D.D.C. June 23, 2025). The Government Accountability Office has rejected the argument that the ICA permits pocket rescissions, GAO, *Impoundment Control Act—Withholding of Funds Through Their Date of Expiration*, B-330330 (Dec. 10, 2018), yet Defendant Vought has explicitly stated recently that the Administration plans to attempt this tactic. He stated on CNN, for instance: "The very Impoundment Control Act itself allows for a procedure called pocket rescissions, later in the year, to be able to bank some of these savings, without the bill actually being passed. . . . It's a provision that has been rarely used. But it is there. And we intend to use all of these tools."[5]

---

[4] On June 3, 2025, the President submitted a rescission proposal to Congress under the Impoundment Control Act, including proposed rescissions of certain foreign-aid appropriations. *See* Proposed Rescissions of Budgetary Resources at 2–17 (May 28, 2025). But the proposed foreign assistance rescissions concern only funds appropriated in Fiscal Year 2025, and not funds appropriated in Fiscal Year 2024 and prior years that are expiring in September 2025. *Id.*

[5] Jennifer Scholtes, *White House Floats a New Funding Trick — And GOP Lawmakers Grimace*, Politico (June 20, 2025), https://www.politico.com/news/2025/06/20/pocket-rescissions-white-house-funding-trick-00410444; *see also* Tony Romm, *White House Eyes Rarely Used Power to Override Congress on Spending*, N.Y. Times (June 17, 2025),

Regarding terminations issued prior to February 13, Defendants have forged ahead in effectuating those terminations, despite the Court's injunction prohibiting such action. In May, Defendant Lewin approved an Action Memo "to effectuate" the 462 award terminations issued prior to February 13. Ex. A at 1, 3. Thereafter, USAID's Chief Acquisition Officer directed staff "to effectuate the terminations of awards issued prior to February 13, 2025." Ex. B.

## LEGAL STANDARD

"[F]ederal courts are not reduced to issuing injunctions . . . and hoping for compliance." *Hutto v. Finney*, 437 U.S. 678, 690 (1978). "Once issued, an injunction may be enforced." *Id.* "A court's powers to enforce its own injunction by issuing additional orders is broad, particularly where the enjoined party has not fully complied with the court's earlier orders." *Kifafi v. Hilton Hotels Ret. Plan*, 79 F. Supp. 3d 93, 100 (D.D.C. 2015) (quotation marks omitted).

## ARGUMENT

### I.    Defendants Are Violating the Preliminary Injunction

The Court's preliminary injunction is clear: Defendants cannot "unlawfully impound[] congressionally appropriated foreign aid funds" and "shall make available for obligation the full amount of funds that Congress appropriated for foreign assistance programs in the Further Consolidated Appropriations Act of 2024." PI Op. 48. In the three-and-a-half months since the Court issued that injunction, Defendants have spent virtually none of the impounded funds, including many billions in funds that will expire on September 30, 2025. *See, e.g*, ECF No. 79 ¶ 8.

---

https://www.nytimes.com/2025/06/17/us/politics/trump-vought-congress-Spending-rescission.html.

Defendants' failure to spend the funds at issue plainly violates the Court's order.

Defendants have not obligated the vast majority of expiring foreign assistance funds, nor have

they taken affirmative steps to obligate those funds. Defendants instead say that they will wait to

spend any funds until—at the earliest—the D.C. Circuit resolves their appeal in mid-August. *See*

5/6/2025 Hr'g Tr. At 32. In their opposition to the motion to enforce in *AVAC*, they assert that

even with "an adverse decision from the D.C. Circuit by August 15, 2024," "sufficient time

remains for USAID and State to obligate any presently unobligated funds, *or take other*

*appropriate action consistent with applicable law*." *AVAC*, ECF No. 106 at 3-4 (emphasis

added). The "other appropriate action" appears to refer to a pocket rescission, as confirmed by

Defendants' misplaced insistence that the ICA "places no limit on how late in the fiscal year a

President may propose funds for rescission … and may withhold funds pending Congressional

consideration of such a rescission proposal." *Id.* at 5. To the extent Defendants intend to actually

obligate the appropriated funds, the notion that there is sufficient time to do so starting in mid-

August is based on nothing more than Defendant Lewin's bare statement in his declaration that,

"In [his] experience, Defendants should have sufficient time to obligate foreign assistance funds

that would otherwise expire on September 30, 2025, if the process begins by August 15, 2025."

