# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| GLOBAL HEALTH COUNCIL, *et al.*,<br><br>       *Plaintiffs*,<br><br>   v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>       *Defendants*. | Civil Action No. 25-cv-402 (AHA) |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE THE PRELIMINARY INJUNCTION

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

ARGUMENT ...................................................................................................... 4

I.  GHC's Proposed Enforcement Relief Is Unsustainable Because Defendants Are Complying With The Preliminary Injunction's Appropriations Provision ......................... 4

II.  Adequate Time Remains For Defendants To Comply With The Preliminary Injunctions' Appropriations Provision If The D.C. Circuit Rules By August 15, 2025 As The Parties Have Requested ................................................................. 14

III.  Neither An Appropriations Compliance Plan Nor Any Purported Equitable Modification Of The Period Of Availability Of Funds Is Warranted .............................. 15

    A.  The Appropriations Compliance Plan Proposal Is Flawed ................................... 15

    B.  An Order Extending The Period Of Availability Would Be Improper In This Context And Is Unwarranted In Any Event ................................................ 18

IV.  Any Enforcement Relief On The Appropriations Provision Is Properly Confined To The GHC Plaintiffs, And Cannot Run To Non-Parties, Under *Trump v . CASA, Inc*. ............................................................................................................. 21

V.  The Preliminary Injunction Did Not Restrain Defendants From Individually Reviewing And Ratifying Award Terminations Predating This Court's TRO ................. 22

VI.  Prudential Concerns Militate Against Entertaining Plaintiffs' Motion ........................... 24

CONCLUSION .................................................................................................. 26

# TABLE OF AUTHORITIES

**CASES**

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State, (AVAC),*
  766 F. Supp. 3d 74 (D.D.C. 2025) ............................................................................. 23

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State, (AVAC),*
  768 F. Supp. 3d 1 (D.D.C. 2025) ......................................................................... 24, 25

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State, (AVAC),*
  768 F. Supp. 3d 26 (D.D.C. 2025) ............................................................................ 24

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State, (AVAC),*
  770 F. Supp. 3d 121 (D.D.C. 2025) ................................................................ 3, 4, 5, 21, 24

\*    *Am. Ins. Ass'n v. Garamendi,*
  539 U.S. 396 (2003) ................................................................................................ 20

*Athridge v. Iglesias,*
  464 F. Supp. 2d 19 (D.D.C. 2006) ....................................................................... 5, 25

*Bowsher v. Synar,*
  478 U.S. 714 (1986) ................................................................................................ 10

\*    *Bureau of Nat'l Affairs, Inc. v. U.S. Dep't of Justice,*
  742 F.2d 1484 (D.C. Cir. 1984) ......................................................................... 15, 16

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) ................................................................................................ 22

*City of Houston v. Dep't of Hous. & Urban Dev.,*
  24 F.3d 1421 (D.C. Cir. 1994) ................................................................................ 18

*Clinton v. City of New York,*
  524 U.S. 417 (1998) ................................................................................................ 13

*Dep't of Educ. v. California,*
  145 S. Ct. 966 (2025) .............................................................................................. 19

*Doe v. Esper,*
  No. 17-cv-1597, 2019 WL 4394842 (D.D.C. Sept. 13, 2019) ................................. 17

*Elec. Frontier Found. v. DOJ,*
  739 F.3d 1 (D.C. Cir. 2014) ..................................................................................... 16

*Envt'l Prot. Agency v. Mink,*
    410 U.S. 73 (1973) ................................................................. 18

*Goodluck v. Biden,*
    104 F.4th 920 (D.C. Cir. 2024) ............................................. 18

*Great-West Life & Annuity Ins. Co. v. Knudson,*
    534 U.S. 204 (2002) ............................................................... 19

*Grupo Mexicano de Desarrollo, S. A. v. All. Bond Fund, Inc.,*
    527 U.S. 308 (1999) ............................................................... 21

\*   *In re Sealed Case,*
    121 F.3d 729 (D.C. Cir. 1997) .......................................... 16, 17

*INS v. Legalization Assistance Project of L.A. Cnty. Fed'n of Labor,*
    510 U.S. 1301 (1993) ............................................................. 22

*Jama v. Immigr. & Customs Enf't,*
    543 U.S. 335 (2005) ............................................................... 13

*Nat'l Ass'n of Reg'l Councils v. Costle,*
    564 F.2d 583 (D.C. Cir. 1977) .............................................. 18

*Parker v. DOJ Off. of Pro. Resp.,*
    278 F. Supp. 3d 446 (D.D.C. 2017) ...................................... 16

*Recycling Sols., Inc. v. District of Columbia,*
    175 F.R.D. 407 (D.D.C. 1997) ............................................. 17

*Rochester Pure Waters Distr. v. EPA,*
    960 F.2d 180 (D.C. Cir. 1992) .............................................. 19

*Savignac v. Jones Day,*
    763 F. Supp. 3d 17 (D.D.C. 2025) ........................................ 17

*Tax Analysts v. I.R.S.,*
    117 F.3d 607  (D.C. Cir. 1997) ............................................. 17

\*   *Trump v. CASA, Inc.,*
    No. 24A884, 2025 WL 1773631 (U.S. June 27, 2025) ......... 2, 21, 22

*Turkiye Halk Bankasi A.S. v. United States,*
    598 U.S. 264 (2023) ................................................................. 7

*United States v. Oakland Cannabis Buyers' Co-op,*
    532 U.S. 483 (2001) ............................................................... 18

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
  576 U.S. 1 (2015) .......................................................................................... 21

**CONSTITUTION**

U.S. Const. art. I, § 8, cl. 3 ............................................................................ 20

U.S. Const. art. I, § 8, cl. 11 .......................................................................... 20

**STATUTES**

2 U.S.C. § 682 ................................................................................................... 8

2 U.S.C. § 683 ......................................................................................... 8, 10, 11

2 U.S.C. § 684 ........................................................................................... 10, 11

22 U.S.C. § 2151a ............................................................................................. 7

22 U.S.C. § 2151b ........................................................................................ 7, 21

22 U.S.C. § 2151c ............................................................................................. 7

22 U.S.C. § 2151d ............................................................................................. 7

22 U.S.C. § 2174 ............................................................................................... 7

22 U.S.C. § 2291 ............................................................................................... 7

22 U.S.C. § 2346 ............................................................................................... 7

22 U.S.C. § 2348 ............................................................................................... 7

22 U.S.C. § 2349aa ........................................................................................... 7

22 U.S.C. § 2382 ............................................................................................. 21

22 U.S.C. § 2395 ............................................................................................... 7

31 U.S.C. § 1502 ........................................................................................ 18, 19

31 U.S.C. § 1512 .......................................................................................... 8, 16

31 U.S.C. § 1513 .......................................................................................... 8, 16

31 U.S.C. § 1558 ............................................................................................. 19

Continuing Appropriations Act, 2020, Pub. L. No. 116-59, 133 Stat. 1093 (2019) .................... 12

Continuing Appropriations Act, 2023, Pub. L. No. 117-180, 136 Stat. 2114 (2022) .................. 12

