**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

GLOBAL HEALTH COUNCIL, *et al.*,

       *Plaintiffs*,

   v.

DONALD J. TRUMP, *et al.*,

       *Defendants*.

Civil Action No. 25-cv-402 (AHA)

<u>**GLOBAL HEALTH COUNCIL PLAINTIFFS'
REPLY IN SUPPORT OF THEIR MOTION TO
ENFORCE PRELIMINARY INJUNCTION**</u>

## TABLE OF CONTENTS

REPLY ....................................................................................................................................... 1

ARGUMENT ........................................................................................................................... 3

A.  The Preliminary Injunction Requires Defendants to Spend the Full Amounts
    Appropriated ................................................................................................................ 3

B.  The Injunctions Prohibits Defendants' Delays ............................................................ 5

C.  Defendants May Not Evade the Injunction Through a Pocket Rescission ................... 8

D.  The Court Should Require Defendants to Immediately Take all Steps Necessary to
    Obligate Funds Before They Expire ........................................................................... 11

E.  The Deliberative Process Privilege Is No Basis for Defendants to Refuse to Submit a
    Compliance Plan ......................................................................................................... 14

F.  The Court Should Extend the Period of Availability If Needed ................................ 17

G.  *Trump v. CASA* Provides No Basis for Limiting Relief .............................................. 19

H.  Defendants Violated the Injunction by Effectuating Prior Terminations ................... 22

# TABLE OF AUTHORITIES

**Cases**

*Dep't of Com. v. New York*, 588 U.S. 752 (2019) ........................................................12

*Alexander v. FBI*, 186 F.3d 113 (D.D.C. 1998) ..........................................................14

*Bitscopic, Inc. v. United States*, 166 Fed. Cl. 677 (2023) ..........................................15

*Borden v. United States*, 593 U.S. 420 (2021) .............................................................8

*CC Distribs., Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989) ....................26

*City of Houston v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421 (D.C. Cir. 1994)..............17, 18

*City of New Haven v. United States*, 809 F.2d 900 (D.C. Cir. 1987) .........................6, 9

*Clinton v. City of New York*, 524 U.S. 417 (1998) ......................................................10

*Coal. of MISO Transmission Customers v. FERC*,
    45 F.4th 1004 (D.C. Cir. 2022) ............................................................................20

*Connecticut v. Schweiker*, 684 F.2d 979 (D.C. Cir. 1982) ........................................17

*Dalton v. Specter*, 511 U.S. 462 (1994) .......................................................................3

*eFedBudget Corp.*, B-298627, 2006 CPD P 159, 2006 WL 3347953 (Nov. 15, 2006)...............15

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000).............................9

*Food Mktg. Inst. v. ICC*, 587 F.2d 1285 (D.C. Cir. 1978) ..........................................25

*Goodluck v. Biden*, 104 F.4th 920 (D.C. Cir. 2024).....................................................18

*In re Cheney*, 544 F.3d 311 (D.C. Cir. 2008)...............................................................14

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
    898 F. Supp. 2d 603 (S.D.N.Y. 2012) .................................................................16

*Innovation Dev. Enters. Of America, Inc. v. United States*, 108 Fed. Cl. 711 (2013)..................15

*Kittner v. Gates*, No. 09-1245, 2011 WL 1791233 (D.D.C. May 11, 2011)..................4

*Matter of: TLC Services, Inc.*, B-252614, 93-1 CPD P 481,
    1993 WL 239100 (June 22, 1993)........................................................................13

*Nat'l Ass'n of Reg'l Councils v. Costle*, 564 F.2d 583 (D.C. Cir. 1977) ................17, 18

*Nat'l L. Ctr. on Homelessness & Poverty v. U.S. Dep't of Veterans Affs.*,
    842 F. Supp. 2d 127 (D.D.C. 2012) ............................................................................. 15

*Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429 (D.C. Cir. 1992) ...................... 15

*Protect Democracy Project, Inc. v. HHS*, 569 F. Supp. 3d 25 (D.D.C. 2021) .............................. 17

*Pub. Emps. for Env't Resp. v. Env't Prot. Agency*, 288 F. Supp. 3d 15 (D.D.C. 2017) ............... 17

*Rotair Aerospace Corp. v. United States*, 173 Fed. Cl. 187 (2024) .............................................. 13

*Rochester Pure Waters Dist. v. E.P.A.,* 960 F.2d 180 (D.C. Cir. 1992) ........................................ 18

*Shaw v. Hunt*, 517 U.S. 899 (1996) ............................................................................................... 20

*Shawnee Tribe v. Mnuchin*, 984 F.3d 94 (D.C. Cir. 2021) ........................................................... 18

*Sikorsky Aircraft Corp. v. United States*, 106 Fed. Cl. 571 (2012) ............................................. 16

*Teton Historic Aviation Found. v. U.S. Dep't of Def.*, 785 F.3d 719 (D.C. Cir. 2015) ................ 20

*Trump v. CASA Inc.*, No. 24A884,
    2025 WL 1773631 (U.S. June 27, 2025) .......................................................... 19, 20, 21, 22

*United States v. Stover*, 329 F.3d 859 (D.C. Cir. 2003) ............................................................... 19

**Statutes**

2 U.S.C. § 683 ........................................................................................................................... 7, 9

2 U.S.C. § 684 ............................................................................................................................... 5

28 U.S.C. § 1491 ......................................................................................................................... 13

31 U.S.C. § 1512 ........................................................................................................................... 6

31 U.S.C. § 3553 ......................................................................................................................... 13

41 U.S.C. § 3304 ......................................................................................................................... 12

Pub. L. No. 118-47, 138 Stat. 460 (Mar. 23, 2024) .................................................................. 3, 4

**Rules**

Fed. R. Civ. P. 71 ......................................................................................................................... 19

**Regulations**

2 C.F.R. § 200.472 ....................................................................................................................... 24

2 CFR § 200.204...................................................................................................................13

48 C.F.R. § 6.301................................................................................................................12

48 CFR § 31.205-42.............................................................................................................24

**REPLY**

Defendants offer no meaningful argument that they have complied with the injunction to date and will do so moving forward. They do not describe a single step they have taken since March to obligate foreign assistance appropriations as this Court required, they do not detail any steps they are now taking to obligate funds, and they do not commit to ever obligating the funds before they expire, even if the preliminary injunction remains in place.

