1           UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
2

3  AIDS VACCINE ADVOCACY          )
   COALITION, et al.,             )
4                                 )
              Plaintiffs,         )
5                                 )
        vs.                       )  CASE NO. 1:25-cv-00400-AHA
6                                 )
   UNITED STATES DEPARTMENT OF    )
7  STATE, et al.,                 )
                                  )
8              Defendants.        )
   _____  )
9  GLOBAL HEALTH COUNCIL, et      )
   al.,                           )
10                                )
              Plaintiffs,         )
11                                )
        vs.                       )  CASE NO. 1:25-cv-00402-AHA
12                                )
   DONALD J. TRUMP, et al.,       )
13                                )
              Defendants.         )
14 _____  )

15

16           TRANSCRIPT OF STATUS CONFERENCE
     **BEFORE THE HONORABLE AMIR H. ALI, DISTRICT JUDGE**
17             Monday - August 25, 2025
              1:31 p.m. - 2:47 p.m.
18               Washington, DC

19

20

21
   _____
22                   **SONJA L. REEVES**
             **Registered Diplomate Reporter**
23              **Certified Realtime Reporter**
             **Federal Official Court Reporter**
24             333 Constitution Avenue, NW
                 Washington, DC 20001
25    Transcript Produced from the Stenographic Record

```
 1   FOR THE PLAINTIFFS
     Case No. 25-0400:
 2        Public Citizen Litigation Group
          BY:  LAUREN BATEMAN, ALLISON ZIEVE and NICOLAS SANSONE
 3        1600 20th Street, NW
          Washington, DC 20009
 4
     FOR THE PLAINTIFFS
 5   Case No. 25-0402:
          Arnold & Porter Kaye Scholer LLP
 6        BY:  STEPHEN WIRTH
          601 Massachusetts Avenue, NW
 7        Washington, DC 20001

 8        Jacobson Lawyers Group, LLC
          BY:  DANIEL F. JACOBSON
 9        1629 K Street, NW, Suite 300
          Washington, DC 20006
10
11   FOR DEFENDANTS:
          U.S. Department of Justice
12        BY:  INDRANEEL SUR and JOSHUA NATHANIEL SCHOPF
          1100 L Street, NW
13        Washington, DC 20530

14

15

16

17

18

19

20

21

22

23

24

25
```

1              (Call to Order of the Court at 1:31 p.m.)

2              DEPUTY CLERK:  Your Honor, this is Civil Action 25-400

3    and Civil Action 25-402, AIDS Vaccine Advocacy Coalition, et

4    al. versus United States Department of State, et al., and

5    Global Health Council, et al. versus Donald J. Trump, et al.

6              Will parties please come forward to the lectern and

7    identify yourself for the record this afternoon.  We'll start

8    with plaintiffs' counsel first.

9              MS. BATEMAN:  Good afternoon, Your Honor.  Lauren

10   Bateman of Public Citizen Litigation Group for AIDS Vaccine

11   Advocacy Coalition plaintiffs.

12             THE COURT:  Good afternoon, Ms. Bateman.

13             MR. WIRTH:  Good afternoon, Your Honor.  Stephen Wirth

14   from Arnold & Porter for the GHC plaintiffs.

15             THE COURT:  Hello, Mr. Wirth.

16             MR. JACOBSON:  Good afternoon, Your Honor.  Daniel

17   Jacobson also for the Global Health Council plaintiffs.

18             THE COURT:  Good afternoon.

19             MR. SUR:  Good afternoon, Your Honor.  Indraneel Sur

20   for the United States Department of Justice for the defendants,

21   and my colleague, Joshua Schopf, is at the table as well.

22             THE COURT:  Good afternoon, Mr. Sur.

23             Good to be with you all.

24             It may actually just be helpful for me to ask at the

25   outset, is there going to be single counsel speaking on behalf

1    of plaintiffs?  Do you want to split it between the two cases?

2    Tell me what to expect.

3           MR. WIRTH:  Your Honor, we divided up some topics to

4    discuss with Your Honor today.  We're happy to take any

5    questions you have, but I'll be addressing, to the extent the

6    Court is interested, the motion to stay that is pending.

7           My co-counsel, Dan Jacobson, will be discussing a

8    potential motion that we are intending to file this afternoon,

9    motion to clarify, and also responding to any statements by the

10   government concerning their plans going forward.

11          And Ms. Bateman also has an issue that she's going to

12   raise on behalf of the AVAC plaintiffs.

13          THE COURT:  Okay.  I'll certainly tell you kind of

14   what would be helpful to me, but maybe in the interest of

15   organizing the hearing, I can get at least one sentence from

16   Mr. Jacobson and Ms. Bateman about the other issues so I can

17   decide how to order things.

18          MR. JACOBSON:  Yes, Your Honor.  As Mr. Wirth

19   mentioned, we intend to file later this afternoon a motion for

20   clarification of the scope of the preliminary injunction along

21   with a request for an indicative ruling in the event that the

22   DC Circuit affirms in the manner that Judge Pan suggested in

23   her dissent, which is affirmed, to the extent necessary, to

24   provide complete relief to the plaintiffs.

25          This all relates to the *CASA* issue from the Supreme

1  Court, which obviously was decided while the appeal was

2  pending.  Judge Pan suggested, at plaintiffs' counsel

3  suggestion, that one path for the DC Circuit would be to take

4  the same disposition that *CASA* affirmed, to the extent it's no

5  broader than necessary.

6         We intend to submit with our motion for an indicative

7  ruling declaration from our plaintiffs that lays out just which

8  sort of categories and subcategories of appropriations from the

9  statute itself that they compete for in support of that motion.

10        THE COURT:  So the idea is to ask me to rule on that

11 pending the en banc court's consideration of -- is it the

12 petition for rehearing or if it's granted?

13        MR. JACOBSON:  I would say just if the case were

14 remanded without disposition, including because you might have

15 seen in the letter the government submitted earlier today they

16 have stated that they intend to go to the U.S. Supreme Court as

17 soon as tomorrow, we do think it would also be beneficial for

18 the Supreme Court's review to have clarity on sort of the scope

19 of the injunction that is at play so that is not an unsettled

20 issue as they consider what to do.

21        THE COURT:  Okay.  That's helpful to know.

22        Ms. Bateman?

23        MS. BATEMAN:  Thank you, Your Honor.  To the extent

24 it's non-duplicative, we intend to address potential new

25 evidence, as well as plaintiffs' pending motion to compel the

1    production of the administrative record.

2         THE COURT:  Okay.  And new evidence going to what?

3         MS. BATEMAN:  New evidence going to compliance.

4         THE COURT:  With respect to the part of the injunction

5    dealing with the pre-TRO terminations or the part of the

6    injunction going towards the constitutional ruling?

7         MS. BATEMAN:  The latter.

8         THE COURT:  The latter.

9         MS. BATEMAN:  Thank you.

10         THE COURT:  Can you give me a sense of what that

11    evidence goes to?

12         MS. BATEMAN:  It's two emails from within the agency

13    relating to the government's efforts to comply, or lack

14    thereof, with the preliminary injunction and hamstringing

15    themselves in terms of taking actual steps towards compliance.

16         THE COURT:  Okay.  I'll come back to that, or you

17    should feel free to raise it later in the hearing.

18         So we're here on a status conference, and the reason

19    is I thought it would be helpful to hear from both parties

20    specifically on the next steps as it relates to the preliminary

21    injunction and compliance with it, but let me just front for

22    that discussion a couple of important considerations at the

23    outset, and I'm hoping that the parties' submissions today can

24    be mindful of them in proposing the steps that are feasible and

25    balance the various directives that I have from, currently at

1    least, the circuit.  And so some of this will be obvious, but I
2    think it's important enough to lay out.
3            And so since we last met, we have the recent panel
4    opinion disagreeing with the preliminary injunction ruling, and
5    that's a binding opinion from the circuit and needs to be
6    accounted for in the parties' submissions today and in next
7    steps.
8            I also have other orders from the DC Circuit that I
9    have to comply with.  That includes an order that was issued
10   simultaneous with the panel opinion that withholds the mandate
11   pending an en banc petition, which I understand has now been
12   filed, and then I have an order from the en banc circuit five
13   days ago that specifically states, and I'll quote, "Because
14   this Court's mandate has not yet issued, the preliminary
15   injunction that requires the government to obligate the
16   appropriated funds remains in effect," end quote.
17           So I obviously need to give those orders due respect
18   and take them into account as well, and it would be helpful for
19   parties to do that.  And then I think it's fair to say we have
20   other important interests in the background here that haven't
21   fully played out.  The en banc court is currently considering
22   the plaintiffs' petition for rehearing as well as whether to
23   stay the panel opinion or the mandate.
24           I understand from the government's letter, which was
25   filed with the circuit this weekend and with me this morning,

1  that it likely plans to appeal to the Supreme Court.

2  Obviously, we can't predict how that will play out, but it is,

3  it seems to me, an important interest to have in consideration.

4        So what I would like to have the parties focus on

5  today is how to order the affairs going forward with a

6  preliminary injunction that remains in effect, as the en banc

7  court observed, and do so in a manner that respects and

8  accounts for the various important and perhaps competing

9  interests in the status quo.

10        And so I'll just say there may be an instinct on

11  either side to go to the mat here.  Perhaps the plaintiffs

12  would like to say, and I'm not saying they have said this, but,

13  your know, the en banc court says the PI remains in place, so

14  they have got to obligate everything by tomorrow.  I use that

15  just as an example.  I know that's not something the plaintiffs

16  have said, but it wouldn't be a very helpful submission.

17        And similarly, perhaps the government would like to

18  say we won in front of the panel and we will win going forward

19  and shouldn't have to take any steps.  I think the problem

20  there is at a minimum that it doesn't really account for the en

21  banc court's order and recognition that the PI remains active

22  while everything is still under consideration by the circuit

23  court, above my pay grade.

24        So I'll also say that up until now, this Court, and I

25  think it's fair to say the circuit court, have relied upon the

1    government's requests and representations as it relates to

2    timing.  And I'm referring to the government's request to the

3    Court that it not be required to obligate any funds until

4    August 15th because it would remain feasible to do so, and then

5    similarly the government's indication to the circuit that a

6    decision by August 15th would leave enough time and remain

7    feasible for that and for subsequent review, and the circuit

8    obviously met that deadline.

9         So given that, and we now find ourselves in the timing

10    proposed by the government, I think it would be helpful to hear

11    from the government first.  So, Mr. Sur, if you could come up.

12    And I guess, given the government's representations that this,

13    where we are today, is kind of a feasible timeline, including

14    design to account for further review, it would be helpful to

15    understand the milestones or benchmarks, however you would kind

16    of propose it, that the government would need to meet to ensure

17    that compliance remains feasible between now and

18    September 30th.

19         MR. SUR:  Thank you, Your Honor.

20         So I think the government understands that the PI is

21    in effect as the en banc order that this Court then quoted in

22    its order reflect and as the submissions to the court of

23    appeals reflect.

24         So the agencies have been complying and are taking

25    further steps so that the obligation process is underway.  It

1  is a process, so there are these different steps.  And I'm

2  going to have some situation -- a description to provide to the

3  Court.

4       Before I do that, just to address your point about the

5  milestones, I think what's a little bit complicated is that

6  there are a vast array of different instruments that can be

7  used to obligate the foreign assistance funds that are at

8  issue, and the different instruments would have different

9  processes that attach to them.  So I don't think it's possible

10 to give one sort of unitary roadmap that would apply

11 everywhere, but I think maybe after I provide the overview that

12 I'm prepared to, that might help sort of inform.

13      THE COURT:  That's fine.  Why don't you go ahead with

14 the overview you plan to give.  That might be what I'm asking

15 for.  I understand you might have a different way of coming at

16 it.

17      MR. SUR:  Sure.  So as I said, the obligation process

18 is underway.  Obviously, the government has asked for relief

19 from the court of appeals, but the process that's underway,

20 broadly speaking, falls into three steps.

21      And so the first step would be the agency approval of

22 proposed particular obligations.

23      The second step would be the congressional

24 notifications of those proposals and addressing any

25 congressional views that are expressed.

1           And then the third step would be what we may be more

2  familiar with as lawyers who document transactions, which is

3  the finalizing of the documents that would implement the

4  obligation.

5           So going to that first step, as of this month up to

6  Friday, end of the day Friday, the senior policy officials at

7  State, who have been carrying on the functions for USAID under

8  an interagency agreement, have approved approximately

9  3.5 billion in expiring funds that are pertinent to this case,

10  subject to the congressional notification requirements that are

11  going forward.

12          And then following the -- as I said, following the

13  agency approval of the proposed obligations, we do then go to

14  the congressional notification process.

15          THE COURT:  Can I ask you, you said 3.5 billion, is

16  that across kind of all of the topics areas for which funds

17  have been appropriated?

18          MR. SUR:  Those are the expiring funds, yes.

19          THE COURT:  Out of a total of how much roughly?

20  3.5 billion out of how many?

21          MR. SUR:  I believe the estimate is 12 billion.

22          So the congressional notification process is provided

23  for in the substantive statute, which is, as I said, the

24  Foreign Assistance Act itself.  The codified section is 22

25  U.S.C. 2394-1.

1          And the appropriations statutes also provide

2  additional notification requirements.  So the notifications are

3  going to the various committees that under those statutes

4  require these notifications in advance of the obligations, and

5  usually it's a 15-day period that they require.  So broadly

6  speaking, it's the appropriations and the foreign relations

7  committees that receive these notifications.

8          Just to give a little bit of context about that, so

9  some of them are tied to the particular nations where the

10  proposed obligations would be implemented, right.  So the

11  example, in case the Court wants to look into this later on

12  just for its own awareness of the picture, the Further

13  Consolidated Appropriations Act in Section 7015(f) lists

14  several countries that are subject to a special notification

15  requirement when there is a proposed obligation in those

16  particular countries.

17          And then there are other provisions that are tied to

18  particular programs and particular vehicles.  So for example,

19  also the FCAA, the Further Consolidated Appropriations Act,

20  section 7009(b)(3), requires notification if interagency

21  agreements are going to be used of a certain type.

22          THE COURT:  Can I just clarify?  So these

23  notifications, congressional or otherwise that you're

24  discussing that need to and are in the process of happening, it

25  sounds like, that's for the 3.5 billion?

1          MR. SUR:  So the 3.5 billion is the approved, and a

2    section of that has already been subject to notification with

3    other notifications that are underway in preparation.

4          THE COURT:  Was that something -- is this -- is it

5    responsive to the kind of what has happened since August 15th,

6    that 3.5 billion, or is this throughout the whole year?  What

7    is this responsive to, the 3.5 billion?

8          MR. SUR:  If I might, just drawing from the most

9    recent declaration that was filed in the court of appeals,

10   planning for the PI, preceded the August 15th date, because

11   although the parties had requested that the court of appeals

12   rule, the court of appeals, of course, had not, as I understand

13   it, guaranteed the date of the opinion issuance.

14         So to get to the point of notifying, there was advance

15   work being done.  So I don't think it would be --

16         THE COURT:  Yeah, I'm not trying -- let me just say

17   what's on my mind so that it's clear, and I may be jumping

18   ahead, and you can tell me if I am.

19         I'm hearing what you're describing to me about what

20   the government has done so far, and I'm trying to also think

21   through the question, I think, that I teed up, which is how do

22   we ensure we have a plan for which compliance remains feasible?

23         And so if you were to tell me that process of

24   approving the 3.5 billion took several months, then I would

25   have a lot of questions.  But what about the remaining amount

1    over the course of between now and September 30th, like what

2    does it look like from here on out?  But if you tell me, okay,

3    we have gotten this far with the 3.5 billion in a matter of a

4    week or two, the next question I know that you'll answer is

5    what the plan is for the rest, so I guess that's where it is

6    coming from.

7         MR. SUR:  Briefly stated, the agency's plans recognize

8    the September 30th expiration and accounted for and continue to

9    account for the need to move expeditiously in granting those

10   approvals.

11        So the first step is within the agency's control.  The

12   second step, notification and the 15 days, I think that is in

13   the statute and is the prerogative of Congress and so can't be

14   compressed, but the first step has moved quickly, I think,

15   that's my understanding.

16        THE COURT:  It could move quickly -- is it fair to

17   infer that it could move quickly, that's in the plan?  Yes?

18        MR. SUR:  Right.

19        THE COURT:  And at what level of generality does that

20   take place, or has it taken place in this instance, I should

21   say, as to the agency approvals?

22        This is not a situation where -- and correct me if I'm

23   wrong, I'm not meaning to put words in your mouth.  This is not

24   a situation where the agency has decided to whom the obligated

25   funds -- where the money would go yet?  We're not at that

1   point, right?  This is just approving proposed obligations

2   within the agency and then notifying Congress of proposed

3   notifications?  At what level of generality does that approval

4   in the notification take place?

5          MR. SUR:  The transmittal letters that I have seen, I

6   think, assume that the agency has already assessed what

7   vehicles will be used to do the implementation.  If I may --

8          THE COURT:  Why don't you go ahead.

9          MR. SUR:  I'm going to resume the description.

10          THE COURT:  Keep going.

11          MR. SUR:  So the recent notifications that have gone

12   out, there was one on August 18th and two on August 20th, and

13   those letters combined with other notifications up until

14   Friday, from what I understand, cover about 1.1 billion in the

15   pertinent funds that are expiring.

