**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

GLOBAL HEALTH COUNCIL, *et al.*,

       *Plaintiffs*,

   v.

DONALD J. TRUMP, *et al.*,

       *Defendants*.

Civil Action No. 25-cv-402 (AHA)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND
PARTIAL SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ................................................................................................... 1

BACKGROUND ...................................................................................................... 3

I.    Factual Background ........................................................................................ 3

II.   Procedural History ......................................................................................... 9

ARGUMENT ........................................................................................................ 11

I.    Plaintiffs Are Likely to Succeed on the Merits............................................. 11

    A.    The Appropriations Statutes Impose Mandatory Duties on Defendants to Spend Specific Amounts for Specific Purposes......................................................... 11

    B.    The Impoundment Control Act Does Not Preclude APA Review .............................. 13

    C.    Plaintiffs Are Likely to Succeed on Their § 706(2) Claims ................................. 15

        1.    Defendants' Decision Not to Obligate the Funds is Final Agency Action .............. 15

        2.    Defendants' Decision Not to Obligate the Funds Is Contrary to Law..................... 17

        3.    Defendants' Decision Not to Obligate the Funds Is Arbitrary and Capricious ........ 18

    D.    Plaintiffs Are Likely to Succeed on Their § 706(1) Claims ......................................... 21

    E.    Plaintiffs Are Likely to Succeed on Their Mandamus Claim....................................... 24

    F.    Plaintiffs Are Likely to Succeed on Their Constitutional Claims if Defendants Raise a Constitutional Defense......................................................................... 26

    G.    Defendants' Attempted Pocket Rescissions Do Not Relieve Them of Their Duties under the Appropriations Acts to Spend the Funds ....................................... 26

II.   Plaintiffs Will Suffer Irreparable Harm ....................................................... 28

III.  The Balance of Harms and Public Interest Overwhelmingly Favor an Injunction........... 30

IV.   Proposed Relief............................................................................................ 32

    A.    Temporary Restraining Order............................................................................... 32

    B.    Motion for Preliminary Injunction....................................................................... 32

i

C.  Partial Summary Judgment ............................................................................ 33

D.  Mandamus .................................................................................................... 34

E.  Content of Order ........................................................................................... 34

CONCLUSION ............................................................................................................ 34

## TABLE OF AUTHORITIES

### Cases

*Abbott Lab'ys v. Gardner*, 387 U.S. 136 (1967) .......................................................... 14

*Afghan & Iraqi Allies v. Blinken*, 103 F.4th 807 (D.C. Cir. 2024) ................................ 22

*AGMA Sec. Serv., Inc. v. United States*, 152 Fed. Cl. 706 (2021) ................................ 29

*Alameda Cnty. Med. Ctr. v. Leavitt*, 559 F. Supp. 2d 1 (D.D.C. 2008) ........................ 17

*Ark Initiative v. Tidwell*, 816 F.3d 119 (D.C. Cir. 2016) .............................................. 18

*Ashtari v. Pompeo*, 496 F. Supp. 3d 462 (D.D.C. 2020) ............................................... 21

*Bennett v. Spear*, 520 U.S. 154 (1997) .................................................................. 15, 17

*Borden v. United States*, 593 U.S. 420 (2021) .............................................................. 15

*Bridgeport Hosp. v. Becerra*, 108 F.4th 882 (D.C. Cir. 2024) ..................................... 33

*C.G.B. v. Wolf*, 464 F. Supp. 3d 174 (D.D.C. 2020) ..................................................... 30

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416 (2024) ............................... 9

*City of New York v. Ruckelshaus*, 358 F. Supp. 669 (D.D.C. 1973) ............................. 14

*Clinton v. City of New York*, 524 U.S. 417 (1998) ........................................................ 27

*Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004 (D.C. Cir. 2022) .............. 29, 32

*Comm. for Creative Non-Violence v. Watt*, 662 F.2d 36 (D.C. Cir. 1981) .................... 15

*In re Barr Labs., Inc.*, 930 F.2d 72 (D.C. Cir. 1991) ..................................................... 22

*Corner Post v. Bd. of the Fed. Resrv. Sys.*, 603 U.S. 799 (2023) ................................. 34

*Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1 (2020) ....... 20, 21

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ...................................... 18, 20

*Global Health Council v. Donald J. Trump*, 25-5097 (D.C. Cir. Apr. 2, 2025) ....... 1, 9, 10, 26, 32

*Guadamuz v. Ash*, 368 F. Supp. 1233 (D.D.C. 1973) ................................................... 14

*In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013) .......................... 11, 13, 18, 24-25, 31

*In re Ctr. for Biological Diversity*, 53 F.4th 665 (D.C. Cir. 2022) .............................. 24

ii

*Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795 (D.C. Cir. 1983)................... 14

*Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221 (1986)................................. 17

*Kaufman v. Mukasey*, 524 F.3d 1334 (D.C. Cir. 2008) ................................. 21

*Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524 (1838)..................................... 13, 25

*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ..................... 29

*Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181 (D.D.C. 2024) ............................ 21

*Louisiana v. Weinberger*, 369 F. Supp. 856 (E.D. La. 1973) ................................. 14

*Meina Xie v. Kerry*, 780 F.3d 405 (D.C. Cir. 2015) ........................................ 21

*Miles v. Apex Marine Corp.,* 498 U.S. 19 (1990) .......................................... 12

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,

    463 U.S. 29 (1983)........................................................................ 18, 20

*Nat'l Council of Cmty. Mental Health Ctrs. v. Weinberger*,

    361 F. Supp. 897 (D.D.C. 1973)........................................................ 14

*NIH v. Am. Pub. Health Ass'n*, No. 25A103,

    2025 WL 2415669 (U.S. Aug. 21, 2025)................................................ 29

*Open Communities Alliance v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017) ............................ 30

*Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*,

    324 F.3d 726 (D.C. Cir. 2003)........................................................ 15, 17

*Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43 (1993) ..................................... 14

*Sierra Club v. Env't Prot. Agency*, 955 F.3d 56 (D.C. Cir. 2020)................................ 17

*South Carolina v. United States*, 907 F.3d 742 (4th Cir. 2018)................................ 22

*State Highway Comm'n v. Volpe*, 479 F.2d 1099 (8th Cir. 1973) ................................ 14

*Telecomms. Rsch. & Action Ctr. (TRAC) v. Fed. Commc'ns Comm'n*,

    750 F.2d 70 (D.C. Cir. 1984)......................................................... 22, 23

*Train v. City of New York*, 420 U.S. 35 (1975)........................................... 14

*Transactive Corp. v. United States*, 91 F.3d 232 (D.C. Cir. 1996)..........................................18, 20

*Trump v. Global Health Council*, No. 25A227 (U.S. Aug. 26, 2025)...........................1, 8, 10, 16

*United States v. Trucking Mgmt., Inc.*, 28 Fed. R. Serv. 2d 839 (D.D.C. 1979)..........................17

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001)................................................................27

## **Statutes**

2 U.S.C. § 681(3)..........................................................................................................................14

2 U.S.C. § 681(4)....................................................................................................................2, 26

2 U.S.C. § 683(a).........................................................................................................................12

2 U.S.C. § 683(b).........................................................................................................................24

2 U.S.C. § 688..............................................................................................................................27

5 U.S.C. § 704..............................................................................................................................17

5 U.S.C. § 706(1)....................................................................................................21, 22, 24, 34

5 U.S.C. § 706(2)................................................................................................................*passim*

28 U.S.C. § 1361..........................................................................................................................24

42 U.S.C. § 10134(d)...................................................................................................................25

Pub. L. No. 118-47, §7019(a), 138 Stat. at 771 (2024)......................................................2, 3, 11

Pub. L. No. 118-47, div. F, tits. II–III, 138 Stat. 460, 740–49 (2024)....................................2, 11

Pub. L. No. 118-47, §7030 to 7061 (2024)....................................................................................3

Pub. L. No. 118-47, §§ 7043(c)(2), 138 Stat. at 812 (2024).........................................................3

## **Other Authorities**

GAO, B-330330, at 5 (Dec. 10, 2018)..........................................................................................27

2 GAO, Principles of Federal Appropriations Law, 6-28 (3d ed. Jan. 2004).............................12

Exec. Order No. 14,169 at § 2, 90 Fed. Reg. 8619 (Jan. 20, 2025).........................................5, 19

## INTRODUCTION

"This case involves the Executive Branch's effort to unilaterally decline to spend billions of dollars Congress appropriated for foreign aid funding." Statement of Garcia, J., respecting the denial of rehearing *en banc*, No. 25-5097 (D.C. Cir. Aug. 28, 2025). Defendants have declared their intent to impound the relevant appropriations. They told the Supreme Court that they intend to "allow [the] funds to expire without obligation" regardless of whether Congress rescinds the duly enacted appropriations through legislation. App. to Stay at 33, *Trump v. Global Health Council*, No. 25A227 (U.S. Aug. 26, 2025). And last night, they set into motion a plan to do just that, via a "pocket rescission." Having waited until less than 45 days before the funds expire, President Trump submitted a rescission package to Congress of more than $4 billion, which purportedly will enable the funds to expire regardless of whether Congress acts on the proposal. A White House statement asserted that "it doesn't matter" what Congress does.[1] And for the billions of additional expiring funds not included in the package, Defendants have refused to provide assurances as to whether and how they will obligate the funds consistent with Congress' directives in the 2024 Appropriations Act and prior appropriations acts.

