**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

GLOBAL HEALTH COUNCIL, *et al.*,

              *Plaintiffs*,

      v.

DONALD J. TRUMP, *et al.*,

              *Defendants*.

Civil Action No. 25-cv-402 (AHA)

**DEFENDANTS' OPPOSITION TO
GHC PLAINTIFFS' MOTIONS FOR TEMPORARY RESTRAINING ORDER,
PRELIMINARY INJUNCTION, AND SUMMARY JUDGMENT**

## INTRODUCTION[1]

In vacating the preliminary injunction requiring State and USAID to "make available for obligation the full amount of funds that Congress appropriated for foreign assistance programs in the Further Consolidated Appropriations Act of 2024" (FCAA), the D.C. Circuit concluded that Plaintiffs had not sufficiently shown irreparable harm based on denial of "opportunity to compete for" disputed funds, *GHC v. Trump*, No. 25-5097, 2025 WL 2480618, at *13 (D.C. Cir. Aug. 13, 2025)—and Plaintiffs fare no better in showing irreparable harm requirement to sustain their August 29 motion for a temporary restraining order, preliminary injunction, and partial summary judgment (Doc. 133). Their new declarations assume that the Government is not obligating *all* of the pertinent FCAA funds expiring on September 30, but that is incorrect.

Rather, of the approximately $11.5 billion in pertinent expiring funds, Defendants are advancing the multi-step process for obligating about $6.5 billion "consistent with available authorities," including notifications to committees of Congress and negotiation or consultation with foreign entities, and the responsible officials have "already given appropriate policy direction for the allocation of all available expiring funds to specific purposes and programs." *See* Declaration of Jeremy Lewin ¶¶ 6-10 (filed in support of this opposition). Plaintiffs have no irreparable harm from, and no need for any injunctive relief concerning, those funds.

There is a separate category of approximately $4 billion in pertinent expiring funds, concerning which the President on August 28 transmitted a special message to Congress under the Impoundment Control Act proposing those funds for rescission, the D.C. Circuit has made clear that Plaintiffs, as private parties, cannot obtain injunctive relief via the Administrative Procedure

---

[1] The deadline for the instant Opposition provided insufficient time for Defendants to prepare tables of contents and authorities.

Act, which does not supply a cause of action when another statute precludes judicial review through text or structure, as the ICA does here.

Plaintiffs nevertheless now seek to reinstall the vacated preliminary injunction on a different theory. They seize on the D.C. Circuit's August 28 denial of their motion for rehearing *en banc*, when the panel amended its opinion so as not to rule out—but certainly *not* to validate— the *possibility* that Plaintiffs could pursue an APA claim predicated *on the FCAA* itself. On that basis they seek a proposed TRO (Doc. 133-13) purporting not to require "Defendants to actually obligate any appropriations," but that would mandate that Defendants "take all preparatory steps necessary to be able to obligate the expiring appropriations"—by which they mean *not just* the $6.5 billion Defendants are in the process of obligating, *but also* the $4 billion described in the special message. Neither category of funds can sustain the injunctive relief purportedly sought under the FCAA.

As to the funds Defendants are obligating, the steps Defendants are taking reflect the opposite of agency decisions *not* to obligate the FCAA funds. And given that Defendants are making their best efforts to meet the September 30 deadline, Plaintiffs' late-breaking unreasonable delay claim is also as unfounded as their other claims.

As to the funds described in the special message, despite Plaintiffs' effort to paint the dispute as one about the FCAA, their lengthy discussion of the ICA makes it obvious that their actual objection is premised once again on the ICA. Even if Plaintiffs' understanding of the FCAA were correct (and it is not), the President's special message under the ICA has proposed funds for rescission and commenced the 45-day period during which Congress considers those proposals. Under Defendants' view of the ICA, those funds described in the special message would only be available for obligation if that period concludes without Congress pass a rescission bill (by which

point the funds will have expired). Plaintiffs appear to disagree with that view, but the D.C. Circuit squarely held that Plaintiffs cannot use the APA to obtain enforcement of the ICA—and that holding controls the outcome as to the funds described in the special message. To be sure, the President transmitted his message after the D.C. Circuit mandate issued, and less than 45 days from September 30.

Even as to the FCAA, Plaintiffs have no likelihood of success on the merits of their claim. Plaintiffs have not predicated their claims here on provisions (either in permanent law or in annual appropriations appropriations) directing money to Plaintiffs, and the case bears little resemblance to the statutory mandates in *Train v. City of New York*, 420 U.S. 35 (1975), or *In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013), on which they rely. Plaintiffs assert that the language of the relevant appropriations provisions requires the Executive Branch to spend the full amount appropriated. But in many instances the statutes simply provide that large undifferentiated sums are appropriated for various activities. Such provisions supply no specific command to provide specific funds on a specific timetable. Even where appropriations provisions state that amounts "'shall be made available,'" such language "contain[s] an element of ambiguity" as to whether Congress intended the amount to serve as a floor or ceiling or both. 2 GAO, Principles of Federal Appropriations Law 6-31 (3d ed. 2006). That ambiguity cannot sustain Plaintiffs' claims under the APA or the mandamus act, especially since these appropriations were adopted against the backdrop of the ICA, which expressly contemplates that the Executive Branch may obligate less than the amounts that Congress has appropriated.

And the remaining equitable factors favor Defendants. The D.C. Circuit determined the equitable balance supported vacatur of the preliminary injunction and expedited issuance of the mandate. Plaintiffs furnished the Court with nothing to justify departing from the Court of

Appeals' assessment of that balance, especially in the sensitive foreign policy context in which the suit arises.

The TRO and PI motions should be denied, and the embedded summary judgment motion should be severed and denied without prejudice to renewal after Defendants have had full opportunity to respond to the operative pleading.

## BACKGROUND

1. ***Foreign Aid Funds.***    Today, the "primary legislative basis" for foreign assistance programs is the Foreign Assistance Act of 1961, Pub. L. No. 87-195, 75 Stat. 424 (FAA).[2]    That statute generally confers on the President and his subordinates broad discretion to manage foreign aid.  Thus, for many programs, Congress has expressly directed that any aid should be subject to the President's discretionary terms and conditions.  For example, Congress permitted assistance for health programs "on such terms and conditions as [the President] may determine." 22 U.S.C. § 2151b(c)(1); *see also, e.g.*, *id.* § 2291(a)(4) (counternarcotic and other anticrime programs); *id.* § 2346(a) (economic and political stability assistance); *id.* § 2347(a) (international military education and training assistance); *id.* § 2348 (peacekeeping operations); *id.* § 2349aa (antiterrorism assistance).

Similarly, Congress has generally sought to ensure that the President and his subordinates have flexibility to align foreign assistance programs with the President's foreign policy.   Thus, Congress has provided generally that foreign assistance "may be furnished" on "such terms" as "may be determined to be best suited to the achievement of the purposes" of the FAA.   22 U.S.C. § 2395(a).    And Congress has tasked the Secretary of State, "[u]nder the direction of the

---

[2] Emily M. Morgenstern & Nick M. Brown, Cong. Research Serv., R40213, *Foreign Assistance: An Introduction to U.S. Programs and Policy* 1 (2022).  Internal citations, quotation marks, and alterations are omitted in this brief unless noted.

President," with the responsibility for the "continuous supervision and general direction of economic assistance," to ensure that "the foreign policy of the United States is best served thereby."  *Id.* § 2382(c); *see also, e.g.*, *id.* § 2382(a); *id.* § 2346(b).  In short, while Congress has articulated various "goals" to guide the President's administration of foreign aid, 22 U.S.C. § 2151(a), Congress has generally deferred to the President regarding how best to implement foreign assistance programs consistent with the President's broader foreign policy goals and statutory requirements.  This deference reflects the longstanding broad authority of the Executive Branch in conducting foreign affairs.  *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003).

