**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

GLOBAL HEALTH COUNCIL, *et al.*,

        *Plaintiffs*,

   v.

DONALD J. TRUMP, *et al.*,

        *Defendants*.

Civil Action No. 25-cv-402 (AHA)

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING
ORDER, PRELIMINARY INJUNCTION, AND PARTIAL SUMMARY JUDGMENT**

## INTRODUCTION

Defendants' opposition makes clear the need for urgent relief. Regarding the more than $4 billion in appropriations included in the rescission proposal, Defendants do not dispute that USAID and the State Department have decided not to obligate those funds by September 30. That final decision violates the 2024 Appropriations Act and other relevant appropriations acts.

Defendants' main response—that Plaintiffs cannot challenge the President's special message or enforce the ICA—distorts Plaintiffs' claims. Plaintiffs' claims are that the 2024 Appropriations Act and prior appropriations acts require the agencies—USAID and the State Department—to obligate specific amounts for specific purposes by September 30, and that these requirements remain binding unless and until Congress enacts new legislation amending or repealing these appropriations laws.

It is the government that relies on the rescission proposal, as a defense to Plaintiffs' claims, asserting that the President's special message lifts the agencies' mandate to obligate the funds, or even prohibits the agencies from doing so. But Defendants' brief lays bare the lack of any legal foundation for this theory. Defendants do not point to *any* statutory text stating that agencies need not obligate funds included in a rescission proposal. The ICA in fact provides the opposite: "[n]othing contained in [the ICA] . . . supersed[es] any provision of law which requires the obligation of budget authority." 2 U.S.C. § 681(4).

As for the other expiring funds from the 2024 Appropriations Act, Defendants assert, for the first time in the six months since this Court's March 10 preliminary injunction, that they plan to obligate them. But their submission strongly suggests that they do *not* intend to obligate those funds in the amounts that Congress required for specific purposes. The Court should require Defendants to immediately provide further information relevant to this issue, as described below.

Finally, Defendants fail to respond to Plaintiffs' claims regarding expiring funds from appropriations acts prior to 2024, even though there are likely substantial amounts remaining from prior acts that will expire on September 30, 2025. This, too, suggests that Defendants do not intend to obligate these funds as legally required. The Court should require basic answers about Defendants' intentions with respect to these funds as well.

## ARGUMENT

I.    **Defendants Appear to Admit that They Will Not Comply with the 2024 Appropriations Act for the Funds That They Purportedly Will Obligate, and Will Not Obligate Expiring Funds from Prior Acts**

The Further Consolidated Appropriations Act of 2024 (the "2024 Appropriations Act") and prior appropriations acts require not only that Defendants obligate the relevant funds, but also that they obligate them for specific purposes. ECF No. 133-1 ("Mem.") 11–13. As explained, Sections 7030 to 7061 specify that "not less than" particular amounts "shall be made available" for particular purposes, and Section 7019(a) mandates that foreign assistance funds "shall be made available in the amounts specifically designated" in the tables appended to the Act. *See* Pub. L. No. 118-47, div. F, tits. II–III, 138 Stat. 460, 740–49, 771 (2024).

Defendants' brief strongly suggests that they will not comply with these requirements for the $6.5 billion in expiring funds from the 2024 Appropriations Act that they purportedly intend to obligate, and that they will not obligate expiring funds from prior appropriations acts at all. With respect to the 2024 Appropriations Act funds, Defendants contend that Section 7019(a) does "*not . . .* direct[] the Executive Branch to spend all of the appropriated funds" specified in the tables, that the amounts listed in the table are merely a "ceiling" on how much they may spend for the designated purposes, and that they retain wide discretion to spend less than those amounts. Opp. 22. As for the directives in Sections 7030 to 7061 to obligate "not less than" certain amounts for specific purposes, Defendants ignore these provisions entirely, and instead

2

assert that the 2024 Appropriations Act contains no "unequivocal commands" to spend specific funds. Opp. 19. The clear inference from these positions that Defendants do not intend to comply with the directives in the tables or Sections 7030 to 7061.

Defendant Lewin's declaration is consistent with this understanding. He asserts that he and Secretary Rubio have approved allocations "to specific purposes and programs," Lewin Decl. ¶ 7, but does not state that those funds are being allocated *for the specific purposes and programs* that Congress required in the appropriations acts, including in Sections 7019(a) and 7030 through 7061. This omission, coupled with Defendants' legal argument that Sections 7019(a) and 7030 through 7061 are not mandatory, makes it reasonable to conclude that Defendants are not complying with their obligations under the 2024 Appropriations Act.

As for expiring funds from earlier appropriations acts, Defendants are conspicuously silent—even though Plaintiffs expressly addressed these funds in their motion. There are likely substantial funds from prior appropriations acts set to expire on September 30. For instance, all recent foreign operations appropriations acts have provided (in Section 7011) that "foreign assistance funds shall remain available for an additional 4 years from the date on which the availability of such funds would otherwise have expired, if such funds are initially obligated before the expiration of their respective periods of availability contained in this Act." *See, e.g.*, Pub. L. 116-94 § 7011, 133 Stat. 2848 (2019) (the "2020 Appropriations Act"). USAID and the State Department frequently use this "de-obligation/re-obligation" authority. Thus, money appropriated in the 2020 Appropriations Act that was originally set to expire on September 30, 2021, which was obligated before that date and then de-obligated, will expire on September 30, 2025. The 2020 Appropriations Act requires Defendants to obligate these expiring funds in the amounts and for the purposes specified in the bill before the funds expire. Yet Defendants' brief

and the Lewin declaration are devoid of any statement that Defendants intend to obligate these expiring funds.

