# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GLOBAL HEALTH COUNCIL,
  2300 N Street NW, Suite 501 A
  Washington, DC 20037,

SMALL BUSINESS ASSOCIATION FOR
INTERNATIONAL COMPANIES,
  655 15th Street NW, Suite 425
  Washington, DC 20005,

HIAS,
  300 Spring Street,
  Silver Spring, MD 20910,

MANAGEMENT SCIENCES FOR HEALTH,
  4201 Wilson Blvd., Suite 500
  Arlington, VA 22203,

CHEMONICS INTERNATIONAL, INC.,
  1275 New Jersey Ave. SE, Suite 200
  Washington, DC 20003,

DAI GLOBAL, LLC,
  7600 Wisconsin Ave., Suite 200
  Bethesda, MD 20814,

DEMOCRACY INTERNATIONAL, INC.,
  7200 Wisconsin Ave., Suite 1000
  Bethesda, MD 20814,

and

AMERICAN BAR ASSOCIATION,
  321 N. Clark Street
  Chicago, IL 60654,

                    *Plaintiffs*,

        v.

DONALD J. TRUMP, in his official capacity as
President of the United States of America,
  1600 Pennsylvania Ave. NW
  Washington, DC 20050,

Civil Action No. 25-cv-402-AHA

MARCO RUBIO, in his official capacity as
Secretary of State and Acting Administrator of the
United States Agency for International
Development,
    2201 C Street NW
    Washington, DC 20520,

JEREMY LEWIN, in his official capacity as Acting
Director of Foreign Assistance at the United States
Department of State and in his official capacity
performing the duties of the Deputy Administrator
and Chief Operating Officer of the United States
Agency for International Development,
    2201 C Street NW
    Washington, DC 20004,

RUSSELL VOUGHT, in his official capacity as
Director of the Office of Management and Budget,
    725 17th Street NW
    Washington, DC 20503,

UNITED STATES DEPARTMENT OF STATE,
    2201 C Street NW
    Washington, DC 20520,

UNITED STATES AGENCY FOR
INTERNATIONAL DEVELOPMENT,
    2201 C Street NW
    Washington, DC 20004,

and

OFFICE OF MANAGEMENT AND BUDGET,
    725 17th Street NW
    Washington, DC 20503,

                    *Defendants*.

## SECOND AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      This lawsuit seeks to enjoin an unlawful and unconstitutional exercise of executive power that has created chaos in the funding and administration of the United States Agency for International Development (USAID), the U.S. Department of State, and other federal foreign-assistance programs, causing grievous irreparable harm to Plaintiffs and other grantees, contractors, and implementing partners.

2.      In an unprecedented series of actions, the President and other executive-branch officials have sought to withhold billions of dollars in congressionally appropriated foreign-assistance funding and to terminate the overwhelming majority of foreign-assistance awards, as part of a plan to discontinue congressionally mandated foreign assistance programs that the Administration claims do not serve its policy priorities. One cannot overstate the impact of that unlawful course of conduct: on businesses large and small forced to shut down their programs and let employees go; on hungry children across the globe who will go without food; on populations around the world facing deadly disease; and on our constitutional order.

3.      As directed by federal statute, USAID and the Department of State administer billions of dollars appropriated by Congress each year for foreign assistance. Through grantees, contractors, subcontractors, and other partners—many of whom have worked with these agencies for decades—these agencies' foreign assistance activities play a critical role in advancing the United States' interests and standing abroad.

4.      But on the day he took office, President Trump issued an executive order announcing his view that U.S. foreign-assistance programs are "antithetical to American values" and ordered an immediate "pause" on all foreign-assistance funding. In response, with extremely limited and incoherently implemented exceptions, USAID and the State Department halted the

flow of funding even to existing partners, even for work performed before President Trump took office, plunging those organizations (and the people who depend on them) into turmoil and costing thousands of Americans their jobs. Defendants also began terminating "tranches" of many hundreds of foreign-assistance awards, based on a "review process" that was cursory and arbitrary at best, as inconsistent with their policy priorities. Ultimately, in a matter of weeks, as part of an express plan to eliminate the vast majority of USAID's programs, Defendants terminated more than 90% of USAID awards. Defendants also terminated the large majority (upwards of 60%) of State Department foreign-assistance awards.

5.    Defendants have been candid about their motivations. As agency memoranda, guidance, and public statements make clear, the President disagrees with Congress's choice to establish and fund foreign-assistance programs, which have been legislatively mandated for more than a half century. And in implementing his executive order, the government has offered no reasoned justification for its actions other than to effectuate the President's "policy agenda."

6.    Shortly before his summary dismissal, the USAID Office of Inspector General sounded the alarm on the scope and effects of Defendants' actions. The waiver process that supposedly allowed certain foreign-assistance programs to resume was opaque and illusory. The freeze halted not just the obligation of new funding, but the disbursement of funds for work that had already been performed. And far from combatting waste, fraud, and abuse in U.S. foreign-assistance programs, Defendants' actions have exacerbated these problems.

7.    To be sure, the President may establish his own policy priorities and pursue the implementation of those policies consistent with the law. This lawsuit does not seek to invade his ability to do so. Still, like other abrupt funding freezes that courts have enjoined, Defendants' actions here violate basic precepts of administrative law, numerous federal statutes, and bedrock

separation-of-powers principles. Neither the President nor his subordinates have authority to thwart duly enacted statutes and substitute their own funding preferences for those that Congress has enacted through legislation, or to delay or defer for policy reasons the obligation and expenditure of funds that Congress has appropriated. The explanations Defendants have offered to justify the sudden halt to the funding and administration of congressionally mandated foreign-assistance programs fail to grapple with its grave implications for agency implementing partners, the people who depend on them, and the United States. The Court must hold these actions unlawful and set them aside.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the action arises under federal law, including the U.S. Constitution and the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq*. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 704-06, and mandamus relief pursuant to 28 U.S.C. § 1361.

9.    Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because this action seeks relief against federal agencies and officials acting in their official capacities; at least one defendant is located in this district; and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

10.    Plaintiff Global Health Council (GHC) is a private, not-for-profit, membership alliance incorporated in Delaware, headquartered in Washington, D.C., and enjoying tax-exempt status under Section 501(c)(3) of the Internal Revenue Code. GHC was founded in 1972 under the

name National Council of International Health as a U.S.-based, nonprofit membership organization with the purpose of identifying priority global health problems and reporting on them to the U.S. public, legislators, international and domestic government agencies, academic institutions, and the world health community. Many of GHC's members administer global health programs and receive funding from USAID and other federal agencies in the form of contracts, grants, and cooperative agreements. GHC's members depended on sustained, uninterrupted funding to continue their work.

11.    Plaintiff Small Business Association for International Companies (SBAIC) is a membership organization established to promote the meaningful utilization of U.S. small businesses at U.S government agencies providing foreign assistance, including USAID. SBAIC has almost 170 members, including small businesses under every Small Business Administration category. SBAIC's members are or were recipients of foreign aid through contracts, grants, and cooperative agreements.

12.    Plaintiff HIAS is a global, faith-based 501(c)(3) nonprofit organization headquartered in Silver Spring, Maryland. Working with the organized American Jewish community, HIAS is dedicated to ensuring that the world's forcibly displaced people find welcome, safety, and freedom. As of January 20, 2025, 80% of HIAS's funding came from the U.S. government, including the Department of State and USAID.[1]

13.    Plaintiff Management Sciences for Health, Inc. (MSH) is a global nonprofit organization incorporated in Massachusetts and headquartered in Arlington, VA. Founded in 1971, MSH has worked to improve health systems and health outcomes in more than 150 countries by

---

[1] Plaintiff HIAS's claims do not encompass cooperative agreements related to the U.S. Refugee Admissions Program (USRAP) (award nos. SPRMCO24CA0348, SPRMCO22CA0311, SPRMCO24CA0349, SPRMCO24CA0354).

providing governments, health organizations, and the private sector with the strategies, tools, and management support to effectively and efficiently deliver high-functioning health systems. As of January 20, 2025, approximately 88% of MSH's funding came from USAID. MSH held funding agreements with USAID for 19 different projects in 20 countries in the form of cooperative agreements, contracts, and sub-agreements.

14.    Plaintiff Chemonics International, Inc. (Chemonics) is an employee-owned sustainable development company headquartered in Washington, D.C. Founded in 1975, Chemonics has been a trusted partner to the U.S. government for 50 years, having successfully implemented more than 1,000 foreign-assistance programs in more than 100 countries on behalf of USAID and other U.S. government clients. As of January 20, 2025, approximately 88% of Chemonics and its subsidiaries' funding came from USAID, in the form of cooperative agreements and contracts, and at that time Chemonics was working with USAID on 104 different projects in over 90 countries. Chemonics was also a sub-awardee on one USAID cooperative agreement.

15.    Plaintiff DAI Global, LLC (DAI) is an employee-owned global development company headquartered in Bethesda, Maryland. DAI was founded in 1970 and has been a trusted partner of the U.S. government, especially USAID, for more than 50 years, delivering successful projects in more than 150 countries. As of January 20, 2025, nearly 80% of DAI's revenue (more than $750 million in 2024) came from USAID—including the Millenium Challenge Corporation and its affiliated Millenium Challenge Accounts in Compact Countries—through cooperative agreements and contracts. On January 20, DAI was working with USAID and Millennium Challenge Accounts on 99 different projects in 45 countries.

16.    Plaintiff Democracy International, Inc., a small business, is an international development company founded in 2003 and headquartered in Bethesda, Maryland. Over the past

22 years, it has conducted more than 200 democracy, human rights, governance, peace and resilience, and other projects for USAID in more than 80 countries. Approximately 96% of Democracy International's revenues in 2024 came from prime cooperative agreements and contracts from USAID.

17.    Plaintiff the American Bar Association (ABA) is a non-partisan organization, founded in 1878 with a mission to defend liberty and pursue justice in the United States. Its Fund for Justice and Education (ABA FJE), the 501(c)(3) charitable fund of the Association, features many pro bono, public service, and education programs that improve access to justice in the United States and globally. The ABA Center for Global Programs (CGP) is an ABA FJE-entity whose mission serves the ABA's Goal IV: Advance the Rule of Law. For 35 years, and in more than 100 countries, ABA CGP has, at the behest of, and in partnership with, USAID, the Department of State, and other U.S. government agencies, implemented international rule of law and human rights programming that supports U.S. national interests. In total, approximately 38% of ABA's FY 2025 international awards funding was derived from USAID, after a competitive procurement process. As of January 20, 2025, ABA was implementing 19 programs funded by USAID via cooperative agreements, subawards, and subcontracts.

18.    Defendant Donald J. Trump is the President of the United States. He is being sued in his official capacity only.

19.    Defendant United States Department of State is an executive department of the United States government that is responsible for the United States' foreign policy and relations. The Department of State is headquartered in Washington, D.C.

6

20.     Defendant United States Agency for International Development (USAID) is an independent agency of the United States government that is responsible for administering civilian foreign aid and assistance. USAID is headquartered in Washington, D.C.

21.     Defendant Office of Management and Budget (OMB) is a federal agency within the Executive Office of the President that is responsible for producing the President's budget and coordinating interagency policy initiatives. OMB is headquartered in Washington, D.C.

22.     Defendant Marco Rubio is the Secretary of State and Acting Administrator of USAID. He is being sued in his official capacity only. Secretary Rubio maintains an office at 2201 C Street NW, Washington, D.C. 20520.

23.     Defendant Jeremy Lewin is the Acting Director of Foreign Assistance at the Department of State and is performing the duties of the Deputy Administrator and Chief Operating Officer of USAID. He is being sued in his official capacity only.[2] Mr. Lewin maintains an office at 2201 C Street NW, Washington, D.C. 20520.

24.     Defendant Russell Vought is the Director of OMB. He is being sued in his official capacity only. Director Vought maintains an office at 725 17th Street NW, Washington, D.C. 20503.

## FACTUAL ALLEGATIONS

### Congress Establishes USAID as an Independent Agency and Appropriates Funding for Foreign Assistance

25.     For more than a half century, federal law has declared it the policy of the United States to support economic development and foster democratic institutions abroad through foreign

---

[2] Mr. Lewin is "automatically substituted as a party" for Peter Marocco, who was named as a defendant in his official capacity in Plaintiffs' original complaint, pursuant to Federal Rule of Civil Procedure 25(d).

assistance. *See* Foreign Assistance Act of 1961 § 102, Pub. L. No. 87-195, 75 Stat. 424, 424 (codified as amended at 22 U.S.C. § 2151). Congress has implemented that policy through numerous statutory programs directing USAID, the Department of State, and others to support a host of critical goals, from global health to agricultural production to disaster relief. 22 U.S.C. §§ 2151-2152k, 2292-94. And for more than a half century, USAID and the Department of State have fulfilled these statutory mandates by leading American efforts to alleviate poverty, disease, and humanitarian need; supporting developing countries' economic growth; and building countries' capacity to participate in world trade. Cong. Rsch. Serv., IF10261, U.S. Agency for International Development: An Overview 1 (2025) [hereinafter CRS Report].

26.     Founded in 1961, USAID was established to counter the influence of the Soviet Union during the Cold War and to run various foreign-assistance programs based on the idea that American security was tied to stability and economic advancements in other nations—the cornerstone of what is now called "soft power." As President Kennedy stated on signing the Foreign Assistance Act, "Our adversaries are intensifying their efforts in the entire under-developed world. Those who oppose their advance look to us and I believe, at this dangerous moment, we must respond." Statement by the President Upon Signing the Foreign Assistance Act, 1 Pub. Papers 588 (Sept. 4, 1961), http://bit.ly/4hwm68U. Or as Senator Lindsey Graham noted more recently, soft power is a "critical component of defending America and our values." Chantal Da Silva, *What Cutting USAID Could Cost the U.S.—And How China, Russia May Benefit*, NBC News (Feb. 4, 2025), https://bit.ly/3WVDNGy. "If you don't get involved in the world and you don't have programs in Africa where China's trying to buy the whole continent, we're making a mistake," Graham explained. *Id.*

27.     Since its establishment, USAID has played a critical role in furthering core U.S. interests by reducing the spread of communicable disease, fighting poverty, improving access to education, and promoting economic growth, among other functions. In the 1960s, for example, USAID was a key part of the global effort to eradicate smallpox and, years later, a similar effort to fight polio. Today, USAID plays an indispensable role in implementing the President's Emergency Plan for AIDS Relief, a program that, since its inception during the George W. Bush Administration in 2003, has delivered AIDS treatment to tens of millions of people in 54 countries.

28.     USAID's work is essential to addressing the root causes of extremism, terrorism, and international conflict. As then-Acting USAID Administrator John Barsa put it in 2020, "Our aid advances American interests by reducing the vulnerability of populations to extreme ideologies[;] … [it] cultivates democracies and creates a network of states that advance our common interests and values[;] … [it] restores stability, and prevents disasters from creating the conditions that can give rise to conflict and discord[;] … [and it] can stop wars before they start, reducing the need to put our men and women in uniform in harm's way." John Barsa, Acting Administrator, U.S. Agency for Int'l Dev., Remarks at the Concordia UNGA Summit (Sept. 21, 2020), https://bit.ly/4hwmx32 (Barsa, *Remarks*).

29.     USAID's programs also strengthen allies' economies, open markets, create opportunities for American businesses, protect America's supply chains, and create jobs to reduce migration pressure. These programs counter malign influences globally from China, Russia, Iran, and others, and advance America's national security and economic interests. In short, USAID has long played a key role in furthering American interests.

30.     But USAID does not do this alone. In fact, USAID generally does not implement foreign-assistance projects itself. Instead, most USAID projects are administered through grants,

cooperative agreements, or contracts with partner organizations, including nonprofits and academic institutions. *See* CRS Report at 1. USAID partners, including American companies employing thousands of Americans, thus perform the lion's share of the work necessary to safeguard American security, promote economic prosperity, and address global challenges before they reach American shores.

