**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| GLOBAL HEALTH COUNCIL, *et al.*,<br><br>   *Plaintiffs*,<br><br> v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>   *Defendants*. | Civil Action No. 25-cv-402 (AHA) |

## PLAINTIFFS' MOTION FOR ORDER TO SHOW CAUSE ON COMPLIANCE WITH THE PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ........................................................................................................... 1

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 3

    A.   The Special Message ................................................................................................ 3

    B.   The Preliminary Injunction and Pending Appeals ................................................. 4

    C.   Developments Regarding Funds Not Included in the Special Message ............................ 5

LEGAL STANDARD ............................................................................................................. 10

ARGUMENT ......................................................................................................................... 10

    I.   There Is Reason to Believe Defendants Are Not Complying with the Injunction ............ 10

    II.   An Order to Show Cause Is Warranted .................................................................. 17

    III.   The Court Should Permit a Deposition of Lewin If Defendants Do Not Adequately Respond to the Order to Show Cause ............................................................. 18

CONCLUSION ....................................................................................................................... 20

## INTRODUCTION

Plaintiffs bring this urgent motion for an order to show cause after learning information that raises serious questions about Defendants' compliance with the Court's September 3 preliminary injunction.

The injunction requires Defendants to obligate, by September 30, 2025: (1) the expiring funds Congress appropriated in the other fifteen relevant categories in Title III and Title IV, and (2) "the minimum or specific expiring funds that Congress required the agency Defendants to obligate for particular uses and purposes in Section 7019(a) and Sections 7030-7061." Defendants must take these actions with respect to expiring funds from the 2024 Appropriations Act and prior appropriation acts. Because Defendants have sought only a partial stay of the injunction from the Supreme Court—limited to the appropriations included in the President's special message proposing the rescission of certain funds—the injunction currently remains in full force and effect except as to the requirements to obligate the Development Assistance, Democracy Fund, and Peacekeeping Operations appropriations in the special message (for which the Chief Justice has issued an administrative stay). This motion relates only to the portions of the preliminary injunction not subject to a stay.

Based on information from a State Department official who has submitted a declaration attached to this motion, it appears that Defendants have made plans to take actions that would violate the injunction. Most notably, Defendants apparently intend, through accounting maneuvers, to utilize the appropriations in the special message to get out of complying with the directives in Sections 7030-7061 to spend minimum amounts for specific purposes. Defendants apparently will "attribute," meaning assign as an accounting matter, appropriations in the special message for use in meeting a particular Section 7030-7061 directive, and then claim that the

"rescission" of the funds in the special message obviates the requirement that Defendants comply with the directive. Defendants apparently will do this even where they could use other appropriations not in the special message to carry out the directive.

For instance, Section 7061(e) provides that "[o]f the funds appropriated under title III of this Act, not less than $256,500,000 shall be made available for adaptation programs." Defendants could likely utilize various Title III categories of appropriations to carry out this directive, such as Economic Support Fund or Development Assistance appropriations. Under the approach described by the declarant, Defendants would assign Development Assistance funds to the directive, because those appropriations are in the special message, rather than Economic Support Fund appropriations that are available to spend on adaptation programs. If the Development Assistance funds are deemed rescinded, Defendants would spend $0 on adaptation programs. Defendants would then be able to use the $256 million in funds from the Economic Support Fund that they could have put toward complying with the adaptation programs directive for other purposes for which Congress did not specifically direct spending (or, as described below, Defendants may simply park the $256 million in an inter-agency agreement with no specific purpose designated for the funds).

Such a plan would be a clear end-run around the mandates of the appropriations acts and this Court's injunction. It would result in dozens or hundreds of directives in Section 7030-7061, comprising hundreds of millions or even billions of dollars, not being carried out, in contravention of the appropriations acts and this Court's order. An order to show cause is necessary on this basis alone.

There are additional reasons for an order to show cause. Defendants seem to have confirmed in correspondence with Plaintiffs that they will follow the plan they described in the September 4 status report, which was to obligate funds to instruments that do not specify the

purposes for which the funds are being obligated. That plan would violate the injunction, which requires Defendants, "by September 30," to obligate "the minimum or specific expiring funds that Congress required the agency Defendants to obligate for particular uses and purposes in Section 7019(a) and Sections 7030-7061." In addition, Defendants have continued to decline to provide any information regarding expiring funds from appropriations acts prior to 2024, despite the injunction expressly covering such funds.

