Exhibit 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GLOBAL HEALTH COUNCIL,
    2300 N Street NW, Suite 501 A
    Washington, DC 20037,

SMALL BUSINESS ASSOCIATION FOR
INTERNATIONAL COMPANIES,
    655 15th Street NW, Suite 425
    Washington, DC 20005,

HIAS,
    300 Spring Street,
    Silver Spring, MD 20910,

MANAGEMENT SCIENCES FOR HEALTH,
    4201 Wilson Blvd., Suite 500
    Arlington, VA 22203,

CHEMONICS INTERNATIONAL, INC.,
    1275 New Jersey Ave. SE, Suite 200
    Washington, DC 20003,

DAI GLOBAL, LLC,
    7700 Wisconsin Ave., Suite 340
    Bethesda, MD 20814,

DEMOCRACY INTERNATIONAL, INC.,
    7200 Wisconsin Ave., Suite 1000
    Bethesda, MD 20814,

and

AMERICAN BAR ASSOCIATION,
    321 N. Clark Street
    Chicago, IL 60654,

                *Plaintiffs*,

    v.

DONALD J. TRUMP, in his official capacity as
President of the United States of America,
    1600 Pennsylvania Ave. NW
    Washington, DC 20050,

Civil Action No. 25-cv-402-AHA

MARCO RUBIO, in his official capacity as
Secretary of State,
    2201 C Street NW
    Washington, DC 20520,

JEREMY LEWIN, in his official capacity
performing the duties of Under Secretary for
Foreign Assistance, Humanitarian Affairs and
Religious Freedom at the United States Department
of State ,
    2201 C Street NW
    Washington, DC 20004,

RUSSELL VOUGHT, in his official capacity as
Director of the Office of Management and Budget
and Acting Administrator of the United States
Agency for International Development,
    725 17th Street NW
    Washington, DC 20503,

UNITED STATES DEPARTMENT OF STATE,
    2201 C Street NW
    Washington, DC 20520,

UNITED STATES AGENCY FOR
INTERNATIONAL DEVELOPMENT,
    2201 C Street NW
    Washington, DC 20004,

and

OFFICE OF MANAGEMENT AND BUDGET,
    725 17th Street NW
    Washington, DC 20503,

                    *Defendants*.

## THIRD AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

# INTRODUCTION

1.      Over the course of eleven months, the President and executive-branch officials have dismantled U.S. foreign aid spending and operations in defiance of the will of Congress. They have even abolished, without congressional approval, the United States Agency for International Development (USAID)—eliminating the entire agency that Congress created to serve as the principal administrator of foreign aid programs and funding.

2.      Defendants' unlawful actions have caused grievous harm to Plaintiffs and other USAID and State Department grantees, contractors, and implementing partners. For many of the Plaintiffs in this action, their businesses' or organization's existence depended entirely on USAID and the funds it is supposed to award to implementing partners.

3.      The harms have been far more devastating for people in need around the world. According to recent estimates, the dismantling of USAID has already caused the deaths of six-hundred-thousand people, two-thirds being children. Many more people have needlessly suffered disease, starvation, and poverty that congressionally appropriated foreign assistance would have prevented, if only Defendants had spent it as Congress directed. This tragedy is ongoing and will only continue as foreign-assistance operations remain disrupted and congressionally appropriated funds remain unavailable for their intended purposes.

4.      Plaintiffs now assert claims with respect to four categories of unlawful actions Defendants have taken.

5.      First, Defendants have decided not to spend foreign assistance appropriations in the amounts that Congress required, for the purposes that Congress required, and by the deadlines Congress required. Defendants' withholding of, and intent to impound, foreign assistance funds

violates the relevant appropriations acts, constitutes arbitrary and capricious agency action, and represents an unconstitutional violation of the separation of powers.

6.      Second, Defendants' elimination of foreign assistance programs, initiatives, offices, and partnerships represents arbitrary and capricious agency actions in every way possible. Programs such as the Feed the Future Initiative and Power Africa, offices such as USAID's Bureaus for Democracy, Human Rights, and Governance, and partnerships in which the United States participated such as Gavi, the Vaccine Alliance, advanced U.S. interests as determined by Congress and provided a lifeline to millions of persons in need around the world. In eliminating these programs, initiatives, offices, and partnerships, Defendants provided no reasoned explanations, and in many cases provided no explanation at all. Nor did Defendants consider the enormous reliance interests upended by these eliminations.

7.      Third, Defendants acted unlawfully in their disposition of billions of dollars of appropriations at the end of Fiscal Year 2025, with respect both to money they did obligate and money they did not. For funds they did purportedly obligate, Defendants failed to comply with the directives of Sections 7030-7061 of the 2024 Appropriations Act to obligate specific or minimum amounts for particular purposes. Even if Defendants were unable to meet all of the directives because some funds were purportedly unavailable because they had been included in the President's late-August rescission proposal, Defendants were required by law to maximize the number of directives that they would meet. For the money in the rescission proposal, Defendants violated the relevant appropriations acts by not obligating the funds prior to September 30, 2025, the original expiration date that Congress had set. And if Defendants were correct that Congress had to be given 45 days to consider the proposal no matter what, that would just mean that Defendants are continuing to violate the law, because 2 U.S.C. § 683(b) provides

without qualification that funds "shall be made available" for obligation if Congress did not act on a rescission proposal within the 45-day period.

8.    Fourth and finally, Defendants' abolishment of USAID as an executive agency violates foundational principles of the separation of powers. Under the Constitution, only Congress has the power to establish agencies and assign them duties, and the Executive Branch has no power to unilaterally wipe away an agency that Congress has created and provided myriad responsibilities. Only Congress can abolish USAID through duly enacted legislation. Defendants' unilateral elimination of USAID flies in the face of the separation of powers.

9.    Defendants have been candid about their motivations. As agency memoranda, guidance, and public statements make clear, the President disagrees with Congress's choice to establish and fund foreign-assistance programs, which have been legislatively mandated for more than a half century. To be sure, the President may establish his own policy priorities and pursue the implementation of those policies consistent with the law. But neither the President nor his subordinates may simply disregard Congress' directives, especially when Congress has acted pursuant to its core constitutional power of the purse and its exclusive authority to establish agencies of the federal government.

10.    Whether for policy or political reasons, Defendants made foreign-assistance funding the testing ground for an unprecedented assertion of unilateral executive power in defiance of Congress and all established principles of administrative law. The Court must hold these actions unlawful and set them aside.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the action arises under federal law, including the U.S. Constitution and the

Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq*. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 704-06, and mandamus relief pursuant to 28 U.S.C. § 1361.

12.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because this action seeks relief against federal agencies and officials acting in their official capacities; at least one defendant is located in this district; and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

13.     Plaintiff Global Health Council (GHC) is a private, not-for-profit, membership alliance incorporated in Delaware, headquartered in Washington, D.C., and enjoying tax-exempt status under Section 501(c)(3) of the Internal Revenue Code. GHC was founded in 1972 under the name National Council of International Health as a U.S.-based, nonprofit membership organization with the purpose of identifying priority global health problems and reporting on them to the U.S. public, legislators, international and domestic government agencies, academic institutions, and the world health community. Many of GHC's members administer global health programs and receive funding from USAID and other federal agencies in the form of contracts, grants, and cooperative agreements. GHC's members depended on sustained, uninterrupted funding to continue their work.

14.     Plaintiff Small Business Association for International Companies (SBAIC) is a membership organization established to promote the meaningful utilization of U.S. small businesses at U.S government agencies providing foreign assistance, including USAID. SBAIC has almost 170 members, including small businesses under every Small Business Administration

category. SBAIC's members are or were recipients of foreign aid through contracts, grants, and cooperative agreements.

15.    Plaintiff HIAS is a global, faith-based 501(c)(3) nonprofit organization headquartered in Silver Spring, Maryland. Working with the organized American Jewish community, HIAS is dedicated to ensuring that the world's forcibly displaced people find welcome, safety, and freedom. As of January 20, 2025, 38% of HIAS's funding came from the U.S. government, including the Department of State and USAID.

16.    Plaintiff Management Sciences for Health, Inc. (MSH) is a global nonprofit organization incorporated in Massachusetts and headquartered in Arlington, VA. Founded in 1971, MSH has worked to improve health systems and health outcomes in more than 150 countries by providing governments, health organizations, and the private sector with the strategies, tools, and management support to effectively and efficiently deliver high-functioning health systems. As of January 20, 2025, approximately 88% of MSH's funding came from USAID. .

17.    Plaintiff Chemonics International, Inc. (Chemonics) is an employee-owned sustainable development company headquartered in Washington, D.C. Founded in 1975, Chemonics has been a trusted partner to the U.S. government for 50 years, having successfully implemented more than 1,000 foreign-assistance programs in more than 100 countries on behalf of USAID and other U.S. government clients. As of January 20, 2025, approximately 88% of Chemonics and its subsidiaries' funding came from USAID, with Chemonics actively working with USAID on 104 different projects in over 90 countries.

18.    Plaintiff DAI Global, LLC (DAI) is an employee-owned global development company headquartered in Bethesda, Maryland. DAI was founded in 1970 and has been a trusted

partner of the U.S. government, especially USAID, for more than 50 years, delivering successful projects in more than 150 countries. As of January 20, 2025, nearly 80% of DAI's revenue (more than $750 million in 2024) came from USAID. As of January 20, 2025, DAI was working with USAID and Millennium Challenge Accounts on 99 different projects in 45 countries.

19.     Plaintiff Democracy International, Inc., a small business, is an international development company founded in 2003 and headquartered in Bethesda, Maryland. Over the past 22 years, it has conducted more than 200 democracy, human rights, governance, peace and resilience, and other projects for USAID in more than 80 countries. Approximately 96% of Democracy International's revenues in 2024 came from prime awards from USAID.

20.     Plaintiff the American Bar Association (ABA) is a non-partisan organization, founded in 1878 with a mission to defend liberty and pursue justice in the United States. Its Fund for Justice and Education (ABA FJE), the 501(c)(3) charitable fund of the Association, features many pro bono, public service, and education programs that improve access to justice in the United States and globally. The ABA Center for Global Programs (APA CGP) is an ABA FJE-entity whose mission serves the ABA's Goal IV: Advance the Rule of Law. For 35 years, and in more than 100 countries, ABA CGP has, at the behest of, and in partnership with, USAID, the Department of State, and other U.S. government agencies, implemented international rule of law and human rights programming that supports U.S. national interests. In total, approximately 38% and 60% of ABA GGP's FY 2025 funding is respectively derived from USAID and Department of State funding after a competitive procurement process. As of January 20, 2025, ABA was implementing 19 programs funded by USAID and 45 programs funded by the Department of State.

21.     Defendant Donald J. Trump is the President of the United States. He is being sued in his official capacity only.

22.     Defendant United States Department of State is an executive department of the United States government that is responsible for the United States' foreign policy and relations. The Department of State is headquartered in Washington, D.C.

23.     Defendant United States Agency for International Development (USAID) is codified in law as a standalone agency of the United States government that is responsible for administering civilian foreign aid and assistance. USAID was headquartered in Washington, D.C.

24.     Defendant Office of Management and Budget (OMB) is a federal agency within the Executive Office of the President that is responsible for producing the President's budget and coordinating interagency policy initiatives. OMB is headquartered in Washington, D.C.

25.     Defendant Marco Rubio is the Secretary of State. He is being sued in his official capacity only. Secretary Rubio maintains an office at 2201 C Street NW, Washington, D.C. 20520.

26.     Defendant Jeremy Lewin is performing the duties of Under Secretary for Foreign Assistance, Humanitarian Affairs and Religious Freedom at the United States Department of State and previously served as the Deputy Administrator of USAID. He is being sued in his official capacity only. Mr. Lewin maintains an office at 2201 C Street NW, Washington, D.C. 20520.

27.     Defendant Russell Vought is the Director of OMB and Acting Administrator of USAID. He is being sued in his official capacities only. Director Vought maintains an office at 725 17th Street NW, Washington, D.C. 20503.

