# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GLOBAL HEALTH COUNCIL, *et al.*,

                    *Plaintiffs*,

        v.

DONALD J. TRUMP, *et al.*,

               *Defendants*.

Civil Action No. 1:25-cv-402 (AHA)

## DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

Defendants respectfully move under Federal Rule of Civil Procedure 12(b)(1), or, in the alternative, Rule 12(b)(6), for an order dismissing the Third Amended Complaint, ECF No. 174. The grounds for this Motion are set forth in the accompanying Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss. A proposed order is also attached.

Dated: January 23, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division

ALEXANDER K. HAAS
Director

Federal Programs Branch

JEAN LIN
Special Litigation Counsel
Federal Programs Branch

*/s/  Pierce J. Anon*
J. STEPHEN TAGERT
PIERCE J. ANON
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Phone: (202) 305-7573
Email: pierce.anon@usdoj.gov

*Counsel for Defendants*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GLOBAL HEALTH COUNCIL, *et al.*,

       *Plaintiffs*,

      v.

DONALD J. TRUMP, *et al.*,

       *Defendants*.

Civil Action No. 1:25-cv-402 (AHA)

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED COMPLAINT

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 3

LEGAL STANDARD ........................................................................................................... 9

ARGUMENT ..................................................................................................................... 10

I.     THE COURT SHOULD DISMISS ALL OF PLAINTIFFS' FUNDING CLAIMS ........ 10

     A.     Most Claims Related to Funds That Plaintiffs Believe Should Have Been Dispersed Prior to September 30, 2025 Are Moot ................................................. 11

     B.     Plaintiffs Funding Claims Under The APA Are Foreclosed by the Supreme Court's September 26, 2025 Order and Precluded by the ICA ............................. 14

     C.     The Program Funding Decisions at Issue Are Committed to Agency Discretion by Law ................................................................................................ 19

     D.     The Challenged Funding Decisions Constitute Presidential Actions, and Thus, Are Not Subject to APA Review ............................................................... 20

     E.     Plaintiffs' APA Claims Fail to State A Claim Because They Do Not Challenge a "Discrete" Agency Action ................................................................ 21

     F.     Defendants' Conduct Was Not Contrary To Law .................................................. 22

     G.     The Third Amended Complaint Fails to State an Arbitrary and Capricious Claim .................................................................................................................... 24

     H.     Plaintiffs' Allegations of Unreasonable Delay Fail to State a Claim .................. 25

     I.     Plaintiffs Cannot State a Claim Relating to the Proposed Rescission ................. 27

II.    THE AGENCY REORGANIZATION AND PROGRAM TERMINATION CLAIMS DO NOT PLAUSIBLY ALLEGE A VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT ........................................................................ 28

     A.     Plaintiffs Lack Standing to Challenge USAID's Reorganization ........................ 29

     B.     Plaintiffs Lack Standing to Challenge the Elimination of Any USAID Programs to Which Plaintiffs Have Never Participated ........................................ 31

     C.     Plaintiffs Do Not Allege Any Agency Action ....................................................... 31

     D.     Defendants Have Not Acted Contrary to Law (Claim Seven) ............................. 33

E.      Defendants Did Not Act Arbitrarily and Capriciously as to Reorganizing
        USAID And Its Programs (Claims Seven and Eight) ........................................... 37

III.    PLAINTIFFS' ADDITIONAL CONSTITUTIONAL CLAIMS FAIL ........................... 38

A.      Plaintiffs Fail to State Claims for Violations of the Separation of Powers
        Doctrine (Claims Seven and Ten) ....................................................................... 38

B.      Plaintiffs' Take Care Clause Claim Fails ............................................................. 40

IV.     THE *ULTRA VIRES* CLAIM IS NOT PLAUSIBLY ALLEGED (CLAIMS FOUR,
        NINE, FOURTEEN, SEVENTEEN) ................................................................................ 42

V.      THE MANDAMUS CLAIMS ARE NOT PLAUSIBLY ALLEGED (CLAIMS
        FIVE AND EIGHTEEN) ................................................................................................... 43

CONCLUSION ...................................................................................................................... 44

# TABLE OF AUTHORITIES

## CASES

*13th Reg. Corp. v. Dep't of the Interior*,
    654 F.2d 758 (D.C. Cir. 1980) ................................................................. 43

*AIDS Vaccine Advocacy Coal. v. Dep't of State*,
    770 F. Supp. 3d 121 (D.D.C. 2025) ......................................................... 22

*Air Courier Conference of Am. v. Am. Postal Workers Union*,
    498 U.S. 517 (1991) ................................................................................. 19

*Akers v. Watts*,
    589 F. Supp. 2d 12 (D.D.C. 2008) ........................................................... 38

*Ala.-Coushatta Tribe of Tex. v. United States*,
    757 F.3d 484 (5th Cir. 2014) ................................................................... 32

*Already, LLC v. Nike, Inc.*,
    568 U.S. 85 (2013) ................................................................................... 11

*Am. Anti-Vivisection Soc'y v. Dep't of Agric.*,
    946 F.3d 615 (D.C. Cir. 2020) ........................................................... 26, 29

*\*Am. Foreign Serv. Ass'n v. Trump* ("*AFSA*"),
    792 F. Supp. 3d 116 (D.D.C. 2025) ................................................ *passim*

*Am. Forest Res. Council*,
    77 F.4th 787 (D.C. Cir. 2023), *cert. denied* 144 S. Ct. 1110 (2024) ................................. 22, 33

*Am. Ins. Ass'n v. Garamendi*,
    539 U.S. 396 (2003) ............................................................................. 3, 39

*Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*,
    801 F. Supp. 2d 383 (D. Md. 2011), *aff'd*, 698 F.3d 171 (4th Cir. 2012) ................................. 32

*Anglers Conservation Network v. Pritzker*,
    809 F.3d 664 (D.C. Cir. 2016) ................................................................. 26

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................. 10

*Bancoult v. McNamara*,
    445 F.3d 427 (D.C. Cir. 2006) ................................................................. 39

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ................................................................................................ 10

*Block v. Cmty. Nutrition Inst.,*
   467 U.S. 340 (1984) ........................................................................... 8, 15, 16, 18

*Bradford v. Dep't of Lab.,*
   101 F.4th 707 (10th Cir. 2024) ......................................................................... 21, 22

*Chamber of Com. of U.S. v. Reich,*
   74 F.3d 1322 (D.C. Cir. 1996) ................................................................................ 32

*Cheney v. U.S. Dist. Ct. for Dist. of Columbia,*
   542 U.S. 367 (2004) ................................................................................................ 43

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.,*
   333 U.S. 103 (1948) .......................................................................................... 39, 41

*City of Houston, Tex. v. Dep't of Hous. & Urb. Dev.,*
   24 F.3d 1421 (D.C. Cir. 1994) ................................................................................ 12

*City of New Haven v. United States,*
   809 F.2d 900 (D.C. Cir. 1987) ................................................................................ 17

*City of New York v. Dep't of Def.,*
   913 F.3d 423 (4th Cir. 2019) .................................................................................. 21

*Clarke v. Sec. Indus. Ass'n,*
   479 U.S. 388 (1987) ................................................................................................ 19

*Cobell v. Kempthorne,*
   455 F.3d 301 (D.C. Cir. 2006) ................................................................................ 21

*Cobell v. Norton,*
   392 F.3d 461 (D.C. Cir. 2004) ................................................................................ 26

*Consol. Edison Co. v. Ashcroft,*
   286 F.3d 600 (D.C. Cir. 2002) ................................................................................ 44

*Da Costa v. Immigr. Inv. Program Off.,*
   80 F.4th 330 (D.C. Cir. 2023) ................................................................................ 26

*Dalton v. Specter,*
   511 U.S. 462 (1994) .................................................................................... *passim*

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019).................................................................................... 25

*\*Dep't of State v. Aids Vaccine Advoc. Coal.*,
  606 U.S. ---, 146 S. Ct. 19 (2025)..................................................... *passim*

*Detroit Int'l Bridge Co v. Canada*,
  189 F. Supp. 3d 85 (D.D.C. 2016), *aff'd on other grounds*, 883 F.3d 895 (D.C. Cir. 2018) ... 32

*DHS v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020)........................................................................................ 21

*DOJ v. FLRA*,
  981 F.2d 1339 (D.C. Cir. 1993)................................................................. 42

*Donelson v. U.S. Bureau of Prisons*,
  82 F.Supp.3d 367 (D.D.C. 2015), *aff'd sub nom. Donelson v. Fed. Bureau of Prisons*,
  No. 15–5136, 2015 WL 9309944 (D.C. Cir. Dec. 7, 2015)...................... 38

*El-Shifa Pharm. Indus. Co. v. United States*,
  607 F.3d 836 (D.C. Cir. 2010).................................................................. 27

*Estate of Heiser v. Islamic Republic of Iran*,
  466 F.Supp.2d 229 (D.D.C. 2006)............................................................ 38

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)............................................................................ 24, 37

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024)............................................................................ 29, 30

*Fed. Express Corp. v. U.S. Dep't of Com.*,
  39 F.4th 756 (D.C. Cir. 2022)................................................................... 42

*Fla. Audubon Soc'y v. Bentsen*,
  94 F.3d 658 (D.C. Cir. 1996)..................................................................... 31

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992)...................................................................... 20, 31, 40

*Free Enter. Fund v. Pub. Co. Acct. Bd.*,
  561 U.S. 477 (2010)................................................................................... 41

*Fund for Animals Inc. v. U.S. Bureau of Land Mgmt.*,
  460 F.3d 13 (D.C. Cir. 2006)..................................................................... 22

*Glob. Health Council v. Trump ("GHC"),*
  153 F.4th 1 (D.C. Cir. 2025) ................................................................. *passim*

*Haig v. Agee,*
  453 U.S. 280 (1981) ................................................................................ 24

*Harisiades v. Shaughnessy,*
  342 U.S. 580 (1952) ................................................................................ 39

*Havens Realty Corp. v. Coleman,*
  455 U.S. 363 (1982) ................................................................................ 29

*Heckler v. Chaney,*
  470 U.S. 821 (1985) ................................................................................ 20

*In re Henry M. Jackson,* U.S. Senate,
  B-200685, 1980 WL 14499 (Comp. Gen. Dec. 23, 1980) ...................... 44

*In re Aiken County,*
  725 F.3d 255 (D.C. Cir. 2013) ................................................................ 44

*In re Nat'l Nurses United,*
  47 F.4th 746 (D.C. Cir. 2022) ................................................................ 43

*Iron Arrow Honor Soc'y v. Heckler,*
  464 U.S. 67 (1983) .................................................................................. 11

*Jagers v. Federal Crop Ins. Corp.,*
  758 F.3d 1179 (10th Cir. 2014) .............................................................. 25

*Jama v. Immigr. & Customs Enf't,*
  543 U.S. 335 (2005) ................................................................................ 28

*Jenson v. Huerta,*
  828 F.Supp.2d 174 (D.D.C. 2011) .......................................................... 38

*Jerome Stevens Pharms., Inc. v. FDA,*
  402 F.3d 1249 (D.C. Cir. 2005) .............................................................. 10

*Johnson v. Eisentrager,*
  339 U.S. 763 (1950) ................................................................................ 39

*Khadr v. United States,*
  529 F.3d 1112 (D.C. Cir. 2008) ................................................................ 9

*Kowalski v. Tesmer*,
   543 U.S. 125 (2004) ........................................................................................ 31

*Lewis v. Drug Enforcement Admin.*,
   777 F.Supp.2d 151 (D.D.C.  2011) ................................................................ 38

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ................................................................................... 19, 20

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ........................................................................................ 41

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ........................................................................................ 21

*Marbury v. Madison*,
   5 U.S. (1 Cranch) 137 (1803) ................................................................... 40, 41

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209 (2012) ........................................................................................ 19

*Milk Train, Inc. v. Veneman*,
   310 F.3d 747 (D.C. Cir. 2002) ...................................................................... 20

*Mississippi v. Johnson*,
   71 U.S. (4 Wall) 475 (1867) ................................................................ 2, 40, 41

*Moms Against Mercury v. FDA*,
   483 F.3d 824 (D.C. Cir. 2007) ...................................................................... 10

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) .......................................................................................... 24

*Murphy v. Islamic Republic of Iran*,
   740 F. Supp. 2d 51 (D.D.C. 2010) ................................................................ 38

*Murthy v. Missouri*,
   603 U.S. 43 (2024) .......................................................................................... 30

*Nat. Res. Def. Council, Inc. v. Hodel*,
   865 F.2d 288 (D.C. Cir. 1988) ...................................................................... 34

*Nat'l Ass'n of Clean Air Agencies v. EPA*,
   489 F.3d 1221 (D.C. Cir. 2007) ............................................................... 24, 37

*Nat'l Institutes of Health v. Am. Pub. Health Ass'n*,
  606 U.S. ---, 145 S. Ct. 2658 (2025) ................................................................ 15

*Newdow v. Roberts*,
  603 F.3d 1002 (D.C. Cir. 2010) ...................................................................... 40

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) ............................................................................... *passim*

*Nuclear Regul. Comm'n v. Texas ("NRC")*,
  605 U.S. 665 (2025) ......................................................................... 8, 42, 43

*Oestereich v. Selective Serv. Sys. Loc. Bd. No. 11*,
  393 U.S. 233 (1968) ...................................................................................... 42

*Power v. Barnhart*,
  292 F.3d 781 (D.C. Cir. 2002) ...................................................................... 43

*Sampson v. Murray*,
  415 U.S. 61 (1974) ....................................................................................... 39

*Schneider v. Kissinger*,
  412 F.3d 190 (D.C. Cir. 2005) ...................................................................... 39

*Schroer v. Billington*,
  525 F. Supp. 2d 58 (D.D.C. 2007) ............................................................... 42

*Sierra Club v. Costle*,
  657 F.2d 298 (D.C. Cir. 1981) ...................................................................... 25

*Sierra Club v. Peterson*,
  228 F.3d 559 (5th Cir. 2000) ........................................................................ 33

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) .................................................................................. 9, 30

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ...................................................................................... 30

*Sustainability Inst. v. Trump*,
  --- F.4th ---, 2026 WL 157120 (4th Cir. Jan. 21, 2026) ................................ 15

*Telecomm. Rsch. & Action Ctr. v. FCC*,
  750 F.2d 70 (D.C. Cir. 1984) ........................................................................ 26

