**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| GLOBAL HEALTH COUNCIL, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-cv-402 (AHA) |
| DONALD J. TRUMP, *et al.*, | |
| *Defendants*. | |

## <u>PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................................1

BACKGROUND .................................................................................................................3

    A.  Congress Establishes USAID as an Independent Agency and Appropriates Funding for Foreign Assistance ................................................................................................3

    B.  The New Administration Takes Office and Decides Not to Administer Foreign Aid Spending and Programs as Congress Directed ..................................................5

    C.  Defendants Abolish USAID ..............................................................................6

    D.  Defendants Eliminate USAID and State Programs and Initiatives.....................7

    E.  Defendants Refuse to Properly Obligate Expiring Funds...................................8

    F.  The Third Amended Complaint .........................................................................10

ARGUMENT ......................................................................................................................10

I.  THE COMPLAINT STATES CLAIMS FOR DEFENDANTS' FAILURE TO OBLIGATE FUNDS ......................................................................................................10

    A.  Plaintiffs' Funding Claims Are Not Moot. ......................................................10

    B.  The ICA Does Not Preclude Plaintiffs' APA Funding Claims.........................14

        1. The Supreme Court's Stay Order Does Not Foreclose the Claims...............14

        2. Defendants' Preclusion Theory Is Wrong.....................................................17

    C.  Defendants' Funding Mandates Are Not Committed to Agency Discretion....................22

    D.  The Challenged Funding Decisions Are Subject to APA Review.....................23

    E.  Plaintiffs Challenge Discrete Agency Actions .................................................23

    F.  Defendants' Decisions Not to Spend Funds Are Contrary to Law....................24

    G.  Defendants' Decisions Not to Spend Funds Are Arbitrary and Capricious ....................27

    H.  Plaintiffs Have Stated a Claim for Agency Action Unlawfully Withheld or Unreasonably Delayed ........................................................................................28

    I.  Plaintiffs Have Stated a Claim That Defendants' Failure to Obligate Funds in the Special Message Is Unlawful.........................................................................28

J.   Defendants Must Now Obligate the Funds Included in the Special Message ...................30

II.   THE COMPLAINT STATES CLAIMS FOR UNLAWFULLY ABOLISHING USAID AND ELIMINATING ITS PROGRAMS, INITIATIVES, AND BUREAUS .................................31

A.   Plaintiffs Have Standing to Challenge the Abolishment of USAID..................................31

B.   Plaintiffs Have Standing to Challenge the Elimination of Any Programs, Initiatives, and Bureaus For Which They Compete.....................................................................................34

C.   Plaintiffs May Challenge the Discrete Decision to Abolish USAID and its Programs and Initiatives..........................................................................................................................35

D.   Plaintiffs Have Stated Claims That Abolishing USAID Is Unconstitutional ..................36

E.   Plaintiffs Have Stated a Claim That Defendants' Abolishment of USAID and Elimination of Its Programs Was Arbitrary and Capricious..................................................................42

III.   THE COMPLAINT STATES CLAIMS FOR ULTRA VIRES AGENCY ACTION ............44

IV.   THE COMPLAINT STATES A CLAIM FOR MANDAMUS ...............................................45

CONCLUSION..............................................................................................................................45

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abbott Laboratories v. Gardner*,
    387 U.S. 136 (1967) ................................................................................. 17

*American Foreign Service Ass'n v. Trump*,
    792 F. Supp. 3d 116 (D.D.C. 2025) .......................................................... 33

*Berrigan v. Sigler*,
    499 F.2d 514 (D.C. Cir. 1974) .................................................................. 15

*Block v. Community Nutrition Inst.*,
    467 U.S. 340 (1984) ........................................................................... 17, 20

*Bostock* v. *Clayton Cnty., Georgia*,
    590 U.S. 644 (2020) ........................................................................... 19, 29

*Buckley v. Valeo*,
    424 U.S. 1 (1976) ...................................................................................... 37

*Camp v. Pitts*,
    411 U.S. 138 (1973) .................................................................................. 42

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
    601 U.S. 416 (2024) .................................................................................. 24

*Chafin v. Chafin*,
    568 U.S. 165 (2013) .................................................................................. 10

*City of Houston v. Dep't of Hous. & Urban Dev.*,
    24 F.3d 1421 (D.C. Cir. 1994) .................................................................. 13

*City of New Haven v. United States*,
    809 F.2d 900 (D.C. Cir. 1987) .................................................................. 20

*City of New York v. Ruckelshaus*,
    358 F. Supp. 669 (D.D.C. 1973) ............................................................... 18

*Clarke v. United States*,
    915 F.2d 699 (D.C. Cir. 1990) .................................................................. 10

*Clinton v. City of New York*,
    524 U.S. 417, 437 (1998) .......................................................................... 29

*Coal. of MISO Transmission Customers v. FERC*,
    45 F.4th 1004 (D.C. Cir. 2022) ................................................................. 35

*Cobell v. Norton*,
240 F.3d 1081 (D.C. Cir. 2001) ........................................................................... 23

*CSL Plasma Inc. v. CBP*,
33 F.4th 584 (D.C. Cir. 2022) ............................................................................. 21

*Dalton v. Specter*,
511 U.S. 462 (1994) ................................................................................. 2, 39, 40

*Del Monte Fresh Produce Co. v. United States*,
570 F.3d 316 (D.C. Cir. 2009) ........................................................................... 12

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ........................................................................... 22, 32, 34

*Dep't of State v. Aids Vaccine Advoc. Coal.*,
146 S. Ct. 19 (2025) ..................................................................................... 9, 14

*Diamond Alternative Energy, LLC v. EPA*,
606 U.S. 100 (2025) .................................................................................... 33, 34

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ........................................................................................... 27

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ........................................................................................... 43

*Flaherty v. Bryson*,
850 F. Supp. 2d 38 (D.D.C. 2012) ...................................................................... 33

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .................................................................................... 23, 35

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) .................................................................................... 37, 42

*Freytag v. Comm'r*,
501 U.S. 868 (1991) ........................................................................................... 37

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ........................................................................................... 11

*Global Health Council v. Trump*,
153 F.4th 1, 19 (D. Cir. 2025) .............................................................. 19, 30, 40, 41

*Global Health Council v. Trump*,
2025 WL 2537200 (D.C. Cir. Aug. 28, 2025) ........................................... 40, 44, 45

*Guadamuz v. Ash*,
368 F. Supp. 1233 (D.D.C. 1973) ....................................................................... 18

*In re Aiken Cnty.,
   725 F.3d 255 (D.C. Cir. 2013) .................................................................... 24, 25, 45

Ipsen Biopharmaceuticals, Inc. v. Becerra,
   678 F. Supp. 3d 20 (D.D.C. 2023) ................................................................. 33, 34

Japan Whaling Ass'n v. Am. Cetacean Soc.,
   478 U.S. 221 (1986) ............................................................................................. 24

Kendall v. United States ex rel. Stokes,
   37 U.S. (12 Pet.) 524 (1838) ............................................................................... 18

Lexmark Int'l, Inc. v. Static Control Components, Inc.,
   572 U.S. 118 (2014) ............................................................................................. 32

Lincoln v. Vigil,
   508 U.S. 182 (1993) ............................................................................................. 22

Louisiana v. Weinberger,
   369 F. Supp. 856 (E.D. La. 1973) ...................................................................... 18

Lujan v. Defs. of Wildlife,
   504 U.S. 555 (1992) ............................................................................................. 31

Masek v. United States,
   No. CV 22-03574 (RC), 2024 WL 1240093, at *7 (D.D.C. Mar. 22, 2024) ........... 43

Myers v. United States,
   272 U.S. 52 (1926) ............................................................................................... 37

Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.,
   26 F.4th 960 (D.C. Cir. 2022) ............................................................................. 44

Nat'l Ass'n of Reg'l Councils v. Costle,
   564 F.2d 583 (D.C. Cir. 1977) ............................................................................ 13

Nat'l Council of Cmty. Mental Health Ctrs. v. Weinberger,
   361 F. Supp. 897 (D.D.C. 1973) ........................................................................ 18

Nat'l Treasury Emps. Union v. Vought,
   149 F.4th 762 (D.C. Cir. 2025) ........................................................................... 32

Norton v. Southern Utah Wilderness Alliance,
   542 U.S. 55 (2004) ............................................................................................... 35

Reno v. Cath. Soc. Servs., Inc.,
   509 U.S. 43 (1993) .......................................................................................... 17, 20

Rhode Island v. Trump,
   155 F.4th 35 (1st Cir. 2025) ................................................................................ 32

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
   591 U.S. 197 (2020) ........................................................................................ 40

*Shawnee Tribe v. Mnuchin*,
   984 F.3d 94 (D.C. Cir. 2021) ................................................................... 13, 23

*State Highway Comm'n of Mo. v. Volpe*,
   347 F. Supp. 950 (W.D. Mo. 1972) ............................................................... 18

*Train v. City of New York*,
   420 U.S. 35 (1975) ........................................................................................ 18

*Trump v. Boyle*,
   145 S. Ct. 2653 (2025) .................................................................................. 16

*Walker v. Cheney*,
   230 F. Supp. 2d 51 (D.D.C. 2002) ............................................................... 21

*Weyerhaeuser Co.* v. *U.S. Fish & Wildlife Serv.*,
   586 U.S. 9 (2018) .................................................................................... 17, 22

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579, 585 (1952) ......................................................................... 38, 40

*Zivotofsky v. Kerry*,
   576 U.S. 1 (2015) .......................................................................................... 42


**Statutes**

2 U.S.C. § 681 ....................................................................................... *passim*

2 U.S.C. § 683 ....................................................................................... *passim*

2 U.S.C. § 687 ............................................................................................... 20

5 U.S.C. § 706 ................................................................... 17, 22, 25, 26

5 U.S.C. § 701 ............................................................................................... 22

22 U.S.C. § 6601 .......................................................................................... 36

22 U.S.C. § 6563 ............................................................................................ 3

Department of Transportation Act of 1966, Pub. L. No. 89-670, § 12(c)(1)(A),
   80 Stat. 931 ................................................................................................. 17

Foreign Affairs Reform and Restructuring Act of 1998 § 413, Pub. L. No. 105-277, 112 Stat.
   2681 .............................................................................................................. 36

Full-Year Continuing Appropriations and Extensions Act, 2025, §§ 1101-08, 139 Stat. 9, Pub. L.
   119-4 (Mar. 15, 2025) ................................................................................... 3

Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, tits. II–III, 138 Stat. 460 (2024) .................................................................................................................. passim

**Other Authorities**

1 Supp. Op. O.L.C. 303, 309 (1969) ............................................................................ 24

2 GAO, Principles of Federal Appropriations Law, 6-28 (3d ed. Jan. 2004) .............................. 23

Cong. Rsch. Serv., IF10261.20, U.S. Agency for International Development: An Overview 1 (Updated Sept. 5, 2025) ......................................................................................... 5, 37

Exec. Order No. 14,169 at § 2, 90 Fed. Reg. 8619 (Jan. 20, 2025) ................................................. 3

Further Consolidated Appropriations Act, 2024, Comm. Print of the H. Comm. on Appropriations, Legislative Text and Explanatory Statement (excerpts), Dkt. 125-11 ............. 1

GAO, B-329092 (Dec. 12, 2017) ................................................................................... 24

**Constitutional Provisions**

U.S. Const. Art. I, § 8, cl. 18 ....................................................................................... 36

## INTRODUCTION

Plaintiffs' Third Amended Complaint asserts claims with respect to four categories of unlawful actions: (1) Defendants' decisions not to spend foreign assistance funds in the amounts that Congress required, for the purposes that Congress required (Claims 1 to 6): (2) Defendants' abolishment of USAID as an agency (Claims 7 to 10); (3) Defendants' elimination of specific foreign assistance programs, initiatives, bureaus, and partnerships (Claim 11); and (4) Defendants' disposition of appropriations originally set to expire on September 30, 2025 (Claims 12 to 18). Defendants advance no basis to dismiss the claims in any of these categories.

