**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| GLOBAL HEALTH COUNCIL, *et al.*,<br><br>　　　　　*Plaintiffs*,<br><br><br>　　　v.<br><br><br>DONALD J. TRUMP, *et al.*,<br><br>　　　　　*Defendants*. | Civil Action No. 1:25-cv-402 (AHA) |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56. In support of this motion, the Court is respectfully referred to Defendant's accompanying memorandum of points and authorities.

Dated: July 27, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division

ALEXANDER K. HAAS
Director
Federal Programs Branch

*/s/ Pierce J. Anon*
PIERCE J. ANON
JOSHUA N. SCHOPF
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch

P.O. Box 883
Washington, DC 20044
Phone: (202) 305-7573
Email: pierce.anon@usdoj.gov

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

GLOBAL HEALTH COUNCIL, *et al.*,

        *Plaintiffs*,

        v.

DONALD J. TRUMP, *et al.*,

        *Defendants*.

Civil Action No. 1:25-cv-402 (AHA)

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 3

STANDARD OF FACTS ................................................................................................. 11

LEGAL STANDARD ....................................................................................................... 11

ARGUMENT .................................................................................................................... 12

I.     THRESHOLD DEFECTS DOOM PLAINTIFFS' FUNDING CLAIMS ...................... 12

      A.    All of Plaintiffs' Funding Claims Under the APA Are Foreclosed by the Supreme Court's September 26, 2025 Order and Precluded by the ICA ............. 13

      B.    Most Claims Related to Funds That Plaintiffs Believe Should Have Been Obligated Prior to September 30, 2025 Are Moot ................................................... 20

      C.    The Program Funding Decisions at Issue Are Committed to Agency Discretion by Law ............................................................................................... 22

      D.    The Challenged Rescission Proposal Decisions Constitute Presidential Actions, and Thus, are not Subject to APA Review ............................................ 24

      E.    Plaintiffs' APA Claims Fail on the Merits Because They Do Not Challenge a "Discrete" Agency Action ...................................................................................... 25

II.    DEFENDANTS' FUNDING DECISIONS ARE REASONABLE AND CONSISTENT WITH APPLICABLE LAW ................................................................. 27

      A.    Plaintiffs Arbitrary and Capricious Claim Fails on the Merits ............................ 27

      B.    Defendants' Conduct Was Not Contrary To Law ................................................ 32

      C.    Plaintiffs' Allegations of Unreasonable Delay Fail on the Merits ....................... 36

III.   PLAINTIFFS' CONSTITUTIONAL CLAIMS ALSO FAIL ......................................... 38

      A.    Plaintiffs Take Care Clause Claims Fails ............................................................ 38

IV.   THE *ULTRA VIRES* CLAIM IS NOT PLAUSIBLY ALLEGED (CLAIMS FOUR, NINE, FOURTEEN, SEVENTEEN) ................................................................. 40

V.    THE MANDAMUS CLAIMS ARE NOT PLAUSIBLY ALLEGED (CLAIMS FIVE AND EIGHTEEN) ................................................................................................ 42

VI.    PLAINTIFFS PROPOSED REFLIEF GOES WELL BEYOND APPROPRIATE LIMITS .............................................................................................................. 43

CONCLUSION................................................................................................................ 45

# TABLE OF AUTHORITIES

**CASES**

*13th Reg. Corp. v. Dep't of the Interior*,
654 F.2d 758 (D.C. Cir. 1980) ................................................................................ 42

*AIDS Vaccine Advocacy Coal. v. Dep't of State*,
770 F. Supp. 3d 121 (D.D.C. 2025) ........................................................................ 33

*Air Courier Conference of Am. v. Am. Postal Workers Union*,
498 U.S. 517 (1991) ................................................................................................ 19

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013) .................................................................................................. 21

*Am. Anti-Vivisection Soc'y v. Dep't of Agric.*,
946 F.3d 615 (D.C. Cir. 2020) ................................................................................ 37

*Am. Ass'n of Physics Tchrs., Inc. v. Nat'l Sci. Found.*,
804 F. Supp. 3d 45 (D.D.C. 2025) .......................................................................... 39

*Am. Forest Res. Council*,
77 F.4th 787 (D.C. Cir. 2023), *cert. denied* 144 S. Ct. 1110 (2024) ...................... 25

*Am. Ins. Ass'n v. Garamendi*,
539 U.S. 396 (2003) .................................................................................................. 4

*Anglers Conservation Network v. Pritzker*,
809 F.3d 664 (D.C. Cir. 2016) ................................................................................ 38

*Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) ................................................................................................ 26

*Bd. of Cnty. Comm'rs of Weld Cnty. v. EPA*,
72 F.4th 284 (D.C. Cir. 2023) ................................................................................ 44

*Bennett v. Spear*,
520 U.S. 154 (1997) ................................................................................................ 26

*Block v. Cmty. Nutrition Inst.*,
467 U.S. 340 (1984) .................................................................................. 8, 15, 16, 18

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ................................................................................................ 45

*California v. Texas*,
    593 U.S. 659 (2021)............................................................................................... 45

*Cheney v. U.S. Dist. Ct. for Dist. of Columbia*,
    542 U.S. 367 (2004) .............................................................................................. 42

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
    333 U.S. 103 (1948) .............................................................................................. 40

*Child Trends, Inc. v. U.S. Dep't of Educ.*,
    795 F. Supp. 3d 700 (D. Md. 2025) ..................................................................... 15

*City of Houston, Tex. v. Dep't of Hous. & Urb. Dev.*,
    24 F.3d 1421 (D.C. Cir. 1994) ............................................................................. 21

*City of New Haven v. United States*,
    809 F.2d 900 (D.C. Cir. 1987) ............................................................................. 18

*City of New York v. Dep't of Def.*,
    913 F.3d 423 (4th Cir. 2019) ............................................................................... 25

*Clarke v. Sec. Indus. Ass'n*,
    479 U.S. 388 (1987) .............................................................................................. 19

*Cobell v. Kempthorne*,
    455 F.3d 301 (D.C. Cir. 2006) ............................................................................. 25

*Cobell v. Norton*,
    392 F.3d 461 (D.C. Cir. 2004) ............................................................................. 38

*Consol. Edison Co. v. Ashcroft*,
    286 F.3d 600 (D.C. Cir. 2002) ............................................................................. 43

*Da Costa v. Immigr. Inv. Program Off.*,
    80 F.4th 330 (D.C. Cir. 2023) ............................................................................. 37

*Dalton v. Specter*,
    511 U.S. 462 (1994) ................................................................................ 3, 8, 39, 40

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) .............................................................................................. 28

*Dep't of State v. Aids Vaccine Advoc. Coal.*,
    606 U.S. ---, 146 S. Ct. 19 (2025) ................................................................. *passim*

v

*DHS v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020) .......................................................................................... 12, 24, 32

*DOJ v. FLRA*,
  981 F.2d 1339 (D.C. Cir. 1993) ................................................................................ 41

*DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.*,
  76 F.3d 1212, 1214 (D.C. Cir. 1996) ........................................................................ 26

*Edmond v. United States*,
  520 U.S. 651 (1997) ................................................................................................. 36

*El-Shifa Pharm. Indus. Co. v. United States*,
  607 F.3d 836 (D.C. Cir. 2010) ................................................................................. 38

*EPA v. Brown*,
  431 U.S. 99 (1977) ................................................................................................... 26

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ................................................................................................. 27

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ................................................................................................. 27

*Fed. Express Corp. v. U.S. Dep't of Com.*,
  39 F.4th 756 (D.C. Cir. 2022) .................................................................................. 41

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ....................................................................................... 24, 26, 39

*Free Enter. Fund v. Pub. Co. Acct. Bd.*,
  561 U.S. 477 (2010) ................................................................................................. 40

*Fund for Animals Inc. v. U.S. Bureau of Land Mgmt.*,
  460 F.3d 13 (D.C. Cir. 2006) ................................................................................... 25

*Gen. Land Off. v. Biden*,
  722 F. Supp. 3d 710 (S.D. Tex. 2024), *mot. denied by sub. nom*,
  *Gen. Land Off. v. Trump*, 2025 WL 3050184 (S.D. Tex. Sep. 15, 2025) ................................ 17

*Glob. Health Council v. Trump ("GHC")*,
  153 F.4th 1 (D.C. Cir. 2025),
  *reh'g en banc denied by*, No. 2025 WL 2709437 (D.C. Cir. Aug. 28, 2025) .................... *passim*

vi

*Goodluck v. Biden,*
  104 F.4th 920 (D.C. Cir. 2024),
  *reh'g en banc denied*, No. 21-5263, 2024 WL 4092894 (D.C. Cir. Sep. 3, 2024)................... 22

*Grand Canyon Air Tour Coal. v. FAA,*
  154 F.3d 455 (D.C. Cir. 1998)................................................................................... 37

*Haig v. Agee,*
  453 U.S. 280 (1981)................................................................................................... 27

*Heckler v. Chaney,*
  470 U.S. 821 (1985)................................................................................................... 23

*Hutto v. Davis,*
  454 U.S. 370 (1982)................................................................................................... 15

*In re Henry M. Jackson*, U.S. Senate,
  B-200685, 1980 WL 14499 (Comp. Gen. Dec. 23, 1980)........................................ 43

*In re Aiken County,*
  725 F.3d 255 (D.C. Cir. 2013)................................................................................. 43

*In re Nat'l Nurses United,*
  47 F.4th 746 (D.C. Cir. 2022).................................................................................. 42

*In re Am. Rivers & Idaho Rivers United,*
  372 F.3d 413 (D.C. Cir. 2004)................................................................................. 37

*Iron Arrow Honor Soc'y v. Heckler,*
  464 U.S. 67 (1983)..................................................................................................... 21

*Jagers v. Federal Crop Ins. Corp.,*
  758 F.3d 1179 (10th Cir. 2014) ............................................................................... 28

*Jama v. Immigr. & Customs Enf't,*
  543 U.S. 335 (2005)................................................................................................... 36

*Lincoln v. Vigil,*
  508 U.S. 182 (1993)................................................................................................... 22

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992)................................................................................................... 40

*Lujan v. Nat'l Wildlife Fed'n,*
  497 U.S. 871 (1990)................................................................................................... 25

*Marbury v. Madison*,
  5 U.S. (1 Cranch) 137 (1803)..........................................................................39, 40

*Mashpee Wampanoag Tribal Council, Inc. v. Norton*,
  336 F.3d 1094 (D.C. Cir. 2003) ............................................................................37

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012)..............................................................................................20

*Milk Train, Inc. v. Veneman*,
  310 F.3d 747 (D.C. Cir. 2002) ..............................................................................23

*Mississippi v. Johnson*,
  71 U.S. (4 Wall) 475 (1867) ...........................................................................39, 40

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)................................................................................................27

*Nat'l Institutes of Health v. Am. Pub. Health Ass'n*,
  606 U.S. ---, 145 S. Ct. 2658 (2025).........................................................2, 14, 15

*Newdow v. Roberts*,
  603 F.3d 1002 (D.C. Cir. 2010) ............................................................................39

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004).........................................................................25, 33, 37, 38

*Nuclear Regul. Comm'n v. Texas ("NRC")*,
  605 U.S. 665 (2025)...........................................................................................8, 41

*Oestereich v. Selective Serv. Sys. Loc. Bd. No. 11*,
  393 U.S. 233 (1968)..............................................................................................41

*Palisades Gen. Hosp. Inc. v. Leavitt*,
  426 F.3d 400 (D.C. Cir. 2005)..............................................................................44

*Power v. Barnhart*,
  292 F.3d 781 (D.C. Cir. 2002)..............................................................................42

*PPG Indus., Inc. v. United States*,
  52 F.3d 363 (D.C. Cir. 1995)................................................................................44

*Rochester Tel. Corp. v. United States*,
  307 U.S. 125 (1939)..............................................................................................26

*Schroer v. Billington*,
  525 F. Supp. 2d 58 (D.D.C. 2007) ............................................................................ 41

*Select Specialty Hosp.-Akron, LLC v. Sebelius*,
  820 F. Supp. 2d 13 (D.D.C. 2011))*, aff'd,* 80 F.4th 346 (D.C. Cir. 2023) ............................... 12

*Sierra Club v. Costle*,
  657 F.2d 298 (D.C. Cir. 1981) .................................................................................. 28

*Sierra Club v. EPA*,
  353 F.3d 976 (D.C. Cir. 2004) ............................................................................ 27, 32

*Sustainability Inst. v. Trump*,
  165 F.4th 817 (4th Cir. 2026) ................................................................................. 14

*Telecomm. Rsch. & Action Ctr. v. FCC*,
  750 F.2d 70 (D.C. Cir. 1984) .................................................................................. 37

*Thakur v. Trump*,
  163 F.4th 1198 (9th Cir. 2025) ............................................................................... 14

*Thompson v. N. Am. Stainless, LP*,
  562 U.S. 170 (2011) .............................................................................................. 19

*Train v. City of New York*,
  420 U.S. 35 (1975) ........................................................................................... 19, 33

*Trudeau v. FTC*,
  456 F.3d 178 (D.C. Cir. 2006) ................................................................................ 41

*Trump v. Boyle*,
  606 U.S. ---, 145 S. Ct. 2653 (2025) ...................................................................... 2, 14

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) .......................................................................................... 3, 45

*Trump v. Hawaii*,
  585 U.S. 667 (2018) .............................................................................................. 28

*Trump* v. *Mazars USA, LLP*,
  591 U.S. 848 (2020) .............................................................................................. 18

*United States v. Sanchez-Gomez*,
  584 U.S. 381 (2018) .............................................................................................. 21

ix

*United Stated v. Texas,*
  99 U.S. 670 (2023) .................................................................................................................... 27

*W. Va. Ass'n of Cmty. Health Ctrs., Inc. v. Heckler,*
  734 F.2d 1570 (D.C. Cir. 1984) .............................................................................................. 21

*Wilbur v. U.S. ex rel. Kadrie,*
  281 U.S. 206 (1930) .................................................................................................................. 43

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) .................................................................................................................... 4

**CONSTITUTION**

U.S. Const. art. II, § 3 .................................................................................................................... 39

