**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| GLOBAL HEALTH COUNCIL, *et al.*,<br><br>       *Plaintiffs*,<br><br>    v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>       *Defendants*. | Civil Action No. 25-cv-402 (AHA) |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
<u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

INTRODUCTION ...............................................................................................................1

STATEMENT ....................................................................................................................3

    A. Background ...........................................................................................................3

        1. The Appropriations Bills and Mandatory Funding ...............................................3

        2. The Disposition of Funds Expiring on September 30, 2025....................................6

        3. Defendants' Actions Regarding Funds Expiring on September 30, 2026 ..............7

    B. Scope of This Motion...........................................................................................10

ARGUMENT ...................................................................................................................11

    I. Defendants' Disposition of Expiring Global Health Programs and Development Assistance Funds, as Reflected in the Congressional Notification, Is Unlawful ..............11

    A. Defendants' Closeout Scheme Is Unlawful In Multiple Ways....................................13

        1. The Closeout Scheme Violates Section 7019(a) and Certain Directives in Sections 7030–7061 ...........................................................................................13

        2. The Closeout Scheme Violates the Appropriations Provisions of Title III by Impounding GHP and DA Funds.......................................................................15

        3. The Closeout Scheme Violates the Purpose Statute by Applying GHP and DA Funds to Purposes Other than Those Specified by Congress..........................17

    B. Defendants' Closeout Scheme Is Reviewable under the APA ...................................19

    C. Defendants' Closeout Scheme Is Arbitrary and Capricious ......................................20

    II. Defendants Are Violating Directives by Allocating Rescinded Funds to Them................22

    A. Congress's Directives Remain Binding, and the Remaining Appropriations Are Sufficient to Satisfy Them .................................................................................22

    B. Defendants Allocated Rescinded Funds to Disfavored Directives to Avoid Spending Available Funds on Them.........................................................................25

    C. The Rescissions Neither Repealed the Directives Nor Excused Defendants from Maximizing Compliance.................................................................................28

    D. Defendants' Allocation Scheme Is Contrary to Law, Unlawfully Withholds Required Agency Action, and Is Arbitrary and Capricious......................................31

    III. Defendants Have Unlawfully Withheld or Unreasonably Delayed Obligation of Expiring Funds..................................................................................................32

A.   Defendants Are Obligating Funds at a Historically Anomalous Pace .........................32

B.   Defendants' Obligation Rate Is Unreasonable under the TRAC Factors ....................33

IV. Plaintiffs Are Entitled to Summary Judgment Regarding the Pocket Rescission .............36

V.  To the Extent the APA Does Not Afford Complete Relief, Plaintiffs Are Entitled
    to *Ultra Vires* or Mandamus Relief ...................................................................................38

A.   Defendants' Conduct Is *Ultra Vires* .........................................................................38

B.   Alternatively, Mandamus Is Warranted.....................................................................39

VI. The Court Should Enter Multiple Forms of Relief............................................................40

CONCLUSION.................................................................................................................................45

## TABLE OF AUTHORITIES

**Cases**

*Action on Smoking & Health v. C.A.B.*,
713 F.2d 794 (D.C. Cir. 1983) ........................................................................ 41

*AGMA Sec. Serv., Inc. v. United States*,
152 Fed. Cl. 706 (2021) ................................................................................. 43

*In re Aiken Cnty.*,
725 F.3d 255 (D.C. Cir. 2013) .............................................................. 15, 16, 40

*Amoco Prod. Co. v. Vill. of Gambell, AK*,
480 U.S. 531 (1987) ...................................................................................... 42

*Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*,
64 F.4th 1354 (D.C. Cir. 2023) ....................................................................... 41

*Ark Initiative v. Tidwell*,
816 F.3d 119 (D.C. Cir. 2016) ........................................................................ 32

*Bennett v. Spear*,
520 U.S. 154 (1997) ...................................................................................... 20

*Bridgeport Hosp. v. Becerra*,
108 F.4th 882 (D.C. Cir. 2024) ....................................................................... 40

*City of Los Angeles v. Adams*,
556 F.2d 40 (D.C. Cir. 1977) ............................................................... 29, 30, 32

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
601 U.S. 416 (2024) ...................................................................................... 16

*Clinton v. City of New York*,
524 U.S. 417 (1998) ...................................................................................... 37

*Coal. of MISO Transmission Customers v. FERC*,
45 F.4th 1004 (D.C. Cir. 2022) ....................................................................... 42

*In re Ctr. for Biological Diversity*,
53 F.4th 665 (D.C. Cir. 2022) ......................................................................... 39

*Del Monte Fresh Produce Co. v. United States*,
570 F.3d 316 (D.C. Cir. 2009) ........................................................................ 37

*Demby v. Schweiker*,
671 F.2d 507, 508 (D.C. Cir. 1981) ................................................................. 30

*Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*,
591 U.S. 1 (2020) ......................................................................................... 32

*Dep't of State v. AIDS Vaccine Advoc. Coal.*,
  146 S. Ct. 19 (2025)..............................................................................7, 37, 40

*Fed. Express Corp. v. U.S. Dep't of Com.*,
  39 F.4th 756 (D.C. Cir. 2022)........................................................................ 38

*Glob. Health Council v. Trump*,
  153 F.4th 1 (D.C. Cir. 2025)..................................................................... 38, 39

*League of Women Voters of United States v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016).......................................................................43, 44

*Mashpee Wampanoag Tribal Council, Inc. v. Norton*,
  336 F.3d 1094, 1100 (D.C. Cir. 2003)........................................................... 34

*Meina Xie v. Kerry*,
  780 F.3d 405 (D.C. Cir. 2015)........................................................................ 31

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Auto. Ins. Co.*,
  463 U.S. 29 (1983)........................................................................................... 21

*Navajo Sch. Bd., Inc. v. Babbitt*,
  87 F.3d 1338 (D.C. Cir. 1996)...........................................................29, 30, 32

*NIH v. Am. Pub. Health Ass'n*,
  No. 25A103, 145 S. Ct. 2658 (2025) ............................................................. 43

*Norton v. Southern Utah Wilderness Alliance*,
  542 U.S. 55 (2004)........................................................................................... 20

*U.S. Dep't of the Navy v. FLRA*,
  665 F.3d 1339 (D.C. Cir. 2012)...................................................................... 18

**Statutes**

2 U.S.C.
  § 622(2) ........................................................................................................... 12
  § 681(4) ........................................................................................................... 36
  § 682(1) ........................................................................................................... 12
  § 683(a) ........................................................................................................... 12
  § 683(b) ........................................................................................................... 36
  § 684(a) ........................................................................................................... 12

5 U.S.C.
  § 706(1) ....................................................................................................*passim*
  § 706(2) ...............................................................................................19, 22, 41

22 U.S.C. § 2413................................................................................................. 8

28 U.S.C. § 1361............................................................................................... 39

31 U.S.C. § 1301(a) ................................................................................................ 12, 17, 39

Further Consolidated Appropriatons Act, 2024,
   Pub. L. No. 118-47 ...................................................................................................... *passim*

Full-Year Continuing Appropriations and Extensions Act, 2025,
   Pub. L. No. 119-4 ........................................................................................................ *passim*

Rescissions Act of 2025,
   Pub. L. No. 119-28 .............................................................................. 2, 6, 8, 22, 23, 25, 29

**Rules**

Federal Rules of Civil Procedure
   Rule 57 ........................................................................................................................... 41
   Rule 65(d)(2) ................................................................................................................... 42

**Other Authorities**

2 GAO, *Principles of Federal Appropriations Law*, 6-28 (3d ed. Jan. 2004) .............................. 16

OMB Circular No. A-11 (2025) ............................................................................................. 11, 20

*Rescissions Proposals Pursuant to the Congressional Budget and Impoundment Control Act of
   1974,* 90 Fed. Reg. 24,298 (June 9, 2025) ................................................................. 5

**INTRODUCTION**

Defendants' methods of defying Congress's spending commands have become far more sophisticated than at the outset of the current Administration, but they are no less unlawful. The administrative record reveals multiple schemes by which Defendants are subverting Congress's spending mandates without publicly stating that they are doing so.

*First*, Defendants have decided to withhold several billion in expiring Global Health Programs and Development Assistance funds, purportedly to pay the costs of closing out terminated USAID awards. Defendants have stated they will not obligate these funds for substantive programming purposes until all USAID awards are closed out, even though all USAID awards undisputedly will not be closed out by September 30, 2026. The administrative record contains *zero* explanation for why Defendants are withholding these appropriations for closeout costs in these circumstances. There are no calculations demonstrating these funds are needed to cover anticipated closeout costs, and there is no reasoning for why these accounts were chosen to hold back for closeout costs rather than other accounts not expiring this year. Nor is there any articulation of how, consistent with the Purpose Statute, Defendants may use these Global Health Programs and Development Assistance funds to close out awards that were funded with different appropriations for different purposes in prior years.

This closeout scheme violates the Purpose Statute and the provisions in title III of the State, Foreign Operations, and Related Programs (SFOPS) Act requiring that the funds be obligated by September 30, 2026. Defendants are also using this closeout scheme to circumvent the mandatory directives in Section 7019(a) and Sections 7030–7061, which require Defendants to spend minimum or specific amounts on particular programs or topics. Defendants are "allocating" portions of the Global Health Programs and Development Assistance appropriations being withheld for closeouts to particular directives they disfavor for policy reasons, and treating

the allocated funds as amounts they do not need to spend to comply with the given directive. The result is direct violations of the unambiguous commands in Section 7019(a) and Sections 7030–7061 that Defendants "shall" spend minimum or specific amounts for specific purposes.

*Second*, Defendants are employing a similar but even more brazen allocation approach with the appropriations rescinded in the Rescissions Act of 2025. Even after the rescissions, there are sufficient appropriations for Defendants to comply with all the mandatory directives in Section 7019(a) and Sections 7030–7061, which Congress never repealed. But Defendants have unnecessarily allocated the rescinded appropriations to certain disfavored directives, so that they can claim that the funds they would have used for meeting those directives are gone. With this tactic, Defendants can use the remaining, non-rescinded appropriations on their own priorities, rather than Congress's. An agency, however, cannot repeal a statutory command through accounting tricks. The directives in Section 7019(a) and Sections 7030–7061 remain operative and binding, and Defendants are not complying with them.

