**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

GLOBAL HEALTH COUNCIL, *et al.*,

        *Plaintiffs*,

        v.

DONALD J. TRUMP, *et al.*,

        *Defendants*.

Civil Action No. 1:25-cv-402 (AHA)

**DEFENDANTS' OPPOSITION
TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT
OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 3

I.    NUMEROUS THRESHOLD DEFECTS INDEPENDENTLY WARRANT
SUMMARY JUDGMENT FOR DEFENDANTS ............................................................ 3

    A.    Plaintiffs Cannot Evade the Supreme Court's Order by Framing Their ICA
Claims as Failures to Comply with Appropriations Acts ....................................... 3

    B.    The "Closeout Scheme" Theory Appears Nowhere in the Third Amended
Complaint and is Forfeited.................................................................................... 6

    C.    Plaintiffs Still Identify No Final Agency Action .................................................. 10

    D.    Plaintiffs' Claims are not Ripe—They Rest on Speculation About Future
Events.................................................................................................................. 12

    E.    The Challenged Actions Are Still Committed to Agency Discretion, And
Plaintiffs Are Still Outside the Zone of Interest .................................................. 13

II.    PLAINTIFFS' CLAIMS FAIL ON THE MERITS............................................................ 15

    A.    Defendants Intent to Obligate GHP and DA Funds to Closeout Costs for
Terminated Awards, is Well-Reasoned and Consistent with the APA's
Deferential Standard of Review............................................................................ 15

    B.    The Attribution of Rescinded Appropriations is Lawful ..................................... 21

    C.    Defendants Are Not Unreasonably Delaying Any Expiring Funds...................... 25

        i.    The Carlile Declaration's Methodology is Faulty and
Misleading.................................................................................................. 25

        ii.    The *TRAC* Factors Weigh in Favor of Defendants .................................. 28

III.    THE CLAIMS FOR FUNDS EXPIRING IN 2025 ARE MOOT AND
PLAINTIFFS NOW SEEK AN ADVISORY OPINION................................................ 30

    A.    Plaintiffs' Claims Related to the Special Message are Foreclosed....................... 30

    B.    Plaintiffs' Claim That Expired Funds Can be Resurrected is Incorrect,
Moot, and in any Event Forfeited ....................................................................... 32

IV.    THE ULTRA VIRES AND MANDAMUS CLAIMS ARE NOT PLAUSIBLY
ALLEGED ...................................................................................................................... 33

V.    PLAINTIFFS PROPOSED RELIEF IS OVERBROAD, INAPPROPRIATE, AND NOT SUPPORTED BY LAW .......................................................................... 35

CONCLUSION ............................................................................................................. 39

# TABLE OF AUTHORITIES

**CASES**

*Action on Smoking & Health v. Dep't of Lab.*,
100 F.3d 991 (D.C. Cir. 1996) ................................................................................ 29

*Akiachak Native Cmty. v. U.S. Dep't of Interior*,
827 F.3d 100 (D.C. Cir. 2016) ................................................................................ 31

*Alphabet Workers Union-Commc'n Workers of Am., Loc. 9009 v. NLRB*,
134 F.4th 1217 (D.C. Cir. 2025) ............................................................................. 31

*Am. Ins. Ass'n v. Garamendi,*
539 U.S. ................................................................................................................... 37

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................................. 7

*Bd. of Cnty. Comm'rs of Weld Cnty., Colo. v. EPA*,
72 F.4th 284 (D.C. Cir. 2023) ..................................................................... 36, 37, 38

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................. 7, 8

*Bennett v. Spear*,
520 U.S. 154 (1997) ........................................................................................... 10, 11

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
419 U.S. 281 (1974) ................................................................................................ 15

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ................................................................................. 36, 37, 38

*California v. Texas*,
593 U.S. 659 (2021) ................................................................................................ 37

*Cheney v. U.S. Dist. Ct. for Dist. of Columbia*,
542 U.S. 367 (2004) ................................................................................................ 34

*Chi. & So. Air Lines v. Waterman S. S. Corp.*,
333 U.S. 103 (1948) ................................................................................................ 37

*City of Dania Beach v. FAA*,
628 F.3d 581 (D.C. Cir. 2010) ................................................................................ 27

*City of Houston v. Dep't of Hous. & Urb. Dev.*,
  24 F.3d 1421 (D.C. Cir. 1994) ............................................................................... 32

*Clarke v. Sec. Indus. Ass'n*,
  479 U.S. 388 (1987) ............................................................................................... 15

*Clinton v. City of New York*,
  524 U.S. 417 (1998) ............................................................................................... 31

*Ctr. for Sci. in the Pub. Int. v. U.S. FDA*,
  74 F. Supp. 3d 295 (D.D.C. 2014) ........................................................................ 29

*Dep't of Just. v. Fed. Lab. Rels. Auth.*,
  981 F.2d 1339 (D.C. Cir. 1993) ............................................................................ 34

*Dep't of State v. Aids Vaccine Advoc. Coal.*, (*AVAC*),
  146 S. Ct. 19 (2025) ......................................................................................... *passim*

*DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.*,
  76 F.3d 1212 (D.C. Cir. 1996) .............................................................................. 11

*El-Shifa Pharm. Indus. Co. v. United States*,
  607 F.3d 836 (D.C. Cir. 2010) .............................................................................. 30

*EMR Network v. FCC*,
  391 F.3d 269 (D.C. Cir. 2004) .............................................................................. 29

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ............................................................................................... 15

*FEC v. Rose*,
  806 F.2d 1081 (D.C. Cir. 1986) ............................................................................ 29

*Franks v. Salazar*,
  751 F.Supp.2d 62 (D.D.C. 2010) .......................................................................... 27

*Gill v. Whitford*,
  585 U.S. 48 (2018) ................................................................................................. 37

*Gilmour v. Gates,*
  382 F.3d 1312 (11th Cir. 2004) .......................................................................... 8, 10

*Glob. Health Council v. Trump*, (*GHC*),
  153 F.4th 1 (D.C. Cir. 2025),
  *reh'g en banc denied by*, No. 2025 WL 2709437 (D.C. Cir. Aug. 28, 2025) ................ 3, 15, 34

iv

*Gov't of Manitoba v. Bernhardt,*
  923 F.3d 173 (D.C. Cir. 2019) ................................................................................. 9

*Grand Canyon Air Tour Coal. v. FAA,*
  154 F.3d 455 (D.C. Cir. 1998) ............................................................................... 28

*HP Commc'ns, Inc. v. Cnty. of San Diego,*
  826 F. Supp. 3d 1239 (S.D. Cal. 2026) .................................................................... 8

*IMS, P.C. v. Alvarez,*
  129 F.3d 618 (D.C. Cir. 1997) ............................................................................... 27

*In re Am. Rivers & Idaho Rivers United,*
  372 F.3d 413 (D.C. Cir. 2004) ............................................................................... 28

*In re Barr Labs., Inc.,*
  930 F.2d 72 (D.C. Cir. 1991) ................................................................................. 29

*In re Nat'l Nurses United,*
  47 F.4th 746 (D.C. Cir. 2022) ................................................................................ 35

*Jo v. Dist. of Columbia,*
  582 F. Supp. 2d 51 (D.D.C. 2008) ........................................................................... 8

*Kidwell v. Dep't of Army, Bd. for Correc. of Mil. Recs.,*
  56 F.3d 279 (D.C. Cir. 1995) ................................................................................... 5

*Larsen v. U.S. Navy,*
  525 F.3d 1 (D.C. Cir. 2008) ................................................................................... 31

*Lewis v. Casey,*
  518 U.S. 343 (1996) .............................................................................................. 38

*Lewis v. Cont'l Bank Corp.,*
  494 U.S. 472 (1990) .............................................................................................. 32

*Lincoln v. Vigil,*
  508 U.S. 182 (1993) .............................................................................................. 13

*Lujan v. Nat'l Wildlife Fed'n,*
  497 U.S. 871 (1990) ................................................................................................ 9

*Madsen v. Women's Health Ctr., Inc.,*
  512 U.S. 753 (1994) .............................................................................................. 38

*Maryland v. U.S. Dep't of Veteran Affs.,*

v

130 F. Supp. 3d 342 (D.D.C. 2015) ................................................................................ 8

*Mashpee Wampanoag Tribal Council, Inc. v. Norton*,
336 F.3d 1094 (D.C. Cir. 2003) ............................................................................. 28, 29

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982) ...................................................................................... 5

*Mexichem Specialty Resins, Inc. v. EPA*,
787 F.3d 544 (D.C. Cir. 2015) .................................................................................... 36

*Mobarez v. Kerry*,
187 F. Supp. 3d 85 (D.D.C. 2016) ............................................................................. 30

*Monsanto Co. v. Geertson Seed Farms,*
561 U.S. 139 (2010) .................................................................................................... 36

*Nat. Res. Def. Council, Inc. v. Hodel*,
865 F.2d 288 (D.C. Cir. 1988) .......................................................................... 1, 10, 11

*Navajo Nation v. U.S. Forest Serv.*,
535 F.3d 1058 (9th Cir. 2008) ...................................................................................... 7

*New Life Evangelistic Ctr., Inc. v. Sebelius*,
753 F. Supp. 2d 103 (D.D.C. 2010) ...................................................................... 20, 21

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) .................................................................................................. 9, 35

*Nuclear Regul. Comm'n v. Texas*, (*NRC*),
605 U.S. 665 (2025) .................................................................................................... 34

*Oestereich v. Selective Serv. Sys. Loc. Bd. No. 11*,
393 U.S. 233 (1968) .................................................................................................... 34

*Oliveras-Villafane v. Baxter Healthcare SA*,
140 F.4th 29 (1st Cir. 2025) .......................................................................................... 9

*Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*,
448 F. Supp. 2d 1 (D.D.C. 2006) .......................................................................... 27, 28

*Palisades General Hosp. Inc. v. Leavitt*,
426 F.3d 400 (D.C. Cir. 2005) .................................................................................... 35

*Pickern v. Pier 1 Imports (U.S.), Inc.*,
457 F.3d 963 (9th Cir. 2006) ........................................................................................ 7

*Power v. Barnhart*,
  292 F.3d 781 (D.C. Cir. 2002) ........................................................................................... 35

*Rivera-Gomez v. de Castro*,
  843 F.2d 631 (1st Cir. 1988) ............................................................................................... 9

*Rochester Tel. Corp. v. United States*,
  307 U.S. 125 (1939) ........................................................................................................... 11

*Schroer v. Billington*,
  525 F. Supp. 2d 58 (D.D.C. 2007) ..................................................................................... 34

*Schuler v. PricewaterhouseCoopers*,
  514 F.3d 1365 (D.C. Cir. 2008) ........................................................................................... 9

*Sharp v. Rosa Mexicano, D.C., L.L.C.,*
  496 F.Supp.2d 93 (D.D.C. 2007) ......................................................................................... 8

*Sierra Club v. EPA*,
  353 F.3d 976 (D.C. Cir. 2004) ........................................................................................... 20

*Telecomm. Rsch. & Action Ctr. v. FCC*, (*TRAC*)
  750 F.2d 70 (D.C. Cir. 1984) ................................................................................. 28, 29, 30

*Texas v. United States*,
  523 U.S. 296 (1998) ........................................................................................................... 12

*Theodore Roosevelt Conservation P'ship v. Salazar*,
  616 F.3d 497 (D.C. Cir. 2010) ........................................................................................... 27

*Thorp v. District of Columbia*,
  325 F.R.D. 510 (D.D.C. 2018) ............................................................................................. 7

