# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GLOBAL HEALTH COUNCIL, *et al.*,

     *Plaintiffs*,

v.

DONALD J. TRUMP, *et al.*,

     *Defendants*.

Civil Action No. 1:25-cv-402 (AHA)

## DECLARATION OF KYLE PETERSON

In accordance with the provisions of 28 U.S.C. § 1746, I, Kyle Peterson, state as follows, under penalty of perjury, pertinent to the above-styled and numbered case:

1.     I am over 18 years of age, of sound mind, and otherwise competent to make this declaration. This declaration is based on my personal knowledge and information provided to me in my official capacity by others.

2.     I am currently the Acting Director of the Office of Foreign Assistance Oversight (FAO) in the Department of State and a career member of the Senior Executive Service. In this role, and under the direction of the Under Secretary of State for Foreign Assistance, Humanitarian Affairs, and Religious Freedom, I oversee FAO's work to provide day-to-day oversight of the Department's foreign assistance budget, policy, and assistance effectiveness efforts, including appropriated foreign assistance resources.

3.     The Plaintiffs' analysis comparing the amount of available funds in the title III appropriations under the Full-Year Continuing Appropriations Act, 2025, with the amount of earmarks and statutory directives is incomplete, and therefore misleading, in several respects.

4.     As a matter of longstanding practice and consistent with the Department's understanding of congressional expectations, funds in title III that are appropriated to entities other than State or USAID have not been used to meet funding earmarks and directives in annual appropriations acts unless expressly provided by Congress. This includes funds in title III appropriated to Peace Corps, Millennium Challenge Corporation, and Treasury under the Full-Year Continuing Appropriations Act, 2025. As a practical matter, this reduces by roughly $1.48

billion (net of rescissions) the amount of title III funds available to meet the funding earmarks and directives compared to the Plaintiffs' estimate.

5.      Section 7019(f) of the FY 2024 appropriations act, including as carried forward by the Full-Year Continuing Appropriations Act, 2025, provides that funds appropriated by the act under the headings International Disaster Assistance (IDA) and Migration and Refugee Assistance (MRA) – which totals $5.9 billion for FY 2025, net of rescissions and funds that were not designated by the President as being for an emergency requirement – "shall not be included for purposes of meeting amounts designated for countries in this Act, unless such headings are specifically designated as the source of funds." As a practical matter, excluding the FY 2025 funds available in those accounts therefore reduces by another roughly $5.9 billion the amount of title III funds available to meet the funding earmarks and directives compared to the Plaintiffs' estimate. Similarly, many of the funding earmarks and directives that apply to title III funds are for purposes that align most closely with the Assistance for Europe, Eurasia and Central Asia (AEECA), Development Assistance (DA), Democracy Fund (DF), and Economic Support Fund (ESF) authorities and accounts. As a general matter, the Department has used funds appropriated to State and USAID from other headings in title III to meet funding earmarks and directives (including Global Health Programs (GHP) funds) only where there has been a very clear purpose alignment. Plaintiffs therefore correctly exclude GHP funds from their overall calculation of title III funds available to meet more general funding earmarks and directives, since the purposes typically do not overlap with those funding earmarks and directives.

6.      Taking these considerations together, the funds practically available to meet the title III earmarks and directives is roughly $3.66 billion (from the AEECA, DA, DF, ESF, TI, and CCF accounts) compared to the $6.5 billion in mandatory earmarks and directives that Plaintiffs cite. Thus, as a practical matter, Defendants did not have the flexibility that Plaintiffs assert to meet all mandatory funding earmarks and directives from remaining available funds.  To take FY 2025 ESF as a specific case, Plaintiffs' declaration accurately notes that the total remaining FY 2025 ESF is $1.94 billion, after accounting for rescissions and funding that is not available for obligation because it was not designated by the President as being for an emergency requirement. Plaintiffs compare that amount to roughly $1.8 billion in aggregate earmarks and directives that require using only Economic Support Fund appropriations. Here again, Plaintiffs' analysis omits key considerations. For example, section 7041(e) of the FY 2024 appropriations act, as carried forward by the Full-Year Continuing Appropriations Act, 2025, provides that: "Of the funds appropriated by this Act under titles III and IV, not less than $1,650,000,000 shall be made available for assistance for Jordan, of which not less than $845,100,000 shall be made available for budget support for the Government of Jordan and not less than $425,000,000 shall be made available under the heading 'Foreign Military Financing Program'". While this earmark does not specifically require the use of ESF funds, Defendants allocated $1.2 billion in FY 2025 ESF to meet the budget support earmark and the remaining economic assistance portions of this earmark in line with longstanding practice and Defendants' understanding of congressional expectations. Similarly,

