**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| GLOBAL HEALTH COUNCIL, *et al.*,<br><br>      *Plaintiffs*,<br><br>      v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>      *Defendants*. | Civil Action No. 25-cv-402 (AHA) |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

ARGUMENT...........................................................................................................................3

    I.   Plaintiffs' Claims Are Reviewable ...............................................................................3

        A.  Plaintiffs' Claims Are Not Precluded by the Impoundment Control Act......................3

            1.   Plaintiffs' Claims Regarding the Directives and the Purpose Statute Are Not Precluded...........................................................................................................4

            2.   The Supreme Court's Emergency Order Does Not Preclude Any of Plaintiffs' Claims ......................................................................................................7

            3.   Defendants' Preclusion Arguments Are Wrong .....................................................11

        B.   None of Plaintiffs' Claims Is Moot.............................................................................17

        C.  The Spending Requirements Are Not Committed to Agency Discretion....................21

        D.  The Decision Not to Spend Funds in the Special Message Is an Agency Action Subject to APA Review .......................................................................................23

        E.  Plaintiffs Challenge Discrete, Final Agency Actions ..................................................24

    II.  Defendants' Funding Decisions Regarding Funds Expiring on September 30, 2026 Violate the APA ........................................................................................................26

        A.  Defendants' Actions Are Contrary to Law .................................................................26

        B.  Defendants Have Unlawfully Withheld and Unreasonably Delayed Obligating the Expiring Funds........................................................................................................30

        C.  Defendants' Actions Are Arbitrary and Capricious....................................................32

    III.  Defendants' Failure to Obligate the Funds in the Special Message Violates the APA.................................................................................................................................34

        A.  Plaintiffs Are Entitled to Declaratory Relief on Counts 13 and 14 ...........................34

        B.  Defendants' Ongoing Failure to Obligate Funds Included in the Special Message Violates § 683(b) ........................................................................................36

    IV.  The Court Should Defer Ruling on Plaintiffs' Separation of Powers Claim....................37

    V.  To the Extent the APA Does Not Afford Complete Relief, Plaintiffs Are Entitled to Ultra Vires or Mandamus Relief..........................................................................................39

        A.  Defendants' Conduct Is Ultra Vires............................................................................39

        B.  Alternatively, Mandamus Is Warranted......................................................................39

    VI.  Plaintiffs' Proposed Relief Is Appropriate and Necessary ..............................................40

CONCLUSION.........................................................................................................................41

**TABLE OF AUTHORITIES**

**Cases**

*Abbott Laboratories v. Gardner*,
  387 U.S. 136 (1967).................................................................................................. 11

*Amador Cnty., Cal. v. Salazar*,
  640 F.3d 373 (D.C. Cir. 2011).................................................................................. 16

*Berrigan v. Sigler*,
  499 F.2d 514 (D.C. Cir. 1974).................................................................................. 11

*Block v. Cmty. Nutrition Inst.*,
  467 U.S. 340 (1984).................................................................................................. 14

*Bostock v. Clayton Cnty.*,
  590 U.S. 644 (2020).................................................................................................. 14

*Bowsher v. Merck & Co.*,
  460 U.S. 824 (1983).................................................................................................. 36

*Chafin v. Chafin*,
  568 U.S. 165 (2013).................................................................................................. 17

*Chamber of Com. v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996).................................................................................. 24

*City of New Haven v. United States*,
  809 F.2d 900 (D.C. Cir. 1987).................................................................................. 14

*City of New York v. Ruckelshaus*,
  358 F. Supp. 669 (D.D.C. 1973)............................................................................... 12

*Clarke v. United States*, 915 F.2d 699
  (D.C. Cir. 1990) ........................................................................................................ 17

*Clinton v. City of New York*,
  524 U.S. 417 (1998).................................................................................................. 13

*Cobell v. Norton*,
  240 F.3d 1081 (D.C. Cir. 2001)................................................................................ 26

*CSL Plasma Inc. v. U.S. Customs & Border Protection*,
  33 F.4th 584 (D.C. Cir. 2022)................................................................................... 17

*Dalton v. Specter*,
  511 U.S. 462 (1994).................................................................................................. 39

*Del Monte Fresh Produce Co. v. United States*,
  570 F.3d 316 (D.C. Cir. 2009).................................................................................. 20

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019)........................................................................................ 21, 23

*Dep't of State v. Aids Vaccine Advoc. Coal.*,
  146 S. Ct. 19 (2025)......................................................................................... 8, 10

*Dep't of Homeland Sec. v. Regents of the University of California*,
  591 U.S. (2020).................................................................................................. 34

*FDA v. R.J. Reynolds Vapor Co.*,
  606 U.S. 226 (2025).......................................................................................... 16

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
  528 U.S. 167 (2000).......................................................................................... 17

*General Land Office v. Biden*,
  722 F. Supp. 3d 710 (S.D. Tex. 2024) .............................................................. 15

*Gen. Land Off. v. Trump*, No.
  7:21-cv-272, 2025 WL 3050184 (S.D. Tex. Sept. 15, 2025)............................. 19

*Glob. Health Council (GHC) v. Trump*,
  153 F.4th 1 (D.C. Cir. 2025)....................................................................... *passim*

*Guadamuz v. Ash*,
  368 F. Supp. 1233 (D.D.C. 1973) ...................................................................... 12

*In re Aiken Cnty.*,
  725 F.3d 255 (D.C. Cir. 2013)...................................................................... 30, 40

*In re Fed. Bureau of Prisons' Execution Protocol Cases*,
  980 F.3d 123 (D.C. Cir. 2020)........................................................................... 41

*Kendall v. United States ex rel. Stokes*,
  37 U.S. (12 Pet.) 524 (1838).............................................................................. 12

*Lincoln v. Vigil*,
  508 U.S. 182 (1993)...................................................................................... 22, 23

*Louisiana v. Weinberger*,
  369 F. Supp. 856 (E.D. La. 1973)...................................................................... 12

*Milk Train, Inc. v. Veneman*,
  310 F.3d 747 (D.C. Cir. 2002)........................................................................... 22

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010)........................................................................................... 41

*Nat'l Council of Cmty. Mental Health Ctrs. v. Weinberger*,
  361 F. Supp. 897 (D.D.C. 1973)........................................................................ 12

iii

*NetCoalition v. SEC*,
  715 F.3d 342 (D.C. Cir. 2013) ................................................................................ 16

*NLRB Union v. FLRA*,
  834 F.2d 191 (D.C. Cir. 1987) ................................................................................ 16

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) ............................................................................................. 24, 28

*Ramirez v. ICE*,
  568 F. Supp. 3d 10 (D.D.C. 2021) .......................................................................... 41

*Reno v. Cath. Soc. Servs., Inc.*,
  509 U.S. 43 (1993) ............................................................................................. 11, 14

*Ridgely v. Lew*, 55 F. Supp. 3d 89
  (D.D.C. 2014) .......................................................................................................... 41

*Shawnee Tribe v. Mnuchin*, 984 F.3d 94
  (D.C. Cir. 2021) ................................................................................................. 20, 23

*Sherley v. Sebelius*, 689 F.3d 776
  (D.C. Cir. 2012) ...................................................................................................... 25

*State Highway Comm'n of Mo. v. Volpe*,
  347 F. Supp. 950 (W.D. Mo. 1972) ........................................................................ 12

*Train v. City of New York*,
  420 U.S. 35 (1975) .................................................................................................. 12

*Trump v. Boyle*,
  145 S. Ct. 2653 (2025) ...................................................................................... 10, 13

*Trump v. Hawaii*,
  585 U.S. 667 (2018) ................................................................................................ 34

*U.S. Dep't of the Navy v. FLRA*,
  665 F.3d 1339 (D.C. Cir. 2012) ............................................................................... 6

*Walker v. Cheney*,
  230 F. Supp. 2d 51 (D.D.C. 2002) .......................................................................... 16

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
  586 U.S. 9 (2018) .............................................................................................. 11, 21

**Statutes**

2 U.S.C.
  § 622.......................................................................................................................... 4
  § 681................................................................................................................ *passim*

2 U.S.C. (continued)
    § 683..................................................................................................... 2, 21, 37, 38
    § 687.......................................................................................................... 4, 15, 1

5 U.S.C.
    § 701............................................................................................................. 16, 21
    § 702................................................................................................................... 16
    § 704................................................................................................................... 26
    § 706.............................................................................................................. *passim*

31 U.S.C. § 1301(a) ................................................................................... 6, 22, 29

Further Consolidated Appropriations Act, 2024
    Pub. L. No. 118-47....................................................................................... *passim*

**Other Authorities**

GAO, Principles of Federal Appropriations Law (3d ed. 2004)...................................... 21

GAO, *Impoundment of the Advanced Research Projects Agency—Energy Appropriation
    Resulting from Legislative Proposals in the President's Budget Request for Fiscal Year 2018*,
    B-329092 (Dec. 12, 2017) ....................................................................................... 30

GAO, *Impoundment Control Act—Withholding of Funds through Their Date of Expiration*, B-
    330330 (Dec. 10, 2018) ....................................................................................... 36

**INTRODUCTION**

Defendants seek summary judgment while largely ignoring the administrative record they produced. The existing record reveals two major schemes to circumvent Congress's spending commands for funds set to expire on September 30, 2026. First, Defendants have reserved several billion dollars in expiring Global Health Programs (GHP) and Development Assistance (DA) funds to pay closeout costs of terminated USAID awards. Defendants are holding back the funds for substantive programming until after all closeout actions are complete, which will be after the funds have expired, and for the GHP and DA funds that are paid for closeouts, Defendants are using the funds for purposes that Congress never authorized. Under the second scheme, Defendants have unnecessarily allocated the appropriations rescinded in 2025 to various directives they disfavor, for the purpose of not complying with the directives even though they could meet them with non-rescinded funds. Together, these schemes evade Congress's commands under the relevant appropriations provisions and the mandatory directives in Sections 7019(a) and 7030–7061. Defendants knew that these actions are central to Plaintiffs' funding claims, and yet their motion has almost nothing to say about either scheme.

