**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| GLOBAL HEALTH COUNCIL, *et al.*,<br><br>　　　　*Plaintiffs*,<br><br>　　v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>　　　　*Defendants*. | Civil Action No. 25-cv-402 (AHA) |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR
MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

ARGUMENT..........................................................................................................................2

    I.  Plaintiffs Have Not Forfeited Any Claims Related to the Closeout Scheme ......................2

    II.  Plaintiffs' Claims Are Reviewable ..................................................................................7

        A.  Plaintiffs' Claims Are Not Precluded by the Impoundment Control Act......................7

        B.  Plaintiffs Challenge Final Agency Action .................................................................10

        C.  Plaintiffs' Claims Are Ripe........................................................................................12

    III. Defendants' Funding Decisions Regarding Funds Expiring on September 30, 2026 Violate the APA....................................................................................................12

        A.  Defendants' Closeout Scheme Is Unlawful ................................................................12

            1.  Defendants Do Not Rebut the Three Independent Ways the Closeout Scheme Violates Congress's Commands...........................................................12

            2.  Defendants Supply No Reasoned Explanation for the Closeout Scheme..............16

        B.  Defendants Are Violating Directives by Allocating Rescinded Funds to Them .........18

            1.  Defendants' Non-Compliance with Directives from Allocating Rescinded Funds Is Contrary to Law and Agency Action Unlawfully Withheld ...................18

            2.  Defendants' Allocation of Rescinded Funds Is Arbitrary and Capricious ...........24

        C.  Defendants Have Unlawfully Withheld and Unreasonably Delayed Obligating Expiring Funds.........................................................................................................24

    IV. Defendants' Failure to Obligate the Funds in the Special Message Violates the APA...........................................................................................................................26

    V. Plaintiffs Have Not Forfeited Claims Related to Funds Set to Expire in 2025 ..................27

    VI. Plaintiffs' Proposed Order Provides Them with Complete Relief ...................................29

CONCLUSION.....................................................................................................................30

# TABLE OF AUTHORITIES

**Cases**

*Am. Petroleum Inst. v. EPA*,
683 F.3d 382 (D.C. Cir. 2012)............................................................................... 12

*Dep't of State v. AIDS Vaccine Advoc. Coal.*,
146 S. Ct. 19 (2025).......................................................................................... 7, 9

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).............................................................................................. 6

*Bostock v. Clayton Cnty., Georgia*,
590 U.S. 644 (2020)...................................................................................... 19, 22

*Bridgeport Hosp. v. Becerra*,
108 F.4th 882 (D.C. Cir. 2024)............................................................................. 29

*Califano v. Yamasaki*,
442 U.S. 682 (1979)............................................................................................ 29

*Cboe Futures Exch., LLC v. SEC*,
77 F.4th 971 (D.C. Cir. 2023)............................................................................... 17

*City of Los Angeles v. Adams*,
556 F.2d 40 (D.C. Cir. 1977)................................................................................ 20

*Clinton v. New York*,
524 U.S. 417 (1998)............................................................................................ 26

*CREW v. OMB*,
791 F. Supp. 3d 29 (D.D.C. 2025)........................................................................ 11

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020)......................................................................................... 17, 24

*Elec. Frontier Found. v. DOJ*,
739 F.3d 1 (D.C. Cir. 2014)................................................................................. 16

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025)................................................................................ 29

*IMS, P.C. v. Alvarez*,
129 F.3d 618 (D.C. Cir. 1997).............................................................................. 26

*Jo v. District of Columbia*,
582 F. Supp. 2d 51 (D.D.C. 2008).......................................................................... 7

*Loving v. IRS*,
917 F. Supp. 2d 67 (D.D.C. 2013)........................................................................ 30

*Mexichem Specialty Resins, Inc. v. EPA*,
    787 F.3d 544 (D.C. Cir. 2015) ...................................................................................... 30

*Morton v. Mancari*,
    417 U.S. 535 (1974) .............................................................................................. 19, 21

*Nat'l L. Ctr. on Homelessness & Poverty v. VA*,
    842 F. Supp. 2d 127 (D.D.C. 2012) ............................................................................ 26

*Navajo Sch. Bd., Inc. v. Babbitt*,
    87 F.3d 1338, 1348 (D.C. Cir. 1996) .......................................................................... 20

*Planned Parenthood of Cent. N.C. v. Cansler*,
    877 F. Supp. 2d 310 (M.D.N.C. 2012) .......................................................................... 7

*Sharp v. Rosa Mexicano, D.C., LLC*,
    496 F. Supp. 2d 93 (D.D.C. 2007) ................................................................................ 7

*Sierra Club v. EPA*,
    353 F.3d 976 (D.C. Cir. 2004) .................................................................................... 17

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) .................................................................................................... 29

*Wiley v. Glassman*,
    511 F.3d 151 (D.C. Cir. 2007) ...................................................................................... 6

**Statutes**

2 U.S.C. § 687 .................................................................................................................... 8

5 U.S.C.
    § 706(1) ................................................................................................................. 12, 26
    § 706(2) ................................................................................................................. 26, 39

22 U.S.C. § 7019(a) .................................................................................................. *passim*

31 U.S.C. § 1301(a) ........................................................................................................ 16

Rescissions Act of 2025,
    Pub. L. 119–28 ..................................................................................................... 19, 20

**Rules**

Federal Ruels of Civil Procedure
    Rule 8 ........................................................................................................................... 6
    Rule 15(d) ..................................................................................................................... 6
    Rule 56(a) .................................................................................................................... 30

**Regulations**

2 C.F.R. § 200.405(c) ...................................................................................................... 15

48 C.F.R. § 31.201-4.................................................................................................... 15

**Other Authorities**

*Dep't of Health & Hum. Servs.—Detail of Office of Cmty. Servs. Emps.*,
    64 Comp. Gen. 370, 375–76, 381–83 (1985) (B-211373)........................................... 9

*Dep't of Homeland Sec.—Border Barrier Construction & Obligations*,
    B-335747 (Comp. Gen. Apr. 22, 2024) ..................................................................... 9

GAO, *Principles of Federal Appropriations Law*, GAO-16-464SP (4th ed. 2016)....................... 8

OMB Circular A-11 .............................................................................................. 8, 10

*Questions Concerning Availability & Use of Funds Appropriated to NIH*,
    64 Comp. Gen. 359, 365–66 (1985) (B-217722).......................................................... 9

**INTRODUCTION**

Stripped of its overheated rhetoric and erroneous claims of lack of "notice" and "forfeiture," Defendants' opposition makes clear that they have no real factual or legal response to the violations Plaintiffs have established.

Regarding the closeout scheme, Defendants do not deny that they are using Global Health Programs (GHP) and Development Assistance (DA) appropriations to pay closeout costs on terminated awards that have nothing to do with global health or development. Defendants do not deny that, as a result, they will violate numerous table and bill directives requiring use of GHP and DA funds for specific programs and topics. Indeed, they now reveal that the GHP and DA funds will be used for a "new central audit mechanism" to "close out USAID." That most certainly is not the purpose for which Congress appropriated these funds, resulting in an undeniable violation of the Purpose Statute. In a precedential opinion issued earlier today, the D.C. Circuit confirmed the vital importance of the Purpose Statute, explaining that "Government funds may be spent only as Congress directs." *Nat'l Tr. for Historic Pres. in the U.S. v. NPS*, No. 26-5123, slip op. at 69 (D.C. Cir. Aug. 7, 2026) (citing 31 U.S.C. § 1301(a). And Defendants hardly dispute the third legal violation attendant to the closeout scheme: they do not deny that they will not use any of these GHP and DA funds for substantive programming until after all closeouts are complete, which will not be until after the funds expire on September 30, 2026.

