UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NATIONAL CENTER FOR LEARNING DISABILITIES, et al., | | |
| Plaintiffs, | | |
| v. | | Civil Action No. 26-cv-13019-ADB |
| OFFICE OF MANAGEMENT AND BUDGET, et al., | | |
| Defendants. | | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Plaintiffs National Center for Learning Disabilities, Inc. ("NCLD"); Knowledge Alliance, BNP Education Partners, LLC ("BNP"); and Massachusetts Teachers Association ("MTA") (collectively, "Plaintiffs") bring this action against the United States Office of Management and Budget ("OMB"); Russell Vought, OMB Director; the United States Department of Education (the "Department"); Linda McMahon, Secretary of Education; Matthew Soldner, Acting Director of the Institute of Education Sciences ("IES"); and the United States of America (collectively, "Defendants"), challenging certain apportionments and obligations of funds, or lack thereof. See [ECF No. 1 ("Complaint" or "Compl.")].

Plaintiffs contend that OMB has unlawfully delayed apportioning certain funds to the Department, failed to publicly disclose certain apportionments as required by statute, and added extra-statutory conditions to certain apportioned funds using improper footnotes, and, further

allege that the Department has not obligated funds to certain entities within the Department, plans to let those funds expire unused, and has not obligated funds in accordance with congressional explanatory statements. See generally [Compl.].

Specifically, Plaintiffs bring the following claims: OMB's apportionments and/or failure to apportion funds were contrary to law in violation of 5 U.S.C. § 706(2)(A)–(C) (Count 1); OMB's failure to apportion funds was an agency action unlawfully withheld or unreasonably delayed in violation of § 706(1) (Count 2); OMB's use of apportionment footnotes requiring compliance with Executive Orders 14151 and 14332 (the "Executive Orders") was contrary to law in violation of § 706(2)(A)–(C) (Count 3); OMB's use of apportionment footnotes requiring compliance with Executive Orders 14151 and 14332 was arbitrary and capricious in violation of § 706(2)(A) (Count 4); OMB's nondisclosure of the May 2026 apportionment of IES funds was contrary to law in violation of § 706(1) and unlawfully withheld agency action in violation of § 706(2)(A) and (C) (Count 5); OMB's apportionment of funds to "unallocated" lines was contrary to law in violation of § 706(2)(A)–(C) (Count 6); Defendants' failure to apportion and obligate IES funds consistently with congressional explanatory statements was arbitrary and capricious in violation of § 706(2)(A) (Count 7); and Defendants' failure to obligate certain funds prior to their expiration deadlines is agency action unlawfully withheld or unreasonably delayed in violation of § 706(1) (Count 8).[1] [Compl. ¶¶ 140–202]. In addition to their arguments on the merits, Defendants raise several threshold issues, including that some of Plaintiffs' claims are moot while others are unripe, that the relevant statutory schemes preclude Plaintiffs'

---

[1] Plaintiffs have withdrawn Count 9 of their Complaint, which alleged that Defendants' failure to obligate certain funds was contrary to law. [ECF No. 63 at 10 n.2].

Administrative Procedure Act ("APA") claims, and that Plaintiffs do not have Article III standing. See generally [ECF No. 56].

Currently before the Court are a motion for summary judgment by Plaintiffs, [ECF No. 46], and a motion to dismiss, or in the alternative, for summary judgment by Defendants, [ECF No. 56]. Given the time-sensitive nature of Plaintiffs' claims involving funds which will expire on September 30, 2026, the Court today will resolve the pending motions only in part, addressing Counts 3, 4, 7, and 8 to the extent that each claim pertains to outstanding obligations, Defendants' failure to apportion funds in accordance with congressional explanatory statements, and the apportionment footnotes involving Executive Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025), and Executive Order No. 14332, 90 Fed. Reg. 38929 (Aug. 7, 2025). For the reasons stated herein, Plaintiffs' motion for summary judgment, [ECF No. 46], is **GRANTED IN PART**, and Defendants' motion to dismiss, or in the alternative, for summary judgment, [ECF No. 56], is **GRANTED IN PART**.

## I. BACKGROUND[2]

### A. Relevant Entities

IES is the statistics, research, and evaluation arm of the Department. Education Sciences Reform Act of 2002 (ESRA), Pub. L. 107-279, 116 Stat. 1941, as amended by Pub. L. 117-286 (2022).

The National Center for Education Research ("NCER") within IES promotes research aimed at better understanding how to improve education across the country for all kinds of learners. [ECF No. 57 ("SOF") ¶ 4]; see 20 U.S.C. § 9531.

[2] Because the Court is currently only addressing Counts 3, 4, 7, and 8, this background section will include only information relevant to those claims.

The National Center for Education Statistics ("NCES") within IES "collect[s], analyze[s], and report[s] education information and statistics in a manner that[] (A) is objective, secular, neutral, and nonideological and is free of partisan political influence and racial, cultural, gender, or regional bias; and (B) is relevant and useful to practitioners, researchers, policymakers, and the public." 20 U.S.C. § 9541(b).

The National Center for Special Education Research ("NCSER") within IES "sponsor[s] research to expand knowledge and understanding of the needs of infants, toddlers, and children with disabilities . . . [and] sponsor[s] research to improve services provided under, and support[s] the implementation of, the Individuals with Disabilities Education Act." 20 U.S.C. § 9567. Congress has mandated that NCSER research be "objective, secular, neutral, and nonideological, and . . . free of partisan political influence, and racial, cultural, gender, regional, or disability bias." Id. § 9567b(b)(3).

IES also administers the Regional Educational Laboratories ("REL") program, which helps education practitioners and policymakers improve student outcomes. [SOF ¶ 10]. IES "enter[s] into contracts with entities to establish a networked system of 10 regional educational laboratories that serve the needs of each region of the United States." 20 U.S.C. § 9564(a).

The Comprehensive Centers program is a technical assistance program that funds expert centers to help states, districts, and schools implement federal education programs and improve teaching, assessment, and school performance. [SOF ¶ 15]. Congress authorized the Secretary of Education "to award not less than 20 grants to local entities . . . especially to low-performing schools and districts, to establish comprehensive centers." 20 U.S.C. § 9602(a)(1). On June 4, 2026, the Department announced that the Comprehensive Centers program would be moved to IES. [SOF ¶ 16].

The Education Innovation and Research program ("EIR"), which the Department also recently moved to IES, [SOF ¶ 20], issues grants to study and implement practices "to improve student achievement and attainment for high need students," 20 U.S.C. § 7261(a)(1)(A).

NCLD is a nonprofit that works with educators, students, families, and others to "advance research, share resources, build coalitions, and advocate for policies that reduce systemic barriers for individuals with learning disabilities." [SOF ¶ 75]. NCLD relies on IES-created data and research, including from NCSER and NCES, to perform its own research and develop policy briefs. [Id.].

Knowledge Alliance is a nonprofit association composed of 19 education organizations which operate under grants and contracts from the Department. [SOF ¶¶ 72–73].

BNP is an entity that has previously received awards under the REL program and competed for awards from the Comprehensive Centers program, and it relies on NCES data in its own work. [SOF ¶ 74].

The MTA represents 117,000 members who rely on IES data and research projects in their own work and have historically applied for IES-funded grants and received benefits through REL projects. [SOF ¶ 76].

**B. The Appropriation, Apportionment, and Obligation Process**

The Constitution gives Congress the power to "lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States," U.S. Const., art. I, § 8, cl. 1, so that Congress "may raise and appropriate money to advance the general welfare," Medina v. Planned Parenthood S. Atl., 606 U.S. 357, 371–72 (2025) (citation modified). "Congress therefore has 'exclusive power over the federal purse.'" Glob. Health Council v. Trump, 153 F.4th 1, 8 (D.C. Cir. 2025) (quoting Dep't of Navy v.

FLRA, 665 F.3d 1339, 1346 (D.C. Cir. 2012)). "The Legislative branch, consisting of two Houses of Congress elected by the citizens of the states, has the power to levy taxes, finance government operations through appropriations, and to set the terms and conditions on the use of those appropriations." New York v. Trump, 769 F. Supp. 3d 119, 128 (D.R.I. 2025) (citing U.S. Const. art. I, §§ 8, 9).

The appropriations process is one way Congress "uses its power to authorize spending to support federal programs and activities." New York, 769 F. Supp. 3d at 128. As is relevant in the instant case, the first step of this process is appropriation, by which Congress "creates the legal authority to 'make funds available for obligation'" by the relevant agency. Id. (citing 2 U.S.C. § 622(2)(A)(i)). After Congress appropriates the funds, OMB apportions those funds to the relevant agency by "distribut[ing] amounts available for obligation" into different accounts. U.S. Gov't Accountability Off., GAO-05-734SP, A Glossary of Terms Used in the Federal Budget Process, 12 (2005). The third step is obligation, by which the agency makes a "'definite commitment that creates a legal liability of the government for the payment of goods and services ordered or received, or a legal duty on the part of the United States that could mature into' such a liability." New York, 769 F. Supp. 3d at 128 (quoting Budget Glossary). Once funds are obligated, they can be disbursed or expended, which is the "actual spending of federal funds." Id.

### C. The Anti-Deficiency Act

The Anti-Deficiency Act ("ADA") (originally enacted as Act of July 12, 1870, ch. 251, § 7, 16 Stat. 230, 251) (codified as amended in scattered sections of 31 U.S.C.), governs the process by which OMB must apportion congressionally appropriated funds to the relevant agencies, and "expressly prohibits agencies from incurring obligations in excess of

appropriations." Navajo Nation v. U.S. Dep't of Interior, 852 F.3d 1124, 1128 (D.C. Cir. 2017). The ADA provides that "an appropriation available for obligation for a definite period shall be apportioned to prevent obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation for the period." 31 U.S.C. § 1512(a). Under the ADA, once Congress has appropriated funds, the apportioning official, here OMB, may establish a reserve only for specific reasons, such as to provide for contingencies or achieve savings, and must report the reserve to Congress following the process set forth in the Impoundment Control Act of 1974, 2 U.S.C. § 681 (the "ICA"). 31 U.S.C. § 1512(b)–(c). Prior to 1974, the ADA permitted reserves more broadly, but Congress repealed that provision to "preclude the President from relying on the Act as authority for implementing policy impoundments." City of New Haven v. United States, 809 F. Supp. 2d 900, 906 (D.C. Cir. 1987).

