**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| GLOBAL HEALTH COUNCIL, *et al.*,<br>*Plaintiffs*,<br>v.<br>DONALD J. TRUMP, *et al.*,<br>*Defendants*. | Civil Action No. 25-00402 (AHA) |

**Memorandum Opinion and Order**

American nonprofits, businesses, and other organizations that administered foreign aid in partnership with the U.S. Agency for International Development ("USAID") sue various federal agencies and officials for allegedly deciding to not spend funds that Congress appropriated for foreign aid and to abolish USAID as an agency. The defendants move to dismiss; the court grants the motion in part and denies it in part.

## I. Background[1]

The Foreign Assistance Act of 1961 commits the United States "to assist people in developing countries to eliminate hunger, poverty, illness, and ignorance" and declares that "a principal objective of the foreign policy of the United States is the encouragement and sustained support of the people of developing countries in their efforts to acquire the knowledge and resources essential to development and to build the economic, political, and social institutions which will improve the quality of their lives." 22 U.S.C. § 2151(a) (setting forth explicit priorities

---

[1] As required at this stage, the court accepts the complaint's well-pled allegations as true and draws all reasonable inferences in the plaintiffs' favor. *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015).

for foreign assistance). It also expressly authorizes the President "to furnish assistance, on such terms and conditions as he may determine," for various programs and target areas identified by the act—including health programs, economic development, anticrime efforts, military education, and peacekeeping. *Id.* § 2151b(c)(1); *see id.* §§ 2291(a)(4), 2346(a), 2347(a), 2348. Pursuant to this authority, President Kennedy established USAID within the State Department in 1961. *See* Exec. Order No. 10973, § 102, 26 Fed. Reg. 10469, 10469 (Nov. 3, 1961). And in 1998, Congress "formally established USAID as a standalone agency outside the State Department." ECF No. 174 ¶ 34; *see* Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, §§ 1413(a), 1601, 112 Stat. 2761, 2791, 2795–97 (codified at 22 U.S.C. §§ 6563, 6601) (providing "there is within the Executive branch of Government the United States Agency for International Development," unless abolished pursuant to a reorganization plan submitted within 60 days of October 21, 1998); *see also* ECF No. 174 ¶ 34 (alleging the presidential reorganization plan submitted in December 1998 declined to abolish USAID or reassign its functions and instead ordered that "USAID will remain a distinct agency with a separate appropriation").

Since the agency's founding, Congress "has consistently appropriated funds for foreign assistance through USAID." ECF No. 174 ¶ 35; *see, e.g.*, Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 729, 740. The complaint alleges that through the funds and programs it administers, USAID "has played a critical role in furthering core U.S. interests by reducing the spread of communicable disease, fighting poverty, improving access to education, and promoting economic growth, among other functions." ECF No. 174 ¶ 30. And USAID's work "is essential to addressing the root causes of extremism, terrorism, and international conflict." *Id.* ¶ 31. Most of that work has been carried out "through

grants, cooperative agreements, or contracts with partner organizations," including the plaintiffs here. *Id.* ¶ 33.

As it had done in years before, in 2024, Congress passed a law appropriating tens of billions of dollars to be spent by USAID and the State Department on various categories of foreign aid. *Id.* ¶¶ 35–36; *see, e.g.*, Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024, 138 Stat. at 740–43 (appropriating $4 billion to be spent on global health programs, $3.93 billion to be spent on development assistance, and more). This 2024 appropriations act set a deadline of September 30, 2025, to spend many of the funds, while some other funds had later or no deadlines. ECF No. 174 ¶ 37; *see* Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024, tits. III–IV, 138 Stat. at 740–44, 747–49. Congress also included further directives on how the money was to be spent, requiring that "specific or minimum amounts of funds" be spent "for specific foreign aid purposes," on specific "subcategories" of aid, and on specific, identified programs. ECF No. 174 ¶¶ 42–46; *see* Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024, tit. VII, §§ 7019(a), 7030–7061, 138 Stat. at 771, 780–842.

On January 20, 2025, the President signed an executive order directing an immediate, 90-day pause and review of "United States foreign development assistance." *Reevaluating and Realigning United States Foreign Aid*, Exec. Order No. 14169, § 3, 90 Fed. Reg. 8619, 8619 (Jan. 30, 2025). In the days that followed, agency officials took actions to institute an immediate suspension of all foreign aid spending and operations. *See* ECF No. 174 ¶¶ 60–66. For example, a few days after the executive order, the Secretary of State issued a memorandum suspending all new foreign aid spending by or through the State Department and USAID, pending agency review. *Id.* ¶¶ 61–62. Agency officials also began shutting down all overseas USAID missions, placing

thousands of USAID employees on leave, barring those employees from entering USAID's premises, and closing USAID's building headquarters in Washington, D.C. *Id.* ¶¶ 67–69.

The complaint alleges agency officials then took actions to abolish USAID as an agency, and, as part of that effort, "eliminated long-established USAID and State Department programs, initiatives, bureaus, and intentional partnerships." *Id.* ¶¶ 1, 8, 83; *see id.* ¶¶ 74–80, 84–99. This included notifying Congress of their intent to phase out most of USAID's functions and proceeding to shut down USAID's forward-looking operations, terminate nearly all of its remaining employees, and realign certain remaining functions to the State Department, as well as announcing they would "seek to retire USAID's independent operations." *Id.* ¶¶ 74–80; *see id.* ¶¶ 81–82 (alleging the remaining employees "were working only on the winding down of USAID").

In February 2025, the plaintiffs here and in another case sued to challenge the decisions to pause foreign aid spending and to dismantle USAID's operations, seeking multiple forms of preliminary relief. *See* ECF Nos. 1–2, 4. The court granted in part a motion for temporary restraining order, enjoining the agencies' initial and immediate blanket pause of spending appropriated foreign aid. *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 766 F. Supp. 3d 74, 84 (D.D.C. 2025). The government sought emergency relief in the Supreme Court from an effort to enforce the temporary restraining order, which was denied, and the 90-day pause is no longer at issue in this case. *Dep't of State v. AIDS Vaccine Advoc. Coal.*, 145 S. Ct. 753, 753 (2025) (mem.); *see AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 803 F. Supp. 3d 164, 171–72 (D.D.C. 2025); *see also* ECF No. 171 at 1. This court later granted in part a motion for preliminary injunction, finding the plaintiffs were likely to succeed on their claims that refusing to spend appropriated foreign aid funds violated the Constitution's separation of powers and enjoining the defendants

from unlawfully impounding appropriated foreign aid funds. *AIDS Vaccine*, 803 F. Supp. 3d at 172. The defendants appealed that ruling to the D.C. Circuit.

After the President's executive order and while the parties litigated the appeal, Congress again passed a law to appropriate foreign aid funds—a 2025 continuing resolution that directed spending "on the same terms and conditions as in the 2024 Appropriations Act." ECF No. 174 ¶ 49; *see* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, §§ 1101–1108, 139 Stat. 9, 10–12. The law appropriated new funds in the same amounts and with the same relative spending window as the 2024 appropriations act, such that many funds had to be spent by September 30, 2026. ECF No. 174 ¶ 49; *see* Full-Year Continuing Appropriations and Extensions Act, 2025, §§ 1101(a)(11), 1103, 139 Stat. at 12.

In May 2025, the President transmitted a special message to Congress proposing the rescission of some of the foreign aid funds appropriated by the 2025 continuing resolution. *Rescissions Proposals Pursuant to the Congressional Budget and Impoundment Control Act of 1974*, 90 Fed. Reg. 24298, 24299–301 (June 9, 2025). Congress responded in July 2025, passing a law that rescinded most of the funds the President proposed. *See* Rescissions Act of 2025, Pub. L. No. 119-28, 139 Stat. 467, 467–70; ECF No. 174 ¶ 50; *see also* Impoundment Control Act of 1974 ("ICA"), Pub. L. No. 93-344, §§ 1012(a), 1014, 88 Stat. 332, 333–35 (codified at 2 U.S.C. §§ 683(a), 685) (laying out the process by which the President may transmit a "special message" to Congress proposing recissions of appropriated funds, upon receipt of which Congress may rescind some or all of the funds described in the message).

In August 2025, the D.C. Circuit held the plaintiffs could not bring a constitutional claim challenging the executive branch's refusal to spend funds that Congress appropriated. *Glob. Health Council v. Trump*, 153 F.4th 1, 13–17 (D.C. Cir. 2025). The circuit later amended its opinion to

make clear it did not "decide whether the ICA precludes suits under the [Administrative Procedure Act] to enforce appropriations acts." *Id.* at 20 n.17. On the day the circuit's mandate issued, vacating this court's injunction, the President transmitted a second special message to Congress, asking it to rescind approximately $4 billion in foreign aid appropriations that had a September 30, 2025, spending deadline. ECF No. 174 ¶¶ 101–02; *see Rescissions Proposals Pursuant to the Congressional Budget and Impoundment Control Act of 1974*, 90 Fed. Reg. 42613, 42614–17 (Sep. 3, 2025). Unlike the earlier proposal, Congress did not take any action to rescind funds based on this August 2025 rescission proposal. ECF No. 174 ¶ 105.