*Id.*, ECF No. 106-1 ¶ 7. Lewin provides no factual basis for this assertion, nor does he articulate

what "experience" he is referencing given that he has never served as a government employee

before this Administration, and USAID has not been entering new obligations since he joined the

agency. Lewin's unexplained assertion contradicts all available evidence, discussed below.

The Court's preliminary injunction simply does not give Defendants license to do nothing

for months while they appeal the injunction to the D.C. Circuit—especially considering that they

never moved for a stay pending appeal. The injunction "enjoin[s]" Defendants from "unlawfully

impounding" funds and orders that Defendants "shall" make those funds available for obligation. PI Op. 48. Those obligations are binding on Defendants *now*, and have been binding for months. Defendants' inaction perpetuates the unconstitutional deferral and rescission of funds the Court's preliminary injunction was designed to prevent, in multiple ways.

First, the Court held that Defendants may not delay spending billions in appropriations based on objections to Congress's policies in appropriating the funds. ECF 60 at 36. Consistent with D.C. Circuit precedent, the Court rejected Defendants' contentions that their wholesale pause in spending appropriations is the type of "trivial" or "programmatic" delay that does not raise constitutional concerns. *Id.* (citing *City of New Haven v. United States*, 809 F.2d 900, 901 (D.C. Cir. 1987)); *see also* GAO, *Office of Management and Budget—Withholding of Ukraine Security Assistance*, B-331564, at 6 (Jan. 16, 2020), https://perma.cc/6TMT-3CH2. In their response in *AVAC*, Defendants now suggest that there cannot be an unlawful deferral so long as OMB is responsible for the delay, by refusing to apportion funds to the agency, but that is nonsensical. *AVAC*, ECF No. 106 at 4. The purpose of apportionment is the opposite of impoundment: it is to prevent agencies from spending funds *too quickly*. *See* 31 U.S.C. § 1512(a).

Yet Defendants' response to the preliminary injunction has been to double down on their unlawful delays, as if the Court never entered an injunction at all. While there could be more complicated compliance questions if Defendants were obligating foreign aid appropriations at *some* rate, there are no difficulties in assessing Defendants' compliance with the injunction when their rate of spending is effectively *zero*.

Second, Defendants appear to intend to allow billions in funds to expire at the end of the fiscal year. Defendants' intent to permanently impound these funds is apparent from their many

10

recent public statements, *supra* 4-7, their arguments in the related case that the ICA poses "no limit" on pocket rescissions, *id.*, and their failure to take any of the time-sensitive steps necessary to issue new contracts and grants in order to obligate the funds before September 30. The process of obligating funds is lengthy and time-consuming. USAID's "Procurement Action Lead Times" (PALT)—meaning the amount of time between when an agency announces a funding opportunity and when it issues an award—illustrate the point. For competitive grants and cooperative agreements, USAID's PALT is 150 days. Ex. C. at 15. The time required to award contracts is even longer. For competitive Definite Contracts, the PALT is 268 days. *Id.* In his declaration in *AVAC*, Lewin does not explain how these timelines can be reconciled with his assertion that "the process to award contracts and grants, and then obligate funds for those contracts and grants can generally be completed in six weeks." *AVAC*, ECF No. 106-1, ¶ 6.

Indeed, the PALT timelines derive, in part, from regulatory requirements. As relevant to grants and cooperative agreements, OMB's Uniform Guidance, which USAID has adopted, *see* 2 C.F.R. § 700.2, requires federal agencies to go through a multi-step process before obligating appropriated funds. *See* 2 C.F.R. § 200.201-211. The agency "must" issue a public notice of funding opportunity (NOFO). *Id.* § 200.204. Because of the detailed information requested, just completing a grant application can take "weeks." *The Grant Lifecycle*, Grants.gov, https://www.grants.gov/learn-grants/grants-101/the-grant-lifecycle. Thus, agencies generally "should make all funding opportunities available for application for at least 60 calendar days." *Id.* § 200.204(b). And "no funding opportunity should be available for less than 30 calendar days unless the Federal agency determines that exigent circumstances justify this." *Id.* Once a NOFO closes, the agency review process generally takes "1-3 months." *See What is the Grant Lifecycle?*, Grants.gov Community Blog (Sept. 19, 2016), https://grantsgovprod.wordpress.com/

2016/09/19/what-is-the-grant-lifecycle. The agency may also seek to negotiate with the applicant before deciding whether to grant an award. Finally, at the conclusion of this process, the agency will issue the award, which itself can take additional weeks or months.