Pub. L. 118-47, 138 Stat. 460 (March 23, 2024). ........................................................... 4, 6, 9, 20

## LEGISLATIVE HISTORIES

167 Cong. Rec. H7593 (daily ed. Dec. 9, 2021).......................................................................... 12

Congressional Power of the Purse Act, H.R. 6628, 116th Cong. § 101 (2020)........................... 12

Protecting Our Democracy Act, H.R. 5314, 117th Cong. § 501 (2021) ..................................... 12

Protecting Our Democracy Act, H.R. 5048, 118th Cong. § 501 (2023) ..................................... 12

S. Rep. No. 94-403 (1975)........................................................................................................... 12

## REGULATIONS

48 CFR § 706.302-70(a)(2)........................................................................................................... 15

## OTHER AUTHORTIES

1 GAO, Principles of Federal Appropriations Law,
    2004 WL 5661416 (Jan. 2004) (GAO Redbook)............................................................... 18, 19

2 GAO, Principles of Federal Appropriations Law (3d ed. 2006) (GAO Red Book)................ 6, 7

GAO B-115398 (Aug. 12, 1975),
    https://www.gao.gov/assets/acg-76-5.pdf ...............................................................................11

GAO B-115398 (Dec. 15, 1975),
    https://www.gao.gov/assets/acg-76-12.pdf .......................................................................11, 12

GAO B-115398 (Aug. 27, 1976),
    https://www.gao.gov/assets/b-115398.33-d19688.pdf............................................................11

GAO B-115398 (Oct. 26, 1977),
    https://www.gao.gov/products/ogc-78-2 .................................................................................11

GAO B-220532 (Sept. 19, 1986),
    https://www.gao.gov/assets/ogc86-22.pdf ..............................................................................11

GAO, B-330330 (Dec. 10, 2018),
    https://www.gao.gov/assets/b-330330.pdf .........................................................................10, 11

Letter from Mark R. Paoletta, General Counsel, OMB, to Tom Armstrong, General Counsel, GAO (Nov. 18, 2018), *available at* https://trumpwhitehouse.archives.gov/wp-content/uploads/2019/11/Letter-to-GAO-on-Rescissions.pdf (2018 OMB Ltr.) ................10, 11

*The President's Veto Power*, 12 Op. O.L.C. 128 (1988) .............................................................. 13

*Whether Appropriations May Be Used for Informational Video News Releases*, 2005 WL 8167269 (O.L.C. Mar. 11, 2005) .............................................................................. 10

## INTRODUCTION

GHC Plaintiffs have moved to purportedly enforce the preliminary injunction of March 10, 2025, seeking entry of an order that would drastically expand the decree by imposing new requirements on Defendants not supported by the Court's prior rationale and poorly timed in light of the pending expedited appeal slated for oral argument next week and prompt decision thereafter.

*First*, Plaintiffs have not identified any applicable statutory requirement that the Executive Branch expend all of the appropriated funds here. Plaintiffs err in relying on appropriations tables that are aimed at giving direction to the Executive Branch about how to allocate portions of the lump-sum appropriations to certain uses, not at directing the Executive Branch to spend all of the appropriated funds. Here, the relevant context omitted by Plaintiffs makes clear that Congress intended the Executive Branch to exercise discretion over how to expend these appropriations of foreign assistance funds, consistent with the President's lead role in crafting foreign policy. Moreover, Plaintiffs have not identified any applicable statutory requirement that the Executive Branch expend the appropriated funds immediately. Rather, Defendants' evaluation of the appropriate next steps within the time available under the Further Consolidated Appropriations Act (FCAA), 2024 remains lawful. Also mistaken is Plaintiffs' assertion that the Impoundment Control Act of 1974 (ICA) prohibits Defendants from transmitting rescission proposals after 45 legislative days before the funds expire—*i.e.*, from using a "pocket rescission." The pertinent provision of the ICA does not require the President to make withheld budget authority available for obligation more than 45 days before the end of a fiscal year. Although legislation has sometimes been proposed to change that, those unenacted proposals show only that Congress has recognized the possibility of a pocket rescission, and Congress has not taken action to prevent them.

*Second*, as explained in the declaration accompanying this opposition, if State and USAID were required by court order to obligate funds within the approximately six-week period from

August 15, 2025 (the date by which the D.C. Circuit has been asked with Plaintiffs' consent to decide the PI appeal) to September 30, 2025 (the end of the fiscal year), they would be able to do so by exercising existing authorities that allow agency acceleration of contracting and grant-making processes, including but not limited to the authorities the declaration describes, which authorize exceptions and waivers from the customary "full and open competition" procedures and authorize modifications of existing contracts or an award of new contracts on an expedited basis.

*Third*, GHC Plaintiffs' demand for a compliance plan on the appropriations provision of the PI would improperly disclose internal proposals for the obligation of budget authority and hence flout the deliberative process privilege. And their request for an equitable modification of the period of availability for the funds expiring at the end of the fiscal year flouts established boundaries of the relevant D.C. Circuit decisions, which did not address funds subject to potential rescission proposals, and which also did not address the foreign relations context where the Executive has the lead role.

*Fourth*, insofar as the Court grants GHC Plaintiffs any purported "enforcement" relief as to the PI's appropriations provision, such relief would properly be limited to the GHC Plaintiffs only, not to any funding recipients not before the Court, given the restrictions on universal injunctions under *Trump v. CASA, Inc.*, No. 24A884, 2025 WL 1773631 (U.S. June 27, 2025).

*Fifth*, contrary to Plaintiffs' contention, the March 10, 2025 preliminary injunction opinion did not invalidate all terminations before February 13, 2025, but instead adhered to the Court's previous recognition that it was *not* constraining individual award decisions based on applicable statutes, regulations, and award provisions. Hence, State and USAID leadership acted consistent with the PI when they authorized agency personnel to implement terminations that agencies had

announced pre-TRO but that agencies confirmed post-TRO were warranted under applicable award terms and regulations.

*Sixth*, given that the pending expedited appeal from the PI is calendared for oral argument next week, this Court should refrain from taking any additional steps, including granting a motion to enforce, to avoid burdening the Court of Appeals with potential new complications resulting from the last-minute reconfiguration of the PI that GHC Plaintiffs seek to obtain.

Hence, the GHC Plaintiffs' motion to enforce the PI, like the AVAC Plaintiffs' substantially duplicative motion, should be denied.

## BACKGROUND

This Court on March 10, 2025 issued a preliminary injunction (the "Order") that, *inter alia*, enjoined "Defendants from unlawfully impounding congressionally appropriated foreign aid funds," and ordered Defendants to "take all steps necessary" to effectuate the injunction. PI Op., 770 F. Supp. 3d 121, 155 (D.D.C. 2025). At that time, the Court rejected as overbroad Plaintiffs' proposed relief—an order that Defendants continue to contract with them—recognizing that "both the Constitution and Congress's laws have traditionally afforded the Executive discretion on how to spend within the constraints set by Congress." *Id*. at 154. The Court instead confined the relief to an "order" that "Defendants to make available for obligation the full amount of funds Congress appropriated under the relevant laws." *Id*. at 154-55 (citations modified).