Defendants' arguments against enforcement of the injunction do not actually concern enforcement; they instead challenge the injunction itself. Defendants seek to re-litigate arguments this Court already rejected, on the separation of powers, the Impoundment Control Act, the President's foreign affairs powers, and more. And they raise new arguments never made before to this Court, including that the appropriations statutes do not require the agencies to spend all the funds as a statutory matter, and that the injunction may be too broad. The time to make all those arguments was in February and March during the preliminary injunction proceedings, and the time for a motion for reconsideration or a stay pending appeal more generally has long passed. Now, it is time for compliance.

Yet Defendants' opposition makes clear that Defendants will take no steps until at least August 15, when Defendants hope the D.C. Circuit will rule on their pending appeal. If the D.C. Circuit affirms, they suggest they will take one of two paths, both of which are unlawful—and one of which is impossible even if it were lawful.

First, Defendants state that they could use vehicles other than full and open competition to award contracts, grants, and cooperative agreements during the period between August 15 and September 30, 2025. That almost surely would not be lawful: federal law prohibits agencies from using less than full and open competition simply because funds are set to soon expire or there

was a lack of advance planning by the agency. Even if it were lawful, the timeline for limited competition and sole awards is still months, not weeks. It will simply not be possible for Defendants to obligate billions of dollars by September 30 if they do nothing until August 15.

Second, Defendants suggest that they may attempt a "pocket rescission," and ask the Court to affirmatively endorse this tactic now. The Court should reject pocket rescissions, both as a way for Defendants to evade the current injunction and as a tactic to circumvent Congress's appropriations laws more generally.

The Court should also order Defendants to produce a real compliance plan. The deliberative process privilege should not apply, but if the Court deems it appropriate, it may have Defendants submit their plan for in camera review of any privileged portions. The Court should also make clear that it will extend the period of availability of the expiring funds if necessary as a last resort. Defendants do not deny that D.C. Circuit precedent allows such action; they instead ask the Court not to do so because they really want to impound these funds.

Defendants' discussion of the Supreme Court's recent decision on universal injunctions is inapt in the context of a motion to enforce, where they have not sought to stay the injunction's scope. But in any event, *CASA* poses no barrier to the relief granted. Plaintiffs' relevant injury is the lost opportunity to compete for funds, and their declarations establish that they compete for the full spectrum of foreign aid funds. The only way to provide complete relief is to order Defendants to make all funds available for obligation.

Finally, Defendants ask this Court to belatedly read an atextual exception into the Court's injunction to allow them to effectuate pre-February 13 terminations. That request is all but an admission that Defendants are violating the plain text of the injunction. Plaintiffs' motion to enforce the preliminary injunction should be granted.

## ARGUMENT

### A.    The Preliminary Injunction Requires Defendants to Spend the Full Amounts Appropriated

The impoundment portion of this Court's injunction is clear: "The Restrained Defendants are enjoined from unlawfully impounding congressionally appropriated foreign aid funds and shall make available for obligation the *full amount of funds that Congress appropriated* for foreign assistance programs in the Further Consolidated Appropriations Act of 2024." ECF No. 60 at 48 (emphasis added).

Despite having been ordered to obligate "the full amounts of funds" appropriated, Defendants argue that "Plaintiffs have not identified any applicable statutory requirement that the Executive Branch expend all of the appropriated funds here." Opp. 6. Defendants thus seek to litigate the propriety of the injunction to which they are subject. And the time to raise this argument would have been at the preliminary injunction stage, and Defendants did not do so there.

In Defendants' preliminary injunction briefing before this Court, the only defenses raised to Plaintiffs' separation of powers claims were: (1) that under *Dalton v. Specter*, 511 U.S. 462 (1994), Plaintiffs' separation of powers claims were not actionable because they were based on statutory violations; and (2) there could be no separation of powers violation because "the President's powers in the realm of foreign affairs are vast and generally unreviewable." ECF No. 34 at 23-24. It was not until their pending appeal that Defendants first raised an argument that the appropriations statutes do not, in fact, require them to obligate all of the appropriated funds. *See* Defs. Br. 36-39, No. 25-5097 (D.C. Cir. May 9, 2025). Plaintiffs have responded to that unsupported contention in their appellate briefing, Pls. Br. 32-45, but for purposes of these district court proceedings to enforce this Court's injunction, Defendants' arguments are both

waived and irrelevant. *Cf. Kittner v. Gates*, No. 09-1245, 2011 WL 1791233, at *2 (D.D.C. May 11, 2011) ("A motion for reconsideration may not … be used to raise arguments or defenses that could have been advanced during the original proceeding."). What matters for present purposes is whether Defendants' have complied with the terms of the injunction, and they have not.

As for the subcategories for which Congress directed particular amounts must be spent, Defendants' response is difficult to discern. Congress directed in Section 7019 that "funds appropriated by this Act under titles III through V shall be made available *in the amounts specifically designated* in the respective tables included in the explanatory statement" appended to the Act. In Sections 7030-7061, Congress then specified other purposes for which specific amounts of Title III and Title IV funds must be spent. In many of these provisions, Congress directed that "not less than" a certain amount "shall be made available" for a purpose or programs. *See, e.g.*, Pub. L. No. 118-47 §§ 7034, 7035, 7041, 7061. In others, Congress designated that a precise amount shall be spent on the relevant purposes or program, no more and no less. *See, e.g.*, *id.* § 7060(a)(1)(B). The meaning of the foreign assistance programs is thus plain: Titles III and IV appropriate top-line amounts that Defendants must obligate for broad categories of purposes. Section 7019 and Sections 7030-7061 then specify sub-amounts that must be spent on more narrowly defined purposes. But the total amounts Defendants obligate across all programs must add up to the top-line amounts in Titles III and IV.

In their opposition, Defendants fail to address the spending mandates in Sections 7030-7061. *See* Opp. 6-7. As for the tables referenced in Section 7019(a), Defendants correctly observe that these "tables are … aimed at giving direction to the Executive Branch about how to allocate portions of the lump-sum appropriations to certain uses." *Id.* at 6. But Defendants then claim that it is somehow "ambiguous" whether Defendants must spend the amounts specified in the table. *Id.* at 6-7. Congress left no ambiguity. In Section 7019(d)(1), Congress provided that

4

Defendants may not deviate from the table amounts *at all* for Global Health Programs, and for other programs, Congress in Section 7019(b) stipulated that Defendants "may only deviate up to 10 percent from the amounts specifically designated in the respective tables."