16          And so they were sent by the State Department's Bureau

17   of Legislative Affairs and they concern the USAID Global Health

18   programs' area of appropriations.  So now, I should add that

19   customarily, because they reflect interbranch dialogue, subject

20   to further deliberations both by the agency and by the

21   committees, the letters themselves aren't public.

22          But to help the Court's understanding, I'm able to

23   give the description of the dates and then sort of what,

24   generally speaking, they describe the programs that the funds

25   are being obligated to, they provide a description of which of

1    the foreign nations that the funds are being expended in so

2    that the letter will point out that if, let's say, three of the

3    nations are nations that are in the special notification

4    requirement, so the transmittal letter will point that out that

5    these are countries that are -- the reason that this is being

6    pointed out to the committees.  And then it will give some

7    description of what it is that's proposed for obligation.

8           I'll give you one example.  The August 20th letter is

9    one of them, describes the program as "tuberculosis, malaria,

10   global health security, maternal and child health nutrition,"

11   and another one just uses the more general term "global health

12   security."  So at a high level of generality they are giving

13   the description of the topic.

14          And other additional congressional notifications are

15   underway, so that roughly covers us where we are in the second

16   step of the process.

17          The third step of the process is actually, as I said

18   before, finalizing the documentation that would implement, and

19   there it's important to have the actual budgetary resources to

20   do the obligation.  So those have to be -- they are apportioned

21   by the Office of Management and Budget.

22          And up until Friday for the month of August, OMB has

23   already apportioned about 1.5 billion in expiring funds for

24   that third step, broadly speaking.

25          So we talked earlier about, again, at a high level of

1    generality about the variety of instruments that are used to

2    obligate these funds, and so I think I'm going to come back to

3    that topic now because it's important I think to realize that

4    unlike some of the other appropriations that make for other

5    agencies, for State and USAID, they have a variety of vehicles

6    that they can use to obligate the funds under the Foreign

7    Assistance Act.

8         And some of those are instruments that none of the

9    plaintiffs who are in this case are direct parties to.  So the

10   examples I'll give are interagency agreements.  The Foreign

11   Assistance Act in Section 632(b), which is codified at 22

12   U.S.C. 2392(b), allows the agencies to provide the funds to

13   another government agency to implement a foreign assistance

14   program that would use that other agency's services or

15   facilities or obtain commodities from those other agencies, so

16   that would be one example.

17        And then two other examples are awards to public

18   international organizations.  And another example, and this has

19   already, I think, come up again in the declaration that the

20   government filed most recently, are the direct agreements with

21   the foreign governments.  And those direct agreements are

22   described in a variety of terms.  One of the terms that's used

23   is development objective agreement, or abbreviated DOAG.

24        The use of those vehicles, again, so as I say, the

25   plaintiffs are not necessarily in any of those.  As I gave the

1   description, you will see that none of those counterparties
2   directly are private sector NGOs.  That being said, just to
3   give an example, the use of those instruments may allow down
4   the road for particular private NGOs to then perform the work.

5        So, for example, the development objective agreement
6   with a foreign nation, that foreign nation then, the officials
7   in that nation may select a private NGO to actually carry out
8   some of the work that is provided for in the agreement with
9   State and USAID.  So I think that is actually why the term
10  development objective agreement, as it was used in the
11  communications by some of the agency personnel, ended up being
12  quoted in the Global Health Council plaintiffs' February 11th
13  motion.  Those motion papers actually used the term "develop
14  objective agreement," and I think the reason they found it
15  significant to include quotations using that term is that,
16  again, these foreign nations, as the circumstances allow, may
17  end up reaching agreements downstream from State and USAID.

18       THE COURT:  Got it.  Can I just make sure I follow?
19  You're making the point that there is a variety of instruments
20  for spending the funds.  And you gave me examples of ones that
21  I think don't involve, at least directly, the plaintiffs, and
22  then there would be instruments as well through which funds
23  could be obligated and spent directly in grants and agreements
24  with the plaintiffs.

25       MR. SUR:  Right, those exist also.

1          THE COURT:  I want to make sure I have got the

2    universe.

3          MR. SUR:  And so I think the plaintiffs have in their

4    submission to the Court emphasized contracts, grants, and the

5    ordinary full and open competition regulatory provisions and

6    sort of internal agency guidelines on timing of running those

7    ordinary full and open competition processes.

8          And in the circumstance that the defendants are

9    confronting at this moment with the September 30th deadline,

10   the ordinary full and open competition sort of weeks, if not

11   months long processes, are simply not realistic.  And that's

12   why in the prior submissions from defendants, the agency has

13   referred to as examples of some of the provisions that they

14   might activate.

15         There are provisions that allow for other than full

16   and open competition where they aren't putting out these

17   traditional notices that are out for 30 days.  I think given

18   the timeframe that's involved, that is not a realistic way of

19   proceeding, but the agencies are working on developing the

20   issuances that they would need to go through the required steps

21   for activating those other than full and open competition

22   processes, right.

23         So typically, just to sort of generalize, we cited in

24   the papers some of the particular provisions, but at a high

25   level of generality, there is usually some responsible agency

1    official who provides a determination and a finding of the need

2    for the use of these procedures that are for other than foreign

3    competition, and so the agencies are doing that work.  They are

4    evaluating what those justifications would require, but that's

5    part of the effort that we have described that, again, in sort

6    of going back to the reason that the government has sought, for

7    example, the stay of the PI is that that's a lot of effort that

8    would have to be expended over the objection of the defendants

9    essentially because of the circumstance that we face with the

10   DC Circuit's opinion.

11        THE COURT:  Just to understand, are there limitations,

12   either statutory or in regulations or guidance, on how much has

13   to go through open grant process, perhaps oversimplifying it,

14   versus these other instruments you're describing?

15        MR. SUR:  My understanding is that State and USAID

16   have very broad, and must have very broad discretion, under the

17   statutes for their choice of the different instruments.  I

18   think the questions being examined is for the -- insofar as

19   there are contract and grant specific regulations, formulating

20   the justifications that would fit within those, the exceptions

21   provisions, if you will.

22        THE COURT:  Tell me what you mean by the exceptions

23   provisions.  Are those exception provisions that create

24   exceptions which allow these different instruments, or are they

25   exceptions which allow you to proceed on these different

 1   instruments in a quicker fashion?  Just unpack that for me.

 2        MR. SUR:  The full and open competition provisions,

 3   those are focused on and they are tied to contracts and grants,

 4   broadly speaking, and they are not tied to the other

 5   instruments that I described before, because, for example, just

 6   in the way that land is unique, a foreign government would be

 7   unique, so it wouldn't be sensible to require competition in

 8   the way that you would among private sector competing providers

 9   for a particular service.

10        THE COURT:  Understood.

11        MR. SUR:  Just to clarify that.  So there are

12   regulations that emphasize two things.  One is the traditional

13   full and open competition expectation, which validates the

14   understanding that usually it's the best price that's obtained

15   through a competitive process, and then there are provisions

16   that enable the agencies under special circumstances to

17   determine that the full and open competitive process would not

18   meet the agency's need for a variety of reasons that may arise,

19   and it's that exceptions category right now that the agencies

20   are working on.

21        THE COURT:  Okay.  Anything else you want to offer in

22   terms of what the agency has done, and it would be helpful to

23   have a little bit more detail.  I know that you may have to

24   take it at a certain level of generality because of the

25   different instruments, but it would still be helpful to

1  understand what needs to happen and what the plan would be just

2  to ensure that compliance remains feasible.

3      MR. SUR:  The request that the government filed with

4  the DC Circuit and the declaration filed Friday point out the

5  practical side of discussions with foreign governments, with

6  international organizations, which is that just entering into

7  the discussion starts to create expectations, so that it isn't

8  realistic to expect that the work can remain essentially

9  nonbinding until the day before September 30th, right.

10     So that's not a realistic view of how this works.

11 That's essentially why, as I understand it, the government has

12 emphasized that September 2nd is like the last date by which

13 those discussions would have to begin.  But whatever other

14 dates there are, I don't think we can say that there is any

15 particular one that is set in stone at this point because of

16 the range of instruments involved.

17     THE COURT:  You said there is a plan to expend the

18 full, what I understood to be, an approximately 12 billion by

19 September 30th.  So what is the plan?

20     MR. SUR:  I mean, I don't -- I don't know the plan.

21 There is a plan that the agencies have formulated, and it

22 will -- it necessarily has to shift with how events turn out,

23 right.  So, for example, if they pursue one particular

24 instrument and the proposed counterparty is or is not able to

25 take that on, right, so they have contingencies built into

1  that.

2      THE COURT:  Got it.  So the plan is at the level, at

3  least as you're describing it, as like particular -- I'm not

4  asking you to tell me that these are at this point -- but

5  particular nations and agencies, like it's at that level of

6  detail that there is a plan to expend the funds with

7  contingencies.

8      MR. SUR:  I think that is right.  That is my

9  understanding.

10     THE COURT:  Okay.  All right.  Anything else you want

11 to offer before I hear from plaintiffs on this point?

12     MR. SUR:  I will say this is actually not on this

13 point, but just on the other points that were raised, while I

14 recognize that the Court identified this as a status

15 conference, the Court also emphasized certain aspects of

16 preliminary injunction compliance that were of interest to the

17 Court.

18     So I did not -- for example, on Mr. Jacobson's

19 proposed motion to clarify, shortly before coming to this

20 session I received an email describing that proposed motion at

21 a high level of generality, which didn't allow me to even

22 formulate a response.

23     THE COURT:  I'm not going to expect you to respond to

24 it.  I haven't seen the motion.  I'm not going to expect you to

25 respond to the motion.  You're not waiving anything with

1    respect to that motion, if that's what you're worried about.

2         MR. SUR:  If I may also, plaintiffs' counsel mentioned

3    new evidence.  This is the first I have heard of this, so I'm

4    at somewhat of a disadvantage in responding.

5         THE COURT:  I won't expect you to respond to it.  I'll

6    give you the option of responding to it when you hear what it

7    is.

8         MR. SUR:  I appreciate that.  I think Mr. Wirth

9    mentioned a stay motion.  If that's the stay motion that's

10   before the court of appeals, our office doesn't handle the

11   appellate function, that's the civil appellate staff, so I

12   wouldn't be able to really comment on that unless it more

13   broadly goes to some of the interests that are at this phase in

14   the case.

15        THE COURT:  That makes complete sense, and to some

16   degree, as I mentioned at the outset, what I'm trying to

17   understand here is how to operate with the directives I have

18   from the circuit.

19        But let me ask you one question, which maybe is coming

20   back to your point about the September 2nd -- your

21   understanding of the September 2nd guideline and kind of the

22   options on the table.  One thing I'm trying to sort out is,

23   like I said at the beginning, we have been operating on the

24   government's proposed timeline, and it was a timeline that you

25   offered to me, and I think it's fair to say, to the circuit

1    about what was feasible for the government to operate on.  You

2    of course would have known what types of processes could and

3    couldn't have been run during that period.

4         And I guess help me understand, how can it be that the

5    government proposed a timeline that quite honestly, you know, I

6    think plaintiffs, it seemed too, and the circuit, and the Court

7    has been giving the government the room to operate on that

8    timeline, but now the argument, as I understand it, is that the

9    government would somehow be irreparably harmed by proceeding on

10   the timeline.

11        To build into my question, we had discussions way back

12   when about this, about you're not going to come back later and

13   tell me this is not feasible, and, also, I think you had said

14   that this is designed with further appellate proceedings in

15   mind, so even if it takes a little longer than August 15, this

16   all remains feasible.

17        I'm having trouble reconciling that issue.  How could

18   it be that you proposed a timeline that was feasible but would

19   cause you irreparable harm?

20        MR. SUR:  One part of that, I think, is the assessment

21   of the harm in this setting necessarily requires -- let me back

22   up a second.

23        I understand that formally the stay factors separate

24   the merits from the harms, but as a practical matter, they are

25   tied.  And so the assessment of the harm to the government I

1    think has to factor in that these efforts that are being

2    expended are over the government's objection where there is a

3    binding panel opinion that says there is no cause of action.

4         Again, I understand that usually we filter them out,

5    but the nature of the problem here partly is that there is a

6    binding panel opinion and it favors the government.  So --

7         THE COURT:  Yeah, I understand you have the panel

8    opinion.  I started there, and I think that is something I have

9    got to figure out -- it's a circuit precedent.  I also have the

10   subsequent order from the en banc court saying otherwise --

11   saying not otherwise, but saying that the preliminary

12   injunction remains in effect and saying that the government

13   needs to comply.

14        I guess are you really telling me had you lost in the

15   circuit you wouldn't be saying stay that opinion because we're

16   irreparably harmed by the September 2nd deadline?  Because when

17   we had the discussion way back when you didn't say to me this

18   is feasible, but it's assuming that we lose in the circuit,

19   and, if we win, I would have these concerns that we would be

20   irreparably harmed.  It seems to me like you would be making

21   the same argument whether you won or lost before the circuit

22   panel, but you can tell me if I'm wrong on that.

23        MR. SUR:  Partly because I'm not in a position to

24   answer that is that I don't think in the district court we

25   would typically ever make a representation about whether or not

1  there would be an appellate request for a stay or not, because

2  that would be the function of -- other offices would handle

3  that.

4          THE COURT:  You came for a -- you requested a stay in

5  my court.

6          MR. SUR:  Right.

7          THE COURT:  So are you saying that you wouldn't

8  request a stay in my court -- you wouldn't have requested a

9  stay in my court and made those arguments so that you could

10  seek a stay all the way up had you lost?

11         MR. SUR:  I don't think I'm saying that.  I think what

12  I'm saying is that it's difficult for me to say.  After an

13  appellate resolution, it's difficult for me to comment on, and

14  I can't really comment on whether the government would have

15  sought further review or not because our office doesn't carry

16  that function out.  So I can't really --

17         THE COURT:  I'm just making -- I'm trying to

18  understand the earlier representations about it being feasible

19  and how that relates to the notion that you would be

20  irreparably harmed now.  There is a lot that may play out.

21             Suppose the en banc circuit disagrees with the panel

22  and reinstates the preliminary injunction, you said that -- I

23  think your response to me was that it turns on the fact that

24  you have a panel opinion in your favor.

25             Are you saying that the September 2nd concern goes

1  away if you get an en banc court, the kind of live circuit

2  opinion actually is against you?

3          MR. SUR:  I don't think so.  I think that's about the

4  practicalities of negotiating with the foreign governments with

5  the public instrumentalities.

6          THE COURT:  It kind of brings me back to the question

7  I had, which was how could it be that the government proposed

8  this as the plan, and, again, was given significant leeway on

9  that, right, for months didn't obligate any funds under the

10  preliminary injunction, didn't reveal the plans you're now

11  telling me about on the representation and reliance that that

12  was feasible, but now, I think you just said, kind of whether

13  we were to win or lose in the circuit, the practicalities

14  irreparably harm us.

15          How could it both be that you affirmatively advanced

16  that as the feasible schedule and now we're saying in the

17  timing that we are in, which is what you proposed, right, you

18  got the decision from the circuit in time, we're not talking in

19  that time period, that you're irreparably harmed by it?

20          Because it's an equitable consideration, right, if you

21  want to back up from the factors.  I'm trying to understand how

22  that can be right, fair, something that happens in a court of

23  law?

24          MR. SUR:  The other thing about that is that I think

25  our discussion was May 5th, May 6th.  Subsequently we have the

the Supreme Court's *CASA* decision about the harm to the
government, especially when it concerns nonparties, and we have
that problem here as well.

So even if we were to hermetically seal the merits
part from the irreparable harm part, I think where we are now,
we have a new perspective under the *Trump against CASA*
principles how the government is irreparably harmed when its
policies are not able to be applied, even as to nonparties,
right.  So I think that is part of what I'm summarizing as the
gist of our submissions.

THE COURT:  So is that something that I could help
with through an indicative ruling that narrows -- you're right,
the *Trump v. CASA* happened since my preliminary injunction, so
I didn't have the benefit of it.

Is that something that would help the government?  I'm
not saying you can't go pursue all other avenues on appeal, of
course, but just in terms of addressing, I think, what you just
responded to as potential harm to the government.  I assume
that you would be in agreement with that limiting of the
injunction.

MR. SUR:  Just repeat myself, I have not seen this --
even a description of this indicative ruling that allowed me to
convey what the gist was to be able to formulate a response.

THE COURT:  Let me just simplify.  Forget that
Mr. Jacobson suggested filing a motion.  When I asked you about

1    the reconciling for me the fact that the government

2    affirmatively proposed this schedule and now it seems to be

3    harmed by it, you gave me as an explanation, *Trump v. CASA,* and

4    I'm trying to understand what it is about *Trump v. CASA* that I

5    could account for that would address the harm that the

6    government is concerned with.

7            MR. SUR:  I think that we have plaintiffs in this case

8    and we have non-plaintiffs, and under the current wording of

9    the PI, there is nothing that limits the relief as to

10    non-plaintiffs.  So the text of the PI doesn't really account

11    for --

12            THE COURT:  My recollection, you can correct me if I'm

13    wrong, was that before the circuit the parties agreed that the

14    scope should be limited to the types of grants that plaintiffs

15    compete for.