The laws Congress passed do not countenance Defendants' actions. The 2024 Appropriations Act mandates that USAID and the State Department obligate more than $15 billion in foreign assistance funds by September 30, 2025. For the vast majority of these funds, Congress prescribed hundreds of subcategories of purposes for which precise or minimum amounts of funds "shall be made available." The 2024 Appropriations Act thus imposes mandatory duties on Defendants to obligate the funds by September 30, 2025, and the submission

---

[1] Jennifer Scholtes & Kyle Cheny, White House declares $4.9B in foreign aid unilaterally canceled in end-run around Congress' funding power, Politico (Aug. 29, 2025), https://www.politico.com/news/2025/08/29/trump-asks-congress-to-claw-back-5b-in-foreign-aid-amid-threat-of-pocket-cancellation-00535396

of a rescissions proposal to Congress in no way relieves them of those duties. Congress expressly said as much in the text of the Impoundment Control Act, which provides that "[n]othing contained in this Act . . . shall be construed as . . . superseding any provision of law which requires the obligation of budget authority." *Id.* § 681(4). Defendants can point to no text of the ICA stating otherwise; instead they construct a convoluted theory based on purported implications and interactions of various provisions—precisely the type of statutory interpretation that cannot authorize agency action on major questions of vast significance. Defendants' theory that the President may unilaterally impound funds merely by notifying Congress of his intent to do so would also render the ICA unconstitutional, making it a replica of the Line-Item Veto Act that the Supreme Court struck down. And, with certainty, allowing the President to impound funds is not what Congress intended in passing the Impoundment *Control* Act.

The D.C. Circuit has cleared the way for Plaintiffs to seek expeditious relief on their APA claims, and Plaintiffs will succeed on these claims. Defendants' decision to not spend all expiring appropriations is contrary to the requirements of the 2024 Appropriations Act and prior appropriations acts, and their refusal to obligate funds constitutes agency action wrongfully withheld. The decision to not spend the appropriations is also arbitrary and capricious, regardless of whether Defendants' pocket rescission theory were correct (and it is not). Nowhere have Defendants offered a reasoned explanation for not spending the funds. Nor have Defendants considered the reliance interests of implementing partners like Plaintiffs or the millions of vulnerable people around the world whose lives depend on this aid.

Plaintiffs represent a broad cross-section of companies and organizations that compete for nearly all types of foreign assistance funds. For many Plaintiffs, USAID funding comprises almost the entirety of their revenues, making Defendants' failure to make these funds available for obligation existential to their business. Plaintiffs urgently require relief to prevent Defendants

from bringing about this harm through their unlawful actions.

Through this motion, Plaintiffs seek (1) a narrow temporary restraining order and (2) a preliminary injunction and summary judgment that would require Defendants to obligate the expiring funds by September 30. Plaintiffs conferred with Defendants following today's status conference to try to eliminate the need for Plaintiffs to seek a TRO, but Defendants would not provide the basic assurances that Plaintiffs requested. In particular, Plaintiffs requested an assurance that, if the Court awards a preliminary or permanent injunction at a later date, Defendants will not claim an inability to obligate the funds based on steps not taken between now and the time of the Court's decision. Defendants responded that, "as to the expiring [2024 Appropriations Act funds] *within* the special message, Defendants cannot take steps toward obligation at this time." Defendants cited no legal authority for the proposition that they cannot "take steps toward obligation."

Plaintiffs respectfully request that the Court immediately enter the narrow TRO requested to ensure Defendants do not make obtaining relief impossible, and that the Court resolve the remainder of the motion as promptly as possible. At this time, Plaintiffs do not request that the Court extend the period of availability of the funds (although Plaintiffs reserve the right to make that request as a last resort).

## BACKGROUND

### I.    Factual Background

In the Further Consolidated Appropriations Act of 2024 (the "2024 Appropriations Act), Congress appropriated more than $30 billion in non-military foreign assistance funding to USAID and the State Department. Pub. L. No. 118-47, div. F, tits. II–III, 138 Stat. 460, 740–49 (2024). Congress appropriated these funds in Titles III and IV of the law across fifteen broad categories of purposes. Congress did not employ any language giving the agencies discretion to

spend less than the full amounts appropriated in any of the fifteen categories. *See id.* Of the fifteen categories, Congress provided that the following categories of funds will expire on September 30, 2025. *See id.*

- Global Health Programs (USAID): $3.99 billion;

- Development Assistance: $3.93 billion

- Economic Support Fund: $3.89 billion

- Democracy Fund (State): $205 million

- Democracy Fund (USAID): $140 million

- Assistance for Europe, Eurasia, and Central Asia: $770 million

- International Narcotics Control and Law Enforcement: $1.40 billion

- Non-Proliferation, Anti-Terrorism, Demining: $870 million

- Peacekeeping Operations: $291 million

Within the fifteen categories, the 2024 Appropriations Act further specified subcategories of purposes for which USAID and State must obligate specific amounts of funds. *See* Further Consolidated Appropriations Act, 2024, Comm. Print of the H. Comm. on Appropriations, Legislative Text and Explanatory Statement (excerpts), Dkt. 125-11. In Section 7019(a), Congress provided that "funds appropriated by this Act under title III through V *shall be made available in the amounts specifically designated* in the respective tables included in the explanation statement." *Id.* § 7019(a), 138 Stat. at 771 (emphasis added). Those tables include line items with specific amounts that must be obligated for narrowly defined purposes. *See* Further Consolidated Appropriations Act, 2024, Comm. Print of the H. Comm. on Appropriations, Legislative Text and Explanatory Statement (excerpts), Dkt. 125-11. Congress provided that, for most line items in the tables, Defendants "may only deviate up to 10 percent from the amounts specifically designated in the respective tables," and for the roughly $10 billion

in line items for Global Health Programs, the agencies may not deviate from the table amounts at all. 2024 Appropriations Act §§ 7019(b), (d)(2), 138 Stat. at 771.

Sections 7030 to 7061 of the 2024 Appropriations Act prescribe subcategories for which USAID and State must spend *minimum* amounts of funds. Those sections contain directives that "not less than" specific amounts of money "shall be made available" by USAID or State for particular purposes. For instance, the Act provides that "not less than $400,000,000 shall be made available for a Countering PRC Influence Fund to counter the influence of the Government of the People's Republic of China and the Chinese Communist Party." *Id.* §§ 7043(c)(2), 138 Stat. at 812.

Across Section 7030 to 7061 and the tables made binding by Section 7019(a), the 2024 Appropriations Act contains roughly 240 subcategories of purposes for which Congress required specific amounts of funds—or "not less than" specific amounts of funds—that "shall be made available" by Defendants. These directives total nearly $25 billion in appropriations.

Every annual appropriations act from 2019 through 2023 contained the same structure as the 2024 Appropriations Act. They all appropriated funds across the same fifteen broad categories, and then required the specific or minimum amounts "shall be made available" for identified subcategories set forth in the tables appended to the act and the separate directives provided later in the bill text. See, e.g., Pub. L. No. 116-6 § 7019(a), 133 Stat. 307. Some funds from these prior appropriations acts will expire on September 30, 2025.

On his first day in office, the President issued an executive order purporting to immediately freeze all foreign assistance funding. Exec. Order No. 14,169 at § 2, 90 Fed. Reg. 8619 (Jan. 20, 2025). The order further directed that "no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President." *Id.* To implement the order, the Secretary of State and officials at USAID issued a series of

agency memoranda immediately halting virtually all foreign assistance funding and ordering implementing partners to stop work.[2] The government also began terminating foreign assistance awards *en masse*. *See, e.g.*, TRO Order at 3–4, Dkt. 21.

This Court has already found that the government has "no intent to spend" the funds that Congress had appropriated for foreign assistance, stating: "[T]he record here shows that Defendants are acting to rescind or defer the funds Congress has appropriated and have no intent to spend them." ECF No. 60 at 31. The Court's finding was supported by multiple public and contemporaneous statements by Executive Branch officials, who explained that Defendants sought to "end foreign aid funding" for "policy reasons." *Id.* at 31–32.