Since establishing the general statutory framework governing foreign assistance programs, Congress has regularly appropriated funds to allow the Executive Branch to implement programmatic goals.  Congress recently appropriated foreign assistance funds in Division F of the Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, 138 Stat. 460, 729. There, Congress addressed various operational needs of the government's foreign assistance programs.   In some circumstances, Congress appropriated large sums for carrying out types of foreign assistance programs, establishing only general constraints on the Executive Branch's discretion in how to use those funds.  *S e e ,  e . g .*, 138 Stat. at 742 (development assistance); 138 Stat. at 744 (disaster relief); 138 Stat. at 740-42 (global health funds).  Only in some limited instances did Congress appropriate funds for specific recipients.   Thus, for example, Congress appropriated more than $6 billion for expenses related to "the prevention, treatment, and control of, and research on, HIV/AIDS," including $1.65 billion "for a United States contribution to the Global Fund to Fight AIDS, Tuberculosis and Malaria."   138 Stat. at 742.  Congress also appropriated funds to support the administration of foreign assistance programs.  *See, e.g.*, 138 Stat. at 739-40.  Some of the funds appropriated in the Further Consolidated Appropriations Act

of 2024 remain available until September 30, 2025, whereas other funds remain available until later dates or until expended. *See, e.g.*, 138 Stat. at 742.

**2. D.C. Circuit Proceedings.** The Government appealed from the preliminary injunction as to appropriated funds, and moved to expedite the appeal. C.A. Doc. 2113162 (Apr. 28, 2025). The Government explained that the decree required it to obligate covered funds before they expire. *Id.* at 3. For funds expiring on September 30, 2025, the Government explained that it would be required to "begin obligating and expending funds, potentially irretrievably, before that deadline." Id. The Government requested a decision by August 15, 2025, to ensure that it could receive effective relief, if it were to prevail on appeal. *Id.* That deadline was likewise critical to allow the Government to seek further review in the Supreme Court, if necessary. The court of appeals granted expedition. C.A. Doc. 2114642 (May 6, 2025).

A divided panel of the Court of Appeals on August 13 vacated the preliminary injunction in relevant part. 2025 WL 2480618. Plaintiffs filed a petition for rehearing *en banc* and an emergency motion for an administrative stay and for a stay of the panel opinion and judgment pending en banc review. C.A. Doc. 2130281 (Aug. 15, 2025); C.A. Doc. 2130328 (Aug. 15, 2025). They asserted that emergency relief was warranted because of the funds expiring on September 30, which the Government imminently would need to begin to obligate. *See* C.A. Doc. 2130281, at 1. The Court of Appeals denied an administrative stay on the ground that "[b]ecause this court's mandate has not yet issued, the preliminary injunction that requires the government to obligate the appropriated funds remains in effect." 2025 WL 2429482, at *1 (Aug. 20, 2025).

The Government opposed rehearing *en banc* and the stay motion, and cross- moved to stay the preliminary injunction or to issue the mandate expeditiously. C.A. Doc. 2131124 (Aug. 20, 2025); C.A. Doc. 2131127 (Aug. 20, 2025). The Government explained that staying the injunction

or issuing the mandate is necessary because the preliminary injunction requiring it to obligate funds prevents the Government from taking lawful actions, including following statutory procedures for rescission set out in the ICA. C.A. Doc. 2131124, at 8-9. And the Government requested resolution of the motions and issuance of the mandate by August 26, at 10 a.m., to facilitate Supreme Court review. The Government also filed a declaration detailing steps that it would need to take to obligate funds expiring on September 30, 2025, including "close to irrevocable" steps which would need to begin no later than September 2. C.A. Doc. 2131614. The Government applied to the Supreme Court on August 26 for a stay of the preliminary injunction.

The D.C. Circuit on August 28 denied rehearing *en banc* (C.A. Doc. 2132525), and the panel amended its opinion (and Circuit Judge Pan amended her dissenting opinion), and issued the mandate (C.A. Doc. 2132521).

**3. Two Categories of Expiring Funds.** Jeremy Lewin is currently performing the duties of the Under Secretary of State for Foreign Assistance, Humanitarian Affairs, and Religious Freedom and serving as a Senior Advisor to the Secretary and the Director of Foreign Assistance. Lewin Decl. ¶ 2. As of August 28, 2025, State and USAID have approximately $10.5 billion in remaining unobligated foreign assistance funds appropriated in titles III and IV of the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024 (Division F of Public Law 118-47)—and the Full-Year Continuing Appropriations and Extensions Act, 2025 (Public Law 119-4), and supplemental appropriations including Making Emergency Supplemental Appropriations for the Fiscal Year Ending September 30, 2024, and for Other Purposes (Public Law 118-50) (incorporating H.R. 8035, the "Ukraine Supplemental" and H.R. 8035, the "Israel Supplemental."). Lewin Decl. ¶ 4.

"Consistent with their available authorities," Mr. Lewin explains, "State and USAID are making best efforts to obligate" $6.5 billion of the $10.5 billion amount in expiring appropriated balances for foreign assistance by September 30, 2025.  Lewin Decl. ¶ 6.  State expects to be able to obligate substantially all these funds before their expiration.  *Id*.  Mr. Lewin and the Secretary of State "have already given appropriate policy direction for the allocation of all available expiring funds to specific purposes and programs."  Lewin Decl. ¶ 7.

Agency staff are working as quickly as possible to complete necessary technical and legal steps to facilitate timely obligation of funds.  Lewin Decl. ¶ 8.  Those steps include technical budget and program work, preparation of Congressional Notifications, and negotiation of bilateral diplomatic and interagency agreements.  *Id*.  The staff "expect these plans for expiring foreign assistance balances can reasonably be implemented before the end of the fiscal year."  *Id.*

Separately, of the $10.5 billion amount, approximately, a pertinent $4 billion is the subject of rescission proposals the President transmitted to Congress on August 28 with his special message under the ICA, 2 U.S.C. § 683(a).  Lewin Decl. ¶ 5; *see* GHC Doc. 129.  The funds within the rescission proposals are not available for obligation, and agency attempts to obligate those funds would exceed apportionments approved by the Office of Management & Budget (OMB), which could entail risks under the Anti-Deficiency Act, 31 U.S.C. § 1341.  Lewin Decl. ¶ 5.

**4. Motions of August 29.**  Plaintiffs moved on August 29 for leave to file a second amended complaint alleging a new claim under 5 U.S.C. § 706(1) (Doc. 132), and for a TRO, PI, and partial summary judgment (Doc. 133).   Although the Proposed TRO (Doc. 133-13) purports not to require "Defendants to actually obligate any appropriations," it also would require Defendants to "take all preparatory steps necessary to be able to obligate the expiring

appropriations," which on Plaintiffs' description includes appropriations in the FCAA, including those described in the President's special message.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). The movant must "make a 'clear showing that four factors, taken together, warrant [such] relief'": (1) "likely success on the merits"; (2) "likely irreparable harm in the absence of preliminary relief"; (3) "a balance of the equities in its favor"; and (4) "accord with the public interest." *See Archdiocese of Wash. v. WMATA*, 897 F.3d 314, 321 (D.C. Cir. 2018). "The likelihood of success and irreparability of harm 'are the most critical' factors." *Trump v. Thompson*, 20 F.4th 10, 31 (D.C. Cir. 2021) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). "The balance-of-equities and public-interest factors merge if the government is the opposing party." *GHC*, 2025 WL 2480618, at *5.

## ARGUMENT

Although the Government's decisions to obligate appropriated funds do not directly regulate Plaintiffs who are or were party to Government contracts and grants, thus raising an Article III standing issue, *see, e.g.*, *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381-84 (2024), given the D.C. Circuit's conclusion that Plaintiffs showed standing as alleged competitors under circuit precedent, *GHC*, 2025 WL 2480618, at **4-5, the Government does not here further dispute Plaintiffs' standing to proceed. Instead, Plaintiffs' motion fails on the merits at every turn.

The Plaintiffs before the Court cannot enforce the FCAA using the APA. As to the President's special message, the ICA precludes review of Plaintiffs' APA challenge despite their labeling of the claim as one under the FCAA. Plaintiffs are also outside the zone-of-interests because the FCAA does not direct the payment of money to them. Moreover, there is no "final" agency decision not to obligate funds; instead, Defendants are advancing the process to obligate

many of the pertinent expiring funds.  For its part, the President's special message is not subject to review because the President is not an agency within the APA's meaning.  Furthermore, the entire program of foreign assistance obligation cannot be challenged under the APA because that program is not a "discrete" action.