Thus, notwithstanding Defendant Lewin's declaration, Plaintiffs remain likely to succeed on their claims with respect to expiring funds beyond those included in the rescission proposal (and Plaintiffs are likely to succeed with respect to the funds in the rescission proposal as well). *See infra* Section II. But to the extent there is any question about Defendants' intent, the Court should require Defendants to immediately disclose further information relevant to Defendants' assertions, either as part of the injunction or in advance of issuing the injunction. Alternatively, the Court could authorize Plaintiffs to submit a small number of interrogatories for this information.[1]

Specifically, Defendants should be required to identify or explain: (i) all of the funds from the 2024 Appropriations Act and prior appropriations acts that are expiring on September 30, 2025, broken down by category and subcategory; (ii) the "specific purposes and programs" for which Defendants have approved plans for obligation, Lewin Decl. ¶ 6; (iii) whether or not they intend to obligate expiring amounts for the specific purposes listed in the tables appended to the 2024 Appropriations Act, in the amounts specifically designated in the tables; (iv) whether or not they intend to obligate "not less than" the minimum amounts that Sections 7030 to 7061 require be obligated for specific purposes; and (iv) whether or not they intend to obligate expiring amounts from previous appropriations acts.

Moreover, Defendants should identify basic information about the "bilateral and diplomatic interagency agreements" through which they intend to obligate funds. For the

---

[1] If Defendants do not provide adequate information, Plaintiffs reserve the right to immediately seek a deposition or live testimony from Lewin, given that he has voluntarily submitted another declaration.

"interagency agreements" in particular, there is no reason Defendants cannot name the agency or agencies that will be part of these agreements, the amounts that will be obligated through the agreements, and the purposes for which the amounts will be obligated.[2]

## II.    Plaintiffs Are Likely to Succeed on the Merits

### A.    Plaintiffs Allege Violations of the Appropriations Acts, Not the ICA

Plaintiffs' claims for violations of the appropriations acts are straightforward. The 2024 Appropriations Act and prior acts mandate that Defendants obligate specific amounts of money, for specific purposes, by a specific date (September 30, 2025). These appropriations acts are duly-enacted laws like any other, and Defendants' duty to comply with these laws remains unless and until Congress enacts new legislation amending or repealing these laws.

Defendants mischaracterize Plaintiffs' claims as alleging violations of the ICA and as an attempt to "circumvent" the panel decision. *See* Opp. 13–14. Plaintiffs' contrary-to-law claims under the APA allege violations *only* of the 2024 Appropriations Act and prior appropriations acts. And the panel significantly amended its opinion to leave open the APA claims that Plaintiffs now assert, and members of the *en banc* court denied rehearing specifically to enable Plaintiffs to pursue these claims expeditiously. *See* Pls.' Mot. at 10–11

Contrary to Defendants' assertions, Plaintiffs do not allege any violations of the ICA and its requirements. Plaintiffs do not challenge or "seek to nullify" "the President's special message," do not "assert[] that Defendants have not complied with ICA requirements by

---

[2] The imperative for Defendants to provide additional information as to their plans is heightened given Lewin's assertion that the State Department will obligate $6.5 billion without any competition. That is unprecedented, and it is difficult to understand how Defendants could do so without violating federal statutes and regulations that require full and open competition, and that preclude agencies from bypassing that competition requirement based on lack of advanced planning. *See* 41 U.S.C. § 3304(e)(5); 48 C.F.R. § 6.301(c). Given the unprecedented nature of the obligation process that Lewin suggests, and Defendants' desire throughout this case to avoid obligating funds for their intended purposes, it cannot simply be accepted on faith that Defendants can and will lawfully obligate billions of dollars in the manner they suggest.

effectuating a so-called pocket-rescission," and do not "assert[] that Defendants are 'violating the ICA.'" *Contra* Opp. 13, 16. The ICA is relevant to Plaintiffs' motion only insofar as *the government* raises it as a *defense* to the alleged violations of the 2024 Appropriations Act and prior appropriations acts, by arguing that the President's submission of the special message renders "[t]he funds within the rescission proposal . . . not available for obligation." *Id.* at 8.

## B.    The Impoundment Control Act Does Not Preclude APA Review

Defendants contend that the ICA "precludes judicial review" of Plaintiffs' claims. But that argument rests on Defendants' mischaracterization of Plaintiffs' claims as alleging violations of the ICA. But as explained, Plaintiffs' claims allege violations of the appropriations acts. Defendants offer no argument for why the ICA would preclude review of those claims.

Nor could they. 2 U.S.C. § 681(3) provides: "Nothing contained in [the ICA] … shall be construed as … affecting in any way the claims or defenses of any party to litigation concerning any impoundment." Defendants conceded in opposing *en banc* rehearing at the D.C. Circuit that this provision and cases such as *Train v. City of New York*, 420 U.S. 35 (1975), establish that the ICA does not prohibit private plaintiffs from bringing APA claims for violations of appropriations acts. Defendants expressly stated that "a court could enjoin a refusal to spend appropriated funds where the relevant statutes required that the funds be spent," and that "[n]either the ICA, nor the panel's ruling . . ., affects any 'preexisting right' that 'injured private parties' may have to enforce statutory obligations through a suit under the APA." *En Banc* Resp. at 15–16, No. 25-5097 (Aug. 20, 2025). Defendants were correct then and are incorrect now.

## C.    Plaintiffs Are Within the Zone of Interests of the Appropriations Laws

Plaintiffs also fall squarely within the zone of interests of the appropriations laws. *Contra* Opp. 14–15. "The zone of interests test does not require that the statute directly regulate the plaintiff, nor does it require specific congressional intent to benefit the plaintiff." *CSL Plasma*

*Inc. v. CBP*, 33 F.4th 584, 589 (D.C. Cir. 2022). Plaintiffs' injuries need only be "*arguably within the zone of interests to be protected or regulated by the statute.*" *Id.* (emphasis added) (quotation marks omitted). "A plaintiff may sue under the APA unless her interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *FDA v. R.J. Reynolds Vapor Co.*, 145 S. Ct. 1984, 1991 (2025) (quotations omitted). This test is "not especially demanding," *id.* (quotations omitted), and indeed is a "'lenient' test," *CSL Plasma*, 33 F.4th at 589 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014)). And "the benefit of any doubt goes to the plaintiff." *Lexmark*, 572 U.S. at 130.