31.     In 1998, Congress formally established USAID as an independent agency outside the Department of State. Foreign Affairs Reform and Restructuring Act of 1998 § 1413, Pub. L. No. 105-277, 112 Stat. 2681, 2681-791; *see* 5 U.S.C. § 104. In so doing, Congress carefully circumscribed the President's authority to make changes to the agency's structure or operations, allowing the President only sixty days after USAID's establishment to eliminate the agency or reassign its functions. 22 U.S.C. § 6601(a). President Clinton declined to do so. Instead, he ordered that "USAID will remain a distinct agency with a separate appropriation." Reorganization Plan and Report Submitted by President Clinton to the Congress on December 30, 1998, Pursuant to Section 1601 of the Foreign Affairs Reform and Restructuring Act of 1998.

32.     Since then, Congress has repeatedly appropriated funds for foreign assistance through USAID. The most recent of those appropriations bills, enacted into law March 23, 2024, directs funding to USAID for global health programs, development assistance, disaster assistance, and initiatives to promote and strengthen democracy abroad, among other purposes. *See* Further Consolidated Appropriations Act of 2024 ("2024 Appropriations Act"), Pub. L. No. 118-47, div. F, tits. II-III, 138 Stat. 460, 739-43.

33.     For example, Congress most recently appropriated to USAID nearly $4 billion "for global health activities" called for in "chapters 1 and 10 of part I of the Foreign Assistance Act of 1961" (FAA), which "shall be made available for training, equipment, and technical assistance to

build the capacity of public health institutions and organizations in developing countries." *Id.* tit. III, 138 Stat. at 740; *see* 22 U.S.C. §§ 2151-2152k, 2293-2294 (FAA provisions). Congress instructed USAID to effectuate these purposes through "such activities as" child survival and maternal health programs; immunization and oral rehydration; programs addressing the needs of mothers and children; assistance for displaced children; programs for the prevention and treatment of HIV/AIDS, tuberculosis, polio, malaria, and other infectious diseases; disaster preparedness; programs for responding to emergent global health threats; and family planning and reproductive health. Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 740. The 2024 Appropriations Act provided that this $4 billion appropriation is "available until September 30, 2025." *Id.*

34.    Congress's other foreign-aid appropriations are similarly specific and directive, covering a range of international development and assistance programs that Congress deemed necessary, as it has done repeatedly over the past half century. In particular, the 2024 Appropriations Act appropriates:

a.    $3.93 billion to USAID to carry out provisions of the FAA that direct actions to help develop agriculture, education and human resources, energy production, schools and hospitals, small businesses, and human welfare in sub-Saharan Africa (*id.* at 742);

b.    $4.78 billion to USAID "to carry out the provisions of section 491 of the [FAA] for international disaster relief, rehabilitation, and reconstruction assistance" (*id.*);

c.    $75 million "for international disaster rehabilitation and reconstruction assistance administered by" USAID's Office of Transition Initiatives "pursuant to section 491 of the [FAA], and to support transition to democracy and long-term development of countries in crisis" (*id.*);

11

     d.     $55 million to implement the Complex Crisis Fund established by the Global Fragility Act of 2019, which USAID administers "to support programs and activities to prevent or respond to emerging or unforeseen events overseas," 22 U.S.C. § 9808(b) (*see* Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 743);

     e.     $3.89 billion to implement the FAA's Economic Support Fund, which the State Department and USAID administer to furnish "assistance to countries and organizations … to promote economic or political stability," 22 U.S.C. § 2346(a), (b) (*see* Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 743);

     f.     $140 million "to carry out the provisions of the [FAA] for the promotion of democracy globally, including to carry out" pro-democracy training, institution-building, and pluralism purposes established in the National Endowment for Democracy Act, 22 U.S.C. § 4411(b)(3), (5) (*see* Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 743); and

     g.     $770 million for assistance programs under the FREEDOM Support Act, Pub. L. No. 102-511, which authorizes assistance for "urgent humanitarian needs," "[e]stablishing a democratic and free society," "[d]eveloping free and independent media," and other critical measures in nations of the former Soviet Union, 22 U.S.C. § 2295; as well as the Support for Eastern European Democracy (SEED) Act of 1989, Pub. L. No. 101-17, which calls for currency stabilization loans, debt reduction, agricultural assistance, and other measures to promote democracy and free markets in eastern Europe, 22 U.S.C. § 5401 (*see* Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 744).

35.    For many of these programs, the 2024 Appropriations Act provided that the appropriations are available until September 30, 2025. Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 742-44. On information and belief, a majority of remaining funds expire on September 30, 2025

or September 30, 2026. Defendants possess the exact expiration dates for the applicable appropriations amount for each program, which should be discoverable.

36.     Likewise, Congress has appropriated funds for foreign aid to be administered by the Department of State. The 2024 Appropriations Act appropriates to the State Department:

a.     $6 billion "to carry out the provisions of the Foreign Assistance Act of 1961 for the prevention, treatment, and control of, and research on, HIV/AIDS" (*id.* at 742);

b.     $205 million "to carry out the provisions of the [FAA] for the promotion of democracy globally" consistent with the National Endowment for Democracy Act, 22 U.S.C. § 4411(b)(3), (5) (*see* Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 743);

c.     $3.93 billion for migration and refugee assistance, including to enable the Secretary of State to carry out the provisions of section 2(a) and (b) of the Migration and Refugee Assistance Act of 1962," 22 U.S.C. 2601 (*see* Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 744);

d.     $870 million for preventing the proliferation of nuclear weapons, combatting terrorism, and demining conflict zones pursuant to specified provisions of the FAA, FREEDOM Support Act, and Arms Export Control Act (*id.* tit. IV, 138 Stat. at 748)

e.     $410 million to carry out provisions of section 511 of the FAA "for peacekeeping operations and other programs carried out in furtherance of the national security interests of the United States," 22 U.S.C. § 2348 (*see* Pub. L. No. 118-47, div. F, tit. IV, 138 Stat. at 749-50); and

f.     $1.4 billion "to carry out section 481 of the [FAA]," which authorizes assistance "for the control of narcotic and psychotropic drugs and other controlled

substances, or for other anticrime purposes," 22 U.S.C. § 2291(a)(4) (*see* Pub. L. No. 118-47, div. F, tit. IV, 138 Stat. at 747).

37.     The 2024 Appropriations Act speaks in mandatory terms. For example, it directs that funds appropriated for global health programs "shall be apportioned directly to the United States Agency for International Development." *Id.*, 138 Stat. 740. Other provisions similarly provide that specific funding amounts "shall" be apportioned to USAID or the State Department for specified purposes. *See, e.g.*, *id.*, 138 Stat. 741-43.

38.     In addition to apportioning funds directly to USAID and State for these congressionally established purposes, the 2024 Appropriations Act requires Defendants to spend specific or minimum amounts of funds for specific foreign aid purposes. Section 7019(a) requires that funds "shall be made available" in amounts specifically designated in tables appended to the Act. Sections 7030 to 6061 provide that "no less than" particular amounts of funds "shall be made available" for particular foreign aid purposes.

39.     The Act also calls for specific, concrete actions from USAID and the State Department to implement statutory foreign-assistance programs funded under the Act. For example, the Act commands that "[f]unds appropriated by this Act under the heading 'Economic Support Fund' *shall be made available* for programs to protect international freedom of expression and independent media, including through multilateral initiatives." *Id.* div. F, tit. VII, § 7032(h), 138 Stat. at 787 (emphasis added). The Act also defines "democracy programs" for purposes of several of its USAID and State appropriations so as to prescribe particular types of programs: those "that support good governance, credible and competitive elections, freedom of expression, association, assembly, and religion, human rights, labor rights, independent media, and the rule of law, and that otherwise strengthen the capacity of democratic political parties, governments,

nongovernmental organizations and institutions, and citizens to support the development of democratic states and institutions that are responsive and accountable to citizens." *Id.* § 7032(c), 138 Stat. at 786. And the Act commands that "USAID *shall continue* to implement civil society and political competition and consensus building programs abroad with funds appropriated by this Act in a manner that recognizes the unique benefits of grants and cooperative agreements in implementing such programs." *Id.* § 7032(f), 138 Stat. at 787 (emphasis added).

40.     The Act also generally prohibits deviation from its funding allocations beyond small, defined amounts without congressional consultation and justification based on case-by-case exigencies. *See id.* § 7019(b), 138 Stat. at 772.

41.     Congress's 2024 foreign-aid appropriations build on multiple years of prior appropriations for similar purposes, much of which remains available for obligation and expenditure. For example, Congress has appropriated at least $3 billion annually to USAID for global health programs since at least 2019 and, according to the most recently published federal spending data, over $12 billion of the total available resources for these appropriations remain unobligated.[3]

42.     On March 15, 2025, Congress enacted a continuing resolution that has the effect of re-appropriating all of the funds that were appropriated to USAID in the 2024 Appropriations Act, on the same terms and conditions as in the 2024 Appropriations Act. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, §§ 1101-08, 139 Stat. 9, 10-12, Pub. L. 119-4 (Mar. 15, 2025) (the "2025 Continuing Resolution"). Under the continuing resolution, specific programs for

---

[3] *See* Pub. L. No. 117-328, div. K, tit. III, 136 Stat. 4459, 4985 (Dec. 29, 2022) ($4.17 billion); Pub. L. No. 117-103, div. K, 136 Stat. 49, 575 (Mar. 15, 2022) ($3.88 billion); Pub. L. No. 116-260, div. K, tit. III, 134 Stat. 1182, 1691 (Dec. 27, 2020) ($3.3 billion); Pub. L. No. 116-94, div. G, tit. III, 133 Stat. 2534, 2827 (Dec. 20, 2019) ($3.16 billion); Pub. L. No. 116-6, div. F, tit. III, 133 Stat. 278 (Feb. 15, 2019) ($3.12 billion); *Global Health Programs, State: FY 2025 Snapshot*, USASpending.gov, https://www.usaspending.gov/federal_account/019-1031.

which Congress appropriated funds in the 2024 Appropriations Act carry over. For example, as described above, the 2024 Appropriations Act appropriated $3,985,450,000 for Global Health Programs, to last through two fiscal years (in that case, through September 30, 2025). The 2025 Continuing Resolution thus *re*-appropriated an *additional* $3,985,450,000 for Global Health Programs, to again last through two fiscal years (this time, through September 30, 2026). This is true for each of the programs and initiatives in the 2024 Appropriations Act that received specific appropriations. The 2025 Continuing Resolution thus appropriated to USAID and the State Department the same levels of funds for the same discrete programs, on the same terms, as did the text of the 2024 Appropriations Act.

### *Defendants Abruptly Freeze Foreign Assistance Funding*

43.    Starting in late January 2025, Defendants suddenly halted the payment of foreign-assistance funds, terminated the vast majority of foreign-assistance awards, and dismantled federal foreign-assistance programs specifically established by Congress.

44.    This process began with Executive Order 14,169. *See* 90 Fed. Reg. 8619 (Jan. 20, 2025). In that Order, entitled "Reevaluating and Realigning United States Foreign Aid," President Trump claimed that "[t]he United States foreign aid industry and bureaucracy are not aligned with American interests and in many cases antithetical to American values. They serve to destabilize world peace by promoting ideas in foreign countries that are directly inverse to harmonious and stable relations internal to and among countries." *Id.* § 1. He further asserted that "[i]t is the policy of United States that no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President of the United States." *Id.* § 2.

45.    In order to more "fully align[]" foreign assistance programs with President Trump's policy preferences, Executive Order 14,169 directed four actions. *Id.*

46.     First, it directed a "90-day pause in United States foreign development assistance," purportedly "for assessment of programmatic efficiencies and consistency with United States foreign policy." *Id.* § 3(a). It required all "department and agency heads with responsibility for United States foreign development assistance programs" to "immediately pause new obligations and disbursements of development assistance funds to foreign countries and implementing non-governmental organizations, international organizations, and contractors." *Id.* Under the order, programs were to be paused "pending review[]," and OMB was to "enforce this pause through its apportionment authority." *Id.* This "pause" could be waived for specific programs by the Secretary of State. *Id.* § 3(e).

47.     Second, the Executive Order directed each "responsible department and agency head[]" to initiate those "[r]eviews of each foreign assistance program … under guidelines provided by the Secretary of State, in consultation with the Director of OMB." *Id.* § 3(b).

48.     Third, based upon these reviews, "[t]he responsible department and agency head[], in consultation with the Director of OMB" was ordered to "make determinations within 90 days of this order on whether to continue, modify, or cease each foreign assistance program … with the concurrence of the Secretary of State." *Id.* § 3(c).

49.     Fourth, the Executive Order purportedly allowed "[n]ew obligations and disbursements of foreign development assistance funds [to] resume for a program prior to the end of the 90-day period" only after "a review is conducted, and the Secretary of State or his designee, in consultation with the Director of OMB, decide to continue the program in the same or modified form." *Id.* § 3(d). Any "other new foreign assistance programs and obligations must be approved by the Secretary of State or his designee, in consultation with the Director of OMB." *Id.*

50.     Defendants swiftly set to work implementing the Executive Order. On January 22, 2025, then-USAID Acting Administrator Jason Gray instructed agency employees that, pursuant to the Executive Order, "USAID will immediately pause all new program-funded commitments and new or incremental obligations." USAID, Initial Instructions for Implementing Executive Order Reevaluating and Realigning United States Foreign Aid (Jan. 22, 2025) (the "Gray Initial Instructions") (ECF 57-1). The instructions further stated that "[t]his directive encompasses every level of programming—including at the obligation (e.g., development objective agreement) and subobligation levels. Any pause on disbursements will be subject to further guidance." *Id.* The instructions permitted waivers only "for emergency humanitarian assistance" with individual approval from "both the Acting Administrator of USAID and the Director of Foreign Assistance at the U.S. Department of State," subject to a waiver process that supposedly was forthcoming. *Id.* What followed was a series of directives and purported "guidance" documents that merely repeated the same vague and general instructions over and over and promised further detail that never came.

51.     On January 24, 2025, and "[c]onsistent with the President's Executive Order on Reevaluating and Realigning United States Foreign Aid," Secretary of State Marco Rubio issued a memorandum "paus[ing] all new obligations of funding, pending a review, for foreign assistance programs funded by or though the Department and USAID." Memorandum from the Secretary of State ¶ 1, 25 STATE 6828 (Jan. 24, 2025) (the "Rubio Memo") (ECF 17-1, Ex. B).

52.     Secretary Rubio asserted that the funding freeze's purpose was "to determine whether the foreign assistance policies and interests supported by appropriations are not duplicated, are effective, and are consistent with President Trump's foreign policy." *Id.* ¶ 2. To "ensure that all foreign assistance is aligned with President Trump's foreign policy agenda," he ordered a "government-wide comprehensive review of all foreign assistance." *Id.* ¶¶ 3, 4. He

further directed that "no new obligations shall be made for foreign assistance until such time as the Secretary shall determine, following a review," and that "contracting officers and grant officers [must] immediately issue stop-work orders" for any "existing foreign assistance awards." *Id.* ¶ 7. In short, Secretary Rubio mandated that neither the Department of State nor USAID would provide any foreign assistance "without the Secretary of State's authorization or the authorization of his designee." *Id.* ¶ 5.