An order to show cause is warranted in these circumstances. Below, Plaintiffs set forth proposed questions for Defendants to answer. Given the upcoming September 30 deadline, Plaintiffs respectfully request that Defendants be ordered to respond to these or other appropriate questions by the end of Monday, September 22, or early on Tuesday, September 23.[1]

## BACKGROUND

### A. The Special Message

On August 28, immediately after the D.C. Circuit's issuance of its mandate, the President signed letters to the House and Senate indicating that he would transmit a special message to Congress requesting 15 rescissions of appropriated funds, most of which are relevant to this case. ECF Nos. 129-1, 129-2. For each rescission proposal attached to the special message, the proposal lists the amount and category of appropriations that are the subject of the proposal (e.g., a specific account for the Democracy Fund). ECF No. 129-3. The fifteen rescission proposals covered only three of the categories of appropriations at issue in this case: Development Assistance, Democracy Fund, and Peacekeeping Operations. *Id.* The proposals appear to

---

[1] Pursuant to Local Rule 7(m), Plaintiffs notified Defendants of Plaintiffs' intent to file this motion and Defendants oppose the motion. Plaintiffs also explained the bases for the motion and asked Defendants to provide any information that is contrary to the factual bases for this motion, or any explanations for the facts if accurate. Defendants' responses, detailed in detail below, did not mitigate the need to file this motion.

encompass nearly all unobligated balances from these categories of appropriations that expire on

September 30, 2025.

### B. The Preliminary Injunction and Pending Appeals

On September 3, this Court issued its preliminary injunction requiring that Defendants

obligate expiring foreign assistance funds. ECF No. 139. The Court ordered, in full:

> The agency Defendants—that is, all Defendants except the President—are enjoined
> to make available for obligation and obligate, by September 30, 2025, for the uses
> and purposes specified by Congress: (1) the expiring funds Congress appropriated
> for foreign assistance programs in the fifteen categories of appropriations specified
> in the *Global Health* Plaintiffs' motion from Title III and Title IV of the Further
> Consolidated Appropriations Act of 2024 and prior appropriations acts, unless
> Congress rescinds the relevant appropriation through duly enacted legislation; and
> (2) the minimum or specific expiring funds that Congress required the agency
> Defendants to obligate for particular uses and purposes in Section 7019(a) and
> Sections 7030-7061 of the Further Consolidated Appropriations Act of 2024 and
> prior appropriations acts, with the exception of the subcategories of funds for which
> no Plaintiffs would compete as identified in *Glob. Health*, ECF No. 133-2, unless
> Congress rescinds the relevant appropriation through duly enacted legislation.

*Id.* at 41.

Defendants subsequently moved for emergency relief from the D.C. Circuit, seeking to

stay the entire preliminary injunction. The D.C. Circuit denied a stay on September 5.

On September 8, Defendants sought a partial stay and administrative stay from the

Supreme Court. Defendants explained that their "request for relief from [the Supreme] Court,

[was] limited to the $4 billion that are the subject of the President's rescission proposal." Appl.

For a Stay, No. 25A269 at 17 n.4. Defendants did not seek a stay of the injunction with respect to

any other expiring funds. For those, Defendants described the injunction as "merely an

unnecessary nuisance." *Id.* at 2.

On September 9, Chief Justice Roberts granted a partial administrative stay with respect

to the "funds that are subject to the President's August 28, 2025 rescission proposal currently

pending before Congress." The stay application is fully briefed and awaiting decision from the

Supreme Court.

**C. Developments Regarding Funds Not Included in the Special Message**

At the August 29 status conference, this Court directed the parties to file a status report on September 4 regarding the different categories of funds at issue. On the day that filing was due, Defendants notified Plaintiffs that they would not provide information in the status report regarding expiring funds from appropriations acts prior to 2024. In the joint submission that night, Defendants wrote that they were not including information on these funds because the 2024 Appropriations Act "was the only appropriations statute addressed in the Court's *March 10* preliminary injunction," ECF No. 145 at 2 (emphasis added), even though the prior appropriations acts were explicitly included in the operative September 3 preliminary injunction.