**FACTUAL ALLEGATIONS**

*Congress Establishes USAID as an Executive Agency*

28.     For more than a half century, federal law has declared it the policy of the United States to support economic development and foster democratic institutions abroad through foreign assistance. *See* Foreign Assistance Act of 1961 § 102, Pub. L. No. 87-195, 75 Stat. 424, 424 (codified as amended at 22 U.S.C. § 2151). Congress has implemented that policy through numerous statutory programs directing USAID, the Department of State, and others to support a host of critical goals, from global health to agricultural production to disaster relief. 22 U.S.C. §§ 2151-2152k, 2292-94. And for more than a half century, USAID and the Department of State have fulfilled these statutory mandates by leading American efforts to alleviate poverty, disease, and humanitarian need; supporting developing countries' economic growth; and building countries' capacity to participate in world trade. Cong. Rsch. Serv., IF10261, U.S. Agency for International Development: An Overview 1 (Jan. 6, 2025) [hereinafter Jan. 2025 CRS Report].

29.     Founded in 1961, USAID was established to counter the influence of the Soviet Union during the Cold War and to run various foreign-assistance programs based on the idea that American security was tied to stability and economic advancements in other nations—the cornerstone of what is now called "soft power." As President Kennedy stated on signing the Foreign Assistance Act, "Our adversaries are intensifying their efforts in the entire under-developed world. Those who oppose their advance look to us and I believe, at this dangerous moment, we must respond." Statement by the President Upon Signing the Foreign Assistance Act, 1 Pub. Papers 588 (Sept. 4, 1961), https://perma.cc/H8WR-B76D. Or as Senator Lindsey Graham noted more recently, soft power is a "critical component of defending America and our values." Chantal Da Silva, *What Cutting USAID Could Cost the U.S.—And How China, Russia May Benefit*, NBC News (Feb. 4, 2025), https://perma.cc/GT2Q-6E82. "If you don't get involved

in the world and you don't have programs in Africa where China's trying to buy the whole continent, we're making a mistake," Graham explained. *Id.*

30.    Since its establishment, USAID has played a critical role in furthering core U.S. interests by reducing the spread of communicable disease, fighting poverty, improving access to education, and promoting economic growth, among other functions. In the 1960s, for example, USAID was a key part of the global effort to eradicate smallpox and, years later, a similar effort to fight polio. Today, USAID plays an indispensable role in implementing the President's Emergency Plan for AIDS Relief, a program that, since its inception during the George W. Bush Administration in 2003, has delivered AIDS treatment to tens of millions of people in 54 countries.

31.    USAID's work is essential to addressing the root causes of extremism, terrorism, and international conflict. As then-Acting USAID Administrator John Barsa put it in 2020, "Our aid advances American interests by reducing the vulnerability of populations to extreme ideologies[;] … [it] cultivates democracies and creates a network of states that advance our common interests and values[;] … [it] restores stability, and prevents disasters from creating the conditions that can give rise to conflict and discord[;] … [and it] can stop wars before they start, reducing the need to put our men and women in uniform in harm's way." John Barsa, Acting Administrator, U.S. Agency for Int'l Dev., Remarks at the Concordia UNGA Summit (Sept. 21, 2020), archived at https://bit.ly/48Rw9SM (Barsa, *Remarks*).

32.    USAID's programs also strengthen allies' economies, open markets, create opportunities for American businesses, protect America's supply chains, and create jobs to reduce migration pressure. These programs counter malign influences globally from China, Russia, Iran,

and others, and advance America's national security and economic interests. In short, USAID has long played a key role in furthering American interests.

33.     But USAID does not do this alone. In fact, USAID generally does not implement foreign-assistance projects itself. Instead, most USAID projects are administered through grants, cooperative agreements, or contracts with partner organizations, including nonprofits and academic institutions. *See* Jan. 2025 CRS Report at 1. USAID partners, including American companies employing thousands of Americans, thus perform the lion's share of the work necessary to safeguard American security, promote economic prosperity, and address global challenges before they reach American shores.

34.     In 1998, Congress formally established USAID as a standalone agency outside the State Department. Foreign Affairs Reform and Restructuring Act of 1998 § 413, Pub. L. No. 105-277, 112 Stat. 2681, 2681-791; *see* 5 U.S.C. § 104. In so doing, Congress carefully circumscribed the President's authority to make changes to the agency's structure or operations, allowing the President only sixty days after USAID's establishment to eliminate the agency or reassign its functions. 22 U.S.C. § 6601(a). President Clinton declined to do so. Instead, he ordered that "USAID will remain a distinct agency with a separate appropriation." Reorganization Plan and Report Submitted by President Clinton to the Congress on December 30, 1998 pursuant to Section 1601 of the Foreign Affairs Reform and Restructuring Act of 1998.

### *Congress Appropriates Funding for Foreign Assistance*

35.     Since Congress established USAID as its own agency in 1998, Congress has consistently appropriated funds for foreign assistance through USAID. In March 2024, Congress appropriated tens of billions to USAID to carry out the following eight topline categories of foreign assistance activities:

36.    With respect to USAID, the 2024 Appropriations Act appropriates, among other amounts:

a.    $4 billion "for global health activities" called for in "chapters 1 and 10 of part I of the Foreign Assistance Act of 1961" (FAA), which "shall be made available for training, equipment, and technical assistance to build the capacity of public health institutions and organizations in developing countries." *Id.* tit. III, 138 Stat. at 740; *see* 22 U.S.C. §§ 2151-2152k, 2293-2294 (FAA provisions). Congress instructed USAID to effectuate these purposes through "such activities as" child survival and maternal health programs; immunization and oral rehydration; programs addressing the needs of mothers and children; assistance for displaced children; programs for the prevention and treatment of HIV/AIDS, tuberculosis, polio, malaria, and other infectious diseases; disaster preparedness; programs for responding to emergent global health threats; and family planning and reproductive health. Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 740.

b.    $3.93 billion in "development assistance" to carry out provisions of the FAA that direct actions to help develop agriculture, education and human resources, energy production, schools and hospitals, small businesses, and human welfare in sub-Saharan Africa (*id.* at 742);

c.    $4.78 billion in "international disaster assistance" "to carry out the provisions of section 491 of the [FAA] for international disaster relief, rehabilitation, and reconstruction assistance" (*id.*);

d.    $75 million in "transition initiatives" for "international disaster rehabilitation and reconstruction assistance administered by" USAID's Office of

Transition Initiatives "pursuant to section 491 of the [FAA], and to support transition to democracy and long-term development of countries in crisis" (*id.*);

e.     $55 million to implement the Complex Crisis Fund established by the Global Fragility Act of 2019, which USAID administers "to support programs and activities to prevent or respond to emerging or unforeseen events overseas," 22 U.S.C. § 9808(b) (*see* Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 743);

f.     $3.89 billion to implement the FAA's Economic Support Fund, which the State Department and USAID administer to furnish "assistance to countries and organizations … to promote economic or political stability," 22 U.S.C. § 2346(a), (b) (*see* Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 743);

g.     $140 million "to carry out the provisions of the [FAA] for the promotion of democracy globally, including to carry out" pro-democracy training, institution-building, and pluralism purposes established in the National Endowment for Democracy Act, 22 U.S.C. § 4411(b)(3), (5) (*see* Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 743); and

h.     $770 million for assistance for Europe, Eurasia, and Central Asia under the FREEDOM Support Act, Pub. L. No. 102-511, which authorizes assistance for "urgent humanitarian needs," "[e]stablishing a democratic and free society," "[d]eveloping free and independent media," and other critical measures in nations of the former Soviet Union, 22 U.S.C. § 2295, and the Support for Eastern European Democracy (SEED) Act of 1989, Pub. L. No. 101-17, which calls for currency stabilization loans, debt reduction, agricultural assistance, and other measures to promote democracy and free markets in eastern Europe, 22 U.S.C. § 5401 (*see* Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 744).

37.    For many of these funds, the 2024 Appropriations Act provided that the appropriations would be available until September 30, 2025, while for others Congress provided that the funds would remain available until expended. Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 742-44. For none of these appropriations did Congress provide USAID discretion to spend less than the full top-line amount appropriated.

38.    For the Global Health Programs funds, Congress provided that the money "shall be apportioned directly to [USAID]," and Congress similarly provided that the funds for Development Assistance, International Disaster Assistance, and the Complex Crises Fund "shall be apportioned to [USAID]." *Id.*

39.    Congress has separately appropriated funds for foreign aid to be administered by the State Department. In Titles III and IV of the 2024 Appropriations Act, Congress appropriated to the State Department the following seven top-line categories of appropriations:

a.    $6 billion "to carry out the provisions of the Foreign Assistance Act of 1961 for the prevention, treatment, and control of, and research on, HIV/AIDS" (*id.* at 742);

b.    $205 million "to carry out the provisions of the [FAA] for the promotion of democracy globally" consistent with the National Endowment for Democracy Act, 22 U.S.C. § 4411(b)(3), (5) (*see* Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 743);

c.    $3.93 billion for migration and refugee assistance, including to enable the Secretary of State to carry out the provisions of section 2(a) and (b) of the Migration and Refugee Assistance Act of 1962," 22 U.S.C. 2601 (*see* Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 744);

d.      $870 million for preventing the proliferation of nuclear weapons, combatting terrorism, and demining conflict zones pursuant to specified provisions of the FAA, FREEDOM Support Act, and Arms Export Control Act (*id.* tit. IV, 138 Stat. at 748)

e.      $410 million to carry out provisions of section 511 of the FAA "for peacekeeping operations and other programs carried out in furtherance of the national security interests of the United States," 22 U.S.C. § 2348 (*see* Pub. L. No. 118-47, div. F, tit. IV, 138 Stat. at 749-50); and

f.      $1.4 billion "to carry out section 481 of the [FAA]," "for the control of narcotic and psychotropic drugs and other controlled substances, or for other anticrime purposes," 22 U.S.C. § 2291(a)(4) (*see* Pub. L. No. 118-47, div. F, tit. IV, 138 Stat. at 747).

40.     Of these appropriations to the State Department, all except the funds for HIV/AIDS and Peacekeeping Operations were to remain available until September 30, 2025. The HIV/AIDS funds were to remain available for four years, until September 30, 2028. A portion of the Peacekeeping Operations funds were to remain available until September 30, 2024, while a majority were to remain available until September 30, 2025.

41.     The 2024 Appropriations Act speaks in mandatory terms. For example, it directs that funds appropriated for global health programs "shall be apportioned directly to the United States Agency for International Development." *Id.*, 138 Stat. 740. Other provisions similarly provide that specific funding amounts "shall" be apportioned to USAID or the State Department for specified purposes. *See, e.g.*, *id.*, 138 Stat. 741-43.

42.     In addition to apportioning funds directly to USAID and State for these congressionally established purposes, the 2024 Appropriations Act requires Defendants to spend

specific or minimum amounts of funds for specific foreign aid purposes. Section 7019(a) requires that funds "shall be made available" in amounts specifically designated in tables appended to the Act. Those tables include line items with specific amounts that must be obligated for defined purposes. *See* Further Consolidated Appropriations Act, 2024, Comm. Print of the H. Comm. on Appropriations, Legislative Text and Explanatory Statement, ECF No. 125-11 (hereinafter "Legislative Tables").

43.     In addition, Sections 7030 to 6061 of the 2024 Appropriations Act prescribe subcategories for which USAID and State must spend minimum amounts of funds. Those sections contain directives that "no less than" particular amounts of funds "shall be made available" for particular foreign aid purposes. For instance, the Act provides that "[o]f the funds appropriated by this Act . . . under the heading 'Democracy Fund,' not less than $5,000,000 shall be made available for democracy and Internet freedom programs for Hong Kong." *Id.* §§ 7043(g)(2), 138 Stat. 814.