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
　551 U.S. 308 (2007) .................................................................................. 10, 11

*Thakur v. Trump*,
　--- F.4th ---, 2025 WL 3760650 (9th Cir. Dec. 23, 2025) ................................ 15

*Thompson v. N. Am. Stainless, LP*,
　562 U.S. 170 (2011) .......................................................................................... 19

*Train v. City of New York*,
　420 U.S. 35 (1975) ...................................................................................... 18, 23

*TransUnion LLC v. Ramirez*,
　594 U.S. 413 (2021) .......................................................................................... 30

*Trudeau v. FTC*,
　456 F.3d 178 (D.C. Cir. 2006) ......................................................................... 42

*Trump v. Boyle*,
　606 U.S. ---, 145 S. Ct. 2653 (2025) ................................................................ 15

*Trump v. Hawaii*,
　585 U.S. 667 (2018) .......................................................................................... 25

*Trump* v. *Mazars USA, LLP*,
　591 U.S. 848 (2020) .......................................................................................... 18

*Tulare Cnty. v. Bush*,
　306 F.3d 1138 (D.C. Cir. 2002) ....................................................................... 32

*United States v. Curtiss-Wright Exp. Corp.*,
　299 U.S. 304 (1936) .......................................................................................... 39

*United States v. Sanchez-Gomez*,
　584 U.S. 381 (2018) .......................................................................................... 11

*W. Va. Ass'n of Cmty. Health Ctrs., Inc. v. Heckler*,
　734 F.2d 1570 (D.C. Cir. 1984) ....................................................................... 12

*Wilbur v. U.S. ex rel. Kadrie*,
　281 U.S. 206 (1930) .......................................................................................... 44

*Wisc. Pub. Power, Inc. v. FERC*,
　493 F.3d 239 (D.C. Cir. 2007) ......................................................................... 37

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952).................................................................................................... 3

**CONSTITUTION**

U.S. Const. art. II, § 3 .................................................................................................... 40, 41

**STATUTES**

2 U.S.C. § 681 ............................................................................................................ 18

2 U.S.C. § 683 ............................................................................................................ 5, 8, 16

2 U.S.C. § 684 ............................................................................................................ 5, 16

2 U.S.C. § 686 ............................................................................................................ 5

2 U.S.C. § 687 ............................................................................................................ 5, 16, 17

2 U.S.C. § 688 ............................................................................................................ 5, 16

5 U.S.C. § 104 ............................................................................................................ 6, 34

5 U.S.C. § 701 ............................................................................................................ 15, 16, 19, 20

5 U.S.C. § 704 ............................................................................................................ 21, 31

5 U.S.C. § 706 ............................................................................................................ 25, 26, 27

22 U.S.C. § 2151b ...................................................................................................... 3, 35

22 U.S.C. § 2291 ........................................................................................................ 13

22 U.S.C. § 2346 ........................................................................................................ 3, 6

22 U.S.C. § 2348 ........................................................................................................ 3, 13

22 U.S.C. § 2349aa ..................................................................................................... 3

22 U.S.C. § 2381 ........................................................................................................ 3, 35, 37

22 U.S.C. § 2382 ........................................................................................................ 3, 23

22 U.S.C. § 2392 ........................................................................................................ 33

22 U.S.C. § 2395 ........................................................................................................ 3, 23

22 U.S.C. § 6501 .................................................................................................. 35

22 U.S.C. § 6563 ............................................................................................. 6, 34

22 U.S.C. § 6581 .................................................................................................. 35

22 U.S.C. § 6592 ............................................................................................. 6, 34

28 U.S.C. § 1361 .................................................................................................. 43

31 U.S.C. § 1531 ............................................................................................. 7, 34

42 U.S.C. § 10134 ................................................................................................ 44

The Foreign Assistance Act of 1961 ("FAA"),
    Pub. L. No. 87-195, 75 Stat. 424 ..................................................................... 3

Impoundment Control Act of 1974 ("ICA"),
    Pub. L. No. 93-344, 88 Stat. 297 ..................................................................... 5

Reorganization Act of 1977,
    Pub. L. No. 95-17, 91 Stat. 29 ........................................................................ 37

Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"),
    Pub. L. No. 105-277, 112 Stat. 2681 ................................................................ 6

Homeland Security Act of 2002,
    Pub. L. No. 107-296, 116 Stat. 2135, codified at 6 U.S.C. § 468(b)–(d) ................................ 37

Continuing Appropriations Act, 2020,
    Pub. L. No. 116-59, 133 Stat. 1093 (2019) ................................................... 28

Continuing Appropriations Act, 2023,
    Pub. L. No. 117-180, 136 Stat. 2114 (2022) ................................................. 28

Further Consolidated Appropriations Act, 2024 (the "FY 2024 Appropriations Act"),
    Pub. L. No. 118-47, 138 Stat. 460 ......................................................... *passim*

Full-Year Continuing Appropriations and Extensions Act, 2025,
    Pub. L. 119-4, 139 Stat. 9 .................................................................................. 4

Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans
    Affairs, and Extensions Act, 2026 (the "Continuing Resolutions"),
    Pub. L. 119-37, 139 Stat. 495 (Nov. 12, 2025) ............................................. 4

**RULES**

Fed. R. Civ. P. 12(b)(6) ................................................................................ 10, 38

**REGULATIONS**

Exec. Order No. 10,973, 26 Fed. Reg. 10,469 (Nov. 3, 1961) ...................................... 6

Exec. Order No. 14,169, 90 Fed. Reg. 8,619 (Jan. 20, 2025) ............................... 6, 7, 32

**LEGISLATIVE HISTORIES**

167 Cong. Rec. H7593 (daily ed. Dec. 9, 2021) ...................................................... 28

Congressional Power of the Purse Act, H.R. 6628, 116th Cong. § 101 (2020) ........................... 28

Protecting Our Democracy Act, H.R. 5314, 117th Cong. § 501 (2021) ...................................... 28

Protecting Our Democracy Act, H.R. 5048, 118th Cong. § 501 (2023) ...................................... 27

**OTHER AUTHORITIES**

CRS, *Foreign Aid Reform: Issues for Congress and Policy Options*, RL34243 (2009),
    https://perma.cc/C28M-2DCC ................................................................... 36

CRS, *Restructuring Foreign Aid: The Role of the Director of Foreign Assistance in
    Transformational Development*, RL33491 (2007),
    https://perma.cc/VSF8-F784 ................................................................... 36

Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245 (2001) ............................... 21

GAO B-115398 (OGC-76-2) (Oct. 26, 1977),
    https://www.gao.gov/assets/ogc-78-2.pdf ................................................................ 27

GAO B-115398 (ACG-76-5), Enclosure II (Aug. 12, 1975),
    https://www.gao.gov/assets/acg-76-5.pdf ................................................................ 27

GAO B-115398 (ACG-76-12) (Dec. 15, 1975),
    https://www.gao.gov/assets/acg-76-5.pdf ................................................................ 27

GAO, *Foreign Aid Reform: Comprehensive Strategy, Interagency Coordination, and
    Operational Improvements Would Bolster Current Effort*, GAO-09-192 (2009),
    https://www.gao.gov/assets/gao-09-192.pdf. ................................................................ 36

GAO, *Principles of Federal Appropriations Law* 6-26 to 6-30 (3d ed. 2006) (GAO Red Book),
    https://www.gao.gov/assets/gao-06-382sp.pdf ................................................................ 24

George Ingram, *Institutional Architecture of U.S. Foreign Aid*
  (Global Economy and Development, Brookings Institute 2017),
  https://perma.cc/WYM3-KYJT ................................................................. 36

Memorandum from William H. Rehnquist, Assistant Att'y Gen., *Presidential Authority to*
*Impound Funds Appropriated for Assistance to Federally Impacted Schools*,
  1 Supp. Op. O.L.C. 303 (1969),
  https://perma.cc/NRU3-DFK7 ......................................................... 22, 24

*Presidential Administration*,
  114 Harv. L. Rev. 2245 (2001) ............................................................. 21

*The President's Veto Power*,
  12 Op. O.L.C. 128 (1988), https://perma.cc/9TXB-QNB2 ...................................... 23

Sec'y of State, Emergency Humanitarian Waiver to Foreign Assistance Pause (Jan. 28, 2025),
  http://state.gov/emergency-humanitarian-waiver-toforeign-assistance-pause .......................... 6

xiv

## INTRODUCTION

Plaintiffs—organizations and professional associations with members that were grantees of various U.S. Agency for International Development ("USAID") programs—have received complete relief for their previous contract related claims, resulting in their decision to drop those claims. But they want more. Plaintiffs ask this Court to order the federal government to pay *tens of billions of dollars* in foreign aid in the manner that Plaintiffs so desire. Plaintiffs' novel legal theory would allow any individual, who might have a chance of receiving a fragment of an appropriation, to pursue claims under the Administrative Procedure Act ("APA") and not only force the government to obligate *expired* funds but also dictate the manner in which those funds are obligated. This expansive theory cannot withstand scrutiny, and it is certainly not the law.

Indeed, Plaintiffs' theory is foreclosed by the Supreme Court and the D.C. Circuit's decisions in this very case. In August 2025, the D.C. Circuit held that Plaintiffs could not pursue an APA claim for Defendants' alleged violation of the Impoundment Control Act. And in September 2025—after Plaintiffs amended their complaint to allege an APA claim to enforce the appropriations statutes themselves instead—the Supreme Court held in a stay order that Defendants "made a sufficient showing that the Impoundment Control Act precludes [Plaintiffs'] suit, brought pursuant to the Administrative Procedure Act, to enforce the appropriations at issue here." *Dep't of State v. Aids Vaccine Advoc. Coal.*, 606 U.S. ---, 146 S. Ct. 19, 19 (2025). Thus, Plaintiffs' claims asking the Court to require Defendants to take certain actions in relation to the appropriations statutes are precluded.

Even if that were not the case, Plaintiffs' funding claims fail for other reasons. Most of Plaintiffs' claims relating to the Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. F, 138 Stat. 460, 729 (the "FY 2024 Appropriations Act"), are moot because those funds have lapsed. Not only have Plaintiffs failed to allege any reviewable discrete agency action, but the program funding decisions are also committed to agency discretion by law; thus, their APA claims are simply unreviewable. Nor have Plaintiffs stated a claim that Defendants acted contrary

to any appropriations statute, or otherwise acted arbitrarily and capriciously, or unreasonably delayed any agency action.

Plaintiffs also attempt to bootstrap a whole new set of APA claims relating to USAID's reorganization and Defendants' alleged elimination of foreign-assistance programs which Plaintiffs never participated. But materially identical claims have already failed in this District. In *Am. Foreign Serv. Ass'n v. Trump* ("*AFSA*"), Judge Nichols found that those plaintiffs did not have Article III standing to assert claims related to the reorganization of USAID or pursue claims for third parties not before the Court. *See generally* 792 F. Supp. 3d 116 (D.D.C. 2025). The same is true here because none of Plaintiffs' alleged financial injuries were caused by USAID's reorganization, nor have Plaintiffs demonstrated that they can assert third-party standing to assert claims relating to certain USAID programs, initiatives, offices, and partnerships where Plaintiffs have no injury themselves. Those claims also fail to state a claim because Plaintiffs do not identify any final agency action reflecting a consummated agency decision and because those decisions fall squarely within the constitutional and statutory discretion of the President.

Plaintiffs' constitutional claims—for alleged violations of the separation of powers and the Take Care Clause—fare no better. Those claims simply recast their statutory arguments in constitutional dressing, which is specifically foreclosed by the Supreme Court's decision in *Dalton v. Specter*, 511 U.S. 462 (1994). As for the Take Care Clause, it does not provide a cause of action to review agency action. *See Mississippi v. Johnson*, 71 U.S. 475, 501 (1867). And Plaintiffs' theories—that either Defendants acted *ultra vires* or that Plaintiffs should receive mandamus relief for the same actions that are part of Plaintiffs' APA challenges—simply cannot meet the exceedingly high standards required to warrant relief.

Plaintiffs seek a second and third bite at the proverbial apple for claims that have been foreclosed by every other federal court addressing those issues. This Court should rule in the same manner and dismiss the entirety of the Third Amended Complaint with prejudice.

**BACKGROUND**

**1.** ***Foreign Aid Funds.*** The Foreign Assistance Act of 1961, Pub. L. No. 87-195, 75 Stat. 424 ("FAA"), is the statutory framework for most foreign assistance programs. It confers on the President and the Executive Branch broad discretion to determine how best to implement foreign assistance programs. *See, e.g.*, 22 U.S.C. § 2395(a) (foreign assistance "may be furnished" on "such terms" as "may be determined to be best suited to the achievement of the purposes" of the FAA); *see also, e.g.*, *id.* § 2151b(c)(1) ("the President is authorized to furnish assistance, on such terms and conditions as he may determine, for health programs"); *id.* § 2346(a) (economic and political stability assistance); *id.* § 2348 (peacekeeping operations); *id.* § 2349aa (antiterrorism assistance). Consistent with the "President's 'vast share of responsibility for the conduct of our foreign relations,'" *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (quoting *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 610-611 (1952) (Frankfurter, J., concurring)), the FAA also ensures that foreign assistance programs align with the President's foreign policy by tasking the Secretary of State, "[u]nder the direction of the President," with the responsibility of the "continuous supervision and general direction of economic assistance" to ensure that "the foreign policy of the United States is best served thereby." 22 U.S.C. § 2382(c); *see also, e.g.*, *id.* § 2382(a); *id.* § 2346(b). The FAA generally provides that "[t]he President may exercise any functions conferred upon him by this chapter through such agency or officer of the United States Government as he shall direct." 22 U.S.C. § 2381.

Since establishing the general statutory framework governing foreign assistance programs, Congress has regularly appropriated funds to allow the Executive Branch to implement those programs. In fiscal year 2024, Congress appropriated substantial foreign assistance funds in division F of the FY 2024 Appropriations Act. Congress took various approaches and addressed various operational needs of the government's foreign assistance programs. In some circumstances, Congress appropriated large sums while significantly preserving the Executive Branch's discretion relating to how to use those funds. *See, e.g.*, 138 Stat. at 742 (appropriating nearly $4 billion for necessary expenses to carry out FAA provisions that relate to "development

3

assistance"); *id.* at 744 (appropriating nearly $5 billion for necessary expenses to FAA provisions relating to "international disaster relief, rehabilitation, and reconstruction assistance" and nearly $4 billion for various activities "to meet refugee and migration needs").