Regarding the first and fourth categories, related to appropriations, Defendants make a potpourri of arguments for dismissal—nine in total—but most are taken verbatim from arguments Defendants made in prior briefs that this Court correctly rejected. Indeed, because these sections of the motion to dismiss are largely copy-and-pasted from prior briefs, Defendants ignore entire categories of appropriations now at issue, including money appropriated in the 2025 Continuing Resolution set to expire in September 2026 or later, and funds that Defendants obligated in September 2025 but for which Defendants intentionally deviated from congressional directives on the specific purposes for which the money had to be obligated.

The new appropriations-related arguments that Defendants make fall flat as well. Defendants assert that the appropriations claims are moot, but their mootness argument is limited to the unobligated funds in the August 2025 special message, and not the far greater sums in the 2025 Continuing Resolution or those that were obligated just prior to September 30, 2025. Even as to the special message funds, Plaintiffs' claims are not moot because declaratory relief would meaningfully benefit them on conduct likely to recur, because Plaintiffs bring claims that Defendants now have an indefinite duty under 2 U.S.C. 683(b) to obligate the funds, and because

this Court could extend the funds' period of availability. Defendants also argue that the Supreme Court's partial stay order precludes all of Plaintiffs' appropriations claims. But the Court's order was expressly limited to "the appropriations at issue" in the stay request (*i.e.*, the funds subject to the special message), and Defendants relied on arguments specific to the fact that those funds were in a pending rescission proposal. And as to the special message funds, the Court explicitly stated that its order was not a final determination on the merits, which means it cannot be controlling in ruling on a motion to dismiss.

On the abolishment of USAID, Plaintiffs clearly have standing to challenge the demolition of their principal business partner, with which they had forged deep relationships over decades and upon which their businesses financially depended. The abolishment of the agency was a discrete agency action subject to APA review—the State Department formally notified Congress of the elimination of the agency by a date certain—and that agency action was patently arbitrary and capricious. The elimination of USAID, a congressionally created agency, is also unconstitutional. The Necessary and Proper Clause vests Congress, and only Congress, with the power to create federal agencies and define their duties, and the President has no power to abolish an agency by fiat. Rather than refute this principle, Defendants' main merits defense is that there has been only a "re-organization" of USAID. That characterization defies belief given the facts alleged. Defendants also assert that *Dalton v. Specter*, 511 U.S. 462 (1994), forecloses this constitutional claim, but this claim does not rest on asserted violations of particular statutory commands or prohibitions. It is a claim concerning the structural allocation of power under the Constitution. Moreover, unlike in the prior D.C. Circuit appeal, Defendants now present constitutional defenses to this claim, and the D.C. Circuit made clear that a separation of powers claim is reviewable in such circumstances.

Finally, on Plaintiffs' APA challenges to the elimination of specific programs, initiatives, and bureaus, Defendants erroneously suggest that Plaintiffs challenge the elimination of programs and initiatives for which they do not compete. Plaintiffs cabin this claim to the eliminated programs, initiatives, and bureaus for which they would compete for opportunities.

Given that the ongoing harm to Plaintiffs and that the next expiration of funds is just seven months away, Plaintiffs respectfully request that the Court expeditiously deny the motion to dismiss, so that the parties may move promptly to summary judgment proceedings after the production of an administrative record.

## BACKGROUND

### A. Congress Establishes USAID as an Independent Agency and Appropriates Funding for Foreign Assistance

The Court is familiar with the factual background. Founded in 1961, USAID was established to counter the influence of the Soviet Union during the Cold War and to run various foreign-assistance programs based on the idea that American security was tied to stability and economic advancements in other nations. In 1998, Congress formally established USAID as a standalone agency outside the State Department. *See* 22 U.S.C. § 6563(a).

In the Further Consolidated Appropriations Act of 2024 (the "2024 Appropriations Act), Congress appropriated more than $30 billion in non-military foreign assistance funding to USAID and the State Department. Pub. L. No. 118-47, div. F, tits. II–III, 138 Stat. 460, 740–49 (2024). Congress appropriated these funds in Titles III and IV of the law across fifteen broad categories of purposes. Congress did not employ any language giving the agencies discretion to spend less than the full amounts appropriated in any of the fifteen categories. *See id.*

Within the fifteen categories, the 2024 Appropriations Act further specified subcategories of purposes for which USAID and State must obligate specific amounts of funds. *See* Further

3

Consolidated Appropriations Act, 2024, Comm. Print of the H. Comm. on Appropriations, Legislative Text and Explanatory Statement (excerpts), Dkt. 125-11. In Section 7019(a), Congress provided that "funds appropriated by this Act under title III through V *shall be made available in the amounts specifically designated* in the respective tables included in the explanation statement." 138 Stat. at 771 (emphasis added). Those tables include line items with specific amounts that must be obligated for narrowly defined purposes. *See* Dkt. 125-11.

In addition, Sections 7030 to 7061 of the 2024 Appropriations Act prescribe subcategories for which USAID and State must spend minimum amounts of funds. Those sections contain directives that "no less than" particular amounts of funds "shall be made available" for particular foreign aid purposes. For instance, the Act provides that "[o]f the funds appropriated by this Act . . . under the heading 'Democracy Fund,' not less than $5,000,000 shall be made available for democracy and Internet freedom programs for Hong Kong." 138 Stat. at 814. Across Sections 7030 through 7061 and the tables made binding by Section 7019(a), the 2024 Appropriations Act contains roughly 240 subcategories of purposes for which Congress required specific amounts of funds—or "not less than" specific amounts of funds—that "shall be made available" by the agencies.

Many of the line items in the tables referenced in Section 7019(a), and many of the directives in Sections 7030 to 7061, reference specific initiatives, programs, and partnerships for which the appropriations must be used. The Act also calls for specific, concrete actions from USAID and the State Department to implement statutory foreign-assistance programs funded under the Act. The Act also generally prohibits deviation from its funding allocations beyond small, defined amounts without congressional consultation and justification based on case-by-case exigencies. 138 Stat. at 772

On March 15, 2025, Congress enacted a continuing resolution that re-appropriated all of the funds that were appropriated to USAID and the State Department in the 2024 Appropriations Act, on the same terms and conditions as in the 2024 Act. Full-Year Continuing Appropriations and Extensions Act, 2025, §§ 1101-08, 139 Stat. 9, 10-12, Pub. L. 119-4 (Mar. 15, 2025) (the "2025 Continuing Resolution"). Under the continuing resolution, specific programs for which Congress appropriated funds in the 2024 Appropriations Act carry over. The 2025 Continuing Resolution thus appropriated to USAID and the State Department the same levels of funds for the same discrete programs, on the same terms, as did the text of the 2024 Appropriations Act.

### B. The New Administration Takes Office and Decides Not to Administer Foreign Aid Spending and Programs as Congress Directed

On his first day in office, the President issued an executive order purporting to immediately freeze all foreign assistance funding. Exec. Order No. 14,169 at § 2, 90 Fed. Reg. 8619 (Jan. 20, 2025). The order further directed that "no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President." *Id.* The Secretary of State and officials at USAID issued a series of agency memoranda to implement the order, immediately halting the spending of foreign assistance funding. *See, e.g.*, TRO Order at 3–4, Dkt. 21.

In parallel, in early February, Defendants began cutting agency employees and contractors. The State Department shut down all overseas USAID missions, immediately recalling thousands of USAID employees. *Id.* ¶ 67. It placed thousands of USAID employees on administrative leave and "substantially reduced the [agency's] operational capacity" by causing thousands of institutional support contractors and employees of USAID contractors or grantees to be laid off or furloughed. *Id.*

C.      **Defendants Abolish USAID**

On March 10, 2025, Secretary Rubio announced in a post on X that Defendants were "officially cancelling 83% of the programs at USAID." *Id.* ¶ 74. As for the remaining 17% of programs, Defendants "intend for the … programs … to now be administered more effectively under the State Department." *Id.* ¶ 75. On March 28, Defendant Lewin sent a memorandum to all USAID employees announcing that Defendants "will seek to retire USAID's independent operation." *Id.* Lewin wrote that the State Department "intends to assume responsibility for many of USAID's functions and its ongoing programming." *Id.* That same day, nearly all of USAID's remaining 900 employees received notice that they would be subject to a final reduction-in-force, to go into effect on July 1 or September 2. *Id.* ¶ 76.

Also on March 28, the State Department sent a Congressional Notification to Congress expressing its "intent to realign select USAID functions to the Department and to phase out others." *See* Congressional Notification Transmittal Letter, March 28, 2025, at 3, https://perma.cc/8TYS-BGX3 ("March CN"). The State Department stated that "USAID conducted a comprehensive review of its existing programs and awards to assess their alignment with U.S. foreign policy objectives," and that "numerous programs were discontinued" as a result. *Id.* In May 2025, the State Department sent another Congressional Notification indicating that it would eliminate most offices in its Bureau of Democracy, Human Rights, and Labor, including all of its regional offices. Congressional Notification Transmittal Letter, 35-032, at 19, https://perma.cc/3W5R-XK46 ("May CN").

Consistent with these congressional notifications, on July 1, 2025, Secretary Rubio announced that USAID would "officially cease to implement foreign assistance," and USAID officially shut down and ceased forward-looking operations. Cong. Rsch. Serv., IF10261.20,

U.S. Agency for International Development: An Overview 1 (Updated Sept. 5, 2025); Fatma Tanis & Leila Fadel, *USAID Officially Shuts Down and Merges Remaining Operations with State Department*, NPR (July 1, 2025), https://perma.cc/8BA9- XVF4.

### D. Defendants Eliminate USAID and State Programs and Initiatives

Defendants have also eliminated long-established USAID and State Department programs, initiatives, bureaus, and international partnerships on which Plaintiffs have relied and would compete for awards. For example, the "Feed the Future" Initiative was first established in 2010 to help alleviate global poverty and has been credited with lifting 23.4 million people out of poverty, preventing stunting caused by malnutrition in 3.4 million children, and creating opportunities for 5.2 million families who no longer suffer from hunger. Third Am. Compl. ¶ 84. Defendants have fully or largely eliminated the "Feed the Future" initiative, materially curtailing program activity and dismissing or reassigning staff. Defendants have eliminated similarly longstanding initiatives and programs, including USAID's Family Planning and Reproductive Health Initiatives, USAID's entire Education Portfolio, and more. *See id.* ¶¶ 88–99 (providing additional examples).

Defendants have also eliminated bureaus and funds that USAID and State set up to carry out their statutory duties, including Bureaus for Democracy, Human Rights, and Governance; for Conflict Prevention and Stabilization; and for Resilience, Environment, and Food Security. And USAID and State have discontinued providing funding for international partnerships and initiatives including the Global Partnership for Education and more. *Id.* ¶ 98. Plaintiffs have competed or would compete for awards funded from or administered by each of the eliminated programs, initiatives, offices, or partnerships listed in the Third Amended Complaint.