**STATUTES**

2 U.S.C. § 681 ................................................................................................................................ 19

2 U.S.C. § 683 ............................................................................................................... 6, 9, 16, 34

2 U.S.C. § 684 ....................................................................................................................... 6, 16

2 U.S.C. § 686 ................................................................................................................................ 6

2 U.S.C. § 687 ....................................................................................................................... 6, 16

2 U.S.C. § 688 ....................................................................................................................... 6, 16

5 U.S.C. § 104 ................................................................................................................................ 6

5 U.S.C. § 701 .............................................................................................................. 15, 16, 22, 24

5 U.S.C. § 704 .............................................................................................................................. 25

5 U.S.C. § 706 .............................................................................................................. 12, 36, 38, 43

22 U.S.C. § 2151b .......................................................................................................................... 3

22 U.S.C. § 2346 ..................................................................................................................... 3, 4, 7

22 U.S.C. § 2348 ............................................................................................................................ 4

22 U.S.C. § 2349aa ........................................................................................................................ 4

22 U.S.C. § 2381 ............................................................................................................................ 4

22 U.S.C. § 2382 .......................................................................................................... 4, 33

22 U.S.C. § 2395 .......................................................................................................... 3, 33

22 U.S.C. § 6563 ............................................................................................................. 6, 7

22 U.S.C. § 6592 ............................................................................................................... 6

28 U.S.C. § 1361 ............................................................................................................. 42

31 U.S.C. § 1531 ............................................................................................................. 7,

42 U.S.C. § 10134 ........................................................................................................... 43

The Foreign Assistance Act of 1961 ("FAA"),
    Pub. L. No. 87-195, 75 Stat. 424 ................................................................................ 3

Impoundment Control Act of 1974 ("ICA"),
    Pub. L. No. 93-344, 88 Stat. 297 ........................................................................... 5, 15

Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"),
    Pub. L. No. 105-277, 112 Stat. 2681 .......................................................................... 6

Continuing Appropriations Act, 2020,
    Pub. L. No. 116-59, 133 Stat. 1093 (2019) ............................................................... 36

Continuing Appropriations Act, 2023,
    Pub. L. No. 117-180, 136 Stat. 2114 (2022) ............................................................. 36

Further Consolidated Appropriations Act, 2024 (the "FY 2024 Appropriations Act"),
    Pub. L. No. 118-47, 138 Stat. 460 ...................................................................... *passim*

Full-Year Continuing Appropriations and Extensions Act, 2025,
    Pub. L. 119-4, 139 Stat. 9 ............................................................................... 5, 30, 31

Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans
    Affairs, and Extensions Act, 2026 (the "Continuing Resolutions"),
    Pub. L. 119-37, 139 Stat. 495 (Nov. 12, 2025) .......................................................... 5

## REGULATIONS

Exec. Order No. 10,973, 26 Fed. Reg. 10,469 (Nov. 3, 1961) ....................................... 6

Exec. Order No. 14,169, 90 Fed. Reg. 8,619 (Jan. 20, 2025) ...................................... 7, 8

**LEGISLATIVE HISTORIES**

167 Cong. Rec. H7593 (daily ed. Dec. 9, 2021) ............................................................ 35

Congressional Power of the Purse Act, H.R. 6628, 116th Cong. § 101 (2020) ............................ 35

Protecting Our Democracy Act, H.R. 5314, 117th Cong. § 501 (2021) ...................................... 35

Protecting Our Democracy Act, H.R. 5048, 118th Cong. § 501 (2023) ...................................... 35

**OTHER AUTHORITIES**

Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245 (2001) ................................ 24

GAO B-115398 (OGC-76-2) (Oct. 26, 1977),
    https://www.gao.gov/assets/ogc-78-2.pdf ................................................................ 35

GAO B-115398 (ACG-76-5), Enclosure II (Aug. 12, 1975),
    https://www.gao.gov/assets/acg-76-5.pdf ................................................................ 35

GAO B-115398 (ACG-76-12) (Dec. 15, 1975),
    https://www.gao.gov/assets/acg-76-5.pdf ................................................................ 35

GAO, *Principles of Federal Appropriations Law* 6-26 to 6-30 (3d ed. 2006) (GAO Red Book),
    https://www.gao.gov/assets/gao-06-382sp.pdf ............................................................ 34

Letter from Mark R. Paoletta, General Counsel, OMB, to Tom Armstrong, General Counsel,
    GAO (Nov. 18, 2018),
    https://trumpwhitehouse.archives.gov/wp-content/uploads/2019/11/Letter-to-GAO-on-
    Rescissions.pdf .......................................................................................... 36

Memorandum from William H. Rehnquist, Assistant Att'y Gen., *Presidential Authority to
    Impound Funds Appropriated for Assistance to Federally Impacted Schools*,
    1 Supp. Op. O.L.C. 303 (1969),
    https://perma.cc/NRU3-DFK7 ................................................................................ 27

*Presidential Auth. to Impound Funds Appropriated for Assistance to Federally Impacted Schs.*,
    1 Supp. Op. O.L.C. 303 (Dec. 1, 1969) https://perma.cc/NRU3-DFK7 ...................................... 33

*The President's Veto Power*,
    12 Op. O.L.C. 128 (1988), https://perma.cc/9TXB-QNB2 .................................................... 33

Sec'y of State, Emergency Humanitarian Waiver to Foreign Assistance Pause (Jan. 28, 2025),
    http://state.gov/emergency-humanitarian-waiver-toforeign-assistance-pause .............................. 7

**INTRODUCTION**

Plaintiffs—organizations and professional associations with members that were grantees of various U.S. Agency for International Development ("USAID") programs—have received complete relief for their claims concerning the foreign assistance appropriations that expired on September 30, 2025. But they now seek far more capacious relief. Plaintiffs ask this Court to order the federal government to obligate *tens of billions of dollars* in foreign aid in the manner that Plaintiffs desire. Plaintiffs' novel legal theory would allow any individual, who might have a chance of receiving a fragment of an appropriation, to pursue claims under the Administrative Procedure Act ("APA") and not only force the Government to obligate *expired* funds but also dictate the time and manner in which those funds are obligated. This expansive theory cannot withstand scrutiny, and it is certainly not the law.

Plaintiffs contend that Defendants failed to apportion or obligate funds expiring on September 30, 2025, and September 30, 2026, in the amounts and for the purposes Congress prescribed. They further contend that Defendants unlawfully failed to obligate funds identified in the President's August 28, 2025, Special Message because Defendants allegedly failed to comply with the Impoundment Control Act ("ICA").

But all of these theories are foreclosed by higher court decisions in this very litigation. The Supreme Court in September 2025 stayed this Court's prior injunction after concluding that the Government had made a sufficient showing that the ICA precluded Plaintiffs' APA suit to enforce foreign assistance appropriations. *See Dep't of State v. Aids Vaccine Advoc. Coal.*, 606 U.S. ---, 146 S. Ct. 19, 19 (2025) ("*AVAC*"), And the D.C. Circuit in August 2025 likewise held that the ICA establishes a carefully calibrated process of interbranch notice, congressional consideration, and enforcement by the Comptroller General. *See Glob. Health Council v. Trump*, 153 F.4th 1, 7, 19 (D.C. Cir. 2025) ("*GHC*"). Plaintiffs attempt to circumvent these holdings by simply relabeling their impoundment claims as claims to enforce the underlying appropriations statutes. But the substance of these claims remains the same: Plaintiffs seek judicial enforcement of statutory expenditure obligations arising from the alleged rescission, withholding, or deferral of

1

appropriated funds.  Because those claims necessarily arise under the ICA, whether or not Plaintiffs expressly invoke it, they are subject to the ICA's framework and are thus precluded.

The Supreme Court's decision cannot be disregarded merely because it arose in an interim posture.  Although interim orders are not necessarily conclusive on the merits, they must "'inform how a [lower] court' proceeds 'in like cases,'" *Trump v. Boyle*, 606 U.S. ---, 145 S. Ct. 2653, 2654 (2025).  And, as Justice Gorsuch explained in *Nat'l Insts. of Health v. Am. Pub. Health Ass'n ("NIH")*: "even probabilistic holdings—such as [a] top-line conclusion that 'the Government is likely to succeed in showing the District Court lacked jurisdiction,'. . . must 'inform how a [lower] court' proceeds 'in like cases,'" 606 U.S. ---, 145 S. Ct. 2658, 2664 (2025) (Gorsuch, J., concurring in part and dissenting in part) (citation omitted).  A contrary ruling would be in considerable tension with the Supreme Court's "top-line conclusion" in this very litigation.  *Id*. at 2664 (stating that the reasoning in a decision for interim relief "bind[s] lower courts as a matter of vertical *stare decisis*.").

Even apart from preclusion, Plaintiffs' claims independently fail.  Their claims on funds expiring at the end of FY 2025 are moot because virtually all of the relevant appropriations have been obligated or have expired consistent with the appropriations acts. A live controversy no longer exists requiring this Court to compel the obligation of those funds.  And Plaintiffs' claims on funds expiring at the end of FY 2026 is no less defective.  Plaintiffs identify no discrete, final agency action reflecting a consummated decision not to obligate the relevant funds.  The applicable period of availability has not expired, and the Department of State and USAID are working to obligate the funds during that period.  Time remains for the agencies to obligate the funds, and all the while, hundreds of millions of dollars that Plaintiffs previously characterized as unlawfully withheld have already been disbursed.  The APA does not authorize courts to supervise an agency's day-to-day administration of appropriations or to compel broad programmatic compliance untethered to a discrete agency action that the agency is legally required to take.  Not only have Plaintiffs failed to allege any reviewable discrete agency action, but the program funding decisions are also committed to agency discretion by law; thus, their APA claims are simply unreviewable.

2

Moreover, the Court should deny Plaintiffs' substantive APA claims: Defendants have acted consistently with the law, and have engaged in rational and reasoned decisionmaking as evidenced by the voluminous administrative record. Nor have Defendants unreasonably delayed any agency action. Ample time remains to obligate any funds not already obligated.

Plaintiffs' constitutional claims—for alleged violations of the separation of powers and the Take Care Clause—fare no better. As the D.C. Circuit stated in *GHC,* those claims, camouflaged as statutory claims, have been recast in constitutional dressing and are foreclosed by *Dalton v. Specter*, 511 U.S. 462 (1994). As for the Take Care Clause, it does not provide a cause of action to review agency action. And Plaintiffs' other theories—that either Defendants acted *ultra vires* or that Plaintiffs should receive mandamus relief for the same actions that are part of Plaintiffs' APA challenges—simply cannot meet the exceedingly high standards required to warrant relief.

Finally, Plaintiffs' requested relief goes beyond appropriate limits in an APA case. At most this Court has authority to vacate any allegedly unlawful agency actions and remand the matter to Defendants for further explanation or other action consistent with the correct legal standards. Yet Plaintiffs seek a blanket injunction governing broad categories of agency conduct without establishing that those actions have any specific relationship to the named Plaintiffs or their asserted injuries. Such relief may extend no further than necessary to provide relief to the plaintiffs with standing before the Court. *Trump v. CASA, Inc.*, 606 U.S. 831, 851-52 (2025).

Plaintiffs seek a second and third bite at the proverbial apple for claims that have been largely, if not entirely, foreclosed. This Court should enter Summary Judgement for Defendants.

**BACKGROUND**

**1. *Foreign Aid Funds.*** The Foreign Assistance Act of 1961, Pub. L. No. 87-195, 75 Stat. 424 ("FAA"), is the statutory framework for most foreign assistance programs. It confers on the President and the Executive Branch broad discretion to determine how best to implement foreign assistance programs. *See, e.g.*, 22 U.S.C. § 2395(a) (foreign assistance "may be furnished" on "such terms" as "may be determined to be best suited to the achievement of the purposes" of the FAA); *see also, e.g.*, *id.* § 2151b(c)(1) ("the President is authorized to furnish assistance, on such

3

terms and conditions as he may determine, for health programs"); *id.* § 2346(a) (economic and political stability assistance); *id.* § 2348 (peacekeeping operations); *id.* § 2349aa (antiterrorism assistance). Consistent with the "President's 'vast share of responsibility for the conduct of our foreign relations,'" *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (quoting *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 610-611 (1952) (Frankfurter, J., concurring)), the FAA also ensures that foreign assistance programs align with the President's foreign policy by tasking the Secretary of State, "[u]nder the direction of the President," with the responsibility of the "continuous supervision and general direction of economic assistance" to ensure that "the foreign policy of the United States is best served thereby." 22 U.S.C. § 2382(c); *see also, e.g.*, *id.* § 2382(a); *id.* § 2346(b). The FAA generally provides that "[t]he President may exercise any functions conferred upon him by this chapter through such agency or officer of the United States Government as he shall direct." *Id*. § 2381.

Since establishing the general statutory framework governing foreign assistance programs, Congress has regularly appropriated funds to allow the Executive Branch to implement those programs. In fiscal year 2024, Congress appropriated substantial foreign assistance funds in division F of the FY 2024 Appropriations Act. Congress took various approaches and addressed various operational and programmatic needs of the government's foreign assistance programs. In some circumstances, Congress appropriated large sums while significantly preserving the Executive Branch's discretion relating to how to use those funds. *See, e.g.*, Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 742 (the "FY 2024 Appropriations Act") (appropriating nearly $4 billion for necessary expenses to carry out FAA provisions that relate to "development assistance"); *id.* at 744 (appropriating nearly $5 billion for necessary expenses to FAA provisions relating to "international disaster relief, rehabilitation, and reconstruction assistance" and nearly $4 billion for various activities "to meet refugee and migration needs").

In other circumstances, Congress imposed substantive restrictions on the use of those funds. For example, Congress appropriated nearly $4 billion for global health programs—that is,

for "such activities as" "child survival and maternal health programs," "immunization and oral rehydration programs," "family planning/reproductive health," and others. *Id.* at 740. But in appropriating those funds, Congress also included provisions restricting how those funds could be spent, such as prohibiting the use of funds "to pay for the performance of abortion as a method of family planning" or "to lobby for or against abortion" and directing that any "voluntary family planning project" funded with the appropriation "shall meet" various requirements. *Id.* at 740-41.