*Third*, Defendants have more broadly unlawfully withheld and unreasonably delayed the obligation of expiring appropriations. With only months left before the statutory deadline, obligation rates for nearly every relevant account are historically anomalous. Defendants' own record confirms that obligations require multiple complicated administrative steps. As September 30 approaches, delay makes compliance increasingly difficult and ultimately impossible. That is enormously consequential for Plaintiffs and the ultimate beneficiaries of these funds, which Congress provided to advance human health and welfare around the globe.

*Finally*, Defendants continue to defend the "pocket rescission" they used last year. The relevant appropriations required Defendants to obligate the funds by September 30, 2025, and there is no legal basis for the proposition that the President's mere sending of a proposal to Congress to rescind the funds relieves Defendants of their statutory duty to spend. Defendants'

2

continued defense of that tactic creates a concrete risk that they will use it again whenever the Executive prefers not to execute the appropriations laws.

The Court should grant partial summary judgment to Plaintiffs on their claims related to appropriations set to expire on September 30, 2026 and those seeking declaratory relief regarding the pocket rescission last year, and enter appropriate relief to bring an end to Defendants' evasions of their legal duties to comply with Congress's spending commands.

## STATEMENT

This case's lengthy factual and procedural history is set forth in Plaintiffs' prior filings and the Court's prior opinions. This statement addresses only information relevant to this motion.

### A.      Background

#### 1.   *The Appropriations Bills and Mandatory Funding*

**a.** In titles III and IV of the SFOPS Act of 2024, which was incorporated as Division F of the Further Consolidated Appropriations Act of 2024 ("2024 Appropriations Act"), Congress appropriated more than $38 billion in foreign assistance funding to USAID and the State Department. Decl. of Joseph Carlile ("Carlile Decl.") ¶ 10; *see* Pub. L. No. 118-47, div. F, tits. II–III, 138 Stat. 460, 740–49 (2024). Congress appropriated these funds across more than fifteen categories of appropriations, each with their own heading. *See, e.g.*, 138 Stat. 740 ("Global Health Programs" heading). Congress made most of these appropriations available for obligation for two fiscal years, through September 30, 2025; others were made available for longer periods or even without any expiration.

As relevant to this motion, the following title III appropriations have two-year periods of availability: (a) Global Health Programs (USAID) ($3.985 billion); (b) Development Assistance ($3.93 billion); (c) Economic Support Fund ($3.59 billion); (d) Democracy Fund ($345 million);

3

and (e) Assistance for Europe, Eurasia, and Central Asia ($460 million). 138 Stat. 740, 742–44. And as relevant to this motion, these title IV appropriations also have two-year periods of availability: (i) International Narcotics Control and Law Enforcement ($1.285 billion); (ii) Non-Proliferation, Anti-Terrorism, De-Mining and Related Programs ($870 million); and (iii) a portion of Peacekeeping Operations ($291,425,000). 138 Stat. 747–49.

Separate from the titles appropriating funds, the SFOPS Act also contains statutory mandates that USAID and the State Department obligate specific or minimum amounts of the appropriations to particular programs or subject matters. These mandates, or "directives," come in two forms. First, in Section 7019(a), Congress provided that "funds appropriated by this Act under title III through V *shall be made available in the amounts specifically designated* in the respective tables included in the explanatory statement." 138 Stat. 771 (emphasis added). Those tables are organized by the category of title III or IV appropriation from which funds must be used to meet the directives, and each table includes lines with specific amounts that must be obligated for more granular purposes. *See* Ex. A (Explanatory Statement).[1] Congress provided that, for most of the directives in the tables, Defendants "may only deviate up to 10 percent from the amounts specifically designated in the respective tables" unless the Secretary of State or USAID Administrator determines that greater deviations are necessary. 2024 Appropriations Act § 7019(b), 138 Stat. 772. And for the roughly $10 billion in table directives for Global Health Programs, the agencies may not deviate from the table amounts at all. *Id.* § (d)(2).

Second, Sections 7030 to 7061 of the SFOPS Act contain mandatory directives in the bill text, requiring that "not less than" specific amounts of appropriations in titles III, IV, or V "shall be made available" for delineated purposes. For instance, Section 7061(b)(1) directs that "[o]f

---

[1] All exhibit citations are to exhibits attached to the Declaration of Daniel Jacobson.

the funds appropriated under title III of this Act, not less than $365,750,000 shall be made available for biodiversity conservation programs." 138 Stat. 841. This motion uses the term "bill directives" to distinguish these directives from the Section 7019(a) "table directives."

**b.** On March 15, 2025, Congress enacted a continuing resolution that effectively re-enacted the SFOPS Act in the 2024 Appropriations Act, on the same terms and conditions as in the 2024 Appropriations Act. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, div. A, §§ 1101(a)(11), (c), 1102–05, 139 Stat. 9, 10–12 ("2025 Continuing Resolution").

Under the 2025 Continuing Resolution, appropriations carry the same period of availability as in the 2024 Appropriations Act. *Id.* § 1103. For example, the 2024 Appropriations Act appropriated $3.985 billion to USAID for Global Health Programs, to last through two fiscal years (in that case, through September 30, 2025). 138 Stat. 740. The 2025 Continuing Resolution thus re-appropriated an additional $3.985 billion to USAID for Global Health Programs, to again last through two fiscal years (this time, through September 30, 2026). The 2025 Continuing Resolution also re-enacted Section 7019(a) and Sections 7030–7061, and thus carried forward all of the same directives, at the same levels, as in the 2024 Appropriations Act.

**c.** In a special message dated May 28 and transmitted to Congress on June 3, 2025, President Trump proposed the rescission of billions of dollars in foreign aid appropriations from various categories of title III, IV, and V appropriations in the SFOPS Act. *See Rescissions Proposals Pursuant to the Congressional Budget and Impoundment Control Act of 1974*, 90 Fed. Reg. 24,298, 24,299 (June 9, 2025). Underlying the special message was a recommendation from Defendant Vought to the President describing the proposed rescissions. Vought wrote that "[t]his special message emphasizes the need to cut wasteful foreign assistance spending at the Department of State and USAID and through other international assistance programs." *Id.*

"These rescissions," he added, "would eliminate programs that are antithetical to American interests, such as funding the World Health Organization, 'family planning' and 'reproductive health,' LGBTQI+ activities, 'equity' programs, radical Green New Deal-type policies, and color revolutions in hostile places around the world." *Id.*

On July 24, 2025, Congress enacted some but not all of the proposed rescissions in the Rescissions Act of 2025, Pub. L. No. 119-28, 139 Stat. 467. The Act rescinded roughly $6.6 billion in previously enacted appropriations relevant to this lawsuit. That included rescissions of the following funds from the 2025 Continuing Resolution: $500 million of the $3.99 billion in Global Health Programs (GHP) appropriations for USAID, $2.5 billion of the $3.9 billion in Development Assistance (DA) Appropriations, and $1.65 billion of the $3.89 billion in Economic Support Fund appropriations. 139 Stat. 468. The Act also rescinded portions of some of the title III appropriations that do not have expiration dates. Even after these rescissions, however, there remained more than $20 billion in title III appropriations from the 2025 Continuing Resolution, plus many billions more in title IV appropriations. Carlile Decl., Table 2.

The Rescissions Act of 2025 also did not repeal or amend Section 7019(a) or Sections 7030–7061 or the directives contained therein.

### 2.   *The Disposition of Funds Expiring on September 30, 2025*

On August 28, 2025, the President submitted another special message to Congress proposing the rescission of funds. This time, however, Defendants proposed rescissions of funds set to expire only a month later, and they had no intention that Congress act on the proposal. Instead, Defendants immediately touted the action as a "historic pocket rescission," asserting that the mere transmission of the special message less than 45 days before the relevant funds were set to expire had the effect of "cancelling $5 billion in foreign aid and international organization funding that violates the President's America First priorities." Ex. B.

On September 3, 2025, this Court granted Plaintiffs' motion for a preliminary injunction, requiring that Defendants obligate expiring funds by September 30, 2025. Dkt. 139. The government ultimately sought a partial stay of the injunction from the Supreme Court, limited to the roughly $4 billion in the pocket rescission. The Supreme Court granted a partial stay "as to the funding subject to the President's August 28 special message," while emphasizing that the stay "reflected [its] preliminary view" and "should not be read as a final determination on the merits." *Dep't of State v. AIDS Vaccine Advoc. Coal.* (*AVAC*), 146 S. Ct. 19 (2025).

For the funds subject to the preliminary injunction that were not stayed, which Defendants have now pegged at roughly $7 billion, Defendants have represented that they obligated all but roughly $20 million of those funds before they expired. AR 4–6 ¶¶ 5, 8; AR 208.[2] For at least $1.55 billion of the funds, the obligation came via an interagency agreement between USAID and the State Department on September 30, 2025. Ex. I (AR 585–92). The obligating instrument itself ███████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████ *Id.* (AR 585–87).

### 3. Defendants' Actions Regarding Funds Expiring on September 30, 2026

**a.** The administrative record reveals aspects of Defendants' plans for the appropriations in the 2025 Continuing Resolution that expire on September 30, 2026. In particular, Defendants have produced the "Section 653(a) report" that Defendants transmitted to Congress in relation to these funds. AR 460–520.[3] Section 653(a) of the Foreign Assistance Act requires State and

---

[2] Plaintiffs previously filed AR 1–417. *See* Dkt. 187-2.

[3] Local Rule 7(n)(2) provides that the parties shall file an appendix with cited portions of the administrative record within 14 days after the motion is fully briefed. Given the time-sensitivity of this motion, Plaintiffs are filing herewith certain cited portions of the administrative record, including the 653(a) report (Ex. J). Because Defendants have designated portions of the 653(a)

USAID to submit a detailed spending plan to Congress within 30 days of the enactment of any law appropriating foreign assistance funds. 22 U.S.C. § 2413. For the 2025 Continuing Resolution, that deadline was made 45 days. 2025 Continuing Resolution § 1113(a), (c)(12), 139 Stat. 9, 14–15. But the FY 2025 Section 653(a) report was not approved for transmission to Congress until February 25, 2026—more than 9 months after the statutory deadline. AR 531–33.