*Train v. City of New York*,
  420 U.S. ............................................................................................................................. 13

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) ........................................................................................................... 37

*U.S. Dep't of the Navy v. Fed. Lab. Rels. Auth.*,
  665 F.3d 1339 (D.C. Cir. 2012) ......................................................................................... 17

*United States v. Hicks*,
  283 F.3d 380 (D.C. Cir. 2002) ............................................................................................. 7

*Wasco Prods., Inc., v. Southwall Techs., Inc.*,
   435 F.3d 989 (9th Cir. 2006) ................................................................... 8

*Williams v. Romarm, SA*,
   756 F.3d 777 (D.C. Cir. 2014) ................................................................. 9

*Youssef v. F.B.I.*,
   541 F. Supp. 2d 121 (D.D.C. 2008), *rev'd in part*, 687 F.3d 397 (D.C. Cir. 2012) ............... 8, 9

**STATUTES**

2 U.S.C. § 687 .......................................................................................... 4, 6

5 U.S.C. § 551 ............................................................................................. 16

5 U.S.C. § 701 ............................................................................................. 13

5 U.S.C. § 706 ......................................................................................... 27, 35

22 U.S.C. § 2151t ........................................................................................ 37

22 U.S.C. § 2382 ......................................................................................... 13

22 U.S.C. § 2395 ......................................................................................... 13

31 U.S.C. § 1301(a) ..................................................................................... 17

**RULES**

Fed. R. Civ. P. 8(a) ....................................................................................... 7

Fed. R. Civ. P. Rule 15(d) ......................................................................... 6, 7

**REGULATIONS**

2 C.F.R. § 200.344 ....................................................................................... 18

2 C.F.R. § 200.405 ....................................................................................... 18

**OTHER AUTHORITIES**

6A Wright & Miller, Fed. Prac. & Proc. Civ. § 1504 (3d ed. 1998) ............................................. 7

GAO, *Principles of Federal Appropriations Law* (3d ed. 2006) (GAO Red Book),
   https://www.gao.gov/assets/gao-06-382sp.pdf. ....................................................... 14

GAO, *Principles of Federal Appropriations Law* (4th ed. 2017 rev.),
   https://perma.cc/S9L8-E24L ............................................................................. 17

*Presidential Auth. to Impound Funds Appropriated for Assistance to Federally Impacted Schs.*,
  1 Supp. Op. O.L.C. 303 (Dec. 1, 1969),
  https://perma.cc/NRU3-DFK7 ...................................................................................... 13

*The President's Veto Power*,
  12 Op. O.L.C. 128 (1988),
  https://perma.cc/9TXB-QNB2 ...................................................................................... 14

**INTRODUCTION**

For seventeen months, Plaintiffs have litigated this case on a single premise: that Defendants are impounding, rescinding, withholding, or otherwise failing to obligate appropriated foreign assistance funds.  Now, after the Supreme Court held that Defendants made "a sufficient showing that the Impoundment Control Act precludes [Plaintiffs'] suit, brough pursuant to the Administrative Procedure Act, to enforce the appropriations at issue," *Dep't of State v. Aids Vaccine Advoc. Coal.*, 146 S. Ct. 19, 19 (2025) ("*AVAC*"), Plaintiffs attempt to disclaim that premise, at least in part, telling this Court that their claims, supported by provisions in an appropriations act, "are not appropriations provisions," "do not equate to impoundments," and invite the Court to assume every dollar will be timely obligated.  Pls.' MSJ at 12, 15, 29.  However styled, Plaintiffs' claims are ones to "enforce the appropriations at issue," *AVAC*, 146 S. Ct. at 19, and are thus precluded by the Impoundment Control Act ("ICA").

To start, Plaintiffs' "closeout scheme" theory is not properly before the Court for the independent reason that it appears nowhere in the Third Amended Complaint.  Plaintiffs plainly do not seek judgment on the claims that they had pled.  Had they wished to litigate this theory, the mechanisms were available and familiar—amendment under Rule 15(a), or a supplemental pleading under rule 15(d) for claims arising from post-complaint events.  They pursued neither.  And no operative pleading gives Defendants the fair notice that Rule 8 requires.  It is settled in this district that a plaintiff may not amend its complaint through summary judgment briefing. And summary judgment briefing is not to be used as a procedural second chance to flesh out barebones pleadings, as Plaintiffs have done here.

Moreover, Plaintiffs still identify no final agency action.  Congressional notifications are communications between the political branches, whose sufficiency is for the recipient, not a Court, to assess. *Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288 at 319 (D.C. Cir. 1988).  Notifications and apportionments alike also remain revisable throughout the period of availability, and the record proves it. In June 2026, OMB released $647.05 million of the reserved

Global Health Program funds for Ebola response.  Schmitt Decl. ¶ 10, AR 000002; AR000406–08.  This demonstrates that Plaintiffs' challenge is contingent on future administrative actions and is therefore not final—and for the same reasons, are not ripe.  Stripped of its framing, Plaintiffs' case is based on predictions. Nothing more.  The judgments Plaintiffs challenge are also committed to agency discretion by law, and Plaintiffs fall outside the zone of interests of statutes that regulate the relationship between Congress and the Executive, not individual awardees or grant participants.

Plaintiffs' case on the merits fares no better.  Defendants intend to obligate the expiring Global Health Program and Development Assistance funds.  To the extent those funds pay close-out costs for awards serving the same congressional purposes, that use is lawful. Indeed, as Plaintiffs now concede, an appropriation for an object covers the expenses that are necessarily incident to accomplishing it.  Pls.' MSJ at 18.  Defendants do just that.  Further, the attribution of rescinded appropriations was likewise lawful. Where the Rescissions Act of 2025 barred rescission from a certain account, Defendants have fully complied.  And where the Act prescribed no method for applying rescissions, Defendants exercised the discretion Congress had left them, applying reductions to unobligated balances consistent with foreign policy priorities and the Act's express limitations—just as administrations of both parties have done *for decades*.  Nor have Defendants unreasonably delayed the obligation of funding.  The declaration and analysis on which Plaintiffs' delay theory rests is methodologically faulty, and the *TRAC* facts favor Defendants in any event.

Finally, Plaintiffs' claims concerning funds that expired on September 30, 2025, are moot.  Lapsed appropriations cannot be revived, and no exception applies.  What is more, Plaintiffs' motion addresses those funds only as to the August 2025 Special Message, thus forfeiting the remainder of their 2025 claims.  In similar fashion, their *ultra vires* and mandamus theories cannot possibly satisfy the extraordinary standards that those doctrines demand. And the relief they request is both overbroad and unsupported by law.  The Court should grant summary judgment to Defendants.

2

**ARGUMENT**

I.  **NUMEROUS THRESHOLD DEFECTS INDEPENDENTLY WARRANT SUMMARY JUDGMENT FOR DEFENDANTS**

A.  **Plaintiffs Cannot Evade the Supreme Court's Order by Framing Their ICA Claims as Failures to Comply with Appropriations Acts**

This is the fourth version of Plaintiffs' case, and the third distinct legal theory advanced in an attempt to reach the same result. Plaintiffs began in February 2025 with claims challenging the termination of their own awards. ECF No. 1. When that theory encountered jurisdictional limits on contract-based claims against the United States under the Tucker Act, Plaintiffs moved for leave to file a Third Amended Complaint that, by their own description, "removes allegations and claims based on previous contracts, grants, and cooperative agreements, and other awards that Plaintiffs held, including allegations and claims relating to the termination" of those awards, ECF No. 171 at 1. Those claims did not disappear. The bulk of these Plaintiffs are litigating those claims concurrently, under the same set of operative facts, in the Court of Federal Claims. *See HIAS v. United States* (1:26-cv-00429).

When the D.C. Circuit held that Plaintiffs could not "recast statutory claims as constitutional ones," *Glob. Health Council v. Trump*, 153 F.4th 1, 14, 17 (D.C. Cir. 2025) ("*GHC*"), *reh'g en banc denied by*, No. 2025 WL 2709437 (D.C. Cir. Aug. 28, 2025), and that their impoundment claims were impliedly precluded by the ICA, *id*. at 18-19, Plaintiffs switched gears and recharacterized that identical conduct as an APA claim "based on the appropriations acts" that was "completely independent" of the ICA. Mem. Op. and Order, ECF No. 139 at 16. And after the Supreme Court stayed this Court's Order that accepted that framing, Plaintiffs attempted to again amend their operative Complaint, but this time through their Motion for Summary Judgment, by stipulating that the directives they seek to enforce "are not appropriations provisions" and that the Court should "assume *arguendo* that Defendants will obligate all the funds before they expire on September 30, 2026." Pls.' MSJ, ECF No. 202 at 12, 15.

The through-line is constant: the conduct challenged has not changed, the relief sought has not changed, only Plaintiffs' self-defined labels have changed.  The Court should deny Plaintiffs' latest attempt to try and artfully plead their way around the ICA's preclusive effect.

Defendants explained at length in their Motion for Summary Judgement, ECF No. 201 ("Defs.' MSJ"), that Plaintiffs' funding claims are precluded because they are subject to the ICA's framework under the Supreme Court's *AVAC* decision.  146 S. Ct. 19 (2025). Anticipating this problem, Plaintiffs instead insist that their newly minted theory—advanced for the first time in their MSJ and framed in an attempt to place their claims outside the ICA's preclusive reach, falls within Counts 1-5 of their operative Complaint, Pls.' MSJ at 10.  But *every one* of those counts challenges the asserted "Failure to Obligate Congressionally Mandated Foreign Assistance Funding."  3rd Am. Compl. at 40-47.  In other words, Plaintiffs' own operative Complaint admits that they seek to enforce the ICA.  *See* 2 U.S.C. § 687 ("If . . . budget authority is required to be made available for obligation and such budget authority is not made available for obligation, the Comptroller General is hereby expressly empowered . . . to bring a civil action . . . to require such budget authority to be made available by obligation[.]"  And Plaintiffs cannot avoid that reality by attempting to argue that their claims are somehow outside of the ICA's jurisdiction.

*First*, Plaintiffs' opening theory regarding the "closeout scheme" is that Defendants are not lawfully obligating funds to the directives that Congress commanded but are instead funneling those funds to close-out costs.  Pls.' MSJ at 13-15.  In support, they cite to Section 7019(a) and Sections 7030–7061 of the appropriations act.  *Id*.  They argue that these sections are not appropriations provisions but are direct statutory commands regarding how appropriated funds must be used.  *Id*. at 12.  Yet, these cited sections *are* appropriations provisions located in an appropriations act—their heading makes that clear: 7019(a) is titled "Allocation Tables" and 7019(b) is titled "Authorized Deviations."

And even though Plaintiffs now claim that the "violations here do not equate to impoundments," Pls.' MSJ at 15, the Supreme Court did not qualify their Order as one "to enforce the [ICA]" but rather "to enforce the appropriations[.]"  *AVAC*, 146 S. Ct. at 19.  So, if Plaintiffs'

4

theories assert statutory provisions directing how funds should be used, or allege the failure to obligate appropriated funds, as Plaintiffs have been arguing for the past seventeen months, then they are claims "to enforce the appropriations at issue" that the ICA precludes. *Id*.

*Second*, Plaintiffs' claims are at base challenging the alleged impoundment of funds, or alleged deviations from the funding directives in appropriations acts. These are attempts to enforce government appropriations, and any contrary characterization is not supported by their pleadings. A claim's character is determined by the rights asserted and relief sought, not by Plaintiffs' attempts to attach a new label. *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967-68 (D.C. Cir. 1982) ("The classification of a particular action . . . depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought"); *see also Kidwell v. Dep't of Army, Bd. for Correc. of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995) (stating that the Tucker Act "cannot be avoided by . . . disguising a money claim as a claim requesting a form of equitable relief" and that to "enforce this prohibition on the creative drafting of complaints, we look to the complaint's substance, not merely its form." (citation omitted)).