section 2(b)(9) of the Rescissions Act of 2025 provides that "none of the [ESF] funds rescinded under this paragraph shall be from the unobligated balances for assistance to Jordan, Egypt, or the Countering PRC Influence Fund" (CPIF). Of those funds, only Egypt is included in Plaintiffs' estimate of directives that require using only ESF.  In contrast, of the amounts made available for FY 2025 ESF, Defendants allocated $1.2 billion to Jordan, $125 million to Egypt, and $155 million to CPIF, as shown (but redacted) in AR 493 and AR 496, and other funding memos, including AR 863, AR 1654, AR 2317, and AR 2384. Mathematically, after having made these allocations of remaining ESF consistent with this Congressional direction in the Rescissions Act, only $460.4 million remained available in FY 2025 ESF to allocate for other purposes, which is far below the Plaintiffs' estimated aggregate earmarks and directives that are ESF-only, let alone earmarks and directives for title III that ESF is commonly used to fund as a practical matter.

7.      The Department applied the rescissions under the Rescissions Act of 2025 to funding earmarks and directives consistent with the terms of the legislation, and consistent with its longstanding practice.  In particular, the Rescissions Act of 2025 rescinded certain amounts from the funds appropriated by the FY 2024 and FY 2025 appropriations acts under certain headings. Unlike recissions enacted in other legislation, the Rescissions Act of 2025 does not prescribe general requirements regarding how the rescissions are to be applied – for example, the provisions do not require the rescissions to be applied proportionately to all programs funded from an account or prohibit application of the rescissions to earmarks or directives in general.   Instead, the Rescissions Act of 2025 establishes specific limitations on the application of certain rescissions to certain appropriations. For example, section 2(b)(5) of the Act prohibits applying the rescission from FY 2025 GHP funds to funds for HIV/AIDS, Tuberculosis, Malaria, Nutrition, or Maternal and Child Health programs while clarifying that the prohibition does not include family planning and reproductive health programs.

8.      Based on these considerations, the Department has long understood rescissions from lump sum appropriations to allow broad discretion to determine how to apply the rescission based on relevant policy priorities, subject only to the express limitations in the rescission legislation.  Accordingly, the Department does not understand the Rescissions Act of 2025 to require the Department to apply the rescissions first to funds that are not attributed to an earmark or directive or to prohibit application of the rescissions to funds necessary to meet earmarks or directives. Consistent with this understanding, the Department exercised its discretion to apply the rescissions to unobligated balances that remained in the relevant accounts consistent with foreign policy and foreign assistance priorities, subject only to the specific limitations prescribed in the Act.

9.      The Department applied the rescissions consistent with the limitations in the Rescissions Act of 2025 – for example, as reflected in the allocations in AR 490 (DA Feed the Future Innovation labs and commodity-based food aid), AR 491 (DA CPIF), AR 493 (ESF Egypt

and Jordan), AR 496 (ESF CPIF), AR 503 (GHP).  In addition, in a number of cases, the Department did not apply rescissions under the Rescissions Act of 2025 to the full amount of an earmark and directive and instead applied rescissions in line with foreign policy and foreign assistance priorities.  For example:

    a.  $10 million in INCLE is included for Forensic DNA under section 7034(b)(2) (INCLE table, AR 507-511)

    b.  $3 million in ESF is included for Vietnam war legacy programs under section 7043(k)(3) (ESF table, AR 493)

    c.  Funding for micro, small, and medium-sized enterprises is allocated to Egypt under section 7060(e) (ESF table, AR 493)

    d.  ESF and INCLE funding is allocated to counter trafficking in persons under section 7060(f) (AR 493, AR 507-511)

    e.  ESF funding is allocated for water programs in Jordan under section 7060(i) (ESF table, AR 493)

    f.  ESF is allocated for the Philippines under section 7061(b)(1) (ESF table, AR 493)

    g.  INCLE funding is allocated for combatting wildlife trafficking in multiple places under section 7061(b)(2) (AR 507-511).

10.  The Department has consistently implemented similar enacted rescission legislation in line with this approach, including applying the rescissions to funds attributed to funding earmarks and directives consistent with foreign policy and foreign assistance priorities. For example, in September 2021, pursuant to section 7071 of the FY 2021 appropriations act (Division K of Public Law 116-260), the Department rescinded $75 million from prior year ESF that had been allocated to Afghanistan and that contributed to meeting funding directives. Similarly, the Department's application of the ESF rescission in section 7075(d) of the FY 2024 appropriations act (Division F of Public Law 118-47) included funds that contributed to several funding directives across multiple fiscal years of appropriation.

I declare that the foregoing is true and correct to the best of my knowledge.

Dated: August 3, 2026

_____
**Kyle Peterson**