Rather than address the current factual and legal landscape, Defendants' motion is predominantly copied and pasted from their January motion to dismiss, which in turn was largely copied and pasted from their filings regarding the impoundment claims that Plaintiffs were pursuing last year for appropriations that were set to expire last year. Defendants' lead argument in their motion—that the ICA precludes Plaintiffs' APA claims—has no possible application to Plaintiffs' claims that are not about impoundments, but rather are about failure to comply with Congress's commands regarding how the funds must be used; specifically, with respect to complying with the table and bill directives and the purposes of the GHP and DA appropriations. These claims would remain even if Defendants timely obligated every available dollar. And

Plaintiffs' claims that do involve failure to obligate funds before they expire arise under the appropriations acts, not the ICA. The ICA itself explicitly states that it does not preclude such claims, and the Supreme Court's order was limited to funds in a pending pocket rescission and was preliminary even as to those funds. Defendants' remaining threshold arguments—concerning mootness, agency discretion, reviewability, and final agency action—are as flimsy now as they were when Defendants raised the same arguments, verbatim, in their motion to dismiss.

Defendants are also wrong on the merits. The relevant appropriations laws are mandatory and not permissive, as this Court has held and has been settled for decades. Defendants stretch so far as to argue the directives in Sections 7019(a) and 7030–7061 are not mandatory, even though they provide that "not less than" certain amounts, or amounts "specifically designated," "shall be made available" by Defendants for particular programs or topics. That Defendants would deny that these words mean what they mean underscores how far they will go to defend actions that are legally indefensible. The directives are unambiguous commands that Defendants are indisputably violating through the closeout scheme and the allocation of rescinded funds. And the closeout scheme is resulting in violations of the purpose and obligation requirements of the GHP and DA appropriations provisions as well. As for Plaintiffs' arbitrary-and-capricious claims, Defendants do not attempt to show that they satisfied the ordinary requirements of reasoned decisionmaking—acknowledging their change in position, considering reliance interests, and addressing the relevant evidence and consequences. They instead rest largely on the novel and unsupported theory that those requirements do not apply when agencies act in "the foreign policy context."

Defendants' motion fails from every direction. Defendants' threshold arguments do not reach Plaintiffs' actual claims and otherwise fail. Where Defendants have produced the

2

administrative record, it supports Plaintiffs. And where Defendants have not produced the record, summary judgment is unavailable. The Court should deny Defendants' motion.

ARGUMENT

## I.    Plaintiffs' Claims Are Reviewable

Defendants repeat, largely verbatim, the five threshold grounds they raised in their motion to dismiss for why the Court cannot review Plaintiffs' claims. The arguments were wrong then and are even more wrong now. Defendants' threshold objections therefore provide no basis to avoid the merits.

### A.  Plaintiffs' Claims Are Not Precluded by the Impoundment Control Act

The ICA does not preclude any of Plaintiffs' funding claims. Defendants' theory fails out of the gate for Plaintiffs' claims relating to *how* the agencies are using appropriations, as opposed to whether the funds will be obligated before they expire. Specifically, the ICA has no bearing at all on Plaintiffs' claims that Defendants are violating the directives in Sections 7019(a) and 7030–7061—by allocating rescinded funds and money being held back for the closeout scheme to the directives—and that they are violating the Purpose Statute by using GHP and DA appropriations to pay closeout costs. For purposes of these claims, the Court may assume *arguendo* that Defendants *will* obligate all relevant funds before they expire in some manner, and thus the claims do not involve any rescission or deferral for which the Comptroller General could bring suit under the ICA.

Plaintiffs' remaining funding claims enforce the appropriations provisions of titles III and IV of the SFOPS Act—not the ICA. At Defendants' own request, the Supreme Court's emergency order was expressly limited to the circumstance of funds in a pending ICA rescission proposal, and the order has no application to APA claims seeking to enforce an appropriations law for funds never included in a rescission proposal. The order neither addressed those claims

3

nor finally resolved the merits even as to the funds it did address. And this Court has already correctly held that the ICA does not preclude APA claims alleging violations of appropriations laws. Dkt. 139 at 11–17. Defendants' contrary theory turns the ICA on its head: a statute enacted to constrain executive impoundment would instead shield violations of Congress's spending commands from judicial review.

### 1. Plaintiffs' Claims Regarding the Directives and the Purpose Statute Are Not Precluded

Defendants' preclusion theory rests on the premise that Plaintiffs bring "a suit of the type that the ICA assigned only to the Comptroller General." Gov't MSJ 16–17. That premise is mistaken with respect to *all* of Plaintiffs' claims, for the reasons explained below. *See infra* Section I.A.3. But even accepting Defendants' theory at face value, it would preclude only claims relating to impoundments—*i.e.*, the "rescission" or "deferral" of appropriations. 2 U.S.C. §§ 682–683. It would not reach Plaintiffs' claims regarding Defendants' failures to comply with the directives under Sections 7019(a) and 7030-7061 or Defendants' violations of the Purpose Statute. The ICA provides no cause of action and no remedy for such violations.

The ICA does not authorize the Comptroller General to sue over every violation involving appropriated funds.[1] It applies only "[i]f, under this chapter, budget authority is required to be made available for obligation and such budget authority is not made available for obligation." 2 U.S.C. § 687. In such circumstances, it purports to authorize the Comptroller General to bring suit "to require such budget authority to be made available for obligation." *Id.* "Budget authority" means funds appropriated by Congress that enable agencies "to incur financial obligations." *Id.* § 622(2). The ICA thus addresses whether budget authority has been

---

[1] This assumes that the Comptroller General would *ever* have Article III standing to bring an ICA claim, which is unlikely. *See infra* Section I.A.3.

made available—*i.e.*, whether appropriations have been obligated. It does not address every statutory mandate and restriction on how an agency uses or allocates appropriations.

That distinction defeats Defendants' preclusion argument as to Plaintiffs' claims that Defendants are violating: (1) certain GHP and DA table directives made mandatory through Section 7019(a), and certain directives in Sections 7060 and 7061, by allocating GHP and DA funds being withheld for closeout costs to the directives; *see* Pls.' MPSJ 13–15; (2) the Purpose Statute, in using GHP and DA appropriations to pay closeout liabilities that are not properly chargeable to those accounts, *see id.* at 17–19; and (3) numerous table and bill directives, by allocating funds rescinded by Congress in the Rescissions Act of 2025 toward the table and bill directives, *see id.* at 22–32.

The ICA does not authorize the Comptroller General to bring suit for any of these legal violations, which do not center on any impoundment of funds.

*First*, the claim that Defendants will violate the affirmative commands of Sections 7019(a), 7060, and 7061 through the closeout scheme turns on whether an obligation to pay for closeouts may be counted toward meeting these directives—not whether budget authority has been made available. *See* Pls.' MPSJ 13–15. Even if Defendants ultimately obligate every dollar reserved for closeout costs to such costs, those obligations do not satisfy directives requiring specific or minimum amounts to be used for new substantive programming on topics like HIV/AIDS, maternal and child health, and basic education. Whether an obligation satisfies these directives is governed by Section 7019(a) or Sections 7030–7061, not the ICA. An order that merely requires Defendants to make "budget authority available for obligation," which is the sole relief the Comptroller General could obtain, 2 U.S.C. § 687, would not address or remedy the violations of the directives.

5

*Second*, and similarly, the Comptroller General could not sue under the ICA regarding the Purpose Statute violations in obligating GHP and DA appropriations for closeout costs of terminated awards that were funded using different appropriations, from different fiscal years, for different purposes. Pls.' MPSJ 17–19. This claim solely concerns the obligation of appropriations for an object not authorized by those appropriations—here, closeout liabilities improperly charged to the 2025 Continuing Resolution GHP and DA accounts. *See* 31 U.S.C. § 1301(a); *U.S. Dep't of the Navy v. FLRA*, 665 F.3d 1339, 1348–49 (D.C. Cir. 2012). The funds at issue in this claim have not been *impounded*; they have been *used* (for an improper purpose). The ICA does not address, and provides no cause of action to remedy, the obligation of appropriations for improper purposes.

*Third*, Plaintiffs' claim concerning the allocation of rescinded title III and IV appropriations funds to the table and bill directives does not challenge a deferral or rescission of appropriations. This claim expressly assumes that Congress validly rescinded the relevant appropriations, Plaintiffs do not seek to restore or require obligation of that rescinded budget authority. *See* Pls.' MPSJ 22–32. The issue underlying this claim is how Defendants use the appropriations that were *not* rescinded. The administrative record establishes that Defendants intentionally and unnecessarily allocated the rescinded appropriations to the directives, to purportedly reduce the amount that must be obligated to meet the directives, so that they could use the non-rescinded funds on their own policy agenda rather than Congress's. The violation is not a failure to obligate the funds, but rather a failure to comply with directives requiring Defendants to obligate specific or minimum amounts for the programs or topics designated under which directive—where Congress did not repeal the directives and Defendants have sufficient non-rescinded funds to meet them. The violation would remain even if Defendants timely obligate every non-rescinded dollar to purposes other than the directives. Again, the ICA does

not authorize the Comptroller General to sue over a failure to comply with directives regarding how appropriations must be used.[2]

Because the ICA does not speak to the legal violations underlying these claims, Defendants' preclusion arguments do not bear on these claims whatsoever.

### 2. *The Supreme Court's Emergency Order Does Not Preclude Any of Plaintiffs' Claims*

Defendants lead with their (now-familiar) argument that the Supreme Court's emergency order, which stayed the portion of this Court's injunction relating to the appropriations in the then-pending August 2025 rescission proposal, forecloses all of Plaintiffs' funding claims. That argument is plainly wrong as to the directives and Purpose Statute claims described above, and it is also wrong as to Plaintiffs' funding claims that do involve impoundments of funds.

This Court's September 2025 preliminary injunction covered two buckets of funds: (1) more than $6.5 billion in then-unobligated, expiring funds that were not included in the special message; (2) more than $4 billion in funds included in the special message. Defendants sought a stay from the D.C. Circuit as to both sets of funds, but when the D.C. Circuit denied a stay, Defendants limited their Supreme Court stay request to only the $4 billion in pocket rescission funds. Defendants repeatedly emphasized to the Supreme Court that their stay application was "limited to the $4 billion that are the subject of the President's rescission proposal." Partial Stay

---

[2] For the same reasons, the ICA cannot preclude Count 12 of the Third Amended Complaint, which concerns a similar allocation scheme that Defendants employed with the funds in the August 2025 special message. As alleged in the Third Amended Complaint, Defendants violated table and bill directives for funds originally set to expire on September 30, 2025, by unnecessarily allocating appropriations in the special message to the directives. *See* TAC ¶¶ 207–16. Count 12 does not question whether the special message rescinded the relevant funds as Defendants contend; rather, the claim is that Defendants unlawfully failed to comply with the directives using the remaining appropriations that were not in the special message. The Comptroller General could not bring such a claim for violating the directives. Plaintiffs did not include Count 12 in their motion for partial summary judgment, but to the extent Defendants move for summary judgment on this claim on jurisdictional grounds, it should be denied.