With respect to their allocation of rescinded funds to directives, Defendants admit that they intentionally allocated as many rescinded funds as possible to directives they disfavor on policy grounds, to avoid complying with these directives. Defendants seek to justify their actions by invoking purported customs and prior practice, but none of that can supersede the plain text of the statutory directives, which have not been repealed and contain unambiguous "shall" commands. Defendants do not dispute that, due to the allocations, they will not comply with

many directives with which they could comply using non-rescinded funds. Defendants trifle with the notion that they could practically meet *all* of the directives. Their points on this front are wrong, but the legal violations would stand even if they were right. Under binding D.C. Circuit precedent that Defendants fail to address, they must maximize compliance with the directives as much as possible even if there is a funding shortfall. It is uncontested that they have not done so.

With the record and the law against them, Defendants devote much of their opposition to attacking Plaintiffs and trying to keep the Court from reaching the merits. Their principal accusation—that Plaintiffs somehow "forfeited" their challenge to the closeout scheme revealed in the Congressional Notification—is both wrong on the law and outrageous in light of the course of proceedings. Defendants themselves argued months ago that the Notification added nothing new to Plaintiffs' existing claims. They voiced no objection at all when the Court repeatedly ordered them to include everything underlying the Notification—including "how the conclusions in the CN were reached and any basis for them"—as part of the administrative record on the claims as pleaded. Defendants cannot now claim "sandbagging" because the record they produced reveals additional evidence of the violations Plaintiffs already pleaded.

The Court should grant Plaintiffs partial summary judgment and order the relief necessary to ensure that the appropriations are used as Congress directed before they expire.

**ARGUMENT**

## I.    Plaintiffs Have Not Forfeited Any Claims Related to the Closeout Scheme

**a.** Defendants' argument that Plaintiffs "forfeited" their challenge to the closeout scheme is not only wrong; Defendants themselves affirmatively waived that argument several times over.

Start with Defendants' motion to strike Plaintiffs' June 1 Notice about the Congressional Notification. Defendants emphatically took the position that the closeout scheme is encompassed by Plaintiffs' existing complaint. Defendants characterized the Notice as a sur-reply and argued

2

that the matters addressed in a sur-reply "must truly be new," and that "Plaintiffs cannot meet that standard here." Dkt. 184 at 2. "As to the Congressional Notice itself," Defendants asserted, "Plaintiffs have long known that the Global Health Programs funding expires on September 30, 2026." *Id.* Defendants argued that Plaintiffs' Notice about the Congressional Notification "makes arguments regarding impoundment and non-obligation of funds, which are issues fully addressed by the parties' briefing on Defendants' pending motion to dismiss." *Id.* Defendants then compared Plaintiffs' discussion of the Congressional Notification to the allegations in the Third Amended Complaint, to show that the issues arising from the Notification were already encompassed within the complaint. *Id.* Defendants urged the Court to strike Plaintiffs' Notice because it "merely reiterates arguments already made and does not add anything new." *Id.*

Beyond the motion to strike, Defendants waived the argument repeatedly throughout the process of producing the administrative record. Defendants clearly believed the issues surrounding the Congressional Notification were encompassed within Plaintiffs' pleaded claims, as they included the Congressional Notification in the original (deficient) administrative record. AR 230–34; *see* Dkt. 187-2. They then agreed to produce the decision-making materials underlying the Congressional Notification in subsequent productions, again without ever raising any objection that it was not within the scope of Plaintiffs' claims.

Indeed, the July 2 hearing at which Defendants agreed to produce all materials underlying the Notification highlights the absurdity of Defendants' claimed lack of "notice" and "sandbagging," and the falseness of their assertion that they "were not directed to produce information specific to [Plaintiffs'] closeout cost theory." Gov't Opp. 9. At the hearing, the Court and the parties extensively discussed the Notification's significance to Plaintiffs' existing claims and the record to be produced. *See* 7/2/2026 Hr'g Tr. 36:23–44:1, 49:5–52:20. Plaintiffs explained, for example, that the record should include the "calculation" of how Defendants

decided to reserve $19 billion for closeouts, and the Court understood Plaintiffs to be asking for "anything that went into the numbers and other decisions that are in the CN, which Mr. Anon already said he thinks is complete but wants to button things up." *Id.* at 50:2–51:3.

The Court then made clear that "any" documents that went into the Congressional Notification were "fair game to include in the administrative record." 7/2/2026 Hr'g Tr. 52:4–8. The Court stressed to Defendants' counsel that it wanted to "make sure when you go back it's with that in mind, that there would be any memoranda and back-and-forth communications, internal stuff about [the Congressional Notification] would be within the scope of [] an administrative record." *Id.* at 52:8–14. Rather than object that such materials would be outside the scope of the pleaded claims, counsel responded with a "thumbs-up." *Id.* Later in the same hearing, the Court again emphasized, "I do want to make sure that as it relates to the April 2026 CN, the administrative record is complete, and so it would be any documents showing *how the conclusions in the CN were reached* and *any basis for them*." *Id.* at 61:9–12 (emphasis added). The next day, the Court expressly ordered Defendants to "complete and supplement the administrative record to include any documents relating to . . . the April 2026 congressional notification, to the extent not already provided." 7/3/2026 Minute Order.

There is more. At the July 8 status conference, Defendants' counsel again agreed to produce materials "regarding the congressional notification," including a "master document that [went] to the . . . decision-maker." 7/8/2026 Hr'g Tr. 4:23–5:10. Defendants then stipulated that they would produce, to the extent not already provided, "any other documents responsive to . . . the Court's July 3, 2026 Minute Order [regarding] the April 2026 congressional notification." Dkt. 190 at 3. Those productions ultimately included the OMB approval memorandum and supporting materials underlying the Congressional Notification. AR 558–60, 567–76.

4

Having received notice months ago regarding Plaintiffs' arguments on the Congressional Notification, having affirmatively argued that those issues were already encompassed within the operative complaint, and having repeatedly treated the Notification and its supporting decision-making materials as properly part of the administrative record, Defendants waived any pleading-scope objection. Defendants cannot be heard to argue now, with weeks left before funds expire, that the Court must turn a blind eye to decisions reflected in the Notification.

More troubling than Defendants' waiver, however, is their statement that "Defendants did not assemble a record concerning closeout cost methodology." Gov't Opp. 10. If true, Defendants have failed to comply with the Court's directives at the July 2 hearing and in the July 3 minute order. Defendants appear to be laying the groundwork for arguing that the Court lacked a proper record to rule on Plaintiffs' arbitrary-and-capricious claims (or others), and the Court should not tolerate it. Plaintiffs respectfully submit that the Court should require Defendants to either clarify that the record is complete in this respect or show cause why they should not be found to have violated the court's orders, with appropriate evidentiary sanctions to attach.[1]

**b.** Waiver aside, Plaintiffs' complaint fully encompasses their legal claims concerning the closeout scheme. Count I of the Third Amended Complaint alleges:

> Defendants have made a final decision not to obligate, by the deadlines set by Congress, the full amounts that Congress has appropriated and required to be obligated for specific purposes, including in the top-level categories of

---

[1] In arguing that Plaintiffs have forfeited claims relating to the closeout scheme, Defendants also make a passing reference to Plaintiffs' claim relating to the allocation of rescinded funds. Gov't Opp. 9. Defendants do not develop any argument that those claims are not within the scope of the case, and the entire section is otherwise limited to the closeout scheme, as evidenced by its title: "The 'Closeout Scheme' Theory Appears Nowhere in the Third Amended Complaint and is Forfeited." Gov't Opp. 6. In any event, as Defendants recognize, the Third Amended Complaint expressly alleges that allocating rescinded funds in such manner is unlawful, *see* TAC ¶¶ 208–16 (Count 12), and the claims now at issue merely reflect an additional iteration of such unlawful action that was revealed in the administrative record, and are encompassed within Counts 1-6.

appropriations in Titles III and IV, in the tables incorporated by reference in Section 7019(a), and in the directives in Sections 7030–7061.