### D. Material Facts

#### 1. IES Funds

In its continuing resolution of 2025, Congress appropriated funds to IES at the same levels and subject to the same conditions as funds appropriated to IES in the Consolidated Appropriations Act of 2024, Pub. L. 118-47 (2024) (the "2024 Appropriations Act"); namely, it appropriated $793 million[3] to IES and made those funds available for a two-year period ending September 30, 2026. See Pub. L. 119-4, §§ 1101-1102 (2025). Then, in 2026, Congress appropriated $789 million to IES to be available until September 30, 2027. Consolidated Appropriations Act of 2026, Pub. L. 119-75, 140 Stat. 173, 303 (the "2026 Appropriations Act"). In these appropriations acts, Congress included explanatory statements setting forth how it

[3] Defendants claim that $25 million of those appropriated funds were rescinded. [SOF ¶ 25].

intended for each agency to allocate funds among programs. See 2024 Appropriations Act, 138 Stat. 690; [SOF ¶¶ 22–27].

With respect to the IES funds that expire on September 30, 2026, OMB has apportioned these funds to the Department.[4] The IES apportionments include binding footnotes which provide that (1) the Department can only use the funds in accordance "with the latest agreed-upon spending plan for Fiscal Year 2025 between the [Department] and [OMB]," and (2) "[a]s permissible by law, amounts apportioned shall be spent in a manner consistent with . . . Executive Order 14151" and Executive Order 14332 (the "Executive Order Footnotes"). [SOF ¶¶ 50, 52].

As of today, approximately $180 million of IES funds expiring on September 30, 2026, have not yet been obligated by the Department. [SOF ¶ 57]; [ECF No. 56 at 19]. On August 20, 2026, the Department notified Congress of its intent to reprogram $68,653,580.92 of the appropriated IES funding towards other programs or activities. [ECF No. 58-1].

For the funds expiring on September 30, 2027, OMB has apportioned only some of the funds, including some apportionments made to an "Undistributed" line, and some with similar binding footnotes requiring that the funds be used in compliance with Executive Order 14151 and/or Executive Order 14332. [SOF ¶¶ 67–68].

[4] The parties disagree as to the timing of the apportionments. Plaintiffs argue that the funds were first apportioned on May 13, 2025, and that a large portion of the funds were apportioned to an "Unallocated" line. [SOF ¶ 47]. OMB contends that the funds were apportioned prior to May 13, 2025, because they were automatically apportioned under section 120.41 of OMB circular A-11 after the 2025 Continuing Resolution was entered into law, but that automatic apportionments are not reflected on the form SF-132 until an account-specific apportionment is made, which is what occurred on May 13, 2025. [Id.].

2. Comprehensive Centers Funds

In the 2026 Appropriations Act, Congress appropriated $50 million for the Comprehensive Centers, separately from other IES programs. See 140 Stat. 295. These funds expire September 30, 2026. [SOF ¶ 29]. As of today, OMB has apportioned all of these funds; however, approximately $49.5 million remains unobligated. [ECF No. 56 at 19]. These apportionments for the Comprehensive Centers originally included the same footnotes from OMB requiring that the Department comply with Executive Orders 14151 and 14332; however, those footnotes were removed on July 21, 2026. [SOF ¶ 61].

3. EIR Funds

Congress appropriated $235 million to the EIR program in the 2026 Appropriations Act, see 140 Stat. 296, which expire December 31, 2026, [SOF ¶ 30]. By July 21, 2026, OMB had apportioned all of the EIR funds that were set to expire on December 31, 2026. [SOF ¶ 63]. In the apportionments, OMB included the Executive Order Footnotes. [Id.]. As of today, approximately $11 million of the apportioned funds remains unobligated. See [ECF No. 56 at 19].

**E. Procedural History**

Plaintiffs filed their Complaint on June 30, 2026. [Compl.]. On July 7, 2026, they moved for expedited production of the Administrative Record and summary judgment briefing. [ECF No. 28]. The Court held a hearing on July 14, 2026, [ECF No. 34], and directed the parties to file a proposed briefing schedule by July 17, 2026. On July 17, 2026, the parties filed a joint status report, [ECF No. 36], and Defendants opposed the motion for expedited production and summary judgment briefing, [ECF No. 37]. On July 22, 2026, the Court granted Plaintiffs' motion in part and ordered Defendants to produce the Administrative Record by August 4, 2026,

and set a schedule for summary judgment and motion to dismiss briefing. [ECF No. 39]. In accordance with the schedule, Plaintiffs moved for summary judgment on August 11, 2026, [ECF No. 46], Defendants moved to dismiss, or in the alternative, for summary judgment on August 25, 2026, [ECF No. 56], and Plaintiffs filed a brief in opposition to Defendants' motion and in support of their own motion for summary judgment on September 1, 2026, [ECF No. 63]. The Court held a hearing on the parties' motions on September 8, 2026. [ECF No. 65].

## II. LEGAL STANDARD

### A. Motion to Dismiss

In evaluating a motion to dismiss under Rule 12(b)(1), the Court must determine whether the facts as alleged in the complaint, "taken at face value," support the existence of subject matter jurisdiction. Gordo-González v. United States, 873 F.3d 32, 35 (1st Cir. 2017) (citing Muñiz-Rivera v. United States, 326 F.3d 8, 11 (1st Cir. 2003)). The Court "appl[ies] a standard of review 'similar to that accorded a dismissal for failure to state a claim' under subsection 12(b)(6)." Menge v. N. Am. Specialty Ins. Co., 905 F. Supp. 2d 414, 416 (D.R.I. 2012) (quoting Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995)). The Court must "accept the factual averments of the complaint as true, and construe those facts in the light most congenial to [Plaintiffs'] cause." Royal v. Leading Edge Prods., Inc., 833 F.2d 1, 1 (1st Cir. 1987) (first citing Guessefeldt v. McGrath, 342 U.S. 308, 310 (1952); and then citing Chongris v. Bd. of Appeals, 811 F.2d 36, 37 (1st Cir. 1987)). "Dismissal can be justified only if it clearly appears that no colorable hook exists upon which subject matter jurisdiction can be hung." Id. Even so, "a plaintiff who seeks to bring her suit in a federal forum bears the burden of establishing that the federal court has subject-matter jurisdiction." Klimowicz v. Deutsche Bank Nat'l Tr. Co., 907 F.3d 61, 64 (1st Cir. 2018) (citing Gordo-González, 873 F.3d at 35).

When deciding a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts, analyze those facts in the light most favorable to the plaintiff, and draw all reasonable factual inferences in favor of the plaintiff. See Gilbert v. City of Chicopee, 915 F.3d 74, 80 (1st Cir. 2019) (first citing Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 7 (1st Cir. 2011); and then citing Gargano v. Liberty Int'l Underwriters, Inc., 572 F.3d 45, 48 (1st Cir. 2009)). "[A] complaint must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief,'" Cardigan Mountain Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015) (quoting Fed. R. Civ. P. 8(a)(2)), and set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory," Pitta v. Medeiros, 90 F.4th 11, 17 (1st Cir. 2024) (quoting Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008)). Although detailed factual allegations are not required, a complaint must set forth "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Rather, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570).

### B. Motions for Summary Judgment

Summary judgment is normally appropriate where the movant can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "However, in cases involving review of agency action under the APA, the traditional Rule 56 standard does not apply due to the limited role of a court in reviewing the administrative record." Bennett v. Murphy, 166 F. Supp. 3d 128, 139 (D. Mass. 2016) (citing Int'l Jr. Coll. of Bus. and Tech., Inc. v. Duncan, 802 F.3d 99, 106 (1st Cir. 2015)).

In particular, for summary judgment motions under the APA, the Court's review "is limited to the administrative record,"[5] Lovgren v. Locke, 701 F.3d 5, 20 (1st Cir. 2012), and "[t]he 'entire case' on review is a question of law." Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (citation omitted); id. (holding that in summary judgment cases involving final agency action the district judge "sits as an appellate tribunal"); see also Doe v. United States Citizenship & Immigr. Servs., 239 F. Supp. 3d 297, 305 (D. D.C. 2017) ("Summary judgment is [ ] the mechanism for deciding whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." (internal quotations omitted)).

"Under the APA, a reviewing court may set aside an agency's decision if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law,' such as if it is 'unsupported by substantial evidence.'" Atieh v. Riordan, 797 F.3d 135, 138 (1st Cir. 2015) (quoting 5 U.S.C. § 706(2)). As a general matter, judicial review of an APA claim is "narrow" because "the APA standard affords great deference to agency decisionmaking." Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997). "If the agency's decision is supported by any rational view of the record, a reviewing court must uphold it." Atieh, 797 F.3d at 138. Importantly, the Court "may not substitute [its] judgment for that of the agency, even if [it] disagree[s] with [the agency's] conclusions." Sig Sauer, Inc. v. Brandon, 826 F.3d 598, 601 (1st Cir. 2016) (quoting Craker v. DEA, 714 F.3d 17, 26 (1st Cir. 2013)).

---

[5] It is sometimes appropriate "to resort to extra-record information to enable judicial review to become effective," particularly when the "procedural validity of [the agency's] action . . . remains in serious question." Esch v. Yeutter, 876 F.2d 976, 991 (D.C. Cir. 1989). Due to the evolving nature of this action, the Court will rely on updated declarations regarding the timing of planned obligations where the information set forth in those declarations is undisputed.