Once back in this court, the plaintiffs filed a renewed motion for preliminary injunction, which this court granted in part. *AIDS Vaccine*, 803 F. Supp. 3d at 170–71. The court concluded the plaintiffs were likely to succeed on their Administrative Procedure Act ("APA") claims based on Congress's appropriations laws and enjoined the agency defendants from refusing to spend funds that Congress directed to be spent by September 30, 2025, unless Congress acted to rescind those funds. *Id.* at 194; *see also id.* (further ordering that the agency defendants may not newly obligate the funds and then de-obligate them after the spending deadline "for the purpose of unilaterally withholding the funds"). The court made clear that if the defendants had concerns with the feasibility of complying with the second preliminary injunction, they could request extension of the relevant spending windows. *Id.*

The defendants moved to stay the preliminary injunction, which this court denied. *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. 25-cv-00400, 2025 WL 2576702, at *1–3 (D.D.C. Sep. 5, 2025). The D.C. Circuit reached the same conclusion, denying the defendants' motion to stay the preliminary injunction pending appeal. *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. 25-5317, 2025 WL 2600116, at *1 (D.C. Cir. Sep. 5, 2025). The defendants then sought a

partial stay from the Supreme Court, arguing they should be allowed to proceed with this litigation without spending the appropriations described in the President's August 2025 rescission proposal. The Supreme Court granted the partial stay request "as to the funding subject to the President's August 28 special message." *Dep't of State v. AIDS Vaccine Advoc. Coal.*, 146 S. Ct. 19, 19 (2025) (mem.). The court emphasized its decision was based on a balance of stay factors "at this early stage." *Id.* And the court cautioned that "[t]he relief granted by the Court today reflects our preliminary view, consistent with the standards for interim relief" and "should not be read as a final determination on the merits." *Id.* Although the Supreme Court issued its stay pending the government's D.C. Circuit appeal and any petition for certiorari, the defendants later dismissed their appeal of this court's second preliminary injunction, before review on the merits. *See AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. 25-5317, 2026 WL 476138, at *1 (D.C. Cir. Feb. 18, 2026).

After the Supreme Court's stay order, the plaintiffs filed a third amended complaint, asserting 18 claims that challenge the defendants' decision to not spend foreign aid funds in the amounts and for the purposes Congress appropriated them (counts one through six and twelve through eighteen) and the defendants' decision to abolish USAID and eliminate its programs (counts seven through eleven). *See* ECF No. 174 ¶¶ 127–247. The plaintiffs assert these claims under the APA, under alternative ultra vires and mandamus theories, and as freestanding constitutional, separation-of-powers claims. *Id.* The defendants move to dismiss all claims.

## II. Discussion

To survive dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), a plaintiff must show the court has jurisdiction to hear their claim. *See Shuler v. United States*, 531 F.3d 930, 932 (D.C. Cir. 2008). And to survive dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a complaint must "state a claim to relief

that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). For both inquiries, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences from those allegations in the plaintiffs' favor, though it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (failure to state a claim); *see Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (subject matter jurisdiction).

The court first considers the defendants' arguments for dismissal of claims challenging their alleged failure to comply with Congress's appropriations laws and then considers the defendants' arguments for dismissal of claims related to their alleged abolition of USAID.

### A. The Court Dismisses The Plaintiffs' Appropriations Claims In Part

The plaintiffs bring a series of claims about two decisions the defendants made with respect to appropriated funds. They, first, challenge the defendants' decision to not spend foreign aid funds Congress appropriated to USAID in specified amounts and/or for specific programs or purposes required by appropriations laws, including the 2024 appropriations act and 2025 continuing resolution. They challenge this action as contrary to law, arbitrary and capricious, and unlawfully withholding or unreasonably delaying mandated spending in violation of the APA (counts one to three); under alternative ultra vires and mandamus theories (counts four and five); and as a separation-of-powers violation (count six). The plaintiffs, second, challenge the defendants' more specific decision to not spend funds that the President proposed to Congress for rescission in August 2025, while still designating those unspent funds as satisfying congressional spending directives. They challenge that action as contrary to law and unlawfully withholding or

unreasonably delaying mandatory spending in violation of the APA (counts twelve, thirteen, fifteen, and sixteen) as well as under alternative ultra vires and mandamus theories (counts fourteen, seventeen, and eighteen).

The court starts by considering the defendants' argument that appropriations claims become moot when the applicable spending deadline passes before the case reaches final judgment. After concluding that the defendants' failure to spend appropriated funds by the deadline does not itself moot a challenge to the legality of that action, the court considers whether the plaintiffs state a separation-of-powers claim, APA claims, or their alternative claims.

1. *Claims Challenging The Legality Of An Agency's Decision To Not Spend Appropriated Funds By Congress's Spending Deadline Do Not Become Moot Because The Spending Deadline Passes During Litigation*

Since filing this lawsuit in early 2025, the plaintiffs' claims have challenged the legality of the defendants' alleged decision to not spend appropriated funds by Congress's deadline for doing so. While the parties were still litigating over preliminary relief in this case, one of those statutory spending deadlines, September 30, 2025, passed. The defendants argue that, even assuming the plaintiffs are correct that they made an unlawful decision to not spend appropriated funds by the deadline, the plaintiffs' claims challenging that alleged decision are moot because the plaintiffs were (and are) still in the process of litigating their claims after the deadline passed and, the defendants say, the funds are no longer available. According to the defendants, the plaintiffs' claims must therefore be dismissed insofar as they challenge spending decisions related to funds that Congress appropriated to be spent by September 30, 2025. The defendants' argument, which hardly addresses any of the relevant precedent, is not persuasive.[2]

---

[2] In their motion to dismiss, the defendants limited their mootness argument to appropriated funds that were included in the President's August 2025 rescission proposal and were not obligated

"Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies." *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983); *see* U.S. Const. art. III, § 2. "The party seeking jurisdictional dismissal must establish mootness, while the opposing party has the burden to prove that a mootness exception applies." *Reid v. Hurwitz*, 920 F.3d 828, 832 (D.C. Cir. 2019). Under applicable precedent, the court concludes it has jurisdiction over the plaintiffs' claims for two reasons.

First, as the plaintiffs point out, even if one assumed a challenge to an agency's refusal to spend funds before Congress's spending deadline becomes moot once the deadline passes, this type of challenge clearly falls within the exception for "cases that are 'capable of repetition, yet evading review.'" *Murphy v. Hunt*, 455 U.S. 478, 482 (1982). This exception protects courts' ability to resolve recurring disputes that, because of their "short-lived" nature, will "evade review, or at least considered plenary review." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 547 (1976); *see United Bhd. of Carpenters & Joiners of Am. v. Operative Plasterers' & Cement Masons' Int'l Ass'n*, 721 F.3d 678, 688 (D.C. Cir. 2013). Federal courts properly exercise jurisdiction over a case if "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party would be subjected to the same action again." *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 322 (D.C. Cir. 2009) (alterations omitted). That is so even when "the specific action that the plaintiff challenges has ceased." *Id.* at 321.

---

for any purpose by September 30, 2025. *See* ECF No. 176 at 13 n.2 (representing that "the vast majority of funds that were not rescinded, or included in the President's special message under the ICA, were obligated before the end of the fiscal year" and describing those funds as "outside the scope" of the defendants' argument). On reply, the defendants argued for the first time that their mootness argument encompasses all funds with a September 30, 2025, spending deadline. Because the court has an independent obligation to assure its own jurisdiction, the court considers whether the plaintiffs' claims are moot as to that broader set of funds. *See* Fed. R. Civ. P. 12(h)(3).

This is the quintessential example of a case that is capable of repetition but would otherwise evade review. There is little question that claims challenging an agency's decision not to spend appropriated funds will generally—indeed, nearly always—take longer to litigate than the window to spend the funds. Like here, Congress frequently appropriates funds to be spent within the same or part way through the next calendar year. *See, e.g.*, Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024, tit. III, 138 Stat. at 740 (enacted March 23, 2024; appropriating nearly $4 billion in funds for "global health activities . . . to remain available until September 30, 2025"). So, even if an agency were to announce on the very day funds are appropriated that it will not spend the money, there would generally not be enough time to fully litigate the case before the spending deadline. *See Del Monte*, 570 F.3d at 322 ("This court has held that agency actions of less than two years' duration cannot be fully litigated prior to cessation or expiration." (quotation marks omitted) (collecting cases)). And realistically, the timeline will be shorter. This case is an example: The plaintiffs allege the defendants decided to not spend appropriated funds just months before Congress's September 30, 2025, spending deadline. *See* ECF No. 174 ¶¶ 72–73. And the President sent Congress the proposal to rescind appropriated funds (central to seven of the plaintiffs' claims) just weeks before the deadline. *Id.* ¶¶ 100–01; *see id.* ¶¶ 207–47 (counts twelve through eighteen). Indeed, although the plaintiffs have proceeded expeditiously, including seeking preliminary relief, this case was still in litigation over that preliminary relief when the September 30, 2025, spending deadline passed. In fact, the Supreme Court resolved the government's request for interim relief just days before the spending deadline for the funds in question, and the parties did not reach motion-to-dismiss briefing in this court until after the deadline passed. It is clear challenges to a refusal to spend funds generally, and certainly here, cannot be fully litigated before the spending deadline.

The challenged action here—an agency decision to not spend appropriated funds by Congress's deadline—is also "reasonably likely to recur." *Del Monte*, 570 F.3d at 324. That proposition is unremarkable in the abstract: Presidential administrations span multiple fiscal years, and it would be reasonable to expect that a policy decision to forgo certain spending would stretch beyond any one appropriations law. This proposition is made concrete in the plaintiffs' complaint, which specifically alleges the defendants have publicly adopted a policy to forgo spending across multiple years and acts, including specifically the 2024 appropriations act and 2025 continuing resolution, and have not retracted those positions. *See, e.g.*, ECF No. 174 ¶¶ 71–73, 102, 106–08, 129, 210–13. Indeed, less than a week after this decision, another spending deadline applicable to foreign aid appropriations at issue in this case will pass. *See id.* ¶ 49. The plaintiffs have therefore plausibly alleged action that is capable of repetition, in addition to otherwise evading review, and their claims are properly subject to judicial review even assuming a challenge to an agency's decision to not spend funds by a deadline is moot once the deadline is blown.

Second, and in any event, the plaintiffs' claims are not moot, and the defendants ignore a swath of binding circuit precedent in arguing otherwise. According to the defendants, any claims challenging the failure to spend funds as appropriated by Congress before the statutory deadline are "moot because those funds have lapsed." ECF No. 176 at 1. But that assertion is not enough. There is "no case or controversy, and a suit becomes moot, when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quotation marks omitted). That happens "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Id.*; *see also Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 98 (D.C. Cir. 2021) ("As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot.").