The process for awarding government contracts can be even more complex and time-consuming. *See* Dominick A. Fiorentino, Cong. Research Serv., RS22536, *Overview of the Federal Procurement Process and Resources* ("Process Overview") (2023). That process is governed by the more than 2,000-page *Federal Acquisition Regulation*, and typically begins with the agency transmitting a "notice of proposed contract action" to the "governmentwide point of entry (GPE)." *See* 48 C.F.R. § 5.203(a); *id.* § 5.003. The notice must generally be published at least 15 days before issuing the solicitation. *Id.* § 5.203(a). The contracting officer then establishes a deadline for potential contractors to submit their proposals (usually at least 30 or 45 days). *Id.* § 5.203(b)-(e). Once those proposals are submitted, the agency then reviews the proposals using the "source selection methods"—usually either sealed bidding or negotiated contracting, which can take additional time. *See* Process Overview at 2, 7. And at the conclusion of this process, disgruntled bidders can protest the award, which can result in further delay. *See* 4 C.F.R. §§ 21.1(a), 21.6.

Defendants have provided no explanation how they intend to obligate all of the funds set to expire in September given these timelines and multi-step processes for issuing awards. Defendants certainly have not articulated how they will obligate funds in time if they wait until mid-August or later to even begin these processes. As described below, the Court should require Defendants to begin these processes now if Defendants will need to issue new awards to comply with the injunction. Or, if Defendants intend to meet the injunction's obligation requirements by restoring terminated awards, or in some other fashion, they should say so.

Defendants are independently violating the portion of the preliminary injunction that prohibits Defendants from "giving effect to any terminations . . . issued between January 20, 2025, and February 13, 2025." ECF No. 60 at 48. Defendants themselves described their moving ahead with these terminations as "effectuating the terminations of awards issued prior to February 13, 2025." Ex. B; *see also* Ex. A. On their face, therefore, Defendants' actions violate the language of the injunction.

## II.    The Court Should Enforce Its Injunction

In the face of Defendants' continued failure to comply, the Court should exercise its "broad" powers to enforce its preliminary injunction. *Kifafi*, 79 F. Supp. 3d at 100. There are at least six measures the Court can and should take to ensure compliance.

### 1.    The Court Should Confirm That Defendants Must Obligate Funds in Accordance with the Specific Directives of the Relevant Appropriations Act

Given Defendants' statements that they have eliminated or are actively eliminating entire functions and programs of USAID, *supra* 6-7, the Court should confirm that Defendants must obligate the appropriations expiring in September in accordance with Congress' specific directives for how USAID and State must spend the funds.

The 2024 Appropriations Act, and the appropriations acts from prior years that still have unexpired funds, appropriated specific pots of money to USAID and the State Department for specific purposes. The 2024 Act appropriated funds to USAID and the State Department for HIV/AIDS prevention, treatment, and research ($6 billion); other global health programs ($4 billion); development assistance ($3.9 billion); international disaster assistance ($4.8 billion), transition initiatives ($75 million); the Complex Crises Fund ($55 million); the Economic Support Fund ($3.9 billion); the promotion of democracy globally ($205 million); assistance for Europe, Eurasia, and Central Asia ($770 million); migration and refugee assistance ($3.9

billion); and the U.S. Emergency Refugee and Migration Assistance Fund ($100,000). *See* Pub. L. No. 118-47, 138 Stat. 460, 739-43. The collective $13 billion in appropriations for global health programs, development assistance, the Economic Support Fund, democracy programs, and assistance for Europe, Eurasia, and Central Asia are available only until September 30, 2025.

Congress was even more prescriptive in mandating how Defendants must spend the appropriations within the above categories. The 2024 Appropriations Act and prior years' acts directed that "funds appropriated by this Act [for foreign assistance] shall be made available in *the amounts specifically designated* in the respective tables included in the explanatory statement" appended to the Act. *See* Pub L. No. 118-47, div. F, tit. III, 138 Stat. at 771) (emphasis added). Those tables specify the amount of funds that must be spent on dozens of specific programs and activities. *See* Ex. D at 1170-74. Section 7019(b) provides that Defendants "may only deviate up to 10 percent from the amounts specifically designated in the respective tables," subject to conditions and exceptions, and the limited authority to deviate does not apply to global health programs. 138 Stat. at 771.