Defendants appealed the preliminary injunction, Doc. 72, and moved to expedite so the Court of Appeals could decide the appeal by August 15, 2025. Unopposed Mot. to Expedite at 3, No. 25-5097 (D.C. Cir. Apr. 28, 2025). The appeal is now fully briefed, with oral argument calendared for July 7, 2025. No. 25-5097 (D.C. Cir. May 20, 2025). If the D.C. Circuit decides the appeal by August 15, 2025, Defendants submitted to the Court of Appeals that would allow for resolution before September 30, 2025 (the end of the fiscal year). In the meantime, Defendants

via their status reports have described their efforts to comply with the preliminary injunction, including as to the provision regarding appropriations. The reports informed the Court of efforts to evaluate the appropriate next steps in consultation with the Office of Management and Budget and in light of the planned USAID reorganization. *See, e.g.*, Status Report, Doc. 102, ¶ 7 (June 12, 2025).

As relevant here, under the FCAA, the currently available foreign assistance funds Congress appropriated to USAID and State subject to the preliminary injunction remain available to be obligated through at least until the end of the current fiscal year, which is September 30, 2025. *See, e.g.,* Pub. L. 118-47, 138 Stat. 460, 740 (March 23, 2024).

GHC Plaintiffs moved on June 24, 2025 to purportedly enforce the PI, seeking to leverage Defendants' opposition filed the day before to the AVAC Plaintiffs' substantially duplicative motion to enforce the preliminary injunction.[1]

## ARGUMENT

**I.    GHC's Proposed Enforcement Relief Is Unsustainable Because Defendants Are Complying With The Preliminary Injunction's Appropriations Provision**

The appropriations provision of the preliminary injunction rests on this Court's interpretation of the FCAA and the ICA. PI Op., 770 F. Supp. 3d at 143-48. During the pendency of Defendants' appeal of the Court's preliminary injunction, granting relief on Plaintiffs' motion to enforce would be inappropriate because Plaintiffs' have failed to meet their burden of

---

[1]    According to the GHC Plaintiffs, they seek an order "(1) confirming that Defendants must obligate all of the expiring foreign assistance appropriations in accordance with Congress' specific directives for how the funds must be spent; (2) requiring Defendants to submit a detailed plan for compliance; (3) ordering Defendants to immediately start all steps necessary to obligate expiring funds; (4) making clear that Defendants may not leverage their ongoing noncompliance to impound funds through a 'pocket rescission' or other strategy; (5) explaining that the Court will, if necessary as a last resort, extend the period of availability for expiring funds to prevent them from being impounded; and (6) prohibiting Defendants from effectuating terminations issued prior to February 13 without the consent of the awardee." Doc. 97.

establishing that Defendants would be unable to obligate those funds that would otherwise expire on September 30, 2025, or take other lawful action with respect to those funds.  To date, Defendants have complied with the preliminary injunction, and the pertinent statutes, by evaluating the appropriate next steps in consultation with OMB and in light of the planned reorganization of USAID and State.  *See, e.g.*, Status Report, Doc. 94, ¶ 7 (June 20, 2025).

As a preliminary matter, Plaintiffs use their motion to enforce to rehash arguments they made in their appellate briefing.  *Compare, e.g.*, Appellee Br., No. 25-5098 (D.C. Cir. June 6, 2025) at 40-44 (arguing the ICA does not allow the Executive Branch to transmit rescission proposals after 45 legislative days before the funds expire), *with* Pls. Enf. Mot. 18 (same).  If the D.C. Circuit were to reverse or vacate the preliminary injunction, any actions taken now would be unnecessary, wasteful, and cause confusion.  *See, e.g.*, *Athridge v. Iglesias*, 464 F. Supp. 2d 19, 22-23 (D.D.C. 2006).  Plaintiffs are simply using their purported "enforcement" motion as a vehicle for repeating in this Court arguments the D.C. Circuit is set to promptly decide.  That alone is a sufficient basis for denying the motion.

The Plaintiffs' motion is also predicated on several misunderstandings about Defendants' efforts and the appropriations process.  Plaintiffs assert that, to comply with the preliminary injunction, Defendants must: (1) obligate funds in amounts specified in certain tables in the FCAA; (2) obligate those funds immediately to ensure they do not expire; and (3) are foreclosed under the injunction from transmitting rescission proposals after 45 legislative days before the funds expire—*i.e.*, prohibiting Defendants from a "pocket rescission."  GHC Enf. Mot. 13-15, 16-19. But the pertinent statutes do not support those contentions.  And the preliminary injunction does not enjoin the lawful exercise of Defendants' authority under existing appropriations and budget

laws.  The Executive Branch and Congress will work out which appropriations must be obligated and expended, which appropriations should be rescinded, and any other budgetary issues.

*First*, Plaintiffs have not identified any applicable statutory requirement that the Executive Branch expend all of the appropriated funds here.  GHC Enf. Mot. 13-15.  The FCAA appropriates sums of money for broad purposes.  Among other things, Congress appropriated billions of dollars "[f]or necessary expenses to carry out" provisions of the Foreign Assistance Act, including "for global health activities"; "for international disaster relief, rehabilitation, and reconstruction assistance"; and for development assistance.  Pub. L. No. 118-47, div. F, 138 Stat. 460, 740, 742. On their own, those appropriations lack any mandatory language directing the obligation and expenditure of the full amount of funds appropriated for those purposes.

Plaintiffs rely on section 7019 of the FCAA, which provides that "funds appropriated by this Act" in certain foreign assistance accounts "shall be made available in the amounts specifically designated in the respective tables . . . ." in the Joint Explanatory Statement accompanying the act. GHC Enf. Mot. 14 (quoting 138 Stat. at 771) (emphasis omitted).  But Plaintiffs fail to understand the import of these tables.  Those provisions reflect Congress's desire to designate different portions of the top-line foreign-assistance appropriations for particular countries or purposes.  *See* 2 GAO, Principles of Federal Appropriations Law 6-26 to 6-30 (3d ed. 2006) (GAO Red Book). The tables are thus aimed at giving direction to the Executive Branch about how to allocate portions of the lump-sum appropriations to certain uses.  Consistent with that understanding, and as GAO has made clear, the use of such "shall be available" language "to earmark a portion of a lump-sum appropriation" does not necessarily reflect a congressional command to make the full sum available for obligation.  *See id*. at 6-30 to 6-31.  Instead, the use of such language "contain[s] an element of ambiguity," and the question whether the language reflects a floor or a ceiling or

both on the amount that may be obligated for the relevant purpose "depends on the underlying congressional intent." *Id*. at 6-31.