Congress was clear. The 2024 Appropriations Act, and appropriations acts before it, require Defendants to spend specific sums for specific foreign assistance purposes, and this Court's injunction requires Defendants to obligate the "full amounts" that Congress required.

### B.    The Injunctions Prohibits Defendants' Delays

Defendants assert that no "applicable statutory requirement" requires them to obligate or expend the funds "immediately," and that the relevant appropriations permit "Defendants' evaluation of the appropriate next steps within the time available." Opp. 8. That again directly contravenes the Court's order and raises arguments the Court already rejected.

This Court enjoined not just Defendants' unlawful impoundment writ large, but also their unlawful *deferral* of foreign-assistance funds. As this Court explained in rejecting Defendants' identical argument at the preliminary injunction phase, "[t]he notion that the Executive has simply 'paused' appropriations does not avoid the problem." ECF No. 60 at 36. Congress has authorized agencies to defer obligating appropriations only pursuant to certain procedural requirements, *id.* at 31, and *only* "(1) to provide for contingencies; (2) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (3) as specifically provided by law," 2 U.S.C. § 684(b). "No officer or employee of the United States may defer any budget authority for any other purpose." *Id.* This Court found that Defendants' "blanket suspension of billions of dollars appropriated by Congress for specific purposes" thus violated Congress' expressed will, and hence the separation of powers. ECF No. 60 at 37. Confirming that the injunction does not permit a continued delay of obligating funds, this Court enjoined Defendants "from unlawfully impounding" foreign aid funds, and specifically ordered

that Defendants "shall take all steps necessary to effectuate this order." ECF No. 62 at 48.

Defendants' varied claims that they are under no time constraints thus facially conflict with this

Court's injunction, which alone is reason to require immediate action.

The Court therefore need not address Defendants' newfound statutory theories to claim

an authority to defer spending, but if the Court does address these new arguments, they lack

merit. Defendants' primary argument (at 8) is that OMB's authority to *apportion* funds under 31

U.S.C. § 1512(a) gives the Executive Branch ultimate say over when to obligate and spend

money. As Plaintiffs explained in their motion, Pls. Mot. to Enforce 10, the purpose of

apportionment is the *opposite* of impoundment: apportionment "prevent[s] agencies from

*prematurely exhausting* their appropriated funds," not from *spending* those funds in the first

place.[1] More importantly, Congress has emphatically rejected Defendants' understanding of

§ 1512(a). As the D.C. Circuit recounted in *City of New Haven*, Congress specifically amended

the very provisions on which Defendants rely "to preclude the President from relying on that Act

as authority for implementing policy impoundments." *City of New Haven v. United States*, 809

F.2d 900, 906 (D.C. Cir. 1987). Prior to 1974, the Anti-Deficiency Act broadly authorized the

President to "apportion funds where justified by 'other developments subsequent to the date on

which such appropriation was made available." *Id.* at 906 n.18. Congress struck that language in

1974 "to preclude the President from invoking the Act as authority for implementing 'policy'

impoundments," as "President Nixon had attempted." *Id.* Reading apportionment authorities to

authorize Defendants to indefinitely defer spending appropriations, to the point of triggering a

permanent lapse, would provide the President the very power that Congress took action to deny.

---

[1] Cong. Res. Service, *Office of Management and Budget (OMB) Reporting on Apportionments* 1 (Apr. 10, 2025) (emphasis added),
https://www.congress.gov/crs_external_products/IN/PDF/IN12538/IN12538.8.pdf.

Defendants' second argument—based on the "structure of the ICA"—is also unfounded. Opp. 8. Defendants argue that they need not spend *any* appropriated funds unless and until: (1) the President "determines" the funds should be rescinded, (2) the President submits a rescission proposal to Congress, and (3) Congress fails to enact the proposal within 45 legislative days, or, if the President submits the proposal less than 45 legislative days before the funds expire, Congress actively votes down the proposal before the expiration date. In Defendants' view, if the President does not initiate the rescission process or waits until the eleventh hour to do so, the Executive Branch need not spend *any* of the funds that Congress appropriated.

This theory, too, would transform the ICA into a vehicle that *enables* impoundment, and it would render the ICA's rescissions procedures a dead letter. *See* 2 U.S.C. § 683(a). The ICA creates an exception to the default rule that appropriations must be spent in full. The ICA permits the President to submit a rescission proposal to Congress "whenever the President determines that … budget authority *should be rescinded* for fiscal policy or other reasons." 2 U.S.C. § 683(a) (emphasis added).[2] But under Defendants' theory, this statutory procedure—the central feature of the ICA—is never needed. The ICA requires the President to submit a rescission proposal only when he "determines" that funds "should be rescinded." *Id.* But if appropriations *themselves* did not require agencies to spend the funds before they expire, as Defendants posit, why would funds ever need to "be rescinded"? *Id.*

The appropriations would simply expire, unspent, without the President ever having to submit a rescission proposal. 2 U.S.C. § 683(a).

---

[2] The ICA also permits the President to submit a rescission proposal where the President determines that Congress's objectives and intended scope of work can be fulfilled without the full appropriated amount. 2 U.S.C. § 683(a). This part of § 683(a) does not apply where, as here, the President has policy disagreements with Congress' objectives and intended program scope.

This Court "should not lightly conclude that Congress enacted a self-defeating statute." *Borden v. United States*, 593 U.S. 420, 460 (2021) (quotations omitted). The only way to read the ICA in harmony with appropriations is that appropriations presumptively must be spent unless the President obtains Congress' approval to rescind the appropriations.

Finally, Defendants claim that they still have plenty of time to obligate funds before September 30 even following "an adverse decision from the D.C. Circuit by August 15." But as Plaintiffs explain below, and as confirmed by a declarant with extensive firsthand experience with the necessary contracting and grantmaking procedures, Defendants' timeline is impossible. *See infra* 11-14.