16            Is that what we're referring to, so that the universe

17    is limited to what the plaintiffs would actually have standing

18    to challenge?

19            MR. SUR:  I'm at a disadvantage, because I wasn't --

20    again, our office doesn't handle the appellate phase, so I was

21    not party to that agreement if there was one.

22            THE COURT:  I don't want you to concede something that

23    you're not aware of at the moment.

24            Anything else you want to submit before I hear from

25    plaintiffs?

1        MR. SUR:  I think I have given the overview of sort of

2   our position.

3        THE COURT:  Okay.  Why don't I hear from them, and

4   then I'll give you the chance to respond to anything you

5   haven't heard before.

6        MR. WIRTH:  Good afternoon, Your Honor.

7        THE COURT:  I do -- just to be clear, I do want to

8   focus on what I highlighted at the beginning primarily.  I know

9   there is a lot of pending things going on, but it would be

10  helpful for me -- I think the government focused on what they

11  have done with respect to compliance and ensuring that

12  compliance remains feasible and what needs to be done.

13        So if you could kind of respond to, and if you need to

14  make affirmative arguments --

15        MR. WIRTH:  Absolutely, Your Honor.  I would like to

16  begin I think where Your Honor began with the effect of the

17  panel's decision and the en banc court's order and sort of what

18  does that mean for the status quo right now.

19        THE COURT:  You can, except insofar as the bottom line

20  is just that the status quo is that the preliminary injunction

21  remains in effect and the en banc court acknowledged that.  I

22  don't think it would be good to spend time on that.

23        MR. WIRTH:  We absolutely agree with that.  And I

24  think we would just say that at this point the most prudent

25  course for Your Honor with respect to the government's pending

1   stay in this court would be to allow the en banc proceedings to

2   play out because we have dueling motions in front of the en

3   banc court.  There is a motion to stay, a motion to issue the

4   mandate forthwith, there is our pending en banc petition.  All

5   of that pending, right.  And the government has asked for

6   circuit to act very quickly and we expect that they will.

7           Just in terms of we would not want this Court to stay

8   the PI now only for that to be overtaken by en banc proceedings

9   potentially within the next 36 hours.

10          THE COURT:  I understand you all have made a lot of

11  arguments to the circuit and to the en banc court.  I get the

12  argument that it may not make sense to stick my neck out in

13  there at this point.

14          MR. WIRTH:  I think that also goes to exactly what

15  Your Honor was just discussing with the government with respect

16  to the schedule the government proposed here.  We think that it

17  is reasonable to hold the government to its prior submissions,

18  its prior schedule.

19          We would note that this new September 2nd deadline has

20  only come -- only just materialized on Friday.  That's after

21  the government has already moved for a stay in this court.

22  They have known about the complications related to negotiating

23  bilateral agreements for months presumably.  It sounds like

24  they have done some of that already, so presumably they already

25  know those complications.

1              And to the extent the government has issues of

2    revealing that it is interested in these negotiations now, we

3    think certainly the government could tell these foreign

4    government partners things are in flux and we need to take that

5    into account in light of proceedings ongoing in the United

6    States courts.  We don't think that that is irreparable harm,

7    certainly not one justifying the Court staying the preliminary

8    injunction now.

9              Beyond that, I would be happy to answer any questions

10   that the Court has with respect to those issues.

11             Mr. Jacobson also I think is going to have some

12   reaction specifically to the government's past conduct and

13   their ability to appropriate going forward, and also with

14   respect to what we think the government should be doing now in

15   order to demonstrate compliance going forward.

16             So I'm happy to pass it off to him or happy to answer

17   any questions you have.

18             THE COURT:  That would be helpful to hear.  Thanks.

19             MR. JACOBSON:  Thank you, Your Honor.  With respect to

20   sort of how to balance what Your Honor was talking about, the

21   PI is in effect, but there is a ruling, and in light of the

22   submission we just heard from the government, to us, the most

23   important thing the Court could do today or tonight or in the

24   immediate term is to require the government to produce a

25   detailed plan of what it's going to do and how it's actually

going to be able to comply with the injunction, not to obligate
the money this week, not to get ahead of the Supreme Court.
We're not asking for anything like that, but to provide
assurance to the Court and the party and that it actually does
have a plan to fully comply with both the law, the statutes
here, and the Court's injunction.

There were several parts of the submission today that
raise some pretty screaming red flags in terms of whether they
will be able to comply lawfully with the injunction.  We don't
have information currently to fully assess it, but I would like
to lay out those concerns for Your Honor and why I think it
speaks to the need for more details to be submitted in writing
here.

To take a step back, the relevant appropriations here
under the 2024 Appropriations Act, the way they were
structured, if Your Honor recalls, is there is 15 sort of broad
categories of appropriations, right.  Global health,
development assistance, international narcotics and law
enforcement, and so on, right, 15.  And those appropriated, I
believe, roughly $30.4 billion.

There was then like hundreds, I think around 240
subcategories of appropriations that we pointed out to Your
Honor in our motion to enforce a few months ago.  So part of
the Appropriations Act said, this is section 7019(a), that said
that USAID and State have to obligate the funds in the specific

amount designated in certain tables.  Those tables then laid
out line items, so not just global health, but like X amount
for malaria, Y amount for tuberculosis treatment, and so on and
so forth.

Further in the act there are more what are called
directives that say not less than X amount should be obligated
for certain activities, so if you combine all of those what
we'll call the subcategories, there is about 240.

As Your Honor ruled in ruling on the motion to
enforce, the government doesn't just need to obligate the total
amount, it needs to obligate them consistent with the statute
and those directives to obligate specific amounts to certain
subcategories.  And so it's key to us to make sure the
government actually has a plan to comply in that sense, to
obligate this money in the amount that Congress required for
the purposes Congress required.

Whether they can do that through these sort of broad
DOAGs that Mr. Sur mentioned, maybe, but we need to see the
details.  It seems hard to believe they could, but --

THE COURT:  When you say -- you're talking about the
instruments that Mr. Sur laid out, you're saying whether they
could do so with these other instruments you're not sure?

MR. JACOBSON:  Yeah.  Like he mentioned rather than
doing grants or contracts where they are actually giving out
the money directly to private organizations or nonprofits, they

1    would obligate a big chunk of money through a bilateral

2    agreement to another country.  My understanding is they can

3    specify the purposes of those obligations to another country in

4    these bilateral agreements, so maybe they could do that in a

5    way to meet all these different subcategories that they have to

6    hit.

7        We don't know if that's what their plan is though.  Or

8    are they just going to say, X country, we're obligating to you

9    a pot of $10 billion, and we're not going to say what it's for,

10   in which case, in our view, that would not comply with the

11   injunction or the statute.

12       THE COURT:  You said what would be helpful to have is

13   a detailed plan.  I think Mr. Sur made the point that there has

14   got to be contingencies.  An example he gave was a nation would

15   agree to the funding and to be the person who then spends it,

16   including potentially with private organizations, and so there

17   is unpredictability into it.

18       What would your response be to that?  Or maybe less

19   interested in kind of a back and forth response, but what is it

20   in a plan that could be provided realistically?

21       MR. JACOBSON:  So I think how much they are planning

22   on obligating through bilateral agreements versus grants and

23   contracts that are direct, having that breakdown would be

24   extremely helpful.  Presumably if they are going to be doing

25   some, he mentioned, and I'll get to this, less than full and

1   open competition for contracts and grants, they have in mind

2   for what purposes, what subject matters those are going to be

3   for.  So having that laid out, we're planning on issuing --

4   they can even give a range -- amount of money in contracts for

5   the following foreign assistance purposes that are required

6   from the statute.

7           But making sure they have a detailed plan for actually

8   spending the money as it's required would require that sort of

9   thing, not just sort of these broad strokes of we're going to

10  obligate money generally.

11          I would also say, Your Honor, one very quick and easy

12  thing they could do, Mr. Sur mentioned that they have approved

13  already $3.5 billion, I believe the number was, for how that

14  money will be obligated.  I don't see any reason why they

15  couldn't file that today about what that money entails and how

16  it's going to be obligated, given that it's already approved,

17  it's not deliberative, it's not pre-decisional, it's approved,

18  in his own words.

19          I think just having a plan from them that walks

20  through what their intent is without having to get into the

21  nuts and bolts detail of what each and every bilateral

22  agreement is going to specify and what each and every type of

23  contract would be, but just broadly sketch out how they will

24  comply.

25          One thing I will point Your Honor to if it's helpful,

1    there actually was another case decided in this district about

2    a week or two ago by Judge Sooknanan, if I'm pronouncing that

3    right, a case called *National Fair Housing Alliance* with

4    respect to HUD funds, where a similar claim and a similar

5    injunction where the claim was you have to spend this amount of

6    money before the end of the year.

7         And the judge there in entering a TRO did require --

8    the remedy was a submission of a detailed plan like the one

9    we're talking about.  So there is now precedent for taking that

10   approach here.

11        With respect to the reference to -- the same thing I

12   should say, Your Honor, with respect to those subcategories,

13   they have to make sure they obligate the right amounts that

14   Congress required for each of those 240 subcategories, they

15   can't get around that through these interagency agreements that

16   they mentioned where they are going to give the money to a

17   different federal agency.

18        We have no idea standing here today if that's what

19   they are intending to do.  Are they intending to park the money

20   in a different agency and not obligate is for the purposes

21   Congress laid out?  We need to know sooner rather than later in

22   order to address it if they are planning on going about this in

23   a way that in our view does not comply with the injunction and

24   the statute.

25        THE COURT:  What's the mechanism or remedy if that's

1   the case?  If the plaintiffs think some way that the government

2   intends to spend the money isn't lawful or doesn't count as an

3   appropriation because it goes to another agency, what are you

4   proposing is the way to actually deal with that?

5        MR. JACOBSON:  The first would be to just know if it's

6   a problem.  Let's say they submit a plan as I'm suggesting and

7   it says we're going to obligate $8 billion to DHS for

8   immigration enforcement.  I'm just making something up.  We

9   would then probably -- I would want to confer with my

10  co-counsel.  We would probably move to enforce the Court's

11  preliminary injunction, because the Court's preliminary

12  injunction required them to spend the money as Congress

13  specified for the specific foreign assistance purposes

14  specified in the 2024 Appropriations Act, and they are bound to

15  do that, so we would move to enforce, I suspect, at that point.

16       With respect to less than full and open competition,

17  this is another one of those red flags that we just need to

18  know how they are intending to do this in order to assess

19  whether we need to seek some sort of quick relief in moving to

20  enforce.  Mr. Sur said, well, because of where we are now, it's

21  simply not possible to do a normal competition, a grant

22  competition where you post a notice and you solicit bids, the

23  same thing for contracts.

24       Of course, the only reason there is not enough time to

25  do it now is because they didn't do it after the Court entered

1    an injunction six months ago.  There would have been plenty of

2    time to do it then.

3           And this is important not just for that rhetorical

4    point, but there is actually federal statutes and regulations

5    that we pointed out in our reply on the motion to enforce that

6    says an agency cannot rely on its own lack of advanced planning

7    to use less than full and open competition.  There is a

8    regulation in the FAR with respect to contracts that

9    specifically says -- I can just read it for Your Honor, but it

10   says the fact that funds will expire is not a reason that

11   agencies are allowed to use less than full and open

12   competition, the fact they will expire soon.

13          How does the government plan to reconcile that with

14   what we heard today?  We need more details to assess that.

15   Like I said, I can't --

16          THE COURT:  What's the plaintiffs' position on how

17   much time it actually requires to run a full and fair

18   competition process, assuming the government would ever be

19   required to do that?

20          MR. JACOBSON:  The answer is always "it depends."  It

21   depends on the scope of the award and how many participants

22   reasonably could apply for it.  What we laid out in the motion

23   to enforce is what's called the PALT, which is like the average

24   lead times at USAID, where it's in the avenue of months to

25   longer than months for contracts.  So for contracts, I think

1    it's like six months at least, maybe longer.  For grants, it's

2    a couple months.

3              THE COURT:  In the interest of kind of focusing, any

4    other red flags you want to raise, as you put it, or, again,

5    kind of coming back to my question, there is a generality

6    question here.  I went back and forth with Mr. Sur on this, and

7    I think he made some fair points about staying at the right

8    level of generality.

9              There has got to be careful balance here of getting

10   the right kind of information that doesn't intrude too much.

11   Anything else you want to offer on what level of generality to

12   ask for information on this?

13             MR. JACOBSON:  I think the generality to ask for is

14   the generality that's needed to be known to know whether they

15   are complying with the statute or not.  You think about what

16   the statutes require here, it's specific amounts of money for

17   specific purposes as defined at a high level in the statute, a

18   relatively high level.  And so I would say we need that

19   information about how --

20             THE COURT:  The reason I say that the level of

21   generality matters, I think still for plaintiffs as well, this

22   has been a case about -- I know these are terms of art -- first

23   blanket freezing funding and rescinding funding.  I'm not

24   meaning to start to get into statutory terms.  That's what the

25   case was about, and it wasn't about kind of the nuances of was

1  this particular exception followed in the appropriations law.

2          So I think you do have like a level of generality

3  question here too, because I don't know that the injunction was

4  geared towards every particular error that the plaintiffs

5  allege would somehow become a violation of the injunction.

6          MR. JACOBSON:  To the extent we're talking about just

7  whether they are obligating the amounts of money for the

8  purposes Congress said, I do believe --

9          THE COURT:  That's my question is how do we get at the

10  right level of generality.

11          MR. JACOBSON:  To my mind -- obviously, Your Honor

12  probably would not want to go as far as I would like to go.  It

13  would be sort of laying out in detail how they are planning on

14  -- how much they are planning to obligate for global health --

15  all the different --

16          THE COURT:  Coming back to the purposes in the act.

17          MR. JACOBSON:  There's malaria, there's tuberculosis,

18  even a statement saying they are planning to do it, they have a

19  plan to do it would go a long way in our perspective and

20  something we could hold them to.

21          If I could mention as another red flag, and this is

22  the emails that Ms. Bateman was alluding to.  We learned over

23  the weekend that late last week the State Department -- take a

24  step back.

25          A couple weeks ago, the president issued a new

1    executive order with respect to grants and the approval process

2    for issuing grants and issuing notice of funding opportunities

3    for new grants.  I won't go through all the details.  We

4    learned over the weekend that on Thursday and Friday of last

5    week the State Department sent out sort of broad emails to all

6    people there who work on issuing new awards saying pursuant to

7    this executive order, because we don't yet have a plan on

8    complying with the executive order, no new funding

9    solicitations can go out for grants.

10          They said that on Thursday.  On Friday they said, oh,

11   to clarify, this includes sole source, like less than full and

12   open competition grants cannot go out.

13          So again, we don't know, are they planning on having

14   an exception to that to comply with this injunction?  It all

15   speaks to the need for more detail here and more transparency

16   about do they actually have a plan to comply here.

17          Forgive me, Your Honor, just one minute.  I'll raise

18   one more flag and then stop with the flags, Your Honor.

19          Mr. Sur mentioned apportionments from OMB and the role

20   that plays in the process.  We now know from a different case

21   that myself and counsel for the AVAC plaintiffs are involved in

22   that OMB recently was forced to disclose all of the

23   apportionments it's been doing for the last few months.

24          I know for at least some of money here, OMB issued

25   apportionments that give the money to USAID or State, but

1    included conditions saying you can't actually spend any of that

2    money unless we approve exactly how you're going to spend it.

3    OMB is a defendant to this case, and so again details, is that

4    going to be a holdup here.  Can they provide us any assurances

5    that won't be a holdup here because OMB hasn't approved how

6    they're going to use the money, or if that is going to be a

7    holdup, how long is that process going to take?

8              I'm happy to give Your Honor more details on the

9    nitty-gritty of that how works, but essentially OMB included

10   footnotes to the apportionments saying here is the money, but

11   you can't spend it unless we pre-approve how you're going to

12   spend it.

13             THE COURT:  I can ask Mr. Sur this, because he's the

14   one that gave us the stages, but at what stage does that OMB

15   approval or footnote have in the process that Mr. Sur laid out,

16   are you aware?

17             MR. JACOBSON:  That depends on probably what current

18   OMB leadership would say.  Certainly it would prevent them from

19   actually obligating the money until it's approved.

20             THE COURT:  Prevent them from approving the proposed

21   obligations within the agency, or just prevent them from

22   actually obligating it after the notifications and after it's

23   all finalized?

24             MR. JACOBSON:  These footnotes that I'm describing

25   have never happened before in history the way they are being

1   used here, so we don't really know how OMB is applying them.

2   We just know what they say.

3          Your Honor, I can wait to address or to lay out

4   thoughts on timing of the indicative ruling motion.

5          THE COURT:  For the indicative ruling motion, it would

6   be helpful to have that in writing, especially since the

7   government has not seen it and I haven't seen it yet.

8          I think you covered the emails then.

9          Mr. Sur, can I hear from you briefly.  I do have other

10  hearings after this I have got to adjourn for.

11         MS. BATEMAN:  Just one small issue as well.

12         THE COURT:  Okay.

13         MS. BATEMAN:  In light of the ongoing proceedings in

14  the DC Circuit and possibly imminently in the Supreme Court as

15  well, AVAC plaintiffs fear that lifting the abeyance on the

16  motion to dismiss may take a while, and, as a result, we ask

17  Your Honor to rule on the pending motion to compel production

18  of the administrative record, just because it's a discrete

19  issue that could unstick proceedings in this court for

20  plaintiffs in both cases.