The government has never disputed this intent. *Id.* at 32. Rather, senior officials have confirmed it repeatedly. *See* U.S. Dep't of State, Prioritizing America's National Interests One Dollar at a Time (Jan. 29, 2025), https://tinyurl.com/2eyamdfm (touting in late January that "even at this early stage," the government's actions had already "prevented" over $1 billion in foreign assistance spending); *see also* @elonmusk, X (Feb. 2, 2025, 12:20PM), https://tinyurl.com/4bnu7b7z (statement from then–presidential advisor Elon Musk that "USAID is a criminal organization" and that it is "[t]ime for [USAID] to die"); @realDonaldTrump, TruthSocial (Feb. 7, 2025, 9:31AM), https://tinyurl.com/3wmdpvex (Presidential statement calling to "CLOSE [USAID] DOWN").

---

[2] See *Memorandum from the Secretary of State*, 25 STATE 6828 (Jan. 24, 2025); USAID, *Notice on Implementation of Executive Order on Reevaluating and Realigning United States Foreign Aid* (Jan. 24, 2025); USAID, *Initial Instructions for Implementing Executive Order Reevaluating and Realigning United States Foreign Aid* (Jan. 22, 2025); USAID, *Follow-Up Instructions for Implementing Executive Order Reevaluating and Realigning United States Foreign Aid* (Jan. 24, 2025); USAID, *Clarification on Implementing the President's Executive Order on Reevaluating and Realigning United States Foreign Aid* (Jan. 26, 2025).

The government has continued to make clear that it intends to permanently impound the foreign assistance funds. On March 10, Secretary Rubio announced that Defendants were "officially cancelling 83% of the programs at USAID." @Marco Rubio, X (Mar. 20, 4:55AM), https://tinyurl.com/yu9mytdk. On March 28, the State Department sent a Congressional Notification to Congress stating that numerous USAID functions "would be eliminated" or "abolished." Congressional Notification Transmittal Letter, March 28, 2025, at 4, http://bit.ly/42t0Yvn. The offices and functions that the letter indicated would be eliminated included the Bureau for Democracy, Human Rights and Governance; the Bureau for Conflict Prevention and Stabilization; the Bureau for Inclusive Growth, Partnership, and Innovation; the Bureau for Resilience, Environment, and Food Security; and more. *Id.* at 3–4, 11 (listing limited programs to "realign" to the State Department, and announcing intent to eliminate the rest). The Notification included a chart showing that USAID had nearly $24 billion in appropriations that remain unobligated. *Id.* at 8–9. The Notification gave no indication as to how the government intended to obligate these funds in light of its proposed plan to eliminate USAID programs. Consistent with the Notification, on July 1, USAID officially shut down and ceased its operations. *See* Declaration of Jeremy Lewin, ECF No. 99-1.

On June 3, 2025, the President submitted a rescission proposal to Congress regarding certain *other* foreign-assistance funds appropriated in Fiscal Year 2025, but that proposal did not include the funds appropriated in Fiscal Year 2024 and prior years. *See* Proposed Rescissions of Budgetary Resources at 2–17 (May 28, 2025). Congress rejected some of the proposed rescissions but enacted others.

At the August 25, 2025 hearing before this Court, and in their Supreme Court stay application, Defendants represented that there are roughly $12 billion in funds from the 2024 Appropriations Act that remain unobligated and will expire on September 30, 2025. App. to Stay

at 5, *Trump v. Global Health Council*, No. 25A227 (U.S. Aug. 26, 2025); 8/25/25 Hr'g Tr. at 11. That estimate does not appear to include funds from prior appropriations acts that remain available for obligation until September 30, 2025. Defendants asserted at the August 25 hearing that they have approved plans to obligate only $3.5 billion of the remaining expiring funds. 8/25/25 Hr'g Tr. at 11.

In their Supreme Court stay application filed on August 26, Defendants also made clear that they have decided that, in the absence of an injunction, they will not spend all of the expiring funds, and that their strategy to impound will include a so-called "pocket rescission" of some of the funds. With a pocket rescission, Defendants will deliberately wait until less than 45 days remain before the end of the fiscal year, propose a rescission at that time, and then claim that the funds may be left to expire so long as Congress does not affirmatively step in and reject the rescission proposal, because the Act purportedly gives Congress forty-five days to consider the proposal. Defendants told the Supreme Court that, "[a]bsent [an] injunction, the President would be able to propose rescissions for the funds that are set to expire on September 30, 2025, and allow those funds to expire without obligation if Congress does not act before that date." App. to Stay at 33, *Trump v. Global Health Council*, No. 25A227 (U.S. Aug. 26, 2025). Defendants thus argued that this Court's prior injunction was causing them irreparable injury by prohibiting them from "pursuing the rescission of [expiring] funds and allowing the appropriations to expire during the 45-day period. *Id.* at 32; *see also id.* at 3, 7, 30.

On August 28, immediately after the D.C. Circuit amended its opinion and issued its mandate, President Trump submitted a rescissions package to Congress to effectuate their pocket rescission strategy. ECF No. 129. The package includes more than $4 billion in expiring foreign aid funds that were appropriated in the 2020, 2021, and 2024 Appropriations Acts. The appropriations included in the package include $3.2 billion in development assistance from the

2024 Appropriations Act. The proposal states that "[t]he rescission would align with the Administration's efforts to return funding from wasteful U.S. Agency for International Development programs to the American taxpayers." ECF No. 129-3 at 15. The proposal would also rescind more than $600 million from the Democracy Fund appropriated in various years, purportedly in order to "return funding from wasteful foreign assistance programs to taxpayers in alignment with America First foreign policy." *Id.* at 3–6.

## II.    Procedural History

On March 10, 2025, this Court granted a preliminary injunction enjoining Defendants from "unlawfully impounding congressionally appropriated foreign aid funds," and finding that Plaintiffs were likely to succeed on their separation-of-powers claim that Defendants were intentionally and unlawfully refusing to spend Congressionally appropriated funds. ECF No. 60 at 33. The Court accordingly ordered Defendants to "make available for obligation the full amount of funds that Congress appropriated for foreign assistance programs in the Further Consolidated Appropriations Act of 2024." *Id.* at 48.

Three weeks after the district court issued its injunction, the government appealed the aspect of the injunction requiring the obligation of foreign-assistance funds. *See Global Health Council v. Donald J. Trump*, 25-5097 (D.C. Cir. Apr. 2, 2025). On August 13, a divided panel of the D.C. Circuit issued a decision vacating the portion of the district court's preliminary injunction requiring the obligation of funds, reaching three holdings. Slip op., No. 25-5097 (D.C. Cir. Aug. 13, 2025). First, the panel majority held that Plaintiffs lacked a cause of action to bring their constitutional separation-of-powers claim because it derived from statutory violations. *Id.* at 16–24. Second, the majority concluded that plaintiffs lacked an APA cause of action to challenge violations of the 2024 Appropriations Act. *Id.* at 25–29. Finally, the panel majority

held that plaintiffs were unable to bring an ultra vires claim for violations of the 2024 Appropriations Act. Judge Pan dissented.

Plaintiffs filed a petition for rehearing en banc, and the parties filed cross-motions for stays with the D.C. Circuit. Defendants also subsequently filed an application for a stay of the preliminary injunction in the Supreme Court. App. to Stay, *Trump v. Global Health Council*, No. 25A227 (U.S. Aug. 26, 2025).

On August 28, the D.C. Circuit panel amended its opinion, narrowing it significantly by withdrawing the holding that plaintiffs could not bring APA claims for violations of the 2024 Appropriations Act. *See* Amended Op., Per Curiam Order to Amend No. 25-5097 (D.C. Cir. Aug. 28, 2025). The en banc court denied the petition for rehearing based on the panel's revised opinion. *See* Per Curiam Order, En Banc, Denying Pet'n for Rehearing, No. 25-5097 (D.C. Cir. Aug. 28, 2025). Judge Pan's dissental from that denial reiterated her objections to the panel majority's separation of powers holding and emphasized that "the full court's decision is based, in large part, on the panel's revision of its original opinion to provide a pathway for the grantees in this case to pursue relief under the Administrative Procedure Act (APA)." *Id.* at 7. If the en banc court had granted the petition and the Supreme Court had granted a stay, Judge Pan reasoned that "there might have been a significant gap in time with no operative order requiring the government to obligate the funds in question," whereas "with an immediate remand, the grantees may well secure relief more quickly by pursuing a new preliminary injunction based on their APA or ultra vires claims before the district court." *Id.* at 7. Judge Garcia, joined by Judge Millett, agreed in a statement that en banc review would have served "primarily to delay resolution of the plaintiffs' statutory [APA] claim," which may now be "litigated expeditiously in the district court." *Id.* at 8.