In any event, even if Plaintiffs could enforce the FCAA using the APA, their claims fail. The FCAA does not mandate obligation of funds in the manner Plaintiffs demand, and they fail to place the appropriations provisions they quote in their pertinent context, including the discretion-confirming provisions of the Foreign Assistance Act.  The agencies are acting reasonably and have reasonably explained those actions in obligating funds.  There has been no actionable delay as agencies are advancing the process of obligating the funds before September 30 (even if the new delay-based claim were entertained).  Additionally, although the D.C. Circuit has made clear Plaintiffs cannot use the APA to litigate their ICA arguments, insofar as the Court addresses those arguments, they are incorrect, and the President's special message is a valid basis for Defendants not to obligate funds included within that message.

Plaintiffs' mandamus claim also suffers from critical deficiencies (similar to those in their *ultra vires* claim, which the D.C. Circuit rejected).

The remaining equitable factors weigh against granting any injunctive relief.  The D.C. Circuit's weighing of the equities against Plaintiffs remains instructive.  Plaintiffs' submissions on irreparable harm fail to acknowledge that substantial funds are being obligated before expiration, and overstate the scope of the funds for which Plaintiffs have historically-based capability of competing.  On the other hand, the proposed injunctive relief would impermissibly burden Defendants in their formulation and implementation of foreign policy decisions.

Additionally, Plaintiffs' summary judgment motion is premature, and should be stayed or denied.

## I.    PLAINTIFFS MAY NOT ENFORCE THE FCAA VIA THE ADMINISTRATIVE PROCEDURE ACT

### A.    The ICA Precludes APA Review Of The Instant Plaintiffs' Claims, And They Fall Outside The Zone Of Interests Of The Foreign Assistance Appropriations Laws In Any Event

Two related limitations restrict the instant Plaintiffs from using the APA's cause of action to enforce the FCAA as a means for compelling steps toward obligation of funds to their benefit, including funds described in the President's special message, where Congress did not intend such enforcement.

*First*, a plaintiff may not seek review under the APA if "statutes preclude judicial review." 5 U.S.C. § 701(a)(1).  By providing a detailed scheme for administrative and judicial review, Congress can displace the APA's default cause of action.  *See, e.g.*, *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984).  Preclusion of review is determined "not only from [the statute's] express language, but also from the structure of the statutory scheme."  *Id.*

As the ICA reflects, Congress has constructed a reticulated scheme to govern the relationship between the Legislative and Executive Branches when it comes to spending appropriated funds.  That statute is built around give-and-take between the political branches.  Thus, the statute directs the President to send a special message to Congress when he proposes to defer or rescind appropriated funds, *see* 2 U.S.C. §§ 683(a), 684(a), which allows Congress to determine how to respond given the particular circumstances of a specific proposal.  And the statute specifies particular forms of legislative action that Congress may undertake to address proposed rescissions.  *See id.* § 688.  Moreover, insofar as the ICA contemplates litigation to enforce any obligation to spend appropriate funds, it provides for suits brought by the Comptroller

General, an official within the Legislative Branch.  2 U.S.C. § 687.  And the statute imposes limitations on the bringing of any such suit that reinforce Congress's desire to control any response to the Executive's actions.  No such suit may be brought until the Comptroller General files "an explanatory statement" of "the circumstances giving rise to the" contemplated suit "with the Speaker of the House of Representatives and the President of the Senate" and then "25 calendar days of continuous session of the Congress" elapse.  *Id.*  Regardless whether such a suit would be cognizable under Article III and the separation of powers, the statute does not contemplate enforcement at the behest of private parties.  And the statute certainly does not contemplate that private parties would be entitled to bring enforcement actions without regard to the procedural limitations that Congress imposed for the Comptroller General. [3]

Congress may impliedly preclude some parties from seeking judicial review of administrative action by constructing a detailed scheme that provides for review only by other parties.  For example, in *Block*, Congress provided for dairy "[h]andlers and producers—but not consumers"—to "participate in the adoption and retention of" certain agency orders related to milk prices and for handlers, at least, to pursue administrative remedies and obtain judicial review of agency orders with which they disagreed.  467 U.S. at 346.  In holding that the statutory structure precluded consumers' attempt to challenge those orders through the APA, the Supreme Court explained that there was no "express provision for participation by consumers in any" administrative or judicial proceeding related to the orders and that, "[i]n a complex scheme of this

---

[3]  *See Pub. Citizen v. Stockman*, 528 F. Supp. 824, 827-30 & n.1 (D.D.C. 1981) (explaining why private enforcement of ICA "would represent a great disservice to the objectives which underlie" that statute); *see also Gen. Land Off. v. Biden*, 722 F. Supp. 3d 710, 734–35 (S.D. Tex. 2024).

type, the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process." *Id.* at 347.

So too here.  The ICA provides a variety of mechanisms for legislative responses to any proposal by the Executive Branch to defer or rescind appropriated funds and, to the extent it contemplates litigation at all, it contemplates only suits brought by a Legislative Branch official and only after Congress has first had the opportunity to act.  That scheme provides no role for third parties like plaintiffs to play in either the legislative or judicial enforcement processes.

The D.C. Circuit applied *Block* to hold that Plaintiffs lack a cause of action "to undergird their claim that the defendants *have acted contrary to law by violating the ICA*."  *GHC*, 2025 WL 2480618 at *11 (emphasis added).  That holding directly forecloses Plaintiffs' claims here, at least as to the funds described in the President's special message.  To be sure, the D.C. Circuit noted that it did not "decide whether the ICA precludes suits *under the APA to enforce appropriations acts*."  *Id.* at *11 n.17 (emphasis added).  But there is a critical difference between a claim seeking "to enforce appropriations acts," *id.*, whose availability the D.C. Circuit did not decide, and a claim predicated on the assertion that Defendants have not complied *with ICA requirements* by effectuating a so-called "pocket rescission"—which is a claim that boils down to one asserting that Defendants are "violating the ICA."  In that regard, Plaintiffs' claim behind its TRO and PI request is *transparently* a claim asserting noncompliance with the ICA as the ground for APA relief against Defendants' adherence to the President's special message:  They include an extended discussion about the ICA (Mem. 26-28); they purport to respect what the ICA "confirms" (Mem. 12); and they insist that the ICA does not preclude their APA claim—without squaring their effort to construe the ICA with the panel's application of *Block*.

This Court should not accept Plaintiffs' invitation to circumvent the panel decision in that fashion. Rather, any disputes between the President and Congress in this sphere may be "hashed out in the hurly-burly, the give-and-take of the political process between the legislative and the executive." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 859 (2020). In that process, Congress has ample political tools to address any perceived problem itself, including by altering existing or future appropriations or engaging in its traditional oversight functions. And in determining whether and how to enlist these political tools in any particular dispute, Congress may properly calibrate any response depending on the specific context and Congress's particular views.

Hence, permitting Plaintiffs in the instant suits to challenge the Executive Branch's spending decisions through an APA suit would "severely disrupt" the statute's "complex and delicate" enforcement scheme. *Block*, 467 U.S. at 348. That is plainly true as to the funds that are the subject of the President's special message. And to the extent GHC Plaintiffs raise other arguments, the ICA also precludes them because they cannot point to any appropriations heading or other statute that expressly identifies any of them as holding a right to payment that an alleged impoundment would impair.

It is thus "clear that Congress intended that" any response to the Executive's actions in this sphere should "be confined to" the Legislative Branch-directed responses undertaken "in accordance with" the statute's scheme. *Id*; *see also Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 15 (1981) ("In the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate.").

For similar reasons, Plaintiffs are not within the zone of interests of the FCAA for purposes of an APA suit. To invoke the APA, a "plaintiff must establish that the injury" it complains of

14

"falls within the zone of interests sought to be protected by the statutory provision" at issue. *Air Courier Conference of Am. v. Am. Postal Workers Union*, 498 U.S. 517, 523-24 (1991). That limitation reflects the common-sense intuition that Congress does not intend to extend a cause of action to "plaintiffs who might technically be injured in an Article III sense but whose interests are unrelated to the statutory prohibitions" they seek to enforce. *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 178 (2011). Thus, where, as here, the plaintiff is not the object of a challenged regulatory action, the plaintiff has no right of review if its "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). And when a plaintiff attempts to use the APA's cause of action to challenge the government's compliance with a different statute, the "interest he asserts must be arguably within the zone of interests to be protected or regulated by the statute that he says was violated." *Patchak*, 567 U.S. at 224.