Plaintiffs' injuries—namely, their inability to compete for foreign assistance funds that Defendants are refusing to make available—are not "marginally related" to the purposes of the appropriations law, *FDA*, 145 S. Ct. at 1991, but rather squarely fall within the zone of interests of the appropriations laws. *CSL Plasma* is instructive. There, a group of companies that collect and process blood plasma for medical use challenged a CBP policy that barred B-1 visa holders from crossing the U.S.–Mexico border to donate plasma for a monetary stipend. 33 F.4th at 586–88. The D.C. Circuit held that the companies fell within the Immigration and Naturalization Act's zone of interests—notwithstanding the fact that such companies are not regulated by that statute—because the companies "depend[ed] heavily on B-1 visitors in the border region" and had made substantial "investments in reliance on the large number of Mexicans who cross the border to sell plasma." *Id.* at 590–91.

Like the plasma companies in *CSL Plasma*, Plaintiffs here depend on, and have organized their businesses in reliance of, the availability foreign assistance funds that Congress required Defendants to make available for obligation. It does not matter that Plaintiffs are not the direct "object of … regulatory action" or that no statute "requires" the government to take action

benefitting Plaintiffs specifically. Opp. 15. The same was true of the plasma companies. *See CSL Plasma*, 33 F.4th at 590–91. If anything, the appropriations laws here have an even more direct relationship to Plaintiffs' businesses. Congress has organized the federal government's foreign assistance programs around partnerships with organizations like Plaintiffs, who use appropriated funds to implement congressionally mandated programs. SAC ¶ 30 (ECF No. 132-2). There is no question that Plaintiffs' "interests are such that they in practice can be expected to police the interests that the [appropriations law] protect[]." *CSL Plasma*, 33 F.4th at 589.

**D.    Plaintiffs Are Likely to Succeed on Their § 706(2) Claims**

*1.    <u>The Agencies' Decision Not to Obligate the Funds is Final Agency Action</u>*

The decision by USAID and the State Department not to spend all of the appropriated funds for the specific purposes mandated by Congress is "final" and sufficiently "discrete" for purposes of the APA because it is "definitive and has a direct and immediate effect on [Plaintiffs'] day-to-day business." *Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003) (cleaned up); *see* Mem. 15–18.[3]

Defendants do not dispute that USAID and the State Department have conclusively decided not to obligate the approximately $4 billion in expiring appropriations identified in the special message via a pocket rescission. Defendants appear not to dispute that that decision is final and discrete. Instead, Defendants contend that "[t]he President's special message … is not subject to … the APA because the President is not an agency within the meaning of the APA." Opp. 14. But this contention misunderstands Plaintiffs' claims. Plaintiffs are not challenging the special message or seeking to "review[]" or "nullify" it. Opp. 14. Plaintiffs challenge the

---

[3] Plaintiffs do not need to identify any final and discrete agency action to state a claim under 5 U.S.C. § 706(1) for agency action unlawfully withheld or unreasonably delayed. *See Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001).

decisions by the agencies—USAID, the State Department, and OMB—not to apportion and obligate these funds, even though the 2024 Appropriations Act and prior appropriations acts require them to do so. The President is free to send his special message, which merely "*proposes*" rescissions, and Congress is free to enact (or not enact) that proposal. 2 U.S.C. § 683(a)(1) (emphasis added). But unless and until Congress does so, the appropriations laws require USAID and the State Department to obligate the expiring funds. Plaintiffs challenge USAID, the State Department, and OMB's refusal to comply with the appropriations laws.

Defendants are likewise incorrect that the agencies' decision cannot be challenged because "[a]gencies lack the power to disagree with the President[]," and they must "respect the special message by withholding the funds from obligation." Opp. 16. To start, nothing in the special message directs or requires the agencies not to spend the funds. *See* ECF No. 129. The special message merely contains a proposal to Congress. And even if the President had directed the agencies not to obligate the funds, this is not a situation where the agencies are "implementing determinations that Congress has vested directly in the President." Opp. 16. Congress holds the constitutional power of the purse and has not vested in the President any authority to unilaterally rescind (or refuse to obligate) appropriated funds. *See infra* Section II.A. Moreover, agency action taken to implement presidential directives remains reviewable under the APA, except in narrow cases where "the President has final constitutional or statutory responsibility for the *final step* necessary for the agency action directly to affect the parties." *Chamber of Com. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996); *see, e.g.*, *East Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1236–37, 1251–52 (9th Cir. 2018); *Sherley v. Sebelius*, 689 F.3d 776, 780, 784–85 (D.C. Cir. 2012). Here, the President has neither constitutional nor statutory responsibility for the final step necessary to obligate or not obligate appropriations.

As for the expiring funds not proposed for rescission, including but not limited to the remaining $6.5 billion in expiring appropriations from the 2024 Appropriations Act, Plaintiffs challenge Defendants' decision not to obligate the full amount of those funds in the amounts Congress mandated for specific purposes and programs. As explained, Defendants have indicated that they will not comply with these requirements, and that decision too is final and discrete. Defendants are incorrect that Plaintiffs' APA claim is "an amorphous, roving challenge to the entirety of USAID's and State's systems of obligating funds." Opp. 18. Plaintiffs simply seek to enforce the appropriations laws' discrete requirements that Defendants obligate specific amounts of money for specific purposes. Plaintiffs' challenge is about *whether*—not *how*—Defendants will obligate the required amounts for the required purposes.