53.     The same day, USAID Senior Procurement Executive (SPE) Jami Rodgers issued a notice "[i]n accordance with the President's Executive Order" to "paus[e] all new obligations of funding, and sub-obligations of funding under Development Objective Agreements." USAID, Notice on Implementation of Executive Order on *Reevaluating and Realigning United States Foreign Aid* (Jan. 24, 2025) (the "Rodgers Guidance") (ECF 57-2). The notice directed agency contracting and agreement officers to "<u>immediately</u> issue stop-work orders, [and] amend, or suspend existing awards." *Id.* It also forbid agency personnel to "issue new awards or release any new requests for proposals (RFPs), requests for application (RFAs), notices of funding opportunities (NOFOs), or any other kind of solicitation for foreign assistance funding until each activity has been reviewed and approved as consistent with the President's policy." *Id.*

54.     Also the same day, Gray issued follow-up instructions to agency employees for implementing the Executive Order and the Rubio Memo. USAID, Follow-Up Instructions for Implementing Executive Order Reevaluating and Realigning United States Foreign Aid (Jan. 24, 2025) (the "Gray Follow-Up Instructions") (ECF 57-3). The follow-up instructions directed that, "[p]er the [Rubio Memo], within 30 days, the Director of the Department of State's Policy Planning Staff (S/P) or its designate shall develop appropriate review standards to ensure that all foreign assistance is aligned with President Trump's foreign policy agenda. Information on this

review process will be shared as it becomes available." *Id.* The follow-up instructions further stated that, "[c]onsistent with and building on" the Gray Initial Instructions, "all new program-funded obligations and subobligations are to remain on pause unless exempt." *Id.* Gray also announced that he was "immediately directing all contracting and agreement officers to issue stop-work orders or bilateral amendments, consistent with the terms of the relevant awards or agreements, until determinations are made following the review." *Id.* Finally, Gray summarized the provisions of the Rubio Memo regarding waivers and stated, "[w]e will provide further guidance related to implementation of this direction including the process for waivers as soon as possible. We will also provide subsequent guidance on how USAID will review all programs, to include current and ongoing programs, to ensure they are aligned with the foreign policy of the President of the United States." *Id.*

55. Two days later, on January 26, 2025, Gray issued a further clarification. USAID, Clarification on Implementing the President's Executive Order on Reevaluating and Realigning United States Foreign Aid (Jan. 26, 2025) (the "Gray Clarification") (ECF 57-4). As described by the USAID Inspector General, this clarification "also included a directive for staff to refrain from external communications outside of communications necessary to implement the pause." USAID Office of Inspector General, Advisory Notice, *Oversight of USAID-Funded Humanitarian Assistance Programming Impacted by Staffing Reductions and Pause on Foreign Assistance* at 1 (Feb. 10, 2025) [hereinafter OIG Report] (quotation marks omitted).

56. The next day, January 27, then-Acting OMB Director Matthew J. Vaeth issued a similar directive. He issued a memorandum ordering a "temporary pause of agency grant, loan, and other financial assistance programs." Memorandum For Heads of Executive Departments and Agencies 1, M-25-13 (Jan. 27, 2025) (capitalization modified), https://bit.ly/3WUBPWY. That

memorandum directed that, to implement the Executive Order and the President's other policy directives, "each agency must complete a comprehensive analysis of all their Federal financial assistance programs," and, in the interim, "**must temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance, and other relevant activities that may be implicated by the executive order[], including, but not limited to, financial assistance for foreign aid, [and] nongovernmental organizations." *Id.* at 2.

57.     Vaeth's memo, while expressly written to implement President Trump's Executive Order 14,169, gave additional reasons for OMB's actions. The memo cited the need "to align Federal spending and action with the will of the American people as expressed through Presidential priorities." *Id.* at 1. Director Vaeth also stated that "[f]inancial assistance should be dedicated to advancing Administration priorities, focusing taxpayer dollars to advance a stronger and safer America, eliminating the financial burden of inflation for citizens, unleashing American energy and manufacturing, ending 'wokeness' and the weaponization of government, promoting efficiency in government, and Making America Healthy Again. The use of Federal resources to advance Marxist equity, transgenderism, and green new deal social engineering policies is a waste of taxpayer dollars that does not improve the day-to-day lives of those we serve." *Id.* at 1.

58.     Vaeth's memorandum has since been stayed and rescinded. A court in this District has enjoined the government from "implementing, giving effect to, or reinstating under a different name the directives in [Vaeth's memorandum] with respect to the disbursement of Federal funds under all open awards," and ordered it to "to release any disbursements on open awards that were paused due to [the memorandum]." *Nat'l Council of Nonprofits v. OMB*, 2025 WL 368852, at *14 (D.D.C. Feb. 3, 2025); *see Nat'l Council of Nonprofits v. OMB*, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) (granting preliminary injunction).

59.     Defendants nonetheless continued to carry out the Executive Order and implementing directives by Rubio, Gray, Rodgers, and Vaeth. In late January and early February, USAID issued stop-work orders to contractor and grantee agency partners, requiring them to immediately stop work and to minimize the incurrence of costs allocable to the work covered by the order during the period of work stoppage. Purportedly subject to limited waivers—for which a formal approval process was never developed—Defendants halted the flow of foreign-assistance funding to USAID partners. In a declaration filed with this Court on February 10, then-Acting Deputy Administrator Peter Marocco admitted that USAID had "generally paused all expenditures in connection with foreign aid," for "both new programs … as well as existing ones." Decl. of Peter Marocco ¶ 28, *Am. Foreign Serv. Ass'n v. Trump* (*AFSA*), No. 25-cv-352 (D.D.C. Feb. 10, 2025), ECF No. 20-1; *see* Notice of Correction, *AFSA*, ECF No. 21 (similar).

60.     Although the Rubio Memo and other agency directives purported to freeze only "new obligations," Defendants in fact acted to abruptly halt the overwhelming majority of disbursements to USAID and State Department partners even for *existing* grants, cooperative agreements, and contracts. Such partners remained totally cut off from federal funds, including funds appropriated in fiscal year 2023 or earlier and payments for work already performed, even where the Department of State had purported to issue a waiver. As of February 10, 2025, for instance, Plaintiff Democracy International—a small business—had not received payment for $3.8 million for work completed within the scope of duly authorized USAID programs concluded before the issuance of stop-work orders and suspensions. At that time, USAID had also failed to make payment on over $120 million in invoices for work Plaintiff DAI already completed, some of which were past due. Similarly, at that time, Plaintiff Chemonics had roughly $103.6 million in outstanding invoices issued to USAID for work performed in 2024, most of which were submitted

prior to the stop-work orders. And USAID had failed to pay tens of millions of dollars for work performed by Plaintiff SBAIC's members.

61.     As the USAID Inspector General recognized, "uncertainty about the scope of foreign assistance waivers and permissible communications with implementers, has degraded USAID's ability to distribute and safeguard taxpayer-funded humanitarian assistance." OIG Report at 5.

62.     The Department of State also halted disbursement of appropriated foreign-assistance funding through programs administered outside USAID. For example, Plaintiff ABA implemented 59 programs funded by the Department of State, which had committed to pay ABA more than $39.5 million in additional funding over the next five years as of March 1, 2025. Of this amount, $38.7 million was legally "obligated" pursuant to the award documents before the January 24 Executive Order and the subsequent implementing memos. For USAID awards, Plaintiff ABA had a total of $83.7 million remaining in its awards, of which $27.7 million was legally "obligated" under the award documents. Thus, the total amount of the remaining "obligated" portion of the awards from the Department of State and USAID was $66.4 million. Despite the legal commitments to fund at least the amount of the awards that were legally "obligated," the ABA received suspensions and then terminations for all of these programs, without any recognition concerning the "obligated" nature of these awards.

63.     In parallel, in early February, Defendants began cutting agency employees and contractors. The State Department shut down all overseas USAID missions, immediately recalling thousands of USAID employees. Humeyra Pamuk, *Trump Administration Puts on Leave USAID Staff Globally in Dramatic Aid Overhaul*, Reuters (Feb. 4, 2025), https://bit.ly/3WU13oq. It placed thousands of USAID employees on administrative leave, directing them "not to enter USAID

premises, access USAID systems, or attempt to use [their] position or authority with USAID in any way without [the] prior permission [of Peter Marocco] or prior permission of a supervisor in [their] chain of command." Alex Marquardt et al., *USAID Employees Around the World Will Be Placed on Leave Friday and Ordered to Return to US*, CNN (Feb. 5, 2025), https://bit.ly/3CNJtM6. Defendants also caused thousands of institutional support contractors and employees of USAID contractors or grantees to be laid off or furloughed. As the USAID Office of Inspector General observed in the February 10, 2025 report, these "personnel actions … substantially reduced the [agency's] operational capacity." OIG Report at 1.

64.     On February 3, 2025, the State Department issued a press release announcing that Secretary of State Rubio had been appointed as Acting Administrator of USAID. Media Note, Office of the Spokesperson (Feb. 3, 2025), https://bit.ly/4hVdBUR. That press release asserted that "it is now abundantly clear that significant portions of USAID funding are not aligned with the core national interests of the United States." *Id.* The next day, Secretary Rubio sent a letter to the Senate Foreign Relations Committee and House Foreign Affairs Committee providing "notice" and advising Congress of the State Department's "intent to initiate consultations … regarding the manner in which foreign aid is distributed around the world." Image of letter available at Brett Murphy (@BrettMurphy), X (Feb. 3, 2025, 3:41 PM), https://bit.ly/3Q9gWDQ.

65.     The effect of these actions was to halt the obligation and disbursement of foreign-assistance funding wholesale. In the words of the USAID Inspector General, "staff reductions, together with a lack of clarity about the scope of the humanitarian assistance waivers and the extent of permissible communications between [] staff and [] implementers, has significantly impacted USAID's capacity to disburse and safeguard its humanitarian assistance programming." OIG Report at 2.

***Defendants Scramble to Terminate Awards in Advance of This Court's TRO Ruling***

66.     Over the course of four days—from February 9 to 13—Defendants issued four "tranches" of terminations: batches of contracts, grants, cooperative agreements, and awards that had been selected by State Department leadership for immediate *en masse* termination. Each tranche included hundreds of contracts, grants, cooperative agreements, and awards.

67.     On or about Sunday, February 9, SPE Rodgers sent an email to USAID staff (ECF 19-1), which included a link to a list of awards identified for termination. Rodgers requested "[staff] support in taking action on these activities by issuing notices to [agency] partners." The email stated: "For your convenience, M/OAA Policy has drafted several templates to assist with this process." The email did not include a timeframe for completion of these terminations, nor did it state that the terminations should be processed with urgency.

68.     On Monday, February 10, the plaintiffs in *AIDS Vaccine Advocacy Coalition v. U.S. Department of State* (*AVAC*), No. 1:25-cv-00400 (D.D.C.), filed a complaint challenging the suspension of foreign aid.

69.     On the morning of Tuesday, February 11, the Plaintiffs in this case filed their original Complaint and motion for a temporary restraining order and preliminary injunction.

70.     On or about Tuesday, February 11, SPE Rodgers sent a follow-up message (ECF 19-2) to Contracting and Agreement Officers executing the terminations informing them that "Agency leadership has asked that we move quickly to terminate the awards." The message included two tranches of awards slated for termination no later than February 11—that day—and another tranche slated for termination no later than February 12—the next day.

71.     The notice also answered questions the agency had received, apparently in response to internal apprehension about the terminations. One question was whether the general counsel could provide "a formal written opinion confirming the Contracting & Agreement Officers are

acting within their warrant authority in executing these terminations" and clarification that "COs/AOs will not be held personally liable if the Agency is later found to have acted arbitrarily or violated federal statutes, such as the Impoundment Act." Rodgers responded by stating that Contracting and Agreement Officers would be acting within their authority and could not be held personally liable. *See* ECF 19-2.

72.     Other questions included "[u]nder whose authority … the Office of Acquisition and Assistance [is] terminating these awards" and "[w]hat should be used as the basis" for the terminations. Rodgers responded that the State Department had prepared an action memorandum for each tranche that provided blanket authorization for every termination within that tranche. Rodgers further stated that, "given the timeline for complaint termination notifications … the termination notices do not need to contain termination process details." As authority for the terminations, Rodgers stated that "Secretary Rubio … has instructed USAID to terminate these awards as part of the President's Executive Order on Reevaluating and Realigning United States Foreign Aid." *See* ECF 19-2.

73.     Consistent with this direction from SPE Rodgers, Plaintiffs immediately received a wave of new termination notices. For example:

a.     Plaintiff DAI Global received no termination notices prior to February 10. DAI Global received one termination notice on February 10 (after *AVAC* was filed), five termination notices on February 11 (including four after this lawsuit was filed), and twelve termination notices on February 12 (including two after the TRO hearing concluded).

b.     Plaintiff Chemonics International received no terminations prior to February 11. Chemonics received three terminations on February 11 (all after this lawsuit

was filed), and eight terminations on February 12 (including one after the TRO hearing concluded).

        c.     Plaintiff Democracy International received no terminations prior to February 10. Democracy International received three terminations on February 10, six on February 11 (including four after this lawsuit was filed), and three on February 12.

        d.     Plaintiff MSH received no terminations prior to February 11. That day, MSH received its first termination.

    74.    The Court held a hearing on Plaintiffs' TRO motion, as well as the TRO motion in *AVAC*, on February 12, 2025.

    75.    On February 13, 2025, this Court enjoined all Defendants aside from President Trump (the "Restrained Defendants") from enforcing or giving effect to Sections 1, 5, 7, 8, and 9 of the Rubio Memo and any other directives that implement Sections 3(a) and 3(c) of Executive Order 14,169.

    76.    Among other things, the Court enjoined the Restrained Defendants from "suspending, pausing, or otherwise preventing the obligation or disbursement of appropriated foreign-assistance funds in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025." TRO (ECF 21), at 14. The order also enjoined the Restrained Defendants from "issuing, implementing, enforcing, or otherwise giving effect to terminations, suspensions, or stop-work orders in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025." *Id.*

### *Defendants Fail to Comply with the TRO and Conduct a Pretextual Review to Justify Terminating the Overwhelming Majority of USAID Awards*

    77.    Defendants failed to comply with the Court's TRO.

78.    In the days immediately following issuance of the TRO, Defendants made no payments to Plaintiffs; continued to give legal effect to terminations and stop-work orders issued prior to the TRO; and continued to issue new terminations of foreign assistance awards.

79.    In response to Defendants' non-compliance, plaintiffs in *AVAC* filed a motion for contempt and to enforce the TRO on February 19.

80.    On February 20, the Court granted the motion in part. *See* ECF 28. The Court explained that although the TRO "does not restrain the agencies' exercise of authorities under law," "the TRO does not permit Defendants to simply search for and invoke new legal authorities as a *post hoc* rationalization for the enjoined agency action." *Id.* at 2. The Court thus granted the motion to enforce "insofar as Defendants have continued their blanket suspension of funds pending review of agreements." *Id.*

81.    Also on February 20, Plaintiffs here filed their own motion to enforce the TRO, explaining that "since the Court entered its [TRO], Defendants have not disbursed a single dollar of the hundreds of millions owed and due to Plaintiffs—even for awards not subject to any purported termination or suspension and even for work already performed before the unlawful funding freeze." ECF 29 at 1. Plaintiffs requested that the Court order "the immediate payment of all funds owed and due to Plaintiffs and other USAID and State Department implementing partners." *Id.*

82.    On February 21, the Court denied the motion without prejudice as moot in light of the Court's [February 20] order that Defendants are to "'immediately cease [the blanket suspension of funds] and to take all necessary steps to honor the terms of contracts, grants, cooperative agreements, loans, and other federal foreign assistance awards that were in existence as of January

19, 2025, including but not limited to disbursing all funds payable under those terms.'" 2/21 Minute Order (quoting ECF 28 at 5).

83. On February 24, Plaintiffs renewed their motion to enforce the TRO, explaining that Defendants still had made no payments and that "several Plaintiffs [we]re facing new and mounting irreparable harms that threaten their very existence and which require emergency relief prior to the Court's hearing on the preliminary injunction motion." ECF 36 at 2.

84. On February 25, following a hearing, the Court granted Plaintiffs' motion to enforce the TRO, directing Defendants to immediately lift the pause on payments and disburse foreign-assistance funds to Plaintiffs and other implementing partners consistent with the TRO. The Court set a deadline for compliance of 11:59 PM on February 26. *See* 2/25 Minute Order.

85. Defendants immediately appealed the Court's enforcement order and moved both this Court and the D.C. Circuit for a stay of the order pending appeal. *See* ECF 38, 39.

86. This Court denied Defendants' motion on February 26. ECF 41.

87. Without waiting for the D.C. Circuit to rule, Defendants submitted an emergency application to the Supreme Court seeking an administrative stay and summary vacatur of this Court's enforcement order.

88. Shortly thereafter, the D.C. Circuit dismissed Defendants' appeal for lack of appellate jurisdiction and denied Defendants' stay motion.

89. The Supreme Court entered an administrative stay of this Court's enforcement order shortly before 9 PM on February 26.

90. On March 5, the Supreme Court denied Defendants' application and lifted the administrative stay.

91.     During this period, the Court's February 13 TRO was never stayed. Yet Defendants continued to take no actions to comply with it.