Also in the joint status report on September 4, Defendants indicated that prior to the preliminary injunction, they planned to obligate expiring funds not included in the proposed rescission, but that "the instruments obligating these funds may cover a broad range of activities, including activities to meet applicable earmarks and table allocations," and "those instruments *may not* specifically address or identify funds for individual earmarks and allocations." *Id.* at 3 (emphasis added). "In those cases," Defendants added, "Defendants *may* rely on subsequent means (such as subawards) *after September 30* to address such an earmark or allocation by applying funds to more specific programs and activities consistent with the earmark or allocation." *Id.* (emphases added).

Defendants also attached to the September 4 status report a chart describing the different categories of expiring funds from the 2024 Appropriations Act (but not prior acts), as well as notes from Defendants on their plans for obligating the funds. For most of the entries, Defendants wrote: "Plan to obligate all expiring funds associated with this earmark," but "subject to potential deviation." ECF No. 145-1. For some of these entries, Defendants wrote that their

obligation plan was "subject to potential deviation consistent with authorities in sections 7019 and 7060," and for many others, Defendants wrote that their obligations were "subject to potential deviation consistent with available authorities." *Id.* Defendants' submission did not identify the other purported "available authorities" for deviations.

On September 9, Plaintiffs emailed Defendants regarding the funds for which Defendants had not sought a stay from the Supreme Court. Plaintiffs asked Defendants to provide, among other information, information on the amounts of the $6.5 billion already obligated, the amount of expiring funds from appropriations acts prior to 2024 (broken down by category), and confirmation that Defendants would no longer pursue their plan described in the September 4 status report of utilizing instruments to obligate funds that may not specify the line items or directives for which the funds were being obligated. The totality of Defendants' response to this inquiry was: "Defendants understand the preliminary injunction of September 3, and have made clear that Defendants intend to act accordingly, including as to the funds about which you inquire."

Plaintiffs have since learned from a State Department employee that Defendants apparently intend or intended to take actions that, if undertaken, appear to violate the Court's injunction. The declarant attests to Defendants' apparent plan regarding the directives in Section 7030-7061 that "not less than" specific amounts "shall be made available" for particular purposes. Defendants apparently will "attribute" as an accounting matter the appropriations included in the special message as going toward meeting these directives, and then take the position that if the rescission proposal is considered effectuated (via a pocket rescission), they do not need to comply with the directive because the funds that were to be used for the directive have been rescinded. Defendants, according to the declarant, will do this accounting maneuver even if the statutory directive in Sections 7030-7061 does not require using appropriations from

the Development Assistance, Democracy Fund, or Peacekeeping Operations appropriations in the rescission proposal. Declaration of John Doe (Doe Decl.) ¶ 8.

The declarant provides several examples of this strategy. Many directives merely require Defendants to use "funds appropriated under title III [and/or title IV] of this Act" to meet the "not less than" directive. For instance, as described, Section 7061(e) states that "[o]f the funds appropriated under title III of this Act, not less than $256,500,000 shall be made available for adaptation programs." 2024 Appropriations Act, § 7061(e). Under the approach described, the State Department would attribute the majority, if not all, of the unobligated balances from this $256,500,000 directive to the funds included in the rescission proposal, and then claim they do not need to spend such funds on adaptation programs, notwithstanding that other remaining funds "appropriated under title III" could be used to meet this directive. Doe Decl. ¶ 8. Another hypothetical described by the declarant is if a funding directive of $100 million had been met in prior years through $75 million from Development Assistance and $25 million from the Economic Support Fund. *Id.* The approach being deployed would be to now attribute all $100 million to Development Assistance, which would be deemed rescinded if the pocket rescission is treated as effective. *Id.* As a result, $0 would be spent to meet the directive for which Congress required spending $100 million, and Defendants could spend the $100 million (or even just $25 million) from the Economic Support Fund that could have gone toward meeting the directive on purposes that Congress did not specifically require, or more likely on an inter-agency agreement that obligates the funds on paper only.