44.     Across Sections 7030 through 7061 and the tables made binding by Section 7019(a), the 2024 Appropriations Act contains roughly 240 subcategories of purposes for which Congress required specific amounts of funds—or "not less than" specific amounts of funds—that "shall be made available" by the agencies. These directives total nearly $25 billion.

45.     Many of the line items in the tables referenced in Section 7019(a), and many of the directives in Sections 7030 to 7061, reference specific initiatives, programs, and partnerships for which the appropriations must be used.

46.     The Act also calls for specific, concrete actions from USAID and the State Department to implement statutory foreign-assistance programs funded under the Act. For example, the Act commands that "[f]unds appropriated by this Act under the heading 'Economic

Support Fund' *shall be made available* for programs to protect international freedom of expression and independent media, including through multilateral initiatives." *Id.* div. F, tit. VII, § 7032(h), 138 Stat. at 787 (emphasis added). The Act also defines "democracy programs" for purposes of several of its USAID and State appropriations so as to prescribe particular types of programs: those "that support good governance, credible and competitive elections, freedom of expression, association, assembly, and religion, human rights, labor rights, independent media, and the rule of law, and that otherwise strengthen the capacity of democratic political parties, governments, nongovernmental organizations and institutions, and citizens to support the development of democratic states and institutions that are responsive and accountable to citizens." *Id.* § 7032(c), 138 Stat. at 786. And the Act commands that "USAID shall continue to implement civil society and political competition and consensus building programs abroad with funds appropriated by this Act in a manner that recognizes the unique benefits of grants and cooperative agreements in implementing such programs." *Id.* § 7032(f), 138 Stat. at 787 (emphasis added).

47.    The Act also generally prohibits deviation from its funding allocations beyond small, defined amounts without congressional consultation and justification based on case-by-case exigencies. *See id.* § 7019(b), 138 Stat. at 772.

48.    Congress's 2024 foreign-aid appropriations build on multiple years of prior appropriations for similar purposes, much of which remains available for obligation and expenditure. For example, Congress has appropriated at least $3 billion annually to USAID for global health programs since at least 2019 and, according to the most recently published federal

spending data, over $14 billion of the total available resources for these appropriations remain unobligated.[1]

49.     On March 15, 2025, Congress enacted a continuing resolution that has the effect of re-appropriating all of the funds that were appropriated to USAID in the 2024 Appropriations Act, on the same terms and conditions as in the 2024 Appropriations Act. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, §§ 1101-08, 139 Stat. 9, 10-12, Pub. L. 119-4 (Mar. 15, 2025) (the "2025 Continuing Resolution"). Under the continuing resolution, specific programs for which Congress appropriated funds in the 2024 Appropriations Act carry over. For example, as described above, the 2024 Appropriations Act appropriated $3,985,450,000 for Global Health Programs, to last through two fiscal years (in that case, through September 30, 2025). The 2025 Continuing Resolution thus *re*-appropriated an *additional* $3,985,450,000 for Global Health Programs, to again last through two fiscal years (this time, through September 30, 2026). The 2025 Continuing Resolution replicated not just the top-line appropriations, but also the same directives in Sections 7030-7061 and the required amounts from the tables as provided in Section 7019(a). The 2025 Continuing Resolution thus appropriated to USAID and the State Department the same levels of funds for the same discrete programs, on the same terms, as did the text of the 2024 Appropriations Act.

50.     In July 2025, acting in part on a rescission proposal from the President, Congress rescinded a portion of the funds that it had appropriated for foreign aid in the 2025 Continuing

---

[1] *See* Pub. L. No. 117-328, div. K, tit. III, 136 Stat. 4459, 4985 (Dec. 29, 2022) ($4.17 billion); Pub. L. No. 117-103, div. K, 136 Stat. 49, 575 (Mar. 15, 2022) ($3.88 billion); Pub. L. No. 116-260, div. K, tit. III, 134 Stat. 1182, 1691 (Dec. 27, 2020) ($3.3 billion); Pub. L. No. 116-94, div. G, tit. III, 133 Stat. 2534, 2827 (Dec. 20, 2019) ($3.16 billion); Pub. L. No. 116-6, div. F, tit. III, 133 Stat. 278 (Feb. 15, 2019) ($3.12 billion); *Global Health Programs, State: FY 2025 Snapshot*, USASpending.gov, https://www.usaspending.gov/federal_account/019-1031.

Resolution. *See* Rescissions Act of 2025, 139 Stat. 467, Pub. L. 119-28 (July 24, 2025). For example, Congress rescinded $500,000,000 in funding for Global Health Programs, except that "none of the amounts rescinded . . . shall be from the unobligated balances for the following programs: HIV/AIDS, Tuberculosis, Malaria, Nutrition, or Maternal and Child Health." 139 Stat. at 468. Congress also rescinded some funding for the Complex Crises Fund, the Democracy Fund, the Economic Support Fund, and certain other categories of funding. *See id.* However, Congress left in place many billions of dollars in foreign aid that it had appropriated in the 2025 Continuing Resolution, and Congress declined to adopt the President's request to rescind money appropriated for the State Department's PEPFAR program.

51.    On November 12, 2025, Congress enacted a continuing resolution re-appropriating pro-rata amounts appropriated in the 2024 Appropriations Act for USAID and the State Department, to be available until January 30, 2026. Pub. L. 119-37, 139 Stat. 495 (2025).

### The New Administration Takes Offices and Decides Not to Administer Foreign Aid Spending and Programs as Congress Directed

52.    Starting on President Trump's first day in office, Defendants halted spending foreign assistance appropriations required by Congress to be spent for specific purposes.

53.    This process began with Executive Order 14,169. *See* 90 Fed. Reg. 8619 (Jan. 20, 2025). In that Order, entitled "Reevaluating and Realigning United States Foreign Aid," President Trump asserted his authority "under the Constitution and the laws of the United States of America" to issue an executive order purporting to immediately freeze all foreign assistance funding. *Id.* at § 2. The President claimed that "[t]he United States foreign aid industry and bureaucracy are not aligned with American interests and in many cases antithetical to American values. They serve to destabilize world peace by promoting ideas in foreign countries that are directly inverse to harmonious and stable relations internal to and among countries." *Id.* § 1. He

further asserted that "[i]t is the policy of United States that no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President of the United States." *Id.* § 2.

54.     The Acting Deputy of USAID confirmed that the President "exercised his constitutional authority" to issue the executive order. Decl. of Pete Marocco ¶ 3, ECF No. 25-1.

55.     In order to more "fully align[]" foreign assistance programs with President Trump's policy preferences, Executive Order 14,169 directed four actions. *Id.*

56.     First, it directed a "90-day pause in United States foreign development assistance," purportedly "for assessment of programmatic efficiencies and consistency with United States foreign policy." *Id.* § 3(a). It required all "department and agency heads with responsibility for United States foreign development assistance programs" to "immediately pause new obligations and disbursements of development assistance funds to foreign countries and implementing non-governmental organizations, international organizations, and contractors." *Id.* Under the order, programs were to be paused "pending review[]," and OMB was to "enforce this pause through its apportionment authority." *Id.* This "pause" could be waived for specific programs by the Secretary of State. *Id.* § 3(e).

57.     Second, the Executive Order directed each "responsible department and agency head[]" to initiate those "[r]eviews of each foreign assistance program … under guidelines provided by the Secretary of State, in consultation with the Director of OMB." *Id.* § 3(b).

58.     Third, based upon these reviews, "[t]he responsible department and agency head[], in consultation with the Director of OMB" was ordered to "make determinations within 90 days of this order on whether to continue, modify, or cease each foreign assistance program … with the concurrence of the Secretary of State." *Id.* § 3(c).

59.     Fourth, the Executive Order purportedly allowed "[n]ew obligations and disbursements of foreign development assistance funds [to] resume for a program prior to the end of the 90-day period" only after "a review is conducted, and the Secretary of State or his designee, in consultation with the Director of OMB, decide to continue the program in the same or modified form." *Id.* § 3(d). Any "other new foreign assistance programs and obligations must be approved by the Secretary of State or his designee, in consultation with the Director of OMB." *Id.*

60.     Defendants swiftly set to work implementing the Executive Order. On January 22, 2025, then-USAID Acting Administrator Jason Gray instructed agency employees that, pursuant to the Executive Order, "USAID will immediately pause all new program-funded commitments and new or incremental obligations." USAID, Initial Instructions for Implementing Executive Order Reevaluating and Realigning United States Foreign Aid (Jan. 22, 2025) (the "Gray Initial Instructions") (ECF 57-1). The instructions further stated that "[t]his directive encompasses every level of programming—including at the obligation (e.g., development objective agreement) and subobligation levels." *Id.*

61.     On January 24, 2025, and "[c]onsistent with the President's Executive Order on Reevaluating and Realigning United States Foreign Aid," Secretary of State Marco Rubio issued a memorandum "paus[ing] all new obligations of funding, pending a review, for foreign assistance programs funded by or through the Department and USAID." Memorandum from the Secretary of State ¶ 1, 25 STATE 6828 (Jan. 24, 2025) (the "Rubio Memo") (ECF 17-1, Ex. B).

62.     Secretary Rubio asserted that the funding freeze's purpose was "to determine whether the foreign assistance policies and interests supported by appropriations are not duplicated, are effective, and are consistent with President Trump's foreign policy." *Id.* ¶ 2. To "ensure that all foreign assistance is aligned with President Trump's foreign policy agenda," he

ordered a "government-wide comprehensive review of all foreign assistance." *Id.* ¶¶ 3, 4. He further directed that "no new obligations shall be made for foreign assistance until such time as the Secretary shall determine, following a review," and that "contracting officers and grant officers [must] immediately issue stop-work orders" for any "existing foreign assistance awards." *Id.* ¶ 7. In short, Secretary Rubio mandated that neither the Department of State nor USAID would provide any foreign assistance "without the Secretary of State's authorization or the authorization of his designee." *Id.* ¶ 5.

63.    The same day, USAID Senior Procurement Executive (SPE) Jami Rodgers issued a notice "[i]n accordance with the President's Executive Order" to "paus[e] all new obligations of funding, and sub-obligations of funding under Development Objective Agreements." USAID, Notice on Implementation of Executive Order on *Reevaluating and Realigning United States Foreign Aid* (Jan. 24, 2025) (the "Rodgers Guidance") (ECF 57-2). The notice also instructed agency personnel not to "issue new awards or release any new requests for proposals (RFPs), requests for application (RFAs), notices of funding opportunities (NOFOs), or any other kind of solicitation for foreign assistance funding until each activity has been reviewed and approved as consistent with the President's policy." *Id.*

64.    Also the same day, Gray issued follow-up instructions to agency employees for implementing the Executive Order and the Rubio Memo. USAID, Follow-Up Instructions for Implementing Executive Order Reevaluating and Realigning United States Foreign Aid (Jan. 24, 2025) (the "Gray Follow-Up Instructions") (ECF 57-3). The follow-up instructions directed that, "[p]er the [Rubio Memo], within 30 days, the Director of the Department of State's Policy Planning Staff (S/P) or its designate shall develop appropriate review standards to ensure that all foreign assistance is aligned with President Trump's foreign policy agenda. Information on this

review process will be shared as it becomes available." *Id.* The follow-up instructions further stated that, "[c]onsistent with and building on" the Gray Initial Instructions, "all new program-funded obligations and subobligations are to remain on pause unless exempt." *Id.* Gray also announced that he was "immediately directing all contracting and agreement officers to issue stop-work orders or bilateral amendments, consistent with the terms of the relevant awards or agreements, until determinations are made following the review." *Id.*

65.    Two days later, on January 26, 2025, Gray issued a further clarification. USAID, Clarification on Implementing the President's Executive Order on Reevaluating and Realigning United States Foreign Aid (Jan. 26, 2025) (the "Gray Clarification") (ECF 57-4). As described by the USAID Inspector General, this clarification "also included a directive for staff to refrain from external communications outside of communications necessary to implement the pause." USAID Office of Inspector General, Advisory Notice, *Oversight of USAID-Funded Humanitarian Assistance Programming Impacted by Staffing Reductions and Pause on Foreign Assistance* at 1 (Feb. 10, 2025) [hereinafter OIG Report] (quotation marks omitted).