In other circumstances, Congress appropriated large sums for certain programs while also imposing substantial restrictions on the use of those funds. For example, Congress appropriated nearly $4 billion for global health programs—that is, for "such activities as" "child survival and maternal health programs," "immunization and oral rehydration programs," "family planning/reproductive health," and others. *Id.* at 740. But in appropriating those funds, Congress also included provisions restricting how those funds could be spent, such as prohibiting the use of funds "to pay for the performance of abortion as a method of family planning" or "to lobby for or against abortion" and directing that any "voluntary family planning project" funded with the appropriation "shall meet" various requirements. *Id.* at 740-41.

Congress also earmarked funds for more specific purposes or specific recipients. *See, e.g.*, *id.* at 742 (appropriating more than $6 billion for expenses related to "the prevention, treatment, and control of, and research on, HIV/AIDS," including $1.65 billion "for a United States contribution to the Global Fund to Fight AIDS, Tuberculosis and Malaria"). Congress further appropriated funds to support the administration of foreign assistance programs. *See, e.g.*, *id.* at 739-40 (funds to finance the Executive Branch's operating expenses and capital expenditures necessary to implement foreign assistance programs).

Some of the funds appropriated in division F of the FY 2024 Appropriations Act expired on September 30, 2025, while other funds remain available until later dates or until expended. *See, e.g.*, *id.* at 742. Congress also enacted two continuing resolutions—making new appropriations, under the same authorities and conditions as the FY 2024 foreign assistance appropriations—for fiscal years 2025 and 2026. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, §§ 1101-08, 139 Stat. 9, 10-12, Pub. L. 119-4 (Mar. 15, 2025); Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026, Pub. L. 119-37, 139 Stat. 495 (Nov. 12, 2025) (the "Continuing Resolutions").

2. ***Impoundment Control Act.*** Congress has sought to impose certain requirements on the Executive's decisions whether to obligate and expend appropriated funds through the Impoundment Control Act of 1974, Pub. L. No. 93-344, tit. X, 88 Stat. 297, 332. The ICA provides that the President may transmit a "special message" to Congress whenever he "determines that all or part of any budget authority will not be required to carry out the full objectives or scope of programs for which it is provided or that such budget authority should be rescinded for fiscal policy or other reasons" or "whenever all or part of budget authority provided for only one fiscal year is to be reserved from obligation for such fiscal year." 2 U.S.C. § 683(a). That special message must contain specific information about the proposed rescission, including "the amount of budget authority" involved and "the reasons why the budget authority should be rescinded." *Id*.

Once Congress receives a special message, it can rescind some or all funds covered by the special message. The statute specifies certain procedures to ensure timely consideration of any such rescission bill. *See id.* § 688. But if Congress has not "completed action on a rescission bill rescinding all or part of the amount proposed to be rescinded" within 45 days, then the statute states that the amount proposed to be rescinded "shall be made available for obligation." *Id*. § 683(b). In addition, the President must transmit a special message to Congress whenever the Executive Branch "proposes to defer any budget authority provided for a specific purpose or project," which are "permissible" in certain specified situations. *Id.* § 684(a)-(b).

Finally, the ICA provides mechanisms for the Comptroller General, an official within the Legislative Branch, to enforce the statute. If the Comptroller General concludes that the "President has failed to transmit a special message with respect to" a particular deferral or decision to establish a reserve, he is directed to "make a report on such reserve or deferral and any available information concerning it to both Houses of Congress." *Id.* § 686(a). And if "budget authority is required to be made available for obligation and such budget authority is not made available for obligation," the statute provides that the Comptroller General may "bring a civil action" in district court under specified conditions. *Id.* § 687.

   **3.  *USAID*.**  In 1961, President Kennedy issued Executive Order 10,973, directing the Secretary of State to "establish an agency in the Department of State to be known as the Agency for International Development."  Exec. Order No. 10,973 § 102, 26 Fed. Reg. 10,469 (Nov. 3, 1961).  Section 1413 of the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, 112 Stat. 2681 (1998), recognized USAID as an "independent establishment."  *See* 22 U.S.C. § 6563; 5 U.S.C. § 104.  Under FARRA, the USAID Administrator is "under the direct authority and foreign policy guidance of the Secretary of State."  22 U.S.C. § 6592.  And several types of foreign assistance are jointly administered by the Department of State and USAID.  *See, e.g.*, *id.* § 6563; *id.* § 2346(b) (economic support funds).

   Upon taking office, President Trump paused United States foreign development assistance to allow his administration to assess programmatic efficiencies and to ensure that all foreign aid is consistent with United States foreign policy.  *See* Exec. Order No. 14,169, *Reevaluating and Realigning United States Foreign Aid*, 90 Fed. Reg. 8,619 (Jan. 20, 2025).  Secretary of State Marco Rubio implemented this Executive Order through a direction issued on January 24, 2025.  Marocco Decl., No. 1:25-cv-352, ECF No. 20-1, ¶ 3, (Feb. 10, 2025).  Secretary Rubio also approved some waivers of the pause, including waivers for foreign military financing for Israel and Egypt, emergency food expenses, administrative expenses, and certain expenses incurred before the pause went into effect, *id.* ¶ 10, and a waiver of the pause for life-saving humanitarian assistance during the review.  *See* Sec'y of State, Emergency Humanitarian Waiver to Foreign Assistance Pause (Jan. 28, 2025),  http://state.gov/emergency-humanitarian-waiver-toforeign-assistance-pause; Defs.' Opp'n to Pls.' Mots. For Prelim. Relief, ECF No. 34.  Some USAID and State awards were also retained, while others were terminated.  Joint Status Report, ECF No. 42.

   The FY 2024 Appropriations Act gives the President and the Secretary of State broad discretion to use appropriated funds.  The FY 2024 Appropriations Act appropriated to the President $1,695,000,000 for "necessary expenses to carry out the provisions of section 667 of the [FAA]," 138 Stat. at 739, which authorizes funding for certain operational activities.  It further provided that the Secretary of State may transfer certain appropriated funds to USAID's operating

expenses account.  *Id.*  Finally, the FY 2024 Appropriations Act allows for the reprogramming of funds subject to prior notice to the Committees on Appropriations.  *Id.* at 766.  Elsewhere, Congress generally authorized the transfer of funds from one agency to another "to finance or discharge a function or activity transferred or assigned under law."  31 U.S.C. § 1531(a).

4. ***This Litigation.***  This suit arises from implementation of the President's Executive Order No. 14,169, which states that "[i]t is the policy of the United States that no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President of the United States."  90 Fed. Reg. at 8619.

Plaintiffs filed their original complaint in February 2025, raising constitutional, APA, and *ultra vires* challenges to the cancellation of foreign-assistance awards as well as the pause of obligating appropriated funds for future awards.  ECF No. 1.  After initially issuing a temporary restraining order, *see* ECF No. 4, the Court entered a preliminary injunction order, holding that Plaintiffs were likely to succeed on their claims that Defendants unlawfully "engag[ed] in a unilateral rescission or deferral of congressionally appropriated funds in violation of Congress's spending power" and did not follow the ICA's procedures.  Preliminary Injunction Order, ECF No. 60, at 29-37.  The Court enjoined the government "from unlawfully impounding congressionally appropriated foreign aid funds" and ordered Defendants to "make available for obligation the full amount of funds" appropriated in the FY 2024 Appropriations Act.  *Id.* at 48.

On appeal, the U.S. Court of Appeals for the D.C. Circuit reversed, finding that Plaintiffs "lack[ed] a cause of action to press their claims."  *Glob. Health Council v. Trump*, 153 F.4th 1, 7 (D.C. Cir. 2025) ("*GHC*").  The court held that Plaintiffs likely could not assert a constitutional claim for an alleged violations of separation-of-powers principles because that avenue was foreclosed by *Dalton v. Specter*, 511 U.S. 462 (1994), because plaintiffs may not "recast statutory claims as constitutional ones" to evade any limitations to judicial review.  *See GHC*, 153 F.4th at 14, 17.  The court also held that Plaintiffs' APA claim—to enforce the ICA provisions that govern when the Executive Branch must make funds available for obligation—is "impliedly precluded."  *Id.* at 18 (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984)).  Specifically, because

the ICA contains a complex and delicate scheme with an enforcement mechanism available for the Comptroller General only, the ICA impliedly prevented "backdoor [] citizen suits to enforce the ICA at any time and without notice to the Congress of the alleged violation." *Id.* at 19. Finally, the D.C. Circuit held that Plaintiffs could not assert an *ultra vires* claim because Plaintiffs could point to no "specific prohibition that defendants [] violated to an extreme and nearly jurisdictional degree" and instead "basically dress[ed] up a typical statutory-authority argument as an ultra vires claim." *Id.* at 20-21 (quoting *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 682 (2025) ("*NRC*")). After the vacatur of the preliminary injunction, the President promptly transmitted to Congress a special message under the ICA proposing rescissions of approximately $4 billion in funds. *See* Notice of Transmittal of Special Message Under 2 U.S.C. § 683, ECF No. 129.

On remand, Plaintiffs moved to amend the complaint a second time and sought preliminary relief as well as partial summary judgment to compel the government to obligate all funds expiring on September 30, 2025. Pls.' Mot. for a TRO, Prelim. Inj., and Partial Summ. J., ECF No. 133. Plaintiffs contended that the appropriations statutes themselves required Defendants to obligate all funds, including the $4 billion that the President proposed for rescissions. Mem. of L. in Supp. of Pls.' Mot. for a TRO, Prelim. Inj., and Partial Summ. J., ECF No. 133-1. The Court granted Plaintiffs' requested relief in part, stating that even though Plaintiffs could not enforce violations of the ICA process, APA claims "based on the appropriations acts" are "completely independent of whether Defendants have complied or failed to comply with the ICA's requirements" because they "seek[] to enforce compliance with the appropriations acts." Mem. Opinion and Order, ECF No. 139 at 16. The Court then held that the appropriations statutes required Defendants to obligate all appropriate funds that were expiring on September 30. *Id.* at 21-26. After not receiving a stay from this Court or the D.C. Circuit, Defendants obtained a stay from the Supreme Court.

The Supreme Court held that (1) Defendants "made a sufficient showing that the Impoundment Control Act precludes respondents' suit, brought pursuant to the Administrative Procedure Act, to enforce the appropriations at issue"; (2) "mandamus relief is unavailable to [Plaintiffs]"; and (3) "the asserted harms to the Executive's conduct of foreign affairs appear to

outweigh the potential harm faced by respondents." *Dep't of State*, 146 S. Ct. at 19.  In dissent, Justice Kagan recognized that if any funding under the FY 2024 Appropriations Act was not obligated before the end of the fiscal year (September 30, 2025), then the funding would "become unavailable for spending . . . *for all time*." *Id.* at \*2 (Kagan, J., dissenting) (emphasis added); *see also id.* at \*4 (noting that the Court's ruling "allow[ed] the Executive to cease obligating $4 billion in funds that Congress appropriated for foreign aid").

**5.  *The Third Amended Complaint.***  After the Supreme Court's ruling, eight Plaintiffs moved to file the Third Amended Complaint, which "removes allegations and claims based on previous contracts, grants, cooperative agreements, and other awards that Plaintiffs held, including allegations and claims relating to the termination of Plaintiffs' contracts, grants, cooperative agreements, and other awards."  GHC Pls.' Mot. for Leave to File Third Am. Compl., ECF No. 171, at 1.  Plaintiffs assert eighteen causes of action—ranging from claims under the APA and that Defendants acted *ultra vires* to alleged violations of the separation of powers—involving four categories of actions allegedly taken by Defendants.  First, Plaintiffs claim that Defendants "decided not to spend foreign assistance appropriations in the amounts that Congress required, for the purposes that Congress required, and by the deadlines Congress required."  3rd Am. Compl., ECF No. 174, ¶ 5.  Second, Plaintiffs claim that Defendants eliminated "foreign assistance programs, initiatives, offices, and partnerships" that "advanced U.S. interests as determined by Congress and provided a lifeline to millions of persons in need around the world."  *Id.* ¶ 6.  Third, Plaintiffs claim that "Defendants acted unlawfully in their disposition of billions of dollars of appropriations at the end of Fiscal Year 2025, with respect both to money they did obligate and money they did not."  *Id.* ¶ 7.  Fourth, Plaintiffs claim that "Defendants' abolishment of USAID as an executive agency violates foundational principles of the separation of powers."  *Id.* ¶ 8.

## LEGAL STANDARD

Plaintiffs bear the burden of establishing subject-matter jurisdiction.  *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008); *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).  Under Rule 12(b)(1), a court may consider material outside the complaint.  *See*

*Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253-54 (D.C. Cir. 2005). "Where both standing and subject matter jurisdiction are at issue," the "court may inquire into either and, finding it lacking, dismiss the matter without reaching the other." *Moms Against Mercury v. FDA*, 483 F.3d 824, 826 (D.C. Cir. 2007).

A Rule 12(b)(6) motion tests whether a complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a complaint "does not need detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The Court may consider documents incorporated by reference under Rule 12(b)(6). *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

## ARGUMENT

### I. THE COURT SHOULD DISMISS ALL OF PLAINTIFFS' FUNDING CLAIMS

Plaintiffs allege a total of thirteen claims related to Defendants' failure to obligate foreign assistance funds Congress appropriated in FY 2024 Appropriations Act and the Continuing Resolutions. 3rd Am. Compl. ¶¶ 127-67, 207-47. Those claims should be dismissed in their entirety for several reasons. *First*, most claims related to the FY 2024 Appropriations Act are moot as the relevant two-year funds have lapsed. *Second*, the Supreme Court's order in this case forecloses Plaintiffs' theory that they may pursue an APA claim under the FY 2024 Appropriations Act and Continuing Resolutions because the ICA precludes such a suit. *Third*, even were that not the case, the funding decisions at issue are committed to agency discretion by law. *Fourth*, Plaintiffs fail to state a claim because they do not challenge any identifiable final agency action. *Fifth*, Defendants did not act contrary to the FY 2024 Appropriations Act or the Continuing Resolutions. *Sixth*, Plaintiffs fail to allege an arbitrary and capricious claim because the APA allows Presidential Administrations to change priorities to align with the national interest. *Seventh*, Plaintiffs have not plausibly alleged that Defendants unreasonably delayed in obligating any funds because Plaintiffs do not allege any discrete agency action that Defendants had a non-discretionary

duty to perform. *Finally*, Plaintiffs cannot demonstrate that they have any basis to require the funds included in the President's rescission proposal to be obligated.