### E.    Defendants Refuse to Properly Obligate Expiring Funds

This Court's first preliminary injunction in this case enjoined Defendants from "unlawfully impounding congressionally appropriated foreign aid funds" and ordered Defendants to "make available for obligation the full amount of funds that Congress appropriated for foreign assistance programs in the Further Consolidated Appropriations Act of 2024." Dkt. 60 at 33, 48. In August 2025, the D.C. Circuit vacated the portion of the Court's preliminary injunction that required Defendants to obligate funds before their September 30, 2025 expiration, holding that Plaintiffs lacked a cause of action to bring their constitutional separation-of-powers claim because it derived from statutory violations.

Within hours of the D.C. Circuit issuing its mandate, the President submitted a rescissions package to Congress seeking to rescind more than $4 billion in expiring foreign aid appropriations, explicitly calling it a "pocket rescission." Dkt. 129. The package targeted funds appropriated in the 2020, 2021, and 2024 Appropriations Acts, including $3.2 billion in development assistance from the 2024 Act and over $600 million from the Democracy Fund.

On August 29, 2025, Plaintiffs moved for a preliminary injunction requiring Defendants to make available for obligation, and obligate by September 30, 2025, all expiring foreign assistance funds appropriated in the 2024 and prior appropriations acts. The motion covered both the $4 billion in the rescissions package and an additional $6.5 billion in expiring funds not included in the proposal. The Court granted the motion on September 3, 2025. Dkt. 139. The government sought a stay of the injunction pending appeal, which this Court and the D.C. Circuit denied. Dkt. 146; Order, No. 25-5317 (Sept. 5, 2025). Defendants then sought a partial stay in the Supreme Court, but only with respect to the $4 billion proposed for rescission. On September 26, the Supreme Court granted a partial stay, writing that, "at this early stage," the Government had made a sufficient showing that the ICA precluded Plaintiffs' APA claims "to enforce the

appropriations at issue here," meaning the $4 billion in the special message for which Defendants had limited their stay request. *Dep't of State v. AIDS Vaccine Advoc. Coal.*, 146 S. Ct. 19 (2025). The Court thus stayed this Court's injunction only "as to the funding subject to the President's August 28 special message." *Id.* Even as to those funds, the Court cautioned that its order "should not be read as a final determination on the merits," but that the relief granted "reflected [its] preliminary view, consistent with the standards for interim relief." *Id.*

Congress never took any action on the President's rescission proposal. No bill to effectuate the proposal was even introduced, and the 45-day period for Congress to pass such a rescission bill has since expired. *See* 2 U.S.C. § 683(b). Defendants have taken the position that Congress's inaction before the September 30, 2025 expiration date means that they may now withhold the full $4 billion included in the rescission proposal. With respect to the $6.5 billion subject to the non-stayed portion of Court's injunction, Defendants represented that they obligated close to that full amount prior to the funds' expirations. Defendants obligated most of these funds through an inter-agency transaction between USAID and the State Department, under which USAID "obligated" the funds to the State Department, and the funds are now parked at the State Department.

Plaintiffs allege that, in obligating that $6.5 billion, Defendants failed to obligate the minimum amounts required to be obligated for specific purposes by Sections 7030–7061 of the 2024 Appropriations Act and prior acts, and instead deliberately minimized compliance with those directives. Defendants did so by attributing appropriations in the pocket rescission proposal to specific Sections 7030–7061 directives—despite no legal requirement to do so—and then asserting that no funds remained available because those amounts were deemed "rescinded," even where other appropriations could have been used to meet the directives. Defendants also

obligated funds through instruments that do not specify their purposes and have provided no explanation of how such instruments satisfy statutory requirements to obligate specified or minimum amounts for designated statutory purposes.

F.      **The Third Amended Complaint**

The Third Amended Complaint asserts claims with respect to four categories of unlawful actions. First, in Claims 1–6, Plaintiffs challenge Defendants' decisions not to spend foreign assistance appropriations in the amounts that Congress required, for the purposes that Congress required, and by the deadlines Congress required. These counts encompass funds appropriated in the 2024 Appropriations Act, the 2025 Continuing Resolution, and in prior appropriations acts. Second, in Claims 7–10, Plaintiffs challenge Defendants' abolishment of USAID. Third, Claims 11 alleges that Defendants' elimination of specific foreign assistance programs, initiatives, bureaus, and partnerships was arbitrary and capricious. Fourth, Claims 12–17 challenge Defendants' disposition of billions of dollars of appropriations at the end of Fiscal Year 2025, with respect both to money they did obligate and money they did not.

## ARGUMENT

I.      **THE COMPLAINT STATES CLAIMS FOR DEFENDANTS' FAILURE TO OBLIGATE FUNDS**

A.      **Plaintiffs' Funding Claims Are Not Moot.**

A case "becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Chafin v. Chafin*, 568 U.S. 165, 172–73 (2013). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id.* Dismissal for mootness is appropriate only if "events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (en

banc). And where Defendants invoke changed circumstances or post-filing conduct, this standard is "stringent": "The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to recur lies with the party asserting mootness." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).

The appropriations at issue in the Third Amended Complaint fall into three buckets: (1) funds originally scheduled to expire later than September 30, 2025, such as funds appropriated in the 2025 Continuing Resolution; (2) funds that were originally scheduled to expire on September 30, 2025 and were obligated before that date; and (3) funds that were originally scheduled to expire on September 30, 2025 and were not obligated before that date.

On the first bucket, Plaintiffs' claims are plainly live with respect to funds whose expiration date is in September 2026 or later. Defendants do not appear to argue otherwise.[1]

Regarding the second bucket, USAID purportedly obligated roughly $6.5 billion in expiring appropriations in the weeks before September 30, 2025, mostly via an interagency agreement with the State Department. Third Am. Compl. ¶ 106. Count 12 alleges that Defendants violated the 2024 Appropriations Act and prior acts in how they obligated these funds, by intentionally minimizing compliance with Congress's directives in §§ 7030–7061. *See id.* ¶¶ 207–16. This claim is not moot because these USAID and State Department appropriations include a unique provision that the funds "shall remain available for obligation for an additional 4 years" beyond their original expiration date if the funds were "initially obligated" before that original expiration date. Pub. L. No. 118-47, div. F, § 7011. Thus, if the Court concludes that

---

[1] Defendants erroneously describe this first bucket as a "smaller subset of funds addressed in the Third Amended Complaint." MTD 4, 13 n.2. These funds include nearly all the funds in the 2025 Continuing Resolution, funds appropriated for the State Department's PEPFAR program in 2022 to 2024, *see, e.g.*, 138 Stat. 742, and funds for which Congress provided no expiration date. Counts 1 to 6 encompass all of these non-expired funds.

Defendants acted unlawfully in how they obligated the funds, the Court may order Defendants to de-obligate and re-obligate the funds consistent with Congress's directives. Defendants do not appear to argue that the claims over these funds are moot either. *See* MTD 12–13.

Defendants' mootness arguments instead appear to focus entirely on the final and smallest bucket of funds—the over $4 billion in funds not obligated before their original expiration date of September 30, 2025. These funds include the roughly $4 billion in appropriations included in the August 28, 2025 special message, as well as any other expiring funds that Defendants did not obligate before September 30, 2025, for impermissible policy reasons (as opposed to the legitimate grounds upon which agencies may not obligate small amounts of expiring funds, *see* Dkt. 139 at 40). Claims 1 to 6 encompass these funds as well, and Claims 13 through 17 focus on the funds included in the August 28, 2025 special message specifically. These claims are not moot for three independent reasons.

First, even if the Court would not extend the period of availability of these funds (*see infra*), in Claims 13 and 14, Plaintiffs seek a declaration that Defendants' failure to obligate these funds by the statutory deadline was unlawful. Declaratory judgment claims do not become moot merely because the "specific conduct" challenged has already come to pass: "a plaintiff's challenge will not be moot where it seeks declaratory relief as to an ongoing policy," and even challenges to "isolated agency action" remain live if they fit "capable of repetition, yet evading review." *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 321 (D.C. Cir. 2009). Here, Defendants do not contend that this pocket rescission was a one-off event; they affirmatively defend the practice as lawful and grounded in historical executive branch practice, confirming that it is an ongoing policy likely to recur at the end of future fiscal years. Given the inherently short window created by transmitting a special message within 45 days of the

expiration of budget authority, Claims 13 and 14 present a recurring controversy that will predictably evade review. A declaratory judgment would afford Plaintiffs concrete relief even if the Court did not compel expenditure of the appropriations in question.

Second, in Claims 15 to 18, Plaintiffs alternatively challenge Defendants' ongoing failure to obligate the funds included in the special message pursuant to 2 U.S.C. § 683(b). Section 683(b) requires an agency to make available for obligation any funds that were proposed to be rescinded but which Congress did not rescind. Where, as here, an agency does not obligate funds by their statutory expiration date on the ground that § 683(b) requires that Congress be given a full 45-day period to consider the proposal, then § 683(b) requires that the funds "shall be made available for obligation" by the agency after that 45-day period runs, even if that is after the funds' statutory expiration date. Accordingly, Claims 15 to 18 are not moot.

Finally, the claims are not moot because this Court has the inherent equitable authority to "simply suspend the operation of a lapse provision and extend" the period of availability for funds beyond their statutory expiration date. *City of Houston v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421, 1426 (D.C. Cir. 1994) (quoting *Nat'l Ass'n of Reg'l Councils v. Castle*, 564 F.2d 583, 588 (D.C. Cir. 1977)). This Court may exercise this power after the original expiration date for funds has passed, so long as Plaintiffs filed their challenge to the failure to spend before that expiration date. *See Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 103 (D.C. Cir. 2021). The possibility that this Court could extend the period of availability for the over $4 billion in funds at issue alone renders Plaintiffs' claims over those funds not moot.

**B.      The ICA Does Not Preclude Plaintiffs' APA Funding Claims**

**1.      The Supreme Court's Stay Order Does Not Foreclose the Claims**

Defendants argue (at 14–15) that the Supreme Court's emergency order, which stayed the portion of this Court's injunction relating to the appropriations in the August rescission proposal, forecloses Plaintiffs from bringing APA claims over *any* failure to obligate funds in violation of an appropriations act, even for funds not included in a recession proposal. It does not.

The Supreme Court's order was expressly cabined to "the funding subject to the President's August 28 special message," and thus did not apply to APA claims relating to appropriations not included in a rescission proposal. *Dep't of State v. Aids Vaccine Advoc. Coal.* (*AVAC*), 146 S. Ct. 19, 19 (2025). Defendants repeatedly emphasized to the Supreme Court that their stay application was "limited to the $4 billion that are the subject of the President's rescission proposal." Stay Appl. at 17 n.4, *AVAC*, No. 25A269. It was for that reason the Supreme Court highlighted that, of the total $10.5 billion funds covered by this Court's preliminary injunction, "$4 billion was proposed to be rescinded in a 'special message' transmitted pursuant to the Impoundment Control Act." *Id.* (citing 2 U.S.C. § 681 et seq.). The Court then held that "[t]he Government, at this early stage, has made a sufficient showing that the Impoundment Control Act precludes respondents' suit, brought pursuant to the Administrative Procedure Act, to enforce *the appropriations at issue here*." *Id.* (emphasis added). The "appropriations at issue here" referred only to the funds in the rescission proposal, as these were the only funds "at issue" in the stay application. Indeed, the Court granted a stay only "as to the funding subject to the President's August 28 special message." 146 S. Ct. at 19.