Congress also earmarked funds for more specific purposes or specific recipients. *See, e.g.*, *id.* at 742 (appropriating more than $6 billion for expenses related to "the prevention, treatment, and control of, and research on, HIV/AIDS," including $1.65 billion "for a United States contribution to the Global Fund to Fight AIDS, Tuberculosis and Malaria"). Congress further appropriated funds to support the administration of foreign assistance programs. *See, e.g.*, *id.* at 739-40 (funds to finance the Executive Branch's operating expenses and capital expenditures necessary to implement foreign assistance programs).

Some of the funds appropriated in division F of the FY 2024 Appropriations Act expired on September 30, 2025, while other funds remain available until later dates or until expended. *See, e.g.*, *id.* at 742. Congress also enacted two continuing resolutions—making new appropriations, under the same authorities and conditions as the FY 2024 foreign assistance appropriations—for fiscal years 2025 and 2026. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, §§ 1101-08, 139 Stat. 9, 10-12; Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026, Pub. L. No. 119-37, 139 Stat. 495 (Nov. 12, 2025) (the "Continuing Resolutions").

**2. *Impoundment Control Act.*** Congress has sought to impose certain requirements on the Executive's decisions whether to obligate and expend appropriated funds through the Impoundment Control Act of 1974, Pub. L. No. 93-344, tit. X, 88 Stat. 297, 332. The ICA provides that the President may transmit a "special message" to Congress whenever he "determines that all or part of any budget authority will not be required to carry out the full objectives or scope of programs for which it is provided or that such budget authority should be rescinded for fiscal policy

or other reasons" or "whenever all or part of budget authority provided for only one fiscal year is to be reserved from obligation for such fiscal year." 2 U.S.C. § 683(a). That special message must contain specific information about the proposed rescission, including "the amount of budget authority" involved and "the reasons why the budget authority should be rescinded." *Id.*

Once Congress receives a special message, it can pass legislation rescinding some or all funds covered by the special message. The statute specifies certain procedures to ensure timely consideration of any such rescission bill. *See id.* § 688. But if Congress has not "completed action on a rescission bill rescinding all or part of the amount proposed to be rescinded" within 45 days, then the statute states that the amount proposed to be rescinded "shall be made available for obligation." *Id*. § 683(b). In addition, the President must transmit a special message to Congress whenever the Executive Branch "proposes to defer any budget authority provided for a specific purpose or project," which are "permissible" in certain specified situations. *Id.* § 684(a)-(b).

Finally, the ICA provides mechanisms for the Comptroller General, an official within the Legislative Branch, to enforce the statute. If the Comptroller General concludes that the "President has failed to transmit a special message with respect to" a particular deferral or decision to establish a reserve, he is directed to "make a report on such reserve or deferral and any available information concerning it to both Houses of Congress." *Id*. § 686(a). And if "budget authority is required to be made available for obligation and such budget authority is not made available for obligation," the statute provides that the Comptroller General may "bring a civil action" in district court under specified conditions. *Id*. § 687.

**3. *USAID.*** In 1961, President Kennedy issued Executive Order 10,973, directing the Secretary of State to "establish an agency in the Department of State to be known as the Agency for International Development." Exec. Order No. 10,973 § 102, 26 Fed. Reg. 10469 (Nov. 3, 1961). Section 1413 of the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, 112 Stat. 2681, recognized USAID as an "independent establishment." *See* 22 U.S.C. § 6563; 5 U.S.C. § 104. Under FARRA, the USAID Administrator is "under the direct authority and foreign policy guidance of the Secretary of State." 22 U.S.C. § 6592. And several

6

types of foreign assistance are jointly administered by the Department of State and USAID. *See, e.g.*, *id.* § 6563; *id.* § 2346(b) (economic support funds).

Upon taking office, President Trump paused United States foreign development assistance to allow his administration to assess programmatic efficiencies and to ensure that all foreign aid is consistent with United States foreign policy. *See* Exec. Order No. 14,169, *Reevaluating and Realigning United States Foreign Aid*, 90 Fed. Reg. 8619 (Jan. 20, 2025). Secretary of State Marco Rubio implemented this Executive Order through a direction issued on January 24, 2025. Marocco Decl., No. 1:25-cv-352, ECF No. 20-1, ¶ 3, (Feb. 10, 2025). Secretary Rubio also approved some waivers of the pause, including waivers for foreign military financing for Israel and Egypt, emergency food expenses, administrative expenses, and certain expenses incurred before the pause went into effect, *id.* ¶ 10, and a waiver of the pause for life-saving humanitarian assistance during the review. *See* Sec'y of State, Emergency Humanitarian Waiver to Foreign Assistance Pause (Jan. 28, 2025), http://state.gov/emergency-humanitarian-waiver-toforeign-assistance-pause; Defs.' Opp'n to Pls.' Mots. For Prelim. Relief, ECF No. 34. Some USAID and State awards were also retained, while others were terminated. Joint Status Report, ECF No. 42.

The FY 2024 Appropriations Act gives the President and the Secretary of State broad discretion to use appropriated funds. The FY 2024 Appropriations Act appropriated to the President $1,695,000,000 for "necessary expenses to carry out the provisions of section 667 of the [FAA]," 138 Stat. at 739, which authorizes funding for certain operational activities. It further provided that the Secretary of State may transfer certain appropriated funds to USAID's operating expenses account. *Id.* Finally, the FY 2024 Appropriations Act allows for the reprogramming of funds subject to prior notice to the Committees on Appropriations. *Id.* at 766. Elsewhere, Congress generally authorized the transfer of funds from one agency to another "to finance or discharge a function or activity transferred or assigned under law." 31 U.S.C. § 1531(a).

**4. *This Litigation*.** This suit arises from implementation of the President's Executive Order No. 14,169, which states that "[i]t is the policy of the United States that no further United

States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President of the United States." 90 Fed. Reg. at 8619.

Plaintiffs filed their original complaint in February 2025, raising constitutional, APA, and *ultra vires* challenges to the termination of foreign-assistance awards as well as the pause of obligating appropriated funds for future awards. ECF No. 1. After initially issuing a temporary restraining order, *see* ECF No. 4, the Court entered a preliminary injunction order, holding that Plaintiffs were likely to succeed on their claims that Defendants unlawfully "engag[ed] in a unilateral rescission or deferral of congressionally appropriated funds in violation of Congress's spending power" and did not follow the ICA's procedures. Prelim. Inj. Order, ECF No. 60, at 29-37. The Court enjoined the government "from unlawfully impounding congressionally appropriated foreign aid funds" and ordered Defendants to "make available for obligation the full amount of funds" appropriated in the FY 2024 Appropriations Act. *Id.* at 48.

On appeal, the U.S. Court of Appeals for the D.C. Circuit reversed, finding that Plaintiffs "lack[ed] a cause of action to press their claims." *GHC,* 153 F.4th at 7. The court held that Plaintiffs likely could not assert a constitutional claim for alleged violations of separation-of-powers principles because under *Dalton v. Specter*, 511 U.S. 462 (1994), Plaintiffs may not "recast statutory claims as constitutional ones" to evade any limitations to judicial review. *See GHC*, 153 F.4th at 14, 17. The court also held that Plaintiffs' APA claim—to enforce the ICA provisions that govern when the Executive Branch must make funds available for obligation—is "impliedly precluded." *Id.* at 18 (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984)). Specifically, because the ICA contains a complex and delicate scheme with an enforcement mechanism available for the Comptroller General only, the ICA impliedly prevented "backdoor [] citizen suits to enforce the ICA at any time and without notice to the Congress of the alleged violation." *Id.* at 19. Finally, the D.C. Circuit held that Plaintiffs could not assert an *ultra vires* claim because Plaintiffs could point to no "specific prohibition that defendants [] violated to an extreme and nearly jurisdictional degree" and instead "basically dress[ed] up a typical statutory-authority argument as an ultra vires claim." *Id.* at 20-21 (quoting *Nuclear Regul. Comm'n v. Texas*,

8

605 U.S. 665, 682 (2025) ("*NRC*")).  After the vacatur of the preliminary injunction, the President promptly transmitted to Congress a special message under the ICA proposing rescissions of approximately $4 billion in funds.  *See* Notice of Transmittal of Special Message Under 2 U.S.C. § 683, ECF No. 129.

On remand, Plaintiffs moved to amend the complaint a second time and sought preliminary relief as well as partial summary judgment to compel the government to obligate all funds expiring on September 30, 2025.  Pls.' Mot. for a TRO, Prelim. Inj., and Partial Summ. J., ECF No. 133.  Plaintiffs contended that the appropriations statutes themselves required Defendants to obligate all funds, including the $4 billion that the President proposed for rescissions.  Mem. of L. in Supp. of Pls.' Mot. for a TRO, Prelim. Inj., and Partial Summ. J., ECF No. 133-1.  The Court granted Plaintiffs' requested relief in part, stating that even though Plaintiffs could not enforce violations of the ICA process, APA claims "based on the appropriations acts" are "completely independent of whether Defendants have complied or failed to comply with the ICA's requirements" because they "seek[] to enforce compliance with the appropriations acts."  Mem. Opinion and Order, ECF No. 139 at 16.  The Court then held that the appropriations statutes required Defendants to obligate all appropriate funds that were expiring on September 30, 2025.  *Id.* at 21-26.  After not receiving a stay from this Court or the D.C. Circuit, Defendants obtained a stay from the Supreme Court.

The Supreme Court held that (1) Defendants "made a sufficient showing that the Impoundment Control Act precludes respondents' suit, brought pursuant to the Administrative Procedure Act, to enforce the appropriations at issue"; (2) "mandamus relief is unavailable to [Plaintiffs]"; and (3) "the asserted harms to the Executive's conduct of foreign affairs appear to outweigh the potential harm faced by respondents."  *AVAC*, 146 S. Ct. at 19.  In dissent, Justice Kagan recognized that if any expiring funding under the FY 2024 Appropriations Act was not obligated before the end of the fiscal year (September 30, 2025), then the funding would "become unavailable for spending . . . ***for all time***."  *Id.* at 21 (Kagan, J., dissenting) (emphasis added); *see also id.* at 23 (noting that the Court's ruling "allow[ed] the Executive to cease obligating $4 billion in funds that Congress appropriated for foreign aid").

**5.** *The Third Amended Complaint.*  After the Supreme Court's ruling, eight Plaintiffs moved to file the Third Amended Complaint, which "removes allegations and claims based on previous contracts, grants, cooperative agreements, and other awards that Plaintiffs held, including allegations and claims relating to the termination of Plaintiffs' contracts, grants, cooperative agreements, and other awards."  GHC Pls.' Mot. for Leave to File 3rd Am. Compl., ECF No. 171 at 1.  Plaintiffs assert eighteen causes of action—ranging from claims under the APA and that Defendants acted *ultra vires* to alleged violations of the separation of powers—involving four categories of actions allegedly taken by Defendants.  First, Plaintiffs claim that Defendants "decided not to spend foreign assistance appropriations in the amounts that Congress required, for the purposes that Congress required, and by the deadlines Congress required."  3rd Am. Compl., ECF No. 174 ¶ 5.  Second, Plaintiffs claim that Defendants eliminated "foreign assistance programs, initiatives, offices, and partnerships" that "advanced U.S. interests as determined by Congress and provided a lifeline to millions of persons in need around the world."  *Id.* ¶ 6.  Third, Plaintiffs claim that "Defendants acted unlawfully in their disposition of billions of dollars of appropriations at the end of Fiscal Year 2025, with respect both to money they did obligate and money they did not."  *Id.* ¶ 7.  Fourth, Plaintiffs claim that "Defendants' abolishment of USAID as an executive agency violates foundational principles of the separation of powers."  *Id.* ¶ 8.

**6.** *Litigation Since Plaintiffs' Third Amended Complaint.*  In response to Plaintiffs' Third Amended Complaint, Defendants filed a Motion to Dismiss on January 23, 2026, ECF No. 176.  Plaintiffs filed their Opposition shortly thereafter, ECF No. 178, followed by Defendants' Reply on February 24, 2026, ECF No. 181.  While Defendants' Motion to Dismiss was pending before this Court, Plaintiffs filed a "notice" asking the Court to (1) take judicial notice of USAID's April 2026 congressional notification, and (2) requested that the Court expedite ruling on Plaintiffs' claims, among other forms of contemplated relief.  ECF No. 183.  Defendants promptly filed a motion to strike Plaintiffs' alleged notice, arguing that under the applicable caselaw the alleged notice constituted an improper sur-reply and should be struck from the docket.  ECF No. 184.  The Court soon after held a status conference.  In the June 12, 2026, status conference, the Court agreed

10

with Defendants that Plaintiffs' "notice" was improper and struck it from the record. June 12, 2026, Hr'g Tr. at 10:6-8. At the same time, the Court considered Plaintiffs' request to expedite the case to partial summary judgment notwithstanding Defendants' pending Motion to Dismiss. The Court thereafter entered an expedited schedule regarding production of the Administrative Record ("AR") and the parties' summary judgment briefs addressing Plaintiffs' funding claims:

> By June 26, 2026, Defendants shall produce the administrative record for Plaintiffs' funding claims, insofar as they concern funds set to expire on September 30, 2025, and funds set to expire on September 30, 2026. Recognizing Defendants' submission that it may be more logical and feasible to produce the administrative record by appropriations law rather than by expiration date, Defendants may produce the administrative record as to each appropriations law implicated by Plaintiffs' funding claims, as long as doing so would encompass the full administrative record for funds set to expire on September 30, 2025, and funds set to expire on September 30, 2026. Plaintiffs shall file any motion to supplement the administrative record by July 1, 2026. The parties shall file their motions for summary judgment by July 13, 2026, their responses by July 23, 2026, and their replies by July 28, 2026.