The 653(a) report detailed how Defendants have allocated the funds appropriated in the 2025 Continuing Resolution to specific countries, regions, and bureaus, and toward meeting the various statutory directives. It stated that ██████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████ AR 460. It further explained that the allocations ██████████████████████████████████████████████████████ ████████████████████████████ *Id.*

The report detailed how Defendants are allocating the appropriations rescinded in the Rescissions Act of 2025. Specifically, and as detailed below, *infra* Section I.A.1, the report shows that Defendants are allocating as much of the rescinded appropriations as possible to the table and bill directives. The premise of these allocations is that, however much in rescinded appropriations that Defendants allocate to a directive, Defendants need not obligate that amount to actually meeting the directive, because the funds allotted are no longer available. The report shows that Defendants have strategically—by choice and not necessity—allocated rescinded appropriations to directives that they do not want to carry out for policy reasons. Defendants thus purported to satisfy those directives on paper, without spending the allocated funds for the purposes Congress specified.

report and certain other documents as confidential under the terms of the parties' protective order, Plaintiffs are filing those documents under seal.

**b.** The 653(a) report also shows Defendants manipulating $2 billion in GHP appropriations and $1.179 billion in Development Assistance (DA) appropriations under a separate scheme. In the report, Defendants ███████████████████████████ ████████████████████████████████████████████ AR 464, 475.

At the time the Section 653(a) report was submitted, Defendants had already drafted a Congressional Notification indicating that they would be withholding the exact same amounts in GHP and DA appropriations expiring this year for paying "close out" costs for terminated USAID awards. Ex. H (AR 561–66). On April 20, 2026, Defendants transmitted that Congressional Notification to Congress. AR 230. The ostensible purpose of reserving these funds, according to the Congressional Notification, is to have those funds available to pay the costs of "closing out" contracts, grants, and cooperative agreements terminated last year. AR 230–31. But the Congressional Notification also lists nearly $16 billion in other, non-expiring funds available for this purpose, including the undisbursed amounts of the money originally obligated to the terminated awards, which is the standard source of funds for paying closeout costs. AR 231, 234 & nn.2, 4–6. Neither the Congressional Notification nor any document in the administrative record attests that these $16 billion will be insufficient to pay all closeout costs, nor is there any explanation of why the expiring GHP and DA funds were chosen to be withheld for this purpose.

OMB cemented that the expiring GHP and DA funds will be used only for closeout costs, and not put toward substantive programming, through legally binding apportionments. On November 24, 2025, OMB apportioned the $1.179 billion in DA appropriations to a line titled "Unallocated," which precludes the funds from being used for substantive programming. AR

9

316–18. On April 10, 2026, OMB apportioned the $2 billion in GHP funds to "USAID Close Out," which legally precludes the funds for being used for any other purpose.[4]

Defendants do not represent that all closeouts will be completed before these GHP and DA appropriations expire. They state only that USAID expects to complete a "significant number" of closeout actions by September 30, 2026, and that the agency is working to "wrap up as much as possible" by that date. AR 1–2 ¶ 8. At the same time, the Congressional Notification provides that any unused funds will be made available for programmatic purposes only "after USAID has completed *all* closeout actions." AR 233–34 (emphasis added).

**c.** Even for funds that were not allocated to rescissions or reserved for closeouts, Defendants are extraordinarily delayed in obligating, with just two months remaining now until they expire. As detailed further, *infra* Section III, Defendants' pace of obligating the expiring funds is a historical outlier compared to the obligation rates for these appropriations in the previous five years. *See* Carlile Decl. ¶¶ 27–31 & Appendix A.

### B.    Scope of This Motion

Plaintiffs seek partial summary judgment on (1) Counts 1–5 as relating to funds expiring September 30, 2026; and (2) Counts 13 and 14, which seek declaratory relief concerning Defendants' failure to obligate the funds included in the August 2025 special message. Sections

---

[4] Defendants inexplicably did not include the April 10, 2026 apportionment as part of the administrative record, but it is publicly available at https://openomb.org/file/11515780#tafs_11515780--019-1031A-072-2025-2026--1--2026. In June 2026, OMB issued a new apportionment that permitted $647.05 million of these GHP funds to be used for Ebola response, but OMB kept the remaining $1.353 billion apportioned exclusively to "USAID Close Out." AR 2 ¶ 10, 406–08.

10

I–III address the APA claims under Counts 1–3; Section IV addresses Count 13; and Section V addresses Plaintiffs' alternative ultra vires and mandamus claims under Counts 4, 5, and 14.[5]

## ARGUMENT

### I.    Defendants' Disposition of Expiring Global Health Programs and Development Assistance Funds, as Reflected in the Congressional Notification, Is Unlawful

The April 2026 Congressional Notification and related documents in the administrative record demonstrate that Defendants have decided not to obligate billions in expiring GHP and DA funds for foreign assistance programming, and instead will ostensibly use the funds to close out thousands of terminated awards. AR 230–34, 316–18, 406–08. Defendants have made clear that they will not release these funds for obligation to foreign aid programs until *all* USAID award closeouts are complete—a condition Defendants admit will not be satisfied before the funds expire on September 30. AR 2 ¶ 8; AR 233. This scheme is unlawful several times over.

To understand how, it is important to distinguish between the appropriations provisions of the SFOPS Act and the directives that appear later in the Act. Titles I to V of the SFOPS Act contain the provisions appropriating "budget authority"—the "authority provided by law to incur financial obligations that will result in outlays." OMB Circular No. A-11, at 12–14 (2025). As relevant here, in title III under the headings "Global Health Programs" and "Development Assistance," Congress appropriated $3,985,450,000 and $3,931,000,000 to USAID, with both appropriations to "remain available until September 30, [2026]." 138 Stat. 740–42.[6]

---

[5] This motion does not seek judgment on Counts 6–12 and 15–18. It also does not seek judgment on Counts 1–5 insofar as they relate to no-year funds, funds expiring after September 30, 2026, or funds that were originally set to expire on September 30, 2025. Those claims remain pending.

[6] The citations and quotes hereinafter are to the SFOPS Act within the 2024 Appropriations Act, which was carried forward in the 2025 Continuing Resolution.

These appropriations provisions carry dual legal requirements. First, the agency must obligate all of the funds appropriated by the expiration date. *See infra* Statement A.1. The appropriation on its own imposes this requirement, *id.*, and the Impoundment Control Act provides a process for the Executive Branch to be relieved of this requirement, where it wishes to either "defer" spending the funds or to permanently "rescind" the funds, *see* 2 U.S.C. §§ 682(1), 683(a), 684(a). Second, the appropriations provisions require that the agency must obligate the funds for the purposes specified therein, and they *must not* obligate those funds for any other purpose. This requirement derives from the appropriations provisions in conjunction with the Purpose Statute, which provides that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a).

The directives in Sections 7019(a) and Sections 7030–7061 are *not* appropriations provisions, but instead are direct statutory commands regarding how funds appropriated earlier in the Act must be used. In Section 7019(a), Congress provided that "funds appropriated by this Act under titles III through V shall be available in the amounts specifically designated in the respective tables included in the explanatory statement." And in Sections 7030–7061, Congress provided directives that, "of the amounts appropriated" in the earlier titles, "not less than" specific amounts must be obligated for particular programs or subject matters. Because these directives are not appropriations, an agency's failure to comply with them does not constitute a "rescission" or "deferral" of "budget authority" as those terms are defined or used in the Impoundment Control Act. *See* 2 U.S.C. §§ 622(2), 682(1), 683(a)–(b), 684(a). Rather, failure to comply with the directives simply violates the statutory commands contained in these provisions.

Defendants' setting aside and diversion of GHP and DA funds as outlined in the April 2026 Congressional Notification is final agency action that violates the obligation and purpose

12

requirements of the appropriations provisions in title III, as well as the separate directives. It also constitutes agency action unlawfully withheld, and is arbitrary and capricious.

### A. Defendants' Closeout Scheme Is Unlawful In Multiple Ways

#### 1. The Closeout Scheme Violates Section 7019(a) and Certain Directives in Sections 7030–7061

Defendants' decision to withhold expiring GHP and DA funds from obligation for substantive programming defies the unambiguous commands of Section 7019(a) with respect to both GHP and DA funds, and certain directives in Sections 7030–7061 for DA funds.

Regarding GHP funds, Congress was emphatic that USAID had to meet the directives in the GHP table in the explanatory statement, which prescribe specific amounts to be spent in nine global health areas, such as Maternal and Child Health, Malaria, Tuberculosis, HIV/AIDS, Global Health Security, and so on. Ex. A at 1170. Not only does Section 7019(a) require USAID to obligate funds in the "amounts specifically designated" in the GHP table, but Section 7019(d)(1) provides that USAID may not "deviate from amounts designated in the respective tables" for GHP to any extent, in contrast to other tables for which Congress provided some authority to deviate from the table amounts in Section 7019(b).

The administrative record makes clear that, because of the closeout scheme, Defendants will not comply with the Section 7019(a) mandate for GHP funds. In the Section 653(a) report, Defendants did not include any plans to use the relevant $2 billion in GHP funds for substantive programming, but instead ███████████████████████████████ AR 473–75, 503. Defendants then divvied up this $2 billion ███████████████—*i.e.*, funds being withheld for closeout costs—among the directives in the GHP table in the explanatory statement. AR 503. That is, Defendants allocated to particular table directives—and specifically directives that they disfavor on policy grounds—a portion of the $2 billion being withheld, such that

Defendants can assert that they need not spend those allocated amounts toward meeting the given directive, because they are being withheld for closeout costs. *See id.*

As a hypothetical, if a GHP table directive provided that $10 million of the GHP appropriations shall be spent on combatting Disease A, and Defendants allocated $9 million of the GHP appropriations being withheld for closeout costs to that directive, Defendants would proceed on the basis that they must obligate only $1 million on substantive programming to combat Disease A. In their view, they need not spend the additional $9 million on such programming, because that $9 million is being held for closeout purposes. Consequently, Defendants would violate the statutory command in Section 7019(a) to obligate the amount "specifically designated" in the table, $10 million, on combatting Disease A.