Indeed, the bulk of Plaintiffs' proposed order asks this Court to compel obligation of specified amounts by a statutory deadline. Pls.' Proposed Order at 3-5, ECF No. 202-23. That is a suit "to enforce the appropriations at issue"—covered by the ICA—under any logic. *AVAC*, 146 S. Ct. at 19. And regarding the source of the rights upon which Plaintiffs base their claims, one need only look to every operative briefing and claim Plaintiffs have advanced over the past seventeen months. *See* Original Compl., ECF No. 1 ¶¶ 83-88; 105-107 (arguing at length that "Congress has expressly disabled the President from declining to obligate appropriated funds in the Impoundment Control Act"); *id*. ¶¶ 118-120 ("By refusing to spend funds that Congress has allocated . . . Defendants have violated the Impoundment Control Act"); *see also* 1st Am. Compl. ¶¶ 118-123; 168-170; 217-219, ECF No. 73 ("[The ICA] does not allow any form of impoundment, including deferral, for policy reasons."); *see also* 2nd Am. Compl. ¶¶ 119-120; 167-169; 217-224, ECF No. 132-2; *see also* 3rd Am. Compl. ¶ 5, ECF No. 171-2.

Plaintiffs' Third Amended Complaint attempted to surgically remove references to impoundment, *see* ECF No. 171-1, but the crux of their complaint remains the same—they want to stop the alleged impoundment, rescission, withholding, or deferral of funds.  However styled, the closeout theory alleges that appropriated funds are being "withheld" from obligation or that funds "will not" be obligated for programming because of the plan to use the funds for USAID close-out costs for terminated programs.  Pls.' MSJ at 1, 11-22.  And the allocation theory alleges that Defendants will not obligate required amounts for earmarked purposes because "Defendants have unnecessarily allocated the rescinded appropriations to certain disfavored directives, so that they can claim that the funds they would have used for meeting those directives are gone."  *Id*. at 2, 22-32.  But, those are claims about the alleged impoundment, rescission, withholding, or deferral of appropriated funds—the exclusive province of the ICA's interbranch process and the Comptroller General's enforcement authority.  *See* 2 U.S.C. § 687; Defs.' MSJ at 13-20.

### B. The "Closeout Scheme" Theory Appears Nowhere in the Third Amended Complaint and is Forfeited

Plaintiffs argue, for the first time in any operative briefing, that Defendants are directing several billion dollars of Global Health Program ("GHP") and Development Assistance ("DA") funds to pay close-out costs for terminated USAID and State awards.  Pls.' MSJ. at 11-22.  Plaintiffs moved to file their Third Amended Complaint on December 12, 2025.  But this novel theory, raised for the first time in their MSJ, post-dated that operative pleading.  *See id.*, Section I (concerning the April 2026 Congressional Notification, the basis for their closeout theory).  Thus, Plaintiffs do not seek judgment on the claims they pled.  The Third Amended Complaint, filed on December 12, 2025, says nothing about award closeouts, closeout costs, or the subsequent April 2026 congressional notification.  It could not have. None of those documents existed. Fed. R. Civ. P. Rule 15(d) supplies the mechanism for claims arising from post pleading events, and it requires a motion and leave of the Court.  But Plaintiffs sought neither.  Even though Plaintiffs have moved for leave to amend three times in this litigation and are plainly familiar with the requirement.  *See* ECF No. 171.

*First*, if Plaintiffs wanted to plead "any transaction, occurrence, or event that happened after the date of the pleading to be supplemented" the proper avenue to do so is to move for leave to file a supplemental complaint under Fed. R. Civ. P. 15(d).   Plaintiffs failed to do so. Specifically, "Rule 15(d) is used to set forth new facts that update the original pleading or provide the basis for additional relief; to put forward new claims or defenses based on events that took place after the original complaint or answer was filed; [and] to include new parties where subsequent events have made it necessary to do so." *Thorp v. District of Columbia*, 325 F.R.D. 510, 513 (D.D.C. 2018) (quoting *United States v. Hicks*, 283 F.3d 380, 386 (D.C. Cir. 2002)).   In this way, Rule 15(d) serves to "promote as complete an adjudication of the dispute between the parties as is possible." 6A Wright & Miller, Fed. Prac. & Proc. Civ. § 1504 (3d ed. 1998).

Plaintiffs originally raised the April 2026 Congressional Notification in a "notice."   But Defendants filed a motion to strike Plaintiffs' alleged notice, arguing that under the applicable caselaw the alleged notice constituted an improper sur-reply of the pending motion to dismiss and should be struck from the docket.  ECF No. 184.  The Court agreed with Defendants that Plaintiffs' "notice" was improper and struck it from the record.  June 12, 2026, Hr'g Tr. at 10:6-8.  Thus, there is no operative pleading to support this new theory.

*Second*, because Plaintiffs advance entirely new theories not found in any other briefing, Plaintiffs' Third Amended Complaint does not provide the notice required under Rule 8.  *See* Fed. R. Civ. P. 8(a).  Given *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009), a plaintiff must amend the complaint or otherwise incorporate new allegations when they arise, *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968-69 (9th Cir. 2006).  Thus, "where . . . the complaint does not include the necessary factual allegations . . . raising such a claim in a summary judgment motion is insufficient to present the claim to the district court." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008).

Here, Plaintiffs have not previously put Defendants on adequate notice of their closeout theory.  Throughout four iterations, the complaint has never alleged such a practice, or included the word "closeout."  Rather, Plaintiffs asserted facts supporting this claim for the first time in

their MSJ.  Plaintiffs may not raise this argument at the summary judgment stage because it did not provide Defendants adequate notice of this theory.  *Sharp v. Rosa Mexicano, D.C., L.L.C.,* 496 F.Supp.2d 93, 97 n. 3 (D.D.C. 2007) (stating that plaintiff may not, "through summary judgment briefs, raise [] new claims . . . because [the] plaintiff did not raise them in his complaint").  That is exactly what Plaintiffs have done here.  *Maryland v. U.S. Dep't of Veteran Affs.*, 130 F. Supp. 3d 342, 356 (D.D.C. 2015) ("the Court will not address this allegation, raised for the first time in [Plaintiffs'] cross-motion for summary judgment."); *HP Commc'ns, Inc. v. Cnty. of San Diego*, 826 F. Supp. 3d 1239, 1246 (S.D. Cal. 2026) ("Courts may only consider a new theory of liability at summary judgment if the facts pled in the complaint are sufficient to give the defendant fair notice of the claim.").  And "[i]t is well-established in this district that a plaintiff cannot amend his Complaint in an opposition to a defendant's motion for summary judgment." *Jo v. Dist. of Columbia,* 582 F. Supp. 2d 51, 64 (D.D.C. 2008); *Youssef v. F.B.I.*, 541 F. Supp. 2d 121, 161 (D.D.C. 2008), (Holding that a Plaintiff "cannot amend his complaint . . . by filing a Motion for Partial Summary Judgment"), *rev'd in part*, 687 F.3d 397 (D.C. Cir. 2012).

*Third*, while Plaintiffs may argue that the closeout theory is merely an instance of Defendants' broadly alleged failure to obligate funds consistent with statutory requirements, Rule 8 compliance compels more.  A complaint must give Defendants "fair notice of what the . . . claim is and the *grounds upon which it rests*."  *Twombly* 550 U.S. at 545 (emphasis added) (citation omitted).  Plaintiffs' pleading of the bare conclusion that funds were not obligated consistent with requirements in appropriations acts, is not pleading the grounds that they now assert here.  "Liberal pleading does not require that, at the summary judgment stage, defendants must infer all possible claims that could arise out of facts set forth in the complaint." *Gilmour v. Gates,* 382 F.3d 1312, 1314–15 (11th Cir. 2004) (per curiam); *Wasco Prods., Inc., v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("[S]ummary judgment is not a procedural second chance to flesh out inadequate pleadings." (citation omitted)).  What is more, the APA forecloses the same pleading tactics on its own terms.  A plaintiff must "direct its attack against some particular 'agency action'

8

that causes it harm." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). They must be "circumscribed [and] discrete." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004).

And while Plaintiffs did invoke vague claims in their Complaint of an alleged accounting maneuver relating to the allocation of Special Message Funds, *see* 3rd Am. Compl. ¶ 210, nowhere did they discuss this new closeout theory. And Plaintiffs never raised that issue as it concerns the Rescission Act of 2025. Yet nearly half of Plaintiffs' substantive case now rests on this new Rescissions Act theory as well. Plaintiffs must plead the grounds upon which their theory rests with some minimum level of specificity. This they have failed to do. "A party forfeits an argument by mentioning it only 'in the most skeletal way . . . .'" *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179, n.1 (D.C. Cir. 2019) (citation omitted); *Oliveras-Villafane v. Baxter Healthcare SA*, 140 F.4th 29, 34 (1st Cir. 2025) ("Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (quoting *Rivera-Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir. 1988)). This Court should not indulge such sandbagging. *Williams v. Romarm, SA*, 756 F.3d 777, 783 (D.C. Cir. 2014). The Court could end its analysis there.

Further, the D.C. Circuit instructs lower courts to "read [the plaintiff's] complaint as he wrote it." *Schuler v. PricewaterhouseCoopers,* 514 F.3d 1365, 1371 (D.C. Cir. 2008). Based on this guidance, the Court should "construe [the Plaintiffs'] complaint "as [they] wrote it," taking into account the factual allegations as [they] ha[ve] presented them." and that "[i]n so doing, the Court reaches the inescapable conclusion that [the Plaintiff] has moved for summary judgment on a claim that he failed to plead in his complaint." *Youssef*, 541 F. Supp. 2d at 163. At some point, the pleadings must fix the boundaries of this case.

Because these claims are raised for the first time in a motion for summary judgment, Defendants were not on notice that these were part of Plaintiffs' pleadings and therefore were not directed to produce information specific to their closeout cost theory outside of a general request to produce materials related to the Congressional Notification. The prejudice is concrete. Defendants thus produced an administrative record against the claims Plaintiffs pled, and in the scope this Court ordered and for which the Parties agreed. June 12, 2026, Min. Order; JSR, ECF

9

No. 190.  Defendants did not assemble a record concerning closeout cost methodology because no pleading placed closeout cost methodology at issue.  Plaintiffs now argue that the record's silence on that subject establishes arbitrariness.  Pls.' MSJ at 21-22.  "Liberal pleading does not require that, at the summary judgment stage, defendants must infer all possible claims that could arise out of facts set forth in the complaint." *Gilmour,* 382 F.3d at 1314–15.  Thus, Plaintiffs cannot now complain, as they do, that "[t]he administrative record contains *zero* explanation for why Defendants are withholding these appropriations for closeout costs in these circumstances." Pls.' MSJ at 1.  It is not true that there is *zero* explanation for obligating funds for close-out costs.  Nevertheless, Plaintiffs fault Defendants for not documenting a decision that no pleading ever challenged.

Last, Defendants have informed the Court at several junctures of Plaintiffs' practice of litigating claims that they have not pled.  *See* ECF No. 197 ¶ 5; June 2, 2026, Hr'g Tr. at 57:16-24; ECF No. 184. The Court should respectfully decline to entertain new theories untethered to any operative pleading and should hold Plaintiffs to the case that they have actually pled.