Appl. at 17 n.4, *AVAC*, No. 25A269. In the very first paragraph of their stay reply, Defendants made clear that "[t]he dispute over the new injunction has narrowed to the $4 billion that the President designated to Congress for proposed rescission, thereby triggering the Impoundment Control Act of 1974 (ICA), 2 U.S.C. § 681 et seq., and freezing those funds while the interbranch process unfolds." Stay Reply 1.

In turn, the Supreme Court's order was expressly cabined to "the funding subject to the President's August 28 special message," and thus did not apply to APA claims relating to appropriations not included in a rescission proposal. *Dep't of State v. Aids Vaccine Advoc. Coal. (AVAC)*, 146 S. Ct. 19, 19 (2025). The Court highlighted that, of the total $10.5 billion funds covered by this Court's preliminary injunction, "$4 billion was proposed to be rescinded in a 'special message' transmitted pursuant to the Impoundment Control Act." *Id.* (citing 2 U.S.C. § 681 *et seq.*). The Court then held that "[t]he Government, at this early stage, has made a sufficient showing that the Impoundment Control Act precludes respondents' suit, brought pursuant to the Administrative Procedure Act, to enforce *the appropriations at issue here*." *Id.* (emphasis added). The "appropriations at issue here" referred only to the funds in the rescission proposal. Indeed, the Court granted a stay only "as to the funding subject to the President's August 28 special message." 146 S. Ct. at 19.

Defendants' substantive arguments in seeking a stay were also focused on the unique circumstances of appropriations included in a pending rescission proposal. Defendants repeatedly emphasized that "[t]his case . . . does not concern an unlawful 'impoundment,' but rather a rescission proposal that comports with the ICA." Stay Appl. at 22, *AVAC*, No. 25A269. And Defendants contended that "claims concerning the effect of an ICA rescission proposal are precluded, because they cannot be divorced from the ICA's reticulated procedures and limited remedial mechanisms." *Id.* at 23. In their stay reply, Defendants asserted that "[i]t is especially

8

clear that the ICA precludes APA claims where, as here, the President has triggered the ICA's congressional review process," and "the Executive and Legislative Branches are now engaged in an ICA-prescribed negotiation where Congress has ample time and tools to respond." Stay Reply at 2. According to the Solicitor General, it was "plain that *this* APA suit is precluded, *regardless of how broadly the ICA precludes suits in other contexts*." *Id.* (second emphasis added).

Given that Defendants limited their stay request and arguments in favor of a stay to the funds in the pocket rescission, that the Supreme Court limited its order to those "appropriations at issue here," and that the Court did not provide any reasoning to suggest its holding had broader implications, there is no basis to conclude that the Court's order should (much less must) be read to apply to appropriations not included in a pending-rescission proposal. It is a bait-and-switch for Defendants to have limited their stay applications and arguments to such funds— asserting that the Court's resolution of the application would not resolve "how broadly the ICA precludes suit in other contexts," Stay Reply at 2—and to now claim that the Court's order "forecloses all of Plaintiffs' funding claims under the APA," Gov't MSJ 13.

The Supreme Court's order accordingly has no impact on Plaintiffs' funding claims concerning appropriations that expire this year and related directives. Defendants characterize Plaintiffs' claims as "materially the same," suggesting that the only difference is the fiscal year in which the appropriations expire. Gov't MSJ 15. But the relevant distinction is not simply the expiry date. The funds expiring in 2026 were not included in the August 2025 special message, are not subject to any pending rescission proposal, and are challenged based on different agency decisions made months later and now documented in the administrative record. As described above, *supra* Section I.A.1, several of Plaintiffs' claims have nothing to do with whether Defendants make all available budget authority available for obligation, which was the sole

question in the stay application. The Supreme Court's preliminary order concerning the failure to obligate funds subject to a pending special message says nothing about those claims.

Although, as Defendants note (at 2), the Supreme Court has advised that its "interim orders . . . inform how a court should exercise its equitable discretion in like cases," *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025), this is neither a like case nor the same procedural posture. For substantially the same reasons, Defendants' reliance on Justice Gorsuch's partial concurrence on the controlling force of a "top-line conclusion" is misplaced. Gov't MSJ 2 (quoting *Nat'l Institutes of Health* (*NIH*) *v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2663 (2025) (Gorsuch, J., concurring in part and dissenting in part)). The Supreme Court's "top-line conclusion" here was its tentative conclusion regarding a claim over the impoundment of funds in a pending special message. "A different outcome here"—regarding different legal claims, related to different funds not in a rescission proposal—would not be in any "tension with the Supreme Court's holding." Gov't MSJ 15.

Even as to the $4 billion included in the special message, the Supreme Court's order was expressly—and emphatically—preliminary and therefore does not compel this Court to grant final judgment to Defendants. The Court's entire reasoning consists of only five sentences in the second half of the first paragraph, beginning with "The Government, at this early stage." *AVAC*, 146 S. Ct. at 19. Within that brief passage, the Court embedded two caveats about the case's procedural posture, followed by two entire sentences admonishing that its decision is preliminary and non-final: "This order should not be read as a final determination on the merits. The relief granted by the Court today reflects our preliminary view, consistent with the standards for interim relief." *Id.* It is blackletter law that a preliminary decision "does not constitute the law of the case . . . and does not limit or preclude the parties from litigating the merits." *Berrigan v. Sigler*, 499 F.2d 514, 518 (D.C. Cir. 1974). That principle applies with particular force here: the

10

Supreme Court has not used comparable language to caveat its decisions in other emergency-docket stay orders over the past year, underscoring that the Court did not intend its order to resolve any legal issue. In arguing that the Court's order compels *final judgment* in their favor, it is Defendants who are running afoul of the order.

### 3. Defendants' Preclusion Arguments Are Wrong

As a matter of law, the ICA does not preclude Plaintiffs' APA claims that Defendants' actions violate appropriations acts. Dkt. 139 at 11–17.

**a.** The Supreme Court has "long applied a strong presumption favoring judicial review of administrative action," including under the APA, "for one suffering legal wrong because of agency action." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 22 (2018) (quotations omitted). "[J]udicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967). Courts may "find an intent to preclude such review only if presented with 'clear and convincing evidence.'" *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 64 (1993) (quoting *Abbott*, 387 U.S. at 141).

As this Court recognized, nothing in the ICA suggests that Congress intended to displace the longstanding right of private parties to bring APA suits for appropriations act violations. *See* Dkt. 139 at 14–15 ("The Court agrees that neither the text of the ICA nor the panel's decision [in GHC] impedes Plaintiffs from bringing an APA action to enforce the appropriations acts."). To the contrary, the ICA expressly provides that "[n]othing contained in this Act . . . shall be construed as . . . affecting in any way the claims . . . of any party to litigation concerning any impoundment." 2 U.S.C. § 681(3).

This clear textual command in § 681(3) was enacted against the backdrop of a long history of private plaintiffs successfully challenging the Executive Branch's refusal to comply

11

with an appropriation act's directive to spend money, including under the APA. *See* Dkt. 139 at 14–15. Almost 200 years ago, the Supreme Court approved a writ of mandamus compelling an agency to release appropriated funds, in an action brought by a private party. *See Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524 (1838). Nearly 150 years later, in *Train v. City of New York*, 420 U.S. 35 (1975), the Supreme Court reaffirmed the ability of a private party to compel an agency to comply with a congressional spending mandate, this time through the APA. In *Train*, private plaintiffs brought an APA claim challenging an agency's refusal to spend the full amount of money that Congress directed "shall be allotted" under an appropriations statute. *See City of New York v. Ruckelshaus*, 358 F. Supp. 669, 673 (D.D.C. 1973) (noting that the plaintiffs brought an APA claim). The Supreme Court affirmed the district court injunction compelling the agency to spend the full amounts Congress required.

*Train* was one of a series of cases brought during the Nixon administration where private litigants successfully challenged an agency's refusal to spend appropriations. *See, e.g., State Highway Comm'n of Mo. v. Volpe*, 347 F. Supp. 950, 954 (W.D. Mo. 1972), *aff'd as modified*, 479 F.2d 1099 (8th Cir. 1973) (granting relief under 5 U.S.C. § 706); *Guadamuz v. Ash*, 368 F. Supp. 1233 (D.D.C. 1973); *Louisiana v. Weinberger*, 369 F. Supp. 856 (E.D. La. 1973); *Nat'l Council of Cmty. Mental Health Ctrs. v. Weinberger*, 361 F. Supp. 897 (D.D.C. 1973). Defendants thus are flat wrong that neither "courts" nor "private parties" have historically resolved "disputes over the President's decisions relating to the obligation and expenditure of funds appropriated by Congress." Gov't MSJ 18; *see also Clinton v. City of New York*, 524 U.S. 417 (1998) (ruling for private parties challenging President's line-item veto of appropriations).

It was against this long history of private parties bringing successful claims to compel the spending of appropriations that Congress made clear that "nothing contained" in the ICA "shall be construed" as "affecting in any way" such claims. 2 U.S.C. § 681(3).

**b.** Defendants assert that § 681(3) applies only to a party "*that may bring litigation.*" Gov't MSJ 19 (quoting *Glob. Health Council (GHC) v. Trump*, 153 F.4th 1, 19 (D.C. Cir. 2025)). But precedent establishes that private plaintiffs "may bring" APA claims for violations of appropriations acts, and "nothing contained" in the ICA "affect[s] in any way" the "claims . . . of any party to litigation concerning any impoundment." 2 U.S.C. § 681(3). Plaintiffs here are "any party." *FDA v. R.J. Reynolds Vapor Co.*, 145 S. Ct. 1984, 1994 (2025) (Congress's use of "any" party "suggests an intent to cover more than one party"). And Plaintiffs' claims that Defendants have failed or will fail to obligate funds by their respective deadlines "concern[] any impoundment." The disclaimer in § 681(3) could not more clearly refute Defendants' preclusion argument.