TAC ¶ 129. Count I further alleges:

By refusing to spend funds that Congress has appropriated for USAID's operations *and for specified foreign-assistance programs and purposes*, or by spending the funds *on purposes other than those which Congress specified*, Defendants have violated federal statutes including the 2024 Appropriations Act, the 2025 Continuing Resolution, . . . and *the Purpose Act*.

*Id.* ¶ 132 (emphases added); *see also id.* ¶¶ 137–38, 148, 154, 158, 167. Plaintiffs' claims about the closeout scheme allege these precise final decisions and legal violations. *See* Pls.' MPSJ 13–19. And Plaintiffs' Prayer for Relief requested the very relief that Plaintiffs seek in relation to the closeout scheme. *E.g.*, TAC Prayer ¶ 3. The administrative record subsequently disclosed *how* Defendants are carrying out the already-pleaded legal violations, and Plaintiffs' summary judgment motion applied those facts disclosed in the record to the claims already pleaded.

Rule 8 does not require a plaintiff to catalogue the evidence—or the precise mechanism implementing an alleged violation—that the administrative record will eventually disclose. "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007). The D.C. Circuit has held that even a claim first identified in summary-judgment briefing should not be struck where its factual basis is "substantially similar" to a pleaded claim and there is no undue prejudice. *Wiley v. Glassman*, 511 F.3d 151, 159 (D.C. Cir. 2007) (*per curiam*).

Nor does Rule 15(d)—which *allows* a party to supplement its pleading with events that happened after the date of the pleading—impose a rolling obligation to update a complaint whenever post-complaint events illuminate or provide additional evidence of an existing claim. Defendants' contrary rule would require plaintiffs in *every* case to supplement their complaints

6

whenever discovery or an administrative record revealed additional evidence supporting an existing claim. Neither Rule 8 nor Rule 15(d) requires that exercise.

Defendants' cases only confirm Plaintiffs' position. They involve plaintiffs who attempted to introduce entirely new *claims* at summary judgment. *See, e.g. Sharp v. Rosa Mexicano, D.C., LLC*, 496 F. Supp. 2d 93, 97 n.3 (D.D.C. 2007) (noting that plaintiff may not "raise [] new claims" through summary judgment); *Jo v. District of Columbia*, 582 F. Supp. 2d 51, 65 (D.D.C. 2008) (similar). Plaintiffs here have not sought to add any new claims, parties, or additional relief based on the closeout scheme; their motion seeks judgment and relief only on the claims already pleaded. *See Planned Parenthood of Cent. N.C. v. Cansler*, 877 F. Supp. 2d 310, 312 n.1 (M.D.N.C. 2012) (holding that the plaintiff "need not amend its Complaint to include such additional facts" where post-complaint events added no claim, relief, or theory).

## II.    Plaintiffs' Claims Are Reviewable

### A.    Plaintiffs' Claims Are Not Precluded by the Impoundment Control Act

Plaintiffs bring two categories of claims as relevant to Defendants' ICA preclusion arguments. In one category, Plaintiffs allege that Defendants are failing to obligate funds at all, by reserving GHP and DA funds as part of the closeout scheme (Pls.' MPSJ 15–17), by unlawfully withholding or unreasonably delaying the obligation of soon-expiring funds more broadly (*id.* at 32–36), and by having failed to obligate the funds in the pocket rescission (*id.* at 36–38). Plaintiffs' prior briefing explains why *AVAC*'s preliminary order concerning the funds subject to the August 28 special message does not control these claims and why the ICA's text, structure, and history foreclose Defendants' preclusion arguments. Plaintiffs rest on those fully developed arguments.

The second category of claims does not rest on any impoundment of funds by failing to obligate them before they expire. These claims instead relate to how Defendants are using the

7

appropriations, and specifically that they are not complying with the mandatory commands in Sections 7019(a) and 7030–7061 to use the specified amounts of funds for the purposes in each directive, and that they are using GHP and DA appropriations for closeouts in violation of the Purpose Statute. Defendants attempt to sweep these claims into their ICA preclusion argument by treating every claim involving appropriated funds or a provision of an appropriation act as a claim the Comptroller General could bring under the ICA. Gov't Opp. 3–6. But that is not how the ICA works. It applies where budget authority that is required to be made available for obligation "is not made available"—via a deferral or rescission—and it purports to authorize an action by the Comptroller General "to require such budget authority to be made available for obligation." 2 U.S.C. § 687. Plaintiffs' claims for violations of the bill and table directives and the Purpose Statute do not allege that the relevant budget authority, *i.e.*, the relevant title III appropriations, is "[un]available for obligation" due to a rescission or deferral. The alleged violations of the directives and Purpose Statute stand even assuming *arguendo* Defendants make all of the relevant budget authority available for obligation before it expires. *See* Pls.' MSJ Opp. 4–7. The Comptroller General could not bring those claims under the ICA.

Defendants argue that the Sections 7019(a) and 7030–7061 directives "*are* appropriations provisions" because they are "located in an appropriations act." Gov't Opp. 4. That is both wrong and misses the point. An "appropriation" is "a provision of law . . . authorizing the expenditure of funds for a given purpose," and "[u]sually . . . provides budget authority." OMB Circular A-11 § 20.3 Titles III through V of the SFOPS Act do that. The directives in Sections 7019(a) and 7030–7061, in contrast, do not "authoriz[e]" spending funds or confer budget authority; they direct how Defendants must use the budget authority provided under the titles. The text of Section 7019(a) and Sections 7030–7061 make this clear; they command specific amounts that Defendants must spend on the directives from the "funds appropriated by this Act

8

under" titles III, IV, or V. The bill headings Defendants invoke (Gov't Opp. 4)—"Allocation Tables" and "Authorized Deviations"—confirm Plaintiffs' point: These provisions allocate and constrain budget authority appropriated elsewhere; they do not create that authority.

Defendants assign talismanic significance to the Supreme Court's phrase "to enforce the appropriations at issue here," extrapolating from that single line that Plaintiffs' claims concerning "how funds should be used . . . are claims 'to enforce the appropriations at issue' that the ICA precludes." Gov't Opp. 4–5 (quoting *Dep't of State v. AIDS Vaccine Advoc. Coal.*, 146 S. Ct. 19, 19 (2025)). But "the appropriations at issue here" in *AVAC* were only the $4 billion subject to the August 28 special message. And the context for the Court's order was Defendants' argument that the ICA precluded Plaintiffs' APA claims to require obligation of those funds, before they were impounded, because the ICA purports to authorize the Comptroller General to bring such impoundment claims. Plaintiffs' directives and Purpose Statute claims, in contrast, do not seek to enforce the appropriations in title III and IV insofar as they require that the funds be obligated before they expire.