## III. DISCUSSION

### A. Justiciability

Defendants raise several threshold issues that are relevant to Plaintiffs' claims generally. The Court will first address these arguments and then proceed to discuss the merits of Plaintiffs' claims related to the funds that expire on September 30, 2026.

#### 1. Article III Standing

The Constitution gives the judiciary power to hear "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. The Supreme Court has interpreted this language to mean that courts may decide only "cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102 (1998). A plaintiff's standing to sue is "part of the common understanding of what it takes to make a justiciable case." Id. Therefore, "the absence of standing sounds the death knell for a case." Microsystems Software, Inc. v. Scandinavia Online AB, 226 F.3d 35, 39 (1st Cir. 2000). The standing determination is "claim-specific," meaning that an individual plaintiff "must have standing to bring each and every claim that [he or] she asserts." Katz v. Pershing, LLC, 672 F.3d 64, 71 (1st Cir. 2012).

Article III standing requires that three conditions be satisfied. "First and foremost, there must be alleged (and ultimately proved) an 'injury in fact.'" Steel Co., 523 U.S. at 103 (quoting Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)). This injury "must be concrete in both a qualitative and temporal sense," "distinct and palpable" as opposed to "abstract," and "actual or imminent" as opposed to "conjectural or hypothetical." Whitmore, 495 U.S. at 155 (citation modified). Second, standing requires causation, defined as a "fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." Steel Co., 523

U.S. at 103. Finally, standing requires "redressability—a likelihood that the requested relief will redress the alleged injury." Id.

Defendants set forth several arguments as to why Plaintiffs have failed to establish Article III standing for their claims. [ECF No. 56 at 22–25].

First, Defendants argue that Plaintiffs have alleged "competitive injury" and, therefore, they must demonstrate that they are "able and ready to bid on contracts and that a discriminatory policy prevents [them] from doing so on an equal basis." [ECF No. 56 at 22 (quoting Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 666 (1993))]. Defendants contend that Plaintiffs have not alleged that they are ready and able to bid on each set of funds at issue here or that they are disadvantaged with respect to or unable to compete on an equal basis with other applicants. [Id. at 23 (citing Castro v. Scanlan, 86 F.4th 947, 954 (1st Cir. 2023))]. Plaintiffs respond that the core question at the heart of the standing inquiry is whether they have a "personal stake" in the litigation, and that they must be able to answer the question "[w]hat's it to you" for each claim they assert. [ECF No. 63 at 10 (quoting Bost v. Ill. State Bd. of Elections, 607 U.S. 71, 76 (2026))]. With respect to "competitive injury," Plaintiffs claim that their members compete for awards under every statutory research center and program at issue, and that for each of the appropriations at issue, Plaintiffs have lost the opportunity to obtain any funds that have not been obligated or that are being reprogrammed away from REL, a program from which Plaintiffs frequently receive funds. [Id. at 11 (first citing [Dinkes Decl. ¶ 20]; and then citing [Norford Decl. ¶ 4])]. Plaintiffs also argue that there is no requirement that they be disadvantaged relative to their competitors to establish injury, differentiating Castro on the basis that it dealt with the "doctrine of economic competitor standing" which concerns the idea that "one direct competitor's gain of market share is another's loss," Castro, 86 F.4th at 954, 957

(holding that plaintiff was not a direct and current competitor with a former president for votes in a primary election), and therefore irrelevant here, [ECF No. 63 at 12 n.3]. Instead, they point to a long line of cases recognizing standing where a party has been denied an opportunity to compete, including Global Health Council v. Trump, 153 F.4th 1, 12 (D.C. Cir. 2025), in which the D.C. Circuit recently held that plaintiffs had standing because the prospect of competing for funds in the future would partially redress their injuries, id. ("[A] plaintiff may be harmed by denial of the opportunity to compete for a pool of funds for which they are able and willing to compete."). [ECF No. 63 at 13]; see CC Distribs., Inc. v. United States, 883 F.2d 146, 150 (D.C. Cir. 1989) ("[A] plaintiff suffers a constitutionally cognizable injury by the loss of an opportunity to pursue a benefit."). Plaintiffs have submitted multiple declarations establishing that they and their members are "ready and able" to compete for funding under the Department programs at issue and have received funds from them in the past. See [ECF No. 52 ¶¶ 9–24, 28–29]; [ECF No. 51 ¶¶ 3–5, 7]; [ECF No. 49 ¶¶ 13, 16, 20, 30]. The Court agrees with Plaintiffs that, in relation to their claim that obligations have been unlawfully withheld or unreasonably delayed, they have Article III standing based on their inability to compete for grant funding. See Washington v. FEMA, 818 F. Supp. 3d 195 (D. Mass. 2025) (finding that plaintiffs had standing where the shuttering of a FEMA program cost them the chance to pursue future funding).

Second, Defendants argue that the potential harm Plaintiffs may suffer based on disruption of their research is speculative and not imminent because Plaintiffs have no right to the funds at issue here, unlike the plaintiffs in Global Health Council, which Defendants argue were grantees who were entitled to payments from certain withheld funds. [ECF No. 56 at 23 (citing Glob. Health Council, 153 F.4th at 11)]. Defendants are correct that some of the plaintiffs in Global Health Council established standing based on the agency's failure to disburse funds in

accordance with pre-existing contracts, however, after the agency there "paid out substantially all of the amounts owed on existing contracts . . . as required by part of the district court's injunction," the D.C. Circuit subsequently found that the plaintiffs were also harmed and had standing due to the "denial of the opportunity to compete for a pool of funds for which they are able and willing to compete." 153 F.4th at 12.

Third, Defendants argue that Plaintiffs' alleged harm from the Executive Order Footnotes is not "certainly impending" because Plaintiffs allege only that the footnotes may create uncertainty. [ECF No. 56 at 24]. Defendants claim that in order for Plaintiffs to suffer harm as a result of the footnotes, the Department must interpret and apply them in a way that conflicts with existing laws, even though the footnotes themselves state that they are to be applied "as permissible by law," which is a "highly attenuated chain of possibilities." [Id. (quoting Clapper v. Amnesty Int'l USA, 568 U.S. 398, 410 (2013))]. Plaintiffs contend that they have standing to challenge the footnotes because the Department and its political appointees have interpreted the prohibition on "DEI" to require "scrapping programs for children with disabilities" on the basis that these programs are a form of inclusion, and that "Knowledge Alliance's members have been chilled from mentioning their work involving equity and disabilities in their funding applications." [ECF No. 63 at 15]. According to Plaintiffs, this shows that the Executive Order Footnotes will harm them regardless of whether the Department carries them out in a way that directly conflicts with any statute. [Id.]. The Court finds that this threat of harm to Plaintiffs is not so attenuated as to preclude Article III standing. The Supreme Court in Clapper found that the plaintiffs' alleged harm was "highly speculative" because it would only come about if the government decided to target certain specific communications, invoked certain surveillance methods over others, survived review by the Foreign Intelligence Surveillance Court, and

succeeded in intercepting communications intended for the plaintiffs. 568 U.S. at 410. Here, Plaintiffs' alleged harm is much less speculative, as they claim that political appointees within the Department have already terminated certain grants they consider to be DEI-related, [ECF No. 63 at 15 n.4], and they have already had to adjust their funding applications based on the footnotes, [id. at 15].

Fourth, Defendants argue that Plaintiffs cannot assert informational standing based on their use of IES data and research because no statute gives them the right to have this information. [ECF No. 56 at 24 (citing Amrhein v. eClinical Works, LLC, 954 F.3d 328, 333 (1st Cir. 2020))]. Defendants claim that this harm is not traceable to any particular apportionment or obligation and that it is speculative because it is based on the assumption that the Department will not obligate the funds and that the programs will not generate the information that they seek. [Id.]. Plaintiffs respond that even if it is true that a statute must give them the right to the information at issue, "there are myriad statutes requiring the Department to publish and disseminate research produced through the IES, Comprehensive Centers, and EIR programs." [ECF No. 63 at 14]. Specifically, they point to 20 U.S.C. § 9574, which requires that data collected by IES be made available to the public; 20 U.S.C. § 9533(a)(7), which sets forth a similar requirement for NCER; and 20 U.S.C. § 9602(f)(B), which sets forth a similar requirement for the Comprehensive Centers, and several other examples. [ECF No. 64 at 14]. A "plaintiff suffers an 'injury in fact' when [he or she] fails to obtain information which must be publicly disclosed pursuant to a statute," Fed. Election Comm'n v. Akins, 524 U.S. 11, 21 (1998) (citing Pub. Citizen v. Dep't of Justice, 491 U.S. 440, 449 (1989)), and the Court finds that Plaintiffs have made a sufficient showing that the aforementioned statutes require public disclosure of the research and data that they seek.