The D.C. Circuit has long held courts have the power to award appropriated funds "even after the date when the appropriation lapses, so long as the lawsuit was instituted *on or before that date*," except insofar as "the relevant funds have been obligated." *Shawnee Tribe*, 984 F.3d at 98–99 (quoting *City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1426 (D.C. Cir. 1994)). As Judge Starr once similarly synthesized in an opinion for the court: Circuit precedent permits "funds to be awarded to a deserving plaintiff even after the statutory lapse date, as long as the lawsuit was instituted on or before that date," assuming "that funds remain after the statutory lapse date." *W. Va. Ass'n of Cmty. Health Ctrs., Inc. v. Heckler*, 734 F.2d 1570, 1576–77 (D.C. Cir. 1984). Thus, a claim filed before the spending deadline becomes moot during litigation only if the defendant shows that "all funds have properly been awarded" and there is therefore no ability to "recover the previously awarded funds." *Id.* at 1577 & n.8; *see also Goodluck v. Biden*, 104 F.4th 920, 927 (D.C. Cir. 2024) ("Congress has expressly authorized courts to suspend the lapse of budget authority while lawsuits play out." (citing 31 U.S.C. § 1502(b)); *City of Houston*, 24 F.3d at 1426 (recognizing federal courts have the authority to "simply suspend the operation of a lapse provision and extend the term of already existing budget authority" unless "budget authority has lapsed before suit is brought" or "the relevant funds have been obligated"); *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 55–56 (D.C. Cir. 1977) (holding the case was not moot and the government could be ordered to appropriate funds even after lapse because the plaintiff sued before the lapse).

Applying these standards to the allegations in the complaint, the court cannot conclude the plaintiffs' spending challenges are moot. Twelve of the plaintiffs' thirteen appropriations claims encompass the legality of the defendants' decision to not spend funds with a September 30, 2025, deadline. *See* ECF No. 174 ¶¶ 127–67, 217–27 (counts one through six, thirteen, and fourteen challenging the decision not to spend the funds before the applicable spending deadline, including

the September 30, 2025, deadline that has passed); *id.* ¶¶ 228–47 (counts fifteen through eighteen alleging the decision not to spend some funds after the September 30, 2025, deadline violates a provision of the ICA). The plaintiffs' suit and challenge to that "was instituted on or before" the spending deadline, and the very nature of these claims is that those funds have never "properly been awarded." *W. Va. Ass'n*, 734 F.2d at 1576–77. These claims therefore fit neatly within the category that the circuit has long held not to be moot—precedent the defendants do not address.[3]

The remaining appropriations claim alleges that the defendants' handling of certain funds with a September 30, 2025, deadline conflicts with congressional spending directives in the relevant appropriations laws. *See* ECF No. 174 ¶¶ 207–16 (count twelve); *see also id.* ¶¶ 127–67 (counts one through six alleging the directives were violated for a broader set of funds, including the September 2025 ones). Whether this claim is moot would be a closer call in the abstract, depending on whether the funds at issue have "properly been awarded." *W. Va. Ass'n*, 734 F.2d at 1577. But two aspects of the plaintiffs' particular claim here allow it to survive, at least for now. First, the plaintiffs allege that the funds at issue have not been obligated to any third party but instead just reallocated within government "to the State Department and others without designating a particular purpose for the use of the funds" through "accounting maneuvers." ECF No. 174 ¶¶ 210–11. The plaintiffs therefore specifically allege the circumstance described by the D.C. Circuit in which the funds, even if "awarded," can be "recovered" by the federal government—indeed,

---

[3] In their reply brief, the defendants assert that the court "does not have the equitable authority to extend the period of availability" for funds, including in cases filed before the spending deadline involving funds that are unspent or recoverable, because that remedy does not track those "traditionally afforded by the equity courts." ECF No. 181 at 3 (quoting *Goodluck*, 104 F.4th at 924). The case the defendants cite appears to express doubt about the line of circuit precedent discussed in cases like *Shawnee Tribe* and *West Virginia Association*. *See Goodluck*, 104 F.4th at 928. But this court is bound to follow circuit precedent, and the defendants make no effort to reconcile their position with that precedent.

according to the complaint, the funds currently remain in the possession of the federal government, unspent. *W. Va. Ass'n*, 734 F.2d at 1577 n.8; *see also Nat'l Ass'n of Neighborhood Health Ctrs., Inc. v. Mathews*, 551 F.2d 321, 338–39 (D.C. Cir. 1976) (holding the plaintiffs' entitlement to federal funds could be paid out with funds that had previously been awarded in part because the federal government was already seeking to recover the previously—and improperly—awarded funds). And second, as the plaintiffs point out, the relevant foreign aid appropriations laws have a unique provision stating that funds "initially obligated" before the spending deadline "shall remain available [for obligation] for an additional 4 years" after that deadline. *See* Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024, § 7011, 138 Stat. at 763; ECF No. 178 at 11–12. The plaintiffs argue this provision would extend the deadline for appropriated funds that have been initially obligated to the State Department or other agencies without actually being spent outside of the government, and the defendants do not dispute that contention on reply.

To be sure, the defendants may well show, on proven facts rather than allegations, that the plaintiffs' claims relate to funds that were properly spent, for which no relief can be granted. But they have not done so at this stage, and merely raising uncertainty as to whether the court will be able to grant relief to the plaintiffs is not enough to dismiss the claims as moot. *See Chafin*, 568 U.S. at 174 (rejecting defendant's argument about "the legal availability of a certain kind of relief" because it "confuses mootness with the merits" and explaining that a case is not moot unless the plaintiffs' claim that the court may grant the requested relief is "so implausible that it is insufficient to preserve jurisdiction"); *Almaqrami v. Pompeo*, 933 F.3d 774, 780 (D.C. Cir. 2019) (same).

The defendants have therefore failed to show the case is moot under the applicable legal standards and, even if they had, the plaintiffs plausibly allege the challenged action here is capable of repetition and would otherwise evade review.

*2. The Plaintiffs' Separation-of-Powers Appropriations Claim Must Be Dismissed*

The plaintiffs' sixth count alleges that the defendants' refusal to spend congressionally appropriated foreign aid violates the Constitution's separation of powers. *See* ECF No. 174 ¶¶ 162–67. The D.C. Circuit has held that plaintiffs have no such constitutional cause of action. *Glob. Health*, 153 F.4th at 13–18. This court "has no further role in adjudicating" this claim and "any further argument must be addressed to the en banc Circuit or Supreme Court." *AIDS Vaccine*, 803 F. Supp. 3d at 174. The court therefore dismisses count six.[4]

*3. The Plaintiffs Plausibly Allege APA Claims Challenging The Defendants' Refusal To Spend Appropriated Funds*

The defendants raise a series of threshold challenges to the plaintiffs' APA appropriations claims, some of which are more persuasive than others.

*a. The Plaintiffs Cannot Seek APA Review Of The President's Actions But Can Seek Review Of Agency Action*

The defendants argue the APA does not apply to presidential actions. The APA authorizes review of "agency" action or inaction, and the President is not an "agency." *See Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992). The defendants are therefore correct that no APA claims can proceed as to the President or his actions. *See AIDS Vaccine*, 803 F. Supp. 3d at 181. The plaintiffs appear to concede as much and do not assert their APA appropriations claims against

[4] The defendants also argue for dismissal insofar as the plaintiffs bring an appropriations claim under the Take Care Clause, but the plaintiffs respond that they do not assert that claim. ECF No. 178 at 42 n.5.

the President or seek vacatur of any action by the President. *See* ECF No. 174 at 40–44, 53–56, 58–59.

The defendants also try to go further, casting all the actions of agencies and agency officials that the plaintiffs challenge as "Presidential Actions" because those actions were consistent with the President's executive order or August 2025 rescission proposal. ECF No. 176 at 20–21 (arguing "[a]gencies lack the power to disagree with the President's lawful exercise of policy discretion"). As the D.C. Circuit explained: "Presidential action may be reviewed through APA challenges to final agency action by subordinates implementing the President's directives where such review is not otherwise precluded." *Glob. Health*, 153 F.4th at 17 n.14; *see also Chamber of Com. of the U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) ("[T]hat the Secretary's regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA, even if the validity of the Order were thereby drawn into question."). And this court previously rejected the defendants' argument because they made no effort to ground it in the APA's text, which defines "agency" to include "each authority of the Government of the United States." 5 U.S.C. § 551(1); *see AIDS Vaccine*, 766 F. Supp. 3d at 83; *see also AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 770 F. Supp. 3d 121, 137 n.8 (D.D.C. 2025), *vacated on other grounds sub nom. Glob. Health*, 153 F.4th 1. The court also explained that the defendants' argument proves too much, as it would allow the government to recast any agency action as orders or directives originating from the President to avoid APA review. *AIDS Vaccine*, 766 F. Supp. 3d at 83; *see AIDS Vaccine*, 770 F. Supp. 3d at 137 n.8. Each time the court rejected the argument, it recognized the defendants would have further opportunity to develop it. *AIDS Vaccine*, 766 F. Supp. 3d at 83; *see AIDS Vaccine*, 770 F. Supp. 3d at 137 n.8. Yet their latest articulation remains a cursory paragraph without reference to the governing text and without addressing the obvious line-drawing

problems. ECF No. 176 at 20–21. The plaintiffs therefore cannot seek review of the President's orders or actions but can seek review of whether the agencies' actions complied with the APA.

*b. The Defendants' Other Threshold APA Arguments Are Not Persuasive*

The defendants also reiterate some other threshold challenges to APA review, and the court pauses to consider whether their most recent elaborations are persuasive.