Congress further specified in the 2024 Appropriations Act that "of the amounts appropriated" under the Act, "not less than" certain dollar amounts "shall be made available" for particular purposes, including but not limited to specific foreign assistance sectors (*see, e.g.*, Pub L. No. 118-47 § 7060), programs and initiatives (*see, e.g.*, §§ 7030, 7059, 7061); and regions and countries (*see, e.g.*, §§ 7041(a)(1), 7043, 7044, 7045). These minimum required spending amounts collectively add up to many billions of dollars.

14

The Court should require Defendants to obligate all funds that expire in September

2025—from the 2024 Appropriations Act and prior acts—in accordance with Congress's

directives for how Defendants must spend the funds.[6]

### 2. The Court Should Require Defendants to Submit a Plan for Compliance

The Court should require Defendants to submit a detailed plan outlining how they intend

to obligate all of the expiring appropriated funds in accord with Congress' directives, and by the

September 30, 2025 obligation deadline. Defendants assert in their response to the *AVAC* motion

that requiring production of such a plan "would improperly override the Government's

deliberative process privilege." *AVAC*, ECF No. 106 at 6. Even assuming that a statement of

steps that a litigant will take to comply with a judicial order could constitute predecisional and

deliberative information, the Court should reject this argument for two reasons. First, Defendants

have waived any privilege through Lewin's assertion that Defendants "have already undertaken

preparations to be ready to obligate expiring foreign assistance funds on a short timeline as

necessary." *AVAC*, ECF No. 106-1, ¶ 6. A party cannot use a privilege "both as a sword and a

shield," and thus "where a party raises a claim which in fairness requires disclosure of the

protected communication, the privilege may be implicitly waived." *Savignac v. Jones Day*, 763

F. Supp. 3d 17, 25 (D.D.C. 2025); *see also Recycling Sols., Inc. v. District of Columbia*, 175

F.R.D. 407, 408–09 (D.D.C. 1997). That is precisely what Defendants attempt to do here, and

therefore the privilege is waived.

Second, even if Defendants' plans for compliance fell within the deliberative process

privilege and were not waived, "[t]he deliberative process privilege is a qualified privilege and

---

[6] Of course, Defendants must honor the obligations they enter to comply with the preliminary injunction. Plaintiffs reserve the right to seek further relief should Defendants not follow through in disbursing funds pursuant to those obligations.

can be overcome by a sufficient showing of need." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997). "This need determination is to be made flexibly on a case-by-case, ad hoc basis," based on a balancing of "the relevance of the evidence, the availability of other evidence, the seriousness of the litigation, the role of the government, and the possibility of future timidity by government employees." *Id.* at 737-38. All of these factors weigh in favor of disclosure here. The evidence is highly relevant to whether and how Defendants intend to comply with the injunction, the information is not available from other sources, the seriousness of the litigation here is plain, and concerns over the effect on other government employees is limited in the context of a violation of an injunction, which hopefully remains rare. Thus, if necessary, the Court should find any privilege overcome. *See, e.g.*, *Doe 2 v. Esper*, 2019 WL 4394842, at *9-10 (D.D.C. Sept. 13, 2019).

### 3. The Court Should Require Defendants to Immediately Take all Steps Necessary to Obligate Funds Before They Expire

The Court should further order Defendants to *immediately* take all necessary measures to obligate the funds at issue before they lapse on September 30, 2025, and to file weekly status reports updating the parties and the Court on the specific steps Defendants have taken to carry out the plan they have submitted to the Court.

To the extent Defendants will have to restore the terminated awards to comply with the injunction, the Court should require Defendants to make that clear and set forth a schedule for rescinding the terminations and obligating expiring funds to those awards prior to September 30.

To the extent that Defendants will issue new contracts, grants, and cooperative agreements to comply with the injunction, the Court should require Defendants to take immediate steps including posting NOFOs and bid. Defendants have had months to figure out how to spend the funds consistent with the injunction. Any further delay will likely render it

impossible for them to obligate all of the expiring funds given the lengthy time it takes to solicit and issue awards, as described above. If Defendants believe they have a way to obligate the funds without observing the usual regulatory processes—while still following Congress' specific directives on how to spend the funds—they should tell the Court and Plaintiffs. Absent such explanation, Defendants should be required to start the obligation process now.