Here, the relevant context—omitted by Plaintiffs—makes clear that Congress intended the Executive Branch to exercise discretion over how to expend these appropriations. For example, section 7019(b) of the FCAA authorizes State and USAID to deviate up to 10 percent from the amounts designated in the tables (except with respect to Global Health Programs) and to exceed that percentage if a specific determination is made and reported to Congress. In addition, in accord with the President's primary role in the conduct of foreign affairs, Congress recognized that the President may furnish a wide range of foreign assistance "on such terms and conditions as he may determine." *See, e.g.*, 22 U.S.C. §§ 2151a(a)(1), 2151b(c)(1), 2151c(a), 2151d(b)(1), 2174(a), 2291(a)(4), 2346(a), 2347(a), 2348, 2349aa; *see also id*. § 2395(a) (providing that "assistance under this chapter may be furnished on a grant basis or on such terms . . . as may be determined to be best suited to the achievement of the purposes of this chapter"). That recognition supports the conclusion that any ambiguous language in the appropriations acts must be understood to retain the Executive Branch's programmatic discretion. Rather than construing related statutes together, Plaintiffs omit the important backdrop against which the relevant appropriations were made, and on that basis argue Defendants lack any discretion under the FCAA. GHC Enf. Mot. 13-15. But there is no basis for their presupposition that appropriations statutes, unlike all other statutes, must be read in isolation. *See, e.g.*, *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 275 (2023). It is Plaintiffs, and not Defendants, who take an extreme position by reading virtually every appropriations statute, regardless of context, as an inexorable command to expend all of the funds.

*Second*, even if provisions of the FCAA are understood to require the obligation of certain amounts for certain purposes, Plaintiffs have not identified any applicable statutory requirement that the Executive Branch obligate or expend the appropriated funds immediately.   Rather, Defendants' evaluation of the appropriate next steps within the time available under the FCAA remains lawful.   Notably, Congress expressly directed the Executive to apportion, or reapportion, appropriated funds to *determine when to make them available* to agencies to carry out federal law. *See* 31 U.S.C. § 1512.

The structure of the ICA confirms Defendants are not required to immediately obligate funds at this point.   The ICA allows the President and Congress to engage in an inter-Branch dialogue when the President determines not to obligate appropriated funds.   At a high level, the President is required to transmit a special message to Congress when he "determines" that "budget authority should be rescinded for fiscal policy or other reasons."   2 U.S.C. § 683(a); *see also id*. § 686(a).   After that message is sent, Congress may consider whether to rescind the budget authority in question.   And if Congress has not rescinded "all or part of the amount proposed to be rescinded" within "45 calendar days of continuous session of the Congress" after receipt of the message, *id*. §§ 682(3), 683(b), then the amount proposed to be rescinded "shall be made available for obligation," *id*. § 683(b).   That final provision requiring the covered appropriations to be made available for obligation thus takes effect only following Congress's receipt of the contemplated message and the elapsing of 45 days of continuous session.

Thus, the ICA allows for a process by which appropriated funds may be lawfully rescinded. But, at this point, the inter-Branch process contemplated by the statute as to fiscal year 2024 funds set to expire on September 30, 2025 and implicated by the motion to enforce has not even begun,

much less concluded. And so, Defendants are not unlawfully impounding congressionally appropriated funds at this point.

The FCAA similarly does not require Defendants to obligate funds immediately. Under the FCAA, the currently available foreign assistance funds Congress appropriated to USAID and State subject to the preliminary injunction remain available to be obligated through at least until the end of the current fiscal year, which is September 30, 2025. *See, e.g.*, 138 Stat. at 740. As a matter of course in all federal agencies, appropriated funds are routinely obligated over the course of the fiscal year, as the year progresses. Sufficient time remains for USAID and State to obligate any presently unobligated funds, or take other appropriate action consistent with applicable law, with respect to those funds before the end of the current fiscal year. *See* Lewin Decl. ¶¶ 4-18 (attached hereto as Exhibit A). Even an adverse decision from the D.C. Circuit by August 15, 2025 would provide adequate time for Defendants to take such actions with respect to unobligated funds. *See id*. And various statutory mechanisms are in place which allow Defendants to obligate expiring foreign assistance funds on a short timeline as necessary. *See id*.

*Third*, the ICA does not prohibit the Executive from transmitting rescission proposals after 45 legislative days before the funds expire—which Plaintiffs refer to as a "pocket rescission." In a "pocket rescission," funds lapse not by Presidential order, but by the text of the underlying appropriation itself enacted by Congress. Congress can, and often does, appropriate "no year" money that does not lapse. When Congress determines to set a definite end date upon funds, that choice is Congress's, which, as discussed below, knows full well the possibility that funds that lapse may not be expended. Because the statute does not prohibit such an occurrence, the Court should clarify that its preliminary injunction, which is predicated on an interpretation of the ICA, does not do so, either.

Plaintiffs rest their contrary argument on a 2018 GAO opinion which contends amounts must be made available for obligation absent Congress's approval of a rescission proposal. GHC Enf. Mot. 18 (citing GAO, B-330330, *Impoundment Control Act—Withholding of Funds through Their Date of Expiration* 5 (Dec. 10, 2018)). GAO's 2018 opinion lacks persuasive value. "Because GAO is part of the Legislative Branch, Executive Branch agencies are not bound by GAO's legal advice." *Whether Appropriations May Be Used for Informational Video News Releases*, 2005 WL 8167269, at *1 (O.L.C. Mar. 11, 2005) (citing *Bowsher v. Synar*, 478 U.S. 714, 727-32 (1986)).

The cited GAO opinion is contested, as OMB previously explained in correspondence that the 2018 GAO opinion did not properly address.[2] As OMB explained, *see id.* at 1-2, although § 683(b) limits the President's withholding authority to 45 days of continuous Congressional session, it does not impose an additional requirement on the President to make withheld budget authority available for obligation before the end of a fiscal year. The silence in § 683(b) on when in the fiscal year the President may propose rescissions and withhold budget authority stands in stark contrast to § 684, which governs Presidential deferrals of funds. That authority allows the President to delay the obligation or outlay of budget authority for certain statutorily prescribed reasons, but not beyond the end of the fiscal year. Section 684(a) provides that a "deferral may not be proposed for any period of time extending beyond the end of the fiscal year in which the special message proposing the deferral is transmitted to the House and the Senate." 2 U.S.C. § 684(a). Thus, the ICA's text shows that Congress considered the possible effects of withholding funds close to the end of the fiscal year and decided to limit such withholdings only for deferrals,

---

[2] *See generally* Letter from Mark R. Paoletta, General Counsel, OMB, to Tom Armstrong, General Counsel, GAO (Nov. 18, 2018), *available at* https://trumpwhitehouse.archives.gov/wp-content/uploads/2019/11/Letter-to-GAO-on-Rescissions.pdf (2018 OMB Ltr.).

not for rescissions. Additionally, § 684(c) provides that the deferral requirements "do not apply to any budget authority proposed to be rescinded . . . under" § 683. The requirements imposed in § 684 do not apply to funds withheld pursuant to § 683. And as OMB further explained, the absence of a statutory requirement that the President make withheld budget authority available for obligation before the end of a fiscal year is confirmed by historical examples of presidentially-proposed rescissions sent to Congress late in the fiscal year, where funds were withheld for the statutorily permitted period of 45 days, even when that period extended further than the end of a fiscal year and the funds lapsed. *See* 2018 OMB Ltr. at 3-4.