### C.    Defendants May Not Evade the Injunction Through a Pocket Rescission

Plaintiffs' opening brief asked the Court to make clear that Defendants may not leverage their ongoing noncompliance with the injunction to effectuate a permanent impoundment of funds through a "pocket rescission." Pls. Mot. to Enforce 2, 17-19, ECF No. 97-1. Defendants do not respond directly to this request. Nor do they provide any reason why—even if they are correct that the ICA permits pocket rescissions in the abstract (which it does not)—they should be permitted to carry out a pocket rescission that is possible only because they have not complied with the preliminary injunction for five months—from March through August. They should not be. The Court should clarify that, regardless of whether the ICA otherwise permits pocket rescissions, Defendants may not utilize that tactic here to evade the preliminary injunction that they have been continuously violating.

Instead, Defendants ask the Court to "clarify" that its preliminary injunction does not prohibit pocket rescissions, Opp. 9—which would amount to endorsing Defendants' apparent plan to attempt a pocket rescission. But their efforts to defend the lawfulness of pocket rescissions fall flat. As Plaintiffs explained in their opening brief, the plain text of the ICA

requires that funds "shall be made available for obligation" unless "Congress has completed action on a rescission bill" within 45-session days of the proposal, 2 U.S.C. § 683(b). Funds may only be "made available for obligation" while they remain available, but Congress will not have "completed" action on a rescission proposal during the period of availability under the scenario Defendants posit. Defendants also offer no explanation why the 45-day window for Congress to act would continue running after the funds expire, given that Congress cannot rescind funds that have already expired. Congress is presumed to not enact laws that are pointless. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (court must interpret statute as a "coherent regulatory scheme" and "fit, if possible, all parts into a harmonious whole").

Defendants also offer no plausible explanation why Congress would have intended to provide a mechanism that facilitates the impoundment of funds. The D.C. Circuit rejected a similar effort by the government to turn the ICA on its head in *City of New Haven v. United States*, 809 F.2d 900 (D.C. Cir. 1987). There, the Court held that "the 'raison d'etre' of the entire legislative effort was to assert *control* over presidential impoundments." *Id.* at 907. "It is simply untenable to suggest that a Congress precluded from achieving this goal would have turned around and ceded to the President the very power it was determined to curtail." *Id.* That holding applies equally here. Defendants' only rejoinder is that Congress provided a "definite end date" for the foreign assistance appropriations, where it allows other "no year" appropriations to remain available indefinitely. Opp. 9. But the fact that Congress set an expiration for these appropriations proves the opposite—Congress required that Defendants must spend all of these funds by an expiration date because Congress deemed the prompt and definite obligation of the funds by that date important.

Finally, Defendants do not meaningfully address that their interpretation of the ICA would render it unconstitutional in the same way as the Line-Item Veto Act, by giving the

President the authority to unilaterally cancel obligations unless Congress affirmatively steps in and rejects the President's action. Defendants seek to distinguish the Line-Item Veto Act on the basis that "the dispute here concerns the President's authority to determine how and whether to obligate and expend appropriated funds through dialogue with Congress." Opp. 13. But the exact same rationale was advanced by the Clinton Administration in *Clinton v. City of New York*, 524 U.S. 417 (1998), which concerned "the President's authority to determine how and whether to obligate and expend appropriated funds"—there, by cancelling appropriations—"through a dialogue with Congress" that required sending a special message to Congress of the cancellation and giving Congress a chance to disapprove it. *See id.* at 436-37. There are no material differences between *Clinton* and what Defendants propose here. Both Defendants' theory of pocket rescissions and a line-item veto license Executive Branch nullification of appropriations enacted into law by Congress.

Defendants also misleadingly quote from *Clinton* to suggest that the Court recognized "the President's 'traditional authority to decline to spend appropriated funds.'" Opp. 13. That statement in *Clinton* was referring to appropriations that explicitly gave the President discretion to spend less than the full amount appropriated, such as providing "'sums not exceeding' specified amounts to be spent on various Government operations." *Clinton*, 524 U.S. at 446. None of the appropriations here provide such discretion.

In any event, regardless of whether the ICA otherwise permits pocket rescissions, the Court should make clear that Defendants may not utilize that tactic here to evade the preliminary injunction this Court entered long ago.

10

**D.     The Court Should Require Defendants to Immediately Take all Steps Necessary to Obligate Funds Before They Expire**

The preliminary injunction requires that Defendants "shall take all steps necessary to effectuate this order." ECF No. 60 at 48. That alone prohibits Defendants from waiting until August 15 to take steps toward obligating funds. In any event, it is implausible that Defendants could obligate the billions of dollars in expiring funds if they wait until August 15 to do anything, across all the different purposes and programs for which funds must be obligated.

Defendants rely on a new declaration from Defendant Jeremy Lewin to assert that it is possible to wait until August 15 to take action and still obligate all expiring funds by September 30. Mr. Lewin asserts: "In my experience, Defendants should have sufficient time to obligate foreign assistance funds that would otherwise expire on September 30, 2025, if the process begins by August 15, 2025." ECF No. 99-1 ¶ 18. The Court should discount Mr. Lewin's assertions as a threshold matter because he has tendered no "experience" or other qualifications upon which to make these statements.  Prior to helming the Administration's campaign against foreign assistance funding, he was a junior associate at a large law firm.  Before this year, Lewin had never previously served in the federal government; he has never served as a contracting or program officer; and, during his brief tenure at USAID, the agency has not been awarding foreign assistance awards.  In the declaration attached to this filing, an actual contracting officer makes clear that "USAID would have needed to start the process of obligating expiring funds many months ago to have any chance of obligating all of the expiring funds by September 30, 2025."  Declaration of Zahra Doe (Doe Decl.) ¶ 30 (Attached as Exhibit A).