21         THE COURT:  I have that pending motion.  Thanks.

22         Mr. Sur, can I hear from you briefly, anything you

23  want to respond to, but I would be interested in, I guess, two

24  things in particular, OMB potentially requiring approval to the

25  extent that you have anything that would be helpful to add, and

1    then the other to give you an opportunity in light of the

2    proposal plaintiffs made about a pretty high level of

3    generality statement that funds will be obligated for each of

4    the purposes and a very limited breakdown that wouldn't require

5    getting in the nitty-gritty just in terms of a plan.

6            MR. SUR:  So this is the first I'm hearing about this

7    OMB footnote issue, so I'm not really in a position to respond,

8    except I will say in preparing for this hearing and the Court's

9    order about the preliminary injunction compliance by

10   September 30th, that does include the restrained defendants.

11           So the agencies are implementing and --

12           THE COURT:  You have been in consultation with your

13   clients who are the defendants here so it takes into account

14   OMB?

15           MR. SUR:  Notwithstanding whatever generalizations

16   that may be made with other cases that I'm not familiar with,

17   everything that I said to you before about the agencies moving

18   toward a September 30th deadline, despite their objection, I

19   think remains --

20           THE COURT:  That's helpful.

21           MR. SUR:  On this point about the specificity of the

22   obligations, again, I don't have -- because I don't have

23   firsthand experience with the development objective agreement,

24   it's difficult for me to say, but my understanding that this

25   category of instrument does allow for the United States agency

1   that's making the agreement to specify what the accepted

2   purposes and functions would be.  So if there are particular

3   subcategories of obligation that are provided for in the

4   appropriation statutes, the development objective agreement

5   could well provide for that.

6        There isn't anything in the notion of this genre of

7   agreement that forecloses that level of specificity in the

8   purposes.  These aren't newfangled instruments, by the way.  As

9   I said, the term itself is used in the GHC motion papers of

10  February 11th, so they are well established in the field.

11       Overall, in terms of what Mr. Jacobson asked for, I

12  think -- I just want to point to several problems that

13  disclosure of a plan would present.  We have explained, I think

14  that in our previous submissions, that a lot of what takes

15  place in terms of discussions between the agencies is

16  deliberative, and we also have a separate interbranch dialogue

17  that would be cut off if there were some disclosure before, for

18  example, the Senate appropriations or foreign relations

19  committee had a chance to weigh in on funding decisions that

20  maybe had cleared the agency stage, but haven't yet made their

21  way to Congress through the notification procedures because the

22  transmittal notices haven't been finalized yet.

23       That's a delicate act, again, not only to preserve the

24  executive's flexibility in terms of its deliberation, but also

25  the dialogue that takes place with Congress under these

1    notification provisions.  I think disclosure of a plan would

2    interrupt and present problems of its own.

3            On the interagency agreements, I think this -- I just

4    want to clarify that what is contemplated is also subjected to

5    these notice provisions to Congress.  I don't think the foreign

6    relations committee would tolerate the extreme hypothetical

7    that counsel offered on the other side.  That would not be

8    something that the agency would propose because the agency

9    knows that the relevant committees wouldn't view that as within

10   the scope of the appropriations that Congress has provided.

11           So I just want to clarify that I think the whole

12   purpose of congressional notification requirements is to rule

13   out those kinds of extreme scenarios despite the picture that's

14   painted just in that extreme hypothetical.

15           And then the third point that I will make, again, I

16   don't know this other case that may have issued in a different

17   matter, but just the fact that the plaintiff in that case, if I

18   heard correctly, involves housing advocacy, suggests to me that

19   they may be focused on areas of domestic law where there are

20   different substantive statutory provisions maybe that spell out

21   in more detail, and also appropriations laws that spell out in

22   more detail what the particularities of a spending plan might

23   be that wouldn't apply here.

24           THE COURT:  If you're not familiar with the case, I

25   won't make you respond to it.  I'm familiar with it.  I know

1    the context.

2          MR. SUR:  I want to stress that the substantive

3    provisions of the Foreign Assistance Act to which the

4    appropriations are tied confer and recognize a great deal of

5    discretion, so even if there were some plan requirement that

6    made sense for some domestic agency context, it wouldn't make

7    sense for this case to impose some kind of a detailed

8    requirement that would threaten to override the discretion

9    that's in the statute.  So I do think it's important for the

10   Court to have those in mind.

11          If the Court is looking for an alternative, maybe

12   there are particular questions that the agencies could reply to

13   if the Court were to put the questions in an order.  That might

14   present a different set of problems depending on the level of

15   generality, but in terms of requiring outright disclosure of a

16   plan, for reasons we have presented in our previous

17   submissions, I just think would be sources of multiple

18   objections on the grounds that I'm trying to sketch.

19          THE COURT:  That's helpful, and let me give some

20   thought as to whether there is any sort of preliminary

21   questions that would make sense to include in the status report

22   for this week, for example.  Again, I think you all have the

23   point, but I think there is a kind of question of the

24   appropriate level of generality respecting the various

25   interests that we have at play here, which include ensuring

1    that it remains feasible to comply with the preliminary

2    injunction, but also respecting the various things I outlined

3    at the beginning, including the panel opinion and the en banc

4    court and potential for further proceedings.

5          I do need to adjourn for another hearing.  I do

6    appreciate everybody's submissions.

7          We'll go ahead and adjourn and call the next case.

8        (Proceedings concluded at 2:47 p.m.)

9

10                          CERTIFICATE

11    I, Sonja L. Reeves, Federal Official Court Reporter in and
      for the United States District Court of the District of
12    Columbia, do hereby certify that the foregoing transcript is a
      true and accurate transcript from the original stenographic
13    record in the above-entitled matter and that the transcript
      page format is in conformance with the regulations of the
14    Judicial Conference of the United States.

15    Dated this 25th day of August, 2025.

16

17                          /s/ Sonja L. Reeves
                            SONJA L. REEVES, RDR-CRR
18                          FEDERAL OFFICIAL COURT REPORTER

19

20

21

22

23

24

25

## $

**$10** [1] - 36:9

## /

**/s** [1] - 50:17

## 1

**1.1** [1] - 15:14
**1.5** [1] - 16:23
**1100** [1] - 2:12
**11th** [2] - 18:12, 47:10
**12** [2] - 11:21, 22:18
**15** [4] - 14:12, 25:15, 34:16, 34:19
**15-day** [1] - 12:5
**15th** [4] - 9:4, 9:6, 13:5, 13:10
**1600** [1] - 2:3
**1629** [1] - 2:9
**18th** [1] - 15:12
**1:25-cv-00400-AHA** [1] - 1:5
**1:25-cv-00402-AHA** [1] - 1:11
**1:31** [2] - 1:17, 3:1

## 2

**20001** [2] - 1:24, 2:7
**20006** [1] - 2:9
**20009** [1] - 2:3
**2024** [2] - 34:15, 39:14
**2025** [2] - 1:17, 50:15
**20530** [1] - 2:13
**20th** [3] - 2:3, 15:12, 16:8
**22** [2] - 11:24, 17:11
**2392(b** [1] - 17:12
**2394-1** [1] - 11:25
**240** [3] - 34:21, 35:8, 38:14
**25** [1] - 1:17
**25-0400** [1] - 2:1
**25-0402** [1] - 2:5
**25-400** [1] - 3:2
**25-402** [1] - 3:3
**25th** [1] - 50:15
**2:47** [2] - 1:17, 50:8
**2nd** [6] - 22:12, 24:20, 24:21, 26:16, 27:25, 32:19

## 3

**3.5** [10] - 11:9, 11:15,

**11:20, 12:25, 13:1, 13:6, 13:7, 13:24, 14:3, 37:13**
**30** [1] - 19:17
**30.4** [1] - 34:20
**300** [1] - 2:9
**30th** [8] - 9:18, 14:1, 14:8, 19:9, 22:9, 22:19, 46:10, 46:18
**333** [1] - 1:24
**36** [1] - 32:9

## 5

**5th** [1] - 28:25

## 6

**601** [1] - 2:6
**632(b** [1] - 17:11
**6th** [2] - 28:25

## 7

**7009(b)(3** [1] - 12:20
**7015(f** [1] - 12:13
**7019(a** [1] - 34:24

## 8

**8** [1] - 39:7

## A

**abbreviated** [1] - 17:23
**abeyance** [1] - 45:15
**ability** [1] - 33:13
**able** [7] - 15:22, 22:24, 24:12, 29:8, 29:23, 34:1, 34:9
**above-entitled** [1] - 50:13
**Absolutely** [1] - 31:15
**absolutely** [1] - 31:23
**accepted** [1] - 47:1
**account** [8] - 7:18, 8:20, 9:14, 14:9, 30:5, 30:10, 33:5, 46:13
**accounted** [2] - 7:6, 14:8
**accounts** [1] - 8:8
**accurate** [1] - 50:12
**acknowledged** [1] - 31:21
**Act** [9] - 11:24, 12:13, 12:19, 17:7, 17:11, 34:15, 34:24,

**39:14, 49:3**
**act** [4] - 32:6, 35:5, 42:16, 47:23
**Action** [2] - 3:2, 3:3
**action** [1] - 26:3
**activate** [1] - 19:14
**activating** [1] - 19:21
**active** [1] - 8:21
**activities** [1] - 35:7
**actual** [2] - 6:15, 16:19
**add** [2] - 15:18, 45:25
**additional** [2] - 12:2, 16:14
**address** [5] - 5:24, 10:4, 30:5, 38:22, 45:3
**addressing** [3] - 4:5, 10:24, 29:17
**adjourn** [3] - 45:10, 50:5, 50:7
**administrative** [2] - 6:1, 45:18
**advance** [2] - 12:4, 13:14
**advanced** [2] - 28:15, 40:6
**advocacy** [1] - 48:18
**Advocacy** [2] - 3:3, 3:11
**ADVOCACY** [1] - 1:3
**Affairs** [1] - 15:17
**affairs** [1] - 8:5
**affirmatively** [2] - 28:15, 30:2
**affirmed** [2] - 4:23, 5:4
**affirms** [1] - 4:22
**afternoon** [11] - 3:7, 3:9, 3:12, 3:13, 3:16, 3:18, 3:19, 3:22, 4:8, 4:19, 31:6
**agencies** [15] - 9:24, 17:5, 17:12, 17:15, 19:19, 20:3, 21:16, 21:19, 22:21, 23:5, 40:11, 46:11, 46:17, 47:15, 49:12
**agency** [24] - 6:12, 10:21, 11:13, 14:21, 14:24, 15:2, 15:6, 15:20, 17:13, 18:11, 19:6, 19:12, 19:25, 21:22, 38:17, 38:20, 39:3, 40:6, 44:21, 46:25, 47:20, 48:8, 49:6
**agency's** [4] - 14:7, 14:11, 17:14, 21:18

**ago** [5] - 7:13, 34:23, 38:2, 40:1, 42:25
**agree** [2] - 31:23, 36:15
**agreed** [1] - 30:13
**agreement** [14] - 11:8, 17:23, 18:5, 18:8, 18:10, 18:14, 29:19, 30:21, 36:2, 37:22, 46:23, 47:1, 47:4, 47:7
**agreements** [11] - 12:21, 17:10, 17:20, 17:21, 18:17, 18:23, 32:23, 36:4, 36:22, 38:15, 48:3
**ahead** [5] - 10:13, 13:18, 15:8, 34:2, 50:7
**AIDS** [3] - 1:3, 3:3, 3:10
**al** [8] - 1:3, 1:7, 1:9, 1:12, 3:4, 3:5
**ALI** [1] - 1:16
**allege** [1] - 42:5
**Alliance** [1] - 38:3
**ALLISON** [1] - 2:2
**allow** [8] - 18:3, 18:16, 19:15, 20:24, 20:25, 23:21, 32:1, 46:25
**allowed** [2] - 29:22, 40:11
**allows** [1] - 17:12
**alluding** [1] - 42:22
**alternative** [1] - 49:11
**AMIR** [1] - 1:16
**amount** [9] - 13:25, 35:1, 35:2, 35:3, 35:6, 35:11, 35:15, 37:4, 38:5
**amounts** [4] - 35:12, 38:13, 41:16, 42:7
**answer** [5] - 14:4, 26:24, 33:9, 33:16, 40:20
**appeal** [5] - 5:1, 8:1, 29:16
**appeals** [6] - 9:23, 10:19, 13:9, 13:11, 13:12, 24:10
**appellate** [6] - 24:11, 25:14, 27:1, 27:13, 30:20
**applied** [1] - 29:8
**apply** [3] - 10:10, 40:22, 48:23
**applying** [1] - 45:1
**apportioned** [2] -

**16:20, 16:23**
**apportionments** [4] - 43:19, 43:23, 43:25, 44:10
**appreciate** [2] - 24:8, 50:6
**approach** [1] - 38:10
**appropriate** [2] - 33:13, 49:24
**appropriated** [3] - 7:16, 11:17, 34:19
**appropriation** [2] - 39:3, 47:4
**Appropriations** [5] - 12:13, 12:19, 34:15, 34:24, 39:14
**appropriations** [13] - 5:8, 12:1, 12:6, 15:18, 17:4, 34:14, 34:17, 34:22, 42:1, 47:18, 48:10, 48:21, 49:4
**approval** [6] - 10:21, 11:13, 15:3, 43:1, 44:15, 45:24
**approvals** [2] - 14:10, 14:21
**approve** [2] - 44:2, 44:11
**approved** [7] - 11:8, 13:1, 37:12, 37:16, 37:17, 44:5, 44:19
**approving** [3] - 13:24, 15:1, 44:20
**area** [1] - 15:18
**areas** [2] - 11:16, 48:19
**argument** [3] - 25:8, 26:21, 32:12
**arguments** [3] - 27:9, 31:14, 32:11
**arise** [1] - 21:18
**Arnold** [2] - 2:5, 3:14
**array** [1] - 10:6
**art** [1] - 41:22
**aspects** [1] - 23:15
**assess** [3] - 34:10, 39:18, 40:14
**assessed** [1] - 15:6
**assessment** [2] - 25:20, 25:25
**assistance** [5] - 10:7, 17:13, 34:18, 37:5, 39:13
**Assistance** [4] - 11:24, 17:7, 17:11, 49:3
**assume** [2] - 15:6, 29:18
**assuming** [2] - 26:18, 40:18

assurance [1] - 34:4
assurances [1] - 44:4
attach [1] - 10:9
August [11] - 1:17, 9:4, 9:6, 13:5, 13:10, 15:12, 16:8, 16:22, 25:15, 50:15
AVAC [3] - 4:12, 43:21, 45:15
avenue [1] - 40:24
Avenue [2] - 1:24, 2:6
avenues [1] - 29:16
average [1] - 40:23
award [1] - 40:21
awards [2] - 17:17, 43:6
aware [2] - 30:23, 44:16
awareness [1] - 12:12

## B

background [1] - 7:20
balance [3] - 6:25, 33:20, 41:9
banc [19] - 5:11, 7:11, 7:12, 7:21, 8:6, 8:13, 8:21, 9:21, 26:10, 27:21, 28:1, 31:17, 31:21, 32:1, 32:3, 32:4, 32:8, 32:11, 50:3
Bateman [6] - 3:10, 3:12, 4:11, 4:16, 5:22, 42:22
BATEMAN [9] - 2:2, 3:9, 5:23, 6:3, 6:7, 6:9, 6:12, 45:11, 45:13
become [1] - 42:5
BEFORE [1] - 1:16
began [1] - 31:16
begin [2] - 22:13, 31:16
beginning [3] - 24:23, 31:8, 50:3
behalf [2] - 3:25, 4:12
benchmarks [1] - 9:15
beneficial [1] - 5:17
benefit [1] - 29:14
best [1] - 21:14
between [4] - 4:1, 9:17, 14:1, 47:15
beyond [1] - 33:9

bids [1] - 39:22
big [1] - 36:1
bilateral [5] - 32:23, 36:1, 36:4, 36:22, 37:21
billion [17] - 11:9, 11:15, 11:20, 11:21, 12:25, 13:1, 13:6, 13:7, 13:24, 14:3, 15:14, 16:23, 22:18, 34:20, 36:9, 37:13, 39:7
binding [3] - 7:5, 26:3, 26:6
bit [3] - 10:5, 12:8, 21:23
blanket [1] - 41:23
bolts [1] - 37:21
bottom [1] - 31:19
bound [1] - 39:14
breakdown [2] - 36:23, 46:4
briefly [3] - 14:7, 45:9, 45:22
brings [1] - 28:6
broad [6] - 20:16, 34:16, 35:17, 37:9, 43:5
broader [1] - 5:5
broadly [6] - 10:20, 12:5, 16:24, 21:4, 24:13, 37:23
Budget [1] - 16:21
budgetary [1] - 16:19
build [1] - 25:11
built [1] - 22:25
Bureau [1] - 15:16
BY [4] - 2:2, 2:6, 2:8, 2:12