10

## ARGUMENT

**I.    Plaintiffs Are Likely to Succeed on the Merits**

**A.    The Appropriations Statutes Impose Mandatory Duties on Defendants to Spend Specific Amounts for Specific Purposes**

The 2024 Appropriations Act, and the prior appropriations acts that provided foreign assistance funds that will soon expire, mandate that Defendants obligate all of the funds appropriated for foreign assistance purposes. In the recent D.C. Circuit appeal, Defendants contended that appropriations are merely a ceiling on how much an agency may spend, leaving the agency discretion to spend less than the full appropriated amount. Gov't Br. at 53, No. 25-5079 (D.C. Cir. May 9, 2025). That contention is incorrect and Congress has emphatically rejected it.

It is long settled that, absent an express indication to the contrary, an appropriation is a mandate that the Executive Branch spend "the full amount appropriated by Congress for a particular project or program." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013). Neither the President nor any agency has "unilateral authority to refuse to spend the funds." *Id.*

For this reason, when Congress intends for an agency to have discretion to spend less than the full appropriated amount, Congress uses hallmark permissive language, such as appropriating "up to," "not more than," or "sums not exceeding" specific amounts. Examples of such language "abound in our history." *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 442 (2024) (Kagan, J., concurring) (quotations omitted). Since the Founding, Congress has made "appropriation[s] of 'sums not exceeding' a specified amount," which do not "mandate that the Executive spend that amount," but "instead provide the Executive discretion over how much to spend up to a cap." *Id.* at 432–33 (majority op.). Congress has consistently used clear language when it intends to allow the Executive Branch to spend less than the full amount

appropriated. In the 2024 Appropriations Act alone, the phrase "not to exceed" appears over 200 times. *See* 2 GAO, Principles of Federal Appropriations Law, 6-28 (3d ed. Jan. 2004) (explaining that, with a "not to exceed" appropriation, "the agency is not required to spend the entire amount"). Such language would be entirely unnecessary if an appropriation standing alone gave the executive discretion to spend less than the appropriated amount.

If there were any doubt that appropriations statutes, by default, require expending the full amount appropriated, Congress conclusively dispelled it in the ICA. As the Government Accountability Office (GAO) has explained, the ICA "operates on the *premise* that when Congress appropriates money to the executive branch, the President is required to obligate the funds," B-329092 (Dec. 12, 2017) (emphasis added). Starting from that premise, the ICA provides a procedure for the President to follow when he desires that funds "be rescinded for fiscal or other policy reasons" 2 U.S.C. § 683(a) (setting forth a process for the President to send a rescission request to Congress). This provision clearly rests on the assumption that the Executive Branch must otherwise spend the full measure of appropriations if not rescinded. If appropriations did not require agencies to spend the funds, they would never need to "be rescinded." The appropriations would simply expire, unspent, without the President ever having to ask for them to be rescinded. Thus, while the ICA itself does not require appropriations to be spent in the first instance, it confirms that Congress enacts appropriations statutes knowing and intending that the full amounts be spent. *See Miles v. Apex Marine Corp.,* 498 U.S. 19, 32 (1990) ("Congress is aware of existing law when it passes legislation.").

In the 2024 Appropriations Act, Congress appropriated more than $30 billion across fifteen categories of foreign assistance purposes, and Congress did not give Defendants discretion to spend less than the full amounts appropriated for any of the fifteen categories. *See* 138 Stat. at 740–49. In none of the fifteen categories did Congress provide that USAID or State

may obligate "up to," "not more than," or "not to exceed" the topline appropriated amount. Defendants therefore must spend "the full amount appropriated by Congress" for each of the fifteen categories, and they have no "unilateral authority to refuse to spend the funds." *In re Aiken Cnty.*, 725 F.3d at 261 n.1.

What's more, Congress used express, mandatory language in directing Defendants to obligate specific amounts for hundreds of subcategories of foreign assistance purposes. In the 2024 Appropriations Act (and prior acts), Congress provided that foreign assistance funds "shall be made available in the amounts specifically designated" in tables appended to the act. *Id.* 2024 Appropriations Act § 7019(a), 138 Stat. at 771. Sections 7030 through 7061 of the Act further provide that "not less than" specific amounts "shall be made available for" various foreign aid purposes. Congress could not have more clearly mandated that Defendants obligate precise or minimum amounts for specific purposes.

### B.    The Impoundment Control Act Does Not Preclude APA Review

In the Court of Appeals and Supreme Court, Defendants at times suggested that the ICA precludes Plaintiffs from bringing APA claims based on violations of the 2024 Appropriations Act. To the extent Defendants make that argument here, it lacks merit.

There is a long history of private plaintiffs successfully challenging the Executive's refusal to spend funds as required under an appropriations act, including under the APA. Almost 200 years ago, the Supreme Court approved a writ of mandamus compelling an agency to release appropriated funds, in an action brought by a private party. *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524 (1838). Nearly 150 years after that, the Supreme Court reaffirmed the ability of a private party to compel an agency to comply with a congressional spending mandate, this time through the APA. In *Train v. City of New York*, 420 U.S. 35 (1975), private plaintiffs brought an APA claim challenging an agency's refusal to spend the full sums that

Congress directed be spent under a statute. *See City of New York v. Ruckelshaus*, 358 F. Supp. 669, 673 (D.D.C. 1973) (noting that the plaintiffs brought an APA claim). The Supreme Court affirmed the district court injunction finding a statutory violation and compelling the expenditure of the funds. *Train* was one of a series of cases brought during the Nixon administration where private litigants successfully challenged an agency's refusal to spend appropriations. *See, e.g.*, *Guadamuz v. Ash*, 368 F. Supp. 1233 (D.D.C. 1973); *Louisiana v. Weinberger*, 369 F. Supp. 856 (E.D. La. 1973); *Nat'l Council of Cmty. Mental Health Ctrs. v. Weinberger*, 361 F. Supp. 897 (D.D.C. 1973); *State Highway Comm'n v. Volpe*, 479 F.2d 1099 (8th Cir. 1973).

On top of this long history, the APA carries "a strong presumption of reviewability that can be rebutted only by a clear showing that judicial review would be inappropriate." *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 807 (D.C. Cir. 1983) (quotations omitted). "[J]udicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140–41 (1967). Courts may "find an intent to preclude such review only if presented with 'clear and convincing evidence.'" *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 64 (1993) (quoting *Abbott*, 387 U.S. at 141).

There is no evidence that Congress intended the ICA, and the right of action it conferred upon the Comptroller General to challenge certain ICA violations, to strip private plaintiffs of their well-settled ability to bring APA challenges for violations of appropriations acts. The ICA in fact explicitly provides the opposite: "[n]othing contained in this Act … shall be construed as … affecting in any way the claims or defenses of any party to litigation concerning any impoundment." 2 U.S.C. § 681(3). This provision alone conclusively refutes any argument that the ICA precludes Plaintiffs from bringing their APA claims here. Such an argument, moreover, would turn the purpose of the ICA on its head. It would transform the ICA from a law meant to

14

*prevent* impoundments to one that greatly facilitates impoundments by making them harder to challenge. Congress did not "enact[] a self-defeating statute." *Borden v. United States*, 593 U.S. 420, 460 (2021) (quotations omitted).

### C.    Plaintiffs Are Likely to Succeed on Their § 706(2) Claims

Defendants' decision not to obligate expiring, congressionally mandated foreign assistance funds is a reviewable final agency action under the APA, and it is both contrary to the appropriations laws and arbitrary and capricious. 5 U.S.C. § 706(2).

#### 1.    *Defendants' Decision Not to Obligate the Funds is Final Agency Action*

An agency decision constitutes "final agency action." where it "mark[s] the consummation of the agency's decisionmaking process" and determines "rights or obligations … from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation omitted). "An agency action is deemed final if it is definitive and has a direct and immediate effect on the day-to-day business of the party challenging the agency action." *Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003) (cleaned up).

Defendants' decision not to obligate the funds Congress appropriated meets these criteria. This Court has already found that "the record here shows that Defendants are acting to rescind or defer the funds Congress has appropriated and have no intent to spend them." ECF No. 60 at 31. "When given the opportunity" in the prior preliminary injunction proceedings, Defendants did not "dispute[] this is their intent"—*i.e.*, to not obligate the funds. ECF No. 60 at 31–32.