Those statutes are directed at regulating the relationship between Congress and the Executive Branch. They do not suggest Congress intended to permit enforcement by third parties like Plaintiffs, who hope to be awarded some of the appropriated funds—but who cannot point to even a single statute that requires that foreign-assistance funds be obligated to them. When applied to foreign assistance appropriations in particular, the statute ensures that judgments about foreign policy are reserved to the political branches.

### B.  Plaintiffs Do Not Challenge "Final" Agency Action Where The Obligation Process Is Advancing, And The President Is Not Subject To The APA

Furthermore, Plaintiffs err in contending (Mem. 15-17) that they can apply the reasoned-decisionmaking and other APA requirements to Defendants' allegedly "final" "decision not to obligate the funds" (Mem. 15).

The President's special message, which Plaintiffs seek to nullify through proposed orders that would require funds proposed for rescission to instead be made available for obligation, is not subject to the reasoned-decisionmaking and other requirements of the APA because the President is not an agency within the meaning of the APA. *See Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). The special message is not agency action, and it cannot be reviewed for APA purposes, including for whether it is reasonable and reasonably explained in the manner required of agency rules under the arbitrary-and-capricious standard, *see Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

But the same is true of agency actions implementing determinations that Congress has vested directly in the President: Agencies lack the power to disagree with the President's exercise of policy discretion vested specifically in him, so when agencies implement such directives by the President (as would be the situation when agencies respect the special message by withholding the funds from obligation and otherwise refraining from taking steps to obligate funds proposed for rescission), there is no genuine agency decisionmaking to review. See, e.g., *Bradford v. U.S. Dep't of Lab.*, 101 F.4th 707, 731 (10th Cir. 2024) ("[I]t would have been futile for DOL to have considered comments advocating alternatives that it lacked discretion to adopt."); *see also DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 25 (2020) (declining to consider claim that the Secretary of Homeland Security was "required to explain a legal conclusion that was not hers to make"); *cf.* Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2351 (2001) (distinguishing a challenge "to an action delegated to an agency head but directed by the President," as to which "the review provisions usually applicable to that agency's action should govern," from "a challenge to an action that Congress has committed to the sole discretion of the President"). Applying APA standards to presidential determinations as implemented by an agency would also "contravene the

thrust of the Supreme Court's holding in *Franklin* by subjecting almost every executive order to APA review." *Feds for Med. Freedom v. Biden*, 581 F. Supp. 3d 826, 835 (S.D. Tex. 2022), *aff'd*, 63 F.4th 366 (5th Cir. 2023) (en banc), *vacated as moot*, 144 S. Ct. 480 (2023).

There is also no "final agency action" subject to APA review as to the funds State is taking steps to obligate. To qualify as "final agency action," a particular agency decision must, among other things, "mark the 'consummation' of the agency's decisionmaking process." *See Bennett v. Spear*, 520 U.S. 154, 178 (1997). As today's declaration makes clear, agencies are actively engaged in the obligation process, so there is no final "decision not to obligate" as to those funds. The ongoing steps State is taking to obligate the remaining pertinent expiring funds do not mark the consummation of an agency decisionmaking process and thus do not involve final decisions that a court can review for APA reasoned decisionmaking and other purposes.

### C. Plaintiffs Do Not Allege "Discrete" Agency Action Apart From Acts Concerning Their Own Awards

Review under the APA is available only for "agency action." 5 U.S.C. § 704. But Plaintiffs seek to use the APA as a vehicle to obtain relief for themselves, but also for *every* recipient of foreign-assistance funds. Yet an APA plaintiff must plead and challenge "an identifiable action or event." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990). The agency actions that can properly be challenged under the APA are those that are "circumscribed [and] discrete." *See Norton v. So. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). Hence, "courts cannot order 'programmatic improvements,' or 'compel compliance with broad statutory mandates.'" *Cobell v. Kempthorne*, 455 F.3d 301, 305 (D.C. Cir. 2006) (quoting *Lujan*, 497 U.S. at 891, and *Norton*, 542 U.S. at 66). That "distinction between discrete acts, which are reviewable, and programmatic challenges, which are not, is vital to the APA's conception of the separation of powers" and

prevents courts from veering into "day-to-day agency management" of agencies. *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019).

APA review is unavailable for review of an agency's "constructing a building, operating a program, or *performing a contract*," *Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013) (emphasis added), or making a budget request, *see Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006). *Cf. Am. Forest Res. Council v. United States*, 77 F.4th 787, 805 (D.C. Cir. 2023). The APA precludes an amorphous, roving challenge to the entirety of USAID's and State's systems of obligating funds. That is the exact type of broad programmatic or "blunderbuss" challenge seeking supervision of an agency's day-to-day activities the APA does not allow. *See Fund for Animals*, 460 F.3d at 20; *see also Am. Forest Res. Council*, 77 F.4th at 805.

## II.    PLAINTIFFS FAIL TO SHOW UNLAWFUL CONDUCT IN VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

### A. Defendants' Conduct Was Not Contrary To Law Because The Pertinent Appropriations Law Do Not Mandate That Funds Be Obligated In The Manner Plaintiffs Demand

Plaintiffs' label their APA "contrary to law" claim as predicated on the FCAA, but they fail to concentrate on language in particular appropriations statutes that they contend require obligation of funds to them. Instead, they assert (Mem. 11) that "absent an express indication to the contrary, an appropriation is a mandate" to obligate, generally, citing *In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013) (Kavanaugh, Cir. J., for the Court).

But that case cannot bear the weight Plaintiffs place on it. There, the D.C. Circuit issued a writ of mandamus directing the Nuclear Regulatory Commission (NRC) to "promptly continue" proceedings on the Department of Energy's application for authorization to store nuclear waste at Yucca Mountain. 725 F.3d at 267. The D.C. Circuit rejected the NRC's contention that, because

Congress had not appropriated sufficient funds for the agency to complete that process, NRC could "shut down its review and consideration" of the application. *Id.* at 258. But there, substantive law, the Nuclear Waste Policy Act, mandated the Commission "shall consider" the application and "'shall issue a final decision approving or disapproving'" the application within three years of its submission. *Id.* at 257-58 (quoting 42 U.S.C. § 10134(d)). "[I]f Congress appropriates no money for a *statutorily mandated program*," the D.C. Circuit remarked, "the Executive obviously cannot move forward." *Id.* at 259 (emphasis added).

But here, there is no statutory mandate, either in the FAA or in any pertinent appropriations statute, requiring Defendants to contract with or obligate funds to Plaintiffs, and their failure to identify such a statute is telling. Plaintiffs argue broadly that because "[i]n none of the fifteen categories" of foreign assistance in the FCAA "did Congress provide that USAID or State may obligate 'up to,' 'not more than,' or 'not to exceed' the topline appropriated amount" (Mem. 12-13), it follows that "the full amount" must be obligated—but that relies again on *Aiken County*, and not on statutory language viewed in context.

In many instances, the appropriations statute simply provides that Congress is appropriating large undifferentiated sums for various activities, such as "to carry out" specified provisions of the Foreign Assistance Act, 138 Stat. at 742, or "to meet refugee and migration needs," 138 Stat. at 744. And even where Congress included more specific directions in the appropriations statute, those directions often restrict the manner in which, or the general purposes for which, the funds could be spent. *See, e.g.*, 138 Stat. at 740-41, 742. In general, they do not provide affirmative, unequivocal commands to provide specific funds on a specific timetable for specific recipients. And although this Court noted one instance where the appropriations act specifies that the covered funds "shall be made available for" specific purposes, 138 Stat. at 740

(cited at 770 F. Supp. 3d at 144), that specification appears in a list of provisos restricting the manner and purposes of expending the funds. In that context, it is best understood as a direction regarding the specific purposes and activities for which those funds may be used—not as a command (and certainly not an unequivocal one) to make all of the appropriated sums available, much less to do so on any particular timeline. Plaintiffs' new TRO and PI requests are not grounded on any more specific provision earmarking funds for particular recipients.

Thus, taken on their own, many of the appropriations provisions on which Plaintiffs have relied simply "permit[] but do[] not require the Executive Branch to spend funds." *Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, 1 Op. O.L.C. Supp. 303, 309 (1969); *cf. Train v. City of New York*, 420 U.S. 35, 43-44 (1975) (similarly recognizing that an appropriations provision may permit, but not require, expenditure "of the entire amounts authorized"). It is the Impoundment Control Act, in most cases, that governs circumstances in which the President makes a policy determination not to expend funds. And although some provisions of the appropriations statute contain more specific commands regarding obligating funds to particular recipients or for particular purposes, Plaintiffs have not predicated their claims here on provisions directing money to Plaintiffs, and those limited provisions could not in any event justify the broad injunction they seek covering not just the expiring foreign assistance amounts in the FCAA, but also expiring amounts from prior years.