### 2. *Defendants' Decision Not to Obligate the Funds Is Contrary to Law*

The agencies' decision not to obligate the amounts specified in the 2024 Appropriations Act and prior appropriations acts, for the purposes specified, is contrary to those laws. Although Defendants dispute that these appropriations acts require them to obligate the full amounts appropriated, the contours of Defendants' position are unclear. They assert that "*many* of the appropriations provisions on which Plaintiffs have relied simply permit but do not require the Executive Branch to spend funds." Opp. 19 (quotations and alterations omitted) (emphasis added). But they do not identify *which* appropriations are among the "many" that are purportedly permissive. Does the 2024 Appropriations Act require USAID and the State Department to spend the full amounts appropriated for Development Assistance or Democracy Programs, the two main categories included in the recent rescission proposal? 138 Stat. at 742–43. Or what about the more than $10 billion appropriated for Global Health Programs? *Id.* at 740–42. Despite insisting that "each appropriation must be analyzed individually," Opp. 21, Defendants present no such individualized analysis. Plaintiffs and the Court are left to guess as to the features of an

10

appropriation that Defendants believe make one optional versus required, and as to Defendants' views as to the status of each appropriation at issue in this case.

The fact is that all of the relevant appropriations here require Defendants to obligate the full amounts appropriated. Start with the provisions within Section 7030 to 7061 specifying that "not less than" a particular amount "shall be made available" for a particular purpose. Defendants ignore these provisions, which require Defendants to obligate minimum amounts of funds for specific purposes.

Section 7019(a) similarly requires that funds appropriated in the 2024 Appropriations Act "shall be made available in the amounts specifically designated" in the tables appended to the act, for the particular purposes enumerated in each line of the tables. 138 Stat. at 771. Defendants acknowledge that "[t]hose provisions reflect Congress's desire to designate different portions of the top-line foreign-assistance appropriations for particular purposes," but then assert that these provisions are not "aimed at . . directing the Executive Branch to spend all the appropriated funds." Opp. 22. Defendants' assertion is irreconcilable with the plain text of the statute. A mandate to make funds available in "amounts specifically designated" is a directive to spend specific amounts of funds. For that same reason, Defendants' citation (at 22) to the GAO Redbook that the phrase "shall be available" can sometimes be ambiguous is inapt; the language here is "shall be *made* available"; and the funds shall be made available in precise dollar "amounts specifically designated." There is no ambiguity that the Executive "shall" "ma[k]e" these funds available in these "amounts."

Defendants point to Section 7019(b), which provides that they "may only deviate up to 10 percent from the amounts specifically designated in the respective tables." That language only makes their duty to spend even clearer. For the line items in the tables (except for those under Global Health programs and certain funds under the Economic Support Fund, for which the

agencies may deviate less, *see* §§ 7019(d)(2)–(3)), USAID and the State Department must spend at least 90% of the dollar amount listed on the relevant line of the table, and may not "deviate" more than that absent certain congressional notifications that have not happened here.

In any event, for all of the funds appropriated in the relevant fifteen categories in Titles III and IV, Congress's appropriation is a mandate that the agency obligate the full amounts provided for that category. Defendants' contrary suggestion—that appropriations are only a ceiling and provide the Executive discretion to spend less—is a radical theory that was soundly rejected fifty years ago. As Plaintiffs' explained in their opening brief, it is long-settled—and is Circuit precedent—that absent an express indication to the contrary, an appropriation requires that the Executive Branch spend "the full amount appropriated by Congress for a particular project or program." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013). Neither the President nor an agency has "unilateral authority to refuse to spend the funds." *Id.*

Defendants' contrary view revives the position advanced by the Nixon administration, which Congress rejected in the ICA. As Plaintiffs have explained, the ICA codified into law "the premise" that an appropriations act requires the Executive to obligate the full amount appropriation. Mem. 10 (quoting B-329092 (Dec. 12, 2017)). That the ICA confirms the proper interpretation of the 2024 Appropriations Act does not make Plaintiffs' claim one under the ICA. *Cf.* Opp. 13. It confirms that the text of one statute (the ICA) is helpful in understanding the proper construction of the different statutes upon which Plaintiffs base their claims (the 2024 Appropriations Act and prior appropriations acts). And the ICA is not even necessary to reject Defendants' interpretation of the appropriations acts. It is independently dispositive that Congress uses express discretionary language—appropriating "up to," "not to exceed," or "sums not exceeding" an amount—when it wishes to give agencies discretion to spend less than the amount appropriated, and Congress did not use any of that language in the appropriations here.

12

Defendants offer no explanation for why Congress would use this discretionary language to "impose[] a cap," Opp. 23, when in their view an appropriation standing alone imposes a cap, even without this language.

The Nixon-era Office of Legal Counsel (OLC) opinion that Defendants cite does not help them. That opinion reflected the Nixonian view that Congress subsequently rejected. Moreover, the opinion characterized its view as "basically a rule of construction" from which Congress could depart. 1 Supp. Op. O.L.C. 303, 309 (1969). The opinion made clear that OLC's view would be different "where the appropriation act or the substantive legislation, fairly construed, requires" spending particular amounts. *Id.* As explained above, the governing "rule of construction" has since been conclusively settled: Absent specific discretionary language to the contrary, the Executive Branch must spend the full amount of an appropriation

### 3.  *Defendants' Decision Not to Obligate the Funds Is Arbitrary and Capricious*

Defendants' refusal to spend billions in appropriated foreign-assistance funding is arbitrary and capricious. Mem. 18-21. USAID and the State Department have not provided any reasoned explanation why they are not obligating the full amounts Congress appropriated, even if (as Defendants claim) they are not legally bound to do so. The sole explanation proffered is the suggestion that the President's special message *prohibits* the agencies from obligating the funds, but as already explained, that is not so.