92.     First, Defendants continued the Executive Order's pause of all foreign-assistance funds, including as to the subset of payments owed for work already completed (the subject of the Court's February 25 order enforcing the TRO). And even after the Court entered the TRO, "Secretary Rubio … implemented a [new] 15-day disbursement pause on all $15.9B worth of grants at the State Department." ECF 29-1 (emphasis omitted).

93.     Defendants made no or almost no disbursements of foreign-assistance funds and issued no guidance to personnel on how to comply with the TRO. Instead, Defendants added new layers of review to all disbursements of foreign-assistance funds. They required line-by-line policy justifications for payments for past work that had already been approved through normal approval processes, and they required all payments to be routed through a single (or a small number of) political appointees, who refused to authorize essentially any payments.

94.     In fact, Defendants have yet to finish making payments to Plaintiffs and other implementing partners for work completed prior to February 13, notwithstanding the fact that the TRO has been in place for *over two months* and that the Court has since issued a preliminary injunction.

95.     Second, Defendants continued to treat all terminations and stop-work orders issued prior to the issuance of the TRO as continuing in full force and effect. In fact, Defendants issued guidance that the TRO had "[n]o effect on terminated awards." Zahra Doe Decl. (ECF No. 42-1) ¶ 13. Senior agency officials stated that Secretary Rubio had individually reviewed all of the prior terminations and determined that they were allowable under the terms of the individual awards, and that the terminations were in the national interest and consistent with priorities. 2/26 Marocco

Decl. ¶¶ 1-2 (ECF 43-1). But it would be impossible for one person or even a group of people to meaningfully review all of these contracts and awards in such a short period. Nor is it plausible that every single contract or award originally terminated under a blanket termination of hundreds of contracts would—on subsequent review, applying different criteria—each individually be terminated.

96. Third, even after the Court issued the TRO, Defendants continued to issue new terminations of foreign assistance awards *en masse*. *See* PI Order (ECF No. 60), at 26 ("[I]n the roughly two weeks following the TRO, Defendants issued *thousands* of terminations." (emphasis added)). They issued several new tranches of terminations, re-sent prior tranches (which had been originally issued before the TRO), and directed Contracting Officers to terminate all of the awards as quickly as possible.

97. Defendants claimed the new terminations were made after an individualized review of contracts and based on independent legal authority—contractual terms that purportedly allow Defendants to terminate contracts "as inconsistent with the national interests and foreign policy of the United States"—rather than on the Executive Order and implementing memoranda. 2/26 Marocco Decl. (ECF No. 43-1) ¶ 1; *see* 2/18 Marocco Decl. (*AVAC* ECF No. 22-1) ¶¶ 9-11, 23; 2/25 Marocco Decl. (ECF No. 39-1) ¶¶ 5-7. Defendants claimed further that Secretary of State Rubio was the final decision-maker "with respect to each award." 2/26 Marocco Decl. (ECF No. 43-1) ¶ 1.

98. On February 23, SPE Rodgers circulated a fifth tranche of contract terminations and directed Contracting Officers to an FAQ dated February 20, 2025, which did not discuss the TRO and continued to refer to the Executive Order. *See* Zahra Doe Decl. (ECF No. 42-1) ¶¶ 23-24. Specifically, the FAQ stated: "The termination authority is delegated to the Senior Procurement

Executive from the Acting USAID Administrator, Secretary Rubio, who has instructed USAID to terminate these awards as part of the President's Executive Order on Reevaluating and Realigning United States Foreign Aid. Please refer to the M/OAA Director's email to A&A staff dated February 10, 2025." *Id.* ¶ 24.

99.    Counsel for Plaintiffs alerted Defendants' counsel to this noncompliance with the TRO. An hour later, USAID Industry Liaison Matthew Johnson sent an email stating that the FAQ had been retracted: "The Q&A document sent around earlier has been withdrawn and will be updated. That document reflected an outdated and now inaccurate version with several citations that indicated that President Trump's Executive Orders were the basis for termination actions." *Id.* ¶ 26. The email continued: "For the avoidance of doubt, Tranche 5 termination authority has no relationship to any Executive Order. These awards were individually reviewed by Secretary Rubio and the USAID Front Office and were determined to be inconsistent with the national interest and Agency priorities." *Id.* ¶ 27.

100.    The email continued further: "Accordingly, USAID has elected to enforce termination authorities in the relevant instruments. Similarly, Secretary Rubio has individually reviewed Tranches 1-4 and made similar determinations in his capacity as Acting Administrator of USAID." *Id.* ¶ 28.

101.    On March 6, USAID Contracting Officers and Award Officers received an email from SPE Rodgers, instructing them to immediately review a list of terminated awards for which "expedited notices" had been issued and "issue [] detailed, expanded termination notice[s]" using templates linked in the email. Ex. A to 3/7 Jessica Doe Decl. (*AVAC* ECF No. 55-1), at 1. Rodgers further directed that "[e]ach template must be tailored to the specific award and implementing partner, referencing the relevant clauses or provisions within the award." *Id.* at 2. He explained

that the "templates [we]re designed to ensure consistent … communication between USAID CO/AOs and implementing partners following terminations." *Id.*

102.    Defendants' and senior agency officials' statements that Secretary Rubio individually reviewed thousands of award terminations is implausible. Contracts, grants, cooperative agreements, and other awards are long, technical, and complicated documents. They often include technical specifications that are dozens of pages long, as well as lengthy technical appendices. It would take a single person many weeks of work to substantively review hundreds— let alone thousands—of contracts and awards, especially if that person was not already familiar with the programs at issue.

103.    Further, without consulting the Contracting Officers, Award Officers, Contracting Officer's Representatives (CORs), or Award Officer's Representatives (AORs) who manage a specific contract or award—or the implementing partners themselves—it would be impossible in most cases to understand whether a specific award could be terminated, effective immediately, without incurring even greater termination costs or causing harm to the national interest or agency priorities.

104.    For example, the Contracting Officers, Award Officers, and CORs/AORs have specific information about the status of ongoing work, whether immediate termination would incur sunk costs (for example, by allowing already-purchased food and medicine to expire), whether immediate termination would risk the health or safety of agency personnel or implementing partners, among many other award-specific factors.

105.    It is thus implausible that the Secretary himself or even a group of political appointees engaged in a meaningful individualized review of the thousands of contracts and awards terminated prior to the Court's TRO or in the span of two weeks after the Court's TRO.

106.    Marocco's own declarations make clear that the so-called "review process" for selecting contracts, grants, and other awards for termination consisted of little more than a cursory review of a spreadsheet, with a single line of data per award, which "included information about the recipient, the amount of the award, the subject matter, and a description of the project that *often*"—*i.e.*, not always—"included the location of the project." 2/25 Marocco Decl. (ECF 39-1) ¶ 5 (emphasis added).

107.    In other words, Defendants were terminating and suspending hundreds of millions of dollars in awards based on a one-line summary, without actually looking at the award documents themselves, without consulting the personnel who manage the project, without understanding what the project was intended to achieve, how it was performing, how many beneficiaries would be affected by project termination, and, in many cases, without even knowing the location of the project.

108.    Unsurprisingly, these *en masse* terminations included even awards with waivers for life-saving humanitarian aid and essential services, which Defendants did not intend to terminate. For example, a wave of terminations on February 26, 2025 included "almost all of the awards that were needed to implement lifesaving activities," including in relation to malaria, tuberculosis, and Ebola. Enrich Decl., Ex. A., ECF 47-1, p. 6. After these terminations, a USAID official sent an email "indicat[ing] that the awards that were terminated should not have been, and had been terminated in error: 'Please hold on these life saving programs and let us review in the morning. There is an acknowledgment some may have been sent out in error and we have the ability to rescind. We need to identify what those are." *Id.*

109.    On or around April 5, Defendants executed yet another tranche of mass terminations, this time for roughly 50 humanitarian aid programs within the USAID Bureau of

Humanitarian Assistance totaling over $1.3 billion. Many of these programs had previously received waivers for as life-saving food aid programs. The terminated awards included every remaining USAID program in Afghanistan, Syria, and Yemen, as well as many awards in Lebanon, Jordan, Niger, Somalia, and others. Upon information and belief, these terminations were directly ordered by Defendant Jeremy Lewin.

110.    Defendants ultimately terminated "roughly 9,900 of 13,100 USAID and State Department awards." PI Order (ECF No. 60), at 26 (emphasis added).

111.    Before terminating their USAID and State Department grants and cooperative agreements, Defendants did not provide implementing partners with notice or an opportunity to be heard. Nor did Defendants provide implementing partners with an opportunity for an administrative appeal or otherwise to be heard *after* it terminated their USAID and State Department grants and cooperative agreements.

112.    On information and belief, USAID and State Department award terminations were carried out in at least seven tranches.

113.    On information and belief, agency personnel prepared and Secretary Rubio approved an action memorandum for each tranche of award terminations.

114.    On information and belief, the action memoranda did not provide individualized information about the awards selected for termination.

115.    On information and belief, the action memoranda state that tranches of awards were selected for termination for programmatic reasons described at a high level of generality—for example, because the awards related to "democracy promotion."

116.    On information and belief, these action memoranda state that terminating the selected awards will result in cost savings and will save taxpayers money.

117.    On information and belief, agency personnel prepared a spreadsheet listing the awards selected for termination, which was attached to each action memorandum.

118.    On information and belief, the spreadsheets listing awards selected for termination did not include substantial information concerning the content, scope, or location of the programs at issue; nor did the spreadsheets identify any potential reliance interests that would be upended, nor any costs or other adverse effects that would arise, if the awards were terminated.

***Defendants Make Some Payments to Implementing Partners Under the Court's Preliminary Injunction But Make No Efforts to Comply with the Court's Anti-Impoundment Injunction***

119.    On March 10, 2025, the Court issued a preliminary injunction against all Defendants except President Trump. ECF 60.

120.    The preliminary injunction had three primary components: (1) it enjoined Defendants from giving effect to any terminations, suspensions, or stop-work orders issued between January 20 and February 13, 2025; (2) it enjoined Defendants from withholding payments or letter-of-credit drawdowns for work completed before February 13 and directs Defendants to process at least roughly 300 payments per day; and (3) it enjoined Defendants from impounding congressionally appropriated foreign-assistance funds and directs Defendants to make available for obligation the full amount of foreign-assistance funds appropriated in the Further Consolidated Appropriations Act of 2024.

***Defendants Decide to Unilaterally Terminate Congressionally Mandated Foreign-Assistance Programs and to Not Spend Appropriated Funds as Required by Lawful Acts of the Legislative Branch***

121.    On March 10, 2025, Secretary Rubio announced in a post on X that Defendants were "officially cancelling 83% of the programs at USAID." @Marco Rubio, Mar. 20, https://x.com/marcorubio/status/1899021361797816325. Rubio asserted that the terminated programs "spent tens of billions of dollars in ways that did not serve, (and in some cases even

harmed), the core national interests of the United States." *Id.* As for the remaining 18% of programs, Defendants "intend for the … programs … to now be administered more effectively under the State Department." *Id.*

122.    On March 28, Defendant Lewin sent a memorandum to all USAID employees announcing that Defendants "will seek to retire USAID's independent operation." Will Steakin & Lucien Bruggeman, *After months of cuts, State Department says it's officially shuttering USAID*, ABC News, Mar. 28, 2025. Lewin wrote that the State Department "intends to assume responsibility for many of USAID's functions and its ongoing programming." *Id.*

123.    Also on March 28, the State Department sent a Congressional Notification to Congress expressing its "intent to realign select USAID functions to the Department and to phase out others." Congressional Notification Transmittal Letter, March 28, 2025, at 3, http://bit.ly/42t0Yvn. The State Department stated that "USAID conducted a comprehensive review of its existing programs and awards to assess their alignment with U.S. foreign policy objectives," and that "numerous programs were discontinued" as a result. *Id.* Further, the State Department stated that it "has carefully considered which USAID programs could continue to advance the Administration's foreign policy objectives," which "have been determined to be humanitarian assistance, global health functions, strategic investment, and limited national security programs." *Id.* The State Department explained that it planned to restructure the organization to retain these limited functions but that "[o]ther functions … would be eliminated … ." *Id.* at 4.

124.    The Congressional Notification also included a chart showing USAID's remaining unobligated funds. The chart indicates that, as of March 23, USAID had nearly $24 billion in appropriations that remained unobligated. USAID has provided no explanation as to how it will

obligate these appropriated funds before they expire on September 30, 2025, September 30, 2026, or any other applicable date.

125.    On August 28, 2025, President Trump submitted a rescissions package to Congress to rescind more than $4 billion dollars in expiring foreign aid appropriations—with the explicit intent to effectuate a "pocket rescission" of these funds. ECF No. 129. The package includes more than $4 billion in expiring foreign aid funds that were appropriated in the 2020, 2021, and 2024 Appropriations Acts. The proposal seeks rescission of $3.2 billion in development assistance from the 2024 Appropriations Act, which the proposal states "would align with the Administration's efforts to return funding from wasteful U.S. Agency for International Development programs to the American taxpayers." ECF No. 129-3 at 15. The proposal also seeks rescission of more than $600 million from the Democracy Fund appropriated in various years, which the proposal states "would return funding from wasteful foreign assistance programs to taxpayers in alignment with America First foreign policy." *Id.* at 3–6.

### *Defendants' Actions Shutter Longstanding USAID and State Department Partners and Imperil Their Employees*

126.    Defendants' actions have devastated USAID's implementing partners, including Plaintiffs and their members.

127.    Most of USAID's programs were implemented—whether by grant, cooperative agreement, or contract—by private-sector partners. CRS Report, *supra*, at 1. USAID had thousands of partners—Plaintiffs among them—including nonprofit organizations, for-profit contractors, universities, international organizations, and foreign governments. *See id.* Their work was critical to USAID's efforts to fight disease, educate children, provide clean water, and support economic and other forms of development in approximately 130 countries around the world. *See*

*id.* And they worked in some of the most needy parts of the world, including conflict zones. *See id.*

128.    Defendants' actions stopped these efforts, with immediate consequences. Half a billion dollars' worth of food grown in America's heartland—enough to feed more than 30 million people—rotted in domestic ports and warehouses, unable to reach starving populations abroad. *See* Tim Carpenter, *Kansas's Moran, Davids Sound Alarm on Delay of USAID Food Aid to Starving Pepple Worldwide*, Kansas Reflector (Feb. 7, 2025), https://bit.ly/40U5KQl; Christopher Vondracek, *Shuttering of USAID Could Mean the End of Millions in Income for Midwest Farm Operations*, Minn. Star Tribune (Feb. 6, 2025), https://bit.ly/4guXYlK. Efforts aimed at preventing and treating disease stalled as tens—if not hundreds—of thousands of healthcare workers were let go. Declan Walsh, "*We Are in Disbelief": Africa Reels as U.S. Aid Agency is Dismantled*, N.Y. Times (Feb. 8, 2025), https://bit.ly/40RJpCT.

129.    Plaintiffs have been irreversibly harmed by these actions.

130.    Plaintiff Democracy International's Justice, Rights, and Security—Rapid Response Assistance project provided lifesaving humanitarian assistance, which includes essential medicines, medical services, food, shelter, and subsistence assistance. To name just two of many impacted programs: In Bangladesh, Democracy International had to stop providing medical care to hundreds of adolescents and young students who were seriously injured and traumatized in the violent crackdowns on protesters last summer, leaving them without necessary medical services. And in Burkina Faso, human rights defenders who are working to track violence against Christian communities are now at risk of being killed because Democracy International's program can no longer help them relocate and provide them with food, shelter, and subsistence. Cutting off Democracy International's programs has also halted emergency assistance to refugees and victims

of state-sponsored violence; interrupted programs working to prevent at-risk youth from joining gangs; and left beneficiaries vulnerable to being recruited into terrorist organizations.

131.    Since January 20, all 22 of Plaintiff Democracy International's USAID prime awards (cooperative agreements and contracts) and its one USAID project subaward have been terminated. Only the company's one cooperative agreement from the State Department has not been terminated. These awards received funding from the following Appropriations accounts and funds: Complex Crises Fund, Development Assistance, Transition Initiatives, Assistance for Europe, Eurasia and Central Asia, Democracy Fund, Global Health Programs, and Economic Support Fund. The total remaining value (ceiling amount) of awards terminated is $151 million and the total remaining obligated amount for awards terminated is $44.6 million. These terminations represent approximately 97% of Democracy International's 2024 revenue. Collectively, these terminations represent near catastrophic harm to the company, which was a rapidly growing small business, as they effectively eliminate virtually all of Democracy International's programs and revenue.