The declarant attests that "[e]ven if it were impossible to comply with all funding directives without attributions from some of the funds in the proposed rescission (a calculation I have not done), the approach being utilized is to maximize the number and amount of funding directives tied to funds proposed for rescission." Doe Decl. ¶ 8.

In addition, the State Department employee attests that Defendant Lewin made a formal determination to deviate by more than 5% from the amounts specifically listed in the tables referenced in Section 7019(a) of the 2024 Appropriations Act for "Global Programs" of the Economic Support Fund, despite the fact that Section 7019(d)(3) precludes Defendants from deviating from the table amounts by more than 5% for these Global Programs. Doe Decl. ¶¶ 5-8.

The declarant also attests that there is a Congressional Notification for the expiring funds not subject to the proposed rescission that does not reference plans for programming in multiple areas covered by statutory directives, including Adaptation, Sustainable Landscapes, Clean Energy, and Biodiversity. Doe Decl. ¶ 9. The declarant further attests that Defendants intend to use appropriations in the Economic Support Fund not subject to the rescission proposal on several focus areas: addressing immigration issues, diversifying critical minerals supply chains, promoting strategic infrastructure investment, countering the People's Republic of China's influence on the telecommunications and energy industries, mitigating Iran's influence, and supporting cyber, democracy, economic growth, and education programs. *Id.*

On September 19, Plaintiffs emailed Defendants regarding Plaintiffs' intent to file the instant motion, and described the four grounds for seeking an order to show cause that would be given in the motion: (1) that Defendant Lewin had determined to deviate by more than 5% from the table amounts for Global Programs; (2) that Defendants intend to attribute appropriations in the special message to the directives in Sections 7030-7061, even where not necessary; (3) that Defendants have refused to provide any information regarding funds from pre-2024 appropriations acts; and (4) that Defendants had not disavowed the plan laid out in the September 4 status report to obligate funds to instruments that may not specify specific purposes for which the funds are being obligated.

8

In response, on issue (1), Defendants asserted that "State is aware that an error was made in its determination relating to the "Global Programs" allocations in the Economic Support Fund table, and State intends to correct it." On issue (3), Defendants claimed that they "have been clear that, except as subject to the administrative stay, they will adhere the preliminary injunction, including as to funds appropriated in prior years," but that [t]he injunction does not require disclosure of any additional information at this time." On issue (4), Defendants contended that "it is standard practice in implementing foreign-assistance funds to use 'sub-obligations' under broader obligating instruments to meet particular earmarks and other directives."

Regarding issue (2), on Defendants' attribution plan for the Section 7030-7061 directives, Defendants asserted that "it is mathematically impossible for Defendants to withhold the funds included in the rescission proposal consistent with the Impoundment Control Act—and consistent with the Supreme Court's administrative stay—without allocating those withheld funds to earmarks." In response, Plaintiffs asked Defendants to "confirm that Defendants will comply with the maximum number of Section 7030-7061 appropriations for which it is mathematically possible to comply using funds from Title III and Title IV appropriations other than Development Assistance, Democracy Fund, and Peacekeeping Operations." Plaintiffs further requested confirmation "that Defendants are not tying more directives than is mathematically necessary to the appropriations in the special message." Defendants did not provide these confirmations. Instead, they stated that, "in allocating funds withheld consistent with the rescission proposal to earmarks, Defendants are reasonably considering the nature of the accounts, existing plan levels, and historical spending for the accounts." No further details were provided.

**LEGAL STANDARD**

This Court "has inherent power to ensure compliance with its orders." *SEC v. Bilzerian*, 131 F. Supp. 2d 10, 15 (D.D.C. 2001), *aff'd*, 75 F. App'x 3 (D.C. Cir. 2003). And this Court "has broad discretion in using its inherent equitable powers to ensure compliance with its orders." *Nat'l Ctr. on Homelessness & Poverty v. U.S. Dep't of Veterans Affs.*, 842 F. Supp. 2d 127, 131 (D.D.C. 2012). That discretion includes the authority to require an enjoined party to produce information or evidence to substantiate its compliance with an injunction. "Equity would not be achieved if a court decided simply to rubber-stamp an enjoined party's unsupported self-assessment of its compliance with a court order." *Id.*

**ARGUMENT**

I. **There Is Reason to Believe Defendants Are Not Complying with the Injunction**

In four different areas, there are substantial grounds to question Defendants' compliance with the Court's injunction.