66.    The State Department also halted most spending of appropriated foreign-assistance funding through programs administered outside USAID.

67.    In parallel, in early February, Defendants began cutting agency employees and contractors. The State Department shut down all overseas USAID missions, immediately recalling thousands of USAID employees. Humeyra Pamuk, *Trump Administration Puts on Leave USAID Staff Globally in Dramatic Aid Overhaul*, Reuters (Feb. 4, 2025), https://bit.ly/3WU13oq. It placed thousands of USAID employees on administrative leave, directing them "not to enter USAID premises, access USAID systems, or attempt to use [their] position or authority with USAID in any way without [the] prior permission [of Peter Marocco] or prior permission of a

supervisor in [their] chain of command." Alex Marquardt et al., *USAID Employees Around the World Will Be Placed on Leave Friday and Ordered to Return to US*, CNN (Feb. 5, 2025), https://perma.cc/VM4L-TSSA. Defendants also caused thousands of institutional support contractors and employees of USAID contractors or grantees to be laid off or furloughed. As the USAID Office of Inspector General observed in the February 10, 2025 report, these "personnel actions … substantially reduced the [agency's] operational capacity." OIG Report at 1.

68.     On February 3, 2025, the State Department issued a press release announcing that Secretary of State Rubio had been appointed as Acting Administrator of USAID. Media Note, Office of the Spokesperson (Feb. 3, 2025), https://perma.cc/5Y9E-Q7CA. That press release asserted that "it is now abundantly clear that significant portions of USAID funding are not aligned with the core national interests of the United States." *Id.*

69.     On the same day, the USAID building headquarters in DC was closed, preventing staff from accessing it. Ido Sadeh-Wertz & Phelim Kine, *USAID Building Closed as Agency's Future in Doubt*, Politico (Feb. 3, 2025), https://perma.cc/6QFY-ULNS. Later reporting confirmed that the building lease was terminated. Ellen Knickmeyer, *Trump Administration Takes USAID Off Its Building Lease*, PBS NewsHour (Feb. 10, 2025), https://perma.cc/G7UD-CTGN.

70.     On February 4, 2025, Secretary Rubio sent a letter to the Senate Foreign Relations Committee and House Foreign Affairs Committee providing "notice" and advising Congress of the State Department's "intent to initiate consultations … regarding the manner in which foreign aid is distributed around the world." Image of letter available at Brett Murphy (@BrettMurphy), X (Feb. 3, 2025, 3:41 PM), https://perma.cc/8V6C-A23F.

71.    The effect of these actions was to halt the spending of foreign-assistance funding wholesale and functionally halt all USAID initiatives and programs. In the words of the USAID Inspector General, "staff reductions, together with a lack of clarity about the scope of the humanitarian assistance waivers and the extent of permissible communications between [] staff and [] implementers, has significantly impacted USAID's capacity to disburse and safeguard its humanitarian assistance programming." OIG Report at 2.

72.    From February through August 2025, USAID and the State Department obligated only small portions of the foreign assistance funds they had appropriated, including funds that were set to expire on September 30, 2025. During this time, Defendants obligated only extremely few funds that had been appropriated to USAID. Defendants refused to obligate foreign assistance funds during this period even though, until late August 2025, they were under a preliminary injunction from this Court to obligate all funds that were expiring on September 30, 2025.

73.    On information and belief, absent this litigation and the preliminary injunctions that Plaintiffs obtained, Defendants would have intentionally allowed more than $10 billion in foreign assistance funds expire on September 30, 2025, unspent.

### *Defendants Abolish USAID*

74.    On March 10, 2025, Secretary Rubio announced in a post on X that Defendants were "officially cancelling 83% of the programs at USAID." @Marco Rubio, Mar. 20, https://perma.cc/8HSH-WBNS. Rubio asserted that the eliminated programs "spent tens of billions of dollars in ways that did not serve, (and in some cases even harmed), the core national interests of the United States." *Id.* As for the remaining 17% of programs, Defendants "intend for the … programs … to now be administered more effectively under the State Department." *Id.*

75.    On March 28, Defendant Lewin sent a memorandum to all USAID employees announcing that Defendants "will seek to retire USAID's independent operation." Will Steakin

& Lucien Bruggeman, *After months of cuts, State Department says it's officially shuttering USAID*, ABC News, Mar. 28, 2025 https://perma.cc/C2BG-VQQC. Lewin wrote that the State Department "intends to assume responsibility for many of USAID's functions and its ongoing programming." *Id.*

76.    That same day, nearly all of USAID's remaining 900 employees received notice that they would be subject to a final reduction-in-force, to go into effect on July 1 or September 2. Fatma Tanis, *USAID Terminates Nearly All Its Remaining Employees*, NPR, Mar. 28, 2025, https://perma.cc/9JP2-96E3.

77.    Also on March 28, the State Department sent a Congressional Notification to Congress expressing its "intent to realign select USAID functions to the Department and to phase out others." *See* Congressional Notification Transmittal Letter, March 28, 2025, at 3, https://perma.cc/8TYS-BGX3 ("March Congressional Notification"). The State Department stated that "USAID conducted a comprehensive review of its existing programs and awards to assess their alignment with U.S. foreign policy objectives," and that "numerous programs were discontinued" as a result. *Id.* Further, the State Department stated that it "has carefully considered which USAID programs could continue to advance the Administration's foreign policy objectives," which "have been determined to be humanitarian assistance, global health functions, strategic investment, and limited national security programs." *Id.* The State Department explained that it planned to restructure the organization to retain these limited functions but that "[o]ther functions … would be eliminated … ." *Id.* at 4.

78.    The Congressional Notification also included a chart showing USAID's remaining unobligated funds. The chart indicated that, as of March 23, 2025, USAID had nearly $24 billion in appropriations that remained unobligated.

79.     In May 2025, the State Department sent another Congressional Notification, indicating that it would eliminate most offices in its Bureau of Democracy, Human Rights, and Labor, including all of its regional offices. Congressional Notification Transmittal Letter, 35-032, at 19, https://perma.cc/3W5R-XK46 ("May Congressional Notification") (USAID Organization Chart as of March 2025).

80.     Consistent with these congressional notifications, on July 1, 2025, USAID officially shut down and ceased forward-looking operations. Cong. Rsch. Serv., IF10261.20, U.S. Agency for International Development: An Overview 1 (Updated Sept. 5, 2025). On that day, Secretary Rubio announced that USAID would "officially cease to implement foreign assistance." *Id*.; Fatma Tanis & Leila Fadel, *USAID Officially Shuts Down and Merges Remaining Operations with State Department*, NPR (July 1, 2025), https://perma.cc/8BA9-XVF4.

81.     On information and belief, the employees that remained past July 1 through their September 2 reduction-in-force effective dates were not performing forward-looking work to carry out the agency's statutory duties and mission, but instead were working only on the winding down of USAID, transferring funds to the State Department, and offboarding and separation of staff.

82.     On information and belief, the full-time employees remaining at USAID are mainly contracting officers charged with closing out terminated awards. On information and belief, these individuals report to the Office of Management and Budget.

### *Defendants Eliminate USAID and State Programs and Initiatives*

83.     As part of abolishing USAID, or even before abolishing USAID, Defendants eliminated long-established USAID and State Department programs, initiatives, bureaus, and

intentional partnerships (programs and initiatives) on which Plaintiffs have relied and would compete for awards.

84.     For example, The "Feed the Future" Initiative was first established in 2010 to help alleviate global poverty. *See* Cong. Rsch. Serv., R44216, The Obama Administration's Feed the Future Initiative 1 (Oct. 5, 2015). Since that time, USAID has spent billions of dollars on the initiative, which is credited with lifting 23.4 million people out of poverty, preventing stunting caused by malnutrition in 3.4 million children, and creating opportunities for 5.2 million families who no longer suffer from hunger. Daniel V. Speckhard, *Feed the Future: After a Decade of Success, Let's Make It Better*, Atlantic Council, https://perma.cc/75G5-T9ZA. Congress has specifically funded the initiative, including in Section 7060(d) of the 2024 Appropriations Act, which provided $960 million to carry out the purposes of the Global Food Security Act of 2016, including specifically the "Feed the Future" Initiative. 138 Stat. at 839.

85.     On information and belief, Defendants have fully or largely eliminated the "Feed the Future" initiative, materially curtailing program activity and dismissing or reassigning staff.

86.     On information and belief, Defendants also eliminated the longstanding USAID "American Schools and Hospitals Abroad" (ASHA) program. Congress first authorized the ASHA programs in the Smith-Mundt Act of 1947 and reauthorized it in Section 214 of the FAA. *See* 22 U.S.C. 2174. Throughout this time, USAID carried out ASHA's purpose of strengthening overseas schools and hospitals that best demonstrate American ideas and values and creating institutions that meet America's educational standards, expanding educational and medical opportunities in Africa, Asia, Eurasia, Europe, Latin America, the Caribbean and the Near East. U.S. Agency for Int'l Dev., American Schools and Hospitals Abroad (July 18, 2012) archived at

https://bit.ly/44USaPs. Section 7060(b) of the 2024 Appropriations Act provided $31.5 million for the ASHA program.

87.     On information and belief, Defendants eliminated the ASHA program entirely and eliminated the USAID ASHA Office.

88.     On information and belief, Defendants also eliminated the "Power Africa" program. The Power Africa program was created in 2013 to double access to electricity in sub-Saharan Africa, where more than 600 million people lacked access at the time. *See* FACT SHEET: Power Africa, https://perma.cc/CV4E-NNJB. In recent years, the program had an annual budget of roughly $100 million, channeled through USAID. Chico Harlan, *The U.S. Says Africa Needs Energy. But DOGE Halted a Program to Help*, Wash. Post, Apr. 14, 2025, https://perma.cc/U5CC-SUT8. The program helped to accelerate the completion of 164 energy-related projects across Africa, and had $26.4 billion in deals with U.S. companies at the time the program was eliminated. *See id.* Congress has specifically funded the program, including in § 7061(f) of the 2024 Appropriations Act.

89.     On information and belief, Defendants have eliminated the Power Africa program in its entirety, no longer spending money on the initiative and dismissing all staff.

90.     On information and belief, Defendants have also eliminated USAID's Family Planning and Reproductive Health initiatives (Legislative Tables at 1170). USAID's Office of Population and Reproductive Health has existed for decades and provided global family planning and reproductive health assistance, contributing to goals including protecting women's health by reducing unintended and high-risk pregnancies. *U.S. Bilateral International Family Planning and Reproductive Health Programs: Background and Selected Issues*, Cong. Research Serv. R46215 (Feb. 6, 2020) available at https://perma.cc/GY3U-73V6. On information and belief, Defendants

have eliminated USAID's Office of Population and Reproductive Health entirely, no longer funding or carrying out the programs and dismissing or reassigning all staff that worked on it.

91.     On information and belief, Defendants have also eliminated USAID's education programs. Congress has long directed and funded USAID's education activities, and first made education a distinctive policy objective of foreign assistance in 1973, when it added sector-specific objectives to the FAA, including goals "to reduce illiteracy, to extend basic education, and to increase manpower training in skills related to development." 22 U.S.C. § 2151c. For decades, USAID's Office of Education Programs has implemented education activities, including activities aimed at improving reading skills for 100 million primary school children, improving workforce development programs to build appropriate skills to meet developing country needs, and increasing equitable access to education in crisis and conflict environments. *Foreign Aid and the Education Sector: Programs and Priorities* 1 (Cong. Research Serv. R44676, Version 3, updated Nov. 2, 2016) https://perma.cc/6C96-KU77,.