## A. Most Claims Related to Funds That Plaintiffs Believe Should Have Been Dispersed Prior to September 30, 2025 Are Moot

The Third Amended Complaint seeks to require Defendants to take certain actions in relation to the FY 2024 Appropriations Act,[1] and it contains several references to the FY 2024 Appropriations Act as the basis for Plaintiffs' claims. *See, e.g.*, 3rd Am. Compl. ¶ 36a-h (listing appropriations in the FY 2024 Appropriations Act). But most funds under that Act lapsed, expiring on September 30, 2025. Thus, that funding is "unavailable for spending . . . for all time," *Dep't of State*, 146 S. Ct. at 21 (Kagan, J., dissenting), and Plaintiffs' claims related to it is moot.

"Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies." *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983). A case that "becomes moot at any point during the proceedings . . . is outside the jurisdiction of the federal courts." *United States v. Sanchez-Gomez*, 584 U.S. 381, 385-86 (2018) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)). A case is moot when "the parties lack a legally cognizable interest in [its] outcome." *Already*, 568 U.S. at 91 (citation omitted).

Plaintiffs artful pleading in the Third Amended Complaint does not change the analysis; they cannot resurrect funding that has already expired. "It is an elementary principle of the federal

---

[1] *See, e.g.*, 3rd Am. Compl. at 61 (Prayer for Relief 4) (asking the Court to "[d]eclare unlawful, vacate, set aside, postpone the effective date of, and enjoin Defendants' decisions in August and September 2025 not to maximize the number of directives in Sections 7030-7061 of the [FY] 2024 Appropriations Act . . . ."); *id.* (Prayer for Relief 5) (asking the Court to "[d]eclare unlawful Defendants' decision not to obligate, by September 30, 2025, the appropriations included in the August 28, 2025 special message"); *id.* at 62 (Prayer for Relief 7) (asking the Court to "[o]rder that . . . Defendants are compelled to make available for obligation and to obligate, by the deadline set by Congress: (i) the full amount of funds that Congress appropriated for foreign assistance programs in the [FY] 2024 Appropriations Act, the 2025 Continuing Resolution, and prior and subsequent appropriations acts and (ii) the specific or minimum amounts of funds that Congress required Defendants to obligate for particular uses and purposes in Section 7019(a) and Sections 7030-7061 of the 2024 Appropriations Act and in prior appropriations . . . ."). The Third Amended Complaint also contains several references to the FY 2024 Appropriations Act as the basis for Plaintiffs' claims. *See, e.g.*, *id.* ¶ 36a-h (listing appropriations in the FY 2024 Appropriations Act).

budget process that, in general, a federal agency's budget authority lapses on the last day of the period for which funds were [available to be] obligated." *W. Va. Ass'n of Cmty. Health Ctrs., Inc. v. Heckler*, 734 F.2d 1570, 1576 (D.C. Cir. 1984). Afterward, "the unobligated funds revert back into the general Treasury." *Id.* Because the relevant funds have lapsed, and because no tolling principle applies to Plaintiffs' claims in the Third Amended Complaint (which are wholly different from their prior claims), the case is moot. *See City of Houston, Tex. v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1424 (D.C. Cir. 1994) ("It is a well-settled matter of constitutional law that when an appropriation has lapsed . . . federal courts cannot order the expenditure of funds that were covered by that appropriation.").

Thus, the Court does not have the ability to order anything in relation to most provisions of the FY 2024 Appropriations Act because "many of these funds . . . w[ere] available [only] until September 30, 2025." 3rd Am. Compl. ¶ 37. Plaintiffs identified as much:

- $4 billion for "global health activities" toto carry out "chapters 1 and 10 of part I of the Foreign Assistance Act of 1961, for global health activities." *See* 3rd Am. Compl. ¶ 36a. To the extent the funds were not obligated, the funds expired on September 30, 2025. *See* FY 2024 Appropriations Act, 138 Stat. at 740.

- $3.93 billion in "development assistance." *See* 3rd Am. Compl. ¶ 36b. To the extent the funds were not obligated, the funds expired on September 30, 2025. *See* 2024 Appropriations Act, 138 Stat. at 742.

- $3.89 billion for implementing the FAA's Economic Support Fund. *See* 3rd Am. Compl. ¶ 36f. To the extent the funds were not obligated, the funds expired on September 30, 2025. *See* FY 2024 Appropriations Act, 138 Stat. at 743.

- $140 million "to carry out the provisions of the [FAA] for the promotion of democracy globally." *See* 3rd Am. Compl. ¶ 36g. To the extent the funds were not obligated, the funds expired on September 30, 2025. *See* FY 2024 Appropriations Act, 138 Stat. at 743.

- $770 million for assistance for Europe, Eurasia, and Central Asia.  *See* 3rd Am. Compl. ¶ 36h. To the extent the funds were not obligated, the funds expired on September 30, 2025.  *See* FY 2024 Appropriations Act, 138 Stat. at 743.

- $205 million "to carry out the provisions of the [FAA] for the promotion of democracy globally."  *See* 3rd Am. Compl. ¶ 39b.  To the extent the funds were not obligated, the funds expired on September 30, 2025.  *See* FY 2024 Appropriations Act, 138 Stat. at 743.

- $870 million for preventing the proliferation of nuclear weapons, combatting terrorism, demining, and related programs pursuant to specified provisions of the FAA, FREEDOM Support Act, and Arms Export Control Act.  *See* 3rd Am. Compl. ¶ 39d.  To the extent the funds were not obligated, the funds expired on September 30, 2025.  *See* FY 2024 Appropriations Act, 138 Stat. at 748.$291 million (out of $410 million) to carry out provisions of section 551 of the FAA.  *See* 3rd Am. Compl. ¶ 39e.  To the extent the funds were not obligated, the funds expired on September 30, 2025.  *See* FY 2024 Appropriations Act, 138 Stat. at 748.

- $1.4 billion "to carry out section 481 of the [FAA]".  *See* 3rd Am. Compl. ¶ 39f.  To the extent the funds were not obligated, the funds expired on September 30, 2025.  *See* FY 2024 Appropriations Act, 138 Stat. at 747.[2]

Because those funds have lapsed, they are unavailable and cannot be obligated.  To be sure, Plaintiffs allege that "Congress enacted a continuing resolution re-appropriating pro-rata amounts appropriated in the FY 2024 Appropriations Act for USAID and the State Department, to be available until January 30, 2026."  3rd Am. Compl. ¶ 51.  But that is incorrect and unsupported by the cited provision.  Instead of "re-appropriating" any of the funds that Plaintiffs aver are somehow

---

[2] A smaller subset of funds addressed in the Third Amended Complaint do not seem to be expired.  *See* FY 2024 Appropriations Act, 138 Stat. 742-44.  And although outside the scope of a motion to dismiss, it is Defendants' understanding that the vast majority of funds that were not rescinded, or included in the President's special message under the ICA, were obligated before the end of the fiscal year, with expired unobligated amounts being broadly consistent with historical levels.

now resurrected, Congress enacted new appropriations in the same amounts for FY 2025 and subject to the same authorities and conditions as provided in the FY 2024 Appropriations Act. But all the unobligated amounts from the two-year appropriations previously available in the FY 2024 Appropriations Act lapsed and are no longer available.

### B. Plaintiffs Funding Claims Under the APA Are Foreclosed by the Supreme Court's September 26, 2025 Order and Precluded by the ICA

1. The Supreme Court has already decided that Defendants "made a sufficient showing that the Impoundment Control Act precludes [Plaintiffs'] suit, brought pursuant to the Administrative Procedure Act, to enforce the appropriations at issue here." *Dep't of State*, 146 S. Ct. at 19. That order forecloses all Plaintiffs' funding claims under the APA.[3]

This Court previously held that "there is no impediment to judicial review of an agency's unilateral decision not to spend funds through an APA claim premised on appropriations acts" when it reviewed Plaintiffs' nearly identical prior claims. ECF No. 139 at 12. But the Supreme Court disagreed, holding that the ICA likely precluded such an avenue of relief. *See Dep't of State*, 146 S. Ct. at 19. Nothing counsels a different outcome here, and thus the APA is not a proper avenue for Plaintiffs' to pursue their funding claims.

---

[3] *See* 3rd Am. Compl. ¶ 131 (First Claim for Relief) (seeking to enforce the FY 2024 Appropriations Act and Continuing Resolutions, which allegedly "required that the appropriation amount 'shall' be apportioned to USAID or the State Department" and "that specific or minimum amounts 'shall be made available' by USAID and the State Department"); *id.* ¶ 138 (Second Claim for Relief) ("Defendants' decisions not to obligate foreign assistance appropriations in the amounts and for the purposes that Congress directed are arbitrary and capricious."); *id.* ¶ 148 (Third Claim for Relief) ("The [FY] 2024 Appropriations Act, the 2025 Continuing Resolution, and prior appropriations acts mandate that Defendants obligate the full amounts appropriated by specific deadlines and for specific purposes, with no discretion to spend less than those full amounts. Defendants have non-discretionary duties to comply with these commands."); *id.* ¶ 208 (Twelfth Claim for Relief) ("In the [FY] 2024 Appropriations Act and prior appropriations acts, Congress included directives in Sections 7030-7061 requiring that minimum or specific amounts of funds 'shall be made available' for specific purposes."); *id.* ¶ 220 (Thirteenth Claim for Relief) ("The 2024 Appropriations Act and prior appropriations acts mandated that Defendants obligate the full amount of funds included in the special message by September 30, 2025 . . . ."); *id.* ¶ 229 (Fifteenth Claim for Relief) ("Defendants have made a final decision not to obligate the appropriations included in the August 28, 2025 special message."); *id.* ¶ 235 (Sixteenth Claim for Relief) ("Defendants' failure to obligate funds included in the August 28, 2025 rescission proposal constitutes agency action unlawfully withheld.").

That the Supreme Court's order granted only interim relief pending appeal does not change that result. The Supreme Court "often addresses requests for interim relief," and when it "issues a decision, it constitutes a precedent that commands respect in lower courts," with its "reasoning bind[ing] lower courts as a matter of vertical *stare decisis*." *Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 606 U.S. ---, 145 S. Ct. 2658, 2663 (2025) ("*NIH*") (Gorsuch, J., concurring in part and dissenting in part); *see also Trump v. Boyle*, 606 U.S. ---, 145 S. Ct. 2653, 2654 (2025) (interim orders in like cases "inform how a court should exercise its equitable discretion in like cases"). And the Ninth Circuit recently recognized that it was "bound" by the Supreme Court's interim order on reviewability under the APA of grant termination challenges, *see Thakur v. Trump*, --- F.4th ---, 2025 WL 3760650, at *3 (9th Cir. Dec. 23, 2025) ("We are bound by *NIH*, which held that the APA's limited waiver of sovereign immunity did 'not provide the District Court with jurisdiction to adjudicate' similar APA claims challenging grant terminations." (quoting *NIH*, 145 S. Ct. at 2658)), while the Fourth Circuit followed *NIH* and another recent interim docket decision, saying that those cases were "instructive" and that the plaintiffs could not "circumvent" them. *See Sustainability Inst. v. Trump*, --- F.4th ---, 2026 WL 157120 at *5-6 (4th Cir. Jan. 21, 2026).

2. Even had the Supreme Court not already provided clear guidance about the ICA's preclusive effect on Plaintiffs' APA claims, it is clear that the ICA is the exclusive means for enforcing the appropriations at issue. A plaintiff may not seek review under the APA if "statutes preclude judicial review." 5 U.S.C. § 701(a)(1). By providing a detailed scheme for administrative and judicial review, Congress can displace the APA's default cause of action. *See, e.g.*, *Block*, 467 U.S. at 345. Preclusion of review is determined "not only from [the statute's] express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Id.* Congress may "preclude[] all judicial review" or may instead limit judicial review to a particular channel or a type of case. *Id.*

For instance, Congress may impliedly preclude some parties from seeking APA review by establishing a "complex and delicate" scheme that provides for judicial review only by others. *Id.* at 347-48. That was true in *Block* itself, where the Supreme Court held that Congress had

precluded an APA action brought by consumers seeking judicial review of milk market orders issued by the Secretary of Agriculture. *Id.* at 341. The relevant statute provided a mechanism for dairy handlers to seek judicial review after administrative exhaustion, and allowed for "[h]andlers and producers—but not consumers" to "participate in the adoption and retention of market orders." *Id*. at 346. By omitting consumers, Congress intended to foreclose them from seeking judicial review of market orders. *Id*. at 347. Allowing otherwise would "effectively nullify" the administrative exhaustion that Congress had expressly required. *Id*. at 348.

The ICA's political-branch procedures and specific judicial-review mechanism preclude APA review of Plaintiffs' claims in an even more straightforward manner: only the Comptroller General may bring claims that the Executive Branch engaged in unlawful impoundments by failing to obligate the funds at issue. Plaintiffs sue to compel Defendants to "ma[k]e available for obligation" appropriations that are purportedly "required to be made available" under the appropriations statutes but are "not made available for obligation" by the President. 2 U.S.C. § 687. Consequently, Plaintiffs bring a suit of the type that the ICA assigned only to the Comptroller General, compelling the conclusion that the ICA "preclude[s] judicial review" of Plaintiffs' APA claims. *See* 5 U.S.C. § 701(a)(1).

As the D.C. Circuit recognized, whenever the President wishes to rescind or delay any budget obligations for any appropriations that fall within the ICA's scope is subject to its "complex scheme of notification," potential "congressional action," and "suit by a specified legislative branch official" after notice to Congress. *GHC*, 153 F.4th at 18. The President must notify Congress when he proposes to defer or rescind the appropriated funds in a "special message" that meets particular statutory requirements. 2 U.S.C. §§ 683(a), 684(a). Congress then determines how to respond: discussion and negotiation between the political branches can ensue; Congress can disapprove the rescission or deferral; it can vote to rescind some parts of the package but not others; it can legislate further; and it can decline to respond. *See* 2 U.S.C. § 688.