Defendants' arguments in seeking a stay, moreover, were focused on the unique circumstances of appropriations included in a pending rescission proposal. Defendants

14

repeatedly emphasized that "[t]his case … does not concern an unlawful 'impoundment,' but rather a rescission proposal that comports with the ICA." Stay Appl. at 22, *AVAC*, No. 25A269. And Defendants contended that "claims concerning the effect *of an ICA rescission proposal* are precluded, because they cannot be divorced from the ICA's reticulated procedures and limited remedial mechanisms." *Id.* at 23. Similarly, on the equities, Defendants asserted that the injunction "harms . . . the political process" because it "compromise[s] the ICA's procedures just as Congress is considering the President's rescission package." *Id.* at 4. Especially given that the Supreme Court did not provide any reasoning to support its holding, there is no basis to conclude that the Court's order should (much less must) be read more broadly than the scope of the arguments that Defendants put forward in seeking a stay.

Even as to the $4 billion included in the special message, the Supreme Court's order was expressly (and emphatically) preliminary and therefore does not compel this Court to grant Defendants' motion to dismiss on the merits. The Court's entire reasoning consists of only five sentences in the second half of the first paragraph, beginning with "The Government, at this early stage." *AVAC*, 146 S. Ct. at 19. Within that brief passage, the Court embeds two caveats about the case's procedural posture, followed by two entire sentences admonishing that its decision is preliminary and non-final: "This order should not be read as a final determination on the merits. The relief granted by the Court today reflects our preliminary view, consistent with the standards for interim relief." *Id.*; *see also id.* at 20 (Kagan, J., dissenting) ("To its credit, the majority emphasizes in its order that it has reached only a 'preliminary view' of the issues raised, which should not be read as a 'final determination on the merits.'"). It is blackletter law that a preliminary decision "does not constitute the law of the case . . . and does not limit or preclude the parties from litigating the merits." *Berrigan v. Sigler*, 499 F.2d 514, 518 (D.C. Cir. 1974).

That principle applies with particular force here: the Supreme Court has not included language of this nature caveating their decisions in other emergency docket stay orders over the last year, underscoring that the Court did not intend its order to resolve any legal issue.

That is of particular significance given the different procedural posture of the case now, where Defendants are seeking to conclusively dismiss Plaintiffs' claims. Although the Court has advised that its "interim orders . . . inform how a court should exercise its equitable discretion in like cases," *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025), this is not a like case where this Court is exercising equitable discretion in deciding whether to grant a preliminary injunction. Rather, this Court must assess whether to dismiss on the legal merits, and the Supreme Court's interim order cannot be controlling where it was not "a final determination on the merits." *AVAC*, 146 S. Ct. at 19. For substantially the same reasons, Defendants' citation to Justice Gorsuch's partial concurrence in a different emergency order is inapt. MTD 15 (quoting *Nat'l Institutes of Health* (*NIH*) *v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2663 (2025) (Gorsuch, J., concurring in part and dissenting in part)). There cannot be "vertical stare decisis" where the Court's statements were cabined to the context of a preliminary injunction and included explicit instructions that its "order should not be read as a final determination on the merits." *AVAC*, 146 S. Ct. at 19. Moreover, the Court did not even provide any "reasoning" for its stay order here, much less reasoning that "was clear." *NIH*, 145 S. Ct. at 2663.

Applying the Supreme Court's preliminary stay order to foreclose Plaintiffs' claims would be particularly inappropriate because Plaintiffs have since amended their complaint, changing their claims and legal theories to account for significantly changed factual circumstances. Plaintiffs had originally sought a preliminary injunction to compel Defendants to obligate funds set to expire on September 30, 2025, while the President's special message

remained pending before Congress. Now that the ICA process has concluded and Congress did

not act on the President's special message, there is no concern that (as the Solicitor General told

the Supreme Court) this litigation would "'severely disrupt' the ICA's 'complex and delicate

administrative scheme.'" Stay Appl. at 21, *AVAC*, No. 25A269 (quoting *Block v. Community

Nutrition Inst.*, 467 U.S. 340, 348 (1984)). Indeed, in Claims 15 through 17, Plaintiffs bring new

claims under 2 U.S.C. § 683(b), which arose only *after* the ICA's 45-day period ended and which

have not yet been considered by this Court, much less the Supreme Court.

### 2.    Defendants' Preclusion Theory Is Wrong

On the merits, this Court has correctly held that the ICA does not preclude Plaintiffs'

APA claims that Defendants' actions violate appropriations acts. Dkt. 139 at 11–17.

a. The Supreme Court has "long applied a strong presumption favoring judicial review of

administrative action," including under the APA, "for one suffering legal wrong because of

agency action." *Weyerhaeuser Co.* v. *U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 22 (2018)

(quotations omitted). "[J]udicial review of a final agency action by an aggrieved person will not

be cut off unless there is persuasive reason to believe that such was the purpose of Congress."

*Abbott Laboratories* v. *Gardner*, 387 U.S. 136, 140 (1967). Courts may "find an intent to

preclude such review only if presented with 'clear and convincing evidence.'" *Reno* v. *Cath. Soc.

Servs., Inc.*, 509 U.S. 43, 64 (1993) (quoting *Abbott*, 387 U.S. at 141).

As this Court recognized, nothing in the ICA suggests that Congress intended to displace

the longstanding right of private parties to bring APA suits for appropriations act violations. *See*

Dkt. 139 at 14–15 ("The Court agrees that neither the text of the ICA nor the panel's decision [in

*GHC*] impedes Plaintiffs from bringing an APA action to enforce the appropriations acts."). To

the contrary, the ICA expressly provides that "[n]othing contained in this Act . . . shall be

construed as . . . affecting in any way the claims . . . of any party to litigation concerning any impoundment." 2 U.S.C. § 681(3).

This clear textual command in § 681(3) was enacted against a long history of private plaintiffs successfully challenging the Executive Branch's refusal to comply with an appropriation act's directive to spend money, including under the APA. *See* Dkt. 139 at 14–15. Almost 200 years ago, the Supreme Court approved a writ of mandamus compelling an agency to release appropriated funds, in an action brought by a private party. *See Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524 (1838). Nearly 150 years later, in *Train v. City of New York*, 420 U.S. 35 (1975), the Supreme Court reaffirmed the ability of a private party to compel an agency to comply with a congressional spending mandate, this time through the APA. In *Train*, private plaintiffs brought an APA claim challenging an agency's refusal to spend the full amount of money that Congress directed "shall be allotted" under an appropriations statute. *See City of New York v. Ruckelshaus*, 358 F. Supp. 669, 673 (D.D.C. 1973) (noting that the plaintiffs brought an APA claim). The Supreme Court affirmed the district court injunction compelling the agency to spend the full amounts Congress required.

*Train* was one of a series of cases brought during the Nixon administration where private litigants successfully challenged an agency's refusal to spend appropriations. *See, e.g.*, *State Highway Comm'n of Mo. v. Volpe*, 347 F. Supp. 950, 954 (W.D. Mo. 1972), *aff'd as modified*, 479 F.2d 1099 (8th Cir. 1973) (granting relief under 5 U.S.C. § 706); *Guadamuz v. Ash*, 368 F. Supp. 1233 (D.D.C. 1973); *Louisiana v. Weinberger*, 369 F. Supp. 856 (E.D. La. 1973); *Nat'l Council of Cmty. Mental Health Ctrs. v. Weinberger*, 361 F. Supp. 897 (D.D.C. 1973).

It was against this long history of private parties bringing successful claims to compel the spending of appropriations that Congress made clear that "nothing contained" in the ICA "shall be construed" as "affecting in any way" such claims. 2 U.S.C. § 681(3).

b. Defendants assert that § 681(3) applies only to a party "that may bring litigation." MTD 18 (quoting *Glob. Health Council* (*GHC*) *v. Trump,* 153 F.4th 1, 19 (D.C. Cir. 2025)). But precedent establishes that Plaintiffs "may bring" APA claims for violations of appropriations acts, and "nothing contained" in the ICA "affect[s] in any way" those claims. 2 U.S.C. § 681(3). Indeed, as this Court noted, Defendants previously took the position that plaintiffs "may generally enforce compliance with statutory mandates through suits under the APA." Dkt. 139 at 13 (quoting Resp. to Pet'n for Rehearing En Banc ("En Banc Resp.) at 1, *GHC*, No. 25-5097 (D.C. Cir. Aug. 20, 2025)). In Defendants' own words, nothing in "the ICA . . . affects any 'preexisting right' that 'injured private parties' may have to enforce statutory obligations through a suit under the APA." En Banc Resp. at 15–16, No. 25-5097 (Aug. 20, 2025).

Defendants also suggest that § 681(3) means only that the ICA did not retroactively affect cases pending at the time of the ICA's enactment. MTD 18. But Congress uses clear language when specifying that legislation does not affect pending cases. *See, e.g.*, Department of Transportation Act of 1966, Pub. L. No. 89-670, § 12(c)(1)(A), 80 Stat. 931, 949 ("[T]he provisions of this Act shall not affect suits commenced prior to the date this section takes effect[.]"). It did not use such language in § 681(3).

The Supreme Court has made clear that "[o]nly the written word is the law," and that atextual assumptions and inferences cannot override a statute's plain meaning. *Bostock* v. *Clayton Cnty., Georgia*, 590 U.S. 644, 653 (2020). Defendants cannot reconcile their implied preclusion theory with § 681(3)'s plain text. In any event, here, statutory text and purpose align.

19

As its name suggests, the Impoundment Control Act's overriding purpose was to "control" impoundments. "[T]he ICA was passed at a time when Congress was united in its furor over presidential impoundments." *City of New Haven* v. *United States*, 809 F.2d 900, 906 (D.C. Cir. 1987). Defendants' argument—that Congress in the ICA made it *harder* to challenge and prevent impoundments—contravenes both the ICA's text and core purpose.

c. Defendants nevertheless contend that Congress's creation of a right of action for the Comptroller General impliedly precludes private enforcement suits. MTD 15–17. That argument fails at the threshold because the statutory authorization for Comptroller General suits cannot override the express language of § 681(3), which preserves "the claims . . . of any party to litigation concerning any impoundment." Congress's use of the phrase "*any*" party "suggests an intent to cover more than one party." *FDA* v. *R. J. Reynolds Vapor Co.*, 145 S. Ct. 1984, 1994 (2025) (citation omitted).

The Supreme Court's decision in *Block v. Community Nutrition Institute*, 467 U.S. 340 (1984), is not to the contrary. There, the Court held that where a marketing-order statute sought to ensure "the protection of the producers of milk and milk products" and authorized judicial review at their behest, it impliedly precluded consumer suits. *Id.* at 352. But the mere fact that Congress has authorized suits by the Comptroller General to enforce the ICA does not constitute "clear and convincing evidence" of Congress's "intent to preclude such review" of claims brought by private parties to enforce their rights under other statutes. *Reno*, 509 U.S. at 64.