June 12, 2026 Min. Order. This schedule was ultimately revised by the Parties' agreement with the administrative record[1] due on July 23, 2026, consisting of rolling productions on July 9, 16, 20 and 23, motions for summary judgment due on July 27, 2026, and replies due on August 3, 2026. *See* Joint Status Report, ECF No. 190. Plaintiffs' claims about the alleged abolishment of USAID (Claims 7-11) and about any funding that expires after September 30, 2026 are not at issue in the current summary judgment schedule. Those claims remain subject to Defendants' pending motion to dismiss, as do all the claims at issue here.

**STATEMENT OF FACTS**

Given the expedited nature of this briefing, any relevant factual materials are noted within the body of the brief.

---

[1] Defendants intend to produce the cited portions of the administrative record shortly after the briefing period has concluded. If Defendants move to file such documents under seal, Defendants will follow the procedures set forth in this Court's standing order, ECF No. 32.

11

**LEGAL STANDARD**

When agency action is challenged under the APA, summary judgment "serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Select Specialty Hosp.-Akron, LLC v. Sebelius*, 820 F. Supp. 2d 13, 21 (D.D.C. 2011))*, aff'd,* 80 F.4th 346 (D.C. Cir. 2023). Under the APA, an agency action may not be set aside unless it is "arbitrary," "capricious," or "not in accordance with law." 5 U.S.C. § 706(2)(A). APA review of final agency action is highly deferential, and the agency's actions are presumed to be valid. "[A] court is not to substitute its judgment for that of the agency," *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 16 (2020) (citation omitted), but instead to assess only whether the decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment," *id.* (citation omitted).

**ARGUMENT**

Plaintiffs' claims concerning foreign assistance funds fall into a few categories. *First*, Plaintiffs allege that Defendants have failed to obligate certain appropriated amounts of foreign assistance funds by the date of their expiration, as relevant here September 30, 2025. 3rd Am. Compl. ¶¶ 127-67; 207-42; and Plaintiffs also *appear* to allege that Defendants will fail to obligate certain other funds by the date of their expiration on September 30, 2026. *Id.* ¶¶ 127-67. *Second*, Plaintiffs allege that Defendants improperly failed to obligate funds subject to the President's Special Message of August 28, 2025, including because Defendants allegedly failed to comply with the Impoundment Control Act. *Id.* ¶¶ 207-47. *Finally*, Plaintiffs allege that Defendants have improperly allocated various funds to purposes not authorized by Congress or in amounts not consistent with congressional appropriations. *See id.* ¶¶ 127-67; 207-42

Plaintiffs' claims fail for a host of reasons. Numerous threshold defects apparent on the face of the pleadings are fatal to all of these claims. And even if the Court reaches the merits of these claims as evaluated against the AR, Plaintiffs find no basis for relief.

12

## I.   THRESHOLD DEFECTS DOOM PLAINTIFFS' FUNDING CLAIMS

Plaintiffs allege a total of thirteen claims related to Defendants' failure to obligate foreign assistance funds Congress appropriated in the FY 2024 Appropriations Act and the Continuing Resolutions.  3rd Am. Compl. ¶¶ 127-67, 207-47.  Those claims should be dismissed in their entirety for several reasons.  *First*, the Supreme Court's order in this case forecloses Plaintiffs' theory that they may pursue an APA claim under the Appropriations Acts and Continuing Resolutions because the ICA precludes such a suit.  *Second*, most claims related to the FY 2024 Appropriations Act are moot as the relevant two-year funds either have been obligated or have lapsed.  *Third*, even were that not the case, the funding decisions at issue are committed to agency discretion by law.  *Fourth*, Plaintiffs fail to state a claim because they do not challenge any identifiable final agency action.  *Fifth*, Plaintiffs have not plausibly alleged that Defendants acted arbitrary or capriciously because the agency has acted reasonably, or that Defendants unreasonably delayed obligating funds because Plaintiffs do not allege any discrete agency action that Defendants had a non-discretionary duty to perform.  *Finally*, Plaintiffs cannot demonstrate that they have any basis to require the funds included in the President's rescission proposal to be obligated since those funds were withheld from obligation consistent with the ICA and have now lapsed pursuant to the terms of the relevant appropriations.

### A.  All of Plaintiffs' Funding Claims Under the APA Are Foreclosed by the Supreme Court's September 26, 2025 Order and Precluded by the ICA

1.  The Supreme Court has already decided that Defendants "made a sufficient showing that the Impoundment Control Act precludes [Plaintiffs'] suit, brought pursuant to the Administrative Procedure Act, to enforce the appropriations at issue here."  *AVAC,* 146 S. Ct. at 19.  That order forecloses all of Plaintiffs' funding claims under the APA.[2]

---

[2] *See* 3rd Am. Compl. ¶ 131 (First Claim for Relief) (seeking to enforce the FY 2024 Appropriations Act and Continuing Resolutions, which allegedly "required that the appropriation amount 'shall' be apportioned to USAID or the State Department" and "that specific or minimum amounts 'shall be made available' by USAID and the State Department"); *id.* ¶ 138 (Second Claim for Relief) ("Defendants' decisions not to obligate foreign assistance appropriations in the amounts and for the purposes that Congress directed are arbitrary and capricious."); *id.* ¶ 148 (Third Claim

13

This Court previously held that "there is no impediment to judicial review of an agency's unilateral decision not to spend funds through an APA claim premised on appropriations acts" when it reviewed Plaintiffs' nearly identical prior claims. ECF No. 139 at 12. But the Supreme Court disagreed, holding that the ICA likely precluded such an avenue of relief. *See AVAC*, 146 S. Ct. at 19. Nothing counsels a different outcome here.

That the Supreme Court's order granted only interim relief pending appeal does not change that result. The Supreme Court "often addresses requests for interim relief," and when it "issues a decision, it constitutes a precedent that commands respect in lower courts," with its "reasoning bind[ing] lower courts as a matter of vertical *stare decisis*." *NIH*, 145 S. Ct. at 2663 (Gorsuch, J., concurring in part and dissenting in part); *see also Boyle*, 145 S. Ct. at 2654 (interim orders in like cases "inform how a court should exercise its equitable discretion in like cases"). And the Ninth Circuit recently recognized that it was "bound" by the Supreme Court's interim order on reviewability under the APA of grant termination challenges, *see Thakur v. Trump*, 163 F.4th 1198, 1204 (9th Cir. 2025) ("We are bound by *NIH*, which held that the APA's limited waiver of sovereign immunity did 'not provide the District Court with jurisdiction to adjudicate' similar APA claims challenging grant terminations." (quoting *NIH*, 145 S. Ct. at 2658)), while the Fourth Circuit followed *NIH* and another recent interim docket decision, saying that those cases were

for Relief) ("The [FY] 2024 Appropriations Act, the 2025 Continuing Resolution, and prior appropriations acts mandate that Defendants obligate the full amounts appropriated by specific deadlines and for specific purposes, with no discretion to spend less than those full amounts. Defendants have non-discretionary duties to comply with these commands."); *id.* ¶ 208 (Twelfth Claim for Relief) ("In the [FY] 2024 Appropriations Act and prior appropriations acts, Congress included directives in Sections 7030-7061 requiring that minimum or specific amounts of funds 'shall be made available' for specific purposes."); *id.* ¶ 220 (Thirteenth Claim for Relief) ("The 2024 Appropriations Act and prior appropriations acts mandated that Defendants obligate the full amount of funds included in the special message by September 30, 2025 . . . ."); *id.* ¶ 229 (Fifteenth Claim for Relief) ("Defendants have made a final decision not to obligate the appropriations included in the August 28, 2025 special message."); *id.* ¶ 235 (Sixteenth Claim for Relief) ("Defendants' failure to obligate funds included in the August 28, 2025 rescission proposal constitutes agency action unlawfully withheld.").

14

"instructive" and that the plaintiffs could not "circumvent" them. *See Sustainability Inst. v. Trump*, 165 F.4th 817, 827 (4th Cir. 2026).

The Supreme Court's decision applies to the funds at issue here. *First*, the Court had made that determination expressly for a subset of funds presently at issue, those expiring at the end of September 30, 2025. *Second*, the Court's holding necessarily also extends to the funds expiring at the end of September 30, 2026. The reasoning underlying the Supreme Court's order does not change merely because some of the funds at issue are available for obligation in a different fiscal year. Indeed, "even probabilistic holdings—such as California's top-line conclusion that 'the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA,'—must 'inform how a [lower] court' proceeds 'in like cases,'" *NIH*, 145 S. Ct. at 2664 (Gorsuch, J., concurring in part and dissenting in part)(citation omitted). Under the Supreme Court's decision, this is just such a "like case." A different outcome here, when the funds at issue are materially the same, would be in considerable tension with the Supreme Court's holding. And "unless we wish anarchy to prevail within the federal judicial system," a precedent of the Supreme Court "must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be." *Hutto v. Davis*, 454 U.S. 370, 375 (1982) (per curiam).

To be sure, this applies to *all* of Plaintiffs' alleged withholding or delay claims. The ICA imposes limits on the Executive Branch's ability to delay or withhold the spending of appropriated funds. *See Glob. Health Council v. Trump*, 153 F.4th 1, 8 (D.C. Cir. 2025), *reh'g en banc denied by*, No. 2025 WL 2709437 (D.C. Cir. Aug. 28, 2025); *see also Child Trends, Inc. v. U.S. Dep't of Educ.*, 795 F. Supp. 3d 700, 720 (D. Md. 2025) ("The ICA establishes 'congressional control over the impoundment of funds by the Executive Branch' and prohibits the Executive from impounding congressionally appropriated funds, unless certain procedures are followed.") (quoting Pub. L. No. 93-344). Thus, all of Plaintiffs' alleged rescission, withholding, or delay claims fall under the ICA's regime and therefore are precluded under the Supreme Court's decision.

15

2. Even had the Supreme Court not already provided clear guidance about the ICA's preclusive effect on Plaintiffs' APA claims, the ICA is the exclusive means for enforcing the appropriations at issue. A plaintiff may not seek review under the APA if "statutes preclude judicial review." 5 U.S.C. § 701(a)(1). By providing a detailed scheme for administrative and judicial review, Congress can displace the APA's default cause of action. *See, e.g.*, *Block*, 467 U.S. at 345. Preclusion of review is determined "not only from [the statute's] express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Id.* Congress may "preclude[] all judicial review" or may instead limit judicial review to a particular channel or a type of case. *Id.*

For instance, Congress may impliedly preclude some parties from seeking APA review by establishing a "complex and delicate" scheme that provides for judicial review only by others. *Id.* at 347-48. That was true in *Block* itself, where the Supreme Court held that Congress had precluded an APA action brought by consumers seeking judicial review of milk market orders issued by the Secretary of Agriculture. *Id.* at 341. The relevant statute provided a mechanism for dairy handlers to seek judicial review after administrative exhaustion and allowed for "[h]andlers and producers—but not consumers" to "participate in the adoption and retention of market orders." *Id*. at 346. By omitting consumers, Congress intended to foreclose them from seeking judicial review of market orders. *Id*. at 347. Allowing otherwise would "effectively nullify" the administrative exhaustion that Congress had expressly required. *Id*. at 348.

The ICA's political-branch procedures and specific judicial-review mechanism preclude APA review of Plaintiffs' claims in an even more straightforward manner: only the Comptroller General may bring claims that the Executive Branch engaged in unlawful impoundments by failing to obligate the funds at issue. Plaintiffs sue to compel Defendants to "ma[k]e available for obligation" appropriations that are purportedly "required to be made available" under the appropriations statutes but are "not made available for obligation" by the President. 2 U.S.C. § 687. Consequently, Plaintiffs bring a suit of the type that the ICA assigned only to the

16

Comptroller General, compelling the conclusion that the ICA "preclude[s] judicial review" of Plaintiffs' APA claims.  *See* 5 U.S.C. § 701(a)(1).

As the D.C. Circuit recognized, *any* presidential rescission or deferral of *any* budget obligation falling within the ICA's scope is subject to the statute's "complex scheme of notification," potential "congressional action," and "suit by a specified legislative branch official" after notice to Congress.  *GHC*, 153 F.4th at 18.  The President must notify Congress when he proposes to defer or rescind the appropriated funds in a "special message" that meets particular statutory requirements.  2 U.S.C. §§ 683(a), 684(a).  Congress then determines how to respond: discussion and negotiation between the political branches can ensue; Congress can disapprove the rescission or deferral; it can vote to rescind some parts of the package but not others; it can legislate further; and it can decline to respond.  *See id*. § 688.

The ICA expressly permits judicial enforcement only at the end of that process and only by the Comptroller General.  *Id*. § 687.  Congress contemplated that those suits cover any instance in which, "under this Act, budget authority is required to be made available for obligation and such budget authority is not made available for obligation," and it specifically chose to limit the venue to the U.S. District Court for the District of Columbia and "expressly empowered" the court to enter "any decree, judgment, or order which may be necessary or appropriate to make such budget authority available for obligation."  *Id.*  The ICA also requires such suits may happen only twenty-five in-session days after the Comptroller General provides Congress with a statement explaining the "circumstances giving rise to the action contemplated," allowing Congress the opportunity to avoid litigation.  *Id.*

And any argument that the Comptroller General could not establish standing under the ICA is immaterial.  Even if true, that does not mean that Plaintiffs have a cause of action.  What matters, as the D.C. Circuit concluded, is that only the GAO, through the Comptroller General, can bring such claims.  *GHC*, 153 F.4th at 19; *see also Gen. Land Off. v. Biden*, 722 F. Supp. 3d 710, 734-35 (S.D. Tex. 2024) (concluding that since "the ICA provides that the Comptroller General may bring suit for alleged ICA violations and meticulously outlines the mechanism for doing

17

so . . . APA review for ICA violations is improper[,]" and noting further that plaintiffs' ICA-based APA claim was thus "precluded from judicial review."), *mot. denied by sub. nom*, *Gen. Land Off. v. Trump*, 2025 WL 3050184 (S.D. Tex. Sep. 15, 2025). Even if certain appropriations may mandate that specific payments be made to a specific entity by a specific date—statutes that the ICA expressly declines to supersede—there is no freestanding ability for Plaintiffs to circumvent the ICA process through an APA suit.