The allocations are just as, if not more, extreme in nullifying Congress's mandates. In the GHP table of the explanatory statement, █████████████████████████████████ ███████████████████ Ex. A at 1170. In the 653(a) report, Defendants allocated ████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████ AR 501–03, 524. In other words, Defendants are ████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████ Defendants have similarly allocated funds being withheld for closeouts to ██████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████ AR 503. As a result, for each of these items, Defendants will not comply with Section 7019(a)'s mandate to obligate the amounts "specifically designated" in the table.

14

Defendants have similarly allocated roughly ████████ of the $1.179 billion in DA funds being withheld for closeout costs across ████ statutory directives that Defendants disfavor for policy ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████ AR 488–90. As a result, Defendants will not comply with the statutory mandates in these provisions that "not less than" specific amounts "shall be made available" for the specified programs and topics in each directive.

Importantly, the violations of Section 7019(a) and the above provisions of Sections 7060 and 7061 exist regardless of whether Defendants do ultimately use the funds being withheld to pay closeout costs. The violations here do not equate to impoundments—the Court may assume *arguendo* that Defendants will obligate all the funds before they expire on September 30, 2026. The violations instead are for failure to comply with the explicit statutory mandates regarding how much Defendants must obligate toward specific programs and subject matters.

### 2. The Closeout Scheme Violates the Appropriations Provisions of Title III by Impounding GHP and DA Funds

To the extent any GHP and DA appropriations being withheld to potentially pay closeout costs are *not* obligated by September 30, 2026, the closeout scheme violates the appropriations provisions of title III by impounding the funds.

**a.** Congressional appropriations are mandatory, not optional, as this Court has held. Dkt. 139 at 22–26. It is long settled that, absent an express indication to the contrary, an appropriation is a mandate that the Executive Branch spend "the full amount appropriated by Congress for a particular project or program." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013). Neither

15

the President nor an agency has "unilateral authority to refuse to spend the funds." *Id.* For this reason, when Congress intends for an agency to have discretion to spend less than the full appropriated amount, Congress uses hallmark permissive language, such as appropriating "up to," "not more than," or "sums not exceeding" specific amounts.

Since the Founding, Congress has made "appropriation[s] of 'sums not exceeding' a specified amount," which do not "mandate that the Executive spend that amount," but "instead provide the Executive discretion over how much to spend up to a cap." *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 432–33 (2024); *see also id.* at 442 (Kagan, J., concurring) (quotations omitted); *see* Dkt. 139 at 24–25. Congress has consistently used clear language when it intends to allow the Executive Branch to spend less than the full amount appropriated. In the 2024 Appropriations Act alone, the phrase "not to exceed" appears over 200 times. *See* 2 GAO, *Principles of Federal Appropriations Law*, 6-28 (3d ed. Feb. 2006) (explaining that, with a "not to exceed" appropriation, "the agency is not required to spend the entire amount"). Such language would be entirely unnecessary if an appropriation standing alone gave the executive discretion to spend less than the appropriated amount.

In the 2024 Appropriations Act, as re-enacted in the 2025 Continuing Resolution, Congress did not give Defendants discretion to obligate less than the full amounts appropriated in any of the relevant title III or title IV appropriations, including for GHP and DA. *See* 138 Stat. 740–49. In none of the fifteen categories did Congress provide that USAID or State may obligate "up to," "not more than," or "not to exceed" the appropriated amount. Defendants therefore must spend "the full amount appropriated by Congress" for each category, and they have no "unilateral authority to refuse to spend the funds." *Aiken Cnty.*, 725 F.3d at 261 n.1.

**b.** In the 2024 Appropriations Act, as re-enacted in the 2025 Continuing Resolution, Congress required Defendants to obligate the full appropriated amounts of GHP and DA funds

16

by September 30, 2026. *See* 138 Stat. 740–42; 139 Stat. 10–12. But Defendants have nevertheless made a final decision to indefinitely reserve billions of dollars of these funds to possibly pay closeout costs. The April 2026 Congressional Notification expressly states that the funds being withheld for closeout may be used for foreign-assistance programs only "after USAID has completed *all* closeout actions." AR 233–34 (emphasis added). And Defendants' declaration makes clear that USAID will not complete all closeouts before the funds expire: Defendants state that USAID expects to complete only a "significant number of closeout actions by September 30, 2026," and is working "to wrap up as much as possible." AR 2 ¶ 8.

Moreover, it is apparent that large percentages of the withheld GHP and DA funds will not actually be needed to pay closeout costs. The Congressional Notification acknowledges that expected closeout costs will be "substantially less" than the amounts reserved. AR 233. The administrative record does not even contain evidence that anticipated closeout costs are greater than the $15.3 billion that Defendants maintain for closeouts from other sources; namely, the unliquidated balances of the funds obligated to the terminated awards and amounts obligated to Development Objective Assistance Agreements but not yet subobligated. AR 234.

The record thus indicates that at least some, potentially billions, in expiring GHP and DA funds being withheld for closeout will expire unobligated on September 30, 2026. That violates the appropriations provisions of the 2025 Continuing Resolution.

### 3. *The Closeout Scheme Violates the Purpose Statute by Applying GHP and DA Funds to Purposes Other than Those Specified by Congress*

To the extent Defendants have already used, or do use, expiring GHP and DA appropriations to pay closeouts costs on awards, they are violating the Purpose Statute in conjunction with the title III appropriations provisions.

The Executive Branch must spend appropriated funds for—and only for—the purposes Congress specified. "A core tenet of appropriations law is enshrined in 31 U.S.C. § 1301(a), the 'Purpose Statute,' which commands: 'Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law.'" *U.S. Dep't of the Navy v. FLRA*, 665 F.3d 1339, 1348 (D.C. Cir. 2012) (Kavanaugh, J.).

To be sure, an appropriation for a specified object also covers expenses "necessarily incident to accomplishing that object." *Id.* at 1349 (citation omitted). That doctrine permits, for instance, using the undisbursed balance of funds obligated to a terminated award to pay for closeout costs, since the awardee's activities in closing out an award are a necessary incident to the programming purposes for which the funds were provided. Other appropriations, such as for operational or administrative expenses, likewise could probably be put toward closeout reimbursements. But any discretion an agency might exercise in funding incidental expenses ends when the expense's "relationship to an authorized purpose or function" is "so attenuated as to take it beyond that range of permissible discretion." *Id.* at 1349 (citation omitted). An agency may select reasonable means of carrying out Congress's purposes; it may not substitute different purposes for them.

Here, Defendants cannot show that GHP and DA funds appropriated by Congress in the 2025 Continuing Resolution—to carry out substantive global health and development programs—bear the required nexus to closeout costs for terminated awards that were funded with different appropriations, in most cases from a prior appropriations act. There is nothing in the administrative record establishing that Defendants intend to use the billions of GHP and DA funds being withheld to pay closeout costs for terminated awards that were funded with the same GHP and DA appropriations from the 2025 Continuing Resolution. Given the scope of the GHP and DA funds being withheld, and the fact that other appropriations from the 2025 Continuing

18

Resolution are *not* being withheld, it is apparent that Defendants intend to use the GHP and DA funds to pay closeout costs for awards that were funded with entirely different categories of appropriations, such as Economic Support Fund, Democracy Fund, International Narcotics Control and Law Enforcement, and so on. AR 231. Defendants state without qualification that the reserved GHP funds "will be used to settle terminated awards that do not have sufficient unliquidated obligations to pay closeout costs." AR 2 ¶ 7. Neither the Congressional Notification, the apportionments, nor any other record document estimates the closeout liabilities properly chargeable to GHP and DA, maps individual awards to the appropriations that funded them, or requires each new obligation to be charged to the same account as the underlying award. *See* AR 230–34, 316–18, 406–08, 558–65.

By reserving GHP and DA funds for that broader object—and by obligating or expending them on any costs not properly chargeable to those appropriations—Defendants have applied the funds beyond the purposes Congress authorized. Their decision is therefore contrary to the Purpose Statute and exceeds their statutory authority. 5 U.S.C. § 706(2)(A), (C).

## B.      Defendants' Closeout Scheme Is Reviewable under the APA

Defendants' closeout scheme is reviewable by this Court under the APA, as both final agency action under 5 U.S.C. § 706(2) and agency action unlawfully withheld or unreasonably delayed under 5 U.S.C. § 706(1).

**1.** With respect to final agency action, Defendants have made a final decision to withhold the expiring GHP and DA balances from obligation for substantive programming and to use them to pay closeout costs instead. That final decision is reflected in the April 16, 2026 approval memo signed by Director Vought, in the April 2026 Congressional Notification, and in OMB's apportionments of these funds. The fact that Vought formally approved the plan, *see* Ex. G (AR 558–60), Defendants notified Congress of the decision, AR 230–34, and OMB then issued

19

legally binding apportionments that restricted the funds to be used only for closeout activities, AR 316–18, 406–08, independently and together, leave no doubt that Defendants culminated their decisionmaking process to withhold GHP and DA funds to use for paying closeout costs.

Legal consequences flow from that decision. OMB's apportionments of $2 billion of GHP funds (and now $1.353 billion post-Ebola funding) to "USAID Close Out," and $1.179 billion in DA funds to "Unallocated," legally prohibit the State Department and USAID from obligating the funds toward substantive programming. AR 316–18, 406–08; *see* 31 U.S.C. § 1517–19; OMB Circular No. A-11 §§ 120.1, 120.10, 120.13, 120.47–120.50 (2025). With the GHP apportionment, USAID and State legally may use this $1.353 billion solely on "USAID Close Out." And apportionments aside, amounts being withheld for, or that are legally obligated to, closeouts cannot be obligated to substantive programming. Defendants' decision to undertake the closeout scheme is final agency action, *see Bennett v. Spear*, 520 U.S. 154, 177–78 (1997), which this Court must set aside as contrary to law for the reasons provided above.

**2.** Regardless of whether Defendants' scheme reflects final agency action, Defendants' failure to carry out the directives in Section 7019(a) and Sections 7030–7061, as well as their failure to obligate all the GHP and DA funds appropriated in title III by their expiration date, constitute agency action "unlawfully withheld" under 5 U.S.C. § 706(1). The duties under these provisions are defined by particular amounts, purposes, and a fixed deadline; they are not generalized commands to improve Defendants' administration of foreign assistance. *See Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 62–65 (2004). This Court has already held that the same provisions impose nondiscretionary duties enforceable under § 706(1), notwithstanding Defendants' discretion over how to satisfy them. Dkt. 139 at 28–29.