### C.     Plaintiffs Still Identify No Final Agency Action

Plaintiffs purport to identify "final agency action" in four places: the April 2026 Congressional Notification, the 653(a) Congressional Reports, OMB apportionments along with the alleged associated decisions, and an internal OMB approval memorandum.  Pls.' MSJ at 19-20, 31.  None qualifies under *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

*First*, notifications and reports to Congress are communications between the political branches, not final decisions "by which rights or obligations have been determined."  *Id*. at 178 (citation omitted).  The D.C. Circuit has explained that the adequacy of reports and notifications to Congress is purely a matter for Congress to decide: "absence of a congressional directive for judicial review of claims by non-congressional parties," this issue, Executive Branch responses to congressional reporting requirements, "seems to us quintessentially within the province of the political branches to resolve as part of their ongoing relationships." *Nat. Res. Def. Council, Inc.,*

10

865 F.2d at 319.  In that circumstance, the D.C. Circuit said that a transmission from the Secretary of the Interior to Congress as part of a mandated reporting requirement was an unreviewable agency action.  *Id*.  Nothing counsels a different outcome here. The April 2026 Congressional Notification and section 653(a) Congressional Reports are non-reviewable agency actions and any grievance associated with such actions are generalized; Plaintiffs would not be in the zone of interests in any event, *see infra* at 14-15.

*Second*, in any event, the CN serves as a framework for future agency spending. It does not determine how such funds will be obligated and disbursed.  It is an indication of intent.  But it is not "the consummation of the agency's decisonmaking process."  *Bennett*, 520 U.S. at177–78 (citation modified).  Any final decision necessarily comes later after a determination has been made about where and how to obligate certain funds.  Plaintiffs claim that a significant portion of the GHP funds are being used for close-out costs as opposed to other purposes. But this is not based on any final agency action*,* rather, it's an inference by Plaintiffs that is itself based on a document that is purely interlocutory.

*Third*, for similar reasons, nor are OMB's apportionments the consummation of any decisionmaking process with respect to these Plaintiffs.  Apportionment is an internal Executive Branch device to control funds and are inherently preliminary and procedural. Indeed, apportionments are revisable at any time during the period of availability, and the record proves it.  As Defendants stated, and as Plaintiffs now acknowledge, in June $647.05 million of the allegedly non-obligated Global Health Program funds were apportioned.  Schmitt Decl. ¶ 10, AR 000002; AR 000406–08; Pls.' MSJ at 10 n.4.  Indeed, a substantial apportionment that OMB has already revised, in response to real world programmatic needs, is the antithesis of a consummated decision "from which legal consequences will flow."  *Bennett*, 520 U.S. at 178 (citation omitted); *see also infra*  at 12, 25.  If an action affects the challenger's rights only "on the contingency of future administrative action," it is not final.  *DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) (quoting *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939).  And Plaintiffs' assertion that the allocations in the 653(a) memos are final agency

11

actions fails for the same reason—all of those amounts are necessarily tentative and represents a "point in time" estimate to Congress. *See* Declaration of Tricia Schmitt, attached herein as Exhibit B ("2nd Schmitt Decl.") at ¶¶ 11-12. Plaintiffs therefore do not challenge any identifiable final agency action.

### D.    Plaintiffs' Claims are not Ripe—They Rest on Speculation About Future Events

Stripped of labels, Plaintiffs base every theory in their MSJ on speculation. The closeout theory guesses that reserved funds "will expire unobligated on September 30, 2026." Pls.' MSJ at 17. Plaintiffs' theory utilizing the Purpose Statute predicts that Global Health Programs and Development Assistance funds will be obligated to closeout costs "not properly chargeable to those appropriations." *Id*. at 19. And Plaintiffs' theory about delaying the obligation of funds speculates that the agencies' pace of obligation will prove insufficient to fully obligate all funding. But "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted).

The record establishes that obligations are ongoing: "[a] significant portion of foreign assistance is usually obligated at the end of the fiscal year." Schmitt Decl. ¶ 12, AR 000002; *see also* Lewin Decl. at ¶ 9, AR 000006. And that "State is not aware of any plan not to obligate funding that expires on September 30, 2026." Lewin Decl. ¶ 9, AR 000009. Nearly sixty days remain. Plaintiffs' fears may never materialize, and indeed, as mentioned, the June 2026 Ebola reapportionment and the hundreds of millions of dollars in recent obligations documented in the administrative record, *see* Defs.' MSJ at 29-32, demonstrates that the agencies are putting funds to their statutory purposes on a rolling basis. The federal courts are not a roving ombudsman designed to superintend an agency's federal spending decisions that are, by their very nature, ongoing and dependent on a host of contingencies, particularly when premised on such a speculative grievance.

12

E.    **The Challenged Actions Are Still Committed to Agency Discretion, And Plaintiffs Are Still Outside the Zone of Interest**

Which account should bear the administrative costs of closing out thousands of terminated awards, and how the account-level rescissions in the Rescissions Act of 2025 should be attributed, are archetypal judgments "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion[,]" because the point of such appropriations "is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993). This is doubly true where, as here, the balancing occurs in the realm of foreign affairs. *See* Defs.' MSJ at 22-24, 27-29.

Underlying Plaintiffs' entire argument about Defendants' allocation of appropriated funding, whether for use in closeout costs for terminated awards or in order to comply with funds rescinded as part of the Rescissions Act of 2025, is the notion that Defendants have limited or no discretion in determining how to allocate such funds. Pls.' MSJ at 11-33. But the appropriations provisions on which Plaintiffs rely simply "permit[] but do[] not require the Executive Branch to spend funds." *Presidential Auth. to Impound Funds Appropriated for Assistance to Federally Impacted Schs.*, 1 Supp. Op. O.L.C. 303, 309 (Dec. 1, 1969), https://perma.cc/NRU3-DFK7; *cf. Train v. City of New York*, 420 U.S. at 43-44 (recognizing that an appropriations provision may permit, but not require, expenditure "of the entire amounts authorized"). The Foreign Assistance Act of 1961 ("FAA") too has generally granted the President and the Secretary of State significant latitude to determine how best to administer foreign assistance to ensure that those programs achieve foreign aid goals that align with the President's foreign policy. *See, e.g.*, 22 U.S.C. §§ 2382(c), 2395(a). And for many specific programs, Congress expressly gave the President discretion to provide assistance on such terms and conditions as the President determines.

Notably, the context of these statutes further supports that the President has discretion over how to expend the appropriations. There is a long history of the Executive Branch declining to

13

obligate the full amount of appropriated funds in various contexts, particularly in the realm of foreign affairs. *See The President's Veto Power*, 12 Op. O.L.C. 128, 168 & n.56 (1988), https://perma.cc/9TXB-QNB2. The appropriations at issue here touch on the sensitive subject of foreign affairs, where the President enjoys considerable authority under the Constitution and under the FAA. The risk of impinging on a core executive power provides a powerful basis to sustain, not override, the Executive Branch's discretion in this area.

Nor does the language in the Appropriations Acts and Continuing Resolutions that foreign-assistance appropriations "shall be made available," in amounts specifically designated, constitute an unequivocal command to spend all appropriated funds. *See* 3rd Am. Compl. ¶¶ 42-44; Pls.' MSJ at 28, 31. It merely reflects Congress's desire to designate different portions of the top-line foreign-assistance appropriations for particular purposes and providing direction to the Executive Branch about how to allocate portions of the lump-sum appropriations to certain purposes. *See* 2 GAO, *Principles of Federal Appropriations Law* 6-26 to 6-30 (3d ed. 2006) (GAO Red Book), https://www.gao.gov/assets/gao-06-382sp.pdf. Consistent with that understanding, and as the Government Accountability Office has explained, the use of such "shall be available" language "to earmark a portion of a lump-sum appropriation" does not by itself reflect a congressional command to make the full sum available for obligation. *See id.* at 6-30 to 6-31. And Defendants retain discretion as to how to use appropriated funds to achieve the purposes laid out by Congress.

As for those earmarks, Plaintiffs claim that Congress sometimes appropriates sums "up to, not more than, or . . . not exceeding a specified amount." Pls.' MSJ at 16 (citation modified). They argue that the absence of that language here means that the Executive had no discretion to obligate less than the amount made available for a particular purpose. *See id.* But that shows only that Congress is inconsistent in how it describes its general practice of imposing a ceiling on the use of a lump-sum appropriation for particular purposes. *See* GAO Red Book 6-27 to 6-29.

What is more, Plaintiffs still do not meet the zone of interest requirements. *See* Defs.' MSJ at 19-20. The earmark directives they seek to enforce regulate the relationship between Congress and the Executive. The D.C. Circuit has held that the provisions Plaintiffs seek to enforce do not

14

"confer rights upon" these Plaintiffs. *GHC*, 153 F.4th at 20.   In cases where the plaintiff is not itself the subject of the contested regulatory action, the zone of interest test denies a right of review "if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). Just so here. Plaintiffs are well outside the zone of interest for the statutes they wish to enforce.

## II.    PLAINTIFFS' CLAIMS FAIL ON THE MERITS

As explained further below, Defendants neither violated the law when indicating an intent to use funds to pay closeout costs of terminated USAID awards, or when allocating appropriations post-Rescissions Act of 2025.  Any second guessing of the agencies' rational determinations should be made in the context of the APA's deferential standard of review.  "Under the 'arbitrary and capricious' standard the scope of review is a narrow one." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974). The agency needs only "a rational connection between the facts found and the choice made," *id*. (citation omitted), acting within a wide "zone of reasonableness," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).   Even "a decision of less than ideal clarity" will be upheld so long as "the agency's path may reasonably be discerned." *Bowman*, 419 U.S. at 286. The Agency Defendants more than clear this bar.

### A. Defendants Intent to Obligate GHP and DA Funds to Closeout Costs for Terminated Awards, is Well-Reasoned and Consistent with the APA's Deferential Standard of Review

Defendants' April 20, 2026 Congressional Notification ("CN") explained USAID's intent to obligate funds to close-out terminated foreign assistance awards and contracts.  Schmitt Decl. ¶ 7, AR 000002. Directing the obligation of funds to close-out costs is lawful for a variety of reasons.

As an initial matter, Plaintiffs are wrong about the alleged ramifications of apportioning $1.179 billion in DA funds to an "unallocated" cell of a funding spreadsheet.  Pls.' MSJ at 20. Plaintiffs claim that on November 24, 2025 OMB placed $1.179 billion in DA appropriations to a

15

line titled "unallocated" which "precludes the funds from being used for substantive programming." *Id*. at 9.  But the use of the unallocated lines cell is a temporary measure, and one that has been used across administrations going back decades. *See* AR 000418-419 (showing approximately $1.7 billion and $4 billion in "unallocated lines" for the FY 2022 apportionment). And, in any event, likely does not even qualify as "agency action," *see* 5 U.S.C. § 551(13), let alone final agency action.  Point in fact: on July 29, 2026, OMB approved an apportionment that shifted the DA funds from Unallocated to "[a]ll activities."  2nd Schmitt Decl. ¶ 15.  Contrary to Plaintiffs' contentions, this means that such funds are now slated to be used for substantive programming obligations. *See id*. at ¶¶ 13-15; *see also* Ex. C (showing that $1.179 billion of DA funds are no longer in the "unallocated" line but are made available under "all acitivites."). Regardless, Defendants are acting in concert with the law with the funding intentions notified to Congress.