Indeed, Defendants acknowledged to the D.C. Circuit in opposing *en banc* review that private plaintiffs "may generally enforce compliance with statutory mandates through suits under the APA." Resp. to Pet'n for Rehearing En Banc at 1, *GHC*, No. 25-5097 (D.C. Cir. Aug. 20, 2025). In Defendants' own words, nothing in "the ICA . . . affects any 'preexisting right' that 'injured private parties' may have to enforce statutory obligations through a suit under the APA." *Id.* at 15–16.

Defendants cannot reconcile their implied preclusion theory with § 681(3)'s plain text, and it is well settled that, in interpreting statutes, "[o]nly the written word is the law." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 653 (2020). But even looking beyond the text here, the statutory text and purpose align. As its name suggests, the Impoundment Control Act's overriding purpose was to "control" impoundments. "[T]he ICA was passed at a time when Congress was united in its furor over presidential impoundments." *City of New Haven v. United States*, 809 F.2d 900, 906 (D.C. Cir. 1987). Defendants' argument—that Congress in the ICA made it harder to challenge and prevent impoundments—contravenes both the ICA's text and core purpose.

13

**c.** Neither *Block v. Community Nutrition Institute*, 467 U.S. 340 (1984), nor any other precedent supports Defendants' argument that Congress's creation of a right of action for the Comptroller General impliedly precludes private enforcement suits. Gov't MSJ 16–19. In *Block*, the Court held that where a marketing-order statute sought to ensure "the protection of the producers of milk and milk products" and authorized judicial review at their behest, it impliedly precluded consumer suits. Id. at 352. But the mere fact that Congress has authorized suits by the Comptroller General to enforce the ICA does not constitute "clear and convincing evidence" of Congress's "intent to preclude such review" of claims brought by private parties to enforce their rights under other statutes. *Reno*, 509 U.S. at 64. An APA claim enforcing an appropriations act invokes no ICA remedy and bypasses no ICA prerequisite.

Defendants also misread the D.C. Circuit's amended opinion in this case, asserting that the Circuit "concluded" that "only the GAO, through the Comptroller General, can bring such claims" to enforce an appropriations statute. Gov't MSJ 17–18. The panel repeatedly and deliberately confined that reasoning to claims "to enforce the ICA." The very sentence Defendants quote says Congress did not create a "backdoor for citizen suits *to enforce the ICA*." *GHC*, 153 F.4th at 19 (emphasis added). And the panel expressly declined to decide "whether the ICA precludes suits under the APA to enforce appropriations acts." *Id.* at 20 n.17. In the amended opinion that withdrew the panel's original opinion, the panel narrowed its holding to cover only APA claims to enforce the ICA; the opinion does not address APA claims to enforce appropriations statutes themselves. It was on this basis that the full D.C. Circuit did not grant *en banc* review. *Global Health Council v. Trump*, No. 25-5097, 2025 WL 2709437, at *3 (D.C. Cir. Aug. 28, 2025) (Garcia, J., statement respecting denial of rehearing *en banc*) (explaining that the amended opinion "allowed" Plaintiffs to pursue their APA claims for violations of the appropriations acts).

14

The panel's decision accordingly does not foreclose any of Plaintiffs' claims. The decision did not address at all non-impoundment claims like those Plaintiffs now assert regarding Defendants' failure to comply with directives and violation of the Purpose Statute in how they are obligating funds. And for Plaintiffs' claims that do challenge a failure to obligate funds by their deadline, bring the claim the panel left open—for violations of the appropriations acts' independent commands, not the ICA's provisions. Defendants' own authority confirms the distinction. Although *General Land Office v. Biden* held that an "ICA-based APA claim" alleging an ICA violation was precluded, the court adjudicated the plaintiffs' APA claim under the appropriations acts. 722 F. Supp. 3d 710, 734–43 (S.D. Tex. 2024).

What's more, the ICA's provision affording a right of action to the Comptroller General cannot be preclusive because the Comptroller General could not, in fact, bring suit. The Comptroller General, as an individual Article I official who does not suffer direct injury due to any impoundment, would lack Article III standing to bring suit under 2 U.S.C. § 687. Defendants appear to share this view; they strongly hinted to the Supreme Court in this case that they do not believe an action by the Comptroller General would be "cognizable," *see* Stay Appl. at 22, and the government has argued that the Comptroller General lacks standing under a functionally identical statutory right of action provision, *Walker v. Cheney*, No. 02-cv-340 (D.D.C. May 21, 2002), Dkt. 12 at 11. As Judge Bates held in agreeing with the government, the Comptroller General "has no freestanding institutional injury or personal injury of his own to assert." *Walker v. Cheney*, 230 F. Supp. 2d 51, 66 (D.D.C. 2002). Because the Comptroller's statutory right of action is entirely inoperative, it cannot act to preclude private suits.

Defendants' response now—that "[e]ven if true" this defect is "immaterial" because "only" the Comptroller General may sue—misunderstands (or ignores) the problem. Gov't MSJ 17. Plaintiffs do not contend that the Comptroller General's lack of standing *creates* a cause of

15

action; the APA already supplies a general cause of action unless another statute precludes review. 5 U.S.C. §§ 701(a)(1), 702. The point is that § 687 cannot *displace* that cause of action if § 687 is inoperative. Implied preclusion turns on congressional intent, and the D.C. Circuit has rejected preclusion where a purported statutory substitute did not "actually create[] an alternative mechanism for compliance with the law." *Amador Cnty. v. Salazar*, 640 F.3d 373, 379–80 (D.C. Cir. 2011); *see NetCoalition v. SEC*, 715 F.3d 342, 352 (D.C. Cir. 2013) ("[W]e have long allowed the availability of other avenues of review to affect our assessment of our jurisdiction."); *NLRB Union v. FLRA*, 834 F.2d 191, 197 (D.C. Cir. 1987) (permitting judicial review as "the only remaining path to judicial consideration of the substantive validity" of agency regulations). If the Comptroller General lacks standing, § 687 is a dead letter. Congress cannot have intended a constitutionally unavailable suit to displace APA review and leave the Executive Branch's compliance with appropriations laws wholly unreviewable.

**d.** Contrary to Defendants' suggestion (at 18–19), Plaintiffs fall squarely within the zone of interests of the appropriations laws, as this Court previously held. Dkt. 139 at 16–17. The APA's zone-of-interests inquiry is "not especially demanding" and permits suit by anyone even "arguably within the zone of interests to be protected or regulated by the statute" at issue. *FDA v. R.J. Reynolds Vapor Co.*, 606 U.S. 226, 233 (2025) (quotation omitted). It "does not require that the statute directly regulate the plaintiff, nor does it require specific congressional intent to benefit the plaintiff." *CSL Plasma Inc. v. U.S. Customs & Border Protection*, 33 F.4th 584, 589 (D.C. Cir. 2022).

Defendants therefore apply the wrong standard when they fault Plaintiffs for identifying no statute that requires an award specifically to them. Gov't MSJ 20. Plaintiffs need not show an entitlement to a particular grant. They compete for funds in the statutory categories and have received those funds for years; their loss is direct, not the generalized interest of an ordinary

16

taxpayer. As this Court held, Plaintiffs' interests are not merely "marginally related" to the appropriations laws: "The relevant acts appropriate foreign assistance funds across a variety of categories, and it is undisputed that Plaintiffs not only compete for those funds but also have been the recipients of such funds for years." Dkt. 139 at 17. The statutes' purposes and Plaintiffs' interests therefore "go hand in hand." *Id.*

### B. None of Plaintiffs' Claims Is Moot

Defendants are also wrong that Plaintiffs' "claims related to funds that . . . should have been obligated prior to September 30, 2025 are moot." Gov't MSJ 20. A case "becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Chafin v. Chafin*, 568 U.S. 165, 172–73 (2013). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id.* Dismissal for mootness is appropriate only if "events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990). And where Defendants invoke changed circumstances or post-filing conduct, this standard is "stringent": "The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to recur lies with the party asserting mootness." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).

Plaintiffs' claims as to funds that should have been obligated before September 30, 2025, fall into two buckets: (1) funds that were obligated before that date and (2) funds that were never obligated, including the funds included in the special message.

As to the first bucket, State and USAID purportedly obligated roughly $7.2 billion in expiring appropriations before September 30, 2025. AR 4. Plaintiffs contend that Defendants violated the 2024 Appropriations Act and prior acts in how they obligated these funds, by not

17

complying with the table and bill directives in the 2024 Appropriations Act. *See* TAC ¶¶ 207–16 (Count 12).[3] Just as they have now done with the appropriations rescinded in the Rescissions Act of 2025, Defendants unnecessarily allocated the appropriations in the pocket rescission to directives that they disfavor, so that they purportedly would not have to comply with the directives in obligating the appropriations *not* included in the special message. Defendants thereby failed to comply with the unambiguous commands of Sections 7019 and 7030–7061 of the 2024 Appropriations Act.

This claim is not moot for several reasons. For one, by Defendants' own admissions, many of the funds expiring on September 30, 2025, were obligated through vehicles that did not specify the purposes for which the funds would be used. *See* 9/4/2025 JSR at 3, Dkt. 145 ("Defendants note that the instruments . . . may not specifically address or identify funds for individual earmarks and allocations."). That includes the interagency agreement between USAID and State on September 30, 2025, AR 585–92 (Dkt. 202-19), and obligations of funds into Development Objective Grant Agreements (DOAGs) where the money has not yet been sub-obligated to a particular purpose. In such instances, Defendants could ensure that the funds go toward meeting the directives, if the Court orders compliance with the directives.

In addition, the Court could order Defendants to de-obligate and re-obligate funds where necessary, based on a unique provision in the SFOPS Act that the relevant funds "shall remain available for obligation for an additional 4 years" beyond their original expiration date if the funds were "initially obligated" before that original expiration date. Pub. L. No. 118-47, div. F, § 7011. The funds relevant to Count 12 were "initially obligated" by their original expiration date of September 30, 2025. Thus, if the Court concludes that Defendants acted unlawfully in

---

[3] As noted below, Count 12 is not ripe for adjudication at this time because Defendants have not yet produced an administrative record with respect to these funds.

failing to meet the directives in Sections 7030–7061 of the 2024 Appropriations Act, the Court may order Defendants to de-obligate and re-obligate these funds as necessary to comply with the Section 7030–7061 directives of the 2024 Appropriations Act.