Indeed, the Comptroller General—the official Defendants say Congress selected to identify and litigate impoundments—has recognized precisely this boundary. GAO's Redbook makes clear that "an improper obligation, although it may violate several other statutes, is generally not an impoundment." 2 GAO, *Principles of Federal Appropriations Law* 2-50, GAO-16-464SP (4th ed. 2016); *see Questions Concerning Availability & Use of Funds Appropriated to NIH*, 64 Comp. Gen. 359, 365–66 (1985) (B-217722). And, on numerous occasions, the Comptroller General has distinguished between impoundments (which fall within GAO's competency to evaluate) and other statutory violations (which do not)—including, specifically, violations of statutory directives governing the use of appropriated funds and of the Purpose Statute. *See, e.g.*, 64 Comp. Gen. at 365–66 (statutory directives); *HHS—Detail of*

9

*Office of Cmty. Servs. Emps.*, 64 Comp. Gen. 370, 375–76, 381–83 (1985), B-211373 (Purpose Statute); *Dep't of Homeland Sec.—Border Barrier Construction & Obligations*, B-335747, at 4 (Comp. Gen. Apr. 22, 2024) (Purpose Statute). That is dispositive: because the Comptroller General could not sue to enforce the directives or Purpose Statute under the ICA, the ICA cannot impliedly preclude Plaintiffs from bringing those claims under the APA.

B.    **Plaintiffs Challenge Final Agency Action**

Plaintiffs have identified final agency actions that are reflected in both the closeout scheme and the allocation of rescinded funds. As to the closeout scheme, Defendants have made a final decision to not obligate all expiring GHP and DA funds before they expire on September 30, because they are withholding obligation of substantial portions these funds for substantive programming until all closeouts are complete, which will not happen until after September 30. Pls.' MPSJ 19–20. Defendants have also made a final decision to obligate some of these funds for improper purposes, by using them to pay closeout costs on terminated awards. *Id.* Defendants notified Congress of these facts in the April 2026 Congressional Notification. AR 230–34. Defendants contend that the Congressional Notification is not *itself* final agency action, Gov't Opp. 10–11, but Plaintiffs have never suggested that it was. The Congressional Notice *reflects* the agency's final decisions to withhold and improperly use GHP and DA funds. The same is true of the Vought approval memo, AR 558–60, which makes clear that Defendants have reached the culmination of their decision-making process to withhold and use these funds for closeouts.

OMB's apportionments reflect that final decision as well, and unlike the Congressional Notification and the OMB approval memo, the apportionments are also final agency action on their own. Pls.' MPSJ 20. The apportionments are final in determining how much and for what purposes State and USAID may obligate the appropriations at any given time. Legal consequences flowed from the apportionments because they legally prohibited the State

10

Department and USAID from obligating the funds toward substantive programming. *Id.* For example, if a State Department or USAID employee attempted to obligate GHP funds on substantive programming, they would face *criminal* penalties under the Anti-Deficiency Act, because the funds have been apportioned solely for "USAID Close Out." Judge Sullivan reached the same conclusions regarding finality and legal consequences in thoroughly rejecting OMB's arguments that apportionments are covered by the deliberative process privilege. *See CREW v. OMB*, 791 F. Supp. 3d 29, 55 (D.D.C. 2025). As Judge Sullivan held, the fact that apportionments may be "revisable," Opp. 11, does not mean that they are nonfinal. "No matter how many times an apportionment changes, each generated apportionment is 'legally binding.'" *Id.* at 55 (quoting OMB Circular A-11 § 120.1). Simply because an agency "can change its decision . . . does not make the decision any less final." *Id.* (collecting cases).

And here, Defendants do not even dispute that their decisions to reserve and use GHP and DA appropriations to pay closeout costs are final and not subject to change. To the contrary, they cite the Schmitt Declaration for the assertions that "the $2 billion of GHP funds will be used to pay close-out costs" and "the $1,179,099,000 of [DA] funds will be obligated consistent with the CN and USAID's close-out priorities." *Id.* (citing Schmitt Decl. ¶¶ 7–9, 12).

As to the allocation of rescinded funds, Defendants have made a final decision to not comply with numerous directives in Sections 7019(a) and 7030–7061, by allocating rescinded funds to them. Pls.' MPSJ 31. Plaintiffs do not claim that the 653(a) report *itself* is final agency action. *Contra* Gov't MSJ 11–12. Rather, the report reveals Defendants' final decision to not obligate the amounts required under the relevant directives to which Defendants have allocated rescinded funds. Defendants do not deny that their allocations, and the associated decision not to comply with the directives, are final. And legal consequences flow from this decision, because Defendants will obligate less funds toward the purposes of the directive as a result.

11

### C.       Plaintiffs' Claims Are Ripe

For similar reasons, all of the claims on which Plaintiffs seek summary judgment are ripe. In assessing ripeness, the Court considers two factors: the "fitness of the issues for judicial decision" and the extent to which delay will cause "hardship to the parties." *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012).

Both factors counsel in favor of the Court deciding these claims now. Defendants have made final decisions that are reviewable under the APA. Delaying review of those final decisions would impose severe, irreparable hardship on Plaintiffs, because those decisions are preventing Plaintiffs from competing for funds critical to their businesses, either because the funds are being improperly put toward areas for which they may not compete, or because the funds will expire unspent in less than two months. The risk that funds will imminently expire unspent, or that Defendants' delay will result in last-minute paper transactions that do not actually make the funds available for obligation, also counsels strongly in favor of adjudicating Plaintiffs' § 706(1) claims regarding the non-obligation of funds more broadly.

Defendants' mootness arguments reinforce why the claims must be adjudicated now. Under logic of Defendants' ripeness argument, Plaintiffs and the Court must wait until October 1 to see the final disposition of funds, at which point Defendants would argue that all of the claims are moot. The result would be that there could never be any judicial review of Plaintiffs' claims.

### III.     Defendants' Funding Decisions Regarding Funds Expiring on September 30, 2026 Violate the APA

### A.       Defendants' Closeout Scheme Is Unlawful

#### 1.       *Defendants Do Not Rebut the Three Independent Ways the Closeout Scheme Violates Congress's Commands*

Defendants' closeout scheme is contrary to law in three independent ways. Defendants do not address the first at all, and they answer the second and third only with unsupported

assurances that the funds will be properly obligated—assurances that are belied by the administrative record and Defendants' own declarations, which say otherwise.

*First*, Defendants have allocated the GHP and DA funds that they withheld as part of the closeout scheme toward particular table and bill directives—specifically, directives they disfavor on policy grounds. That results in violations of Section 7019(a) and certain directives in Sections 7030–7061, because Defendants are not obligating the specific amounts Congress mandated be spent on the subject of each directive. *See* Pls.' MPSJ 13–15. Defendants' opposition does not dispute this claim at all. They do not claim they will comply with the directives. The Court therefore should grant Plaintiffs summary judgment on this claim.

*Second*, the record establishes that a significant portion of the GHP and DA funds reserved for closeouts will not be obligated before they expire, resulting in a textbook impoundment in violation of the GHP and DA appropriations provisions of title III. *See* Pls.' MPSJ 15–17. Defendants respond that Plaintiffs' claim is "premature and speculative" because "[a]mple time remains" to obligate the funds and because "Defendants have made no decision 'to indefinitely reserve billions of dollars of these funds' to pay 'closeout costs.'" Gov't Opp. 18 (quoting Pls.' MPSJ 17). But the record, including the very evidence Defendants cite, says the opposite: The Congressional Notification makes clear that Defendants have decided to reserve expiring GHP and DA funds to pay closeout costs and that these funds will not be released for other uses (if at all) until "after USAID has completed all closeout actions." AR 233; *see* Gov't Opp. 18 ("Defendants intend to obligate funds consistent with the CN."). Defendants do not dispute that fact, and the first Schmitt declaration confirms that Defendants will not complete all closeout actions until after September 30. AR 2 ¶¶ 7–8. At that point, reserved GHP and DA funds will expire unspent. The precise amount that will lapse is uncertain only because Defendants never analyzed how much of the reserve would or could be obligated for closeouts

13

before September 30. That uncertainty does not render Plaintiffs' claims speculative; it shows that Defendants failed to engage in reasoned decision-making. *See infra* Section II.A.2.