Finally, Defendants argue that Plaintiffs cannot establish standing for future injunctive relief by alleging past exposure to harm. [ECF No. 56 at 25]. In order to pursue future injunctive relief, Plaintiffs "must establish an ongoing or future injury that is 'certainly impending'; [they] may not rest on past injury." Arpaio v. Obama, 797 F.3d 11, 19 (D.C. Cir. 2015) (quoting Clapper, 568 U.S. at 409). "To pursue an injunction or declaratory judgment, . . . plaintiffs must allege a likelihood of future violations of their rights." Fair Empl. Council of Greater Wash., Inc. v. BMC Mktg. Corp., 28 F.3d 1268, 1273 (D.C. Cir. 1994). Defendants claim that the only future harm that Plaintiffs have identified is the fear that funds will not be obligated before their respective deadlines, and that because Department officials have sworn that the funds will be obligated in a timely fashion, Plaintiffs have not established a likelihood of future injury that is certainly impending. [Id.]. To the extent that Plaintiffs request permanent, future injunctive relief, the Court reserves ruling on those arguments today.[6]

**2. Mootness**

Mootness is "the doctrine of standing set in a time frame: [t]he requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." Arizonans for Official English v. Arizona, 520 U.S. 43, 68 n.22 (1997) (quoting United States Parole Comm'n v. Geraghty, 445 U.S. 388, 397 (1980)). "Mootness usually results when a plaintiff has standing at the beginning of a case, but, due to intervening events, loses one of the elements of standing during litigation." WildEarth Guardians v. Pub. Serv. Co. of Colorado, 690 F.3d 1174, 1182 (10th Cir. 2012). "Intervening events must 'have

[6] Defendants also argue that Plaintiffs cannot establish standing by alleging that they are harmed because they have been required to divert time and resources to monitoring the apportionment process. [ECF No. 56 at 24–25]. The Court need not reach this argument because it has found that Plaintiffs have established Article III standing on multiple other bases.

completely and irrevocably eradicated the effects' of the parties' conduct in order for a case to be deemed moot." Town of Barnstable v. O'Connor, 786 F.3d 130, 142 (1st Cir. 2015) (quoting Cnty. of Los Angeles v. Davis, 440 U.S. 625, 631 (1979)); see Ramirez v. Sanchez Ramos, 438 F.3d 92, 100 (1st Cir. 2006) ("[I]ntervening events [must] have blotted out the alleged injury and established that the conduct complained of cannot reasonably be expected to recur."). "The Supreme Court has placed the 'heavy burden of persuasion' with respect to mootness on the party advocating for it." Town of Barnstable, 786 F.3d at 142 (quoting United States v. Concentrated Phosphate Exp. Ass'n, 393 U.S. 199, 203 (1968)).

As is relevant here, Defendants argue that Plaintiffs' claim regarding the Department's failure to obligate certain IES and Comprehensive Centers funds that expire on September 30, 2026, is moot because most of the funds have now been obligated and the Department has expressed its "clear intention" to obligate the remaining funds by the deadline. [ECF No. 56 at 26]. Defendants only assert that Plaintiffs' claim is moot "[t]o the extent [they] seek to compel apportionments or obligations that have now occurred," [id.], and while Defendants have expressed an intent to obligate the remaining funds, they have not actually done so, [ECF No. 66 ("Hearing Transc.") at 26]. Accordingly, the Court agrees with Plaintiffs that their claim seeking

to compel Defendants to obligate the currently unobligated and soon-expiring funds to IES and the Comprehensive Centers program before September 30, 2026, is not moot.[7][8]

### 3. Whether Plaintiffs' Claims are Precluded by the Impoundment Control Act or the Anti-Deficiency Act

The APA "confers a general cause of action upon persons 'adversely affected or aggrieved by agency action within the meaning of a relevant statute.'" Block v. Cmty. Nutrition Inst., 467 U.S. 340, 345 (1984) (quoting 5 U.S.C. § 702). Section 701(a) of the APA, however, disallows judicial review where "statutes preclude judicial review." 5 U.S.C. § 701(a)(1). "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." Block, 467 U.S. at 345. Defendants claim that both the Impoundment Control Act of 1974 ("ICA"), which Plaintiffs have not pled, and the Anti-Deficiency Act preclude judicial review of Plaintiffs' APA claims. [ECF No. 56 at 28–30].

[7] Although Defendants' have provided declarations that they "intend" and "plan" to obligate the funds before the September 30, 2026, deadline, their language is carefully phrased as "intent", see [ECF No. 58 at 5]; [ECF No. 41-7 at 2]; [ECF No. 41-9 at 3], rather than any sort of clear agreement or assertion that they "will" obligate the funds. Given the historical context around these programs, namely that the current Administration has already attempted to cancel or substantially cut the programs but was prevented by Congress from doing so, the Court will not rely on mere "intentions" with regard to Defendants' mootness arguments. [Hearing Transc. at 12 (Plaintiffs' counsel noting that these are programs that the current Administration "disfavor[s] on policy grounds" and that "OMB and the Administration asked Congress to stop funding or substantially cut" but "Congress said no")]; [id. at 48 (Defendants' counsel stating that Defendants "intend" to allocate all funds by the upcoming deadline)].

[8] Although Defendants also raise a ripeness argument, that argument is not relevant to the claims being addressed today.

i. The ICA

"In 1974, the Congress imposed statutory requirements on the Executive dealing with the obligation and expenditure of appropriated funds." Glob. Health Council, 153 F.4th at 8 (citing Impoundment Control Act of 1974, Pub. L. No. 93-344, tit. X, 88 Stat. 297, 332–39 (codified at 2 U.S.C. § 681 et seq.)). "To reserve appropriated funds within the Executive until expiry or request the Congress to rescind funds, known as permanent impoundment, the President must send a special message to both chambers of the Congress." Id. (citing 2 U.S.C. § 683(a)). "Any amount proposed to be rescinded or reserved," however, "'shall be made available for obligation' unless the Congress passes a rescission bill within 45 calendar days of receipt of the special message," id. (citing 2 U.S.C. §§ 682(3), 683(b)). "The President must also send a special message containing specific information to the Congress when he proposes to defer, or temporarily impound, appropriated funds." Id. (citing 2 U.S.C. §§ 682(1), 684). "The Congress may disapprove a proposed deferral through an impoundment resolution," id. (citing 2 U.S.C. § 682(4)), and "the ICA sets out a mechanism for reporting and enforcement by the Comptroller General," id. (citing 2 U.S.C. §§ 686–87). Additionally, the ICA states that "[n]othing contained in this Act . . . shall be construed as . . . affecting in any way the claims or defenses of any party to litigation concerning any impoundment." 2 U.S.C. § 681(3).

Defendants argue that the ICA's political-branch procedures and judicial review mechanism preclude APA review of Plaintiffs' claims because only the Comptroller General may bring claims asserting that the Executive Branch engaged in unlawful impoundments by failing to obligate appropriated funds. [ECF No. 56 at 28]. In support of their argument, Defendants point to Global Health Council, in which the D.C. Circuit found that "the ICA created a complex scheme" involving "notification of the Congress, congressional action on a

proposed rescission or deferral and suit by a specified legislative branch official if the executive branch violates its statutory expenditure obligations," 153 F.4th at 18, and note that while the ICA contains the disclaimer that it should not be construed as "affecting in any way the claims or defenses of any party to litigation concerning any impoundment," id. at 19 (quoting 2 U.S.C. § 681(3)), this provision "does not mean that any aggrieved party may initiate litigation to enforce the ICA itself," id. (citing Pub. Citizen v. Stockman, 528 F. Supp. 824, 828 (D.D.C. 1981)).

In response, Plaintiffs contend that the ICA does not, for the most part, actually mandate that agencies spend appropriated funds, but rather, it provides procedures for the President to "get out from those spending mandates." [ECF No. 63 at 19]. Specifically, Plaintiffs assert that the only instances in which the ICA compels the spending of appropriated funds is where the President sends a special message to Congress requesting recission of funds and Congress declines to enact a rescission bill, in which case the ICA mandates that the funds be spent. [Id. (citing 2 U.S.C. § 683(b))]. Next, they argue that the Comptroller General has never actually exercised his or her authority under the ICA to sue, and that this provision is likely inoperative because the Comptroller General lacks Article III standing to sue. [Id. (citing Walker v. Cheney, 230 F. Supp. 2d 51, 66 (D.D.C. 2002))]. And lastly, Plaintiffs assert that nothing in the ICA suggests that Congress intended to displace the right of private parties to bring APA suits for violations of appropriations acts or other statutes, and that at the time that the ICA was enacted, there was a long history of cases involving private parties challenging various agencies' refusals to spend appropriated funds. [Id. at 19–20 (citing, e.g., Train v. City of New York, 420 U.S. 35 (1975); State Highway Comm'n of Mo. v. Volpe, 347 F. Supp. 950, 954 (W.D. Mo. 1972); Guadamuz v. Ash, 368 F. Supp. 1233 (D.D.C. 1973)]. In support of the proposition that the ICA

does not fully preclude review under the APA, Plaintiffs highlight that the D.C. Circuit in Global Health Council found only that parties could not use the APA to sue over violations of the ICA itself, [ECF No. 63 at 21 (citing Global Health Council, 153 F.4th at 18–19)], and that similarly, the Supreme Court's order in Department of State v. AIDS Vaccine Advocacy Coalition ("AVAC"), in which the Court found that the ICA precluded the plaintiffs' APA claims to enforce the appropriations "at issue", 146 S. Ct. 19 (2025) (emphasis added), pertained only to $4 billion of funds that the President had proposed be rescinded via special message, not approximately $6.5 billion of other appropriated funds that the plaintiffs had challenged as improperly withheld, [ECF No. 63 at 22].

The Court finds Plaintiffs' argument persuasive. The language of the statute states that it is not intended to affect the "claims of any party" in "litigation concerning any impoundment." 2 U.S.C. § 681(3). Here, Plaintiffs seek to bring claims concerning an impoundment, and they do not directly seek to use the APA to enforce any provision of the ICA. See generally [Compl.]. And, as Plaintiffs point out, the two cases that Defendants cite in support of the proposition that the ICA precludes this Court's review of Plaintiffs' APA claims seeking to enforce a separate statute, Global Health Council and AVAC, are limited only to attempts to enforce the ICA itself. [ECF No. 56 at 21–22]. The D.C. Circuit in Global Health Council expressly stated that it was not deciding "whether the ICA precludes suits under the APA to enforce appropriations acts," 153 F.4th at 20 n.17, and its discussion of preclusion is clearly limited to APA claims seeking to enforce the ICA itself, see id. at 19 (repeatedly mentioning claims to "enforce the ICA"); see also Neguse v. U.S. Immigr. and Customs Enf't, 813 F. Supp. 3d 45, 88 (D.D.C. 2025) (stating that "Global Health Council addressed whether plaintiffs had an APA cause of action to enforce the [ICA] itself," but did not extend that holding to other statutes or appropriations acts, and

distinguishing the ADA from the ICA, the latter of which "created a complex scheme of interbranch dialogue" (quoting Glob. Health Council, 153 F.4th at 18–19)). As discussed above, the AVAC plaintiffs brought APA claims to enforce certain appropriations acts and the Impoundment Control Act. 146 S. Ct. at 19; AIDS Vaccine Advoc. Coal. v. Dep't of State, 766 F.Supp.3d 74, 85 (D.D.C. 2025). After the D.C. Circuit upheld the district court's preliminary injunction ordering the State Department to obligate $10.5 billion in appropriated funds, the defendants submitted a stay request to the Supreme Court that pertained only to the $4 billion in funds that the President had sought to rescind using the ICA procedures, not the remaining funds, which, like the funds at issue here, the President did not attempt to rescind using the ICA procedures. AVAC, 146 S. Ct. at 19; AIDS Vaccine Advoc. Coal., No. 25-cv-05317, 2025 WL 2600116, at *1 (D.C. Cir. Sep. 5, 2025) (denying stay pending appeal); AIDS Vaccine Advoc. Coal., 766 F. Supp. 3d 74, 85 (D.D.C. 2025). Taking these recent decisions into consideration, and given the "presumption favoring judicial review of administrative action," Block, 467 U.S. at 349 (stating that "clear and convincing evidence of congressional intent [is] needed to overcome the presumption in favor of judicial review"), the Court finds that the ICA does not preclude Plaintiffs' APA claims to enforce the ADA.

ii. The ADA

Defendants assert that the same reasoning they set forth in connection with their ICA argument applies to the Anti-Deficiency Act as well. [ECF No. 56 at 29].