The defendants first argue that the plaintiffs do not challenge sufficiently "discrete" agency action. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). The APA does not authorize broad, programmatic challenges and requires a plaintiff to plead "an identifiable action or event." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990); *see Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006). But as the court has explained, the plaintiffs do the latter: They seek APA review of the defendants' decisions to not spend appropriated foreign aid funds in the amounts and for the purposes Congress specified in appropriations laws. *See, e.g.*, ECF No. 174 ¶¶ 127–51**.** Those claims are "based on the very discrete requirement to spend the amount of funds that Congress has appropriated for particular purposes," and the defendants "have made the very discrete, conclusive decision not to do so." *AIDS Vaccine*, 803 F. Supp. 3d at 181 (citing *Nat'l Wildlife Fed'n*, 497 U.S. at 893–94). Despite the court's earlier rejection of this argument, the defendants offer no analysis beyond a paragraph asserting without meaningful explanation that the plaintiffs bring a broad, programmatic challenge. *See* ECF No. 176 at 21–22.[5]

---

[5] The defendants previously argued that the plaintiffs' appropriations claims do not challenge "final" agency action, but their motion to dismiss abandons that argument in favor of a single, conclusory assertion that the plaintiffs' APA appropriations claims "do not challenge any identifiable final agency action" with no further argument or analysis in their reply. ECF No. 176 at 2; *see AIDS Vaccine*, 803 F. Supp. 3d at 180–81 (concluding the defendants' decisions are final agency action); *see also Trudeau v. FTC*, 456 F.3d 178, 184 (D.C. Cir. 2006) ("[T]he APA's final agency action requirement is not jurisdictional.").

The defendants, second, characterize their decisions on whether to spend (or not spend) the money that Congress directed as "funding choices" that are "committed to agency discretion by law" and therefore unreviewable. *See* ECF No. 176 at 19–20 (citing 5 U.S.C. § 701(a)(2)). The APA precludes judicial review: (1) for "certain categories of administrative decisions that courts traditionally have regarded as committed to agency discretion"; and (2) even outside of those categories, when "statutes are drawn in such broad terms . . . that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Shawnee Tribe*, 984 F.3d at 99 (quotation marks omitted). According to the defendants, when Congress appropriates a lump sum or decides to "leave to the agency" how to spend appropriated funds, the decision on how those funds can "best be distributed" consistent with the statute is committed to agency discretion. ECF No. 176 at 19–20 (citing *Lincoln v. Vigil*, 508 U.S. 182 (1993); *Milk Train, Inc. v. Veneman*, 310 F.3d 747 (D.C. Cir. 2002)). That argument misses the point because the plaintiffs' APA claims do not seek review of how to best spend appropriated funds to serve Congress's defined purposes; the claims challenge the defendants' decisions to not spend the funds *at all*, despite statutory mandates to do so. *See, e.g.*, ECF No. 174 ¶¶ 129–32 (alleging the defendants have violated various federal statutes by "refusing to spend funds that Congress has appropriated for USAID's operations and for specified foreign-assistance programs"). The plaintiffs' core position is therefore that the executive "must follow statutory mandates so long as there is appropriated money available and the President has no constitutional objection to the statute" and may not disregard a statutory mandate to spend funds "simply because of policy objections." *In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013) (emphasis omitted); *see AIDS Vaccine*, 803 F. Supp. 3d at 182–84.

The defendants, third, argue that the plaintiffs' APA appropriations claims are precluded by the Impoundment Control Act. *See* 5 U.S.C. § 701(a)(1) (authorizing APA review except to the

extent that "statutes preclude judicial review"). The D.C. Circuit explicitly left that question open. *See Glob. Health*, 153 F.4th at 20 n.17 (explaining "we need not and do not decide whether the ICA precludes suits under the APA to enforce appropriations acts"). "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Id.* at 18 (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984)).

In their brief opposing en banc review of the D.C. Circuit panel's initial opinion, the defendants argued "[n]either the ICA, nor the panel's ruling that plaintiffs cannot enforce the terms of that statute," affects a party's ability to enforce compliance with statutory obligations through an APA suit. Response to Petition for Rehearing En Banc at 16, *Glob. Health*, 153 F.4th 1 (No. 25-5097). Yet, on remand to this court, the defendants shifted to arguing that the ICA precludes even the plaintiffs' appropriations-based APA claims. This court considered that argument and concluded that "neither the text of the ICA nor the panel's decision impedes Plaintiffs from bringing an APA action to enforce the appropriations acts." *AIDS Vaccine*, 803 F. Supp. 3d at 176. As the court explained, the text of the ICA expressly provides that "[n]othing contained in this Act, or in any amendments made by this Act, shall be construed as . . . affecting in any way the claims or defenses of any party to litigation concerning any impoundment." 2 U.S.C. § 681(3). And although the circuit concluded that the ICA's notification and enforcement mechanisms displace the presumption of judicial review for APA claims premised on the ICA itself, at least while those mechanisms play out, *see Glob. Health*, 153 F.4th at 17–21 & n.18, it would be quite another thing to say the ICA eliminates judicial review for APA claims premised on other statutes, too, as that interpretation would leave no "meaningful avenue" for relief when an executive agency

unilaterally declines to spend funds in violation of appropriations laws. *Glob. Health Council v. Trump*, No. 25-5097, 2025 WL 2709437, at *3 (D.C. Cir. Aug. 28, 2025) (en banc) (Garcia, J., statement respecting the denial of rehearing en banc); *see* Order, *Glob. Health*, No. 25-5097, at 3 (D.C. Cir. Aug. 28, 2025) (amending the panel opinion to say "we need not and do not decide whether the ICA precludes suits under the APA to enforce appropriations acts"). What's more, though the circuit held it is fair to discern that the ICA's notification-and-enforcement regime committed ICA compliance to the U.S. Comptroller General (a legislative-branch official), *see Glob. Health*, 153 F.4th at 18–19, it would upend the objectives of the ICA to hold that it enables the executive branch to unilaterally decline to spend funds in the face of Congress's contrary directives in appropriations laws. After all, as the circuit previously observed, the ICA "was passed at a time when Congress was united in its furor over presidential impoundments and intent on reasserting its control over the budgetary process," and it "contained several strong measures expressly designed to limit the President's ability to impound funds appropriated by Congress." *City of New Haven v. United States*, 809 F.2d 900, 906 (D.C. Cir. 1987). Therefore, as it relates to appropriations acts, the court cannot conclude "congressional intent to preclude judicial review" is "fairly discernible" in the ICA's statutory scheme. *Block*, 467 U.S. at 351.

In their motion to dismiss, the defendants simply reiterate arguments this court previously rejected, with only one addition: They say that the Supreme Court's subsequent order staying part of this court's preliminary injunction settles the issue and "forecloses all Plaintiffs' funding claims under the APA." ECF No. 176 at 14–15. But that is not an accurate characterization of the prior proceedings in this case or what the Supreme Court said. In its second preliminary injunction ruling, this court enjoined the defendants from refusing to spend funds with a September 30, 2025, deadline. *See AIDS Vaccine*, 803 F. Supp. 3d at 194. The government asked the D.C. Circuit to

stay the injunction, which the circuit denied. *AIDS Vaccine*, 2025 WL 2600116, at *1. After that, the defendants sought a partial stay in the Supreme Court only as to the subset of funds included in the President's August 2025 rescission proposal. *Dep't of State*, 146 S. Ct. at 19; *see* Application for Partial Stay of the Injunction Issued by the United States District Court for the District of Columbia and Request for an Immediate Administrative Stay at 5, *Dep't of State*, 146 S. Ct. 19 (No. 25A269) (requesting a stay of the injunction only "with respect to the funds covered by the President's rescission proposal"). The Supreme Court granted the partial stay, reasoning the defendants had "made a sufficient showing that the Impoundment Control Act precludes [the plaintiffs'] suit, brought pursuant to the Administrative Procedure Act, to enforce the appropriations at issue here," while also stating: "This order should not be read as a final determination on the merits" and instead "reflects our preliminary view, consistent with the standards for interim relief." *Dep't of State*, 146 S. Ct. at 19. This court takes what the Supreme Court says seriously and will not read its order as a binding resolution of the merits after the court repeatedly and expressly cautioned otherwise, in a posture the Supreme Court has said should not be treated as binding on later merits decisions. *See Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) (instructing that "interim orders are not conclusive as to the merits," though they must "inform how a court should exercise its equitable discretion in like cases").

The defendants, fourth, offer in passing that the court should dismiss the APA appropriations claims because the plaintiffs fall outside the "zone of interests" of the relevant appropriations laws. *Air Courier Conf. of Am. v. Am. Postal Workers Union*, 498 U.S. 517, 523–24 (1991) (explaining that, to sue under the APA, a plaintiff must establish that their injury "falls within the zone of interests sought to be protected by the statutory provision" at issue (quotation marks omitted)); *see* ECF No. 176 at 18–19. This court previously rejected this zone-of-interests

argument, and the defendants offer no reason to doubt that conclusion. *AIDS Vaccine*, 803 F. Supp. 3d at 179. "The zone of interests test does not require that the statute directly regulate the plaintiff, nor does it require specific congressional intent to benefit the plaintiff." *CSL Plasma Inc. v. U.S. Customs & Border Prot.*, 33 F.4th 584, 589 (D.C. Cir. 2022). It requires only that the plaintiffs' grievances "arguably fall[] within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Mendoza v. Perez*, 754 F.3d 1002, 1016 (D.C. Cir. 2014) (quoting *Bennett v. Spear*, 520 U.S. 154, 162 (1997)). To satisfy that inquiry, there need not be "any indication of congressional purpose to benefit the would-be plaintiff." *Id.* at 1016–17 (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012)). "Rather, a plaintiff falls outside the group to whom Congress granted a cause of action only when its interests 'are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.* at 1017 (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)). The appropriations laws in this case direct foreign aid spending across a variety of categories, and the plaintiffs not only compete for those funds, but also have been the recipients of such funds for years. ECF No. 174 ¶ 99 (alleging the plaintiffs "have competed or would compete for awards funded from or administered by" programs related to global food security, overseas schools and hospitals, access to electricity, and family and reproductive health initiatives, as well as other eliminated programs); *see, e.g.*, *id.* ¶¶ 13–20, 83–98, 117–26. On those allegations, the court cannot conclude the plaintiffs' interests are "marginally related to or inconsistent with" the statutes' purposes of appropriating funds for foreign assistance; the two go hand in hand.