### 4.    The Court Should Confirm That the Injunction Requires Obligating the Funds Regardless of Any Attempted Pocket Rescission

The Court should similarly make clear that the injunction requires Defendants to obligate all of the relevant appropriations, no matter whether Defendants attempt a "pocket rescission." As mentioned, Defendants have previewed in public statements, in their D.C. Circuit brief, and in their opposition to the *AVAC* motion to enforce that they will likely attempt to weaponize the Impoundment Control Act to impound funds: they will wait until less than 45 days remain before September 30, send a rescission proposal for the expiring funds at that point, and then claim that the funds expired during the 45-day period described under 2 U.S.C. § 683(b). *See supra*, 6-7.

This Court can and should make clear that Defendants may not leverage their ongoing noncompliance to impound funds, through a pocket rescission or otherwise. Whether it is an attempted pocket rescission or because Defendants claim there is not enough time to obligate the funds, Defendants cannot take advantage of their disregard of the preliminary injunction to accomplish the very unconstitutional goal that the Court enjoined. Regardless of whether a pocket rescission is lawful in the abstract (and it is not), the Court should confirm that future actions by Defendants will not relieve them of their current duty under the injunction to spend all of the relevant funds before they expire.

But given Defendants' strong suggestion that they will attempt a pocket rescission here, the Court should also hold that Defendants' interpretation of the ICA is incorrect, both as a

matter of plain text and because the ICA would be unconstitutional if it allowed for pocket rescissions. As Defendants acknowledge in their *AVAC* response, *see* ECF No. 106 at 5, GAO in a 2018 decision thoroughly debunked Defendants' interpretation of the statute. "The plain language of [2 U.S.C. § 683(b)] provides that absent Congress's completion of action on a rescission bill rescinding all or part of amounts proposed to be rescinded within the prescribed 45-day period, *such amounts must be made available for obligation*." GAO, B-330330, at 5 (Dec. 10, 2018). Funds cannot be "made available for obligation" if they have expired, meaning an agency must obligate the funds before they expire "unless, within the prescribed 45-day period, the Congress has completed action on a rescission bill." 2 U.S.C. § 683(b). Indeed, the whole point of the 45-day window is to give Congress time to "consider" a rescission proposal, but Congress has no need to "consider" repealing appropriations once they have expired. B-330330, at 5-6; *see* 2 U.S.C. § 688. This reading of the ICA accords with Congress' obvious intent in enacting the ICA, which was to settle once and for all that the President may not impound funds without action by Congress. Defendants' pocket-recission theory would transform the ICA into a tool that *enables* the President to impound funds. This Court "should not lightly conclude that Congress enacted a self-defeating statute." *Borden v. United States*, 593 U.S. 420, 460 (2021) (quotations omitted).

Moreover, the ICA must not be read to permit pocket rescissions as a matter of constitutional avoidance. Defendants' theory—under which the President may wait until the eleventh hour to propose a rescission and the funds then expire unless Congress affirmatively votes down the proposal—is a near-replica of the Line-Item Veto Act of 1996, struck down in *Clinton v. City of New York*, 524 U.S. 417 (1998). Just like Defendants' theory of the ICA here, the Line-Item Veto Act allowed the President to send a special message to Congress that he

intended to cancel appropriations, and the cancellation would be effective unless Congress affirmatively stepped in and passed a disapproval bill. *Id.* at 436-37. Defendants' pocket rescissions paradigm would be unconstitutional for all the same reasons as the Line-Item Veto Act. And again, the whole point of the ICA was to conclusively reject the Executive Branch's view that it may decline to spend duly enacted appropriations—not to supply the Executive Branch with one neat trick for impounding funds.

### 5. The Court Should Specify It Will Extend the Period of Availability If Needed

The Court should require Defendants to make every possible effort to obligate the expiring funds before September 30. Defendants should not be heard to suggest they cannot meet this deadline given that they have been under the preliminary injunction since early March, and given that Defendants have assured the Court that they can obligate the funds in time. *See* 6/5/2025 Tr. at 33. But the Court should also make clear that it will take additional measures if needed to ensure that appropriated funds are not impounded.