Indeed, GAO previously acknowledged that the ICA allows for such rescissions, noting that withholdings for the 45-day period following a special message are within the President's authority under the statute. *See* GAO B-115398 (Aug. 12, 1975) (conceding the President may transmit special messages to withhold the budget authority near their date of expiration for the duration of the 45-day period, and opining that Congress must take affirmative action to prevent the withheld funds from expiring); *see also* GAO B-115398 (Dec. 15, 1975) (same); GAO B-115398 (Aug. 27, 1976) (noting that withheld funds may expire, without stating whether the funds were properly withheld or reporting that they must be made available for obligation); GAO B-115398 (Oct. 26, 1977) (similar); GAO B-220532 (Sept. 19, 1986) (reclassifying deferral as rescission proposal, recognizing potential for funds to expire before being able to be obligated for intended purpose).[3]   GAO's December 1975 opinion notably cited a 1975 Senate report recognizing that the ICA allows for funds to lapse if a recission package is sent to Congress within

---

[3] The opinions cited are available from GAO as follows: Aug. 12, 1975, https://www.gao.gov/assets/acg-76-5.pdf; Dec. 15, 1975, https://www.gao.gov/assets/acg-76-12.pdf; Aug. 27, 1976, https://www.gao.gov/assets/b-115398.33-d19688.pdf; Oct. 26, 1977, https://www.gao.gov/products/ogc-78-2; Sept. 19, 1986, https://www.gao.gov/assets/ogc86-22.pdf; Dec. 10, 2018, https://www.gao.gov/assets/b-330330.pdf.

45 days of the end of the fiscal year.  B-115398 (citing S. Rep. No. 94-403 (1975)).  The opinions
GAO issued shortly after the ICA's enactment carry much greater weight than GAO's 2018 about-
face.

Congress too continues to recognize that the ICA allows for "pocket rescissions."  As
recently as 2023, members of Congress have introduced legislation to expressly prohibit pocket
rescissions by foreclosing any withholding of budget authority pursuant to the ICA within 90
calendar days of the date of expiration of such budget authority.  *See* Protecting Our Democracy
Act, H.R. 5048, 118th Cong. § 501 (2023); *see also* Protecting Our Democracy Act, H.R. 5314,
117th Cong. § 501 (2021); 167 Cong. Rec. H7593 (daily ed. Dec. 9, 2021) (statement of Rep.
Jackson Lee) (H.R. 5314 "would restore Congress' central role in funding decisions by preventing
the President from effectively rescinding funds without congressional approval; . . . whether or not
the funding is part of a Presidential rescission or deferral request; and closing a budget law
loophole that essentially lets the President unilaterally block the spending of enacted
appropriations designated as emergency"); Congressional Power of the Purse Act, H.R. 6628,
116th Cong. § 101 (2020) (attempting to require OMB to release funding to agencies at least 90
days before the funding expires).  Those proposed statutes, which Congress *did not* enact, show
Congress has recognized the possibility of a pocket rescission, and Congress has not taken action
to prevent them.

Rather, where Congress explicitly sought to avoid expiration of time-limited appropriated
funding, it has utilized other mechanisms—for example, extending the period of availability of
expiring appropriations.  *See, e.g.*, Continuing Appropriations Act, 2023, Pub. L. No. 117-180, div.
A., § 124, 136 Stat. 2114, 2120 (2022); Continuing Appropriations Act, 2020, Pub. L. No. 116-59,

div. A, § 124, 133 Stat. 1093, 1098 (2019).  Congress thus knows exactly how to prevent funds from lapsing (in addition to making funds "no year" at the outset).

In light of that history, this Court should not infer that Congress intended to preclude the Executive from exercising a pocket rescission.  A court does not "lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply," and that "reluctance is even greater when Congress has shown elsewhere. . . that it knows how to make such a requirement manifest."  *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005).

Plaintiffs fare no better in comparing their ICA contention to the Line Item Veto Act of 1996.  GHC Enf. Mot. 18-19.  The Supreme Court held that the Line Item Veto Act violated the Constitution's Presentment Clause by allowing the President to cancel portions of statutes enacted by Congress.  *Clinton v. City of New York*, 524 U.S. 417, 436-41 (1998).  The instant suit, by contrast, does not involve "unilateral Presidential action that either repeals or amends parts of duly enacted statutes."  *Id*. at 439.  Rather, the dispute here concerns the President's authority to determine how and whether to obligate and expend appropriated funds through dialogue with Congress and within the process set out in the ICA.  Furthermore, although no President had ever asserted or exercised inherent item veto power, *see id.*, 524 U.S. at 440, there is a long history of the Executive Branch declining to spend the full amount of appropriated funds in various contexts, particularly in the realm of foreign affairs, *see The President's Veto Power*, 12 Op. O.L.C. 128, 168 & n.56 (1988).  The Court in *Clinton* explicitly noted the President's "traditional authority to decline to spend appropriated funds" stood in stark contrast to the Line Item Veto.  524 U.S. at 446-47.  That historical tradition and settled practice form the backdrop against which the relevant statutes were enacted and must be understood.

Additionally, as noted above, no unilateral Presidential action to "cancel" or attempt to "amend" the text of appropriations is at issue here. Rather, the lapse in funds GHC Plaintiffs describe would result from two provisions enacted by Congress through the process of bicameralism and presentment—the underlying appropriations provision determining when the funds lapse, and the ICA, which authorizes the President to send recissions at any point in the fiscal year. Such a lapse represents Congress's determination that the funds should terminate at the end of the fiscal year even if not fully expended.

## II.    Adequate Time Remains For Defendants To Comply With The Preliminary Injunctions' Appropriations Provision If The D.C. Circuit Rules By August 15, 2025 As The Parties Have Requested

GHC Plaintiffs' motion to enforce the PI's appropriations provision is predicated on their assertions (GHC Enf. Mot. 10-12) that even if the D.C. Circuit decides the PI appeal on the timetable the Government requested with Plaintiffs' consent, i.e., by August 15, 2025, Defendants would lack adequate time to obligate the disputed funds before the earliest pertinent expiration date, September 30, 2025. That is incorrect, as explained in the declaration filed today from Jeremy Lewin, who currently serves as the Director of Foreign Assistance and is performing the duties and functions of Deputy Administrator and Chief Operating Officer of USAID, and whose current duties include managing State and USAID's foreign assistance programs and overseeing the responsible administration of USAID's day-to-day activities. Lewin Decl. ¶¶ 1, 2-5, 9, 18 (June 30, 2025) (attached as Exhibit A).

State and USAID have sufficient time to obligate funds well within the approximately six-week period from August 15, 2025 to September 30, 2025, and could exercise existing authorities that allow additional agency acceleration of contracting and grant-making processes. Among the authorities Mr. Lewin describes are those that authorize exceptions and waivers from the

customary "full and open competition" procedures and authorize modifications of existing contracts or an award of new contracts on an expedited basis.  Lewin Decl. ¶¶ 11-12.

For USAID awards, the applicable acquisition regulations include 48 CFR § 706.302-70(a)(2) (as to USAID), which implements an exception to "full and open competition" requirements, "when" imposing those requirements "would impair or otherwise have an adverse effect on programs conducted for the purposes of foreign aid relief, and rehabilitation."  Lewin Decl. ¶ 13.  Similarly, as to State's contracts subject to the Federal Acquisition Regulation (FAR), and federal assistance awards subject to State's Federal Assistance Directive, State would be able to rely on various provisions to accelerate the timeline for obligation of funds before their expiration.  *Id.* ¶ 14.  And the guidance on which GHC Plaintiffs rely in maintaining that the six-week period would be inadequate does not support a contrary conclusion.  *See id.* ¶¶ 15-18.