Mr. Lewin's specific assertions regarding the purported processes that Defendants could employ to quickly obligate funds highlight his lack of relevant knowledge and experience. Mr. Lewin suggests that Defendants could invoke exceptions and waivers from customary "full and

open competition" procedures, authorize modifications of existing contracts or awards of new contracts on an expedited basis, or accelerate grant timelines under exigent circumstances. ECF No. 99-1 (Lewin Decl.) ¶¶ 11-13. But these exceptions and waivers are inapplicable or unauthorized here, and, in any event, would not provide Defendants enough time to obligate the funds before they lapse. For USAID, the average time to award a noncompetitive definite contract open to limited sources was 258 days, and the average time to sole source a contract was 151 days. ECF No. 97-4 at 15. It took an average of 90 days to amend a grant agreement. *Id.* USAID does not have enough remaining contracts to modify that would enable it to obligate billions of dollars at a moment's notice, and even then, bilateral contract modifications take an average of 91 days. *Id.* Mr. Lewin does not explain how USAID would complete these processes in significantly less than these average times, across hundreds of awards all at once, with limited staff. *See* Doe Decl. ¶ 22 ("the timeline for the entire procurement process depends on having appropriately qualified staff," but "nearly 100% of USAID staff has been laid off"). This Court is "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (quotations omitted).

The legal impediments to Mr. Lewin's plan of utilizing less than full and open competition would be just as great as the practical ones. Federal acquisition law dictates that "[i]n no case may an executive agency… enter into a contract for property or services using procedures other than competitive procedures on the basis of the lack of advance planning or concerns related to the amount available to the agency for procurement functions." 41 U.S.C. § 3304(e)(5). Implementing this prohibition, the FAR also prohibits bypassing full and open competition due to "[c]oncerns related to the amount of funds available *(e.g., funds will expire)* to the agency or activity." 48 C.F.R. § 6.301(c).  In other words, federal law and regulations directly contradict Mr. Lewin's declaration and make clear that Defendants cannot cite the

12

impending expiration of the funds as a reason for utilizing less than full and open competition. Defendants' lack of "advance planning" for obligating the funds, in the face of an injunction that required them to do just that, would preclude the use of limited competition as well.

Moreover, attempts to utilize noncompetitive processes in the face of these contrary laws and regulations would fail, because excluded bidders could and surely would contest the lack of competition through protests with GAO or litigation in the Court of Federal Claims. At a minimum, such challenges would bring further delay, as timely protests filed with GAO automatically stay the contract award, 31 U.S.C. § 3553(c)–(d), and bid protest litigants in the Court of Federal Claims may seek a TRO or preliminary injunction, 28 U.S.C. § 1491(b)(2). *See* Doe Decl. ¶ 27 (a bid protest "typically substantially delays the obligation of funds" and "often adds months to years to any specific procurement"). And there is strong reason to believe that the protests or litigation would prevail. The Comptroller General, for instance, has regularly sustained protests of sole-source-basis bid awards where agencies' need for sole-source procurement arises from lack of advance planning. *See, e.g., eFedBudget Corp.*, B-298627, 2006 CPD P 159, 2006 WL 3347953 (Nov. 15, 2006); *Matter of: TLC Services, Inc.*, B-252614, 93-1 CPD P 481, 1993 WL 239100 (June 22, 1993); *Innovation Dev. Enters. Of America, Inc. v. United States*, 108 Fed. Cl. 711 (2013).[3]

Similar timing hurdles defeat Defendants' arguments with respect to grant awards. Although the OMB's Uniform Guidance allows for funding opportunities to be posted for less than 30 days under "exigent circumstances," 2 CFR § 200.204(b), the agency review process

---

[3] *See, e.g.*, *Rotair Aerospace Corp. v. United States*, 173 Fed. Cl. 187, 198 (2024) (plaintiff argued that the government failed to conduct a reasonable investigation into its own data rights before making a sole-source decision); *Bitscopic, Inc. v. United States*, 166 Fed. Cl. 677, 684 (2023) (recounting that plaintiff "has protested at least ten attempts by the VA to make improper sole-source" or brand-name awards, some of which resulted in corrective action).

following an award's closure can still take as long as 3 months, and may be followed by

negotiation with the applicant, and issuance of the award itself can take additional weeks or

months. ECF No. 97-1 at 11-12. Defendants fail to address this timeline, which is evidenced

from the fact that USAID's average time for awarding noncompetitive grants is 90 days. Doe

Decl. ¶ 21.

Finally, although the record is clear that Defendants cannot plausibly obligate the

expiring funds if they wait until August 15 to do anything, if the Court finds that there are

relevant, disputed factual questions on this issue or Defendants' compliance with the injunction

to date, the Court should authorize Plaintiffs to take a limited deposition of Mr. Lewin within the

next 10 days. The D.C. Circuit has held that depositions of government witnesses are appropriate

to allow questioning into facts the government "has itself put in evidence." *In re Cheney*, 544

F.3d 311, 314 (D.C. Cir. 2008); *see also Alexander v. FBI*, 186 F.3d 113, 121-22 (D.D.C. 1998)

(allowing depositions of government declarants and recognizing that depositions "rank high in

the hierarchy of pretrial, truth-finding mechanisms"). Defendants voluntarily chose to submit Mr.

Lewin's testimony to provide a factual basis for opposing the present motion, and that testimony

should not provide a ground for denying relief without Mr. Lewin being subject to cross-

examination. The deposition could be limited to Defendants' steps and plans to comply with the

injunction, and Mr. Lewin's assertions regarding the feasibility of obligating all expiring funds if

Defendants wait until August 15.

### E.    The Deliberative Process Privilege Is No Basis for Defendants to Refuse to Submit a Compliance Plan

Defendants invoke the deliberative process privilege to bar any inquiry into their

compliance with the preliminary injunction. But Defendants fundamentally misunderstand the

nature of Plaintiffs' request and the compliance information that this Court has ordered

Defendants to provide. Plaintiffs have not sought "internal proposals" for the obligation of budget authority, Opp. 9, or documents reflecting "OMB's discussions with State and USAID about how the appropriated funds are apportioned," *id.* at 16. Plaintiffs have not sought any internal documents at all. Rather, the Court has ordered Defendants simply to explain how they have complied with the preliminary injunction—through actions already taken—and how they will comply in the future. 6/16/2025 Minute Order in *AVAC*. Such an order is well within the Court's "broad discretion in using its inherent equitable powers to ensure compliance with its orders." *Nat'l L. Ctr. on Homelessness & Poverty v. U.S. Dep't of Veterans Affs.*, 842 F. Supp. 2d 127, 131 (D.D.C. 2012). "Equity would not be achieved if a court decided simply to rubber-stamp an enjoined party's unsupported self-assessment of its compliance with a court order." *Id.*

Defendants' assertion that its compliance plan *itself* is "predecisional" can only mean that they have no plan, other than to wait for the D.C. Circuit's decision. But Defendants waived that option when they elected not to seek a stay of the injunction. Nor can Defendants seriously contend that the compliance plan is itself "deliberative." The "steps [Defendants] have taken to date to come into compliance" and the "steps Defendants intend to take … to ensure compliance," 6/16/2025 Minute Order in *AVAC*, is "factual information [that] generally must be disclosed," as opposed to materials "embodying officials' opinions." *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992).