## C

cannot [2] - 40:6, 43:12
careful [1] - 41:9
carry [2] - 18:7, 27:15
carrying [1] - 11:7
CASA [7] - 4:25, 5:4, 29:1, 29:6, 29:13, 30:3, 30:4
CASE [2] - 1:5, 1:11
case [20] - 2:1, 5:13, 11:9, 12:11, 17:9, 24:14, 30:7, 36:10, 38:1, 38:3, 39:1, 41:22, 41:25, 43:20, 44:3, 48:16, 48:17, 48:24, 49:7, 50:7

Case [1] - 2:5
cases [3] - 4:1, 45:20, 46:16
categories [2] - 5:8, 34:17
category [2] - 21:19, 46:25
certain [6] - 12:21, 21:24, 23:15, 35:1, 35:7, 35:12
certainly [4] - 4:13, 33:3, 33:7, 44:18
CERTIFICATE [1] - 50:10
Certified [1] - 1:23
certify [1] - 50:12
challenge [2] - 30:18
chance [2] - 31:4, 47:19
child [1] - 16:10
choice [1] - 20:17
chunk [1] - 36:1
circuit [22] - 7:1, 7:5, 7:12, 7:25, 8:22, 8:25, 9:5, 9:7, 24:18, 24:25, 25:6, 26:9, 26:15, 26:18, 26:21, 27:21, 28:1, 28:13, 28:18, 30:13, 32:6, 32:11
Circuit [5] - 4:22, 5:3, 7:8, 22:4, 45:14
Circuit's [1] - 20:10
circumstance [2] - 19:8, 20:9
circumstances [2] - 18:16, 21:16
cited [1] - 19:23
Citizen [2] - 2:2, 3:10
civil [1] - 24:11
Civil [2] - 3:2, 3:3
claim [2] - 38:4, 38:5
clarification [1] - 4:20
clarify [7] - 4:9, 12:22, 21:11, 23:19, 43:11, 48:4, 48:11
clarity [1] - 5:18
clear [2] - 13:17, 31:7
cleared [1] - 47:20
CLERK [1] - 3:2
clients [1] - 46:13
co [2] - 4:7, 39:10
co-counsel [2] - 4:7, 39:10
COALITION [1] - 1:3
Coalition [2] - 3:3, 3:11
codified [2] - 11:24, 17:11

colleague [1] - 3:21
COLUMBIA [1] - 1:1
Columbia [1] - 50:12
combine [1] - 35:7
combined [1] - 15:13
coming [6] - 10:15, 14:6, 23:19, 24:19, 41:5, 42:16
comment [2] - 24:12, 27:13, 27:14
committee [2] - 47:19, 48:6
committees [5] - 12:3, 12:7, 15:21, 16:6, 48:9
commodities [1] - 17:15
communications [1] - 18:11
compel [2] - 5:25, 45:17
compete [2] - 5:9, 30:15
competing [2] - 8:8, 21:8
competition [17] - 19:5, 19:7, 19:10, 19:16, 19:21, 20:3, 21:2, 21:7, 21:13, 37:1, 39:16, 39:21, 39:22, 40:7, 40:12, 40:18, 43:12
competitive [2] - 21:15, 21:17
complete [2] - 4:24, 24:15
compliance [11] - 6:3, 6:15, 6:21, 9:17, 13:22, 22:2, 23:16, 31:11, 31:12, 33:15, 46:9
complicated [1] - 10:5
complications [2] - 32:22, 32:25
comply [13] - 6:13, 7:9, 26:13, 34:1, 34:5, 34:9, 35:14, 36:10, 37:24, 38:23, 43:14, 43:16, 50:1
complying [3] - 9:24, 41:15, 43:8
compressed [1] - 14:14
concede [1] - 30:22
concern [2] - 15:17, 27:25
concerned [1] - 30:6
concerning [1] - 4:10

concerns [3] - 26:19, 29:2, 34:11
concluded [1] - 50:8
conditions [1] - 44:1
conduct [1] - 33:12
confer [2] - 39:9, 49:4
CONFERENCE [1] - 1:16
conference [2] - 6:18, 23:15
Conference [1] - 50:14
conformance [1] - 50:13
confronting [1] - 19:9
Congress [12] - 14:13, 15:2, 35:15, 35:16, 38:14, 38:21, 39:12, 42:8, 47:21, 47:25, 48:5, 48:10
congressional [8] - 10:23, 10:25, 11:10, 11:14, 11:22, 12:23, 16:14, 48:12
consider [1] - 5:20
consideration [4] - 5:11, 8:3, 8:22, 28:20
considerations [1] - 6:22
considering [1] - 7:21
consistent [1] - 35:11
Consolidated [2] - 12:13, 12:19
Constitution [1] - 1:24
constitutional [1] - 6:6
consultation [1] - 46:12
contemplated [1] - 48:4
context [3] - 12:8, 49:1, 49:6
contingencies [3] - 22:25, 23:7, 36:14
continue [1] - 14:8
contract [2] - 20:19, 37:23
contracts [10] - 19:4, 21:3, 35:24, 36:23, 37:1, 37:4, 39:23, 40:8, 40:25
control [1] - 14:11
convey [1] - 29:23
correct [2] - 14:22, 30:12

**correctly** [1] - 48:18
**COUNCIL** [1] - 1:9
**Council** [3] - 3:5, 3:17, 18:12
**counsel** [8] - 3:8, 3:25, 4:7, 5:2, 24:2, 39:10, 43:21, 48:7
**count** [1] - 39:2
**counterparties** [1] - 18:1
**counterparty** [1] - 22:24
**countries** [3] - 12:14, 12:16, 16:5
**country** [3] - 36:2, 36:3, 36:8
**couple** [3] - 6:22, 41:2, 42:25
**course** [6] - 13:12, 14:1, 25:2, 29:17, 31:25, 39:24
**COURT** [67] - 1:1, 3:12, 3:15, 3:18, 3:22, 4:13, 5:10, 5:21, 6:2, 6:4, 6:8, 6:10, 6:16, 10:13, 11:15, 11:19, 12:22, 13:4, 13:16, 14:16, 14:19, 15:8, 15:10, 18:18, 19:1, 20:11, 20:22, 21:10, 21:21, 22:17, 23:2, 23:10, 23:23, 24:5, 24:15, 26:7, 27:4, 27:7, 27:17, 28:6, 29:11, 29:24, 30:12, 30:22, 31:3, 31:7, 31:19, 32:10, 33:18, 35:20, 36:12, 38:25, 40:16, 41:3, 41:20, 42:9, 42:16, 44:13, 44:20, 45:5, 45:12, 45:21, 46:12, 46:20, 48:24, 49:19, 50:18
**court** [25] - 7:21, 8:7, 8:13, 8:23, 8:25, 9:22, 10:19, 13:9, 13:11, 13:12, 24:10, 26:10, 26:24, 27:5, 27:8, 27:9, 28:1, 28:22, 31:21, 32:1, 32:3, 32:11, 32:21, 45:19, 50:4
**Court** [29] - 1:23, 3:1, 4:6, 5:1, 5:16, 8:1, 8:24, 9:3, 9:21, 10:3, 12:11, 19:4, 23:14, 23:15, 23:17, 25:6, 32:7, 33:7, 33:10, 33:23, 34:2, 34:4, 39:25, 45:14, 49:10,

49:11, 49:13, 50:11, 50:11
**court's** [3] - 5:11, 8:21, 31:17
**Court's** [8] - 5:18, 7:14, 15:22, 29:1, 34:6, 39:10, 39:11, 46:8
**courts** [1] - 33:6
**cover** [1] - 15:14
**covered** [1] - 45:8
**covers** [1] - 16:15
**create** [2] - 20:23, 22:7
**CRR** [1] - 50:17
**current** [2] - 30:8, 44:17
**customarily** [1] - 15:19
**cut** [1] - 47:17

**D**

**Dan** [1] - 4:7
**DANIEL** [1] - 2:8
**Daniel** [1] - 3:16
**date** [3] - 13:10, 13:13, 22:12
**Dated** [1] - 50:15
**dates** [2] - 15:23, 22:14
**days** [3] - 7:13, 14:12, 19:17
**DC** [12] - 1:18, 1:24, 2:3, 2:7, 2:9, 2:13, 4:22, 5:3, 7:8, 20:10, 22:4, 45:14
**deadline** [5] - 9:8, 19:9, 26:16, 32:19, 46:18
**deal** [2] - 39:4, 49:4
**dealing** [1] - 6:5
**decide** [1] - 4:17
**decided** [3] - 5:1, 14:24, 38:1
**decision** [4] - 9:6, 28:18, 29:1, 31:17
**decisional** [1] - 37:17
**decisions** [1] - 47:19
**declaration** [4] - 5:7, 13:9, 17:19, 22:4
**defendant** [1] - 44:3
**DEFENDANTS** [1] - 2:11
**Defendants** [1] - 1:8
**defendants** [7] - 1:13, 3:20, 19:8, 19:12, 20:8, 46:10, 46:13

**defined** [1] - 41:17
**degree** [1] - 24:16
**deliberation** [1] - 47:24
**deliberations** [1] - 15:20
**deliberative** [2] - 37:17, 47:16
**delicate** [1] - 47:23
**demonstrate** [1] - 33:15
**DEPARTMENT** [1] - 1:6
**Department** [5] - 2:11, 3:4, 3:20, 42:23, 43:5
**Department's** [1] - 15:16
**DEPUTY** [1] - 3:2
**describe** [1] - 15:24
**described** [3] - 17:22, 20:5, 21:5
**describes** [1] - 16:9
**describing** [5] - 13:19, 20:14, 23:3, 23:20, 44:24
**description** [8] - 10:2, 15:9, 15:23, 15:25, 16:7, 16:13, 18:1, 29:22
**design** [1] - 9:14
**designated** [1] - 35:1
**designed** [1] - 25:14
**despite** [2] - 46:18, 48:13
**detail** [7] - 21:23, 23:6, 37:21, 42:13, 43:15, 48:21, 48:22
**detailed** [5] - 33:25, 36:13, 37:7, 38:8, 49:7
**details** [6] - 34:12, 35:19, 40:14, 43:3, 44:3, 44:8
**determination** [1] - 20:1
**determine** [1] - 21:17
**develop** [1] - 18:13
**developing** [1] - 19:19
**development** [6] - 17:23, 18:5, 18:10, 34:18, 46:23, 47:4
**DHS** [1] - 39:7
**dialogue** [3] - 15:19, 47:16, 47:25
**different** [17] - 10:1, 10:6, 10:8, 10:15, 20:17, 20:24, 20:25, 21:25, 36:5, 38:17,

38:20, 42:15, 43:20, 48:16, 48:20, 49:14
**difficult** [3] - 27:12, 27:13, 46:24
**Diplomate** [1] - 1:22
**direct** [4] - 17:9, 17:20, 17:21, 36:23
**directives** [4] - 6:25, 24:17, 35:6, 35:12
**directly** [4] - 18:2, 18:21, 18:23, 35:25
**disadvantage** [2] - 24:4, 30:19
**disagreeing** [1] - 7:4
**disagrees** [1] - 27:21
**disclose** [1] - 43:22
**disclosure** [4] - 47:13, 47:17, 48:1, 49:15
**discrete** [1] - 45:18
**discretion** [3] - 20:16, 49:5, 49:8
**discuss** [1] - 4:4
**discussing** [3] - 4:7, 12:24, 32:15
**discussion** [4] - 6:22, 22:7, 26:17, 28:25
**discussions** [4] - 22:5, 22:13, 25:11, 47:15
**dismiss** [1] - 45:16
**disposition** [2] - 5:4, 5:14
**dissent** [1] - 4:23
**DISTRICT** [3] - 1:1, 1:1, 1:16
**District** [2] - 50:11
**district** [2] - 26:24, 38:1
**divided** [1] - 4:3
**DOAG** [1] - 17:23
**DOAGs** [1] - 35:18
**document** [1] - 11:2
**documentation** [1] - 16:18
**documents** [1] - 11:3
**domestic** [2] - 48:19, 49:6
**DONALD** [1] - 1:12
**Donald** [1] - 3:5
**done** [6] - 13:15, 13:20, 21:22, 31:11, 31:12, 32:24
**down** [1] - 18:3
**downstream** [1] - 18:17
**drawing** [1] - 13:8
**due** [1] - 7:17
**dueling** [1] - 32:2

**duplicative** [1] - 5:24
**during** [1] - 25:3

**E**

**easy** [1] - 37:11
**effect** [7] - 7:16, 8:6, 9:21, 26:12, 31:16, 31:21, 33:21
**effort** [2] - 20:5, 20:7
**efforts** [2] - 6:13, 26:1
**either** [2] - 8:11, 20:12
**email** [1] - 23:20
**emails** [4] - 6:12, 42:22, 43:5, 45:8
**emphasize** [1] - 21:12
**emphasized** [3] - 19:4, 22:12, 23:15
**en** [19] - 5:11, 7:11, 7:12, 7:21, 8:6, 8:13, 8:20, 9:21, 26:10, 27:21, 28:1, 31:17, 31:21, 32:1, 32:2, 32:4, 32:8, 32:11, 50:3
**enable** [1] - 21:16
**end** [4] - 7:16, 11:6, 18:17, 38:6
**ended** [1] - 18:11
**enforce** [7] - 34:23, 35:10, 39:10, 39:15, 39:20, 40:5, 40:23
**enforcement** [2] - 34:19, 39:8
**ensure** [3] - 9:16, 13:22, 22:2
**ensuring** [2] - 31:11, 49:25
**entails** [1] - 37:15
**entered** [1] - 39:25
**entering** [2] - 22:6, 38:7
**entitled** [1] - 50:13
**equitable** [1] - 28:20
**error** [1] - 42:4
**especially** [2] - 29:2, 45:6
**essentially** [4] - 20:9, 22:8, 22:11, 44:9
**established** [1] - 47:10
**estimate** [1] - 11:21
**et** [8] - 1:3, 1:7, 1:9, 1:12, 3:3, 3:4, 3:5
**evaluating** [1] - 20:4
**event** [1] - 4:21

**events** [1] - 22:22
**everywhere** [1] - 10:11
**evidence** [5] - 5:25, 6:2, 6:3, 6:11, 24:3
**exactly** [2] - 32:14, 44:2
**examined** [1] - 20:18
**example** [15] - 8:15, 12:11, 12:18, 16:8, 17:16, 17:18, 18:3, 18:5, 20:7, 21:5, 22:23, 23:18, 36:14, 47:18, 49:22
**examples** [4] - 17:10, 17:17, 18:20, 19:13
**except** [2] - 31:19, 46:8
**exception** [3] - 20:23, 42:1, 43:14
**exceptions** [5] - 20:20, 20:22, 20:24, 20:25, 21:19
**executive** [3] - 43:1, 43:7, 43:8
**executive's** [1] - 47:24
**exist** [1] - 18:25
**expect** [6] - 4:2, 22:8, 23:23, 23:24, 24:5, 32:6
**expectation** [1] - 21:13
**expectations** [1] - 22:7
**expeditiously** [1] - 14:9
**expend** [2] - 22:17, 23:6
**expended** [3] - 16:1, 20:8, 26:2
**experience** [1] - 46:23
**expiration** [1] - 14:8
**expire** [2] - 40:10, 40:12
**expiring** [4] - 11:9, 11:18, 15:15, 16:23
**explained** [1] - 47:13
**explanation** [1] - 30:3
**expressed** [1] - 10:25
**extent** [7] - 4:5, 4:23, 5:4, 5:23, 33:1, 42:6, 45:25
**extreme** [3] - 48:6, 48:13, 48:14
**extremely** [1] - 36:24

# F

**face** [1] - 20:9
**facilities** [1] - 17:15
**fact** [5] - 27:23, 30:1, 40:10, 40:12, 48:17
**factor** [1] - 26:1
**factors** [2] - 25:23, 28:21
**fair** [7] - 7:19, 8:25, 14:16, 24:25, 28:22, 40:17, 41:7
**Fair** [1] - 38:3
**falls** [1] - 10:20
**familiar** [4] - 11:2, 46:16, 48:24, 48:25
**FAR** [1] - 40:8
**far** [3] - 13:20, 14:3, 42:12
**fashion** [1] - 21:1
**favor** [1] - 27:24
**favors** [1] - 26:6
**FCAA** [1] - 12:19
**fear** [1] - 45:15
**feasible** [17] - 6:24, 9:4, 9:7, 9:13, 9:17, 13:22, 22:2, 25:1, 25:13, 25:16, 25:18, 26:18, 27:18, 28:12, 28:16, 31:12, 50:1
**February** [2] - 18:12, 47:10
**Federal** [1] - 50:11
**federal** [3] - 1:23, 38:17, 40:4
**FEDERAL** [1] - 50:18
**few** [2] - 34:23, 43:23
**field** [1] - 47:10
**figure** [1] - 26:9
**file** [3] - 4:8, 4:19, 37:15
**filed** [6] - 7:12, 7:25, 13:9, 17:20, 22:3, 22:4
**filing** [1] - 29:25
**filter** [1] - 26:4
**finalized** [2] - 44:23, 47:22
**finalizing** [2] - 11:3, 16:18
**fine** [1] - 10:13
**first** [10] - 3:8, 9:11, 10:21, 11:5, 14:11, 14:14, 24:3, 39:5, 41:22, 46:6
**firsthand** [1] - 46:23
**fit** [1] - 20:20
**five** [1] - 7:12
**flag** [2] - 42:21, 43:18