Since the Court issued the March 10 preliminary injunction, it has become even more clear that Defendants have made a final decision not to obligate expiring funds. As described above, Defendants have publicly and repeatedly stated that they will never obligate a portion of the expiring funds: Senior officials have stated they have "prevented" the expenditure of the

15

funds (supposedly) to save taxpayer money, and that they have "cancell[ed] 83% of the programs at USAID." U.S. Dep't of State, *Prioritizing America's National Interests One Dollar at a Time* (Jan. 29, 2025), https://tinyurl.com/2eyamdfm; @Marco Rubio, X (Mar. 20, 4:55AM), https://tinyurl.com/yu9mytdk. Defendants have officially notified Congress that they have "eliminated" or "abolished" numerous USAID's offices and functions that carry the programs for which Congress directed the expiring funds be spent, and Defendants have not transferred these offices' functions to the State Department. *Congressional Notification Transmittal Letter*, March 28, 2025, at 4, http://bit.ly/42t0Yvn. 2.

Moreover, in the five months after the Court issued its preliminary injunction, Defendants took essentially no steps to even prepare to obligate the funds, apparently on the theory that, if the Court's preliminary injunction were overturned on appeal, they would not ever have to obligate the funds. *See* Defs.' Opp. to Pls.' Mot. to Enforce at 5 (ECF 99) ("If the D.C. Circuit were to reverse or vacate the preliminary injunction, any actions taken now [to obligate the funds] would be unnecessary, wasteful, and cause confusion."); *id.* at 25 (similar).

And now, Defendants' attempted pocket rescission leaves no doubt that Defendants have decided not to spend expiring funds. Defendants specifically told the Supreme Court "[a]bsent [an] injunction," they intended "to propose rescissions for the funds that are set to expire on September 30, 2025, and allow those funds to expire without obligation if Congress does not act before that date." App. to Stay at 33, *Trump v. Global Health Council*, No. 25A227 (U.S. Aug. 26, 2025). They have now done just that in submitting a rescission package to Congress for more than $4 billion in expiring funds. *See* Notice of Transmittal of Special Message (ECF 129).

Defendants' definitive actions and statements make clear that the decisionmaking process is over. *See Bennett*, 520 U.S. at 178. Defendants have conclusively decided not to obligate expiring funds for policy reasons. ECF No. 60 at 31–32; *supra* Background Section A.

That decision has legal effect: the funds have not been and will not be made available for obligation to Plaintiffs and others. And the "concrete consequences" of the decision are already being felt by Plaintiffs and across the globe. *Sierra Club v. Env't Prot. Agency*, 955 F.3d 56, 63 (D.C. Cir. 2020) (citation omitted). As Defendants have refused to obligate funds for statutorily mandated USAID and State Department programs, some Plaintiffs have lost nearly all of their revenue (and suffered many other harms). *See infra* Section II. That is already having "a direct and immediate effect on the[ir] day-to-day business." *Reliable Automatic Sprinkler Co.*, 324 F.3d at 731. And if the funds expire on September 30, those harms will be irreparable. *See infra* Section II. Defendants' decision not to obligate the funds is thus a reviewable final agency action. 5 U.S.C. § 704.

### 2. *Defendants' Decision Not to Obligate the Funds Is Contrary to Law*

The Executive Branch "may not act contrary to the will of Congress when exercised within the bounds of the Constitution." *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 233 (1986); *see United States v. Trucking Mgmt., Inc.*, 28 Fed. R. Serv. 2d 839 (D.D.C. 1979) ("[T]he executive branch may not exercise its authority, derived from Congress, in a manner inconsistent with the implied or expressed will of Congress."), *aff'd*, 662 F.2d 36 (D.C. Cir. 1981); *Alameda Cnty. Med. Ctr. v. Leavitt*, 559 F. Supp. 2d 1, 5 (D.D.C. 2008) ("The Executive must comply with the duly enacted commands of Congress.").

Defendants' decision not to obligate the funds is contrary to the 2024 Appropriations Act and prior appropriations acts, which require USAID and the State Department to spend specific sums for specific foreign assistance purposes. Those mandates are not optional. *See supra* Section I.A; *Aiken Cnty.*, 725 F.3d at 261 n.1. In the 2024 Appropriations Act, Congress appropriated more than $30 billion across fifteen categories of foreign assistance purposes, and Congress did not give Defendants discretion to spend less than the full amounts appropriated for

any of the fifteen categories. *See* 138 Stat. at 740–49. By deciding not to obligate the funds Congress appropriated for foreign assistance, Defendants have violated these congressional appropriations laws. That decision is therefore contrary to law. 5 U.S.C. § 706(2).

   *3. Defendants' Decision Not to Obligate the Funds Is Arbitrary and Capricious*

   Defendants' decision not to obligate the funds is also arbitrary and capricious. The APA requires courts to "hold unlawful and set aside" any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under that standard, an agency must "identif[y] and explain[] the reasoned basis" for its decision. *Transactive Corp. v. United States*, 91 F.3d 232, 236 (D.C. Cir. 1996). A reviewing court "must confirm that the agency has fulfilled its duty to 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (quoting *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (citation omitted). Where an agency changes course from a prior policy, it must "display awareness that it is changing position" and "show that there are good reasons for the new policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quotations omitted). And the agency must analyze and account for the "serious reliance interests" that may be affected by its decision. *Id.* (citation omitted).

   Even if the 2024 Appropriations Act and prior acts did not require Defendants to spend all of the expiring funds (and they do), Defendants' decision not to spend the funds would be

arbitrary and capricious. Defendants have failed to "identif[y] and explain[] the reasoned basis" for their decision. *Transactive*, 91 F.3d at 236. This Court already found that Defendants' blanket suspension of foreign aid payments was arbitrary and capricious because Defendants had failed "to offer any explanation, let alone one supported by the record, for why a blanket suspension setting off a shockwave and upending reliance interests for thousands of businesses and organizations around the country was a rational precursor to reviewing programs." PI at 21. Now that Defendants have converted that blanket suspension into a permanent decision not to obligate congressionally mandated foreign assistance funds going forward, they still have provided no reasoned basis for their decision.

To begin, Defendants have not explained why refusing to obligate billions of dollars in congressionally mandated foreign assistance funds is necessary to achieve their purported goal of aligning spending with executive branch priorities. Even if Defendants determined that prior foreign assistance spending was inconsistent with this administration's foreign policy, the permissible solution to that problem is to obligate appropriated funds in a manner that *is* consistent—not to refuse to obligate them at all. Defendants also failed to consider that these congressionally mandated USAID and State Department programs are not light switches to be turned on and off at will. Defendants have offered no explanation that grapples with the reality that those programs may not be able to be revived. That will further exacerbate the devastating harms Defendants' conduct has already caused around the globe and make it harder to address critical humanitarian needs in the future.

Defendants also failed to account for and give appropriate weight to Congress's determination—codified into federal law and repeatedly reinforced in subsequent legislation for the past half century—that the policy of the United States is to support economic development and foster democratic institutions abroad through foreign assistance. Defendants' statements that

19

foreign aid "destabiliz[es] world peace," Exec. Order No. 14,169, 90 Fed. Reg. 8619 (Jan. 20, 2025), are an abrupt reversal of decades of U.S. policy. For years, the federal government has considered foreign aid programs to be an important part of America's foreign policy and national security strategy. *See, e.g.*, John Barsa, Acting Administrator, U.S. Agency for Int'l Dev., Remarks at the Concordia UNGA Summit (Sept. 21, 2020), https://bit.ly/4hwmx32. Now, however, Defendants have asserted that foreign aid programs are a threat to those same interests. But they have failed to "display awareness that [they are] changing position[s]," much less articulated "good reasons" for the shift. *Encino Motorcars*, 579 U.S. at 221 (quotation marks omitted); *see also State Farm*, 463 U.S. at 43.

Defendants also failed to account for the substantial reliance interests their actions have eviscerated. Plaintiffs have relied, as they have for decades, on the continued existence of foreign aid programs and the opportunity to compete for awards under those programs given repeated congressional appropriations, continued bipartisan support, and consistent policy with respect to foreign aid across both Democratic and Republican administrations. In reliance on these revenue streams, they entered into long-term obligations that they can no longer meet. "When an agency changes course … it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account," and the failure to do so is arbitrary and capricious. *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020) (citation omitted). Yet Defendants did not consider the effect that failing to obligate appropriated funds would have on grantees, contractors, and other partners—as well as their employees—all of whom have relied on USAID's and the State Department's longstanding policies.

Nor have Defendants given any indication that they considered the reliance interests of the ultimate recipients and beneficiaries of the funds, who are among the neediest and most vulnerable populations in the world. Defendants have not shown any consideration for the people

who will die and suffer from deliberate disease if these funds are impounded, the children who will suffer from severe malnutrition, and the populations that will be mired in deep poverty without the assistance Congress intended for them. If ever there were a case where an agency needed to consider reliance interests, it is this one. Defendants' complete failure to consider reliance interests alone renders their actions arbitrary and capricious. *Regents*, 591 U.S. at 30.