Nor have Plaintiffs identified any unequivocal command in the underlying statutes authorizing foreign assistance programs that could support the TRO and PI they now seek. As explained, those statutes generally authorize the Executive Branch to provide foreign assistance through particular programs, but they do not generally require the provision of specific funds to specific recipients. Congress instead has generally provided that the President and the Secretary

20

of State have significant latitude to determine how best to administer foreign assistance to ensure that those programs best achieve foreign aid goals and align with the President's foreign policy. *See, e.g.*, 22 U.S.C. §§ 2382(c), 2395(a). And for many specific programs, Congress has expressly given the President discretion to provide assistance on such terms and conditions as the President determines.

Plaintiffs' contrary position hinges on reading virtually every appropriations statute, regardless of context, as an inexorable command to expend all of the funds. But every relevant principle of interpretation refutes their assertion that the fact of a congressional appropriation requires the Executive Branch to expend all appropriated funds. Rather, each appropriation must be analyzed individually—and considered together with the underlying authorizing statute, the Impoundment Control Act, and background constitutional principles—in order for the Executive Branch and Congress to work out which funds should be expended and in what fashion. As discussed above, that process does not involve private plaintiffs.

At a minimum, the statutes at issue here do not provide the sort of "specific, unequivocal command," *Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 63 (2004) (quotation omitted), necessary to justify an affirmative injunction. By and large, the FCAA appropriates sums of money for broad purposes. Among other things, Congress appropriated billions of dollars "[f]or necessary expenses to carry out" provisions of the Foreign Assistance Act "for global health activities"; "for international disaster relief, rehabilitation, and reconstruction assistance"; and for development assistance. FCAA, div. F, 138 Stat. 460, 740, 742. On their own, those appropriations lack any mandatory language directing the obligation and expenditure of funds.

The new TRO and PI motion also relies on language in the statute that provides that foreign-assistance appropriations "shall be made available in amounts specifically designated" by

a set of tables referenced in the appropriations statute.  Mem. 4, 13 (quoting Further Consolidated Appropriations Act of 2024, div. F, § 7019, 138 Stat. at 771).  But Plaintiffs misread that language.

As an initial matter, the provisions in question simply address a different question than the one the TRO and PI motion presents.  Those provisions reflect Congress's desire to designate different portions of the top-line foreign-assistance appropriations for particular purposes.  *See* 2 GAO, *Principles of Federal Appropriations Law* 6-26 to 6-30 (3d ed. 2006) (GAO Red Book). They are thus aimed at giving direction to the Executive Branch about how to allocate portions of the lump-sum appropriations to certain uses, not at directing the Executive Branch to spend all of the appropriated funds.  Consistent with that understanding, and as GAO has made clear, the use of such "shall be available" language "to earmark a portion of a lump-sum appropriation" does not necessarily reflect a congressional command to make the full sum available for obligation.  *See id.* at 6-30 to 6-31.  Instead, the use of such language "contain[s] an element of ambiguity," and the question whether the language reflects a floor or a ceiling or both on the amount that may be obligated for the relevant purpose "depends on the underlying congressional intent."  *Id.* at 6-31.

Here, the relevant context—which Plaintiffs incorrectly urge this Court to ignore—makes clear that Congress intended the Executive Branch to exercise discretion over how to expend these appropriations.  In accord with the President's primary role in the conduct of foreign affairs, Congress recognized that the President may furnish foreign assistance "on such terms and conditions as he may determine."  *See, e.g.*, 22 U.S.C. §§ 2151a(a)(1), 2151b(c)(1), 2151c(a), 2151d(b)(1), 2174(a), 2291a(a)(4), 2346(a), 2347(a), 2348, 2349aa; *see also id.* § 2395(a) (providing that "assistance under this chapter may be furnished on a grant basis or on such terms . . . as may be determined to be best suited to the achievement of the purposes of this chapter"). That recognition supports the conclusion that any ambiguous language in the appropriations acts

must be understood to retain the Executive Branch's programmatic discretion. Rather than construing related statutes together, Plaintiffs insist that the FCAA leaves the agencies no discretion. Mem. 12-13, 17-18, 21. But Plaintiffs cannot support their apparent view that appropriations statutes, unlike every other type of statute, must be read in isolation. *See generally Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 275 (2023).

Plaintiffs further demand that this Court ignore the broader context. The appropriations at issue here touch on the sensitive subject of foreign affairs, where the President enjoys considerable authority under the Constitution and under the Foreign Assistance Act. The risk of impinging on a core executive power provides a powerful basis to sustain, not override, the Executive Branch's discretion in this area.

Indeed, that relevant discretion is only reinforced by the statutory language identified by Plaintiffs (Mem. 4), which also provides that the Executive Branch may deviate "up to 10 percent from the amounts specified" for most of the earmarked appropriations and may deviate further than that limit if particular determinations are made by the Executive Branch and reported to Congress. FCAA, div. F, § 7019(b), 138 Stat. at 772. That discretion and the reporting process underscore that Congress intended the earmarks to function as part of the inter-Branch dialogue generally contemplated by the appropriations statutes and Impoundment Control Act, rather than to generate obligations enforceable judicially by third parties.

Rather than focus on the language in the appropriations at issue, Plaintiffs note that Congress sometimes "appropriates sums 'up to' or 'not to exceed' a specified amount." Mem. 12-13. They argue the existence of this more permissive language must mean that the language here leaves no room for discretion to obligate less than the amount made available for a particular purpose. *See id.* That conclusion does not follow. This language generally imposes a cap on the

use of a lump-sum appropriation for particular purposes.  *See* GAO Red Book 6-27 to 6-29.  Like the "shall be made available" language discussed above, it thus provides Congress's views on the question of how to divide up a broader appropriation among potential objects.  It has no relevance to the separate question whether some or all of the appropriation must be spent in the first place.

There is nothing inconsistent about Congress conferring discretion with different formulations.  *See Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 222 (2009) (declining to draw negative inference based on differences in statutory language).  Differences in language and context may have significance in the proper interpretation of the statute and in the inter-Branch dialogue about appropriations, but Plaintiffs' simplistic statutory interpretation provides no basis for the injunction they seek (again).

### B.  Defendants' Conduct Was Reasonable And Reasonably Explained

For the reasons stated above, the APA's reasoned decisionmaking and other requirements cannot be applied to Defendants' conduct here, including because there is no reviewable final agency action.  But even if Plaintiffs had decisions were subject to review, they do not violate the APA.  For its part, the APA does not preclude agency understandings of the national interest and agency priorities or convenience to shift, for example, in keeping with a "change in administration brought about by the people casting their votes."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part).  Its arbitrary and capricious standard is "[h]ighly deferential," "presumes the validity of agency action," *see Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007), and directs the reviewing court not to "substitute its judgment for that of the agency," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009).

Plaintiffs also utterly disregard the established role of the Executive Branch in formulating foreign policy.  *See, e.g., Garamendi*, 539 U.S. at 414, 420; *Sale v. Haitian Ctrs. Council, Inc.*,

509 U.S. 155, 188 (1993).  Such foreign policy decisions for which the Executive (not any Plaintiff) is responsible necessarily include decisions about contracts for Government-funded activities overseas.  After all, "[p]rotection of the foreign policy of the United States[,] is a governmental interest of great importance, since foreign policy and national security considerations cannot neatly be compartmentalized."  *Haig v. Agee*, 453 U.S. 280, 307 (1981).

Instead of grappling with the foreign policy context surrounding the pertinent appropriations, Plaintiffs assert (Mem. 18-21) that Defendants failed to address "serious reliance interests" the APA requires agencies to "consider."  *See FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898, 917 (2025).  But those interests cannot be taken to include Plaintiffs' *subjective* perceptions founded on their apparent failure to appreciate the consequences of appropriations provisions and interrelated permanent FAA provisions that confer significant discretion on agencies in their funding choices.  Again, GHC Plaintiffs cannot point to any appropriations heading or other statute that expressly identifies any of them as holding a right to payment that would support the kind of reliance interests they focus on.