Defendants also claim (at 24) that "the established role of the Executive Branch in formulating foreign policy" *alone* justifies whatever action Defendants have taken regarding foreign-assistance funds. But that theory would carve out swaths of agency action from the APA's reasoned-decisionmaking requirement. And it flatly contradicts controlling APA precedent, which has carefully scrutinized agency decisionmaking even in areas like immigration, law enforcement, and national security sanctions, where executive power is at its

apex. *See, e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 8, 17 (2020) (vacating rescission of an "immigration program" involving non-enforcement, which "has 'long been regarded as the special province of the Executive Branch'" (quoting *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985)); *Epsilon Elecs., Inc. v. OFAC*, 857 F.3d 913, 927 (D.C. Cir. 2017) (holding determination of sanctions liability was arbitrary and capricious because agency "failed to explain adequately" determination that goods were intended for export to Iran).

Defendants' action is arbitrary and capricious for the additional reason that Defendants failed to account for—or even acknowledge—the "serious reliance interests" of Plaintiffs, their employees, or the ultimate recipients of these funds, many of whom will die and suffer from debilitating disease if Defendants' impoundment plan succeeds. *Regents of the Univ. of Calif.*, 591 U.S. at 30; *see* Mem. 19-21. Defendants brush off these interests (at 25) as "subjective perceptions" that ignore the "significant discretion [for] agencies in their funding choices." But Plaintiffs' reliance on these funds is hardly "subjective." The D.C. Circuit panel acknowledged—and Plaintiffs' new declarations make even clearer—that Plaintiffs "are financially dependent on appropriated foreign assistance funds." Amended Op. at 14 ("For example, Democracy International attests that 96 per cent of its 2024 revenue came directly from USAID."). And Defendants' invocation of "discretion" confuses the action that Plaintiffs challenge as arbitrary and capricious. The agency action at issue is Defendants' choice to not make the relevant foreign-assistance funding available at all—an undifferentiated refusal that, in fact, has *deprived* Defendants of exercising their claimed discretion in choosing among various funding recipients. An order vacating that arbitrary action instead would fully preserve Defendants' ability to choose among competing priorities within each specified purpose for which Congress appropriated these funds. Defendants' unexplained failure to make those important policy choices is arbitrary and capricious.

14

**E.    Defendants Have Unlawfully Refused or Unreasonably Delayed Obligation of Foreign-Assistance Funds**

Independently, an order requiring Defendants to obligate these funds is warranted under 5 U.S.C. § 706(1), which requires courts to "compel agency action unlawfully withheld or unreasonably delayed." Defendants' sole response is that their action was not "unreasonably delayed"— ignoring that Plaintiffs' primary claim is under the *other*, *independent* prong of § 706(1), which governs actions "unlawfully withheld." Consistent with § 706(1)'s text, "unlawfully withheld" claims are distinct, and the *TRAC* factors do not play the same role. *See South Carolina v. United States*, 907 F.3d 742, 756-59 (4th Cir. 2018). Defendants do not contest that if these foreign-aid appropriations are commands (which they are, *supra* Section II.A) then the funds are being "unlawfully" withheld." That alone warrants relief under § 706(1).

Defendants' obligation of these funds is *also* "unreasonably delayed," which is an additional basis for relief under § 706(1). Mem. 22–24. Defendants respond with a generic discussion of the *TRAC* factors but no substantive response to Plaintiffs' explanation of how those factors apply in this case. For example, Defendants cite (at 26) a case highlighting that the lack of a "rigid" statutory "timetable" counsels against APA relief, ignoring that here Congress *did* put an express expiration date on these very funds. *See* Mem. 23. Likewise, Defendants note (at 26-27) the general principle that agencies are best-suited to "allocate [their] resources in the optimal way." But by seeking to abolish USAID and refusing to spend appropriated funds on priorities Congress has directed, Defendants here are *eliminating* "resources" the agency might otherwise have discretion to allocate. *See* Mem. 23.

Likewise, Defendants' assertions (at 27-28) that APA relief would interfere with "an ongoing dialogue about the program with Congress" cannot be squared with their insistence that the conversation is over. *See* Opp. 8 (asserting that the $4 billion including is the rescission

15

proposal is "not available for obligation"). Moreover, Plaintiffs are not requesting relief that would preclude Congress from acting on the rescission proposal; Plaintiffs request an injunction that only requires Defendants to obligate the funds by September 30, if Congress has not rescinded the funds by then. *See* Proposed Order (ECF No. 133-14). Nor is there any ongoing "dialogue" for the other $6.5 billion that Defendants purportedly intend to obligate. Lewin asserts that Defendants have made final decisions over the "specific purposes and programs" for which the funds will be obligated, Lewin Decl. ¶ 7, and Defendants have indicated that those plans do not involve spending money for the purposes that Congress has designated. *Supra* Section I.

### F.    Plaintiffs Are Likely to Succeed on Their Mandamus Claim

If APA relief is not available, mandamus would be appropriate. Defendants fail to mention either the Supreme Court's decision in *Kendall* or the D.C. Circuit's decision in *Aiken County*—controlling authorities on this claim. Mem. 24–25. In *Aiken County*, for example, the D.C. Circuit faced an agency that was failing to comply with a congressional mandate to "issue a final decision approving or disapproving" a license application within three years of its submission. 725 F.3d at 257–58. The court issued a writ of mandamus ordering an agency to "promptly continue with the legally mandated licensing process." 725 F.3d at 267. Defendants do not explain why their refusal to comply with congressional spending mandates here is any less worthy of mandamus.