132.    Plaintiff DAI's portfolio has been similarly devastated, with far-ranging, often life-threatening effects. Specifically, Defendants' actions have ended funding for shelter for minors seeking protection from recruitment into criminal gangs in Central America, for safe drinking water in politically strategic communities in Lebanon, for civil-society organizations contending with brutal authoritarian violence in Burma, and for efforts to track and contain zoonotic diseases in Bangladesh.

133.    Since January 20, DAI received termination notices for 85 of its 91 prime contracts and cooperative agreements. DAI's budgeted revenue from all terminated contracts amounted to 88% of its budgeted 2025 revenue from active U.S.-government funded contracts. These

terminations have seriously damaged the company's financial performance, causing permanent damage to DAI's reputation by forcing nonpayment to numerous vendors, landlords, and security providers. They have also jeopardized DAI's legal standing in the more than 80 countries in which it maintains active operating entities, forced the furlough and termination of more than 3,000 employees around the world, destroyed tens of millions of dollars in equity value held in more than 500 employee-owner retirement accounts, and forced DAI to shift to much more costly sources of financing for its working-capital requirements. DAI's former lenders, which include some of the largest banks in the United States and the United Kingdom, no longer believe that the U.S. government will meet its financial obligations and pay in a timely manner for valid invoices or settlement agreements on U.S. government contracts.

134.    Plaintiff Chemonics has received 89 award terminations since January 20, totaling $3,043,533,592 in obligated funds with an award ceiling total of $4,209,658,782. The cancelled contracts (for contracts in hand) represent 69.1% of 2025 projected revenue; 64.5% of Chemonics's entire budget; 62.3% of award ceilings; and 69.5% of the remaining backlog for the company, as of January 1, 2025.

135.    These terminations have seriously damaged the company's financial performance and permanently eroded Chemonics's reputation by forcing it to delay payments to suppliers, vendors, and landlords and damaging its goodwill with local communities, as well as with its own employees. In addition to damaging its reputation and talent base, staff terminations and delays in payments to partners have also put Chemonics at risk of lawsuits around the world. Indeed, Chemonics has already expended considerable resources on managing employee and partner complaints and threats of litigation.

136.    Nonpayment to partners has also significantly increased security threats to Chemonics personnel worldwide. In several cases, unpaid partners' and vendors' frustrations have escalated to serious intimidation and in-person hostile visits to staff members' residences. In addition, on April 15, 2025, armed AFC/M23 rebels attempted to seize a Chemonics/USAID-owned vehicle from a partner site in Bukavu, Democratic Republic of the Congo, intimidating local staff in the process. The vehicle remained vulnerable at the site because, as of that date, USAID had not approved an Expedited Disposition request seeking to transfer the vehicle between projects while a suitable local partner was identified. Finally, although Chemonics has historically relied heavily on a line of credit from a syndicate of national banks, since February 18, 2025, that syndicate has refused to permit Chemonics to draw down on that line of credit due to Chemonics's financial situation and the syndicate's view that U.S. government receivables are no longer reliable.

137.    Since January 20, 2025, Plaintiff MSH received terminations notices for 14 of its 19 USAID awards (four contracts and ten cooperative agreements), which had a total award ceiling of over $800,590,000 for all project years. Of the remaining five awards, three have received approvals to resume limited scope activities; one has submitted a plan to continue that is under consideration; and a fifth, while "authorized" to resume work, is still suspended as it has yet to be paid for work already completed.

138.    The complete termination of the 14 awards alone is expected to cause a roughly 75% reduction in MSH's projected annual revenue, and a loss of more than $105,300,000 over the next 16 months.

139.    These terminated awards funded projects that strengthened health systems to save lives in dozens of countries. The projects provided essential lifesaving services including

prevention and treatment of HIV and AIDS, tuberculosis, malaria, and other diseases and epidemics, as well as critical maternal, infant, and child health services.

140.    With the drastic reduction of revenue, MSH has had to radically reduce its U.S. staff—from 242 full-time employees to 46 currently, with more terminations forthcoming—and terminate over 700 employees outside the U.S. Combined, these terminations account for over 70% of MSH's total workforce. MSH is also rapidly shuttering offices and losing its business presence in more than ten countries. And these terminations have had a ripple effect, reducing MSH's ability to mobilize new sources of funding to carry out critical, lifesaving activities around the world.

141.    Plaintiffs like MSH have also suffered lost revenue from the loss of future awards they had won but were yet to receive. For example, MSH was informed on April 9, 2025, that the selection process for a five-year, $45 million award of which MSH was "the apparently successful applicant" had been cancelled. MSH thus lost $45 million in future revenue.

142.    Plaintiff HIAS has had its work helping refugees across South America and Africa terminated, including its work helping displaced children who are at high risk of trafficking, sexual exploitation, abuse, and neglect.

143.    Since January 20, HIAS has received ten terminations of cooperative agreements and grants. The terminations valued a total of approximately $34,970,002, representing almost 20% of HIAS's budget. This total includes approximately $27,447,879 of unspent funds. The terminations have drastically impacted HIAS's ability to serve refugees globally: They have reduced the organization's value from $175 million to $40 million and shrunk its global presence from more than twenty country offices, to only eight. As a result, program beneficiaries are set to

lose access to shelter, healthcare, education, dignified work, and education. And HIAS's long-term ability to grow back these U.S.-based and international programs is far from certain.

144.    The ABA has received 67 award terminations since January 20 (48 where it was the primary recipient and 19 where it was a subrecipient), totaling $66,361,556 in obligated funds. ABA's terminated awards were all related to democracy, rule of law, and human rights programs. Emblematic programs include programs to advance access to justice, support counter-terrorism efforts, advance freedom of expression and freedom of religion, strengthen anti-corruption efforts, promote internet freedom, and protect human rights defenders at risk. These terminations have decimated ABA's programs, including its efforts to protect religious freedom in Asia, fight human trafficking in the Democratic Republic of Congo and Colombia, prepare Ukraine to recover from Russia's invasion, advance democracy in Myanmar, and combat money laundering and terrorism in South America.

145.    The funds for ABA's programs were appropriated under the 2024 Appropriations Act or one of the prior years' Appropriations Acts. Specifically, these terminated programs were largely funded through appropriations to either USAID or State Department under the Democracy Fund, the Economic Support Fund, and other funds and allocations under democracy programs, which are defined in successive Appropriations Act(s) to include programs that support promotion of human rights, labor rights, and the rule of law. The terminated awards represented 33% of ABA's total revenue.

146.    The mass termination of the ABA's international foreign assistance programs has caused significant short-term and long-term harms to the ABA's operations and reputation. The ABA has been forced to terminate more than 250 employees and consultants across over two dozen distinct legal jurisdictions; more than 20 office leases in the middle of terms with attendant

deposits; more than 80 sub-awards with local organizations; hundreds of international and local vendor contracts; and a diverse package of software licenses. These terminations represent over $110 million in lost revenue to the ABA—a portion of which is used to support shared costs and infrastructure for the entire organization—and have exposed the ABA to legal claims in a diverse range of legal systems for years to come. As a result of the terminations, the ABA has also been forced to cease all foreign-assistance related communications with this network of foreign counterparts and to abrogate all agreements to provide services, equipment, trainings, or other similar support. The abrupt cessation of these activities is irreparably harming ABA's international brand and pro bono investment, which are decades in the making.

147.    Plaintiff GHC's members, including Plaintiffs Chemonics and MSH, have also been severely impacted by Defendant's actions. One member had to suspend a $20 million hospital accreditation program in Cambodia. Another had to close roughly 1,226 primary care clinics. And a third had to delay implementation of anti-malarial campaigns in Africa that must take place before the rainy season to be effective.

148.    GHC's membership includes over 100 organizations. Across just nine of its member organizations, 213 agreements have been terminated since January 20. The lost revenue from these 213 terminated programs is $7.2 billion. That $7.2 billion includes both obligated and unobligated funding with some programs that were terminated not set to end until 2029. Monetarily, JSI, RTI, and FHI 360 took the biggest hit with lost funds of $1.5 billion, $1.9 billion, and $2.1 billion, respectively. GHC member Save the Children, had $84.5 million in cancelled, unobligated funding across 32 terminated awards. World Vision, also a GHC member, had $22.7 million in future funds across 16 awards cancelled. GHC member Path had eight awards terminated, totaling $266.2 million in obligated funding. GHC member Global Communities had

11 awards terminated, equaling $117.6 million in unobligated funding. GHC member Abt Global LLC had 19 awards terminated, which totaled $183 million in unobligated funding.

149.    Plaintiff SBAIC's members—small businesses that provide foreign assistance in all sectors and all geographies, including conflict zones—have also suffered ruinous injuries. SBAIC's members, including Plaintiff Democracy International, have had their projects devastated by losing access to vitally necessary appropriated funds. Many of SBAIC's members are already running on thinly stretched lines of credit. Each day without USAID payments brings them closer to bankruptcy.

150.    Substantially all of SBAIC's small business members have had contracts, grants, and/or cooperative agreements terminated since January 20. SBAIC members report a total value of contract terminations of $1.98 billion ($1.68 billion in prime contracts and $300 million in subcontracts), across 256 total contract terminations (117 prime contracts and 139 subcontracts), with lost revenues for this and the next few years amounting to $1.15 billion ($984 million in prime contracts and $167 million in subcontracts). Based on reports from 31 member firms, the median SBAIC member firm has lost a devastating 85% of annual revenues due to the terminations, with many having lost almost 100% of annual revenues. Members have suffered global reputational harm, and many have lost access to financing as commercial banks no longer regard USAID as a reliable payer and as a result, will not continue to accept invoices to USAID as valid collateral. Unless these terminations are quickly rescinded, many SBAIC members will lose most of their personnel, many companies will close within weeks or months, and the value of the businesses that owners have spent their careers creating will all but evaporate.

151.    These programs cannot simply be restarted on command. USAID's partners have hemorrhaged resources and employees, and many have ceased operations entirely. Others will be

forced to do so imminently if the terminations are allowed to stand.

152.    At the end of February, Plaintiff Democracy International furloughed 100 percent of its 95 U.S.-based home office employees and placed 93% of employees working on USAID projects in overseas offices on "administrative leave." In response to termination notices for all of its USAID programs, Democracy International has given or will give notice of termination to all of these overseas employees. In March, the company rehired some home-office employees temporarily at reduced salaries and benefits to conduct program closeouts.

153.    Plaintiff DAI has furloughed or terminated 612 U.S.-based staff, deferred payments to hundreds of vendors, summarily terminated numerous subcontracts and grants, and violated the terms of hundreds of leases and other contractual arrangements. In numerous cases, furloughed and terminated DAI staff members are no longer able to meet their own critical financial obligations for housing, education, and medical care.

154.    Plaintiff Chemonics has been forced to terminate 582 members of its U.S. staff, representing 53% of its US-based workforce. Among its overseas staff, Chemonics has terminated or is in the process of terminating 64% of its U.S. expatriates, 42% of its third-country nationals, and more than 85% of its local staff members.

155.    Plaintiff HIAS has had to lay off more than 500 international staff, shutter its program offices, and defer payments to vendors.

156.    Defendants' actions shredded Plaintiffs' and other partners' credibility within the communities that they operate (or operated) in. These organizations often operate in unstable, conflict-torn environments. The people and governments there are often skeptical of them and their efforts. It takes hard work for organizations to build trust in these communities and to prove that they are truly there to help. Once that trust is gained, these communities rely on these organizations

for important, basic services. Defendants have forced Plaintiffs and others to abruptly shut their doors and cease offering those services, destroying the trust and credibility that had been built up over decades.

157.    Defendants' actions have also made it difficult or impossible for Plaintiffs and other partners to compete for future USAID and State Department contracts, grants, and cooperative agreements by harming Plaintiffs' capacity, terminating programs, forcing furloughs and terminations, cutting off critical revenues and resources, and destroying community trust.

## LEGAL ALLEGATIONS

### *Neither the President, Secretary of State, nor USAID Administrator Has Unilateral Authority to Withhold Appropriated Foreign-Assistance Funds or to Terminate Statutory Programs*

158.    The Constitution empowers Congress to make the laws of this nation. U.S. Const. art. I, § 1.

159.    As part of Congress's legislative power, the Constitution vests Congress, not the Executive, with "exclusive power" over federal spending. *Dep't of Navy v. FLRA*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992)). Understood since the founding as "'the most complete and effectual weapon'" of a representative body, Congress's power of the purse serves as "a bulwark of the Constitution's separation of powers among the three branches of the National Government." *Id.* at 1346-47 (quoting The Federalist No. 58, at 359 (James Madison) (Clinton Rossiter ed., 1961)). To ensure that Congress alone would control the public fisc, the Constitution both grants to Congress the power to direct federal spending and denies that power to the other branches. The spending power is the first listed among Congress's enumerated powers in Article 1, Section 8. And the Appropriations Clause forbids the expenditure of federal funds except "in Consequence of Appropriations made by Law." U.S. Const., art. I, § 9, cl. 7.

160.    Consistent with the Constitution's division of legislative and executive powers, the President must "faithfully execute[]" the law as Congress enacts it. U.S. Const., art. II, § 3. "[T]he President may not decline to follow a statutory mandate or prohibition simply because of policy objections." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.). To allow otherwise would have "serious implications for our constitutional structure." *Id.* at 267.

161.    Like other statutes enacted by Congress, an appropriations act is "Law." U.S. Const., art. I, § 9, cl. 7. And as with any other law, the separation of powers forbids the President from revising or ignoring an appropriations statute once duly enacted. *See Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

162.    The President also lacks inherent constitutional power to withhold funds that Congress has lawfully appropriated. Absent statutory authorization, the President possesses only the powers that the Constitution independently confers on the Executive. U.S. Const., art. II, § 1, cl. 2. The power to set federal funding policies is not among those powers. When the President "has policy reasons … for wanting to spend less than the full amount appropriated by Congress for a particular project or program[,] … even the President does not have unilateral authority to refuse to spend the funds." *In re Aiken County*, 725 F.3d at 261 n.1.

163.    Longstanding historical practice and the reasoned views of every branch of government confirm that the President has no authority to unilaterally revise congressional appropriations. The Comptroller General, the top legislative-branch official charged with oversight of federal expenditures, has explained in opinions going back to 1973 that "[t]he Constitution grants the President no unilateral authority to withhold funds from obligation." *In re Office of Management and Budget—Withholding of Ukraine Security Assistance*, B-331564, 2020 WL 241373 (Comp. Gen. Jan. 16, 2020); *see Report to the Sen. Subcomm. On Separation of Powers*,

B-135564, 1973 WL 159460 (Comp. Gen. July 26, 1973). And the Supreme Court, since before the Civil War, has disapproved of assertions of executive power to withhold funds required to be disbursed by statute. *See, e.g.*, *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 610 (1838); *see also Clinton v. City of New York*, 524 U.S. 417, 468 (1998) (Scalia, J., concurring in part and dissenting in part) (explaining that President Nixon once asserted a "constitutional right to impound appropriated funds," but the Supreme Court's "decision two years later in *Train v. City of New York*, 420 U.S. 35 (1975), proved him wrong" (quotation omitted)).

164.    Indeed, since 1969, the Department of Justice has adhered to that settled understanding of the separation of powers. As later-Chief Justice Rehnquist wrote in an Office of Legal Counsel opinion, "the suggestion that the President has a constitutional power to decline to spend appropriated funds … is supported by neither reason nor precedent." *Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, 1 Op. O.L.C. Supp. 303, 309 (1969). That "the President disagree[s] with spending priorities established by Congress" cannot "justify his refusal to spend." *Id.* at 311.

165.    Even if the Constitution did not altogether deny the President the power of the purse, Congress has done so through three federal statutes. In this posture, the President's "power is at its lowest ebb," and his attempt to override Congress's funding priorities could be sustained only if Congress had no power over federal expenditures at all, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)—a proposition flatly inconsistent with the Constitution's text and structure.