A. **Section 7030-7061 Directives**

Defendants would violate the injunction if, as the State Department declarant asserts, they are assigning appropriations in the rescission proposal to Section 7030-7061 directives, even where other appropriations could be used to meet those directives, to enable Defendants not to carry out the directive. Defendants must comply with the statutory mandates in Sections 7030-7061 wherever there are sufficient appropriations available to do so. They certainly cannot, as the declarant describes, *minimize* the number of statutory mandates with which they comply, by "maximiz[ing] the number and amount of funding directives tied to funds proposed for rescission," Doe Decl. ¶ 8.

The preliminary injunction requires Defendants to obligate, by September 30, 2025, "the minimum or specific expiring funds that Congress required the agency Defendants to obligate for

particular uses and purposes in . . . Sections 7030-7061" of the relevant appropriations acts. ECF No. 139 at 41. Those directives provide that "not less than" minimum amounts "shall be made available" for various enumerated purposes. The vast majority of these directives do not specify one particular category of Title III and IV appropriations that must be used to meet the directive. Many of the directives specify that, "of the funds appropriated by this Act," or "of the funds appropriated by Title III of this Act" (or "by Titles III and IV of this Act,"), not less than the specific amount shall be made available for specific purposes. *See, e.g.*, 2024 Appropriations Act, §§ 7058, 7059, 7060. Other directives identify multiple Title III and Title IV categories of appropriations that may be used to meet the directive. For instance, Section 7060(a)(3) directs that "of the funds appropriated by this Act under the headings 'Development Assistance', 'Economic Support Fund', and 'Assistance for Europe, Eurasia and Central Asia', not less than $7,000,000 shall be made available for scholar rescue programs." USAID may tap into any of these categories of appropriations, or any combinations thereof, to obligate the minimum $7 million required for scholar rescue programs.

As described, Defendants' apparent plan is to "attribute" appropriations in the rescission proposal for use in carrying out a directive within Section 7030-7061, and then not comply with the directive if the rescission proposal is deemed effectuated. Doe Decl. ¶ 8. For instance, in the above example for scholar rescue programs, Defendants would designate Development Assistance funds to meet the full $7 million in required spending, even though there are $7 million available from the Economic Support Fund and the Europe, Eurasia and Central Asia account that could be used to carry out the directive. Assigning the Development Assistance funds to the directive would, under Defendants' apparent plan, allow them to spend no money on scholar rescue programs if the Development Assistance appropriations are deemed rescinded. And Defendants would be able to use the $7 million from the Economic Support Fund and

Europe, Eurasia and Central Asia account that could have been used on scholar rescue programs for other purposes that do not carry out any specific congressional directive.

Defendants would employ the same maneuver even where the relevant statutory directive does not specify any particular categories of appropriations for the directive, such as where Congress provided that the directive must be met from "the funds appropriated by this Act." For example, Section 7061(i) provides that "[o]f the funds appropriated under title III of this Act, not less than $19,000,000 shall be made available to support Indigenous and other civil society organizations in developing countries that are working to protect the environment." There are likely several categories of Title III appropriations that could be tapped for this directive, but Defendants would assign Development Assistance funds to the directive in their accounting system, and then not spend any money on the directive if the Development Assistance are deemed rescinded.

The injunction and statutory directives do not permit such creative accounting. The President's rescission proposal, even if deemed effective in rendering unavailable for obligation the appropriations in the proposal, does not negate the statutory directives in Sections 7030 to 7061. The President's special message proposes only to rescind the budget authority provided through appropriations in Titles III and IV, and specifically the budget authority for Development Assistance and Democracy Fund in Title III and "Peacekeeping Operations" in Title IV. *See* ECF No. 129-3. Even if Congress affirmatively enacted the rescission proposal into law, the directives in Sections 7030 to 7061 would remain the law of the land—the rescission bill would not rescind these provisions of the 2024 Appropriations Act and prior appropriations acts.