92.     The FAA declares it officially the policy of the United States for USAID to carry out basic education programs abroad. The FAA provides: "it shall be the policy of the United States to work with partner countries, as appropriate, other donors, multilateral institutions, the private sector, and nongovernmental and civil society organizations, including faith-based organizations and organizations that represent teachers, students, and parents, to promote sustainable, quality basic education through [certain] programs and activities." 22 U.S.C. § 2151c(c)(2).

93.     Congress has also appropriated funds specifically for education programs. The 2024 Appropriations Act and 2025 Further Continuing Resolution appropriated more than $1 billion for basic education programs, including $922 million for the Nita M. Lowey Basic

Education Fund (of which Congress directed that $150 million should be available for the education of girls in areas of conflict), § 7060(1)(A); and $152 million for contributions to multilateral partnerships that support educations, § 7060(1)(B). Congress further directed that not less than $271 million shall be made available for assistance for higher education, § 7060(3); and that not less than $7 million shall be made available for scholar rescue programs to support projects that strengthen democracy and civil society by protecting scholars at risk overseas, including through fellowships and placement opportunities abroad, § 7060(3).

94. On information and belief, Defendants have shuttered USAID's education portfolio in its entirety, halting all basic and higher-education programs, and dismissing or reassigning the staff responsible for administering education initiatives. This includes eliminating USAID's Office of Education and eliminating the congressionally-mandated Senior Coordinator for Basic Education Assistance. *See* Pub. L. 115-56, Div. A, § 3, Sept. 8, 2017, 131 Stat. 1134–35.

95. Defendants have eliminated additional longstanding programs and initiatives, including but not limited to the Advisor for Indigenous Peoples Issues (Legislative Tables at 1173), Prosper Africa (§ 7062(b)), and Development Innovation Ventures (Legislative Tables at 1173).

96. On information and belief, Defendants have eliminated other programs and initiatives as well.

97. In addition to establishing these programs and initiatives, USAID and State also set up various bureaus and funds to carry out their statutory duties. For example, USAID established Bureaus for Democracy, Human Rights, and Governance; for Conflict Prevention and Stabilization; and for Resilience, Environment, and Food Security. *See* March Congressional

Notification at 11 (USAID Organization Chart as of March 2025). The State Department likewise established the Human Rights and Democracy Fund and the Bureau of Democracy, Human Rights, and Labor. *Id.* at 12 (State Organization Chart); *see also* 138 Stat. at 743 (appropriating funds for Human Rights and Democracy Fund). On information and belief, Defendants have eliminated each of these bureaus and funds.

98.     On information and belief, USAID and State have also discontinued providing funding for, or participating in, certain international partnerships and initiatives, such as Gavi, the Vaccine Alliance, the Global Partnership for Education, and the Education Cannot Wait initiatives.

99.     Plaintiffs have competed or would compete for awards funded from or administered by each of the eliminated programs, initiatives, offices, or partnerships, listed in the paragraphs above, as well as other programs, initiatives, offices, or partnerships that have been eliminated on information and belief.

***Defendants Refuse to Spend Funds Expiring at the End of FY25 As Congress Directed***

100.     On August 28, 2025, the D.C. Circuit issued its mandate effectuating a three-judge panel's amended opinion vacating the portion of the Court's previous preliminary injunction requiring Defendants to obligate funds before they expired on September 30, 2025.

101.     Within hours of the mandate's issuance, President Trump purportedly submitted a rescissions package to Congress to rescind more than $4 billion dollars in expiring foreign aid appropriations—with the explicit intent to effectuate a "pocket rescission" of these funds. ECF No. 129. The package included expiring foreign aid funds that were appropriated in the 2020, 2021, and 2024 Appropriations Acts. The proposal sought rescission of $3.2 billion in development assistance from the 2024 Appropriations Act, which the proposal stated "would

align with the Administration's efforts to return funding from wasteful U.S. Agency for International Development programs to the American taxpayers." ECF No. 129-3 at 15. The proposal also sought rescission of more than $600 million from the Democracy Fund appropriated in various years, which the proposal stated "would return funding from wasteful foreign assistance programs to taxpayers in alignment with America First foreign policy." *Id.* at 3–6.

102.    The Office of Management and Budget proclaimed on social media the next day that the President "CANCELLED $4.9 billion in America Last foreign aid using a pocket rescission." @WHOMB, X, Aug. 29, 2025 (8:46 AM), https://perma.cc/L8YZ-WVMQ. The White House stated in an official press release that the President had acted "to deploy a pocket rescission, cancelling $5 billion in foreign aid." White House, Historic Pocket Rescission Package Eliminates Woke, Weaponized, and Wasteful Spending, Aug. 29 2025, https://perma.cc/BV3F-P789 (emphasis in original). The White House told the press that same day that "it doesn't matter" what Congress does in response to the proposal. Jennifer Scholtes & Kyle Cheney, *White House declares $4.9B in foreign aid unilaterally canceled in end-run around Congress' funding power*, POLITICO (Aug. 29, 2025), https://perma.cc/P3A7-HY5M.

103.    On August 29, 2025, Plaintiffs moved for a preliminary injunction, seeking an order requiring Defendants to make available for obligation and to obligate, by September 30, 2025, all expiring funds that Congress appropriated for foreign assistance programs in the 2024 Appropriations Act and prior appropriations acts. Plaintiffs' motion encompassed both the $4 billion proposed for rescission in the President's rescissions package and an additional $6.5 billion in expiring funds that were not included in the package. This Court granted Plaintiffs' motion as to both categories of funds on September 3, 2025. ECF No. 139. The government sought a stay

of the injunction pending appeal, which this Court and the D.C. Circuit denied. ECF No. 146; Order, No. 25-5317 (Sept. 5, 2025).

104.    Defendants then sought a partial stay in the Supreme Court, but only with respect to the $4 billion proposed for rescission. Defendants did not seek a stay with respect to the other $6.5 billion in funds subject to the Court's injunction. On September 26, the Supreme Court granted a partial stay as to the $4 billion proposed for rescission only. *Dep't of State v. AIDS Vaccine Advoc. Coal.*, No. 25A269, 2025 WL 2740571 (U.S. Sept. 26, 2025). The Court cautioned that its order "should not be read as a final determination on the merits," but that the relief granted "reflected [its] preliminary view, consistent with the standards for interim relief." *Id.*

105.    With respect to the $4 billion proposed for rescission, Congress never took any action with respect to the President's proposal. No bill to effectuate the proposal was even introduced, consistent with the fact that Defendants never intended Congress to actually consider the proposal at all. The 45-day period for Congress to pass such a rescission bill has since expired. *See* 2 U.S.C. § 683(b). Defendants have taken the position that Congress's inaction before the September 30, 2025 expiration date means that they may now withhold the full $4 billion included in the rescission proposal.

106.    With respect to the other $6.5 billion subject to this Court's injunction, Defendants represented that they obligated that full amount prior to the funds' expirations. However, on information and belief, Defendants obligated most of these funds through an inter-agency transaction between USAID and the State Department, under which USAID "obligated" the funds to the State Department, and the funds are now parked at the State Department. Defendants had

indicated in filing that they would obligate some or most of these funds to the State Department without specifying the purpose for which the funds will be used. ECF No. 145 at 3.

107.    On information and belief, Defendants did not obligate the minimum amounts required for specific purposes, pursuant to directives in Sections 7030-7061 of the 2024 Appropriations Act and prior appropriations acts. Instead, on information and belief, Defendants intentionally minimized the number of directives they would comply with. On information and belief, Defendants did so by "attributing" appropriations in the pocket rescission proposal to particular Section 7030-7061 directives, even though nothing in the special message or any other source of law required doing so, and Defendants then claimed that there was no money to comply with the directives because the money in the special message was deemed "rescinded." Defendants have done this even where they could use other appropriations not in the special message to carry out the directive.

108.    Defendants have also obligated funds using instruments that do not specify the purposes for which the funds are being obligated. Defendants have provided no information as to how they intend to use these instruments to comply with the appropriations statutes' requirements to be specific or minimum amounts of funds on the top-level categories of foreign-assistance appropriations, the amounts designated in the tables appended to the act, and the amounts in the directives in Sections 7030-7061.

### Defendants' Actions Shutter Longstanding USAID and State Department Partners and Imperil Their Employees

109.    Defendants' actions have devastated USAID's implementing partners, including Plaintiffs and their members.

110.    Most of USAID's programs were implemented—whether by grant, cooperative agreement, or contract—by private-sector partners. Jan. 2025 CRS Report, *supra*, at 1. USAID

had thousands of partners—Plaintiffs among them—including nonprofit organizations, for-profit contractors, universities, international organizations, and foreign governments. *See id.* Their work was critical to USAID's efforts to fight disease, educate children, provide clean water, advance democracy and protect human rights, and support economic and other forms of development in approximately 130 countries around the world. *See id.* And they worked in some of the most needy parts of the world, including conflict zones. *See id.*

111.    Defendants' actions stopped these efforts, with immediate consequences. Half a billion dollars' worth of food grown in America's heartland—enough to feed more than 30 million people—rotted in domestic ports and warehouses, unable to reach starving populations abroad. *See* Tim Carpenter, *Kansas's Moran, Davids Sound Alarm on Delay of USAID Food Aid to Starving Pepple Worldwide*, Kansas Reflector (Feb. 7, 2025) https://perma.cc/8JLT-AK2A; Christopher Vondracek, *Shuttering of USAID Could Mean the End of Millions in Income for Midwest Farm Operations*, Minn. Star Tribune (Feb. 6, 2025), https://perma.cc/B3WP-E9XU?type=standard. Efforts aimed at preventing and treating disease stalled as tens—if not hundreds—of thousands of healthcare workers were let go. Declan Walsh, *"We Are in Disbelief": Africa Reels as U.S. Aid Agency is Dismantled*, N.Y. Times (Feb. 8, 2025), https://bit.ly/40RJpCT.

112.    As of April 1, 2025, an estimated $27 million worth of family planning products already procured by USAID were stuck on boats, in ports, and in warehouses, with no programs or employees left to unload them or hand them over to governments. *Millions of Women Will Lose Access to Contraception as a Result of Trump Aid Cuts*, N.Y. Times (Apr. 1, 2025), https://bit.ly/4pZWzsu. In response, USAID leadership proposed destroying the products. *Id.*

113.    In July 2025, Defendants ordered that nearly 500 metric tons of emergency food—

enough to feed about 1.5. million children for a week—be incinerated because it was set to expire unused. The food, meant for children in Afghanistan and Pakistan, became ash. Hana Kiros, *The Trump Administration Is About to Incinerate 500 Tons of Emergency Food, The Atlantic*, July 14, 2025, https://perma.cc/6W9E-FG4P?type=image.

114.    By August, Defendants' cuts to foreign aid had stalled treatment campaigns for debilitating tropical diseases, placing millions of doses of essential medications at risk of expiration and waste in storage facilities. Drugs for Tropical Diseases Go to Waste After US Aid Cuts, Eco-Business (Aug. 25, 2025), https://bit.ly/4j41431. In Africa alone, about 1.6 million doses of medication had already expired in August, with 8 million more set to by the end of 2025 and another 90 million by May 2026. *Id.*

115.    Plaintiffs have been irreversibly harmed by these actions.

116.    Plaintiff Democracy International's Justice, Rights, and Security—Rapid Response Assistance project provided lifesaving humanitarian assistance, which includes essential medicines, medical services, food, shelter, and subsistence assistance. To name just two of many impacted programs: In Bangladesh, Democracy International had to stop providing medical care to hundreds of adolescents and young students who were seriously injured and traumatized in the violent crackdowns on protesters last summer, leaving them without necessary medical services. And in Burkina Faso, human rights defenders who are working to track violence against Christian communities are now at risk of being killed because Democracy International's program can no longer help them relocate and provide them with food, shelter, and subsistence. Cutting off Democracy International's programs has also halted emergency assistance to refugees and victims of state-sponsored violence; interrupted programs working to prevent at-risk youth from joining gangs; and left beneficiaries vulnerable to being recruited into terrorist

organizations.