The ICA expressly permits judicial enforcement only at the end of that process and only by the Comptroller General. 2 U.S.C. § 687. Congress contemplated that those suits would be

capacious: they cover any instance in which, "under this Act, budget authority is required to be made available for obligation and such budget authority is not made available for obligation," and it specifically chose to limit the venue to the U.S. District Court for the District of Columbia and "expressly empowered" the court to enter "any decree, judgment, or order which may be necessary or appropriate to make such budget authority available for obligation." *Id.* The ICA also requires such suits may happen only 25 in-session days after the Comptroller General provides Congress with a statement explaining the "circumstances giving rise to the action contemplated," allowing Congress the opportunity to avoid litigation. *Id.*

This statutory scheme preserves the political branches' accountability for enacting and implementing the appropriations laws and accounts for the possibility that the Executive Branch may decide to withhold funds in a wide variety of contexts for a wide variety of reasons—some of which may implicate the Executive's own constitutional prerogatives, some of which may give Congress no concern at all, and some of which may draw a response from Congress affirmatively acquiescing in or rejecting the Executive's proposal. *Cf. City of New Haven v. United States*, 809 F.2d 900, 901 (D.C. Cir. 1987) (explaining how Congress has previously acknowledged that "the executive branch necessarily withholds funds on hundreds of occasions during the course of a fiscal year" and such delays may result from "the normal and orderly operation of the government"). In keeping with the long history of the political branches resolving appropriations disputes, the ICA's procedures ensure that the political branches—not courts or private parties— control disputes over the President's decisions relating to the obligation and spending of funds appropriated by Congress.

"[I]t does not make sense that the Congress would craft a complex scheme of interbranch dialogue but *sub silentio* also provide a backdoor for citizen suits" through the APA "at any time and without notice to the Congress of the alleged violation." *GHC*, 153 F.4th at 19. That reticulated scheme of give-and-take between the political branches and congressional notification before suit necessarily forecloses private parties from seeking judicial review, supplanting interbranch negotiations, and leapfrogging the Comptroller General. *See Block*, 467 U.S. at 347-

48.  Any disputes between the President and Congress are to be "hashed out in the hurly-burly, the give-and-take of the political process between the legislative and the executive," *Trump* v. *Mazars USA, LLP*, 591 U.S. 848, 859 (2020) (citation omitted)—not through private suits by potential downstream beneficiaries of appropriations. Plaintiffs' suit to force Defendants to obligate all funds—especially when Plaintiffs seek to force the obligation of *tens of billions of dollars*—would "severely disrupt" the ICA's "complex and delicate administrative scheme." *Block*, 467 U.S. at 348.  Were it otherwise, private litigants could circumvent the ICA as to virtually any appropriations, claiming that the underlying appropriations statutes require faster or different obligations regardless of whether the political branches are poised to resolve those same disputes via the ICA's procedures.  Accordingly, Plaintiffs' APA funding claims must be dismissed.

3. The ICA's disclaimer—that nothing in it "shall be construed" as "affecting in any way the claims or defenses of any party to litigation concerning any impoundment," 2 U.S.C. § 681(3)—does not change the result.  As the D.C. Circuit recognized, that language "disclaims any effect on the claims or defenses of any party *that may bring litigation*" and "also meant that a case then-pending before the Supreme Court at the time that the ICA became law was not moot." *GHC*, 153 F.4th at 19.  The Supreme Court recognized the latter effect of that provision in holding that the ICA did not moot a suit concerning the allotment of certain appropriated funds that was pending at the time the ICA was enacted.  *See Train v. City of New York*, 420 U.S. 35, 41 n.8 (1975).  Nothing about that provision overcomes the plain implication of the ICA's structure as precluding private parties to interfere in this process through the APA.  Nor would precluding Plaintiffs' APA claims here mean that *all* private suits brought to enforce appropriations statutes are precluded.  Unlike the appropriations at issue in this case, certain appropriations may mandate that specific payments be made to a specific entity by a specific date—statutes that the ICA expressly declines to supersede.  *See* 2 U.S.C. § 681(4).

4. Relatedly, Plaintiffs cannot state a claim for their challenge concerning the appropriations statutes because Plaintiffs do not fall within the zone of interest of those statutes. To invoke the APA, a "plaintiff must establish that the injury" it complains of "falls within the

18

zone of interests sought to be protected by the statutory provision" at issue. *Air Courier Conference of Am. v. Am. Postal Workers Union*, 498 U.S. 517, 523-24 (1991). That limitation reflects the common sense intuition that Congress does not extend causes of action to "plaintiffs who might technically be injured in an Article III sense but whose interests are unrelated to the statutory prohibitions" they seek to enforce. *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 178 (2011). Thus, where, as here, the plaintiff is not the object of a challenged regulatory action, the plaintiff has no right of review if its "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). And when a plaintiff attempts to use the APA to challenge the government's compliance with a statute, the "interest he asserts must be arguably within the zone of interests to be protected or regulated by the statute that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). Plaintiffs cannot do so here. While they hope to be awarded some of the appropriated funds, they cannot point to a single statute that requires that foreign-assistance funds be awarded to them. Indeed, the appropriation statutes are directed at regulating the relationship between Congress and the Executive Branch; and Plaintiffs' interest are akin to ordinary taxpayers.

## C. The Program Funding Decisions at Issue Are Committed to Agency Discretion by Law

Plaintiffs' APA claims should be dismissed for another threshold reason—the challenged funding choices are committed to agency discretion by law, 5 U.S.C. § 701(a)(2); thus, they are unreviewable under the APA.

An agency decision to discontinue a previously funded program and reallocate those funds to other uses is committed to agency discretion by law. *Lincoln v. Vigil*, 508 U.S. 182, 185-88 (1993). The "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion," because the point of such appropriations "is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192. In making that

19

allocation, the agency must engage in "'a complicated balancing of a number of factors . . . within its expertise,'" including "whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'" *Id.* at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)). As long as the agency abides by the relevant statutes and by any obligations that may arise from regulations or grant instruments, the APA "gives the courts no leave to intrude." *Id.* That logic applies not just to lump-sum appropriations but to other funding programs that leave to the agency "the decision about how the moneys" for a particular program "could best be distributed consistent with" the statute. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Such decisions also "clearly requir[e] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Id.* at 752.

The foreign assistance programs at issue here are just such programs: the FAA and the pertinent appropriations statutes grant State and USAID significant discretion in determining how best to allocate appropriated funds across applicants for contracts, grants, and cooperative agreements. Indeed, with very limited exceptions, neither the authorizing nor the appropriating statutes require that any particular funds be awarded to any particular implementer, let alone to any of the Plaintiffs here.

### D.  The Challenged Funding Decisions Constitute Presidential Actions, and Thus, Are Not Subject to APA Review

Yet another threshold hurdle that Plaintiffs cannot overcome is that the President proposed for the rescission of funding consistent with the ICA. The President is not an "agency" under the APA. 5 U.S.C. § 701(b)(1); *see Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992). His actions therefore "are not subject to [the APA's] requirements" and "are not reviewable" under the APA. *Franklin*, 505 U.S. at 801. Agencies lack the power to disagree with the President's lawful exercise of policy discretion vested specifically in him, which is the case here. So, when agencies implement such directives by the President (as would be the situation when agencies follow the

President's direction to withhold funds proposed for rescission by the President consistent with the ICA), there is no genuine agency decision-making to review. *See, e.g., Bradford v. Dep't of Lab.*, 101 F.4th 707, 731 (10th Cir. 2024) ("[I]t would have been futile for DOL to have considered comments advocating alternatives that it lacked discretion to adopt."); *see also DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 25 (2020) (declining to consider claim that the Secretary of Homeland Security was "required to explain a legal conclusion that was not hers to make"); *cf.* Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2351 (2001) (distinguishing a challenge "to an action delegated to an agency head but directed by the President," as to which "the review provisions usually applicable to that agency's action should govern," from "a challenge to an action that Congress has committed to the sole discretion of the President"). Accordingly, Plaintiffs' claims related to the withholding of funds from obligation consistent with the ICA must be dismissed for this reason as well.

### E. Plaintiffs' APA Claims Fail to State A Claim Because They Do Not Challenge a "Discrete" Agency Action

Review under the APA is available only for "agency action," 5 U.S.C. § 704, and an APA plaintiff must plead and challenge "an identifiable action or event." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990). The agency actions that can be challenged under the APA are those that are "circumscribed [and] discrete." *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). "[C]ourts cannot order 'programmatic improvements,' or 'compel compliance with broad statutory mandates.'" *Cobell v. Kempthorne*, 455 F.3d 301, 305 (D.C. Cir. 2006) (quoting *Lujan*, 497 U.S. at 891; *Norton*, 542 U.S. at 66). That "distinction between discrete acts, which are reviewable, and programmatic challenges, which are not, is vital to the APA's conception of the separation of powers" and prevents the courts from being injected into "day-to-day agency management" of agencies. *City of New York v. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019).

Here, the Third Amended Complaint does not challenge any discrete action—*i.e.*, any termination of Plaintiffs' own funding instruments, but instead challenges *every* possible funding decision related to the appropriations identified in the amended complaint. *See, e.g.*, 3rd Am.

Compl. at 61 ("asking the Court to "enjoin Defendants' decisions not to spend foreign assistance appropriations in the specific or minimum amounts, for the specific purposes, that Congress directed in appropriations acts"). That is the exact type of broad programmatic or "blunderbuss" challenge seeking supervision of an agency's day-to-day activities the APA does not allow. *See Fund for Animals Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006); *see also Am. Forest Res. Council*, 77 F.4th at 805. Yet, because the APA precludes an amorphous, roving challenge to the Executive Branch's purported failure to obligate funds, Plaintiffs' claims fail for lack of discreteness under *Lujan* and *Norton*, warranting dismissal.

### F. Defendants' Conduct Was Not Contrary To Law

Plaintiffs also fail to state a claim for their contrary-to-law APA claims. By and large, the FY 2024 Appropriations Act provided sums of money for broad purposes. Among other things, Congress appropriated billions of dollars "[f]or necessary expenses to carry out" provisions of the Foreign Assistance Act "for global health activities"; "for international disaster relief, rehabilitation, and reconstruction assistance"; "to meet refugee and migration needs"; and for development assistance. FY 2024 Appropriations Act, div. F, 138 Stat. at 740, 742, 744. On their own, those appropriations lack any mandatory language directing the obligation and expenditure of funds. Where Congress included more specific directions in the Act, those often restricted the manner in which, or the purposes for which, the funds could be spent. *See, e.g.*, *id.* at 740-41, 742. In other words, those instructions were not unequivocal commands to provide specific funds on a specific timetable for specific recipients. Although this Court previously noted one instance where the appropriations act specified that the covered funds "shall be made available for" specific purposes, *id.* at 740, *cited by AIDS Vaccine Advocacy Coal. v. Dep't of State*, 770 F. Supp. 3d 121, 144 (D.D.C. 2025), that specification appears in a list of provisions restricting the manner and purposes of expenditures. It is a direction regarding the specific purposes and activities for which those appropriated funds may be used, not a command to obligate all of them on any timeline.

The appropriations provisions on which Plaintiffs rely simply "permit[] but do[] not require the Executive Branch to spend funds." *Presidential Auth. to Impound Funds Appropriated for*

*Assistance to Federally Impacted Schs.*, 1 Supp. Op. O.L.C. 303, 309 (Dec. 1 1969) https://perma.cc/NRU3-DFK7; *cf. Train*, 420 U.S. at 43-44 (recognizing that an appropriations provision may permit, but not require, expenditure "of the entire amounts authorized"). The FAA too has generally granted the President and the Secretary of State significant latitude to determine how best to administer foreign assistance to ensure that those programs achieve foreign aid goals that align with the President's foreign policy. *See, e.g.*, 22 U.S.C. §§ 2382(c), 2395(a). And for many specific programs, Congress expressly gave the President discretion to assist on such terms and conditions as the President determines.

Notably, the context of these statutes further supports that the President has discretion over how to expend the appropriations. There is a long history of the Executive Branch declining to spend the full amount of appropriated funds in various contexts, particularly in the realm of foreign affairs. *See* The President's Veto Power, 12 Op. O.L.C. 128, 168 & n.56 (1988), https://perma.cc/9TXB-QNB2. The appropriations at issue here touch on the sensitive subject of foreign affairs, where the President enjoys considerable authority under the Constitution and under the FAA. The risk of impinging on a core executive power provides a powerful basis to sustain, not override, the Executive Branch's discretion in this area.

In short, neither the FY 2024 Appropriations Act nor the Continuing Resolutions include any "specific, unequivocal command," *Norton*, 542 U.S. at 63 (quotation omitted), that Defendants can be said to have violated. Although some provisions of the FY 2024 Appropriations Act contain more specific restrictions regarding obligating funds to particular recipients or for particular purposes, the Third Amended Complaint does not assert that Plaintiffs are such recipients.

Nor does the language in the FY 2024 Appropriations Act and Continuing Resolutions that foreign-assistance appropriations "shall be made available," in amounts specifically designated, constitute an unequivocal command to spend all appropriated funds. *See* 3rd Am. Compl. ¶¶ 42-44. It merely reflects Congress's desire to designate different portions of the top-line foreign-assistance appropriations for particular purposes and providing direction to the Executive Branch about how to allocate portions of the lump-sum appropriations to certain purposes. *See* 2 GAO,

*Principles of Federal Appropriations Law* 6-26 to 6-30 (3d ed. 2006) (GAO Red Book), *available at* GAO-06-382SP Principles of Federal Appropriations Law: Third Edition, Volume II, https://www.gao.gov/assets/gao-06-382sp.pdf.    Consistent with that understanding, and as the Government Accountability Office has explained, the use of such "shall be available" language "to earmark a portion of a lump-sum appropriation" does not by itself reflect a congressional command to make the full sum available for obligation. *See id.* at 6-30 to 6-31.

### G. The Third Amended Complaint Fails to State an Arbitrary and Capricious Claim

Plaintiffs also fail to state an arbitrary and capricious claim because the APA does not preclude the agency from accounting for shifts in national interest and priorities in keeping with a "change in administration brought about by the people casting their votes." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part).  This is so because the APA's arbitrary and capricious standard is "[h]ighly deferential," "presumes the validity of agency action," *see Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007) (citation omitted), and directs the reviewing court not to "substitute its judgment for that of the agency." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (citation omitted).