What's more, the ICA's provision affording a right of action to the Comptroller General cannot be preclusive because the Comptroller General could not, in fact, actually bring suit. The Comptroller General, as an individual Article I official that does not suffer direct injury due to any impoundment, would lack Article III standing to bring suit under 2 U.S.C. § 687. Defendants

appear to share this view; they strongly hinted to the Supreme Court in this case that they do not believe an action by the Comptroller General would be "cognizable," *see* Stay Appl. at 22, and the government has argued that the Comptroller General lacks standing under a functionally identical statutory right of action provision, *Walker v. Cheney*, No. 02-cv-340, (D.D.C. May 21, 2002), ECF 12 at 11. As Judge Bates held in agreeing with the government, the Comptroller General "has no freestanding institutional injury or personal injury of his own to assert." *Walker v. Cheney*, 230 F. Supp. 2d 51, 66 (D.D.C. 2002). Because the Comptroller's statutory right of action is inoperative, it cannot act to preclude private suits.

d. Contrary to Defendants' suggestion (at 18–19), Plaintiffs also fall squarely within the zone of interests of the appropriations laws, as this Court previously held. Dkt. 139 at 16–17. "The zone of interests test does not require that the statute directly regulate the plaintiff, nor does it require specific congressional intent to benefit the plaintiff." *CSL Plasma Inc. v. CBP*, 33 F.4th 584, 589 (D.C. Cir. 2022). Plaintiffs' injuries need only be "*arguably* within the zone of interests to be protected or regulated by the statute." *Id.* (emphasis added) (quotation marks omitted). This is a "lenient test," *id.*, and "not especially demanding," *FDA v. R.J. Reynolds Vapor Co.*, 145 S. Ct. 1984, 1991 (2025) (quotations omitted).

As this Court has already held, Plaintiffs' injuries are not "marginally related" to the purposes of the appropriations law, *FDA*, 145 S. Ct. at 1991, but rather squarely fall within the zone of interests of the appropriations laws. "The relevant acts appropriate foreign assistance funds across a variety of categories, and it is undisputed that Plaintiffs not only compete for those funds but also have been the recipients of such funds for years." Dkt. 139 at 17. Accordingly, Plaintiffs' interests and the statutes' purposes "go hand in hand, and Plaintiffs accordingly are within the relevant zone of interests." *Id.*

21

**C.      Defendants' Funding Mandates Are Not Committed to Agency Discretion**

Defendants also advance the erroneous argument that the executive branch's decisions in how and whether to obligate foreign assistance appropriations is "committed to agency discretion by law," and immune from APA review on that basis. MTD 19. The Supreme Court has repeatedly emphasized that, "to honor the presumption of review" under the APA, § 701(a)(2) must be read "quite narrowly." *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (quoting *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018)). The Court has limited this exception to the "rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion"—i.e., where there is "no law to apply"—"such as a decision not to institute enforcement proceedings." *Id.* at 772 (quotations omitted).

Here, the relevant appropriations acts provide "meaningful standard[s]" for assessing how much in funds Defendants must spend, and for what purposes. The topline appropriations in Title III and Title IV, the tables incorporated into § 7019(a), and the directives in §§ 7030–61 in the relevant appropriations acts require Defendants to spend specific or minimums sums of money, for specific purposes specified in the provisions.

This case is nothing like *Lincoln v. Vigil*, 508 U.S. 182 (1993), to which Defendants cite. In *Lincoln*, the plaintiffs challenged the Indian Health Service's discontinuation of the Indian Children's Program. *Id.* at 184. That program was not required by the relevant statute, which provided a broad "lump-sum" appropriation for the Service generally. *See id.* at 184–86. Here, Congress did "statutorily restrict[] what can be done with those funds." *Id.* at 192 (quotations omitted), by specifying the purposes for which different buckets of funds must be used, and the amounts that must be spent in each of those buckets. The Supreme Court and the D.C. Circuit has found sufficient "law to apply" with statutes that are far less prescriptive and limiting of

agency discretion than the appropriations acts here. *See, e.g.*, *Shawnee Tribe*, 984 F.3d at 94

(statute appropriating funds for "necessary expenditures incurred due to the public health

Emergency with respect to [COVID-19]"); *Dep't of Commerce*, 588 U.S. at 773 (Census Act

imposing "a duty to conduct a census that is accurate and that fairly accounts for the crucial

representational rights that depend on the census and the apportionment").

### D.    The Challenged Funding Decisions Are Subject to APA Review

The funding decisions here are agency actions reviewable under the APA, contrary to

Defendants' assertion that they constitute unreviewable actions by the President. *See Franklin v.*

*Massachusetts*, 505 U.S. 788, 800–01 (1992); Dkt. 21 at 11; Dkt. 60 at 20, n.8. As this Court

correctly held with respect to Defendants' blanket suspension of funds, Plaintiffs are challenging

*agency* actions, and those actions "have immediate effect and constitute the action under review,

without any further action by the President." Dkt. 21 at 11; *see* Dkt. 60 at 20, n.8. Defendants'

arguments would impermissibly "allow the President and agencies to simply reframe agency

action as orders or directives originating from the President to avoid APA review." *Id.*

### E.    Plaintiffs Challenge Discrete Agency Actions

Defendants are also incorrect that Plaintiffs' funding claims fail to challenge "discrete"

agency actions. MTD 21–22. This Court has correctly held that Defendants' decision not to

spend specific amounts of appropriated funds for specific purposes is sufficiently "discrete"

under § 706(2).[2] Plaintiffs "are not asserting any type of broad, programmatic challenge that the

APA forbids." Dkt. 139 at 20. Rather, Plaintiffs' challenge "is based on the very discrete

requirements to spend the amount of funds that Congress has appropriated for particular

---

[2] Plaintiffs do not need to identify any final and discrete agency action to state a claim under 5
U.S.C. § 706(1) for agency action unlawfully withheld or unreasonably delayed. *See Cobell v.*
*Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001). In any event, Defendants' decisions to unlawfully
withhold and delay funding are sufficiently discrete for the same reasons explained above.

purposes," and Plaintiffs plausibly allege that "Defendants have made the very discrete, conclusive decision not to do so." *Id.* at 20–21.

### F.    Defendants' Decisions Not to Spend Funds Are Contrary to Law

The Executive Branch "may not act contrary to the will of Congress when exercised within the bounds of the Constitution." *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 233 (1986). Defendants' decision not to obligate foreign assistance funds is contrary to the appropriations acts, which require USAID and the State Department to spend specific sums for specific foreign assistance purposes.

1. Congressional appropriations are mandatory, not optional, as this Court has held. Dkt. 139 at 22–26. It is long settled that, absent an express indication to the contrary, an appropriation is a mandate that the Executive Branch spend "the full amount appropriated by Congress for a particular project or program." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013). Neither the President nor an agency has "unilateral authority to refuse to spend the funds." *Id.*

For this reason, when Congress intends for an agency to have discretion to spend less than the full appropriated amount, Congress uses hallmark permissive language, such as appropriating "up to," "not more than," or "sums not exceeding" specific amounts. Examples of such language "abound in our history." *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 442 (2024) (Kagan, J., concurring) (quotations omitted). Since the Founding, Congress has made "appropriation[s] of 'sums not exceeding' a specified amount," which do not "mandate that the Executive spend that amount," but "instead provide the Executive discretion over how much to spend up to a cap." *Id.* at 432–33 (majority op.). Congress has consistently used clear language when it intends to allow the Executive Branch to spend less than the full amount appropriated. In the 2024 Appropriations Act alone, the phrase "not to exceed" appears over 200 times. *See* 2

GAO, Principles of Federal Appropriations Law, 6-28 (3d ed. Jan. 2004) (explaining that, with a "not to exceed" appropriation, "the agency is not required to spend the entire amount"). Such language would be entirely unnecessary if an appropriation standing alone gave the executive discretion to spend less than the appropriated amount.

In each of the 2024 Appropriations Act and the 2025 Continuing Resolution, Congress appropriated more than $30 billion across fifteen categories of foreign assistance purposes, and Congress did not give Defendants discretion to spend less than the full amounts appropriated for any of the fifteen categories. *See* 138 Stat. at 740–49. In none of the fifteen categories did Congress provide that USAID or State may obligate "up to," "not more than," or "not to exceed" the topline appropriated amount. Defendants therefore must spend "the full amount appropriated by Congress" for each of the fifteen categories, and they have no "unilateral authority to refuse to spend the funds." *Aiken Cnty.*, 725 F.3d at 261 n.1.

What's more, Congress used express, mandatory language in directing Defendants to obligate specific amounts for hundreds of subcategories of foreign assistance purposes. In the 2024 Appropriations Act (and prior acts), Congress provided that foreign assistance funds "shall be made available in the amounts specifically designated" in tables appended to the 2024 Act. *Id.* 2024 Appropriations Act § 7019(a), 138 Stat. at 771. That provision, like all provisions of the 2024 Appropriations Act, was re-enacted in the 2025 Continuing Resolution for the funds appropriated as part of the 2025 Continuing Resolution. Sections 7030 to 7061 of the 2024 Act and the 2025 Continuing Resolution further provide that "not less than" specific amounts "shall be made available for" various foreign aid purposes. Congress could not have more clearly mandated that Defendants obligate precise or minimum amounts for specific purposes.

2. Defendants argue (at 22) that the appropriations here, "lack any mandatory language directing the obligation and expenditure of funds." The directives in Section 7019(a) and Sections 7030–7061 certainly contain mandatory language, providing that specific or minimum amounts "shall be made available" for obligation. And as to the topline appropriations in Titles III and IV, Defendants' position ignores "the understanding of appropriations laws upon which Congress has operated for centuries." Dkt. 139 at 23. As explained, Congress knows how to make appropriations a discretionary cap and not a floor, but did not do so here.

The Nixon-era Office of Legal Counsel (OLC) opinion that Defendants cite does not help them. That opinion reflected the Nixonian view that Congress subsequently rejected, including in the ICA, which operates on the "the premise" that an appropriations act requires the Executive to obligate the full amount appropriated. GAO, B-329092 (Dec. 12, 2017). Moreover, the Nixon-era OLC opinion characterized its view as "basically a rule of construction" from which Congress could depart. 1 Supp. Op. O.L.C. 303, 309 (1969).

Defendants assert (at 23) that there is a "long history" of presidential impoundments, "particularly in the realm of foreign affairs." But the OLC opinion they cite for that proposition says nothing of the sort. The OLC opinion hypothesizes that a President could "impound funds where to spend such funds would infringe on . . . his duties in the area of foreign affairs." *The President's Veto Power*, 12 Op. O.L.C. 128, 168 n.56 (1988), https://perma.cc/9TXB-QNB2. But the opinion gives no specific examples of that ever happening, much less "a long history" (MTD 23), and Defendants have never contended that the appropriations directives at issue here would "infringe on" the President's constitutional "duties."

Defendants acknowledge (at 23) that the appropriations' "shall be made available" language "reflects Congress's desire to designate different portions of the top-line foreign-

26

assistance appropriations for particular purposes," but Defendants nevertheless insist that these provisions do not "constitute an unequivocal command to spend all appropriated funds." That is irreconcilable with the plain text of the statute. Defendants' citation (at 22) to the GAO Redbook that the phrase "shall be available" can sometimes be ambiguous is inapt; the language here is "shall be *made* available," and the foreign assistance funds shall be made available in precise dollar "amounts specifically designated."

Plaintiffs have stated a claim that Defendants have acted contrary to law in not obligating and deciding not to obligate the funds Congress appropriated for foreign assistance in the 2024 Appropriations Act, the 2025 Continuing Resolution, and prior acts. 5 U.S.C. § 706(2).