Further, this statutory scheme preserves the political branches' accountability for enacting and implementing the appropriations laws and accounts for the possibility that the Executive Branch may decide to withhold funds in a wide variety of contexts for a wide variety of reasons— some of which may implicate the Executive's own constitutional prerogatives, some of which may give Congress no concern at all, and some of which may draw a response from Congress affirmatively acquiescing in or rejecting the Executive's proposal. *Cf. City of New Haven v. United States*, 809 F.2d 900, 901 (D.C. Cir. 1987) (explaining how Congress has previously acknowledged that "the executive branch necessarily withholds funds on hundreds of occasions during the course of a fiscal year" and such delays may result from "the normal and orderly operation of the government"). In keeping with the long history of the political branches resolving appropriations disputes, the ICA's procedures ensure that the political branches—not courts or private parties—largely control disputes over the President's decisions relating to the obligation and expenditure of funds appropriated by Congress.

"[I]t does not make sense that the Congress would craft a complex scheme of interbranch dialogue but *sub silentio* also provide a backdoor for citizen suits" through the APA "at any time and without notice to the Congress of the alleged violation." *GHC*, 153 F.4th at 19. That reticulated scheme of give-and-take between the political branches and congressional notification before suit necessarily forecloses private parties from seeking judicial review, supplanting interbranch negotiations, and leapfrogging the Comptroller General. *See Block*, 467 U.S. at 347-48. Any disputes between the President and Congress are to be "hashed out in the hurly-burly, the give-and-take of the political process between the legislative and the executive," *Trump v. Mazars*

18

*USA, LLP*, 591 U.S. 848, 859 (2020) (citation omitted)—not through private suits by potential downstream beneficiaries of appropriations. Plaintiffs' suit to force Defendants to obligate all funds, and to obligate them in the manner Plaintiffs desire——would "severely disrupt" the ICA's "complex and delicate administrative scheme." *Block*, 467 U.S. at 348. Were it otherwise, private litigants could circumvent the ICA as to virtually any appropriations, claiming that the underlying appropriations statutes require faster or different obligations regardless of whether the political branches are poised to resolve those same disputes via the ICA's procedures. Accordingly, Plaintiffs' APA funding claims must be dismissed.

3. The ICA's disclaimer—that nothing in it "shall be construed" as "affecting in any way the claims or defenses of any party to litigation concerning any impoundment," 2 U.S.C. § 681(3)—does not change the result. As the D.C. Circuit recognized, that language "disclaims any effect on the claims or defenses of any party *that may bring litigation*" and "also meant that a case then-pending before the Supreme Court at the time that the ICA became law was not moot." *GHC*, 153 F.4th at 19. The Supreme Court recognized the latter effect of that provision in holding that the ICA did not moot a suit concerning the allotment of certain appropriated funds that was pending at the time the ICA was enacted. *See Train v. City of New York*, 420 U.S. 35, 41 n.8 (1975). Nothing about that provision overcomes the plain implication of the ICA's structure as precluding private parties to interfere in this process through the APA. Nor would precluding Plaintiffs' APA claims here mean that *all* private suits brought to enforce appropriations statutes are precluded. Unlike the appropriations at issue in this case, certain appropriations may mandate that specific payments be made to a specific entity by a specific date—statutes that the ICA expressly declines to supersede. *See* 2 U.S.C. § 681(4).

4. Relatedly, Plaintiffs fail in their challenge concerning the appropriations statutes because Plaintiffs do not fall within the zone of interest of those statutes. To invoke the APA, a "plaintiff must establish that the injury" it complains of "falls within the zone of interests sought to be protected by the statutory provision" at issue. *Air Courier Conf. of Am. v. Am. Postal Workers Union*, 498 U.S. 517, 523-24 (1991). That limitation reflects the commonsense intuition that

19

Congress does not extend causes of action to "plaintiffs who might technically be injured in an Article III sense but whose interests are unrelated to the statutory prohibitions" they seek to enforce. *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 178 (2011).  Thus, where, as here, the plaintiff is not the object of a challenged regulatory action, the plaintiff has no right of review if its "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit."  *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987).  And when a plaintiff attempts to use the APA to challenge the government's compliance with a statute, the "interest he asserts must be arguably within the zone of interests to be protected or regulated by the statute that he says was violated."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012).

Plaintiffs cannot do so here.  While they hope to be awarded some of the appropriated funds, they cannot point to a single statute that requires that foreign-assistance funds be specifically awarded to them.  And more generally, with limited exceptions, Plaintiffs cannot plausibly argue that these appropriations statutes reflect any congressional purpose to award funds to any particular grantee.  Indeed, the appropriation statutes are directed at regulating the relationship between Congress and the Executive Branch and they are largely agnostic about the recipients of federal funding. Plaintiffs' interests are thus akin to ordinary taxpayers.

### B. Most Claims Related to Funds That Plaintiffs Believe Should Have Been Obligated Prior to September 30, 2025 Are Moot

The Third Amended Complaint seeks to require Defendants to take certain actions in relation to the FY 2024 Appropriations Act,[3] and it contains several references to the FY 2024

---

[3] *See, e.g.,* 3rd Am. Compl. at 61 (Prayer for Relief 4) (asking the Court to "[d]eclare unlawful, vacate, set aside, postpone the effective date of, and enjoin Defendants' decisions in August and September 2025 not to maximize the number of directives in Sections 7030-7061 of the [FY] 2024 Appropriations Act . . . ."); *id.* (Prayer for Relief 5) (asking the Court to "[d]eclare unlawful Defendants' decision not to obligate, by September 30, 2025, the appropriations included in the August 28, 2025 special message"); *id.* at 62 (Prayer for Relief 7) (asking the Court to "[o]rder that . . . Defendants are compelled to make available for obligation and to obligate, by the deadline set by Congress: (i) the full amount of funds that Congress appropriated for foreign assistance programs in the [FY] 2024 Appropriations Act, the 2025 Continuing Resolution, and

Appropriations Act as the basis for Plaintiffs' claims.  *See, e.g.*, 3rd Am. Compl. ¶ 36a-h (listing appropriations in the FY 2024 Appropriations Act).  But most foreign assistance funds under that act are two-year funds that have either been obligated or have lapsed, expiring on September 30, 2025.  Thus, any funding that expired is "unavailable for spending . . . for all time," *AVAC*, 146 S. Ct. at 21 (Kagan, J., dissenting), and Plaintiffs' claims related to it are moot.

"Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies." *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983).  A case that "becomes moot at any point during the proceedings . . . is outside the jurisdiction of the federal courts." *United States v. Sanchez-Gomez*, 584 U.S. 381, 385-86 (2018) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)).  A case is moot when "the parties lack a legally cognizable interest in [its] outcome." *Already*, 568 U.S. at 91 (citation omitted).

Plaintiffs' artful pleading in the Third Amended Complaint does not change the analysis; they cannot resurrect funding that has already expired.  "It is an elementary principle of the federal budget process that, in general, a federal agency's budget authority lapses on the last day of the period for which funds were [available to be] obligated." *W. Va. Ass'n of Cmty. Health Ctrs. v. Heckler*, 734 F.2d 1570, 1576 (D.C. Cir. 1984).  Because all of the relevant expiring funds under the FY 2024 Appropriations Act have been obligated or have lapsed, and because no tolling principle applies to Plaintiffs' claims in the Third Amended Complaint (which are wholly different from their prior claims), the claims as to these funds are moot.  *See City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1424 (D.C. Cir. 1994) ("It is a well-settled matter of constitutional law that when an appropriation has lapsed . . . federal courts cannot order the expenditure of funds that were covered by that appropriation.").

---

prior and subsequent appropriations acts and (ii) the specific or minimum amounts of funds that Congress required Defendants to obligate for particular uses and purposes in Section 7019(a) and Sections 7030-7061 of the 2024 Appropriations Act and in prior appropriations . . . .").  The Third Amended Complaint also contains several references to the FY 2024 Appropriations Act as the basis for Plaintiffs' claims.  *See, e.g.*, *id.* ¶ 36a-h (listing appropriations in the FY 2024 Appropriations Act).

21

Thus, the Court does not have the ability to order the obligation of expiring foreign assistance funds under the FY 2024 Appropriations Act because "many of these funds . . . w[ere] available [only] until September 30, 2025" and virtually all the funds were obligated prior to their expiration.  3rd Am. Compl. ¶ 37.  *See* Defs.' Mot. To Dismiss, ECF No. 176 at 12-13 (listing at that time specifically what funds were already obligated or had expired).

And to the extent any of the funds Plaintiffs mention have lapsed, they are unavailable and cannot be obligated.  Plaintiffs allege that "Congress enacted a continuing resolution re-appropriating pro-rata amounts appropriated in the FY 2024 Appropriations Act for USAID and the State Department, to be available until January 30, 2026."  3rd Am. Compl. ¶ 51.  That is incorrect and unsupported by the provision cited by Plaintiffs.  Instead of "re-appropriating" any of the funds that Plaintiffs aver are somehow now resurrected, Congress enacted new appropriations in the same amounts for FY 2025 and subject to the same authorities and conditions as provided in the FY 2024 Appropriations Act.   But all the unobligated amounts from the two-year appropriations previously available in the FY 2024 Appropriations Act lapsed, are no longer available, and Plaintiffs' claims regarding the obligation of those funds are thus moot.

Moreover, the Court does not have equitable authority to extend the period of availability. Any equitable remedy "must track remedies traditionally afforded by the equity courts."  *Goodluck v. Biden,* 104 F.4th 920, 924 (D.C. Cir. 2024); *see also id.* at 928 (criticizing older, contrary cases as belonging to the "'*ancien regime*' when courts took a much more freewheeling approach to the law of remedies."), *reh'g en banc denied*, No. 21-5263, 2024 WL 4092894 (D.C. Cir. Sep. 3, 2024). Plaintiffs can point to no historical analogue in equity to allow a court to extend the period of appropriations.  And to the extent there is any judge-made equitable authority to "suspend" a "lapse," that still does not "revive" funds that have already expired.

Regardless, and as discussed below, *infra* at 29, with the exception of the funds subject to the August 28, 2025 Special Message and some other de minimis appropriations amounting to no more than approximately twenty million dollars, Defendants have obligated all funding in the relevant foreign assistance accounts that were set to expire on September 30, 2025.

22

### C. The Program Funding Decisions at Issue Are Committed to Agency Discretion by Law

Plaintiffs' APA claims should be denied for another threshold reason—the challenged funding choices are committed to agency discretion by law, 5 U.S.C. § 701(a)(2); thus, they are unreviewable under the APA.

Even if the agencies decided to reprogram funds, an agency decision to discontinue a previously funded program and reallocate those funds to other uses are committed to agency discretion by law. *Lincoln v. Vigil*, 508 U.S. 182, 185-88 (1993). The "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion," because the point of such appropriations "is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192. In making that allocation, the agency must engage in "'a complicated balancing of a number of factors . . . within its expertise,'" including "whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'" *Id.* at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)). As long as the agency abides by the relevant statutes and by any obligations that may arise from regulations or grant instruments, the APA "gives the courts no leave to intrude." *Id.* That logic applies not just to lump-sum appropriations but to other funding programs that leave to the agency "the decision about how the moneys" for a particular program "could best be distributed consistent with" the statute. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Such decisions also "clearly requir[e] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Id.* at 752.

The foreign assistance programs at issue here are just such programs: the FAA and the pertinent appropriations statutes grant State and USAID significant discretion in determining how best to allocate appropriated funds across applicants for contracts, grants, and cooperative agreements. Indeed, with very limited exceptions, neither the authorizing nor the appropriating

23

statutes require that any particular funds be awarded to any particular implementer, let alone to any of the Plaintiffs here.  And Plaintiffs claim that the topline appropriations in Title III and Title IV of the FY 2024 Appropriations Act, *see* 3rd Am. Compl. ¶¶ 36-40, the tables incorporated into § 7019(a) and the directives in §§ 7030-61 of the FY 2024 appropriations act, *see id*. ¶¶ 43-45, mandate that Defendants spend specific amounts of money for specific purposes misses the point. Although Congress specified certain funds for specific purposes, the Executive Branch has discretion as to how to use those funds to achieve those purposes, making it committed to agency discretion.

What is more, the Foreign Assistance Act of 1961 ("FAA") and the appropriations statutes grant State and USAID significant discretion in determining how best to allocate appropriated funds across applicants for contracts, grants, and cooperative agreements.  Plaintiffs also ignore the statutory text that allows the Executive Branch to deviate "up to 10 percent from the amounts specified" in tables in the Joint Explanatory Statement accompanying the FCAA and to deviate even further if determinations are made by the Executive Branch and reported to Congress.  FCAA, div. F, § 7019(b), 138 Stat. at 772.  *See supra* 31-32; AR 000832-35.  That discretion, and the associated reporting process, underscore that Congress intended the earmarks to function as part of the inter-branch dialogue generally contemplated by the appropriations statutes and the ICA, rather than to generate judicially enforceable obligations.

## D. The Challenged Rescission Proposal Decisions Constitute Presidential Actions, and Thus, are not Subject to APA Review

Yet another threshold hurdle that Plaintiffs cannot overcome is that the President proposed for the rescission of funding consistent with the ICA.  The President is not an "agency" under the APA.  5 U.S.C. § 701(b)(1); *see Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992).  His actions therefore "are not subject to [the APA's] requirements" and "are not reviewable" under the APA.  *Franklin*, 505 U.S. at 801.  Agencies lack the power to disagree with the President's lawful exercise of policy discretion vested specifically in him, which is the case here.  So, when agencies implement such directives by the President (as would be the situation when agencies follow the

24

President's direction to withhold funds proposed for rescission by the President consistent with the ICA), there is no genuine agency decision-making to review. *See, e.g., DHS*, 591 U.S. at 25 (declining to consider claim that the Secretary of Homeland Security was "required to explain a legal conclusion that was not hers to make"); *cf.* Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2351 (2001) (distinguishing a challenge "to an action delegated to an agency head but directed by the President," as to which "the review provisions usually applicable to that agency's action should govern," from "a challenge to an action that Congress has committed to the sole discretion of the President"). Accordingly, Plaintiffs' claims related to the withholding of funds from obligation consistent with the ICA must be dismissed for this reason as well.