20

### C.    Defendants' Closeout Scheme Is Arbitrary and Capricious

Defendants' decision to withhold and use expiring GHP and DA funds for closeouts is also arbitrary and capricious.

*First*, Defendants did not "examine the relevant data and articulate a satisfactory explanation for its action," including a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted). The record contains no estimates or methodology for determining the anticipated costs of closing out all USAID awards, so as to substantiate the amounts being reserved. The Congressional Notification states that USAID was still "finalizing estimates" and acknowledges that expected closeout costs would be "substantially less" than the amounts being reserved. AR 231, 233–34. But nowhere in the record have Defendants provided an actual estimate of those costs. There is no evidence that the undisbursed amounts obligated to the terminated awards—which are the standard source of funds for closeout costs—are insufficient, let alone an estimate of the size of the shortfall. Nothing in the record estimates what liabilities would remain after using the $15.374 billion in unliquidated obligations and unsubobligated funds, plus $625.483 million in prior-year and no-year unobligated funds, that the Congressional Notification identifies as available funds, and nothing explains why any shortfall would be properly chargeable to GHP or DA.

Indeed, Defendants never explain why they selected *these* expiring GHP and DA accounts to pay closeout costs rather than other resources. There are tens of billions in foreign aid appropriations that do not expire this year. Why did Defendants choose to hold in abeyance funds that will expire this year, before all closeouts are complete, rather than other funds?

*Second*, Defendants did not consider alternatives. They did not consider using other, non-expiring accounts. And their own conclusion that expected costs would be substantially less than

21

the amounts reserved called for consideration of a smaller incremental holdback. Defendants also did not consider asking Congress for a supplemental or deficiency appropriation to cover the closeout costs, which is an available course of action when unanticipated costs or liabilities exceed amounts appropriated for a given purpose. *See* OMB Circular 20.2 (defining supplemental appropriations); 145.10 (discussing deficiency appropriations).

*Third*, Defendants failed to consider an important aspect of the problem—their required compliance with the directives in Section 7019(a) and Sections 7030–7061 using the expiring GHP and DA appropriations. The record contains no evidence that Defendants considered the need to comply with these mandates in deciding which funds to hold back for closeout purposes.

These failures leave no rational connection between the information Defendants identified and their sweeping reservation of the expiring GHP and DA balances. The decision is therefore arbitrary and capricious and must be set aside. 5 U.S.C. § 706(2)(A).

## II.    Defendants Are Violating Directives by Allocating Rescinded Funds to Them

The record is now clear that Defendants have also decided to leverage the Rescissions Act of 2025 to not comply with dozens of mandatory table and bill directives. As with the funds being withheld for closeout costs, Defendants have allocated money that Congress rescinded in the Rescissions Act of 2025 to particular directives that they do not want to comply with for policy reasons, so that they can claim the money for meeting those directives has been rescinded, even though Congress did no such thing. Indeed, as a matter of basic math, Defendants could comply with all the directives with the appropriations not rescinded, and they are using these allocations to intentionally not do so.

22

A.    **Congress's Directives Remain Binding, and the Remaining Appropriations Are Sufficient to Satisfy Them**

As described, *supra* Section I, the directives at issue are not appropriations, but rather statutory commands regarding how USAID and State must spend funds appropriated elsewhere in the SFOPS Act. For instance, in Section 7060(a)(1)(a), Congress provided that "[o]f the funds appropriated under title III of this Act, not less than $922,000,000 shall be made available for the Nita M. Lowey Basic Education Fund." 138 Stat. 838. Per this directive, Defendants must obligate at least $922 million for the Nita M. Lowey Basic Education Fund, and they may use any "of the funds appropriated under title III" of the SFOPS Act to meet this requirement. For other directives, Congress specified that one particular title III or title IV appropriation must be used to carry out the directive, such as Development Assistance funds. *See, e.g.*, 2024 Appropriations Act, § 7045(l), 138 Stat. 823 ("Of the funds appropriated by this Act under the heading 'Development Assistance,' not less than $15,000,000 shall be made available for democracy and religious freedom programs for Nicaragua").

Similarly, Section 7019(a) provides that "funds appropriated by this Act under titles III through V shall be made available in the amounts specifically designated" in the tables. 138 Stat. 771. Those tables are organized by appropriation, meaning Defendants must use a particular title III, IV, or V appropriation to carry out each table directives. For instance, of the $3.89 billion that Congress appropriated for the Economic Support Fund, Congress earmarked $3 million for "atrocities prevention" programs in the explanatory statement, Ex. A at 1174.

In the Rescissions Act of 2025, Congress did not repeal or amend Sections 7019 or 7030–7061. Rather, Congress only rescinded partial amounts of some appropriations in titles III, IV, and V. Congress, for example, rescinded $1.65 billion of the $3.89 billion appropriated in the 2025 Continuing Resolution for the Economic Support Fund. 139 Stat. 468. But Congress did

23

not alter any of the directives for which Economic Support Fund appropriations could be used to meet the directives (*e.g.*, § 7060(a)(1)), or had to be used to meet the directives (*e.g.*, § 7060(g)).

Putting to the side the GHP funds, which are uniquely situated,[7] Congress left in place sufficient appropriations, post-rescissions, for Defendants to meet all of the directives in Sections 7030–7061 and the table made mandatory through Section 7019(a). The total remaining Development Assistance funds appropriated in the 2025 Continuing Resolution is $1.43 billion. Carlile Decl. ¶ 36. That is greater than the aggregate amount of directives that require using only Development Assistance, which is $1.26 billion. *Id.* The total remaining Economic Support Fund appropriations are $1.94 billion, compared to roughly $1.8 billion in aggregate directives that require using only Economic Support Fund appropriations. *Id.* ¶ 37. And across all title III appropriations in the 2025 Continuing Resolution, there are roughly $11 billion in appropriations following the 2025 rescissions, which far exceeds the aggregate $6.5 billion in mandatory directives for which Congress required using only funds appropriated in title III. *Id.* ¶ 37. The cushion is even greater for directives that Defendants may meet with any appropriations in title III or title IV, *see, e.g.*, § 7045(b)(1)(B), as Congress appropriated more than $8.5 billion in total across title IV. *See* 138 Stat. 747–50. Thus, even after rescission, Defendants have sufficient funds to fully comply with the directives involving title III and title IV funds.

What's more, Defendants are permitted to count a single obligation of funds toward meeting multiple directives, if the funds will fulfill the purposes of each. By way of example, if USAID uses $1 million in Economic Support Fund appropriations for a grant for higher

---

[7] GHP is different because the combined sum of the individual table directives for USAID ($4.37 billion), *see* Ex. A at 1170, is greater than the total GHP appropriations to USAID ($3.985 billion).  Absent the rescission of $500 million of GHP funds, Defendants would be able to meet all the directives because they can count an obligation to meeting multiple GHP tables directives if the obligation fulfills the purposes of both. But whether Defendants could meet all the directives without the $500 million rescinded is unclear.

24

education programs in Vietnam, the $1 million can be allocated to meeting both the Higher

Education directive (§ 7060(a)(2)) and the Vietnam directive (§ 7043(k)). In this example,

USAID uses just $1 million in appropriations to meet $2 million worth of directives. USAID and

the State Department commonly attribute an obligation to multiple directives in this manner,

which means the agencies can meet all the table and bill directives using far fewer appropriations

than the straight sum of the individual directives. Given this, Defendants certainly can meet the

directives from the 2025 Continuing Resolution using the remaining appropriations following the

rescissions.

**B.      Defendants Allocated Rescinded Funds to Disfavored Directives to Avoid Spending Available Funds on Them**

The administrative record now shows that Defendants have undertaken a plan to leverage

the funds rescinded in the Rescissions Act of 2025 to intentionally not meet many directives.

Defendants are allocating appropriations rescinded in 2025 to numerous disfavored directives,

and are then claiming that they need not spend that allocated amount to meet the directive,

because the allocated funds were rescinded.[8]

A hypothetical again illustrates this scheme. If a bill directive provided that not less than

$50 million of the funds appropriated in title III shall be spent on Widget Programs, and

Defendants allocated $50 million of the rescinded DA appropriations to that directive,

Defendants would proceed on the basis that they need not obligate any funds for Widget

---

[8]  AR 3429 (Ex. K) reflects Defendants' view that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Programs. They take the view that they need not carry out the directive at all, because the $50 million in rescinded funds allocated to Widget Programs are not available for use. But with the rescinded funds, nothing required Defendants to allocate the $50 million—or any amount—of the rescinded funds to the Widget Programs directive, because the total non-rescinded DA appropriations are greater than the aggregate of all directives requiring use of DA funds. Allocating rescinded funds to the directive is a choice Defendants have made to intentionally minimize compliance with the directive because they disfavor Widget Programs.

Defendants carried out this tactic for scores of directives. In ███████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Congress thus provided that Defendants could use money from the *entire Act* to meet the directive to obligate ████ ████████████████████████ Yet Defendants chose to allocate rescinded funds to the directive: they allocated ███████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████ Even though Defendants may use funds from across all of title III to carry out this relatively small directive, Defendants allocated to the

directive ███████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████ That combines to ████████, exactly how much Congress required

Defendants to spend. Defendants thus purported to wipe out the entire directive through the

allocation, even though Congress has never repealed the statutory command ██████████

The above examples are not anomalies. Defendants have wiped out 26 entire directives

through allocating rescinded funds in this manner.[9] And they have allocated rescinded funds to at

least 22 other directives, for most of which the allocated rescinded funds make up a majority or

substantial majority of the total amount that Congress required to be spent on the directive.[10]

These directives include topics to which Defendants have expressed hostility, including ██████

█████████████████████████████████████████████████████████

████████████████████████████████████████

Defendants have deployed this allocation system even more comprehensively to evade

compliance with the table directives in the explanatory statement, for which Section 7019(a)

mandates compliance. Defendants allocated ███████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████ AR 521–22. ███████████████████████████

---

[9] The directives for which Defendants have allocated rescinded funds aggregating to the entire amount in the directive are Sections ██████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████

[10] The other directives for which Defendants have allocated rescinded funds are ████████

█████████████████████████████████████████████████████████

██████████████████████████

27

, Defendants allocated

*Id.*

The evident purposes of this allocation scheme are twofold. First, Defendants are using the allocations to avoid obligating funds for congressionally prescribed programs that they disfavor on policy grounds. Second, by allocating rescinded funds to directives, which cabin Defendants' potential uses of the funds, Defendants have much more freedom to spend the non-rescinded funds on their priorities—irrespective of Congress's intent. For instance, when Defendants undertook similar allocations in relation to the August 2025 pocket rescission, a September 16, 2025 email to Jeremy Lewin described

Ex. L (AR 3561).