*First*, Defendants are not violating or "nullifying," Pls.' MSJ at 14, any mandates or directives expressed in Section 7019(a) or in Sections 7030-706. The more than $15 billion in funds already obligated into USAID Development Objective Agreements ("DOAG") discussed in the April CN have already been obligated based on Congress's directives, including those contained in title III and title IV of the FY 2024 appropriations act, the tables subject to section 7019(a), and the requirements in sections 7030-61.  2nd Schmitt Decl. ¶ 6.  Funds used to close-out terminated awards are taken from the same programs and used for the same purposes directed by Congress.  For instance, funds obligated but not disbursed on a Food Security award are being used to pay the termination and close-out costs of that same Food Security award. *Id.*  Paying close out costs is an activity necessarily incident to the programming purposes for which the funds were provided, as these grants and contracts have been terminated and these costs are now legally owed to the awardees.

Moreover, to guarantee that all terminated awards have sufficient balances for close-out costs, USAID may also need to utilize unobligated funding, such as the FY 2025 Development Assistance and Global Health Programs funding, and prior-year and no-year balances. *Id.* at ¶ 7.

This funding is used based on Congress's directives, including incorporated tables where applicable, with appropriate amounts being withheld for close-out costs. *Id.*

*Second,* Defendants are following the "Purpose Statute." This statute states that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). As Plaintiffs admit, such appropriations for an object covers "expenses 'necessarily incident to accomplishing that object,'" Pls.' MSJ at 18 (quoting *U.S. Dep't of the Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1349 (D.C. Cir. 2012) (Kavanaugh, J.)), such as disbursement for "closeout costs." *Id. See also* GAO, *Principles of Federal Appropriations Law*, 3-14-15 (4th ed. 2017 rev.), https://perma.cc/S9L8-E24L ("[I]t is not expected, nor would it be reasonably possible, that every item of expenditure be specified in the appropriation act. Thus, while the statute sets out a strict principle of appropriations law, defining the objects for which any particular appropriation was made recognizes an element of discretion . . . .").

This is precisely what Defendants are doing and precisely what the CN indicates. For just one example, and as discussed previously, USAID is using appropriations directed to food security to close-out terminated food security awards. Schmitt Decl. ¶ 6, AR 000002. And all costs related to termination settlements and closeout of an award must be paid for using the appropriations directed for that award. These costs are allowable under the Federal Acquisition Regulation ("FAR") and 2 CFR (governing federal grants and agreements), and therefore must be paid by the US Government. Since the termination and close-out costs are specific for each award and tied directly to it, the FAR and 2 CFR require that those costs be paid for from the funding provided to each award.

More specifically, for all contracts, FAR Part 31.201-4 states that a cost is only allocable to a government contract if it is incurred specifically for that contract or benefits the specific contract. So, by way of example: because the termination and closeout of Award A provides no benefit or connection to Award B, charging Award A's closeout costs to Award B is strictly prohibited under the regulations. Additionally, FAR Part 31.205-42 explicitly dictates that costs

17

attributable to only one terminated contract shall not be allocated to other contracts. And FAR Part 32.7 directs that funds cannot be legally diverted or co-mingled to cover administrative, closeout, or settlement shortfalls of a different contract. Further, FAR Part 49.1 directs that if allowable termination and closeout costs exceed the funds remaining on that specific award, the agency must seek to obligate additional funds to that specific award before it can be settled and closed out and they cannot unilaterally tap into funding of another award to cover the difference.

For all assistance awards, 2 C.F.R. § 200.405 (c) explicitly states "[a] cost allocable to a particular Federal award may not be charged to other Federal awards." Furthermore, in 2 C.F.R. § 200.344 (e) the awarding agency must make termination payments "under the award being closed out." Just like with contracts, termination and close-out costs *must be paid* for using obligated funding to the specific award being closed out.

*Third,* Defendants are not "impounding" GHP and DA funds.  Pls.' MSJ at 15.  Plaintiffs' claims that Defendants will not obligate certain GHP and DA funds by September 30, 2026 are premature and speculative.  Ample time remains to obligate funds funding expiring on September 30, 2026.  Schmitt Decl. ¶ 12, AR 000002; Lewin Decl. ¶ 9, AR 000006.  And Defendants have made no decision "to indefinitely reserve billions of dollars of these funds" to pay "closeout costs." Pls.' MSJ at 17; Schmitt Decl. ¶ 12, AR 000002; Lewin Decl. ¶ 9, AR 000006. Nor have Defendants made any decision not to obligate such funds.  *See id.*; Schmitt Decl. ¶ 12, AR 000002. For similar reasons, Plaintiffs unlawful withholding claim, Pls.' MSJ at 20, necessarily fails as Defendants intend to obligate funds consistent with the CN.

*Fourth*, Defendants' actions related to the CN are rational and reasonable.  That is all that the standard of review under the APA requires.  USAID reported its intent to obligate funds appropriated to a variety of appropriation accounts in FY 2025 and prior years to close-out terminated foreign assistance awards and contracts.  AR 000233-34.  And the contents of the CN were also discussed in internal memoranda documenting the agency's thinking.  AR 000558-60.

State provided this congressional notification consistent with section 7015(c) of the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024, and as

18

carried forward by the Full-Year Continuing Appropriations Act, 2025, and section 7015(c) of the National Security, Department of State, and Related Programs Appropriations Act, 2026. 2nd Schmitt Decl. ¶¶ 3-4. The CN addressed $19 billion available to USAID for close-out purposes, including both unobligated (~$4 billion) and obligated balances (~$15 billion), including $3.2 billion in unobligated expiring FY 2025 Development Assistance and Global Health Program funding and $15.4 billion in obligated funding that has either not been disbursed on a terminated award, or has not been un-subobligated on a DOAG (and of this amount, only around $1 billion expires on September 30, 2026). Because the $1 billion is already obligated, funding will remain available in the expired phase for disbursement or upward adjustments for five years after September 30. *Id*. at ¶ 4-5. These funds may be used to pay legitimate bills due that need to get paid and that have not yet been settled. This is not a pretextual action or label for rescission. In fact, rescissions do not include expired funds.

As explained in the CN, the Administration plans to use previously obligated, but unliquidated, funding in terminated awards or un-subobligated funding in the related DOAG for award close-out costs. AR 000234. And according to the CN, close-out costs may include a range of costs related to final settlement, to include any pending invoices, adjustments to negotiated indirect costs rate agreements ("NICRA"), costs associated with disposition of assets, and/or other claims. These are legitimate and required costs that must be paid. This $15.4 billion in obligated funding discussed in the CN represents the bulk of what USAID expects to spend for its close-out costs. 2nd Schmitt Decl. at ¶¶ 4-6.

The use of GHP and DA unobligated balances are needed because some close-out costs cover multiple awards or are not incurred until an award is closed. As a result, using unobligated balances allows the agency to cover close-out costs because the final costs are not yet known, or cover multiple awards across DOAGs, or where there are insufficient unliquidated balances on grants and contracts. 2nd Schmitt Decl. at ¶ 8. In addition, USAID is required to audit the close-out of awards above a certain threshold. The costs of these audits are an allowable termination cost and the funds used to pay for these audits must come from the awards being audited and

19

cannot come from funding for other awards. Some of the awards that will need to be audited do not have sufficient funds to pay for the audits and therefore additional funding has to be added to those awards. And funding already obligated on other awards may not be available for this purpose, as it requires final close-out of the specific award. Therefore, the unobligated GHP and DA funding is critical to support the central audit mechanism. *Id*.

In addition, some awards may not have enough unliquidated obligations currently available to cover approved termination settlements. In such situations, the only way to fund such closing costs is from unobligated balances, as, for example, is the case for close-out costs for economic growth activities as part of the Asia regional program, which serves the Indo-Pacific region. *Id*. at ¶ 10.

Further, generally speaking, the close-out process is complex, and final costs are difficult to predict. Determining exact funding needed to close-out any program requires careful analysis of remaining funds in the award, as well as negotiation with the implementer regarding termination expenses. Costs could include items such as severance payments, lease cancellation penalties, and payments to subcontractors for past performance. It is impossible to know these costs with certainty until the programs are closed. Thus, the "envelope" of funding available for close-out in the Congressional Notification was, by necessity, a ceiling rather than a forecast of exact amounts needed for close-out obligations. The consequence of reserving too little funding is an inability to meet obligations that USAID has already incurred. *Id*. at ¶ 11.

As the record and agency declarations indicate, Defendants have more than met the APA's "minimum rationality standard." *Sierra Club v. EPA*, 353 F.3d 976, 978-79 (D.C. Cir. 2004). What Plaintiffs' dispute really boils down to is a disagreement as to how Defendants are choosing to obligate funds and the choices Plaintiffs would rather Defendants make. Such disagreements do not rise to arbitrariness. *See, e.g.*, *New Life Evangelistic Ctr., Inc. v. Sebelius*, 753 F. Supp. 2d 103, 133 (D.D.C. 2010) ("[M]ere disagreement cannot discharge [plaintiffs'] burden of establishing that the determination was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.").

### B.      The Attribution of Rescinded Appropriations is Lawful

Nor do any of Defendants' allocation actions to account for funds rescinded in the Rescissions Act of 2025 violate the law.  Contrary to Plaintiffs' claim, there are certain sectoral and other earmarks applicable to the accounts subject to the Rescissions Act of 2025. It is not mathematically possible for Defendants to adhere to all of the earmarks and directives that apply to the expiring appropriations while still withholding funds from obligation consistent with the Rescissions Act of 2025, the President's rescission proposal and the Impoundment Control Act. *See* Declaration of Kyle Peterson, attached herein as Exhibit A ("Peterson Decl.") at ¶ 6. State has reasonably attributed funds rescinded pursuant to the Rescissions Act funds, as well as funds included in the Special Message to relevant earmarks and directives based on the nature of the accounts, existing plan levels, foreign policy and foreign assistance priorities, and historical spending for the accounts. This is typical agency practice.

*First*, the State Department applied the rescissions under the Rescissions Act of 2025 to funding earmarks and directives consistent with the terms of the legislation, and consistent with its longstanding practice. *See* Peterson Decl. at ¶ 7.  In particular, the Rescissions Act of 2025 rescinded certain amounts from the funds appropriated by the FY 2024 and FY 2025 appropriations acts under certain headings.  *Id*.  Unlike recissions enacted in other legislation, the Rescissions Act of 2025 does not prescribe general requirements regarding how the rescissions are to be applied – for example, the provisions do not require the rescissions to be applied proportionately to all programs funded from an account or prohibit application of the rescissions to earmarks or directives in general.  *Id*.  Instead, the Rescissions Act of 2025 establishes specific limitations on the application of certain rescissions to certain appropriations.  *Id*.  For example, section 2(b)(5) of the Act prohibits applying the rescission from FY 2025 GHP funds to funds for HIV/AIDS, Tuberculosis, Malaria, Nutrition, or Maternal and Child Health programs while clarifying that the prohibition does not include family planning and reproductive health programs.

*Id*. As with the ESF funds noted above, the Administrative Record reflects adherence to this Congressional direction. *Id*.

*Second*, based on these considerations, the Department has long understood rescissions from lump sum appropriations to allow broad discretion to determine how to apply the rescission based on relevant policy priorities, subject only to the express limitations in the legislation. *Id*. at ¶ 8. Accordingly, the Department does not understand the Rescissions Act of 2025 to require the Department to apply the rescissions first to funds that are not attributed to an earmark or directive or to prohibit application of the rescissions to funds necessary to meet earmarks or directives. *Id*. Consistent with this understanding, the Department exercised its discretion to apply the rescissions to unobligated balances that remained in the relevant accounts consistent with foreign policy and foreign assistance priorities, subject only to the specific limitations prescribed in the Act. *Id*.