Defendants' mootness arguments make no mention of Count 12 or the authority from Section 7011 to de-obligate and re-obligate the funds that were originally set to expire on September 30, 2025. Defendants did briefly address this authority in their reply on the motion to dismiss, but their response was difficult to follow. They argued that it was an "extraordinary proposition" that the Court could order Defendants to de-obligate and re-obligate funds, but then added: "To the extent some funds remain available beyond their original expiration date, that is only because Defendants have already obligated those funds, thus extending their period of availability consistent with the law." Dkt. 181 at 5. That is Plaintiffs' point; the period of availability for the funds has been extended, meaning that Defendants may de-obligate the funds and enter new obligations with them. Courts have ordered such relief where an agency obligated funds for an improper purpose and the period of availability for the funds had not expired. *See Gen. Land Off. v. Trump*, No. 7:21-cv-272, 2025 WL 3050184, at *2 (S.D. Tex. Sept. 15, 2025) (recounting that DHS had to terminate contracts after the court ruled that the funds had to be used for different purposes).

As to the second bucket, the more than $4 billion in funds not obligated before their original expiration date (including because they were included in the special message), these claims are not moot either for three reasons.

First, in Counts 13 and 14, Plaintiffs seek a declaration that Defendants' failure to obligate these funds by the statutory deadline was unlawful. As explained in Plaintiffs' motion for summary judgment, these declaratory judgment claims are not moot because they challenge an ongoing government policy and also satisfy the "capable of repetition, yet evading review"

19

exception to mootness. Pls.' MPSJ 38. Given the inherently short window created by transmitting a special message within 45 days of the expiration of budget authority, such an action cannot "be fully litigated prior to its cessation or expiration." *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 322 (D.C. Cir. 2009). And there is also a "reasonable expectation" that Defendants will try to use the pocket rescission again, for reasons Plaintiffs have explained: Defendants have continued to defend it as lawful and have suggested that they will continue to use "every tool in the executive fiscal toolbox" to cut funding for programs with which they disagree. *See* Pls.' MPSJ 38; Dkts. 202-12, 202-13, 202-14.

Second, for purposes of Counts 1–5, the Court may still extend the period of availability of the appropriations in the August 2025 special message, to require Defendants to obligate the funds in the amounts and for the purposes that Congress required (if Plaintiffs ultimately seek such relief). Defendants contend that the Court's equitable authority does not include the power to "'revive' funds that have already expired," Gov't MSJ 22, but the D.C. Circuit has held otherwise. In *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 103 (D.C. Cir. 2021), the court cited a GAO opinion for the proposition that "[a]s long as the suit is filed prior to the expiration date, the court acquires the necessary jurisdiction and has the equitable power to 'revive' expired budget authority." *Id.* at 98 (quoting GAO, Principles of Federal Appropriations Law, 5-85 (3d ed. 2004)). The D.C. Circuit then ordered the district court to enter a preliminary injunction with respect to the relevant funds, for which the original deadline to obligate the funds had passed months prior to the decision. *See id.* at 99.[4]

---

[4] Although not entirely clear from the opinion, *Shawnee Tribe* appears to be another instance where the court ordered an agency to de-obligate and re-obligate funds where the original obligations were improper (there, because the agency used an improper methodology).

Third, in Counts 15–18, Plaintiffs alternatively challenge Defendants' ongoing failure to obligate the funds included in the special message pursuant to 2 U.S.C. § 683(b). Section 683(b) requires an agency to make available for obligation any funds that were proposed to be rescinded but which Congress did not rescind within 45 days of the rescission proposal. If Plaintiffs are correct on the merits that § 683(b) requires obligation even if the original expiration date has passed, which the Court must assume in assessing jurisdiction, then these claims are not moot.

## C.  The Spending Requirements Are Not Committed to Agency Discretion

Defendants also argue that the Executive Branch's decisions about how and whether to obligate foreign assistance funds are immune from APA review because they are "committed to agency discretion by law." Gov't MSJ 23–24. The Supreme Court has repeatedly emphasized that, "to honor the presumption of review" under the APA, this exception must be read "quite narrowly." *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (quoting *Weyerhaeuser*, 586 U.S. at 23). The Court has limited the exception to the "rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion"—*i.e.*, where there is "no law to apply"—"such as a decision not to institute enforcement proceedings." *Id.* at 772 (quotations omitted).

Here, the relevant appropriations provisions of titles III and IV, and the directives in Sections 7019(a) and 7030–7061, provide more than "meaningful standard[s]" for assessing Defendants' actions in obligating or not obligating funds. All of the relevant title III and IV appropriations require that the full amounts appropriated be obligated by particular deadlines. The appropriations, including for GHP and DA as relevant to the closeout scheme, specify the purposes for which each account may be used, and the Purpose Statute restricts Defendants to using the funds for those authorized purposes. 31 U.S.C. § 1301(a). And Sections 7019(a) and 7030–7061 require that specific or minimum amounts of the title III and IV appropriations "shall

21

be made available" for designated programs or topics. Defendants may contend that they are complying with these statutes as a matter of fact or statutory interpretation, but there can be no reasonable dispute that the statutes provide "law to apply" for all of Plaintiffs' funding claims.

*Lincoln v. Vigil*, 508 U.S. 182 (1993), is inapposite. In *Lincoln*, the plaintiffs challenged the Indian Health Service's discontinuation of the Indian Children's Program. *Id.* at 184. That program was not required by the relevant statute, which provided a broad "lump-sum" appropriation for the Service generally. *See id.* at 184–86. Here, by contrast, Congress did "statutorily restrict[]" and prescribe "what can be done with those funds," *id.* at 192 (quotations omitted), by specifying the purposes for which a certain amount of the funds must be used.

*Milk Train*, Defendants' other principal authority, draws the same line. There, Congress authorized the Secretary of Agriculture to distribute dairy assistance "in a manner determined appropriate by the Secretary." *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). The D.C. Circuit held unreviewable the Secretary's choice under that provision of a production cap governing the distribution of funds among eligible producers. *Id.* at 751–52. But the court separately held reviewable whether the Secretary had violated a requirement that the funds be used for "economic losses incurred during 1999." *Id.* at 752. That restriction supplied a "statutory reference point" against which the agency's action could be judged. *Id.*

The D.C. Circuit reached the same conclusion in *Shawnee Tribe*, holding that there was sufficient "law to apply" in assessing compliance with a statute that "appropriates funds for only 'necessary expenditures incurred due to the public health emergency with respect to' COVID-19." 984 F.3d at 100. The relevant statutes here are even more prescriptive. As in *Shawnee Tribe*, "Congress has 'circumscribe[d] agency discretion to allocate resources by putting restrictions in the operative statutes.'" *Id.* (quoting *Lincoln*, 508 U.S. at 193).

Defendants' highlighting of Section 7019(b)'s deviation authority proves the point. Gov't MSJ 31–32. Section 7019(b) provides that Defendants "may only deviate up to 10 percent" from specified table amounts, unless the Secretary of State or USAID Administrator takes a specific, identifiable action: notifying Congress in writing that a greater deviation is necessary to respond to "significant, exigent, or unforeseen events." 138 Stat. 771–72. And Congress specified that Defendants may not use this authority for certain table directives—Defendants may not deviate at all from the amounts designated in the GHP table, and may deviate by no more than 5% from the amounts designated for "Global Programs" in the Economic Support Fund table. 138 Stat. 772. As for the bill directives in Sections 7030–7061, Congress provided no deviation authority with the sole exception of Section 7060(j), for which Defendants may deviate from the listed minimums by up to 10% if there are unforeseen or exigent circumstances. 138 Stat. 840–41. The sections providing deviation authority confirm that the underlying directives are mandatory, and supply precise lines regarding permissible deviations. These are "meaningful standards" for the Court to apply. *Dep't of Com.*, 588 U.S. at 772.

It is irrelevant that no statute guarantees an award to any particular Plaintiff. *See* Gov't MSJ 23–24. Plaintiffs seek no such order. The Court can set aside unlawful funding decisions and compel compliance with Congress's commands while leaving Defendants free to select among lawful recipients, instruments, and program designs. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 65 (2004).

### D. The Decision Not to Spend Funds in the Special Message Is an Agency Action Subject to APA Review

Defendants argue that their failure to obligate the funds included in the August 2025 special message "constitute[s] Presidential actions" and thus is "not subject to APA review." Gov't MSJ 20–21. This Court correctly rejected that argument last year, recognizing that

Plaintiffs "do not ask the Court to review, enjoin, or vacate the President's special message" but instead "seek judicial review of the agencies' determination to unilaterally decline to spend funds." Dkt. 139 at 20. Those agency determinations are reviewable under the APA.

Defendants nonetheless suggest that "when agencies implement . . . directives by the President," as "would be the situation when agencies follow the President's direction to withhold funds proposed for rescission," then "there is no genuine agency decision-making to review." Gov't MSJ 20–21. But Defendants point to nothing in the administrative record or otherwise showing that the President "direct[ed]" the agencies to withhold the funds at issue here. *See id.* Nor do Defendants point to any provision of the ICA that legally *prohibits* agencies from obligating funds that are the subject of a pending rescission proposal.

Even if Defendants could point to some order from the President to State and USAID not to obligate the funds in the special message, it is well-established that agency action taken to implement presidential directives remains reviewable under the APA, except in narrow cases where "the President has final constitutional or statutory responsibility for the final step necessary for the agency action directly to affect the parties." *Chamber of Com. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996); *see, e.g.*, *Sherley v. Sebelius*, 689 F.3d 776, 780, 784–85 (D.C. Cir. 2012). The President has neither constitutional nor statutory responsibility for the final step necessary to obligate or not obligate appropriated funds, and so Plaintiffs' claims with respect to Defendants' failure to obligate the funds at issue in the August 2025 special message are reviewable. Defendants' arguments to the contrary would impermissibly "allow the President and agencies to simply reframe agency action as orders or directives originating from the President to avoid APA review," as this Court has recognized. Dkt. 21 at 11.