Defendants note that, two days after Plaintiffs filed their motion highlighting OMB's apportionment of $1.179 billion in DA funds being reserved for closeouts to an "Unallocated" line, Defendants relabeled the apportionment from "Unallocated" to "All activities." Gov't Opp. 15–16. But Plaintiffs' claim does not depend on the "Unallocated" label. The challenged action is Defendants' decision to withhold GHP and DA appropriations from obligation for their intended purposes. Defendants' brief erroneously asserts that the funds are now "slated to be used for substantive programming obligations." Gov't Opp. 16. But the second Schmitt declaration confirms that nothing has really changed, as she writes that these funds will still be reserved "consistent with the CN and USAID's close-out priorities." Second Schmitt Decl. ¶ 15.

*Third*, Defendants have decided to withhold GHP and DA funds to pay closeout costs that are not properly chargeable to those appropriations, in violation of the Purpose Statute and the purpose specifications of the GHP and DA appropriations. *See* Pls.' MPSJ 17–19. Defendants do not deny that they are using or will use GHP and DA appropriations to pay closeout costs for awards that have nothing to do with global health or development assistance, or for costs that otherwise do not advance the global health and development purposes for which Congress appropriated these funds in 2025. The Schmitt declaration conspicuously does *not* state that Defendants will use GHP and DA funds *only* to close out GHP and DA awards, funded with the same 2025 appropriations or otherwise. Given that non-denial, and in light of the entire record, the only reasonable conclusion is that Defendants have decided to use GHP and DA funds to close out awards entirely unrelated to the purposes of these appropriations.

Indeed, Defendants give away the game with their new revelation that they intend to use GHP and DA appropriations to fund a "new central audit mechanism" to "close out USAID."

14

Second Schmitt Decl. ¶ 9. Congress provided billions in GHP and DA appropriations in 2024, and then re-appropriated these billions again in the 2025 Continuing Resolution, to combat disease, reduce poverty, and save and improve lives. Congress did not appropriate these funds to USAID to finance a "new central audit mechanism" or otherwise facilitate the Defendants' unlawful abolishment of USAID. This revelation is a forthright admission that Defendants have decided to spend GHP and DA funds in violation of the Purpose Statute.

Rather than address any of these legal violations from the reservation and use of expiring GHP and DA funds, Defendants spend pages defending other aspects of the closeout plan laid out in the Congressional Notification that Plaintiffs do not challenge. *See* Gov't Opp. 16–20. Plaintiffs have not challenged the "plans to use previously obligated, but unliquidated, funding in terminated awards or un-subobligated funding in the related DOAG for award close-out costs." *Id.* at 19. Schmitt describes an instance where the unliquidated balance of a Food Security award was used to pay costs properly chargeable *to that same award*. Second Schmitt Decl. ¶ 6. Plaintiffs agree that the use of these funds for closeout is entirely proper, and this example only highlights the improper nature of how Defendants are using the expiring GHP and DA funds.

Defendants' discussion of cost allocability under two FAR regulations is also a non sequitur. *See* Gov't Opp. 17–18. FAR 31.201-4 allocates a cost according to the "relative benefits received or other equitable relationship." 48 C.F.R. § 31.201-4. And 2 C.F.R. § 200.405(c) prohibits charging a cost allocable to one award to another, including "to avoid restrictions imposed by Federal statutes." Neither provision supersedes the Purpose Statute, 31 U.S.C. § 1301(a), or authorizes Defendants to obligate GHP and DA appropriations for purposes other than those for which Congress appropriated the funds. *See* Pls.' MPSJ 13–19.

15

### 2.    *Defendants Supply No Reasoned Explanation for the Closeout Scheme*

Under the APA, courts ask whether the contemporaneous record supplies a rational connection between the problem the agency identified and those choices. *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983). The record is barren of a rational connection, reasoned decision-making, or a satisfactory explanation for Defendants' closeout actions. Defendants describe the closeout scheme, but they still do not explain *why* they selected GHP and DA appropriations for withholding; *why* they selected appropriations expiring this year; *why* they reserved the entire $2.532 billion balance; or *why* other programming must await completion of every closeout, when they know that will result in GHP and DA funds expiring. Those are the basic links between the stated problem and the means chosen. The contemporaneous record supplies none of them. And even Defendants' extra-record declarations, submitted for this litigation, provide no answers.

Instead, Defendants respond that they reported their plan to Congress and that "the contents of the CN were also discussed in internal memoranda documenting the agency's thinking." Gov't Opp. 18 (citing AR 558–60). But the Congressional Notification itself provides no reasoning, *see* AR 233–34, and the section of the approval memo they cite, entitled "Analysis and Policy Considerations," is almost entirely redacted, AR 558–60. Defendants cannot have it both ways. If the redacted portions reflect merely predecisional recommendations—as Defendants previously argued at length, Dkt. 194 at 9–13—then the memorandum does not supply the agency's final explanation. If Defendants instead now contend that the memorandum represents "the agency's thinking" (Gov't Opp. 18), they cannot invoke the deliberative-process privilege to shield the adopted reasoning. *See Elec. Frontier Found. v. DOJ*, 739 F.3d 1, 10–11 (D.C. Cir. 2014) (adoption of a memo's reasoning "destroys the privilege"). Conversely, Defendants cannot establish they engaged in reasoned decision-making by pointing out that a

16

memorandum exists while withholding the reasoning they ask Plaintiffs and the Court to credit. *See Cboe Futures Exch., LLC v. SEC*, 77 F.4th 971, 978–79 (D.C. Cir. 2023).

The Second Schmitt Declaration cannot supply the missing rationale after the fact. Its explanations concerning centralized audits, costs spanning multiple awards, the Asia regional program, and the risks of under-reserving do not appear in the administrative record. *See* Gov't Opp. 19–20 (citing Second Schmitt Decl. ¶¶ 8–11). An agency may later elaborate on the rationale it gave when it acted, but it may not offer new reasons in litigation. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20–23 (2020).

Even if considered, the declaration does not answer the central questions. Uncertain final costs may explain use of a ceiling or "envelope," Second Schmitt Decl. ¶ 11, but there is zero explanation for how Defendants calculated this ceiling amount. Uncertainty alone does not justify reserving $2.532 billion before identifying award-specific needs. And Defendants themselves say that the $15.4 billion in already-obligated balances will cover the bulk of expected closeout costs. Gov't Opp. 19; AR 233–34. Moreover, whatever the appropriate envelope amount, there is still no explanation why Defendants chose to use the expiring GHP and DA accounts for closeouts, as opposed to non-expiring accounts, or why they decided to withhold any remainder until every closeout is complete.

Defendants plead for deference (Gov't Opp. 15), but they supply no reasoning to which the Court can defer. Even the "minimum rationality standard" (*id.* at 20) requires an agency to articulate a rational connection between the facts and choice made, and to consider important aspects of the problem. *Sierra Club v. EPA*, 353 F.3d 976, 978–79 (D.C. Cir. 2004). Defendants' closeout decisions cannot reflect reasoned decision-making where there is no reasoning at all.

17

**B.      Defendants Are Violating Directives by Allocating Rescinded Funds to Them**

        1.      *Defendants' Non-Compliance with Directives from Allocating Rescinded Funds Is Contrary to Law and Agency Action Unlawfully Withheld*

Defendants largely admit the facts underlying Plaintiffs' claims relating to the allocation of rescinded funds to the directives in Sections 7019(a) and 7030–7061. They do not deny that, even where they were not required to do so, they allocated rescinded funds to directives that they disfavor on policy grounds, in order to avoid complying with the directives. They openly admit that they allocated the relevant funds "based on relevant policy priorities," and that they could— but did not—"apply the rescissions first to funds that are not attributed to an earmark or directive." Gov't Opp. 22 . Defendants do not contest that they *minimized* compliance with the directives, to the most extreme degree possible, by allocating as many rescinded funds as possible to them. And they do not dispute the most essential fact: through these allocations, they have made a final decision not to comply with mandatory "shall" directives in Sections 7019(a) and 7030–7061 with which they *could* comply using non-rescinded funds.