First, Defendants argue that the ADA "has no rights creating language" and therefore does not create a private right of action. [ECF No. 56 at 29–30]. This argument is inapposite because Plaintiffs bring their claims under the APA, and not directly under the ADA.

Second, Defendants contend that APA review is precluded because the ADA provides a comprehensive remedial scheme which, they argue, confirms that Congress did not intend for private parties to be able to pursue alleged violations of the statute. [ECF No. 56 at 30]. Specifically, they state that if an Executive Branch employee violates sections 1512 or 1513 of the ADA, the head of the employee's agency must report the violation to the President, Congress, and the Comptroller General, [ECF No. 56 at 30 (citing 31 U.S.C. §§ 1351, 1517(b))], and that the ADA's remedial provisions, which include measures spanning from administrative discipline to criminal penalties, do not include a method for private parties to enforce appropriations as Plaintiffs seek to do here, [id.]. Further, they again point to the D.C. Circuit and the Supreme Court's holdings in Global Health Council and AVAC to suggest that the ICA precludes all APA review, including Plaintiffs' "backdoor" attempt to use the ADA to enforce the ICA. [Id. at 31].

Defendants' arguments are ultimately unavailing. First, as Plaintiffs point out, the penalties and remedial actions in the ADA highlighted by Defendants are consequences that the statute sets out for Executive Branch employees who obligate funds in excess of congressional appropriations, not those who fail to fully obligate appropriated funds. Here, Plaintiffs' APA claims do not invite review that would disrupt those specific statutory remedies. [ECF No. 63 at 24 (citing 31 U.S.C. §§ 1341(a), 1349–1351)]; see Neguse, 813 F. Supp. 3d at 88 (holding that the ADA did not preclude plaintiffs APA claim to enforce provision of appropriations act). Second, at least one other court has found that APA review of the ADA is appropriate. Am. Fed'n of State Cnty. & Mun. Emps., AFL-CIO v. OMB, 807 F. Supp. 3d 1004, 1031 (N.D. Cal. 2025). In that case, the plaintiffs similarly brought APA claims asserting that certain agency actions were unlawful in violation of the ADA, and the court found that "the APA clearly

provides a cause of action to challenge agency conduct such as what is alleged here." Id. at 1032. For these reasons, and those discussed above in connection with the ICA, the Court does not find that the ADA's remedial scheme for the type of violation Plaintiffs' allege is so comprehensive as to preclude judicial review under the APA.

#### 4. Zone of Interests

Next, Defendants argue that Plaintiffs' injuries fall outside the zones of interest for the ADA and the relevant appropriations acts. "An APA claimant must establish that the claim arguably falls within the zone of interests to be protected or regulated by the underlying statute." SeaFreeze Shoreside, Inc. v. U.S. Dep't of the Interior, 123 F.4th 1, 20 (1st Cir. 2024) (citing Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 129–30 (2014)). "As the word 'arguably' suggests, the zone-of-interests test 'is not especially demanding.'" Id. (quoting Lexmark, 572 U.S. at 130) (citation modified). When conducting a zone-of-interests test, courts "do not require any 'indication of congressional purpose to benefit the would-be plaintiff.'" Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 225 (2012) (quoting Clarke v. Sec. Indus. Assn., 479 U.S. 388, 399–400 (1987)). "Thus, the zone-of-interests test 'forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue.'" SeaFreeze Shoreside, Inc., 123 F.4th at 20 (quoting Lexmark, 572 U.S. at 130) (further quotations omitted).

Defendants contend that Plaintiffs' claims are not within the zone of interests of the ADA or the relevant appropriations acts because these statutes do not reflect congressional purpose to award funds to any particular grantee and are instead focused on regulating the relationship between the legislative and executive branches. [ECF No. 56 at 33]. As Plaintiffs argue,

however, they need not show "any indication of congressional purpose to benefit" themselves specifically. Seafreeze Shoreside, Inc., 123 F.4th at 20 (quoting Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians, 567 U.S. at 225). Under the "lenient" application of the zone-of-interests tests in the APA context, Lexmark, 572 U.S. at 130—which is informed by Congress's "'evident intent' when enacting the APA 'to make agency action presumptively reviewable,'" Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians, 567 U.S. at 225 (quoting Clarke, 479 U.S. at 399), and entitles Plaintiffs to "the benefit of any doubt," id.—the sole inquiry is whether Plaintiffs' interests are aligned and consistent with the implicit purposes of the relevant statutes: here, education-related endeavors, in the case of the appropriations acts, and the timely, prudent obligation of congressionally appropriated funds, in the case of the ADA. The zone-of-interests inquiry is not intended to be demanding, and Plaintiffs' interests here are sufficiently connected to the purposes of the ADA and the appropriations acts.

#### 5. Decisions Committed to Agency Discretion

Defendants also argue that their funding choices, specifically the decision to reallocate or reprogram funds for other purposes within an appropriation, are decisions committed to agency discretion by law and therefore unreviewable pursuant to 5 U.S.C. § 701(a)(2). [ECF No. 56 at 33]. The Court notes at the outset that this exception to APA review is limited to those "rare circumstances" where "no meaningful standard" exists by which a reviewing judge could cabin that agency discretion. Dep't of Com. v. New York, 588 U.S. 752, 772 (2019) (noting that "to honor the [APA's] presumption of review," this exception is read "quite narrowly").

In support of their argument, Defendants first point to section 1512(b)(2) of the ADA, which states that "[t]he official designated in section 1513 of this title to make apportionments shall apportion an appropriation under paragraph (1) of this subsection as the official considers

appropriate." 31 U.S.C. § 1512(b)(2). They also refer the Court to Lincoln v. Vigil, which states that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion," 508 U.S. 182, 185–88, 192 (1993), and that these funding decisions require the agency to "balanc[e] a number of factors" such as "whether its 'resources are best spent' on one program or another,'" id. ("[T]he very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way."); Milk Train, Inc. v. Veneman, 310 F.3d 747, 751 (D.C. Cir. 2002) (holding that the court lacked jurisdiction to review challenge to cap on production "[i]nsofar as Congress has left to the Secretary's sole judgment the determination of the manner for providing assistance to dairy farmers").

Plaintiffs argue that Lincoln can be distinguished because the program at issue in Lincoln was not required by or referenced in any statute, see 508 U.S. at 184–86 ("Congress never expressly appropriated funds for these centers"), in contrast to the IES programs and centers at issue here, which Congress created and are required by statute, [ECF No. 63 at 26]. Plaintiffs argue that the statutes creating these programs and centers "provide meaningful standards for assessing the reasonableness of how IES allocates its funds." [Id.]. For example, Congress has mandated via statute that NCER "shall support not less than 8 national research and development centers" each assigned 11 research topics; financial support for the centers "shall be of sufficient size and scope to be effective," 20 U.S.C. § 9533(c); NCES must "collect, report, analyze, and disseminate statistical data" on at least 15 different categories of information, id. § 9543(a)(1); NCSER must carry out research activities in 17 congressionally identified areas that are of importance to education policymakers, id. § 9567b(A)(4), (8); and the REL program, "shall enter

into contracts with entities to establish a networked system of 10 regional educational laboratories that serve the needs of each region of the United States," id. § 9564(a).

The Court finds Plaintiffs' reasoning persuasive. "[A]n agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes (though not, as we have seen, just in the legislative history)." Lincoln, 508 U.S. at 193. Here, Plaintiffs have shown that "[t]here are numerous statutory provisions" requiring the centers and programs at issue here to carry out certain functions and activities, including "to consider certain research activities," Am. Pub. Health Assoc. v. Nat'l Insts. of Health, 145 F.4th 39, 53 (1st Cir. 2025), which "circumscribe agency discretion to allocate resources," id. (quoting Lincoln, 508 U.S. at 193). The congressionally mandated requirements and responsibilities applicable to these programs and centers supply a "meaningful standard against which to judge the agency's exercise of discretion." Lincoln, 508 U.S. at 191 (quoting Heckler v. Chaney, 470 U.S. 821, 830 (1985)). As such, the Court concludes that the Department's reprogramming of funds and its decision not to follow congressional explanatory statements is reviewable under the APA.