*c. The Plaintiffs Plausibly Allege APA Claims Challenging The Defendants' Refusal To Spend Appropriated Funds*

Having confirmed this case raises a justiciable controversy and addressed the defendants' threshold APA arguments, the court turns to whether the plaintiffs have stated APA claims challenging the defendants' decisions to not spend appropriated funds. *See* 5 U.S.C. § 706(2) (requiring courts to "hold unlawful and set aside agency action" that is arbitrary and capricious or contrary to law); *id.* § 706(1) (requiring courts to "compel agency action unlawfully withheld or unreasonably delayed"). At this stage, the court must accept as true all well-pleaded factual allegations in the complaint and ask whether the complaint "allows the court to draw the reasonable inference that the" defendants are liable under various sections of the APA. *Iqbal*, 556 U.S. at 678. Doing so, the court concludes the plaintiffs' claims survive dismissal and require resolution based on a proper administrative record.

The plaintiffs' contrary-to-law claims allege the defendants' funding decisions violated Congress's mandatory directives in the relevant appropriations laws (counts one, twelve, and thirteen) and the ICA's requirement that funds not rescinded by Congress within 45 days of receiving the President's August 2025 rescission proposal "shall be made available for obligation" (count 15; *see* 2 U.S.C. § 683(b)). Both of these avenues were left open by the circuit's amended opinion in this case. *See Glob. Health*, 153 F.4th at 20 n.17; *id.* at 21 n.18 (concluding the APA does not provide "a cause of action to enforce the ICA at least while the ICA's statutory processes run their course," but observing that "APA review may be available afterwards"). And this court concludes the plaintiffs plausibly allege that the defendants acted contrary to those laws by refusing to spend the appropriated funds by Congress's spending deadlines. ECF No. 174 ¶¶ 35–49, 71–73, 105, 107; *see AIDS Vaccine*, 803 F. Supp. 3d at 182–84 (concluding the plaintiffs were likely to succeed in showing the agency defendants' "decision not to spend the specific amount of

funds Congress dictated for specific purposes in appropriations laws, and instead unilaterally decline to spend billions of dollars, is contrary to the appropriations laws").

The defendants argue that the plaintiffs cannot state claims about appropriations described in the August 2025 rescission proposal, reasoning that "the ICA does not prohibit the Executive from transmitting rescission proposals within 45 days" of a spending deadline and the plaintiffs cannot enforce the ICA. ECF No. 176 at 27–28. But, as the court has previously explained, the plaintiffs' APA claim based on the appropriations acts is completely independent of whether [the defendants] have complied or failed to comply with the ICA's requirements. *AIDS Vaccine*, 803 F. Supp. 3d at 179; *see also id.* at 187–89 (rejecting the argument that simply proposing a rescission eliminates the defendants' obligation to spend appropriated funds). The plaintiffs do not, for instance, challenge the validity of or seek to enjoin the President's transmittal of the special message, but rather they seek to enforce compliance with the appropriations laws. *Id*. at 179; *see also Glob. Health*, 153 F.4th at 20 n.17, 21 n.18. And, beyond their general arguments applicable to all the APA appropriations claims, the defendants present no specific arguments that counts fifteen and sixteen—which assert APA claims for failure to obligate after the ICA process ran its course—fail to state a claim. *See Glob. Health*, 153 F.4th at 21 n.18.

The plaintiffs' arbitrary-and-capricious claim (count two) alleges the defendants' decision to not spend appropriated funds was not "the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983); *see Jackson v. Mabus*, 808 F.3d 933, 936 (D.C. Cir. 2015) (requiring that agency decisions be "reasonable and reasonably explained"). Specifically, the complaint alleges the defendants provided no adequate justification for refusing to spend foreign aid funding. ECF No. 174 ¶¶ 140–41. It also alleges the defendants failed to consider how their decision jeopardized "the serious reliance interests of

contractors, grantees, and the members of the public that they serve." *Id.* ¶¶ 143–44; *see id.* ¶¶ 111–14 (describing the "immediate consequences" of the defendants' decision, including wasted food, supplies, and medicine); *id.* ¶¶ 116–26 (describing the harm the defendants' decision had on the plaintiffs' business operations). And the complaint alleges there "is no indication" that the defendants considered "any reasonable alternative policy change." *Id.* ¶ 144.

The defendants do not dispute that the types of unreasoned decisionmaking the plaintiffs allege—failure to provide adequate justification or consider important facets—would be arbitrary and capricious as a general matter, and they do not dispute that the plaintiffs' allegations are sufficiently specific to plausibly allege those types of decisionmaking are what happened here. *See State Farm*, 463 U.S. at 43, 52; *Iqbal*, 556 U.S. at 678–80. Instead, the defendants emphasize the President's role in foreign policy and that the Foreign Assistance Act gives the executive branch discretion in making funding decisions. ECF No. 176 at 24–25. There is important truth to both of those responses, but they miss the point here: The plaintiffs' arbitrary-and-capricious claim challenges the manner in which the agency defendants exercised that executive power—namely, whether the agency undertook "reasoned decisionmaking." *State Farm*, 463 U.S. at 52. That the executive branch has great discretion in spending congressionally appropriated foreign aid funds does not insulate it from review of whether agency decisions to not spend those funds at all were made in an arbitrary and capricious manner. *See AIDS Vaccine*, 803 F. Supp. 3d at 185 (rejecting the defendants' "unbridled understanding of the President's foreign policy power, which would put the Executive above Congress in an area where it is 'firmly established' that the two branches share power, where Congress is exercising one of its core powers, and where there is no constitutional objection to the laws it has made" (quoting *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 62 (2015) (Roberts, C.J., dissenting)); *see also Youngstown Sheet & Tube Co. v.*

*Sawyer*, 343 U.S. 579, 637–38 (1952) (Jackson, J., concurring). The court therefore concludes the plaintiffs state a claim that the defendants' actions were arbitrary and capricious and therefore violate the APA. 5 U.S.C. § 706(2)(A); *see AIDS Vaccine*, 803 F. Supp. 3d at 185 (concluding the plaintiffs were likely to succeed on their arbitrary-and-capricious claim because the defendants "have not offered any explanation for the decision to ignore billions of dollars in appropriated funds rather than obligate them in a manner that aligns with both Congress's stated purposes and the Executive's priorities").

The plaintiffs' third and sixteenth counts allege the defendants have withheld or unreasonably delayed mandatory spending of foreign aid funds by Congress's statutory deadline. ECF No. 174 ¶¶ 147–51, 234–37. The APA authorizes courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Courts can do so "when an agency is compelled by law to act within a certain time period," even when the agency retains some discretion about precisely what form that action takes. *Norton*, 542 U.S. at 65. These claims require a plaintiff to show "that an agency failed to take a discrete agency action that it is required to take." *Id.* at 64 (emphasis omitted). Here, the plaintiffs allege the defendants spent "only small portions of the foreign assistance funds" that Congress mandated be spent by September 30, 2025, in the months leading up to that deadline. ECF No. 174 ¶ 72. They further allege that, if the plaintiffs had not filed this lawsuit and obtained preliminary injunctive relief, the defendants "would have intentionally allowed more than $10 billion in foreign assistance funds" to go unspent by the deadline. *Id.* ¶ 73. The complaint also alleges the defendants unlawfully withheld some funds: refusing to spend the $4 billion described in the President's August 2025 rescission proposal and transferring another $6.5 billion between agencies rather than making those funds available for the purposes Congress directed. *See id.* ¶¶ 105–07. On these allegations, which the court must accept

as pled, the plaintiffs have plausibly stated a claim that the defendants unlawfully withheld or unreasonably delayed agency action mandated by federal law. *See, e.g.*, *Telecomm. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 79–80 (D.C. Cir. 1984).

The defendants' contrary arguments are not persuasive. The plaintiffs do not need to allege any affirmative agency action to state unlawful-withholding-or-unreasonable-delay claims. *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001) (explaining that, when "an agency is under an unequivocal statutory duty to act, failure so to act constitutes, in effect, an affirmative act that triggers" APA review). "Were it otherwise, agencies could effectively prevent judicial review of their policy determinations by simply refusing to take final action." *Id.* And, as previously explained, the defendants' arguments about executive branch discretion in spending foreign aid funds or the President's "vast responsibilities in conducting the Nation's foreign affairs" miss the point and do not foreclose the plaintiffs' claims challenging the failure to spend those funds at all. ECF No. 176 at 26–27; *see Norton*, 542 U.S. at 65.

Of course, the administrative record may well show that the defendants acted in accordance with the law, in a reasonable and reasoned way, and without any unlawful withholding or unreasonable delay. *See Walter O. Boswell Memorial Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984) ("If a court is to review an agency's action fairly, it should have before it neither more nor less information than did the agency when it made its decision."). But the plaintiffs' allegations, which the court must assume are true, are sufficient to state claims under the APA and therefore survive dismissal. *See, e.g.*, *E.Q. v. Dep't of Homeland Sec.*, 835 F. Supp. 3d 221, 249–50 (D.D.C. 2026); *Vassiliades v. Rubio*, 792 F. Supp. 3d 1, 21 (D.D.C. 2025); *Hamal v. Dep't of Homeland Sec.*, No. 19-cv-2534, 2020 WL 2934954, at *4 (D.D.C. June 3, 2020).

*4. The Plaintiffs Plausibly Allege Ultra Vires And Mandamus Claims Based On The Defendants' Failure To Follow Appropriations Laws But Not Based On The ICA*

In addition to their APA claims, the plaintiffs assert three claims that the defendants acted ultra vires (counts four, fourteen, and seventeen) and two for mandamus (counts five and eighteen). These claims generally require a plaintiff to show no statutory or alternative remedy is available, so they are presumably asserted in the alternative to the APA claims. *See Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (ultra vires); *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380–81 (2004) (mandamus).