In particular, as a last resort, the Court may exercise its equitable authority to extend the appropriations' period of availability. The D.C. Circuit "has repeatedly 'reaffirmed the power of the courts to order that funds be held available beyond their statutory lapse date if equity so requires.'" *Connecticut v. Schweiker*, 684 F.2d 979, 997 (D.C. Cir. 1982) (quoting *Nat'l Ass'n of Reg'l Councils v. Costle*, 564 F.2d 583, 588 (D.C. Cir. 1988)). Where equity requires, a court may "simply suspend the operation of a lapse provision and extend the term of already existing budget authority." *City of Houston, Tex. v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1426 (D.C. Cir. 1994) (quoting *Costle*, 564 F.2d at 588). The Court may exercise this equitable power so long as a plaintiff "both file[s] its suit before the relevant appropriation lapses and seek[s] a preliminary injunction" before the expiration. *Id.* at 1427.

For example, in *Shawnee Tribe v. Mnuchin*, 984 F.3d 94 (D.C. Cir. 2021), the plaintiff brought an APA challenge to the manner in which the Treasury Secretary had allocated and distributed funds to tribes under the CARES Act. *Id.* at 96. During the pendency of the suit, the relevant appropriation lapsed. *Id.* at 98-99. Relying on *City of Houston*, the court concluded that notwithstanding the lapse, the case was not moot because the plaintiff had filed suit before the deadline. *Id.*; *see also* 1 GAO, *Principles of Federal Appropriations Law* 5-85 (3d ed. 2004) ("As long as the suit is filed prior to the expiration date, the court acquires the necessary jurisdiction and has the equitable power to 'revive' expired budget authority.").

If ever there were a case for a court to exercise this equitable authority, it is this one. This Court has found that Defendants have sought to impound tens of billions in foreign assistance appropriations, and they have continued in this effort even in the face of an injunction requiring them to spend the funds. Defendants should not be permitted to run out the clock. Plaintiffs therefore respectfully request that the Court explain that it will extend the period of availability, if needed, for Defendants to obligate all of the relevant funds. Defendants must know that further delay tactics will not succeed.[7]

### 6. The Court Should Reaffirm That Defendants May Not Effectuate Pre-February 13 Terminations

Finally, the Court should reaffirm that Defendants may not give effect to terminations issued prior to February 13, 2025, at least without the consent of the funding recipient. In so doing, the Court should enjoin Defendants from carrying out the Action Memo signed by Defendant Lewin, *see* Ex. A, and the subsequent directive from the USAID Chief Acquisition

---

[7] Extending the period of availability would be another means to moot Defendants' theory that the ICA permits pocket rescissions. The Court could extend the period of availability until some time after any 45-day period following a rescission proposal has elapsed. *See* 2 U.S.C. § 683(b).

Officer based on that Action Memo, *see* Ex. B. Unless the funding recipient agrees otherwise, Defendants should be prohibited from taking any future action to effectuate the terminations dated prior to February 13, and should be required to reverse any actions taken since the preliminary injunction to effectuate these terminations.

## CONCLUSION

For the above reasons, the Court should grant Plaintiffs' motion to enforce the preliminary injunction, and enter the attached proposed order.

Dated: June 24, 2025                                Respectfully submitted,

                                                    */s/ Daniel F. Jacobson*
                                                    Daniel F. Jacobson (D.C. Bar 1016621)
                                                    John Robinson (D.C. Bar 1044072)
                                                    Nina Cahill*
                                                    JACOBSON LAWYERS GROUP PLLC
                                                    1629 K Street NW, Suite 300
                                                    Washington, DC 20006
                                                    Tel: (301) 823-1148
                                                    dan@jacobsonlawyersgroup.com

                                                    William C. Perdue (D.C. Bar 995365)
                                                    Sally L. Pei (D.C. Bar 1030194)
                                                    Samuel M. Witten (D.C. Bar 378008)
                                                    Stephen K. Wirth (D.C. Bar 1034038)
                                                    Samuel F. Callahan (D.C. Bar 888314461)
                                                    Dana Kagan McGinley (D.C. Bar 1781561)
                                                    Allison Gardner (D.C. Bar 888303942)
                                                    Daniel Yablon (D.C. Bar 90022490)
                                                    ARNOLD & PORTER KAYE SCHOLER LLP
                                                    601 Massachusetts Ave., NW
                                                    Washington, DC 20001-3743
                                                    Tel: (202) 942-5000
                                                    stephen.wirth@arnoldporter.com

                                                    *application for admission pending

                                                    *Counsel for Plaintiffs*