## III.    Neither An Appropriations Compliance Plan Nor Any Purported Equitable Modification Of The Period Of Availability Of Funds Is Warranted

### A.    The Appropriations Compliance Plan Proposal Is Flawed

GHC Plaintiffs seek an order requiring Defendants, *inter alia*, to file a plan for compliance with the preliminary injunction.  Such a plan is unwarranted because Defendants are already complying with the preliminary injunction, and Plaintiffs' proposed order raises prudential concerns given the expedited appeal currently pending and because the requested relief would force Defendants to disclose privileged ongoing deliberations.  Defs. Opp'n to Mot. to Enforce the Prelim. Inj., *AVAC*, No. 25-cv-400 (June 23, 2025) (AVAC Opp.).

As Defendants explained in their AVAC opposition (at 7), "the President," not an administrative agency, "makes the final decision concerning what budget requests should be submitted to the Congress."  *Bureau of Nat'l Affairs, Inc. v. U.S. Dep't of Justice*, 742 F.2d 1484, 1497 (D.C. Cir. 1984).  And "the President is not bound in any way by the funding levels sought

by the various agencies.  Rather, their budgetary 'decisions' constitute advice and suggestions for the President, albeit ones that are likely to frame the ultimate budgetary choices made by him." *Id*.  Similarly, here, the proposed uses of USAID and State's foreign assistance appropriations that GHC Plaintiffs seek to probe are, at most, internal plans on which the agencies have not reached decision.  And, relatedly, as OMB carries out its statutorily delegated apportionment authority under 31 U.S.C. §§ 1512 and 1513, which is among OMB's core functions, OMB's discussions with State and USAID about how the appropriated funds are apportioned throughout the fiscal year, are also predecisional and deliberative.  So the release of a nonfinal plan concerning the apportionment of those funds, as Plaintiffs seek, would, among other things, harm OMB's processes for obtaining information from agencies and formulating advice concerning, and making decisions about, apportionments.

Contrary to Plaintiffs' contention (GHC Enf. Mot. 15-16), the compliance plan sought would present genuine deliberative process concerns, and the Government has in no way waived or forfeited the privilege.  In the deliberative process context, an agency's authorized disclosure of an otherwise privileged document to a third party may waive privilege as to that specific document. *In re Sealed Case*, 121 F.3d 729, 741 (D.C. Cir. 1997).  Cases analyzing waiver of the privilege thus have generally asked whether the Government has expressly adopted or incorporated by reference a document that would have otherwise been protected, *Elec. Frontier Found. v. DOJ*, 739 F.3d 1, 10 (D.C. Cir. 2014), or whether the Government has entered a specific fact into the public domain, *Parker v. DOJ Off. of Pro. Resp.*, 278 F. Supp. 3d 446, 453 (D.D.C. 2017).  But release of a document or fact only waives the privilege "for the document or information specifically released, and not for related materials." *In re Sealed Case*, 121 F.3d at 741 (citations omitted).  Such a limitation helps ensure that agencies do not forego voluntarily disclosing some

privileged material out of the fear that, by doing so, they are exposing other, more sensitive documents. *Id.*[4]

Plaintiffs also err in contending that Mr. Lewin's statement in the *AVAC* Declaration that Defendants "have already undertaken preparations to be ready to obligate" funds (Doc. 106-1, ¶ 6) waives or forfeits the deliberative process privilege. That statement did not disclose any specific document. Nor did it adopt or incorporate by reference any specific document otherwise protected by the privilege. And the only "fact" the declaration even arguably puts in the public domain is that Defendants have undertaken preparations, which does not waive the contents of those preparations or related materials. *See In re Sealed Case*, 121 F.3d at 741.

Nor do Plaintiffs substantiate their position (GHC Enf. Mot. 16) that Plaintiffs have such an overwhelming need for information subject to the deliberative process privilege that the court can permissibly dispense with the concerns Defendants have identified about the inhibiting effect on internal discussions that requiring a compliance plan would have here. Rather, requiring disclosure of any such plan would have a chilling effect on candor in inter-agency discussions and cause public confusion. That is why ordering Defendants to file a plan now when decisions have yet to be finalized would counter decades of court recognition that administrative decisionmaking

---

[4] The cases on which Plaintiffs rely are not instructive. Plaintiffs largely cite decisions about the attorney-client privilege, not the deliberative process privilege. *See Savignac v. Jones Day*, 763 F. Supp. 3d 17 (D.D.C. 2025); *Recycling Sols., Inc. v. District of Columbia*, 175 F.R.D. 407 (D.D.C. 1997). But waiver of the attorney-client privilege is not akin to waiver of the deliberative process privilege. *See Tax Analysts v. I.R.S.*, 117 F.3d 607, 616-21 (D.C. Cir. 1997) (one privilege may be applicable where the other is not). Moreover, the cited cases involved existing materials that one party sought from another. *See Savignac*, 763 F. Supp. 3d at 29; *Recycling Sols., Inc.*, 175 F.R.D. at 408. Here, Plaintiffs seek an order that would require the Government to create documents that would disclose deliberative and pre-decisional information. *Cf. Doe v. Esper*, No. 17-cv-1597, 2019 WL 4394842, at *10 (D.D.C. Sept. 13, 2019) (even if plaintiffs could demonstrate that need for information outweighs privilege, court is still required to make individualized determinations whether documents "fall into . . . subcategory of documents to which the deliberative process privilege does not apply.").

should not occur "in a fishbowl." *Envt'l Prot. Agency v. Mink*, 410 U.S. 73, 87 (1973). *See also* AVAC Opp., Doc. 106 at 6-7.

### B.   An Order Extending The Period Of Availability Would Be Improper In This Context And Is Unwarranted In Any Event

GHC Plaintiffs further err in seeking an order that would "extend the [FY 2024] appropriations' period of availability" (Enf. Mot. 19), which would be a premature and improper under the circumstances here. GHC Plaintiffs rely (Enf. Mot. 19-20) on cases reasoning that courts may authorize the expenditure of funds "after the funds have expired for obligational purposes." 1 GAO, Principles of Federal Appropriations Law 5-85, 2004 WL 5661416 at *2 (Jan. 2024) (GAO Redbook). "As long as the suit is filed prior to the expiration date," as the current suit was, "the court acquires the necessary jurisdiction and has the equitable power to 'revive' expired budget authority." *Id.* at *4; *see City of Houston v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421, 1426 (D.C. Cir. 1994); *see also Nat'l Ass'n of Reg'l Councils v. Costle*, 564 F.2d 583, 588 (D.C. Cir. 1977) (describing authority to "reallocate funds which had been illegally awarded to the wrong category of recipients" and to redirect funds that have already been obligated).