Even if the deliberative process privilege were potentially implicated, Defendants have waived reliance on the privilege through Mr. Lewin's affirmative assertion that "Defendants … have already undertaken preparations to be ready to obligate expiring foreign assistance funds on a short timeline as necessary." ECF No. 99-1 ¶ 17. Defendants cite inapposite cases about limited waiver where the government selectively discloses a document or fact to a third party or released it into the public domain. Opp. 16. But the waiver principle that Plaintiffs have relied on is the

sword/shield doctrine, not selective disclosure. And contrary to Defendants' suggestion, the sword/shield doctrine is not limited to the attorney-client privilege, but applies to the deliberative process privilege as well. *See, e.g.*, *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 898 F. Supp. 2d 603, 610 (S.D.N.Y. 2012) (because government "placed its own decision-making process at issue," the deliberative process privilege "must give way" to avoid the "inequitable use of privilege "as a sword rather than a shield"); *Sikorsky Aircraft Corp. v. United States*, 106 Fed. Cl. 571, 580 (2012) ("The government may waive the deliberative process privilege by … placing a portion of privileged material at issue while self-servingly retaining the rest.").

Even if not waived, Defendants have not rebutted Plaintiffs' showing that their need for the information at issue outweighs the risk of "future timidity by government employees" if the information is disclosed. Mot. 16. The information is highly relevant because, as explained, Defendants' actions to date at a minimum raise significant questions about their compliance with this Court's injunction. Any concern that that inquiry into compliance will force agency employees having to operate "in a fishbowl," Opp. 18, has no application here because, again, Plaintiffs are not seeking internal agency communications reflecting employees' candid deliberations. Accordingly, Defendants cannot invoke the deliberative process privilege to bar inquiry into their compliance with this Court's order.

In all events, to allay any purported concerns over the deliberative process privilege, the Court could require Defendants to submit a complete, unredacted compliance plan for *in camera* review, and the Court could then rule upon the propriety of any privilege assertions. This would ensure that Defendants disclose to the Court the detailed steps that have purportedly taken and will take to comply with the Court's injunction. There would be no legitimate basis for Defendants to refuse to submit the plan for *in camera* review, as routinely occurs in this District

16

for courts to evaluate assertions of deliberative process privilege. *Pub. Emps. for Env't Resp. v. Env't Prot. Agency*, 288 F. Supp. 3d 15, 23 (D.D.C. 2017) ("The Court may also rely on its own in camera inspection of documents to discern whether the deliberative process privilege applies."); *Protect Democracy Project, Inc. v. HHS*, 569 F. Supp. 3d 25, 43-44 (D.D.C. 2021) (ordering government to submit documents for in camera review to determine whether deliberative process privilege applies).

### F.    The Court Should Extend the Period of Availability If Needed

Defendants give away the game in protesting any extension of the period of availability to ensure, if necessary, that expiring funds are obligated consistent with the preliminary injunction. If Defendants were certain that they could obligate all the expiring funds even if they wait until August 15, they would have no basis for objecting to an extension of the expiration date, since they could simply obligate the funds before any extension took effect. Defendants' real objection appears to be that an extension would enable them to spend funds they do not want or intend ever to spend.

Legally, this Court's authority to extend the period of availability if needed is firmly established.  Defendants acknowledge binding circuit precedent holding that, where a suit is filed prior to the appropriations' expiration date, a court may "simply suspend the operation of a lapse provision and extend the term of already existing budget authority." *City of Houston v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421, 1426 (D.C. Cir. 1994); *see also Nat'l Ass'n of Reg'l Councils v. Costle*, 564 F.2d 583, 588 (D.C. Cir. 1977); ECF No. 99 at 18. The D.C. Circuit "has repeatedly 'reaffirmed the power of the courts to order that funds be held available beyond their statutory lapse date if equity so requires.'" *Connecticut v. Schweiker*, 684 F.2d 979, 997 (D.C. Cir. 1982) (quoting *Costle,* 564 F.2d at 588).

This precedent is not disturbed by *Goodluck v. Biden*, 104 F.4th 920 (D.C. Cir. 2024). *Goodluck* declined to import the doctrine into an entirely unrelated immigration context, which concerned judicial orders to the State Department to continue processing visa applications after the statutory deadlines had passed. *Id.* at 921, 927-28. Though not extending their principles to new contexts, the court recognized that *City of Houston* and *Costle* are controlling Circuit precedent with respect to district courts' "equitable authority" to extend an appropriations deadline. *See Goodluck*, 104 F.4th at 927-28. The D.C. Circuit has invoked this equitable authority to extend appropriations deadlines several times, including as recently as 2021. *See Shawnee Tribe v. Mnuchin*, 984 F.3d 94 (D.C. Cir. 2021).

Defendants' contention that the court may not "revive" appropriations that Congress has rescinded is not presented here, because Congress has not made a rescission. *Cf. Rochester Pure Waters Dist. v. E.P.A.,* 960 F.2d 180, 185 (D.C. Cir. 1992). What Defendants really seem to be arguing is that the Court may not extend the period of availability so as to preclude a *pocket* rescission. *See* Opp. 20. Even if Defendants were correct that the ICA permits them to wait 45 session days to obligate funds following a rescission proposal, no matter when that proposal is submitted, nothing in the ICA suggests that agencies have a vested right to use a rescission proposal to cause funds to expire. Defendants' desire not to spend funds is not a basis for this Court to refuse to utilize an available tool to prevent an unlawful impoundment.

Finally, while Defendants describe the President's foreign affairs powers, they cite no authority that the executive's "broad power to manage foreign aid" alters the court's equitable authority to suspend a lapse. This Court has already rejected Defendants' arguments that appropriations relating to foreign affairs hold different legal status from all other appropriations. ECF No. 60 at 37-38. There is no special right to impound foreign assistance funds.