**flags** [4] - 34:8, 39:17, 41:4, 43:18
**flexibility** [1] - 47:24
**flux** [1] - 33:4
**focus** [2] - 8:4, 31:8
**focused** [2] - 21:3, 31:10, 48:19
**focusing** [1] - 41:3
**follow** [1] - 18:18
**followed** [1] - 42:1
**following** [3] - 11:12, 37:5
**footnote** [2] - 44:15, 46:7
**footnotes** [2] - 44:10, 44:24
**FOR** [4] - 1:1, 2:1, 2:4, 2:11
**forced** [1] - 43:22
**forecloses** [1] - 47:7
**foregoing** [1] - 50:12
**Foreign** [4] - 11:24, 17:6, 17:10, 49:3
**foreign** [17] - 10:7, 12:6, 16:1, 17:13, 17:21, 18:6, 18:16, 20:2, 21:6, 22:5, 28:4, 33:3, 37:5, 39:13, 47:18, 48:5
**forget** [1] - 29:24
**forgive** [1] - 43:17
**formally** [1] - 25:23
**format** [1] - 50:13
**formulate** [2] - 23:22, 29:23
**formulated** [1] - 22:21
**formulating** [1] - 20:19
**forth** [3] - 35:4, 36:19, 41:6
**forthwith** [1] - 32:4
**forward** [7] - 3:6, 4:10, 8:5, 8:18, 11:11, 33:13, 33:15
**free** [1] - 6:17
**freezing** [1] - 41:23
**Friday** [8] - 11:6, 15:14, 16:22, 22:4, 32:20, 43:4, 43:10
**front** [3] - 6:21, 8:18, 32:2
**full** [15] - 19:5, 19:7, 19:10, 19:15, 19:21, 21:2, 21:13, 21:17, 22:18, 36:25, 39:16, 40:7, 40:11, 40:17, 43:11
**fully** [3] - 7:21, 34:5, 34:10

**function** [3] - 24:11, 27:2, 27:16
**functions** [2] - 11:7, 47:2
**funding** [6] - 36:15, 41:23, 43:2, 43:8, 47:19
**funds** [22] - 7:16, 9:3, 10:7, 11:9, 11:16, 11:18, 14:25, 15:15, 15:24, 16:1, 16:23, 17:2, 17:6, 17:12, 18:20, 18:22, 23:6, 28:9, 34:25, 38:4, 40:10, 46:3

# G

**geared** [1] - 42:4
**general** [1] - 16:11
**generality** [18] - 14:19, 15:3, 16:12, 17:1, 19:25, 21:24, 23:21, 41:5, 41:8, 41:11, 41:13, 41:14, 41:21, 42:2, 42:10, 46:3, 49:15, 49:24
**generalizations** [1] - 46:15
**generalize** [1] - 19:23
**generally** [2] - 15:24, 37:10
**genre** [1] - 47:6
**GHC** [2] - 3:14, 47:9
**gist** [2] - 29:10, 29:23
**given** [6] - 9:9, 9:12, 19:17, 28:8, 31:1, 37:16
**Global** [4] - 3:5, 3:17, 15:17, 18:12
**GLOBAL** [1] - 1:9
**global** [5] - 16:10, 16:11, 34:17, 35:2, 42:14
**government** [49] - 4:10, 5:15, 7:15, 8:17, 9:10, 9:11, 9:16, 9:20, 10:18, 13:20, 17:13, 17:20, 20:6, 21:6, 22:3, 22:11, 25:1, 25:5, 25:7, 25:9, 25:25, 26:6, 26:12, 27:14, 28:7, 29:2, 29:7, 29:15, 29:18, 30:1, 30:6, 31:10, 32:5, 32:15, 32:16, 32:17, 32:21, 33:1, 33:3, 33:4, 33:14,

33:22, 33:24, 35:10, 35:14, 39:1, 40:13, 40:18, 45:7
**government's** [10] - 6:13, 7:24, 9:1, 9:2, 9:5, 9:12, 24:24, 26:2, 31:25, 33:12
**governments** [3] - 17:21, 22:5, 28:4
**grade** [1] - 8:23
**grant** [2] - 20:13, 20:19, 39:21
**granted** [1] - 5:12
**granting** [1] - 14:9
**grants** [13] - 18:23, 19:4, 21:3, 30:14, 35:24, 36:22, 37:1, 41:1, 43:1, 43:2, 43:3, 43:9, 43:12
**great** [1] - 49:4
**gritty** [2] - 44:9, 46:5
**grounds** [1] - 49:18
**Group** [3] - 2:2, 2:8, 3:10
**guaranteed** [1] - 13:13
**guess** [5] - 9:12, 14:5, 25:4, 26:14, 45:23
**guidance** [1] - 20:12
**guideline** [1] - 24:21
**guidelines** [1] - 19:6

# H

**hamstringing** [1] - 6:14
**handle** [3] - 24:10, 27:2, 30:20
**happy** [5] - 4:4, 33:9, 33:16, 44:8
**hard** [1] - 35:19
**harm** [9] - 25:19, 25:21, 25:25, 28:14, 29:1, 29:5, 29:18, 30:5, 33:6
**harmed** [7] - 25:9, 26:16, 26:20, 27:20, 28:19, 29:7, 30:3
**harms** [1] - 25:24
**health** [6] - 16:10, 16:11, 34:17, 35:2, 42:14
**Health** [4] - 3:5, 3:17, 15:17, 18:12
**HEALTH** [1] - 1:9
**hear** [9] - 6:19, 9:10, 23:11, 24:6, 30:24, 31:3, 33:18, 45:9, 45:22

**heard** [5] - 24:3, 31:5, 33:22, 40:14, 48:18
**hearing** [6] - 4:15, 6:17, 13:19, 46:6, 46:8, 50:5
**hearings** [1] - 45:10
**hello** [1] - 3:15
**help** [5] - 10:12, 15:22, 25:4, 29:11, 29:15
**helpful** [19] - 3:24, 4:14, 5:21, 6:19, 7:18, 8:16, 9:10, 9:14, 21:22, 21:25, 31:10, 33:18, 36:12, 36:24, 37:25, 45:6, 45:25, 46:20, 49:19
**hereby** [1] - 50:12
**hermetically** [1] - 29:4
**high** [7] - 16:12, 16:25, 19:24, 23:21, 41:17, 41:18, 46:2
**highlighted** [1] - 31:8
**history** [1] - 44:25
**hit** [1] - 36:6
**hold** [2] - 32:17, 42:20
**holdup** [3] - 44:4, 44:5, 44:7
**honestly** [1] - 25:5
**Honor** [31] - 3:2, 3:9, 3:13, 3:16, 3:19, 4:3, 4:4, 4:18, 5:23, 9:19, 31:6, 31:15, 31:16, 31:25, 32:15, 33:19, 33:20, 34:11, 34:16, 34:23, 35:9, 37:11, 37:25, 38:12, 40:9, 42:11, 43:17, 43:18, 44:8, 45:3, 45:17
**HONORABLE** [1] - 1:16
**hoping** [1] - 6:23
**hours** [1] - 32:9
**Housing** [1] - 38:3
**housing** [1] - 48:18
**HUD** [1] - 38:4
**hundreds** [1] - 34:21
**hypothetical** [2] - 48:6, 48:14

## I

**idea** [2] - 5:10, 38:18
**identified** [1] - 23:14
**identify** [1] - 3:7
**immediate** [1] -

33:24
**immigration** [1] - 39:8
**imminently** [1] - 45:14
**implement** [3] - 11:3, 16:18, 17:13
**implementation** [1] - 15:7
**implemented** [1] - 12:10
**implementing** [1] - 46:11
**important** [10] - 6:22, 7:2, 7:20, 8:3, 8:8, 16:19, 17:3, 33:23, 40:3, 49:9
**impose** [1] - 49:7
**include** [4] - 18:15, 46:10, 49:21, 49:25
**included** [2] - 44:1, 44:9
**includes** [1] - 7:9, 43:11
**including** [4] - 5:14, 9:13, 36:16, 50:3
**indication** [1] - 9:5
**indicative** [6] - 4:21, 5:6, 29:12, 29:22, 45:4, 45:5
**INDRANEEL** [1] - 2:12
**Indraneel** [1] - 3:19
**infer** [1] - 14:17
**inform** [1] - 10:12
**information** [4] - 34:10, 41:10, 41:12, 41:19
**injunction** [31] - 4:20, 5:19, 6:4, 6:6, 6:14, 6:21, 7:4, 7:15, 8:6, 23:16, 26:12, 27:22, 28:10, 29:13, 29:20, 31:20, 33:8, 34:1, 34:6, 34:9, 36:11, 38:5, 38:23, 39:11, 39:12, 40:1, 42:3, 42:5, 43:14, 46:9, 50:2
**insofar** [2] - 20:18, 31:19
**instance** [1] - 14:20
**instinct** [1] - 8:10
**instrument** [2] - 22:24, 46:25
**instrumentalities** [1] - 28:5
**instruments** [17] - 10:6, 10:8, 17:1, 17:8, 18:3, 18:19, 18:22,

20:14, 20:17, 20:24, 21:1, 21:5, 21:25, 22:16, 35:21, 35:22, 47:8
**intend** [4] - 4:19, 5:6, 5:16, 5:24
**intending** [4] - 4:8, 38:19, 39:18
**intends** [1] - 39:2
**intent** [1] - 37:20
**interagency** [5] - 11:8, 12:20, 17:10, 38:15, 48:3
**interbranch** [2] - 15:19, 47:16
**interest** [4] - 4:14, 8:23, 23:16, 41:3
**interested** [4] - 4:6, 33:2, 36:19, 45:23
**interests** [4] - 7:20, 8:9, 24:13, 49:25
**internal** [1] - 19:6
**international** [3] - 17:18, 22:6, 34:18
**interrupt** [1] - 48:2
**intrude** [1] - 41:10
**involve** [1] - 18:21
**involved** [3] - 19:18, 22:16, 43:21
**involves** [1] - 48:18
**irreparable** [3] - 25:19, 29:5, 33:6
**irreparably** [7] - 25:9, 26:16, 26:20, 27:20, 28:14, 28:19, 29:7
**issuance** [1] - 13:13
**issuances** [1] - 19:20
**issue** [9] - 4:11, 4:25, 5:20, 10:8, 25:17, 32:3, 45:11, 45:19, 46:7
**issued** [5] - 7:9, 7:14, 42:25, 43:24, 48:16
**issues** [3] - 4:16, 33:1, 33:10
**issuing** [4] - 37:3, 43:2, 43:6
**items** [1] - 35:2
**itself** [3] - 5:9, 11:24, 47:9

## J

**Jacobson** [7] - 2:8, 3:17, 4:7, 4:16, 29:25, 33:11, 47:11
**JACOBSON** [15] -

2:8, 3:16, 4:18, 5:13, 33:19, 35:23, 36:21, 39:5, 40:20, 41:13, 42:6, 42:11, 42:17, 44:17, 44:24
**Jacobson's** [1] - 23:18
**Joshua** [1] - 3:21
**JOSHUA** [1] - 2:12
**Judge** [3] - 4:22, 5:2, 38:2
**judge** [1] - 38:7
**JUDGE** [1] - 1:16
**Judicial** [1] - 50:14
**jumping** [1] - 13:17
**Justice** [2] - 2:11, 3:20
**justifications** [2] - 20:4, 20:20
**justifying** [1] - 33:7

## K

**Kaye** [1] - 2:5
**keep** [1] - 15:10
**key** [1] - 35:13
**kind** [17] - 4:13, 9:13, 9:15, 11:16, 13:5, 24:21, 28:1, 28:6, 28:12, 31:13, 36:19, 41:3, 41:5, 41:10, 41:25, 49:7, 49:23
**kinds** [1] - 48:13
**known** [3] - 25:2, 32:22, 41:14
**knows** [1] - 48:9

## L

**lack** [2] - 6:13, 40:6
**laid** [6] - 35:1, 35:21, 37:3, 38:21, 40:22, 44:15
**land** [1] - 21:6
**last** [5] - 7:3, 22:12, 42:23, 43:4, 43:23
**late** [1] - 42:23
**latter** [2] - 6:7, 6:8
**Lauren** [1] - 3:9
**LAUREN** [1] - 2:2
**law** [5] - 28:23, 34:5, 34:18, 42:1, 48:19
**lawful** [1] - 39:2
**lawfully** [1] - 34:9
**laws** [1] - 48:21
**Lawyers** [1] - 2:8
**lawyers** [1] - 11:2
**lay** [3] - 7:2, 34:11, 45:3
**laying** [1] - 42:13

**lays** [1] - 5:7
**lead** [1] - 40:24
**leadership** [1] - 44:18
**learned** [2] - 42:22, 43:4
**least** [6] - 4:15, 7:1, 18:21, 23:3, 41:1, 43:24
**leave** [1] - 9:6
**lectern** [1] - 3:6
**leeway** [1] - 28:8
**Legislative** [1] - 15:17
**less** [7] - 35:6, 36:18, 36:25, 39:16, 40:7, 40:11, 43:11
**letter** [5] - 5:15, 7:24, 16:2, 16:4, 16:8
**letters** [3] - 15:5, 15:13, 15:21
**level** [20] - 14:19, 15:3, 16:12, 16:25, 19:25, 21:24, 23:2, 23:5, 23:21, 41:8, 41:11, 41:17, 41:18, 41:20, 42:2, 42:10, 46:2, 47:7, 49:14, 49:24
**lifting** [1] - 45:15
**light** [4] - 33:5, 33:21, 45:13, 46:1
**likely** [1] - 8:1
**limitations** [1] - 20:11
**limited** [3] - 30:14, 30:17, 46:4
**limiting** [1] - 29:19
**limits** [1] - 30:9
**line** [2] - 31:19, 35:2
**lists** [1] - 12:13
**Litigation** [2] - 2:2, 3:10
**live** [1] - 28:1
**LLC** [1] - 2:8
**LLP** [1] - 2:5
**look** [2] - 12:11, 14:2
**looking** [1] - 49:11
**lose** [2] - 26:18, 28:13
**lost** [3] - 26:14, 26:21, 27:10

## M

**malaria** [3] - 16:9, 35:3, 42:17
**Management** [1] - 16:21
**mandate** [4] - 7:10,

7:14, 7:23, 32:4
**manner** [2] - 4:22, 8:7
**Massachusetts** [1] - 2:6
**mat** [1] - 8:11
**materialized** [1] - 32:20
**maternal** [1] - 16:10
**matter** [4] - 14:3, 25:24, 48:17, 50:13
**matters** [2] - 37:2, 41:21
**mean** [3] - 20:22, 22:20, 31:18
**meaning** [2] - 14:23, 41:24
**mechanism** [1] - 38:25
**meet** [3] - 9:16, 21:18, 36:5
**mention** [1] - 42:21
**mentioned** [10] - 4:19, 24:2, 24:9, 24:16, 35:18, 35:23, 36:25, 37:12, 38:16, 43:19
**merits** [2] - 25:24, 29:4
**met** [2] - 7:3, 9:8
**might** [8] - 5:14, 10:12, 10:14, 10:15, 13:8, 19:14, 48:22, 49:13
**milestones** [2] - 9:15, 10:5
**mind** [5] - 13:17, 25:15, 37:1, 42:11, 49:10
**mindful** [1] - 6:24
**minimum** [1] - 8:20
**minute** [1] - 43:17
**moment** [2] - 19:9, 30:23
**Monday** [1] - 1:17
**money** [23] - 14:25, 34:2, 35:15, 35:25, 36:1, 37:4, 37:8, 37:10, 37:14, 37:15, 38:6, 38:16, 38:19, 39:2, 39:12, 41:16, 42:7, 43:24, 43:25, 44:2, 44:6, 44:10, 44:19
**month** [2] - 11:5, 16:22
**months** [11] - 13:24, 19:11, 28:9, 32:23, 34:23, 40:1, 40:24, 40:25, 41:1, 41:2,

43:23
**morning** [1] - 7:25
**most** [4] - 13:8, 17:20, 31:24, 33:22
**motion** [29] - 4:6, 4:8, 4:9, 4:19, 5:6, 5:9, 5:25, 18:13, 23:19, 23:20, 23:24, 23:25, 24:1, 24:9, 29:25, 32:3, 34:23, 35:9, 40:5, 40:22, 45:4, 45:5, 45:16, 45:17, 45:21, 47:9
**motions** [1] - 32:2
**mouth** [1] - 14:23
**moved** [2] - 14:14, 32:21
**moving** [2] - 39:19, 46:17
**MR** [57] - 3:13, 3:16, 3:19, 4:3, 4:18, 5:13, 9:19, 10:17, 11:18, 11:21, 13:1, 13:8, 14:7, 14:18, 15:5, 15:9, 15:11, 18:25, 19:3, 20:15, 21:2, 21:11, 22:3, 22:20, 23:8, 23:12, 24:2, 24:8, 25:20, 26:23, 27:6, 27:11, 28:3, 28:24, 29:21, 30:7, 30:19, 31:1, 31:6, 31:15, 31:23, 32:14, 33:19, 35:23, 36:21, 39:5, 40:20, 41:13, 42:6, 42:11, 42:17, 44:17, 44:24, 46:6, 46:15, 46:21, 49:2
**MS** [8] - 3:9, 5:23, 6:3, 6:7, 6:9, 6:12, 45:11, 45:13
**multiple** [1] - 49:17
**must** [1] - 20:16