**D.      Plaintiffs Are Likely to Succeed on Their § 706(1) Claims**

Even if Defendants' decision to not spend appropriated funds were not an unlawful final agency action under 5 U.S.C. § 706(2), Plaintiffs still would be entitled to relief under 5 U.S.C. § 706(1), which requires courts to "compel agency action unlawfully withheld." Claims under § 706(1) are available when an agency has failed to take a "discrete agency action that it is required to take." *Ashtari v. Pompeo*, 496 F. Supp. 3d 462, 467 (D.D.C. 2020) (quoting *Kaufman v. Mukasey*, 524 F.3d 1334, 1338 (D.C. Cir. 2008) (emphasis removed)). Courts accordingly apply § 706(1) to compel agencies to comply with "specific statutory requirement[s]" that they have failed to heed. *Meina Xie v. Kerry*, 780 F.3d 405, 408 (D.C. Cir. 2015); *see also Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181, 192 (D.D.C. 2024) (explaining that a plaintiff can challenge agency inaction under § 706(1) or § 706(2) when an agency is "under an unequivocal statutory duty to act").

Defendants' failure to obligate expiring foreign-assistance funds meets these standards. As discussed above, the 2024 Appropriations Act and prior acts mandate that Defendants obligate the full amounts appropriated by a specific deadline—September 30, 2025—with no discretion to spend less than those full amounts. *Supra* pp.11-13. Defendants have non-discretionary duties to comply with these commands. *Id*. Defendants' withholding of these

appropriated funds therefore is "unlawful[]," and relief is warranted on that basis alone. 5 U.S.C. § 706(1).[3]

Even if the Court analyzed the issue as one of action "unreasonably delayed" rather than "unlawfully withheld," Plaintiffs are still entitled to relief under § 706(1). The D.C. Circuit applies six "*TRAC* factors" in determining whether an agency's delay is unreasonable. *See Telecomms. Rsch. & Action Ctr.* (*TRAC*) *v. Fed. Commc'ns Comm'n*, 750 F.2d 70 (D.C. Cir. 1984); *see Afghan & Iraqi Allies v. Blinken*, 103 F.4th 807, 815 (D.C. Cir. 2024). Each of these factors warrants a finding of unreasonable delay here.[4]

*First*, the "rule of reason" counsels strongly in favor of relief. *TRAC*, 750 F.2d at 80. It is now August 29. Defendants have not delayed obligating these funds as part of an effort to effectively spend the funds as Congress required. The delay reflects Defendants' openly declared intent to disregard Congress' directives and permanently impound the funds. There is nothing reasonable about Defendants' intent to ignore the law.

Defendants' delay is also especially reasonable given that Defendants were under an injunction for five months to spend the funds, and despite "declin[ing] to seek a stay pending

---

[3] Congress imposed a non-discretionary duty on Defendants to obligate all of the funds in the fifteen relevant categories of foreign assistance appropriations, and thus § 706(1) relief is appropriate for all of those funds. At a minimum, it is warranted for the subcategories of appropriations for which Congress provided that specific or minimum amounts "shall be made available" by Defendants.

[4] The D.C. Circuit does not appear to have directly resolved whether relief for agency action "unlawfully withheld," as opposed to "unreasonably delayed," is conditioned on the *TRAC* factors. *Compare In re Barr Labs., Inc.*, 930 F.2d 72 (D.C. Cir. 1991) (applying *TRAC* to a claim against an agency that had missed a statutory deadline, but analyzing the claim as one of "unreasonabl[e] delay[]"), *with South Carolina v. United States*, 907 F.3d 742, 756-59 (4th Cir. 2018) (distinguishing between "unlawfully withheld" and "unreasonably delayed" claims, which are "separate statutory claims"). And here, *TRAC* is incongruous because the agency has *stated* its intention of "withholding" its action, as discussed in the context of Plaintiffs' § 706(2) claim above. But even assuming *TRAC* applies to both varieties of § 706(1) claims, these same factors would support relief under § 706(1)'s "unlawfully withheld" prong.

appeal" for that entire period, ECF No. 126, at 2, Defendants never took any steps toward obligating at least $12 billion in funds that will soon expire, even though the process of obligating funds typically takes months or longer. Moreover, Defendants previously claimed that August 15—two weeks ago—was the deadline by which they would have to initiate steps toward obligating funds. By any measure, Defendants' failure to obligate or approach the point of obligating at least $12 billion in expiring funds at this point, with the funds on the precipice of irretrievable loss, is unreasonable.

*Second*, Congress's explicit "timetable" here—in the form of appropriations with specified expiration dates—supplies additional "content for this rule of reason." *TRAC*, 750 F.2d at 80.

*Third*, as discussed in the context of Plaintiffs' irreparable harm and the public interest, there is overwhelming evidence of serious "human health and welfare … at stake"—the harm here is not merely "economic." *Id.*

*Fourth*, "expediting" Defendants' obligation could hardly displace "activities of a higher or competing priority," given that these funds reflect essentially *all* of USAID's mission, and in the five months Defendants declined to take steps toward spending these funds, it was free to devote resources to other priorities. *Id.* Indeed, USAID has no other "priorities" to pursue because Defendants have sought to abolish it.

*Fifth*, "the nature and extent of the interests prejudiced by" Defendants' delay are as serious as they come, taking not just an enormous human toll but also infringing on Congress's exclusive constitutional power of the purse.

And *sixth*, while "impropriety" is not necessary for a delay to be unreasonable, *id.*, this Court's recent order recognized that, in light of Defendants' "litigation decisions" and "representations" in this case, granting equitable relief in their favor "would violate basic notions

of fair play," ECF No. 126, at 2. The same logic counsels against endorsing Defendants' delay. It is not reasonable for an agency to announce that it will not be spending funds, ignore a court order to spend those funds for five months, and then insist that they need yet *more* time. Plaintiffs are entitled to relief under § 706(1).

### E.    Plaintiffs Are Likely to Succeed on Their Mandamus Claim

Alternatively, if APA relief is not available, Plaintiffs would be entitled to a writ of mandamus requiring Defendants to obligate funds as required by the 2024 Appropriations Act and prior acts. Federal officials have violated a "clear duty" to obligate these funds; Defendants' actions are "so egregious as to warrant mandamus" (as confirmed by the *TRAC* factors discussed above); and assuming Plaintiffs are not entitled to APA relief, Plaintiffs have "no other adequate means to attain the relief [they] desire[]." *In re Ctr. for Biological Diversity*, 53 F.4th 665, 670 (D.C. Cir. 2022) (quotations omitted); *see* 28 U.S.C. § 1361.

The D.C. Circuit in *Aiken County* granted mandamus in an indistinguishable posture. As the D.C. Circuit panel in this case explained, *Aiken* "involved a writ of mandamus under the APA to compel federal officers to perform a statutory duty unreasonably withheld." Amended Op. at 22. In particular, a federal statute provided "that the Nuclear Regulatory Commission 'shall consider' the Department of Energy's license application to store nuclear waste at Yucca Mountain" and 'shall issue a final decision approving or disapproving' the application within three years of its submission." *Aiken Cnty.*, 725 F.3d at 257–58 (quoting 42 U.S.C. § 10134(d)). When the agency failed to resolve the license application by the statutory deadline, two states, as well as "entities and individuals in those States," sought a writ of mandamus. *Id.* at 258. These petitioners were injured by the Commission's delay because "[n]uclear waste [was] currently stored in those States in the absence of a long-term storage site such as Yucca Mountain." *Id.* The D.C. Circuit "grant[e]d the petition for writ of mandamus," ordering that "the Nuclear

Regulatory Commission must promptly continue with the legally mandated licensing process" "unless and until Congress authoritatively says otherwise or there are no appropriated funds remaining." *Id.* at 259, 267. And in doing so, it confirmed that "the President and federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress." *Id.* at 260.

Aiken is part of a longer tradition. Over 200 years ago, in *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524 (1838), the Supreme Court approved a writ of mandamus compelling an agency to release appropriated funds, in an action brought by a private party. *See* Amended Op. at 22 n.13 (recognizing *Kendall* as "another mandamus case"). The company had sought a writ of mandamus directing the Postmaster General to make the full payment of a contractual settlement that Congress had authorized. 37 U.S. at 608–09, 626. In affirming the circuit court's issuance of the writ, this Court rejected the Postmaster's argument that the judiciary would improperly "infringe[] upon the executive department of the government" in adjudicating the claim. *Id.* at 610. The Court further rejected the Postmaster's contention that he had constitutional authority to refuse to release the funds, as part of taking care that the laws be faithfully executed. *Id.* at 613. So too here, if relief were not available under the APA, mandamus would be appropriate to require compliance with Congress's clear commands.