And, again as explained above, because Defendants are advancing in the obligations process for the majority of the pertinent expiring funds, reliance interests are not being sidestepped to a degree that could warrant extraordinary remedies such as the proposed TRO or PI.

### C.  Defendants' Conduct Does Not Support The Unreasonable Delay Claim

After months of embroiling the court in disputes about the pace of compliance with the now-vacated preliminary injunction, GHC Plaintiffs now seek to assert a claim that agency action has been "unreasonably delayed" for APA purposes, 5 U.S.C. § 706(1).  Again, although all of the APA claims on the preclusion and other grounds described above, if the Court reaches the new claim and amendment were allowed, the added claim would fail, because Plaintiffs misapply

(Mem. 21-24) relevant factors.  *See Telecomm. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) (TRAC).

The first and second factors are typically considered together and ask whether the agency's timeline conforms to a "rule of reason," a flexible assessment of the context of the agency's action. *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003). Before enjoining an agency to alter its working rate, a court must consider, in detail, the circumstances of the agency action at issue—and not just compare the alleged delay with an idealized timeframe.  *See id.*  The mere presence of a statutory timetable (Factor 2) does not supplant the overarching rule of reason (Factor 1).  *See Cutler v. Hayes*, 818 F. 2d 879, 898 (D.C. Cir. 1987).  Where "Congress deemed it unwise to impose a rigid timetable on [an agency]; [courts] are not free to ignore that judgment and rewrite the statute to include a specific timetable." *See In re Am. Fed'n of Gov't Emps.*, 837 F.2d 503, 506 (D.C. Cir. 1988).  Nor is there a "per se rule as to how long is too long to wait for agency action." *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004) (citation omitted); *see also, e.g.*, *Mashpee*, 336 F.3d at 1100-01 (vacating and remanding determination that five-year delay was unreasonable); *Grand Canyon Air Tour Coal. v. FAA*, 154 F.3d 455, 477-78 (D.C. Cir. 1998) (declining to order agency action notwithstanding a ten-year delay in issuing a rule and a 20-year delay in achieving the rule's statutory objective).

TRAC Factor 4 considers how compelling agency action would affect "agency activities of a higher or competing priority."  *TRAC*, 750 F.2d at 80; *see also Mashpee*, 336 F.3d at 1100-02 (district court erred by disregarding the importance of "competing priorities" for limited resources in finding a five-year delay in agency action constituted unreasonable delay). And "[t]he agency is in a unique--and authoritative--position to view its projects as a whole, estimate the prospects

for each, and allocate its resources in the optimal way." *In re Barr Labs., Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991). So "priority-setting in the use of agency resources . . . is least subject to second-guessing by courts." *EMR Network v. FCC*, 391 F.3d 269, 273 (D.C. Cir. 2004); *see FEC v. Rose*, 806 F.2d 1081, 1091 (D.C. Cir. 1986); *Action on Smoking & Health v. Dep't of Lab.*, 100 F.3d 991, 994-95 (D.C. Cir. 1996) (refusing TRAC relief).

TRAC Factors 3 and 5, both of which consider the nature of the interests implicated by any agency delay, overlap in this case. "The third looks to whether human health and welfare are at stake," and "the fifth assesses the nature and extent of the interests prejudiced by delay." *Ctr. for Sci. in the Pub. Int. v. U.S. Food & Drug Admin.*, 74 F. Supp. 3d 295, 304 (D.D.C. 2014) (internal quotation marks omitted). Yet "courts are not a forum for reconsidering the wisdom of discretionary decisions made by the political branches in the realm of foreign policy or national security." *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010) So the courts should not, as Plaintiffs urge here, "traverse the thicket of thorny foreign-policy issues" that "would impermissibly encroach upon the discretion that the Constitution affords the political branches to conduct foreign affairs." *Mobarez v. Kelly*, 187 F. Supp. 3d 85, 90 (D.D.C. 2016). That is especially appropriate where the Executive is in an ongoing dialogue about the program with Congress. *See, e.g.*, *Council of & for the Blind of Del. Cnty. Valley, Inc. v. Regan*, 709 F.2d 1521, 1526 (D.C. Cir. 1983) (*en banc*) (noting that "Congress' oversight function was further aided" by an annual reporting requirement--much less frequent reporting than the quarterly congressional reports required for the SIV program); *cf. Nine Iraqi Allies v. Kerry*, 168 F. Supp. 3d 268, 297 (D.D.C. 2016) ("[w]hat efforts are reasonable will depend upon 'complex concerns involving security and diplomacy' far beyond the expertise of the Court--but squarely within that of the Secretary") (citations omitted). And Factor 6 examines whether the agencies acted in good

faith. *See TRAC*, 750 F.2d at 80; *Liberty Fund, Inc. v. Chao*, 394 F. Supp. 2d 105, 120 (D.D.C. 2005).

Here, although some of the pertinent funds are expiring, there is no fixed timetable for obligating them, and although Plaintiffs have sought earlier in the suit to depict USAID guidance as requiring that contracts and grants be obligated on a particular (months-long) timetable, that is not a relevant yardstick for the current situation. Moreover, the foreign policy setting of the suit, which Plaintiffs downplay, and the engagement with Congress are factors weighing against a finding of unreasonable delay. Rather, this Court should find that Defendants' forward momentum in obligating the funds weighs in their favor. As reflected in the Lewin Declaration (filed today), consistent with their available authorities, State and USAID are making best efforts to obligate $6.5 billion of the $10.5 billion amount in expiring appropriated balances for foreign assistance by September 30, 2025. State expects to be able to obligate substantially all these funds before their expiration. Lewin Decl. ¶ 6. Based on plans approved by senior officials, agency staff are working as quickly as possible to complete necessary technical and legal steps to facilitate timely obligation of funds. Those steps include technical budget and program steps, preparation and transmission of Congressional Notifications (CNs), and negotiation of bilateral diplomatic and interagency agreements. Lewin Decl. ¶¶ 7-8.

### D. Plaintiffs' Contentions About Rescissions Are Mistaken In Any Event

Although there is no reason to reach the issue because Plaintiffs have no basis for enforcing the ICA, contrary to their contention (Mem. 26-28), the ICA does not prohibit the Executive from transmitting rescission proposals after 45 legislative days before the funds expire—which Plaintiffs refer to as a "pocket rescission."

In a "pocket rescission," funds lapse not by Presidential order, but by the text of the underlying appropriation itself enacted by Congress. Congress can, and often does, appropriate

"no year" money that does not lapse. When Congress determines to set a definite end date upon funds, that choice is Congress's, which, as discussed below, knows full well the possibility that funds that lapse may not be expended.

In arguing that what they call a "pocket rescission" is invalid and warrants relief tantamount to reinstatement of the vacated PI, Plaintiffs rely heavily on a 2018 GAO opinion which contends amounts must be made available for obligation absent Congress's approval of a rescission proposal. Mem. 27 (citing GAO, B-330330, *Impoundment Control Act—Withholding of Funds through Their Date of Expiration* 5 (Dec. 10, 2018)). GAO's 2018 opinion lacks persuasive value. "Because GAO is part of the Legislative Branch, Executive Branch agencies are not bound by GAO's legal advice." *Whether Appropriations May Be Used for Informational Video News Releases*, 2005 WL 8167269, at *1 (O.L.C. Mar. 11, 2005) (citing *Bowsher v. Synar*, 478 U.S. 714, 727-32 (1986)).