Defendants instead attempt to analogize (at 32) Plaintiffs' mandamus claim to the *ultra vires* claim rejected by the D.C. Circuit panel. But Defendants overlook a key difference: the D.C. Circuit evaluated only whether Defendants had clearly violated a "specific provision" of "*[t]he ICA*"—not whether Defendants were clearly violating provisions of the 2024

Appropriations Act and prior appropriations acts, as Plaintiffs claim here. Amended Op. at 30–31 (emphasis added).

Defendants also claim that the appropriations acts establish no "dut[ies] *owed to the plaintiff.*" Opp. 33 (emphasis in original) (quoting 28 U.S.C. § 1361). But *Aiken County* shows why their understanding of the Mandamus Act cannot be correct. The challengers in *Aiken County* were the States of Washington and South Carolina, as well as "entities and individuals in those States." 725 F.3d at 258. As here, the statutory requirement under which the challengers sought mandamus did not *expressly* confer legal rights on them. Quite the opposite: The statute there required the Nuclear Regulatory Commission to review a license application for nuclear storage at Yucca Mountain—in Nevada—by a date certain, and expressly required notice of agency actions to the State of Nevada, not others. *See* 42 U.S.C. § 10134(a), (b), (d). Yet the Commission's adjudication of the license application for nuclear storage in Nevada had clear, direct consequences for the challengers: "Nuclear waste is currently stored in those States in the absence of a long-term storage site such as Yucca Mountain." 725 F.3d at 258. That was enough to support the challengers' right to a writ of mandamus.

The connection here is even more direct. "[T]he declarations make clear the degree to which" Plaintiffs "are financially dependent on appropriated foreign assistance funds." Amended Op. at 14. Plaintiffs compete for these funds year after year, and many of their organizations exist *entirely* to carry out the purposes Congress specified in these appropriations act. *Supra* Section II.C. And the appropriations laws create an express, legally enforceable duty to make these funds *available*, such that Plaintiffs and others can seek to obtain the funds.

Finally, Defendants claim (at 33) that the relevant statutory duty here is not "ministerial" because the Executive Branch has "constitutional and statutory discretion in making foreign assistance funding decisions." But, as with Plaintiffs' arbitrary and capricious claim, the writ of

17

mandamus Plaintiffs seek would preserve that discretion. *Supra* Section I.D.3. What Plaintiffs seek is an order that Defendants obligate these sums in the amounts for the purposes Congress has specified. Within those broadly stated purposes (and subject to any other applicable rules and regulations), Defendants may exercise their discretion over particular "foreign assistance funding decisions." But the decision of whether to obligate these funds *at all* for the purposes that Congress specified—like the decision of whether to review a license application that Congress has required the agency to review—is ministerial, not discretionary. Assuming APA relief is unavailable, mandamus is warranted.

### G. Plaintiffs Are Likely to Succeed on Their Constitutional Claims

To the extent that Defendants now rely (again) on the President's "authority under the Constitution" to justify their actions, Opp. 23, Plaintiffs are likely to succeed on their claim that Defendants' reliance on that claimed constitutional authority to disregard Congress's mandates violates the separation of powers. *See* Mem. 26.

### H. Defendants' Attempted Pocket Rescissions Do Not Relieve Them of Their Duties under the Appropriations Acts to Spend the Funds

The Court should reject the government's defense that the President's submission of a rescission proposal relieves Defendants of their duty under the 2024 Appropriations Act and prior acts to obligate the relevant funds before they expire.

The 2024 Appropriations Act, which requires Defendants to obligate specific amounts of funds for specific purposes by September 30, 2025, is the law of the land. *Supra* Section I. It was enacted as Public Law 118-47 "after three procedural steps were taken: (1) a bill containing its exact text was approved by a majority of the Members of the House of Representatives; (2) the Senate approved precisely the same text; and (3) that text was signed into law by the President." *Clinton v. City of New York*, 524 U.S. 417, 448 (1998). The 2024 Appropriations Act, like the

prior appropriations acts enacted through the same process, remains binding law unless and until Congress enacts new legislation repealing or altering these laws through the same three procedural steps.[4]

Defendants point to nothing in the ICA that provides otherwise. They claim that "funds within the rescission proposals are not available for obligation," Opp. 8, but they point to no statutory text to that effect. They assert that "the ICA . . . authorizes the withholding of funds while Congress considers a rescissions package," Opp. 32, but they again cite no statutory text supporting that proposition. Nor do they cite any statutory language providing that the agencies may withhold funds beyond their expiration date simply because a rescission proposal has been submitted but not acted upon.

That is unsurprising. The ICA's actual text provides the opposite of what Defendants assert. It states that "[n]othing contained in this Act . . . shall be construed as . . . superseding any provision of law which requires the obligation of budget authority." *Id.* § 681(4). Defendants offer no response to this provision. "Only the written word is the law," *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 653 (2020), but Defendants' theory is untethered to any words written into law.

Indeed, because Defendants' proposed interpretation raises questions of "vast economic and political significance," their theory requires not just textual support, but rather "clear congressional authorization" for the power they claim. *W. Virginia v. Env't Prot. Agency*, 597

---

[4] The legal effect of the President's submission of a rescission proposal to Congress under the ICA is no different from any other legislative proposals that the President submits to Congress under the Recommendations Clause. The President is free to submit proposed legislation to Congress seeking amendment or repeal of existing laws, but those existing laws remain binding unless Congress enacts the President's proposal. The ICA simply creates unique procedures for Congress's consideration of a rescission proposal; it gives rescission proposals privileged status in the House and Senate and prevents the Senate from filibustering the proposed legislation.