166.    First, Congress has mandated that the Executive Branch spend specific amounts of money for specific foreign aid purposes in annual appropriations acts, including the 2024 Appropriations Act and the 2025 Continuing Resolution.

167.    Congress expressly provided only limited circumstances in which the President may decline to obligate appropriated funds in the Impoundment Control Act of 1974, Pub. L. No. 93-344, 88 Stat. 333 (codified as amended at 2 U.S.C. §§ 682 *et seq.*). Under the Impoundment Control Act, the President may only decline to spend funds if he transmits a special message to Congress proposing to rescind funds, and Congress rescinds the appropriation as the President requested. 2 U.S.C. § 683(b); *see id.* § 684(a). The Impoundment Control Act does not allow for rescissions of appropriated funds in other circumstances. This framework comports with the constitutional mandate that changes to enacted legislation—including appropriations acts—require bicameralism and presentment. *See INS v. Chadha*, 462 U.S. 919, 956 (1983).

168.    The Impoundment Control Act also permits the President to "defer[]" a budget authority—that is, to withhold or delay the obligation or expenditure of appropriated funds—but only for limited purposes, for a limited time, and after transmitting a special message to Congress setting forth, among other things, the reasons for the proposed deferral. 2 U.S.C. § 684(a); *see id.* § 682(1). Under that provision, deferral is permissible only "(1) to provide for contingencies; (2) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (3) as specifically provided by law." *Id.* § 684(b). "No officer or employee of the United States may defer any budget authority for any other purpose." *Id.* Neither the President nor any executive officer may defer obligation or expenditure of appropriated funds for policy reasons. *Aiken County*, 725 F.3d at 261 n.1; *see also* GAO, B-331564, at 6.

169.    Second, the Anti-Deficiency Act Amendments of 1982, Pub. L. No. 97-258, 96 Stat. 929 (codified as amended at scattered sections of Title 31), prohibit executive branch officers from holding appropriated funds in reserve except under the same limited circumstances set forth in the Impoundment Control Act. Under the Anti-Deficiency Act, "[a]ppropriations shall be

applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). "In apportioning or reapportioning an appropriation, a reserve may be established only—(A) to provide for contingencies; (B) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (C) as specifically provided by law." *Id.* § 1512(c)(1). Like the Impoundment Control Act, this statute forbids the Executive to decline to spend and hold in reserve appropriated funds for policy reasons or to otherwise redirect funds to purposes other than those Congress prescribed in the appropriation.

170.    The Anti-Deficiency Act also prohibits all federal agencies from spending funds that have not been lawfully appropriated or otherwise lawfully provided to the agency. "[A]n officer or employee of the United States Government … may not … make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation." 31 U.S.C. § 1341.

171.    Third, the Purpose Act provides that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). Defendants thus cannot spend funds that Congress appropriated to USAID and the State Department on purposes for which Congress did not appropriate the funds.

172.    No provision of the 2024 Appropriations Act, the 2025 Continuing Resolution, or any other statute authorizes the President, Secretary of State, or USAID Administrator to impose a freeze or termination of appropriated foreign assistance funding.

173.    Defendants lack authority to refuse to carry out the duties and foreign-assistance programs that Congress mandated. For example, Congress in the 2024 Appropriations Act mandated that USAID carry out a host of programs established in the FAA to support "global health activities," including child survival, maternal health, immunization, and assistance for

displaced children. Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 740; *see* 22 U.S.C. §§ 2151-2152k, 2293-94 (FAA provisions establishing these programs). It ordered USAID to implement development programs focused on agriculture, education and human resources, energy production, schools and hospitals, small businesses, and human welfare in sub-Saharan Africa. Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 742; *see* 22 U.S.C. §§ 2151a, 2151c, 2174, 2211-2211d, 2293-2294. It directed USAID to carry out a statutory program for international disaster relief and preparedness. Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 742; *see* 22 U.S.C. § 2292. And it prescribed specific, concrete actions USAID and the State Department must take in furtherance of the democracy programs Congress was funding. *See, e.g.*, Pub. L. No. 118-47, div. F, tit. IV, § 7032. Defendants had and have no authority to disregard these congressional directives and thereby nullify statutorily mandated assistance programs.

### *The Post-TRO Award Terminations Are Reviewable as a Pretextual and Post Hoc Rationalization of the Blanket Funding Freeze*

174.    The Administrative Procedure Act requires courts to "hold unlawful and set aside" any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To pass muster under that standard, an agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)). The government's explanation must also be "genuine." *Dep't of Com. v. New York*, 588 U.S. 752, 780, 785 (2019). "Accepting contrived reasons would defeat the purpose of the enterprise." *Id.* Agency action that "rest[s] on a pretextual basis" must therefore be set aside. *Id.* In determining whether an agency's given explanation for its action is pretextual,

courts are "not required to exhibit a naiveté from which ordinary citizens are free." *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.).

175.    Defendants attempt to characterize the post-TRO tranches of terminations as based on the terms of specific award instruments—not Executive Order 14,169 or subsequent implementing directives. But there is no evidence whatsoever that Defendants had any specific terms and conditions in mind when they issued the tranches of award terminations that post-date the TRO. Instead, Defendants simply invoked the awards' terms and conditions as a pretext for avoiding the TRO's plain prohibition on terminating Plaintiffs' and other implementing partners' awards while this lawsuit was pending.

176.    Indeed, the termination notices did not even "refer[] to the terms of agreements or legal authority," as this Court has recognized. PI Order (ECF No. 60), at 28 (citing Ex. A to 2/27 Sullivan Decl. at 1-4 (ECF No. 44) (four such termination notices)).

177.    And some post-TRO terminations, as the Court has also recognized, even "continued to assert that the termination was 'part of' or 'in alignment with' the Executive Order." (quoting Zahra Doe Decl. (ECF No. 42-1) ¶ 24).

178.    Defendants' first post-TRO status report on February 18 makes the pretextual, *post hoc* nature of Defendants' justification for their mass terminations crystal clear. Defendants reported there that, "*in light of the TRO*, the Department of State and USAID *have begun* an analysis of the thousands of contracts, grants, and cooperative agreements on which action was taken during the almost four weeks between the issuance of the Executive Order and the Court's order." Defs.' 2/18 Status Report (ECF No. 25) ¶ 8 (emphases added).

179.    That post-TRO analysis, Defendants reported, "confirmed that at least substantially all of the terminations, suspensions, and stop-work orders issued on USAID contracts, grants, and

cooperative agreements were allowed by the terms of those instruments or terms implicitly incorporated into those instruments." *Id.* ¶ 9. They reported the same with respect to State Department contracts, grants, and cooperative agreements. *Id.* ¶ 10.

180.    In other words, Defendants terminated award instruments first and only then went back to check whether those terminations could be explained in relation to "the terms of those instruments or terms implicitly incorporated into those instruments." *Id.* ¶¶ 9-10.

181.    A March 6 communication from SPE Rodgers reflects this same backwards order of operations. On March 6, in an apparent attempt to avoid messaging mishaps and inconsistences, SPE Rodgers "instructed contracting officers to follow earlier terminations with expanded termination notices 'tailored to the specific award and implementing partner, referencing the relevant clauses or provisions within the award.'" PI Order (ECF No. 60), at 28 (quoting Ex. A to 3/7 Jessica Doe Decl. (*AVAC* ECF No. 55-1), at 1). But they were to do so for agreements that had *already* been terminated. The goal was simply "ensur[ing] consistent … communication between USAID CO/Aos and implementing partners following terminations." Ex. A to 3/7 Jessica Doe Decl. (*AVAC* ECF No. 55-1), at 2).

182.    Defendants' proffered justifications for the mass award terminations further demonstrate pretext by the fact that their so-called "individualized" review was not at all individualized—and was hardly a review.

183.    In reality, post-TRO, Defendants were still terminating agreements *en masse*, and still doing so pursuant to Executive Order 14,169.

184.    Defendants' "contrived reasons" for the post-TRO terminations render the terminations arbitrary and capricious. *Dep't of Com.*, 588 U.S. at 780; *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. As such, they must be set aside. *See Dep't of Com.*, 588 U.S. at 785.

185.    Further, "[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself" when it took the action. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50 (citing *SEC v. Chenery*, 332 U.S. 194, 196 (1947). To be sure, the "rule is not a time barrier which freezes an agency's exercise of its judgment after an initial decision has been made and bars it from further articulation of its reasoning." *Loc. 814, Int'l Bhd. Of Teamsters, Chauffeurs, Warehousemen v. NLRB*, 546 F.2d 989, 992 (D.C. Cir. 1976). But it *is* a rule "which forbids judges to uphold agency action on the basis of … rationalizations offered for the first time in litigation affidavits." *Id.*

186.    Insofar as Defendants' invocation of contractual terms and conditions are *post hoc* rationalizations for the *pre*-TRO blanket terminations, those termination cannot be upheld on that basis.

### The Approved Action Memoranda Directing Termination of Vast "Tranches" of Awards Are Independently Reviewable as Final Agency Actions

187.    Each of the action memoranda directing termination of a tranche of awards, as approved by the Secretary of State, is a "final agency action" reviewable under the Administrative Procedure Act. 5 U.S.C. § 704. Reflecting the authoritative decision of the agencies' highest decisionmaker, those memoranda removed all discretion from line agency staff and marked the end of the agencies' purported decision-making process.

188.    Agency action is final, and thus subject to review under the Administrative Procedure Act, if it "mark[s] the 'consummation' of the agency's decisionmaking process" and is an action either "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quoting *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948); then quoting *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). In

applying that standard, the Supreme Court has employed a "pragmatic" approach, deeming agency actions final so long as they reflect more than a "tentative" decision and bind agency staff. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597-99 (2016).

189.    First, each action memorandum marked the consummation of the agencies' decisionmaking process with respect to the identified award tranche. "The consummation prong of the finality inquiry requires [the court] to determine 'whether an action is properly attributable to the agency itself and represents the culmination of that agency's consideration of an issue,' or is, instead, 'only the ruling of a subordinate official, or tentative.'" *NRDC v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020) (quoting *Bennet*, 520 U.S. at 177-78).

190.    Far from a tentative ruling by a subordinate official, the action memoranda approved by the Secretary of State authoritatively announced the decision of the agencies' highest decisionmaker with respect to each tranche of awards. As described in agency correspondence, and on information and belief, each approved action memorandum was the Secretary of State's final word on awards of particular subject matter, articulating the agencies' reasoning for terminating that tranche of awards. *See* ECF 19-1, p. 4 ("An Action Memorandum for each tranche of awards was reviewed and cleared through the State Department's Director of Foreign Assistance and approved by the Secretary."); ECF 25-1, ¶ 16 (explaining that awards were grouped for termination under one of seven "policy bases"). Indeed, Defendants' declarations in this case have described the Secretary of State's approval of each slate of terminations as the "ultimate" step in the agencies' review. ECF 39-1, ¶¶ 5-6; *see also* ECF 43-1, ¶¶ 1-2 ("Secretary Rubio has now made *a final decision* with respect to each such award affirmatively electing to either retain the award or terminate as inconsistent with the national interests and foreign policy of the United States." (emphasis added)).

191.    Because the action memoranda embodied the Secretary's "final decision" as to each award tranche, ECF 43-1, ¶¶ 1-2, the "mere possibility" that the agency "might reconsider" award terminations or later grant case-by-case waivers makes no difference. *Sackett v. EPA*, 566 U.S. 120, 127 (2012); *see also Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA*, 752 F.3d 999, 1006 (D.C. Cir. 2014) ("An agency action may be final even if the agency's position is subject to change in the future." (quotation marks omitted)). "That possibility," the Supreme Court has explained, "is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal." *Hawkes*, 578 U.S. at 598.

192.    Second, the action memoranda approved by the Secretary of State determined rights and obligations and produced legal consequences. As both the Supreme Court and the D.C. Circuit have held, an internal agency directive satisfies the finality inquiry's second prong so long as it "b[inds] [agency] staff," *Biden v. Texas*, 597 U.S. 785, 808 (2022) (citation omitted), or "withdraws [their] previously-held discretion," *Scenic Am., Inc. v. United States Dep't of Transportation*, 836 F.3d 42, 56 (D.C. Cir. 2016). *See, e.g.*, *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 405 (D.C. Cir. 2020) (holding that guidance document "carries legal consequences because it withdraws some of the discretion" previously held by agency staff); *NRDC v. EPA*, 643 F.3d 311, 319 (D.C. Cir. 2011) (similar). The action memoranda here bound line agency staff to terminate each award tranche without further discretion, leaving them only the ministerial function of issuing form termination letters. And there can be no doubt that the action memoranda carried the force of law, because agency guidance to Contracting Officers identified the action memoranda as the "authority" for terminations. *See, e.g.*, ECF 19-1, p.4. ("These action[] memos will be filed in a shared drive. This documentation along with this email can be used to support the terminations.").

193.    That individual award terminations might also be judicially reviewable makes the action memoranda no less final. Indeed, both the Supreme Court and D.C. Circuit have held agency memoranda to be final under the APA even if those memoranda might produce *other* agency actions amenable to challenge—as in the common scenario where a broadly applicable final rule contemplates future agency enforcement actions under that rule. In *Biden v. Texas*, for example, the Supreme Court held that a memorandum to agency staff forbidding asylum seekers from being returned to Mexico pending immigration hearings was a final agency action. 597 U.S. at 808. Individual removal decisions, of course, are also reviewable final agency actions. But the Court rejected the argument that the memorandum was merely "an abstract decision apart from specific agency action," holding that it produced legal consequences because it "bound DHS staff." *Id.* at 808-09; *see also Hawkes*, 578 U.S. at 599-600 (explaining that the Court's cases recognized agency action may be final even if it "would have effect only if and when" it was implemented "against a particular [regulated party]" (quoting *Abbot Labs. v. Gardner*, 387 U.S. 136, 150 (1967))).

194.    The action memoranda here are even more conclusive in effect than the memorandum in *Biden v. Texas*. Announcing the Secretary of State's final decision, the action memoranda required line agency staff to terminate each tranche of awards without any further individualized review. *See AVAC* ECF 26-3, ¶¶ 28-29 (describing email informing Contracting Officers that "[a]n Action Memorandum for each tranche of awards was … approved by the Secretary" and directing staff to terminate all awards in the first three tranches within two days); ECF 19-1. That is, the action memoranda withdrew *all* the Contracting Officers' "previously-held discretion" with respect to each award tranche, not merely "some" of it. *Scenic America*, 836 F.3d at 56. And because the action memoranda, on information and belief, are the documents which set

forth the Secretary of State's grounds for decision, their legality is particularly "fit for judicial resolution." *Carter/Mondale Presidential Committee*, 711 F.2d 279, 286 (D.C. Cir. 1983) (quoting *FTC v. Standard Oil Co.*, 449 U.S. 232, 239-40 (1980)).

### The Decisions to Shut Down Foreign-Assistance Programs Are Reviewable Final Actions

195.    Defendants' decisions to eliminate foreign-assistance programs are a final agency action reviewable under the APA.

196.    By their own admission, Defendants have reached the "consummation of [their] decisionmaking process" and legal consequences are already flowing from their decisions. *Bennett*, 520 U.S. at 178 (quotations omitted). Defendants' decisions to shut down USAID's and the State Department's programs are not "tentative" decisions; they bind agency staff. *Hawkes Co.*, 578 U.S. at 597-99.

197.    Defendants have made a final decision not to spend substantial sums appropriated to USAID and the State Department. Secretary Rubio left no doubt in his March 10 social media post that the decision to shut down most USAID programs was final; he wrote that Defendants were "officially cancelling 83% of the programs at USAID." @MarcoRubio, *supra*.

198.    The State Department's Congressional Notification further confirms that Defendants have reached a final decision to eliminate most of the foreign assistance programs administered by USAID. The Congressional Notification indicates that there are nearly $24 billion in USAID appropriations that remain unobligated. Defendants have given no indication as to how these funds will be spent, consistent with Congress's directives, if not on the foreign-assistance programs that Defendants have decided to eliminate.