Thus, the directives in Section 7030 to 7061 requiring that minimum amounts of funds be made available for particular purposes would remain "statutory mandates," and the Executive Branch "must follow statutory mandates *so long as there is appropriated money available and*

the President has no constitutional objection to the statute." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (emphasis added). Here, there are only four directives for which there would be no "appropriated money available" if the rescission proposal were deemed effectuated, because Congress specified that only Development Assistance, Democracy Fund, or Peacekeeping Operations fund could be used to meet the directive. *See* 2024 Appropriations Act, §§ 7043(g), 7045(i) 7060(b), 7060(h). For all other directives, there would remain other categories of appropriations that could be used to comply with the directive.

This Court's injunction unambiguously requires Defendants to do just that: "The agency Defendants . . . are enjoined to make available for obligation and obligate, by September 30, 2025 . . . the minimum or specific expiring funds that Congress required the agency Defendants to obligate for particular uses and purposes in . . . Sections 7030-7061." ECF No. 139 at 41. Defendants must comply with this mandate "so long as there is appropriated money available" to do so. *Aiken Cnty.*, 725 F.3d at 259.

To the extent Defendants assert that it is mathematically impossible to comply with *all* of the Section 7030-7061 directives without using *some* of the appropriations in the rescission proposal, that would not eliminate their legal duties. For one, Defendants should show their math. But even if it is impossible to meet all directives without some funds in the rescission proposal, Defendants still must comply with as many of the directives as possible using eligible and available appropriations. Defendants certainly cannot, as the declarant attests, intentionally "maximize the number and amount of funding directives tied to funds proposed for rescission." Doe Decl. ¶ 8.

As described further below, the Court should require Defendants to disclose for each relevant directive in Sections 7030-7061 the amounts that they are attributing from each category of Title III and Title IV appropriations. The Court should also require Defendants to disclose the

13

attribution breakdown that was used last year the directives, to assess the degree to which Defendants are deviating from prior practice to "maximize the number and amount of funding directives tied to funds proposed for rescission." Doe Decl. ¶ 8.

### B. Instruments That Do Not Specify the Purpose of the Obligation

The obligation plan set forth in the September 4 joint status report, and Defendants' indication that they will still follow that plan despite the preliminary injunction, supplies another basis to question whether Defendants will comply with the injunction. In the September 4 status report, Defendants notified this Court that their plan was to use "instruments" that "may not specifically address or identify funds for individual earmarks and allocations." ECF No. 145 at 3 (emphasis added). Defendants added that they "may," and by implication may not, "rely on subsequent means . . . *after September 30* to address such an earmark or allocation by applying funds to more specific programs and activities consistent with the earmark or allocation." *Id.* (emphases added). Plaintiffs inquired after the injunction's issuance whether Defendants would still follow this plan, and Defendants have declined to say they will not. Just yesterday, Defendants seemed to indicate that they will stick to this plan. They asserted, in reference to this stated plan, that "it is standard practice in implementing foreign-assistance funds to use 'sub-obligations' under broader obligating instruments to meet particular earmarks and other directives."

This Court's September 3 injunction plainly requires the agency Defendants "to obligate, *by September 30, 2025, for the uses and purposes specified by Congress*," the expiring funds in the fifteen categories in Titles III and IV and "the minimum or specific expiring funds that Congress required the agency Defendants to obligate *for particular uses and purposes in Section 7019(a) and Sections 7030–7061*." ECF No. 139 at 41 (emphases added). The injunction does not permit Defendants to park vast sums of appropriations for unidentified purposes by

14

September 30, and then, at some later point, decide whether or not to spend the money for the purposes that Congress intended. Indeed, Defendants have not committed that they will ever obligate or sub-obligate the funds for the specific purposes that Congress directed; they stated only that they "may" do so. ECF No. 145 at 3.

Defendants' assertion regarding purported "standard practice" in obligating foreign assistance funds is a not a legal defense. Plaintiffs understand that prior practice was different from the plan Defendants have described. But even if it were the same, the only relevant legal questions are what the appropriations acts and this Court's injunction require. Neither the 2024 Appropriations Act nor the preliminary injunction contains a grandfather clause.