117.    Approximately 98% of Democracy International's 2024 revenue came directly or indirectly from USAID. In the past, Democracy International has held awards funded from the following Appropriations Act Title III categories: Complex Crises Fund; Development Assistance; Transition Initiatives; Assistance for Europe, Eurasia and Central Asia; Democracy Fund (USAID); Global Health Programs; and Economic Support Fund. It has also held awards funded from numerous subcategories set forth in the tables designated by Section 7019(a) of the 2024 Appropriations Act or identified in Sections 7019 to 7061 of the Act, and, if given the opportunity, would compete for future awards appropriated for the purposes and subpurposes of these appropriations. Because USAID has not spent these funds as directed by Congress, Democracy International has not had the opportunity to bid on new projects in 2025 and has had to significantly reduce staff salaries and cut benefits as a result. Democracy International expects to miss out on nearly all of the revenues it had projected for 2025 and 2026, reducing the company's annual revenues by more than 95 percent. Such a significant loss of revenue poses an existential threat to the company and will put the company at risk of bankruptcy.

118.    Plaintiff DAI's portfolio has been similarly devastated, with far-ranging, often life-threatening effects. Specifically, Defendants' actions have ended funding for shelter for minors seeking protection from recruitment into criminal gangs in Central America, for safe drinking water in politically strategic communities in Lebanon, for civil-society organizations contending with brutal authoritarian violence in Burma, and for efforts to track and contain zoonotic diseases in Bangladesh.

119.    In prior years, nearly 80% of DAI's revenue (more than $750 million in 2024) came from U.S. foreign assistance funds, including those managed by USAID and the Department

of State. Like Democracy International, DAI has received awards funded by various categories and subcategories of appropriations set forth in Titles III and IV of the Appropriations Acts, and would compete for such awards in the future. *See* Appendices B–C. If USAID does not spend these funds as directed by Congress, DAI expects to miss out on 80% of the revenue it had projected for 2026, creating major financial, operations, capacity, and reputational harms for the company.

120.    Plaintiff Chemonics is also heavily reliant on USAID, with 88% of its revenues coming from USAID in prior years. If USAID does not spend appropriated funds as directed by Congress, Chemonics expects to miss out on $618 million in 2026 revenues, representing 73.7% of its total projected revenue for that year. The inability to compete for foreign assistance funds going forward threatens Chemonics' ability to implement vital programs that advance national security, food security, economic growth, and humanitarian assistance worldwide. For 50 years in more than 100 countries, Chemonics has worked to build relationships, goodwill, and its reputation. The substantial loss in revenue would create major financial, operations, and reputational  threats to the company.

121.    Plaintiff MSH has historically relied on USAID for 90% of its total annual revenues. MSH has consistently provided technical assistance across a wide range of functions, including supply chain functions, health financing, leadership and governance, and workforce training. MSH's technical assistance enables governments and large institutions to efficiently deliver healthcare across a range of populations and health areas, including HIV/AIDS, tuberculosis, malaria and maternal and child health. It has competed for and been awarded funding under global health programs for more than 50 years.

122.    Without access to programs and funding opportunities that Congress has directed

USAID to provide, MSH expects to miss out on 67% of its projected revenue for 2026, posing a catastrophic and existential threat to the organization. MSH would be forced to terminate critical staff, reduce its global presence, and suffer harm to the reputation it has built over the course of 50 years. In addition, without USAID support, MSH has been rendered vulnerable to legal claims and extortion by foreign governments claiming tax amounts that are not owed. In addition, the sudden dissolution of programs has meant that USAID has not conducted adequate project reviews and gave high-performing MSH projects perfunctory lower scores.

123.    Plaintiff HIAS has relied on State Department and USAID funding to serve refugees globally for years, with such funding making up 38% of its FY25 revenues. As with the other Plaintiffs, it has received awards in multiple categories and subcategories of appropriations that Defendants are withholding, and would compete for awards under a broad array of programs. Defendants' actions in withholding such funds, eliminating such programs, and abolishing USAID pose an existential threat to the company.

124.    Plaintiff ABA had relied on USAID funding to advance access to justice, support counter-terrorism efforts, advance freedom of expression and freedom of religion, strengthen anti-corruption efforts, promote internet freedom, and protect human rights defenders at risk. It previously received funding under the Democracy Fund, the Economic Support Fund, and other funds and allocations under democracy programs, which are defined in appropriations statutes to include programs that support promotion of human rights, labor rights, and the rule of law. ABA's Center for Global Programs (ABA CGP) has relied on USAID for approximately 38% of its revenues in the past, and relied on the State Department for another 60% of its revenues. If Congressionally appropriated funds are withheld, ABA CGP expects to lose 90% of its projected revenues for 2026, which would pose a dire threat to the ongoing viability of ABA CGP.

125.    Plaintiff GHC's members, including Plaintiff MSH, have also been severely impacted by Defendants' actions. GHC's membership includes over 100 organizations. These organizations have previously held awards funded by *every category* of "global health programs" appropriations, including appropriations for maternal and child health, to combat HIV/AIDs, and for family planning and reproductive health. If given the opportunity, GHC's members would compete for such awards again in the future. Defendants' actions have harmed several of GHC's members, many of whom report projected revenue losses of 25–60% of their annual budgets, forcing them to close or downsize U.S. offices, move jobs overseas, impose pay cuts, and eliminate health insurance and benefits for American employees.

126.    Plaintiff SBAIC's members—American small businesses that provide foreign assistance in all sectors and all geographies, including conflict zones—have also suffered ruinous injuries. SBAIC's members, including Plaintiff Democracy International, have had their operations devastated by losing access to vitally necessary appropriated funds. SBAIC member companies are dependent on these funds and constructed business models around this funding; numerous member companies would lose nearly 100% of their revenue if funds appropriated by Congress are not spent, posing existential harm for such companies.

## CLAIMS FOR RELIEF

### Counts 1-6: Failure to Obligate Congressionally Mandated Foreign Assistance Funding

### *FIRST CLAIM FOR RELIEF*

**Violation of the Administrative Procedure Act—Contrary to Law:
Failure to Obligate Congressionally Mandated Foreign Assistance Funding**
*Against Defendants Rubio, Lewin, Vought,
Department of State, USAID, and OMB*

127.    Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

128.    A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

129.    Defendants have made a final decision not to obligate, by the deadlines set by Congress, the full amounts that Congress has appropriated and required to be obligated for specific purposes, including in the top-level categories of appropriations in Titles III and IV, in the tables incorporated by referenced in Section 7019(a), and in the directives in Sections 7030-7061. The decision not to obligate congressionally mandated foreign assistance funding is a final agency action reviewable under 5 U.S.C. §§ 702 and 706.

130.    Because annual appropriations acts require Defendants to obligate funds in specific amounts by specific deadlines for specific purposes, if the executive branch wishes not to spend funds as directed by Congress, it must request that Congress rescind the funds, and must obligate the funds as required unless Congress actually rescinds the funds in a bill that the President signs.

131.    In the 2024 Appropriations Act and the 2025 Continuing Resolutions and subsequent continuing resolutions, Congress did not provide the agencies discretion to spend less than the full amounts appropriated for the designated categories and sub-categories of purposes. To the contrary, the 2024 Appropriations Act and 2025 Continuing Resolution, and subsequent continuing resolutions, required that the appropriated amounts "shall" be apportioned to USAID or the State Department to spend for specific top-line categories of purposes, and that specific or minimum amounts "shall be made available" by USAID and the State Department for specific sub-categories of purposes.

132.    By refusing to spend funds that Congress has appropriated for USAID's operations and for specified foreign-assistance programs and purposes, or by spending the funds on purposes other than those which Congress specified, Defendants have violated federal statutes including the 2024 Appropriations Act, the 2025 Continuing Resolution, prior and subsequent appropriations acts, and the Anti-Deficiency Act and the Purpose Act.

133.    The Constitution vests lawmaking power in Congress, including exclusive power over federal spending. The executive branch lacks inherent constitutional power to ignore statutory mandates and decline to spend funds that Congress has appropriated. By ignoring statutory mandates and refusing to spend funds that Congress has allocated for specified foreign-assistance programs, Defendants have violated the constitutional separation of powers.

134.    Defendants' conduct is therefore "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and Plaintiffs are entitled to relief under 5 U.S.C. § 706(2).

### SECOND CLAIM FOR RELIEF

**Violation of the Administrative Procedure Act—Arbitrary and Capricious:**
**Failure to Obligate Congressionally Mandated Foreign Assistance Funding**
*Against Defendants Rubio, Lewin, Vought,*
*Department of State, USAID, and OMB*

135.    Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

136.    A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

137.    The decision not to obligate congressionally mandated foreign assistance funding is a final agency action reviewable under 5 U.S.C. §§ 702 and 706.

138.    Defendants' decisions not to obligate foreign assistance appropriations in the amounts and for the purposes that Congress directed are arbitrary and capricious.

139.    Defendants have failed to adequately justify their actions; have failed to consider key aspects of the problem, reasonable alternatives, and the substantial reliance interests at stake; have relied on factors Congress did not authorize them to consider; and have failed to acknowledge or justify their change of position.

140.    Defendants provided no reasoned explanation for their decision not to obligate congressionally mandated foreign assistance funding.

141.    Defendants failed to reasonably explain the reasons for their change in policy in failing to obligate congressionally mandated foreign assistance funding.

142.    Defendants ignored the factors that Congress required the agencies to consider and considered factors that Congress did not permit them to consider.

143.    Defendants failed to consider the serious reliance interests of contractors, grantees, and the members of the public that they serve that are jeopardized by their decision not to obligate congressionally mandated foreign assistance funding.

144.    In deciding not to obligate congressionally mandated foreign assistance funding, Defendants have failed to consider multiple important aspects of the problem. There is no indication that Defendants considered the detrimental impact of not obligating congressionally mandated foreign assistance funding, any reasonable alternative policy change, or grantees' reasonable reliance on the funds or the reliance interests of communities served by foreign assistance programs.

145.    Defendants' decision not to obligate congressionally mandated foreign assistance funding must be declared unlawful and set aside as arbitrary and capricious.

146.    Plaintiffs are entitled to relief under 5 U.S.C. § 706(2).

### THIRD CLAIM FOR RELIEF

**Violation of the Administrative Procedure Act—**
**Agency Action Unlawfully Withheld or Unreasonably Delayed:**
**Failure to Obligate Congressionally Mandated Foreign Assistance Funding**
*Against Defendants Rubio, Lewin, Vought,*
*Department of State, USAID, and OMB*

147.    Plaintiffs re-allege and incorporate by reference all prior and subsequent

paragraphs.

148.    The 2024 Appropriations Act, the 2025 Continuing Resolution, and prior

appropriations acts mandate that Defendants obligate the full amounts appropriated by specific

deadlines and for specific purposes, with no discretion to spend less than those full amounts.

Defendants have non-discretionary duties to comply with these commands.

149.    Defendants' withholding of these appropriated funds is "unlawful." 5 U.S.C.

§ 706(1).

150.    Alternatively, Defendants have "unreasonably delayed" spending the relevant

funds.

151.    Plaintiffs are entitled to relief under § 706(1).

### FOURTH CLAIM FOR RELIEF

**Ultra Vires:**
**Failure to Obligate Congressionally Mandated Foreign Assistance Funding**
*Against Defendants Rubio, Lewin, Vought,*
*Department of State, USAID, and OMB*

152.    Plaintiffs re-allege and incorporate by reference all prior and subsequent

paragraphs.

153.    A nonstatutory right of action is also available to challenge federal officials' ultra

vires violations of, or actions in excess of authority under, federal statutes. Plaintiffs may assert

such claims where an official's ultra vires actions are a "clear departure by the [agency] from its statutory mandate" and are "blatantly lawless" violations of statutory requirements. *Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022).