Here, the President has an established role in formulating foreign policy. And it is indisputable that the "[p]rotection of the foreign policy of the United States[,] is a governmental interest of great importance, since foreign policy and national security considerations cannot neatly be compartmentalized." *Haig v. Agee*, 453 U.S. 280, 307 (1981).  Then-Assistant Attorney General William H. Rehnquist reasoned that, should Congress direct spending so as to "interfere with the President's authority in an area confided by the Constitution to his substantive direction and control, such as his authority as Commander in Chief of the Armed Forces and his authority over foreign affairs," that may violate Article II of the U.S. Constitution.  Memorandum from William H. Rehnquist, Assistant Att'y Gen., Office of Legal Counsel, *Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, 1 Supp. Op. O.L.C. 303, 310-311 (Dec. 1, 1969), https://perma.cc/NRU3-DFK7.  Such foreign policy decisions for

which the Executive is responsible necessarily include the obligation of foreign assistance funds for activities overseas. And a court should not conduct "a searching inquiry into the persuasiveness of the President's justifications." *Trump v. Hawaii*, 585 U.S. 667, 686 (2018).

Moreover, a court may not reject an agency's stated reasons simply because the agency might also have had other unstated reasons. *See Jagers v. Federal Crop Ins. Corp.*, 758 F.3d 1179, 1185-1186 (10th Cir. 2014) (rejecting argument that "the agency's subjective desire to reach a particular result must necessarily invalidate the result, regardless of the objective evidence supporting the agency's conclusion"). Agency policymaking is not a "rarified technocratic process, unaffected by political considerations or the presence of Presidential power." *Sierra Club v. Costle*, 657 F.2d 298, 408 (D.C. Cir. 1981). "Such decisions are routinely informed by unstated considerations of politics, the legislative process, public relations, interest group relations, foreign relations, and national security concerns (among others)." *Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019).

Instead of grappling with the foreign policy context surrounding the pertinent appropriations, Plaintiffs allege that Defendants failed to address "serious reliance interests of contractors, grantees, and the members of the public." *See* 3rd Am. Compl. ¶ 143. But any such general reliance interests do not render Defendants' conduct irrational, particularly given Plaintiffs' fundamental misunderstanding of the appropriations statutory scheme, including the permanent FAA provisions that confer significant discretion on the President and the Executive Branch in making funding decision, as well as the discretion granted by the Constitution, to the President, in the realm of foreign affairs. Indeed, the cited appropriations statutes do not identify any Plaintiffs as holding a right to payment that would support the kind of reliance interests Plaintiffs allege here.

### H.  Plaintiffs' Allegations of Unreasonable Delay Fail to State a Claim

Plaintiffs also allege that Defendants "unreasonably delayed" obligating funds in violation of the APA, 5 U.S.C. § 706(1). *See* 3rd Am. Compl. ¶¶ 147-51 (Third Claim for Relief); *id.* ¶¶ 234-37 (Sixteenth Claim for Relief). Plaintiffs fail to establish that they meet the requirements for such

a claim. As the D.C. Circuit has explained, "[t]o state a claim for unreasonable delay, Plaintiffs must first allege that the agency 'failed to take a discrete agency action that it is required to take,'" *Da Costa v. Immigr. Inv. Program Off.*, 80 F.4th 330, 340 (D.C. Cir. 2023) (emphasis omitted) (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004)), and "second, that the delay was unreasonable." *Id.* (citing *Am. Anti-Vivisection Soc'y v. Dep't of Agric.*, 946 F.3d 615, 621 (D.C. Cir. 2020)); *see also Telecomm. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) ("*TRAC*") (identifying factors for assessing reasonableness of agency delay).

Importantly, while Plaintiffs characterize their claim as one of delay, this is not a situation where the agencies simply delayed action; instead, the agencies withheld certain appropriated funds pursuant to the President's rescission proposal consistent with the ICA, and the funds then expired. Thus, Plaintiffs' claims are really one of failure to act, which can be reviewed under 5 U.S.C. § 706(1) "only within strict limits." *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016). Specifically, like an unreasonably delay claim, a failure to act claim can proceed only where an agency has "failed to perform a non-discretionary duty to act"—*i.e.*, "a specific, unequivocal command" to act. *Norton*, 542 U.S. at 63, 64. "This standard reflects the common law writ of mandamus, which the APA 'carried forward' in § 706(1)." *Pritzker*, 809 F.3d at 670 (quoting *Norton*, 542 U.S. at 63). It is also rooted in separation-of-powers principles because it "protect[s] agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Norton*, 542 U.S. at 66-67; *accord Cobell v. Norton*, 392 F.3d 461, 478 (D.C. Cir. 2004).

Here, as explained above, Plaintiffs do not allege any discrete agency action that the agencies are required to take, nor the violation of any specific, unequivocal command to obligate the appropriated funds. To the contrary, the appropriations statutes both granted the Executive Branch significant discretion in obligating funds and recognized the President' vast responsibilities in conducting the Nation's foreign affairs. And it is beyond dispute that "courts are not a forum for reconsidering the wisdom of discretionary decisions made by the political branches in the realm

26

of foreign policy or national security." *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010). Plaintiffs' claims under 5 U.S.C. § 706(1), therefore fail to state a claim.

## I.     Plaintiffs Cannot State a Claim Relating to the Proposed Rescission

Plaintiffs also cannot state a claim for Defendants to obligate $4 billion in appropriations that were part of the President's special message to Congress sent on August 28, 2025, pursuant to the ICA. *See* 3rd Am. Compl. ¶¶ 217-22 (Thirteenth Claim for Relief). To start, Plaintiffs have no basis for enforcing the ICA. *See Dep't of State*, 146 S. Ct. at 19. But even if they did, the ICA does not prohibit the Executive from transmitting rescission proposals within 45 days of the expiration of the funds (sometimes described colloquially as a "pocket rescission").

In this situation, funds lapse not by Presidential order, but by the text of the appropriations statute. Indeed, after the ICA's enactment, several Presidents proposed rescinding funds that would expire before the end of the 45-day period during which Congress would consider a rescission bill. The year after the ICA was enacted, President Ford sent a special message proposing to rescind funds that would lapse "nearly a month before expiration of the 45 days of continuous session the Congress normally has to review proposed rescissions." GAO B-115398 (ACG-76-5), Enclosure II (Aug. 12, 1975), https://www.gao.gov/assets/acg-76-5.pdf. President Carter similarly sent proposed rescissions for funds that would expire before the end of the 45-day period. *See* GAO B-115398 (OGC-76-2), at 2 (Oct. 26, 1977), https://www.gao.gov/assets/ogc-78-2.pdf. In both cases, the funds lapsed during the 45-day period and were not obligated. In response, the Comptroller General proposed that Congress consider "changing the [ICA] to prevent funds from lapsing where the 45-day period has not expired." https://www.gao.gov/assets/acg-76-12.pdf. Congress never did.

In fact, here, Congress has recognized that the ICA allows the Executive Branch to withhold funds proposed for rescission for 45 days under the ICA—even if the funds expire in the meantime. This is because, as recently as 2023, members of Congress introduced bills to foreclose any withholding of budget authority pursuant to the ICA within 90 calendar days of the date of expiration of such budget authority. *See* Protecting Our Democracy Act, H.R. 5048, 118th Cong.

§ 501 (2023).[4]  These bills were *not* enacted, demonstrating that Congress has recognized the possibility of a "pocket rescission," yet did not take any action to prevent its use.

Congress also knows how to prevent funds from lapsing (in addition to making funds "no year" at the outset). It has, for example, extended the period of availability of expiring appropriations. *See, e.g.*, Continuing Appropriations Act, 2023, Pub. L. No. 117-180, div. A., § 124, 136 Stat. 2114, 2120 (2022); Continuing Appropriations Act, 2020, Pub. L. No. 116-59, div. A, § 124, 133 Stat. 1093, 1098 (2019).

Against this backdrop, this Court should not infer that Congress intended to preclude the Executive from proposing rescission within 45 days of the expiration of the funds and withholding the funds under the ICA beyond their expiration.  A court does not "lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply," and that "reluctance is even greater when Congress has shown elsewhere . . . that it knows how to make such a requirement manifest." *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005).

## II. THE AGENCY REORGANIZATION AND PROGRAM TERMINATION CLAIMS DO NOT PLAUSIBLY ALLEGE A VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

Plaintiffs' claims relating to the alleged "abolishment" of USAID, 3rd Am. Compl. (Claims for Relief 7-10) and "elimination" of certain programs, initiatives, offices and partnerships, *id.* (Claim for Relief 11) fare no better and should be dismissed.

*First*, Plaintiffs lack Article III standing to pursue any claims related to USAID's reorganization or to any decisions to end programs separate from those in which Plaintiffs participated.  Those are unrelated to their prior contracts with USAID, and the Third Amended

---

[4] *See also* Protecting Our Democracy Act, H.R. 5314, 117th Cong. § 501 (2021); 167 Cong. Rec. H7593 (daily ed. Dec. 9, 2021) (statement of Rep. Jackson Lee) (H.R. 5314 "would restore Congress' central role in funding decisions by preventing the President from effectively rescinding funds without congressional approval; . . . whether or not the funding is part of a Presidential rescission or deferral request; and closing a budget law loophole that essentially lets the President unilaterally block the spending of enacted appropriations designated as emergency"); Congressional Power of the Purse Act, H.R. 6628, 116th Cong. § 101 (2020) (attempting to require OMB to release funding to agencies at least 90 days before the funding expires).

Complaint is devoid of any allegations demonstrating how Defendants caused Plaintiffs any injury that is likely to be redressed by a court order. *Second,* Plaintiffs fail to identify any discrete, final agency action subject to review under the APA. Rather than challenge a final agency decision, Plaintiffs litigate an amalgam of ongoing policy judgments and funding decisions that are neither final nor judicially reviewable. *Finally,* even if Plaintiffs could clear those jurisdictional barriers, their APA claims fail on the merits because those challenged actions fall squarely within the constitutional and statutory discretion of the President and the Executive Branch.

### A. Plaintiffs Lack Standing to Challenge USAID's Reorganization

This is not the first case in which organizations have sought to enjoin the government from reorganizing USAID. In *AFSA*, the plaintiffs challenged the "wholesale dissolution of USAID" and sought to "require the government to immediately cease actions to shut down USAID's operations," without challenging any "granular action taken by defendants." 792 F. Supp. 3d at 126, 128. Judge Nichols held that no plaintiff had standing to assert such a claim; instead, at best, the organizations had standing to pursue claims relating to "discrete personnel actions." *Id.* at 130.

Like in *AFSA*, Plaintiffs do not have standing to challenge USAID's reorganization. (Claims for Relief 7-10). All Plaintiffs, except GHC and SBAIC, argue that they have organizational standing. 3rd Am. Compl. ¶¶ 116-24. To have standing "in [its] own right," an organization must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393-94 (2024). And like an individual, an organization may not establish standing simply based on the intensity of its interest or because of strong opposition to the government's conduct, "no matter how longstanding the interest and no matter how qualified the organization," *id.* at 394 (citation omitted); rather, the organization must show "far more than simply a setback to the organization's abstract social interests." *Id.* (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)); *see also Am. Anti-Vivisection Soc'y*, 946 F.3d at 618 ("an organization must allege a concrete and demonstrable injury to the organization's activities" (citation omitted)).

29

As for Plaintiffs GHC and SBAIC, who allege associational standing, 3rd Am. Compl. ¶¶ 125-26, they must show, among other things, that their members would otherwise have standing to sue in their own right and must "identify [the] members who have suffered the requisite harm." *See Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). Finally, standing cannot be asserted "in gross," as Plaintiffs must have standing for "each claim that they press against each defendant," *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (citation omitted), and "for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). And when pursuing "forward-looking" relief such as an injunction, a party must show that the plaintiff "face[s] 'a real and immediate threat of repeated injury.'" *Murthy*, 603 U.S. at 58 (citation omitted).

Here, Plaintiffs fail to show causation, which requires "a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." *Steel Co.*, 523 U.S. at 103. The chain of causation between the illegal conduct and the injury cannot be "too speculative or too attenuated." *All. for Hippocratic Med.*, 602 U.S. at 382-83. Plaintiffs have not alleged any injury, financial or otherwise, that is the result of Defendants' alleged decision to "abolish[] USAID" and "transfer" either "some" or "all" of USAID's statutory responsibilities to the State Department. *See* 3rd Am. Compl. ¶¶ 174, 184. Instead, the organizational Plaintiffs claim only financial injuries that allegedly resulted because of the Executive Branch's decisions related to appropriations. *See generally id.* ¶¶ 116-24. The same is true for the associational Plaintiffs whose members allegedly "suffered ruinous injuries" by "ha[ving] their operations devastated by losing access to vitally necessary appropriated funds." *See id.* ¶¶ 125-26. None of those injuries relate to the Executive Branch's decision to reorganize USAID; instead, all depend on the individual contractual decisions made by the Executive Branch in determining whether to contract with individual Plaintiffs to perform specific services with the appropriations over which the President has discretion. *Cf. AFSA*, 792 F. Supp. 3d at 129 (plaintiffs had standing only to pursue relief related to the government's personnel actions regarding USAID, not USAID's reorganization).

Nor would an order requiring Defendants to keep USAID separate from the State Department redress any of Plaintiffs' alleged injuries. "Redressability examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663-64 (D.C. Cir. 1996) (footnote omitted) (en banc). Here, if the Court were to order USAID to remain separate from the State Department, nothing would change for Plaintiffs, as that would not open up "the prospect of competing for funds . . . [to] partially redress the injuries to [Plaintiffs'] finances," which was the D.C. Circuit's basis for finding that Plaintiffs had alleged standing. *GHC*, 153 F.4th at 12. It also would not require Defendants to contract with Plaintiffs in the future.

### B. Plaintiffs Lack Standing to Challenge the Elimination of Any USAID Programs to Which Plaintiffs Have Never Participated

Plaintiffs similarly lack standing to challenge the termination of any programs in which they never participated. 3rd Am. Compl. ¶¶ 197-206 (Claim for Relief 11). Plaintiffs allege that Defendants eliminated various programs, initiatives, bureaus, and international partnerships that previously were administered by USAID, *see id.* ¶¶ 83, 197-206, such as the "Feed the Future" initiative and an "American Schools and Hospitals Abroad" program. *Id.* ¶¶ 84-99.