### G.    Defendants' Decisions Not to Spend Funds Are Arbitrary and Capricious

This Court previously held that Plaintiffs are likely to succeed "in showing the agency defendants acted arbitrarily and capriciously in unilaterally withholding billions in appropriated funds without explanation or consideration of reliance interests." Dkt. 139 at 26. That holding was correct. Defendants now attempt to create an exception to APA review for political decision-making or matters involving national security. Contrary to Defendants' suggestion, *State Farm* provides no exception to arbitrary and capricious review for "shifts in national interest and priorities." MTD 24. Instead, when an agency changes course, it must "provide a reasoned explanation for the change," and account for the "serious reliance interests" a prior policy has engendered. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009). Defendants do none of that here, relying instead on abstract assertions of national interest and presidential authority without explaining how the challenged actions comport with the governing statutes, the agencies' own prior findings, or the real-world consequences of abruptly terminating funded programs. Plaintiffs have more than sufficiently stated arbitrary-and-capricious claims.

**H.    Plaintiffs Have Stated a Claim for Agency Action Unlawfully Withheld or Unreasonably Delayed**

With respect to Plaintiffs' claims under 5 U.S.C. § 706(1), Defendants entirely ignore that Plaintiffs bring claims for agency actions "unlawfully withheld," instead making arguments only with respect to the "unreasonable delay" claims that Plaintiffs make in the alternative. MTD 25–26; s*ee* Third Am. Compl. ¶¶ 147–51 (Third Claim for Relief); *id.* ¶¶ 234–37 (Sixteenth Claim for Relief). And even for the unreasonable delay claims, Defendants address only the appropriations that were expiring in September 2025, and their sole argument is to repeat their contention that the appropriations statutes lack "any specific, unequivocal command to obligate the appropriated funds." MTD 26. Defendants make no arguments with respect to funds that expire in September 2026 or later, nor any arguments under the "*TRAC* factors." *See id.* at 25–27; *see also* Dkt. 139 at 28–29 (finding the *TRAC* factors weigh in Plaintiffs' favor on their claims for violations of the appropriations acts).

With respect to the sole argument that Defendants do make on the unreasonable delay claims, Defendants are again incorrect because they are refusing to carry out unequivocal commands to spend specific amounts of money for specific purposes, as already explained.

**I.    Plaintiffs Have Stated a Claim That Defendants' Failure to Obligate Funds in the Special Message Is Unlawful**

Claims 13 and 14 assert claims for declaratory relief that Defendants' refusal to obligate the funds in the August 2025 special message violated the relevant appropriations acts. As previously explained, the Supreme Court's ruling does not compel dismissal of the APA claim asserting these violations (Claim 13), and no *ultra vires* claim (as in Claim 14) was before the Supreme Court with respect to these funds.

On the merits, this Court correctly rejected Defendants' argument (at MTD 27–28) that the President's submission of a rescission proposal on August 28, 2025 relieved Defendants of

their duty under the 2024 Appropriations Act and prior acts to obligate the relevant funds before

they expire. *See* Dkt. 139 at 31–34. The relevant appropriations acts imposed duties on

Defendants to obligate specific amounts of funds for specific purposes by September 30, 2025,

and no provision of the ICA relieved Defendants of that duty just because a rescission proposal

for the funds was submitted. To the contrary, Congress specified in the ICA that "[n]othing

contained in this Act . . . shall be construed as . . . superseding any provision of law which

requires the obligation of budget authority." 2 U.S.C. § 681(4).

As this Court observed, Defendants "selectively quote[d]" from 2 U.S.C. § 683(b) and

"creatively rearrange[d] the text" to assert that the provision precluded obligating funds while a

rescission proposal was pending. Dkt. 146 at 2–3. Rather than repeat that approach, Defendants

now omit any textual analysis at all. *See* MTD at 27–28. They rely solely on a few historical

examples of rescission proposals late in a fiscal year and the fact that some members of Congress

introduced a bill that was never voted upon. *Id.* But again, "[o]nly the written word is the law."

*Bostock*, 590 U.S. at 653. The Court should reject Defendants' text-free approach to statutory

interpretation.

Defendants' interpretation would also raise serious constitutional questions. Just as with

the Line-Item Veto Act, Defendants' theory is that the ICA permits the President to cancel

statutory spending merely by submitting a "special message" to Congress, so long as Congress

does not step in and vote down the proposal. *Clinton v. City of New York*, 524 U.S. 417, 437

(1998). Under Defendants' theory of the ICA, "[i]n both legal and practical effect," the President

may amend appropriations laws through a unilateral submission of a special message to

Congress, even if Congress does not itself amend those laws through new legislation. *Id.* at 438.

But "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Id.*

Accordingly, for the same reasons that the Court previously held that the rescission proposal did not allow Defendants to evade their statutory obligations to obligate funds, Plaintiffs have stated a claim that Defendants' evasion of such obligations is unlawful.

**J.      Defendants Must Now Obligate the Funds Included in the Special Message**

Claims 15 to 18 assert that Defendants have an ongoing duty under 2 U.S.C. § 683(b) to obligate the funds in the August 2025 special message. Section 683(b) provides that "[a]ny amount of budget authority proposed to be rescinded" in a special message "shall be made available for obligations" unless Congress enacts a rescission bill "within the prescribed 45-day period." Where, as here, an agency does not obligate funds on the ground that § 683(b) gives Congress a full 45 days to consider a rescission proposal—even if that extends beyond the original expiration date of the funds—then § 683(b)'s requirement that any amounts not rescinded within that 45-day period "shall be made available for obligation" applies beyond the original statutory expiration date as well.

Beyond their general arguments that apply to all of Plaintiffs' APA claims, Defendants present no argument that Claims 15 to 17 fail to state a claim, and Defendants' thus have forfeited any such arguments. That includes any argument that the D.C. Circuit's prior opinion in this case forecloses Plaintiffs' claims to enforce § 683(b)'s requirement.

Regardless, the D.C. Circuit's decision does not preclude these claims. For the APA claims (Claims 15 and 16), the D.C. Circuit expressly limited its holding to be that "the grantees lack a cause of action to enforce the ICA *at least while the ICA's statutory processes run their course*." *GHC*, 153 F.4th 1 at n.18 (emphasis added). The Court left open "that APA review may be available afterwards." *Id.* The ICA processes have now "run their course" for the funds in the

August 2025 special message, as 45 days have passed from when the proposal was submitted and Congress did not enact a rescission bill. Defendants' arguments about litigation interfering with interbranch dialogue no longer apply, and Plaintiffs may bring APA claims that Defendants are violating § 683(b). Moreover, Plaintiffs assert a mandamus claim to compel the obligation of funds under § 683(b) (Claim 18), and the D.C. Circuit distinguished mandamus claims from the APA claims it held precluded. *Id.* at 16.

## II.    THE COMPLAINT STATES CLAIMS FOR UNLAWFULLY ABOLISHING USAID AND ELIMINATING ITS PROGRAMS, INITIATIVES, AND BUREAUS

### A.    Plaintiffs Have Standing to Challenge the Abolishment of USAID

Plaintiffs more than adequately allege standing to challenge Defendants' abolishment of USAID. Plaintiffs allege that their businesses were dependent on USAID and describe in detail the ways in which they have been financially devastated by Defendants' decision to abolish USAID. "Approximately 98% of Democracy International's 2024 revenue came directly or indirectly from USAID." Third Am. Compl. ¶ 117. And because of USAID's abolishment, Democracy International "expects to miss out on nearly *all* of the revenues it had projected for 2025 and 2026, reducing the company's annual revenues by more than 95 percent" and "pos[ing] an existential threat to the company" that will put it "at risk of bankruptcy." *Id.*; *see also, e.g.*, *id.* ¶ 120 (plaintiff Chemonics relied on USAID for 88% of its revenues); *id.* ¶ 121 (plaintiff MSH relied on USAID for 90% of its revenues).

Defendants do not contest that these harms constitute injuries-in-fact. *See* MTD 29–30. Instead, Defendants argue that Plaintiffs "fail to show causation" between their injuries and the abolishment of USAID. *Id.* at 30. To establish causation for purposes of Article III standing, however, Plaintiffs need show only that their alleged injuries are "fairly traceable" to the defendants' challenged actions. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

"Proximate causation is not a requirement of Article III standing." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014); *see also Dep't of Com. v. New York*, 588 U.S. 72, 768 (2019) ("Article III requires no more than *de facto* causality." (quotations omitted)). On a motion to dismiss, Plaintiffs need only plausibly allege that their harms are traceable to the challenged actions. *Ashcroft v. Iqbal*, 556 U.S. 662, 578 (2009).

Here, it is at the very least "plausible" that Plaintiffs' harms are traceable to the abolishment of USAID. As set forth in the complaint, USAID has for decades worked closely with implementing partners, including Plaintiffs, to administer USAID projects through grants, cooperative agreements, or contracts. Third Am. Compl. ¶ 33. These implementing partners, including Plaintiffs, "perform[ed] the lion's share of the work" of the agency. *Id.* Plaintiffs were known as implementing "partners" for a reason; they worked hand-in-hand with established contacts at USAID to implement USAID programs and initiatives, often through cooperative agreements that required extensive coordination and led to the forming of deep relationships. And each plaintiff was financially dependent on USAID for a substantial portion of its revenues—more than 80% of annual revenues for most Plaintiffs. *See id.* ¶¶ 117–26. Such allegations are clearly sufficient to plausibly allege that Plaintiffs' injuries are "fairly traceable" to the abolishment of the agency on which Plaintiffs relied. *See, e.g.*, *Nat'l Treasury Emps. Union (NTEU) v. Vought*, 149 F.4th 762, 776–77 (D.C. Cir. 2025) (holding that NAACP had standing to challenge abolishment of CFPB because it was "actively working" with the agency to address predatory practices affecting its members), *reh'g en banc granted,* No. 25-5091, 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025);[3] *Rhode Island v. Trump*, 155 F.4th 35, 44 (1st Cir. 2025) (plaintiffs had standing to challenge abolishment of Institute of Museum and Library Services).

---

[3] Although the D.C. Circuit has granted en banc review in *NTEU*, the panel's decision remains binding under D.C. Circuit Rule 40(d).

Defendants argue that Plaintiffs' injuries "resulted because of the Executive Branch's decisions related to appropriations" rather than the decision to abolish USAID. MTD 30. For one, the failures to spend USAID appropriations for the purposes Congress mandated is certainly "traceable," at least in part, to the decisions to abolish USAID. Moreover, as described above, it is not just the failure to spend the dollars that harms Plaintiffs (although that certainly does), but also the elimination of the relationships and experience with the agency with which Plaintiffs had worked for decades, and upon which Plaintiffs' business depended. If the government nationalized a private business that served as a plaintiff's main customer, the plaintiff would have standing to challenge the government's actions even if the government promised it would spend, on someone, the same amounts that the nationalized business spent.