### E. Plaintiffs' APA Claims Fail on the Merits Because They Do Not Challenge a "Discrete" Agency Action

Review under the APA is available only for "agency action," 5 U.S.C. § 704, and an APA plaintiff must plead and challenge "an identifiable action or event." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990). The agency actions that can be challenged under the APA are those that are "circumscribed [and] discrete." *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). "[C]ourts cannot order 'programmatic improvements,' or 'compel compliance with broad statutory mandates.'" *Cobell v. Kempthorne*, 455 F.3d 301, 305 (D.C. Cir. 2006) (quoting *Lujan*, 497 U.S. at 891; *Norton*, 542 U.S. at 66). That "distinction between discrete acts, which are reviewable, and programmatic challenges, which are not, is vital to the APA's conception of the separation of powers" and prevents the courts from being injected into "day-to-day agency management" of agencies. *City of New York v. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019).

Here, the Third Amended Complaint does not challenge any discrete action—*i.e.*, any termination of Plaintiffs' own funding instruments,[4] but instead challenges *every* possible funding decision related to the appropriations identified in the amended complaint. *See, e.g.*, 3rd Am. Compl. at 61 ("asking the Court to "enjoin Defendants' decisions not to spend foreign assistance

---

[4] Defendants provide notice to the Court that a related case, dealing with materially the same underlying facts and the majority of the individual Plaintiffs as in this litigation, is currently being litigated in the Court of Federal Claims. *See HIAS v. United States* (1:26-cv-00429).

25

appropriations in the specific or minimum amounts, for the specific purposes, that Congress directed in appropriations acts"). That is the exact type of broad programmatic or "blunderbuss" challenge seeking supervision of an agency's day-to-day activities the APA does not allow. *See Fund for Animals Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006); *see also Am. Forest Res. Council*, 77 F.4th at 805. Yet, because the APA precludes an amorphous, roving challenge to the Executive Branch's purported failure to obligate funds, Plaintiffs' claims fail for lack of discreteness under *Lujan* and *Norton*, warranting dismissal.

What is more, regarding Plaintiffs' challenge of FY 25 funds that could expire on September 30, 2026—Plaintiffs can point to no final agency action. Defendants have made no decision *not to* obligate funds. Indeed, the declarations of Jeremy Lewin ("Lewin Decl.") and Tricia Schmitt ("Schmitt Decl.") confirm as much. *See* AR 000002 (Schmitt Decl.) at ¶¶ 8-12; 000004 (Lewin Decl.) at ¶ 9.

To constitute final agency action: (1) "the action must mark the consummation of the agency's decisionmaking process" and (2) it "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). An agency action must impose "direct and appreciable legal consequences" on the plaintiff, *Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016) (quoting *Bennett*, 520 U.S. at 178). If an action affects the challenger's rights only "on the contingency of future administrative action," it is not final. *DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) (quoting *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939)); *see also Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) (action must "directly affect the parties.").

Plaintiffs' primary argument is that certain funds will not be obligated. But even assuming that State or USAID have not yet obligated funds (and they have), or that OMB has not apportioned those funds at this time, *i.e.*, has not "released" them, that would not constitute reviewable final agency action. They cite no authority for the proposition that a *lack* of an obligation or apportionment is itself legally binding. Because their fears have not been realized, Plaintiffs

26

cannot challenge any action tentatively signaling a withholding of funds itself but instead must await further agency actions implementing it. *See, e.g., Franklin*, 505 U.S. at 797 ("The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties."); *DRG Funding Corp.*, 76 F.3d at 1214 ("[C]ourts have defined a nonfinal agency order as one, for instance, that does not itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action." (quotation marks omitted)); *EPA v. Brown*, 431 U.S. 99, 104 (1977) ("For [courts] to review [agency actions] not yet promulgated, the final form of which has only been hinted at, would be wholly novel.").

## II. DEFENDANTS' FUNDING DECISIONS ARE REASONABLE AND CONSISTENT WITH APPLICABLE LAW

### A. Plaintiffs' Arbitrary and Capricious Claim Fails on the Merits

"The APA's arbitrary-and-capricious standard requires" only that an "agency action be reasonable," and "[j]udicial review under that standard is deferential." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). This standard "deems the agency action presumptively valid provided the action meets a minimum rationality standard." *Sierra Club v. EPA*, 353 F.3d 976, 978 (D.C. Cir. 2004). A reviewing court should not "substitute its judgment for that of the agency." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (citation omitted). Defendants' actions meet these tests.

For starters, the APA does not preclude an agency from accounting for shifts in priorities in keeping with a "change in administration brought about by the people casting their votes." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part). Here, the President has an established role in formulating foreign policy. And it is indisputable that the "[p]rotection of the foreign policy of the United States[,] is a governmental interest of great importance, since foreign policy and national security considerations cannot neatly be compartmentalized." *Haig v. Agee*, 453 U.S. 280, 307 (1981). Then-Assistant Attorney General William H. Rehnquist reasoned that, should Congress direct

spending so as to "interfere with the President's authority in an area confided by the Constitution to his substantive direction and control, such as his authority as Commander in Chief of the Armed Forces and his authority over foreign affairs," that may violate Article II of the U.S. Constitution. Memorandum from William H. Rehnquist, Assistant Att'y Gen., Office of Legal Counsel, *Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, 1 Supp. Op. O.L.C. 303, 310-311 (Dec. 1, 1969), https://perma.cc/NRU3-DFK7; *see also United Stated v. Texas,* 99 U.S. 670, 679-81 (2023) (finding that the President's discretion over arrests and prosecutions extended to the immigration context in part because "foreign-policy objectives" were also implicated.). Such foreign policy decisions for which the Executive is responsible necessarily include the obligation of foreign assistance funds for activities overseas. And a court should not conduct "a searching inquiry into the persuasiveness of the President's justifications." *Trump v. Hawaii*, 585 U.S. 667, 686 (2018).

Moreover, a court may not reject an agency's stated reasons simply because the agency might also have had other unstated reasons. *See Jagers v. Federal Crop Ins. Corp.*, 758 F.3d 1179, 1185-1186 (10th Cir. 2014) (rejecting argument that "the agency's subjective desire to reach a particular result must necessarily invalidate the result, regardless of the objective evidence supporting the agency's conclusion"). Agency policymaking is not a "rarified technocratic process, unaffected by political considerations or the presence of Presidential power." *Sierra Club v. Costle*, 657 F.2d 298, 408 (D.C. Cir. 1981). "Such decisions are routinely informed by unstated considerations of politics, the legislative process, public relations, interest group relations, foreign relations, and national security concerns (among others)." *Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019).

Instead of grappling with the foreign policy context surrounding the pertinent appropriations, Plaintiffs allege that Defendants failed to address "serious reliance interests of contractors, grantees, and the members of the public." *See* 3rd Am. Compl. ¶ 143. But any such general reliance interests do not render Defendants' conduct irrational, particularly given Plaintiffs' fundamental misunderstanding of the appropriations statutory scheme, including the

28

permanent FAA provisions that confer significant discretion on the President and the Executive Branch in making funding decisions, as well as the discretion granted by the Constitution, to the President, in the realm of foreign affairs.  Indeed, the cited appropriations statutes do not identify any Plaintiffs as holding a right to payment that would support the kind of reliance interests Plaintiffs allege here.

Beyond this, and as the near 4,000-page AR indicates, all of Defendant's actions are reasoned and justified.

1. *Special Message Funds*: As explained below, Defendants' actions relating to the proposed recission message are fully consistent with the law.  The ICA does not prohibit the Executive from transmitting rescission proposals within 45 days of the expiration of the funds. And, regardless, Plaintiffs have no basis for enforcing the ICA. *See* 3rd Am. Compl. ¶¶ 217-47. For similar reasons, such action cannot be arbitrary and capricious under the APA.   The Administration submitted the special message to Congress with all of the requisite details and justifications.  *See* AR 000235-593.  The APA requires nothing more.

2. *Funds Expiring on September 30, 2025, and September 30, 2026*: For funding expiring at the end of FY 2025, Defendants obligated all at issue foreign assistance funding not subject to the special message save for a de minimis amount. AR 000004 (Lewin Decl.).  A total of $7.177 billion was obligated by State and USAID.  *Id.; see also* AR 000208 (spreadsheet detailing obligation of funds expiring on September 30, 2025).  De minimis funds, around $20 million, expired on September 30, 2025. These amounts are consistent with historical levels of de minimis funds not being obligated by the end of the fiscal year for operational or other reasons.  AR 000006. And while these funds lapsed prior to expiration, Defendants made no decision not to obligate these funds. *Id.*

For funding expiring at the end of FY 2026, neither State nor USAID has decided not to obligate funds.  AR 000002 (Schmitt Decl.); AR 000006.  State is continuing the process of working to obligate funding that will expire prior to the end of FY 2026.  This process is ongoing. *Id.*  And USAID has explained its intent to obligate funds appropriated to a variety of appropriation

accounts in FY 2025 and prior years to close out terminated foreign assistance awards and contracts. *Id*. Any concern about some funding expiring on September 30, 2026, prior to obligation remains wholly premature, and not ripe for adjudication. Ample time remains to obligate such funds as is standard practice—indeed, "[a] significant portion of foreign assistance is usually obligated at the end of the fiscal year." *Id*. at ¶ 12; *see also* Lewin Decl. at ¶ 9. And "State is not aware of any plan not to obligate funding that expires on September 30, 2026." *Id.* Further, some of this funding has already been obligated for non-close out purposes, such as global health program funds used to address an Ebola outbreak in Africa. *Id.*; AR 001244-49. Thus, the record belies any claims that Defendants will fail to obligate funds not needed for close-out purposes.

Further, as indicated in the numerous funding memoranda produced in the AR, Defendants have obligated (or will soon obligate) funds expiring at the end of FY 2025 and in many cases expiring at the end of FY 2026 to a variety of sources and in a variety of categories, all consistent with statutory authorities. These memoranda explain where and how funds will be obligated, the purpose of the funding and the statutory basis for such funding. This is reasoned decision-making that more than meets the APA's standards.

For instance, in the FY 2025 economic support fund account, under the democracy programs earmark in section 7032(b) of the FY 2024 Appropriations Act as carried forward by the FY 2025 Full-Year Continuing Appropriations Act, the State Department obligated $2,000,000 in FY 2025 funds to support an organization working to return and rehabilitate forcibly transferred Ukrainian children. AR 000610; $3,000,000 to support student success in Afghanistan, AR 000638; and $12,000,000 to support programming in Venezuela to help advance commercial diplomacy and expand U.S. investment in geostrategic sectors, AR 000684, that "directly advances the Administration's commitment to restoring democracy in Venezuela and countering authoritarian regimes in the Western Hemisphere." AR 000688.

In the development assistance account, State obligated $72,000,000 in funding for Feed the Future Labs, consistent with the terms of the Rescissions Act of 2025, partnering with U.S. universities to "mitigate challenges that affect Americans in countries of shared interest in

agriculture and food security by advancing scientific solutions to reduce hunger both at home and abroad." AR 000775.  These funds are available under FY 2024 Appropriations Act, 2024 (Div. F, Pub. L. No. 118-47), as carried forward by the Full-Year Continuing Appropriations Act, 2025 (Div. A, Pub. L. No. 119-4) for this purpose.  AR 000775-76.

For global health funds, $493,000,000 was obligated in FY 2025 funding and $65,743,000 in FY 2026 funding to address "disease outbreaks" and to "move recipient countries towards resilient and durable local health systems . . . ." (AR 001325); $600,000,000 was approved for obligation to Gavi, the vaccine alliance, ($300,000,000 from each fiscal year) to prevent the spread of infectious diseases in accordance with Department of State, Foreign Operations, and Related Program Appropriations Act, 2024 (Div. F, Pub. L. No. 118-47) (FY 2024 SFOAA), as carried forward by the Full-Year Continuing Appropriations Act 2025 (Div. A, Pub. L. No. 119-4) (FY 2025 Full-Year CR), and FY 2026 GHP Maternal and Child Health funds made available by the National Security, Department of State, and Related Programs Appropriations Act, 2026 (Div. F, Pub. L. No. 119-75) (FY 2026 NSSAA) (AR 001388-91); $59,155,468 million obligated by USAID for malaria interventions in twenty-one countries approved in FY 2025 for various years of funding (FY 2019 through FY2024) (AR 1882-1885); and $83,934,254 obligated by USAID for Tuberculosis ("TB") prevention serving sixty-to-ninety million people across twenty countries. AR 001893-96.  This funding, from funding appropriated in fiscal years 2023 and 2024, is "intended to ensure that life-saving commodities can be utilized effectively and avoid stockouts in high burden TB countries."  *Id.* at AR 001894.  *See also id.* at AR 003507-16 (obligating $25,000,000 in FY2024 funding for the Nonproliferation, Anti-Terrorism, and Demining Categories); AR 003537-42 (obligating over $11,000,000 in FY2024 funding for the Nonproliferation, Anti-Terrorism, and Demining Categories, including to fight cybercrime in Central America).

As for deviations from specified funding earmarks, such deviations are permitted under the statutory text if determinations are made by the Executive Branch and reported to Congress. FCAA, div. F, § 7019(b), 138 Stat. at 772. These justifications, and associated Congressional

31

Notices are also included and explained in the AR.  For instance, the AR contains a document titled "Determination under Section 7019(b) of the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024 (Div. F, Pub. L. No. 118-47).  This document, approved on September 11, 2025, by Mr. Jeremy Lewin, authorizes deviations of ten percent from certain amounts specified in certain tables included in the Joint Explanatory statement accompanying the FY 2024 SFOAA and five percent from other amounts specified in the tables. AR 000832-35.  The authorization document explains (1) the legal basis for making the deviations, *see id.* at AR 000832 and (2) the need for making the deviations: "to respond to significant, exigent, or unforeseen events or to address other exceptional circumstances directly related to the national security interest of the United States."  *Id*; s*ee also id.* at AR 000836-37 (presenting detailed justifications for the deviations); AR 000838-57 (explaining need and justification under Section 451 of the FY 2024 FAA to use ESF funds to provide $109,000,000 in support of Armenia-Azerbaijan peace deal); AR 000858-62 (explaining need and justification for deviation from international narcotics and law enforcement allocations in the FY 2025 Joint Explanatory Statement); AR 000870-81 (explaining need and justification for deviations of $732,531,569 in FY 2024 international narcotics and law enforcement funds).