### C.    The Rescissions Neither Repealed the Directives Nor Excused Defendants from Maximizing Compliance

Although Defendants' allocation scheme may be complicated, its illegality is not. The directives in Sections 7030–7061 are unambiguous statutory commands: of the funds appropriated under particular titles or headings earlier in the act, "not less than" a minimum amount "shall be made available" by Defendants for specific purposes. And Section 7019(a) requires that certain appropriations "shall be made available in the amounts specifically designated in the respective tables included in the explanatory statement." Congress has not

28

repealed or amended these statutory provisions, and Defendants are violating those provisions in not using available appropriations to meet them.

As with Plaintiffs' claim that Defendants' closeout scheme violates the directives, *supra* Section I.A.1, it bears emphasis that Plaintiffs do not allege that Defendants are violating the appropriations statutes in titles III through IV in taking these actions. For purposes of this claim, the Court may assume *arguendo* that Defendants will obligate all the non-rescinded funds appropriated in titles III and IV by their statutory deadline. Plaintiffs thus do not allege with these claims that Defendants are impounding the funds by engaging in a rescission or deferral as those terms are defined in the Impoundment Control Act. Rather, Defendants are violating the separate, straightforward statutory provisions in Sections 7019(a) and Sections 7030–7061 regarding the substantive programs and subject matters for which they must use the funds.

Defendants cannot justify these statutory violations by claiming that the rescissions in the Rescissions Act of 2025 forced their hand. For one, as demonstrated above, Defendants had sufficient appropriations following their rescissions to meet all of the directives (with the possible exception of the Global Health Programs table directives). But even if it were not mathematically possible to meet all these directives due to the rescissions, Defendants are required to maximize compliance with the mandatory directives to the greatest extent possible. D.C. Circuit precedent is controlling on this point.

The D.C. Circuit has held that when Congress requires an agency to allocate specific amounts of funds to certain programs, awards, or other purposes, but then there are insufficient appropriations available to carry out those allocations, the agency must "follow as closely as possible the allocation plan Congress designed in anticipation of *full* funding." *Navajo Sch. Bd., Inc. v. Babbitt*, 87 F.3d 1338, 1348 (D.C. Cir. 1996), *amended* (Aug. 6, 1996) (citing *City of Los Angeles v. Adams*, 556 F.2d 40, 50 (D.C. Cir. 1977)). "[A]n insufficient appropriation fails to

excuse an agency from its obligation" to carry out Congress' allocation directives to the extent possible. *Id.* In other words, "the agency administering the statute is required to effectuate the original statutory scheme as much as possible, within the limits of the added constraint" of available appropriations. *Id.* at 1347–48 (quoting *Adams*, 556 F.2d at 50).

In *Adams*, one statutory provision required that the Federal Aviation Administration (FAA) make grants of "not less than" $250 million in each of five fiscal years, pursuant to a formula that split the funds into thirds: one-third to states, one-third to airports, and one-third to be distributed at the FAA's discretion. 556 F.2d at 44. But Congress then did not appropriate sufficient funds to enable the agency to "mak[e] the 'minimum' grants" required by the statute. *Id.* at 49. In response, the agency did not allocate the appropriations pro rata pursuant to the statutory one-thirds formula, but instead "used the discrepancy . . . as a hinge for enlarging its discretion to decide which projects to fund." *Id.* at 43. The court held that the agency erred in using the shortfall as "as a basis for asserting a new discretion concerning the disbursement of [funds]." *Id.* at 50. The agency was "required to effectuate the original statutory scheme as much as possible," which in that case meant hewing to the distribution formula. *Id.* at 50; *see also Ramah Navajo*, 87 F.3d at 1348–49 (reaching similar holding with respect to allocation of funds for Indian tribes, for which there was an appropriations shortfall); *Demby v. Schweiker*, 671 F.2d 507, 508, 513 (D.C. Cir. 1981) (MacKinnon, J., announcing judgment of the court) (holding that an account-level rescission did not repeal a statutory minimum-funding requirement); *id.* at 513–14 (Wright, J., concurring specially) (agreeing because the rescission did not clearly manifest an intent to repeal the requirement nor irreconcilably conflicted with it).

Here, as in *Adams*, Congress directed by statute that "not less than" specific amounts, or amounts "specifically designated," must be made available for certain purposes. Even if the rescissions in 2025 resulted in insufficient appropriations to carry out all of these directives, that

30

did not provide license to USAID and the State Department to "enlarg[e] [their] discretion to decide which projects to fund." *Adams*, 556 F.2d at 43. The agencies were required to "follow as closely as possible the allocation plan Congress designed in anticipation of *full* funding," *Ramah Navajo*, 87 F.3d at 1348, such as by maximizing the number of directives with which they fully comply. Defendants, however, did the opposite. They *minimized* compliance with the directives, allocating as many of the rescinded funds as possible to them, so that Defendants would have "new discretion" regarding how to use Congress's appropriations. *Adams*, 556 F.2d at 50.

### D.    Defendants' Allocation Scheme Is Contrary to Law, Unlawfully Withholds Required Agency Action, and Is Arbitrary and Capricious

Defendants' allocations of the rescinded appropriations, and their associated non-compliance with mandatory directives, violate the APA in multiple ways.

*First*, the allocations, which are memorialized in the FY2025 653(a) report, constitute final agency actions. The allocations reflect final decisions by Defendants of how much in the rescinded appropriations to allocate to—and not spend on—specific directives. These allocations determine rights and obligations and legal consequences flow from them. In Defendants' view, when they allocate rescinded funds to a directive, they are relieved of their legal obligation to spend that amount of money to carry out the given directive. As a direct consequence, the agencies will not spend the allocated amount on contracts, grants, cooperative agreements, and other funding instruments to carry out the directive. Defendants' allocation-related actions therefore are final agency actions, and they are contrary to Section 7019(a) and each directives within Sections 7030–7061 that they are not meeting on this basis.

*Second*, Defendants' failure to obligate funds consistent with these directives constitutes agency action unlawfully withheld for purposes of 5 U.S.C. § 706(1). The directives in Sections 7030–7061 that not less than specific amounts "shall be made available" for the designated

31

purposes, and the mandate in Section 7019(a) that funds "shall be made available in the amounts specifically designated in the respective tables," are "specific statutory requirement[s]" that Defendants have failed to heed. *Meina Xie v. Kerry*, 780 F.3d 405, 408 (D.C. Cir. 2015). Under § 706(1), the Court "shall . . . compel" Defendants to comply with these mandates.

*Third*, Defendants' allocations of the rescinded funds are arbitrary and capricious. The administrative record contains no explanation at all for Defendants' decisions regarding how to allocate these rescinded funds, let alone a "satisfactory explanation" for why Defendants decided to allocate the funds to the mandatory directives in the manner that they did. *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (quoting *State Farm*, 463 U.S. at 43). That itself renders the allocations arbitrary and capricious. So does Defendants' complete failure to consider the "serious reliance interests" of those impacted by these allocations, *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020) (citation omitted), including implementing partners like Plaintiffs and the vulnerable people around the world who are the ultimate beneficiaries of these congressional directives.

And Defendants failed to consider alternatives to their allocations. For instance, if Defendants claim that it would be infeasible or impracticable to comply with all the directives given the rescissions, the obvious (and legally required) alternative was to comply with the directives as much as possible. *See Adams*, 556 F.2d at 50; *Ramah Navajo*, 87 F.3d at 1347–48. Without explanation, Defendants did the opposite. That is arbitrary and capricious.

### III.    Defendants Have Unlawfully Withheld or Unreasonably Delayed Obligation of Expiring Funds

For all of the relevant title III and IV appropriations, Defendants have unlawfully withheld or unreasonably delayed the obligation of funds expiring on September 30, 2026. Congress required those funds to be obligated by that date, in the amounts and for the purposes it

32

specified, yet Defendants are proceeding at a pace far below historical practice and the pace now necessary to meaningfully obligate the funds toward their intended substantive purposes.

**A.      Defendants Are Obligating Funds at a Historically Anomalous Pace**

As of June 30, 2026, with only three months remaining before the funds expire, Defendants have obligated historically small percentages of the appropriations from the 2025 Continuing Resolution that expire this year. For four of the seven appropriations in title III and IV that expire this year—GHP, DA, Assistance for Europe, Eurasia and Central Asia, and Democracy Fund—Defendants have obligated less than 7% of the appropriations. Carlile Decl. at Appendix A, Table 1. For two of the other three (International Narcotics Control and Law Enforcement and Nonproliferation, Anti-terrorism, Demining, and Related Programs), the obligated percentages are 21% and 36%, and only for the Economic Support Fund does the percentage obligated barely crack 50%. *Id.*

It is not just that Defendants have obligated small amounts with just three months left before the funds expire; the obligation rates are outliers compared to the rates for the same accounts at the same point in their 2-year availability period. For five of the seven relevant appropriations, the percentage obligated is lower than at the same point in each of the last five years. *Id.* For the other two appropriations (Economic Support Fund and Democracy Fund), the obligation rate is the second and third lowest respectively compared to the prior half-decade. Across all seven accounts, the median obligated percentage is just 6.64% for the funds expiring this year, whereas the median in all prior five years was above 36%, *Id.*

Defendants cannot answer this evidence merely by observing that foreign-assistance obligations are often concentrated near the fiscal year's end. *See* AR 2 ¶ 12. Plaintiffs' comparison accounts for that practice: it compares the funds expiring this year against the agencies' actual obligation pace during prior years for the exact same appropriations. The pace

of obligating the funds compared to prior years indicated that Defendants are not on track to obligate all the funds by September 30, representing agency action unlawfully withheld. At a minimum, the apples-to-apples comparison to prior years demonstrates that Defendants' glacial pace of obligating these appropriations is not reasonable.