*Third*, the Department has consistently implemented similar enacted rescission legislation in line with this approach, including applying the rescissions to funds attributed to funding earmarks and directives consistent with foreign policy and foreign assistance priorities. *Id*. at ¶ 8. For example, in September 2021, pursuant to section 7071 of the FY 2021 appropriations act (Division K of Public Law 116-260), the Department rescinded $75 million from prior year ESF that had been allocated to Afghanistan and that contributed to meeting funding directives. *Id*. Similarly, the Department's application of the ESF rescission in section 7075(d) of the FY 2024 appropriations act (Division F of Public Law 118-47) included funds that contributed to several funding directives across multiple fiscal years of appropriation. *Id*.

Further, "[a]s a matter of longstanding practice and consistent with the Department's understanding of congressional expectations, funds in title III that are appropriated to entities other than State or USAID have not been used to meet funding earmarks and directives in annual appropriations acts unless expressly provided by Congress." Peterson Decl. at ¶ 4. "This includes funds in title III appropriated to Peace Corps, Millennium Challenge Corporation, and Treasury under the Full-Year Continuing Appropriations Act, 2025." *Id*. "As a practical matter, this reduces

22

by roughly $1.48 billion (net of rescissions) the amount of title III funds available to meet the funding earmarks and directives compared to the Plaintiffs' estimate." *Id*.

Additionally, Section 7019(f) of the FY 2024 appropriations act, including as carried forward by the Full-Year Continuing Appropriations Act, 2025, provides that funds appropriated by the act under the headings International Disaster Assistance and Migration and Refugee Assistance—which totals $5.9 billion for FY 2025, net of rescissions and funds that were not designated by the President as being for an emergency—"shall not be included for purposes of meeting amounts designated for countries in this Act, unless such headings are specifically designated as the source of funds." *Id*. at 5.  As a practical matter, excluding the FY 2025 funds available in those accounts therefore reduces by another roughly $5.9 billion the amount of title III funds available to meet the funding earmarks and directives compared to the Plaintiffs' estimates. *Id.*  Similarly, many of the funding earmarks and directives that apply to title III funds are for purposes that align most closely with the Assistance for Europe, Eurasia and Central Asia (AEECA), Development Assistance (DA), Democracy Fund (DF), and Economic Support Fund (ESF) authorities and accounts. *Id*.  The Department has generally used funds appropriated to State and USAID from other headings in title III to meet funding earmarks and directives (including Global Health Programs funds) only where there has been a very clear purpose alignment.  *Id*.

Taking these considerations together, the funds practically available to meet the title III earmarks and directives is roughly $3.66 billion (from the AEECA, DA, DF, ESF, TI, and CCF accounts) compared to the $6.5 billion in mandatory earmarks and directives that Plaintiffs cite (Pls.' MSJ at 24).  *Id*.  6.  Thus, Defendants did not have the flexibility that Plaintiffs assert, *see, e.g.,* Pls.' MSJ at 24, to meet all mandatory funding earmarks and directives from remaining available funds.  *Id.*

To take FY 2025 ESF as a specific case, Plaintiffs' declaration accurately notes that the total remaining FY 2025 ESF is $1.94 billion, after accounting for rescissions and funding that is not available for obligation because it was not designated by the President as being for an emergency

23

requirement. Plaintiffs then compare that amount to roughly $1.8 billion in aggregate earmarks and directives that require using only Economic Support Fund appropriations. *Id.*

But Plaintiffs' analysis omits key considerations. *Id.* For example, section 7041(e) of the FY 2024 appropriations act, as carried forward by the Full-Year Continuing Appropriations Act, 2025, provides that: "Of the funds appropriated by this Act under titles III and IV, not less than $1,650,000,000 shall be made available for assistance for Jordan, of which not less than $845,100,000 shall be made available for budget support for the Government of Jordan and not less than $425,000,000 shall be made available under the heading 'Foreign Military Financing Program.'" *Id.* While this earmark does not specifically require the use of ESF funds, Defendants allocated $1.2 billion in FY 2025 ESF to meet the budget support earmark and the remaining economic assistance portions of this earmark in line with longstanding practice and Defendants' understanding of congressional expectations. *Id.*

Similarly, section 2(b)(9) of the Rescissions Act of 2025 provides that "none of the [ESF] funds rescinded under this paragraph shall be from the unobligated balances for assistance to Jordan, Egypt, or the Countering PRC Influence Fund" ("CPIF"). *Id.* Of those funds, only Egypt is included in Plaintiffs' estimate of directives that require using only ESF. *Id.* In contrast, of the amounts made available for FY 2025 ESF, Defendants allocated $1.2 billion to Jordan, $125 million to Egypt, and $155 million to CPIF, as shown in AR 000493 and AR 000496, and other funding memos, including AR 000863, AR 001654, AR 002317, and AR 002384. *Id.* "Mathematically, after having made these allocations of remaining ESF consistent with this Congressional direction in the Rescissions Act, only $460.4 million remained available in FY 2025 ESF to allocate for other purposes, which is far below the Plaintiffs' estimated aggregate earmarks and directives that are ESF-only, let alone earmarks and directives for Title III that ESF is commonly used to fund as a practical matter." *Id.*

Thus, as indicated by this narrative and as reflected in the record, Defendants post-Rescissions Act allocation decisions were consistent with the law, reasonable and reasonably explained.

C.    **Defendants Are Not Unreasonably Delaying Any Expiring Funds**

i.    **The Carlile Declaration's Methodology is Faulty and Misleading**

Plaintiffs argue that Defendants are unreasonably delaying obligations of funds yet to expire because they allegedly are "proceeding at a pace far below historical practice . . . ." Pls.' MSJ at 33. In support, Plaintiffs cite an analysis of the "agencies' actual obligation pace during prior years for the exact same appropriations." *Id.*; Declaration of Joseph Carlile, ECF No. 202-2 ("Carlile Decl."). But this analysis is faulty, not to mention misleading, for a host of reasons.

*First*, Plaintiffs' statistical analysis demonstrating the purported delay of the obligation of GHP and DA funds are a function of misleading methodological choices. In constructing the denominator against which he measures obligation rates, Mr. Carlile properly reduced each account by amounts Congress rescinded, *Id.* ¶ 21, and by amounts that the President did not designate as being for an emergency that OMB precluded from obligation, Carlile Decl. ¶¶ 20, 22-23. However, Mr. Carlile did not apply such deductions to the $2 billion in GHP funds and $1.179 billion in DA funds that OMB apportioned to close-out terminated awards. Those funds *are* being obligated. June 26 Schmitt Decl. ¶ 7-9, AR 000002 (stating that the $2 billion of GHP funds will be used to pay close-out costs); *Id.* ¶ 12 (stating that the $1,179,099,000 of "All Activities" funds will be obligated consistent with the CN and USAID's close-out priorities.").

In other words, the denominator used in the analysis signifies the total bucket of funds Plaintiffs allege should be obligated by the end of the fiscal year. But this amount includes the very funds Plaintiffs alleged are being unlawfully directed to closeout costs. The material effect of this methodological flaw is self-evident given that the denominator used in Mr. Carlile's analysis is $3.485 billion for GHP funds, and $1.431 billion for DA funds. Not to mention that the analysis does not include the hundreds of millions of dollars recently apportioned for the Ebola outbreak response and the millions already obligated. Schmitt Decl. ¶ 10, AR 000002. Plainly, the two accounts that Plaintiffs identify as their most extreme examples of delay are thus artifacts of the very close-out decisions that they separately ask this Court to vacate. This is circular in the

25

strictest sense.  Plaintiffs offer the withholding they challenge as independent evidence that the pace of obligation is unlawful.  Mr. Carlile's analysis thus rises or falls with their close-out claims.

*Second*, as previously discussed, *supra* at 21-24, the Carlile declaration still includes an inflated denominator, thus making it seem as if the rate of obligation is much lower than in actuality. For example, if Plaintiffs did not use the title III funds that are appropriated to entities *other than* State or USAID that would "reduce[] by roughly $1.48 billion (net of rescissions) the amount of title III funds available to meet the funding earmarks and directives compared to the Plaintiffs' estimate." Peterson Decl. at ¶ 4.  Further, as also previously stated, "excluding the FY 2025 funds available in those accounts therefore reduces by another roughly $5.9 billion the amount of title III funds available to meet the funding earmarks and directives compared to the Plaintiffs' estimates. *Id*. ¶ 5.

And the numerator—the Defendants' rate of obligation—is undercounted. "While this earmark does not specifically require the use of ESF funds, Defendants allocated $1.2 billion in FY 2025 ESF to meet the budget support earmark and the remaining economic assistance portions of this earmark in line with longstanding practice and Defendants' understanding of congressional expectations. *Id*. at ¶ 6.  And, also for reasons previously stated, the numerator does not count foreign assistance funds to countries besides Egypt. Of the ESF funds in Section 2(b)(9) of the Rescissions Act of 2025 mention by Plaintiffs, only Egypt is included in Plaintiffs' estimate of directives that require using only ESF.  *Id.*  In contrast, of the amounts made available for FY 2025 ESF, Defendants allocated $1.2 billion to Jordan, $125 million to Egypt, and $155 million to CPIF, as shown in AR 000493 and AR 000496, and other funding memos, including AR 000863, AR 001654, AR 002317, and AR 002384.  *Id.* Not to mention that "[m]athematically, after having made these allocations of remaining ESF consistent with this Congressional direction in the Rescissions Act, only $460.4 million remained available in FY 2025 ESF to allocate for other purposes, which is far below the Plaintiffs' estimated aggregate earmarks and directives that are ESF-only, let alone earmarks and directives for title III that ESF is commonly used to fund as a practical matter." *Id.*

*Third*, Plaintiffs' historical analysis is limited to the prior five years. *Id.*; Carlile Decl. ¶ 13 ("[t]o conduct this analysis, I compiled the SF 133 reports for "Department of State" and "International Assistance Programs" from fiscal years 2020–2026."). So, on the basis of an alleged analysis of a single five year period, conducted by an individual with no experience in State Department or foreign assistance budgeting or appropriations (*see* Carlile Decl. ¶¶ 4-7, detailing experience as congressional and OMB staffer working on domestic appropriations matters, and as budget advisor at the Department of Housing and Urban Development), Plaintiffs presume to judge what pace of obligations is appropriate or "historically anomalous." for unreasonable delay purposes. Pls.' MSJ at 33. An analysis of the last five years to opine on "historical" practices that are somehow evidence of unreasonable delay in this year lacks credibility.

*Last*, the Court should not consider this extra-record evidence. When reviewing agency actions under the APA, the Court's review is limited to the administrative record, either "the whole record or those parts of it cited by a party." 5 U.S.C. § 706(2)(F). Because administrative records are presumed complete, motions to supplement the record are granted only in limited circumstances. *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010). Accordingly, it is only in rare circumstances that a court will "consider[] extra-record evidence in reviewing agency actions. *Franks v. Salazar*, 751 F.Supp.2d 62, 67 (D.D.C. 2010). Extra-record evidence is the viewing of "evidence outside of or in addition to the administrative record that was not necessarily considered by the agency." *Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 5 (D.D.C. 2006).