24

### E. Plaintiffs Challenge Discrete, Final Agency Actions

Defendants are also incorrect that Plaintiffs' funding claims fail to challenge "discrete" agency actions. Gov't MSJ 25–27. This Court has correctly held that Defendants' decision not to spend specific amounts of appropriated funds for specific purposes is sufficiently "discrete" under 5 U.S.C. § 706(1) and § 706(2). Plaintiffs "are not asserting any type of broad, programmatic challenge that the APA forbids." Dkt. 139 at 20. Rather, Plaintiffs' challenge "is based on the very discrete requirements to spend the amount of funds that Congress has appropriated for particular purposes," and Plaintiffs have shown that "Defendants have made the very discrete, conclusive decision not to do so." *Id.* at 20–21.

Plaintiffs do not challenge the mere present "lack of an obligation or apportionment," Gov't MSJ 26, or rely solely on a prediction that Defendants eventually will fail to obligate funds. Plaintiffs challenge Defendants' decisions to reserve and use expiring GHP and DA appropriations to pay the closeout costs on terminated awards, rather than for substantive foreign-assistance programming. Plaintiffs challenge the allocation of those funds being withheld for closeout costs to specific table and bill directives, resulting in violations of those directives. And Plaintiffs challenge Defendants' allocation of rescinded funds to particular directives in order to circumvent compliance with directives that Defendants disfavor.

Plaintiffs have explained why these actions meet the *Bennett v. Spear* test. Pls.' MPSJ 19–20, 31. The Schmitt declaration provides further support for finality, confirming that the Congressional Notification "clearly stated USAID's intent" to obligate the identified funds for closeouts and that the reserved GHP balances "will be used" to settle terminated awards. AR 2 ¶ 7. Lewin's general statement that he is unaware of a "plan not to obligate" the expiring funds does not refute Plaintiffs' showing that Defendants are failing to comply with Congress's requirements for how the funds must be used, both under the directives and under the title III

25

GHP and DA appropriations. And Lewin's general statement that he lacks awareness of a plan to impound does not overcome the concrete evidence in the April 2026 Congressional Notification that Defendants will not obligate the GHP and DA appropriations for substantive programming until all closeouts are complete, which will be after September 30, 2026. *See* Pls.' MPSJ 15–17.

Even if Defendants could rebut Plaintiffs' showing of final agency action, and they have not, that would not affect Plaintiffs' claims that Defendants have unlawfully withheld or unreasonably delayed taking certain actions under 5 U.S.C. § 706(1). These claims do not require a showing of "final agency action" within the meaning of Section 704. *See Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001).

## II.    Defendants' Funding Decisions Regarding Funds Expiring on September 30, 2026 Violate the APA

On the merits, Plaintiffs have established that they are entitled to summary judgment on their funding claims at issue in these cross-motions: Counts 1–5 (relating to funds expiring September 30, 2026) and Counts 13 and 14 (seeking declaratory relief concerning Defendants' failure to obligate the funds included in the August 2025 special message). *See* Pls.' MPSJ 11 & n.5 (summarizing claims at issue). Plaintiffs' other claims, including Count 12 challenging *how* Defendants obligated funds that were set to expire on September 30, 2025, are not ripe for adjudication on the merits at this time, as Defendants have not produced an administrative record as to those claims. *See* 7/3/2026 Minute Order (directing Defendants to produce administrative record only as to claims identified above). To the extent Defendants move for summary judgment on that claim, it should be denied on this basis alone.

### A.  Defendants' Actions Are Contrary to Law

As explained in Plaintiffs' motion for summary judgment, Defendants' actions in undertaking the closeout scheme and in allocating rescinded funds to particular directives are

contrary to law. Pls.' MPSJ 11–32. They violate the directives in Section 7019(a) and Sections 7030–7061 by failing to obligate the minimum or specific amounts that Congress required for each program or topic. *Id.* at 13–15, 28–31. The closeout scheme also violates the Global Health Programs and Development Assistance appropriations provisions in title III of the SFOPS Act, both by not obligating those appropriations by September 30, 2026, *id.* at 15–17, and by obligating the funds for unauthorized purposes in violation of the Purpose Statute. *Id.* at 17–19.

Defendants' motion does not address the closeout or allocation actions at all, and their sole argument as to why their funding actions in general are not contrary to law is their discredited theory that the relevant appropriations "permit but do not require the Executive Branch to spend funds." Gov't MSJ 33 (cleaned up). This Court has previously rejected Defendants' theory, which would upend "the understanding of appropriations laws upon which Congress has operated for centuries." Dkt. 139 at 22–23. Moreover, Defendants' theory is non-responsive to several of Plaintiffs' claims that do not turn on the mandatory nature of the appropriations provisions in titles III and IV of the SFOPS Act.

As Plaintiffs explain in their summary judgment motion, the directives in Section 7019 and Sections 7030–7061 are not appropriations provisions, but rather direct statutory commands governing how Defendants must use the funds appropriated in titles III and IV. *See* Pls.' MPSJ 12. Whether the appropriations provisions themselves are mandatory is irrelevant to Defendants' violations of the unambiguous, mandatory commands in the directives.

Defendants offer barely any response regarding the directives. They entirely ignore the text of Sections 7030–7061, which provide that "*not less than*" particular amounts "shall be made available" for the designated activities. Defendants perfunctorily assert that "neither the Appropriations Acts nor the Continuing Resolutions include any 'specific, unequivocal command,'" Gov't MSJ 33 (quoting *Norton*, 542 U.S. at 63), but the requirement that "not less

27

than" a precise amount be obligated for the designated purpose is specific, unequivocal, and a command. Defendants do not articulate any theory for finding otherwise.

Defendants also cannot offer a coherent explanation for how Section 7019(a)'s directives are not mandatory. They cite a portion of the GAO Redbook indicating that "shall be available" language is not always mandatory, Gov't MSJ 34, but the language here is "shall be *made* available." More importantly, Congress mandated that the funds shall be made available "in the amounts specifically designated" in the tables. And Congress then specified by how much the agencies could deviate from those specifically designated amounts: 0% for Global Health Programs directives, 5% for the "Global Programs" table directives using Economic Support Fund money, and 10% for all other table directives (or more than 10% for these if agency leaders make certain determinations). 2024 Appropriations Act §§ 7019(b), 7019(d)(2)–(3), 138 Stat. 772. In directing that funds shall be made available in specifically designated amounts, subject to precise percentages by which the agency could deviate from those amounts, Congress clearly was mandating that the agencies obligate the specified amounts.

Defendants' theory that appropriations need not be fully spent also has no bearing on their Purpose Statute violations in connection with their closeout scheme. Plaintiffs explain in their motion for partial summary judgment how Defendants are violating the Purpose Statute, in conjunction with the Global Health Programs and Development Assistance appropriations provisions, in using these appropriations to pay closeout costs for terminated awards that were funded by different appropriations for different purposes in different years. Pls.' MPSJ 17–19. Regardless of whether Defendants must obligate the full amounts of these appropriations, they indisputably cannot obligate the funds for purposes that are not "the objects for which the appropriations were made." 31 U.S.C. § 1301(a).

28

As for Plaintiffs' claims that do stem from the mandatory nature of the title III and title IV appropriations, Defendants' theory that these appropriations are "permissive" is wrong for all the reasons this Court has already held. Defendants do not deny that Congress uses hallmark discretionary language when it wishes to provide agencies permission to obligate less than the full amounts appropriated, appropriating "up to," "not more than," or "sums not exceeding" specific amounts. Dkt. 139 at 24–25; Pls.' MPSJ 15–16. Defendants do not dispute that "Congress did use that language elsewhere in the [SFOPS] Act," but not in any of the relevant title III or title IV appropriations. Dkt. 139 at 24–25. And Defendants do not refute that this discretionary language would be entirely superfluous if, as they posit, appropriations provide the very same discretion to spend less than the full amount even without this language.

Far from containing the discretionary language necessary to make these appropriations permissive, the relevant title III and title IV appropriations contain language confirming that Congress intended all of the funds to be used. Nearly all of the appropriations specify that the full amount of funds "shall be apportioned" to, or "directly to," USAID or the State Department for use. *See* 138 Stat. 740, 742–43. The Global Health Programs appropriation for USAID employs unusually affirmative language: after appropriating $3.985 billion, Congress specified that "*this amount* shall be made available" for a list of programs and purposes. 138 Stat. 740 (emphasis added). Such language is not necessary to make the appropriations mandatory, though. There is a "bedrock expectation" that appropriations must be obligated in full absent the hallmark discretionary language that Congress has used for centuries when seeking to "displace" this presumption. Dkt. 139 at 25.

Indeed, as this Court previously noted and Defendants now fail to address, "[t]he ICA operates on the premise that when Congress appropriates money to the executive branch, the President is required to obligate the funds." *Id.* at 25 (quoting GAO, Impoundment of the

29

Advanced Research Projects Agency—Energy Appropriation Resulting from Legislative Proposals in the President's Budget Request for Fiscal Year 2018, B-329092, at 2 (Dec. 12, 2017)). "[I]f it were true that appropriations generally defer not just how, but whether, to spend money to the executive branch, it is hard to see what purpose would be served by the ICA's mechanisms allowing the President to submit a rescission proposal for budget authority." *Id.* The ICA's provisions allowing for rescission proposals would be nonsensical if the Executive already has discretion to allow appropriations to expire unspent.

Defendants also do not address the D.C. Circuit precedent already resolving this question. Then-Judge Kavanaugh held that an appropriation is a mandate that the Executive Branch spend "the full amount appropriated by Congress for a particular project or program," and neither the President nor an agency has "unilateral authority to refuse to spend the funds." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013).

Instead of addressing any of these issues, each of which independently refutes their theory, Defendants rely on copy-and-pasted "superficial argument[s]" that do not come close to justifying overturning the long-settled understanding of appropriations law. Dkt. 139 at 23.