Defendants offer no legitimate justification for these violations of the plain text of the directives. They note that in several of the provisions of the Rescissions Act of 2025, Congress specified particular directives that Defendants could not impact based on the rescissions. One of these provisions was for the GHP table directives, Rescissions Act of 2025, Pub. L. 119–28, § 2(b)(5), 139 Stat. 467, 468 (2025). As Plaintiffs noted in their opening brief, these directives are situated differently because in this one instance it may not be possible for Defendants to comply with all of the directives after the rescissions. Pls.' MPSJ 24 n.7. The other example they cite is where Congress indicated that the rescission of some Economic Support Fund appropriations could not be used to reduce spending on the Jordan, Egypt, or Countering PRC Influence Fund directives. Rescissions Act § 2(b)(9). But Congress was merely dictating that *if*

18

the rescissions did result in a shortfall to meet all directives, these three directives were not ones that Defendants could affect. Congress did not, in this or any part of the Rescission Act, repeal any of the bill or table directives from the 2025 Continuing Resolution, or otherwise authorize Defendants to allocate rescinded funds to the directives where it was not mathematically necessary to do so.

Defendants' position reflects a kind of implied repeal argument, but Defendants do not actually argue that Congress impliedly repealed the directives. If Defendants believed there were an implied repeal, there would be no need for them to allocate rescinded funds to the directives; Defendants could simply assert that the directives are no longer in effect. And Defendants do not make an implied repeal argument for good reason: they could not overcome the "strong presumption that repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute." *Am. Forest Res. Council v. United States*, 77 F.4th 787, 799 (D.C. Cir. 2023) (cleaned up). There is no "clear and manifest" language in the Rescissions Act of 2025 expressing congressional intent to repeal or alter the directives in Sections 7019(a) and 7030–7061 of the SFOPS Act, as enacted in the 2025 Continuing Resolution. *Morton v. Mancari*, 417 U.S. 535, 551 (1974) (cleaned up).

Defendants nonetheless assert that their failure to comply with the directives is permissible because "the [State] Department has long understood rescissions . . . to allow broad discretion to determine how to apply the rescission based on relevant policy priorities," and "the Department has consistently implemented similar enacted rescission legislation in line with this approach." Gov't Opp. 21. But "[o]nly the written word is the law," *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 653 (2020), and the plain textual commands of Sections 7019(a) and 7030–601 trump the State Department's purported "understanding" and prior practices. "No

19

branch may rely on adverse possession to claim power that the Constitution vests elsewhere." *Trump v. Slaughter*, 146 S. Ct. 2283, 2303–04 (2026).

Defendants dispute whether, as a "practical" matter, they could meet all of the directives with the appropriations that were not rescinded. Their arguments on that front are misleading and legally irrelevant, as described below. But Defendants' actions are plainly unlawful without even needing to wade into those details, because Defendants undisputedly did not maximize their compliance with the directives to the greatest extent possible, as D.C. Circuit precedent requires.

Defendants do not contest that, under the D.C. Circuit's decisions in *City of Los Angeles v. Adams*, 556 F.2d 40, 50 (D.C. Cir. 1977), and *Navajo Sch. Bd., Inc. v. Babbitt*, 87 F.3d 1338, 1348 (D.C. Cir. 1996), *amended* (Aug. 6, 1996), they are required to "follow as closely as possible the allocation plan Congress designed in anticipation of full funding," even if there is now an appropriations shortfall that precludes meeting all of the directives. Remarkably, Defendants do not address these binding D.C. Circuit precedents at all, despite Plaintiffs relying on them extensively in their motion. *See* Pls.' MPSJ 20–30. Ignoring precedent does not make it any less binding, and there is no dispute that Defendants have violated the dictates of those cases. Defendants' conceded failure to maximize compliance with the directives alone renders the allocations of rescinded funds contrary to law and arbitrary and capricious. *See id.* at 29–32.

In any event, in parsing the carefully worded declaration of the State Department's Kyle Peterson, Defendants do not actually dispute that they could legally and mathematically comply with all of the relevant directives using non-rescinded funds.

*First*, Peterson does not respond at all with respect to Defendants' ability to comply with the directives in Sections 7030–7061 for which Defendants may use appropriations from the "entire Act," or from "titles III and IV." It is uncontested that Defendants allocated rescinded funds to these directives—specifically, ██████████████████████████████

20

███████████████████████████████████████████████████ despite having ample non-rescinded appropriations they could draw from to meet the directives.

*Second*, Peterson does not contest that Defendants have sufficient DA appropriations to comply with all table directives (40 total) and the relevant bill directives (██████████████) for which Defendants must use only DA funds. And yet, Defendants allocated rescinded funds to entirely wipe out all of these directives. For all of the directives referenced in this paragraph, it is undisputed that there is no "irreconcilable" conflict between the directives and the Rescissions Act of 2025, *Morton*, 417 U.S. at 551. Defendants' failure to comply with these directives is plainly contrary to law.

*Third*, there is also no irreconcilable conflict for the directives that require using only Economic Support Fund appropriations. Peterson does not deny that the non-rescinded Economic Support Fund appropriations are greater than the aggregate directives that require using only Economic Support Fund appropriations. ECF No. 202-2 ("Carlile Decl.") ¶ 37. Instead, he points to the fact that Defendants chose to allocate $1.2 billion from the Economic Support Fund to a directive for assistance to Jordan, and asserts that there would be insufficient funds to meet all the Economic Support Fund-related directives after taking this $1.2 billion off the board. Peterson Decl. ¶ 6. As Peterson admits, however, "this earmark does not specifically require the use of ESF funds." *Id.* And nothing in the Rescissions Act *required* them to use Economic Support Fund appropriations for this directive either. *Cf. id.* Defendants' use of these funds for the Jordan directive is a voluntary choice, as they had many billions in other title III and IV appropriations they could have tapped for this directive. Defendants thus acted contrary to law in not fully complying with the table directives (37 in total) and bill directives (████████████ ██████████████████████████████████████ ███████ for which Defendants must use Economic Support Fund appropriations.

21

*Fourth*, and finally, Defendants could carry out all the directives for which they may use any title III appropriations, but only title III appropriations. The total amount of title III appropriations, post-rescissions, is $11.04 billion, which exceeds by roughly $4.5 billion the combined $6.5 billion in table and bill directives that require using only title III appropriations. Carlile Decl. ¶ 38. Defendants make a series of excuses to justify not meeting all of these title III-based directives, but none withstands scrutiny.

Most misleadingly, Defendants suggest that $5.9 billion in title III appropriations for International Disaster Assistance and Migration and Refugee Assistance should be removed from the calculus of available funds, based on a provision stating that these appropriations "shall not be included for purposes of meeting amounts designated for countries in this Act." Gov't Opp. 22 (quoting Peterson Decl. ¶ 5). What Defendants do not disclose is that, of the directives that permit Defendants to use any of the appropriations under title III, there is only one that is arguably "designated for countries"—a $25 million directive for "Al-Hol Action Plan," relating to Al-Hol, Syria. *See* 2024 Appropriations Act, § 7041(i)(3), 138 Stat. 807. Defendants obviously could meet that small directive using other title III appropriations, and the $5.9 billion International Disaster Assistance and Migration and Refugee Assistance appropriations are available to meet all of the other directives allowing use of any title III funds.