### 6. Final Agency Action

Next, Defendants argue that Plaintiffs' APA claims fail because they do not challenge a discrete and final agency action. [ECF No. 56 at 34]. As discussed infra, the APA entitles any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" to judicial review. 5 U.S.C. § 702. Such review, however, is limited to final agency actions unless otherwise specified by statute. See id. § 704. An agency action is final if two conditions are met: first, the action must "mark the consummation of the agency's decisionmaking process" and not be "of a merely tentative or interlocutory nature," and, second,

it must be "one by which rights or obligations have been determined, or from which legal consequences will flow." Harper v. Werfel, 118 F.4th 100, 116 (1st Cir. 2024) (citation modified) (quoting Bennett v. Spear, 520 U.S. 154, 178 (1997)). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." Brnovich v. Biden, 630 F. Supp. 3d 1157, 1171 (D. Ariz. 2022) (quoting Or. Nat. Desert Ass'n v. U.S. Forest Serv., 465 F.3d 977, 982 (9th Cir. 2006)).

With respect to this argument, Defendants primarily contend that because the appropriated funds have not yet been obligated, there is no final agency action. [ECF No. 56 at 35–36 ("Plaintiffs' alleged 'final agency action' is based on nothing but fear that the apportionments and obligations will not be timely made." (emphasis in original))].

Plaintiffs argue, and the Court agrees, that Defendants are conflating two different categories of claims. [ECF No. 63 at 26]. In the first category, Plaintiffs challenge certain completed actions, including OMB apportioning and the Department obligating funds in conflict with congressional explanatory statements, OMB adding binding footnotes to apportionments, and OMB apportioning funds more than 30 days after the issuance of the relevant appropriations act. [ECF No. 63 at 26]. To the extent that Plaintiffs bring contrary-to-law and arbitrary-and-capricious challenges to the footnotes or Defendants' failure to follow congressional explanatory statements with respect to funds that have already been apportioned or obligated, Defendants do not argue that those apportionments or obligations were not final agency actions, see [ECF No. 56 at 34–36], and the Court has no reason to conclude otherwise. In the second category, Plaintiffs seek to compel discrete actions that they believe Defendants have unlawfully withheld or unreasonably delayed. [Id.]. Final agency action is not required for Plaintiffs' second

category of claims, nor could it be. Cobell v. Norton, 240 F.3d 1081, 1095 (D.C. Cir. 2001) ("One exception [to the final agency action requirement] occurs where plaintiffs claim that a governmental action was unlawfully withheld or unreasonably delayed."). Thus, to the extent that Plaintiffs seek in Count 8 to compel the obligation of certain appropriated funds before they expire, that claim does not require final agency action.[9]

## B. Merits

### 1. Executive Order Footnotes

#### i. Excess of Statutory Authority

Plaintiffs challenge OMB's use of the Executive Order Footnotes as in excess of statutory authority in violation of § 706(2)(C) of the APA,[10] [Compl. ¶¶ 163–166]; [ECF No. 50 at 30], contrary to the separation of powers in violation of § 706(2)(B),[11] [Compl. ¶¶ 168–170], and arbitrary and capricious in violation of § 706(2)(A), [id. ¶¶ 171–176].

First, with respect to the § 706(2)(C) claim, Defendants contend that the statutory notes for 31 U.S.C. § 1513, which require OMB to publish apportionments "including any associated footnotes," prove that OMB has the power to issue footnotes along with apportionments. [ECF No. 56 at 38]. They also contend that the Department is already required to adhere to the Executive Orders, which require compliance only as is consistent with applicable law. [Id. at 39

---

[9] The Court notes that since the filing of the Complaint, OMB has apportioned all of the funds that are set to expire September 30, 2026, or December 31, 2026, and Plaintiffs no longer seek to compel the apportionment of those funds. [ECF No. 56 at 19]; [ECF No. 63 at 16].

[10] While Plaintiffs initially claimed that the Executive Order Footnotes were contrary to several statutes applicable to the Department's grants and programs, [Compl. ¶ 167], Plaintiffs now state that the inconsistency between the Executive Order Footnotes and those statutes is not essential to their statutory authority claim, but that the tension between these statutes and the footnotes lends support to their arguments, [ECF No. 63 at 31 n.8].

[11] It is not entirely clear under which subsection of the APA Plaintiffs bring their separation of powers claim, and the Court presumes they bring it pursuant to 5 U.S.C. § 706(2)(B).

(first citing Executive Order 14151 ("This order shall be implemented consistent with applicable law and subject to the availability of appropriations."); and then citing Executive Order 14332 (same))].

In response, Plaintiffs argue that the ADA only authorizes OMB to use footnotes to implement restrictions derived from statutory requirements, such as timing restrictions for the use of certain funds, [Hearing Transc. at 15], not to legislate and inject policy objectives, [ECF No. 63 at 31]. Further, they contend that Defendants' argument about the Department's actual obligation or ability to comply with the footnotes and the Executive Orders is beside the point, and that the actual issue is whether OMB can make compliance with the Executive Orders a condition of an apportionment. [Id.]. They also highlight that failure to comply with apportionment requirements can lead to criminal penalties, unlike failure to comply with executive orders more generally, which Plaintiffs suggest is the real motivation behind the addition of the footnotes. [Id.].

Section 706(2)(C) of the APA instructs that the reviewing court should "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). "Where the statute at issue is one that confers authority upon an administrative agency, that inquiry must be 'shaped, at least in some measure, by the nature of the question presented'—whether Congress in fact meant to confer the power the agency has asserted." West Virginia v. EPA, 597 U.S. 697, 721 (2022). "The agency . . . must point to 'clear congressional authorization' for the power it claims." Id. (quoting Util. Air Regul. Grp. v. EPA, 573 U.S. 302, 324 (2014)). "Extraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s],'" id. (quoting Whitman v. Am. Trucking Ass'n, 531 U.S. 457, 468 (2001)), and Congress does not "typically

use oblique or elliptical language to empower an agency to make a 'radical or fundamental change' to a statutory scheme," id. (quoting MCI Telecomms. Corp. v. Am. Tel. & Tel. Co., 512 U.S. 218, 229 (1994)). "We presume that 'Congress intends to make major policy decisions itself, not leave those decisions to agencies.'" Id. (quoting U.S. Telecom Ass'n v. FCC, 855 F.3d 381, 419 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc)).

Here, Defendants have not pointed to "clear congressional authorization" for OMB to implement policy priorities through apportionment footnotes and rely solely on a singular mention of footnotes in the notes to § 1513. [ECF No. 56 at 38]. The Court does not find that this "modest" and "subtle" footnote reference in § 1513 authorizes the sweeping power to utilize binding apportionment footnotes to advance the Executive Branch's policy objectives. See West Virginia, 597 U.S. at 723. Beyond § 1513, Defendants have not identified any other congressional enactment that could plausibly have given OMB the power to unilaterally advance the Executive's policy priorities when apportioning funds. Moreover, other authorities and sources also suggest that the ADA does not enable OMB to enact and support the current administration's policies via footnote. See City of New Haven v. United States, 809 F.2d 900, 906 & n.18 (D. C. Cir. 1987) ("Congress . . . amended the Anti-Deficiency Act to preclude the President from relying on that Act as authority for implementing policy impoundments" after "President Nixon . . . attempted to use the Act as an instrument for shaping fiscal policy."); Nat'l Endowment for Democracy v. United States, 795 F. Supp. 3d 63, 70 (D.D.C. 2025) ("[T]he executive branch has long recognized that the apportionment authority under § 1512(a) does not alter the substantive obligations imposed by other statutes on the expenditure of funds."); see also Off. of Mgmt. & Budget, Exec. Off. of the President, OMB Circular No. A-11 at § 120.9 (2024) ("[A]pportionment of funds is not a means for resolving any question dealing with . . . the

legality of using funds for the purpose for which they are apportioned."); Comptroller General of the United States, B-163628, at 2 (Jan. 4, 1974), https://www.gao.gov/assets/890/884750.pdf ("[T]he apportionment power may not lawfully be used as a form of executive control or influence over agency functions . . . it may only be exercised by OMB . . . to prevent obligation or expenditure in a manner which would give rise to a need for deficiency or supplemental appropriations . . . ."). For these reasons, Plaintiffs are entitled to summary judgment on their claim that the Executive Order Footnotes are in excess of OMB's statutory authority.

ii. Contrary to the Separation of Powers

Second, with respect to their APA separation of powers claim, Plaintiffs contend that OMB's imposition of the Executive Order Footnotes violates the separation of powers by "usurping Congress's exclusive power to set the terms and conditions of federal spending." [ECF No. 63 at 31]. Defendants' sole argument in opposition to this claim is that it fails because it is purely statutory and merely recasts Plaintiffs' excess of statutory authority claim. [ECF No. 56 at 42].

"While there is no 'separation of powers clause' in the Constitution, 'that doctrine is undoubtedly carved into the Constitution's text by its three articles separating powers and vesting the Executive power solely in the President.'" Rhode Island v. Trump, 810 F. Supp. 3d 283, 309 (D.R.I. 2025) (quoting Trump v. United States, 603 U.S. 593, 637–38 (2024)). "Repose of power in three separate branches of government—the separation of powers—is a check and balance system 'designed to preserve the liberty of all the people.'" Am. Public Health Assoc. v. NIH, 786 F. Supp. 3d 237, 261 (D. Mass. 2025) (citing Collins v. Yellen, 594 U.S. 220, 245 (2021)). "The Framers of the Federal Constitution similarly viewed the principle of separation of powers as the absolutely central guarantee of a just Government . . . . Without a

Case 1:26-cv-00402-AHA Document 169 Filed 09/17/26 Page 35 of 46

secure structure of separated powers, our Bill of Rights would be worthless." Morrison v. Olson, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting). As relevant here, Article I of the Constitution creates the federal legislative power, including "power over the federal purse," Glob. Health Council, 153 F.4th at 8 (quoting Dep't of Navy, 665 F.3d at 1346), and assigns it to Congress—"and to no other [branch]," FCC v. Consumers' Rsch., 606 U.S. 656, 672 (2025); accord Learning Resources, Inc. v. Trump, 607 U.S. 229, 296 (2026) (Gorsuch, J., concurring).