The ultra vires and mandamus claims based on the defendants' failure to comply with appropriations laws are plausibly alleged, largely for the same reasons already stated. The court held a nearly identical mandamus claim was likely to succeed in its second preliminary injunction decision, and the defendants do not provide any basis to reconsider that conclusion. *See AIDS Vaccine*, 803 F. Supp. 3d at 187. Specifically, their argument about the Supreme Court's partial stay order again ignores that the order only related to funds included in the President's August 2025 rescission proposal and repeatedly said its preliminary review and balancing of the stay factors should not be read as binding on later merits decisions. *Dep't of State*, 146 S. Ct. at 19; *see* ECF No. 176 at 43. The defendants also offer only a perfunctory argument for dismissal of the plaintiffs' ultra vires claims, referring to the legal standard governing this type of claim and the D.C. Circuit's dismissal of an ultra vires claim that was premised on the ICA (not failure to follow spending directives in appropriation laws). ECF 176 at 42. The court therefore concludes these claims survive dismissal. *See* ECF No. 174 ¶¶ 152–61, 223–27 (counts four, five, and fourteen).

On the other hand, the plaintiffs' seventeenth and eighteenth counts assert ultra vires and mandamus claims based on the ICA, alleging 2 U.S.C. § 683(b) requires defendants to obligate the funds included in the President's special message because Congress did not act to rescind those

funds. ECF 174 ¶¶ 238–47. The circuit has said the potential for APA review after the ICA's statutory processes have run their course "foreclose[s] the . . . ultra vires claim." *Glob. Health*, 153 F.4th at 21 n.18. The court therefore dismisses count seventeen. Also, the defendants argue the plaintiffs have not identified a sufficiently clear obligation in the ICA to support mandamus relief, and the plaintiffs do not respond. ECF No. 176 at 44; *see* ECF No. 178 at 45. Because a mandamus claim requires "a clear right to relief," and the plaintiffs have not shown that, the court dismisses count eighteen as well. *In re Nat'l Nurses United*, 47 F.4th 746, 752 n.4 (D.C. Cir. 2022); *see Cheney*, 542 U.S. at 381.

**B. The Plaintiffs Plausibly Allege Their Claims Challenging The Abolition Of USAID**

The plaintiffs also assert claims challenging the defendants' alleged abolition of USAID as an agency and elimination of its programs. The plaintiffs challenge these actions as arbitrary and capricious under the APA (counts eight and eleven), violations of the Constitution's separation of powers (counts seven and ten), and ultra vires (count nine). ECF No. 174 ¶¶ 168–206. The court first considers whether the plaintiffs have standing to bring these claims and, after concluding they do, considers whether the plaintiffs have plausibly alleged these claims.

*1. The Plaintiffs Have Standing To Challenge The Defendants' Alleged Decision To Abolish USAID And Eliminate The Foreign Aid Programs In Which The Plaintiffs Have Participated Or Would Participate*

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. This limitation is "fundamental to the judiciary's proper role in our system of government." *Murthy v. Missouri*, 603 U.S. 43, 56 (2024). For there to be a case or controversy, at least one plaintiff must have standing, which requires showing "an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Id.* at 57 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). When resolving standing on a motion to dismiss, the court must "assume the

truth of all material factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged." *Am. Nat'l Ins.*, 642 F.3d at 1139 (quotation marks omitted). The court must also "be careful not to decide the questions on the merits for or against" plaintiffs and, indeed, must "assume that on the merits the plaintiffs would be successful." *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003). The question at this stage is instead limited to whether the plaintiffs have plausibly alleged the elements of standing. *Jeffries v. Volume Servs. Am., Inc.*, 928 F.3d 1059, 1063 (D.C. Cir. 2019) (recognizing that at the pleading stage, "a plaintiff is required only to state plausibly that each standing element exists"); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). The court concludes the plaintiffs plausibly allege standing to challenge the defendants' dismantling of USAID and elimination of its programs, consistent with the conclusions of several courts of appeals addressing similar agency abolition claims. *See, e.g.*, *Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762, 776–77 (D.C. Cir. 2025), *vacated for reh'g en banc*, No. 25-5091, 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025); *Rhode Island v. Trump*, 155 F.4th 35, 44–45 (1st Cir. 2025).[6]

Here, the plaintiffs have clearly alleged concrete injury. The plaintiffs allege the defendants made a decision to dismantle USAID, eliminating both the agency itself and its programs. *See* ECF No. 174 ¶¶ 1, 83, 170, 178, 189, 195–96, 198. And the complaint details several aspects of that decision and its implementation, including further decisions to cancel longstanding paid

[6] Two plaintiffs assert standing to sue on their own (often called organizational standing) and the rest assert standing on behalf of members (often called associational standing). But, beyond articulating the legal standards for each type of standing, the defendants' standing arguments are made against both sets of plaintiffs. *See* ECF No. 176 at 29–31. Because the court's analysis does not turn on differences between the two types of standing, the court addresses all plaintiffs together. *See Biden v. Nebraska*, 600 U.S. 477, 489 (2023) (explaining that, as long as "at least one plaintiff has standing, the suit may proceed").

partnerships with the plaintiffs as partner organizations and to forgo spending billions in available funds for which the plaintiffs would have otherwise competed. *See, e.g.*, *id.* ¶¶ 60–71 (describing the defendants' initial decisions to not spend funds, terminate overseas USAID missions, and place thousands of employees on leave); *id.* ¶¶ 74–81 (describing the termination of nearly all of USAID's employees and the cessation of any forward-looking operations); *id.* ¶¶ 83–99 (describing the elimination of programs on which the plaintiffs "have relied and would compete for awards"). The harms detailed in the complaint include "classic pocketbook" injuries. *Tyler v. Hennepin County*, 598 U.S. 631, 636 (2023); *see TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021); *see also, e.g.*, ECF No. 174 ¶¶ 116–17 (alleging a plaintiff that previously received 98% of its revenue from USAID now "expects to miss out on nearly all of the revenues it had projected for 2025 and 2026, reducing the company's annual revenues by more than 95 percent" and requiring the cancelation of several of its overseas projects); *id.* ¶ 125 (alleging one plaintiff's members include organizations that "have previously held awards funded by every category of 'global health programs' appropriations, including appropriations for maternal and child health, to combat HIV/AIDS, and for family planning and reproductive health" and that have suffered "revenue losses of 25–60% of their annual budgets" (emphasis omitted)).

Indeed, the plaintiffs go further, specifically alleging that the defendants' alleged decision to abolish USAID and the implementation of that decision have posed an existential threat to the plaintiffs' organizations themselves. *See, e.g.*, ECF No. 174 ¶ 117 (alleging USAID's abolition "poses an existential threat" that has put one plaintiff "at risk of bankruptcy"); *id.* ¶ 123 (alleging the defendants' actions in withholding funds, eliminating programs, "and abolishing USAID pose an existential threat" to another plaintiff); *id.* ¶ 125 (alleging the end of USAID has forced one plaintiff's members to "close or downsize U.S. offices, move jobs overseas, impose pay cuts, and

eliminate health insurance and benefits for American employees"); *id.* ¶ 126 (alleging another plaintiff's members have "suffered ruinous injuries" and "had their operations devastated by losing access to vitally necessary appropriated funds," having "constructed business models around" that funding). The complaint also alleges other injuries that have resulted from the defendants' abandonment of USAID and its foreign aid programs. *See id.* ¶ 122 (alleging one plaintiff "has been rendered vulnerable to legal claims and extortion by foreign governments claiming tax amounts that are not owed" because of USAID's absence and that "the sudden dissolution of programs has meant that USAID has not conducted adequate project reviews and gave [this plaintiff's] high-performing . . . projects perfunctory lower scores"); *id.* ¶ 120 (alleging one plaintiff has worked for half a century "in more than 100 countries . . . to build relationships, goodwill, and its reputation" and that USAID's abolition would create major threats to that reputation); *id.* ¶ 119 (alleging reputational harms faced by another plaintiff).

Next, the plaintiffs' injury is "fairly traceable" to the defendants' alleged decision to end USAID. *Murthy*, 603 U.S. at 57. As just described, the plaintiffs allege that the harm to their pocketbooks (including, for some plaintiffs, organizational ruin) and other injuries stem from the decision to shutter USAID, including the defendants' ending longstanding paid partnerships and reducing or eliminating the plaintiffs' opportunity to compete for billions in foreign aid funds. *See, e.g.*, ECF No. 174 ¶¶ 33, 60–71, 74–81, 83–99; *see also id.* ¶¶ 115–26 (alleging the plaintiffs' injuries flow from the lack of "access to programs and funding opportunities that Congress has directed USAID to provide"). The complaint therefore plausibly alleges a causal link between the action challenged—the defendants' alleged abolition of USAID and related dismantling of its operations and programs—and the plaintiffs' injuries.

And finally, it is clear the relief the plaintiffs seek would at least partially "alleviate the particularized injury alleged." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663–64 (D.C. Cir. 1996); *see Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 10 (D.C. Cir. 2015) (observing that relief "need only partially redress a plaintiff's injury to meet the redressability requirement"). If the plaintiffs obtained the relief they seek—an injunction against the elimination of USAID and restoration of its foreign aid programs—the plaintiffs would regain their ability to compete for paid partnerships and foreign aid awards. Prayer for Relief ¶¶ 1–2, ECF No. 174 at 61; *see Glob. Health*, 153 F.4th at 12 (confirming "a plaintiff may be harmed by denial of the opportunity to compete for a pool of funds for which they are able and willing to compete" and that, "even the prospect of a single dollar can effectuate a partial remedy and thereby satisfy the redressability requirement" (formatting modified)).