Most recently, in *Goodluck v. Biden*, 104 F.4th 920, 926-28 (D.C. Cir. 2024), the D.C. Circuit has identified *Costle* and similar cases from the 1970s as reflecting "much more freewheeling approach to the law of remedies" than now is allowed under currently Supreme Court precedents such as *United States v. Oakland Cannabis Buyers' Co-op*, 532 U.S. 483 (2001), which teaches that "a court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation," *id.* at 497. Accordingly, prior decisions such as *Costle* should not be extended to new situations. *See id.* at 928.

The *Goodluck* Court directed attention to 31 U.S.C. § 1502(b). That statute states that a "provision of law requiring that the balance of an appropriation or fund be returned to the general

fund of the Treasury at the end of a definite period does not affect the status of lawsuits or rights of action involving *the right to an amount payable from the balance*." *Id.*; *see* 31 U.S.C. § 1558 (extending availability of funds for 100 days after final ruling on bid protest or other legal action filed in connection with solicitation, proposed award, or award of procurement contract).

GHC Plaintiffs ignore § 1502(b), and make no attempt to show that they have a "right to an amount payable from the balance" within the meaning of that statute. At most, GHC Plaintiffs are recipients of foreign assistance funds under particular instruments, some of which have been terminated, but while Plaintiffs seek to challenge the terminations, the mere existence of such challenges is not sufficient to give them a "right to an amount payable" from the appropriations accounts at issue. And, moreover, insofar as any GHC Plaintiff has a "right to an amount payable" by the Government, the proper forum for enforcement of such a right to a monetary amount would be the Court of Federal Claims under the Tucker Act, not this Court. *See Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (applying *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)).

Moreover, any judicially-inferred equitable authority to "suspend" a "lapse," does not extend to "revive" funds that Congress has rescinded. GAO Redbook, 2004 WL 5661416 at *3-5. "[A]fter Congress has rescinded an appropriation, a court may not order a permanent injunction awarding the rescinded funds to the plaintiff, as the court cannot order the obligation of funds for which there is no appropriation." *Id.* at *5 (citing *Rochester Pure Waters Distr. v. EPA*, 960 F.2d 180, 184 (D.C. Cir. 1992)). *Rochester* held that "the budgetary lapse cases," such as *Costle*, "do not control a situation in which Congress rescinds appropriations with full knowledge of pending claims . . . ." 960 F.2d at 186.

19

But here, GHC Plaintiffs seek to expand (rather than enforce) the preliminary injunction by explicitly adding to it a provision modifying the period of availability of the funds due to expire on September 30, 2025, in an apparent effort—based on Plaintiffs' contention that Defendants must be foreclosed from seeking rescission of the funds—to preclude such a rescission. Such an expansion of the preliminary injunction is not only unnecessary, because no funds have yet expired, but also improper as a bold expansion of the "budgetary lapse cases" into the rescission context, again on nothing more than Plaintiffs' insistence that the Executive Branch should not be able to further contemplate proposing rescission. Nothing in the "budgetary lapse cases" on which Plaintiffs rely would support such an expansion.

And any such expansion would be especially improper in the foreign affairs context of this suit, which was not at issue in the cases Plaintiffs cite. That again ignores that core foreign policy judgments are implicated here. The statutes at issue appropriate foreign assistance funds for causes like "refugee and migration needs," 138 Stat. at 744; international disaster relief, 138 Stat. at 742; and global health, 138 Stat. at 740. Deciding how much money to devote to these causes can affect another country's perception of and rapport with the United States. That delicate weighing of interests is at the heart of the President's "responsibility to maintain the Nation's relationships with other countries." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 420 (2003). Here, the President's role in any future assessment of potential rescission should not be further undermined by this Court. While Congress also plays an important role in the foreign policy sphere, the relevant authority at issue in this case belongs to the Executive Branch. Neither the ICA nor the various appropriations of foreign assistance funds constitute exercises of Congress's power to "regulate Commerce with foreign Nations," U.S. Const. art. I, § 8, cl. 3, or to "declare War," U.S. Const. art. I, § 8, cl. 11. Furthermore, it is both commonplace and lawful for Congress to "grant the President

substantial authority and discretion in the field of foreign affairs." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 20 (2015). Here, the President is statutorily empowered to set "such terms and conditions as he may determine," 22 U.S.C. § 2151b(c)(1), to best accomplish the general purposes of the Foreign Assistance Act, *id.* § 2395(a), and the Secretary of State is charged with overseeing implementation to best serve "the foreign policy of the United States," *id.* § 2382(c). Those statutory provisions authorizing the country's foreign assistance programs confirm the Executive Branch's broad authority to manage foreign aid.

In any event, such questions are properly left to the political process, particularly in light of the reticulated scheme for political resolution of these matters set out in the ICA.

**IV.    Any Enforcement Relief On The Appropriations Provision Is Properly Confined To The GHC Plaintiffs, And Cannot Run To Non-Parties, Under *Trump v . CASA, Inc.***

Insofar as the Court grants GHC Plaintiffs any purported "enforcement" relief as to the PI's appropriations provision, such relief would properly be limited to the GHC Plaintiffs only, not to any funding recipients not before the Court, given the restrictions on universal injunctions announced in *Trump v. CASA, Inc.*, No. 24A884, 2025 WL 1773631 (U.S. June 27, 2025).

The PI's appropriations provision rests on this Court's construction of the FCAA and the ICA, PI Op., 770 F. Supp. 3d at 143-48, and the corresponding equitable relief is bounded by the Judiciary Act of 1789, which "endowed federal courts with jurisdiction over 'all suits . . . in equity,' and which "still today is what authorizes the federal courts to issue equitable remedies," *CASA*, 2025 WL 1773631 at *6 (citations modified). That "statutory grant encompasses only those sorts of equitable remedies 'traditionally accorded by courts of equity' at our country's inception." *Id.* (quoting *Grupo Mexicano de Desarrollo, S. A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)). Observing that the Court had "consistently rebuffed requests for relief that extended beyond the parties," *id.* at *7, the Court determined in *CASA* that "[n]othing like a universal injunction was

available at the founding, or for that matter, for more than a century thereafter. Thus, under the Judiciary Act, federal courts lack authority to issue them," *id.* at *13. And under the "complete relief principle," the Court concluded that the "question is not whether an injunction offers complete relief to *everyone* potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court*." *Id.* at *11 (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Focusing on the "plaintiffs before the court" and not "everyone" is especially important because, "[w]hen a federal court enters a universal injunction against the Government, it 'improper[ly] intru[des]' on 'a coordinate branch of the Government' and prevents the Government from enforcing its policies against nonparties." *CASA*, 2025 WL 1773631, at *14 (quoting *INS v. Legalization Assistance Project of L.A. Cnty. Fed'n of Labor*, 510 U.S. 1301, 1306 (1993) (O'Connor, J., in chambers)).

Under *CASA*, extending any relief on the PI's appropriations provision beyond the GHC Plaintiffs (and, in the AVAC suit, the AVAC Plaintiffs), "to cover all other similarly situated" foreign-assistance funding recipients "would not render" the relief to those particular plaintiffs "any more complete." *See id.* Hence, any "enforcement" relief as to the appropriations provision would necessarily be confined to the particular plaintiffs who filed the instant suits, whereas the Court would "lack authority to issue" broader equitable "relief that extended beyond the parties." *See id.* at *7, 13.