### G.    *Trump v. CASA* Provides No Basis for Limiting Relief

Defendants invoke (at 21) the Supreme Court's recent decision in *Trump v. CASA Inc.*,
No. 24A884, 2025 WL 1773631 (U.S. June 27, 2025), to contend that any "relief" must be
"limited to the GHC Plaintiffs only, not to any funding recipients not before the Court."

To start, Defendants' discussion of *CASA* is irrelevant. Defendants do not challenge the
scope of the injunction—nor could they in this enforcement posture. If Defendants believed that
the injunction is overbroad, the proper mechanism for making that assertion would have been a
motion to stay in this Court or in the D.C. Circuit, which they have never done. Nor have
Defendants make any analogous scope-based objection to the injunction during proceedings on
Plaintiffs' request for a preliminary injunction. To the contrary, during an extensive discussion of
this very topic at the Court's hearing, Defendants *insisted* that any injunction requiring obligation
and expenditure of funds *must* go beyond the named Plaintiffs. Hr'g Tr. at 128:1-3 (The Court:
"So would the right scope of relief be spend, but not spend on plaintiffs?" Defendants' Counsel:
"Yes, for certain … ."); *see also id.* at 116-128. Defendants have accordingly forfeited this
scope-based objection for purposes of their appeal or in further proceedings before this Court.
*See United States v. Stover*, 329 F.3d 859, 872 (D.C. Cir. 2003).

Regardless, any *CASA*-based challenge would fail. As Defendants recognize (at 22),
*CASA* restricted "universal injunctions" but endorsed injunctions insofar as they are necessary to
"offer complete relief to the plaintiffs before the court." 2025 WL 1773631, at *11 (emphasis
omitted). This "complete-relief principle has deep roots in equity." *Id.* at *10. Under this
principle, for example, an injunction in a nuisance suit ordering "the defendant to turn her music
down" is a permissible party-specific injunction, even though it "necessarily benefit[s] the
defendant's surrounding neighbors too." *Id.* at *11. "There may be other injuries," the Court
observed, "for which it is all but impossible for courts to craft relief that is complete *and* benefits

only the named plaintiffs." *Id.* at \*11 n.12. The Court cited the example of "racially gerrymandered congressional maps," for which redressing a plaintiff's constitutional injury requires changing the boundaries of multiple districts and providing relief to all other voters who live in the plaintiff's district. *Id.* (citing *Shaw v. Hunt*, 517 U.S. 899 (1996)). Notwithstanding their broader consequences, such injunctions are not "universal" because, "[a]s a matter of law," "the injunction's protection extends only to the suing plaintiff," in that "only the plaintiff can enforce the judgment against the defendant." *Id.*; *see also* Fed. R. Civ. P. 71 (allowing nonparties to enforce court orders only where the order "grants relief for [the] nonparty").

These principles describe this Court's injunction to a tee. Defendants "engag[ed] in a unilateral rescission or deferral of congressionally appropriated funds in violation of Congress's spending power, as expressed in multiple statutes whose constitutionality has not been questioned." ECF No. 60, at 29. That act is irreparably harming Plaintiffs by depriving them of any opportunity to compete for any of those impounded funds. The lost opportunity to compete for funding is a long-recognized form of injury: the D.C. Circuit has held that a plaintiff suffers clear harm where "it has been walled off from an entire category of projects for which it is qualified, prepared, and eager to compete." *Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1016 (D.C. Cir. 2022). The order to stop impounding appropriated funds thus redresses the injury, even if a plaintiff "may not be able to show that it was *certain to receive* that benefit had it been accorded the lost opportunity." *Teton Historic Aviation Found. v. U.S. Dep't of Def.*, 785 F.3d 719, 724 (D.C. Cir. 2015) (quoting *CC Distribs., Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989)).

Given the nature of a right-to-compete injury, the "only … feasible option" that affords Plaintiffs "complete relief," *CASA*, 2025 WL 1773631, at \*10-11, is the injunction that this Court entered—namely, enjoining Defendants from "unlawfully impounding congressionally

20

appropriated foreign aid funds" and directing Defendants to "make available for obligation the full amount of funds that Congress appropriated for foreign assistance programs in the Further Consolidated Appropriations Act of 2024." ECF No. 60, at 48.

This injunction was plaintiff-specific; only Plaintiffs may enforce it. *See CASA*, 2025 WL 1773631, at *11. Yet, by necessity, providing Plaintiffs an opportunity to compete for funds requires ordering Defendants to "make available" the funds to all competitors, ECF No. 60 at 48, meaning that nonparties will necessarily be able to compete for the funds as well. And the Court's injunction covered all appropriated foreign-aid funds, because—as Defendants have never contested—the record firmly establishes that Plaintiffs are "ready, willing and able" to compete for *all* of these funds. *MISO*, 45 F.4th at 1015. To take one example, Plaintiff SBAIC is a "membership organization" with "almost 170 members" who provide a broad array of "work in all sectors and geographies," including "economic growth, agriculture and food security, democracy and governance, water and sanitation, … global health and education," "humanitarian relief and crisis stabilization," and "monitoring and evaluation to ensure that U.S. Government taxpayer funds are evidence-based and achieve the highest return for every dollar." ECF No. 7-2 at 1, ¶¶ 2-3, 5. Even this *one* plaintiff organization stands "ready, willing and able," to pursue all of the appropriated funds at issue. *MISO*, 45 F.4th at 1015.

The other plaintiffs cover a vast range of appropriations as well:

- DAI earned $750 million in revenue in 2024, nearly 80% of which came from USAID. ECF No. 7-7 at 2, ¶ 3. DAI submitted a list of 97 different foreign assistance grants and cooperative agreements it had active when this case was filed, running the gamut of programs and regions. *Id.* Att. A.

- Chemonics was working with USAID on 104 projects in over 90 countries as of January 2025. ECF No. 7-6 at 3, ¶ 5.

- Global Health Council has 123 member organizations operating in at least 150 countries, working on virtually all aspects of global public health. ECF No. 7-1 at 1, ¶ 4.