# N

**narcotics** [1] - 34:18
**narrows** [1] - 29:12
**NATHANIEL** [1] - 2:12
**nation** [4] - 18:6, 18:7, 36:14
**National** [1] - 38:3
**nations** [6] - 12:9, 16:1, 16:3, 18:16, 23:5
**nature** [1] - 26:5

**necessarily** [3] - 17:25, 22:22, 25:21
**necessary** [2] - 4:23, 5:5
**neck** [1] - 32:12
**need** [19] - 7:17, 9:16, 12:24, 14:9, 19:20, 20:1, 21:18, 31:13, 33:4, 34:12, 35:10, 35:18, 38:21, 39:17, 39:19, 40:14, 41:18, 43:15, 50:5
**needed** [1] - 41:14
**needs** [5] - 7:5, 22:1, 26:13, 31:12, 35:11
**negotiating** [2] - 28:4, 32:22
**negotiations** [1] - 33:2
**never** [1] - 44:25
**new** [10] - 5:24, 6:2, 6:3, 24:3, 29:6, 32:19, 42:25, 43:3, 43:6, 43:8
**newfangled** [1] - 47:8
**next** [5] - 6:20, 7:6, 14:4, 32:9, 50:7
**NGO** [1] - 18:7
**NGOs** [2] - 18:2, 18:4
**NICOLAS** [1] - 2:2
**nitty** [1] - 44:9, 46:5
**nitty-gritty** [2] - 44:9, 46:5
**NO** [2] - 1:5, 1:11
**non** [3] - 5:24, 30:8, 30:10
**non-duplicative** [1] - 5:24
**non-plaintiffs** [2] - 30:8, 30:10
**nonbinding** [1] - 22:9
**none** [2] - 17:8, 18:1
**nonparties** [2] - 29:2, 29:8
**nonprofits** [1] - 35:25
**normal** [1] - 39:21
**note** [1] - 32:19
**nothing** [1] - 30:9
**notice** [3] - 39:22, 43:2, 48:5
**notices** [2] - 19:17, 47:22
**notification** [13] - 11:10, 11:14, 11:22, 12:2, 12:14, 13:20, 13:2, 14:12, 15:4, 16:3, 47:21, 48:1,

48:12
**notifications** [11] - 10:24, 12:2, 12:4, 12:7, 12:23, 13:3, 15:3, 15:11, 15:13, 16:14, 44:22
**notifying** [2] - 13:14, 15:2
**notion** [2] - 27:19, 47:6
**notwithstanding** [1] - 46:15
**nuances** [1] - 41:25
**number** [1] - 37:13
**nutrition** [1] - 16:10
**nuts** [1] - 37:21
**NW** [5] - 1:24, 2:3, 2:6, 2:9, 2:12

# O

**objection** [3] - 20:8, 26:2, 46:18
**objections** [1] - 49:18
**objective** [6] - 17:23, 18:5, 18:10, 18:14, 46:23, 47:4
**obligate** [19] - 7:15, 8:14, 9:3, 10:7, 17:2, 17:6, 28:9, 34:1, 34:25, 35:10, 35:11, 35:12, 35:15, 36:1, 37:10, 38:13, 38:20, 39:7, 42:14
**obligated** [7] - 14:24, 15:25, 18:23, 35:6, 37:14, 37:16, 46:3
**obligating** [5] - 36:8, 36:22, 42:7, 44:19, 44:22
**obligation** [7] - 9:25, 10:17, 11:4, 12:15, 16:7, 16:20, 47:3
**obligations** [8] - 10:22, 11:13, 12:4, 12:10, 15:1, 36:3, 44:21, 46:22
**observed** [1] - 8:7
**obtain** [1] - 17:15
**obtained** [1] - 21:14
**obvious** [1] - 7:1
**obviously** [6] - 5:1, 5:17, 8:2, 9:8, 10:18, 42:11
**OF** [3] - 1:1, 1:6, 1:16
**offer** [3] - 21:21, 23:11, 41:11
**offered** [2] - 24:25, 48:7

**Office** [1] - 16:21
**office** [3] - 24:10, 27:15, 30:20
**offices** [1] - 27:2
**Official** [2] - 1:23, 50:11
**official** [1] - 20:1
**OFFICIAL** [1] - 50:18
**officials** [2] - 11:6, 18:6
**OMB** [13] - 16:22, 43:19, 43:22, 43:24, 44:3, 44:5, 44:9, 44:14, 44:18, 45:1, 45:24, 46:7, 46:14
**one** [25] - 4:15, 5:3, 10:10, 15:12, 16:8, 16:9, 16:11, 17:16, 17:22, 21:12, 22:15, 22:23, 24:19, 24:22, 25:20, 30:21, 33:7, 37:11, 37:25, 38:8, 39:17, 43:17, 43:18, 44:14, 45:11
**ones** [1] - 18:20
**ongoing** [2] - 33:5, 45:13
**open** [14] - 19:5, 19:7, 19:10, 19:16, 19:21, 20:13, 21:2, 21:13, 21:17, 37:1, 39:16, 40:7, 40:11, 43:12
**operate** [3] - 24:17, 25:1, 25:7
**operating** [1] - 24:23
**opinion** [13] - 7:4, 7:5, 7:10, 7:23, 13:13, 20:10, 26:3, 26:6, 26:8, 26:15, 27:24, 28:2, 50:3
**opportunities** [1] - 43:2
**opportunity** [1] - 46:1
**option** [1] - 24:6
**options** [1] - 24:22
**order** [17] - 4:17, 7:9, 7:12, 8:5, 8:21, 9:21, 9:22, 26:10, 31:17, 33:15, 38:22, 39:18, 43:1, 43:7, 43:8, 46:9, 49:13
**Order** [1] - 3:1
**orders** [2] - 7:8, 7:17
**ordinary** [3] - 19:5, 19:7, 19:10
**organizations** [4] - 17:18, 22:6, 35:25, 36:16

**organizing** [1] - 4:15
**original** [1] - 50:12
**otherwise** [3] -
12:23, 26:10, 26:11
**ourselves** [1] - 9:9
**outlined** [1] - 50:2
**outright** [1] - 49:15
**outset** [3] - 3:25,
6:23, 24:16
**overall** [1] - 47:11
**override** [1] - 49:8
**oversimplifying** [1] -
20:13
**overtaken** - 32:8
**overview** [3] - 10:11,
10:14, 31:1
**own** [4] - 12:12,
37:18, 40:6, 48:2

**P**

**p.m** [4] - 1:17, 3:1,
50:8
**page** [1] - 50:13
**painted** [1] - 48:14
**PALT** [1] - 40:23
**Pan** [2] - 4:22, 5:2
**panel** [11] - 7:3, 7:10,
7:23, 8:18, 26:3, 26:6,
26:7, 26:22, 27:21,
27:24, 50:3
**panel's** [1] - 31:17
**papers** [3] - 18:13,
19:24, 47:9
**park** [1] - 38:19
**part** [8] - 6:4, 6:5,
20:5, 25:20, 29:5,
29:9, 34:23
**participants** [1] -
40:21
**particular** [17] -
10:22, 12:9, 12:16,
12:18, 18:4, 19:24,
21:9, 22:15, 22:23,
23:3, 23:5, 42:1, 42:4,
45:24, 47:2, 49:12
**particularities** [1] -
48:22
**parties** [7] - 3:6,
6:19, 7:19, 8:4, 13:11,
17:9, 30:13
**parties'** [2] - 6:23,
7:6
**partly** [2] - 26:5,
26:23
**partners** [1] - 33:4
**parts** [1] - 34:7
**party** [2] - 30:21,
34:4
**pass** [1] - 33:16

**past** [1] - 33:12
**path** [1] - 5:3
**pay** [1] - 8:23
**pending** [11] - 4:6,
5:2, 5:11, 5:25, 7:11,
31:9, 31:25, 32:4,
32:5, 45:17, 45:21
**people** [1] - 43:6
**perform** [1] - 18:4
**perhaps** [4] - 8:8,
8:11, 8:17, 20:13
**period** [2] - 12:5,
25:3, 28:19
**person** [1] - 36:15
**personnel** [1] - 18:11
**perspective** [2] -
29:6, 42:19
**pertinent** [2] - 11:9,
15:15
**petition** [4] - 5:12,
7:11, 7:22, 32:4
**phase** [2] - 24:13,
30:20
**PI** [9] - 8:13, 8:21,
9:20, 13:10, 20:7,
30:9, 30:10, 32:8,
33:21
**picture** [2] - 12:12,
48:13
**place** [6] - 8:13,
14:20, 15:4, 47:15,
47:25
**plaintiff** [1] - 48:17
**Plaintiffs** [2] - 1:4,
1:10
**PLAINTIFFS** [2] -
2:1, 2:4
**plaintiffs** [29] - 3:11,
3:14, 3:17, 4:1, 4:12,
4:24, 5:7, 8:11, 8:15,
17:9, 17:25, 18:21,
18:24, 19:3, 23:11,
25:6, 30:7, 30:8,
30:10, 30:14, 30:17,
30:25, 39:1, 41:21,
42:4, 43:21, 45:15,
45:20, 46:2
**plaintiffs'** [7] - 3:8,
5:2, 5:25, 7:22, 18:12,
24:2, 40:16
**plan** [32] - 10:14,
13:22, 14:5, 14:17,
22:1, 22:17, 22:19,
22:20, 22:21, 23:2,
23:6, 28:8, 33:25,
34:5, 35:14, 36:7,
36:13, 36:20, 37:7,
37:19, 38:8, 39:6,
40:13, 42:19, 43:7,
43:16, 46:5, 47:13,

48:1, 48:22, 49:5,
49:16
**planning** [9] - 13:10,
36:21, 37:3, 38:22,
40:6, 42:13, 42:14,
42:18, 43:13
**plans** [4] - 4:10, 8:1,
14:7, 28:10
**play** [5] - 5:19, 8:2,
27:20, 32:2, 49:25
**played** [1] - 7:21
**plays** [1] - 43:20
**plenty** [1] - 40:1
**point** [22] - 10:4,
13:14, 15:1, 16:2,
16:4, 18:19, 22:4,
22:15, 23:4, 23:11,
23:13, 24:20, 31:24,
32:13, 36:13, 37:25,
39:15, 40:4, 46:21,
47:12, 48:15, 49:23
**pointed** [3] - 16:6,
34:22, 40:5
**points** [2] - 23:13,
41:7
**policies** [1] - 29:8
**policy** [1] - 11:6
**Porter** [2] - 2:5, 3:14
**position** [4] - 26:23,
31:2, 40:16, 46:7
**possible** [2] - 10:9,
39:21
**possibly** [1] - 45:14
**post** [1] - 39:22
**pot** [1] - 36:9
**potential** [4] - 4:8,
5:24, 29:18, 50:4
**potentially** [3] - 32:9,
36:16, 45:24
**practical** [2] - 22:5,
25:24
**practicalities** [2] -
28:4, 28:13
**pre** [3] - 6:5, 37:17,
44:11
**pre-approve** [1] -
44:11
**pre-decisional** [1] -
37:17
**pre-TRO** [1] - 6:5
**preceded** [1] - 13:10
**precedent** [2] - 26:9,
38:9
**predict** [1] - 8:2
**preliminary** [18] -
4:20, 6:14, 6:20, 7:4,
7:14, 8:6, 23:16,
26:11, 27:22, 28:10,
29:13, 31:20, 33:7,
39:11, 46:9, 49:20,

50:1
**preparation** [1] -
13:3
**prepared** [1] - 10:12
**preparing** [1] - 46:8
**prerogative** [1] -
14:13
**present** [3] - 47:13,
48:2, 49:14
**presented** [1] - 49:16
**preserve** [1] - 47:23
**president** [1] - 42:25
**presumably** [3] -
32:23, 32:24, 36:24
**pretty** [2] - 34:8, 46:2
**prevent** [2] - 44:18,
44:21
**Prevent** [1] - 44:20
**previous** [2] - 47:14,
49:16
**price** [1] - 21:14
**primarily** [1] - 31:8
**principles** [1] - 29:7
**private** [6] - 18:2,
18:4, 18:7, 21:8,
35:25, 36:16
**problem** [4] - 8:19,
26:5, 29:3, 39:6
**problems** [3] - 47:12,
48:2, 49:14
**procedures** [2] -
20:2, 47:21
**proceed** [1] - 20:25
**proceeding** [2] -
19:19, 25:9
**proceedings** [7] -
25:14, 32:1, 32:8,
33:5, 45:13, 45:19,
50:4
**Proceedings** [1] -
50:8
**process** [18] - 9:25,
10:1, 10:17, 10:19,
11:14, 11:22, 12:24,
13:23, 16:16, 16:17,
20:13, 21:15, 21:17,
40:18, 43:1, 43:20,
44:7, 44:15
**processes** [5] - 10:9,
19:7, 19:11, 19:22,
25:2
**produce** [1] - 33:24
**Produced** [1] - 1:25
**production** [2] - 6:1,
45:17
**program** [2] - 16:9,
17:14
**programs** [2] -
12:18, 15:24
**programs'** [1] -

15:18
**pronouncing** [1] -
38:2
**proposal** [1] - 46:2
**proposals** [1] - 10:24
**propose** [2] - 9:16,
48:8
**proposed** [19] - 9:10,
10:22, 11:13, 12:10,
12:15, 15:1, 15:2,
16:7, 22:24, 23:19,
23:20, 24:24, 25:5,
25:18, 28:7, 28:17,
30:2, 32:16, 44:20
**proposing** [2] - 6:24,
39:4
**provide** [9] - 4:24,
10:2, 10:11, 12:1,
15:25, 17:12, 34:3,
44:4, 47:5
**provided** [5] - 11:22,
18:8, 36:20, 47:3,
48:10
**providers** [1] - 21:8
**provides** [1] - 20:1
**provisions** [14] -
12:17, 19:5, 19:13,
19:15, 19:24, 20:21,
20:23, 21:2, 21:15,
48:1, 48:5, 48:20,
49:3
**prudent** [1] - 31:24
**Public** [2] - 2:2, 3:10
**public** [3] - 15:21,
17:17, 28:5
**purpose** [1] - 48:12
**purposes** [12] -
35:16, 36:3, 37:2,
37:5, 38:20, 39:13,
41:17, 42:8, 42:16,
46:4, 47:2, 47:8
**pursuant** [1] - 43:6
**pursue** [2] - 22:23,
29:16
**put** [3] - 14:23, 41:4,
49:13
**putting** [1] - 19:16

**Q**

**questions** [8] - 4:5,
13:25, 20:18, 33:9,
33:17, 49:12, 49:13,
49:21
**quick** [2] - 37:11,
39:19
**quicker** [1] - 21:1
**quickly** [4] - 14:14,
14:16, 14:17, 32:6
**quite** [1] - 25:5

**quo** [3] - 8:9, 31:18, 31:20
**quotations** [1] - 18:15
**quote** [2] - 7:13, 7:16
**quoted** [2] - 9:21, 18:12

# R

**raise** [5] - 4:12, 6:17, 34:8, 41:4, 43:17
**raised** [1] - 23:13
**range** [2] - 22:16, 37:4
**rather** [2] - 35:23, 38:21
**RDR** [1] - 50:17
**RDR-CRR** [1] - 50:17
**reaching** [1] - 18:17
**reaction** [1] - 33:12
**read** [1] - 40:9
**realistic** [4] - 19:11, 19:18, 22:8, 22:10
**realistically** [1] - 36:20
**realize** [1] - 17:3
**really** [8] - 8:20, 24:12, 26:14, 27:14, 27:16, 30:10, 45:1, 46:7
**Realtime** [1] - 1:23
**reason** [8] - 6:18, 16:5, 18:14, 20:6, 37:14, 39:24, 40:10, 41:20
**reasonable** [1] - 32:17
**reasonably** [1] - 40:22
**reasons** [2] - 21:18, 49:16
**receive** [1] - 12:7
**received** [1] - 23:20
**recent** [3] - 7:3, 13:9, 15:11
**recently** [2] - 17:20, 43:22
**recognition** [1] - 8:21
**recognize** [3] - 14:7, 23:14, 49:4
**recollection** [1] - 30:12
**reconcile** [1] - 40:13
**reconciling** [2] - 25:17, 30:1
**Record** [1] - 1:25
**record** [4] - 3:7, 6:1, 45:18, 50:13