Here, Defendants have a clear duty to obligate all of the expiring funds, and therefore any writ of mandamus should cover all of those funds. At a minimum, however, mandamus is warranted for the subcategories of appropriations for which Congress provided in the statutory text that specific amounts "shall be made available," or "not less than" specific amounts "shall be made available.

**F.    Plaintiffs Are Likely to Succeed on Their Constitutional Claims if Defendants Raise a Constitutional Defense**

Defendants' actions also violate the separation of powers, to the extent that Defendants raise any argument that the actions can be justified based on the President's constitutional authority and powers. *See* Statement of Katsas, J., concurring in the denial of rehearing *en banc*, No. 25-5097 (D.C. Cir. Aug. 28, 2025).

**G.    Defendants' Attempted Pocket Rescissions Do Not Relieve Them of Their Duties under the Appropriations Acts to Spend the Funds**

On August 28, immediately after the D.C. Circuit issued its mandate, Defendants submitted a rescissions package to Congress to rescind more than $4 billion in expiring foreign aid appropriations—with the explicit intent to effectuate a "pocket rescission" of these funds. The submission of this proposal, however, does not obviate Defendants' legal mandate under the 2024 Appropriations Act and prior acts to obligate the relevant funds before they expire. The statutory text and history, the constitutional avoidance doctrine, and the major questions doctrine all refute Defendants' theory that pocket rescissions are permitted.

The plain text of the ICA makes this clear. Congress provided "[n]othing contained in this Act . . . shall be construed as . . . superseding any provision of law which requires the obligation of budget authority." *Id.* § 681(4). The 2024 Appropriations Act and prior acts "require[] the obligation of budget authority" before that budget authority expires on September 30, 2025, and nothing in the ICA—including its provisions permitting the President to propose a rescission—"supersedes" those "provisions of law" in the appropriations acts. Only by repealing those laws through new legislation rescinding the appropriations could Congress supersede those legal provisions.

Contrary to Defendants' theory, § 683(b) of the ICA does not provide otherwise. That provision states: "Any amount of budget authority proposed to be rescinded . . . as set forth in

such special message shall be made available for obligation unless, within the prescribed 45-day period, the Congress has completed action on a rescission rescinding all or part of the amount proposed to be rescinded." This provision nowhere states that an agency need not comply with an appropriation law's requirement to obligate funds before their expiration date, where Congress has not enacted a rescissions bill before that date. To the contrary, the provision stipulates that funds must "be made available for obligation" if Congress has not "completed action on a rescission bill." Funds cannot be "made available for obligation" if they have expired. *See* GAO, B-330330, at 5 (Dec. 10, 2018) (rejecting pocket rescissions theory). Indeed, the whole point of the 45-day window is to give Congress time to "consider" a rescission proposal, but Congress has no need to "consider" repealing appropriations once they have expired. *Id.* at 5–6; *see* 2 U.S.C. § 688.

If there were any ambiguity (and there is not), the ICA must not be read to permit pocket rescissions as a matter of constitutional avoidance. Defendants' theory—under which the President may unilaterally propose a rescission and the funds then expire unless Congress affirmatively votes down the proposal—is a near-replica of the Line-Item Veto Act of 1996, struck down in *Clinton v. City of New York*, 524 U.S. 417 (1998). Just like Defendants' theory of the ICA here, the Line-Item Veto Act allowed the President to send a special message to Congress that he intended to cancel appropriations, and the cancellation would be effective unless Congress affirmatively stepped in and passed a disapproval bill. *Id.* at 436–37. Defendants' pocket rescissions paradigm would be unconstitutional for all the same reasons as the Line-Item Veto Act.

The major questions doctrine independently precludes Defendants' pocket rescission theory. Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Defendants suggest that Congress hid a woolly mammoth in the ICA.

They contend that Congress, through a convoluted interaction of different provisions, but without expressly saying so, permitted the President to unilaterally impound any and all appropriations without congressional approval. Congress obviously did not intend any such thing in enacting its signature law meant to *stop* impoundments.

Defendants' theory would also have absurd consequences. It would mean that the President could wait as long as he wanted to propose a rescission—a day, an hour, or a minute before funds expire—and those funds would lawfully expire unless Congress voted down the proposal in the seconds or minutes permitted. Defendants' pocket rescission theory is not a serious one.

## II.    Plaintiffs Will Suffer Irreparable Harm

Absent a preliminary injunction, Plaintiffs will face imminent, catastrophic irreparable harm. Plaintiffs are corporations and non-profits, large and small, that depend on these foreign assistance funds, in some cases for almost their entire revenue. Approximately 98% of Plaintiff Democracy International's revenues in 2024 came from USAID awards. Bjornlund Decl. ¶ 4. For Plaintiffs Chemonics and DAI, USAID funding constitutes 88% and 80% of their annual revenues, which were nearly a billion dollars or over a billion dollars prior to the actions here. Butcher Decl. ¶ 3; Northrip Decl. ¶ 9.

If the government succeeds in blocking foreign assistance funds, Plaintiffs will be "walled off from an entire category of projects" for which they are not only "qualified, prepared, and eager to compete," but on which their businesses depend. *Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1016 (D.C. Cir. 2022). Plaintiffs have competed for and been awarded funding under the appropriations described above for years. Bjornlund Decl. ¶ 11; Carlson Decl. ¶¶ 4, 8; Butcher Decl. ¶ 10; Northrip ¶ 9; Wentworth Decl. ¶¶ 3–4; Johnson Decl. ¶ 12. Once the tens of billions of dollars in appropriations expire on September 30, Plaintiffs will

be forever deprived of the opportunity to obtain those funds. As a result, Plaintiffs expect to miss out on significant revenues that they would have received had the government spent the funds at issue. Dunn-Georgiou Decl. ¶ 13; Carlson Decl. ¶¶ 4–7; Butcher Decl. ¶ 10; Northrip Decl. ¶ 11; Hetfield Decl. ¶ 10; Wentworth Decl. ¶ 9; Johnson Decl. ¶ 16. The Supreme Court has made clear that such loss of funds that "cannot be recouped" is itself irreparable harm. *NIH v. Am. Pub. Health Ass'n*, No. 25A103, 2025 WL 2415669, at *1 (U.S. Aug. 21, 2025) (citation omitted); *see also, e.g.*, *AGMA Sec. Serv., Inc. v. United States*, 152 Fed. Cl. 706, 740 (2021) (citing dozens of cases).

While the irrevocable loss of funding is itself sufficient to show irreparable harm, Plaintiffs have also shown that this loss of funding will impose severe—and in some cases existential—harms on Plaintiffs. Dunn-Georgiou Decl. ¶¶ 12-13; Carlson Decl. ¶¶ 13–14; Butcher Decl. ¶ 11; Northrip Decl. ¶ 10. For example, Plaintiff DAI "might not be able to continue operating," and "would be at substantial risk of having to shut down entirely after 22-plus years in business." Bjornlund Decl. ¶ 13. Plaintiff DAI, meanwhile, would need to sever employment and business relationships and reduce services, diminishing its global competitiveness "in a way that [would] be difficult to restore." Northrip Decl. ¶ 10. "[O]bstacles [that] unquestionably make it more difficult for the [plaintiff] to accomplish [its] primary mission . . . provide injury for purposes . . . [of] irreparable harm" *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

Plaintiffs will face these harms imminently if the government fails to spend the funds at issue before they expire on September 30. Carlson Decl. ¶ 14; Butcher Decl. ¶ 12; Hetfield Decl. ¶ 13; Wentworth Decl. ¶ 11; Johnson Decl. ¶ 15. Had the government obligated and awarded these funds as required, Plaintiffs would very likely have already received a number of awards and would have already begun (or would soon begin) to receive payments under the awards.

29

Case 1:25-cv-00402-AHA    Document 133-1    Filed 08/29/25    Page 36 of 41

Dunn-Georgiou Decl. ¶ 12; Carlson Decl. ¶ 14; Northrip Decl. ¶ 11; Wentworth Decl. ¶ 11. Although Plaintiffs have been able to survive for the past few months thanks to payments for work already performed and other modest sources of funding, if the expiring appropriations are not made available, several Plaintiffs' operations would be permanently devastated. Dunn-Georgiou Decl. ¶ 12; Carlson Decl. ¶ 13; Northrip Decl. ¶ 10; Wentworth Decl. ¶ 11; Johnson Decl. ¶ 15.

## III.    The Balance of Harms and Public Interest Overwhelmingly Favor an Injunction

The public interest and balance of the harms merge when seeking injunctive relief against the government, and they strongly weigh in favor of injunctive relief here. "It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quotation marks and citations omitted). Likewise, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Open Communities Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws . . . that govern their existence and operations." *Id.* (internal quotation marks and citations omitted).