GAO's opinion does not grapple with the text and structure of the ICA and instead rests in purposive arguments, as OMB previously explained in correspondence that the 2018 GAO opinion did not properly address.[4] As OMB explained, although § 683(b) limits the President's withholding authority to 45 days of continuous Congressional session, it does not impose an additional requirement on the President to make withheld budget authority available for obligation before the end of a fiscal year. The silence in § 683(b) on when in the fiscal year the President may propose rescissions and withhold budget authority stands in stark contrast to § 684, which governs Presidential deferrals of funds. That authority allows the President to delay the obligation or outlay of budget authority for certain statutorily prescribed reasons, but not beyond the end of

---

[4] *See generally* Letter from Mark R. Paoletta, General Counsel, OMB, to Tom Armstrong, General Counsel, GAO (Nov. 18, 2018), *available at* https://trumpwhitehouse.archives.gov/wp-content/uploads/2019/11/Letter-to-GAO-on-Rescissions.pdf (2018 OMB Ltr.).

the fiscal year. Section 684(a) provides that a "deferral may not be proposed for any period of time extending beyond the end of the fiscal year in which the special message proposing the deferral is transmitted to the House and the Senate." 2 U.S.C. § 684(a). Thus, the ICA's text shows that Congress considered the possible effects of withholding funds close to the end of the fiscal year and decided to limit such withholdings only for deferrals, not for rescissions. Additionally, § 684(c) provides that the deferral requirements "do not apply to any budget authority proposed to be rescinded . . . under" § 683. The requirements imposed in § 684 do not apply to funds withheld pursuant to § 683. And as OMB further explained, the absence of a statutory requirement that the President make withheld budget authority available for obligation before the end of a fiscal year is confirmed by historical examples of presidentially-proposed rescissions sent to Congress late in the fiscal year, where funds were withheld for the statutorily permitted period of 45 days, even when that period extended further than the end of a fiscal year and the funds lapsed. *See* 2018 OMB Ltr. at 3-4. [5]

Indeed, GAO previously acknowledged that the ICA allows for such rescissions, noting that withholdings for the 45-day period following a special message are within the President's authority under the statute. [6] GAO's December 1975 opinion notably cited a 1975 Senate report

---

[5] GAO's opinion also fails to grapple with the ICA's development. In 1987, Congress amended the ICA to address court opinions invalidating the legislative veto. Pub. L. 100–119, title II, §207, Sept. 29, 1987, 101 Stat. 786. Congress restored the deferral provision without the legislative veto, but tightened the reasons for which the President can defer funds. Congress also amended the rescissions provision to prohibit the same funds from being proposed for rescission twice. Despite being aware of the possibility of a "pocket recission," Congress did nothing to address it in those amendments.

[6] *See* GAO B-115398 (Aug. 12, 1975) (conceding the President may transmit special messages to withhold the budget authority near their date of expiration for the duration of the 45-day period, and opining that Congress must take affirmative action to prevent the withheld funds from expiring); *see also* GAO B-115398 (Dec. 15, 1975) (same); GAO B-115398 (Aug. 27, 1976) (noting that withheld funds may expire, without stating whether the funds were properly withheld

recognizing that the ICA allows for funds to lapse if a recission package is sent to Congress within 45 days of the end of the fiscal year. G-115398 (citing S. Rep. No. 94-403 (1975)). The opinions GAO issued shortly after the ICA's enactment carry much greater weight than GAO's 2018 about-face. And Congress too continues to recognize that the ICA allows for "pocket rescissions." As recently as 2023, members of Congress have introduced legislation to expressly prohibit pocket rescissions by foreclosing any withholding of budget authority pursuant to the ICA within 90 calendar days of the date of expiration of such budget authority. *See* Protecting Our Democracy Act, H.R. 5048, 118th Cong. § 501 (2023); *see also* Protecting Our Democracy Act, H.R. 5314, 117th Cong. § 501 (2021); 167 Cong. Rec. H7593 (daily ed. Dec. 9, 2021) (statement of Rep. Jackson Lee) (H.R. 5314 "would restore Congress' central role in funding decisions by preventing the President from effectively rescinding funds without congressional approval; . . . whether or not the funding is part of a Presidential rescission or deferral request; and closing a budget law loophole that essentially lets the President unilaterally block the spending of enacted appropriations designated as emergency"); Congressional Power of the Purse Act, H.R. 6628, 116th Cong. § 101 (2020) (attempting to require OMB to release funding to agencies at least 90 days before the funding expires). Those proposed statutes, which Congress *did not* enact, show Congress has recognized the possibility of a pocket rescission, and Congress has not taken action to prevent them.

Rather, where Congress explicitly sought to avoid expiration of time-limited appropriated funding, it has utilized other mechanisms—for example, extending the period of availability of expiring appropriations. *See, e.g.*, Continuing Appropriations Act, 2023, Pub. L. No. 117-180,

---

or reporting that they must be made available for obligation); GAO B-115398 (Oct. 26, 1977) (similar); GAO B-220532 (Sept. 19, 1986) (reclassifying deferral as rescission proposal, recognizing potential for funds to expire before being able to be obligated for intended purpose).

div. A., § 124, 136 Stat. 2114, 2120 (2022); Continuing Appropriations Act, 2020, Pub. L. No. 116-59, div. A, § 124, 133 Stat. 1093, 1098 (2019).  Congress thus knows exactly how to prevent funds from lapsing (in addition to making funds "no year" at the outset).

GAO's contention that the Supreme Court's invalidation of the line-item veto mandates abandoning its decades long recognition that the ICA authorizes "pocket recissions" is also unpersuasive.  The Court addressed a statute that authorized the President to "cancel in whole" "provisions that have been signed into law." *Clinton v. City of New York*, 524 U.S. 417, 436 (1998). That violated the Presentment Clause because it authorized the President to "amend or repeal properly enacted statutes." *Id.* at 442. In a "pocket recission," by contrast, the funds lapse via operation of statutes that Congress enacted—the ICA, which authorizes the withholding of funds while Congress considers a recissions package, and the underlying appropriation provision, which provides that the funds lapse on September 30.

In light of that history, this Court should not infer that Congress intended to preclude the Executive from exercising a pocket rescission.  A court does not "lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply," and that "reluctance is even greater when Congress has shown elsewhere. . . that it knows how to make such a requirement manifest." *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005).

## III.    THE MANDAMUS CLAIM FAILS

In rejecting the *ultra vires* claim advanced to support the vacated preliminary injunction, the Court of Appeals recognized that Plaintiffs cannot show that Defendants have taken any action entirely in excess of their powers and contrary to a specific statutory prohibition.  *GHC*, 2025 WL 2480618, at *12.  A very similar flaw undercuts their mandamus claim.  Mem. 24-25.  Mandamus is "one of the most potent weapons in the judicial arsenal," *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004), "to be invoked only in extraordinary circumstances," *Power v. Barnhart*,

292 F.3d 781, 784 (D.C. Cir. 2002).  The mandamus plaintiff must show "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff." *In re Nat'l Nurses United*, 47 F.4th 746, 752 n.4 (D.C. Cir. 2022).

*First*, Plaintiffs do not have a clear right to relief.  28 U.S.C. § 1361 provides "original jurisdiction" in this Court "of any action in the nature of mandamus to compel" a Federal officer "to perform a duty *owed to the plaintiff*" (emphasis added).  But the purported duty owed to the particular Plaintiff before the Court must "be clear and compelling." *13th Regional Corp. v. Dep't of the Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980).  Here, Plaintiffs do not identify appropriations statutes that impose an enforceable duty to them as private plaintiffs, where no statute requires that the Government direct foreign assistance funds to them.  *See* Point II.A, *supra*.

*Second*, Defendants do not have a clear duty to act.  Mandamus is "inappropriate except where a public official has violated a 'ministerial' duty." *Consol. Edison Co. v. Ashcroft*, 286 F.3d 600, 605 (D.C. Cir. 2002); *see Wilbur v. United States ex rel. Kadrie*, 281 U.S. 206, 218-19 (1930).  But the challenged actions here are not ministerial duties, given the Executive Branch's constitutional and statutory discretion in making foreign assistance funding decisions as described above.  For example, the ICA "does not impose any specific requirements on the Executive Branch as to the rate at which budget authority must be obligated or expended." *In re Henry M. Jackson*, U.S. Senate, B-200685, 1980 WL 14499 (Comp. Gen. Dec. 23, 1980).

## IV.    THE REMAINING PRELIMINARY INJUNCTION FACTORS COUNSEL AGAINST RELIEF

Plaintiffs fail to reconcile their remaining arguments for injunctive relief either with the Court of Appeals' denial of relief or with the current circumstances, where Defendants are in the process of obligating substantial amounts of pertinent expiring funds.

For its part, in weighing Plaintiffs' asserted harms against Defendants' harms, the recent decisions of the D.C. Circuit are instructive if not binding. The Court of Appeals accelerated issuance of the mandate. And the panel opinion concluded Plaintiffs' showing of harm was not sufficient. That evidently reflects a balancing of the equities in favor of allowing Defendants the benefit of certainty from vacatur of the preliminary injunction.