U.S. 697, 716, 724 (2022) (quotations omitted). This clear statement rule reflects that courts "typically greet assertions of extravagant statutory power over the national economy with skepticism." *Id.* at 724 (quotations omitted). That skepticism is well warranted here, where Defendants claim that a statute meant to prevent impoundments actually empowers the President to impound at will. Defendants point to no "clear congressional authorization" for pocket rescissions; their entire theory of § 683 rests on inferences from other provisions such as § 684, and purported "silence" in § 683(b). Opp. 29-30. The major questions doctrine exists to prevent such efforts to read broad power into statutes where Congress did not explicitly provide it.

Defendants also fail to grapple with the constitutional implications of their interpretation of the ICA. Just as with the Line-Item Veto Act, Defendants' theory is that the ICA permits the President to cancel statutory spending requirements in the 2024 Appropriations Act and prior appropriations acts, merely by submitting a "special message" to Congress, so long as Congress does not step in and vote down the proposal. *Clinton*, 524 U.S. at 437. Under Defendants' theory of the ICA, "[i]n both legal and practical effect," the President may amend appropriations laws through a unilateral submission of a special message to Congress, even if Congress does not itself amend those laws through new legislation. *Id.* at 438. But "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes," and the "constitutional silence on this profoundly important issue [is] equivalent to an express prohibition" on the President taking such action. *Id.* Defendants' interpretation of the ICA would render it unconstitutional under the Presentment Clause, and this Court "must of course avoid reading the statute in a manner that would render it clearly unconstitutional when there is another reasonable interpretation available." *Kennedy v. Braidwood Mgmt., Inc.*, 145 S. Ct. 2427, 2451 (2025) (quotations omitted).

Defendants offer no meaningful basis to distinguish their reading of the ICA with the unconstitutional procedure under the Line-Item Veto Act. They assert that, "in contrast" to the Line-Item Veto Act, "[i]n a pocket rescission . . . the funds lapse via operation of statutes that Congress enacted—the ICA . . . and the underlying appropriations provision." *Id.* at 32. But in *Clinton*, the funds were also cancelled "via operation of statutes that Congress enacted"—in that case the Line-Item Veto Act. The whole point of *Clinton* is that Congress may not enact statutes that give the President authority to unilaterally amend or repeal enacted legislation.

Ultimately, the only support that Defendants' muster for their pocket rescission theory is a December 1975 letter from GAO, in which GAO assumed that there is a need "to wait 45 days of continuous session before it can be determined that a proposed rescission has been rejected." Acg-76-12, B-115398 (Dec. 15, 1975), https://www.gao.gov/assets/acg-76-12.pdf. This letter did not cite any statutory text or other legal authority for this assumption, *see id.*, nor did it consider the constitutional implications of this assumption. GAO has since *repudiated* this letter for these reasons. See GAO, B-330330, Impoundment Control Act—Withholding of Funds through Their Date of Expiration 5 (Dec. 10, 2018)). And, as Defendants themselves note, GAO opinions are in no way binding. *See* Opp. 28.

Defendants also suggest that USAID and the State Department cannot obligate the funds in the rescission proposal because OMB has not apportioned the funds to the agencies. Opp. 8 (citing Lewin Decl. ¶ 5). But OMB is a Defendant in this case, and one Defendant cannot prevent other Defendants from complying with their legal duties or a court order. That is especially so here given that the same person, Russell Vought, is now the head of both OMB and USAID. Lewin Decl. ¶ 3. Moreover, OMB is legally required to apportion these funds to the agencies. OMB must apportion appropriations to an agency within 30 days of an appropriation law's passage, and OMB may hold back funds in reserve only for limited reasons not present here. 31

U.S.C. §§ 1512(c)(1), 1513(b)(2). And for these funds specifically, the 2024 Appropriations Act requires that the Development Assistance funds "shall be apportioned to the United States Agency for International Development," and that the Democracy Fund money "shall be made available for" specific Bureaus at the State Department and USAID. 138 Stat. at 742–43. OMB may not refuse to apportion these funds to the agencies.

## III.    The Remaining Injunction Factors Overwhelmingly Favor an Injunction

Plaintiffs demonstrated through their declarations that they face existential irreparable harm if Defendants impound the funds at issue. Mem. 28–30. Defendants contend that Plaintiffs' economic harms "are not irreparable," but ignore the cases holding that an "irrevocabl[e]" loss of funds *is* irreparable harm. *Id.* at 29. The Supreme Court recently held as much with respect to funds that could not be "recouped" by the U.S. government. *NIH v. Am. Pub. health Ass'n*, No. 25A103, 2025 WL 2415669, at *1 (U.S. Aug. 21, 2025). If the irrevocable loss of funds constitutes irreparable harm to the U.S. government, it certainly is irreparable harm to the Plaintiff corporations and small businesses that rely on these funds for their existence. *See, e.g.*, Bjornlund Decl. ¶ 13 (without relief, Democracy International "would be at substantial risk of having to shut down entirely after 22-plus years in business").

Defendants also cannot rebut Plaintiffs' evidence of harm by suggesting that Plaintiffs may receive "downstream" benefits from some of the $6.5 billion they are now obligating, Opp. 34, while simultaneously making clear that they will not obligate these funds for the purposes that Congress require, *supra* Section I, and that they do "not expect to open up solicitations or otherwise offer *any* additional opportunity to 'compete' for funding from expiring balances," Lewin Decl. ¶ 9 (emphasis added). Defendants have not disclosed any information to suggest that Plaintiffs will benefit from their plans to obligate $6.5 billion in contravention of the statutory requirements. Moreover, Plaintiffs will suffer irreparable harm from Defendants'

refusal to make the more than $4 billion included in the rescission proposal available for obligation.