199.    The shutting down of foreign-assistance programs, and the decision not to spend funds appropriated to USAID and the State Department, substantially injure Plaintiffs by depriving them of the opportunity to compete for future USAID and State Department awards under

congressionally mandated foreign-assistance programs, which account for a substantial majority of Plaintiffs' revenues. Moreover, Plaintiffs and their members receive a substantial portion of their revenue—up to all of it—from USAID and State Department contracts, grants, and cooperative agreements, and they have organized their entire businesses in reliance on their continued ability to compete for and implement foreign-assistance contracts, grants, and cooperative agreements awarded by USAID and the State Department. The *en masse* termination of awards therefore substantially harmed the value of Plaintiffs' and their members' businesses.

### The Stated Grounds for the Funding Freeze, the Post-TRO Award Terminations, and the Shutting Down of Foreign-Assistance Programs Conflict with Applicable Law and Fail to Consider Important Aspects of the Problem

200.    Under the APA, a reviewing court "must confirm that the agency has fulfilled its duty to 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). Agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (citation omitted). And agency action must be "upheld, if at all, on the same basis articulated in the order by the agency itself." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 169 (1962).

201.    The reviewing court must also determine whether a challenged agency action is "contrary to law." *Env't Def. Fund v. EPA*, 124 F.4th 1, 11 (D.C. Cir. 2024). In doing so, courts do not defer to an agency's interpretation of a statute, but rather use their "independent legal judgment" and "apply[] all relevant interpretive tools" to find "the best reading," i.e., "the reading

the court would have reached if no agency were involved." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400-01 (2024) (citation omitted).

202.    Defendants have failed to "identif[y] and explain[] the reasoned basis" for their sudden, blanket freeze on foreign aid and their mass termination of foreign-assistance contracts, grants, and cooperative agreements. *Transactive Corp. v. United States*, 91 F.3d 232, 236 (D.C. Cir. 1996).

203.    President Trump's order claimed that "the United States foreign aid industry and bureaucracy are not aligned with American interests and in many cases antithetical to American values." Exec. Order No. 14,169 § 1, 90 Fed. Reg. 8619 (Jan. 20, 2025). In the President's view, "[t]hey serve to destabilize world peace by promoting ideas in foreign countries that are directly inverse to harmonious and stable relations internal to and among countries." *Id.* The Executive Order offered no explanation or justification for this abrupt, drastic change in the government's view of foreign aid. *See, e.g.*, Barsa, Remarks, *supra*.

204.    The Rubio Memo cited the Executive Order as the basis for the funding freeze and further claimed that "[i]t is currently impossible to access sufficient information in one place to determine whether the foreign assistance policies and interests supported by appropriations are not duplicated, are effective, and are consistent with President Trump's foreign policy." Rubio Memo ¶ 2. Yet that claim about the need for access to information in one place bears no connection to the direction to "immediately issue stop-work orders" for existing grants and contracts, or to halt the process of reviewing proposals for new grants and contacts. *Id.* ¶¶ 7-9.

205.    No subsequent directive purporting to implement the President's executive order or the Rubio Memo has identified any other ground for freezing foreign-assistance funding.

206.    Defendants did not "examine the relevant data" and then articulate a "rational connection between the facts found" and the blanket freeze or the mass terminations. *Ark Initiative*, 816 F.3d at 127 (citation omitted). They have offered not one shred of evidence for their "implausible" justifications. *Id.*

207.    Nor, in any event, did any Defendant explain why a blanket freeze, mass award terminations, or shutting down congressionally mandated foreign-assistance programs were necessary to achieve their purported goals. *See Allied Loc. & Reg'l Mfrs. Caucus v. U.S. E.P.A.*, 215 F.3d 61, 80 (D.C. Cir. 2000) ("To be regarded as rational, an agency must also consider significant alternatives to the course it ultimately chooses.").

208.    Defendants have also "entirely failed to consider … important aspect[s] of the problem." *State Farm*, 463 U.S. at 43. Indeed, after the Executive Order and the Rubio Memo, Defendants acknowledged that they were still conducting a "review" of all foreign assistance funding, which necessarily meant that they had not evaluated "important aspect[s] of the problem" before acting. And at the same time they claimed that a review was ongoing, Defendants dismissed the agency personnel with the experience and technical expertise necessary to conduct any meaningful review.

209.    Defendants also failed to consider that these programs are not light switches to be turned on and off at will. Damage to these interests is being done now, and that damage cannot be undone. Indeed, by halting foreign-assistance payments that are already due and owing, Defendants prevented Plaintiffs and other partners from taking the steps necessary to remain ready to resume work (if the freeze is lifted) or to wind down their projects in an orderly manner (if it is not). And by mass terminating contracts, grants, and cooperative agreements, it is clear that Defendants' have not grappled with the reality that those programs may not be able to be revived.

210.    Defendants also failed to account for the substantial reliance interests their actions have eviscerated. "When an agency changes course … it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account," and the failure to do so is arbitrary and capricious. *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020) (citation omitted). Yet Defendants did not consider the effect the blanket freeze and mass terminations would have on grantees, contractors, and other partners—as well as their employees—all of whom have relied on USAID's and the State Department's longstanding policies.

211.    Defendants also failed to account and give appropriate weight to Congress's determination—codified into federal law and repeatedly reinforced in subsequent legislation for the past half century—that the policy of the United States is to support economic development and foster democratic institutions abroad through foreign assistance.

212.    Indeed, Defendants' sudden freeze on U.S. foreign aid and termination of thousands of contracts, grants, and cooperative agreements—on the supposed premise that such aid "destabiliz[es] world peace," Exec. Order No. 14,169, 90 Fed. Reg. 8619 (Jan. 20, 2025)—is an abrupt reversal of decades of U.S. policy. For years, the United States government has considered foreign aid programs to be an important part of America's foreign policy and national security strategy. *See, e.g.*, Barsa, Remarks, *supra*. Now, however, Defendants have asserted that foreign aid programs are a threat to those same interests. But they have failed to "display awareness that [they are] changing position[s]," never mind articulated "good reasons" for the shift. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quotation marks omitted); *see also State Farm*, 463 U.S. at 43.

213.    Plaintiffs thus relied, as they have for decades, on the continued existence of foreign aid programs and the opportunity to compete for awards under those programs given repeated congressional appropriations, continued bipartisan support, and consistent policy with respect to foreign aid across both Democratic and Republican administrations. In reliance on their awards and revenue streams, they entered into long-term obligations that they can no longer meet.

214.    Defendants' actions are also contrary to law. *See Env't Def. Fund*, 124 F.4th at 11.

215.    The Executive Branch "may not act contrary to the will of Congress when exercised within the bounds of the Constitution." *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 233 (1986); *see United States v. Trucking Mgmt., Inc.*, 28 Fed. R. Serv. 2d 839 (D.D.C. 1979) ("[T]he executive branch may not exercise its authority, derived from Congress, in a manner inconsistent with the implied or expressed will of Congress."), *aff'd*, 662 F.2d 36 (D.C. Cir. 1981); *Alameda Cnty. Med. Ctr. v. Leavitt*, 559 F. Supp. 2d 1, 5 (D.D.C. 2008) ("The Executive must comply with the duly enacted commands of Congress.").

216.    As discussed above, the relevant appropriations acts, including the 2024 Appropriations Act and the 2025 Continuing Resolution, mandate that Defendants obligate specifics amounts of funds by specific deadlines. Defendants may not "refuse to spend the funds" Congress has appropriated unless Congress "approve[s] a recission bill." *Aiken County*, 725 F.3d at 261 n.1 (citing 2 U.S.C. § 683). Congress has not approved any rescission bill, but Defendants are rescinding vast swaths of money nonetheless. By refusing to spend appropriated funds in order to "align[]" that spending with President Trump's "policy agenda," Rubio Memo ¶ 3, Defendants have violated the relevant appropriations acts.

217.    When Congress wishes to give the executive branch discretion to spend less than the full amount appropriated, Congress uses specific language—for example, that an agency is

appropriated "sums not exceeding" or "up to" an amount for a particular purpose. *See, e.g.*, *CFPB v. Cmty. Fin. Servs. Ass'n,* 601 U.S. 416, 432-33 (2024); *id.* at 442-43 (Kagan, J., concurring). Absent such language, courts properly understand appropriations statutes as commands to obligate and expend the full amount of money appropriated. *See, e.g.*, *Train v. City of New York*, 420 U.S. 35, 41-48 (1975) (prior to enactment of Impoundment Control Act, interpreting appropriations statute to require the agency to spend the full amounts specified for a particular program, and rejecting the agency's argument that it had discretion to spend less).

218.    The relevant appropriations statutes here confer no discretion to halt foreign-assistance funding. To the contrary, the 2024 Appropriations Act  and the 2025 Continuing Resolution specify that the appropriated amounts "shall" be apportioned and used for specified purposes, including USAID's global health programs, development assistance, disaster assistance, and initiatives to promote and strengthen democracy abroad. Pub. L. No. 118-47, div. F, tits. II-III, 138 Stat. 460, 739-43. The 2024 Appropriations Act and the 2025 Continuing Resolution also appropriate funds to the Department of State for treating and preventing HIV/AIDS, promoting democracy, assisting refugees, preventing the proliferation of nuclear weapons, combatting terrorism, demining conflict zones, and controlling the international flow of narcotics. *Id.*, 138 Stat. at 744-49. By broadly halting obligations and expenditures related to these purposes, Defendants have violated these congressional appropriations.

219.    The Anti-Deficiency Act imposes similar restrictions. Government officers violate that statute if, among other things, they establish a monetary reserve by withholding appropriated funds from their congressionally assigned program, except for limited purposes. 31 U.S.C. § 1301(a); *id.* § 1512(c)(1). Like the Impoundment Control Act, the Anti-Deficiency Act and the Purpose Act prohibit repurposing appropriated funds for policy reasons. *See id.* §§ 1301(a),

1512(c)(1). To the extent Defendants are holding appropriated foreign-assistance funds in reserve or spending them on other purposes to effectuate the President's policy preferences rather than as Congress has directed, Defendants have also violated the Anti-Deficiency Act and the Purpose Act.

220.    Defendants identify no statutory authority for the wholesale freeze of and refusal to spend foreign-assistance funding, the mass termination of foreign assistance contracts, grants, and cooperative agreements, or the elimination of congressionally mandated foreign-assistance programs. Under the major questions doctrine, agencies must point to "clear congressional authorization" when they claim power to take actions of vast "economic and political significance." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). In *West Virginia*, for example, the Supreme Court held that the EPA lacked the authority to devise certain emissions caps that would have "billions of dollars of impact," because the Clean Air Act did not provide a clear statement to allow the agency to make such a drastic change from the existing standards. *Id.* at 2605. Similarly, in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023), the Court held that the Biden administration's student loan forgiveness program exceeded the authority of the Department of Education because there was no clear statement authorizing the agency to forgive billions in loans on this matter of economic and political significance. Here, Defendants' unilateral, overnight freeze of billions of dollars in congressionally appropriated funding to American nonprofits, academic institutions, and businesses implicates at least as serious economic and political questions. Defendants' actions lack any congressional authorization, much less the clear authorization Supreme Court precedent requires.

221.    Defendants' conduct also contravenes constitutional guarantees designed to protect liberty through the separation of governmental powers. The Constitution gives Congress, not the

President, the power to spend money, U.S. Const. art. I, § 8, and forbids expenditures Congress does not authorize, *id.* art. I, § 9, cl. 7. The Constitution then requires the President to "faithfully execute[]" those authorized expenditures. *Id.*, art. II, § 3. These articles work together to separate the duties of the legislative branch and the executive branch such that only the legislative branch can control federal spending. *Dep't of Navy*, 665 F.3d at 1346. Defendants have breached this separation, usurping for the executive branch the legislature's exclusive powers. By unilaterally refusing to spend what Congress has ordered, Defendants have unlawfully wrested control over the federal fisc from Congress and violated the Constitution.

222.    Defendants' decisions to terminate broad "tranches" of awards, as embodied in the action memoranda approved by the Secretary of State, were also independently arbitrary, capricious, and not in accordance with law. As with the funding freeze, Defendants entirely failed to consider important aspects of the problem, including the substantial reliance interests of implementing partners and program beneficiaries. Defendants' abrupt "change[] [in] course" without taking into account the "serious reliance interests" at stake is sufficient ground to set the action memoranda and any implementing actions aside. *Regents of the Univ. of Calif.*, 591 U.S. at 30. On information and belief, the sole rationale on which the action memoranda relied—that the awards purportedly conflicted with the President's policy agenda—was arbitrary, too. And the Secretary of State reached those decisions through plainly arbitrary means, relying on spreadsheets that lacked the most basic information relevant to the decision whether to terminate, but instead somehow summarized each award recommended for termination *in a single line*. 2/25 Marocco Decl. (ECF 39-1) ¶ 5. Often, the spreadsheet did not even include the country in which programming took place. *Id.* Moreover, by designating broad tranches of awards for termination precisely because they advance congressionally mandated objectives like "the promotion of

democracy globally," the action memoranda unlawfully impound funds and violate the separation of powers. 2024 Appropriations Act, 138 Stat. at 743; *see* ECF 25-1, ¶ 16 (Marocco declaration identifying "Democracy Promotion" as among the "policy bases" for which awards were terminated).

223.    Defendants' decision to shut down entire congressionally mandated foreign-assistance programs likewise violates the APA many times over. The decisions are arbitrary and capricious because Defendants failed to engage in reasoned decisionmaking, did not consider important aspects of the problem, completely ignored reliance interests and the change from decades of congressional and Executive Branch policies, and relied on factors that Congress obviously did not permit Defendants to rely upon given that Congress has mandated the existence and ongoing operation of USAID's and the State Department's foreign-assistance programs. In that regard, the decision to shut down USAID's and the State Department's programs violates the Foreign Assistance Act, the 2024 Appropriations Act and 2025 Continuing Resolution, the Impoundment Control Act, the Anti-Deficiency Act, and the Purpose Act.

224.    Because Defendants' actions are arbitrary, capricious, and not in accordance with law, the Court must hold those actions unlawful and set them aside. *See* 5 U.S.C. § 706(2).

### *Plaintiffs Are Also Entitled to Nonstatutory Relief and Mandamus to Remedy Defendants' Unconstitutional and Ultra Vires Actions*

225.    In addition to bringing claims under the APA, Plaintiffs also may pursue nonstatutory claims—and seek mandamus relief—to remedy Defendants' constitutional and statutory violations.

226.    Equitable relief is available to enjoin federal officials from violating the Constitution, including the separation of powers. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

227.    A nonstatutory right of action is also available to challenge federal officials' *ultra vires* violations of, or actions in excess of authority under, federal statutes. Plaintiffs may assert such claims where an official's *ultra vires* actions are a "clear departure by the [agency] from its statutory mandate" and are "blatantly lawless" violations of statutory requirements. *Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022).

228.    Finally, Plaintiffs are entitled to mandamus relief because federal officials have violated a "clear duty"; Plaintiffs have "no other adequate means to attain the relief [they] desire[]"; and Defendants' actions are "so egregious as to warrant mandamus." *In re Ctr. for Biological Diversity*, 53 F.4th 665, 670 (D.C. Cir. 2022) (quotations omitted); *see* 28 U.S.C. § 1361. As the D.C. Circuit has held, mandamus is warranted where "the President and federal agencies … ignore statutory mandates or prohibitions merely because of policy disagreement with Congress." *Aiken Cnty.*, 725 F.3d at 260.

229.    If relief is not available under the APA, Plaintiffs are entitled to equitable injunctive or mandamus relief with respect to Defendants' freeze of foreign assistance funding, the mass termination of awards, and the shutting down of congressionally mandated programs. All of these actions violate the separation of powers and are "blatantly lawless" and "clear departures" from the Foreign Assistance Act, the 2024 Appropriations Act and 2025 Continuing Resolution, the Impoundment Control Act, the Anti-Deficiency Act, and the Purpose Act. *Fed. Express Corp.*, 39 F.4th at 764.

## CLAIMS FOR RELIEF

### *FIRST CLAIM FOR RELIEF*

**Violation of the Administrative Procedure Act—Arbitrary and Capricious
(Against Defendants Rubio, Lewin, Vought,
Department of State, USAID, and OMB)**

230.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

231.    A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

232.    The Rubio Memo, Rodgers Guidance, Gray Initial Instructions, Gray Follow-Up Instructions, Gray Clarification, and Defendants' other actions to implement the Executive Order are final agency actions reviewable under 5 U.S.C. §§ 702 and 706.