## C. Global Programs from the Economic Support Fund

There are additional grounds for further inquiry with respect to whether Defendants will comply with the statutory for Global Programs funded by the Economic Support Fund. The State Department declarant attests that Defendant Lewin formally determined that Defendants would deviate by more than 5% from the amounts specifically designated in the tables for these Global Programs. Doe Decl. ¶ 7. That would violate Sections 7019(a) and 7019(d)(3) of the relevant appropriations acts, which do not permit Defendants to deviate by more than 5% from the amounts designated in the tables for these Global Programs.[2]

---

[2] Section 7019(b) permits Defendants to "deviate up to 10 percent" from certain line items in the table, and to deviate more for those line items if the Secretary of State or USAID Administrator makes a formal determination that deviating by more than 10% is necessary to national security. Global Programs from the Economic Support Fund are an exception to this deviation authority. For the line items in the tables for these Global Programs, Section 7019(d)(3) provides that Defendants may deviate only up to 5% from the table amounts, and that "the provisos in such subsection (b) shall not apply." The "provisos in such subsection b" include the proviso that Defendants may deviate more than 10% (or 5% here) upon a determination of necessity to national security.

Defense counsel has now indicated that Defendant Lewin's determination was an "error" that "State intends to correct." The Court should require Defendants to formally disavow that they will deviate by more than 5% for these Global Programs, and to confirm that they will obligate, by September 30, within 5% of the amount specifically designated in the table for each Global Program.

### D. Appropriations from Pre-2024 Appropriations Acts

This Court's injunction requires Defendants to obligate expiring funds from "Title III and Title IV of the Further Consolidated Appropriations Act of 2024 and prior appropriations acts," and to comply with the various directives in all those acts. ECF No. 139 at 41-42. The injunction does not differentiate in any way between the requirements of the 2024 Appropriations Act and those of prior acts. Defendants must obligate expiring funds from all of these laws.

Yet Defendants have refused to provide any information regarding expiring funds from pre-2024 appropriations acts. Although they have provided such information for funds from the 2024 Appropriations Act, they have steadfastly declined to provide the same information for the funds appropriated prior to 2024. There is no sound basis for Defendants to refuse to disclose information about the amount and nature of expiring funds that remain from these acts—that basic factual information is not privileged. Indeed, this information would all be subject to disclosure under FOIA. There also is no sound basis for Defendants to refuse to disclose their obligation plans for these funds. Defendants' silence on these funds raises significant questions whether Defendants will obligate the funds in the manner the Court required.[3]

_____

[3] Some of the funds from prior appropriations acts likely are funds that, pursuant to Section 7011, had an original expiration date of September 30, 2021, but for which the expiration date was extended four years (until September 30, 2025) because the funds were obligated during the original period of availability and then de-obligated. Importantly, for any such funds, Section 7019(d)(1) dictates that Defendants may not deviate from the amounts specifically designated in the tables for the funds.

## II.    An Order to Show Cause Is Warranted

In light of the indications that Defendants may not comply with the injunction, an order to show cause is warranted to obtain information and evidence from Defendants relevant to their compliance, and to provide them an opportunity to state the legal basis for their actions.

Plaintiffs respectfully submit that, among any other issue the Court deems it appropriate for Defendants to address in response to an order to show cause, the Court should require Defendants to:

- Disclose, with respect to the funds expiring on September 30, 2025, for each of the categories and subcategories of appropriations set forth in Defendants' table, ECF No. 145-1, how much money has already been obligated.

- Confirm that they have not deviated and will not deviate by more than 5% from the amounts specifically designated in the tables in the explanatory statement, with respect to line items in the table for "Global Programs" from the Economic Support Fund.

- Address whether they will not carry out any directives in Sections 7030 to 7061, even when the amount of available funds from appropriations that are not included in the special message exceeds the minimum amount that the directive requires to be obligated for the designated purpose.

- Produce their attributions of Title III and Title IV appropriations to each directive in Sections 7030-7061, and the attributions that were used for the directives for funds that expired on September 30, 2024.