154.    Defendants' refusal to obligate the full amounts that Congress required to be spent by specific deadlines, for specific purposes, is a clear departure from the appropriations acts' requirements and is blatantly lawless.

155.    No statute, constitutional provision, or other source of law authorizes Defendants to withhold, rescind, or re-purpose foreign-assistance funds that Congress has appropriated. Nor does any statute, constitutional provision, or other source of law authorize Defendants to withhold foreign-assistance funds on the ground that the President disfavors the objective for which Congress has specifically directed funds be spent. Defendants' actions in doing so exceed their lawful authority.

156.    Pursuant to Plaintiffs' non-statutory right of action, the Court should declare unlawful and enjoin Defendants' ultra vires actions.

### FIFTH CLAIM FOR RELIEF

**Mandamus:**
**Failure to Obligate Congressionally Mandated Foreign Assistance Funding**
*Against Defendants Rubio, Lewin, Vought,*
*Department of State, USAID, and OMB*

157.    Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

158.    If relief is not available on Plaintiffs' APA and ultra vires claims concerning Defendants failure to obligate congressionally mandated foreign assistance funding by the specific deadlines, for the specific purposes, that Congress required, the Court should enter a writ of mandamus.

159.    Defendants have disregarded their clear duties to spend appropriations enacted by Congress for those programs.

160.    Mandamus is warranted "to correct transparent violations of a clear duty to act" by federal officials, including specifically where federal officials refuse to spend congressionally appropriated funds for policy reasons. *Aiken Cnty.*, 725 F.3d at 258.

161.    Mandamus is warranted here if Plaintiffs are unable to obtain complete relief on their other claims.

### SIXTH CLAIM FOR RELIEF

**Violation of the Separation of Powers:**
**Failure to Obligate Congressionally Mandated Foreign Assistance Funding**
*Against All Defendants*

162.    Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

163.    Plaintiffs have a non-statutory right of action to declare unlawful and enjoin Defendants' unconstitutional actions. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

164.    The Constitution vests exclusive lawmaking in Congress, including exclusive power over federal spending.

165.    Under Article II, the President must take care to faithfully execute the laws, including appropriations acts. Consistent with the constitutional division of legislative and executive powers and the requirements of bicameralism and presentment, the President has no unilateral authority to amend or ignore congressional appropriations. Nor may the President direct federal officers or agencies to act in derogation of a federal statute.

166.    Yet President Trump purported to exercise his Article II constitutional powers in directing USAID and the State Department to not spend foreign-assistance fund as Congress intended. At the time of taking relevant actions, and at all times prior to appellate proceedings from the March 2025 preliminary injunction, the President and the other Defendants relied solely on the President's purported constitutional authority for refusing to spend foreign-assistance appropriations as Congress directed.

167.    By refusing to obligate foreign-assistance funds that Congress has appropriated in the amounts and for the purposes that Congress directed, including by doing so based on incorrect assertions of the President's constitutional powers, Defendants are violating the separation of powers.

### Claims 7-10: Abolishment of USAID

#### *SEVENTH CLAIM FOR RELIEF*

**Violation of the Administrative Procedure Act—Contrary to Law:**
**Abolishment of USAID**
*Against Defendants Rubio, Lewin, Vought,*
*Department of State, USAID, and OMB*

168.    Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

169.    A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2).

170.    The decision to abolish USAID is a final agency action reviewable under 5 U.S.C. §§ 702 and 706.

171.    The Constitution grants Congress "plenary control over the . . . existence of executive offices." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 500 (2010);

*see* U.S. Const. Art. I, § 8, cl. 18. The President lacks authority to unilaterally abolish an agency that Congress has created.

172.    Congress exercised its authority under the Necessary and Proper Clause to create USAID as an executive agency. *See* 22 U.S.C. § 6563 ("[T]here is within the Executive branch of Government the United States Agency for International Development as an entity described in section 104 of title 5 [*i.e.*, an executive agency]."). In the Foreign Assistance Act, Congress has assigned specific responsibilities to the USAID Administrator to be carried out by USAID. And Congress has not exercised its authority to abolish USAID. To the contrary, Congress has continued to fund USAID as recently as March 2025 and November 2025.

173.    Under Article II, the President must take care to faithfully execute the laws, including laws establishing executive agencies. Consistent with the constitutional division of legislative and executive powers and the requirements of bicameralism and presentment, the Executive Branch has no unilateral authority to abolish a federal agency that Congress established, nor may it reassign all of an agency's statutory responsibilities to a different federal agency.

174.    By abolishing USAID and purporting to transfer some of its statutory responsibilities to the State Department, without congressional authorization, Defendants are violating the separation of powers.

175.    Defendants' conduct is contrary to law, and Plaintiffs are entitled to relief under 5 U.S.C. § 706(2).

### *EIGHTH CLAIM FOR RELIEF*

**Violation of the Administrative Procedure Act—Arbitrary and Capricious: Abolishment of USAID**
*Against Defendants Rubio, Lewin, Vought,*
*Department of State, USAID, and OMB*

176.   Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

177.   A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

178.   The decision to abolish USAID is a final agency action reviewable under 5 U.S.C. §§ 702 and 706.

179.   Defendants' actions are arbitrary and capricious. Defendants have failed to adequately justify their actions; have failed to consider key aspects of the problem, reasonable alternatives, and the substantial reliance interests at stake; have relied on factors Congress did not authorize them to consider; and have failed to acknowledge or justify their change of position.

180.   Defendants provided no reasoned explanation for their decision to abolish USAID.

181.   Defendants failed to reasonably explain the reasons for their change in policy in abolishing USAID.

182.   Defendants ignored the factors that Congress required the agencies to consider and considered factors that Congress did not permit them to consider.

183.   Defendants failed to consider the serious reliance interests of contractors, grantees, other implementing partners, the beneficiaries of USAID programs, and others that are jeopardized by abolishing USAID.

184.    In abolishing USAID and transferring all of its statutory responsibilities to the State Department, Defendants have failed to consider multiple important aspects of the problem. Defendants failed to adequately consider the detrimental impact of the abolishment of USAID on plaintiffs and other implementing partners, or the communities served by plaintiffs and other implementing partners, and Defendants did not adequately consider any alternative more limited policy change, or grantees' reasonable reliance on USAID or the reliance interests of communities served by USAID.

185.    Defendants' decision to abolish USAID must be declared unlawful and set aside as arbitrary and capricious.

186.    Plaintiffs are entitled to relief under 5 U.S.C. § 706(2).

### NINTH CLAIM FOR RELIEF

**Ultra Vires:**
**Abolishment of USAID**
*Against Defendants Rubio, Lewin, Vought,*
*Department of State, USAID, and OMB*

187.    Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

188.    A nonstatutory right of action is also available to challenge federal officials' ultra vires violations of, or actions in excess of authority under, federal statutes. Plaintiffs may assert such claims where an official's ultra vires actions are a "clear departure by the [agency] from its statutory mandate" and are "blatantly lawless" violations of statutory requirements. *Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022).

189.    No statute, constitutional provision, or other source of law authorizes Defendants to abolish USAID without congressional authorization. Defendants' actions doing so exceed their lawful authority.

190.    Pursuant to Plaintiffs' non-statutory right of action, the Court should declare unlawful and enjoin Defendants' ultra vires actions.

### TENTH CLAIM FOR RELIEF

**Violation of the Separation of Powers:**
**Abolishment of USAID**
**(Against All Defendants)**

191.    Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

192.    Plaintiffs have a non-statutory right of action to declare unlawful and enjoin Defendants' unconstitutional actions. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

193.    The Constitution grants Congress "plenary control over the . . . existence of executive offices." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 500 (2010); *see* U.S. Const. Art. I, § 8, cl. 18. The President lacks authority to unilaterally abolish an agency that Congress has created.

194.    Congress exercised its authority under the Necessary and Proper Clause to create USAID as an executive agency. *See* 22 U.S.C. § 6563 ("[T]here is within the Executive branch of Government the United States Agency for International Development as an entity described in section 104 of title 5 [*i.e.*, an executive agency]."). In the Foreign Assistance Act, Congress has assigned specific responsibilities to the USAID Administrator, to be carried out by USAID. And Congress has not exercised its authority to abolish USAID. To the contrary, Congress has continued to fund USAID as recently as March 2025.

195.    Under Article II, the President must take care to faithfully execute the laws, including laws establishing executive agencies. Consistent with the constitutional division of

legislative and executive powers and the requirements of bicameralism and presentment, the President has no unilateral authority to amend or ignore legislation establishing an executive agency. Nor may the President direct federal officers or agencies to act in derogation of a federal statute.

196.    By abolishing USAID and purporting to transfer some of its statutory responsibility to the State Department, without congressional authorization, Defendants are violating the separation of powers.

**Claim 11: Elimination of Programs, Initiatives, Offices and Partnerships**

***ELEVENTH CLAIM FOR RELIEF***

**Violation of the Administrative Procedure Act—Arbitrary and Capricious: Elimination of Foreign-Assistance Programs, Initiatives, Offices and Partnerships**
*Against Defendants Rubio, Lewin, Vought,*
*Department of State, USAID, and OMB*

197.    Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

198.    Defendants' decisions to entirely or almost entirely shut down foreign-assistance programs, initiatives, offices, and partnerships are final agency actions reviewable under 5 U.S.C. §§ 702 and 706.

199.    "The creation of [an agency] program—and its rescission—is an action that provides a focus for judicial review" under the APA." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1906 (2020).

200.    Defendants' actions are arbitrary and capricious. Defendants have failed to adequately justify their actions; failed to consider key aspects of the problem, reasonable alternatives, or the substantial reliance interests at stake; relied on factors Congress did not authorize them to consider; and failed to acknowledge or justify their change of position.

201.    Defendants provided no reasoned explanation for their decision to eliminate foreign-assistance programs, initiatives, offices, and partnerships, nor did they offer any reasonable explanation for these decisions.

202.    Defendants failed to reasonably explain the reasons for their change in policy in eliminating long-standing USAID programs, initiatives, offices, and partnerships.

203.    Defendants failed to consider the serious reliance interests of contractors, grantees, other implementing partners, and the ultimate beneficiaries of the eliminated USAID initiatives, offices, and partnerships.

204.    Defendants have failed to consider multiple important aspects of the problem. There is no indication that Defendants considered the detrimental impact of the elimination of USAID programs, initiatives, offices, and partnerships on Plaintiffs and the people that they serve, or any reasonable alternatives.

205.    Defendants' decision to eliminate USAID programs, initiatives, offices, and partnerships, must be declared unlawful and set aside as arbitrary and capricious.

206.    Plaintiffs are entitled to relief under 5 U.S.C. § 706(2).

## Claims 12-17: Disposition of Funds Originally Set to Expire on September 30, 2025

### *TWELFTH CLAIM FOR RELIEF*

**Violation of the Administrative Procedure Act—Contrary to Law:**
**Failure to Comply with Directives for Funds Originally Set to Expire in September 2025**
*Against Defendants Rubio, Lewin, Vought,*
*Department of State, USAID, and OMB*

207.    Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

208.    In the 2024 Appropriations Act and prior appropriations acts, Congress included directives in Sections 7030-7061 requiring that minimum or specific amounts of funds "shall be made available" for specific purposes.

209.    Many of the directives in Sections 7030-7061 do not specify one particular top-line category of appropriations from Titles III or IV that must be used to meet the directive. Some merely require Defendants to use "funds appropriated under title III [and/or title IV] of this Act" to meet the directive that "not less than" a particular amount "shall be available for a particular purpose. For instance, Section 7061(e) states that "[o]f the funds appropriated under title III of this Act, not less than $256,500,000 shall be made available for adaptation programs." 2024 Appropriations Act, § 7061(e).