But Plaintiffs do not allege any injury to themselves that relates to Defendants' alleged decision to end these programs, much less how a favorable court order could redress Plaintiffs' injuries. Instead, Plaintiffs assert standing for non-parties before the Court. However, "[p]arties generally cannot rest their claims to relief on the legal rights or interests of third parties, because only the party with the right has the appropriate incentive to challenge (or not challenge) governmental action." *See AFSA*, 792 F. Supp. 3d at 131 (citation modified) (quoting *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004)). Plaintiffs thus cannot challenge any governmental actions relating to any programs in which they did not participate.

### C. Plaintiffs Do Not Allege Any Agency Action

Review under the APA is available only to challenge an "agency action." 5 U.S.C. § 704. It is "well-settled" that the President is not an "agency" under the APA. *Franklin v. Massachusetts*,

505 U.S. 788, 801 (1992); *Tulare Cnty. v. Bush*, 306 F.3d 1138, 1143 (D.C. Cir. 2002).  Thus, to the extent Plaintiffs are challenging Executive Order 14,169, which is Presidential action, it is unreviewable under the APA.  *See Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1326 (D.C. Cir. 1996) (no APA cause to action to challenge an executive order); 3rd Am. Compl. ¶¶ 53, 55. Thus, Plaintiffs' claims that the President lacked authority to issue the Executive Order, that he relied on insufficient evidence, and that he did not make appropriate findings are not reviewable under the APA.  *See Chamber of Com.*, 74 F.3d at 1326.

Plaintiffs' challenge to the implementation of the Executive Order likewise fails. *First*, an agency action is not reviewable under the APA when a complaint effectively seeks review of the President's action by suing an agency acting on behalf of the President.  *See Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 801 F. Supp. 2d 383, 402 (D. Md. 2011) (concluding that where the Department of State was acting on behalf of the President, its actions were not reviewable under the APA), *aff'd*, 698 F.3d 171 (4th Cir. 2012); *Detroit Int'l Bridge Co v. Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016) ("[s]everal cases have concluded that an agency's action on behalf of the President, involving discretionary authority committed to the President, is 'presidential' and unreviewable under the APA" and concluding that the action by the Department of State on behalf of the President was unreviewable under the APA), *aff'd on other grounds*, 883 F.3d 895 (D.C. Cir. 2018).  While Plaintiffs' claims for relief—except for claims six and ten—artfully avoid naming the President, they cannot evade the settled rule that agency action is not reviewable under the APA when the complaint, in substance, seeks judicial review of the President's actions.

*Second*, Plaintiffs do not identify a discrete action that the defendant agencies here— USAID or State—have taken that is subject to APA review.  Agency actions that can be challenged under the APA are limited to those that are "circumscribed [and] discrete," not merely challenges to an agency's day-to-day activities.  *Norton*, 542 U.S. at 62.  The APA does not permit "programmatic challenges," meaning "challenges that seek 'wholesale improvement' of an agency's programs by court decree." *Ala.-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484,

490 (5th Cir. 2014) (quoting *Sierra Club v. Peterson*, 228 F.3d 559, 566 (5th Cir. 2000)); *Am. Forest Res. Council v. United States*, 77 F.4th 787, 805 (D.C. Cir. 2023) (rejecting a "blunderbuss challenge" in which the plaintiffs "complain not that the Secretary failed to take a specific action but rather that she failed to carry out the . . . Act's general directives"), *cert. denied* 144 S. Ct. 1110 (2024).

Here, Plaintiffs' complaint does not challenge a discrete agency action.  Rather, Plaintiffs argue that Defendants' "dismantling of USAID" is a final agency action because Defendants have cancelled programs, eliminated offices, and terminated employees.  3rd Am. Compl. ¶¶ 3, 74-82. This is the exact type of broad programmatic or "blunderbuss" challenge that is impermissible under the APA.  *Am. Forest Res. Council*, 77 F.4th at 805.

## D.  Defendants Have Not Acted Contrary to Law (Claim Seven)

Plaintiffs argue that the "abolishment" of USAID is contrary to law.  They contend that Defendants have violated the FY 2024 Appropriations Act and Continuing Resolutions.  3rd Am. Compl. ¶ 172.   They also invoke FARRA to argue that Congress has not exercised its authority to undo its own establishment of USAID.  Plaintiffs also seek to rely on the FAA for the proposition that Congress has assigned specific responsibilities to USAID that have not been revoked. *Id.*

But Defendants did not act contrary to any of these laws.  Contrary to Plaintiffs' contention, the Executive Branch has not abolished USAID, and Congress did not foreclose USAID's reorganization by appropriating specific funds to USAID in the FY 2024 Appropriations Act. While the 2024 Act provided that certain funds were to be apportioned to USAID, Congress separately authorized the transfer of those funds to the State Department or other agencies to implement programs for which USAID is responsible.  *See, e.g.*, 22 U.S.C. § 2392(a) (authorizing the President to "allocate or transfer to any agency of the United States Government any part of any funds available for carrying out the purposes of [the FAA]"); *id.* § 2392(b) (authorizing "[a]ny officer of the United States Government carrying out functions under [the FAA to] utilize the services (including defense services) and facilities of, or procure commodities, defense articles,

or military education and training from, any agency of the United States Government as the President shall direct, or with the consent of the head of such agency"); *see also* 31 U.S.C. § 1531(a) (authorizing the transfer of funds from one agency to another "to finance or discharge a function or activity transferred or assigned under law from one executive agency to another").

As for the issue of whether Defendants' congressional notifications met the requirements set forth in the FY 2024 Act, that is a political question. *See Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 319 (D.C. Cir. 1988). The notification provisions are for the benefit of Congress, and it is up to Congress to determine whether they are satisfied. If they are not, Congress has tools at its disposal to ensure compliance. But the federal courts have no role in that back-and-forth to superintend Congress's judgment about these matters. Instead, this is precisely sort of statutory condition that is not privately enforceable. *See Norton*, 542 U.S. at 67 ("The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with [] congressional directives is not contemplated by the APA.").

Plaintiffs are also incorrect that Defendants violated FARRA by reorganizing USAID. Plaintiffs' Third Amended Complaint is unclear about why Plaintiffs believe Defendants violated FARRA, but in a few places, Plaintiffs cite Section 1413 of FARRA, which recognized USAID as an "independent establishment." 3rd Am. Compl. ¶¶ 172, 194; 22 U.S.C. § 6563. An "independent establishment" is defined, in relevant part, as an entity "in the executive branch" that is "not an Executive department" or "part thereof." 5 U.S.C. § 104(1). In other words, USAID is "independent" in the sense that it is not part of another Executive Branch agency, but it is still firmly within Executive Branch control. This status does not say anything about what functions or personnel the agency must retain. Nor does this status require USAID to remain independent of direction by the Secretary of State. To the contrary, FARRA placed the USAID Administrator "under the direct authority and foreign policy guidance of the Secretary of State." 22 U.S.C. § 6592. USAID thus is still an "independent establishment" consistent with FARRA and retains personnel who carry out the agency's remaining functions, including any statutory responsibilities.

Plaintiffs similarly err in invoking FARRA's 60-day period for USAID's reorganization. *See* 3rd Am. Compl. ¶ 34. Plaintiffs emphasize that FARRA directed the President to decide how to reorganize USAID within 60 days, but that provision did not create a sole, one-time opportunity for agency reorganization that expired in 1998. Read in context, that provision directed the President to timely weigh in on options for the reorganization of USAID pursuant to the authorities and requirements in FARRA, thereby ensuring that the President would play a central role in restructuring foreign affairs agencies within the Executive Branch. FARRA, however, does not limit the President from taking future action in this area. In other words, the 60-day provision may have created a limited window for the President to reorganize USAID *pursuant to FARRA*, but it did not constrain the President's ability to reorganize USAID more generally. And under the FAA, the President has authority to "exercise any functions conferred upon him by this [Act] through such agency or officer of the United States as he shall direct," 22 U.S.C. § 2381, and to administer aid programs "on such terms and conditions as [the President] may determine." *Id.* § 2151b(c)(1). Nowhere did Congress preclude future Presidential reorganizations of USAID.

A contrary interpretation would be inconsistent with the stated goals of FARRA. FARRA expressly *authorized* the President to reorganize foreign affairs agencies, including to transfer USAID's functions to the State Department. It would turn that authorization on its head to conclude that Congress thereby implicitly *prohibited* future reorganization efforts to achieve similar efficiency gains. By consolidating agencies with overlapping functions, Congress sought "to strengthen . . . the leading role of the Secretary of State in the formulation and articulation of United States foreign policy" and "to consolidate and reinvigorate the foreign affairs functions of the United States *within the Department of State*." *Id.* § 6501(1), (2) (emphasis added). Congress aimed to do so, in part, by "providing for the reorganization of the Department of State to maximize the efficient use of resources, which may lead to budget savings, eliminated redundancy in functions, and improvement in the management of the Department of State." *Id.* § 6501(2)(C). Congress therefore set a floor for efficiency gains, including at USAID. *See id.* § 6581(b) (requiring, "at a minimum, for the transfer to and consolidation with the Department of State" of

certain USAID functions). FARRA has never been understood to restrain future Administrations from working to achieve those same goals through additional reorganization efforts.

Historical practice confirms that FARRA contains no such limitation. For example, in 2006, President Bush undertook a "major transformation in the U.S. government's procedures for directing and managing foreign assistance programs." GAO, *Foreign Aid Reform: Comprehensive Strategy, Interagency Coordination, and Operational Improvements Would Bolster Current Effort*, GAO-09-192 at 1 (2009), https://www.gao.gov/assets/gao-09-192.pdf. Those reforms created a new Bureau of Foreign Assistance at the State Department to improve the coordination of foreign aid. CRS, *Foreign Aid Reform: Issues for Congress and Policy Options*, RL34243 at 11 (2009), https://perma.cc/C28M-2DCC. They also eliminated certain USAID offices, transferring those functions and some staff from USAID to the State Department. Had FARRA prohibited future Administrations from reorganizing USAID, President Bush's efforts to do so would have been contrary to statute. But that clearly was not the case. *See* CRS, *Restructuring Foreign Aid: The Role of the Director of Foreign Assistance in Transformational Development*, RL33491 (2007), https://perma.cc/VSF8-F784 ("[T]he current restructuring requires no legislative action."); George Ingram, *Institutional Architecture of U.S. Foreign Aid*, at 2 (Global Economy and Development, Brookings Institute 2017), https://perma.cc/WYM3-KYJT (highlighting the 2006 reforms as demonstrating the President's "wide latitude in how they structure foreign assistance"). Furthermore, Congress expressly confirmed in the FY 2024 Appropriations Act that the President retains authority to reorganize USAID—consistent with a long line of statutes that have required only congressional consultation and notification for reorganization of the Department of State and USAID. *See, e.g.*, FY 2024 Appropriations Act, 138 Stat. at 766, § 7015(a) (including a congressional notification requirement to "create, close, reorganize, downsize, or rename bureaus, centers, or offices"); *id.* at 843-44, § 7063(a), (b) (recognizing that the President retains authority to reorganize USAID, providing that appropriated funds may not be used to "implement a reorganization [or] redesign" of USAID without "prior consultation" with Congress, including actions to "eliminate" or "consolidate" USAID or "transfer" its authorities "to other agencies");

22 U.S.C. § 2381 (authorization to exercise FAA functions "through such agency or officer" as the President "shall direct").

In contrast, where Congress intends to foreclose significant reorganizations of Executive Branch entities, it does so explicitly.  For example, when Congress transferred the U.S. Coast Guard to the Department of Homeland Security, Congress provided that the Coast Guard "shall be maintained as a distinct entity" and that generally no "function" of the Coast Guard "may be diverted to the principal and continuing use of any other organization, unit, or entity of the Department." Homeland Security Act of 2002, Pub. L. No. 107-296, § 888(b)–(d), 116 Stat. 2135, 2249, codified at 6 U.S.C. § 468(b)–(d); *see also, e.g.*, Reorganization Act of 1977, Pub. L. No. 95-17 § 905, 91 Stat. 29, 31 (prohibiting "abolishing or transferring an executive department or independent regulatory agency, or all the functions thereof").  Congress included no such limitation on the transfer of USAID's functions in FARRA or any other statute.

### E.  Defendants Did Not Act Arbitrarily and Capriciously as to Reorganizing USAID And Its Programs (Claims Seven and Eight)

Plaintiffs argue that Defendants' purported "decision[s] to abolish USAID" and to "shut down foreign-assistance programs, initiatives, offices, and partnerships" are arbitrary and capricious.  3rd Am. Compl. ¶¶ 176-186, 198-206.  These claims should be dismissed.  The arbitrary and capricious standard is "[h]ighly deferential," "presumes the validity of agency action," *see Nat'l Ass'n of Clean Air Agencies*, 489 F.3d at 1228 (citation omitted), and directs the reviewing court not to "substitute its judgment for that of the agency."  *Fox*, 556 U.S. at 513. Given that "reasonableness is a zone, not a pinpoint," *Wisc. Pub. Power, Inc. v. FERC*, 493 F.3d 239, 266 (D.C. Cir. 2007) (per curiam), Plaintiffs necessarily lack plausible allegations that Defendants did not act reasonably in reorganizing USAID or in terminating some programs.

Here, all of Plaintiffs' arbitrary and capricious arguments have been fully addressed in the administrative record in *AFSA.  See* Decl. of Pete Marocco, No. 1:25-cv-352, ECF No. 20-1;

Administrative Record, ECF No. 85.[5]  That record demonstrates the agency acted reasonably, justified their actions, and considered reliance interests and reasonable alternatives.

## III.    PLAINTIFFS' ADDITIONAL CONSTITUTIONAL CLAIMS FAIL

### A.    Plaintiffs Fail to State Claims for Violations of the Separation of Powers Doctrine (Claims Seven and Ten)

Plaintiffs allege that the reorganization of USAID and the Executive Branch's decisions related to appropriations violate "the separation of powers." *See* 3rd Am. Compl. ¶¶ 162-67 (Sixth Claim for Relief); *id.* ¶¶ 191-96 (Tenth Claim for Relief).  In their view, Defendants violated the separation of powers by "refusing to obligate foreign-assistance funds that Congress has appropriated in the amounts and for the purposes that Congress directed," *id.* ¶ 167, and by "abolishing USAID and purporting to transfer some of its statutory responsibility to the State Department, without congressional authorization." *Id.* ¶ 196.