Plaintiffs need "make only a reasonable showing that 'but for' defendants' action the alleged injury would not have occurred." *Ipsen Biopharmaceuticals, Inc. v. Becerra*, 678 F. Supp. 3d 20, 30–31 (D.D.C. 2023) (quotations omitted), *aff'd*, 108 F.4th 836 (D.C. Cir. 2024); *see also Flaherty v. Bryson*, 850 F. Supp. 2d 38, 50 (D.D.C. 2012) (plaintiff need show only that "the agency's actions materially increased the probability of injury" (alterations and quotations omitted)). Here, it is at minimum plausible that, but-for Defendants' abolishment of USAID, Plaintiffs would not have suffered such devastating harms, or at least would not have suffered them to the same extent. *See Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 114 (2025) ("[e]ven 'one dollar' of additional revenue" will suffice for purposes of Article III standing).

This case is unlike *American Foreign Service Ass'n v. Trump*, 792 F. Supp. 3d 116 (D.D.C. 2025), where the union plaintiffs were asserting "personnel-related injuries" that "depend[ed] entirely on their members' employment or contractual relationship with USAID."

*Id.* at 128–29. The court held that such plaintiffs could not rely on such injuries to challenge other, unrelated agency actions, such as "grant terminations, website closures, or lease transfers," which had no relation to the plaintiffs' alleged injuries. *Id.* at 130. Here, by contrast, Plaintiffs are long-term partners of USAID that depend on all aspects of the agency. Plaintiffs' injuries are directly traceable to the abolishment of the entire agency.

Defendants also contend that relief on this claim would not "redress any of Plaintiffs' alleged injuries." MTD 31. But, again, it is more than plausible that an order enjoining Defendants from abolishing an agency on which Plaintiffs have relied for decades would redress at least some of Plaintiffs' harms. *See Diamond Alternative Energy*, 606 U.S. at 114. Defendants assert that the existence of a standalone, distinct USAID "would not *require* Defendants to contract with Plaintiffs in the future." MTD 31 (emphasis added). But for purposes of Article III, Plaintiffs need not "show to a scientific certainty" or provide "strict proof of causation to meet the jurisdictional requirement." *Ipsen Biopharmaceuticals*, 678 F. Supp. 3d at 30. They need only plausibly allege that at least some of their injuries are "likely" to be redressed by a favorable ruling, *Dep't of Com. v. New York*, 588 U.S. at 766, and Plaintiffs have done so here.

### B.    Plaintiffs Have Standing to Challenge the Elimination of Any Programs, Initiatives, and Bureaus For Which They Compete

Defendants erroneously assert that Plaintiffs challenge the elimination of programs, initiatives, bureaus, and international partnerships in which they do not participate, MTD 31; *see* Third Amend. Compl. ¶ 83–99. To the contrary, Plaintiffs allege that they "have competed or would compete for awards funded from or administered by each of the eliminated programs, initiatives, offices, or partnerships, listed in the paragraphs above, as well as other programs, initiatives, offices, or partnerships that have been eliminated on information and belief." Third Amend. Compl. ¶ 99. Claim 11 is thus limited to the elimination of programs, initiatives,

bureaus, and international partnerships for which Plaintiffs would compete for funds. *See Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1016 (D.C. Cir. 2022).

### C.    Plaintiffs May Challenge the Discrete Decision to Abolish USAID and its Programs and Initiatives

Defendants' attempt to recharacterize the abolishment of USAID and its programs and initiatives as unreviewable presidential action fails for the reasons stated above. In addition, the contemporaneous record shows that the relevant decisions were made not by the President but by the State Department and Secretary of State. It was the State Department that sent the March and May 2025 Congressional Notifications outlining its plans to "integrate" some USAID functions into the State Department and to "abolish" and "eliminate" the others. March CN at 1, 3. It was USAID that sent RIF notices to virtually all USAID employees terminating them as of June 1 or September 2, 2025. Third Am. Compl.¶ 76. And it was the Secretary of State who announced on social media on June 1 that USAID would "officially cease to implement foreign assistance." *Id.* ¶ 80. Unlike the apportionment actions statutorily committed to the President in *Franklin*, Plaintiffs challenge decisions that the agencies themselves acknowledged as their own.

The abolishment of USAID and its programs and initiatives are also discrete, concrete agency actions that bear no resemblance to the "programmatic" challenges barred by *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) ("*SUWA*"). Defendants' decision to abolish USAID as an agency was not a generalized policy preference or a continuing failure to act, but a single, consummated agency determination announced through formal congressional notifications with specified dates certain, and executed in fact. *See supra* Background Section C.

35

That decision is a consummated agency determination with immediate legal consequences for contractors, grantees, and statutory programs.[4]

The contrast between this case and the D.C. Circuit panel's discussion in *NTEU* of actions relating to the CFPB is illuminating. In *NTEU*, the panel held that there was no "action" to eliminate the CFPB because "[t]he plaintiffs point to no . . . statement, formal or informal, written or oral," that was designed "to implement, interpret, or prescribe law or policy" regarding elimination of the CFPB. 149 F.4th at 783. Here, the March and May Congressional Notifications are precisely such "statements" implementing and prescribing the policy of eliminating USAID. The May Congressional Notification specified that the document was outlining plans for a "post-USAID era." May CN at 21. The same is true of the statements by agency officials describing the intent to eliminate, or the actualization of eliminating, USAID. *E.g.*, Third Am. Compl. ¶ 75 (Lewin announcing to all USAID employees that Defendants "will seek to retire USAID's independent operation"). Nor do Plaintiffs lump a "constellation" of different agency actions under the banner of eliminating the agency. *NTEU*, 149 F.4th at 785. It is Defendants—in the Congressional Notifications and other agency statements like Lewin's— who described various measures such as abolishment and transferring USAID functions and terminating staff as part of a singular decision to eliminate USAID as an agency.

### D.    Plaintiffs Have Stated Claims That Abolishing USAID Is Unconstitutional

Plaintiffs have stated claims that Defendants' abolishment of USAID violates the separation of powers. Plaintiffs assert this claim under the APA for agency action contrary to law

---

[4] Defendants do not appear to challenge that the elimination of specific programs, initiatives, and bureaus are discrete agency actions. *Cf.* Opp. 32–33. But even if they did, Defendants' decision to terminate particular programs, initiatives, and bureaus constitute discrete agency actions, just as the rescission of the DACA program was reviewable as discrete agency decision. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16–18 (2020) ("The creation of that program—and its rescission—is an action that provides a focus for judicial review.").

(Claim 7), as a freestanding constitutional claim not under the APA (Claim 9), and as a non-statutory review claim for *ultra vires* action (Claim 9). The prerequisites for APA review described above do not apply to the latter two counts.

The Constitution gives Congress "plenary control over the . . . existence of executive offices." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 500 (2010). Specifically, the Necessary and Proper Clause grants Congress the exclusive power to "carr[y] into Execution" not only the powers enumerated in Article I, Section 8, but also "all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. Art. I, § 8, cl. 18. The Supreme Court has repeatedly recognized that "under the Necessary and Proper Clause," Congress may "undoubtedly . . . create 'offices'" within the Executive Branch. *Buckley v. Valeo*, 424 U.S. 1, 138 (1976). "To Congress under its legislative power is given the establishment of offices [and] the determination of their functions and jurisdiction." *Myers v. United States*, 272 U.S. 52, 129 (1926); *see also Freytag v. Comm'r*, 501 U.S. 868, 883 (1991) (recognizing Congress's "authority to create offices").

Here, Congress exercised its authority under the Necessary and Proper Clause to create USAID as an executive agency. In 1998, Congress formally established USAID as a standalone agency—specifically, an "independent establishment"—outside the State Department. *See* Foreign Affairs Reform and Restructuring Act of 1998 § 413, Pub. L. No. 105-277, 112 Stat. 2681, 2681–791. In so doing, Congress prescribed limited authority for the President to "abolish[]" the agency, allowing the President only sixty days after USAID's establishment to do so. *See* 22 U.S.C. § 6601(a). But President Clinton declined to abolish the agency within that window, and thus only Congress could now abolish it through legislation.

Presidential authority to act "must stem either from an act of Congress or from the Constitution itself," *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952), and Defendants can point to no constitutional or statutory provision authorizing the President, let alone the State Department and USAID, to abolish USAID. By unilaterally abolishing USAID without an act of Congress, Defendants are violating the separation of powers.

Defendants' arguments for dismissing these claims fall flat. Defendants first argue that "the Executive Branch has not abolished USAID," instead describing their actions merely as a "reorganization" of USAID. MTD 33. But the complaint credibly alleges that USAID has in fact been abolished in every material respect. In its March notification to Congress, the State Department made clear that all USAID functions would either be (i) transferred to the State Department or (ii) eliminated. Third Am. Compl. ¶ 77; *see also* March CN at 1. Then in May 2025, the State Department set forth further details on the plans for the State Department to take over some USAID's programs, and discussed how State offices will be critical "in a post-USAID era." May CN at 1, 21. The May notification described the planned reorganization of *the State Department*, not of USAID. *Id.* at 3 ("The Department of State is notifying Congress of its intent to reorganize *the Department's* domestic operations.").

The complaint alleges that USAID then officially shut down and ceased forward-looking operations on July 1, 2025. Third Am. Compl. ¶ 80. On that same day, Secretary Rubio announced that USAID would "officially cease to implement foreign assistance." Cong. Rsch. Serv., IF10261.20, U.S. Agency for International Development: An Overview 1 (Updated Sept. 5, 2025). The agency appears to have no employees performing its duties and mission. Third Am. Compl. ¶¶ 81–82. These facts plausibly state a claim that USAID has been abolished.

Aside from arguing that USAID has not been abolished, Defendants largely seek to rebut arguments that Plaintiffs have not made. Defendants argue, for example, that "whether Defendants' congressional notifications met the requirements set forth in the [2024 Appropriations] Act . . . is a political question." MTD 34. But Plaintiffs' complaint does not assert that Defendants acted contrary to law by violating any "notification" provisions; the complaint is clear that Plaintiffs' contrary-to-law claim is premised on Defendants' substantive *abolishment* of USAID, in violation of the separation-of-powers. Third Am. Compl. ¶¶ 174–75.

Defendants likewise contend that the President has authority to "reorganize" USAID, *see* MTD 35–36, but again, Plaintiffs have never contended otherwise. It is thus irrelevant whether past Presidents have reorganized USAID in certain respects by creating or eliminating individual offices. *See id.* Plaintiffs' claim is that Defendants cannot *abolish* a federal agency that Congress has created. Defendants cite no historical precedent or other authority authorizing them to do so. Indeed, Defendants appear to have recognized, in the March 2025 congressional notification and the June 30 Lewin Declaration, that *legislation* is required to abolish USAID. But no such legislation has been enacted; Defendants have simply abolished the agency unilaterally.

Finally, Defendants argue that Plaintiffs' constitutional claim is precluded by the Supreme Court's decision in *Dalton v. Specter*, 511 U.S. 462 (1994). Plaintiffs recognize the D.C. Circuit's interpretation of *Dalton* in the prior appeal in this case, but even assuming that interpretation withstands the upcoming en banc proceedings in *NTEU* and *Climate United v. Citibank*, N.A., No. 25-5122 (D.C. Cir.), it does not preclude Plaintiffs' constitutional abolishment claim. This claim is differently situated in two critical ways from the separation-of-powers claim that the D.C. Circuit addressed in this case (which was predicated on Defendants' refusal to obligate funds as required by appropriations statutes).