These representative example records more than satisfy the APA's requirements that agencies meet a "minimum rationality standard." *Sierra* Club, 353 F.3d at 978.  No reasonable observer could review the thousands of AR pages and the hundreds of funding approvals and related materials, with all of their explanations and rationales, and reach the conclusion that Defendants acted in an arbitrary and capricious manner.  In any event, "a court is not to substitute its judgment for that of the agency."  *DHS*, 591 U.S. at 16 (citation omitted).

### B.  Defendants' Conduct Was Not Contrary To Law

**1. *The Appropriations Acts*:** Plaintiffs also fail to establish that Defendants have acted contrary-to-law under the APA.  By and large, the FY 2024 Appropriations Act provided sums of money for broad purposes.  Among other things, Congress appropriated billions of dollars "[f]or necessary expenses to carry out" provisions of the Foreign Assistance Act "for global health

32

activities"; "for international disaster relief, rehabilitation, and reconstruction assistance"; "to meet refugee and migration needs"; and for development assistance.  FY 2024 Appropriations Act, div. F, 138 Stat. at 740, 742, 744.  On their own, those appropriations lack any mandatory language directing the obligation and expenditure of funds.  Where Congress included more specific directions in the Act, those often restricted the manner in which, or the purposes for which, the funds could be spent.  *See, e.g.*, *id.* at 740-41, 742.  In other words, those instructions were not unequivocal commands to provide specific funds on a specific timetable for specific recipients.  Although this Court previously noted one instance where the appropriations act specified that the covered funds "shall be made available for" specific purposes, *id.* at 740, *cited by AIDS Vaccine Advocacy Coal. v. Dep't of State*, 770 F. Supp. 3d 121, 144 (D.D.C. 2025), that specification appears in a list of provisions restricting the manner and purposes of expenditures.  It is a direction regarding the specific purposes and activities for which those appropriated funds may be used, not a command to obligate all of them on some specific timeline.

The appropriations provisions on which Plaintiffs rely simply "permit[] but do[] not require the Executive Branch to spend funds."  *Presidential Auth. to Impound Funds Appropriated for Assistance to Federally Impacted Schs.*, 1 Supp. Op. O.L.C. 303, 309 (Dec. 1, 1969) https://perma.cc/NRU3-DFK7; *cf. Train*, 420 U.S. at 43-44 (recognizing that an appropriations provision may permit, but not require, expenditure "of the entire amounts authorized").  The FAA too has generally granted the President and the Secretary of State significant latitude to determine how best to administer foreign assistance to ensure that those programs achieve foreign aid goals that align with the President's foreign policy.  *See, e.g.*, 22 U.S.C. §§ 2382(c), 2395(a).  And for many specific programs, Congress expressly gave the President discretion to provide assistance on such terms and conditions as the President determines.

Notably, the context of these statutes further supports that the President has discretion over how to expend the appropriations.  There is a long history of the Executive Branch declining to obligate the full amount of appropriated funds in various contexts, particularly in the realm of foreign affairs.  *See The President's Veto Power*, 12 Op. O.L.C. 128, 168 & n.56 (1988),

33

https://perma.cc/9TXB-QNB2.  The appropriations at issue here touch on the sensitive subject of foreign affairs, where the President enjoys considerable authority under the Constitution and under the FAA.  The risk of impinging on a core executive power provides a powerful basis to sustain, not override, the Executive Branch's discretion in this area.

In short, neither the Appropriations Acts nor the Continuing Resolutions include any "specific, unequivocal command," *Norton*, 542 U.S. at 63 (quotation omitted), that Defendants can be said to have violated.  Although some provisions of the FY 2024 Appropriations Act contain more specific restrictions regarding obligating funds to particular recipients or for particular purposes, the Third Amended Complaint does not assert that Plaintiffs are such recipients.

Nor does the language in the Appropriations Acts and Continuing Resolutions that foreign-assistance appropriations "shall be made available," in amounts specifically designated, constitute an unequivocal command to spend all appropriated funds.  *See* 3rd Am. Compl. ¶¶ 42-44.  It merely reflects Congress's desire to designate different portions of the top-line foreign-assistance appropriations for particular purposes and providing direction to the Executive Branch about how to allocate portions of the lump-sum appropriations to certain purposes.  *See* 2 GAO, *Principles of Federal Appropriations Law* 6-26 to 6-30 (3d ed. 2006) (GAO Red Book), *available at* GAO-06-382SP Principles of Federal Appropriations Law: Third Edition, Volume II, https://www.gao.gov/assets/gao-06-382sp.pdf.  Consistent with that understanding, and as the Government Accountability Office has explained, the use of such "shall be available" language "to earmark a portion of a lump-sum appropriation" does not by itself reflect a congressional command to make the full sum available for obligation.  *See id.* at 6-30 to 6-31. And as discussed *supra* at 22-24, Defendants retain discretion as to how to use appropriated funds to achieve the purposes laid out by Congress.

**2. *The Special Message*:** Nor have Defendants acted contrary to law with respect to the nearly $4 billion subject to the August 28, 2025 Special Message.  Plaintiffs argue that under 2 U.S.C. § 683(b), an agency must "make available for obligation any funds that were proposed to be rescinded but which Congress did not rescind." 3rd Am. Comp. ¶ 231.  Plaintiffs contend that

34

this obligation to make funds available exists even if it is after the funding lapsed under the terms established in the relevant appropriations statute. *Id.*

Plaintiffs are wrong. *First*, Plaintiffs have no basis for enforcing the ICA. *See AVAC*, 146 S. Ct. at 19. But even if they did, the ICA does not prohibit the Executive from transmitting rescission proposals within 45 days of the expiration of the funds and withholding the funds from obligation for 45 days consistent with the ICA (sometimes described colloquially as a "pocket rescission").

*Second*, in this situation, funds lapse not by Presidential order, but by the text of the appropriations statute. Indeed, after the ICA's enactment, several Presidents proposed rescinding funds that would expire before the end of the 45-day period during which Congress would consider a rescission bill. The year after the ICA was enacted, President Ford sent a special message proposing to rescind funds that would lapse "nearly a month before expiration of the 45 days of continuous session the Congress normally has to review proposed rescissions." GAO B-115398 (ACG-76-5), Enclosure II (Aug. 12, 1975), https://www.gao.gov/assets/acg-76-5.pdf. President Carter similarly sent proposed rescissions for funds that would expire before the end of the 45-day period. *See* GAO B-115398 (OGC-76-2), at 2 (Oct. 26, 1977), https://www.gao.gov/assets/ogc-78-2.pdf. In both cases, the funds lapsed during the 45-day period and were not obligated. In response, the Comptroller General proposed that Congress consider "changing the [ICA] to prevent funds from lapsing where the 45-day period has not expired." GAO B-115398 (Dec. 15, 1975), https://www.gao.gov/assets/acg-76-12.pdf. Congress never did.

In fact, here, Congress has recognized that the ICA allows the Executive Branch to withhold funds proposed for rescission for 45 days under the ICA—even if the funds expire in the meantime. This is because, as recently as 2023, members of Congress introduced bills to foreclose any withholding of budget authority pursuant to the ICA within 90 calendar days of the date of expiration of such budget authority. *See* Protecting Our Democracy Act, H.R. 5048, 118th Cong.

35

§ 501 (2023).[5]  These bills were *not* enacted, demonstrating that Congress has recognized the possibility of a "pocket rescission," yet did not take any action to prevent its use.

Congress also knows how to prevent funds from lapsing (in addition to making funds "no year" at the outset). It has, for example, extended the period of availability of expiring appropriations.  *See, e.g.*, Continuing Appropriations Act, 2023, Pub. L. No. 117-180, div. A., § 124, 136 Stat. 2114, 2120 (2022); Continuing Appropriations Act, 2020, Pub. L. No. 116-59, div. A, § 124, 133 Stat. 1093, 1098 (2019).

*Third*, as discussed above, the Executive Branch retains authority under the relevant appropriations acts to determine whether to expend funds up to the amounts appropriated.  And while § 683(b) limits the President's withholding authority to 45 days of a continuous Congressional session, it imposes no additional requirement on the President to make withheld budget authority available for obligation before the end of a fiscal year, nor does it extend the period of availability of funds that lapse during the 45-day period.  *See generally* Letter from Mark R. Paoletta, General Counsel, OMB, to Tom Armstrong, General Counsel, GAO (Nov. 18, 2018), *available at* https://trumpwhitehouse.archives.gov/wp-content/uploads/2019/11/Letter-to-GAO-on-Rescissions.pdf ("2018 OMB Ltr.").  More broadly, the general provisions of section 683(b) do not supersede the more specific provisions of the relevant appropriations laws or the FAA.  *See Edmond v. United States*, 520 U.S. 651, 657 (1997) ("Ordinarily, where a specific provision conflicts with a general one, the specific governs.").

Against this backdrop, this Court should not infer that Congress intended to preclude the Executive from proposing rescission within 45 days of the expiration of the funds and withholding

---

[5] *See also* Protecting Our Democracy Act, H.R. 5314, 117th Cong. § 501 (2021); 167 Cong. Rec. H7593 (daily ed. Dec. 9, 2021) (statement of Rep. Jackson Lee) (H.R. 5314 "would restore Congress' central role in funding decisions by preventing the President from effectively rescinding funds without congressional approval; . . . whether or not the funding is part of a Presidential rescission or deferral request; and closing a budget law loophole that essentially lets the President unilaterally block the spending of enacted appropriations designated as emergency"); Congressional Power of the Purse Act, H.R. 6628, 116th Cong. § 101 (2020) (attempting to require OMB to release funding to agencies at least 90 days before the funding expires).

the funds under the ICA beyond their expiration.  A court does not "lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply," and that "reluctance is even greater when Congress has shown elsewhere . . . that it knows how to make such a requirement manifest."  *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005).

### C.  Plaintiffs' Allegations of Unreasonable Delay Fail on the Merits

Plaintiffs also allege that Defendants "unreasonably delayed" obligating funds in violation of the APA, 5 U.S.C. § 706(1).  *See* 3rd Am. Compl. ¶¶ 147-51 (Third Claim for Relief); *id.* ¶¶ 234-37 (Sixteenth Claim for Relief).  Plaintiffs fail to establish that they meet the requirements for such a claim.  As the D.C. Circuit has explained, "[t]o state a claim for unreasonable delay, Plaintiffs must first allege that the agency 'failed to take a discrete agency action that it is required to take,'" *Da Costa v. Immigr. Inv. Program Off.*, 80 F.4th 330, 340 (D.C. Cir. 2023) (emphasis omitted) (quoting *Norton*, 542 U.S. at 64), and "second, that the delay was unreasonable."  *Id.* (citing *Am. Anti-Vivisection Soc'y v. Dep't of Agric.*, 946 F.3d 615, 621 (D.C. Cir. 2020)); *see also Telecomm. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) ("*TRAC*") (identifying factors for assessing reasonableness of agency delay).  The overarching principle of the *TRAC* factors is a "rule of reason," a flexible assessment of the context of the agency's action.  *See Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003).  The mere presence of a statutory timetable does not supplant the overarching rule of reason.  *See Cutler v. Hayes*, 818 F. 2d 879, 898 (D.C. Cir. 1987).  Nor is there a "per se rule as to how long is too long to wait for agency action."  *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004) (citation omitted); *see also Grand Canyon Air Tour Coal. v. FAA*, 154 F.3d 455, 477-78 (D.C. Cir. 1998) (declining to order agency action notwithstanding a ten-year delay in issuing a rule and a 20-year delay in achieving the rule's statutory objective).

Here, not only has there been no lengthy delay or withholding akin to those discussed in the cases cited above, Plaintiffs do not even plausibly allege any discrete agency action that the agencies are required to take, nor the violation of any specific, unequivocal command to obligate

37

the appropriated funds. Moreover, Defendants have already obligated some of the funds at issue. *See, e.g., supra* at 27-32. For other FY 2024 and FY 2025 funds that remain available for obligation, Defendants still have time (even years) to make any funding decisions. Thus, no delay or withholding claim applies. As for funds allegedly expiring in September 2026 or later, Plaintiffs do not explain their basis for arguing that such funds are being unreasonably delayed or unlawfully withheld since ample time exists to obligate those funds before they expire. *See* Schmitt Decl., AR 000002 ("Notably, for the unobligated balances that expire on September 30, 2026, there are [66] days until September 30, so time remains to obligate such funds.").

To the extent Plaintiffs' claims are instead construed as involving an asserted failure to act, which can also be reviewed under 5 U.S.C. § 706(1), those claims fail as they do not conform to the "strict limits" of such claims. *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016). Specifically, like an unreasonable delay claim, a failure to act claim can proceed only where an agency has "failed to perform a non-discretionary duty to act"—*i.e.*, "a specific, unequivocal command" to act. *Norton*, 542 U.S. at 63, 64. "This standard reflects the common law writ of mandamus, which the APA 'carried forward' in § 706(1)." *Pritzker*, 809 F.3d at 670 (quoting *Norton*, 542 U.S. at 63). It is also rooted in separation-of-powers principles because it "protect[s] agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Norton*, 542 U.S. at 66-67; *accord Cobell v. Norton*, 392 F.3d 461, 478 (D.C. Cir. 2004).

Here, as explained above, Plaintiffs do not allege any discrete agency action that the agencies are required to take, nor the violation of any specific, unequivocal command to obligate the appropriated funds. To the contrary, the appropriations statutes both granted the Executive Branch significant discretion in obligating funds and recognized the President' vast responsibilities in conducting the Nation's foreign affairs. And it is beyond dispute that "courts are not a forum for reconsidering the wisdom of discretionary decisions made by the political branches in the realm

of foreign policy or national security." *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010). Plaintiffs' claims under 5 U.S.C. § 706(1), therefore, should be denied.