> **B.    Defendants' Obligation Rate Is Unreasonable under the *TRAC* Factors**

For purposes of an unreasonable delay analysis, the six factors identified in *TRAC* govern. *See* 750 F.2d 70. Most important here, agency action must proceed according to a "rule of reason," and a timetable fixed by Congress "may supply content for this rule of reason." *Id.* at 80. The inquiry is context-specific and depends on "the facts and circumstances" presented, including the complexity of the required action and the agency's available resources. *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100, 1102 (D.C. Cir. 2003).

This factor weighs decisively against Defendants here. Congress fixed September 30 as the outer boundary for obligation of the funds, yet Defendants are proceeding far more slowly than they have historically and far more slowly than necessary to complete the required obligations by that deadline. Indeed, Defendants' own declarant explains that lawful obligations may require funding-approval memoranda, congressional consultation and notification, spend plans and certifications, technical and programmatic work, OMB apportionments, negotiations with foreign governments and interagency partners, preparation and execution of grants and contracts, and financial-system processing. AR 5 ¶ 7. In 2025, the agencies' effort to obligate $7.177 billion involved dozens of approval memoranda and approximately 357 cost actions between June and September. *Id.* And even then, because of Defendants' late start toward obligating funds, they ended up obligating billions via an inter-agency agreement between USAID and the State Department, on the day the funds were to expire, that was essentially a

34

paper transaction that did not specify any actual uses for the funds. Ex. I (AR 585–92). Those funds may not be put to use in the real world for years now.

That disposition of billions of dollars last year highlights that the unreasonableness of Defendants' slow pace of obligating funds is not just in relation to whether they will obligate the funds at all by September 30. Reasonableness also encompasses whether the delay in obligating funds will significantly delay putting the funds toward the substantive foreign assistance purposes that Congress intended. Those intended substantive purposes supply further "content" for the rule of reason here. *TRAC*, 750 F.2d at 80. Congress appropriated the funds for programs addressing communicable disease, maternal and child health, food security, education, economic development, democracy, and other urgent human needs. The closer that September 30 gets without funds being obligated, the more likely that any obligations that do occur will be non-specific transactions that do not go toward implementing these substantive goals anytime soon. Defendants' historically delayed rate of obligating the relevant foreign assistance appropriations thus is highly unreasonable from this perspective.

The remaining *TRAC* factors reinforce the same conclusion. The third and fifth factors—the effect of delay on human health and welfare and the nature and extent of the interests prejudiced—strongly favor relief for the reasons explained above. *TRAC*, 750 F.2d at 80.[11] And Plaintiffs are being seriously prejudiced as well. As the available period to obligate funds closes, Plaintiffs and other implementing partners lose opportunities to compete for awards. If the appropriations expire unobligated, those opportunities—and the health and welfare benefits the appropriations were enacted to provide—will be lost altogether.

---

[11] The fourth factor does not weigh against relief because Plaintiffs seek enforcement of Congress's appropriation-wide deadline, not priority for a particular applicant or program. *See TRAC*, 750 F.2d at 80.

As for the final factor, Plaintiffs need not show that Defendants have acted improperly. *TRAC*, 750 F.2d at 80. Yet the record provides no reason to assume that the present delay will correct itself without judicial relief. This Court has twice found that Defendants did not intend to spend all the foreign-assistance funds Congress appropriated. Dkt. 60 at 31–32; Dkt. 139 at 18–19. Defendants thereafter permitted billions of dollars included in the August 2025 special message to expire, and they have now reserved substantial expiring appropriations for closeout activities that will not be completed by September 30. *See supra* Section I.A. That history is not necessary to establish unreasonable delay, but it confirms that the Court should evaluate Defendants' current trajectory based on demonstrated performance rather than unsupported assurances that sufficient time remains. Considering all six *TRAC* factors together, Defendants' delay is unreasonable.

## IV.    Plaintiffs Are Entitled to Summary Judgment Regarding the Pocket Rescission

The Court should also issue a declaratory judgment now that Defendants' use of the "pocket rescission" tactic to impound funds was unlawful when they used it with the August 2025 special message, and would be unlawful if they were to attempt the tactic again this year or in future years. *See* Third. Am. Compl. Claims 13, 14.

As this Court correctly held when it considered this issue last year, the President's mere submission of a rescission proposal on August 28, 2025 did not relieve Defendants of their duty under the 2024 Appropriations Act and prior acts to obligate the relevant funds before they expired. Dkt. 139 at 31–34. The relevant appropriations acts imposed duties on Defendants to obligate specific amounts of funds for specific purposes by September 30, 2025, and no provision of the ICA relieved Defendants of that duty just because a rescissions proposal for the funds was submitted (but not passed). To the contrary, Congress specified in the ICA that

"[n]othing contained in this Act . . . shall be construed as . . . superseding any provision of law which requires the obligation of budget authority." 2 U.S.C. § 681(4).

As this Court observed, Defendants' position that they were under no obligation to spend the funds "selectively quote[s]" from 2 U.S.C. § 683(b) and "creatively rearrange[s] the text" to assert that the provision precluded obligating funds while a rescission proposal was pending. Dkt. 146 at 2–3. Defendants' "jarring" approach to statutory text finds no support in the ICA or the relevant appropriations statutes. *Id.*

Defendants' interpretation would also raise serious constitutional questions. Just as with the Line-Item Veto Act, Defendants' theory is that the ICA permits the President to cancel statutory spending merely by submitting a "special message" to Congress, so long as Congress does not vote down the proposal. *See Clinton v. City of New York*, 524 U.S. 417, 437 (1998). Under Defendants' theory of the ICA, "[i]n both legal and practical effect," the President may amend appropriations laws through a unilateral submission to Congress, even if Congress does not itself amend those laws through new legislation. *Id.* at 438. But "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Id.*

The Supreme Court's stay ruling does not foreclose these claims. As Plaintiffs explained in their opposition to the motion to dismiss, the Supreme Court expressly stated that its decision "should not be read as a final determination on the merits" but only "reflect[ed] [the Court's] preliminary view, consistent with the standards for interim relief." *AVAC*, 146 S. Ct. at 19; *see also* 7/2/2026 Hr'g Tr. 16:20–21. And the Court's stay decision did not even address any *ultra vires* claim, *see* Third. Am. Compl. Claim 14. Plaintiffs will further address any argument that the ICA precludes Plaintiffs from bringing APA claims with respect to these appropriations in response to Defendants' cross-motion, should Defendants raise the argument there.

Nor are these claims moot. Declaratory judgment claims do not become moot merely because the "specific conduct" challenged has come to pass: "a plaintiff's challenge will not be moot where it seeks declaratory relief as to an ongoing policy," and even challenges to "isolated agency action" remain live if they fit the "capable of repetition, yet evading review" exception. *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 321 (D.C. Cir. 2009) (citations omitted). That exception applies if "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party would be subjected to the same action again." *Id.* at 322.

Both elements are satisfied here. Given the inherently short window created by transmitting a special message within 45 days of the expiration of budget authority, such an action cannot "be fully litigated prior to its cessation or expiration"; indeed, that is what happened last year, when litigation over the special message was cut short before it could be finally decided on the merits. And there is also a "reasonable expectation" that Defendants will try to use the pocket rescission again. Defendants have affirmatively touted the August 2025 pocket rescission as "historic," Ex. B, and steadfastly defended it as lawful and grounded in historical executive branch practice. *See*, *e.g.*, Dkts. 176, 181. Indeed, less than a week after sending the August 2025 special message, Vought proclaimed: "we're going to use that authority aggressively to protect the American people." Ex. C (Daily Signal). And at a June 30, 2026 House Appropriations hearing, Vought stated that "every tool in the executive fiscal toolbox has been used, "that the Administration "will continue to do so," and that "[a] historic paradigm shift in the budget process is occurring." Ex. D (Vought Statement).

Accordingly, for the same reasons that the Court previously held that the rescission proposal did not allow Defendants to evade their statutory duties to obligate funds, Plaintiffs are entitled to a declaratory judgment that Defendants' evasion of such duties is unlawful.

38

V.    **To the Extent the APA Does Not Afford Complete Relief, Plaintiffs Are Entitled to** ***Ultra Vires*** **or Mandamus Relief**

A.    **Defendants' Conduct Is** ***Ultra Vires***

If the APA does not afford complete relief here, the court should grant summary judgment on Plaintiffs' *ultra vires* claims. *Ultra vires* review is available when no statute expressly precludes review, no alternative procedure affords meaningful and adequate review, and the challenged conduct is plainly beyond the agency's delegated authority and contrary to a specific, clear, and mandatory statutory prohibition. *Glob. Health Council* (*GHC*) *v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025). The third requirement includes circumstances where an agency "violates a clear and mandatory statutory command" to an "extreme" degree, *id.*, or otherwise engages in action that is "blatantly lawless," *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) (quotations omitted). The disregarded statute must also confer rights upon the plaintiff. *GHC*, 153 F.4th at 20.

The "contrary to law" and "unlawfully withheld" violations established above meet this standard. Using funds provided for global health or development assistance purposes to close out awards having nothing to do with those topics is blatantly lawless under the Purpose Statute, 31 U.S.C. § 1301. Obligating less than a specified amount on a particular program, where Congress has directed that the agency obligate "not less than" that amount, is an extreme violation of a clear and mandatory statutory command. So too is failing to obligate appropriations by the deadline Congress mandated, solely because the Administration has *asked* Congress to relieve them on that duty. Those statutory commands also confer the relevant right on Plaintiffs: the

39

opportunity to compete for funds that Congress required Defendants to make available, as this Court already found. Dkt. 139 at 30. Defendants' conduct is therefore *ultra vires*.[12]

### B. Alternatively, Mandamus Is Warranted

If neither the APA nor *ultra vires* review affords complete relief, Plaintiffs are entitled to mandamus. 28 U.S.C. § 1361. A writ may issue when an agency has violated a "crystal-clear legal duty," no other adequate means of relief exists, and compelling equitable grounds—including delay "so egregious as to warrant mandamus"—support relief. *In re Ctr. for Biological Diversity*, 53 F.4th 665, 670 (D.C. Cir. 2022) (citations omitted).