Consequently, this declaration constitutes extra-record evidence that was not introduced by a motion to supplement or otherwise include as evidence. Although the Court should consider only what was actually "before the agency at the time [of the] decision," *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623 (D.C. Cir. 1997), the D.C. Circuit has stated that extra-record evidence is reviewable if Plaintiffs demonstrate one of three "unusual circumstances." *City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010) (citation omitted). It is Plaintiffs burden to demonstrate such "unusual circumstances justifying a departure from this general rule," but they have failed to do

27

so. *Id*. (citation omitted). Therefore, the Court should not consider this impermissible extra-record evidence. *See Pac. Shores*, 448 F. Supp. 2d at 6 (declining to review the extra-record evidence and its associated arguments because a motion to supplement was never before the court).

For these reasons, the Carlile declaration is not only faulty and out of context, but it should not be considered by this Court at all because Plaintiffs have not satisfied their burden, or even moved, to introduce such extra-record evidence.

### ii.      The *TRAC* Factors Weigh in Favor of Defendants

In any event, none of Plaintiffs' calculations prove unreasonable delay, especially for funds that do not even expire until September 30. Plaintiffs do not plausibly allege any discrete agency action that the agencies are required to take for funds that have yet to expire. *See supra* 10-12; Defs.' MSJ. at 25. Further, Defendants are not delaying the obligation of those funds; rather Defendants are "diligently working to obligate the funds prior to their expiration . . . ." Lewin Decl. ¶ 9, AR 000006. And the *TRAC* factors, *see Telecomm. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) ("*TRAC*"), do not weigh in Plaintiffs favor.

The first and second factors are generally considered together and ask whether the agency's timeline conforms to a "rule of reason," a flexible assessment of the context of the agency's action. *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003). This "rule of reason" underlies all the *TRAC* factors. Before enjoining an agency to alter its working rate, a court must consider, in detail, the circumstances of the agency action at issue—and not just compare the alleged delay with an idealized timeframe. *See id.* at 1102. Nor is there a "per se rule as to how long is too long to wait for agency action." *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004) (citation omitted); *see also Mashpee* 336 F.3d at 1100-1 (vacating and remanding determination that five-year delay was unreasonable); *Grand Canyon Air Tour Coal. v. FAA*, 154 F.3d 455, 477-78 (D.C. Cir. 1998) (declining to order agency action notwithstanding a ten-year delay in issuing a rule and a 20-year delay in achieving the rule's statutory objective).

28

*TRAC* factor four, which Plaintiffs attempt to downplay and relegate to a footnote, Pls.' MSJ. at 35 n.11, considers how compelling agency action would affect "agency activities of a higher or competing priority[.]" *TRAC*, 750 F.2d at 80; *see also Mashpee*, 336 F.3d at 1100-02 (district court erred by disregarding the importance of "competing priorities" for limited resources in finding a five-year delay in agency action constituted unreasonable delay). And "[t]he agency is in a unique--and authoritative--position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way." *In re Barr Labs., Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991). So "priority-setting in the use of agency resources [] is least subject to second-guessing by courts." *EMR Network v. FCC*, 391 F.3d 269, 273 (D.C. Cir. 2004); *see FEC v. Rose*, 806 F.2d 1081, 1091 (D.C. Cir. 1986); *Action on Smoking & Health v. Dep't of Lab.*, 100 F.3d 991, 994-95 (D.C. Cir. 1996) (refusing *TRAC* relief).

Plaintiffs claim that Defendants are obligating funding "far more slowly than necessary to complete the required obligations by that deadline," Pls.' MSJ. at 34, and cite one of Defendants' declarations as evidence that this will be the case. *Id.* But Defendants' declarants indicated nothing of the sort. In fact, the Lewin declaration, the same one Plaintiffs cite, explains that State has already significant work to obligate the funds, "including by approving funds for obligation, preparing and transmitting congressional notifications, addressing other pre-obligation requirements for the funds, preparing Notices of Funding Opportunities, negotiating with foreign states, interagency partners, and international organizations, and preparing agreements and other obligating documents. Lewin Decl. ¶ 9, AR 000006. And State "assesses that the amount of expiring funds this year, net of rescissions enacted by the Congress in 2025, is substantially smaller than last fiscal year." *Id.*; *see also* Schmitt Decl. ¶ 12, AR 000002 ("for the unobligated balances that expire on September 30, 2026, . . . time remains to obligate such funds.").

TRAC factors three and five, both of which consider the nature of the interests implicated by any agency delay, overlap in this case. "The third looks to whether human health and welfare are at stake," and "the fifth assesses the nature and extent of the interests prejudiced by delay." *Ctr. for Sci. in the Pub. Int. v. U.S. FDA*, 74 F. Supp. 3d 295, 304 (D.D.C. 2014) (citation

29

modified).  But "courts are not a forum for reconsidering the wisdom of discretionary decisions made by the political branches in the realm of foreign policy or national security." *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010).  Accordingly, the Court should not dictate at what rate foreign assistance funds are obligated, which "would impermissibly encroach upon the discretion that the Constitution affords to the political branches to conduct foreign affairs[.]" *Mobarez v. Kerry*, 187 F. Supp. 3d 85, 90 (D.D.C. 2016).

Finally, factor six scrutinizes whether the agencies acted in good faith.  *See TRAC*, 750 F.2d at 80.  As reflected in the administrative record, Defendants are operating with appropriate haste to obligate relevant funding prior to the expiration of any funding on September 30, 2026. *See, e.g.* Lewin Decl. ¶ 9, AR 000006.  Plaintiffs' insinuations that Defendants are acting or will act "improperly" to delay such funding have no evidentiary basis.  *See* Pls.' MSJ at 36.

## III.    THE CLAIMS FOR FUNDS EXPIRING IN 2025 ARE MOOT AND PLAINTIFFS NOW SEEK AN ADVISORY OPINION

### A.    Plaintiffs' Claims Related to the Special Message are Foreclosed

Plaintiffs seek a declaratory judgment finding that (1) Defendants past use of a "pocket rescission," as Plaintiffs call the Special Message, was unlawful and that (2) any future, speculative use is also unlawful. Pls.' MSJ at 36.  Such relief is unavailable for multiple reasons.

As the Supreme Court has already determined, Plaintiffs have no basis to enforce appropriations, as precluded by the ICA, *see AVAC*, 146 S. Ct. at 19, and thus no basis to bring claims seeking to hold the Special Message unlawful.  Nor can this Court hold otherwise.  While § 683(b) limits the President's withholding authority to 45 days of a continuous Congressional session, it imposes no additional requirement on the President to make withheld budget authority available for obligation before the end of a fiscal year, nor does it extend the period of availability of funds that lapse during the 45-day period.  *See* Defs.' MSJ at 35.  And the Special Message funds that have expired cannot be resurrected.

30

Nor are Plaintiffs' attempts to compare the ICA to the Line-Item Veto Act of 1996 persuasive. *See* Pls.' MSJ at 37. In *Clinton v. City of New York*, the Supreme Court held that the Line-Item Veto Act violated the Constitution's Presentment Clause by allowing the President to cancel portions of statutes enacted by Congress. 524 U.S. 417, 436-41 (1998). But no such presentment issue occurred here. Rather, this dispute concerns the President's authority to determine how and whether to obligate and expend appropriated funds through dialogue with Congress utilizing the process set out in the ICA and under the terms of the appropriations statutes. The Court in *Clinton* expressly noted that the President's "traditional authority to decline to spend appropriated funds" is in contrast to the Line-Item Veto. *Id*. at 446-47. Additionally, no unilateral Presidential action to "cancel" or "amend" the text of appropriations is at issue. Any lapse in funds results from two provisions enacted by Congress—the underlying appropriations provision determining when the funds lapse, and the ICA, which authorizes the President to send rescission proposals at any point in the fiscal year and to withhold funds from obligation for 45 days after transmitting such a proposal. Such a lapse reflects Congress's determination that the withheld funds should lapse at the end of the fiscal year even if not obligated.

As for Plaintiffs' request for a declaratory judgment for future, speculative action, *i.e.* a future exercise of the "pocket rescission"—such relief would amount to nothing more than an unnecessary and inappropriate advisory opinion and is exactly the type of relief "Article III prohibits." *Akiachak Native Cmty. v. U.S. Dep't of Interior*, 827 F.3d 100, 106 (D.C. Cir. 2016) (quoting *Larsen v. U.S. Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008)).

Further, Plaintiffs' argument that its declaratory judgment claim meets the mootness exception of capable-of-repetition-yet-evading-review also fails. Pls.' MSJ at 38. The capable-of-repetition-yet-evading-review exception requires that "the challenged action be too short in duration to be fully litigated before its cessation or expiration" and that "there be a reasonable expectation that the same complaining party would face the same action again." *Alphabet Workers Union-Commc'n Workers of Am., Loc. 9009 v. NLRB*, 134 F.4th 1217, 1226 (D.C. Cir. 2025).

31

Plaintiffs ignore the fact that any future recission will not involve the same action.  A future hypothetical recission would occur under a different congressional appropriations act, for a different fiscal year, and perhaps for different funding streams.  So, any such recission, which in any event cannot be predicted and which may involve different terms than the August 28, 2025 special message, would not be the "same action" but rather a new action.  And, as evidenced by the lengthy procedural history of this case, including prior D.C. Circuit and Supreme Court review, every reason exists to believe that there would be "ample time to obtain judicial review" of any similar future action, *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 482 (1990).

### B. Plaintiffs' Claim That Expired Funds Can be Resurrected is Incorrect, Moot, and in any Event Forfeited

*First*, as discussed in more detail in our MSJ, the funds subject to the August 2025 Special Message lapsed ten months ago and are unavailable for spending for all time. *See City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1424 (D.C. Cir. 1994) ("It is a well-settled matter of constitutional law that when an appropriation has lapsed . . . federal courts cannot order the expenditure of funds that were covered by that appropriation.").  A declaratory judgment about a hypothetical future message is, as discussed, purely advisory.

*Second*, in any event, Plaintiffs forfeit all claims related to funds expired on September 30, 2025.  Plaintiffs assert in a footnote, Pls.' MSJ at 11 n.5, that their MSJ does not seek relief on Count 6 (separation of powers claim for funds set to expire in 2025 and 2026), Count 12 (alleged violation of APA for funds set to expire in September 2025, and "Counts 1-5 insofar as they relate to . . . funds that were originally set to expire on September 30, 2025. Those claims remain pending."  Not so.

Plaintiffs have selectively and unilaterally decided that while those other claims related to funds set to expire in September 2025 are not at issue, other funds that were *also* set to expire in September 2025, but related to the President's Special Message, are fair game.  *Id*. (unilaterally claiming that although claims 13 and 14 (relating to the September 2025 Special Message) are

subject to the pending MSJ, claims 15-18 (also relating to the September 2025 Special Message) are not). This approach underscores the tactics that Plaintiffs have utilized throughout this case. Plaintiffs cannot unilaterally decide what the scope of the MSJ briefing is when this Court has already done so:

> By June 26, 2026, Defendants shall produce the administrative record for Plaintiffs' funding claims, insofar as they concern funds set to expire on September 30, 2025, and funds set to expire on September 30, 2026. Recognizing Defendants' submission that it may be more logical and feasible to produce the administrative record by appropriations law rather than by expiration date, Defendants may produce the administrative record as to each appropriations law implicated by Plaintiffs' funding claims, as long as doing so would encompass the full administrative record for funds set to expire on September 30, 2025, and funds set to expire on September 30, 2026. Plaintiffs shall file any motion to supplement the administrative record by July 1, 2026. The parties shall file their motions for summary judgment by July 13, 2026, their responses by July 23, 2026, and their replies by July 28, 2026.