### B. Defendants Have Unlawfully Withheld and Unreasonably Delayed Obligating the Expiring Funds

For Plaintiffs' claims under 5 U.S.C. § 706(1), Plaintiffs' summary judgment motion establishes that Defendants are unlawfully withholding the obligation of funds as required under the title III and IV appropriations and the directives in Sections 7019 and 7030–7061. Regarding the directives, under both the closeout scheme and the improper allocations of rescinded funds to directives, Defendants are unlawfully withholding the obligation of funds needed to meet the directives. Pls.' MPSJ 31–36. And Defendants' imminent failure to obligate all Global Health Programs and Development Assistance funds pursuant to the closeout scheme constitutes agency

30

action unlawfully withheld, as it violates the appropriations' requirements to obligate all the funds by September 30, 2026. *Id.* at 20.

Defendants barely address Plaintiffs' § 706(1) claims for agency actions unlawfully withheld. *See* Gov't MSJ 38–39. They simply repeat their arguments that "Plaintiffs do not allege any discrete agency action that the agencies are required to take, nor the violation of any specific, unequivocal command to obligate the appropriated funds." *Id.* As explained *supra* Section I.E, the failure to obligate particular amounts of funds for particular purposes is a discrete agency action. And Defendants' theory that the appropriations provisions and separate directives do not contain mandatory commands fails for all the reasons provided above.

Defendants fare no better on Plaintiffs' claims that the agencies are unreasonably delaying the obligation of expiring appropriations more broadly. *See* Pls.' MPSJ 32–36. For the funds expiring in September 2026, Defendants argue that "ample time exists to obligate those funds before they expire," and that "Plaintiffs do not explain their basis for arguing that such funds are being unreasonably delayed or unlawfully withheld." Gov't MSJ 38. Plaintiffs' motion and the supporting declaration of Joseph Carlile lay out the concrete evidence that Defendants are unreasonably delaying and unlawfully withholding the obligation of expiring funds. Defendants are obligating the expiring foreign assistance appropriations at a historically anomalous pace when compared to the obligation rate for the exact same appropriations over the prior five years. *See* Pls.' MPSJ 33–34 (citing Carlile Decl., Appendix A, Table 1). Across the seven appropriations accounts expiring this year, the median percentage of funds obligated is just 6.64%. *Id.* Thus, with just a few months remaining before funds expire, half of the relevant appropriations still have *more than 93%* of the funds unobligated, with some of the other accounts not much higher. In comparison, in the prior five years the median percentage obligated at this point in the cycle across the seven accounts was above 36%, nearly six times greater. *Id.*

31

Contrary to Defendants' claims, it is not "standard practice" or "usual[]" to have such enormous amounts of expiring foreign assistance funds unobligated with this little time left. Gov't MSJ 30.

The examples that Defendants cite of obligations already undertaken serve only to highlight their meager actions to date. They point to $27 million in obligations from the Economic Support Fund, *see* Gov't MSJ 30, out of the $1.94 billion in Economic Support Fund appropriations from the 2025 Continuing Resolution set to expire this year, Carlile Decl. Table 2. They note an obligation of $72 million in Development Assistance funds, a paltry percentage of the $1.43 billion in Development Assistance funds expiring in September. Defendants point to various amounts of Global Health Programs funds that have been obligated or "approved for obligation," Gov't MSJ 31, but it appears that only $492.25 million of these amounts are from the "2025/2026" GHP appropriations that expire this year, *see* AR 1322–27, 1388, which is again just a fraction of the more than $3.485 billion in GHP appropriations expiring this year. The limited obligations in the administrative record help, not undermine, Plaintiffs' claims that the agencies are unreasonably delaying and unlawfully withholding the obligation of foreign assistance funds expiring this year.[5]

What's more, Defendants nowhere apply the *TRAC* factors that govern the analysis of a § 706(1) claim for agency action unreasonably delayed. *See* Gov't MSJ 37. Defendants cannot possibly obtain summary judgment on the merits of this claim without having applied those factors, which support Plaintiffs in any event. *See* Pls.' MPSJ 34–36.

---

[5] The GHP funds that Defendants are obligating are not even for purposes that Congress specified in the directives; instead, they are largely for headquarters operations and a new faith- and community-based initiative. AR 1322–23

### C. Defendants' Actions Are Arbitrary and Capricious

Defendants' final agency actions in undertaking the closeout scheme and the allocations of rescinded funds are arbitrary and capricious. Regarding the closeout scheme, Defendants did not "examine the relevant data" and articulate a "rational connection" between that data and their actions. The record contains no estimates of closeout costs that justify reserving and using GHP and DA appropriations to pay those costs. Pls.' MPSJ 21. And Defendants never explained why they selected *these* expiring GHP and DA appropriations to pay closeout costs for terminated USAID awards, as opposed to non-expiring accounts, which were an alternative that Defendants never addressed. *Id.* As for the allocations of rescinded funds, the record contains no "satisfactory explanation" for why Defendants allocated the rescinded funds to the directives, nor does it contain any indication that Defendants considered reliance interests or alternatives in allocating the rescinded funds. *Id.* at 32. Defendants' actions in allocating rescinded funds and undertaking the closeout scheme fail to meet the most basic requirements of reasoned decision-making.

Defendants' request for summary judgment on the arbitrary and capricious claims again does not address the closeout scheme or allocations of rescinded funds, despite Defendants being on notice that Plaintiffs would be focusing on these issues. Instead, Defendants vaguely gesture toward the "foreign policy context" of these actions, flirting with their previous defense that requiring compliance with the appropriations here would unconstitutionally infringe on the President's Article II powers. *See* Gov't MSJ 28 ("should Congress direct spending so as to interfere with the President's . . . authority over foreign affairs, that *may* violate Article II of the U.S. Constitution"). But Defendants do not assert that any of the appropriations or directives are actually unconstitutional.

33

Defendants nevertheless seem to suggest that the foreign policy context of these agency actions alters the APA's requirements for reasoned decision-making, but their theory is undeveloped. They cite no case ever holding as such. They point to *Trump v. Hawaii*, 585 U.S. 667, 686 (2018), for the proposition that "a court should not conduct 'a searching inquiry into the persuasiveness of the President's justifications.'" Gov't MSJ 28, but that case has no bearing here at all. It concerned a presidential action, not agency actions, and consequently did not involve APA claims at all. And it concerned Presidential power to exclude foreign nationals from the country, not agency decisions implementing Congress's spending commands.

Defendants therefore find no support for their suggestion that the standard requirements of reasoned decision-making, such as consideration of "reliance interests," do not apply to actions in areas where the Executive Branch has "significant discretion." Gov't MSJ 28–29. Supreme Court decisions from actual APA cases refute their notion. In *Department of Homeland Sec. v. Regents of the University of California*, 591 U.S. 1 (2020), the Court vacated DHS's elimination of DACA for failure to meet core APA requirements, including the requirement to "address . . . legitimate reliance interests" and to "consider [an] important aspect of the problem." *Id.* at 30 (quotations omitted). It did not matter that the challenged actions were in an area where the Executive has "significant discretion" (immigration enforcement), or that the plaintiffs there did not "hold[] a right" to the benefits DACA offered. Gov't MSJ 29. The APA's prohibition on arbitrary and capricious agency action still applied there, as it does here.

Defendants' remaining arbitrary-and-capricious points prove too much. They highlight that the agencies provided detailed explanations for the few obligations they have entered this year, and for their decision last year to deviate from certain table directives to the extent authorized by Section 7019(b) of the SFOPS Act. *See* Gov't MSJ 29–32. Such explanations are wholly lacking for Defendants' decisions underlying the closeout scheme and their allocations of

34

rescinded funds. The record is conspicuously void of *any* justifications or reasoned bases for these actions. Agencies cannot meet the APA's requirements for reasoned decision-making where there is no reasoning behind their actions at all.

III.    **Defendants' Failure to Obligate the Funds in the Special Message Violates the APA**

A.  **Plaintiffs Are Entitled to Declaratory Relief on Counts 13 and 14**

Plaintiffs have explained why they are entitled to summary judgment on their claim seeking declaratory relief that Defendants unlawfully failed to obligate funds included in the August 2025 special message. Pls.' MPSJ 36–38. Defendants largely repeat arguments this Court has already rejected. *See* Gov't MSJ 34–37; Dkt. 139 at 31–32.

*First*, this Court has already rejected Defendants' argument that their conduct was lawful because "the ICA does not prohibit the Executive from transmitting rescission proposals within 45 days of the expiration of the funds." Gov't MSJ 35. As this Court recognized, "Plaintiffs' claims here are premised on Defendants' duty to comply with the directives of the relevant *appropriations acts*." Dkt. 139 at 31 (emphasis added). Those appropriations acts "remain[ed] the law of the land," and required Defendants to obligate all appropriated funds before they expired. *Id.* The ICA is "explicit that it is congressional action—not the President's transmission of a special message—that triggers rescission of the earlier appropriations." *Id.* Defendants' argument that the ICA somehow allows them to impound funds in the last 45 days before the funds expire "finds no support in the text of the ICA" and would "undermine the very purpose of the ICA by turning its protections against impounding funds into a mechanism for doing so." *Id.* at 32.

*Second*, it is irrelevant that with a pocket rescission, funds "lapse not by Presidential order, but by the text of the appropriations statute." Gov't MSJ 35. Again, Plaintiffs' claim is that Defendants acted unlawfully by failing to obligate the funds before they expired, in accordance

with the appropriations laws. Nor do the GAO opinions from the 1970s validate Defendants' position. *See id.* GAO opinions that are "inconsistent with the statutory language" are "not . . . entitled to deference." *Bowsher v. Merck & Co.*, 460 U.S. 824, 837 (1983). And deference is especially unwarranted where GAO has reversed its prior opinions. GAO, *Impoundment Control Act—Withholding of Funds through Their Date of Expiration*, B-330330 (Dec. 10, 2018).

*Third*, as explained above, the appropriations statutes do not give the Executive Branch discretion "to determine whether to expend funds up to the amounts appropriated." Gov't MSJ. 36. As this Court has held, such a theory would upend "the understanding of appropriations laws upon which Congress has operated for centuries." Dkt. 139 at 23. Defendants again confuse the issue by arguing that the ICA "imposes no . . . requirement on the President to make withheld budget authority available for obligation before the end of a fiscal year." Gov't MSJ 36. It is the *appropriations acts* that require Defendants to obligate the funds by the deadline. And nothing in the ICA permits Defendants not to obligate funds while Congress considers a rescission package. To the contrary, the ICA makes clear that "[n]othing contained in this Act . . . shall be construed as superseding any provision of law which requires the obligation of budget authority." 2 U.S.C. § 681(4). Indeed, Defendants acknowledge that the ICA "do[es] not supersede the more specific provisions of the relevant appropriations laws." *Id.* But it is those appropriations laws that required Defendants to obligate the funds before the deadline expired.