Defendants also say that it is "longstanding practice and consistent with the [State] Department's understanding of congressional expectations" that they would not use title III appropriations for the Peace Corps, Millennium Challenge Corporation, and the Treasury Department for meeting the bill directives. Gov't Opp. 22 (quoting Peterson Decl. ¶ 4). But again, purported longstanding practices and an unspoken understanding of expectations are not the law—"[o]nly the written word is." *Bostock*, 590 U.S. at 653. The statutory text provides that Defendants may use any "of the funds appropriated under title III" of the SFOPS Act to meet the

22

directives, which includes the money "appropriated under title III" to the Peace Corps, Millennium Challenge Corporation, and the Treasury Department. Defendants do not claim that these agencies could not substantively carry out projects to meet a number of the directives.

Defendants make a similarly ill-fated argument with respect to title III appropriations for International Disaster Assistance, and Migration and Refugee Assistance, Transition Initiatives, and the Complex Crises Fund. They assert, without specificity, that "many of" the directives "are for purposes that align most closely with" other title III appropriations, and that State "has generally used" funds from the above-listed appropriations "only where there has been a very clear purpose alignment." Gov't Opp. 23. For the relevant directives, Congress did not provide that Defendants must use the title III appropriations that purportedly "align most closely" with the directive, or for which there is "a very clear purpose alignment," whatever those phrases mean. Congress directed that "not less than" specific amounts "shall be made available" for the designated program or topic, and that Defendants may use *any* of the funds appropriated under title III, so long as the activity falls within the broad overall purpose of the given title III appropriation. Defendants make no claim that activities under the directives do not fall within the broad purposes of the four appropriations.

On top of all of this, Defendants ignore the fact that they can—and frequently do— attribute a single obligation to multiple directives that encompass the activities being funded. *See* Pls.' MPSJ 24–25. It is likely for this reason that neither Peterson nor Defendants ever directly assert that they could not, in fact, meet all of the directives if they tried. That fact is therefore not genuinely in dispute.

For all of these reasons, Defendants' failure to meet all the relevant directives to which they allocated rescinded funds—including the directives for which they may use any title III appropriations—is contrary to law and is agency action unlawfully withheld. The directives

23

being violated for which Defendants may use any title III funds are ██████████

████████████████████████████████████████████

### 2.    *Defendants' Allocation of Rescinded Funds Is Arbitrary and Capricious*

Defendants' allocations of rescinded funds to evade compliance with the directives are

also arbitrary and capricious. Indeed, even if Defendants could not practically meet all the

directives given the rescinded appropriations, their allocations would still be arbitrary and

capricious. Defendants have not considered an important aspect of the problem and the factors

that Congress required them to consider, disregarding the fact that the directives contain

unambiguous statutory commands that Congress never repealed, and that they must meet these

commands to the greatest extent possible under governing precedent. The allocations cannot

reflect reasoned decision-making where Defendants did not account for these requirements. The

allocations are independently arbitrary and capricious given that there is no evidence in the

record that Defendants considered the reliance interests of impacted partners and communities

that will be substantially injured by the nullification of these statutory commands. *See DHS v.

Regents*, 591 U.S. at 30.

### C.    **Defendants Have Unlawfully Withheld and Unreasonably Delayed Obligating Expiring Funds**

Plaintiffs' opening brief set forth the anomalously slow pace at which Defendants are

obligating all title III and title IV appropriations that will expire on September 30, 2026. Former

OMB official Joe Carlile looked at the seven title III and IV appropriations enacted in the 2025

Continuing Resolution that expire this year, and calculated the total amount obligated divided by

the total amount of appropriations. Carlile Decl. ¶ 14. He then performed an apples-to-apples

comparison of that same calculation for the same appropriations accounts in the last five funding

cycles. *Id.* For this analysis, he used the authoritative government source of data on agency

24

obligations: monthly SF-133 reports that OMB posts online. *Id.* ¶ 13. The results are jarring. With just a few months to go before funds expire, Defendants have obligated only tiny percentages of most of the appropriations, and the average obligation rate across the seven is extraordinarily lower than at this point in all of the five previous cycles. *Id.* Appendix A, Table 1.

Defendants do not dispute the accuracy of Carlile's calculations, and yet they claim that his methodology is "faulty" and "misleading." Gov't Opp. 25. It is neither. Defendants criticize Carlile for not assuming that they will obligate the billions in GHP and DA appropriations that they are reserving for close-out costs, *see id.*, but the funds have not been obligated, and part of Plaintiffs' claims are that they will not all be, *see supra* Section II.A.1. Defendants attack Carlile for having an "inflated denominator" by purportedly including appropriations for the Peace Corps, the Millennium Challenge Corporation, and the Treasury Department, as well as the International Disaster Assistance and Migration and Refugee Assistance. *See* Gov't Opp. 26. But Carlile did no such thing. His calculations relevant to the unreasonable delay claim focused only on the seven title III and IV appropriations to USAID and the State Department that expire this year, none of which are the ones Defendants invoke. *See* Carlile Appendix A, Table 1 & Charts 1–7. Defendants also accuse Carlile of having an "undercounted" numerator, but the relevant paragraph of their brief is unclear at best. Gov't Opp. 26. Carlile simply divided the total obligations from each appropriation by total appropriations, nothing more and nothing less.

Unable to poke holes in Carlile's calculations, Defendants seek to shunt it aside. They argue that Carlile's declaration "constitutes extra-record evidence" that the Court "should not consider." Gov't Opp. 27. Carlile merely organized and summarized publicly available government data produced by one of the Defendants to this action, OMB. The Court may take judicial notice of this government data. *See Massie v. Pelosi*, 590 F. Supp. 3d 196, 227 n.23

25

(D.D.C. 2022). Defendants cite cases for the proposition that "the Court should consider only what was actually 'before the agency at the time [of the] decision.'" *Id.* (quoting *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623 (D.C. Cir. 1997). But that applies only to challenges to final agency action under § 706(2), not claims for agency action unlawfully withheld or unreasonably delayed under § 706(1). With § 706(1) claims, "review is not limited to the record as it existed at any single point in time, because there is no final agency action to demarcate the limits of the record." *Nat'l L. Ctr. on Homelessness & Poverty v. VA*, 842 F. Supp. 2d 127, 130 (D.D.C. 2012) (quotation omitted). "Said another way, if an agency fails to act, there is no 'administrative record' for a federal court to review." *Id.* There is no basis for Defendants' request to ignore this data for purposes of Plaintiffs' § 706(1) claims.

## IV.    Defendants' Failure to Obligate the Funds in the Special Message Violates the APA

Plaintiffs have already addressed why their claims related to Defendants' failure to obligate funds in the August 2025 special message are not precluded by the ICA or moot. Pls.' Opp. 11–16, 19–21. Defendants argue that this issue is not "capable of repetition" because a future pocket rescission would not involve the "same action." Gov't Opp. 32. But nothing about Plaintiffs' claim turns on which "fiscal year" or "funding streams" are at issue. *Id.* The parties' dispute is purely legal, and the Court can and should decide that legal issue now.