While Defendants are correct that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims," Dalton v. Specter, 511 U.S. 462, 473 (1994), here, Plaintiffs' APA claim that the Executive Order Footnotes violate the separation of powers doctrine and, therefore, the APA, is a constitutional claim and not grounded on statutory authority, see [Compl. ¶¶ 168–170]. In other words, they are alleging that imposing restrictions on the use of appropriated funds beyond those contemplated by Congress when it appropriated the money is a usurpation by OMB of Congress's Spending Clause power. [Id. ¶ 170]. That said, "plaintiffs' concerns are better addressed by []other" aspects of their Complaint, namely through their APA claims that the footnotes are in excess of Defendants' authority under the ADA and are arbitrary and capricious. Jafarzadeh v. Nielsen, 321 F. Supp. 3d 19, 40 (D.D.C. 2018). Where, as here, "a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter." Id. (quoting Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)); see Am. Pub. Health Ass'n, 786 F. Supp. at 261–62 (applying the same principle and declining to address the plaintiffs' separation of powers claim). Therefore, the Court does not reach this claim.

iii. Arbitrary and Capricious

Finally, Plaintiffs claim that the Executive Order Footnotes are arbitrary and capricious in violation of § 706(2)(A) for several reasons, but primarily because OMB has provided no reasoned explanation for its inclusion of the footnotes in the apportionments and because the footnotes are substantively unreasonable. [Compl. ¶¶ 171–176]. "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" Ohio v. EPA, 603 U.S. 279, 292 (2024) (quoting FCC v. Prometheus Radio Project, 592 U.S. 414, 423 (2021)); see Multicultural Media, Telecom & Internet Council v. FCC, 873 F.3d 932, 936 (D.C. Cir. 2017) ("[A]n agency's exercise of discretion must be both reasonable and reasonably explained."). "In reviewing an agency's action under that standard, a court may not 'substitute its judgment for that of the agency,'" Ohio v. EPA, 603 U.S. at 279 (quoting FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009)), "[b]ut it must ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made,'" id. (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43 (1983)). See also Penobscot Air Servs., Ltd. v. FAA, 164 F.3d 713, 719 (1st Cir. 1999) ("The task of a court reviewing agency action under the APA's 'arbitrary and capricious' standard is to determine whether the agency has examined the pertinent evidence, considered the relevant factors, and 'articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" (quoting State Farm, 463 U.S. at 43)). "While this is a highly deferential standard of review, it is not a rubber stamp." Penobscot Air Servs., 164 F.3d at 720 (quoting Dubois v. U.S. Dep't of Agric., 102 F.3d 1273, 1285 (1st Cir. 1996)). "In arbitrary and capricious cases," courts "distinguish substantive unreasonableness claims from lack-of-reasoned explanation claims." Multicultural

Media, Telecom & Internet Council, 873 F.3d at 936. "A decision that the agency's action was substantively unreasonable generally means that, on remand, the agency must exercise its discretion differently and reach a different bottom-line decision." Id. "[A] lack-of-reasoned-explanation claim in this context ordinarily consists of a more modest claim that the agency has failed to adequately address all of the relevant factors or to adequately explain its exercise of discretion in light of the information before it." Id.

Seemingly in response to Plaintiffs' claim that the footnotes are not "substantively reasonable," Defendants contend that the footnotes simply require compliance with the Executive Orders to the extent compliance is consistent with other applicable laws, and that the footnotes thus merely reiterate requirements that agencies like the Department are already required to follow. [ECF No. 56 at 40]. They also aver that "[i]t cannot be arbitrary and capricious for OMB to comply with the Executive Orders in such a manner," [id. at 40–41], and that the footnotes do not contradict any purpose of the appropriations, [id. at 41]. In response, Plaintiffs contend that Defendants can point to no rationale for the footnotes beyond the Executive Orders, [ECF No. 63 at 32], and that "[m]ere compliance with an executive order does not satisfy the APA's demand for a showing of reasoned decision making," [id. (quoting R.I. Coal. Against Domestic Violence v. Kennedy, No. 25-cv-00342, 2026 WL 2364298, at *4 (D.R.I. Aug. 14, 2026))].

"It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" DHS v. Regents of the Univ. of Calif., 591 U.S. 1, 20 (2020) (quoting Michigan v. EPA, 576 U.S. 743, 758 (2015)). Here, Defendants point to the Executive Orders as a "post hoc rationalization," id. at 21 (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)), but

they have not directed the Court to any part of the administrative record where those orders were originally cited as a justification for the inclusion of the footnotes. And, as Plaintiffs point out, OMB did not articulate any reasoned basis for adding the footnotes. [ECF No. 63 at 32]. To reiterate, Defendants have not directed the Court to any part of the administrative record showing that in adding the Executive Order Footnotes to the apportionments at issue here, OMB "examined the pertinent evidence, considered the relevant factors, and 'articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" Penobscot Air Servs., 164 F.3d at 719 (quoting State Farm, 463 U.S. at 43); see generally [ECF No. 56 at 40–41]. Instead, Defendants contend that no explanation was needed because "requiring a federal agency to articulate a rationale for its action—beyond simple compliance with the President's directives—would, in essence, subject the President's directive to arbitrary and capricious review." [ECF No. 56 at 41]. Yet, as Plaintiffs respond, were the Court to adopt this reasoning, it would indicate that the Executive Branch could prevent arbitrary and capricious review by having the President direct the agency to take an action. [ECF No. 63 at 33]; see R.I. Coal. Against Domestic Violence, 2026 WL 2364298, at *4 (finding that agency action was arbitrary and capricious when the administrative record offered no explanation or process for the agency's imposition of new conditions for plaintiffs' receipt of funding). Accordingly, the Court finds that OMB acted arbitrarily and capriciously when it added the Executive Order Footnotes to the challenged apportionments.

**2. Explanatory Statements**

In Count 7, Plaintiffs claim that Defendants have long maintained a policy of apportioning and obligating IES funds consistently with the accompanying explanatory statements from Congress even when the statements are not legally binding, [Compl. ¶ 188], and

that Defendants' change in policy to not do so for 2025/2026 and 2026/2027 IES funds was arbitrary and capricious, [id. ¶¶ 191–192], because it was both substantively unreasonable and done without a reasoned explanation. [Id. ¶¶ 189–192]. In support of their claim, Plaintiffs set forth evidence that from the 2022 fiscal year to the 2024 fiscal year, Defendants allocated IES funds consistently with congressional explanatory statements. [ECF No. 48 ¶ 18]; [Id. at 8]. Defendants do not challenge this assertion, rather, they emphasize that the explanatory statements at issue are not legally binding, and therefore it is not arbitrary or capricious for OMB or the Department to decline to follow them. [ECF No. 56 at 41]. They also argue that Plaintiffs have not shown that there was an existing policy such that any agency action can be framed as a change from the previous status quo. [Id. at 42].

"An agency may change its existing position on an issue 'as long as [it] provide[s] a reasoned explanation for the change.'" Housatonic River Initiative v. EPA, 75 F.4th 248, 270 (1st Cir. 2023) (quoting Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 221 (2016)). "The agency 'need not demonstrate . . . that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible . . . , that there are good reasons for it, and that the agency believes it to be better.'" Id. (quoting Fox Television Stations, Inc., 556 U.S. at 515). An agency must "provide a more detailed justification" for the change in policy when "its prior policy has engendered serious reliance interests that must be taken into account." Fox Television Stations, Inc., 556 U.S. at 515.

"Failure to allege a written policy is not fatal[,] . . . since agency action need not be in writing to be judicially reviewable as a final action." Greater Bos. Legal Servs. v. U.S. Dep't of Homeland Sec., No. 21-cv-10083, 2022 WL 138629, at *7 (D. Mass. Jan. 14, 2022) (internal quotation marks and citation omitted); see also R.I.L-R v. Johnson, 80 F. Supp. 3d 164, 184

(D.D.C. 2015) ("A contrary rule 'would allow an agency to shield its decisions from judicial review simply by refusing to put those decisions in writing.'" (quoting Grand Canyon Tr. v. Pub. Serv. Co., 283 F. Supp. 2d 1249, 1252 (D.N.M. 2003))). That said, the Supreme Court has recently noted that courts "traditionally appl[y] the change-in-position doctrine when an agency shifts from a position expressed in a more formal setting." FDA v. Wages & White Lion Invs., LLC, 604 U.S. 542, 569 n.5 (2025) (emphasis added).

The Court finds that Plaintiffs have not sufficiently shown that Defendants had an unwritten or unspoken policy of apportioning and allocating funds in accordance with non-binding congressional explanatory statements prior to the apportionment of fiscal year 2025/2026 funds for IES. In support of their position, Plaintiffs cite to only two pieces of evidence, both outside the Administrative Record, the first being analysis on data from 2022 to 2024 which shows that IES funds were allocated consistently with congressional explanatory statements during that period, [ECF No. 48 ¶ 18]; [id. at 8], and the second being a paragraph in a declaration from Knowledge Alliance CEO and President, Rachel Dinkes, stating that "[i]n [her] time at Knowledge Alliance, IES has always obligated funds in accordance with the directives in the explanatory statements," [ECF No. 52 ¶ 8]. In her declaration, however, Dr. Dinkes does not state how long she has been at Knowledge Alliance, and in the absence of any other evidence from the period prior to 2022, the Court cannot presume that this alleged policy or practice of adhering to non-binding congressional statements dates back more than three years before 2025. Plaintiffs have provided no indication as to what Defendants' practice was prior to 2022 or whether the alleged practice applied more broadly across all of the Department's components or was a practice limited only to IES. While under certain circumstances a consistent practice over a long period of time could evidence an unwritten policy, the bare fact

that obligations were consistent with congressional explanatory statements for a short period of time does not establish that there was an established policy of making obligations consistent with explanatory statements. As such, based on the meager evidence before it, the Court cannot conclude that a policy existed as described. See Wages & White Lion Invs., LLC, 604 U.S. at 570 (providing examples of changes in agency position including "rescind[ing] a prior regulation, "expand[ing] the scope of its enforcement activity" or "abandon[ing a] decades-old practice") (emphasis added); Encino Motorcars, LLC, 579 U.S. at 222 (again mentioning an agency's change in policy where there had been "decades" of industry reliance).