The defendants do not dispute that the plaintiffs have alleged concrete injuries based on their specific allegations of financial and, in some cases, existential harm. They instead argue the plaintiffs fail to plead the causation and redressability requirements. That is so, the defendants say, because the plaintiffs' injuries resulted from "the Executive Branch's decisions related to appropriations" or "individual contractual decisions made by the Executive Branch." ECF No. 176 at 30. According to the defendants, it follows that the plaintiffs' injuries are not fairly traceable to USAID's abolition, and an order reinstating USAID and its programs would not change anything for the plaintiffs. *Id.* at 31. That's not persuasive for several reasons. First and foremost, the defendants' telling of the story is not what the complaint alleges, let alone the reading "most favorable" to the plaintiffs. *Am. Nat'l Ins.*, 642 F.3d at 1144. Although the plaintiffs bring claims based on the defendants' compliance with appropriations laws, they also allege the defendants made a decision to abolish USAID and its programs and that that decision led to canceling the

plaintiffs' paid partnerships and reducing or eliminating their ability to compete for foreign aid funding. *See, e.g.*, ECF No. 174 ¶¶ 1, 3, 6, 8, 67, 69, 71, 74–82. And at the motion to dismiss stage, the defendants' repeated insistence that USAID has merely been "reorganiz[ed]" cannot overcome the plaintiffs' well-pleaded allegations. *See* ECF No. 176 at 2, 28–30, 33–37. To be sure, the defendants may well later show that any decision to abolish USAID was separate from the decision to not spend foreign aid funds and thereby restrict the plaintiffs' ability to compete for those funds or that the agency has not been abolished at all and has instead been lawfully reorganized. But at this stage the court must take the plaintiffs' allegations, and not the defendants' version of events, as true.

The defendants, second, appear to argue that, even if they accepted the complaint's allegations of an "upstream" decision to abolish USAID and its programs, the plaintiffs are limited to challenging the "downstream" decision to not spend the money Congress directed in appropriations laws. But the plaintiffs' burden is to plausibly allege injuries that are "fairly traceable" to the challenged actions. *Murthy*, 603 U.S. at 57; *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014) ("Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct."). And Article III does not limit the plaintiffs' standing to only challenging "the very last step in the chain of causation." *Bennett*, 520 U.S. at 169; *see, e.g.*, *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Homeland Sec.*, 507 F. Supp. 3d 228, 240 (D.D.C. 2020) (concluding both "upstream" and "downstream" agency actions contributed to the alleged injuries and explaining that "[i]t does not matter if there was more than one source of the plaintiff's injuries").

The defendants, third, suggest that the plaintiffs' allegations are insufficient because it is not possible to spell out the counterfactual world in which USAID was not abolished, but the Supreme Court has rejected that line of argument. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 512 n.12 (2010) (acknowledging that courts "cannot assume" an agency would have made the same choices absent the challenged action and explaining that standing does not require a plaintiff to show what an agency would have done "in that counterfactual world").[7]

Separately, the defendants also argue the plaintiffs cannot assert standing based on the elimination of any USAID programs they have never participated in. ECF No. 176 at 31; *see* ECF No. 174 ¶¶ 197–206 (count eleven challenging the elimination of foreign aid programs). The court agrees; the plaintiffs' injury must be "particularized" to them. *Lujan*, 504 U.S. at 560. They cannot assert standing based solely on the alleged elimination of programs they were not involved in or had no intention of being involved in. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006) (explaining that a plaintiff cannot, "by virtue of his standing to challenge one government action, challenge other governmental actions that did not injure him"). The court's conclusion that the plaintiffs have standing to assert count eleven is accordingly grounded in their allegations that the plaintiffs "competed or would compete for awards funded from or administered by each of the eliminated programs, initiatives, offices, or partnerships, listed in the [complaint], as well as other programs, initiatives, offices, or partnerships that have been eliminated on information and belief." ECF No. 174 ¶¶ 99; *see id.* ¶ 83 (alleging the defendants "eliminated long-established USAID and

---

[7] The defendants also argue a favorable decision from this court would neither "open up 'the prospect of competing for funds to partially redress the injuries to Plaintiffs' finances'" nor require the defendants "to contract with Plaintiffs in the future." ECF No. 176 at 31 (alterations omitted) (quoting *Glob. Health*, 153 F.4th at 12)). In the quoted passage, the circuit concluded the plaintiffs had standing to assert their appropriations claims, the only claims at issue before it. And, as explained, the plaintiffs have now further and plausibly alleged that the "upstream" decision to abolish USAID and its programs led to the very injuries the circuit relied on.

State Department" programs and initiatives "on which Plaintiffs have relied and would compete for awards"); *see Am. Nat'l Ins.*, 642 F.3d at 1139.

*2. The Plaintiffs Plausibly Allege APA Claims That The Decision To Abolish USAID And Its Programs Is Arbitrary And Capricious*

The plaintiffs' eighth and eleventh counts allege that the decision to abolish USAID and eliminate foreign aid programs, initiatives, offices, and partnerships was arbitrary and capricious under the APA. ECF No. 174 ¶¶ 176–86, 197–206; *see* 5 U.S.C. § 706(2)(A) (requiring courts to "hold unlawful and set aside agency action" that is "arbitrary" or "capricious"). As with the APA appropriations claims, the defendants raise some threshold arguments, and the court starts there.

The defendants first reiterate their argument that the APA does not authorize review of presidential action. That point is, again, well taken. *See Franklin*, 505 U.S. at 800–01 (recognizing the President is not an "agency"). Any actions the President took to abolish USAID are therefore not reviewable through the APA. *See id.* The plaintiffs assert their APA abolition claims only against the agency defendants. ECF No. 174 at 47–50, 52. In light of that and *Franklin*, the court construes the allegations relevant to those counts to encompass only the actions of the agency defendants. *See, e.g.*, ECF No. 174 ¶¶ 77–80 (describing notifications the State Department sent to Congress); *id.* ¶¶ 83–99 (alleging the defendants, as a group, "eliminated long-established USAID and State Department programs, initiatives, bureaus, and intentional partnerships"). As discussed, to the extent the defendants further argue that the action by agency defendants can be recast as "effectively" presidential, they continue to fail to ground that argument in the APA's text or meaningfully develop the argument. *See supra* section II.A.3.a; *AIDS Vaccine*, 803 F. Supp. 3d at 181; *AIDS Vaccine*, 766 F. Supp. 3d at 83; *see also Glob. Health*, 153 F.4th at 17 n.14.

The defendants, second, argue that their decision to abolish USAID is not sufficiently "discrete" to allow APA review. *Norton*, 542 U.S. at 62. As already discussed, the APA does not

authorize broad, programmatic challenges and requires a plaintiff to plead "an identifiable action or event." *Nat'l Wildlife Fed'n*, 497 U.S. at 899; *see Cobell*, 455 F.3d at 307. But the plaintiffs do not bring a broad, programmatic challenge; they allege the defendants made a particular decision to abolish USAID, and their complaint details agency instruments and actions that announced and carried out that decision. *See* ECF No. 174 ¶¶ 74–98 (describing public announcements, internal memoranda and notices, and congressional notifications); *id.* ¶¶ 80–82 (specifically alleging that the Secretary of State announced that USAID would "officially cease to implement foreign assistance" alongside the decision to abolish the agency). To be sure, the defendants may later show they never made a decision to abolish USAID, but at this stage the court must accept the plaintiffs' well-pled allegations.[8]

On the merits, the plaintiffs have plausibly alleged arbitrary and capricious agency action. *See State Farm*, 463 U.S. at 43 (explaining that arbitrary-and-capricious review requires agencies to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made" (quotation marks omitted)). Both their claim challenging the abolition of USAID and their claim challenging the elimination of foreign aid programs, initiatives, offices, and partnerships allege that the actions were taken without any justification or consideration of key aspects of the problem, including reasonable alternatives and the substantial reliance interests. ECF No. 174 ¶¶ 179–84 (count eight); *id.* ¶¶ 200–04 (count eleven). The defendants do not appear to dispute that the plaintiffs' allegations, on their own terms, state an arbitrary and capricious claim. They instead assert they acted reasonably by simply "reorganizing

---

[8] The defendants limit this argument to the plaintiffs' APA claim about abolishing USAID (count eight) and do not argue their alleged elimination of foreign aid programs, initiatives, offices, and partnerships (count eleven) is insufficiently discrete agency action. They have therefore forfeited any such argument. *See* ECF No. 176 at 31–33; *see also Air Courier Conf.*, 498 U.S. at 523 n.3 ("The judicial review provisions of the APA are not jurisdictional.").

USAID" and "terminating some programs"—descriptions that bear no resemblance to the plaintiffs' allegations. *Compare* ECF No. 176 at 37, *with* ECF No. 174 ¶ 1 (alleging the defendants have "abolished, without congressional approval, [USAID]—eliminating the entire agency that Congress created to serve as the principal administrator of foreign aid programs and funding"), *and id.* ¶¶ 3, 6, 8, 67, 69, 71, 74–82. The defendants also rely on the administrative record in another case that they believe would show they "acted reasonably, justified their actions, and considered reliance interests and reasonable alternatives." ECF No. 176 at 37–38 & n.5 (citing *Am. Foreign Serv. Ass'n v. Trump*, No. 25-cv-00352 (D.D.C.)). According to the defendants, the administrative record "very well could [be] the same" in this case. ECF No. 181 at 23. Maybe so. But this court is tasked with deciding whether the allegations in this case, accepted as true, state a claim: They do. *See, e.g.*, ECF No. 174 ¶¶ 75–76, 80–81, 93–99. The court also declines to take judicial notice of an administrative record that was prepared based on different claims in a different case and to which the plaintiffs state they do not even have full access. ECF No. 178 at 42.

### 3. *The Plaintiffs Plausibly Allege Claims That Abolishing USAID Is Contrary To The Constitution's Separation of Powers*

The plaintiffs also bring two constitutional claims challenging the defendants' alleged decision to abolish USAID. Count seven alleges the abolition is contrary to the Constitution's separation of powers and therefore violates the APA. ECF No. 174 ¶¶ 168–75; *see* 5 U.S.C. § 706(2)(B) (requiring a reviewing court to "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity"). Count ten alleges the same violation as a freestanding constitutional claim and is asserted against all defendants, including the President. ECF No. 174 ¶¶ 191–96; *see Free Enter. Fund*, 561 U.S. at 491 n.2 (reaffirming there is "an implied private right of action directly under the Constitution to challenge governmental action under . . . separation-of-powers principles" and obtain equitable relief (collecting cases)).

The defendants' arguments and the plaintiffs' responses generally address these claims together, so the court does as well. *See* ECF No. 176 at 38–40; ECF No. 178 at 36–42.[9]

The Supreme Court has recognized that the Constitution gives Congress "plenary control over the salary, duties, and even existence of executive offices." *Free Enter. Fund*, 561 U.S. at 500. And the Supreme Court has recognized that, because Congress can pass laws necessary and proper to that plenary authority, Congress may "undoubtedly . . . create offices" within the executive branch. *Buckley v. Valeo*, 424 U.S. 1, 138 (1976) (quotation marks omitted); *see Myers v. United States*, 272 U.S. 52, 129 (1926) (explaining "Congress under its legislative power is given the establishment of offices [and] the determination of their functions and jurisdiction"). The plaintiffs' seventh and tenth counts allege that the defendants' decision to abolish USAID, in conflict with Congress's statutory recognition of the agency, violates the separation of powers dictated by the Constitution. 22 U.S.C. § 6563(a) (recognizing "there is within the Executive branch of Government the United States Agency of International Development as an entity" unless abolished pursuant to a reorganization plan submitted within 60 days of October 21, 1998, as required by § 6601); *see Youngstown Sheet*, 343 U.S. at 585 (explaining executive power "must stem either from an act of Congress or from the Constitution itself"); *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022) ("Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided.").

Some of the defendants' arguments for dismissal again largely fight the allegations in the complaint, without disputing that those allegations are well pled. The defendants argue, for instance, that they have not acted contrary to the separation of powers because "the Executive

[9] The defendants argue count seven should be dismissed insofar as it asserts an abolition claim under the Take Care Clause; again, the plaintiffs respond that they do not assert that claim. ECF No. 178 at 42 n.5.

Branch has not abolished USAID." ECF No. 176 at 33. But the complaint alleges the agency has been abolished, and, as previously discussed, those allegations are supported by reference to specific public announcements, internal memoranda and notices, and congressional notifications. *See, e.g.*, ECF No. 174 ¶¶ 74–98. The court must therefore accept the allegations as true at this stage. *Banneker Ventures*, 798 F.3d at 1129. The defendants similarly argue that "Congress did not foreclose USAID's reorganization" when it enacted statutes that formally recognized USAID as an independent agency. *See* ECF No. 176 at 33–37 (discussing various provisions of the Foreign Affairs Reform and Restructuring Act). But, again, the plaintiffs' complaint plausibly alleges USAID has been abolished, not merely "reorganized." The defendants may well later show that they simply reorganized USAID in a way that is consistent with the law, but that's a far cry from what the complaint alleges: that the defendants shut down the agency and its programs. *See* ECF No. 174 ¶¶ 1, 3, 6, 8, 67, 69, 71, 74–99, 174, 196.

The defendants' final argument presents a closer call: that the D.C. Circuit has foreclosed the plaintiffs' separation-of-powers abolition claims based on its reading of *Dalton v. Specter*, 511 U.S. 462 (1994). In *Dalton*, the Supreme Court held that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review." 511 U.S. at 473; *see id.* at 472 (rejecting the notion "that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution"). In the previous appeal in this case, the D.C. Circuit held that *Dalton* precluded separation-of-powers claims challenging the impoundment of funds because the plaintiffs' claims, and the defendants' defense to them, ultimately required a determination of whether the President exceeded the authority he had been given under a statute—namely, the ICA, which "provides a mechanism for the President to act on impoundment." *Glob. Health*, 153 F.4th at 14–16; *see id*. at

15 (explaining that the plaintiffs' impoundment argument relied on statutory violations as "predicate acts" and the defendants disclaimed any constitutional defense, relying on an argument that the government "did not exceed its statutory authorization").[10] The defendants say that's true here, too, arguing the plaintiffs' claims that the defendants' abolition of USAID violates the Constitution are "nothing more than a recasting of [the plaintiffs'] statutory arguments." ECF No. 176 at 38.

Very mindful of (and, indeed, driven by) its obligation to follow the circuit's interpretation of *Dalton*, the court concludes the plaintiffs' separation-of-powers abolition claims, as they are alleged, stand on different footing than their impoundment claim. In particular, the circuit relied on three features of the impoundment claim before it, none of which apply here. First, in reaching the conclusion that the plaintiffs' impoundment claim was properly characterized as statutory—that is, effectively an argument that the executive branch exceeded statutory authority—the circuit distinguished cases involving "the conceded *absence* of *any* statutory authority." *Glob. Health*, 153 F.4th at 15 (quoting *Dalton*, 511 U.S. at 473, for its discussion of *Youngstown Sheet*, 343 U.S. 579). Here in contrast, although the plaintiffs rely on Congress's constitutional authority to pass a statute recognizing USAID, they do not argue the executive branch ran afoul of any statutory mandate or exceeded any statutory discretion. The plaintiffs instead allege that the defendants—acting unilaterally and without any statutory authority to abolish USAID—violated the Constitution. ECF No. 174 ¶¶ 174–75; *see* ECF No. 178 at 39–40. And the defendants do not point

[10] The parties do not specifically address whether the D.C. Circuit's holding or analysis applies to both a standalone and an APA separation-of-powers claim, but in the interest of carefully heeding the circuit's mandate, the court assumes it applies to both. *See Glob. Health*, 153 F.4th at 10 (characterizing the relevant claims on appeal as "(2) action contrary to . . . constitutional law in violation of the APA" and "(3) violation of the separation of powers"); *see also AIDS Vaccine*, 770 F. Supp. 3d at 148 (order under appeal concluding the plaintiffs were "likely to succeed on their separation of powers claims," plural).

to any statutory authority that would authorize the alleged decision to abolish USAID. As discussed, their motion to dismiss resists acknowledging the alleged decision to abolish the agency, recasting the defendants' action as merely a reorganization of USAID and defending it on that basis. ECF No. 176 at 39. Because there is no claimed statutory authority for the challenged actions as the plaintiffs have alleged them, it is difficult to characterize the plaintiffs' claims as alleging that the defendants acted in "excess of" statutory authority rather than in the "absence of any statutory authority." *See Dalton*, 511 U.S. at 473. Accordingly, the plaintiffs' constitutional claims here more closely resemble the permissible claims that *Dalton* distinguished. *See id.* (explaining that, "[b]ecause no statutory authority was claimed" in *Youngstown Sheet*, "the case necessarily turned on whether the Constitution authorized the President's actions").

Second, the circuit distinguished cases in which the challenged action would not even have been "contemplated by Congress." *Glob. Health*, 153 F.4th at 16 (quoting *Reich*, 74 F.3d at 1332). Congress formally established USAID as a standalone agency outside the State Department by statute nearly 30 years ago, and there's no indication it would have contemplated the executive branch taking unilateral action to abolish the agency it recognized. *See* 22 U.S.C. § 6563(a). Indeed, much to the contrary, when Congress formally recognized the agency, it gave the executive branch 60 days to transmit any plan or report to reorganize or abolish the agency—which did not happen. *Id.* §§ 6563(a), 6601(a); *see* ECF No. 174 ¶ 34. That Congress explicitly gave the executive branch two months for a plan or report about any reorganization belies the notion that it contemplated the executive simply abolishing the agency on a whim decades later.

And third, the circuit emphasized that the government's defense against the plaintiffs' impoundment claim was grounded specifically on the discretion afforded to it by statute, not under the Constitution. *Glob. Health*, 153 F.4th at 15 (relying on the fact that "the government disclaims

any constitutional defense" on appeal and argued below that "it did not exceed its statutory authorization"); *see Glob. Health*, 2025 WL 2709437, at *1 (Katsas, J., concurring in the denial of rehearing en banc) (emphasizing the government did not challenge the rejection of its "freestanding Article II" defense in the prior appeal in this case); *Nat'l Treasury Emps. Union*, 149 F.4th at 794 (emphasizing "[t]he Executive has invoked no such freestanding Article II power"). Here in contrast, not only have the defendants not disclaimed a constitutional defense, they draw exclusively from the Constitution (beyond their efforts to dispute the complaint's factual allegations). *See* ECF No. 176 at 39 (leading with the argument that "the separation of powers does not generally constrain how the President organizes the Executive Branch," citing statutes about agency reorganization, and then returning to an argument that "Article II of the Constitution gives the President a vast share of responsibility for the conduct of our foreign relations" (quotation marks omitted)). And that is particularly salient given that the defendants decided to rest their argument on constitutional authority, despite clearly being aware of the circuit's holding and reasoning in its earlier decision in this very case.

The court therefore concludes the plaintiffs' claims that the defendants acted contrary to the Constitution's separation of powers by abolishing USAID survive dismissal.

*4. The Plaintiffs Plausibly Allege The Abolition Of USAID Is Ultra Vires*

The plaintiffs also assert an ultra vires claim challenging the defendants' abolition of USAID. *See* ECF No. 174 ¶¶ 187–90 (count nine). As with the appropriations ultra vires claims, the defendants fail to put forth a basis for the court to dismiss this claim. The defendants argue that "the D.C. Circuit held that an almost identical iteration of Plaintiffs' ultra vires claim was not likely to succeed." ECF No. 176 at 42. But that's not a fair characterization. The D.C. Circuit's dismissal of an ultra vires claim was premised on the ICA, not the executive's abolition of an agency, *see Glob. Health*, 153 F.4th at 20–21—indeed, the plaintiffs had not yet asserted claims about the

abolition of USAID during the previous appeal. The court therefore concludes that the plaintiffs' claim that abolishing USAID was ultra vires also survives at this stage.

## III. Conclusion

For these reasons, the defendants' motion to dismiss, ECF No. 176, is granted in part and denied in part, and the court dismisses counts six, seventeen, and eighteen. By October 9, 2026, the parties shall meet, confer, and file a joint status report proposing next steps, including a timeline for completion of the administrative record required for the APA claims that are moving forward.

AMIR H. ALI
United States District Judge

Date: September 25, 2026