## V.    The Preliminary Injunction Did Not Restrain Defendants From Individually Reviewing And Ratifying Award Terminations Predating This Court's TRO

Also meritless is GHC Plaintiffs' request to invalidate terminations of awards initially announced between January 20, 2025 and February 13, 2025 (i.e., prior to the Court's TRO), which State and USAID leadership subsequently confirmed were warranted based on an "individualized review for alignment with Agency priorities and national interest, independent of" the Executive

Order and implementing directives Plaintiffs originally challenged.  *See* GHC Enf. Mot. Ex. A at 1, 3 (Action Memo of April 30, 2025) (Doc. 97-2).  Contrary to Plaintiffs' contention, the March 10, 2025 preliminary injunction did not invalidate all terminations before February 13, 2025, but instead adhered to the Court's previous recognition that it was not constraining individual award decisions based on applicable statutes, regulations, and award provisions.

Hence, State and USAID leadership acted in accordance with the injunction when they authorized agency personnel to implement terminations that agencies announced *pre*-TRO but that agencies confirmed *post*-TRO were warranted under applicable award terms and regulations. *See* GHC Enf. Mot. Ex. B (Doc. 97-3) (supplying confirmation "that the previously issued 462 contracts, grants, and cooperative agreement terminations between January 20 and February 13, 2025 have been issued after individualized review of subject awards . . . .").  That is, the individualized review resulted in "ratification" of the terminations announced pre-TRO.  *See* GHC Enf. Mot. Ex. A at 1.

Importantly, for its part, the original TRO, while erroneous, simply "enjoined" the agencies "from enforcing or giving effect to" agency memoranda that imposed a pause on foreign-aid funding, "including by: suspending, pausing, or otherwise preventing the obligation or disbursement of appropriated foreign-assistance funds in connection with any" instrument "that was in existence as of January 19, 2025."  TRO of Feb. 13, 2025, 766 F. Supp. 3d 74, 85.  But the Court expressly refused to "enjoin" Defendants "from taking action to enforce the terms of particular contracts, including with respect to expirations, modifications, or terminations pursuant to contractual provisions."  *Id.*  As the court subsequently clarified, the TRO still permitted the agencies to continue taking actions (including terminations) on individual awards based on their

underlying "authorities under statutes, regulations, and other legal authorities." Order of Feb. 20, 2025, 768 F. Supp. 3d 1, 4.

And the Court expressly disclaimed any intention of "supervising" Defendants' "determinations as to whether to continue or terminate individual grants based on their terms," or of requiring Defendants to "'litigate every arguable breach of contract in a contempt posture.'" *See* Order of Feb. 22, 2025, 768 F. Supp. 3d 26, 28 (citation omitted). Instead, the TRO was intended "to restore the status quo as it existed before" the challenged "blanket suspension" of foreign-aid funding. *Id.* at 27.

The Court's opinion explaining the preliminary injunction's scope expressly recognized those limitations on the relief the Court granted to Plaintiffs. "In the interest of tailoring its TRO to the reliance interests at stake," the Court observed that it "did not" previously "enjoin Defendants from taking actions based on the particular terms of individual contracts." PI Opp. of March 10, 2025, 770 F. Supp. 3d 121, 141. And in rejecting Plaintiffs' request for a preliminary injunction provision requiring that Defendants "revoke all terminations and suspensions issued since January 20" based on Plaintiffs' failure to articulate an objective, "meaningful standard" for separating allegedly invalid terminations from valid ones, the Court observed that the Plaintiffs' standardless approach "would devolve into the type of intensive supervision of day-to-day agency activities, as well as inquiry into the terms of individual awards, that the Court has expressly rejected." *Id.* at 143.

Hence, when the Court explicitly confined the preliminary injunction to only those directives "[c]onsistent with this opinion," *id.* at 155, the Court cemented its prior understanding that Defendants could continue to implement actions (including terminations) on individual awards

based on their underlying "authorities under statutes, regulations, and other legal authorities." *See* Order of Feb. 20, 2025, 768 F. Supp. 3d at 4.

GHC Plaintiffs' position that, irrespective of the agencies' individualized review, the PI requires invalidating terminations announced before the TRO but that agency leadership subsequently confirmed were warranted under agreement terms and applicable regulations is therefore predicated on a misreading the PI and the Court's antecedent orders, and cannot be sustained.

**VI.      Prudential Concerns Militate Against Entertaining Plaintiffs' Motion**

Given the expedited appeal, this Court should refrain from taking any additional steps, including granting a motion to enforce, while the D.C. Circuit is weighing the validity of the preliminary injunction and preparing to issue a quick decision. Indeed, based on the expedition of the appeal, the Government has not been forced to seek a stay of the preliminary injunction from the D.C. Circuit. Again, like the AVAC Plaintiffs, the GHC Plaintiffs identify no reason for modification or alteration of the preliminary injunction's provision as to appropriations during the pendency of the expedited appeal, and they make no showing that Defendants would be unable to obligate any funds that would expire on September 30, 2025, or otherwise take other action consistent with law with respect to those funds.

And should this Court decide to grant relief on the motion to enforce, the Government respectfully requests that the Court stay such an order for a short time to permit the Government to consider whether to seek appellate relief from such order.

Notably, if the D.C. Circuit were to reverse or vacate the preliminary injunction, any actions taken now would be unnecessary and wasteful. *See, e.g.*, *Athridge*, 464 F. Supp. 2d 19, 22-23 (D.D.C. 2006) (District Court consideration of matter already on appeal would cause "confusion and the waste of time and judicial resources…"). If the D.C. Circuit affirms the preliminary

injunction, Defendants will have adequate time to fully comply prior to September 30, 2025. *See* Lewin Decl. ¶¶ 9-18.

Additionally, any actions ordered now leading to the obligation or disbursement of funds to Plaintiffs would needlessly create harms to the Government that likely could not be unwound. Even apart from the Government's sovereign interests, the motion seeks to require the Government, on Plaintiffs' preferred timetable, to disclose a plan for making available for obligation the full amount of foreign assistance funds appropriated under the relevant appropriations statute. But because the pertinent provision of the preliminary injunction is not limited to funding for programs in which any Plaintiff has participated, such a plan would largely be irrelevant to the particular Plaintiffs.

And, moreover, acceptance of GHC Plaintiffs' proposed relief would harm both the Executive's latitude to propose recissions under the ICA, and Congress's latitude to consider and vote upon such recission proposals under the time limits set out by the ICA.

## CONCLUSION

GHC Plaintiffs misconstrue the preliminary injunction's scope and Defendants' conduct in asserting that entry of their proposed order can be justified as purported enforcement of the preliminary injunction. Their motion to enforce should be rejected for the reasons stated.

Dated: June 30, 2025

Respectfully submitted,

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division

ALEXANDER K. HAAS
Director
Federal Programs Branch

*/s/ Indraneel Sur*
INDRANEEL SUR (D.C. Bar 978017)
Senior Counsel
Joshua N. Schopf
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Phone: (202) 616-8488
Email: indraneel.sur@usdoj.gov

*Counsel for Defendants*