- Management Sciences for Health held awards to fight HIV/AIDS, tuberculosis, malaria, and non-communicable diseases, and for pandemic preparedness. ECF No. 7-5 at 2, ¶ 3.

- HIAS operates in 21 countries supporting refugees and displaced persons. ECF No. 7-3 at 2, ¶ 6.

- Democracy International's roughly $42 million in annual revenues in 2024 came from USAID awards for democracy programs as well as from those promoting good governance and protecting human rights, including for civil society, religious freedom, independent media, peacebuilding, anticorruption, budget transparency, humanitarian assistance for vulnerable and persecuted minorities, and reducing violence against women and girls. ECF No. 7-8 at 3, ¶ 7.

- ABA's Center for Global Programs has operated in more than 100 countries and was working on 19 programs funded by USAID. ECF No. 7-9 at 1-2, ¶¶ 3, 7. The programs collectively committed USAID to over $100 million in funding over the next five years. *Id.* ¶ 7.

For this group of plaintiffs, there is "only one feasible option" to afford them complete relief for their lost opportunity to compete, which is to require that all foreign assistance appropriations be made available. 2025 WL 1773631, at *11. The fact that providing a complete remedy for Plaintiffs' injuries may have the "*practical effect* of benefiting nonparties" is "merely incidental," and would provide no basis for restricting the injunction's scope. *CASA*, 2025 WL 1773631, at *10.[4]

## H.    Defendants Violated the Injunction by Effectuating Prior Terminations

Defendants do not dispute that the preliminary injunction, on its face, enjoins them from "giving effect to any terminations … issued between January 20, 2025, and February 13, 2025." ECF 60 at 48. Nor do they dispute that they are currently "giving effect" to nearly all of the pre-TRO terminations. *See* Mot., Ex. B. Instead, Defendants argue that the Court's preliminary injunction contains an (unwritten) exception that permits them to give effect to pre-TRO

---

[4] Although Plaintiffs' existing declarations substantiate the scope of relief provided, to the extent the Court would find it beneficial for Plaintiffs to provide additional details of the categories of foreign assistance appropriations for which they compete, Plaintiffs are prepared to submit additional declarations with that information.

terminations so long as the agencies subsequently "confirmed *post*-TRO" that the terminations "were warranted under applicable award terms and regulations." Opp. 23. The Court should reject Defendants' mistaken interpretation and enforce the injunction.

To begin, the Court's order does not permit Defendants to evade the injunction by supplying a *post hoc* rationale, nor is any such exception implied. The Court determined that the pre-TRO mass terminations were unlawful because they flowed from the government's unlawful funding freeze and "the directives implementing the Executive Order." ECF 60 at 24; *see id.* at 24-25 & n.10. The Court enjoined Defendants from "giving effect to" those specific terminations, full stop. *Id.* at 48. To be sure, the Court declined—based on the record at the preliminary-injunction stage—to enjoin subsequent terminations, issued post-TRO, pursuant to Defendants' purportedly "new individualized and comprehensive review of awards." *Id.* at 25. But that holding does not disturb the Court's order enjoining Defendants from giving effect to the pre-TRO terminations, which were based on the unlawful funding freeze and agency directives implementing Executive Order 14, 169.

Defendants rely on the Court's TRO opinion and other prior orders to derive an implied exception to the injunction's plain text, where the agencies have subsequently ratified their (temporarily restrained and then preliminarily enjoined) pre-TRO terminations. *See id.* at 23-25. But nothing in those orders endorses Defendants' retroactive "ratification" theory. Opp. 23. Indeed, that theory is contrary to fundamental principles of administrative law, which prohibit the government from adopting *post hoc* rationales to justify agency action. *See, e.g.*, *Food Mktg. Inst. v. ICC*, 587 F.2d 1285, 1290 (D.C. Cir. 1978). The Court's enforcement orders simply clarified that, under the TRO, Defendants were still permitted to "undertak[e] a good-faith, individualized assessment of a contract or grant and, where the terms or authority under law allows, taking action with respect to that particular agreement consistent with any procedures

23

required (including, for example, notice to contracting parties)." ECF 28 at 6. That remains true today. But rather than issue new terminations consistent with required procedures, Defendants instead purported to "giv[e] effect to" the pre-TRO terminations, notwithstanding the preliminary injunction. ECF 60 at 48.

This distinction between giving effect to the pre-TRO termination and issuing a new post-TRO termination matters for a number of reasons, including because the effective date of a termination significantly alters the rights and obligations of award recipients. For example, both 48 C.F.R. § 31.205-42 (applicable to procurement contracts) and 2 C.F.R. § 200.472 (applicable to grants and cooperative agreements) allow for the recovery of reasonable and allocable costs incurred due to the termination of a contract or award, including both costs incurred before termination and certain reasonable post-termination costs. By granting themselves an exception to the preliminary injunction's plain language, Defendants have made it exceptionally difficult, if not impossible, for Plaintiffs and other implementing partners to determine what close-out costs are allowable.

Accordingly, the Court should enforce its injunction prohibiting Defendants from "giving effect to any terminations … issued between January 20, 2025, and February 13, 2025." ECF No. 60 at 48. Unless the funding recipient agrees otherwise, Defendants should be prohibited from taking any future action to effectuate the terminations dated prior to February 13, and should be required to reverse any actions taken since the preliminary injunction to effectuate these terminations.

Dated: July 3, 2025                         Respectfully submitted,

_/s/ Daniel Jacobson_
Daniel F. Jacobson (D.C. Bar 1016621)
John Robinson (D.C. Bar 1044072)
Nina Cahill*
JACOBSON LAWYERS GROUP PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
Tel: (301) 823-1148
dan@jacobsonlawyersgroup.com

William C. Perdue (D.C. Bar 995365)
Sally L. Pei (D.C. Bar 1030194)
Samuel M. Witten (D.C. Bar 378008)
Stephen K. Wirth (D.C. Bar 1034038)
Samuel F. Callahan (D.C. Bar 888314461)
Dana Kagan McGinley (D.C. Bar 1781561)
Allison Gardner (D.C. Bar 888303942)
Daniel Yablon (D.C. Bar 90022490)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel: (202) 942-5000
stephen.wirth@arnoldporter.com

*application for admission pending

_Counsel for Plaintiffs_