**red** [4] - 34:8, 39:17, 41:4, 42:21
**Reeves** [2] - 50:11, 50:17
**REEVES** [1] - 1:22, 50:17
**reference** [1] - 38:11
**referred** [1] - 19:13
**referring** [2] - 9:2, 30:16
**reflect** [3] - 9:22, 9:23, 15:19
**Registered** [1] - 1:22
**regulation** [1] - 40:8
**regulations** [5] - 20:12, 20:19, 21:12, 40:4, 50:13
**regulatory** [1] - 19:5
**rehearing** [2] - 5:12, 7:22
**reinstates** [1] - 27:22
**related** [1] - 32:22
**relates** [4] - 4:25, 6:20, 9:1, 27:19
**relating** [1] - 6:13
**relations** [3] - 12:6, 47:18, 48:6
**relatively** [1] - 41:18
**relevant** [2] - 34:14, 48:9
**reliance** [1] - 28:11
**relied** [1] - 8:25
**relief** [4] - 4:24, 10:18, 30:9, 39:19
**rely** [1] - 40:6
**remain** [3] - 9:4, 9:6, 22:8
**remaining** [1] - 13:25
**remains** [13] - 7:16, 8:6, 8:13, 8:21, 9:17, 13:22, 22:2, 25:16, 26:12, 31:12, 31:21, 46:19, 50:1
**remanded** [1] - 5:14
**remedy** [2] - 38:8, 38:25
**repeat** [1] - 29:21
**reply** [2] - 40:5, 49:12
**report** [1] - 49:21
**Reporter** [4] - 1:22, 1:23, 1:23, 50:11
**REPORTER** [1] - 50:18
**representation** [2] - 26:25, 28:11
**representations** [3] - 9:1, 9:12, 27:18
**request** [5] - 4:21, 9:2, 22:3, 27:1, 27:8

**requested** [3] - 13:11, 27:4, 27:8
**requests** [1] - 9:1
**require** [9] - 12:4, 12:5, 20:4, 21:7, 33:24, 37:8, 38:7, 41:16, 46:4
**required** [9] - 9:3, 19:20, 35:15, 35:16, 37:5, 37:8, 38:14, 39:12, 40:19
**requirement** [4] - 12:15, 16:4, 49:5, 49:8
**requirements** [3] - 11:10, 12:2, 48:12
**requires** [4] - 7:15, 12:20, 25:21, 40:17
**requiring** [2] - 45:24, 49:15
**rescinding** [1] - 41:23
**resolution** [1] - 27:13
**resources** [1] - 16:19
**respect** [15] - 6:4, 7:17, 24:1, 31:11, 31:25, 32:15, 33:10, 33:14, 33:19, 38:4, 38:11, 38:12, 39:16, 40:8, 43:1
**respecting** [2] - 49:24, 50:2
**respects** [1] - 8:7
**respond** [8] - 23:23, 23:25, 24:5, 31:4, 31:13, 45:23, 46:7, 48:25
**responded** [1] - 29:18
**responding** [3] - 4:9, 24:4, 24:6
**response** [5] - 23:22, 27:23, 29:23, 36:18, 36:19
**responsible** [1] - 19:25
**responsive** [2] - 13:5, 13:7
**rest** [1] - 14:5
**restrained** [1] - 46:10
**result** [1] - 45:16
**resume** [1] - 15:9
**reveal** [1] - 28:10
**revealing** [1] - 33:2
**review** [4] - 5:18, 9:7, 9:14, 27:15
**rhetorical** [1] - 40:3
**road** [1] - 18:4

**roadmap** [1] - 10:10
**role** [1] - 43:19
**room** [1] - 25:7
**roughly** [3] - 11:19, 16:15, 34:20
**rule** [4] - 5:10, 13:12, 45:17, 48:12
**ruled** [1] - 35:9
**ruling** [10] - 4:21, 5:7, 6:6, 7:4, 29:12, 29:22, 33:21, 35:9, 45:4, 45:5
**run** [2] - 25:3, 40:17
**running** [1] - 19:6

# S

**SANSONE** [1] - 2:2
**scenarios** [1] - 48:13
**schedule** [4] - 28:16, 30:2, 32:16, 32:18
**Scholer** [1] - 2:5
**Schopf** [1] - 3:21
**SCHOPF** [1] - 2:12
**scope** [5] - 4:20, 5:18, 30:14, 40:21, 48:10
**screaming** [1] - 34:8
**seal** [1] - 29:4
**second** [4] - 10:23, 14:12, 16:15, 25:22
**section** [1] - 11:24, 12:20, 13:2, 34:24
**Section** [2] - 12:13, 17:11
**sector** [2] - 18:2, 21:8
**security** [2] - 16:10, 16:12
**see** [3] - 18:1, 35:18, 37:14
**seek** [2] - 27:10, 39:19
**select** [1] - 18:7
**Senate** [1] - 47:18
**senior** [1] - 11:6
**sense** [7] - 6:10, 24:15, 32:12, 35:14, 49:6, 49:7, 49:21
**sensible** [1] - 21:7
**sent** [2] - 15:16, 43:5
**sentence** [1] - 4:15
**separate** [2] - 25:23, 47:16
**September** [14] - 9:18, 14:1, 14:18, 19:9, 22:9, 22:12, 22:19, 24:20, 24:21, 26:16, 27:25, 32:19, 46:10, 46:18

**service** [1] - 21:9
**services** [1] - 17:14
**session** [1] - 23:20
**set** [2] - 22:15, 49:14
**setting** [1] - 25:21
**several** [4] - 12:14, 13:24, 34:7, 47:12
**shift** [1] - 22:22
**shortly** [1] - 23:19
**side** [3] - 8:11, 22:5, 48:7
**significant** [2] - 18:15, 28:8
**similar** [2] - 38:4
**similarly** [2] - 8:17, 9:5
**simplify** [1] - 29:24
**simply** [2] - 19:11, 39:21
**simultaneous** [1] - 7:10
**single** [1] - 3:25
**situation** [3] - 10:2, 14:22, 14:24
**six** [2] - 40:1, 41:1
**sketch** [2] - 37:23, 49:18
**small** [1] - 45:11
**sole** [1] - 43:11
**solicit** [1] - 39:22
**solicitations** [1] - 43:9
**somewhat** [1] - 24:4
**Sonja** [2] - 50:11, 50:17
**SONJA** [2] - 1:22, 50:17
**Sooknanan** [1] - 38:2
**soon** [2] - 5:17, 40:12
**sooner** [1] - 38:21
**sort** [21] - 5:8, 5:18, 10:10, 10:12, 15:23, 19:6, 19:10, 19:23, 20:5, 24:22, 31:1, 31:17, 33:20, 34:16, 35:17, 37:8, 37:9, 39:19, 42:13, 43:5, 49:20
**sought** [2] - 20:6, 27:15
**sounds** [2] - 12:25, 32:23
**source** [1] - 43:11
**sources** [1] - 49:17
**speaking** [6] - 3:25, 10:20, 12:6, 15:24, 16:24, 21:4
**speaks** [2] - 34:12,

43:15
**special** [3] - 12:14, 16:3, 21:16
**specific** [6] - 20:19, 34:25, 35:12, 39:13, 41:16, 41:17
**specifically** [4] - 6:20, 7:13, 33:12, 40:9
**specificity** [2] - 46:21, 47:7
**specified** [2] - 39:13, 39:14
**specify** [3] - 36:3, 37:22, 47:1
**spell** [2] - 48:20, 48:21
**spend** [8] - 31:22, 38:5, 39:2, 39:12, 44:1, 44:2, 44:11, 44:12
**spending** [3] - 18:20, 37:8, 48:22
**spends** [1] - 36:15
**spent** [1] - 18:23
**split** [1] - 4:1
**staff** [1] - 24:11
**stage** [2] - 44:14, 47:20
**stages** [1] - 44:14
**standing** [2] - 30:17, 38:18
**start** [2] - 3:7, 41:24
**started** [1] - 26:8
**starts** [1] - 22:7
**STATE** [1] - 1:7
**State** [11] - 3:4, 11:7, 15:16, 17:5, 18:9, 18:17, 20:15, 34:25, 42:23, 43:5, 43:25
**statement** [2] - 42:18, 46:3
**statements** [1] - 4:9
**States** [6] - 3:4, 3:20, 33:6, 46:25, 50:11, 50:14
**states** [1] - 7:13
**STATES** [2] - 1:1, 1:6
**status** [6] - 6:18, 8:9, 23:14, 31:18, 31:20, 49:21
**STATUS** [1] - 1:16
**statute** [10] - 5:9, 11:23, 14:13, 35:11, 36:11, 37:6, 38:24, 41:15, 41:17, 49:9
**statutes** [7] - 12:1, 12:3, 20:17, 34:5, 40:4, 41:16, 47:4
**statutory** [3] - 20:12,

41:24, 48:20
**stay** [16] - 4:6, 7:23, 20:7, 24:9, 25:23, 26:15, 27:1, 27:4, 27:8, 27:9, 27:10, 32:1, 32:3, 32:7, 32:21
**staying** [2] - 33:7, 41:7
**stenographic** [1] - 50:12
**Stenographic** [1] - 1:25
**step** [12] - 10:21, 10:23, 11:1, 11:5, 14:11, 14:12, 14:14, 16:16, 16:17, 16:24, 34:14, 42:24
**Stephen** [1] - 3:13
**STEPHEN** [1] - 2:6
**steps** [9] - 6:15, 6:20, 6:24, 7:7, 8:19, 9:25, 10:1, 10:20, 19:20
**stick** [1] - 32:12
**still** [3] - 8:22, 21:25, 41:21
**stone** [1] - 22:15
**stop** [1] - 43:18
**Street** [3] - 2:3, 2:9, 2:12
**stress** [1] - 49:2
**strokes** [1] - 37:9
**structured** [1] - 34:16
**subcategories** [8] - 5:8, 34:22, 35:8, 35:13, 36:5, 38:12, 38:14, 47:3
**subject** [5] - 11:10, 12:14, 13:2, 15:19, 37:2
**subjected** [1] - 48:4
**submission** [5] - 8:16, 19:4, 33:22, 34:7, 38:8
**submissions** [9] - 6:23, 7:6, 9:22, 19:12, 29:10, 32:17, 47:14, 49:17, 50:6
**submit** [3] - 5:6, 30:24, 39:6
**submitted** [2] - 5:15, 34:12
**subsequent** [2] - 9:7, 26:10
**subsequently** [1] - 28:25
**substantive** [3] - 11:23, 48:20, 49:2

**suggested** [3] - 4:22, 5:2, 29:25
**suggesting** [1] - 39:6
**suggestion** [1] - 5:3
**suggests** [1] - 48:18
**Suite** [1] - 2:9
**summarizing** [1] - 29:9
**support** [1] - 5:9
**suppose** [1] - 27:21
**Supreme** [7] - 4:25, 5:16, 5:18, 8:1, 29:1, 34:2, 45:14
**Sur** [14] - 3:19, 3:22, 9:11, 35:18, 35:21, 36:13, 37:12, 39:20, 41:6, 43:19, 44:13, 44:15, 45:9, 45:22
**SUR** [38] - 2:12, 3:19, 9:19, 10:17, 11:18, 11:21, 13:1, 13:8, 14:7, 14:18, 15:5, 15:9, 15:11, 18:25, 19:3, 20:15, 21:2, 22:3, 22:20, 23:8, 23:12, 24:2, 24:8, 25:20, 26:23, 27:6, 27:11, 28:3, 28:24, 29:21, 30:7, 30:19, 31:1, 46:6, 46:15, 46:21, 49:2
**suspect** [1] - 39:15

## T

**table** [2] - 3:21, 24:22
**tables** [2] - 35:1
**teed** [1] - 13:21
**term** [6] - 16:11, 18:9, 18:13, 18:15, 33:24, 47:9
**terminations** [1] - 6:5
**terms** [14] - 6:15, 17:22, 21:22, 29:17, 32:7, 34:8, 41:22, 41:24, 46:5, 47:11, 47:15, 47:24, 49:15
**text** [1] - 30:10
**THE** [69] - 1:1, 1:16, 2:1, 2:4, 3:12, 3:15, 3:18, 3:22, 4:13, 5:10, 5:21, 6:2, 6:4, 6:8, 6:10, 6:16, 10:13, 11:15, 11:19, 12:22, 13:4, 13:16, 14:16, 14:19, 15:8, 15:10, 18:18, 19:1, 20:11, 20:22, 21:10, 21:21,

22:17, 23:2, 23:10, 23:23, 24:5, 24:15, 26:7, 27:4, 27:7, 27:17, 28:6, 29:11, 29:24, 30:12, 30:22, 31:3, 31:7, 31:19, 32:10, 33:18, 35:20, 36:12, 38:25, 40:16, 41:3, 41:20, 42:9, 42:16, 44:13, 44:20, 45:5, 45:12, 45:21, 46:12, 46:20, 48:24, 49:19
**themselves** [2] - 6:15, 15:21
**thereof** [1] - 6:14
**third** [4] - 11:1, 16:17, 16:24, 48:15
**thoughts** [1] - 45:4
**threaten** [1] - 49:8
**three** [2] - 10:20, 16:2
**throughout** [1] - 13:6
**Thursday** [2] - 43:4, 43:10
**tied** [6] - 12:9, 12:17, 21:3, 21:4, 25:25, 49:4
**timeframe** [1] - 19:18
**timeline** [7] - 9:13, 24:24, 25:5, 25:8, 25:10, 25:18
**timing** [5] - 9:2, 9:9, 19:6, 28:17, 45:4
**today** [11] - 4:4, 5:15, 6:23, 7:6, 8:5, 9:13, 33:23, 34:7, 37:15, 38:18, 40:14
**tolerate** [1] - 48:6
**tomorrow** [2] - 5:17, 8:14
**tonight** [1] - 33:23
**took** [1] - 13:24
**topic** [2] - 16:13, 17:3
**topics** [2] - 4:3, 11:16
**total** [2] - 11:19, 35:10
**toward** [1] - 46:18
**towards** [3] - 6:6, 6:15, 42:4
**traditional** [2] - 19:17, 21:12
**transactions** [1] - 11:2
**transcript** [3] - 50:12, 50:12, 50:13
**TRANSCRIPT** [1] - 1:16

**Transcript** [1] - 1:25
**transmittal** [3] - 15:5, 16:4, 47:22
**transparency** [1] - 43:15
**treatment** [1] - 35:3
**TRO** [2] - 6:5, 38:7
**trouble** [1] - 25:17
**true** [1] - 50:12
**Trump** [5] - 3:5, 29:6, 29:13, 30:3, 30:4
**TRUMP** [1] - 1:12
**trying** [8] - 13:16, 13:20, 24:16, 24:22, 27:17, 28:21, 30:4, 49:18
**tuberculosis** [3] - 16:9, 35:3, 42:17
**turn** [1] - 22:22
**turns** [1] - 27:23
**two** [8] - 4:1, 6:12, 14:4, 15:12, 17:17, 21:12, 38:2, 45:23
**type** [2] - 12:21, 37:22
**types** [2] - 25:2, 30:14
**typically** [2] - 19:23, 26:25

## U

**U.S** [2] - 2:11, 5:16
**U.S.C** [2] - 11:25, 17:12
**under** [11] - 8:22, 11:7, 12:3, 17:6, 20:16, 21:16, 28:9, 29:6, 30:8, 34:15, 47:25
**understood** [2] - 21:10, 22:18
**underway** [5] - 9:25, 10:18, 10:19, 13:3, 16:15
**unique** [2] - 21:6, 21:7
**unitary** [1] - 10:10
**UNITED** [2] - 1:1, 1:6
**United** [6] - 3:4, 3:20, 33:5, 46:25, 50:11, 50:14
**universe** [2] - 19:2, 30:16
**unless** [3] - 24:12, 44:2, 44:11
**unlike** [1] - 17:4
**unpack** [1] - 21:1
**unpredictability** [1] - 36:17

**unsettled** [1] - 5:19
**unstick** [1] - 45:19
**up** [14] - 4:3, 8:24,
9:11, 11:5, 13:21,
15:13, 16:22, 17:19,
18:11, 18:17, 25:22,
27:10, 28:21, 39:8
**USAID** [9] - 11:7,
15:17, 17:5, 18:9,
18:17, 20:15, 34:25,
40:24, 43:25
**uses** [1] - 16:11

## V

**Vaccine** [2] - 3:3,
3:10
**VACCINE** [1] - 1:3
**validates** [1] - 21:13
**variety** [5] - 17:1,
17:5, 17:22, 18:19,
21:18
**various** [5] - 6:25,
8:8, 12:3, 49:24, 50:2
**vast** [1] - 10:6
**vehicles** [4] - 12:18,
15:7, 17:5, 17:24
**versus** [4] - 3:4, 3:5,
20:14, 36:22
**view** [4] - 22:10,
36:10, 38:23, 48:9
**views** [1] - 10:25
**violation** [1] - 42:5
**vs** [2] - 1:5, 1:11

## W

**wait** [1] - 45:3
**waiving** [1] - 23:25
**walks** [1] - 37:19
**wants** [1] - 12:11
**Washington** [6] -
1:18, 1:24, 2:3, 2:7,
2:9, 2:13
**week** [6] - 14:4, 34:2,
38:2, 42:23, 43:5,
49:22
**weekend** [3] - 7:25,
42:23, 43:4
**weeks** [2] - 19:10,
42:25
**weigh** [1] - 47:19
**whole** [2] - 13:6,
48:11
**win** [3] - 8:18, 26:19,
28:13
**Wirth** [4] - 3:13, 3:15,
4:18, 24:8
**WIRTH** [7] - 2:6,
3:13, 4:3, 31:6, 31:15,

31:23, 32:14
**withholds** [1] - 7:10
**won** [2] - 8:18, 26:21
**wording** [1] - 30:8
**words** [2] - 14:23,
37:18
**works** [2] - 22:10,
44:9
**worried** [1] - 24:1
**writing** [2] - 34:12,
45:6

## Y

**year** [2] - 13:6, 38:6
**yourself** [1] - 3:7

## Z

**ZIEVE** [1] - 2:2