Here, there is an enormous public interest in ensuring that Defendants comply with their mandates under the 2024 Appropriations Act to spend the money that Congress appropriated pursuant to its exclusive constitutional power of the purse. Indeed, "[t]his case has serious implications for our constitutional structure." *Aiken Cnty*, 725 F.3d at 266–67. "It is no overstatement to say that our constitutional system of separation of powers would be significantly altered" if Defendants were allowed "to disregard federal law in the manner asserted in this case." *Id.* at 267.

The equities also demand an injunction given the devastating humanitarian fallout that would result if critical foreign aid funds are allowed to lapse. Failure to spend the appropriations will lead to mass death, impoverishment, sickness, and waste. According to USAID's own estimates, the consequences will include an expected annual increase of 71,000 to 166,000 deaths by malaria, 2 to 3 million additional deaths from failure to immunize against vaccine-preventable diseases, and 1 million children not treated for severe acute malnutrition. ECF No. 60 at 43. If Defendants are permitted to continue impounding 2024 funds, these harms will both persist and escalate—adding new, distinct harms on top of already-devastating consequences.

The human toll from the additional impoundment of funds is demonstrable: Plaintiffs' inability to compete for future awards "will cause direct harm to some of the most vulnerable people around the world." Carlson Decl. ¶14.. Without the ability to compete for these funds, Plaintiffs will not be able to deliver lifesaving medical services, including providing treatment to malnourished children and combatting disease. Dunn-Georgiou Decl. ¶ 12; Wentworth Decl. ¶ 12. Trafficked women and children will no longer be able to seek redress. Carlson Decl. ¶ 15. The inability to compete for foreign assistance funds threatens Plaintiffs' ability "to implement vital programs that advance national security, food security, economic growth, and humanitarian assistance worldwide." Butcher Decl. ¶ 13.

Defendants' actions will also force additional layoffs at businesses and organizations reliant on foreign assistance, harming workers, their families, and local and national economies. *See* Butcher Decl. ¶ 11; Northrip Decl. ¶ 11; Hetfield Decl. ¶ 11. And the impoundment of funds could undermine programs that foster the rule of law and participatory democracies around the world, including ABA programs that "result in a safer, more prosperous, and stable planet," and "create more favorable environments for U.S. business interest and enhance the viability of global markets." Carlson Decl. ¶ 2. The equities accordingly strongly favor preliminary relief.

31

**IV.    Proposed Relief**

    **A.    Temporary Restraining Order**

Given the impending September 30 deadline for Defendants to obligate the funds at issue, Plaintiffs request that the Court immediately issue a narrow temporary restraining order that: (1) prohibits Defendants from taking any actions that would prevent them from obligating the expiring funding by September 30 and (2) requires Defendants to continue to take all preparatory steps that are essential to be in a position to obligate the expiring funding if the Court issues an order requiring Defendants to do so. To be clear, Plaintiffs do not request that the Court order Defendants to obligate any funding in a temporary restraining order.

    **B.    Motion for Preliminary Injunction**

Defendants conceded in the D.C. Circuit that a preliminary injunction in this matter would be proper in scope if it included only "funds for which [Plaintiffs] are willing and able to compete." Defs.' Br. at 63, No. 25-5097; *MISO*, 45 F.4th at 1015 (quotations omitted). Plaintiffs now request such an injunction.

The declarations attached to this motion set forth the foreign assistance appropriations for which Plaintiffs are able and willing to compete. The declaration set forth all of the relevant Title III and Title IV categories of appropriations for which Plaintiffs would compete, as well as the relevant subcategories for which they would compete. The declarations establish that, of the more than 240 subcategories of foreign assistance appropriations, no Plaintiff would compete for only 11 of them. These subcategories are highlighted red in Exhibit A. These subcategories in aggregate reflect $500,250,000 in appropriations, which is just 1.6% of the $30.4 billion that Congress appropriated in Titles III and IV of the 2024 Appropriations Act (excluding the two military categories in Title IV).

As Defendants acknowledged, Plaintiffs need only demonstrate that they are able and willing to compete for certain funds for those funds to be properly included in the preliminary injunction. So the only subcategories of funds that it would be appropriate to exclude from the injunction are the 11 for which no Plaintiff in this case or in *AVAC* would compete.

It bears emphasis, however, that it is far from speculative that Plaintiffs would actually receive awards across these categories and subcategories if Defendants made the funds available. Exhibit B summarizes the categories and subcategories for which Plaintiffs have previously held awards in recent years. It shows that Plaintiffs have held awards in all Title III and Title IV categories, and in the vast majority of subcategories.

Plaintiffs accordingly request that the Court enter an injunction that is no broader than necessary to provide complete relief to Plaintiffs: all expiring appropriations in the fifteen Title III and Title IV categories described in this motion, with the exception of the 11 subcategories for which no Plaintiff in this case or in *AVAC* would compete.

### C.      Partial Summary Judgment

Finally, Plaintiffs request summary judgment on their APA claims that Defendants' actions are contrary to the 2024 Appropriations Act and prior acts, and represent agency action unlawfully withheld or unreasonably delayed. There are no disputed material facts relevant to these claims—Defendants' own words and actions establish that they have decided not to, and will not, obligate expiring appropriations.

For purposes of Plaintiffs' claims under § 706(2), this Court must declare unlawful and set aside Defendants' decision not to spend the funds, which means vacate that decision. *See Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024); *see also Corner Post v. Bd. of the Fed. Resrv. Sys.*, 603 U.S. 799, 830 (Kavanaugh, J., concurring) ("The APA prescribes the same 'set aside' remedy for all categories of 'agency action.'"). For purposes of Plaintiffs' claims

33

under § 706(1), the Court must "compel" the agency actions unlawfully held or unreasonably delayed, which here are Defendants' not making the expiring funds available for obligation and not obligating the funds for the specific uses prescribed by Congress. These remedies under the APA are directed at Defendants' "actions" and thus are not limited to the funds for which the non-availability directly injures Plaintiffs. *Corner Post, Inc.*, 603 U.S. at 830 (Kavanaugh, J., concurring).

### D.    Mandamus

To the extent relief is not available on Plaintiffs' other claims presented in this motion, the Court should issue a writ of mandamus for the reasons stated supra pp.24-26. Mandamus is warranted for all of the expiring funds that the 2024 Appropriations Act and prior acts required to be spent. But at minimum, mandamus would clearly be warranted for the subcategories of funds for which Congress directed that specific or minimum amounts "shall be made available" by Defendants.

### E.    Content of Order

The proposed order attached to this motion contains the precise language that Plaintiffs request the Court employ in provision relief. As reflected in the proposed order, for purposes of injunctive and summary judgment relief, the Court should specify that Defendants may not impound any of the expiring funds and must obligate those funds before they expire for the uses specified in the 2024 Appropriations Act or prior acts. To prevent evasion of this order, the Court should further provide that Defendants may not newly obligate expiring funds, or keep funds that are currently obligated in that status, and then de-obligate the funds after September 30 for the specific purpose of permanently impounding the funds.

### CONCLUSION

The Court should grant Plaintiffs' motion and enter a temporary restraining order,

preliminary injunction, and partial summary judgment. For appellate purposes, Plaintiffs respectfully request that the Court rule on each of Plaintiffs' cause of actions advanced in this motion.


Dated: August 29, 2025                          Respectfully submitted,

                                                /s/ Daniel F. Jacobson
                                                Daniel F. Jacobson (D.C. Bar # 1016621)
                                                John Robinson (D.C. Bar # 1044072)
                                                Nina Cahill (D.C. Bar # 1735989)
                                                Brian Rosen-Shaud (ME Bar # 006018)[+][^]
                                                JACOBSON LAWYERS GROUP PLLC
                                                1629 K Street NW, Suite 300
                                                Washington, DC 20006
                                                Tel: (301) 823-1148
                                                dan@jacobsonlawyersgroup.com

                                                William C. Perdue (D.C. Bar 995365)
                                                Sally L. Pei (D.C. Bar 1030194)
                                                Samuel M. Witten (D.C. Bar 378008)
                                                Stephen K. Wirth (D.C. Bar 1034038)
                                                Dana Kagan McGinley (D.C. Bar 1781561)
                                                Daniel Yablon (D.C. Bar 90022490)
                                                ARNOLD & PORTER KAYE SCHOLER LLP
                                                601 Massachusetts Ave., NW
                                                Washington, DC 20001-3743
                                                Tel: (202) 942-5000
                                                stephen.wirth@arnoldporter.com

                                                [+] *Pro hac vice* application forthcoming
                                                [^]Not admitted in the District of Columbia.
                                                Practice supervised by members of the D.C.
                                                bar.

                                                *Counsel for Plaintiffs*