Indeed, Plaintiffs' asserted harms at this stage, economic in character, are not irreparable. It is "well settled that economic loss does not, in and of itself, constitute irreparable harm." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015). "Financial injury is only irreparable where no 'adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation.'" *Id*. In that regard, Plaintiffs err in assuming that they will not economically benefit from the current obligation plans on which Defendants are taking further steps, such as where recipients of obligated funds enter into downstream contracts or grants with Plaintiffs. The declarations in support of the motion address the hypothetical circumstance "[i]f the expiring appropriations are not spent," but do not address the reality that many appropriations are being obligated before expiration. *See*, *e.g.*, ABA Decl. ¶ 9 (Doc. 133-4); Chemonics Decl. ¶¶ 10, 12 (Doc. 133-5); DAI Decl. ¶¶ 9, 11 (Doc. 133-6).

The other factors weigh decisively against granting Plaintiffs the extraordinary remedies sought.

*First*, Plaintiffs seek to expose the Government to the risk of contempt proceedings and other sanctions over all foreign assistance award-administration matters. They totally disregard both the clear injury to the agencies' ability to effectuate Executive Branch policy, as well as the substantial and irreparable harm to the public fisc from allowing massive sums to be paid out to Plaintiffs on agreements the Executive Branch has determined are inconsistent with agency

priorities and with the national interest, where agencies are striving to proceed in a manner that ensures accountability and effective expenditure of taxpayer dollars. Nor do Plaintiffs address the risk that sums paid out to Plaintiffs will not be recoverable later, particularly given that the Plaintiffs have not alleged they are able to satisfy the security posting requirement of Federal Rule of Civil Procedure 65(c). *Cf. California*, 145 S. Ct. at 968-69 (Government showed irreparable harm where "respondents have not refuted the Government's representation that it is unlikely to recover the grant funds once they are disbursed").

Plaintiffs would install the Court as an ongoing monitor of foreign assistance funding. That would disrespect the role of the President in foreign affairs and would flout the separation of powers, which assigns to the President the "lead role" and "'vast share of responsibility for the conduct of our foreign relations.'" *Garamendi*, 539 U.S. at 414-15. It would also truncate the prerogatives of Congress and determine foreign policy decisions that have "long been held to belong in the domain of political power not subject to judicial intrusion or inquiry." *Chicago & So. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 111 (1948).

*Second*, extending relief to nonparties would violate the teaching (noted above in addressing Article III standing) that judicial remedies "must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). Relief as to nonparties in this action would find no mooring in any pertinent statutes. To the contrary, various provisions of the foreign assistance statutes confer marked discretion on Executive Branch agencies and the President in developing programs and, as appropriate, selecting awardees of foreign assistance funds. *See, e.g.*, 22 U.S.C. § 2151t(a).

In challenges to agency action, the D.C. Circuit has explained that "[j]udicial remedies should be 'no more burdensome to the defendant than necessary to provide complete relief' to the

plaintiffs or petitioners." *See Bd. of Cnty. Comm'rs of Weld Cnty., Colorado v. EPA*, 72 F.4th 284, 296 (D.C. Cir. 2023) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979), and further quoting *California v. Texas*, 593 U.S. 659, 672 (2021), for teaching that "remedies operate with respect to specific parties rather than on legal rules in the abstract") (citation modified)).  And as the Supreme Court has now made plain, "[u]nder" the complete-relief principle, "the question is not whether an injunction offers complete relief to *everyone* potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief to *the plaintiffs before the court*."  *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2557 (2025).

In that regard, the overbreadth of the requested remedy even as to the Plaintiffs before the Court is apparent from their own submissions, which assert they are willing and able to compete for *many more* contracts and grants that would obligate FAA funds than Plaintiffs historically have operated, even though they supply few facts from which to infer that they could capably perform on such contracts and grants if they obtained those awards.  *Compare* Ex. A (awards Plaintiffs posit they would compete for) (Doc. 133-2) *with* Ex. B (Doc. 133-3) (Plaintiffs' historical awards).  To tailor relief consistent with Article III, the focus must be on those awards Plaintiffs have received historically, not their speculations.  Relief beyond that would exceed "the inadequacy that produced [Plaintiffs'] injury in fact," *see Lewis v. Casey*, 518 U.S. 343, 357 (1996), and would be "more burdensome to the defendant than necessary" to redress Plaintiffs' asserted injury, *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

Moreover, at a minimum, if the Court finds Plaintiffs have met their burden at the TRO or PI stage on their purported APA claim, the APA itself, and respect for the Executive Branch's role in foreign relations and national security affairs, would require *limiting* the remedy to an ordinary

remand directing the agencies to provide additional explanation for their decisions. *See, e.g.*, *Wages & White Lion*, 145 S. Ct. at 928. Given that less burdensome remedy, there would be no basis for the requested orders entangling the court in disputes over the process by which Defendants are obligating expiring funds—let alone disputes over the funds proposed to be rescinded via the President's special message.

*Third*, it bears emphasis that any requested equitable and declaratory relief is categorically unavailable against the President. *See J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *13 (D.C. Cir. Mar. 26, 2025) (Millet, J., concurring). Although courts of equity may in some circumstances permit suits to "enjoin unconstitutional actions by . . . federal officers," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015), the availability of such relief depends on whether it "was traditionally accorded by courts of equity," *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). There is no such tradition of equitable relief against the President. Courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Mississippi*, 71 U.S. at 501. Reaffirming that principle, *Franklin*, 505 U.S. at 800-01, declined to construe the APA to supply a cause of action against the President "[o]ut of respect for the separation of powers and the unique constitutional position of the President." Nor could Plaintiffs' invocation of the Declaratory Judgment Act warrant issuance of a declaration in lieu of an injunction: Courts "have never submitted the President to declaratory relief." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010). Declaratory relief is therefore unavailable for essentially the same reasons that any injunction would be unavailable against the President.

V.      **THE SUMMARY JUDGMENT MOTION SHOULD IN ANY CASE BE DENIED OR STAYED AS PREMATURE**

GHC Plaintiffs purport to bring an APA case, which requires that review be based solely on an administrative record that Defendants have not yet produced, and yet they seek summary judgment concurrently with the filing of their motion for leave to file an amended complaint and their motion for a TRO and PI.  This Court has broad discretion to "determine the order in which [this] civil action[]" is "heard and determined," 28 U.S.C. § 1657(a); *see also McGehee v. U.S. Dep't of Justice*, 362 F. Supp. 3d 14, 18 (D.D.C. 2019).  It should exercise that discretion to deny or stay the summary judgment motion as premature.  Plaintiffs seek summary judgment (Mem. 33-34) while failing to acknowledge that to reach final judgment on an APA claim the court "shall review the whole record or those parts of it cited by a party."  5 U.S.C. § 706.

As the Advisory Committee on Civil Rules has recognized, "in many cases [a] motion [for summary judgment] will be premature until the nonmovant has had time to file a responsive pleading or other pretrial proceedings have been had."  Fed. R. Civ. P. 56, Advisory Committee Note (2010).  Here, not only does the APA basis for the stated claim support postponing a summary judgment decision, but Defendants have previously moved to dismiss GHC Plaintiffs' First Amended Complaint on multiple grounds, which is a further reason "to adhere to the traditional civil litigation sequence," in which a ruling on a motion to dismiss is followed by production of an administrative record, "and only then does the Court consider motions for summary judgment." *G.Y.J.P. ex rel. M.R.P.S. v. Wolf*, 2020 WL 4192490, at *2 (D.D.C. July 21, 2020).  Plaintiffs have no basis for discarding that traditional sequence here, and denying or "staying further briefing" on their premature "motion will allow the parties to avoid the unnecessary expense, the undue burden, and the expenditure of time to brief a motion that the Court may not decide," as well as "allow the

Court to manage the orderly disposition of this case." *Furniture Brands, Int'l, Inc. v. U.S. Int'l Trade Comm'n*, 2011 WL 10959877, at *1 (D.D.C. April 8, 2011).

## CONCLUSION

For the reasons stated, GHC Plaintiffs' motions for interim relief and summary judgment should be denied in full.

Dated: August 31, 2025          Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General, Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General, Civil Division

ALEXANDER K. HAAS
Director

*/s/ Indraneel Sur*
INDRANEEL SUR (D.C. Bar No. 978017)
Senior Counsel
JOSHUA N. SCHOPF
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Phone: (202) 616-8488
Email: Indraneel.Sur@usdoj.gov

*Counsel for Defendants*