Defendants also misread the D.C. Circuit panel and *en banc* opinions. The panel opinion found only that the record as it existed in March was "less developed about how long the grantees could financially continue without the opportunity to compete for impounded funds." Slip op. at 32, *Global Health Council v. Trump*, 25-5097 (D.C. Cir. Apr. 2, 2025). Plaintiffs now have developed the record: as the declarations submitted with Plaintiffs' motion now explain, if the expiring appropriations are not made available, several Plaintiffs' operations would be permanently devastated. Dunn-Georgiou Decl. ¶ 12; Carlson Decl. ¶ 13; Northrip Decl. ¶ 10; Wentworth Decl. ¶ 11; Johnson Decl. ¶ 15.

The *en banc* Court also made clear that this Court's preliminary injunction remained in effect pending consideration of the rehearing petition, ensuring that Defendants continued to take steps to obligate the funds at issue. The full Court then issued the mandate only after the panel majority revised its opinion to clear the way for this Court to consider Plaintiffs' APA claims. Far from "reflect[ing] a balancing of the equities in favor of allowing Defendants the benefit of certainty from vacatur of the preliminary injunction," Opp. 135, the *en banc* proceedings show that the full Court expected that this Court would consider Plaintiffs' APA claims expeditiously and in no way cast doubt on the prospect of further injunctive relief.

Defendants' appeals to the Executive's determinations of spending priorities and the Executive's foreign affairs authority similarly fall flat, Opp. 34-35, because the 2024 Appropriations Act and prior appropriations laws govern the priorities and allocation of funds for foreign assistance. Similarly, Plaintiffs do not request that this Court sit as a "monitor of foreign assistance funding." Opp. 35. The Court need only enter an order requiring Defendants to comply with their statutory obligations to obligate specific funds for specific purposes;

Defendants would still enjoy broad discretion (subject to applicable statutes and rules) in how those funds are spent.

Nor do Plaintiffs seek an order "extending to nonparties." Opp. 35. Plaintiffs have tailored their request for injunctive relief to cover only categories of foreign assistance appropriations for which they compete. *See* Proposed Order; Mem. 32–33. This injunction is necessary to remedy the harm suffered by Plaintiffs, who "ha[ve] been walled off from an entire category of projects for which [they are] qualified, prepared, and eager to compete." *Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1016 (D.C. Cir. 2022). Second, as to Plaintiffs' requested relief for their APA claims, Congress expressly deviated from the general rule that relief must be party specific. "[W]hen a federal court sets aside an agency action, the federal court vacates that [action]" in full, not just as applied to the plaintiffs in the matter. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 830 (2024) (Kavanaugh, J., concurring); *see Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024).

Under the APA, vacatur is the "normal remedy" for unlawful agency action. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014); *see also* 5 U.S.C. § 706(2) (court "shall . . . set aside" unlawful action). Defendants suggest that the Court should remand to the agencies without vacatur, Opp. 36–37, but that is an "exceptional remedy," available only in "limited circumstances," and only if the agency's error is "curable." *Cigar Ass'n of Am. v. FDA*, 132 F.4th 535, 541 (D.C. Cir. 2025). The decision to vacate turns on the "seriousness of the agency action's deficiencies" and the "disruptive consequences" of vacatur. *Id.* Neither factor favors Defendants here, as the agencies' refusal to spend billions of dollars in appropriated funds or to provide any reasons for that refusal are undoubtedly "serious," and requiring the agencies to comply with Congressional mandates would not be "disruptive." In any event, whether to

24

vacate is relevant only to Plaintiffs' motion for partial summary judgment and has no bearing on their separate request for preliminary injunctive relief.

Finally, the Court need not reach the question whether injunctive or declaratory relief is available against the President, as Plaintiffs' injuries can be redressed through relief against the agencies and their leaders.

## IV.    Partial Summary Judgment Is Not Premature

Defendants contend that Plaintiffs' request for partial summary judgment is "premature." Opp. 38. But Rule 56 expressly provides that "a party may file a motion for summary judgment at any time … ." Fed. R. Civ. P. 56(b). Nothing in the Federal Rules precludes an early motion for summary judgment or dictates that such a motion cannot be resolved before the Court has ruled on a motion to dismiss. *Contra* Opp. 38.

Defendants suggest that summary judgment on Plaintiffs' APA claims must await the preparation of the administrative record. Opp. 38. But as Plaintiffs explained, Mem. 15–16, 33, summary judgment is warranted based on Defendants' own words and actions, which are reflected in documents that are already on the record, *see* ECF 133-12. Defendants have not contested the authenticity of any of that record evidence. *See* ECF 135-2. Nor have Defendants identified any facts or documents material to Plaintiffs' APA claims that Plaintiffs have not already cited. In these circumstances, there is no reason why Plaintiffs' motion for summary judgment on their APA claims cannot be resolved based on materials already before the Court.

## CONCLUSION

The Court should grant Plaintiffs' motion. Plaintiffs respectfully request that the Court rule on each of Plaintiffs' cause of actions advanced in this motion.

Dated: September 1, 2025

Respectfully submitted,

*/s/ Daniel F. Jacobson*

Daniel F. Jacobson (D.C. Bar # 1016621)
John Robinson (D.C. Bar # 1044072)
Nina Cahill (D.C. Bar # 1735989)
Brian Rosen-Shaud (ME Bar # 006018)*^
JACOBSON LAWYERS GROUP PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
Tel: (301) 823-1148
dan@jacobsonlawyersgroup.com

William C. Perdue (D.C. Bar 995365)
Sally L. Pei (D.C. Bar 1030194)
Samuel M. Witten (D.C. Bar 378008)
Stephen K. Wirth (D.C. Bar 1034038)
Samuel F. Callahan (D.C. Bar 888314461)
Dana Kagan McGinley (D.C. Bar 1781561)
Daniel Yablon (D.C. Bar 90022490)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel: (202) 942-5000
stephen.wirth@arnoldporter.com

*pro hac vice application forthcoming
^ Not admitted in the District of Columbia.
Practice supervised by members of the D.C.
bar.

*Counsel for Plaintiffs*