233.    The action memoranda approved by the Secretary of State amount to a pretextual and *post hoc* rationalization for the funding freeze.

234.    The action memoranda approved by the Secretary of State are final agency actions reviewable under 5 U.S.C. §§ 702 and 706.

235.    The decisions to shut down foreign-assistance programs are final agency actions reviewable under 5 U.S.C. §§ 702 and 706.

236.    The decision not to obligate congressionally mandated foreign assistance funding is a final agency action reviewable under 5 U.S.C. §§ 702 and 706.

237.    Defendants' actions are arbitrary and capricious. Defendants have failed to adequately justify their actions; have failed to consider key aspects of the problem, reasonable alternatives, and the substantial reliance interests at stake; have relied on factors Congress did not authorize them to consider; and have failed to acknowledge or justify their change of position.

71

*SECOND CLAIM FOR RELIEF*

**Violation of the Administrative Procedure Act—
Contrary to Regulatory, Statutory, and Constitutional Law
(Against Defendants Rubio, Lewin, Vought,
Department of State, USAID, and OMB)**

238.   Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

239.   A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

240.   The Rubio Memo, Rodgers Guidance, Gray Initial Instructions, Gray Follow-Up Instructions, Gray Clarification, and Defendants' other actions to implement the Executive Order are final agency actions reviewable under 5 U.S.C. §§ 702 and 706.

241.   The action memoranda approved by the Secretary of State amount to a pretextual and *post hoc* rationalization for the funding freeze.

242.    The action memoranda approved by the Secretary of State are final agency actions reviewable under 5 U.S.C. §§ 702 and 706.

243.   The decisions to shut down foreign-assistance programs are final agency actions reviewable under 5 U.S.C. §§ 702 and 706.

244.   The decision not to obligate congressionally mandated foreign assistance funding is a final agency action reviewable under 5 U.S.C. §§ 702 and 706.

245.   Annual appropriations acts require Defendants to obligate funds in specific amounts by specific deadlines. If the executive branch wishes not to spend funds that have been lawfully appropriated, it must follow a set procedural path and rely on specific types of reasons. *See* 2 U.S.C. §§ 683, 684; 31 U.S.C. §§ 1301(a), 1512(c)(1).

246.    By refusing to spend funds that Congress has appropriated for USAID's operations and for specified foreign-assistance programs and purposes, or by spending the funds on purposes other than those which Congress specified, Defendants have violated the Impoundment Control Act, the Anti-Deficiency Act, the Purpose Act, and relevant appropriations statutes, including the 2024 Appropriations Act, the 2025 Continuing Resolution, and prior appropriations acts.

247.    In the Foreign Assistance Act, Congress has assigned specific responsibilities to the USAID Administrator, to be carried out by USAID. By shutting down USAID's programs, Defendants have violated the Foreign Assistance Act.

248.    The Constitution vests lawmaking power in Congress, including exclusive power over federal spending. The executive branch lacks inherent constitutional power to ignore statutory mandates and decline to spend funds that Congress has appropriated. By ignoring statutory mandates and refusing to spend funds that Congress has allocated for specified foreign-assistance programs, Defendants have violated the constitutional separation of powers.

249.    Defendants' actions are contrary to law, and the Court must hold them unlawful and set them aside.

### THIRD CLAIM FOR RELIEF

**Violation of the Separation of Powers**
**(Against All Defendants)**

250.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

251.    The Constitution vests exclusive lawmaking in Congress, including exclusive power over federal spending.

252.    Under Article II, the President must take care to faithfully execute the laws, including appropriations acts. Consistent with the constitutional division of legislative and executive powers and the requirements of bicameralism and presentment, the President has no

unilateral authority to amend or ignore congressional appropriations. Nor may the President direct federal officers or agencies to act in derogation of a federal statute.

253. The Impoundment Control Act and Anti-Deficiency Act permit the executive branch to defer or rescind funds only in narrowly prescribed circumstances that are not present here. The annual appropriations acts forbid executive-branch officers from declining to spend appropriated funds unless Congress rescinds the funds, foreclosing any claim of concurrent presidential power.

254. By withholding foreign-assistance funds that Congress has appropriated, Defendants are violating the separation of powers.

255. By withholding, rescinding, and re-purposing foreign-assistance funds on the ground that the President disfavors the policy objectives for which Congress has specifically appropriated funds, Defendants are violating the separation of powers.

256. By shutting down foreign-assistance programs established by Congress, and refusing to carry out their duties assigned by Congress to administer these programs, Defendants are taking actions in violation of the constitutionally established separation of powers.

257. Plaintiffs have a non-statutory right of action to declare unlawful and enjoin Defendants' unconstitutional actions.

### FOURTH CLAIM FOR RELIEF

**Ultra Vires**
**(Against All Defendants)**

258. Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

259. No statute, constitutional provision, or other source of law authorizes Defendants to shut down foreign-assistance programs established by Congress. No statute, constitutional provision, or other source of law authorizes Defendants to withhold, rescind, or re-purpose foreign-

assistance funds that Congress has appropriated. Nor does any statute, constitutional provision, or other source of law authorize Defendants to withhold foreign-assistance funds on the ground that the President disfavors the objective for which Congress has specifically directed fund be spent. Defendants' actions doing so exceed their lawful authority.

260.    Plaintiffs have a non-statutory right of action to declare unlawful and enjoin Defendants' ultra vires actions.

## FIFTH CLAIM FOR RELIEF

### Mandamus
### (Against Defendants Rubio, Lewin, Vought)

261.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

262.    If relief is not available on Plaintiffs' other claims, the Court should enter a writ of mandamus.

263.    Defendants have disregarded their clear duties to carry out statutorily required foreign-assistance programs, and to spend appropriations enacted by Congress for those programs.

264.    Mandamus is warranted "to correct transparent violations of a clear duty to act" by federal officials, including specifically where federal officials refuse to spend congressionally appropriated funds for policy reasons. *Aiken Cnty.*, 725 F.3d at 258.

265.    Mandamus is warranted here if Plaintiffs are unable to obtain complete relief on their other claims.

## SIXTH CLAIM FOR RELIEF

### Procedural Due Process (Fifth Amendment)
### (Against All Defendants)

266.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

267.    "There are three basic elements to a procedural due process claim: there must be (1) a deprivation; (2) of life, liberty, or property; (3) without due process of law." *Lightfoot v. District of Columbia*, 273 F.R.D. 314, 319-20 (D.D.C. 2011). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* (internal quotation marks omitted) (quoting *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976)).

268.    Implementers of grants and cooperative agreements—including Plaintiffs and their members—have a property interest in obligated grant and cooperative agreement funds. *See* 31 U.S.C. § 1501(a)(5); 50 C.F.R. § 80.91. Once grant or cooperative agreement funds have been obligated, "then the beneficiaries thereof must be afforded procedural due process before the grant [or other benefit] can be curtailed either in amount or duration." *Mil-Ka-Ko Research & Dev. Corp. v. Office of Economic Opp.*, 352 F. Supp. 169, 172-73 (D.D.C. 1972).

269.    Defendants deprived implementing partners of their protected property interests when they terminated their grants and cooperative agreements.

270.    Defendants did so without providing implementing partners notice or an opportunity to be heard.

271.    To determine "what process is due" for a given type of deprivation, courts consider the *Mathews* factors: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* (quoting *Mathews*, 424 U.S. at 335).

272.    Under the first *Mathews* factor, the private interests that implementing partners have in their grants and cooperative agreements are substantial. These awards are worth millions of dollars and represent a large portion of implementing partners' revenue. As explained, the government's failure to make payments and its decision to terminate awards has imposed devastating harms on Plaintiffs and their members, causing them to lay off employees, close offices, shut down operations, lose access to credit, face lawsuits and other threats, and lose goodwill it took decades to build. It is threatening implementing partners' very existence.

273.    Under the second *Mathews* factor, the risk of erroneous deprivation absent notice and an opportunity to be heard is high. As the parties who actually carry out the activities funded by USAID and State Department grants and cooperative agreements, implementing partners have unique insight into how those awards do and do not advance program goals, agency priorities, and the national interest. Implementing partners possess on-the-ground knowledge about the inner workings of these awards that is not known even to line-level Award Officers and Representatives--let alone the high-level agency leadership who made the termination decisions here. Moreover, the government itself has publicly admitted that it made numerous errors in the instruments it terminated here.

274.    Under the third *Mathews* factor, the government's interest in terminating grants and cooperative agreements without providing notice and an opportunity to be heard is minimal. Defendants have not identified any emergency that requires terminating grants and cooperative agreements immediately. Providing notice and an opportunity to be heard would impose only minor administrative and fiscal burdens on the government, and it would provide the government with valuable information that would improve its decision-making about which awards to terminate and which to retain.

*SEVENTH CLAIM FOR RELIEF*

**Violation of the Administrative Procedure Act—
Agency Action Unlawfully Withheld or Unreasonably Delayed
(Against Defendants Rubio, Lewin, Vought,
Department of State, USAID, and OMB)**

275.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

276.    Even if Defendants' decision to not spend appropriated funds were not an unlawful final agency action under 5 U.S.C. § 706(2), Plaintiffs still would be entitled to relief under § 706(1), which requires courts to "compel agency action unlawfully withheld."

277.    The 2024 Appropriations Act, the 2025 Continuing Resolution, and prior appropriations acts mandate that Defendants obligate the full amounts appropriated by specific deadlines, with no discretion to spend less than those full amounts. Defendants have non-discretionary duties to comply with these commands.

278.    Defendants' withholding of these appropriated funds therefore is "unlawful." 5 U.S.C. § 706(1).

279.    Alternatively, Defendants have "unreasonably delayed" spending the relevant funds. The D.C. Circuit applies six "*TRAC* factors" in determining whether an agency's delay is unreasonable. *See Telecomms. Rsch. & Action Ctr. (TRAC) v. Fed. Commc'ns Comm'n*, 750 F.2d 70 (D.C. Cir.1984). Each of these factors warrants a finding of unreasonable delay.

280.    First, the "the rule of reason" counsels strongly in favor of relief because Defendants' delay reflects their openly declared intent to defy Congress's directives and permanently impound the funds.

281.    Second, Congress' explicit "timetable" here—in the form of appropriations with specified expiration dates—supplies additional "content for this rule of reason." *TRAC*, 750 F.2d at 80.

282.     Third, there is overwhelming evidence of serious "human health and welfare . . . at stake"—the harm here is not merely "economic." *Id.*

283.     Fourth, "expediting" Defendants' obligation could hardly displace "activities of a higher or competing priority," given that these funds reflect essentially all of USAID's mission, and in the five months Defendants declined to take steps toward spending these funds, it was free to devote resources to other priorities. *Id.*

284.     Fifth, "the nature and extent of the interests prejudiced by" Defendants' delay are as serious as they come, taking not just an enormous human toll but also infringing on Congress's exclusive constitutional power of the purse.

285.     Sixth while "impropriety" is not necessary for a delay to be unreasonable, *id.*, this Court's recent order recognized that, in light of Defendants' "litigation decisions" and "representations" in this case, granting equitable relief in their favor "would violate basic notions of fair play," ECF No. 126, at 2. The same logic counsels against endorsing Defendants' delay. It is not reasonable for an agency to announce that it will not be spending funds, ignore a court order to spend those funds for five months, and then insist that they need yet *more* time.

286.     Plaintiffs are entitled to relief under § 706(1).

## PRAYER FOR RELIEF

**NOW, THEREFORE,** Plaintiffs request judgment in their favor against Defendants as follows:

1.     Declare that Executive Order 14,169 is unconstitutional and unlawful;

2.     Vacate and set aside the Rubio Memo, Rodgers Guidance, Gray Initial Instructions, Gray Follow-Up Instructions, Gray Clarification, and Defendants' other actions to implement

Executive Order 14,169 and declare that the directives they contain are contrary to law and arbitrary and capricious;

3. Temporarily restrain and preliminarily and permanently enjoin Defendants from implementing or giving effect to Executive Order 14,169, the Rubio Memo, the Rodgers Guidance, the Gray Initial Instructions, Gray Follow-Up Instructions, Gray Clarification, and any other actions by Defendants or their agents to implement Executive Order 14,169, including by freezing the obligation and disbursement of appropriated foreign-assistance funds, by suspending or terminating foreign-assistance awards, or by eliminating congressionally mandated USAID or State Department foreign-assistance programs;

4. Postpone the effective date of the Rubio Memo, the Rodgers Guidance, the Gray Initial Instructions, Gray Follow-Up Instructions, Gray Clarification, and any other actions by Defendants or their agents to implement Executive Order 14,169 or otherwise freeze the obligation and disbursement of appropriated foreign-assistance funds;

5. Vacate, set aside, and declare unlawful the action memoranda approved by the Secretary of State and any resulting terminations;

6. Temporarily restrain and preliminarily and permanently enjoin Defendants from implementing or giving effect to the action memoranda approved by the Secretary of State, including by giving effect to any award terminations issued pursuant to those action memoranda;

7. Postpone the effective date of the action memoranda approved by the Secretary of State and any actions taken pursuant to those action memoranda;

8. Vacate and set aside Defendants' elimination of congressionally mandated foreign-assistance programs, Defendants' decisions not to have USAID and the State Department spend its appropriations on the purposes for which Congress appropriated the funds, any decisions from

Defendants to spend USAID's and the State Department's appropriations on purposes other than those for which Congress appropriated the funds, and any other actions taken by Defendants that prevent Defendants from fulfilling their statutory duty to obligate and disburse appropriated foreign-assistance funds in accordance with law;

9.    Order that, pursuant to 5 U.S.C. § 706(1), Defendants are compelled to make available for obligation and to obligate (i) the full amount of funds that Congress appropriated for foreign assistance programs in the 2024 Appropriations Act, the 2025 Continuing Resolution, and prior appropriations acts and (ii) the specific or minimum amounts of expiring funds that Congress required Defendants to obligate for particular uses and purposes in Section 7019(a) and Sections 7030-7061 of the 2024 Appropriations Act and prior appropriations acts.

10.    Temporarily restrain and preliminarily and permanently enjoin Defendants from eliminating congressionally mandated foreign-assistance programs, from refusing to spend USAID's and the State Department's appropriations on the purposes for which Congress appropriated the funds, from spending USAID's and the State Department's appropriations on purposes other than those for which Congress appropriated the funds, and from taking any other action that prevents Defendants from fulfilling their statutory duty to obligate and disburse appropriated foreign-assistance funds in accordance with law;

11.    Postpone the effective date of the Defendants' elimination of congressionally mandated foreign-assistance programs, Defendants' decisions not to have USAID and the State Department spend its appropriations on the purposes for which Congress appropriated the funds, any decisions from Defendants to spend USAID's and the State Department's appropriations on purposes other than those for which Congress appropriated the funds, and any other actions taken

by Defendants that prevent Defendants from fulfilling their statutory duty to obligate and disburse appropriated foreign-assistance funds in accordance with law;

12.     Issue a writ of mandamus compelling Defendants to carry out their clear duties, if complete relief is not available under Plaintiffs' other claims;

13.     Award Plaintiffs reasonable attorneys' fees and costs; and

14.     Grant such other and further relief as the Court may deem just and proper.

Dated: August 29, 2025                      Respectfully submitted,

*/s/ Daniel F. Jacobson*
Daniel F. Jacobson (D.C. Bar 1016621)
John Robinson (D.C. Bar 1044072)
Nina Cahill (D.C. Bar No. 1735989)
JACOBSON LAWYERS GROUP PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
Tel: (301) 823-1148
dan@jacobsonlawyersgroup.com

William C. Perdue (D.C. Bar 995365)
Sally L. Pei (D.C. Bar 1030194)
Samuel M. Witten (D.C. Bar 378008)
Stephen K. Wirth (D.C. Bar 1034038)
Dana Kagan McGinley (D.C. Bar 1781561)
Daniel Yablon (D.C. Bar 90022490)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel: (202) 942-5000
stephen.wirth@arnoldporter.com

*Counsel for Plaintiffs*