- Demonstrate why it is mathematically impossible to meet all the directives using appropriations not included in the special message, to the extent Defendants make that assertion, and provide the maximum number of directives that could be mathematically met using appropriations not included in the special message.

- Disclose, with respect to appropriations acts prior to 2024, for each of the categories and subcategories of appropriations set forth in Defendants' table, ECF No. 145-1, how much in appropriations that will expire on September 30, 2025 were unobligated as of September 3, 2025, and how much remain obligated today.

- Address whether Defendants have obligated, or made a final decision or plan to obligate, any expiring funds using "instruments" that "may not specifically address or identify funds for individual earmarks and allocations."

- If Defendants have obligated any of the expiring funds using such instruments, list how much Defendants have obligated using such instruments, and for what amounts do the instruments not specifically identify funds for individual line items or directives.

- Describe, for each Instrument that Defendants have used or will use to obligate the expiring funds, whether the instrument will specify the particular line items from the Section 7019(a) tables, ECF No. 125-11, or directives from Sections 7030-7061 of the relevant appropriations statute, for which funds are being obligated.

## III.    The Court Should Permit a Deposition of Lewin If Defendants Do Not Adequately Respond to the Order to Show Cause

If Defendants do not adequately respond to the above questions, the Court should authorize Plaintiffs to take a deposition or live testimony from Defendant Lewin. On August 31, in opposition to the preliminary injunction now in force, Lewin submitted a declaration that is just the latest he has submitted in this case. In his August 31 declaration, Lewin attested:

> Consistent with available authorities, State and USAID are making best efforts to obligate the remaining $6.5 billion in expiring appropriated balances for foreign assistance by September 30, 2025. State expects to be able to obligate substantially all these funds before their expiration.

> Secretary Rubio and I have already given appropriate approval for plans to obligate the full amounts in these assistance accounts. Put another way, the

> Secretary and I have already given appropriate policy direction for the allocation
> of all available expiring funds to specific purposes and programs.

ECF No. 135-1 ¶¶ 6-7 (Lewin Decl.).

Lewin has thus attested that he has unique personal knowledge of the approved "plan to obligate the full amounts in [the] assistance accounts," as he personally gave "policy direction for the allocation of all available expiring funds to specific purposes and programs." *Id.*

As Plaintiffs have previously explained, it is a fundamental tenet of American law that a party should have an opportunity to question facts that an opposing party "has itself put into evidence." *In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008). Once a witness has "already seen fit to go under oath" and affirmatively submit a declaration on a contested factual issue, the opposing party is entitled to "follow-up questioning on facts [the witness] has itself put in evidence." *Id.* (deposition of a high-ranking White House official appropriate where the official submitted a declaration in support of a factual defense that the government "ha[d] itself raised"); *see also Alexander v. FBI*, 186 F.R.D. 113, 121 (D.D.C. 1998) (allowing deposition of Clinton White House Director of Records Management because official had submitted a declaration and a deposition was therefore appropriate to "probe the veracity and contours of the statements").

In these circumstances, the "apex doctrine" does not preclude Plaintiffs from seeking Lewin's testimony. *See* ECF No. 110. Nor can Defendants claim that any information to be gleaned from Lewin is privileged; the well-established sword/shield doctrine precludes a party from selectively disclosing information to gain a litigation advantage and then withholding other relevant information. *See Koch v. Cox*, 489 F.3d 384, 390 (D.C. Cir. 2007).

Here, there are particularly compelling reasons to reject any effort to shield Lewin's testimony, given that his declaration is the sole evidence that Defendants have submitted that they intend to obligate the $6.5 billion in expiring funds from the 2024 Appropriations Act.

**CONCLUSION**

For the above reasons, the Court should grant Plaintiffs' motion for an order to show cause, and enter the attached proposed order.

Dated: September 20, 2025

Respectfully submitted,

*/s/ Daniel F. Jacobson*

Daniel F. Jacobson (D.C. Bar 1016621)
John Robinson (D.C. Bar 1044072)
Nina Cahill (D.C. Bar 1735989)
JACOBSON LAWYERS GROUP PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
Tel: (301) 823-1148
dan@jacobsonlawyersgroup.com

*Counsel for Plaintiffs*