210.    After Defendants purported to submit the pocket rescission proposal to Congress on August 28, 2025, Defendants used accounting maneuvers to purport to get out of complying with the directives in Sections 7030-7061 to spend minimum specific amounts for specific purposes. Defendants did so by "attributing," meaning assigning as an accounting matter, appropriations in the special message for use in meeting a particular Section 7030-7061 directive. Defendants then claimed that the "rescission" of the funds in the special message obviated the requirement that Defendants comply with the directive, because the funds in the special message had been designated to be used for the directive were purportedly no longer available. Defendants made use of this tactic even where there were other appropriations available, not in the special message, that could have been used to meet the directive.

211.    By engaging in this tactic, Defendants were able to obligate those available funds to the State Department and others without designating a particular purpose for the use of the funds.

54

212. Defendants' decisions to attribute funds in the special message to Sections 7030-7061 directives, even where such action was not necessary, are final agency actions reviewable under 5 U.S.C. §§ 702 and 706.

213. Defendants' final agency actions to "attribute" appropriations in the special message to the Sections 7030-7061 directives are unlawful, regardless of whether the special message lawfully rendered the funds included in the special message unavailable for obligation, and regardless of whether Defendants thereby lacked sufficient funds to meet all of the Section 7030-7061 directives.

214. As the D.C. Circuit has held, where a statute directs the government to spend certain "minimum funds" for a particular purpose, but a later constraint prevents the government from spending all of the funds for that purpose, the government must still "effectuate the original statutory scheme as much as possible, within the limits of the added constraint." *Ramah Navajo Sch. Bd., Inc. v. Babbitt*, 87 F.3d 1338, 1348 (D.C. Cir. 1996) (quoting *City of Los Angeles v. Adams*, 556 F.2d 40 (D.C. Cir. 1977)), *amended* (Aug. 6, 1996). Thus, Defendants were required to maximize compliance with the Sections 7030-7061 directives "as much as possible." *Id.* But Defendants did the opposite.

215. For the appropriations that were originally set to expire on September 30, 2025, Defendants' failure to comply with the Sections 7030-7061 directives as much as possible is contrary to law, in violation of the 2024 Appropriations Act and prior appropriations acts.

216. Plaintiffs are entitled to relief under 5 U.S.C. § 706(2).

### THIRTEENTH CLAIM FOR RELIEF

**Violation of the Administrative Procedure Act—Contrary to Law:**
**Failure to Obligate by September 30, 2025 Funds Included in the Special Message**
**(Declaratory Relief Only)**
*Against Defendants Rubio, Lewin, Vought,*
*Department of State, USAID, and OMB*

217.    Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

218.    On August 28, 2025, Defendants purported to transmit a special message to Congress proposing to rescind more than $4 billion in appropriations that were originally set to expire on September 30, 2025. Defendants deliberatively waited until less than 45 days remained before September 30, 2025 to submit the rescission proposal, to enable the Defendants to claim that the money was rescinded if Congress took no action on the proposal by September 30, 2025.

219.    Defendants' final decision on or around August 28, 2025 to not obligate the funds in the special message by September 30, 2025 is final agency action reviewable under 5 U.S.C. §§ 702 and 706.

220.    Defendants' decision not to obligate the funds in the pocket rescission by September 30, 2025 violates the 2024 Appropriations and prior appropriations act that set September 30, 2025 as the deadline for Defendants to obligate the funds in the special message.

221.    The 2024 Appropriations Act and prior appropriations acts mandated that Defendants obligate the full amount of funds included in the special message by September 30, 2025, and the submission of a rescission proposal for those funds less than 45 days prior to September 30, 2025, did not obviate Defendants' of their statutory duty to obligate the funds by that date.

222.    Plaintiffs are entitled to declaratory relief that Defendants' decision not to obligate funds in the special message by September 30, 2025, and Defendants' withholding of the funds from obligation beyond that date, are unlawful.

## FOURTEENTH CLAIM FOR RELIEF

### Ultra Vires:
### Failure to Obligate by September 30, 2025 Funds Included in the Special Message
### (Declaratory Relief Only)
*Against Defendants Rubio, Lewin, Vought,*
*Department of State, USAID, and OMB*

223.    Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

224.    A nonstatutory right of action is also available to challenge federal officials' ultra vires violations of, or actions in excess of authority under, federal statutes. Plaintiffs may assert such claims where an official's ultra vires actions are a "clear departure by the [agency] from its statutory mandate" and are "blatantly lawless" violations of statutory requirements. *Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022).

225.    Defendants' refusal to obligate, by September 30, 2025, the appropriations included in the August 28, 2025 special message was a clear departure from the requirements of the 2024 Appropriations Act and prior appropriations acts and was blatantly lawless.

226.    No statute, constitutional provision, or other source of law authorized Defendants to refuse to obligate, by September 30, 2025, the appropriations included in the August 28, 2025 special message. Defendants' actions doing so exceed their lawful authority.

227.    Pursuant to Plaintiffs' non-statutory right of action, the Court should declare unlawful Defendants' ultra vires actions in not obligating, by September 30, 2025, the funds included in the special message.

### FIFTEENTH CLAIM FOR RELIEF

**Violation of the Administrative Procedure Act—Contrary to Law:**
**Ongoing Failure to Obligate Funds Included in the Special Message**
*Against Defendants Rubio, Lewin, Vought,*
*Department of State, USAID, and OMB*

228. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

229. Defendants have made a final decision not to obligate the appropriations included in the August 28, 2025 special message.

230. Under 2 U.S.C. § 683(b), "[a]ny amount of budget authority proposed to be rescinded . . . in [a] special message *shall be made available for obligation* unless, within the prescribed 45-day period, the Congress has completed action on a rescission bill rescinding all or part of the amount proposed to be rescinded or that is to be reserved."

231. Section 683(b) requires an agency to make available for obligation any funds that were proposed to be rescinded but which Congress did not rescind. If an agency does not obligate funds by the deadline that Congress original set for obligation, on the ground that Section 683(b) permits the agency not to obligate funds included in a rescission proposal until Congress has had a full 45-day period to consider the proposal, then Section 683(b) requires that the funds "shall be made available for obligation" by the agency after that 45-day period runs, regardless of whether that is after the original deadline Congress set for the funds to be obligated.

232. Defendants' final decision to never obligate funds included in the August 28, 2025 rescission proposal is contrary to law.

233. Plaintiffs are entitled to relief under 5 U.S.C. § 706(2).

### SIXTEENTH CLAIM FOR RELIEF

**Violation of the Administrative Procedure Act—
Agency Action Unlawfully Withheld or Unreasonably Delayed:
Ongoing Failure to Obligate Funds Included in the Special Message**
*Against Defendants Rubio, Lewin, Vought,
Department of State, USAID, and OMB*

234.    Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

235.    Pursuant to 2 U.S.C. § 683(b), Defendants' failure to obligate funds included in the August 28, 2025 rescission proposal constitutes agency action unlawfully withheld.

236.    Alternatively, Defendants have "unreasonably delayed" obligating funds included in the August 28, 2025 rescission proposal.

237.    Plaintiffs are entitled to relief under 5 U.S.C. § 706(1).

### SEVENTEENTH CLAIM FOR RELIEF

**Ultra Vires:
Ongoing Failure to Obligate Funds Included in the Special Message**
*Against Defendants Rubio, Lewin, Vought,
Department of State, USAID, and OMB*

238.    Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

239.    A nonstatutory right of action is also available to challenge federal officials' ultra vires violations of, or actions in excess of authority under, federal statutes. Plaintiffs may assert such claims where an official's ultra vires actions are a "clear departure by the [agency] from its statutory mandate" and are "blatantly lawless" violations of statutory requirements. *Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022).

240.    Defendants' ongoing refusal to obligate the appropriations included in the August 28, 2025 special message is a clear departure from the requirements of 2 U.S.C. § 683(b) and is blatantly lawless.

241.    No statute, constitutional provision, or other source of law authorizes Defendants to refuse to obligate the appropriations included in the August 28, 2025 special message.

242.    Plaintiffs have a non-statutory right of action to declare unlawful and enjoin Defendants' ultra vires actions.

### EIGHTEENTH CLAIM FOR RELIEF

**Mandamus:**
**Ongoing Failure to Obligate Funds Included in the Special Message**
*Against Defendants Rubio, Lewin, Vought,*
*Department of State, USAID, and OMB*

243.    Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

244.    If relief is not available on Plaintiffs' APA and ultra vires claims concerning Defendants failure to obligate the funds included in the August 28, 2025 special message as required by 2 U.S.C. § 683(b), the Court should enter a writ of mandamus.

245.    Defendants have disregarded their clear duty to spend the funds included in the special message.

246.    Mandamus is warranted "to correct transparent violations of a clear duty to act" by federal officials, including specifically where federal officials refuse to spend congressionally appropriated funds for policy reasons. *Aiken Cnty.*, 725 F.3d at 258.

247.    Mandamus is warranted here if Plaintiffs are unable to obtain complete relief on their other claims.

## PRAYER FOR RELIEF

**NOW, THEREFORE,** Plaintiffs request judgment in their favor against Defendants as follows:

1.      Declare unlawful, vacate, set aside, postpone the effective date of, and enjoin Defendants' abolishment of USAID.

2.      Declare unlawful, vacate, set aside, postpone the effective date of, and enjoin Defendants' elimination of foreign assistance programs, initiatives, offices, and partnerships.

3.      Declare unlawful, vacate, set aside, postpone the effective date of, and enjoin Defendants' decisions not to spend foreign assistance appropriations in the specific or minimum amounts, for the specific purposes, that Congress directed in appropriations acts; any decisions by Defendants to spend USAID's and the State Department's appropriations on purposes other than those for which Congress appropriated the funds; and any other actions taken by Defendants that prevent Defendants from fulfilling their duties to obligate and disburse appropriated foreign-assistance funds in accordance with law;

4.      Declare unlawful, vacate, set aside, postpone the effective date of, and enjoin Defendants' decisions in August and September 2025 not to maximize the number of directives in Sections 7030-7061 of the 2024 Appropriations Act with which Defendants would comply, even if the funds in the August 28, 2025 special message were not available for obligations, and Defendants' decisions to instead attribute funds in the special message to directives in order to minimize the number of directives with which Defendants would comply.

5.      Declare unlawful Defendants' decision not to obligate, by September 30, 2025, the appropriations included in the August 28, 2025 special message.

6.    Declare unlawful, vacate, set aside, and enjoin Defendants' decision not to make available for obligation consistent with 2 U.S.C. § 683(b) the appropriations included in the August 28, 2025 special message, after the 45-day period for Congress to consider the special message had run.

7.    Order that, pursuant to 5 U.S.C. § 706(1), Defendants are compelled to make available for obligation and to obligate, by the deadline set by Congress: (i) the full amount of funds that Congress appropriated for foreign assistance programs in the 2024 Appropriations Act, the 2025 Continuing Resolution, and prior and subsequent appropriations acts and (ii) the specific or minimum amounts of funds that Congress required Defendants to obligate for particular uses and purposes in Section 7019(a) and Sections 7030-7061 of the 2024 Appropriations Act and in prior appropriations, and in subsequent continuing resolutions and appropriations acts.

8.    Order that, pursuant to 5 U.S.C. § 706(1), Defendants must make available for obligation consistent with 2 U.S.C. § 683(b) the appropriations included in the August 28, 2025 special message.

9.    Issue a writ of mandamus compelling Defendants to carry out their clear duties, if complete relief is not available under Plaintiffs' other claims;

10.    Award Plaintiffs reasonable attorneys' fees and costs; and

11.    Grant such other and further relief as the Court may deem just and proper.

Dated: December 12, 2025                          Respectfully submitted,

                          */s/ Daniel F. Jacobson*
                          Daniel F. Jacobson (D.C. Bar 1016621)
                          Stephen K. Wirth (D.C. Bar 1034038
                          John Robinson (D.C. Bar 1044072)
                          Nina Cahill (D.C. Bar No. 1735989)
                          JACOBSON LAWYERS GROUP PLLC
                          5100 Wisconsin Ave. Ste. 301
                          Washington, DC 20016

Tel: (301) 823-1148
dan@jacobsonlawyersgroup.com

*Counsel for Plaintiffs*