But that argument is nothing more than a recasting of Plaintiffs' statutory arguments; thus, those claims are foreclosed by *Dalton*.  There, an appellate court had "reasoned, relying primarily on *Youngstown* . . . that whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." 511 U.S. at 471.  The Supreme Court reversed, as their prior cases "do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472.  Instead, the High Court "often distinguished between claims of

---

[5] The Court can judicially notice the docket of in *AFSA*.  "The Court may review evidence considered in an opinion that is judicially noticed, without necessitating the re-presentment of such evidence." *Murphy v. Islamic Republic of Iran,* 740 F. Supp. 2d 51, 59 (D.D.C. 2010) (citing *Estate of Heiser v. Islamic Republic of Iran,* 466 F.Supp.2d 229,  264 (D.D.C. 2006)). The Court may take judicial notice of another court's proceedings. *See Jenson v. Huerta,* 828 F.Supp.2d 174, 179 (D.D.C. 2011) ("The court may take judicial notice of public records from other court proceedings." (quoting *Lewis v. Drug Enforcement Admin.,* 777 F.Supp.2d 151, 159 (D.D.C.  2011))); *Akers v. Watts,* 589 F. Supp. 2d 12, 15 (D.D.C. 2008) (taking "judicial notice of the records of this Court and of other federal courts"); *Donelson v. U.S. Bureau of Prisons*, 82 F.Supp.3d 367, 371 (D.D.C. 2015) ("The court may take judicial notice of another court's proceedings" when considering a Rule 12(b)(6) motion.), *aff'd sub nom. Donelson v. Fed. Bureau of Prisons*, No. 15–5136, 2015 WL 9309944 (D.C. Cir. Dec. 7, 2015).

constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* Therefore, "claims simply alleging that the President [or an executive officer] has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review." *Id.* at 473. The Court should thus dismiss Plaintiffs' asserted constitutional claims.

Further, the separation of powers does not generally constrain how the President organizes the Executive Branch, reflecting "the well-established rule that the Government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs.'" *See Sampson v. Murray*, 415 U.S. 61, 83 (1974) (citation omitted). Indeed, as discussed above, many statutes authorize the President to organize the administration of foreign aid. Moreover, Article II of the Constitution gives the President a "vast share of responsibility for the conduct of our foreign relations." *Garamendi*, 539 U.S. at 414 (citation omitted).[6] The President exercises that authority by, among other things, ensuring that the Executive Branch is well organized to properly administer foreign aid. Such actions are intertwined with diplomacy and foreign relations, which fall within the "plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319-20 (1936).

In short, Plaintiffs challenge a general policy initiated by the President—and implemented by his subordinates—to pause foreign aid to confirm that those initiatives were within the national interest. That fits comfortably within the Executive Branch's unique expertise and constitutional

---

[6] *See also, e.g.*, *Schneider v. Kissinger*, 412 F.3d 190, 195 (D.C. Cir. 2005) ("It cannot [] be denied that decision-making in the areas of foreign policy and national security is textually committed to the political branches."); *Bancoult v. McNamara*, 445 F.3d 427, 433 (D.C. Cir. 2006) ("[A]n extensive list of constitutional provisions [] entrusted foreign affairs and national security powers to the political branches."); *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("[T]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative.''); *Johnson v. Eisentrager*, 339 U.S. 763, 789 (1950) (noting that the President is "exclusively responsible" for "conduct of diplomatic and foreign affairs"); *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952) (matters relating "to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference").

role; and it is the sort of conduct that a federal court should refrain from disrupting, absent a valid and binding direction to the contrary.  Indeed, ruling in favor of Plaintiffs would create a different constitutional problem: the Court would superintend an agency by declaring the sum of agency actions unconstitutional, which would itself create separation of powers concerns.

### B.  Plaintiffs' Take Care Clause Claim Fails

Embedded in their Sixth and Seventh Claims for Relief, Plaintiffs allege that "the President must take care to faithfully execute the laws," including (1) "appropriations acts," 3rd Am. Compl. ¶ 165, and (2) "laws establishing executive agencies." *Id.* ¶¶ 173, 195.  But that is nothing more than an attempt to circumvent the limitations of the APA by asserting a broad programmatic attack against the President under the Take Care Clause, U.S. Const. art. II, § 3.  *See id.* ¶¶ 165, 173, 195.

That effort fails as a matter of law.   Like their separation of powers claim, this claim is foreclosed by *Dalton* since it is a mere statutory violation dressed up in constitutional garb. Plaintiffs cannot prevail on their Take Care Clause claim because the Clause does not provide a cause of action against the President or any other Defendant, and this Court has no jurisdiction to issue declaratory or injunctive relief against the President in his official capacity, whether or not based on constitutional claims.  *See Dalton*, 511 U.S. at 473; *Mississippi v. Johnson*, 71 U.S. at 501 (1867) ("this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties"); *Franklin*, 505 U.S. at 802-03; *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him, and have never submitted the President to declaratory relief." (citation omitted)).

Through the Take Care Clause, the Constitution vests broad, discretionary authority to "take Care that the Laws be faithfully executed" by the President.  U.S. Const. art. II, § 3.  The Clause, however, does not open the door to any plaintiff seeking to challenge the way the President executes Congress's laws.   Rather, as the Supreme Court has recognized, the duty of the President when exercising his power to see that the laws are faithfully executed is "purely executive and political," and not subject to judicial direction. *Mississippi*, 71 U.S. at 499; *see Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165–66 (1803) ("[T]he President is invested with certain

important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character."). To hold otherwise would upset our constitutional scheme of separation of powers and allow judicial superintendence over the exercise of Executive power that the Clause commits to the President alone. *Dalton*, 511 U.S. at 474–75 (judicial review of discretionary Presidential decisions "is not available"); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 577 (1992) (holding that it would be improper for the courts to take over the President's duty to "take Care that the Laws be faithfully executed" (quoting U.S. Const. art. II, § 3)); *Marbury*, 5 U.S. (1 Cranch) at 170 ("The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion[,]" and political questions "can never be made in this court."); *Chi. & S. Air Lines*, 333 U.S. at 114 (refusing to review President's decision that "embod[ied] Presidential discretion as to political matters beyond the competence of the courts to adjudicate"); *Mississippi*, 71 U.S. at 499.

Nor does the Take Care Clause provide a basis to review the actions of subordinate Executive Branch officials. The Clause speaks only to the President, not to his subordinates, and ensures that the President is principally responsible for the actions of the Executive Branch and directly accountable to the people through the political process. *See Free Enter. Fund v. Pub. Co. Acct. Bd.*, 561 U.S. 477, 492–93 (2010) ("It is *his* responsibility to take care that the laws be faithfully executed."); *id*. at 495–97. Thus, any claim against subordinate officials cannot proceed under the Take Care Clause, but must be brought, if at all, through the APA, which in this case presents separate insurmountable obstacles for Plaintiffs. This is particularly so here because Plaintiffs seek to rely on violations of purported duties that are found nowhere in the statutes related to USAID themselves, but rather, are based on Plaintiffs' subjective political views about how to best implement and administer USAID. *See, e.g.*, 3rd Am. Compl. ¶ 84.

IV.    **THE *ULTRA VIRES* CLAIM IS NOT PLAUSIBLY ALLEGED (CLAIMS FOUR, NINE, FOURTEEN, SEVENTEEN)**

Plaintiffs' *ultra vires* claims—*see* 3rd Am. Compl. ¶¶ 152-56 (Claim for Relief Four); ¶¶ 187-190 (Claim for Relief Nine); ¶¶ 223-27 (Claim for Relief Fourteen); ¶¶ 238-242 (Claim for Relief Seventeen)—fail to state a claim. The D.C. Circuit already held that Plaintiffs' *ultra vires* claim—that "defendants have exceeded their statutory authority" in relation to the ICA—is unavailable because Plaintiffs could "point to no specific prohibition that defendants have violated to an extreme and nearly jurisdictional degree." *GHC*, 153 F.4th at 20. In the Court's view, Plaintiffs' *ultra vires* claims were nothing more than "basically dress[ing] up a typical statutory-authority argument as an ultra vires claim." *Id.* at 21 (*NRC*, 605 U.S. at 682).

Plaintiffs' *ultra vires* claims are similarly foreclosed. *Ultra vires* review is "a doctrine of last resort," *Schroer v. Billington*, 525 F. Supp. 2d 58, 65 (D.D.C. 2007), "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *NRC*, 605 U.S. at 681-82. The strict limitations on non-statutory review are "nearly insurmountable." *DOJ v. FLRA*, 981 F.2d 1339, 1343 (D.C. Cir. 1993). Any overstep by an agency must amount to a "clear departure by the [agency] from its statutory mandate" or be "blatantly lawless." *Oestereich v. Selective Serv. Sys. Loc. Bd. No. 11*, 393 U.S. 233, 238 (1968). The violation must be "so extreme that one may view it as jurisdictional or nearly so," and the "prohibition at issue must confer rights upon the individual seeking ultra vires review." *GHC*, 153 F.4th at 20 (citation omitted).

Here, the *ultra vires* claims fail both because the D.C. Circuit held that an almost identical iteration of Plaintiffs' *ultra vires* claim was not likely to succeed, *see GHC*, 153 F.4th at 20-21, and because even if that were not the case, the claims would fail on their merits for the same reasons as those described above as to the APA, given that "if the plaintiff's claims would have failed under the APA, then those same claims necessarily 'could not succeed under' *ultra vires* review, which has an even 'narrower scope.'" *See Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 766 (D.C. Cir. 2022) (quoting *Trudeau v. FTC*, 456 F.3d 178, 190 (D.C. Cir. 2006)). As in the prior iteration of Plaintiffs' case before the D.C. Circuit and in *NRC*, Plaintiffs' claims here

are a transparent "common maneuver" that basically seek to "dress up a typical statutory-authority argument as an ultra vires claim." 605 U.S. at 682.

## V. THE MANDAMUS CLAIMS ARE NOT PLAUSIBLY ALLEGED (CLAIMS FIVE AND EIGHTEEN)

The Third Amended Complaint seeks mandamus relief requiring Defendants to carry out their "clear dut[ies]" to spend appropriations for foreign aid programs. 3rd Am. Compl. ¶¶157-61 (Fifth Claim for Relief), ¶¶ 243-47 (Eighteenth Claim for Relief). But the Supreme Court has already held in its stay order that Defendants made a "sufficient showing that mandamus relief is unavailable" for Plaintiffs' prior claims that are more focused than the generalized claims in the Third Amendment Complaint. *Dep't of State*, 146 S. Ct. at 19. The Supreme Court's reasoning thus forecloses the nebulous—and thus even weaker—clams in the Third Amended Complaint.

Mandamus is "one of the most potent weapons in the judicial arsenal," *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 380 (2004) (citation omitted), and a "drastic" remedy that is "invoked only in extraordinary circumstances." *See Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002) (citation omitted). The mandamus plaintiff must plausibly allege "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff." *In re Nat'l Nurses United*, 47 F.4th 746, 752 n.4 (D.C. Cir. 2022) (citation omitted). Plaintiffs have not plausibly alleged those elements, and their claims also fail for the same reasons they fail to state a failure to act or unreasonable delay claim under the APA, as discussed above.

*First*, Plaintiffs do not have a clear right to relief. 28 U.S.C. § 1361 provides "original jurisdiction" in this Court "of any action in the nature of mandamus to compel" a Federal officer "to perform a duty *owed to the plaintiff*" (emphasis added). But the purported duty owed to the particular plaintiff must "be clear and compelling." *13th Reg. Corp. v. Dep't of the Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980). Here, Plaintiffs contend that the Constitution, via the ICA and the Anti-Deficiency Act, create a generalized duty to carry out congressionally mandated foreign

assistance programs. 3rd Am. Compl. ¶¶ 132, 230-31, 235; Prayer at ¶ 8. But the Anti-Deficiency Act creates no such duty, and as explained above, neither does the ICA.

*Second*, Defendants do not have a clear duty to act. Mandamus is "inappropriate except where a public official has violated a 'ministerial' duty." *Consol. Edison Co. v. Ashcroft*, 286 F.3d 600, 605 (D.C. Cir. 2002); *see Wilbur v. U.S. ex rel. Kadrie*, 281 U.S. 206, 218-19 (1930). But the challenged actions here are not ministerial duties, given the Executive Branch's constitutional and statutory discretion in making foreign assistance funding decisions. For example, the ICA "does not impose any specific requirements on the Executive Branch as to the rate at which budget authority must be obligated or expended." *In re Henry M. Jackson*, U.S. Senate, B-200685, 1980 WL 14499 (Comp. Gen. Dec. 23, 1980).

Plaintiffs' reliance (3rd Am. Compl. ¶¶ 160, 246) on *In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013) (Kavanaugh, Cir. J.), is misplaced. There, the D.C. Circuit issued a writ of mandamus directing the Nuclear Regulatory Commission (NRC) to "promptly continue" proceedings on the Department of Energy's application for authorization to store nuclear waste at Yucca Mountain. 725 F.3d at 267. The D.C. Circuit rejected the NRC's contention that, because Congress had not appropriated sufficient funds for the agency to complete that process, NRC could "shut down its review and consideration" of the application. *Id.* at 258. Significantly, a substantive law—the Nuclear Waste Policy Act—mandated the Commission "shall consider" the application and "'shall issue a final decision approving or disapproving'" the application within three years of its submission. *Id.* at 257-58 (quoting 42 U.S.C. § 10134(d)). But here, there is no similar statutory mandate requiring Defendants to act in the manner Plaintiffs desire.

## CONCLUSION

For the reasons stated, Defendants' Motion to Dismiss should be granted, the Third Amended Complaint should be dismissed with prejudice, and these suits should be dismissed in full.

Dated: January 23, 2026                    Respectfully submitted,

                                           BRETT A. SHUMATE
                                           Assistant Attorney General
                                           Civil Division

                                           YAAKOV M. ROTH
                                           Principal Deputy Assistant Attorney General
                                           Civil Division

                                           ERIC J. HAMILTON
                                           Deputy Assistant Attorney General
                                           Civil Division

                                           ALEXANDER K. HAAS
                                           Director
                                           Federal Programs Branch

                                           JEAN LIN
                                           Special Litigation Counsel
                                           Federal Programs Branch

                                           */s/ Pierce J. Anon*
                                           J. STEPHEN TAGERT
                                           PIERCE J. ANON
                                           Trial Attorneys
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           P.O. Box 883
                                           Washington, DC 20044
                                           Phone: (202) 305-7573
                                           Email: pierce.anon@usdoj.gov

                                           *Counsel for Defendants*