First, Plaintiffs' claim that the abolishment of USAID violates the separation of powers is not "predicated on . . . underlying alleged statutory violations." *GHC*, 153 F.4th at 15 n.11. This claim does not rest on the violation of any particular statutory mandate or prohibition. As Defendants themselves note, there is no statute that "explicitly" bars the Executive Branch from shutting down USAID. MTD 37. Rather, the prohibition on abolishing USAID comes from the Constitution and the separation of powers embodied within it. Although there is no "separation of powers clause" in the Constitution, this "foundational doctrine[]" is "evident from the Constitution's vesting of certain powers in certain bodies." *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 227 (2020). The Constitution vests Congress—and only Congress—with the authority to create an executive agency and assign it duties, *see* U.S. Const. Art. I, § 8, cl. 18, and therefore only Congress may shut down an agency and re-assign its duties to another agency.

Second, this case falls under *Youngstown*, not the D.C. Circuit's interpretation of *Dalton*, because Defendants invoke their constitutional powers as a defense and do not claim that any statute authorizes the conduct that Plaintiffs have alleged.

The D.C. Circuit acknowledged that a freestanding constitutional cause of action is available to challenge executive action taken in the "*absence* of *any* statutory authority." *GHC*, 153 F.4th at 15 (quoting *Dalton*, 511 U.S. at 473). Here, Defendants do not invoke any statutory authority that they claim grants the President authority to abolish the agency. Defendants argue only that some statutes purportedly authorize them to "organize" and "reorganize" foreign affairs agencies, but Defendants do not assert that any statute empowers them to eliminate USAID entirely. *See* MTD 34–36, 39. Plaintiffs' claim thus fits within the *Youngstown* paradigm; it is a claim that the Executive Branch acted in "the absence of any statutory authority, not a claim that the President acted in excess of such authority." *Dalton*, 511 U.S. at 473.

"Because no statutory authority [is] claimed, the case necessarily turn[s] on whether the Constitution authorized the President's action," *id.*, and Defendants indeed claim constitutional authority for their actions. They assert that: "Article II of the Constitution gives the President a vast share of responsibility for the conduct of our foreign relations"; "[t]he President exercises that authority by . . . ensuring that the Executive Branch is well organized to properly administer foreign aid"; and the exercise of this authority falls within the "plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations." MTD 39 (quotations omitted). Thus, unlike in the prior D.C. Circuit appeal where Defendants "disclaim[ed] any constitutional defense," *GHC*, 153 F.4th at 15, they aggressively present a constitutional defense here. Judge Katsas made clear that Plaintiffs' separation of powers claim would have been cognizable if, as is now the case for Plaintiffs' abolishment claim, Defendants had maintained their constitutional defense. *See* 2025 WL 2709437, at *1 (Katsas, J., concurring in the denial of rehearing en banc).

On the merits, Defendants' Article II defense fails. They contend that the separation of powers "does not generally constrain how the President organizes the Executive Branch." MTD 39. But, again, Plaintiffs are not challenging a "reorganization" of USAID; they are challenging the wholesale *abolishment* of the agency by Executive fiat. Defendants cite no authority that a President has unfettered power to decide that an agency shall simply cease to exist.

Defendants also cite in passing the President's "responsibility for the conduct of our foreign relations," MTD 39, but this Court has already rejected Defendants' prior attempts to invoke the President's foreign-affairs powers to defeat Plaintiffs' separation-of-powers claims. Dkt. 60 at 34–35. As the Court correctly explained then, the Supreme Court has "explicitly rejected" the argument that the President enjoys "unbounded power" in the realm of foreign

41

affairs. *Id.* at 34. "To the contrary, the Supreme Court has recognized that, notwithstanding the Executive's important role in foreign affairs, it is essential the congressional role in foreign affairs be understood and respected.'" *Id.* (quoting *Zivotofsky*, 576 U.S. at 21). It is thus "well established that 'whether the realm is foreign or domestic, it is still the Legislative Branch, not the Executive Branch, that makes the law,'" *id.* at 32 (quoting *Zivotofsky*, 576 U.S. at 21), and that includes the power to eliminate federal agencies, *Free Enter. Fund*, 561 U.S. at 500.

Finally, Defendants suggest that the President's decision to "pause foreign aid" to confirm that certain initiatives were "within the national interest" fits "comfortably within the Executive Branch's unique expertise and constitutional role." MTD 39–40. But Plaintiffs' separation-of-powers claim does not challenge a simple "pause" of foreign aid; it challenges the permanent abolishment of USAID. Far from fitting "comfortably within" the Executive Branch's constitutional role, such action is unprecedented in our nation's history.[5]

### E.    Plaintiffs Have Stated a Claim That Defendants' Abolishment of USAID and Elimination of Its Programs Was Arbitrary and Capricious

Defendants also seek to dismiss two of Plaintiffs' arbitrary-and-capricious claims (Claims 7 and 8) on the pleadings, even though they have not produced an administrative record in this case. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("the focal point for judicial review" in an arbitrary-and-capricious challenge "should be the administrative record"). Defendants ask this Court to take "judicial notice" of the administrative record filed in a *different* case (*AFSA v. Trump*, No. 25-cv-352 (D.D.C.)), but they cite no authority allowing a court to take judicial notice of contested factual assertions in another case's administrative record. Neither this Court nor Plaintiffs even have *access* to the complete administrative record in *AFSA*. As is the usual

---

[5] Defendants separately argue that Plaintiffs' "Take Care Clause" claim fails. MTD 40-41. But Plaintiffs have not asserted an independent claim under the Take Care Clause. Rather, Plaintiffs cited the Take Care Clause only as authority supporting their separation-of-powers claim.

practice in this district, the parties publicly filed only excerpts of the record that were cited by the parties in their briefing. *See* JA at 1, *AFSA*, No. 25-cv-352 (D.D.C. May 16, 2025), Dkt. 85.

Even if the complete record in *AFSA* were accessible, judicial notice of that record in this case would not be appropriate. A court may take judicial notice of certain "adjudicative facts" that are "not subject to reasonable dispute" because they "can be accurately determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). But while courts can take judicial notice of the *fact* that evidence was submitted in another case, they "cannot consider the factual matters within the pleadings as true." *Masek v. United States*, No. CV 22-03574 (RC), 2024 WL 1240093, at *7 (D.D.C. Mar. 22, 2024). Defendants thus cannot rely on the contested factual assertions made by the defendants in the administrative record in *AFSA* to obtain dismissal of Plaintiffs' arbitrary-and-capricious claims in this case.

Defendants' reliance on the administrative record in *AFSA* is particularly inappropriate and prejudicial because the administrative record in *AFSA* was certified in April 2025, months before most of the actions described in the Third Amended Complaint. And *AFSA* did not involve any claim, as Plaintiffs assert here, that Defendants acted arbitrarily and capriciously in eliminating programs, initiatives, and bureaus. Indeed, Defendants have not certified that the documents produced as part of the administrative record in *AFSA* are the complete administrative record in this case, notwithstanding Local Rule 7(n)'s requirement that the government do so "simultaneously with the filing of a dispositive motion."

Nor do Defendants explain how the *AFSA* record establishes, conclusively as a matter of law, that Defendants' decisions to abolish USAID and eliminate programs and initiatives were "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Defendants' entire argument consists of a single, conclusory sentence that the record in

*AFSA* "demonstrates the agency acted reasonably, justified their actions, and considered reliance interest and reasonable alternatives." MTD 38. This Court can easily reject that perfunctory argument. Plaintiffs plausibly allege that, in abolishing USAID and eliminating particular programs, initiatives, and bureaus, Defendants failed to comply with multiple requirements of reasoned decision-making, including in failing to provide a reasoned explanation for their actions, not considering important aspects of the problem, and ignoring serious reliance interests.

Once the administrative record is produced in this case, it will bear out these multiple, independent ways in which Defendants acted arbitrarily and capriciously.

## III.    THE COMPLAINT STATES CLAIMS FOR *ULTRA VIRES* AGENCY ACTION

Plaintiffs have stated claims that Defendants acted *ultra vires* by (i) failing to obligate foreign assistance funding (Claim 4), (ii) abolishing USAID (Claim 9); (iii) failing to obligate funds included in the special message (Claim 14), and (iv) continuing to fail to obligate funds included in the special message, in violation of 2 U.S.C. § 683(b) (Claim 17).

*Ultra vires* review is available where Defendants allegedly "contravene[d] a clear and specific statutory mandate." *Nat'l Ass'n of Postal Supervisors ("NAPS") v. United States Postal Serv.*, 26 F.4th 960, 970–71 (D.C. Cir. 2022). As relevant to Claims 4 and 14, this Court has already held that the appropriations acts impose on Defendants a "clear, long-recognized duty to spend the funds Congress appropriates for specific purposes." Dkt. 139 at 30. The Court further held that that duty "is and always has been *clear*, and it is mandatory." *Id.* Similarly, for Claim 17, under Defendants' own approach to 2 U.S.C. § 683(b), the provision imposes a clear duty that the funds in the August 2025 special message "shall be made available for obligation."

On Claim 9, the abolishment claim, Defendants rely on the D.C. Circuit's ruling in this case that one *ultra vires* claim was unlikely to succeed. MTD 42. As this Court has already recognized, the D.C. Circuit was addressing *ultra vires* claims "premised on the ICA." Dkt. 139

at 6. The D.C. Circuit "d[id] not resolve" Plaintiffs' *ultra vires* claims based on appropriations statutes, *id.*, and it certainly did not address an *ultra vires* claim for abolishing USAID.

## IV.    THE COMPLAINT STATES A CLAIM FOR MANDAMUS

Congress mandated that Defendants spend appropriations enacted by Congress for specific programs, and Defendants have disregarded those duties. Defendants argue that these duties are not owed to Plaintiffs, but the D.C. Circuit's opinion in *Aiken* refutes their understanding of the Mandamus Act. The challengers in *Aiken* were the States of Washington and South Carolina, as well as "entities and individuals in those States." 725 F.3d at 258. As here, the statutory requirement under which they sought mandamus did not *expressly* confer legal rights on those challengers. But the Commission's adjudication of the license application in Nevada had clear, direct consequences for the challengers, which sufficed to support their right to a writ of mandamus. *See GHC*, 2025 WL 2537200, at *14.[6]

Defendants' attempt to distinguish *Aiken* on the basis that the Nuclear Waste Policy Act compelled agency action. But so too here: the appropriations acts at issue "impose a clear duty on the agency Defendants to make those funds available for obligation, allowing Plaintiffs and others to compete for them." Defendants argue that their discretion in making obligations means that their decisions are not ministerial. But the writ of mandamus Plaintiffs seek would preserve that discretion. Plaintiffs seek only an order that Defendants obligate these sums in the amounts for the purposes Congress has specified. Because the decision *whether* to spend (distinct from the decision of *how to* spend) is non-discretionary, Plaintiffs state a claim for mandamus.

## CONCLUSION

The Court should deny Defendants' motion to dismiss.

---

[6] The Supreme Court's stay order does not compel dismissal of the mandamus claims for the reasons explained as to why that order is not controlling as to various buckets of funds.

Dated: February 9, 2026

Respectfully submitted,

*/s/ Daniel F. Jacobson*
Daniel F. Jacobson (D.C. Bar 1016621)
Stephen K. Wirth (D.C. Bar 1034038)
John Robinson (D.C. Bar 1044072)
Nina C. Cahill (D.C. Bar 1735989)
JACOBSON LAWYERS GROUP PLLC
5100 Wisconsin Ave, Suite 301
Washington, DC 20016
Tel: (301) 823-1148
dan@jacobsonlawyersgroup.com