### III.     PLAINTIFFS' CONSTITUTIONAL CLAIMS ALSO FAIL

#### A.  Plaintiffs' Take Care Clause Claim Fails

Embedded in their Sixth and Seventh Claims for Relief, Plaintiffs allege that "the President must take care to faithfully execute the laws," including (1) "appropriations acts," 3rd Am. Compl. ¶ 165, and (2) "laws establishing executive agencies." *Id.* ¶¶ 173, 195. But that is nothing more than an attempt to circumvent the limitations of the APA by asserting a broad programmatic attack against the President under the Take Care Clause, U.S. Const. art. II, § 3. *See id.* ¶¶ 165, 173, 195.

That effort fails as a matter of law. Like their separation of powers claim, this claim is foreclosed by *Dalton* since it is a mere statutory violation dressed up in constitutional garb. *See GHC,* 153 F.4th at 7, 14, 17 (holding that Plaintiffs likely could not assert a constitutional claim for alleged violations of separation-of-powers principles because under *Dalton* Plaintiffs may not "recast statutory claims as constitutional ones" to evade any limitations to judicial review.); *see also Am. Ass'n of Physics Tchrs., Inc. v. Nat'l Sci. Found.*, 804 F. Supp. 3d 45, 73 (D.D.C. 2025) ("Because Plaintiffs' claim is based on alleged violations of an appropriations statute, without which "there could be no improper impoundment," Plaintiffs have no cause of action to bring their constitutional claim."). Plaintiffs cannot prevail on their Take Care Clause claim because the Clause does not provide a cause of action against the President or any other Defendant, and this Court has no jurisdiction to issue declaratory or injunctive relief against the President in his official capacity, whether or not based on constitutional claims. *See Dalton*, 511 U.S. at 473; *Mississippi v. Johnson*, 71 U.S. at 501 (1867) ("this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties"); *Franklin*, 505 U.S. at 802-03; *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him, and have never submitted the President to declaratory relief." (citation omitted)).

Through the Take Care Clause, the Constitution vests broad, discretionary authority to "take Care that the Laws be faithfully executed" by the President. U.S. Const. art. II, § 3. The

Clause, however, does not open the door to any plaintiff seeking to challenge the way the President executes Congress's laws. Rather, as the Supreme Court has recognized, the duty of the President when exercising his power to see that the laws are faithfully executed is "purely executive and political," and not subject to judicial direction. *Mississippi*, 71 U.S. at 499; *see Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165–66 (1803) ("[T]he President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character."). To hold otherwise would upset our constitutional scheme of separation of powers and allow judicial superintendence over the exercise of Executive power that the Clause commits to the President alone. *Dalton*, 511 U.S. at 474–75 (judicial review of discretionary Presidential decisions "is not available"); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 577 (1992) (holding that it would be improper for the courts to take over the President's duty to "take Care that the Laws be faithfully executed" (quoting U.S. Const. art. II, § 3)); *Marbury*, 5 U.S. (1 Cranch) at 170 ("The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion[,]" and political questions "can never be made in this court."); *Chi. & S. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 114 (1948) (refusing to review President's decision that "embod[ied] Presidential discretion as to political matters beyond the competence of the courts to adjudicate"); *Mississippi*, 71 U.S. at 499.

Nor does the Take Care Clause provide a basis to review the actions of subordinate Executive Branch officials. The Clause speaks only to the President, not to his subordinates, and ensures that the President is principally responsible for the actions of the Executive Branch and directly accountable to the people through the political process. *See Free Enter. Fund v. Pub. Co. Acct. Bd.*, 561 U.S. 477, 492–93 (2010) ("It is *his* responsibility to take care that the laws be faithfully executed."); *id*. at 495–97. Thus, any claim against subordinate officials cannot proceed under the Take Care Clause, but must be brought, if at all, through the APA, which in this case presents separate insurmountable obstacles for Plaintiffs. This is particularly so here because Plaintiffs seek to rely on violations of purported duties that are found nowhere in the statutes

40

related to USAID themselves, but rather, are based on Plaintiffs' subjective political views about how to best implement and administer USAID.  *See, e.g.*, 3rd Am. Compl. ¶ 84.

## IV.    THE *ULTRA VIRES* CLAIM IS NOT PLAUSIBLY ALLEGED (CLAIMS FOUR, NINE, FOURTEEN, SEVENTEEN)

Plaintiffs' *ultra vires* claims—*see* 3rd Am. Compl. ¶¶ 152-56 (Claim for Relief Four); ¶¶ 187-190 (Claim for Relief Nine); ¶¶ 223-27 (Claim for Relief Fourteen); ¶¶ 238-242 (Claim for Relief Seventeen)—fail to state a claim.  The D.C. Circuit already held that Plaintiffs' *ultra vires* claim—that "defendants have exceeded their statutory authority" in relation to the ICA—is unavailable because Plaintiffs could "point to no specific prohibition that defendants have violated to an extreme and nearly jurisdictional degree."  *GHC*, 153 F.4th at 20.  In the Court's view, Plaintiffs' *ultra vires* claims were nothing more than "basically dress[ing] up a typical statutory-authority argument as an ultra vires claim."  *Id.* at 21 (*NRC*, 605 U.S. at 682).

Plaintiffs' *ultra vires* claims are similarly foreclosed.  *Ultra vires* review is "a doctrine of last resort," *Schroer v. Billington*, 525 F. Supp. 2d 58, 65 (D.D.C. 2007), "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds."  *NRC*, 605 U.S. at 681-82.  The strict limitations on non-statutory review are "nearly insurmountable."  *DOJ v. FLRA*, 981 F.2d 1339, 1343 (D.C. Cir. 1993).  Any overstep by an agency must amount to a "clear departure by the [agency] from its statutory mandate" or be "blatantly lawless."  *Oestereich v. Selective Serv. Sys. Loc. Bd. No. 11*, 393 U.S. 233, 238 (1968).  The violation must be "so extreme that one may view it as jurisdictional or nearly so," and the "prohibition at issue must confer rights upon the individual seeking ultra vires review."  *GHC*, 153 F.4th at 20 (citation omitted).

Here, the *ultra vires* claims fail both because the D.C. Circuit held that an almost identical iteration of Plaintiffs' *ultra vires* claim was not likely to succeed, *see id.* at 20-21, and because even if that were not the case, the claims would fail on their merits for the same reasons as those described above as to the APA, given that "if the plaintiff's claims would have failed under the APA, then those same claims necessarily 'could not succeed under' *ultra vires* review, which has an even 'narrower scope.'"  *See   Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 766

41

(D.C. Cir. 2022) (quoting *Trudeau v. FTC*, 456 F.3d 178, 190 (D.C. Cir. 2006)).  As in the prior iteration of Plaintiffs' case before the D.C. Circuit and in *NRC*, Plaintiffs' claims here are a transparent "common maneuver" that basically seek to "dress up a typical statutory-authority argument as an ultra vires claim."  605 U.S. at 682.

## V.   THE MANDAMUS CLAIMS ARE NOT PLAUSIBLY ALLEGED (CLAIMS FIVE AND EIGHTEEN)

The Third Amended Complaint seeks mandamus relief requiring Defendants to carry out their "clear dut[ies]" to spend appropriations for foreign aid programs.  3rd Am. Compl. ¶¶ 157-61 (Fifth Claim for Relief), ¶¶ 243-47 (Eighteenth Claim for Relief).  But the Supreme Court has already held in its stay order that Defendants made a "sufficient showing that mandamus relief is unavailable" for Plaintiffs' prior claims that are more focused than the generalized claims in the Third Amendment Complaint.  *AVAC*, 146 S. Ct. at 19.  The Supreme Court's reasoning thus forecloses the nebulous—and thus even weaker—clams in the Third Amended Complaint.

Mandamus is "one of the most potent weapons in the judicial arsenal," *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 380 (2004) (citation omitted), and a "drastic" remedy that is "invoked only in extraordinary circumstances."  *See Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002) (citation omitted).  The mandamus plaintiff must plausibly allege "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff."  *In re Nat'l Nurses United*, 47 F.4th 746, 752 n.4 (D.C. Cir. 2022) (citation omitted).  Plaintiffs have not plausibly alleged those elements, and their claims also fail for the same reasons they fail to state a failure to act or unreasonable delay claim under the APA, as discussed above.

*First*, Plaintiffs do not have a clear right to relief.  28 U.S.C. § 1361 provides "original jurisdiction" in this Court "of any action in the nature of mandamus to compel" a Federal officer "to perform a duty *owed to the plaintiff*" (emphasis added).  But the purported duty owed to the particular plaintiff must "be clear and compelling."  *13th Reg. Corp. v. Dep't of the Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980).  Here, Plaintiffs contend that the Constitution, via the ICA and the

42

Anti-Deficiency Act, create a generalized duty to carry out congressionally mandated foreign assistance programs. 3rd Am. Compl. ¶¶ 132, 230-31, 235; Prayer at ¶ 8. But the Anti-Deficiency Act creates no such duty, and as explained above, neither does the ICA.

*Second*, Defendants do not have a clear duty to act. Mandamus is "inappropriate except where a public official has violated a 'ministerial' duty." *Consol. Edison Co. v. Ashcroft*, 286 F.3d 600, 605 (D.C. Cir. 2002); *see Wilbur v. U.S. ex rel. Kadrie*, 281 U.S. 206, 218-19 (1930). But the challenged actions here are not ministerial duties, given the Executive Branch's constitutional and statutory discretion in making foreign assistance funding decisions. For example, the ICA "does not impose any specific requirements on the Executive Branch as to the rate at which budget authority must be obligated or expended." *In re Henry M. Jackson*, U.S. Senate, B-200685, 1980 WL 14499 (Comp. Gen. Dec. 23, 1980).

Plaintiffs' reliance (3rd Am. Compl. ¶¶ 160, 246) on *In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013) (Kavanaugh, Cir. J.), is misplaced. There, the D.C. Circuit issued a writ of mandamus directing the Nuclear Regulatory Commission (NRC) to "promptly continue" proceedings on the Department of Energy's application for authorization to store nuclear waste at Yucca Mountain. 725 F.3d at 267. The D.C. Circuit rejected the NRC's contention that, because Congress had not appropriated sufficient funds for the agency to complete that process, NRC could "shut down its review and consideration" of the application. *Id.* at 258. Significantly, a substantive law—the Nuclear Waste Policy Act—mandated the Commission "shall consider" the application and "'shall issue a final decision approving or disapproving'" the application within three years of its submission. *Id.* at 257-58 (quoting 42 U.S.C. § 10134(d)). But here, there is no similar statutory mandate requiring Defendants to act in the manner Plaintiffs desire.

## VI. PLAINTIFFS PROPOSED RELIEF GOES WELL BEYOND APPROPRIATE LIMITS

Plaintiffs' requests for relief on their funding claims are also far in excess of what the APA allows and the Court's equitable jurisdiction.

Most of Plaintiffs' funding claims arise under the APA.  But many of Plaintiffs' requests for specific equitable relief are inconsistent with the APA's provision that a reviewing court may only "hold unlawful and set aside agency action" found to be in violation of law pursuant to the APA.  *See* 5 U.S.C. § 706(2).  Plaintiffs ask the Court to "enjoin" various agency actions.  3rd Am. Compl. at 61 (Prayer for Relief).  "[U]nder settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the correct legal standards." *PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995).  Thus, at most this Court has authority pursuant to the APA to vacate the allegedly unlawful agency actions and remand the matter to Defendants for further explanation or other action consistent with the correct legal standards.  *See Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005) (holding the district court's jurisdiction extended only to vacatur of agency action applying incorrect wage data to a determination; the court lacked "jurisdiction to order either reclassification based upon those adjusted wage data or an adjusted reimbursement payment that would reflect such a reclassification").

Plaintiffs' proposed requests also improperly seek blanket relief having no specific relationship to these Plaintiffs and their alleged injuries.  3rd Am. Compl. at 61-62 (Prayer for Relief).  For example, Plaintiffs do not seek to compete for funds in either the Foreign Military Financing accounts (grants to carry out Section 23 of the Arms Export Control Act), or International Military Education and Training accounts (grants to carry out Section 541 of the FAA).  *See generally*, ECF No. 133-2. Further, because Chemonics is no longer a participant in this litigation, Plaintiffs' own filing demonstrates that no individual Plaintiffs now compete for demining operations under the Nonproliferation, Anti-Terrorism, and Demining Categories. *Id*. at 4.  A fundamental mismatch exists between Plaintiffs' sweeping request to compel the immediate obligation of all foreign assistance funds and their concession that they do not compete for all the funds encompassed by that relief. *See generally* ECF No. 133-2.

44

In challenges to agency action, the D.C. Circuit has explained that "[j]udicial remedies should be 'no more burdensome to the defendant than necessary to provide complete relief' to the plaintiffs or petitioners." *See Bd. of Cnty. Comm'rs of Weld Cnty. v. EPA*, 72 F.4th 284, 296 (D.C. Cir. 2023) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979), and further quoting *California v. Texas*, 593 U.S. 659, 672 (2021), for teaching that "remedies operate with respect to specific parties rather than on legal rules in the abstract") (citation modified)).  And as the Supreme Court has now made plain, "[u]nder" the complete-relief principle, "the question is not whether an injunction offers complete relief to *everyone* potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief to *the plaintiffs before the court*."  *CASA, Inc.*, 606 U.S. at 852.

Plaintiffs here seek relief that expansively encompasses all foreign assistance appropriations set to expire on September 30, 2025, or September 30, 2026, regardless of whether such appropriation can be traced to an award to which Defendants can claim some eligibility or entitlement.  This Court cannot issue relief as to appropriations that would not redress any concrete injury of a Plaintiff before the Court.

## CONCLUSION

For the reasons stated, the Court should grant summary judgment to Defendants and deny summary judgment to Plaintiffs.

45

Dated: July 27, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division

ALEXANDER K. HAAS
Director
Federal Programs Branch

*/s/ Pierce J. Anon*
PIERCE J. ANON
JOSHUA N. SCHOPF
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Phone: (202) 305-7573
Email: pierce.anon@usdoj.gov

*Counsel for Defendants*

46