Each requirement is satisfied here. As shown above, Congress imposed discrete, nondiscretionary duties to obligate specified amounts for specified purposes, including in unambiguous "shall" directives in Section 7019(a) and Sections 7030–7061. Defendants have made clear that they will not carry out these duties. *See supra* Sections I–III. The requested writ would preserve Defendants' discretion over how to comply, including which particular awards to make. But Defendants have no discretion whether to comply. If Plaintiffs' other claims do not afford complete relief, the Court should issue the writ. *See Aiken Cnty.*, 725 F.3d at 266–67 (issuing writ of mandamus).[13]

---

[12] None of the statutory commands and prohibitions discussed herein—regarding the mandatory directives, the Purpose Statute, and the pocket rescissions—were addressed by the D.C. Circuit in the prior appeal. *See GHC*, 153 F.4th at 20.

[13] The Supreme Court's stay order does not foreclose that merits conclusion. Its statement that the Government had made a "sufficient showing" that mandamus was unavailable reflected only its preliminary view at an "early stage" and expressly was not a "final determination on the merits." *AVAC*, 146 S. Ct. at 19. The order addressed only the August 28 special-message funds and thus did not address Defendants' failure to meet specific statutory directives.

## VI.    The Court Should Enter Multiple Forms of Relief

The Court should enter four forms of relief to remedy the harms to Plaintiffs: (i) set aside and vacate the challenged final agency actions under 5 U.S.C. § 706(2); (ii) compel agency action unlawfully withheld or unreasonably delayed under 5 U.S.C. § 706(1); (iii) declare that Defendants' actions are unlawful or arbitrary and capricious; and (iv) permanently enjoin Defendants to obligate the funds at issue in accordance with the relevant directives or appropriations provisions. Alternatively, the Court should issue a writ of mandamus.

*First*, the Court should set aside and vacate the challenged actions described above, including Defendants' decisions to withhold GHP and DA funds to pay alleged "closeout" costs rather than for their specified foreign-assistance purposes, *see supra* Section I; and to unnecessarily "allocate" money that Congress rescinded to particular table and bill directives with which they do not wish to comply, *see supra* Section II. Under the APA, the Court "shall" hold unlawful and set aside agency actions found to be arbitrary, capricious or contrary to law. 5 U.S.C. § 706(2). To "set aside" such decisions means "to vacate [them]," *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024) (quotation omitted), meaning that such decisions would be "rescind[ed]" and rendered "void," *Action on Smoking & Health v. C.A.B.*, 713 F.2d 795, 797 (D.C. Cir. 1983).

*Second*, the Court should enter an order under 5 U.S.C. § 706(1) compelling Defendants to timely obligate foreign-assistance funds that they have unlawfully withheld or unreasonably delayed, including through the closeout and allocation schemes addressed above. *See supra* Sections I.B.2, III. The order should also compel Defendants to comply with the mandatory directives in Sections 7030–7061 and Section 7019(a), except to the extent that Defendants invoke express statutory authority under Section 7019(b), Section 7060(j), or another applicable provision to deviate from those directives. The Court entered such relief with respect to both the

41

appropriations and the directives last year after concluding that Plaintiffs were likely to succeed on their § 706(1) claim. *See* Dkt. 139 at 28–29, 41–42.

*Third*, the Court should enter declaratory relief under both the APA and the Declaratory Judgment Act on all claims at issue in this motion, including regarding the August 2025 the pocket rescission. *See supra* Sections I–V.A. "The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Fed. R. Civ. P. 57. A declaratory judgment is appropriate when the declaration would "clarify[] the legal relations" between the parties or "establish[] that [a party's] conduct" is unlawful, which would "ensure[] that [the party] cannot engage in similar . . . conduct" in the future. *Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*, 64 F.4th 1354, 1367 (D.C. Cir. 2023). A declaratory judgment may also "serve as the basis for issuance of a later injunction." *Id.* A declaration would serve a useful purpose here of establishing that Defendants' use of the pocket rescission is unlawful.

*Fourth*, to provide complete relief and prevent circumvention of the Court's order, the Court should enter a permanent injunction. The injunction should require Defendants to obligate the relevant expiring title III and title IV appropriations before the September 30, 2026 deadline, for the purposes specified in titles III and IV for each appropriation. *See supra* Sections I–III, V.A. The injunction should further require Defendants to comply with the mandatory table and bill directives by obligating the minimum or specific amounts of funds required for each. Vacatur of the decisions to withhold, misuse, or improperly allocate funds through the closeout scheme and allocation of rescinded funds is not enough because, although vacatur would nullify those decisions, it may not preclude Defendants from engaging in different tactics to obtain the same or a similar end result. Indeed, this Court has twice found that Defendants had no intention to spend the funds Congress appropriated, *see* Dkt. 60 at 31–32; Dkt. 139 at 18–19, and Defendants validated that conclusion at every time by engaging in new tactics, culminating in the

42

pocket rescission. Even if the Court enters the requested relief under § 706(1), that would not necessarily carry the same force and scope as an injunction. *See, e.g.*, Fed. R. Civ. P. 65(d)(2). A permanent injunction is therefore necessary.

Plaintiffs satisfy each of the factors supporting a permanent injunction, as this Court's prior ruling affirms. Dkt. 139 at 34–38. The requirements for a permanent injunction are "essentially the same" as for a preliminary injunction, except that the moving party must demonstrate "actual success" on the merits, *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 546 n.12 (1987), and the irreparable harm must be if the injunction were never issued, not immediately as with a preliminary injunction. Without question, Plaintiffs face irreparable harm here because, once the appropriations expire, Plaintiffs will permanently lose the opportunity to compete for "an entire category of projects" for which they are not only "qualified, prepared, and eager to compete," but on which their businesses depend. *Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1016 (D.C. Cir. 2022). Plaintiffs have competed for and been awarded funding under the appropriations described above for years. Bjornlund Decl. ¶ 11; Carlson Decl. ¶¶ 4, 8; Northrip Decl. ¶ 9, Oppenheim Decl. ¶ 10; Wentworth Decl. at 8; Johnson Decl. ¶ 12.[14] Now, Plaintiffs expect to miss out on significant revenues that they would have received had the government spent the funds at issue. Boldosser-Boesch Decl. ¶ 12; Carlson Decl. ¶¶ 4–7; Northrip Decl. ¶ 9; Oppenheim Decl ¶ 10; Wentworth Decl. at 8. That such loss of funds that "cannot be recouped" is itself irreparable harm. *NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2658 (2025) (citation omitted); *see also, e.g.*, *AGMA Sec. Serv., Inc. v. United States*, 152 Fed. Cl. 706, 740 (2021) (citing dozens of cases).

---

[14] The categories of funding for which Plaintiffs and their members have competed in the past and would compete in the future are set forth in the declarations. Summary charts reflecting this information are attached as Exhibits E and F.

While the irrevocable loss of funding is itself sufficient to show irreparable harm, Plaintiffs have also shown that this loss of funding will impose severe—and in some cases existential—harms on them. For Plaintiff Democracy International, nearly 98% of its revenues previously came from USAID. Bjornlund Decl. ¶ 11. If the appropriations set to expire in September 2026 are also not spent, "Democracy International expects a reduction of the Company's annual revenues . . . by more than 95 percent from what they were in 2024." *Id.* Such a significant loss of revenue "pose[s] an existential threat to the Company and puts the Company at risk of bankruptcy." *Id.*; Plaintiffs DAI expects to miss out on 80% of the revenue it had previously projected for 2026. Northrip Decl.¶ 9. Such a significant loss of business "will create major financial, operational, capacity, and reputational harms" for the company. *Id.* Other Plaintiffs face similarly devastating harms. *See* Boldosser-Boesch Decl. ¶¶ 12–13; Carlson Decl. ¶¶ 12. "[O]bstacles [that] unquestionably make it more difficult for the [plaintiff] to accomplish [its] primary mission . . . provide injury for purposes . . . [of] irreparable harm" *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

And Plaintiffs will be acutely harmed by Defendants' failure to comply with the mandatory directives, including the directives to which Defendants are allocating rescinded funds and funds being held back to pay closeout costs. Defendants have deployed their unlawful allocations to wipe out the entire █████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████ Defendants have similarly nullified the ███████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████ The ABA has implemented programs around the world to

44

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████ AR 487. In refusing to comply with Congress's express directives,

Defendants are directly harming Plaintiffs.

The balance of the equities and public interest likewise favor a permanent injunction, as this Court previously found. Dkt. 139 at 36–38. "[T]here is generally no public interest in the perpetuation of unlawful agency action." *Id.* at 36 (quoting *League of Women Voters*, 838 F.3d at 12). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws . . . that govern their existence and operations." *Id.* (quotations omitted). Here, there is a "substantial public interest in ensuring that Defendants comply with the appropriations laws enacted by Congress." *Id.* at 36–37. And Plaintiffs have "offered unrebutted evidence of massive harms that will result from Defendants' decision not to spend all expiring foreign assistance funds," ultimately "caus[ing] direct harm to some of the most vulnerable people around the world." *Id.* at 37.

In contrast, a permanent injunction would not impose any hardship on the federal government, as it would "simply require[] that the agency Defendants comply with statutory commands from Congress to spend funds appropriated for foreign assistance." *See id.* at 38. The Executive "retains the discretion to determine *how* those funds are spent." *Id.*

The proposed order attached to this motion contains the precise language that Plaintiffs request the Court employ in providing relief.

## CONCLUSION

The Court should grant partial summary judgment in favor of Plaintiffs.

45

Dated: July 27, 2026

Respectfully submitted,

*/s/ Daniel F. Jacobson*

Daniel F. Jacobson (D.C. Bar # 1016621)
Stephen K. Wirth (D.C. Bar # 1034038)
John Robinson (D.C. Bar # 1044072)
Brian C. Rosen-Shaud (D.C. Bar # 90042065)
Nina Cahill (D.C. Bar # 1735989)
JACOBSON LAWYERS GROUP PLLC
5100 Wisconsin Ave. NW, Suite 301
Washington, DC 20016
Tel: (301) 823-1148
dan@jacobsonlawyersgroup.com

*Counsel for Plaintiffs*