June 12, 2026, Min. Order; June 12, 2026, Hr'g Tr. at 17:8-12 (Plaintiffs' Counsel: "I should say that we would only move for summary judgment on claims covered by the administrative record. So if you only ordered the administrative record to be prepared with respect to specific claims and buckets of funding, our motion would be limited to that, obviously."). Defendants played by the rules and addressed the claims they understood were at issue by spending substantial time collecting the administrative record for funds set to expire in September 2025, as well as substantial space in their MSJ relating to Plaintiffs claims for funds expired in 2025. Those funds are captured by the Motions for Summary Judgement per the Court's Order. Plaintiffs therefore forfeit these claims entirely.

## IV. THE *ULTRA VIRES* AND MANDAMUS CLAIMS ARE NOT PLAUSIBLY ALLEGED

Plaintiffs' fallback theories fail for the reasons already provided. And their new claims regarding Defendants' alleged violations are further from ministerial than the old ones, not closer.

*Ultra Vires*: The D.C. Circuit already held that Plaintiffs' *ultra vires* claim—that "defendants have exceeded their statutory authority" in relation to the ICA—is unavailable

because Plaintiffs could "point to no specific prohibition that defendants have violated to an extreme and nearly jurisdictional degree." *GHC*, 153 F.4th at 20.  In the Court of Appeal's view, Plaintiffs' *ultra vires* claims were nothing more than "basically dress[ing] up a typical statutory-authority argument as an ultra vires claim."  *Id.* at 21 (*Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 682 (2025) ("*NRC*").

*Ultra vires* review is "a doctrine of last resort," *Schroer v. Billington*, 525 F. Supp. 2d 58, 65 (D.D.C. 2007), "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds."  *NRC*, 605 U.S. at 681-82.  The strict limitations on non-statutory review are "nearly insurmountable."  *Dep't of Just. v. Fed. Lab. Rels. Auth.*, 981 F.2d 1339, 1343 (D.C. Cir. 1993).  Any overstep by an agency must amount to a "clear departure by the [agency] from its statutory mandate" or be "blatantly lawless."  *Oestereich v. Selective Serv. Sys. Loc. Bd. No. 11*, 393 U.S. 233, 238 (1968).  The violation must be "so extreme that one may view it as jurisdictional or nearly so," and the "prohibition at issue must confer rights upon the individual seeking ultra vires review." *GHC*, 153 F.4th at 20 (citation omitted).  For the reasons addressed in our MSJ, Defs.' MSJ at 41-42, and our Reply to Plaintiffs' Opposition of Defendants' pending Motion to Dismiss, ECF No. 181, Plaintiffs have not plausibly alleged those their *Ultra Vires* claims breaches this "nearly insurmountable" limitation.  *Id.* at 23.

*Mandamus*: The Third Amended Complaint seeks mandamus relief requiring Defendants to carry out their "clear dut[ies]" to spend appropriations for foreign aid programs.  3rd Am. Compl. ¶¶ 157-61 (Fifth Claim for Relief), ¶¶ 243-47 (Eighteenth Claim for Relief).  But the Supreme Court has already held in its stay order that Defendants made a "sufficient showing that mandamus relief is unavailable" for Plaintiffs' prior claims that are more focused than the generalized claims in the Third Amendment Complaint.  *AVAC*, 146 S. Ct. at 19.  The Supreme Court's reasoning thus forecloses the nebulous—and thus even weaker—claims in the Third Amended Complaint.

Mandamus is "one of the most potent weapons in the judicial arsenal," *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 380 (2004) (citation omitted), and a "drastic" remedy that

34

is "invoked only in extraordinary circumstances," *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002) (citation omitted).  The mandamus plaintiff must plausibly allege "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff."  *In re Nat'l Nurses United*, 47 F.4th 746, 752 n.4 (D.C. Cir. 2022) (citation omitted).  For the reasons addressed in our MSJ, Defs.' MSJ at 42-43, and our Reply at 24, Plaintiffs have not plausibly alleged those elements, and their claims also fail for the same reasons they fail to state a failure to act or unreasonable delay claim under the APA, as discussed above.

## V.    PLAINTIFFS PROPOSED RELIEF IS OVERBROAD, INAPPROPRIATE, AND NOT SUPPORTED BY LAW

Plaintiffs seek four separate forms of relief with burdensome, impractical, and unwieldy requirements imposed on Defendants, as detailed in their expansive six-page proposed order.  Pls.' MSJ at 41; Pls.' Proposed Order, ECF No. 202-23.  None are appropriate as Defendants have not violated the law.  Beyond that, the only proper relief, if any, is a remand to Defendants for further explanation or other action consistent with the correct legal standards.  *See Palisades General Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005); *See also Norton*, 542 U.S. at 66-67 (explaining how the APA's limits on relief are intended to "protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements.").

Plaintiffs' further requests for declaratory relief, to compel agency action and for a permanent injunction are also beyond the scope of any appropriate relief in this matter.  For similar reasons as above, any order compelling agency action should be limited to remanding to the agency for further consideration.  Regardless, such affirmative relief is available only if Defendants have unlawfully withheld or unreasonably delayed action, and even there, the relief is limited to compelling that ministerial duty.  5 U.S.C. § 706(1).  As discussed above, because no unlawful withholding or unreasonable delay occurred here, no such relief is available and certainly not the

expansive, burdensome relief Plaintiffs seek here.  *See Bd. of Cnty. Comm'rs of Weld Cnty., Colo. v. EPA*, 72 F.4th 284, 296 (D.C. Cir. 2023) ("[j]udicial remedies should be 'no more burdensome to the defendant than necessary to provide complete relief' to the plaintiffs or petitioners." (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

As for the permanent injunction Plaintiffs seek, such relief "is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms,* 561 U.S. 139, 165-66 (2010).  So long as "a less drastic remedy" is available, "recourse to the additional and extraordinary relief of an injunction" is not just unnecessary, it is inappropriate. *Id.*  As discussed above, such less drastic remedies are available, such as a remand to the agencies for appropriate action.

Further, as Plaintiffs' harms are economic in character, they are not irreparable.  It is "well settled that economic loss does not, in and of itself, constitute irreparable harm." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015).  "Financial injury is only irreparable where no 'adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation.'" *Id*.  In that regard, Plaintiffs speculate in assuming that they will not economically benefit from the current obligation plans on which Defendants are taking further steps, such as where recipients of obligated funds enter into downstream contracts or grants with Plaintiffs.  The declarations in support of the motion address the hypothetical circumstance if the expiring appropriations "are not spent," but do not address the reality that many appropriations are being obligated before expiration. *See*, *e.g.*, ABA Decl. ¶ 11, ECF No. 202-3; DAI Decl. ¶ 11 ECF No. 202-4; Democracy International Decl. ¶ 11 ECF No. 202-5.  And to the extent that Plaintiffs complain that rescinded funds are no longer available, as elucidated above, such funds are not available based on a valid legal process.

The other factors weigh decisively against granting Plaintiffs the extraordinary remedies sought.  *First,* Plaintiffs would install the Court as an ongoing monitor of foreign assistance funding.  That would disrespect the role of the President in foreign affairs and would flout the separation of powers, which assigns to the President the "lead role" and "'vast share of

36

responsibility for the conduct of our foreign relations.'" *Am. Ins. Ass'n v. Garamendi,* 539 U.S. at 414-15 (citation omitted).  It would also blunt the prerogatives of Congress and determine foreign policy decisions that have "long been held to belong in the domain of political power not subject to judicial intrusion or inquiry." *Chi. & So. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 111 (1948).

*Second*, extending relief to nonparties, as Plaintiffs' proposals necessarily do, would violate the proposition that judicial remedies "must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018).  Relief as to nonparties in this action finds no mooring in any pertinent statutes.  To the contrary, various provisions of the foreign assistance statutes confer marked discretion on Executive Branch agencies and the President in developing programs and, as appropriate, selecting awardees of foreign assistance funds. *See, e.g.*, 22 U.S.C. § 2151t(a).

In challenges to agency action, the D.C. Circuit has explained that "[j]udicial remedies should be 'no more burdensome to the defendant than necessary to provide complete relief' to plaintiffs or petitioners." *See Bd. of Cnty. Comm'rs of Weld Cnty.,* 72 F.4th at 296 (quoting *Califano*, 442 U.S. at 702, and further quoting *California v. Texas*, 593 U.S. 659, 672 (2021), for teaching that "remedies operate with respect to specific parties rather than on legal rules in the abstract") (citation modified)). And as the Supreme Court has now made plain, "[u]nder" the complete-relief principle, "the question is not whether an injunction offers complete relief to *everyone* potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief to *the plaintiffs before the court*." *Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025).

In that regard, the overbreadth of the requested remedies even as to the Plaintiffs before the Court is apparent from their own submissions, which assert they are willing and able to compete for *many more* contracts and grants that would obligate FAA funds than Plaintiffs historically have operated, even though they supply few facts from which to infer that they could capably perform on such contracts and grants if they obtained those awards.  *Compare* Ex. E, ECF No. 202-15 (awards Plaintiffs allege they would compete for) *with* Ex. F, ECF No. 202-16

(categories for which Plaintiffs have historically competed). To tailor relief consistent with Article III, the focus must be on those awards Plaintiffs have received historically, not their speculations. Relief beyond that would exceed "the inadequacy that produced [Plaintiffs'] injury in fact," *see Lewis v. Casey*, 518 U.S. 343, 357 (1996), and would be "more burdensome to the defendant than necessary" to redress Plaintiffs' asserted injury, *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano*, 442 U.S. at 702).

Finally, Plaintiffs' proposed compliance mechanisms are yet another example of Plaintiffs seeking to impose unnecessary burdens and onerous judicial oversight on Defendant agencies. Plaintiffs seek an order that (1) within three days of a decision, OMB revise its apportionments so that all Covered Appropriations are available for timely obligation; (2) within fourteen days, Defendants shall file a plan identifying for complying with the Court's order, which shall include but not be limited to providing, (a) the total unobligated amount remaining; (b) the amount obligated as of the date of the filing; (c) the amounts and nature of any obligations of expiring Global Health Programs and Development Assistance appropriations for a purpose related to paying closeout costs on terminated USAID awards; and (d) the detailed manner in which the Agency Defendants will comply with the applicable requirements of section 7019(a) and sections 7030 through 7061; (3) Defendants file a status report *every* 7 days "and a final certification no later than October 2, 2026 describing their compliance with this order"; and (4) that the "Court retains jurisdiction to supervise and enforce compliance with this Order." Pls.' Proposed Order at 5-6 (Compliance Section).

Such burdensome directives go far beyond any need of the Plaintiffs. *See Bd. of Cnty. Comm'rs of Weld Cnty.,* 72 F.4th at 296 ("remedies should be 'no more burdensome to the defendant than necessary to provide complete relief' to plaintiffs or petitioners."). And such a compliance scheme would impermissibly micromanage Defendants' operations in the realm of foreign policy funding decisions, in contravention of the limitations on the Court's equitable powers and Article III authority. The Court should reject Plaintiffs' proposed remedies and deny Plaintiffs' Motion for Summary Judgment.

Case 1:25-cv-00402-AHA    Document 205    Filed 08/03/26    Page 49 of 49

**CONCLUSION**

For the reasons stated, the Court should grant summary judgment to Defendants. A proposed order is attached.

Dated: August 3, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division

ALEXANDER K. HAAS
Director
Federal Programs Branch

*/s/ Pierce J. Anon*
PIERCE J. ANON
JOSHUA N. SCHOPF
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Phone: (202) 305-7573
Email: pierce.anon@usdoj.gov

*Counsel for Defendants*