### B. Defendants' Ongoing Failure to Obligate Funds Included in the Special Message Violates § 683(b)

The Court should also deny Defendants' cross-motion as to Plaintiffs' claims that Defendants must obligate the funds included in the special message pursuant to 2 U.S.C.

§ 683(b) (Counts 15–18).[6] Section 683(b) provides that "[a]ny amount of budget authority proposed to be rescinded . . . in [a] special message shall be made available for obligation unless, within the prescribed 45-day period, the Congress has completed action on a rescission bill rescinding all or part of the amount proposed to be rescinded."

Defendants did not obligate the $4 billion in the August 2025 special message based on their theory that § 683(b) permits withholding the obligation of those funds for "the prescribed 45-day period," even if that period extends beyond the funds' original expiration date. But if "the prescribed 45-day period" runs past the statutory expiration date, so does the immediately previous clause that the funds "shall be made available for obligation" unless Congress rescinds them within that 45-day period. That clause does not impose a limitation on when funds proposed to be rescinded, but not rescinded within 45 days, "shall be made available for obligation." Defendants cannot selectively pick and choose which parts of § 683(b) apply after the funds were set to expire.

Defendants' interpretation would also make no sense as a matter of Congressional intent. There is no sensible reason why Congress would have wanted to give itself 45 days to consider a rescission proposal, even if the 45 days extended beyond the funds' expiration date, if the agency would not be required to obligate the funds after Congress's consideration ended. Otherwise, there would be zero purpose served by allowing for consideration of the proposal during the post-expiration period.

Notably, Defendants do not contend that the D.C. Circuit's prior opinion forecloses Plaintiffs' APA cause of action to enforce § 683(b). Indeed, the D.C. Circuit concluded only that

---

[6] Plaintiffs have not moved for summary judgment on this § 683(b) claim because it is not time-sensitive. Plaintiffs respectfully submit that the Court may wish to defer ruling on this claim at this time, in the interest of promoting efficient resolution of the claims that are time sensitive.

"the ICA precludes review of any APA challenge by the grantees to the Executive's refusal to obligate funds *at least while the ICA's statutory processes run their course*." *GHC*, 153 F.4th at 21 n.18 (emphasis added). The Court left open "that APA review may be available afterwards." *Id.* The ICA processes have now "run their course" for the funds in the August 2025 special message. Defendants' arguments about interfering with interbranch dialogue no longer apply, and Plaintiffs may bring APA claims that Defendants are violating § 683(b).

Defendants do not dispute that they have not made available for obligation the funds at issue in the August 2025 special message, notwithstanding § 683(b)'s clear requirement that such funds "shall be made available" given that Congress never took action on the proposed rescission. Accordingly, the Court should deny Defendants' cross-motion as to these claims.

## IV.    The Court Should Defer Ruling on Plaintiffs' Separation of Powers Claim

Inexplicably, Defendants do not move for summary judgment on Plaintiffs' actual constitutional claim: that "Defendants are violating the separation of powers." TAC ¶ 167. Instead, Defendants largely copy and paste an alternative argument from their motion to dismiss (Dkt. 176 at 40–41), asserting that there is a Take Care Clause claim "[e]mbedded in [Plaintiffs'] Sixth and Seventh Claims for Relief." Gov't MSJ 39. Not so. As Plaintiffs explained in their opposition to Defendants' motion to dismiss (Dkt. 178 at 42 n.5), Plaintiffs have *not* asserted an independent claim under the Take Care Clause. Rather, Plaintiffs referenced the Take Care Clause only as authority explaining the constitutional separation of powers between the legislative and executive branches: The Constitution vests exclusive lawmaking power in Congress and directs the President to faithfully execute Congress's laws, including appropriations laws. *See* TAC ¶¶ 164–65. Plaintiffs' claim is that Defendants are violating the separation of powers by invoking supposed Article II authority not to spend foreign-assistance funds as Congress directed. *See id.* ¶¶ 166–67. Defendants nevertheless devote their entire

38

constitutional argument to arguing that an unasserted Take Care Clause claim would fail. Gov't MSJ 38–40. That argument does not entitle Defendants to summary judgment on the claim Plaintiffs actually pleaded.

Because neither Plaintiffs nor Defendants move for summary judgment on Plaintiffs' actual separation-of-powers claim, the Court can and should defer ruling on Count 6. Plaintiffs recognize that the D.C. Circuit previously held that Plaintiffs could not pursue their funding-based separation-of-powers claim through a freestanding constitutional cause of action, based on the panel's interpretation of *Dalton v. Specter*, 511 U.S. 462 (1994). *See GHC*, 153 F.4th at 17–23. Plaintiffs respectfully preserve their contention that the panel's interpretation of *Dalton* is incorrect, but they do not ask this Court to revisit that holding or adjudicate the underlying constitutional merits.

Deferring judgment on this claim is particularly appropriate because the *en banc* D.C. Circuit is presently reconsidering the same *Dalton* question in *Climate United Fund v. Citibank, N.A.*, No. 25-5122, and *National Treasury Employees Union v. Vought*, No. 25-5091. Because the resolution of Count 6 is unnecessary to adjudicate Plaintiffs' statutory claims or award the relief Plaintiffs presently seek, there is no reason to enter judgment on the basis of precedent that the *en banc* court may soon clarify or displace.

## V. To the Extent the APA Does Not Afford Complete Relief, Plaintiffs Are Entitled to *Ultra Vires* or Mandamus Relief

### A. Defendants' Conduct Is *Ultra Vires*

If the APA does not afford complete relief here, the Court should grant summary judgment on Plaintiffs' *ultra vires* claims. Pls.' MPSJ 39–40. Defendants are wrong that the D.C. Circuit's prior opinion in this case forecloses Plaintiffs' *ultra vires* claims here. The D.C. Circuit addressed only the availability of an *ultra vires* claim to enforce the provisions of the ICA, not

39

the relevant appropriations provisions of titles III and IV. *See* 153 F.4th at 20–21 & n.18; *see also id.* at 36 n.4 (Pan, J., dissenting). The D.C. Circuit certainly did not address Plaintiffs' current *ultra vires* claims based on violations of the Purpose Statute for GHP and DA funds, and based on violations of Congress's unambiguous commands in Section 7019(a) and Sections 7030–7061 to obligate minimum or specific amounts for particular programs or topics.

### B.  Alternatively, Mandamus Is Warranted

If neither the APA nor *ultra vires* review affords complete relief, Plaintiffs are entitled to mandamus. *See* Pls.' MPSJ 40. Defendants attempt to distinguish *Aiken* on the ground that the Nuclear Waste Policy Act compelled agency action. But so too here: the appropriations acts "impose a clear duty on the agency Defendants to make those funds available for obligation, allowing Plaintiffs and others to compete for them." Dkt. 139 at 30. The language in the directives that "not less than" precise amounts, or "specifically designated" amounts, "shall be made available" for designated purposes is at least as definitive as the statute in *Aiken* that the agency "shall consider" and "shall issue a final decision." 725 F.3d at 257, 266–67.

The Supreme Court's emergency order does not resolve the mandamus claims on the merits because, as discussed above, the Court's order was expressly preliminary and did not address the actions Defendants have since taken to reserve and use funds for closeouts and to allocate rescinded funds to circumvent compliance with the directives.

### VI.  Plaintiffs' Proposed Relief Is Appropriate and Necessary

Plaintiffs seek appropriate relief under the APA and in relation to their *ultra vires* and mandamus claims. *See* Pls.' MPSJ 39–40. On the APA, Defendants erroneously assert that "at most this Court has authority pursuant to the APA to vacate the allegedly unlawful agency actions and remand the matter to Defendants for further explanation or other action consistent with the correct legal standards." Gov't MSJ 44. Defendants ignore the default relief under

40

§ 706(1), which is that "the reviewing court shall compel agency action unlawfully withheld or unreasonably delayed." For Plaintiffs' § 706(2) claims, where the final agency actions encompass decisions not to comply with the mandates of the directives or appropriations provisions, holding unlawful and vacating those decisions necessarily means that the agencies must comply with those mandates. Such compliance reflects, in Defendants' words, the "action[s] consistent with the correct legal standards." Gov't MSJ 44. Moreover, it is well-settled that after finding that a final agency action is contrary to law, a district court may enter a permanent injunction to prevent future violations if the four-factor test for injunctive relief is satisfied. *See In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d 123, 137 (D.C. Cir. 2020) (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010)); *see also, e.g.*, *Ramirez v. ICE*, 568 F. Supp. 3d 10, 22 (D.D.C. 2021) (collecting cases); *Ridgely v. Lew*, 55 F. Supp. 3d 89, 98 (D.D.C. 2014). The Court can easily reject Defendants' cramped view of the final relief available here.

Defendants' remaining points regarding the scope of relief are uncontested. Plaintiffs seek relief only with respect to the categories of appropriations and directives under which they compete for funds, as outlined in Exhibits E and F to Plaintiffs' motion for partial summary judgment. *See* Pls.' MPSJ 43 n.14; Dkts. 202-15, 202-16. Plaintiffs do not seek relief regarding Foreign Military Financing or International Military Education and Training funds, or any other funds for which Plaintiffs have not submitted evidence that they compete. *See* Gov't MSJ 44–45.

## CONCLUSION

The Court should deny Defendants' motion for summary judgment.

Dated: August 3, 2026                    Respectfully submitted,

                                         */s/ Daniel F. Jacobson*
                                         Daniel F. Jacobson (D.C. Bar # 1016621)
                                         Stephen K. Wirth (D.C. Bar # 1034038)
                                         John Robinson (D.C. Bar # 1044072)
                                         Brian C. Rosen-Shaud (D.C. Bar # 90042065)
                                         Nina Cahill (D.C. Bar # 1735989)
                                         JACOBSON LAWYERS GROUP PLLC
                                         5100 Wisconsin Ave. NW, Suite 301
                                         Washington, DC 20016
                                         Tel: (301) 823-1148
                                         dan@jacobsonlawyersgroup.com

                                         *Counsel for Plaintiffs*