On the merits, Defendants argue that their pocket rescission theory is distinct from the Line-Item Veto Act struck down in *Clinton v. New York*, 524 U.S. 417 (1998). Defendants highlight language in *Clinton* acknowledging the President's "traditional authority to decline to spend appropriated funds," Gov't Opp. 31, but the Court was addressing appropriations of "sum[s] not exceeding" specified amounts, unlike the appropriations at issue here. 524 U.S. at 446. Nor is *Clinton* distinguishable on the ground that a pocket rescission involves a "dialogue" with Congress under the ICA. Gov't Opp. 31. The Line-Item Veto Act involved the same

26

dialogue with Congress whereby the President would "transmit a special message to Congress notifying it of each cancellation," and Congress could then enact a "disapproval bill" to nullify the cancellations. 524 U.S. at 437. The Court nonetheless found the Act to be unconstitutional because it authorized the President "[i]n both legal and practical effect" to unilaterally repeal an Act of Congress. *Id.* at 438. Defendants' interpretation of the appropriations statutes and the ICA would present exactly the same constitutional issue, allowing the President in both legal and practical effect to repeal appropriations statutes through unilateral action.

The Court need not rely on this canon, however, because the plain text of the ICA does not provide for pocket rescissions, as this Court has already found. Dkt. 139 at 31–34.

## V.      Plaintiffs Have Not Forfeited Claims Related to Funds Set to Expire in 2025

As to Plaintiffs' claims regarding funds that were set to expire in September 2025 that were not included in the pocket rescission,[2] Defendants bizarrely suggest that Plaintiffs have "forfeited" such claims by not moving for partial summary judgment on them. Gov't Opp. 32–33. But that is the nature of a motion for *partial* summary judgment, where a party moves for summary judgment on some—but not all—of its claims. *See* Fed. R. Civ. P. 56(a). Nothing in the federal rules or otherwise provides that a party "forfeits" claims on which they do not move, and Defendants cite no authority for their position. Plaintiffs sensibly chose, in the interest of efficiency and judicial economy, to move only on those claims that were most urgent (concerning funds expiring in September 2026) or may imminently recur (concerning the pocket rescission).

---

[2] These claims include Counts 1–6 insofar as those counts encompass the funds originally set to expire on September 30, 2025. They also include Count 12, which alleges that Defendants unlawfully minimized compliance with the directives in Sections 7030–7061, as to funds expiring on September 30, 2025, by allocating appropriations in the pocket rescission proposal to the directives with which Defendants did not wish to comply.

Indeed, the Court and the parties openly discussed that Plaintiffs would move only on these claims at the July 2 hearing, in an effort to expedite proceedings on these claims by minimizing the burden on Defendants in producing the record. *See* 7/2/2026 Hr'g Tr. 42:15–25, 60:9–21. Defendants perplexingly rely on this Court's earlier June 12, 2026 minute order to support their forfeiture argument, while completely ignoring the subsequent status hearings and minute orders that refute their position. Gov't Opp. 33. After the Court directed Defendants on June 12 to produce the record for Plaintiffs' claims concerning funds set to expire both in September 2025 and 2026, it was *Defendants* who requested that the Court narrow the scope of the administrative record to Plaintiffs' claims relating to funds expiring in September 2026.

Specifically, at the July 2 hearing, Defendants proposed that the Court "narrow" its order because "plaintiffs' alleged emergency goes only as to the 2026 funds," and suggested that "supplementation of the administrative record could only go to the 2026 funds as well, because much of the burden goes to 2025 funds." 7/2/2026 Hr'g Tr. 42:15–20. Defendants suggested that the "solution" to the problem of burden on the government was to "limit the supplementation of the AR to the 2026 funds, which pose a more immediate understanding." *Id.* at 42:23–25.

The Court then accepted Defendants' proposal to narrow the administrative record to the funds expiring in 2026. The Court stated that the "new scope" for the record would be to "limit supplementation and completion of the administrative record to the decisions made related to funds that are expiring in September 2026." *Id.* at 60:9–21. The Court also directed Defendants to produce certain "funding approval memoranda" and "interagency agreements" related to funds that were set to expire in September 2025 because they were "low-hanging documents" that were expressly referenced in the Lewin declaration that "could be relevant to money [expiring] this year." *Id.* at 65:23–66:16.

The Court's July 3 minute order confirmed the "new scope" of the administrative record. The Court ordered Defendants to "complete and supplement the administrative record" to include any documents relating to: "decisions to obligate or not obligate funds set to expire September 30, 2026," other actions related to such funds, and "any 'funding approval memoranda' and 'interagency agreements' relating to decisions to obligate or not obligate funds set to expire on September 30, 2025." The Court did not order Defendants to produce the full administrative record as to Plaintiffs' claims relating to funds set to expire in September 2025, and Plaintiffs correspondingly did not seek completion of the record as relevant to those claims.

Because Defendants did not produce the complete record as to these claims, Plaintiffs could not have "forfeited" them. For the same reasons, the Court should not grant Defendants' motion to the extent it seeks summary judgment on these claims. *See* Pls.' MSJ Opp. 26.

## VI.    Plaintiffs' Proposed Order Provides Them with Complete Relief

Plaintiffs' proposed relief is "no more burdensome to [Defendants] than necessary to provide complete relief to [Plaintiffs]." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). The proposed relief does not run afoul of *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). Plaintiffs seek relief only to funds for which they are ready and able to compete, and affording Plaintiffs an opportunity to compete for those is necessary to provide Plaintiffs complete relief, even if it may incidentally benefit nonparties. *Id.* at 852. Defendants are wrong that, "consistent with Article III, the focus must be on those awards Plaintiffs have received historically." Gov't Opp. 38. The D.C. Circuit held that Plaintiffs' Article III injury is the denial of the opportunity to compete for funds for which Plaintiffs are ready and able to compete—not the loss of awards they held in the past. *Glob. Health Council v. Trump*, 153 F.4th 1, 12 (D.C. Cir. 2025). This Court has also rejected Defendants' historical-awards limitation. Dkt. 139 at 38–40.

Defendants err in treating remand as the default remedy under the APA. Under Section 706(2), "vacatur is the normal remedy." *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024). Remand without vacatur is exceptional and available only when the error is curable, *id.*, and Defendants make no argument that this case meets those exceptional circumstances.

Defendants also mischaracterize Plaintiffs' injuries as ordinary economic losses remediable later. No damages action can compensate Plaintiffs for a competitive opportunity that disappears when the appropriations expire or are spent on an improper purpose. *See Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) ("Financial injury is . . . irreparable where no adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation."). Courts in this Circuit regularly issue permanent injunctions to prevent unrecoverable financial and business injuries caused by unlawful government action. *See, e.g.*, *Loving v. IRS*, 917 F. Supp. 2d 67, 80–81 (D.D.C. 2013). And the record establishes more than lost revenue: Plaintiffs face further loss of staff, capabilities, and mission, which this Court already held constitute irreparable harms. Dkt. 139 at 34–36.

Finally, Plaintiffs' proposed compliance provisions do not make the Court an ongoing administrator of foreign assistance. *See* Gov't Opp. 36. They are short-lived and objective. OMB must revise apportionments because the existing apportionments restrict the funds' availability. The agencies must file a compliance plan and report figures they necessarily maintain. Nothing directs Defendants to fund a particular program, select a particular recipient, or make a particular foreign-policy judgment. Any administrative burden imposed by the proposed order is minimal and proportionate to Defendants' repeated unlawful conduct.

## CONCLUSION

The Court should deny Defendants' motion for summary judgment.

Dated: August 7, 2026

Respectfully submitted,

*/s/ Daniel F. Jacobson*

Daniel F. Jacobson (D.C. Bar # 1016621)
Stephen K. Wirth (D.C. Bar # 1034038)
John Robinson (D.C. Bar # 1044072)
Brian C. Rosen-Shaud (D.C. Bar # 90042065)
Nina Cahill (D.C. Bar # 1735989)
JACOBSON LAWYERS GROUP PLLC
5100 Wisconsin Ave. NW, Suite 301
Washington, DC 20016
Tel: (301) 823-1148
dan@jacobsonlawyersgroup.com

*Counsel for Plaintiffs*