### 3. Obligations

In Count 8, Plaintiffs have alleged that the Department has a mandatory duty to obligate the full amount of IES and Comprehensive Centers funds before September 30, 2026, when the appropriations expire, and that Defendants have unlawfully withheld or unreasonably delayed those obligations in violation of 5 U.S.C. § 706(1). [Compl. ¶¶ 198, 201–202]. Defendants contend that nothing in the ADA requires them to obligate the funds at a certain pace and that they intend to obligate the funds at issue before the deadline on September 30, 2026. [ECF No. 56 at 43–44].

The APA requires a government agency to "within a reasonable time . . . conclude a matter presented to it," 5 U.S.C. § 555(b), and provides that courts "shall . . . compel agency action unlawfully withheld or unreasonably delayed," id. § 706(1). To evaluate whether agency action is unreasonably delayed, courts in the First Circuit apply the six-factor test set forth in Telecomms. Rsch. & Action Ctr. v. FCC (TRAC), 750 F.2d 70, 80 (D.C. Cir. 1984). The TRAC factors are:

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the

> speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is "unreasonably delayed."

Id. (citation modified). The first factor is the "most important," In re Core Commc'ns, Inc., 531 F.3d 849, 855 (D.C. Cir. 2008), and courts have also described the fourth factor as "carr[ying] the greatest weight in many cases," Giliana v. Blinken, 596 F. Supp. 3d 13, 22 (D.D.C. 2022) (quoting Milligan v. Pompeo, 502 F. Supp. 3d 302, 319 (D.D.C. 2020)), but courts must "consider them all," In re A Cmty. Voice, 878 F.3d 779, 786 (9th Cir. 2017). Further, the first two factors are usually considered together. Dastagir v. Blinken, 557 F. Supp. 3d 160, 165 (D.D.C. 2021). The first factor asks "whether the agency's response time . . . is governed by an identifiable rationale," Ctr. for Sci. in the Pub. Int. v. FDA, 74 F. Supp. 3d 295, 300 (D.D.C. 2014), and the second looks at whether "Congress has provided a timetable" that "may supply content for th[e] rule of reason," TRAC, 750 F.2d at 80.

With respect to the first and second factors, Plaintiffs argue that Congress has provided an express timeline whereby the Department is required to obligate the funds by September 30, and that Defendants have provided no rationale for their slow pace. [ECF No. 50 at 37]. Defendants contend that they are reasonably using their discretion to comply with congressional deadlines and that Congress has provided no rate or speed at which they must obligate the funds so long as the funds are obligated by the official deadline. [ECF No. 56 at 46]. At this time, the Court finds that the first two factors weigh in favor of Defendants. Given the firm deadline, this does not appear to be a situation in which the agency's action could be delayed for years on end

or indefinitely. The funds at issue here were appropriated for a period of either one or two years, with a clear deadline for Defendants to apportion and obligate them on or before September 30, 2026. While the pace of apportionment and obligation may be slower than Plaintiffs prefer, there is a clear end date in sight, and Defendants have stated that they will obligate the funds before that deadline.

Regarding the third factor, Plaintiff argues that "human health and welfare" are at stake here, because these funds are intended to help children, including those with disabilities, [ECF No. 50 at 37], while Defendants contend that the funds at issue concern only economic regulation, [ECF No. 56 at 46]. Some courts have suggested that education benefits fall outside the realm of what is traditionally considered "health and welfare," see Mason v. Wilkie, No. 18-3849, 2018 WL 3831026, at *2 (Vet. App. Aug. 13, 2018) ("The Court notes that we are not dealing with health and welfare benefits, but education benefits."); New York v. DOJ, 804 F. Supp. 3d 294, 324 (D.R.I. 2025) (finding that statute's catch-all category of "welfare" did not include the Head Start childhood education program), while others have suggested that education programs do affect health and welfare, see Muwkema Tribe v. Babbitt, 133 F. Supp. 2d 42, 43 (D.D.C. 2001) (stating that education programs for tribal members affected the tribe's health and welfare). While education research doesn't fall cleanly into either the economic regulation or health and welfare categories, the Court finds that, particularly in this instance, where the funding is intended to support children with disabilities, the action at issue leans slightly more towards the health and welfare category than the economic regulation category.

With respect to the fourth factor, Plaintiffs argue that securing its funding must be of the utmost priority for IES, [ECF No. 50 at 37], while Defendants contend that expediting the obligations would interfere with the agency's administration of these and other programs, [ECF

No. 56 at 46]. Without further information, the Court does not find either of these arguments persuasive, and therefore, factor four does not weigh in either party's favor.

Regarding the fifth factor, Plaintiffs argue that the interests prejudiced by the Department's delay are "enormous." [ECF No. 50 at 37]. Although Defendants do not expressly respond to this argument, the Court notes that all of the harms Plaintiffs reference, such as losing the ability to compete for grant funds and laying off staff, are harms that would occur only if Defendants did not obligate at all, rather than as a result of the timing of the obligating. See [ECF No. 50 at 38–39]. Accordingly, the Court does not find that this factor weighs materially in either party's favor.

Finally, with respect to the sixth factor, Plaintiffs argue that Defendants have repeatedly attempted to impound some of these funds and have been prohibited from doing so by both Congress and another court in the last year. [ECF No. 50 at 37–38 (citing Child Trends, Inc. v. U.S. Dep't of Educ., 795 F. Supp. 3d 700, 720–22 (D. Md. 2025) (ordering the Department to obligate Comprehensive Centers funds)]. The Court finds this context to be important, and it weighs in favor of Plaintiffs.

Taking all of the TRAC factors into consideration, the Court finds that they weigh in favor of Defendants, due in large part to the weight given to the first factor and the facts that Defendants have a clear deadline by which they need to obligate the funds, that deadline has not yet passed, and they have stated that they intend to obligate all funds before deadline. Nonetheless, the current posture of the case presents an ongoing factual dispute concerning whether Defendants will actually obligate the funds by September 30. Despite defense counsel's guarantees, Plaintiffs continue to worry that Defendants will not ultimately allocate the funds. Accordingly, granting summary judgment on the record before the Court would require

weighing defense counsel's statements that the money will be obligated against Plaintiffs' contention that the money will not be timely obligated. The Court thus concludes that the more prudent course is to await notice from defense counsel that all funds have been obligated and enter a decision on Count 8 thereafter. Defendants are **ORDERED** to file a status report by the earliest of either **September 28, 2026**, or whenever all the obligations due September 30 have been completed. In reaching this conclusion—as opposed to awarding either party summary judgment at this time—the Court relies on the truthfulness of Defendants' representations that the Department will obligate the funds before the deadline in a manner consistent with law. If it appears, as September 30 approaches, that Defendants have misled the Court and the funds will not be obligated by the deadline, the Court may reconsider whether there has been undue delay warranting injunctive relief. [12]

### C. Remedy

The APA provides that a "reviewing court shall hold unlawful and set aside" any agency action found to be contrary to law, 5 U.S.C. § 706(2)(A), and vacatur is therefore "the normal

---

[12] Further, the Court notes that at least one other Circuit has adopted the approach that "if a case is timely filed, a court may grant a preliminary injunction so that funds from the appropriation that is about to lapse will remain available pending a dispute's resolution." City of Houston v. Dep't of Hous. & Urban Dev., 24 F.3d 1421, 1427 (D.C. Cir. 1994); see Nat'l Fair Hous. All. v. U.S. Dep't of Hous. & Urban Dev., No. 25-cv-01965, 2025 WL 2105567, at *12 & n.4 (D.D.C. July 28, 2025) (stating that "the D.C. Circuit has blessed this approach" and that the Court would revisit whether an order suspending operation of a funding lapse would be "necessary in the coming weeks to ensure that the appropriated funds [would] not lapse and remain[ed] available for obligation"); Goodluck v. Biden, 104 F.4th 920, 927 (D.C. Cir. 2024) ("Congress has expressly authorized courts to suspend the lapse of budget authority while lawsuits play out.") (citing 31 U.S.C. § 1502(b)); Illinois v. Noem, 25-cv-00495 (D.R.I. Sep. 30, 2025) ECF No. 14 at 2 ("The statutory lapse of the funds appropriated by Congress for the fiscal year 2025 Homeland Security Grant Program is immediately suspended pending further order of the Court, pursuant to the Court's equitable authority, 31 U.S.C. § 1502(b), and any other applicable provision of law.").

remedy under the APA," Long Island Power Auth. v. Fed. Energy Reg. Comm'n, 27 F.4th 705, 717 (D.C. Cir. 2022).

With respect to the Executive Order Footnotes, Plaintiffs not only seek vacatur, but also request permanent injunctive relief "prohibiting operation or enforcement of the apportionment footnotes requiring compliance with Executive[] Order 14151 and/or Executive Order 14332 for the relevant funds." [Compl. at 55]. Because today's ruling addresses the parties' claims only insofar as they affect decisions related to funding that expires on September 30, 2026, the Court will declare unlawful and set aside the Executive Order Footnotes in the apportionments at issue but reserve judgment on Plaintiffs' request for a permanent injunction until the time at which the Court addresses the remainder of Plaintiffs' claims.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment, [ECF No. 46], is **GRANTED** with respect to Counts 3 and 4, and the Court vacates and sets aside the Executive Order Footnotes as contrary to law and arbitrary and capricious in violation of 5 U.S.C. § 706(2). Defendants' motion to dismiss, or in the alternative, motion for summary judgment, [ECF No. 56], is **GRANTED** with respect to Count 7. The Court will resolve Count 8 as specified above depending on when and whether Defendants obligate the funds at issue. The Court reserves judgment on Plaintiffs' remaining claims.

**SO ORDERED.**

September 17, 2026

*/s/ Allison D. Burroughs*
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE